UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------X

PATRIARCH PARTNERS AGENCY
SERVICES, LLC,

                 Plaintiff-Counterclaim-
                 Defendant,

     - v -

ZOHAR CDO 2003-1, LTD., ZOHAR II 2005-1,
LTD., and ZOHAR III, LTD.,

                 Defendants-Counterclaim-
                 Plaintiffs,

     - and -

ALVAREZ & MARSAL ZOHAR AGENCY
SERVICES, LLC

                 Counterclaim-Plaintiff,

     - and -

ZOHAR CDO 2003-1, LLC, ZOHAR II 2005-1,
LLC, ZOHAR III, LLC, and ALVAREZ &
MARSAL ZOHAR MANAGEMENT, LLC,

                 Defendants.

--------------------------------------------------------X

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

16 Civ. 4488 (VM) (KHP)

**DEFENDANTS' SECOND
AMENDED OMNIBUS ANSWER
TO COMPLAINT AND AMENDED
COUNTERCLAIMS AGAINST
PPAS**

      Defendants Zohar CDO 2003-I, Ltd. ("Zohar I"), Zohar CDO 2003-1, LLC, Zohar II

2005-1, Ltd. ("Zohar II"), Zohar II 2005-1, LLC, Zohar III, Ltd. ("Zohar III"), Zohar III, LLC

(collectively, the "Zohar Funds") and Alvarez & Marsal Zohar Management, LLC ("A&M" and

together with the Zohar Funds, "Defendants") respond to the Complaint of Plaintiff Patriarch

Partners Agency Services, LLC ("PPAS")  as follows.  Unless expressly admitted, all allegations

in the Complaint are denied.

## SUMMARY OF THE ACTION

1.      The first paragraph of the Complaint describes PPAS's lawsuit and requires no response.

2.      Defendants deny the allegations in Paragraph 2 of the Complaint except to the extent they state a legal conclusion to which no response is required.

3.      Defendants admit that on June 14, 2016, A&M, as collateral manager for the Zohar Funds, terminated PPAS as Administrative Agent, effective June 17, 2016.  Defendants deny the remainder of Paragraph 3 of the Complaint except to the extent that it states a legal conclusion to which no response is required.

4.      Paragraph 4 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 4 of the Complaint.

## PARTIES TO THIS ACTION

5.      Upon information and belief, Defendants admit that PPAS is a Delaware limited liability company with its principal place of business in New York, New York.  Defendants otherwise lack knowledge sufficient to admit or deny the allegations in Paragraph 5 of the Complaint.

6.      Defendants admit the allegations in Paragraph 6 of the Complaint.

7.      Defendants admit the allegations in Paragraph 7 of the Complaint.

8.      Defendants admit the allegations in Paragraph 8 of the Complaint.

9.      Defendants admit the allegations in Paragraph 9 of the Complaint.

10.      Defendants admit the allegations in Paragraph 10 of the Complaint.

11.      Defendants admit the allegations in Paragraph 11 of the Complaint.

12.     Defendants admit the allegations in Paragraph 12 of the Complaint.

## NATURE OF THE ACTION AND JURISDICTION

13.     Paragraph 13 of the Complaint describes PPAS's lawsuit and states legal conclusions, and requires no response.

14.     Paragraph 14 of the Complaint states a legal conclusion to which no response is required.

15.     Paragraph 15 of the Complaint states a legal conclusion to which no response is required.

16.     Paragraph 16 of the Complaint states a legal conclusion to which no response is required.

17.     Paragraph 17 of the Complaint states a legal conclusion to which no response is required.

## BACKGROUND ALLEGATIONS

18.     Defendants deny the allegations in Paragraph 18 of the Complaint.

19.     Paragraph 19 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 19.

20.      Defendants admit that on June 14, 2016, A&M, as collateral manager for the Zohar Funds, sent letters to PPAS terminating PPAS as Administrative Agent under thirty-eight separate Credit Agreements, effective June 17, 2016.  Defendants deny the remainder of Paragraph 20 of the Complaint except to the extent that it states a legal conclusion to which no response is required.

21.     Defendants admit the existence of certain credit agreements under which PPAS was originally appointed Administrative Agent (the "Credit Agreements") and respectfully refer

the Court to those documents for a full statement of their terms and contents.  Defendants deny the remainder of Paragraph 21 of the Complaint except to the extent that it states a legal conclusion to which no response is required.

22.     Defendants admit that the June 14, 2016 letters notified PPAS that Alvarez & Marsal Zohar Agency Services, LLC ("AMZAS") would serve as successor Administrative Agent upon PPAS's termination, and that AMZAS is currently the Administrative Agent. Defendants deny the remainder of Paragraph 22 of the Complaint except to the extent that it states a legal conclusion to which no response is required.

## COUNT I

### Declaratory Judgment (as against the Zohar Funds)

23.     Defendants repeat and restate all of the preceding responses as if fully set forth herein.

24.     Defendants respectfully refer the Court to Tile 28 of the United States Code, Section 2201 for a full statement of its terms and contents.

25.     Paragraph 25 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 25 of the Complaint.

26.     Paragraph 26 of the Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 26 of the Complaint.

## COUNT II

**Breach of Contract of the Credit Agreements (as against the Zohar Funds)**

27.     Defendants repeat and restate all of the preceding responses as if fully set forth herein.

28.      Defendants admit the existence of the Credit Agreements and respectfully refer the Court to those documents for a full statement of their terms and contents.  Defendants admit that PPAS entered into the Credit Agreements for consideration.  Defendants deny the remainder of Paragraph 28 of the Complaint except to the extent that it states a legal conclusion to which no response is required.

