**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

PATRIARCH PARTNERS AGENCY
SERVICES, LLC,

              Plaintiff- Counterclaim-
              Defendant,

     v.

ZOHAR CDO 2003-1, LTD., ZOHAR II 2005-
1, LTD., ZOHAR III, LTD, and ALVAREZ &
MARSAL ZOHAR AGENCY SERVICES,
LLC,

              Defendants-
              Counterclaim-Plaintiffs,

     v.

ZOHAR CDO 2003-1, LLC, ZOHAR II 2005-
1, LLC, ZOHAR III, LLC, and ALVAREZ &
MARSAL ZOHAR MANAGEMENT, LLC,

              Defendants.

Case No. 16 Civ. 4488 (VM) (KHP)

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS-COUNTERCLAIM-**
**PLAINTIFFS' (i) APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND**
**PRELIMINARY INJUNCTION and (ii) MOTION FOR LEAVE TO AMEND**

Jonathan E. Pickhardt
Rex Lee
Ellison Ward Merkel
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorney for Defendants and Defendant-*
*Counterclaim-Plaintiffs*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF FACTS ...........................................................................................3

 A. The Zohar Funds .........................................................................3

 B. The Zohar Funds' Loan Assets .................................................3

 C. PPAS's Appointment As The Zohar Funds' Agent Under The Credit Documents ........................................................................6

 D. Draws and Repayments Under the Credit Agreements Follow Specific Procedures ............................................................................7

 E. Upon Patriarch's Replacement As Collateral Manager, PPAS Creates Secret Shadow Revolvers .........................................................9

 F. The Portfolio Companies' Payment Defaults .........................12

 G. PPAS's Refusal To Return Funds Associated With Defaulted Borrowers............14

 H. Patriarch's Continued Mismanagement of the Portfolio Companies ..................15

ARGUMENT ..............................................................................................................18

I. THE ZOHAR FUNDS ARE ENTITLED TO TEMPORARY AND PRELIMINARY RELIEF TO PREVENT IRREPARABLE HARM .............................18

 A. The Zohar Funds Are Likely To Prevail On The Merits ......................18

 B. The Zohar Funds Will Suffer Irreparable Harm Absent A Preliminary Injunction ........................................................................21

 C. At A Minimum, The Zohar Funds Have Shown Sufficiently Serious Questions Going To The Merits, And The Balance Of Hardships Tips Decidedly In The Zohar Funds' Favor..............................23

II. LEAVE TO FILE THIRD-AMENDED ANSWER AND COUNTERCLAIMS SHOULD BE GRANTED ........................................................24

CONCLUSION............................................................................................................25

i

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*III Fin. Ltd. v. Aegis Consumer Funding Grp., Inc.*,
   1999 WL 461808 (S.D.N.Y. July 2, 1999) ............................................................. 21

*Brenntag Int'l Chems., Inc. v. Bank of India*,
   175 F.3d 245 (2d Cir. 1999)................................................................................... 21

*Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*,
   598 F.3d 30 (2d Cir. 2010)..................................................................................... 18

*CQS ABS Master Fund Ltd. v. MBIA Inc.*,
   2014 WL 11089340 (S.D.N.Y. Jan. 29, 2014) ................................................. 21-22

*Disney Enters., Inc. v. Finanz St. Honore, B.V.*,
   No. 13-cv-6338, 2017 WL 1862211 (E.D.N.Y. May 8, 2017)....................... 18 n.15

*In re Duro Indus., Inc.*,
   No. 02-16131-CJK (Bankr. D. Mass. Oct. 7, 2002) ........................................ 17-18

*Empower Energies, Inc. v. SolarBlue, LLC*,
   2016 WL 5338555 (S.D.N.Y. Sept. 23, 2016).............................................. 23 n.19

*Foman v. Davis*,
   371 U.S. 178 (1962)............................................................................................... 24

*Jackson v. Johnson*,
   962 F. Supp. 391 (S.D.N.Y. 1997) ........................................................................ 18

*MA Equip. Leasing I, LLC v. Tilton*,
   980 N.E.2d 1072 (Ohio Ct. App. 2012)........................................................... 17 n.14

*Serio v. Black, Davis & Shue Agency, Inc.*,
   2005 WL 3642217 (S.D.N.Y. Dec. 30, 2005) ....................................................... 21

*Vann v. Fischer*,
   2011 WL 6788404 (S.D.N.Y. Dec. 19, 2011) ....................................................... 18

*XRoads Solutions Grp., LLC v. W.W. Holdings, LLC*,
   No. 05-cv-03646(AKH) (Dec. 1, 2006)................................................................. 17

### **Rules / Statutes**

Fed. R. Civ. P. 15(a) .................................................................................................... 24

Fed. R. Civ. P. 16(b)(4)...........................................................................................................24

Defendants-Counterclaim-Plaintiffs Zohar CDO 2003-1, Ltd., Zohar II 2005-1, Ltd., and Zohar III, Ltd. (the "Zohar Funds") respectfully submit this memorandum of law in support of their (i) Application for a Temporary Restraining Order and Preliminary Injunction against Plaintiff-Counterclaim-Defendant Patriarch Partners Agency Services, LLC ("PPAS") and (ii) Motion for Leave to Amend their Answer and Counterclaims.

## PRELIMINARY STATEMENT

The Zohar Funds seek emergency relief to protect their right to tens of millions of dollars of cash that its agent, PPAS, has been concealing for 18 months and which was required to be sent to the Zohar Funds in repayment of defaulted loans. Despite its clear contractual obligation to turn these funds over to the Zohar Funds, PPAS steadfastly refuses to comply with the Zohar Funds' direction to do so. Absent the emergency relief sought by this motion, the Zohar Funds face imminent dispersion of their most promising source of recovery in respect of loans to highly distressed companies that have already shown they lack the financial strength to comply with their obligation to repay their debt (or even make interest payments, which for a number of companies has already been reduced).

As was first revealed to the Zohar Funds through two depositions last week, the second and more important of which occurred last Friday, PPAS holds at least $45 million of the Zohar Funds' cash—cash that was obtained from the Zohar Funds based on the false pretense that certain Portfolio Company borrowers had requested it. In particular, PPAS obtained this cash by causing the Portfolio Companies to fully draw down certain of their credit facilities just before Lynn Tilton and Patriarch were forced to resign as the Collateral Manager for the Zohar Funds. However, rather than provide the cash to the Portfolio Companies at the time, PPAS instead held the money in its own bank accounts at Ms. Tilton's direction. Since then, PPAS has used those funds to operate concealed "shadow" revolver facilities for the Portfolio Companies, while

1

tracking them on a separate set of books that were never shared with the Portfolio Companies' lenders that were the source of the funds.  PPAS also did not disclose this information during document discovery, further demonstrating their efforts to keep this conduct concealed.

