**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| PATRIARCH PARTNERS<br> AGENCY SERVICES, LLC<br><br>       *Plaintiff-*<br>       *Counterclaim Defendant*,<br><br>  v.<br><br>ZOHAR CDO 2003-1, LTD.,<br>ZOHAR II 2005-1, LTD., and<br>ZOHAR III, LTD.,<br><br>       *Defendants-*<br>       *Counterclaim Plaintiffs,*<br><br>  –and–<br><br>ZOHAR CDO 2003-1, LLC,<br>ZOHAR II 2005-1, LLC, and<br>ZOHAR III, LLC,<br><br>       *Defendants.* |

Case No. 16-cv-4488(VM)(KHP)

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT-COUNTERCLAIM PLAINTIFF'S MOTION TO EXCLUDE**
<u>**CERTAIN TESTIMONY OF FREDERICK VAN ZIJL**</u>

**QUINN EMANUEL URQUHART**
  **& SULLIVAN LLP**
Jonathan E. Pickhardt
Ellison Ward Merkel
Evan Hess

51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

*Counsel to the Zohar Litigation Trust-A*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................... 1

BACKGROUND ............................................................................................................... 2

    A.    Overview Of The Remaining Claims In This Action .................................. 2

    B.    Summary Of The Expert Opinions Proffered In Support Of The Remaining Claims .................................................................................................... 4

LEGAL STANDARD ....................................................................................................... 7

ARGUMENT .................................................................................................................... 8

I.    Mr. Van Zijl's Impermissible Opinions Are Not Relevant .............................. 8

    A.    Mr. Van Zijl's Impermissible Opinions Are Not Relevant To PPAS's Affirmative Claim ..................................................................................... 9

    B.    Mr. Van Zijl's Impermissible Opinions Are Not Relevant To The Trustee's Counterclaims ............................................................................. 10

II.    Mr. Van Zijl Is Not Qualified To Opine On Categories 5, 6, And 7, The Only Areas Of His Report Which Are Even Arguably Relevant To Live Claims Or Defenses ........... 13

III.    Mr. Van Zijl's Opinions In Categories 5 And 6 Are Not Supported By Sufficient Data ............................................................................................................ 15

CONCLUSION ................................................................................................................ 16

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*232 Dune Rd. v. Scottsdale Ins. Co.*,
  2023 WL 1967501 (S.D.N.Y. Feb. 13, 2023)...............................................................9

*City of New York v. FedEx Ground Package Sys., Inc.*,
  2018 WL 4961455 (S.D.N.Y. Oct. 15, 2018)...............................................................7

*Daubert v. Merrell Dow Pharmaceuticals, Inc*.,
  509 U.S. 579 (1993) ........................................................................... 1, 2, 7, 8

*Davis v. Carroll*,
  937 F. Supp. 2d 390 (S.D.N.Y. 2013) ....................................................................8, 15

*H. Daya Int'l Co. v. Do Denim, LLC*,
  2023 WL 1340422 (S.D.N.Y. Jan. 31, 2023) .........................................................8, 13

*Lasalle Bank Nat'l Ass'n v. CIBC Inc.*,
  2012 WL 466785 (S.D.N.Y. Feb. 14, 2012) ..............................................................13

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
  209 F. Supp. 3d 612 (S.D.N.Y. 2016) .........................................................................9

*Marx & Co. v. Diners' Club Inc.*,
  550 F.2d 505 (2d Cir. 1977) ......................................................................................11

*R.F.M.A.S., Inc. v. So*,
  748 F. Supp. 2d 244 (S.D.N.Y. 2010) .......................................................................13

*SEC v. Collector's Coffee Inc.*,
  2023 WL 8280531 (S.D.N.Y. Nov. 30, 2023)............................................................15

*SEC v. Mudd*,
  2016 WL 2593980 (S.D.N.Y. May 4, 2016) ...........................................................7 n.3

*United States v. Lesniewski*,
  2013 WL 3776235 (S.D.N.Y. July 12, 2013) ...........................................................8-9

*Washington v. Kellwood Co*.,
  105 F. Supp. 3d 293 (S.D.N.Y. 2015) .........................................................................7

*Whitehurst v. 230 Fifth, Inc.*,
  998 F. Supp. 2d 233 (S.D.N.Y. 2014) .........................................................................9

**<u>Rules</u>**

Federal Rule of Evidence 702......................................................................... 1, 2, 7, 15

Defendant-Counterclaim Plaintiff David Dunn, as Trustee for the Zohar Litigation Trust-A (the "Trust"), moves *in limine* under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993), to exclude certain testimony of Plaintiff-Counterclaim Defendant Patriarch Partners Agency Services, LLC's ("PPAS") expert, Frederick Van Zijl.

