UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PATRIARCH PARTNERS AGENCY SERVICES, LLC, | |
| Plaintiff, | Case No. 16-cv-4488 (VM) (KHP) |
| -against- | |
| ZOHAR CDO 2003-1 LTD., et al., | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF PATRIARCH PARTNERS AGENCY
SERVICES, LLC'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ......................................................................................................... 2

I.    Lynn Tilton Created The Zohar Funds As Vehicles To Restore Distressed
      Companies And Unlock Their Value .............................................................. 2

II.   PPAS Served As The Zohar Funds' Irrevocably Appointed Administrative Agent
      Pursuant To Credit Agreements With The Funds And Portfolio Companies .................... 4

III.  PPAS Oversaw The Zohar Funds' Various Loan Commitments To The Portfolio
      Companies, Including Facilitating Payments Of Principal And Interest ......................... 5

IV.   After Patriarch Partners Resigned As Collateral Manager In March 2016, AMZM
      Replaced It And Conducted A Comprehensive Credit Agreement Review ..................... 7

V.    The Portfolio Companies Deposited Borrowed Money With PPAS And Ms.
      Tilton Diligently Managed That Money In Her Role At Each Portfolio Company .......... 7

VI.   The Zohar Funds Purport To Terminate PPAS As Administrative Agent ........................ 9

VII.  PPAS Immediately Seeks Redress For Unlawful Removal As Administrative
      Agent .............................................................................................................. 10

VIII. The Zohar Funds Declare (And Then Suspend) Events Of Default ................................. 11

IX.   The Zohar Funds File For Bankruptcy Protection ........................................................ 13

LEGAL STANDARD .................................................................................................. 14

ARGUMENT .............................................................................................................. 14

I.    The Zohar Funds Breached The Credit Agreements' Irrevocable Appointment
      And/Or Authorization Of PPAS As Administrative Agent (PPAS Count II) ................. 14

II.   Summary Judgment Should Be Granted Dismissing All Of The Trust's
      Counterclaims For Multiple Independent Reasons ........................................................ 16

      A.    The Exculpation Clause Bars The Trust's Claims, As There Is No Evidence
            Of Gross Negligence Or Willful Misconduct By PPAS (Trust Counts III, IV,
            And V) ...................................................................................................... 16

      B.    The Trust's Claims Fail On The Merits (Trust Counts III, IV, And V) ................. 17

            i.    PPAS Was Not Required To Remit Funds Held For Portfolio
                  Companies For Which The Funds Declared Events Of Default (Trust

Count III) ..................................................................................................... 17

ii.     PPAS Properly Amended Or Modified Loans Orally Or By Course Of Performance (Trust Count IV)..................................................................... 20

iii.    PPAS Was Not Required To Remit Funds It Received From Portfolio Companies In A Custodial Capacity (Trust Count V).................. 22

C.    There Is No Cognizable Evidence Of Trust Damages (Trust Counts III, IV And V) ......................................................................................................... 24

CONCLUSION............................................................................................................. 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .................................................................................................14

*In re Chrysler LLC*,
   405 B.R. 84 (Bankr. S.D.N.Y. 2009) .......................................................................15

*Compania Embotelladora Del Pacifica, S.A. v. Pepsi Cola Co.*,
   650 F. Supp. 2d 314 (S.D.N.Y. 2009), *aff'd*, 976 F.3d 239 (2d. Cir. 2020) ..........25

*Eaton Vance Mgmt. v. Wilmington Sav. Fund Soc., FSB*,
   2018 WL 1947405 (N.Y. Sup. Ct. 2018) .......................................................14, 16, 17

*Gaia House Mezz LLC v. State St. Bank & Tr. Co.*,
   720 F.3d 84 (2d Cir. 2013) .......................................................................................21

*Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*,
   F.4th 83 (2d Cir. 2021) .............................................................................................15

*Harold J. Rosen Tr. v. Rosen*,
   53 A.D.2d 342 (4th Dep't 1976), *aff'd*, 43 N.Y.2d 693 (N.Y. 1977) .....................21

*Ho Myung Moolsan, Co. Ltd. v. Manitou Mineral Water, Inc.*,
   2010 WL 4892646 (S.D.N.Y. 2010) .........................................................................25

*Int'l FCStone Markets v. Intercambio Mexicano de Comercio S.A. de C.V.*,
   2021 WL 1893630 (S.D.N.Y. 2021) .........................................................................18

*JN Contemporary Art LLC v. Phillips Auctioneers LLC*,
   29 F.4th 118 (2d Cir. 2022) ......................................................................................24

*Kirschner v. JPMorgan Chase Bank, N.A.*,
   2020 WL 2614765 (S.D.N.Y. 2020) .........................................................................16

*Lexington 360 Assocs. v. First Union Nat'l Bank of N.C.*,
   234 A.D.2d 187 (1st Dep't 1996) .............................................................................24

*Nem Re Receivables, LLC v. Fortress Re, Inc.*,
   173 F. Supp. 3d 1, 5 (S.D.N.Y. 2016) .....................................................................14

*Prospect Capital Corp. v. Credito Real USA Finance LLC*,
   2023 WL 7498071 (S.D.N.Y. 2023) ....................................................................14, 18

*Quadrant Structured Prods. Co. v. Vertin*,
   23 N.Y.3d 549 (2014) ...............................................................................................15

*Sadowski v. Ng*, 2022 WL 799636
   (S.D.N.Y. Mar. 15, 2022) .........................................................................................14

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

*Spinelli v. NFL*,
  96 F. Supp. 3d 81 (S.D.N.Y. 2015) ........................................................................16

*In re Tilton*, Administrative Proceedings Rulings Release No. 1182 (SEC Sept.
  27, 2017) ...............................................................................................................22

*Viacom Outdoor Inc. v. Wixon Jewelers, Inc.*,
  82 A.D.3d 604 (1st Dep't 2011) ...........................................................................24

*Vt. Teddy Bear Co. v. 538 Madison Realty Co.*,
  1 N.Y.3d 470 (2004) .............................................................................................15

**Rules**

Fed. R. Civ. P. 56(a) ....................................................................................................14

## PRELIMINARY STATEMENT

The outcome of this case is controlled by the clear and unambiguous contracts governing the parties' relationship. The Zohar Funds and Patriarch Partners Agency Services ("PPAS") were parties to dozens of Credit Agreements with borrowers known as "Portfolio Companies," which irrevocably appointed and/or authorized PPAS as Administrative Agent for certain loans. PPAS successfully performed that role for well over a decade. In June 2016, however, the Zohar Funds purported to terminate PPAS as Administrative Agent, violating the explicit language in the Credit Agreements—without even a handwave at justification—causing PPAS to file the instant lawsuit.

Summary judgment as to liability should now be granted on PPAS's contract claim, as its irrevocable appointment is clear from the face of the Credit Agreements. The Funds' successor-in-interest, the Zohar Litigation Trust-A (the "Trust"), has neither cited nor adduced any evidence that could justify this termination. It vaguely references "principles of agency law" instead, but PPAS was not the Trust's common-law agent, and the parties' contract in any event governs.

Far into the litigation, the Funds manufactured a host of new (and meritless) counterclaims—the majority of which it has since abandoned. It continues to press two of them, both for breach of the Credit Agreements. *First*, on October 9, 2017—14 months after the litigation commenced—the Funds declared purported events of default as to a number of Portfolio Companies and then demanded that PPAS turn over to the Funds all monies PPAS was holding on behalf of these companies. But it is undisputed that PPAS responded by demanding that the Funds first advance PPAS the monies necessary to wind the Portfolio Companies down, pursuant to the Credit Agreement provision (§ 9.7) permitting it to "cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished." The Funds simply refused.

