UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PATRIARCH PARTNERS<br>AGENCY SERVICES, LLC<br><br>    *Plaintiff-<br>    Counterclaim Defendant*,<br><br> v.<br><br>ZOHAR CDO 2003-1, LTD.,<br>ZOHAR II 2005-1, LTD., and<br>ZOHAR III, LTD.,<br><br>    *Defendants-<br>    Counterclaim Plaintiffs,*<br><br> –and–<br><br>ZOHAR CDO 2003-1, LLC,<br>ZOHAR II 2005-1, LLC, and<br>ZOHAR III, LLC,<br><br>    *Defendants.* | Case No. 16-cv-4488(VM)(KHP) |

**DEFENDANT-COUNTERCLAIM PLAINTIFF'S REPLY BRIEF IN FURTHER
SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

                                 QUINN EMANUEL URQUHART
                                   & SULLIVAN LLP
                                 Jonathan E. Pickhardt
                                 Ellison Ward Merkel
                                 Evan Hess

                                 51 Madison Avenue, 22nd Floor
                                 New York, NY 10010
                                 (212) 849-7000

                                 *Counsel to the Zohar Litigation Trust-A*

## TABLE OF CONTENTS

                                                **Page**

TABLE OF AUTHORITIES ................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................... 1

ARGUMENT ............................................................................................................................. 2

I.     PPAS's Breach-Of-Contract Claim Fails As A Matter Of Law ......................................... 2

    A.     The Unsuccessful Termination Did Not Cause Any Unpaid Agency Fees ................................................................................................................... 2

    B.     The Unsuccessful Termination Did Not Cause Any Winddown Costs ................... 3

II.    No Disputed Material Facts Exist As To The Trust's Counterclaim Count III ................... 4

    A.     PPAS's Failure To Send Default Notices Was Willful Or Grossly Negligent ................................................................................................................. 5

    B.     PPAS's Failure to Follow The Other Default Instructions Was Willful Or Grossly Negligent ................................................................................................. 6

        1.     Tilton Needed The Cash To Keep Control ..................................................... 6

        2.     PPAS's Allegedly Contrary Evidence Is Consistent With Tilton's Scheme .............................................................................................. 6

        3.     Wind Downs Were Not Necessary And Do Not Excuse PPAS's Misconduct ...................................................................................................... 7

        4.     PPAS Had No Right Not To Act After Requesting Advancement ................. 8

        5.     No Default Instructions Were Permanently Withdrawn ................................. 9

III.   PPAS Fails To Undermine The Trust's Damages ............................................................. 10

CONCLUSION ....................................................................................................................... 10

## TABLE OF AUTHORITIES

**Page**

### Cases

*McNeil v. Aguilos*,
    831 F. Supp. 1079 (S.D.N.Y. 1993) ..................................................................................5 n.6

*Messinger v. JPMorgan Chase Bank, N.A.*,
    126 F. Supp. 3d 376 (S.D.N.Y. 2015) ........................................................................................2

## PRELIMINARY STATEMENT[1]

PPAS's opposition attempts to obscure straightforward facts that entitle the Trust to summary judgment in a haze of conclusory non-sequiturs. PPAS's breach-of-contract claim fails as a matter of law because none of its three damages theories were caused by the unsuccessful attempt to remove PPAS as agent. *First*, PPAS confirms in opposition that it has abandoned its reputational damages theory. *Second*, unable to identify any contemporaneous evidence of unpaid agency fees, PPAS resorts to a last-ditch affidavit that—far from establishing amounts that are owed to PPAS and attributable to the breach alleged here—actually admits that, to the extent any agency fees were unpaid (and it does not establish whether or how many were unpaid), any non-payment resulted from Tilton's unilateral election not to pay them. This admission vitiates this damages theory, as it establishes beyond dispute that the unsuccessful attempt to replace PPAS as agent did not cause any nonpayment of agency fees. PPAS's other damages theory—seeking purportedly unreimbursed winddown expenses—likewise fails, as PPAS cannot identify how expenses incurred in its role as agent could be caused by the unsuccessful attempt to *remove* PPAS from that role. Unable to show injury caused by the unsuccessful attempt to replace PPAS as agent, PPAS cannot establish an essential element of its breach-of-contract claim, and its claim fails as a matter of law.

