UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATRIARCH PARTNERS AGENCY SERVICES, LLC,

                            Plaintiff,

            -against-

ZOHAR CDO 2003-1 LTD., et al.,

                            Defendants.

Case No. 16-cv-4488 (VM) (KHP)

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
PATRIARCH PARTNERS AGENCY SERVICES, LLC'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT .................................................................................................................................. 1

    I.    PPAS Is Entitled to Summary Judgment on its Breach of Contract Claim. ........... 1

        A.    PPAS Has Not Moved for Summary Judgment as to Damages. ................ 1

        B.    PPAS Was Not the Zohar Funds' Common Law Agent ............................ 2

        C.    PPAS Was Not Faithless and Did Not Materially Breach the Credit Agreements. ................................................................................................ 4

    II.    PPAS Should Be Granted Summary Judgment on All of the Trust's Counterclaims. ........................................................................................................ 5

        A.    The Trust Has No Competent Evidence of Damages (Counterclaims III, IV & V). ...................................................................... 5

        B.    The Trust Fails to Adduce Competent Evidence for Its Counterclaim IV ........................................................................................... 5

        C.    There Is No Gross Negligence or Willful Misconduct (Counterclaims III, IV, & V). ..................................................................... 6

        D.    PPAS Did Not Breach the Credit Agreements. ......................................... 7

            i.    PPAS Was Entitled to Advancement of Expenses (Counterclaim III). ............................................................................. 7

            ii.    PPAS Properly Held And Remitted The Funds At Issue (Counterclaim V). ............................................................................ 9

CONCLUSION ............................................................................................................................. 10

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Ames Dept. Stores, Inc.*,
    274 B.R. 600 (S.D.N.Y. 2002) ................................................................................................... 3

*CapLOC, LLC v. McCord*,
    2020 WL 1036044 (S.D.N.Y. Mar. 3, 2020) ............................................................................. 1

*CARCO GROUP Inc. v. Maconachy*,
    718 F.3d 72 (2d Cir. 2013) ........................................................................................................ 4

*Deutsche Lufthansa AG v. Boeing Co.*,
    2007 WL 403301 (S.D.N.Y. 2007) ............................................................................................ 6

*Greenfield v. Philles Records, Inc.*,
    98 N.Y.2d 562 (2002) ........................................................................................................ 8, 10

*Int'l FCStone Markets v. Intercambio Mexicano de Comercia S.A. de C.V.*,
    2021 WL 1893630 (S.D.N.Y. May 11, 2021) ........................................................................... 8

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*,
    424 F.3d 195 (2d Cir. 2005) .................................................................................................... 10

*Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*,
    595 F.3d 458 (2d Cir. 2010) ...................................................................................................... 9

*Lexington 360 Assocs. v. First Union Nat'l Bank of N.C.*,
    234 A.D.2d 187 (1st Dep't 1996) .............................................................................................. 5

*Mionis v. Bank Julius Baer & Co.*,
    301 A.D.2d 104 (1st Dep't 2002) .............................................................................................. 2

*Morgan Stanley & Co. Inc. v. Peak Ridge Master SPC Ltd.*,
    930 F. Supp. 2d 532 (S.D.N.Y. 2013) ....................................................................................... 6

*In re Parmalat Sec. Litig.*,
    594 F. Supp. 2d 444 (S.D.N.Y. 2009) ....................................................................................... 3

*Phansalkar v. Andersen Weinroth & Co., L.P*,
    344 F.3d 184 (2d Cir. 2003) ...................................................................................................... 4

*Samba Enters., LLC v. iMesh, Inc.*,
    2009 WL 705537 (S.D.N.Y. 2009) ....................................................................................... 2, 3

*Veleron Holding, B.V. v. Morgan Stanley*,
    117 F. Supp. 3d 404 (S.D.N.Y. 2015) ............................................................................... 2, 3, 4

*Viacom Outdoor Inc. v. Wixon Jewelers, Inc.*,
    82 A.D.3d 604 (1st Dep't 2011) ................................................................................................ 5