29.     Paragraph 29 of the Complaint states a legal conclusion to which no response is required.

30.     Paragraph 30 of the Complaint states legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 30 of the Complaint.

31.     Defendants deny the allegations in Paragraph 31 of the Complaint.

## COUNT III

**Tortious Interference With Contract (as against A&M)**

32.     Defendants repeat and restate all of the preceding responses as if fully set forth herein.

33.     Paragraph 33 of the Complaint states a legal conclusion to which no response is required.

34.     Paragraph 34 of the Complaint states a legal conclusion to which no response is required.  To the extent that a response is required, Defendants deny the allegations in Paragraph 34 of the Complaint.

35.     Defendants deny the allegations in Paragraph 35 of the Complaint.

36.     Defendants deny the allegations in Paragraph 36 of the Complaint.

## AFFIRMATIVE AND OTHER DEFENSES

Defendants assert the following affirmative defenses and reserve the right to amend this Answer to assert other and further defenses when and if, in the course of its investigation, discovery, or preparation for trial, it becomes appropriate. By designating these matters "defenses," Defendants do not intend to suggest either that PPAS does not bear the burden of proof as to such matters or that such matters are not elements of PPAS's prima facie case against Defendants.

### FIRST DEFENSE

1.     The Complaint fails to state a claim upon which relief may be granted.

### SECOND DEFENSE

2.     PPAS's claims are barred by its breach of contract.

### THIRD DEFENSE

3.     Any provision in the Credit Agreements purporting to irrevocably appoint PPAS as Administrative Agent is unenforceable as a matter of general principles of Agency law.

### FOURTH DEFENSE

4.     PPAS's claims are barred by the doctrine of unclean hands and by its inequitable conduct.

**FIFTH DEFENSE**

5.     PPAS's claims are barred because it has not suffered any injury or damage.

**SIXTH DEFENSE**

6.     The damages PPAS seeks, if awarded, would result in unjust enrichment to PPAS.

**SEVENTH DEFENSE**

7.     Defendants hereby give notice that they intend to rely upon such other and further defenses as may become available or apparent during further proceedings in this case, and hereby reserve their right to amend this Answer and assert such defenses.

## COUNTERCLAIMS AGAINST PPAS

The Zohar Funds[1] and Alvarez & Marsal Zohar Agency Services, LLC ("AMZAS") for their counterclaims against PPAS hereby allege as follows:

## OVERVIEW OF THE ACTION

1.      This action concerns PPAS's systematic failure to satisfy its most basic contractual and fiduciary obligations as Administrative Agent to the Zohar Funds under the Credit Agreements governing the Zohar Funds' loans to over 50 small and mid-sized companies (the "Portfolio Companies").

2.      Under the Credit Agreements, PPAS has a basic and fundamental obligation to act for and on behalf of the Zohar Funds in administering $2.5 billion in loans extended by the Zohar Funds to the Portfolio Companies, including by invoicing and collecting payments from the Portfolio Companies, and collecting and distributing specified financial statements, projections, and budgets prepared by the Portfolio Companies to the lenders, including the Zohar Funds.  The overwhelming majority of the Credit Agreements expressly require that PPAS "promptly notify the Lenders of any notices, documents, requests, demands or other items the Agent received from the Borrower and promptly deliver or convey, to the extent they are in written form, such notices, documents, requests, demands or items to the Lenders."

3.      Despite these clear and unambiguous obligations, PPAS has failed to deliver and, indeed, deliberately withheld critical documents received by it from the Portfolio Companies since at least the fall of 2015, when it became clear that certain affiliates of PPAS that were then acting as collateral managers for the Zohar Funds (the "Patriarch Managers"), would be forced to

---

[1]      For purposes of the Counterclaims, the "Zohar Funds" means only Defendants-Counterclaim-Plaintiffs Zohar I, Zohar II, and Zohar III, and excludes Defendants Zohar CDO 2003-1, LLC, Zohar II 2005-1, LLC, and Zohar III, LLC.

resign from their positions after Zohar I defaulted on its payment obligations to certain of its investors.

4.    Following the resignation of the Patriarch Managers in March 2016, PPAS continued to breach its contractual and fiduciary obligations to pass along to the Zohar Funds critical financial documentation and projections prepared by the Portfolio Companies.  This continuing breach became all the more harmful because the Zohar Funds' new collateral manager, A&M, had, and continues to have, an urgent need for these financial statements, projections and budgets in preparing its plan for remediation of the Zohar Funds' investments in the face of Zohar II's pending default on its obligations to its Noteholders and the upcoming maturity on the Zohar III senior Notes in January 2019.

5.    After several month of fruitless efforts to negotiate compliance from PPAS with its basic contractual and fiduciary obligations, the Zohar Funds determined that PPAS was far too conflicted and recalcitrant to perform its duties as Administrative Agent under the Credit Agreements.  As a result, the Zohar Funds removed PPAS as Administrative Agent effective June 17, 2016, and replaced PPAS with AMZAS, an affiliate of the successor collateral manager, A&M.

6.    Ignoring its removal by the Zohar Funds, PPAS has refused to relinquish its role as Administrative Agent under the Credit Agreements, and continues to hold itself out as the Administrative Agent to this day.  At the same time, PPAS has continued to flout its most basic contractual and fiduciary duties under the Credit Agreements to administer the loans and deliver certain critical financial statements, projections, and budgets to the lenders, including the Zohar Funds.  Moreover, PPAS has started to withhold funds delivered to PPAS for the benefit of the Zohar Funds, quite literally converting amounts owed to the Zohar Funds for its own benefit, and

the benefit of its controlling member, Ms. Tilton.  PPAS has also continued to collect and retain millions in agency fees that it is no longer entitled to.