Importantly, over $20 million of the funds drawn down by PPAS were purportedly for the benefit of Portfolio Companies that subsequently defaulted on their obligation to repay Zohar Fund loans.  The Zohar Funds have accelerated the loans to each of these defaulted Portfolio Companies and demanded immediate repayment.  In furtherance of their collection efforts, the Zohar Funds have directed PPAS to pursue the remedies under the Credit Agreements that support the Zohar Funds' entitlement to the funds in PPAS's account.  These remedies include the Zohar Funds' right to direct that PPAS appropriate any deposits or property of the Portfolio Companies in its possession to repay the Funds.  PPAS has refused to act on the Zohar Funds' direction, in direct contravention of the Zohar Funds' contractual rights as secured lenders.  To the contrary, Patriarch claims that it is acting as a mere depository for the Portfolio Companies, suggesting that the Portfolio Companies could elect to withdraw the funds from PPAS's accounts at any time.  This puts the Zohar Funds at immediate risk that the funds at issue could be transferred to borrowers that are already in default on their obligations to the Zohar Funds.

To prevent dissipation of the Zohar Funds' assets to Portfolio Companies that are insolvent and unlikely to be able to repay the Funds, the Zohar Funds therefore seek temporary and preliminary relief restraining PPAS from transferring funds held on account of ███ defaulted Portfolio Companies (the "Subject Portfolio Companies")[1] absent the prior written

---

[1]   These ███ companies are ████████████████████████████ ████████████████████████████████████████ ██████████████████████  Based on the limited information the Zohar Funds

consent of the Zohar Funds, pending resolution of this action. The Zohar Funds also request that PPAS be directed to immediately produce their daily cash reconciliation worksheets from January 2016 to the present, which will identify the amount of the Zohar Funds' cash that PPAS has held and concealed from the Zohar Funds. The Zohar Funds also seek leave to amend their counterclaims in order to incorporate newly disclosed facts and seek permanent relief consistent with the preliminary relief sought by this motion.

## STATEMENT OF FACTS

### A.    The Zohar Funds

The Zohar Funds are collateralized loan obligation ("CLO") transactions that raised capital through the sale of notes for the ostensible purpose of investing in debt and other assets of distressed companies. Prior to March 2016, the Zohar Funds' investments in loans and other assets were managed by affiliates of Patriarch Partners, LLC ("Patriarch"), an investment firm owned by Ms. Tilton (the "Patriarch Managers"). PPAS is also a Patriarch affiliate. The Zohar Funds' investments performed dismally under the Patriarch Managers and numerous investments were unable to repay the Zohar Funds at the original maturity of their loans. As a result, on November 20, 2015, Zohar I defaulted on its obligation to repay Noteholders, and its asserts were sold at auction. On January 20, 2017, Zohar II defaulted on its obligation to repay Noteholders. It remains in default today. Zohar III faces imminent default on its obligation to repay Noteholders on April 15, 2019.

### B.    The Zohar Funds' Loan Assets

The Zohar Funds used much of the funds raised from Noteholders to originate or acquire loans to small- to mid-sized manufacturing companies (the "Portfolio Companies"). These loans

---

have at this time, these companies drew, and PPAS is holding, the largest amounts under their facilities, out of the borrowers that have defaulted.

constituted a substantial portion of the Zohar Funds' assets that secure repayment of the Zohar Funds' Noteholders.

The loans that the Zohar Funds originated and acquired were documented by several agreements (the "Credit Documents"), which usually included a Security Agreement and a Credit Agreement and followed a typical format.[2]  Under the Security Agreement, each Portfolio Company granted the Zohar Funds a continuing security interest and lien on identified Portfolio Company's collateral, which included among other things, the Portfolio Company's equipment, inventory, securities (equity and debt), receivables, intellectual property, bank accounts, and proceeds (the "Collateral").  Pickhardt Decl. Ex. A § 1; *see also id.* at § 2.

With limited exceptions, the loans originated or acquired by the Zohar Funds were senior secured loans, meaning that the Zohar Funds had a first priority security interest in the collateral pledged by the borrower to secure the loans.  *See, e.g.*, Zohar II Indenture § 12.1(a)(43) ("[N]one of the Collateral Debt Obligations, when initially acquired by the Issuer . . . may consist of subordinated loans" other than certain specified exceptions).  The Zohar Funds' first-priority security interest was memorialized in the Credit Documents.  *See, e.g.*, Pickhardt Decl. Ex. B § 4.1(i) ("From and after the execution and delivery of the Collateral Documents . . . the Agent, on behalf of the Lenders, shall have a first-priority perfected security interest and Liens in and to all the Collateral, free and clear of any Liens other than the Permitted Liens, and entitled to priority under applicable law . . . .").

---

[2]  The Credit Documents for ███████████████ are cited to herein for illustrative purposes.  To the extent the Credit Documents for any of the other relevant Portfolio Companies do not contain substantially analogous provisions, that fact is noted.  These Credit Documents are organized by company and appended to the Pickhardt Declaration.  *See generally* Pickhardt Decl. Exs. S - KK.

Under the Credit Agreement, each Portfolio Company covenanted to pay "its Indebtedness and other obligations, including Tax liability, before the same shall become delinquent or in default." *Id.* § 5.1(k). A Portfolio Company's failure to pay "any installment of principal of, or interest on, the Loans" constitutes an Event of Default under the Credit Agreement. *Id.* § 8.1(a).

Consistent with the Portfolio Company's grant of a security interest under the Security Agreement, when an Event of Default occurs and is continuing under the Credit Agreement, the Lenders have recourse to the Collateral. In the case of an Event of Default for failure to pay principal or interest, the Required Lenders (one or more Lenders representing more than 50 percent of the outstanding principal amount of the Loans) may direct the Agent to "(i) declare the unpaid principal amount of the Loans and interest accrued thereon and all other Obligations to be immediately due and payable . . . or (ii) declare the Commitments terminated, whereupon the Commitments will terminate and any fee hereunder shall be immediately due and payable . . . ." *Id.* § 8.2(a). The Required Lenders may also direct that the Agent (i) "exercise all rights and remedies provided in the Credit Documents," (ii) "exercise any right of counterclaim, setoff banker's lien or otherwise which it may have with respect to money or property of the Borrower," (iii) "enforce any and all Liens and security interests created pursuant to the Credit Documents," and (iv) "exercise any other right or remedy permitted by applicable Regulations or otherwise available to the Agent and/or the Lenders at law, in equity or otherwise." *Id.*[3]

In each instance, the Agent is required to follow the direction of the Required Lenders. *See, e.g.*, *id.* § 9.10 ("The Agent shall take such action with respect to such Default or Event of

---

[3]   The security agreement for ████████████ provides similar remedies to be pursued by the Administrative Agent at the Required Lenders' direction, including the exercise of all rights under the Security Documents, and the exercise of all rights of a secured party under the UCC or any Applicable Law. *See* Pickhardt Decl. Ex. X § 13.2(b)(ix), (xii).