## PRELIMINARY STATEMENT

In the eight years since PPAS filed its initial complaint, the scope of this action has undergone several fundamental shifts, and there are now only three live claims. PPAS has a sole affirmative claim seeking damages for the Zohar Funds' unsuccessful attempt to remove PPAS as administrative agent. The Trust has two live counterclaims arising out of PPAS's misconduct following Lynn Tilton and Patriarch's resignation as collateral manager. *First*, the Trust seeks to recover for PPAS's failure to remit monies belonging to the Zohar Funds after they declared events of default on certain Portfolio Companies and instructed PPAS to remit all Portfolio Company money in PPAS's possession. *Second*, the Trust seeks to recover for PPAS's post-March 2016 practice of receiving, and keeping, Portfolio Company payments on Zohar Fund revolving loan facilities, effectively usurping the Zohar Funds' rights as lenders.

PPAS has inexplicably retained an expert, Frederick Van Zijl, to opine primarily on matters which are not relevant to its affirmative claim and are not relevant to any defenses it may seek to assert to the Trust's counterclaims. Where Mr. Van Zijl's opinions have any semblance of relevance, he lacks the requisite experience to reliably opine and bases his unqualified opinions on an insufficient factual foundation.

*First*, the lion's share of Mr. Van Zijl's opinions are inadmissible because they are irrelevant. Mr. Van Zijl outlines the typical features of collateralized loan obligation transactions ("CLOs"), offers general observations about the similarities and differences between the Zohar

1

Funds and "typical" CLOs, and opines that PPAS fees are consistent with the industry standard. None of these issues is implicated by any live claim or defense.

*Second*, what remains of Mr. Van Zijl's opinions are inadmissible because he lacks the experience or the factual foundation to offer them. Mr. Van Zijl has absolutely no experience working as, or with, a third-party administrative agent, like PPAS, that is neither a bank nor a lender. Nor does he have any experience winding down a company. Without that relevant industry experience, his opinions—that (1) PPAS could deviate significantly from the standard role of an administrative agent based on the Zohar Funds' purportedly "unique" structure, (2) PPAS could engage in banking relationships with the Portfolio Companies, and (3) PPAS could invoke the Credit Agreements' indemnification provisions as grounds to demand advancement to winddown a company—lack any foundation. Mr. Van Zijl compounds his lack of relevant industry experience by relying on a skewed record; he considers only Ms. Tilton's testimony to the exclusion of both other PPAS employees and Portfolio Company employees.

As these opinions do not meet the requirements of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993), they warrant exclusion.

## BACKGROUND

### A.    Overview Of The Remaining Claims In This Action

In the mid-2000s, Lynn Tilton raised billions of dollars of investor money to create the Zohar Funds. ECF No. 179 ("Counterclaims") ¶¶ 2, 13. Within the Zohar structure, Ms. Tilton wore almost every hat and collected hundreds of millions of dollars in fees. *Id.* ¶¶ 13, 46. While Ms. Tilton earned massive fees, the Portfolio Companies performed disastrously, which led to the Zohar Funds defaulting on billions of dollars of obligations to their noteholders.

In February 2016, facing litigation and the failure of Zohar I, Ms. Tilton agreed to step down as the Zohar Funds' collateral manager. *Id.* ¶ 35. Before relinquishing that control,

however, Ms. Tilton secretly caused many of the Portfolio Companies' remaining revolving and delayed draw loan balances to be fully drawn down, with the funds sent to PPAS (as agent under the loan agreements) for transfer to the Portfolio Companies' accounts. *Id.* ¶ 52. From the moment of Ms. Tilton's resignation, PPAS refused to cooperate with the Zohar Funds' new collateral manager, Alvarez & Marsal Zohar Management, LLC ("AMZM"), including by withholding crucial Portfolio Company information. *Id.* ¶¶ 38-42. Faced with a disloyal agent refusing its principal's direction, AMZM terminated PPAS's agency. *Id.* ¶ 46. But PPAS refused to step down and initiated this action instead, seeking a declaration that it should remain the agent under the Credit Agreements and asserting a claim that terminating PPAS breached the Credit Agreements. ECF No. 1 ¶¶ 23-31 ("Compl."); *see also* ECF No. 46 ¶¶ 27-35 ("Am. Compl."). The Zohar Funds and AMZM sought leave to move for injunctive relief removing PPAS as agent, ECF No. 31, but this Court denied that request, leaving PPAS to continue as agent during the pendency of the lawsuit, ECF No. 32. Following the Court's order, PPAS continued to hold itself out as agent and to receive its regular agency fees. Counterclaims ¶ 48.