*Second*, the Funds alleged that PPAS failed to remit certain other monies it received from, and was holding on behalf of, certain Portfolio Companies. The Funds subsequently characterized

1

these custodial accounts as "shadow revolvers" through which PPAS purportedly misappropriated money that belonged to the Funds.  But, as PPAS explained at the time—and has now proven—the meritless "shadow revolver" theory is a figment of the Funds' imagination:  PPAS was holding the money in a custodial capacity at the request and on behalf of the Portfolio Companies, as expressly authorized by the Credit Agreements.  All monies were distributed to and used by those companies.  Moreover, under the Credit Agreements, PPAS cannot be liable for breach of contract except in the case of "gross negligence or willful misconduct," of which the Funds have adduced no evidence.   Independently, the Funds have no cognizable contract damages because their purported expert is their only basis for such damages, while his opinions should be excluded for the reasons set forth in the accompanying *Daubert* motion.

This case has now been pending for over eight years.  The Funds—and now the Trust—have sought to elongate it at every turn, from seeking overbroad discovery to substantially amending their counterclaims three times, in hopes of finding some claim or theory that would stick.  They have failed time and again.  Discovery has now closed and the Trust's counterclaims have been thoroughly disproven.  Summary judgment of liability should be granted to PPAS on its contract claim, and the Trust's counterclaims—five of which it has abandoned, the rest defeated by the Credit Agreements and the undisputed evidence—should be dismissed with prejudice.

## BACKGROUND

I.    **Lynn Tilton Created The Zohar Funds As Vehicles To Restore Distressed Companies And Unlock Their Value**

In 2000, Lynn Tilton created Patriarch to assist financial institutions burdened by nonperforming and distressed loans on their books.  SUF ¶¶1-2.[1]  Ms. Tilton developed an

---

[1] Citations to "SUF ¶ _" refer to PPAS's Rule 56.1 Statement of Undisputed Material Fact, and citations to "Ex._" refer to the exhibits to the Declaration of Akiva Shapiro in Support of PPAS's Motion for Summary Judgment, each filed contemporaneously herewith.

innovative, patented business model that allowed investors to pool resources in a collateralized loan obligation, or "CLO," which, informed by Ms. Tilton's evaluation method, purchased or originated loans to distressed companies and provided the opportunity to profit from their increased equity value. The Portfolio Companies were often undervalued, iconic American brands. SUF ¶¶ 2-4, 17.

The CLOs at issue in the instant case—named Zohar I, Zohar II, and Zohar III (the "Zohar Funds" or the "Funds")—were created by Ms. Tilton in the mid-2000s and ultimately owned by her. SUF ¶¶ 6-8. Ms. Tilton personally contributed over $1 billion to the Funds and the Portfolio Companies, including in some instances through other investment vehicles. SUF ¶ 7. Unlike most CLOs, Ms. Tilton's entities were active partners to the Portfolio Companies, and Ms. Tilton in turn employed her business expertise to actively manage and rejuvenate these brands. SUF ¶¶ 18-19.

The Funds' unique investment strategy was heavily dependent on Ms. Tilton's ability to control the terms of repayment on the loans and the Portfolio Companies' rehabilitation from the inside—typically as the Portfolio Companies' CEO, director, and/or manager. SUF ¶¶ 18-19, 22-25. The strategy also contemplated, and all stakeholders understood, that Tilton-controlled entities would serve in various important roles in connection with the Zohar Funds, including PPAS as Administrative Agent and Patriarch Partners VIII, XIV and XV (collectively, "Patriarch Partners"), respectively, as collateral manager for each Zohar Fund. SUF ¶¶ 14-15, 36-37. The Funds' structure was therefore built on an understanding among all stakeholders that Ms. Tilton would wear many hats with respect to the Zohar Funds and Portfolio Companies. SUF ¶¶ 24-25, 32. In her role as manager, director, and/or CEO of each of the Portfolio Companies, Ms. Tilton was the ultimate decisionmaker for each company from an internal company-governance perspective. *Id.*

**II.    PPAS Served As The Zohar Funds' Irrevocably Appointed Administrative Agent Pursuant To Credit Agreements With The Funds And Portfolio Companies**

PPAS served as Administrative Agent for the loans issued by the Funds.  SUF ¶ 38. Specifically, from the Funds' creation through 2019, PPAS was the "irrevocably appointed Agent" under each Credit Agreement entered into among PPAS, the Zohar Funds as lenders,[2] and the Portfolio Companies as borrowers.  SUF ¶¶ 46-47; *see, e.g.*, Ex. 11 (Croscill Agmt.) § 9.1, 9.2.[3] Consistent with its irrevocable appointment, no provision in the Credit Agreements authorizes the involuntary removal of PPAS as Administrative Agent.  SUF ¶ 48.  Instead, the provision establishing requirements and a process for the appoint of a replacement Administrative Agent is triggered only when PPAS voluntarily "resign[s]."  SUF ¶ 54; Ex. 11 § 9.8.

Pursuant to the Zohar Funds' intended strategy of centralized management and control, and to keep costs low for the already-distressed Portfolio Companies, instead of using a commercial bank, Ms. Tilton created PPAS as a Patriarch-affiliated entity to administer the loans and serve in a custodial (banking-like) function in holding loaned and drawn down funds on behalf of the Portfolio Companies.  SUF ¶¶ 19, 24-26, 33-35, 60-61; Ex. 11 § 9.5.

Administrative agents like PPAS typically have three roles: money movement, documentation (*e.g.*, documenting lender's commitments and the amounts owed to each lender), and information flow (*e.g.*, providing lenders with information from borrowers).  SUF ¶¶ 40-44. PPAS performed each role, *see id.*, although only the money movement role is relevant to the issues remaining in this case.  As part of that role, PPAS invoiced the Portfolio Companies for interest and principal payments due on their loans, collected payments and prepayments of interest

---

[2] The Zohar Funds were not the sole lenders to the Portfolio Companies.  *See* SUF ¶¶ 41-45.

[3] As the Credit Agreements are materially the same in relevant parts, the parties have used the Croscill Credit Agreement as an exemplar throughout this litigation.  Where differences are relevant and material they will be noted. As the Trust has not specified which Portfolio Companies are at issue in its counterclaim IV, PPAS has submitted contemporaneously with this Motion copies of all potentially relevant Credit Agreements and Amendments.

and principal from them, and distributed those payments to their lenders.  SUF ¶¶ 41, 63-64.

Irrevocable appointment of administrative agents, like PPAS, is "common practice" in the industry.  Ex. 8 (Van Zijl Report) ¶¶ 16, 42; *see also* Ex. 13 (Lorry Report) ¶ 32 n.38 (citing model credit agreement); SUF ¶ 49.[4]  Irrevocable appointments "ensure that no lender will later question the administrative agent's continuing authority."  Ex. 8 ¶ 50; *see also* SUF ¶ 50.  Administrative agents are also customarily indemnified by lenders because the modest fees they earn are not intended to, and would not, cover the risks that come with providing or administering large loans.  SUF ¶¶ 56, 59; Ex. 8 ¶ 69; Ex. 13 ¶¶ 36-37.  Without such indemnification, no administrative agent would agree to the role under customary payment terms.  Ex. 8 ¶ 73.  For similar reasons, an administrative agent is not customarily a fiduciary to the lenders.  *Id*. ¶ 65; SUF ¶ 58.

PPAS was typically entitled to $75,000 annually for its services under each Credit Agreement, though it sometimes deferred its compensation for the Portfolio Companies' benefit.  SUF ¶¶ 51-52, 66-67.  Under the Credit Agreements, PPAS was indemnified by the Funds for its work as Administrative Agent, which included the right for PPAS to "call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished," it did not owe the Funds any fiduciary duties, and it could not be held liable for breach of contract except in the case of "gross negligence or willful misconduct."  SUF ¶¶ 55, 59; Ex. 11 (Croscill Agmt.) § 9.7.