PPAS also fails to establish any defense for its failure to follow the Zohar Funds' default instructions. Neither PPAS's improper advancement requests nor the Zohar Funds' temporary abeyances provide any excuse for PPAS's undisputed misconduct: PPAS delayed in sending default notices and then refused to foreclose on Company assets in its own possession while paying tens of millions of dollars to itself and its affiliates. These breaches were part of an intentional

---

[1] Capitalized terms not defined herein are defined in the Counterclaims (ECF No. 179).

1

scheme by Tilton to hoard cash that properly belonged to the Zohar Funds.

## ARGUMENT

**I.    PPAS's Breach-Of-Contract Claim Fails As A Matter Of Law[2]**

PPAS originally asserted three theories of injury purportedly connected to its breach-of-contract claim. Having now abandoned its reputational-harm theory, ECF No. 341 ("Opp.") 12 n.8,[3] what remains are unpaid agency fees and unreimbursed winddown costs. Neither purported injury can be connected to the unsuccessful attempt to revoke PPAS's administrative agency.

### A.    The Unsuccessful Termination Did Not Cause Any Unpaid Agency Fees

Over eight years of litigation, PPAS has been unable to muster any contemporary record evidence to connect the unsuccessful termination of PPAS to a single dollar of unpaid agency fees. Now, facing summary judgment, PPAS resorts to submitting a new self-serving affidavit from Tilton. It is black-letter law that a party cannot defeat summary judgment through "self-serving statements in the nonmoving party's affidavit." *Messinger v. JPMorgan Chase Bank, N.A.*, 126 F. Supp. 3d 376, 382 (S.D.N.Y. 2015). Thus, PPAS cannot create a dispute with Tilton's affidavit.[4]

Even if the Court were to consider this self-serving evidence, Tilton's new affidavit fails

---

[2]  PPAS's opposition misleadingly asserts (Opp. 10-11) that, because the Trust moves as to PPAS's lack of injury, the Trust concedes liability. The Trust makes no such concession, and its opposition to PPAS's motion thoroughly addresses why there is no liability here. ECF No. 344, at 9-17. This baseless attempted "gotcha" should be rejected out of hand.

[3]  PPAS also appears to have reduced its damages claim again. Where PPAS had previously claimed $6,500,000 in unreimbursed wind down costs plus 6,500,000 to 8,500,000 in unpaid agency fees, for a total damages amount of $13,000,000 to $15,000,000, ECF No. 334-47, at 6, PPAS now seems to claim total damages of only $6,500,000, Opp. 12 n.8. PPAS's ever-shifting damages figures are further proof that its damages are illusory.

[4]  PPAS's suggestion that causation should be left for trial is undercut by its own citation. Opp. 12. In *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, the court denied summary judgement despite the plaintiff's failure to adduce evidence of causation "because the Court ha[d] already ruled that [plaintiff] is not required to prove loss causation." 892 F. Supp. 2d 596, 603 (S.D.N.Y. 2012). Here, PPAS must prove causation and has failed to carry its burden.

to establish that the unsuccessful attempt to remove PPAS as agent caused any damages. The affidavit does not include any contemporary evidence of any specific unpaid agency fees. Instead, it baldly asserts that, because of the attempted removal of PPAS as agent, "[s]ome Portfolio Companies determined that they were comfortable continuing to make or making agency fee payments to PPAS" while "[o]ther Portfolio Companies determined that they were not comfortable . . . and halted or did not make such payments accordingly." ECF No. 342 ("Tilton Aff.") ¶¶ 18-19. But, coupled with PPAS's repeated assertion that "it is undisputed that Ms. Tilton was in charge of each Portfolio Company as its manager, director, and/or CEO," Opp. 4, these statements amount to no more than the nonsensical assertion that Tilton, in her own mind, decided that some Companies would continue to pay agency fees and others would not, due to her own varying levels of "comfort" in paying herself agency fees on behalf of that Company.