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

*Zohar CDO 2003-1, LLC v. Patriarch Partners LLC*,
  2016 WL 6248461 (Del. Ch. Oct. 26, 2016) ...........................................................................4

**Rules**

Fed. R. Civ. P. 41(b) ......................................................................................................................6

Fed. R. Civ. P. 41(c)(i) ...................................................................................................................6

Fed. R. Civ. P. 56(a) ......................................................................................................................6

**PRELIMINARY STATEMENT**

In its opposition, the Trust fails to meaningfully challenge the contract provisions and undisputed evidence supporting PPAS's breach claim and defeating the Trust's Counterclaims. Instead, it retreats to long-abandoned redoubts and last-gasp attempts to artificially prolong its meritless seven-year-old claims. But its tactics cannot obscure what its concessions and discovery have made clear: only PPAS's damages merit a trial. *First*, the Trust concedes the Zohar Funds' purported termination of PPAS as Administrative Agent under the Credit Agreements violated those contracts' irrevocable appointment clauses. Opp. 10. That breach is not excused because PPAS was not a common-law agent, did not act faithlessly, and did not materially breach the agreements, entitling PPAS to summary judgment on liability as to its Count II. *Second*, the Trust does not substantively address, and thus concedes, that its Counterclaims II, IV, VI, and VII should be dismissed with prejudice. *Third*, the Trust fails to dispute that it lacks competent evidence of damages. *Finally*, the undisputed evidence shows PPAS did not breach the Credit Agreements by acting pursuant to express contractual rights when it refused to turn over Portfolio Company monies it was holding in custody on the Funds' unilateral demand and to carry out default instructions absent advancement. PPAS's motion should be granted in full.

**ARGUMENT**

**I.    PPAS Is Entitled to Summary Judgment on its Breach of Contract Claim.**

PPAS's termination was a breach. Br. 14-16. The Trust's excuses are invalid.

**A. PPAS Has Not Moved for Summary Judgment as to Damages.**

The Trust first argues that PPAS has not proven "damages caused by its…termination." Opp. 10. This is irrelevant, as PPAS moved for summary judgment only on liability, allowing the parties to "proceed to trial on PPAS's damages." Br. 14; *accord* Dkt. 322. That is no reason not to grant summary judgment on those issues on which PPAS did move. *See CapLOC, LLC v.*

1

*McCord*, 2020 WL 1036044, at *20-21 (S.D.N.Y. 2020) (Marrero, J.) (granting summary judgment as to liability on contract claims, while leaving damages for trial). PPAS's damages present questions of fact regarding which there are material disputes. *See* Dkt. 341 at 11-15.

### B. PPAS Was Not the Zohar Funds' Common Law Agent.

The Trust next seeks solace in the faithless servant doctrine, Opp. 11-16, which fails because PPAS was neither the Funds' common-law agent nor faithless. PPAS was Administrative Agent under the specific terms of the Credit Agreements entered into by the Zohar Funds, other lenders (where applicable), and the Portfolio Companies. Those contracts explicitly state that PPAS "shall have only those duties and responsibilities that are expressly specified" therein and disclaim any fiduciary duties owed by PPAS to the Zohar Funds, provisions which are incompatible with the broader common-law principal-agent relationship the Trust now advances. *See, e.g.*, Ex. 11 §§ 9.1, 9.2. Such disclaimers are not dispositive where "[a] contract otherwise makes clear that the relationship is between principal and agent," but here "the remainder of Sections 9.1 and 9.2 do not do so." Dkt. 91 (MTD Op.) at 15. Those provisions instead express the parties' intention that PPAS is not a common-law agent. *See Samba Enters., LLC v. iMesh, Inc.*, 2009 WL 705537, at *5 (S.D.N.Y. 2009) ("New York courts interpret contracts so as to give effect to the intention of the parties as expressed in the unequivocal language employed."); *Mionis v. Bank Julius Baer & Co.*, 301 A.D.2d 104, 109 (1st Dep't 2002) (similar).