7.     For these reasons, as set forth in greater detail below, the Zohar Funds respectfully respect that the Court enter a declaratory judgment affirming that AMZAS, and not PPAS, is the acting Administrative Agent under the Credit Agreements, enter judgment against PPAS for breach of contract, breach of fiduciary duty, and conversion, and award specific performance and damages against PPAS in an amount to be determined at trial.

## THE PARTIES

8.     Defendant-Counterclaim-Plaintiff **Zohar I** is a limited company organized and existing under the laws of the Cayman Islands.

9.     Defendant-Counterclaim-Plaintiff **Zohar II** is a limited company organized and existing under the laws of the Cayman Islands.

10.     Defendant-Counterclaim-Plaintiff **Zohar III** is a limited company organized and existing under the laws of the Cayman Islands.

11.     Counterclaim-Plaintiff **AMZAS** is a limited liability company organized and existing under the laws of the state of Delaware.

12.     Plaintiff-Counterclaim-Defendant **PPAS** is a limited liability company organized and existing under the laws of the state of Delaware.

## STATEMENT OF FACTS

### I.     BACKGROUND

#### A.     The Zohar Funds

13.     The Zohar Funds were formed by Lynn Tilton and certain affiliated companies in 2003, 2005, and 2007, respectively.  They are investment vehicles established to raise money through the issuance of collateralized loan obligations ("CLOs" or "Notes") and invest in debt—

and, in some instances, equity—of various Portfolio Companies.  The former collateral managers for the Zohar Funds—all subsidiaries of an investment advisor named Patriarch Partners, LLC, which is owned and controlled by Ms. Tilton—selected the Portfolio Companies to which the Zohar Funds extended loans.  The cash flow produced by payment of interest and repayment of principal to the Zohar Funds on those loans is used to repay the Zohar Funds' Noteholders.

14.     The Notes issued by the Zohar Funds to investors were fixed maturity debt instruments, which specified a maturity date on which the Zohar Funds were required to repay their investors.  For each of the Zohar Funds, the maturity on the Notes issued to their senior-most investors were due approximately twelve years after issuance.  Thus, senior Notes issued by Zohar I in 2003 were due in November 2015.  Senior Notes issued by Zohar II in 2005 are due this month, in January 2017.   And senior Notes issued by Zohar III in 2007 will be due in January 2019.

15.     In order to meet the fixed maturity date on their Notes, the Zohar Funds acquired or extended loans with maturity dates on or before the Zohar Funds' respective maturity dates. This was intended to ensure that the cash flows from the loans acquired or extended by the Zohar Funds, including the repayment of principal on those loans, would be available to repay Noteholders before maturity on the Notes.

16.     In the event that the Zohar Funds were not able to repay their senior Notes at maturity, the senior Noteholders (or, for Zohar I and II, the Credit Enhancer) are given certain rights to monetize the assets held by the Zohar Funds, including the right (but not the obligation) to liquidate the Zohar Funds' collateral (*i.e.*, the loans and equity owned by the Zohar Funds) and recover amounts owed out of the liquidation proceeds.  Alternatively, the senior Noteholders (or

the Credit Enhancer) are permitted to continue to manage the loans and equity collateralizing their investment in order to maximize recoveries on the collateral.

### B.     The Credit Agreements

17.     The relationships between the Zohar Funds, as lenders, and the Portfolio Companies, as borrowers, are governed by Credit Agreements and other related lending documents.  The Credit Agreements set forth the basic features of the loan facilities extended to the Portfolio Companies, including the principal amount of the loan, the interest rate owed by the borrower, and the maturity date when the loan has to be repaid.

18.     Under the Credit Agreements, the Portfolio Companies agreed to abide by numerous affirmative and negative covenants while the loans remained outstanding.   For example, the Portfolio Companies agreed to: maintain their corporate existence; maintain their assets in good operating condition and repair; keep their business and assets adequately insured; continue to engage in the same or substantially similar lines of business; pay their Indebtedness and other obligations, including Tax liability, when due; and comply with all laws, rules, licenses, permits, Regulations and orders of any Governmental Body.[2]  The Portfolio Companies further agreed to abstain from: taking on any further indebtedness or creating or incurring any liens without meeting certain specified preconditions; engaging in certain interested transactions with shareholders or affiliates; making certain types of investments; or violating certain financial covenants set forth in the Credit Agreements or a schedule or amendment thereto.[3]

19.     In order to allow monitoring of the Portfolio Companies' financial performance and compliance with their affirmative and negative covenants, the Credit Agreements impose strict requirements that the Portfolio Companies maintain up-to-date financial records and

---

[2] *See, e.g.*, Croscill Credit Agreement § 5.

[3] *See, e.g.*, *id.* § 6.

produce periodic financial statements and projections including: annual audited consolidated financial statements; monthly and/or quarterly unaudited consolidated financial statements; quarterly computations reflecting compliance with financial covenants; and annual financial projections and cash-flow budgets.[4]  The Credit Agreements also permit inspection of the Portfolio Companies' books of account and records and access to company managers, executives and officers to discuss company performance, under certain enumerated conditions.[5]

20.     Finally, the Credit Agreement enumerate various Events of Default, including the borrower's failure to pay principal or interest when due and the breach of certain financial covenants.[6]  Upon an Event of Default, the Credit Agreements provide certain remedies to the lenders (here, the Zohar Funds) including the ability to accelerate the maturity of any outstanding loans and foreclose against collateral securing those loans.[7]

### C.     PPAS's Appointment As Administrative Agent For The Zohar Funds

21.     The Zohar Funds, at the direction of the Patriarch Managers, retained PPAS as Administrative Agent under the vast majority of the Credit Agreements with the Portfolio Companies.  In that role, PPAS was tasked with acting on behalf of the lenders in respect of the loans extended to the Portfolio Companies and "authorize[d] . . . on behalf of and for the benefit of the Lenders, to be the agent for and representative of the Lenders in respect to the Collateral and the Collateral Documents."[8]

---

[4] *See, e.g.*, *id.* § 5.1(a).