Default as shall be reasonably directed by the Lenders")[4]; *id.* § 8.2(a) ("[i]n the case of any Event of Default specified in any Section other than Section 8.1(f) or 8.1(g), the Agent . . . at the request of the Required Lenders ***shall***" take specified steps and exercise enumerated remedies (emphasis added)); *id.* § 8.2(c) ("The Agent ***shall***, at the request of . . . the Required Lenders" take specified steps and exercise enumerated remedies (emphasis added))).

Among the "rights and remedies provided in the Credit Documents," *id.* § 8.2(c)(i), Section 7.4 of the Credit Agreement gives the Zohar Funds a right of set-off. It authorizes "upon the occurrence and during the continuance of any Event of Default each Lender and the Agent . . . to appropriate and to apply any and all deposits . . . to or for the credit or the account of any [Borrower] against and on account of the Obligations of any [Borrower] to such Lender or the Agent hereunder." *Id.* § 7.4.[5] Independent of Section 7.4, Section 5.1(g)(ii)(C) (as amended) grants the Agent the right to "appl[y] to payment of the Obligations" "[a]ny property of any [Borrower] in possession of the Agent . . . (including, without limitation, proceeds of Collateral received or collected by the Agent)." Pickhardt Decl. Ex. C § 5.1(g)(ii)(C) (as amended).[6]

### C.    PPAS's Appointment As The Zohar Funds' Agent Under The Credit Documents

Under the Credit Agreements, PPAS is appointed to act as the Zohar Funds' "Agent." Pickhardt Decl. Ex. B § 9.1 ("PPAS is hereby appointed the Agent hereunder, and ***each Lender hereby authorizes the Agent to act as its agent*** . . . ." (emphasis added))). PPAS is not an agent

---

[4]  The Credit Agreement of ███████████ omits this language. *See generally* Pickhardt Decl. Ex. W.

[5]  The Amended and Restated Loan and Security Agreement of ███████████ omits the term "Agent" from this provision. Pickhardt Decl. Ex. X § 16.4.

[6]  The Amended and Restated Loan and Security Agreement of ███████████ allows the Agent, at the direction of the Lenders, to "apply any Collateral consisting of cash to the payment of the Secured Obligations . . . ."  Pickhardt Decl. Ex. X § 13.2(b)(x).

of the Portfolio Companies.  *Id.* ("[T]he Agent shall act solely as an agent of the Lenders and does not assume . . . any obligation toward or relationship of agency or trust with or for the Borrower.")).[7]  For the Zohar Funds, PPAS administers the $2.5 billion in loans that the Funds extended to the Portfolio Companies.  PPAS does not act as administrative agent for other loan transactions; its purpose was to serve as administrative agent for the Zohar Funds' facilities.

The Agent's pre-default responsibilities include sending to Portfolio Companies periodic invoices of interest, principal, and fees owed to the Zohar Funds, receiving payments from the Portfolio Companies, remitting to the Zohar Funds payments received from the Portfolio Companies, and providing the Zohar Funds with ongoing information related to the loan facilities.  *Id.* §§ 2.3(b)-(d), 2.14(d), 9.11.  The Agent's responsibilities become far more substantial following an Event of Default.  In such circumstances, the Agent is authorized to exercise the remedies of the Lenders, *id.* § 8.2(a)-(c), and is required to act at the direction of the Required Lenders to enforce their rights under the Credit Documents, *id.*

### D.   Draws and Repayments Under the Credit Agreements Follow Specific Procedures

The majority of the loans originated or acquired by the Zohar Funds were simple term debt.  For these loans, the Zohar Funds agreed to provide the borrower an agreed-upon amount of cash-financing for a pre-determined term (typically, several years) in exchange for periodic interest payments at an agreed upon rate and repayment of the loan at an agreed-upon maturity date.  However, the Zohar Funds also originated and acquired two alternative types of loan facilities: (1) revolving credit facilities and (2) delayed draw term loans.

A revolving credit facility is like a consumer credit card.  A lender commits a certain amount of money to the facility, which a borrower can draw from, repay, and draw from again

---

[7]  The Amended and Restated Loan and Security Agreement of ████████████ does not contain this language.  *See generally* Pickhardt Decl. Ex. X.

while the facility is in place.  A borrower pays interest on the amount of money drawn at a given time (like a consumer credit card's outstanding balance).  For the revolving credit facilities held by the Zohar Funds, the borrower also agreed to pay a commitment fee on the amount of money that the lender commits, but that the borrower has not drawn.  Generally, the commitment fee rate on undrawn funds is less than the interest rate on drawn funds.  Pickhardt Decl. Ex. D at 67:11:14.  The revolving credit facilities provided borrowers with access to cash but allowed them to avoid incurring the full cost of financing for undrawn portions of the loan.

The Credit Agreements detail specific procedures that a borrower must follow to draw from and repay the revolving credit facility.  When a Portfolio Company seeks to draw funds, it must submit a Borrowing Certificate to PPAS.  PPAS supplies this Borrowing Certificate along with additional information to the Zohar Funds' Trustee, which maintains their accounts.  Upon receipt of the Borrowing Certificate and other information from PPAS, the Zohar Funds make the requested amount available to PPAS.  In turn, PPAS makes the loan funds available to the Portfolio Company.   The Credit Agreements specify the required information, form, and deadlines for these procedures.  Pickhardt Decl. Ex. B § 2.3(b)-(d).   Likewise, when a Portfolio Company repays amounts borrowed under the revolving credit facility, it must provide notice to PPAS in advance of repayment and specify whether the repayment should operate to reduce the total commitment made by the lender under the revolving credit facility.  *Id.* § 2.11.  PPAS must promptly transmit this notice of repayment to the Zohar Funds.  *Id.*  After receiving the Portfolio Company's repayment, PPAS must distribute the repayment to the Zohar Funds.  *Id.* § 2.14(d).

Delayed draw term loan facilities are similar to revolving credit facilities insofar as a lender commits a certain amount of money that the borrower can draw from over a period of time.  The key distinguishing feature between a delayed draw term loan facility and a revolving

8

credit facility is that, once a borrower repays money borrowed under a delayed draw term loan, it cannot be borrowed again. *Id.* § 2.1(b). Delayed draw term loans follow the same borrowing mechanics as revolving credit facilities. *See id.* §§ 2.3(b)-(d), 2.11, 2.14(d))

Prior to replacement of the Patriarch Managers, the Portfolio Companies regularly drew and repaid money under these loans. And, until then, PPAS followed the procedures required by the Credit Agreements in respect of drawing from and repaying the revolving credit facilities and delayed draw term loans. *See* Pickhardt Decl. Ex. D at 53:11-18.