During discovery in this action, the Zohar Funds learned that PPAS had, in fact, kept most of the funds that had been drawn down from the Zohar Funds on the eve of Ms. Tilton's resignation as collateral manager rather than transferring the funds to the Portfolio Companies. Ex. 1[1] (Mercado Dep. 62:15-64:25). Not only was PPAS still holding these monies in its commingled account over two years later, but PPAS had been operating shadow revolver accounts where it held onto funds from the Portfolio Companies that were intended to be repayments of the Zohar Funds' loans so that Ms. Tilton could control how those monies were loaned back out to the Portfolio

---

[1] References to exhibits herein refer to the Declaration of Ellison Ward Merkel filed in connection with this brief.

Companies.  *Id.* at 52:22-53:10, 69:2-15.  On October 9, 2017, AMZM declared events of default for many of these Portfolio Companies, instructing PPAS to declare all unpaid principal and interest immediately due and payable.  Counterclaims ¶ 59.  After depositions of PPAS employees on October 11 and 13, 2017, revealed that PPAS had been holding and lending Zohar Funds' loan proceeds from its own account and that PPAS was holding approximately $45 million of Portfolio Company money in that account, ECF No. 158 at 1, 14, AMZM again directed PPAS to comply with its default instructions and remit all monies in the PPAS account which were purportedly held on behalf of the defaulted Portfolio Companies, Counterclaims ¶ 61.  PPAS refused to remit the funds, claiming that the funds "belong[ed] to the Portfolio Companies, not the Zohar Funds," such that "PPAS [did] not have the authority to remit them."  *Id.* ¶ 62.  PPAS also refused to proceed with notices of acceleration unless the Zohar Funds advanced to PPAS $2 million for each defaulted Portfolio Company.  *Id.* ¶¶ 60, 62.  In so doing, PPAS breached the Portfolio Companies' Credit Agreements, improperly supplanted the rights of the Zohar Funds and AMZM to control the Zohar Funds' lending activities, and frustrated the Zohar Funds' exercise of their extensive contractual rights upon events of default.  *Id.* ¶¶ 76-83, 90-95.  The Zohar Funds amended their counterclaims to seek damages arising from these PPAS breaches.

### B.    Summary Of The Expert Opinions Proffered In Support Of The Remaining Claims

In support of its claims, PPAS engaged Frederick Van Zijl, whose background is in corporate and investment banking, including experience with financial sponsors and leveraged finance.  Ex. 2 (Expert Report of Frederick G. Van Zijl) ¶¶ 1-8.  Mr. Van Zijl offers seven affirmative opinions.  First, CLOs share typical features, but CLOs often modify this standard structure through bespoke arrangements.  *Id.* ¶¶ 15, 20-43.  Second, the Zohar Funds were similar in many ways to typical CLOs.  *Id.* ¶¶ 16, 47-50, 65.  Third, the Zohar Funds differed from typical

4

CLOs, in part because the business strategy required more active management as the Zohar Funds invested in primarily distressed companies. *Id.* ¶¶ 17, 51-60. Fourth, the Zohar Funds differed from typical CLOs through use of an administrative agent and management consulting team commonly owned with the collateral managers, which could theoretically lead to economic efficiencies. *Id.* ¶¶ 17-18, 61-64. Fifth, the fees PPAS charged for its services as agent were consistent with industry custom and practice. *Id.* ¶¶ 18, 69-72. Sixth, PPAS was entitled to engage in banking activity with the Portfolio Companies under the Credit Agreements. *Id.* ¶¶ 66-68. And lastly, the exculpation and indemnification provisions in the Credit Agreements were consistent with similar provisions in the industry. *Id.* ¶¶ 19, 73-78.

The Trust's expert, David Lorry, has experience in corporate and investment banking, including direct experience in over forty agented loan transactions acting as lender, borrower, and agent. Ex. 3 (Expert Report of David Lorry) ¶¶ 7-14. Mr. Lorry offers four affirmative opinions. First, PPAS's actions to hold and commingle proceeds from the Zohar Funds, to retain payments from borrowers in a commingled bank account, and to make disbursements to the borrowers from that commingled account, were contrary to the "customary ministerial role of administrative agents." *Id*. ¶¶ 18, 70-78. Second, Section 9.5 and similar provisions in the Credit Agreements which provide that the agent is entitled to act with the borrower in "banking, trust, financial advisory or other business" are understood by the market to permit agents that are also banks to provide fee-based banking services to the borrowers, but are not understood to apply to non-bank agents that are not regulated depositary institutions. *Id.* ¶¶ 19, 79-86. Third, PPAS's failure to remit the funds in its account purportedly held on behalf of defaulted Portfolio Companies on the instruction of the lenders was contrary to market expectations and damaged the Zohar Funds in the amount of approximately $12.6 million. *Id.* ¶¶ 20, 89-100. Lastly, PPAS's receipt of and

failure to remit paydowns on revolving credit facilities damaged the Zohar Funds in an amount ranging from $4.5 million to $37.3 million. *Id.* ¶¶ 21, 101-19.