### III.    PPAS Oversaw The Zohar Funds' Various Loan Commitments To The Portfolio Companies, Including Facilitating Payments Of Principal And Interest

The Funds made loan commitments to the Portfolio Companies via their respective credit facilities.  Specifically, they extended three types of loans: Term Loans, Delayed Draw Term

---

[4] PPAS has moved to exclude the Trust's damages expert, David Lorry, including because he is unqualified and did not employ generally accepted or reliable methodologies.  PPAS cites to Mr. Lorry's opinions as additional support only where they accord with the undisputed facts, but it does not rely on any of his opinions.

Loans ("DDTLs") and Revolving Loans ("Revolvers").  A Term Loan, like a standard consumer loan, is a loan in which the borrowed money is transferred in full to the Portfolio Company at the outset.  A DDTL, on the other hand, allows the Portfolio Companies to borrow incrementally over time up to a predetermined maximum amount committed by the Funds.  Interest for a DDTL is based on the amount of money that has actually been borrowed, or "drawn down," *i.e.*, the Portfolio Company does not pay interest on the entire amount committed if only a portion of the loan commitment has been borrowed.  DDTL borrowers cannot reborrow funds that have been repaid.  Finally, a Revolver allows Portfolio Companies to borrow up to a specified amount, pay back part of what they have borrowed, and then reborrow more.  And like a credit card, the borrower only owes interest as to the amount that is currently borrowed, but not the total balance that is available.  *See* SUF ¶¶ 90-96; Ex. 28 (Van Zijl Rebuttal Report) ¶ 20.

Pursuant to the Credit Agreements, the Portfolio Companies were required to make interest and principal payments to the Funds.  Ex. 11 (Croscill Agmt.) § 2.14.  Any principal or interest payments received from the Portfolio Companies were specifically denominated and PPAS always remitted them to the Funds, as reflected in the records of the Funds' Trustee, U.S. Bank.  SUF ¶¶ 63-64.  However, under the Credit Agreements, only such loan payments received by PPAS were required to be remitted to the Funds.  SUF ¶¶ 62-63; *see, e.g.*, Ex. 11 § 2.9.  Indeed, the Credit Agreements explicitly contemplated and permitted movements of other funds between the Portfolio Companies and PPAS, authorizing PPAS to "accept deposits from" and "engage in any kind of banking, trust, financial advisory or other business with" the Portfolio Companies, including holding drawn down funds on their behalf.  Ex. 11 § 9.5; *see also* SUF ¶ 60.  This custodial relationship was a logical extension of and essential tool in Ms. Tilton's active management of the Portfolio Companies' cash usage and related efforts to ensure the Portfolio

Companies' "financial discipline."  Ex. 12 (Tilton) at 119:3-8; *see also* SUF ¶¶ 104-105.

**IV.    After Patriarch Partners Resigned As Collateral Manager In March 2016, AMZM Replaced It And Conducted A Comprehensive Credit Agreement Review**

Patriarch Partners served as the Funds' collateral managers from their inception through March 2016.  SUF ¶¶ 15, 75-76.  At that time, and at Ms. Tilton's direction, Patriarch Partners voluntarily resigned, and Alvarez & Marsal Zohar Management, LLC ("AMZM") became the collateral manager.  SUF ¶¶ 76-77.  AMZM then undertook a comprehensive project to review all of the Credit Agreements between the Zohar Funds and each Portfolio Company.  SUF ¶¶ 84-89. This project was overseen by senior AMZM employees, including Elizabeth LaPuma.  SUF ¶¶ 78-83; Ex. 23 (LaPuma) at 133:12-135:3.  The purpose of this review was to "summariz[e] the relevant agreements and their relevant terms, . . . understand[] the agreement[s] and understand[] if [AMZM] w[as] going to negotiate a new . . . debt agreement for the company when they were restructuring."  Ex. 24 (Daversa) at 38:13-20, 72:17-25; *see* SUF ¶¶ 85-86.  AMZM employees used their "judgment" to determine "what categories of provisions from the Credit Agreement(s) to include" in spreadsheets summarizing each Portfolio Company's Credit Agreement, which spreadsheets were sent to LaPuma for her review.  Ex. 23 (LaPuma) at 161:14-25, 164:2-8; *see also* SUF ¶¶ 86-87.  As part of this project, AMZM analyzed nearly all of the contract provisions at issue in this case and confirmed its contemporaneous understanding of them.  SUF ¶¶ 87-89.

**V.    The Portfolio Companies Deposited Borrowed Money With PPAS And Ms. Tilton Diligently Managed That Money In Her Role At Each Portfolio Company**

Between mid-2015 and early 2016, certain Portfolio Companies elected to draw down money from the Funds under their DDTLs and Revolvers.  SUF ¶¶ 97-98.  They did so out of an abundance of caution because "they needed this money," and determined the "cost benefit of paying interest and having access to [this money]" favored fully drawing down committed funds. Ex. 12 (Tilton) at 133:17-23.  Pursuant to the Credit Agreements, it was understood by all parties

that this funding was committed to the Portfolio Companies regardless of the transition in collateral manager. *See* SUF ¶¶ 101, 103. Some Portfolio Company requests were made while Patriarch Partners was still the collateral manager, and others were made after AMZM took over. SUF ¶¶ 97-102. All such drawdown requests were approved by the collateral manager at the time, on the Funds' behalf, and were forwarded to U.S. Bank as the Trustee, and reflected in U.S. Bank's records as drawdowns by the respective Portfolio Companies. SUF ¶¶ 97-103, 106.

Once the Portfolio Companies drew down their credit facilities, they elected to deposit their money with PPAS, SUF ¶ 100, which was expressly authorized to "accept [those] deposits" and hold them on behalf of the Portfolio Companies. Ex. 11 (Croscill Agmt) § 9.5. The deposited funds belonged to the Portfolio Companies. SUF ¶¶ 60, 103; *see* Ex. 33 (TRUSTEE_AP378984) at 985 ("They are the company's funds. They are available."); Ex. 12 (Tilton) at 71:12-20. Once a drawdown from the Funds took place, the Portfolio Companies would "[s]tart paying interest as well as put that liability on their balance sheet." Ex. 12 at 132:8-13; SUF ¶¶ 106-107. Each draw down was disclosed to the respective Portfolio Company's auditors and reflected on its audited financial statements as a loan made to the company. SUF ¶ 107. While initially held by PPAS on behalf of the Portfolio Companies, all the drawn down money was eventually transferred to the Portfolio Companies. SUF ¶ 108.

Due to the distressed nature of the Portfolio Companies, Ms. Tilton, in her capacity as each of their CEO, manager, and/or director, has never provided their employees with unrestricted access to loan proceeds. SUF ¶¶ 104-105; Ex. 12 at 38:24-39:16. Instead, since the Funds' inception, Ms. Tilton has required the Portfolio Companies' management to explain the basis for any request to use loan proceeds and determined whether to approve or deny each such request. SUF ¶¶ 104-105; *see* Ex. 12 at 32:12-19. Ms. Tilton's decision to have PPAS hold certain

companies' money in a custodial capacity facilitated this fiscal discipline and oversight.

**VI.    The Zohar Funds Purport To Terminate PPAS As Administrative Agent**

Despite PPAS's irrevocable appointment as Administrative Agent, and the absence of any provision authorizing or contemplating PPAS's involuntary removal, the Funds (through AMZM) purported to terminate PPAS under 38 Credit Agreements on June 14, 2016.  SUF ¶¶ 109-110; Exs. 37-38 (the "Termination Letters").  The Termination Letters also purport to notify PPAS and the Portfolio Companies that Alvarez & Marsal Zohar Agency Services, LLC ("AMZAS")—an entity AMZM formed in anticipation of its efforts to remove PPAS—would serve as PPAS's successor.  SUF ¶¶ 110-112; Ex. 39.  The Termination Letters do not identify any alleged wrongdoing by PPAS.  SUF ¶ 113.  Instead, they merely assert, without further explanation: "Pursuant to applicable law, the Zohar Funds have the right to terminate PPAS as Agent upon reasonable notice notwithstanding any provision in the Credit Agreement to the contrary."  Ex. 38; SUF ¶ 114.