PPAS's claim that the "uncertainty" resulting from the unsuccessful termination of PPAS as agent resulted in Tilton choosing for some Companies not to pay fees after June 2016, Opp. 13-14, is also dispelled by Tilton's contemporary conduct. This Court's order was clear that PPAS remain the agent, Opp. 11, and Tilton did *not* express any uncertainty about PPAS's position, nor ask the Court for guidance, in bringing this suit. Tilton and PPAS offer no explanation as to why any agency fees remained unpaid following this Court's order after any conceivable "uncertainty" was removed.

### B. The Unsuccessful Termination Did Not Cause Any Winndown Costs

PPAS likewise fails to credibly link any unreimbursed winddown costs to the unsuccessful termination of PPAS as agent.

*First*, PPAS has no answer for the fact that the unsuccessful termination could not have caused PPAS's unreimbursed winndown costs, as PPAS only incurred winndown costs because it *continued* as agent. *See* ECF No. 329 ("Br.") 16. PPAS's conclusory statement that "[t]he

3

sequence of events makes clear" that PPAS was not reimbursed "*because* of [the Zohar Funds']  position on the purported termination," Opp. 15-16 (original emphasis), is untethered to any evidence in the record, and makes no sense. PPAS cites to no evidence suggesting that any winddown costs were not reimbursed due to a dispute over who the agent should be. Indeed, the Court already had ordered PPAS to continue as agent for the pendency of the litigation, Opp. 11, by the time PPAS requested advancement of these fees. This should end the analysis.

*Second*, PPAS never requested indemnification for these fees.[5] Br. 15. This failure is the cause of any purported unreimbursed costs. Tacitly recognizing this, PPAS now attempts (Opp. 15) to convert its "advancement" request into an "indemnification" request. But advancement and indemnification are distinct. Br. 23-25. PPAS's request was for "advancement of $2 million per Company," Tilton Aff. ¶ 28, not indemnification of prior expenses. PPAS concedes this point (Opp. 19) in characterizing this advancement request as a request for the "prepayment" of expenses. The Zohar Funds declined to make any such "prepayment," and PPAS used this as an excuse to refuse to follow the Funds' instructions. But none of these facts have anything to do with PPAS's attempted replacement.

## II. No Disputed Material Facts Exist As To The Trust's Counterclaim Count III

PPAS does not contest that it had a clear contractual obligation to follow the Zohar Funds' default instructions or that AMZM properly declared a default and provided instructions that PPAS did not follow. Br. 17-18, Opp. 16-17. The resulting breach was willful (or at least grossly negligent), as it was a part of Tilton's scheme to keep control of the Companies despite losing her

---

[5] PPAS also suggests that it was not required to make an indemnification request because it would have been futile. Opp. 15. Not only is PPAS's reliance on shareholder cases about demand-futility entirely irrelevant here, PPAS cannot show futility "given the Trust's claim that PPAS was not the rightful Administrative Agent," *id.*, as again, the Court had already confirmed that PPAS would remain the agent for the Zohar Funds while the litigation was pending, Opp. 11.

4

position as collateral manager. Br. 20-25. To further that scheme, Tilton failed to notice defaults and to follow default instructions. *Id.* PPAS's attempts to excuse this misconduct are unsupported by the record.