Attempting to sidestep the parties' intentions, the Trust simplistically emphasizes the contracts' short-hand use of the term "agent," Opp. 13, which merely refers to PPAS's role as an *administrative agent*, not common-law agency. The Trust's cited authority makes clear that "under New York law," PPAS "does not become an 'agent' . . . simply because that term is used" in the Credit Agreements. *Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 451 (S.D.N.Y. 2015). And unlike the contracts in *Veleron* and *Samba*, the Credit Agreements' purpose was to

2

"set out the loan terms" for credit facilities provided by the Zohar Funds to Portfolio Companies, Opp. 13, with PPAS in an administrative capacity—not "to engage [PPAS] to act on the [Zohar Funds'] behalf—as [their] agent." *Samba*, 2009 WL 705537, at *7-8 (discussing "Agency Agreement" empowering the agent to negotiate deals on behalf of the principal); *cf. Veleron*, 117 F. Supp. 3d at 451-55 (discussing agent's "exclusive" agreement to sell securities on principal's behalf). Accordingly, this Court has already found that Section 9.1 of the Credit Agreements—which appoints and repeatedly refers to PPAS as "the Agent"—did not establish that the parties' relationship was that "between principal and agent." Dkt. 91 (MTD Op.) at 15.

The Trust also claims that the Zohar Funds had "control" over PPAS, Opp. 12, a factor "courts often look to . . . as a critical indicator" where "the existence of any agency relationship is uncertain," *In re Parmalat Sec. Litig.*, 594 F. Supp. 2d 444, 451 (S.D.N.Y. 2009). But that factor weighs against finding an agency relationship because Credit Agreements provided PPAS with substantial discretion (including as to whether to exercise it), as both parties' experts agree is typical for *administrative* agents. *See, e.g.*, Ex. 11 §§ 5.1, 9.7, 9.4(b) ("Agent shall be fully justified in *failing or refusing to take any action* under this Agreement…which involves *discretionary decision making*…"); Ex. 28 ¶15; Ex. 13 ¶34; Ex. 182 (Lorry) at 71:02-04. The undisputed evidence shows that—as a result of PPAS's exercise of this discretion—the Zohar Funds did not "maintain control over key aspects of the undertaking." *Veleron* 117 F. Supp. 3d at 454; *contra Samba*, 2009 WL 705537, at *7 (agent was "always at [principal's] 'direction and control.'"). While the Zohar Funds may have *sought* to direct PPAS's actions, PPAS was not their common-law agent because *it had contractual discretion to act (or not)*. Ex. 11 §§ 5.1, 9.4, 9.7; Ex. 183 (Tilton) at 215:17-216:08, 274:09-23; Ex. 182 (Lorry) at 70:04-14; *see also In re Ames Dept. Stores, Inc.*, 274 B.R. 600, 618-23 (S.D.N.Y. 2002) (administrative agent was not a common-law

3

agent for lender given its discretion over the "collection and handling" of certain funds). This issue should be resolved as a matter of law in favor of PPAS. *See Veleron*, 117 F. Supp. 3d at 451.

### C. PPAS Was Not Faithless and Did Not Materially Breach the Credit Agreements.

The faithless servant doctrine "arises out of an agency or employment relationship," *CARCO GROUP Inc. v. Maconachy*, 718 F.3d 72, 84 (2d Cir. 2013), wherein "an agent is obligated 'to be loyal' . . . and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties,'" *Phansalkar v. Andersen Weinroth & Co., L.P*, 344 F.3d 184, 200 (2d Cir. 2003). Assuming *arguendo* that PPAS was the Zohar Funds' agent (it is not), the Trust's argument would still fail because PPAS did not act faithlessly. The Trust argues PPAS failed to provide "key Company financial information" to the Zohar Funds, without ever explaining what information PPAS was required to provide or how it failed to do so. Opp. 15. That argument is, moreover, barred by the Trust's failure to dispute that its Counterclaim II—which alleges breach based on PPAS's purported failure to provide exactly this information—should be dismissed with prejudice. While the Trust now complains that "PPAS had not provided this information," Opp. 16, it seemingly recognizes that under the Credit Agreements the Portfolio Companies—rather than PPAS—were responsible for "furnish[ing] to the Agent [*i.e.*, to PPAS] and the Lenders [*i.e.*, to the Zohar Funds]" their financial information. Ex. 11 §§ 5.1 (a)(i)-(iii) (cited at Opp. 16). The Trust employs another sleight of hand in stating that the Zohar Funds sued for information and obtained a "judgment against the Patriarch Managers." Opp. 15. The Trust disingenuously conflates those entirely separate entities with PPAS, against whom the Funds in fact *lost or withdrew* their claims in that case. *Zohar CDO 2003-1, LLC v. Patriarch Partners LLC*, 2016 WL 6248461, at *6 n.81 (Del. Ch. 2016).