[5] *See, e.g.*, *id.* § 5.1(b).

[6] *See, e.g.*, *id.* § 8.1.

[7] *See, e.g.*, *id.* § 8.2.

[8] *See, e.g.*, *id.* § 9.2.

22.     Among other duties, the Administrative Agent is responsible for invoicing the Portfolio Companies for amounts of principal and interest owed to the lenders under the Credit Agreements, collecting those amounts from the Portfolio Companies, and distributing those amounts among the lenders in accordance with their relative participation in the loans covered by the Credit Agreements.  *See, e.g.*, Croscill Credit Agreement § 2.14(d) ("The Agent shall promptly distribute to each Lender via facsimile or electronic correspondence, such Lender's applicable Pro Rata Share of all payments and prepayments of principal and interest due hereunder, together with all other amounts due thereto, including, without limitation, all fees payable with respect thereto, to the extent received by the Agent.")

23.     Under the Credit Agreements, the Portfolio Companies are required to furnish the Administrative Agent with numerous audited and unaudited financial statements, certain specified financial projections and budgets, and other information about the operations and performance of the Portfolio Companies.[9]  The Agent is also authorized to "visit and inspect the premises of the Borrower . . . to examine the books of account of any such Persons and their Affiliates . . . and to discuss the affairs, finances and accounts of such Persons and their Affiliates with, and to be advised as to the same by, the managers, executives and officers of such Persons . . . ."[10]

24.     Moreover, under the majority of the Credit Agreements, the Administrative Agent is expressly required to "promptly notify the Lenders of any notices, documents, requests, demands or other items the Agent received from the Borrowers and promptly deliver or convey,

---

[9] *See, e.g.*, *id.* § 5.1(a).

[10] *See, e.g.*, *id.* § 5.1(b).

to the extent they are in written form, such notices, documents, requests, demands or items to the Lenders."[11]

25.     Upon receiving a written notice of an Even of Default, the Administrative Agent is required to "promptly give notice thereof to the Lenders."[12] Under many of the Credit Agreements, the Administrative Agent has the exclusive authority following an Event of Default to enforce security interests against the collateral and exercise the Lenders' other powers, rights and remedies under the Credit Agreements and other related contracts.  In such circumstances, the Agent is required to act at the direction of the Required Lenders (typically, a majority of the Lenders under the Credit Agreement) to exercise the Lenders' rights and remedies.

26.     Under the Credit Agreements, the Administrative Agent was granted certain rights *vis-à-vis* the Lenders, including that the assignment by any Lender of its rights and obligations under the Credit Agreement "require[s] the consent of the Agent."[13]   The ability of the Lenders to obtain this consent is of critical importance when the Lenders are seeking to monetize their investment in the Loans.

27.     In late 2015, the Patriarch Managers purported to assign additional critical rights of the Zohar Funds, as lenders under the Credit Agreements, to PPAS, as Administrative Agent, including the right to waive defaults by the Portfolio Companies under the Credit Agreements, and further purported to prohibit any modification of the terms of the loans to the Portfolio Companies without the consent of PPAS, as Administrative Agent.  While these amendments appear to have been entered into in violation of the Patriarch Managers' fiduciary duties, they at least purport to grant additional rights to the Administrative Agent under the Credit Agreements.

---

[11] *See, e.g.*, *id.* § 9.11.

[12] *See, e.g.*, *id.* § 9.10.

[13] *See, e.g.*, *id.* § 10.4(b).

28.     For each Credit Agreement in which PPAS was appointed Administrative Agent, PPAS receives an annual fee—in most cases, $75,000 per year—for the life of the appointment.[14]  Given the number of Portfolio Companies to which the Zohar Funds have extended loans, PPAS has historically collected over $2 million per year in agency fees.

### D.     The Term Of PPAS's Agency

29.     Under the Credit Agreements, the Zohar Funds—at the direction of the Patriarch Managers and Ms. Tilton—purported to "irrevocably authorize[]" PPAS to act as the Administrative Agent, with no provision for PPAS's removal, whether for cause otherwise.[15]

30.     PPAS, however, does not have any financial interest in the underlying loans extended by the Zohar Funds to the Portfolio Companies.  PPAS's only financial interest in the role of Administrative Agent is the annual fee it receives for its services.  There was thus no legitimate business justification for PPAS to have been granted irrevocable authority to act as the Administrative Agent, let alone to have been granted substantive rights that purport to supersede the rights of the agent's principals—the Zohar Funds.

### E.     Replacement Of Ms. Tilton And The Patriarch Managers

31.     Between 2003 and present, Ms. Tilton and the Patriarch Managers severely mismanaged the Zohar Funds.  As a result of this mismanagement, as well as other more serious misconduct, the Zohar Funds grossly underperformed expectations.  When Zohar I reached maturity in November 2015, its investments in the Portfolio Companies had not generated enough revenue to repay the senior Noteholders.  This resulted in an Event of Default under Zohar I's governing documents.

---

[14] *See, e.g.*, *id.* § 2.9(b).

[15] *See, e.g.*, *id.* § 9.2.