### E.    Upon Patriarch's Replacement As Collateral Manager, PPAS Creates Secret Shadow Revolvers

On March 3, 2016, Alvarez & Marsal Zohar Management ("AMZM") replaced the Patriarch Managers as Collateral Managers for the Zohar Funds. Just before the Patriarch Managers' forced resignation, Ms. Tilton instructed PPAS to draw all the available amounts in the Portfolio Companies' revolving credit facilities and delayed draw term loans and hold the funds in PPAS account. *See id.* 53:19-54:16; 65:2-20. Included in these eleventh hour drawdowns were borrowings totaling (1) ███████ for ███████████████ (2) ██████ for ███████████ (3) ████████ for ██████████████ (4) ████████ for ██████ (5) ████████ for ████████████ (6) ████████ for █████████████ (7) ████████ for ██████████ and (8) ████████ for ████████████ LaPuma Aff. ¶ 3. This $21.7 million in drawdowns equates to nearly half the total amount of cash that is presently held in PPAS's account. Pickhardt Decl. Ex. D at 69:10-70:3. To ensure that the Trustee agreed to fund these requests, the Patriarch Managers characterized them as financings requested by the Portfolio Companies. In fact, the day-to-day management of the Portfolio Companies had no role in the request. As Patriarch's Controller, Carlos Mercado, recently confirmed at his deposition, PPAS simply informed the

Portfolio Companies that their loans "were being fully drawn and that the funds were being held at PPAS," giving operational management no choice in the matter. *Id.* at 64:14-25. Moreover, unbeknownst to the Zohar Funds, their Trustee, or their new Collateral Manager, the funds were never distributed to the Portfolio Companies on whose behalf they were supposedly drawn. Instead, according to Mr. Mercado, the Portfolio Companies were told that "the funds were being held at PPAS and that they would have to go through the process of issuing borrowing requests when they wanted to access those funds." *See id.* at 64:19-25.

Following the drawdown of facilities on the eve of Ms. Tilton's departure as Collateral Manager, PPAS also departed from its regular historical practices to start intercepting principal repayments by the Portfolio Companies that should have gone to the Zohar Funds. Specifically, Mr. Mercado testified that "[p]rior to the resignation [of the Patriarch Managers] princip[al] that was received on a revolver would go back to the trustee [for the Zohar Funds] and then—if the [Portfolio Company] issued a [new] borrowing request for—to access funds on that revolver, a notice would go to the trustee to transfer those funds to the portfolio company." *Id.* at 52:22-53:4. However, "after [the Patriarch Managers] resigned as manager, the . . . revolver payments were received in PPAS and then maintained there until a new borrowing request came in . . ." and PPAS "stopped sending the remittances to the Zohar [F]und[s'] trustees. *See id.* at 54:2-16. This new approach departed from PPAS's practices over the prior seven years of Mr. Mercado's employment. *See id.* at 53:11-54:6. Moreover, it has harmed the Portfolio Companies because a repayment to "PPAS" does not reduce the Portfolio Companies' interest obligations since they are still fully drawn vis-à-vis the Zohar Funds.

Through the process set forth above, PPAS has accumulated at least **$45 million dollars** of cash in its bank accounts. *See id.* at 69:10-15. But the Portfolio Companies do not have

access to these funds without PPAS's permission.  PPAS is thus effectively running shadow revolving credit facilities and delayed draw term loans outside the reach (and visibility) of the Lenders providing the funding for those loans.  This stands in stark contrast to PPAS's historical practice, before the Patriarch Managers stepped down as Collateral Managers, when PPAS would typically hold "[l]ess than a million" dollars in its accounts, typically comprised of funds "in transit" between the Portfolio Companies and the Zohar Funds.  *See id.* at 71:3-14.

To run these shadow facilities, PPAS created its own elaborate set of books that it has not shared with the Lenders.  Renee Dudley, Patriarch's Vice President of Loan Administration, testified she maintained a spreadsheet that "ran side by side" with PPAS's loan administration system and tracked the borrowings and repayments made by the Portfolio Companies but not communicated by PPAS to the Zohar Funds.  Pickhardt Decl. Ex. E at 300:4-23.  Mr. Mercado testified that he also amended other PPAS spreadsheets to track cash activity on these shadow facilities.  Pickhardt Decl. Ex. D at 47:6-49:4.  To date, PPAS has not produced these documents.

Mr. Mercado, the highest ranking financial officer of Patriarch Partners, admitted that while the question of why PPAS was operating this way had occurred to him, he had never been given an explanation by Ms. Tilton.  *Id.* at 59:12-60:16.  But the answer is clear.  PPAS designed this elaborate shadow system to give itself as Agent (where it purportedly acts ***on behalf of*** the Zohar Funds) the very discretion over the Zohar Funds' lending activities that Ms. Tilton supposedly relinquished when the Patriarch Managers were forced to resign as Collateral Managers for the Zohar Funds.  In so doing, PPAS has harmed both the Zohar Funds and the Portfolio Companies.  PPAS harmed the Zohar Funds because it denied the Zohar Funds the normal information flow that comes along with actively funding and receiving repayment on revolving credit facilities and delayed draw term loans, as well as the control that they negotiated

11

for as Lenders under the Credit Agreements in circumstances where those Portfolio Companies default under the agreements.   Moreover, had PPAS not been running a shadow facility and extending credit to the Portfolio Companies using the Zohar Funds' cash, the Zohar Funds may have made different decisions regarding whether to fund draws.   PPAS harmed the Portfolio Companies because it forced them to incur unnecessary financing expenses on revolvers and delayed draw term loans that they neither need nor have access to, ███████████████████ ██████████████████████████ *Id.* at 67:11-14, 68:14-25.   Thus, out of the Portfolio Company borrowers, the Zohar Fund lenders, and PPAS and Ms. Tilton, as the Agent—three of the main parties to the Credit Agreement—Ms. Tilton's actions to retain control over the Portfolio Companies' borrowings have benefitted only one party:  Ms. Tilton.

      **F.**    **The Portfolio Companies' Payment Defaults**

      The elaborate shadow financing scheme established by PPAS is particularly troubling because it allows PPAS to transmit Lender funds to Portfolio Companies that have shown an inability to repay their debts.   No fewer than ██ Portfolio Companies have failed to pay interest for one or more periods, triggering a continuing Event of Default under their Credit Agreements.