Mr. Van Zijl also provided a rebuttal report purporting to rebut certain of Mr. Lorry's opinions. In response to Mr. Lorry's opinion that PPAS's actions as administrative agent diverged from the standard, ministerial role of agents when it held proceeds of Zohar Funds' loans in a commingled PPAS account and made disbursements to and retained payments from Portfolio Companies in that account, Mr. Van Zijl opined in rebuttal that this does not account for the "unique structural and strategic features of the Zohar Funds."[2] Ex. 4 (Expert Rebuttal Report of Frederick G. Van Zijl) ¶¶ 6, 8-12. Mr. Van Zijl also opined in rebuttal that PPAS's demand for advancement of $2 million per company was consistent with the provisions of the Credit Agreements providing for indemnification, and with the economics of agent indemnification more generally. *Id.* ¶¶ 13-16. The balance of Mr. Van Zijl's rebuttal opinions are purported critiques of Mr. Lorry's methodology for calculating the Trust's damages. *Id.* ¶¶ 7, 17-115.

Mr. Van Zijl's opinions thus fall into eight categories:

| Category 1: | The typical features of CLOs (Ex. 2 ¶¶ 15, 20-43) |
|---|---|
| Category 2: | Similarities between the Zohar Funds and typical CLOs (*id.* ¶¶ 16, 47-50, 65) |
| Category 3: | Differences between the Zohar Funds and typical CLOs (*id.* ¶¶ 17-18, 51-64) |
| Category 4: | PPAS fees as consistent with the industry standard (*id.* ¶¶ 18, 69-72) |
| Category 5: | PPAS's actions holding proceeds of Zohar Funds' loans in its own account and making disbursements to and retaining payments from Portfolio Companies in that account as consistent with the unique structure of the Zohar Funds (Ex. 4 ¶¶ 6, 8-12) |

---

[2]   Mr. Van Zijl does not explicitly state which of PPAS's actions that were "contrary to the customary ministerial role of administrative agents," were nevertheless explained by the "unique features" of the Zohar Funds, Ex. 4 ¶ 8, but in explaining which of Mr. Lorry's opinions he purports to rebut, Mr. Van Zijl cites only one paragraph which reads: "PPAS's actions—including (a) to hold and commingle proceeds of loans from the Zohar Funds and to receive and to retain payments from borrowers in PPAS bank accounts, and (b) to make disbursements to the borrowers from such PPAS accounts—are contrary to the customary ministerial role of administrative agents." Ex. 3 ¶ 18.

| Category 6: | PPAS's entitlement to engage in banking activity with borrowers under the Credit Agreements (Ex. 2 ¶¶ 66-68) |
|---|---|
| Category 7: | PPAS's invocation of the indemnification provisions in the Credit Agreements as grounds to demand advancement of wind-down costs (Ex. 4 ¶¶ 13-16) |
| Category 8: | Critiques of Mr. Lorry's damages calculations (*id.* ¶¶ 17-115) |

All of Mr. Van Zijl's opinions that fall within Categories 1-7 (together, the "Impermissible Opinions") are impermissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and should be excluded.[3]

## LEGAL STANDARD

Expert testimony is admissible only if it "assist[s] the trier of fact to … determine a fact in issue." *Daubert*, 509 U.S. at 591. "The party offering the testimony has the burden of establishing its admissibility by a preponderance of the evidence." *City of New York v. FedEx Ground Package Sys., Inc.*, 2018 WL 4961455, at *1 (S.D.N.Y. Oct. 15, 2018). The Court acts as a gatekeeper and ensures that an expert's testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. This requires the Court to assess "three issues: (1) the qualifications of the expert, (2) the reliability of the methodology and underlying data employed by the expert, and (3) the relevance of that about which the expert intends to testify." *Washington v. Kellwood Co*., 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015).

To determine whether a witness is qualified to testify as an expert, the Court "must first ascertain whether the proffered expert has the educational background or training in a relevant

---

[3] The Trust does not seek to exclude Mr. Van Zijl's opinions in Category 8, which purport to rebut Mr. Lorry's damages calculations. For the avoidance of doubt, the Trust intends to argue at summary judgment, and if necessary at trial, that the Category 8 opinions are fundamentally flawed and should be given no weight. Additionally, PPAS intends to file a motion to exclude Mr. Lorry as an expert. Though the Trust believes that motion to be meritless, if successful, Mr. Van Zijl's rebuttal report should be excluded in its entirety as irrelevant. *SEC v. Mudd*, 2016 WL 2593980, at *7 n.14 (S.D.N.Y. May 4, 2016) (expert's rebuttal was "no longer necessary or relevant" after testimony which expert sought to rebut was excluded).

field." *H. Daya Int'l Co. v. Do Denim, LLC*, 2023 WL 1340422, at \*3 (S.D.N.Y. Jan. 31, 2023) (Marrero, J.). To determine whether expert testimony is reliable, the Court should consider whether "the testimony is grounded on sufficient facts or data," whether "the testimony is the product of reliable principles and methods," and whether "the witness has applied the principles and methods reliably to the facts of the case." *Davis v. Carroll*, 937 F. Supp. 2d 390, 412 (S.D.N.Y. 2013). Relevance requires the expert testimony to "fit" the facts of the case. *Daubert*, 509 U.S. at 591. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* (citation omitted).