Following that purported termination, AMZAS improperly held itself out as the Administrative Agent for the Funds, including by contacting Portfolio Companies and demanding that payments under the Credit Agreements be remitted to AMZAS.  SUF ¶¶ 110-112, 116; Ex. 148.  However, no such payments were ever remitted to AMZAS; instead, PPAS continued to serve in the role of administrative agent and to perform all of the functions of the Administrative Agent.  SUF ¶¶ 121-124.

Neither the Funds nor AMZAS complied with or satisfied the requirements set out in the Credit Agreements for a replacement Administrative Agent (which, as noted, was contemplated only if PPAS voluntarily resigned).  SUF ¶¶ 115-116.  For example, had PPAS "resign[ed]," most of the Credit Agreements required its successor to "accept[] the appointment in writing" in order to be "deemed . . . appointed."  Croscill § 9.8(a), (c).  There was no such written acceptance.  *Id.*

Moreover, AMZAS was unprepared and unable to fulfill the obligations required of the Administrative Agent. SUF ¶ 117. For example, AMZAS did not have "the ability to generate and send invoices to the portfolio companies" when it purported to take over as administrative agent, nor was the bank account to which it instructed the Portfolio Companies to send payments ever opened. Ex. 25 (Cover) at 86:4-22, 141:18-142:14; *see also* SUF ¶ 117. AMZAS sought to hire a sub-agent to perform these functions on its behalf, but its engagement letter was never executed. SUF ¶¶ 118-119; Ex. 25 at 96:18-97:13.

**VII.    PPAS Immediately Seeks Redress For Unlawful Removal As Administrative Agent**

On June 15, 2016, one day after PPAS was purportedly terminated, it commenced the instant action against the Funds, AMZM and AMZAS. SUF ¶ 120; Dkt. 1. Defendants sought leave to seek an injunction barring PPAS "from holding itself out as the Zohar Funds' agent," Dkt. 31, and at the pre-motion conference this Court instructed that PPAS should continue in its role as Administrative Agent pending resolution of the lawsuit and denied as moot the Funds' request to move for a preliminary injunction, SUF ¶¶ 121-124.

On January 13, 2017, Defendants filed counterclaims for breach of contract, breach of fiduciary duty, conversion, and for declaratory relief. Dkt. 48. PPAS subsequently moved to dismiss the Funds' counterclaims, Dkt. 90, which this Court granted in part, dismissing the breach of fiduciary duty claim on the grounds that the Funds had failed to allege any breach that was distinct from alleged breaches of the Credit Agreements, Dkt. 91. Defendants subsequently amended their pleadings twice, Dkt. 96, 179, but did not re-plead breach of fiduciary duty.

In their final, operative pleading, Defendants asserted seven counterclaims. Dkt. 179. While all seven counterclaims continue to be live, the Trust has represented that it is pursuing only two of them, both for breach of contract—Count III, for PPAS's alleged failure to deliver to the Funds the Portfolio Companies' monies following the Funds' October 9, 2017 declaration of

events of default as to certain Portfolio Companies, Dkt. 179 ¶¶ 76-83, and Count V, for PPAS's refusal to transfer to the Funds monies that PPAS received from and was holding for certain Portfolio Companies in a custodial capacity pursuant to Section 9.5 of the Credit Agreements, *id.* ¶¶ 90-95.  In addition, the Trust's expert opined on issues relevant only to Count IV, concerning the purported wrongful amendment and/or modification of the Credit Agreements.  *Id.* ¶¶ 84-88; Ex. 13 (Lorry Report) ¶¶ 76-77.  Accordingly, PPAS briefs herein Counts III, IV and V.

## VIII.    The Zohar Funds Declare (And Then Suspend) Events Of Default

On October 9, 2017—14 months into the instant litigation—the Funds (through AMZM) conveyed to PPAS a declaration of events of default for a number of Portfolio Companies, 12 of which are put at issue by the Trust's Count III.[5]  SUF ¶¶ 125-126; Ex. 13 (Lorry Report) ¶¶ 3, 90 n.143.  The basis for these declarations was that the Portfolio Company had purportedly "not met [their] obligations to pay interest for one or multiple periods."  Ex. 41 (Default Letters).  AMZM instructed PPAS to declare their "unpaid principal, interest, and any other Obligations immediately due and payable" and, "[i]f necessary," to "exercise all applicable rights or remedies" under the Credit Agreements.  Ex. 41 (Default Letters); *see also* SUF ¶¶ 125-126, 131.

In response, Ms. Tilton advised AMZM that it was "not prudent to sell or liquidate certain of the[] companies such as Scan Optics, 180s, IMG/Dana, Croscill and Natura," because those companies would "garner greater value if allowed additional time to strengthen and then be sold in the ordinary course and not in a fire sale default and liquidation."  Ex. 42 (Oct. 17, 2017 Tilton Ltr.).  Ms. Tilton also sought clarification as to whether AMZM was demanding that PPAS "send notices of default and acceleration" to the companies and "begin the process of foreclosure to sell or liquidate the companies."  *Id.*  And Ms. Tilton, implicitly invoking the Credit Agreements'

---

[5] The 12 Portfolio Companies put at issue in Count III of the Trust's Counterclaims are 180s, Acme, Best Textiles, Croscill, Hartwell, IMG/Dana, Natura, Netversant, Remco, Scan-Optics, Silverack, and Spiegel.  SUF ¶ 126.

indemnification provision, demanded that the Funds advance "wind-down costs of $2 million per company," before she would take any further action.  *Id.*; *see also* SUF ¶¶ 132-136.

AMZM "agree[d] to hold in abeyance [the] October 9 instructions" as to Scan Optics, 180s, IMG/Dana, Croscill and Natura, but clarified it was "declar[ing] all unpaid principal, interest, and any other Obligations immediately due and payable" for the other companies.  Ex. 43 at 1-2; *see also* SUF ¶¶ 128-131.  AMZM refused to advance to PPAS the requested wind-down costs, claiming that "[n]othing in the Credit Agreements permits PPAS to condition its compliance with its contractual obligations on its first receiving an advance of its expenses . . ."  Ex. 43 at 1; *see also* SUF ¶¶ 134-138.

The parties then exchanged a series of letters, with Ms. Tilton repeatedly citing the relevant indemnification provision (§ 9.7) and demanding that the Funds provide the required upfront coverage of wind-down costs before PPAS would take any action, and AMZM repeatedly refusing to do so.  SUF ¶¶ 59, 136-138.  Amid this exchange, in a November 10, 2017 letter, AMZM demanded that "PPAS . . . remit all funds and deposits of the Defaulted Companies that it is holding" and, without citing any specific provision, baldly asserted that "[e]ach of the Credit Agreements expressly provide [sic] for PPAS to turnover [sic] any such funds being held for portfolio companies in default" as "[t]his money belongs to the Funds and must be used to repay the Defaulted Companies' obligations to the Zohar Funds."  Ex. 47 at 2-3; *see* SUF ¶¶ 139-140.  AMZM did not explain the basis for these assertions.  *Id.*  In subsequent correspondence, PPAS did not engage with this demand, and AMZM did not reiterate it.[6]

---

[6] In October 2017, the Funds also demanded that "PPAS immediately . . . wire to the Trustee for the Zohar Funds all funds being held in any PPAS account that have been received from, or are purportedly held for the benefit of any of the Defaulted Borrowers."  Ex. 149 (Oct. 15, 2017 Ltr.).  PPAS responded that the Funds' "letter rests on a fundamental misunderstanding of the nature of the funds being held by PPAS and the plain terms of the relevant credit agreements," and explaining that "PPAS is merely holding such funds for the benefit of the Portfolio Companies, as it is permitted

In a final letter, Ms. Tilton noted that "AMZM has prudently elected *not* to reinstate its October 9 instructions as to Scan Optics, 180s, IMG/Dana, Croscill and Natura." Ex. 44. AMZM did not respond. SUF ¶¶ 129-130; *see* Ex. 23 (LaPuma) at 284:10-286:8.