### A. PPAS's Failure To Send Default Notices Was Willful Or Grossly Negligent

At the outset, PPAS tries to avoid its failure to send default notices by wrongly contending (Opp. 19-20) that this misconduct was not pleaded. But the Trust's complaint specifically includes these allegations. *See* ECF No. 179 ¶ 59 (alleging that Zohar Funds "instruct[ed] PPAS to send notice immediately to the [Defaulted Borrowers]"); *id.* ¶ 60 (alleging that Tilton refused to send notice unless her demands were met); *id.* ¶ 79 (same).[6]

Substantively, PPAS contends (Opp. 19-20) that it could delay noticing defaults because no Credit Agreements include a deadline for compliance. PPAS misplaces its focus on the Credit Agreements; it is the default letters that provide the relevant deadline: "[t]he Lenders hereby instruct PPAS to send notice *immediately*." *See e.g.*, ECF No. 334-22 (emphasis added).[7] And, the Credit Agreements required PPAS to follow this instruction. *See* Br. 17.

PPAS's attempt (Opp. 20-21) to characterize its delay tactics as good-faith attempts to better understand the default instructions is belied by the fact that PPAS did not actually ask for any clarifying information. Nothing about the default instructions was unclear, and PPAS's response confirms that, as it merely repeated the instructions back verbatim and asked the Zohar Funds to confirm. ECF No. 334-25. Indeed, that PPAS had no need for any "clarification" of the instructions is confirmed by the fact that it did not request any for the Value Companies. Instead,

---

[6] PPAS's sole cited case (Opp. 19), which debuted at summary judgment a new "laundry list of statutes allegedly violated" by defendant, bears no resemblance to the clearly pleaded allegations here. *See McNeil v. Aguilos*, 831 F. Supp. 1079, 1086 (S.D.N.Y. 1993).

[7] PPAS's failure to address this deadline may have been caused by its erroneous citation (Opp. 20) to its own letter, and not the Zohar Funds' default letters.

5

it asked AMZM to rescind those instructions, which the Zohar Funds agreed to do temporarily. *Id.*, ECF No. 334-32. But even if PPAS's characterization could be credited, it would not excuse PPAS's further three-week delay in sending notices to the other four Companies (Br. 19), which PPAS did not and does not explain. Opp. 20.

### B. PPAS's Failure to Follow The Other Default Instructions Was Willful Or Grossly Negligent

As the Trust's moving brief established (Br. 20-25), PPAS's misconduct furthered Tilton's scheme to accumulate Zohar Fund cash under her own control because she was losing her ability to control that cash as the Zohar Funds' collateral manager. This scheme involved causing Companies to draw down on their Zohar Fund facilities, keeping those funds in a single PPAS account, and refusing to follow default instructions that would have required Tilton to relinquish the cash.[8] *Id.* PPAS's various attempts to explain away its misconduct each fail.

#### 1. Tilton Needed The Cash To Keep Control

PPAS's contention (Opp. 24) that the scheme was not necessary because Tilton's "control of the Portfolio Companies was based on her role as their manager, director, and/or CEO," which Tilton maintained, misses the point. Tilton's control of the Companies was nothing without the cash. Her scheme gave her access to that cash and, when the Zohar Funds learned about it and demanded it back, Tilton flatly refused. Br. 20-25.

#### 2. PPAS's Allegedly Contrary Evidence Is Consistent With Tilton's Scheme

PPAS also asserts (Opp. 24) that evidence of Tilton's scheme is contradicted by the fact that PPAS got a head start on holding Company cash in 2015. But early 2015 is precisely when

---

[8] PPAS's attempt (Opp. 24) to limit Tilton's scheme to the Trust's Count V (not Count III) is a red herring. PPAS's failure to notice defaults and follow default instructions willfully furthered Tilton's scheme and, as a result, is not exculpated. That PPAS's actions also separately support a breach claim (Count V) to further this scheme does not alter this fact.