Nor was PPAS required to follow the Zohar Funds' default instructions and remit funds it held in custody for defaulted Portfolio Companies, which the Trust claims "breached its duties of

4

loyalty and good faith." Opp. 15; *see infra* Argument II. In fact, PPAS did not owe any such fiduciary duties, which the Credit Agreements expressly disclaimed. Ex. 11 §§ 9.1, 9.2.

The Trust's related argument that PPAS's "prior material breach of the Credit Agreements" bars it from now prosecuting its own claim, Opp. 15, fails for the same reason: there was no earlier breach. Moreover, the Trust provides no evidence whatsoever that any supposed breaches were material (or, for purposes of the faithless servant doctrine, that any such breaches were "substantial"). While it alleges that it was "forced to make critical lending decisions in the dark," it cites no evidence supporting that proposition or even identifying the "decisions" to which it refers. Opp. 15-16. Absent evidence, that baseless assertion cannot be credited. And, again, the conceded dismissal of its Counterclaim II bars any such arguments.[1]

## II. PPAS Should Be Granted Summary Judgment on All of the Trust's Counterclaims.

The Trust does not mention its abandoned Counterclaims I, II, VI, and VII, which should be dismissed with prejudice (or, for Counterclaim I, as moot). Br. 16. Its other claims fail too.

### A. The Trust Has No Competent Evidence of Damages (Counterclaims III, IV & V).

The Trust does not dispute—and thus implicitly admits—that it lacks any admissible non-expert evidence of damages. *See* Br. 24-25. If PPAS's *Daubert* motion is granted, as it should be, summary judgement should be entered in PPAS's favor on the Trust's Counterclaims as a result. *See Viacom Outdoor Inc. v. Wixon Jewelers, Inc.*, 82 A.D.3d 604 (1st Dep't 2011) (granting summary judgment on contract claim absent admissible evidence of damages); *Lexington 360 Assocs. v. First Union Nat'l Bank of N.C.*, 234 A.D.2d 187, 190 (1st Dep't 1996) (similar).

### B. The Trust Fails to Adduce Competent Evidence for Its Counterclaim IV.

The Trust bizarrely accuses PPAS of "[a]ttempting to inject the issue of amendments" to

---

[1] In its background section, the Trust asserts PPAS failed to "invoice Companies for the correct interest under their loans," Opp. 6, but it leaves that claim out of its argument. No wonder. PPAS immediately notified the Trustee of the limited, inadvertent invoicing errors, and the invoices were duly corrected. Ex. 185 (Mar. 21, 2016 Email).

5

loan terms "into this case," Opp. 25, notwithstanding that the Trust pleaded a claim regarding this very issue.  It does not now dispute that PPAS properly amended or modified loan terms, *see* Br. 20-22, instead refusing to engage on the merits of its Counterclaim IV.  Rather, it asks the Court to "reject PPAS's invitation" to rule on a live claim pending in this action, providing no basis for its request other than its unilateral, unexplained decision to stop pursuing it.  Opp. 25.  Because the time for voluntary dismissal without prejudice has long since passed, Fed. R. Civ. P. 41(c), either summary judgment should be granted because the Trust has not identified any "genuine dispute as to any material fact" nor contested that PPAS is "entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a), or, alternatively, the Trust's uncontested failure to prosecute its claim should result in a dismissal constituting "an adjudication on the merits," Fed. R. Civ. P. 41(b).