32.     Following Zohar I's Event of Default, facing imminent removal by Zohar I's Noteholders and an impending trial on civil fraud charges brought by the Securities and Exchange Commission, Ms. Tilton and the Patriarch Managers agreed to resign from their posts as collateral managers for the Zohar Funds in February 2016.  The Patriarch Managers were replaced by A&M.

33.     The transition was anything but smooth.  Ignoring their contractual obligations to turn over documentation relating to the Zohar Funds' assets, the Patriarch Managers withheld (and continue to withhold) key documents reflecting the Funds' debt and equity investments in the Portfolio Companies.  After the Patriarch Managers and Ms. Tilton refused to produce these core documents for nearly two months, the Zohar Funds were forced to initiate a lawsuit in the Delaware Court of Chancery, seeking documents from Patriarch that would allow A&M to, among other things, determine what assets the Zohar Funds owned, assess the value of those assets, and understand the performance of the Portfolio Companies.

34.     After a full trial on the merits, on October 26, 2016, the Delaware Chancery Court ruled that the Patriarch Managers had breached their contractual obligations by failing to turn over books and records to the Zohar Funds and ordered immediate production of those documents.  The Patriarch Managers and Ms. Tilton responded by appealing and seeking an emergency stay to prevent the Zohar Funds from receiving *their own documents*.  Patriarch's requested emergency stay was denied, and an appeal is now pending before the Delaware Supreme Court.  In the interim, however, the Zohar Funds have begun to receive documents from Patriarch, although these productions have not been completed as of the date of this filing.

**F.      PPAS's Failure To Comply With Its Document Delivery Obligations**

35.      During the final months of the Patriarch Managers' appointments as collateral managers for the Zohar Funds, PPAS began engaging in systematic and pervasive breaches of its document production obligations under the Credit Agreements.

36.      In the fall of 2015, PPAS withheld numerous credit documents from the Zohar Funds, excluding them from the credit documents that were turned over upon the transfer the collateral management duties to A&M.  PPAS's breaches continued following the transfer of collateral management duties from the Patriarch Managers to A&M.  Between March 2, 2016, when A&M officially took over as collateral manager, and June 17, 2016, when the Zohar Funds finally removed PPAS as Administrative Agent, PPAS failed to deliver numerous critical documents required under the Credit Agreements, despite a clear and unequivocal contractual obligation do so, not to mention a fiduciary obligation to do so under the well-settled principles of agency law.  Since PPAS's removal (discussed below), while still holdings itself out as Administrative Agent, PPAS has failed to deliver a single document received from the Portfolio Companies to the Zohar Funds.

37.      PPAS's failure to deliver critical information regarding the performance of the Portfolio Companies comes at a time when that information is dearly needed.  Under properly operating Credit Agreements, the lenders would be able to continually monitor the borrower's financial health, to accurately report on it, and have the tools to determine what to do in a default scenario or when a Company needs more capital.  Since March 2016, a number of the Portfolio Companies have defaulted on payment obligations to the Zohar Funds.  Without access to information that PPAS was required to (but did not) deliver, the Zohar Funds are severely handicapped in their ability to monitor these defaults, understand the performance prospects for the defaulting borrowers, and work towards remediation of these default scenarios.

38.     By way of example, the Zohar Funds have collectively extended $48.7 million in loans to one of the Portfolio Companies, which defaulted on its interest payments in respect of those loans in March 2016, and has not paid any interest since.  As of December 2016, that company was more than $880,000 behind on its interest payments.   Under the defaulting company's Credit Agreement, PPAS had an express obligation to "promptly notify the Lenders [*i.e.*, the Zohar Funds] of any notices, documents, requests, demands or other items the Agent received from the Borrower and promptly deliver or convey, to the extent they are in written form, such notices, documents, requests, demands or items to the Lenders."   Notwithstanding this clear and unequivocal obligation, PPAS has failed to turn over a single document received from the company, withholding each of the financial statements, projections, and budgets that it has (or should have) received from that company under the Credit Agreement.  PPAS's failure to perform has prevented the Zohar Funds, and A&M, from understanding the cause of the company's default and exploring the possible remedies available to the Zohar Funds.

39.     The example in the prior paragraph is not unique.   Indeed, twelve Portfolio Companies have experienced payment defaults since March 2016.  For each of them, PPAS has failed to comply with its contractual and fiduciary obligations to turn over critical documents necessary to understand the causes of the default and prospects for recovery.

### G.     PPAS's Unauthorized Amendment And Modification Of The Credit Agreements

40.     The Credit Agreements unequivocally prohibit *any* "amendment, modification, termination or waiver of any provision of the Credit Documents, or consents to any departure by any Credit Party therefrom" absent written consent of the majority of the lenders.[16]  They further prohibit any amendment, consent or waiver extending the maturity of the loans or "alter[ing] the

---

[16] *See, e.g.*, *id.* § 10.1(a).

amount of principal of the Loans or rate of interest thereon" absent unanimous written consent of the affected lenders.[17]

41.  Notwithstanding these clear requirements of the Indenture, Ms. Tilton and PPAS have admitted to routinely amending the loans "orally" or "by course of performance" without obtaining written consent of the requisite lenders, including by reducing or otherwise modifying the interest payments owed to the Zohar Funds.  These amendments were ineffective under the plain terms of the Credit Agreements, and caused harm to the Zohar Funds by depriving them of millions of dollars of interest due and owing under the Credit Agreements.[18]

42.  Each payment affected by "oral" or "course of performance" amendments or modifications were also "non-conforming payments" under the Credit Agreements.[19]  The Administrative Agent is required to "give prompt telephonic notice to . . . each applicable Lender (confirmed in writing) if any payment is non-conforming."[20]  Yet, PPAS failed to provide any such notice, and continues to fail to provide such notice on non-conforming payments to this day.