      The Portfolio Companies that have failed to pay interest for one or more periods include:



███████████████████████████████████████ and/or other borrowers to those

Portfolio Companies' Credit Agreements (collectively, the "Defaulted Borrowers").

      For at least ████ of the Defaulted Borrowers, Patriarch continued to run shadow revolving

credit facilities despite their default. These included ███████████████ which defaulted

starting in ██████████ and ██████████████████████████████████████

████████████ which all defaulted starting in ████████████ LaPuma Aff. ¶ 4. According to Mr.

Mercado, these █████ companies are among the Portfolio Companies that have maintained

"activity" in their shadow revolving credit facilities up to the present. Pickhardt Decl. Ex. D at

47:22-48:7. Still other Defaulted Borrowers, including ███████████████████████████

███████████ also had revolvers that were drawn down. *Id.* at 48:13-17. Further, Mr. Mercado

testified to "at least half a dozen" other Portfolio Companies that had funds drawn from their

delayed draw term loans that are presently sitting in PPAS's bank account. *Id.* at 48:22-49:4.

      Under the Credit Agreements between each Defaulted Borrower and the Lenders, the

Defaulted Borrowers' failure to pay interest triggered an Event of Default. *See* Pickhardt Decl.

Ex. B § 8.1(a). On October 9, 2017, the Zohar Funds issued notices to PPAS declaring Events of

Default and exercising remedies under the Credit Agreements as to each Defaulted Borrower

(the "Acceleration Notices"). *See* Pickhardt Decl. Exs. F-M. Each Acceleration Notice directed

PPAS "to send notice immediately to the Borrower declaring all unpaid principal, interest, and

any other Obligations immediately due and payable without presentment, demand, protest or

other notice of any kind" and terminating "any and all Revolving Credit Commitments or

Revolving Loans." Pickhardt Decl. Ex. H, at 1. The Zohar Funds further instructed PPAS "to

provide transparency during acceleration and/or foreclosure by providing the Lenders with

timely information, such as detail of measures to be taken, timeline of such measures, regularly

recurring progress updates, and to respond promptly to all requests from the Required Lenders for any additional information."

### G.     PPAS's Refusal To Return Funds Associated With Defaulted Borrowers

Upon replacing Patriarch as the Collateral Manager, AMZM sent monthly letters to Patriarch requesting information regarding the Portfolio Companies but Patriarch has never responded.

As part of ongoing discovery in this action, the Zohar Funds took the deposition of Ms. Dudley on October 11, 2017, and Mr. Mercado on October 13, 2017.  There, the Zohar Funds first learned that PPAS was running shadow revolver facilities.  On October 15, 2017, the Zohar Funds, as Required Lenders under the Defaulted Borrowers' Credit Agreements, demanded "all funds being held in any PPAS account that have been received from, or are purportedly held for the benefit of, any of the Defaulted Borrowers" be wired to the Trustee for the Zohar Funds by Tuesday, October 17, 2017, at 5:00 p.m.  Pickhardt Decl. Ex. N, at 2.  PPAS was required to comply with this demand under the Credit Agreements.  Pickhardt Decl. Ex. B §§ 8.2, 9.10. Instead, by letter from counsel on October 17, 2017, PPAS refused the Zohar Funds' directions.[8] Pickhardt Decl. Ex. P.  In that letter, PPAS contended that it "is merely holding such funds for the benefit of the Portfolio Companies" and that "[t]he funds could have been placed on deposit at any banking institution, but for the sake of convenience were deposited with PPAS."  This contention that PPAS is merely acting as a depository suggests that it is prepared to distribute the funds to the Defaulted Borrowers upon their request—as if they had "been placed on deposit at any banking institution"—notwithstanding the Zohar Funds' clear entitlement to the funds.

---

[8]  On the same day, Ms. Tilton herself sent a separate letter to AMZM, responding to the October 9 Acceleration Notices.  There, she claimed that acceleration of the debt would immediately require liquidating or unwinding the companies and thus demanded $2 million per company for costs before complying with the October 9 Acceleration Notices.  *See* Pickhardt Decl. Ex. Q.

Indeed, the letter expressly references an intent to use the Zohar Funds' money to fund the "orderly winding down" of certain Portfolio Companies—a clear dissipation of funds for which the Zohar Funds would have no means of recovery.

### H. Patriarch's Continued Mismanagement of the Portfolio Companies

The Zohar Funds are thus at immediate risk of substantial harm from PPAS's refusal to return their cash because the Funds are unlikely to obtain full recoveries on their loans to the Portfolio Companies as a result of Ms. Tilton's continuing mismanagement of them.  In addition to serving as the Agent (through PPAS) and formerly as Collateral Manager (through the Patriarch Managers), Ms. Tilton serves as the chief executive officer for many Portfolio Companies and is the sole director of the vast majority of them.  Under her watch, the Portfolio Companies have suffered losses and closures at an alarming rate, with at least six Portfolio Companies having ceased or significantly diminished operations in the last year and a half alone.

For example, ███████████████████████████████ LaPuma Aff ¶ 13.  In 2016, Patriarch shut down Galey & Lord's Cambodian plant without paying its remaining workers their last paycheck.[9]  It also shuttered Galey & Lord's South Carolina textile plant in May 2016, which employed over 100 workers.[10]  In July 2016, Patriarch also shut down Duro Textiles, putting 150 people out of work and leaving debts owed to the Environmental Protection

---

[9]   *See* Kyle Younker & Alex Plough, *Lynn Tilton:  Diva of Distressed or Diva of Destruction?* DEBTWIRE (Mar. 24, 2017), http://investigations.debtwire.com/lynn-tilton-diva-of-distressed-or-diva-of-destruction/.

[10]   *See* Tonya Brown, *Galey and Lord Textile Plant Closing in Society Hill*, ABC15 NEWS (Apr. 6, 2016), http://wpde.com/news/local/galey-and-lord-textile-plant-closing-in-society-hill.

Agency and employee retirement and health funds.[11]  In April 2017, Patriarch closed Remco Maintenance, after failing to make payroll and with outstanding payments due on benefits to local unions. [12]  Patriarch took these actions without notice to the Zohar Funds, thereby preventing them from assessing the companies' prospects.  PPAS has also refused to share critical information concerning the current state of the Zohar Funds' security interest in these borrowers' remaining assets.