## ARGUMENT

The Court should exclude Mr. Van Zijl's Impermissible Opinions regarding (1) the typical features of CLOs, (2) similarities between the Zohar Funds and typical CLOs, (3) differences between the Zohar Funds and typical CLOs, (4) PPAS fees as consistent with the industry standard, (5) PPAS's actions holding proceeds of Zohar Funds' loans in its own account and making disbursements to and retaining payments from Portfolio Companies as consistent with the unique structure of the Zohar Funds, (6) PPAS's entitlement to engage in banking activity with the Portfolio Companies, and (7) PPAS's invocation of the indemnification provisions in the Credit Agreements as grounds to demand advancement of winddown costs. All of these opinions are inadmissible because the opinions are not relevant, are issues on which Mr. Van Zijl is not qualified to opine, or are not supported by sufficient data.

## I.     Mr. Van Zijl's Impermissible Opinions Are Not Relevant

Mr. Van Zijl's Impermissible Opinions are wholly irrelevant to PPAS's sole remaining claim and the Trust's counterclaims, and should be excluded on that basis alone. It is axiomatic that "[e]xpert testimony which does not relate to any issue in the case is not relevant and ergo, non-helpful." *Daubert*, 509 U.S. at 591; *United States v. Lesniewski*, 2013 WL 3776235, at \*11

(S.D.N.Y. July 12, 2013) (Marrero, J.) (excluding expert opinion where "any expert testimony on this topic is unlikely to be relevant to the issues in this case"), *aff'd sub nom. United States v. Rutigliano*, 614 F. App'x 542 (2d Cir. 2015); *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 643 (S.D.N.Y. 2016) (expert testimony excluded as irrelevant because "even if [expert] had a reliable basis for" his conclusions "that opinion would not assist the trier of fact in determining the pertinent issue in this case").

### A.    Mr. Van Zijl's Impermissible Opinions Are Not Relevant To PPAS's Affirmative Claim

PPAS's only remaining claim is that the Zohar Funds "irrevocably appoint[ed] PPAS as their Administrative Agent" under the Credit Agreements, so the Zohar Funds' attempt to terminate PPAS breached those agreements.  Am. Compl. ¶¶ 31-35.  Resolution of this claim implicates two issues, and Mr. Van Zijl opines on neither.

*First*, to prove this claim, PPAS must establish that New York law permits an agent to be appointed irrevocably.  Mr. Van Zijl offers no opinion on this matter—nor could he.  This is a strictly legal question, so expert testimony is improper.  *232 Dune Rd. v. Scottsdale Ins. Co.*, 2023 WL 1967501, at *18 n.15 (S.D.N.Y. Feb. 13, 2023).

*Second*, if PPAS establishes that its irrevocable appointment as agent was permissible under New York law (it was not), PPAS must prove what damages, if any, it incurred.  *See Whitehurst v. 230 Fifth, Inc.*, 998 F. Supp. 2d 233, 246 (S.D.N.Y. 2014) (damages are an "essential element[] to pleading a breach of contract under New York law").  PPAS has claimed three categories of damages: indemnification of unreimbursed costs of winding down Portfolio Companies at the direction of the Zohar Funds, due and unpaid agency fees, and reputational damages.  Ex. 5 (PPAS's Suppl. Resps. & Objs. to Trust's Fourth Set of Interrogs.) at 6.  Yet here too, Mr. Van Zijl offers no opinion.  In fact, he expressly disclaims any opinion on damages

whatsoever.  Ex. 6 (Van Zijl Dep. 106:12-21) ("Q. … In both your opening and rebuttal report, is it correct that you are offering no affirmative opinion about the amount of damages allegedly suffered by PPAS in this case?  A. I'm not … I'm not offering an affirmative – I'm contextualizing what practices [are] for administrative agent fees."); *see also id.* at 102:1-17.  At most, Mr. Van Zijl opines that the fees charged by PPAS were consistent with industry custom and practice, Ex. 2 ¶ 70, but the reasonableness of PPAS's fees is not an issue in dispute.  To be sure, the parties dispute whether or not PPAS is owed fees—and whether any unpaid fees were caused by the unsuccessful attempt to terminate PPAS—but there is no live claim or defense implicating whether PPAS's fees were consistent with industry standards.