## IX.    The Zohar Funds File For Bankruptcy Protection

On March 11, 2018, the Zohar Funds filed Chapter 11 cases in bankruptcy court. *See In re Zohar III Corp.*, No. 18-10512 (Bankr. D. Del.). That filing stayed the instant case. In March 2019, Ankura Trust Company, LLC, was appointed to replace PPAS as the Funds' Administrative Agent (even as PPAS remained agent for other lenders) pursuant to an agreement in the bankruptcy action. This mooted the parties' respective claim (Count I) and counterclaim (I) for a declaration as to the proper Administrative Agent. The Funds' bankruptcy plan was confirmed on August 2, 2022, and on September 22, 2022, upon the parties' agreement, this Court lifted the automatic stay of this action. Dkt. 224. The parties stipulated to the dismissal of AMZAS and AMZM, as well as the dismissal of PPAS's Count III, which was asserted only against those entities. Dkt. 246. The Trust succeeded to the Funds' interests and was substituted for them as defendant and counterclaimant in this action on November 10, 2022. Dkt. 236. The parties then proceeded to complete discovery. *See* SUF ¶¶ 141-146.

PPAS now moves for summary judgment of liability on its remaining claim (Count II) for damages resulting from the improper dismissal of PPAS as Administrative Agent; asks the Court to formally dismiss as moot Count I and Counterclaim I; and moves for summary judgment of dismissal with prejudice of all remaining counterclaims (II-VII), all but two of which (Counterclaims III & V) the Trust is no longer pursuing, *see* Dkts. 300 & 301.

---

to do pursuant to the credit agreements." Ex. 150 (Oct. 17, 2017 Ltr.). Because "[t]hese funds, while held by PPAS, are funds that belong[ed] to the Portfolio Companies, not the Zohar Funds," PPAS explained that it "d[id] not have the authority to remit them to the Zohar Funds upon your unilateral demand," and accordingly refused to do so. *Id.* The Funds unsuccessfully sought a temporary restraining order and preliminary injunction regarding this issue, Dkt. 146, and later amended its counterclaims on December 21, 2017, Dkt. 179.

## LEGAL STANDARD

Summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and it may not rely on conclusory allegations or unsubstantiated speculation." *Nem Re Receivables, LLC v. Fortress Re, Inc.*, 173 F. Supp. 3d 1, 5 (S.D.N.Y. 2016). At summary judgment, "the time has come" for the non-movant "to put up or shut up." *Sadowski v. Ng*, 2022 WL 799636, at *3 (S.D.N.Y. Mar. 15, 2022) (Marrero, J.). As all claims at issue relate to the Credit Agreements, New York law applies. Ex. 11 (Croscill Agmt.) § 10.10.

## ARGUMENT

**I.    The Zohar Funds Breached The Credit Agreements' Irrevocable Appointment And/Or Authorization Of PPAS As Administrative Agent (PPAS Count II)**

The Funds' purported termination and removal of PPAS as the Administrative Agent breached the Credit Agreements, which provided that PPAS's appointment and/or authorization as administrative agent was irrevocable. The Court should grant summary judgment of liability to PPAS and proceed to a trial on PPAS's damages.

The Credit Agreements' "complete, clear and unambiguous" provisions "must be enforced according to the plain meaning of [their] terms." *Prospect Capital Corp. v. Credito Real USA Finance LLC*, 2023 WL 7498071, at *3 (S.D.N.Y. 2023). Because the Funds "expressly agree[d] to delegate [certain rights] to an agent" they should be held "to their bargain." *Eaton Vance Mgmt. v. Wilmington Sav. Fund Soc., FSB*, 2018 WL 1947405, at *6 (N.Y. Sup. Ct. 2018). The Credit Agreement's provisions making clear PPAS's appointment and/or authorization as Administrative

14

Agent was irrevocable must be enforced.

All 38 Credit Agreements provide for the irrevocable appointment and/or authorization of PPAS.  SUF ¶¶ 46-47.  Each states either that "PPAS is hereby ***irrevocably*** appointed the Administrative Agent hereunder," that the Funds "***irrevocably*** authorize[d] the Agent" to act on their behalf, or both.  Croscill §§ 9.1, 9.2.  Such clauses are "common practice" in the industry.  Ex. 8 (Van Zijl Report) ¶¶ 16, 42; *see also* Ex. 13 (Lorry Report) ¶ 32 n.38 (citing model agreement with irrevocable appointment); *In re Chrysler LLC*, 405 B.R. 84, 101 (Bankr. S.D.N.Y. 2009) (credit agreement "irrevocably designated the Administrative Agent").[7]  Moreover, the Credit Agreements contain detailed provisions regarding PPAS's right to "resign at any time," and the Funds' "right to appoint a successor" in that scenario, but not for PPAS's involuntary removal.  Ex. 11 (Croscill Agmt.) § 9.8.  Thus, as the Trust concedes, the Credit Agreements "purported to 'irrevocably authorize[]' PPAS to act as the Administrative Agent, ***with no provision for PPAS's removal, whether for cause [or] otherwise***."  Dkt. 179 ¶ 32.  It is black-letter law that "if parties to a contract omit terms—particularly, terms that are found in other, similar contracts—the inescapable conclusion is that the parties intended the omission."  *Quadrant Structured Prods. Co. v. Vertin*, 23 N.Y.3d 549, 560 (2014); *accord Vt. Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004).  The record is clear: PPAS's appointment was irrevocable.[8]  Therefore,

---

[7] Industry custom and usage "is considered, as needed," unlike extrinsic evidence of parties' subjective intent, which is "generally inadmissible."  *Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, F.4th 83, 94-95 (2d Cir. 2021).

[8] Even if there were any ambiguity, evidence beyond the four corners of the contract confirms that the parties understood PPAS's appointment to be irrevocable.  AMZM's internal documents acknowledge that "Agent may resign, but there is no removal right; Lenders appoint Agent 'irrevocably.'"  SUF ¶ 88; Ex. 27 at 21, 31, 46, 84.  AMZM also noted Credit Agreements amendments "add[ed] the word 'irrevocably'" to the appointment provisions.  SUF ¶ 88; Ex. 27 at 58, 59.  AMZM's corporate representative admitted that the Credit Agreements contained no removal rights, which is why AMZM was unable to cite contractual language when purporting to terminate PPAS.  Ex. 23 (LaPuma Dep.) at 146:14-18, 205:9-208:5.  Moreover, AMZM admitted in letters to the Portfolio Companies that the Credit Agreements "purport to make PPAS's appointment as Agent irrevocable," Ex. 41 (Oct. 9, 2017 Letters), and its termination letters to PPAS likewise acknowledged the absence of "any provision in the Credit Agreement[s]" authorizing PPAS's termination, Exs. 37-38 (Termination Letters).

the Trust's purported removal of PPAS violated the Credit Agreements.[9]

## II. Summary Judgment Should Be Granted Dismissing All Of The Trust's Counterclaims For Multiple Independent Reasons

The Court should grant summary judgment dismissing all of the Trust's counterclaims. Counts II, VI, and VII should be dismissed with prejudice because the Trust is no longer pursuing them, thus effectively conceding their lack of merit.[10]  Count I should be dismissed as moot.  And Counts III, IV, and V should be dismissed for the multiple independent reasons set forth below.