6

questions over Tilton's long-term control began to arise. ECF No. 334-23, at 23. It is thus entirely consistent with her scheme for PPAS's conduct to begin then. PPAS further denies (Opp. 24) that Tilton's scheme allowed her to continue paying affiliates. But PPAS fails to respond to the evidence showing that Patriarch entities received over $26 million after Tilton caused the Companies' drawdowns. Br. 21. Finally, PPAS ignores (Opp. 24) that PPAS flushed the cash out of its account only when the Trust was before this Court seeking an order to freeze that money. PPAS offers no explanation for why Tilton moved the money on that day to accounts that she instructed Company employees not to use. *Id.*; Br. 9.[9]

### 3. Wind Downs Were Not Necessary And Do Not Excuse PPAS's Misconduct

Having received clear instructions to foreclose on Company assets, PPAS responded by claiming that it would need to wind down the Companies. ECF No. 334-25. But PPAS cannot identify any requirement for a wind down before executing on the Zohar Funds' foreclosure instructions. None exists. Br. 22-23. Instead, PPAS attempts (Opp. 22-23) to read an implicit request for a wind down into the Zohar Funds' instructions. This attempt fails because the only support PPAS can muster is *PPAS's own letter*. Opp. 22-23. In arguing that "[t]he Zohar Funds made clear that PPAS's 'exercising liens and security interests' as directed—which they clarified to include 'beginning the process of foreclosure to sell or liquidate companies' … was inseparable from the 'unwinding of a company,'" *id.*, PPAS quotes exclusively from a letter written by Tilton, *not* the Zohar Funds. *Id.*; ECF No. 334-25. PPAS cannot put its own words in the Zohar Funds' mouth to contend the Zohar Funds' requested wind downs.

---

[9] PPAS's assertion (Opp. 24) that Tilton's actions were not concealed because all drawdowns were disclosed misses the point. What PPAS concealed was that Tilton had unilaterally drawn the funds, unbeknownst even to other Company employees, and that she then held that cash in a single PPAS account for which she controlled disbursements.

7

PPAS equally misplaces reliance (Opp. 22) on the Zohar Funds' later requests for updates on the wind downs that PPAS told them were already occurring. Those letters are clear that they seek information about Companies for which "PPAS did not provide the Zohar Funds as lenders with any notice of these [alleged wind downs] until [PPAS's] October 17 letter." ECF No. 334-33; *see* ECF No. 338-29 ("reiterat[ing] the requests … for information regarding the Defaulted Portfolio Companies …."). They were thus requests *for information* about wind downs PPAS had already begun (without informing the Zohar Funds), *not* a request that the wind downs occur.[10]

PPAS's failure to identify any actual request by the Zohar Funds for PPAS to wind a Company down is not surprising: no such request exists. The Zohar Funds' only instructions—to foreclose on Company assets—did not require a wind down and did not implicitly request one.

### 4. PPAS Had No Right Not To Act After Requesting Advancement

PPAS's other defense (Opp. 17-19) for its failure to follow the default instructions is that the Credit Agreements' indemnification provision gave it unspoken advancement rights. But nothing in the Credit Agreements permits advancement and, as a result, PPAS could not await any advancement of funds before following the Zohar Funds' instructions.

The Credit Agreement provision that PPAS relies on in support is titled "Right to Indemnity" and provides exclusively for "indemnification," not advancement. Br. 23-25. Extensive caselaw establishes the difference between these concepts: indemnification is reimbursement, and advancement is prepayment. *Id.* PPAS offers nothing to undermine this distinction here.[11] Opp. 17-19. Instead, PPAS tries (Opp. 17) to side-step this distinction by

---

[10] Each time, PPAS refused to provide the information. ECF No. 338-26, ECF No. 338-30.

[11] PPAS's only attempt to challenge the Trust's caselaw is to point out that one case applies Delaware law. Opp. 19 n.10. But, as the Trust's moving brief notes, Br. 24 n.7, New York courts frequently look to Delaware law on advancement and indemnification provisions.

8

relying on Section 9.7's provision that "the Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished." ECF No. 332-39. In so arguing, PPAS artfully omits that its right to "cease, or not commence" is limited to "the acts indemnification against"—*i.e.*, the wind down of the Companies—not, as PPAS argues (Opp. 17), *carte blanche* to refuse to perform other acts, like issuing notices of default or foreclosing on cash accounts, for which no additional indemnity was being sought.