### C.  There Is No Gross Negligence or Willful Misconduct (Counterclaims III, IV, & V).

PPAS did not engage in gross negligence or willful misconduct as necessary for liability under the Credit Agreements' exculpation provisions, Br. 16-17, which require the Trust to prove "malice, recklessness, deliberate or callous indifference to the rights of others," *Morgan Stanley & Co. Inc. v. Peak Ridge Master SPC Ltd.*, 930 F. Supp. 2d 532, 544 (S.D.N.Y. 2013), "of a kind that smacks of intentional wrongdoing," *Deutsche Lufthansa AG v. Boeing Co.*, 2007 WL 403301, at *3 (S.D.N.Y. 2007).  The Trust responds with an imagined and unproven "scheme to weaponize PPAS" to "keep control of the Companies" and to "keep the Zohar funds' cash for" Ms. Tilton. Opp. 18.  As set out in opposition to the Trust's summary judgment motion, Dkt. 341 at 24, this purported "scheme" is without factual basis and ignores, *inter alia*, that Ms. Tilton controlled the Portfolio Companies through her roles at each company, not through PPAS, Ex. 1 ¶¶ 4-5, and that the Portfolio Companies received the money at issue in keeping with PPAS's consistent—and truthful—refrain that it "belonged to the borrower[s]." Ex. 183 (Tilton) at 73:16-74:06.

The Trust's repeated claim that "PPAS paid itself" is disproven by evidence that (i) the

6

Portfolio Companies made the payments, *see* Ex. 184, and (ii) PPAS was holding the monies on behalf of the Portfolio Companies and thus had no more authority to misappropriate that money to pay the Zohar Funds than a commercial bank has over funds in an individual consumer's account. *See* Ex. 11 § 9.5. The Trust's half-baked theories cannot transform PPAS's alleged breaches into willful misconduct or gross negligence, rather than good-faith disputes. Further, the Trust cites no law suggesting that PPAS's supposed "scheme" meets the high standard of gross negligence or willful misconduct. *See* Opp. 17-18. It does not.

### D. PPAS Did Not Breach the Credit Agreements.

#### i. PPAS Was Entitled to Advancement of Expenses (Counterclaim III).

PPAS's refusal to comply with the Zohar Funds' October 9, 2017 instructions did not breach the Credit Agreements because the Zohar Funds refused to indemnify PPAS for the Portfolio Companies' wind-downs, without which PPAS had discretion to "cease, or not commence" the actions requested by the Zohar Funds. Ex. 11 § 9.7; *see also* Br. 17-20. The Trust argues that there was no need for such wind-downs and that PPAS was not entitled to advancement before carrying out their instructions regardless. Opp. 19-20. Both arguments fail.

*First*, the Zohar Funds' instructions and subsequent correspondence—much of which the Trust omits—makes clear that there was no dispute at the time concerning the need for such wind downs. After noting that wind downs were required to "foreclose promptly" on the Portfolio Companies' assets, the Zohar Funds asked PPAS to "inform [them] within seven days of the expected proceeds to be generated from these companies and the timing for any distribution thereof," reflecting their contemporaneous understanding that wind downs were required and acknowledging their interest in those processes. Ex. 47. Subsequently, they complained that they were not receiving "any detail of the wind-down process," but did not suggest that wind downs were unnecessary. *See* Ex. 48 at 2. Indeed, the Zohar Funds even sought confirmation that

7

Portfolio Companies had been put in "wind down mode." Dkt. 338-29. The Trust's belated focus on "law[s] or obligation[s]" requiring wind downs is misplaced given contemporaneous correspondence demonstrating that, like PPAS, the Zohar Funds understood at the time that their own instructions required such wind-downs. Moreover, AMZM later confirmed its understanding that "foreclosure" involved the same actions and costs as wind-downs. *See* Ex. 23 at 288:22-289:19 (costs associated with a "wind down" are "costs of foreclosure").