### H.  Replacement Of PPAS As Administrative Agent

43.  Due to (among other reasons) PPAS's repeated and ongoing breaches of the Credit Agreements and its blatantly conflicted position as an entity beholden to Ms. Tilton and the Patriarch Managers, the Zohar Funds informed PPAS on June 14, 2016, that it was being removed as Administrative Agent under each of the Credit Agreements, effective June 17, 2016.

---

[17] *See, e.g.*, *id.* § 10.1(c)(i).

[18] Moreover, even in the unlikely event that PPAS could produce some written direction from the Patriarch Managers for certain of these amendments, PPAS knew that this direction was given in violation of the conflict of interest provisions of the Zohar Funds' collateral management agreements and was not permitted to rely on them.

[19] *See, e.g.*, *id* § 2.14(b).

[20] *See, e.g.*, *id.*

The removal letters simultaneous appointed AMZAS or one of the Zohar Funds (with AMZAS as sub-agent) as successor Administrative Agent.

44.     The removal letters directed PPAS to remit all prepaid, but unaccrued, agency fees to AMZAS.  It further instructed PPAS to refrain from holding itself out as Administrative Agent under the Credit Agreements going forward.

**I.     PPAS's Refusal To Relinquish Its Role As Administrative Agent**

45.     In response to the removal letters, PPAS has taken the position that it cannot be removed as Administrative Agent because its authority under the Credit Agreements is described as irrevocable.   PPAS has therefore continued to perform certain of the duties of an Administrative Agent including sending invoices to and collecting money from Portfolio Companies.   PPAS has refused to relinquish fees obtained for performance of the role of Administrative Agent, despite the fact that its removal occurred prior to the end of the timeframe for which those fees were paid.   Moreover, PPAS has continued to collect agency fees even after its removal as Administrative Agent in June 2016.

46.     Despite retaining and continuing to collect its fees, PPAS has continued to flaut its obligations under the Credit Agreements by refusing to deliver to the Zohar Funds documents received by it from the Portfolio Companies.   To the extent PPAS is entitled to retain its role as Administrative Agent—and it is not—it surely cannot do so while failing to comply with the responsibilities of that role.   Yet, that appears to be exactly what it is intent on doing.

47.     Since the noticed removal of PPAS, the Portfolio Companies have continued to experience payment defaults, further highlighting the need for accurate and complete financial information and projections of the type delivered to the Administrative Agent, which must, in turn, be delivered to the Zohar Funds as lenders under the plain terms of the Credit Agreements. Indeed, the latest such Event of Default occurred in December 2016 when one of the Portfolio

Companies failed to make a required $430,000 interest payment. Notwithstanding PPAS's obligation under that company's Credit Agreement to turn over documents, PPAS has failed to deliver any documents related to its financial performance or projections of the company since the transition of the collateral management duties to A&M.

48.     Recent incidents suggest that PPAS's misconduct is escalating. Beyond failing to transit documents and information, PPAS has more recently failed to transmit certain payments received on behalf of the Zohar Funds to their rightful owners. Specifically, on separate occasions in July and September 2016, a Portfolio Company called Transcare, which filed for bankruptcy in February 2016, distributed an aggregate amount of $800,000 to PPAS in recoveries on accounts receivable in which the Zohar Funds and other secured lenders held a security interest. Under the Transcare Credit Agreement, PPAS is required to "promptly distribute" all payments received in respect of the loans to Transcare. However, PPAS has failed to distribute any of that amount to the Zohar Funds. The Zohar Funds have repeatedly requested an explanation for why these funds have not been distributed, but PPAS and Ms. Tilton have refused to provide one.

49.     Thus, while PPAS continues to hold itself out as Administrative Agent, it has failed to comply with even its most basic contractual obligations in that position and has increasingly taken actions that harm the Zohar Funds as lenders under the Credit Agreements. Making matters worse, PPAS has continued to collect millions in agency fees despite failing to perform its duties.

## CAUSES OF ACTION

### COUNT I
### DECLARATORY JUDGMENT
### (AGAINST PPAS)

50.     The Zohar Funds repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

51.     The Zohar Funds, as the Required Lenders under the Credit Agreements, have removed PPAS as Administrative Agent and duly appointed either AMZAS or one the Zohar Funds (with AMZAS as sub-agent) as successor Administrative Agent.

52.     The Zohar Funds have the authority under the Credit Agreements and at common law to effectuate such removal and replacement of the Administrative Agent.  Moreover, the Zohar Funds have the parallel authority under the Credit Agreements to direct PPAS to resign and appoint a successor Administrative Agent of the Zohar Funds' choosing.

53.     PPAS has refused to relinquish its appointment as Administrative Agent and has taken the position, in this lawsuit and in communications with A&M and the Zohar Funds, that it remains Administrative Agent under the Credit Agreements, arguing that its appointment was irrevocable.  Meanwhile, while holding itself out as Administrative Agent despite its removal, PPAS has engaged in a systematic and ongoing breach of its obligations under the Credit Agreements.

54.     An actual and justiciable controversy exists between the parties regarding the effectiveness of PPAS's removal and the appointment of AMZAS or one of the Zohar Funds (with AMZAS as sub-agent) as successor Administrative Agent.  The controversy is of sufficient immediacy and reality to warrant declaratory relief under 28 U.S.C. § 2201, because PPAS's refusal to step down as Administrative Agent has impeded AMZAS's ability to perform its role

as PPAS's successor and has severed the flow of information between the Portfolio Companies and their Lenders.