Other companies were put into bankruptcy.  In February 2016, on the eve of being replaced as the Collateral Manager, Patriarch abruptly caused Transcare, another Portfolio Company, to file for Chapter 7 liquidation, leaving between 1,200 and 1,700 employees out of work and unpaid.[13]  PPAS has then taken any meager recoveries from the bankruptcy and transferred them to one of Ms. Tilton's personal investment vehicles, even though Transcare owes the Zohar Funds ███████  *See* Second Am. Answer & Counterclaims ¶¶ 48, 69-74, ECF No. 96; LaPuma Aff ¶ 13.  A few months later, in June 2016, an operating subsidiary of yet another Portfolio Company, NetVersant, was placed in involuntary Chapter 7 liquidation following judgments against the company relating to claims brought by its employee pension

---

[11]    *See* Kevin P. O'Connor, *Duro Employees Approved for Federal Assistance*, HERALD NEWS (Jan. 27, 2017), http://www.heraldnews.com/news/20170127/duro-employees-approved-for-federal-assistance; Younker & Plough, *supra* note 9.

[12]    *See* Kyle Younker, *Zohar Portfolio Company Remco Maintenance Closes Abruptly Amid Lack of Funds*, DEBTWIRE (May 2, 2017, 6:00 PM), http://www.debtwire.com/info/zohar-portfolio-company-remco-maintenance-closes-abruptly-amid-lack-funds.   Duro Textiles owes ██████████ million to the Zohar Funds, and Remco Maintenance owes ████████ million. LaPuma Aff. ¶¶ 12-13.

[13]    Peg Brickley & Tom Corrigan, *Lynn Tilton's Firm Took Millions from Failing Ambulance Operator*, WALL ST. J. (Feb. 14, 2017, 4:37 PM), https://www.wsj.com/articles/lynn-tiltons-firm-took-millions-from-failing-ambulance-operator-1487108058;    Peg    Brickley, *Turnaround Executive Lynn Tilton to Testify About Failed Ambulance Company*, WALL ST. J. (June  8,  2017  3:00  PM),  https://www.wsj.com/articles/turnaround-executive-lynn-tilton-to-testify-about-failed-ambulance-company-1496948401.

funds.  ██████████████████████████████  but the Funds have not received any

recoveries from the bankruptcy.  LaPuma Aff. ¶ 7.

Not only have Ms. Tilton and Patriarch mismanaged these Portfolio Companies out of

existence or to the brink, they have also attempted extreme measures to avoid paying creditors,

like the Zohar Funds.  In one instance, an Ohio state court granted a temporary restraining order

and ultimately awarded over $6 million in damages and costs to an equipment rental company,

after the court ruled that the Patriarch "lied" to the equipment rental company, concealed

material information, and attempted to steal the equipment that was leased to the Portfolio

Company, Zohar Waterworks.  Patriarch then put Zohar Waterworks into bankruptcy in an

attempt to avoid that judgment.[14]

In another instance, Patriarch and Ms. Tilton are alleged to have caused W.W. Holdings,

LLC to engage in a "rapid-fire asset transfer" before the company was placed into dissolution

proceedings in a strategy that was intended to "increase the value of Patriarch's investment in

[W.W.] Holdings at the expense of strategically selected creditors . . . ." Third Am. Compl. ¶ 28,

*XRoads Solutions Grp., LLC v. W.W. Holdings, LLC*, No. 05-cv-03646 (AKH) (Dec. 1, 2006),

ECF No. 62.  Patriarch repeated this strategy with Duro Industries, Inc., a course of action that

led a federal bankruptcy court in the District of Massachusetts to vacate its final financing order

and dismiss the proposed reorganization because of the "fraud and misrepresentations by [Duro]

and [Patriarch affiliates owned by Ms. Tilton]."  Pickhardt Decl. Ex. O, (*In re Duro Indus., Inc.*,

---

[14]   *See* Press Release, $32 Million Lawsuit Filed Against Lynn Tilton and Patriarch
Partners (Sept. 11, 2009), http://www.prweb.com/releases/2009/09/prweb2852154.htm; *see also
MA Equip. Leasing I, LLC v. Tilton*, 980 N.E.2d 1072, 1075 (Ohio Ct. App. 2012) ("In 2007,
appellees commenced litigation against Waterworks in the Franklin County Court of Common
Pleas for breaches of the equipment and real estate leases between appellees and Waterworks. As
part of that litigation, appellees sought a temporary restraining order to prohibit Waterworks
from removing leased equipment to Mexico without appellees' consent.").

No. 02-16131-CJK, slip op. at 13 (Bankr. D. Mass. Oct. 7, 2002)).  And the same with Rapid

Rack—with reports that before a jury returned a verdict of $3.398 million against the company,

Patriarch transferred "Rapid Rack's valuable assets to a new entity called Silverack."[15]

## ARGUMENT

## I.   THE ZOHAR FUNDS ARE ENTITLED TO TEMPORARY AND PRELIMINARY RELIEF TO PREVENT IRREPARABLE HARM

"In the Second Circuit, the standard for a temporary restraining order is the same as for a

preliminary injunction." *Vann v. Fischer*, 2011 WL 6788404, at *1 (S.D.N.Y. Dec. 19, 2011)

(quoting *Jackson v. Johnson*, 962 F. Supp. 391, 392 (S.D.N.Y. 1997)).  The Zohar Funds are

entitled to both if they can show: (1) the injunction is necessary to prevent irreparable harm; and

(2) either (a) the Zohar Funds are likely to prevail on the merits, or (b) the Zohar Funds have

shown sufficiently serious questions going to the merits to make them fair ground for litigation

and a balance of the hardships tips decidedly in the Zohar Funds' favor.  *Citigroup Global

Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).

The Zohar Funds satisfy these requirements for the following reasons.

### A.   The Zohar Funds Are Likely To Prevail On The Merits

The Zohar Funds are entitled to the funds in PPAS's account.  As an initial matter, there

is no dispute that PPAS holds cash that the Defaulted Borrowers have drawn under the loans

---

[15]   Younker & Plough, *supra* note 9.  Earlier this year, in another situation, Judge Nina Gershon of the Eastern District of New York granted a motion for attachment in the amount of $700,000, against Finanz St. Honore, B.V., an affiliate of Defaulted Borrower ███████ ████████████ after Patriarch and Ms. Tilton caused it to "exhibit[] evasive conduct in this litigation" shortly after it was found liable under a contract for indemnity.  In support of its ruling, the court pointed to Finanz's disappearance from the lawsuit evidenced by its failure to pay its attorney, communicate with its attorney, or oppose the motion for attachment.  *Disney Enters., Inc. v. Finanz St. Honore, B.V.*, No. 13-cv-6338, 2017 WL 1862211, at *2 (E.D.N.Y. May 8, 2017).

with the Zohar Funds. Pickhardt Decl. Ex. P, at 1 (claiming that the Portfolio Companies "deposited [this cash] with PPAS.").[16]

There is also no dispute that Events of Default have occurred. Under the Credit Agreements, the failure to pay interest is an Event of Default. Pickhardt Decl. Ex. B § 8.1(a). Ms. Tilton has admitted that this Event of Default has occurred because the Defaulted Borrowers "have not paid interest for quite some time, in some cases for more than a year." Ex. Q, at 1 (Oct. 17, 2017 Letter from L. Tilton to E. LaPuma).