## B.    Mr. Van Zijl's Impermissible Opinions Are Not Relevant To The Trustee's Counterclaims

The Trust has two live counterclaims in this action, and Mr. Van Zijl's testimony is not relevant to either.

**Counterclaim Count III.**  In Count III, the Trust seeks to recover for PPAS's undisputed failure to remit the monies it was purportedly holding for the benefit of certain Portfolio Company borrowers after the Zohar Funds declared events of default and directed PPAS to remit all Portfolio Company funds in its possession.  Counterclaims ¶¶ 76-83.  In defense of its failure to remit these funds, PPAS relies on two provisions in the Credit Agreements.  PPAS first points to indemnification provisions, to justify its demand for advancement of $2 million in winddown costs for each borrower before it would agree to send back funds it held on behalf of the Portfolio Companies.  ECF No. 300, at 2-3.  Because AMZM did not advance these funds, PPAS claims, it was not required to send back the money in its possession.  *Id.*  Alternatively, PPAS points to Section 9.5 to argue that the Zohar Funds did not have rights to the funds, which PPAS purportedly

held "in a custodial capacity." *Id.* at 2. Here, PPAS claims that it had no legal authority to remit the Portfolio Company funds in its account because it held those funds as a bank. *Id.*

Mr. Van Zijl's Impermissible Opinions are not relevant to the Trust's claim or PPAS's defenses to Count III. *First*, the opinions in Categories 1-4 do not touch on these claims or defenses at all because resolving this claim does not implicate the general structure of CLOs, how the Zohar Funds were generally similar to or different from that standard structure, or the reasonableness of PPAS's fees. *Second*, the opinion in Category 5—that PPAS acted consistently with the Zohar Funds' unique structure when it held loan proceeds in its own account and made disbursements to and retained payments from Portfolio Companies in that account—is limited by its terms to the conduct at issue in Count V, discussed below. *Third*, to the extent that Mr. Van Zijl's opinions in Categories 6 and 7 that PPAS was entitled to act as a bank and that PPAS's "advancement request was consistent with … the bespoke provisions of the Zohar Funds' credit agreements," Ex. 4 ¶ 16, are relevant at all, these opinions impermissibly encroach on the sole province of the Court to interpret the parties' rights and obligations under the Credit Agreements. The Court—not Mr. Van Zijl—interprets the Credit Agreements. "Construction (of a contract) is always a matter of law for the Court." *Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 510 (2d Cir. 1977) (citation omitted).[4]

**Counterclaim Count V.** In Count V, the Trust seeks to recover for PPAS's post-March 2016 practice of receiving—and keeping—Portfolio Company payments on Zohar Fund revolving loan facilities. Counterclaims ¶¶ 90-95. In defense of its failure to remit these regular payments, PPAS claims that it was "properly holding that money for the Portfolio

---

[4]    Mr. Van Zijl also opines that PPAS's demand for "wind-down costs of $2mm per company" was consistent with indemnification provisions in the economic context in which administrative agents operate. Ex. 4 ¶ 16. Even if this opinion meets the relevance threshold, Mr. Van Zijl is not qualified to opine on the matter. *Infra* Part II.

Companies in a banking capacity," pursuant to Section 9.5 of the Credit Agreements.  ECF No. 300, at 3.  Section 9.5 provides that "[t]he Agent … may accept deposits from, lend money to and generally engage in any kind of banking, trust, financial advisory, or other business relationship with the Borrower…."  Ex. 7 (Croscill Credit Agreement).

Like Count III above, Mr. Van Zijl's opinions in Categories 1-4 have no bearing at all on this issue because resolving this claim does not implicate the general structure of CLOs, how the Zohar Funds were generally different from or similar to that standard structure, or the reasonableness of PPAS's fees.  The opinions in Category 7, regarding PPAS's invocation of the indemnification provision, are limited by their terms to Count III.

Thus, Categories 5 and 6 include the only opinions that PPAS can even claim bear any semblance of relevance to Count V.  But Mr. Van Zijl's opinion in Category 5—that the unique structure of the Zohar Funds justifies PPAS's non-ministerial conduct—lacks sufficient specificity to be helpful, and is thus irrelevant.  Though Mr. Van Zijl cites and (presumably) purports to rebut Mr. Lorry's opinion regarding PPAS's non-ministerial conduct when it held and remitted loan proceeds from its own account, Ex. 4 ¶ 8, Mr. Van Zijl does not even explicitly state that this is the conduct purportedly justified by the Zohar Funds' "unique features," let alone explain what unique features provide a basis for PPAS usurping the role of the lenders in the lending process. In Category 6, Mr. Van Zijl opines that Section 9.5 is consistent with his industry experience "where provisions allowing for such banking activity are common."  Ex. 2 ¶ 68.  But Mr. Van Zijl stops short of opining on whether PPAS's actions were consistent with how these provisions are typically used, nor does he opine on how this provision could be used by an agent that is not a bank.[5]  His limited opinion that similar provisions exist in other agreements thus does nothing to

---

[5]    Mr. Lorry opined that PPAS's reliance on Section 9.5 is misplaced because similar

assist the Court in determining anything about how this provision would be used between these parties and is irrelevant.