### A. The Exculpation Clause Bars The Trust's Claims, As There Is No Evidence Of Gross Negligence Or Willful Misconduct By PPAS (Trust Counts III, IV, And V)

PPAS is entitled to judgment on Counts III, IV, and V alleging breaches of contract because the Credit Agreements state that PPAS is not "liable to the Lenders for any action taken or omitted by" PPAS "except to the extent caused by the Agent's gross negligence or willful misconduct." Ex. 11 (Croscill Agmt.) § 9.4.  Such exculpation provisions are common.  Ex. 8 (Van Zijl Report) ¶¶ 74-76; Ex. 13 (Lorry Report) ¶ 35, n.45, ¶ 36 n.47, ¶ 37 n.48; *see also Eaton Vance*, 2018 WL 1947405, at *2 (indemnifying administrative agents for acts not involving "gross negligence or willful misconduct" is a "classic broad exculpatory clause").  And the Trust has acknowledged that "the mere fact of there being a breach may not be sufficient to establish liability for that

---

[9] The Trust's only contemporaneous or subsequent purported justification for its violation of the irrevocable appointment provisions is vague assertions of agency law.  Exs. 37-38 (Termination Letters).  But this Court has already explained "it is doubtful that an agency relationship existed between PPAS and the Zohar Funds," Dkt. 91 at 15, as parties to an agreement can contractually disavow the applicability of general agency principles, *see, e.g.*, *Spinelli v. NFL*, 96 F. Supp. 3d 81, 133 (S.D.N.Y. 2015).  The Credit Agreements did so here in disclaiming for PPAS any duties or responsibilities other than those "expressly set forth" therein. Ex. 11 (Croscill Agmt.) § 9.2.  Indeed, it is common for credit agreements to provide that common-law agency or fiduciary relationships do not exist between administrative agents and lenders.  Ex. 8 (Van Zijl Report) ¶ 65.  Such terms are routinely enforced, because courts "cannot impose a broader agency relationship than that to which the parties agreed in their contract." *Kirschner v. JPMorgan Chase Bank, N.A.*, 2020 WL 2614765, at *14-15 (S.D.N.Y. 2020).  General principles of agency law do not override the parties' express agreement to appoint PPAS irrevocably.  *See Eaton Vance*, 2018 WL 1947405, at *6.

[10] The Trust and/or its predecessor-in-interest pursued discovery relating to these counterclaims as recently as Ms. Tilton's May 10, 2023 deposition, *see, e.g.*, Ex. 12 (Tilton) at 317:10-321:11, forcing PPAS to expend resources (including in discovery) defending against them and demonstrating their lack of merit.  Under FRCP 41, at this stage the Trust cannot voluntarily dismiss these counterclaims without leave of the Court or PPAS's agreement.  In fairness, after forcing PPAS to litigate them to this point, the Trust should not be given a second bite at the apple in this or any other forum.  Accordingly, these counterclaims should be dismissed with prejudice.

breach" and "gross negligence and recklessness may be required" to hold PPAS liable because "under the credit agreements there is an exculpation provision." Dkt. 197 at 22:20-25, 23:1-2. Yet the Trust neither alleges such conduct nor has it adduced any evidence of the same.

That the Trust failed to even plead that the alleged breaches involved gross negligence or willful misconduct, Dkt. 179 ¶¶ 76-95, is reason enough to find against the Trust, *Eaton Vance*, 2018 WL 1947405, at *5 (granting motion to dismiss on "this dispositive issue" where "[n]either gross negligence nor willful misconduct are alleged"). Indeed, this Court recognized that such an exculpation provision could have supported dismissal on the pleadings but declined to dismiss these claims because neither party submitted the Credit Agreements in their entirety in connection with PPAS's motion to dismiss. Dkt. 91 at n.3. The Court now has those agreements. Moreover, the record precludes finding gross negligence or willful misconduct. Mere "ordinary negligence" would be "excused" by the "exculpatory clause," *Eaton Vance*, 2018 WL 1947405, at *5, but there is no evidence of even that. PPAS at all times acted in accord with its good-faith understanding of its and others' rights and duties. The Trust has adduced no contrary evidence.

### B. The Trust's Claims Fail On The Merits (Trust Counts III, IV, And V)

#### i. PPAS Was Not Required To Remit Funds Held For Portfolio Companies For Which The Funds Declared Events Of Default (Trust Count III)

On October 9, 2017, the Funds declared events of default for multiple Portfolio Companies and subsequently demanded that PPAS transfer to it *all* of the Portfolio Companies' monies in PPAS's custody. Count III alleges that PPAS breached the Credit Agreements in failing to deliver the Portfolio Companies' monies to the Funds. But PPAS responded by demanding that the Funds first advance the money needed to cover the costs of winding down the Portfolio Companies because under the Credit Agreement such costs were the Funds' responsibility, not PPAS's. *See* Dkt. 179 ¶¶ 76-83. Because the Funds refused to do so, PPAS was permitted to "cease, or not

commence, to do the acts indemnified against." Ex. 11 (Croscill Agmt.) § 9.7.  Refusing to comply with the Funds' directive absent indemnification did not violate the Credit Agreements.  SUF ¶ 59. Regardless, the Funds also withdrew the event of default declarations for five of Portfolio Companies, eliminating 93% of the supposed damages associated with Count III and leaving at most $850,000 in purported damages.  SUF ¶¶ 128-130; Ex. 13 (Lorry Report) at Fig. 5.

a)    <u>PPAS Properly Sought Indemnification Before Incurring Expenses</u>

PPAS is entitled to summary judgment on Count III because the Credit Agreements allowed PPAS to obtain indemnification **before** incurring costly wind-down expenses.  The Funds were required to indemnify PPAS "for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including attorneys' fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against" PPAS "in exercising its powers, rights and remedies or performing its duties . . . in its capacity as the Agent in any way relating to or arising out" of the Credit Agreements.  Ex. 11 (Croscill Agmt.) § 9.7.  And, "[i]f any indemnity furnished to the Agent for any purpose shall, ***in the opinion of*** PPAS, ***"be insufficient," then PPAS could "call for additional indemnity and cease, or not commence, to do the acts . . . until such additional indemnity is furnished***."  *Id.*  Until its request for indemnification was satisfied—which it never was—PPAS was not required to comply with the Funds' demand.  Therefore, there was no breach.

Given this provision, PPAS did not need to take any action if—in PPAS's "opinion"—it needed more money from the Funds to cover the costs of such action.  This provision "is complete, clear and unambiguous" and therefore "must be enforced according to the plain meaning of its terms."  *Prospect Capital*, 2023 WL 7498071, at *3.  And because it provided discretion to PPAS, courts should defer to PPAS's judgment.  *Int'l FCStone Markets v. Intercambio Mexicano de Comercio S.A. de C.V.*, 2021 WL 1893630, at *1 (S.D.N.Y. 2021).  The Trust cannot now second

18

guess the Credit Agreement's plain language as it was up to PPAS, and PPAS alone, to determine whether its indemnification was sufficient.[11]

AMZM's corporate representative recognized that certain wind-down costs are unavoidable, Ex. 23 (LaPuma) at 249:9-25, but the Portfolio Companies could not afford them. PPAS therefore responded to the default letters by invoking its right to demand advancements sufficient to pay for the Portfolio Companies' winding down.  Ex. 42 (Oct. 17, 2017 Ltr.).  The Funds nevertheless refused PPAS's request and instead denied—without explanation—that the indemnification provision was enforceable.  SUF ¶¶ 136-140.  Once PPAS's demand was refused, any obligation PPAS may otherwise have had to take further action was suspended by the plain terms of the Credit Agreements: PPAS "call[ed] for additional indemnity" and was therefore entitled to "cease, or not commence, to do the acts indemnified against until such additional indemnity [was] furnished," which it never was.  Ex. 11 (Croscill Agmt.) § 9.7; *accord* Ex. 12 (Tilton) at 269:18-270:24.