Even if PPAS was requesting a permissible indemnity in connection with winddown costs, that request did not entitle PPAS to refuse to undertake other actions directed by the Zohar Funds, like the foreclosure of cash accounts holding money loaned by the Zohar Funds. Br. 24-25. PPAS attempts (Opp. 18) to conflate foreclosure and wind downs, arguing that the Zohar Funds foreclosure instructions bear some "hallmarks of wind downs"—a concept undefined by PPAS and unsupported in the record. PPAS invents that concept because nothing in the default instructions actually requested a wind down. Because PPAS's only conceivable indemnification request was thus related to wind downs, and it could not refuse to foreclose on the Companies' cash accounts under the guise of waiting on an "additional indemnity" unrelated to that foreclosure.

### 5. No Default Instructions Were Permanently Withdrawn

PPAS's repeated suggestion (Opp. 9, 16, 18, 23) that the Zohar Funds' temporary abeyance as to the default instructions for the Value Companies was limitless finds no support in the record. While the Zohar Funds agreed to hold their instructions in abeyance for the Value Companies, this agreement was predicated on PPAS providing financial information and, if PPAS failed to provide that information, the instructions were clearly reinstated: "if PPAS fails to comply with this request within seven days of the date hereof, the Zohar Funds reinstate their October 9 directions and direct PPAS to immediately take all actions to foreclose on their Collateral." Br. 10.

9

PPAS ignores this deadline. Opp. 9-25. Instead, PPAS again (Opp. 23) points to its own correspondence (from three months later), which claimed that the instructions had never been reimposed. PPAS's counterfactual statement in its own letter—three months late, and right before Tilton cut off the Zohar Funds' default remedies with bankruptcy—does not provide PPAS with a "good faith basis" (*id.*) for ignoring the Zohar Funds' clear default instructions.

### III.    PPAS Fails To Undermine The Trust's Damages

PPAS cannot dispute that it caused millions of dollars to be drawn down on the Zohar Funds facilities and then held on to those funds despite the Zohar Funds' clear instructions to return them. Yet PPAS argues (Opp. 25) this conduct did not cause damage to the Zohar Funds because PPAS purportedly could not have seized and remitted money in its own possession. PPAS's ability to seize and remit Collateral of the Defaulted Borrowers is part and parcel of PPAS's role as agent. PPAS was required to maintain perfected first-priority security interests in the Collateral on behalf of the Zohar Funds. ECF No. 332-39, at 4.1(i); 9.9(a). The entire point of holding a perfected first-priority security interest is to permit PPAS to quickly foreclose on the Collateral as it was directed to do. PPAS's suggestion that it could not do so is just a recasting of its pseudo-banking defense to the Trust's Counterclaim V, which fails as a matter of law. *See* ECF No. 344, at 24-25.

PPAS's separate assertion (Opp. 25) that the Trust cannot establish damages without expert testimony, which PPAS seeks to exclude, is equally misplaced. PPAS's motion to exclude the Trust's expert should be denied for the reasons provided in the Trust's briefing. ECF No. 336. Even without that testimony, the Trust is prepared to show damages, and PPAS has not asserted any reason why the Trust could not do so.

### CONCLUSION

For the foregoing reasons, PPAS's Count II should be dismissed in its entirety with prejudice, and judgment should be granted as to PPAS's liability on Counterclaim Count III.

10

| | |
|---|---|
| Dated: October 10, 2024<br>New York, New York | */s/ Jonathan Pickhardt*<br><br>**QUINN EMANUEL URQUHART<br>  & SULLIVAN LLP**<br>Jonathan E. Pickhardt<br>Ellison Ward Merkel<br>Evan Hess<br><br>51 Madison Avenue, 22nd Floor<br>New York, NY 10010<br>(212) 849-7000<br>jonpickhardt@quinnemanuel.com<br>ellisonmerkel@quinnemanuel.com<br>evanhess@quinnemanuel.com<br><br>*Counsel to the Zohar Litigation Trust-A* |

11