*Second*, the Credit Agreements provide that "[i]f any indemnity furnished to [PPAS] for any purpose shall, in [PPAS's] opinion . . . be insufficient," then PPAS could "call for additional indemnity and cease, or not commence, to do the acts . . . until such indemnity is furnished." Ex. 11 § 9.7.[2] This provision "must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002). The Trust seeks to condition this clear right to upfront payment on PPAS first incurring costs without reimbursement, but that is a red herring, as there is no dispute that the Funds neither reimbursed PPAS for previously incurred wind-down costs nor advanced them the monies necessary to carry out the Funds' instructions. Opp. 20; Dkt. 342 ¶¶ 25-32. The Trust's attempted distinction between indemnification and advancement ignores the Credit Agreements' clear language empowering PPAS to "cease, or not commence" acting "until" money "is furnished" to it—which can only be advancement. Ex. 11 § 9.7. PPAS was entitled to receive any moneys that in its "opinion," *id.*, it deemed necessary to carry out the Zohar Funds' instructions before acting, *Int'l FCStone Markets v. Intercambio Mexicano de Comercia S.A. de C.V.*, 2021 WL 1893630, at *1 (S.D.N.Y. 2021).[3]

---

[2] The Trust identified a clerical error in the string cite to similar provisions in the relevant Credit Agreements in PPAS's Rule 56.1 Statement. All relevant agreements contain this provision or its functional equivalent, and the correct citations are reflected in the Shapiro Declaration filed contemporaneously herewith.

[3] AMZM was aware of this advancement right, as acknowledged in its Credit Agreement Review Project, Ex. 27 at 21, 31, 46, 84, along with nearly all the contract provisions at issue, Br. 7. Consistent with that right, AMZM's corporate representative testified PPAS was not expected to cover wind-down costs. Ex. 23 at 248:07-20.

8

*Finally*, contemporaneous correspondence makes clear the Zohar Funds never reinstated defaults for the Value Companies. Br. 20. While the Trust now claims that the instructions were "expressly reinstated," subsequent correspondence discussing the Value Companies confirms that the instructions were not, expressly or otherwise. *See* Exs. 45, 46, 48; Dkt. 338-29. Even if they were, PPAS had no obligation to act because its advancement demands were rebuffed.

ii. <u>PPAS Properly Held And Remitted The Funds At Issue (Counterclaim V)</u>.

PPAS did not violate the Credit Agreement in refusing to remit to the Zohar Funds money PPAS was holding in a custodial capacity for the Portfolio Companies. Br. 22-24. The Trust brazenly claims that PPAS "offers nothing to support that it could act in a 'banking-like capacity,'" Opp. 24, even as the Credit Agreements expressly authorize PPAS to "accept deposits from, lend money to, and generally engage in any kind of banking, trust, financial advisory or other business with" the Portfolio Companies, Dkt. Ex. 11 § 9.5. The Trust further argues that this provision should simply be ignored because "PPAS is not a bank" such that "the market" would not expect the contractual language "to apply to non-bank agents, like PPAS." Opp. 24-25. But, to state the obvious, this provision expressly grants rights to the "Agent"—defined as "PPAS," Ex. 11—and thus plainly meant to apply to PPAS, not to the "many agents [who] are banks" providing "their normal banking services" in other transactions governed by other contracts, Opp. 24.

In the context of the specific Credit Agreements at issue here, the Trust is impermissibly asking the Court "by construction [to] excise terms" in the contracts "and thereby make a new contract for the parties," notwithstanding that courts are "not free to alter [a] contract" in that manner. *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010). The unsupported assertion that Section 9.5 does not allow PPAS to "engage in th[e] activities" expressly enumerated therein, Opp. 25, fails "to give full meaning and effect to all of [the Credit Agreements'] provisions" and must "be avoided" lest this Court render Section 9.5

9

"superfluous or meaningless." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005). The Trust fails to cite a single case supporting its argument because it flies in the face of black-letter New York law: Section 9.5 must be enforced according to its plain terms. *Greenfield*, 98 N.Y.2d at 569. And that plain meaning necessitates granting PPAS's motion.