55.    The Zohar Funds therefore seek a declaration that PPAS has been lawfully removed as Administrative Agent under the Credit Agreements and that AMZAS or one of the Zohar Funds (with AMZAS as sub-agent) has been lawfully installed as successor Administrative Agent as of June 17, 2016.  In the alternative, the Zohar Funds seek a declaration that PPAS was (or may be) lawfully removed as Administrative Agent under the Credit Agreements and that AMZAS or one of the Zohar Funds (with AMZAS as sub-agent) was (or may be) lawfully installed as successor Administrative Agent as of such later date as the Court deems appropriate in light of PPAS's ongoing breaches of the Credit Agreements.

**COUNT II**
**BREACH OF CONTRACT**
**SEEKING DAMAGES AND SPECIFIC PERFORMANCE**
**(AGAINST PPAS)**

56.    The Zohar Funds repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

57.    As set forth above, the Zohar Funds are parties to the Credit Agreements.  PPAS was—and according to its position in this litigation, continues to be—a party to the Credit Agreements.  The Credit Agreements are valid and enforceable contracts under which the Zohar Funds have fully performed.

58.    The overwhelming majority of the Credit Agreements, including the Credit Agreements with the Portfolio Companies listed in Appendix A hereto, provide in sum and substance that:

> Delivery of Documents, Notices, Etc.  In addition to, and in furtherance of any requirement placed upon the Agent herein to deliver, provide, distribute, notify or otherwise convey items received from the Borrower to the Lenders, the Agent

24

shall promptly notify the Lenders of any notices, documents, requests, demands or other items the Agent received from the Borrower and promptly deliver or convey, to the extent they are in written form, such notices, documents, requests, demands or items to the Lenders.

*See, e.g.*, Croscill Credit Agreement § 9.11.

59.     Prior to its removal as Administrative Agent, PPAS failed to deliver or convey to the Zohar Funds, as lenders under the Credit Agreements, critical notices, documents, requests, demands, and other items actually received from the Borrowers under the Credit Agreement.  To the extent the Court determines that PPAS remains Administrative Agent under the Credit Agreements after its removal on June 17, 2016, PPAS has continued to fail to deliver or convey to the Zohar Funds, as lenders under the Credit Agreements, critical notices, documents, requests, demands, and other items actually received from the Borrowers under the Credit Agreement.

60.     PPAS's failure to deliver these materials to the Zohar Funds is a knowing and intentional breach of the clear and unequivocal provisions of the Credit Agreements, including the Credit Agreements with the Portfolio Companies listed in Appendix A.

61.     As a result of these breaches, the Zohar Funds have incurred economic loss and damages in an amount to be proven at trial.  The Zohar Funds have also incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect their rights under the Credit Agreements.

62.     Certain of the damages suffered by the Zohar Funds, and that will be suffered by the Zohar Funds in the future, based on PPAS's breaches will be difficult, if not impossible, to calculate, rendering monetary damages an inadequate remedy at law.  As such, the Zohar Funds further seek specific performance of PPAS's obligation to deliver documents under the Credit Agreements, as set forth above.

## COUNT III
### BREACH OF CONTRACT
### SEEKING DAMAGES
### (AGAINST PPAS)

63.     The Zohar Funds repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

64.     As set forth above, the Zohar Funds are parties to the Credit Agreements.  PPAS was—and according to its position in this litigation, continues to be—a party to the Credit Agreements.  The Credit Agreements are valid and enforceable contracts under which the Zohar Funds have fully performed.

65.     Each of the Credit Agreements prohibit *any* "amendment, modification, termination or waiver of any provision of the Credit Documents, or consents to any departure by any Credit Party therefrom" absent written consent of the majority of the lenders and further prohibit any amendment, consent or waiver extending the maturity of the loans or "alter[ing] the amount of principal of the Loans or rate of interest thereon" absent unanimous written consent of the affected lenders.  *See, e.g.*, Croscill Credit Agreement §§ 10.1(a) & (c)(i).

66.     Where the Portfolio Companies fail to pay interest and principal under the Credit Agreements when due, those failures give rise to a "non-conforming payment" and PPAS was therefore required to "give prompt telephonic notice to . . . each applicable Lender (confirmed in writing)" of such payments.  *See, e.g.*, *id.* § 2.14(b).

67.     Prior to its removal as Administrative Agent, PPAS routinely purported to amend or modify the loans "orally" or "by course of performance" in order to reduce the amounts of interest owed to the Zohar Funds.  PPAS failed to obtain the prior written consent of the Zohar Funds, as affected lenders under the Credit Agreements, for these amendments and modifications. This failure was a knowing and intentional breach of the clear and unequivocal provisions of the

Credit Agreements.  PPAS compounded this breach by failing to deliver notice of the resulting

non-conforming payments to the Zohar Funds, in further violation of the Credit Agreements.

68.     As a result of these breaches, the Zohar Funds have incurred economic loss and

damages in an amount to be proven at trial.  The Zohar Funds have also incurred reasonable out-

of-pocket expenses, including legal fees, to enforce and protect their rights under the Credit

Agreements.

**COUNT IV**
**BREACH OF CONTRACT**
**SEEKING DAMAGES**
**(AGAINST PPAS)**

69.     The Zohar Funds repeat and reallege the foregoing allegations as though they

were fully set forth in this paragraph.

70.     As set forth above, the Zohar Funds are parties to the Credit Agreements,

including the Credit Agreement, dated August 4, 2003, governing loans made by the Zohar

Funds to Transcare.  PPAS was—and according to its position in this litigation, continues to

be—a party to the Transcare Credit Agreement.  The Transcare Credit Agreement is a valid and

enforceable contract under which the Zohar Funds have fully performed.