Upon an Event of Default, "[t]he Agent shall, at the request of or with the consent of the Required Lenders, (i) exercise all rights and remedies provided in the Credit Documents." Pickhardt Decl. Ex. B § 8.2(c)(i). The Zohar Funds have made a proper request to PPAS under this provision. Here, the Zohar Funds are the Required Lenders because they represent more than 50 percent of the outstanding principal amount of all the loans. LaPuma Aff. ¶¶ 5-12. Further, Ms. Tilton concedes that the Zohar Funds can direct PPAS. Pickhardt Decl. Ex. Q, at 2 ("If you are, in fact, directing PPAS to send notices of acceleration . . . we will proceed with your direction once we are advanced wind-down costs of $2mm per company."). And the Zohar Funds' October 15, 2017 letter unequivocally directs PPAS to apply the funds in its account on deposit by the Portfolio Companies to the obligations owed to the Zohar Funds. Pickhardt Decl. Ex. N, at 1.

As to the "rights and remedies provided in the Credit Documents," there are at least two that entitle the Zohar Funds to recover their funds from PPAS's account. First, Section 7.4 of the

---

[16]   As noted earlier, given the limited information the Zohar Funds have received at this time, the Zohar Funds seek emergency relief only as to ████ of these companies. The Funds may pursue additional relief as to other companies, if information that is produced reveals the need to do so.

Credit Agreement gives the Zohar Funds a set-off right.  Under this provision, the Defaulted

Borrowers granted the Zohar Funds and PPAS the right

> at any time or from time to time, without notice . . . to set off and
> to appropriate and to apply any and all deposits . . . and any other
> Indebtedness at any time held or owing by such Lender or the
> Agent to or for the credit or the account of any [Portfolio
> Company] against and on account of the Obligations of any
> [Portfolio Company] to such Lender or the Agent hereunder,
> irrespective of whether or not (a) such Lender or the Agent shall
> have made any demand hereunder or (b) the principal of or the
> interest on the Loans or any other amounts due hereunder or the
> other Credit Documents shall have become due and payable and
> although such obligations and liabilities, or any of them, may be
> contingent or unmatured.

Ex. B § 7.4(c).[17]  Thus, the plain language of Section 7.4 permits the Agent "to set off and to

appropriate and to apply any and all deposits," like the deposits in the PPAS account, against the

Defaulted Borrowers' Obligations to the Zohar Funds.

Second, independent of Section 7.4, Section 5.1(g)(ii)(C) provides that "[a]ny property of

any [Portfolio Company] in possession of the Agent . . . (including, without limitation, proceeds

of Collateral received or collected by the Agent) may be, in the discretion of the Agent and

without limitation . . . applied to the payment of the Obligations."  Pickhardt Decl. Ex. C

§ 5.1(g)(ii)(C) (as amended).[18]  Section 5.1(g)(ii)(C) expressly states that the rights provided

therein "do not limit, and are in addition to and not in substitution for, any set off and other rights

that the Agent and the Lenders may have by law."  Accordingly, the plain language of Section

5.1(g)(ii)(C) permits the Agent to "appl[y] to the payment of the Obligations" "[a]ny property of

any [Portfolio Company] in possession of the Agent."

---

[17]   The Amended and Restated Loan and Security Agreement of ███████████
████ omits the term "Agent" from this provision.  Pickhardt Decl. Ex. X § 16.4.

[18]   The Amended and Restated Loan and Security Agreement of ███████████
████ allows the Agent, at the direction of the Lenders, to "apply any Collateral consisting of cash
to the payment of the Secured Obligations . . . ."  Pickhardt Decl. Ex. X § 13.2(b)(x).

In sum, the parties do not dispute that (1) the Defaulted Borrowers have failed to pay interest causing an Event of Default under the Credit Agreements, (2) the Zohar Funds, as Required Lenders, have noticed the Events of Default and accelerated all amounts due under the Credit Agreements, (3) there are funds on deposit with, and in the possession of, PPAS, and (4) the Zohar Funds, as Required Lenders, have directed PPAS to apply those funds to the Obligations through an exercise of two independent rights and remedies under the Credit Documents.   The Zohar Funds are thus almost certain to succeed on the merits of their permanent injunction.

### B.    The Zohar Funds Will Suffer Irreparable Harm Absent A Preliminary Injunction

The critical test for irreparable harm is whether, "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied."  *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999) (citation omitted).   Consistent with this standard, courts in this district have found a threat of irreparable harm where a creditor seeks to prevent dissipation or transfer of collateral, "coupled with the apparent inability of [the debtor] to satisfy an eventual judgment in the event [the creditor] ultimately prevails" due to the debtor's insolvency.  *III Fin. Ltd. v. Aegis Consumer Funding Grp., Inc.*, 1999 WL 461808, at *6 (S.D.N.Y. July 2, 1999); *Serio v. Black, Davis & Shue Agency, Inc.*, 2005 WL 3642217, at *16 (S.D.N.Y. Dec. 30, 2005) ("A serious threat of insolvency by a defendant can constitute such a 'substantial chance' of irreparable harm."); *CQS ABS Master Fund Ltd. v. MBIA Inc.*, 2014 WL 11089340, at *1 (S.D.N.Y. Jan. 29, 2014) (finding that while "[a]ny injury that is solely monetary is generally not irreparable . . . [t]his general rule does not apply . . . if the defendant is insolvent or likely to become insolvent" because "an award of damages from a judgment-proof defendant is not much

of a remedy at all").   The moving party "bears the burden of establishing irreparable injury is likely, not merely possible."   *CQS ABS Master Fund Ltd.*, 2014 WL 11089340, at *1.

Here, the Zohar Funds face a substantial likelihood that, absent a preliminary injunction, they will be unable to obtain a resolution returning them to the position they currently (and properly) occupy.   The Zohar Funds are the rightful owner of approximately $45 million in funds sitting in the bank account of their agent PPAS.   A substantial portion of that amount is comprised of amounts attributable to revolving credit facilities extended to Defaulted Borrowers, and the Zohar Funds have already exercised their unequivocal contractual right to demand return of those funds in satisfaction of principle and interest owed on the defaulted loans.   PPAS has, however, refused that demand and moreover insisted that the funds are the property of the Defaulted Borrowers, creating the imminent risk that they will be distributed to the Defaulted Borrowers upon their request.   If, instead of returning the Zohar Funds' funds, PPAS distributed those amounts to the Defaulted Borrowers—the proverbial throwing good money after bad—one of the Zohar Funds' limited sources of recovery will be lost.