## II.    Mr. Van Zijl Is Not Qualified To Opine On Categories 5, 6, And 7, The Only Areas Of His Report Which Are Even Arguably Relevant To Live Claims Or Defenses

Mr. Van Zijl has no experience with non-bank, non-lender agents like PPAS nor with any CLOs structured similarly to the Zohar Funds.  Mr. Van Zijl is thus not qualified as an expert on the opinions in Categories 5, 6, and 7—the only areas in his report which are even arguably relevant.  To complete the threshold step of qualifying a witness as an expert, courts "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony."  *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 251-52 (S.D.N.Y. 2010) (Marrero, J.); *H. Daya*, 2023 WL 1340422, at *3 ("[N]othing about [expert's] skill, experience, training, or education gives [her] specialized knowledge about the operations of these particular defendants." (citation omitted)).

Mr. Van Zijl's background is in corporate and investment banking, including experience with financial sponsors and leveraged finance.  Ex. 2 ¶¶ 1-8.  This general financial services experience does not touch on any of the key issues of this case on which an expert opinion could be useful to the Court.  The only opinions offered by Mr. Van Zijl which are arguably within that scope of expertise are the opinions in Categories 1, 2, 3, and 4 about how CLOs are typically

---

provisions are understood to permit agents that are also banks to provide fee-based banking services to borrowers, and in his experience, the provision applies only to regulated banks and not non-bank agents like PPAS.  Ex. 3 ¶¶ 79, 86.  Put differently, the provision makes clear that a bank can provide other services to the borrowers notwithstanding the bank's obligations to the lenders as an administrative agent.  In his deposition, Mr. Van Zijl testified that he intended to rebut this opinion, but could identify no reference in his rebuttal report to Mr. Lorry's opinion or to Section 9.5.  Ex. 6, at 107:7-115:24.  Mr. Van Zijl testified at deposition that "there [were] various times where [PPAS was] acting like a bank," *id.* at 161:10-12, but "[o]pinions that are not disclosed in [an] expert's report cannot be offered."  *Lasalle Bank Nat'l Ass'n v. CIBC Inc.*, 2012 WL 466785, at *9 (S.D.N.Y. Feb. 14, 2012).

structured, general observations about how the structure of the Zohar Funds was similar to or different from the typical CLO structure, and the opinion that PPAS's fees are consistent with the industry standard. But those opinions are not relevant to any disputed issue. *See supra* Part I.

To the extent that Mr. Van Zijl does offer opinions that PPAS could even argue are relevant, he lacks the requisite industry experience. *First*, Mr. Van Zijl opines in Category 5 that PPAS's atypical and non-ministerial conduct in holding and remitting loan proceeds from its own account was consistent with the unique structural features of the Zohar Funds, but Mr. Van Zijl has no experience with any CLO similar to the Zohar Funds—he repeatedly emphasizes that the Zohar Funds were unique, sui generis, and unlike other CLOs in key ways. Ex. 6, at 125:19-22 ("Find a comp. Can't find one, right? It's one of a kind."). Equally important, Mr. Van Zijl has no experience with non-bank agents like PPAS. *Id.* at 66:12-23. Indeed, Mr. Van Zijl did not even know that non-lender agents like PPAS exist. *Id.* at 64:4-7 ("I'm not aware of, like, a non-lender administrative agency industry."). *Second*, Mr. Van Zijl opines in Category 6 that Section 9.5 is consistent with his industry experience "where provisions allowing for such banking activity are common." Ex. 2 ¶ 68. But here too, Mr. Van Zijl lacks the requisite experience to opine on how that provision would apply to a non-bank agent, like PPAS, as he has no experience with non-bank agents. Ex. 6, at 66:12-23. And, *third*, Mr. Van Zijl opines in Category 7 that PPAS's demand for "wind-down costs of $2mm per company" was consistent with indemnification provisions in the economic context in which administrative agents operate. Ex. 4 ¶ 16. Fatally, Mr. Van Zijl has no experience either as lender or as agent where an indemnification provision was invoked. Ex. 6, at 313:2-14. Revealingly, Mr. Van Zijl's opinion that a flat-rate advancement demand of $2 million per company was reasonable is not based on any actual experience or cited examples,

but instead based exclusively on Ms. Tilton's say-so.  Ex. 6, at 246:13-256:22 ("I don't know if it's precisely 2 million or not.  I defer to Ms. Tilton on the number.").