AMZM was well aware of PPAS's indemnification rights, which AMZM paraphrased as allowing PPAS to "call for additional indemnity if in the opinion of the Agent, the indemnity is insufficient or becomes impaired."  Ex. 27 (Credit Agreement Review Project Template) at 21, 31, 46, 84.  Indeed, such indemnifications are "consistent with the notion that administrative agents should be reimbursed for any out-of-pocket expenses they are forced to incur" because they are not expected to take on risk disproportionate to the minimal agency fees they are paid to cover the cost of servicing loans.  Ex. 8 (Van Zijl Report) ¶ 77.  The Credit Agreements therefore allowed PPAS to exercise its judgment to demand indemnity prior to incurring expenses to comply with

---

[11] In any event, at the time only two Portfolio Companies had more than $2 million from which their wind downs could have potentially been funded, while Best Textiles had less than $500, for example, and Spiegel had just over $2,000.  Ex. 13 (Lorry Report) at Fig. 5.  Moreover, the money belonged to the Portfolio Companies.  PPAS had no right (let alone, responsibility) to raid the companies' operating accounts at the Funds' request.  *See infra* Section B.iii.

the Funds' instructions. It did just that. SUF ¶ 136.[12]

> b)    Event Of Default Claims Are Unavailable As To The Withdrawn
> Requests For Five Portfolio Companies

At minimum, the Trust cannot pursue Count III as to the Portfolio Companies for which the events of default were withdrawn. Ms. Tilton responded to the default letters by explaining that it was "not prudent to sell or liquidate" Scan Optics, 180s, IMG/Dana, Croscill or Natura because they would "garner greater value if allowed additional time to strengthen and then be sold in the ordinary course and not in a fire sale default and liquidation situation." Ex. 42 (Oct. 17, 2017 Ltr.). In response, the Funds (through AMZM) agreed to "hold in abeyance" the default as to those companies. Ex. 43 (Oct. 23, 2017 Ltr.). Ms. Tilton then confirmed that "AMZM has prudently elected not to reinstate its October 9 instructions as to" them, making it "not necessary" for their wind-down costs to be advanced to PPAS. Ex. 44 (Feb. 16, 2018 Ltr.) at 2. The Funds did not disagree with Ms. Tilton's confirmation, or otherwise respond. *See* SUF ¶¶ 127-130. Because the Funds agreed to hold in abeyance, and did not reinstate, the defaults as to these five portfolio companies, *id.*, PPAS is entitled to summary judgment on Trust Count III at least as to them.[13] This reduces the purported damages associated with this count by 93%—from $12.6 million to only $850,000. SUF ¶¶ 128-130; Ex. 13 (Lorry Report) at Fig. 5.

> **ii.    PPAS Properly Amended Or Modified Loans Orally Or By Course Of
> Performance (Trust Count IV)**

In its Count IV, the Trust alleges that PPAS impermissibly amended or modified the terms

---

[12] At minimum, PPAS's alleged breach was clearly not grossly negligent or willful misconduct. Rather, PPAS engaged with AMZM, expressed willingness to comply with the Funds' demands, and cited contract provisions that entitled it to an advancement of the money needed to accomplish what the Funds demanded of it before it would take any further action. The Funds flatly refused, and PPAS in good faith therefore did not take further action.

[13] Even if there were any dispute as to whether the Funds withdrew these declarations of default, at minimum PPAS expressed its understanding that AMZM had elected not to reinstate those defaults and this understanding stood unrebutted. SUF ¶¶ 127-130. These facts doom Count III as to these Portfolio Companies because, at worst, PPAS misunderstood the Funds' intention, made that misunderstanding clear, and was never corrected. SUF ¶ 130. That cannot constitute gross negligence nor willful misconduct as to these five Portfolio Companies.

of loans made to Portfolio Companies, because the Credit Agreements state that amendments or modifications required the "written consent" of affected lenders, while PPAS "routinely purported to amend or modify loans 'orally' or 'by course of performance' in order to reduce amounts of interest owed to the Zohar Funds." Dkt. 179 ¶¶ 86, 88; *see also* SUF ¶¶ 65-70. The Trust further alleges that the Portfolio Companies' failure "to pay interest and principal under the Credit Agreements when due" resulted in "a 'non-conforming payment'" requiring PPAS to "deliver notice of [such] non-conforming payments" to the Funds, which PPAS did not do. *Id.* ¶¶ 87, 88.

This Count should be dismissed with prejudice because the Trust has abandoned it. *See supra* n.10. But, as the Trust has continued to proffer expert testimony on the issue, *see* Ex. 13 (Lorry Report) ¶¶ 76-77, it can and should also be dismissed on the merits, because New York law permits course of performance amendments even where a contract requires written consent, and the undisputed evidence establishes that the loans were so amended or modified. Thus, any amendment or modification did not violate the Credit Agreements, and there was neither a "non-conforming payment" nor a requirement to deliver notice of same to the Funds. "'[A]ny written agreement, even one which provides that it cannot be modified except by a writing signed by the parties, can be effectively modified by a course of actual performance.'" *Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 90-91 (2d Cir. 2013) (quoting *Harold J. Rosen Tr. v. Rosen*, 53 A.D.2d 342, 352 (4th Dep't 1976), *aff'd*, 43 N.Y.2d 693 (N.Y. 1977)). As such, the Funds, PPAS, and the Portfolio Companies could amend their loans by a course of performance.

That is exactly what they routinely did. The undisputed material evidence demonstrates that Portfolio Companies frequently made payments that departed from those required under the loan documents—for example, "less interest" for a given period—and the Funds (acting through Patriarch Partners as collateral manager), as well as PPAS, accepted those payments as "an

amendment" of the loan terms "by course of performance."  Ex. 2 (Tilton SEC Tr.) at 1831:13-1833:22, 1842:5-16).[14]  As an administrative law judge found based on this unrebutted testimony:

> Tilton presented evidence that she amended loan agreements, as permitted by the indentures, by "course of performance" to allow interest payments to be deferred and accrued or otherwise to change the terms—interest rates and maturities—of loans.  There is no affirmative evidence that she did not amend the loan agreements. In light of the [SEC's] burden of proof and the undisputed fact that she did accept the lesser payments or nonpayments on loans, ***it must be concluded that she did "amend" the loan agreements.***

*In re Tilton*, Administrative Proceedings Rulings Release No. 1182 (SEC Sept. 27, 2017) at 52; *see also* SUF ¶ 73.  Any deviations from loan payment terms were accomplished through such amendments.  They were not non-conforming payments, and PPAS thus had no obligation to deliver notice of the same to the Funds under the Credit Agreements.  *See* Ex. 2 (Tilton SEC Tr.) at 2527:11-2528:5 ("[T]he course of performance amendments kept it current because we had an agreement to accept less.").  In any event, all such payments were "reflected" in the Funds' trustee reports, which all noteholders received.  SUF ¶¶ 71-72.  Therefore, the Zohar Funds did have notice.  *Id.*.  Accordingly, the evidence defeats Trust Count IV.[15]

### iii.    PPAS Was Not Required To Remit Funds It Received From Portfolio Companies In A Custodial Capacity (Trust Count V)

The Trust alleges that PPAS breached the Credit Agreements by failing to remit to the Funds monies that PPAS received from and was holding for certain Portfolio Companies. Specifically, the Trust alleges that "[s]ince March 2016, PPAS has been collecting payments from Portfolio Companies" on Revolvers and DDTLs but that PPAS "failed to distribute any of those amount [*sic*] to the Zohar Funds."  Dkt. 179 ¶ 93.  This supposedly violated the Credit Agreements

---

[14] *See also, e.g., id.* at 1833:3-6 ("In an individual month I will agree to accept less than the contractual rate of interest. Amend and defer. And I will agree between the lender and the borrower that I will accept less, and I will defer."), 1842:5-16 ("[I]t's an amendment by course of performance.  It's an agreement between the borrower and the lender to accept less in that month or that quarter.")