The Credit Agreements, moreover, only required PPAS to distribute to lenders "payments and prepayments *of principal and interest*." Ex. 11 § 2.14(d) (emphasis added). The funds held by PPAS were no such thing. The Trust hangs its hat on spreadsheets with columns labeled "paydown[s]" and "borrowing[s]," Opp. 23, while ignoring evidence explaining that these columns did not reflect payments of interest and principal owed to the Zohar Funds nor draw-downs on their credit facilities, Ex. 19 at 61:04-63:03. Moreover, this argument is belied by the Trust's own Rule 56.1 statement stating that "over $20 million" was transferred from PPAS's bank account on October 19, 2017, including "$10.5 million in funds held purportedly for the benefit of the Defaulted Borrowers," Dkt. 345 ¶ 190, which are reflected on the same underlying spreadsheets as a "borrowing[s]," Dkt. 333-39. That cannot be squared with the Trust's brief claiming that all transactions labeled "borrowing[s]" are "disbursements to the Companies" of funds they are "borrowing." Opp. 23. In citing these spreadsheets in its Rule 56.1 statement, the Trust concedes that the terms "Paydown" and "Borrowing" do not mean that these transactions were principal paydowns or borrowing requests. Rather, as used in the spreadsheets, those terms simply refer to transfers of money into or out of PPAS's bank account.[4]

## **CONCLUSION**

For the foregoing reasons, this Court should grant PPAS's motion for summary judgment.

---

[4] Imprecise language in "[c]ompany communications," Opp. 23-24, likewise fails to support the Trust's theory. Croscill's revolver was indisputably fully drawn down by March 28, 2016, and company employees understood that, while they continued to submit "borrowing certificate[s]" to PPAS thereafter, they did so in full knowledge that "PPAS as agent [was] holding cash for Croscill." Ex. 186 (D. Martin) at 53:2-55:11. In other words, transfers to and from PPAS "were no longer borrowings," but instead money "put [] in custody." Ex. 12 (Tilton) at 129:13-131:11.

Dated: New York, New York　　　　　　　GIBSON, DUNN & CRUTCHER LLP
　　　　October 10, 2024

　　　　　　　　　　　　　　　　　　　　By: <u>*/s/ Akiva Shapiro*</u>
　　　　　　　　　　　　　　　　　　　　　　Akiva Shapiro
　　　　　　　　　　　　　　　　　　　　　　Michael L. Nadler
　　　　　　　　　　　　　　　　　　　　　　Seton Hartnett O'Brien
　　　　　　　　　　　　　　　　　　　　　　200 Park Avenue
　　　　　　　　　　　　　　　　　　　　　　New York City, NY 10166
　　　　　　　　　　　　　　　　　　　　　　Telephone: (212) 351-4000
　　　　　　　　　　　　　　　　　　　　　　Facsimile: (212) 351-4035
　　　　　　　　　　　　　　　　　　　　　　ashapiro@gibsondunn.com
　　　　　　　　　　　　　　　　　　　　　　mnadler@gibsondunn.com
　　　　　　　　　　　　　　　　　　　　　　sobrien@gibsondunn.com

　　　　　　　　　　　　　　　　　　　　　　Monica K. Loseman
　　　　　　　　　　　　　　　　　　　　　　1801 California Street
　　　　　　　　　　　　　　　　　　　　　　Denver, CO 80202
　　　　　　　　　　　　　　　　　　　　　　Telephone: (303) 298-5700
　　　　　　　　　　　　　　　　　　　　　　Facsimile: (303) 298-5907
　　　　　　　　　　　　　　　　　　　　　　mloseman@gibosndunn.com

　　　　　　　　　　　　　　　　　　　　　　*Attorneys for Plaintiff Patriarch Partners*
　　　　　　　　　　　　　　　　　　　　　　*Agency Services, LLC*