71.     Under the Transcare Credit Agreement, PPAS is required to "promptly distribute"

all payments received in respect of the loans to Transcare.  Transcare Credit Agreement § 5.9(c).

72.     On February 24, 2016, Transcare filed for bankruptcy.  Thereafter, on two

separate occasion in July and September 2016, Transcare distributed an aggregate amount of

$800,000 to PPAS in recoveries on accounts receivable in which the Zohar Funds and other

secured lenders held a security interest.  However, PPAS has failed to distribute any of that

amount to the Zohar Funds.

73.     PPAS's failure to promptly distribute funds received from the Transcare bankruptcy for the benefit of the Zohar Funds is a knowing and intentional breach of the Transcare Credit Agreement.

74.     As a result of this breach, the Zohar Funds have incurred economic loss and damages in an amount to be proven at trial.  The Zohar Funds have also incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect their rights under the Credit Agreements.

**COUNT V**
**CONVERSION**
**(AGAINST PPAS)**

75.     Counterclaim Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

76.     Upon its appointment as Administrative Agent, AMZAS or one of the Zohar Funds (as applicable) became entitled to agency fees under the Credit Agreements in an amount of approximately $75,000 per year per Portfolio Company.

77.     When it was replaced as Administrative Agent, PPAS had been prepaid its annual agency fee.  PPAS was therefore required to remit to AMZAS or one of the Zohar Funds (as applicable) as successor Administrative Agent, the portion of the annual agency fee that was unearned as of the date when PPAS was removed.

78.     Moreover, PPAS has (on information and belief) continued to collect annual agency fees from each of the Portfolio Companies, payable on the anniversary of the Closing Date for each Credit Agreement.  These fees are the rightful property of AMZAS or one of the Zohar Funds (as applicable), as successor Administrative Agent.

79.     PPAS has collected the aforementioned agency fees with knowledge that they are the rightful property of AMZAS or one of the Zohar Funds (as applicable), as successor Administrative Agent, and has knowingly refused to remit these amount to AMZAS or one of the Zohar Funds (as applicable).

80.     As a direct and proximate result of the conduct of PPAS, AMZAS and the Zohar Funds have suffered substantial damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Counterclaim-Plaintiffs respectfully request that this Court enter judgment in favor of Counterclaim-Plaintiffs and against Counterclaim-Defendant:

A.      Declaring that PPAS has been lawfully removed as Administrative Agent under the Credit Agreements and that AMZAS or one of the Zohar Funds (with AMZAS as sub-agent) has been lawfully installed as successor Administrative Agent as of June 17, 2016 or, in the alternative, that PPAS was (or may be) lawfully removed as Administrative Agent under the Credit Agreements and that AMZAS or one of the Zohar Funds (with AMZAS as sub-agent) was (or may be) lawfully installed as successor Administrative Agent as of such later date as the Court deems appropriate in light of PPAS's ongoing breaches of the Credit Agreements.

B.      Awarding specific performance requiring PPAS to comply with its document production obligations under the Credit Agreements;

C.      Awarding actual damages to Counterclaim-Plaintiffs in an amount to be proven at trial;

D.      Awarding punitive damages to Counterclaim-Plaintiffs; and

E.       Awarding such other and further relief, in law and equity, as this Court deems

just and proper.

DATED:        New York, New York          Respectfully submitted,
              May 10, 2017
                                          QUINN EMANUEL URQUHART &
                                          SULLIVAN, LLP


                                          By: _____
                                             Michael B. Carlinsky
                                             *michaelcarlinsky@quinnemanuel.com*
                                             Jonathan E. Pickhardt
                                             *jonpickhardt@quinnemanuel.com*
                                             Ellison Ward Merkel
                                             ellisonmerkel@quinnemanuel.com
                                             Blair A. Adams
                                             *blairadams@quinnemanuel.com*

                                             51 Madison Avenue, 22nd Floor
                                             New York, New York 10010
                                             (212) 849-7000

                                             *Attorneys for Zohar CDO 2003-1, LLC; Zohar*
                                             *CDO 2003-1, Ltd.; Zohar II 2005-1, LLC;*
                                             *Zohar II 2005-1, Ltd.; Zohar III, LLC; Zohar*
                                             *III, Ltd.; Alvarez & Marsal Zohar*
                                             *Management, LLC; and Alvarez & Marsal*
                                             *Zohar Agency Services, LLC*

## APPENDIX A

1.   180s, Inc., 180s, LLC, 180s Facilities, LLC, And 180s Holdings, LLC

2.   American LaFrance, LLC

3.   Best Textiles Acquisition, LLC

4.   Croscill Acquisition, LLC

5.   Denali Incorporated

6.   eMag Solutions, L.L.C.

7.   Global Automotive Systems, LLC

8.   Global Rollforming Systems, LLC

9.   Gorham Paper and Tissue, LLC

10.   Hartwell Industries, Inc.

11.   Intera Group, Inc

12.   Intrepid U.S.A., Inc.

13.   Jewel of Jane, LLC

14.   LVD Acquisition LLC (d/b/a Oasis International Inc.)

15.   MD Helicopters, Inc.

16.   Mobile Armored Vehicles, LLC

17.   Natura Water Inc.(f/k/a H2O CO2 Florida Corp.)

18.   RM Acquisition, LLC

19.   Remco Maintenance LLC

20.   Scan-Optics (Canada), Ltd.

21.   Snelling Medical Staffing, LLC

22.   Snelling Staffing, LLC

23.   Stila Styles, LLC

24.   Xpient Solutions, LLC

25.   Zohar TT Acquisition, LLC