It is unlikely that the Zohar Funds would be able to recover for this loss from either PPAS or the Defaulted Borrowers.   In the case of PPAS, aside from the $45 million of the Zohar Funds' cash that PPAS has improperly withheld, PPAS has no material assets, and its annual revenue—drawn from agency fees disputed in this action—is less than two million per year. Pickhardt Decl. Ex. D at 81:5-9 (testifying that PPAS's total annual income is "probably ███ million, in that range"); *see also* Pickhardt Decl. Ex. R (reflecting ███████ in agency fees collected between June 2016 and April 2017).   At that rate, it would take PPAS ██████ to earn enough revenue to cover the $45 million in Zohar Funds' money that it is currently withholding. But PPAS does not have decades of income coming its way.   Instead, its revenue faces imminent

end when the Zohar Funds are successful in establishing that PPAS was properly terminated as Agent in 2016 or, in any event, when the loans administered by PPAS reach maturity, which will occur no later than 2019.  Thus, PPAS is exactly the type of judgment-proof defendant addressed by the insolvency exception described above.

As for the Defaulted Borrowers, these entities have already shown that they are not capable of paying debts when due; that is the source of their defaults.  This ongoing failure to pay their debts demonstrates the likelihood that the defaulted borrowers cannot satisfy a money judgment, thus placing them squarely within the scope of the insolvency exception.[19]

### C.   At A Minimum, The Zohar Funds Have Shown Sufficiently Serious Questions Going To The Merits, And The Balance Of Hardships Tips Decidedly In The Zohar Funds' Favor

Even if the Zohar Funds could not establish a likelihood of success on the merits, it would nevertheless be appropriate for the Court to grant the Zohar Funds' application for temporary and preliminary relief, because there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and the balance of hardships tips decidedly in the Zohar Funds' favor.  *See Tradescape.com v. Shivaram*, 77 F. Supp. 2d 408, 411 (S.D.N.Y.) ("[T]he balance of hardships inquiry asks which of the two parties would suffer most grievously if the preliminary injunction motion were wrongly decided").

Absent a preliminary injunction, the Zohar Funds face the dissipation of tens of millions of dollars over which they claim a first-priority security interest.  Once those funds are distributed to Defaulted Borrowers—which PPAS apparently contends has a legal entitlement to

---

[19]    If that were not enough—and it is—the long history of portfolio companies under Tilton's management evading their creditors, *see supra* Facts, Section H, further supports finding a substantial risk of irreparable harm.  *See Empower Energies, Inc. v. SolarBlue, LLC*, 2016 WL 5338555, at *14 (S.D.N.Y. Sept. 23, 2016) ("Where there are persistent efforts to frustrate collection of money judgments, and a showing that without an injunction collection through enforcement of a judgment will be inadequate, then a preliminary injunction to preserve assets may be appropriate.").

the funds—it is unlikely that these funds will ever be recovered.  As a result, the Zohar Funds will be permanently denied the benefit of their bargain in negotiating their first-priority security interest in these funds.  Any harm to PPAS if the Court enters the proposed order prohibiting distribution of such funds absent the prior written approval of the Zohar Funds is essentially null.  PPAS does not have any substantial interest in the funds that are subject to the proposed order, beyond securing the payment of its agency fees, which pale in comparison to the amounts owed on the loans to the Zohar Funds.  Indeed, the proposed order would benefit PPAS by increasing the likelihood that there will be funds available to pay PPAS's fees.  Thus, the balance of hardships weighs heavily in the Zohar Funds' favor.[20]

## II.   LEAVE TO FILE THIRD-AMENDED ANSWER AND COUNTERCLAIMS SHOULD BE GRANTED

In support the Zohar Funds' application for emergency relief, and to address PPAS's recently discovered misconduct, the Zohar Funds seek leave to file a Third Amended Answer and Counterclaims to assert additional claims for breach of contract, breach of the implied covenant of good faith and fair dealing, money had and received, and the imposition of a constructive trust.[21]  Under Federal Rule of Civil Procedure 15(a), leave to amend should be "freely given."  *See Foman v. Davis*, 371 U.S. 178, 182 (1962).  Rule 16(b)(4) also permits the Court to modify a pretrial schedule if there is "good cause."

The Zohar Funds' proposed amendment satisfies these standards.  The facts giving rise to the amended claims—namely, PPAS's withholding of the Zohar Funds' cash, and its

---

[20]   In addition, there is no harm to PPAS because it concedes that the cash at issue is not its property; as a result, no bond should be required to support the requested relief.

[21]   Under the August 19, 2016 Civil Case Management Plan and Scheduling Order (Doc. No. 28), amended pleadings could be filed without leave until January 13, 2017.  The Zohar Funds filed their Amended Answer and Counterclaims on January 13, 2017 (Doc. No. 48).  In accordance with the Court's order on PPAS's motion to dismiss (Doc. No. 91), the Zohar Funds filed the operative Second Amended Answer and Counterclaims on May 10, 2017 (Doc. No. 96).

maintenance of shadow credit facilities for the Portfolio Companies—were not disclosed by PPAS in document discovery and were revealed only last week in deposition.  The Zohar Funds demanded the return of the cash within days of learning of these facts and have moved promptly upon PPAS's refusal to do so.   As shown earlier, the Zohar Funds have a contractual right to these funds, so the amended claims are meritorious.  Finally, there is no prejudice to PPAS, as fact discovery is ongoing, Ms. Tilton, PPAS's primary witness, has not yet been deposed, and PPAS should have disclosed these facts months ago.  Accordingly, leave to amend should be granted.

## CONCLUSION

The Court should enter a temporary restraining order and preliminary injunction prohibiting PPAS from transferring funds held on account of the following ▇▇▇ Subject Portfolio Companies absent the prior written consent of the Zohar Funds, pending resolution of this action: ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

PPAS should also be ordered to immediately produce daily cash reconciliation worksheets and borrowing requests for all Portfolio Companies from January 2016 to the present, to confirm the amounts that PPAS as held purportedly for these companies' benefit.  Finally, the Zohar Funds should be granted leave to amend their counterclaims.

DATED:   New York, New York
          October 19, 2017

Respectfully submitted,

QUINN EMANUEL URQUHART &
   SULLIVAN, LLP

By:/s/ Jonathan E. Pickhardt
     Jonathan E. Pickhardt
     jonpickhardt@quinnemanuel.com
     Rex Lee
     rexlee@quinnemanuel.com
     Ellison Ward Merkel
     ellisonmerkel@quinnemanuel.com

     51 Madison Avenue, 22nd Floor
     New York, New York 10010
     (212) 849-7000

     *Attorneys for Defendants and Defendant-
     Counterclaim-Plaintiffs*

26