## III.    Mr. Van Zijl's Opinions In Categories 5 And 6 Are Not Supported By Sufficient Data

Mr. Van Zijl's opinions in Categories 5 and 6 are also not supported by sufficient data because he did not consider the deposition testimony of any PPAS employees besides Ms. Tilton, any Portfolio Company employees, and until his rebuttal report, any AMZM employees.  Where "expert testimony rests on inadequate factual foundations, problematic assumptions, or a misleadingly partial selection of relevant facts, it must be excluded under Rule 702."  *Davis v. Carroll*, 937 F. Supp. 2d 390, 418 (S.D.N.Y. 2013); *SEC v. Collector's Coffee Inc.*, 2023 WL 8280531, at *3 (S.D.N.Y. Nov. 30, 2023) (Marrero, J.) (excluding expert testimony where expert did "not grapple with the considerable record evidence that contradicts these assumptions").

Mr. Van Zijl lacks sufficient factual foundation to provide the opinions in Category 5 that PPAS holding and remitting loan proceeds from its own commingled account may have been inconsistent with the standard, ministerial role of agents but was nevertheless consistent with the unique structure of the Zohar Funds.  The only testimony that Mr. Van Zijl considered in forming this opinion was the self-serving testimony of Ms. Tilton.  Ex. 6, at 175:14-179:18.  Mr. Van Zijl did not consider the testimony of Portfolio Company employees or even others affiliated with PPAS.  *Id.*  Mr. Van Zijl's failure to so much as read the testimony of any PPAS employee besides Ms. Tilton is particularly concerning given that it was during the depositions of two PPAS employees, Carlos Mercado and Renee Dudley, that the Trust uncovered the conduct that gave rise to its counterclaims.  ECF No. 158, at 1.  And it was Mr. Mercado and Ms. Dudley whose testimony explained that PPAS's purportedly nonstandard activity began only in February 2016, when Ms. Tilton faced losing control of the Zohar Funds.  Ex. 1, at 53:11-54:16; Ex. 8 (Dudley Dep. 299:21-300:13).  Mr. Van Zijl's incorporation of AMZM testimony into his rebuttal report

on the singular topic of winddown expenses does not remedy the flaws in the opinions in Categories 5 and 6.

Mr. Van Zijl's opinion in Category 6 as to PPAS's invocation of a banking relationship under Section 9.5 of the Credit Agreements provides a salient example of the blind spot caused by reliance on only Ms. Tilton's version of events. Mr. Van Zijl opines that Section 9.5 of the Credit Agreements permitted PPAS to engage in banking activity. Ex. 2 ¶ 68. Though Mr. Van Zijl's report contains no opinion on whether PPAS was engaged in banking activity, Mr. Van Zijl testified that "there [were] various times where [PPAS was] acting like a bank." Ex. 6, at 161:10-12. Setting aside for a moment that this is outside the scope of Mr. Van Zijl's disclosed opinions, *supra* note 5, Mr. Van Zijl does not have a sufficient basis to provide any opinions regarding whether PPAS was acting like a bank because he did not consider the deposition testimony of Portfolio Company employees who did not recall entering any banking relationship with PPAS. Ex. 9 (Martin Dep. 83:7-14) ("I don't have any recollection of there being a banking relationship between the agent and Croscill."); Ex. 10 (O'Shea Dep. 81:19-82:11) ("[W]e did not consider the cash held by PPAS as available to us for expenditure. It was not in our bank account.").

Thus, Mr. Van Zijl's opinions in Category 6, as to PPAS's invocation of a banking relationship under Section 9.5, and Category 5, as to PPAS's conduct which was not consistent with the typical ministerial role of agents, are based on a misleadingly partial selection of relevant facts and must be excluded.

## CONCLUSION

For the foregoing reasons, the Trust respectfully requests that the Court exclude Mr. Van Zijl's opinions in Categories 1-7 regarding: (1) the typical features of CLOs, (2) similarities between the Zohar Funds and typical CLOs, (3) differences between the Zohar Funds and typical

CLOs, (4) PPAS fees as consistent with the industry standard, (5) PPAS's actions holding proceeds of Zohar Funds' loans in its own account and making disbursements to and retaining payments from Portfolio Companies in that account as consistent with the unique structure of the Zohar Funds, (6) PPAS's entitlement to engage in banking activity with borrowers under the Credit Agreements, and (7) PPAS's invocation of the indemnification provisions in the Credit Agreements as grounds to demand advancement of wind-down costs.

Dated:   July 18, 2024
         New York, New York

**QUINN EMANUEL URQUHART**
  **& SULLIVAN LLP**
Jonathan E. Pickhardt
Ellison Ward Merkel
Evan Hess

51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
jonpickhardt@quinnemanuel.com
ellisonmerkel@quinnemanuel.com
blairadams@quinnemanuel.com
evanhess@quinnemanuel.com

*Counsel to the Zohar Litigation Trust-A*