[15] At the very least, there is no evidence demonstrating gross negligence or willful misconduct on the part of PPAS in relying on oral and course of performance amendments and modifications to the loan documents.

because the Trust says that PPAS was "required to 'promptly distribute' all payments received in respect of the loans to the Lenders, including the Zohar Funds." *Id.* ¶ 92. This claim flies in the face of the Credit Agreements' plain terms and the undisputed evidence.[16]

In particular, the Credit Agreements do not entitle the Funds to receive, or require PPAS to "promptly distribute," all money PPAS receives from the Portfolio Companies. Instead, the Credit Agreements state, in relevant part, that PPAS "shall promptly distribute" to the Funds their respective "[s]hare[s] of all payments and prepayments ***of principal and interest due hereunder, together with all other amounts due thereto*** . . . to the extent received by" PPAS. Ex. 11 (Croscill Agmt.) § 2.14(d). In other words, the Funds were only entitled to a distribution from PPAS of their share of (1) principal, (2) interest, and (3) "other amounts due" under the Credit Agreements as received by PPAS. Conversely, nothing in the Credit Agreements requires—or permits—PPAS to remit to the Funds any other monies received from or held on behalf of the Portfolio Companies. Quite the contrary: the Credit Agreements expressly authorized PPAS to "accept deposits from" and "engage in any kind of banking, trust, financial advisory or other business with" the Portfolio Companies, including holding drawn down funds on their behalf. *Id.* § 9.5; *see also* SUF ¶ 60.

The monies PPAS received and held on behalf of the 11 Portfolio Companies put at issue by the Trust's Count V were not among the categories of payments subject to the "promptly distribute" provision. The Trust has not shown and cannot show otherwise. They were not, in other words, interest or principal or other loan payments made by these Portfolio Companies,

---

[16] The Trust is seeking Count V damages in connection with 11 Portfolio Companies: Acme, Best Textiles, Croscill, Hartwell, IMG, Intrepid, Jewel of Jane, LVD, Netversant, Remco, and Spiegel. *See* Ex. 13 (Lorry Report) ¶¶ 3, 90 n.143, 105, fig. 6. PPAS understands the Trust's citation to Section 5.9(c) of "the Credit Agreements" to, in fact, refer to just one Credit Agreement that contains such a provision in Section 5.9(c): Transcare. Because Transcare is not among the 11 Portfolio Companies whose payments the Trust claims were impermissibly retained by PPAS, PPAS understands the Trust's Count V to be premised on the parallel—though somewhat differently worded—provision in those 11 Portfolio Companies' Credit Agreements, an example of which the Trust cites elsewhere in its Counterclaims. *See* Dkt. 179 ¶ 25; Ex. 11 (Croscill Agmt.) § 2.14(d).

which would have had to have been distributed to the Funds.  Rather, the undisputed evidence now confirms what PPAS has told the Trust all along: the monies PPAS received were being held on behalf of the Portfolio Companies in a custodial capacity under Section 9.5.  SUF ¶¶ 60, 97-103.

The Portfolio Companies fully drew down on committed loan facilities, recorded those loans as fully drawn down, and began to pay interest to the Funds on the fully drawn amounts. SUF ¶¶ 106-107.  PPAS, for its part, continued to remit to the Funds all such interest payments. SUF ¶¶ 63-64.  These are the only payments that were required to be remitted to the Funds under the Credit Agreements, and they were.  SUF ¶¶ 62-64; Ex. 11 (Croscill Agmt.) § 2.14(d).

Separately, consistent with Section 9.5, these Companies regularly made deposits to and withdrawals from their custodial accounts with PPAS as needed.  SUF ¶¶ 60-61, 98-103.  They did so with Ms. Tilton's authorization and supervision in her capacity as the Manager, Director and/or CEO—and thus ultimate decisionmaker—of each Portfolio Company.  SUF ¶¶ 100-105. At no time were such custodial deposits "payments [or] prepayments of principal [or] interest due" under the Credit Agreements, nor "other amounts due" to the Funds thereunder.  Ex. 11 § 2.14(d). The notion that these Portfolio Company monies should have been remitted to the Funds has no basis in the Credit Agreements or fact.  The Funds have adduced no evidence to the contrary. Count V must be dismissed.

### C.  There Is No Cognizable Evidence Of Trust Damages (Trust Counts III, IV And V)

"Without a clear demonstration of damages, there can be no claim for breach of contract" under New York law.  *JN Contemporary Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 126 (2d Cir. 2022).  Thus, where a party fails to adduce admissible "evidence of damages resulting from the breach," a contract claim must be dismissed on summary judgment.  *Viacom Outdoor Inc. v. Wixon Jewelers, Inc.*, 82 A.D.3d 604 (1st Dep't 2011) (granting summary judgment); *Lexington 360 Assocs. v. First Union Nat'l Bank of N.C.*, 234 A.D.2d 187, 190 (1st Dep't 1996) (similar).

This includes where a party relies on a damages expert whose opinions are excluded. *See Compania Embotelladora Del Pacifica, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 322-23 (S.D.N.Y. 2009) (granting *Daubert* motion and holding that "summary judgment dismissing [a] breach of contract claim is thus warranted" absent "admissible expert testimony" or other evidence "concerning causation and damages"), *aff'd*, 976 F.3d 239 (2d Cir. 2020); *see also Ho Myung Moolsan, Co. Ltd. v. Manitou Mineral Water, Inc.*, 2010 WL 4892646, at *10-12 (S.D.N.Y. 2010) (rejecting contract claim after excluding proffered expert calculation of damages).

Here, no admissible evidence supports the damages elements of the Trust's counterclaims, all of which are for breach of contract. Dkt. 179, Counts III-V. The Trust lacks any percipient fact witnesses who can testify to its damages. It thus relies exclusively on its purported expert, David Lorry, to establish its damages through his opinions relating to its Counts III and V. But he is limited to providing expert testimony within the confines of Federal Rule of Evidence 702. Thus, should PPAS prevail on its motion to exclude Mr. Lorry's opinions, filed contemporaneously herewith, PPAS will be entitled to summary judgment on the Trust's Counts III and V, as the Trust has no other admissible evidence of alleged damages. Meanwhile, it also has no evidence of damages as to Count IV, whether or not the *Daubert* motion is granted.

For the reasons explained in PPAS's accompanying motion, Mr. Lorry's opinions— including as to damages—should be excluded in full. Accordingly, summary judgment should be entered in PPAS's favor on the Trust's Counterclaims III, IV, and V.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should grant PPAS's motion for summary judgment.

Dated: New York, New York
      July 18, 2024

GIBSON, DUNN & CRUTCHER LLP

By: _/s/ Akiva Shapiro_____
    Akiva Shapiro
    Michael L. Nadler
    Seton Hartnett O'Brien
    200 Park Avenue
    New York, NY 10166-0193
    Telephone: (212) 351-4000
    Facsimile: (212) 351-4035
    ashapiro@gibsondunn.com
    mnadler@gibsondunn.com
    sobrien@gibsondunn.com

    Monica K. Loseman
    1801 California St.
    Denver, CO 80202
    Telephone: (303) 298-5700
    Facsimile: (303) 298-5907
    mloseman@gibosndunn.com

    _Attorneys for Plaintiff Patriarch Partners_
    _Agency Services, LLC_