USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__9/8/25___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PATRIARCH PARTNERS AGENCY SERVICES, LLC,

                    Plaintiff,

         - against -

ZOHAR CDO 2003-I, LTD., et al.,

                    Defendants.

---

16-CV-4488 (VM)

DECISION AND ORDER

**VICTOR MARRERO, United States District Judge.**

        Plaintiff Patriarch Partners Agency Services, LLC ("PPAS") brought this action against defendants Zohar CDO 2003-1, Ltd., Zohar I CDO 2003-1, LLC (together with Zohar CDO 2003-1, Ltd., "Zohar I"), Zohar II 2005-1, Ltd., Zohar II 2005-1, LLC (together with Zohar II 2005-1, Ltd., "Zohar II"), Zohar III, Ltd., and Zohar III, LLC (together with Zohar III, Ltd., "Zohar III", and collectively with Zohar I and Zohar II, the "Zohar Funds" or "Defendants"), Alvarez & Marsal Zohar Management, LLC ("AMZM"), and Alvarez & Marsal Zohar Agency Services, LLC ("AMZAS"). PPAS asserts, among other causes of action, a claim for breach of contract stemming from Defendants' attempted termination of PPAS as administrative agent ("Administrative Agent") under the parties' credit agreements ("Credit Agreements"). (See "Complaint" or "Compl.", Dkt. No. 1; "Amended Complaint" or "Amend. Compl.",

Dkt. No. 46.) The Zohar Funds[1] subsequently brought counterclaims, alleging that PPAS breached the Credit Agreements by, among other things, refusing to remit monies to the Zohar Funds. (See Third Amended Counterclaims.)

Since then, the Zohar Litigation Trust-A (the "Zohar Trust") has replaced the Zohar Funds as defendant/counterclaim plaintiff, (see Dkt. No. 236), and the parties voluntarily dismissed without prejudice PPAS's claims against AMZM and AMZAS pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii), (see Dkt. No. 246).

Pending before the Court are (1) PPAS's motion to exclude the expert testimony of David S. Lorry pursuant to Federal Rule of Evidence 702 ("Rule 702") ("PPAS's Motion to Exclude" or "PPAS MTE", Dkt. No. 325), (2) the Zohar Trust's motion to exclude the expert testimony of Federick Van Zijl pursuant to Rule 702 ("Zohar Trust's Motion to Exclude" or "Zohar MTE", Dkt. No. 320), (3) PPAS's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 ("Rule 56") ("PPAS's Summary Judgment Motion" or "PPAS MSJ", Dkt. No. 322), and (4) the Zohar Trust's motion for partial summary

---

[1] For purposes of the counterclaims, "Zohar I" refers only to Zohar CDO 2003-1, Ltd., "Zohar II" refers only to Zohar II 2005-1, Ltd., "Zohar III" refers only to Zohar III, Ltd., and the "Zohar Funds" refers only to the foregoing entities. (See "Third Amended Counterclaims", Dkt. No. 179 at 8 n.1.)

judgment pursuant to Rule 56 ("Zohar Trust's Summary Judgment Motion" or "Zohar MSJ", Dkt. No. 328). For the reasons stated below, the Court **GRANTS** in part and **DENIES** in part PPAS's Motion to Exclude and the Zohar Trust's Motion to Exclude and **DENIES** PPAS's Summary Judgment Motion and the Zohar Trust's Summary Judgment Motion.

## I.    BACKGROUND[2]

### A.    HOW THE ZOHAR FUNDS OPERATED

The Zohar Funds were three special purpose investment vehicles established by Lynn Tilton ("Tilton") between 2003 and 2007 to issue debt as notes known as collateralized loan obligations ("CLOs"). (See Zohar SMF ¶ 1; PPAS SMF ¶ 6.) At the Funds' founding, Tilton was their ultimate owner. (See id. ¶ 8.)

The Zohar Funds' investors were provided notes in exchange for their capital, which the Funds invested in company loans and equity securities. (See Zohar CMF ¶ 9; Zohar SMF ¶ 1.) The Funds both purchased and loaned money to distressed companies (the "Portfolio Companies"). (See PPAS

---

[2] Except as otherwise noted, the factual recitation derives from PPAS's Local Rule 56.1 ("Rule 56.1") Statement of Undisputed Material Fact, (see "PPAS's Statement of Undisputed Material Fact" or "PPAS SMF", Dkt. No. 331), the Zohar Trust's Rule 56.1 Statement of Undisputed Material Fact (see "Zohar's Statement of Undisputed Material Fact" or "Zohar SMF", Dkt. No. 335), PPAS's Rule 56.1 Counterstatement of Material Fact (see "PPAS's Counterstatement of Material Fact" or "PPAS CMF", Dkt. No. 343), and the Zohar Trust's Rule 56.1 Counterstatement of Material Fact (see "Zohar's Counterstatement of Material Fact" or "Zohar CMF", Dkt. No. 345).

SMF ¶ 16.) Between October 1998 and October 2013, the Zohar Funds extended loans to thirty-seven Portfolio Companies pursuant to separate Credit Agreements. (See Zohar SMF ¶ 10.)

The Portfolio Companies had access to three types of loans through the Zohar Funds: (1) term loans, where the borrower receives the full amount of the loan at the outset, (2) delayed draw term loans ("DDTLs"), where the borrower may borrow incrementally over time up to a predetermined maximum amount of funds, and (3) revolving credit facilities ("Revolvers"), where the borrower may borrow up to a specified amount, pay back part of what it borrowed, and then borrow more. (See PPAS SMF ¶¶ 90-92, 95.)

Tilton held management positions within the Portfolio Companies, including as manager, director, and/or chief executive officer ("CEO"). (See PPAS SMF ¶ 24.) PPAS contends, and the Zohar Trust disputes, that the Zohar Funds' investment strategy relied on Tilton's "active management and control of the Portfolio Companies" to "implement long-term turnaround strategies to create value." (PPAS SMF ¶¶ 18, 23 (internal quotation marks omitted); see Zohar CMF ¶¶ 18, 23.)

Tilton created various entities to manage the Zohar Funds and the Portfolio Companies. (See PPAS SMF ¶ 36.) Patriarch Partners VIII, LLC, Patriarch Partners XIV, LLC, and Patriarch Partners XV, LLC (collectively, the "Patriarch

Managers") are Delaware limited liability companies that served as the first collateral managers ("Collateral Managers") for Zohar I, Zohar II, and Zohar III, respectively, from 2003 to 2016. (See PPAS SMF ¶ 15; Zohar SMF ¶¶ 3-5; PPAS CMF ¶¶ 3-5.) A CLO collateral manager acquires, trades, and monitors the CLO's collateral (*i.e.* its loans and assets), including by selecting loans in which to reinvest the CLO's proceeds. (See PPAS SMF ¶ 74.) Here, the Patriarch Managers selected the Portfolio Companies to which the Zohar Funds extended loans. (See Zohar SMF ¶ 7.) Tilton was the Manager of the Patriarch Managers. (See id. ¶ 6.)

Tilton created PPAS to serve as the "Administrative Agent" under each Credit Agreement. PPAS was a party to the Agreements along with the Zohar Funds, the Portfolio Companies, and in some cases other lenders. (See PPAS SMF ¶ 45; PPAS CMF ¶ 11.) PPAS's primary responsibilities as Administrative Agent were money movement, documentation, and information flow between the lenders, including the Zohar Funds, and the Portfolio Companies. (See PPAS SMF ¶¶ 40-44.) PPAS collected the Portfolio Companies' loan payments and distributed them to the lenders, for example, and received the Companies' borrowing requests and worked with the Collateral Managers to request the funds from the Zohar Funds' bank trustee. (See PPAS SMF ¶¶ 41-42; Zohar SMF ¶¶ 13-15;

PPAS CMF ¶¶ 13-15.) Under the Credit Agreements, the Portfolio Companies paid PPAS a fee for serving as Administrative Agent (the "Agency Fee"), which was typically $75,000 per year. (See PPAS SMF ¶ 52; Zohar SMF ¶ 25.)

In May and June 2011, existing Credit Agreements were amended to state that PPAS was "irrevocably" appointed Administrative Agent. (See Zohar SMF ¶¶ 21-23.) Credit Agreements executed after June 2011 stated that PPAS was "irrevocably" appointed Administrative Agent. (See id. ¶ 24.)

### B. ZOHAR I ENTERS BANKRUPTCY AND THE PATRIARCH MANAGERS STEP DOWN

In November 2015, Zohar I defaulted on its obligations to repay investors, and Patriarch Partners XV, LLC (Zohar I's Collateral Manager) commenced an involuntary Chapter 11 bankruptcy proceeding against it. (See Zohar SMF ¶ 27; PPAS CMF ¶ 27.) On February 5, 2016, the Patriarch Managers resigned as Collateral Managers for all the Zohar Funds, effective as of March 3, 2016. (See PPAS SMF ¶¶ 75-76.) On March 4, 2016, AMZM became the Funds' Collateral Manager. (See PPAS id. ¶ 77; Zohar CMF ¶ 84.) As explained below, PPAS and the Zohar Trust dispute the amount and purpose of certain Zohar Fund monies extended to the Portfolio Companies surrounding the Patriarch Managers' resignations and held by PPAS after the Patriarch Managers' resignations.

6

First, the Zohar Trust and PPAS dispute whether funds extended to the Portfolio Companies surrounding the Patriarch Managers' resignations were invalid borrowings on new loan facilities or draws of remaining balances on existing loan facilities. The Zohar Trust contends that Tilton approved "borrowings" on February 4, 5, 8, and 26, 2016 – during the Patriarch Managers' tenure - and on March 7, 2016 – after AMZM had become Collateral Manager. (See Zohar SMF ¶¶ 29-33; Zohar CMF ¶ 101.) The Trust posits that what PPAS characterizes as draws of existing loans were invalid "purchases and complete draws of entirely new loan facilities." (Id. ¶ 97.) PPAS deposited the approximately $54.6 million in PPAS's account, and many Company employees did not know of or request these borrowings. (See Zohar SMF ¶ 39; Zohar CMF ¶¶ 97-98, 100, 103.)

PPAS counters that certain Portfolio Companies decided to draw their remaining loan balances and deposit the funds in PPAS's account from mid-2015 to early 2016. (See PPAS SMF ¶¶ 97-100.) Those monies belonged to and were available to the Portfolio Companies, subject to Tilton's oversight as manager, director and/or CEO. (See id. ¶ 103.)

Second, the Zohar Trust and PPAS dispute whether, after the Patriarch Managers' resignations, PPAS invalidly held Portfolio Company loan repayments that should have been

remitted to the Zohar Funds, or whether that money consisted of Portfolio Company deposits in PPAS's account of the Companies' fully drawn loan facilities. The Trust asserts that before the Patriarch Managers' resignation, PPAS would maintain less than $1 million in its account, but afterwards, PPAS began "holding tens of millions." (See Zohar SMF ¶ 38-40.) Also, after the Patriarch Managers' resignation, PPAS would receive the Portfolio Companies' loan repayments and keep them in PPAS's account at Tilton's direction "to later loan it back to the Companies." (See id. ¶¶ 41-42; see Zohar CMF ¶ 63.) Starting in March 2016, PPAS tracked this payment and lending activity in monthly account reconciliation spreadsheets. (See id. ¶¶ 43-44; see also "PPAS's Account Reconciliation Spreadsheet", Zohar Ex. 88.)

PPAS counters that it was holding drawn loans on behalf of certain Portfolio Companies in a custodial/banking capacity pursuant to Section 9.5 of the Credit Agreements.[3] Hence, the monies' movement between PPAS and the Portfolio Companies was "more accurately described as deposits and

---

[3] Because the Credit Agreements are "materially the same," both parties use the Croscill Credit Agreement, ("Croscill Agreement" or "Croscill Agmt.", PPAS Ex. 11, Dkt. No. 324-11), as an exemplar. (PPAS MSJ Mem. at 4 n.3; see also Zohar MSJ Mem. at 3 n.2.) Hence, the Court refers to provisions common to the Credit Agreements with their placement in the Croscill Agreement.

withdrawals," not borrowings and paydowns. (See PPAS CMF
¶¶ 41-42.)

C.  ATTEMPTED REMOVAL OF PPAS AND INITIATION OF THE
ACTION

On June 14, 2016, AMZM, acting on the Zohar Funds'
behalf, sent PPAS and the Portfolio Companies letters
purporting to terminate PPAS as Administrative Agent (the
"Termination Letters" or "Termination Ltrs."), PPAS Exs.[4] 37-
38). (See PPAS SMF ¶ 109.) AMZM sought to install AMZAS, an
entity created to replace PPAS, as Administrative Agent, and
AMZAS demanded that the Companies remit loan payments to it.
(See PPAS SMF ¶¶ 110-12; Zohar SMF ¶¶ 49-50.)

PPAS asserted that the purported termination was invalid
under the Credit Agreements, under whose terms PPAS's
appointment was "irrevocable." (Compl. ¶ 19; see id. ¶¶ 20-
21.) On June 15, 2016, PPAS initiated this action against the
Zohar Funds and AMZM. (See id. ¶¶ 6-12.) PPAS later amended
its Complaint to name AMZAS as a defendant, bringing one count
of declaratory judgment pursuant to 28 U.S.C. § 2201 ("Count
I") and one count of breach of contract ("Count II") against
the Zohar Funds, and one count of tortious interference with

---

[4] Citations to "PPAS Ex." correspond to the numbered exhibits submitted
with the Declaration of Akiva Shapiro in support of PPAS's Motion for
Summary Judgment, (see Dkt. No. 324), and the Declaration of Akiva Shapiro
filed contemporaneously with PPAS's Reply, (see Dkt. No. 349). Citations
to page numbers therein correspond to the ECF page number.

contract against AMZM and AMZAS ("Count III"). (<u>See</u> Amend. Compl. ¶¶ 14, 25-41.)

On November 28, 2016, during a pre-motion conference on AMZM and the Zohar Funds' intended motion for a preliminary injunction to bar PPAS from serving as Administrative Agent, the Court instructed that PPAS should continue as Administrative Agent pending resolution of the lawsuit. (<u>See</u> Dkt. No. 31; Dkt. Minute Entry for Nov. 28, 2016; PPAS SMF ¶¶ 121-23.)

### D.    COUNTERCLAIMS AND MOTION TO DISMISS

On January 13, 2017, the Zohar Funds asserted counterclaims against PPAS, which are discussed in further detail below. (<u>See</u> "Second Amended Answer and Counterclaims," Dkt. No. 51 ¶¶ 49-87; "Omnibus Answer and Counterclaims," Dkt. No. 68 ¶¶ 49-87.)

On April 20, 2017, this Court dismissed the Zohar Funds' breach of fiduciary duty counterclaim, but allowed the remaining counterclaims to proceed to discovery.[5] (<u>See</u> Dkt. No. 91 at 18-19.) Subsequently, the Zohar Funds amended their counterclaims twice. (<u>See</u> "Second Amended Counterclaims," Dkt. No. 96; Third Amended Counterclaims.)

---

[5] The Court construed PPAS's letter identifying deficiencies in the Zohar Funds' counterclaims as a motion to dismiss. (<u>See</u> Dkt. No 91 at 1; <u>see also</u> Dkt. Nos. 89-90.)

E.    AMZM DECLARES EVENTS OF DEFAULT

On October 9, 2017, AMZM, on behalf of the Zohar Funds, notified Tilton as Manager of PPAS that nineteen Portfolio Companies (the "Nineteen Companies") failed to pay interest for one or multiple periods, thus triggering events of default ("Events of Default") under the Credit Agreements.[6] (See "Default Letters" or "Default Ltrs.", Zohar Exs.[7] 97, 102-19, 121; see also Zohar SMF ¶¶ 61-63; PPAS SMF ¶ 125.) The Zohar Funds, through AMZM, directed PPAS to send notice to the Nineteen Companies declaring all unpaid obligations immediately due and any DDTLs or Revolvers terminated. The Zohar Funds also instructed PPAS to "exercise all applicable rights or remedies provided in the Credit Documents," including remittance of any funds PPAS held for the Nineteen

---

[6] The Nineteen Companies were: (1) Fetco Home Decor, Inc. ("Fetco"), (2) Inter-Marketing Group, Inc. ("IMG"), Dana Classic Fragrances, Inc. ("Dana"), and Dana S.A.U., (3) Duro Industries, Inc. (f/k/a Chase Street Inc.) ("Chase St."), (4) Duro Textiles, LLC ("Duro"), (5) Galey & Lord, LLC ("Galey"), (6) East Alliance Limited ("East Alliance"), (7) Scan-Optics LLC ("Scan Optics"), (8) Spiegel LLC (f/k/a Artemiss LLC) ("Spiegel"), (9) NetVersant Solutions, Inc. ("Netversant"), (10) Croscill, LLC ("Croscill"), (11) Natura Water, LLC (f/k/a Natura Water, Inc.) ("Natura"), (12) Hartwell Industries Inc. ("Hartwell"), (13) Silverack, LLC ("Silverack"), (14) Galey & Lord Industries, LLC ("GLI"), (15) 180s, Inc. ("180s Inc."), (16) Best Textiles Acquisition, LLC ("Best Textiles"), (17) Acme International Enterprises, Inc. ("Acme"), (18) Remco Maintenance, LLC ("Remco"), and (19) American Doors, LLC (d/b/a Black Mountain Door) ("BMD"). (See Zohar SMF ¶ 63.)

[7] Citations to "Zohar Ex." correspond to the numbered exhibits submitted with the Declaration of Jonathan E. Pickhardt in support of the Zohar Trust's Summary Judgment Motion, (see Dkt. Nos. 332-334), and the Declaration of Jonathan E. Pickhardt in opposition to PPAS's Summary Judgment Motion, (see Dkt. No. 346). Citations to page numbers therein correspond to the ECF page number.

Companies. (Default Ltrs. at 2-3; <u>see also</u> Zohar SMF ¶ 64.) As of October 9, 2017, PPAS was holding funds for twelve of the Nineteen Companies (the "Default Companies"[8]). (See Zohar SMF ¶¶ 65-66.)

On October 17, 2017, Tilton, as Manager of PPAS, replied to the Default Letters, asking AMZM to clarify that it was demanding that PPAS send default notices to the Nineteen Companies and then begin the process of foreclosure to sell or liquidate those Companies. (See "October 17 Letter" or "Oct. 17 Ltr.", PPAS Ex. 42 at 2-3; <u>see also</u> PPAS SMF ¶ 127.) Tilton explained that once default notices were sent, "by law . . . [the Companies] will no longer be able to operate" and "will need to immediately cease operations and terminate all vendor and employee relationships." Hence, Tilton requested "wind-down costs of $2 [million] per [Company]." (Oct. 17 Ltr. at 3.) Additionally, Tilton identified five Default Companies that would generate greater value if allowed additional time to strengthen before being sold (the "Value Companies"). (See <u>id.</u>) Also on October 17, 2017, PPAS's counsel responded separately to AMZM's default instructions, explaining that the funds PPAS held were drawn Revolvers and

---

[8] The Default Companies were: (1) 180s Inc., (2) Acme, (3) Best Textiles, (4) Croscill, (5) Hartwell, (6) IMG/Dana, (7) Natura, (8) Netversant, (9) Remco, (10) Scan Optics, (11) Silverack, and (12) Spiegel. (See Zohar MSJ Mem. at 7 n.3; Zohar SMF ¶ 65.)

DDTLs belonging to the Default Companies, such that PPAS did not have authority to remit that money to the Zohar Funds. (See PPAS's CMF ¶ 80.)

On October 23, 2017, AMZM, acting for the Zohar Funds, responded to PPAS's October 17 Letter, asserting that the Credit Agreements did not permit PPAS to disregard the Zohar Funds' directions pending an advance of wind-down costs. (See "October 23 Letter" or "Oct. 23 Ltr.", PPAS Ex. 43 at 2.) AMZM requested that PPAS deliver the Value Companies' financial information and agreed in the meantime to hold in abeyance the default instructions as to the Value Companies. (See id. at 3; Zohar SMF ¶ 95; Zohar CMF ¶ 128.)

AMZM and PPAS continued to exchange letters relating to the Events of Default, PPAS's request for wind-down costs, and whether AMZM reinstated its default instructions as to the Value Companies through February 2018, which are discussed below in Section III.C.1.

F.    THE ZOHAR FUNDS AMEND THEIR COUNTERCLAIMS

On December 21, 2017, the Zohar Funds amended their counterclaims – the operative counterclaims - asserting seven counterclaims against PPAS. (See Third Amended Counterclaims.) First, one claim for declaratory judgment pursuant to 28 U.S.C. § 2201, seeking a declaration that PPAS was lawfully removed as Administrative Agent under the Credit

Agreements ("Counterclaim I"). (See id. ¶¶ 64-69.) Second, five counts of breach of contract based on (1) PPAS's alleged failure to deliver Portfolio Company documents to the Zohar Funds ("Counterclaim II"), (see id. ¶¶ 70-75); (2) PPAS's alleged refusal to carry out the Zohar Funds' instructions after AMZM declared Events of Default for the Nineteen Companies, including by refusing to remit the Default Companies' funds ("Counterclaim III"), (see id. ¶¶ 76-83); (3) PPAS's acceptance of non-conforming payments from the Portfolio Companies as purported modifications of the loan terms by course of performance ("Counterclaim IV"), (see id. ¶¶ 84-89); (4) PPAS's alleged failure to promptly distribute payments from the Portfolio Companies on Revolvers and DDTLs to the Funds ("Counterclaim V"), (see id. ¶¶ 90-95); and (5) PPAS's alleged failure to distribute funds recovered from Transcare, a Portfolio Company, after Transcare declared bankruptcy ("Counterclaim VI"), (see id. ¶¶ 96-101). Finally, one count of conversion based on PPAS's refusal to remit to AMZAS the portion of PPAS's Agency Fees that it collected after its removal as Administrative Agent ("Counterclaim VII"). (See id. ¶¶ 102-07.)

G.    THE CHAPTER 11 BANKRUPTCY AND THE INSTANT MOTIONS

On February 2, 2021, this action was stayed because the Zohar Funds initiated Chapter 11 bankruptcy proceedings in

the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). (See Dkt. No. 205.) On September 22, 2022, this Court lifted the stay pursuant to 11 U.S.C. § 362(c)(1) because the Bankruptcy Court entered an order closing the Chapter 11 cases of the Zohar Funds. (See Dkt. No. 224.)

On November 10, 2022, Magistrate Judge Katharine H. Parker granted the unopposed motion to substitute the Zohar Trust as defendant/counterclaim plaintiff in place of the Zohar Funds as the Funds' successor in interest. (See Dkt. No. 236.) On November 18, 2022, this Court approved the parties' stipulation of voluntary dismissal without prejudice as to AMZM and AMZAS pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii). (See Dkt. No. 246.) Hence, the remaining parties to this action are PPAS and the Zohar Trust.

On July 18, 2024, the parties filed their dueling Summary Judgment Motions, (see PPAS MSJ; Zohar MSJ), along with supporting memoranda of law, (see "PPAS MSJ Mem.", Dkt. No. 330; "Zohar MSJ Mem.", Dkt. No. 329), and Rule 56.1 statements of undisputed material fact, (see PPAS SMF; Zohar SMF). That same day, the parties filed their dueling motions to exclude the other party's expert report, (see PPAS MTE; Zohar MTE), along with supporting memoranda of law, (see "PPAS MTE Mem.", Dkt. No. 326; "Zohar MTE Mem.", Dkt. No. 321).

On September 12, 2024, the parties filed memoranda of law in opposition to the other's Summary Judgment Motion, (see "PPAS MSJ Opp'n.", Dkt. No. 341; "Zohar MSJ Opp'n.", Dkt. No. 344), and Rule 56.1 counterstatements, (see PPAS CMF; Zohar CMF). Additionally, PPAS submitted Tilton's declaration in opposition to the Zohar Trust's Summary Judgment Motion. (See "Tilton Declaration" or "Tilton Decl.", Dkt. No. 342.) That same day, the parties filed memoranda of law in opposition to the other's Motion to Exclude. (See "PPAS MTE Opp'n.", Dkt. No. 339; "Zohar MTE Opp'n.", Dkt. No. 336.)

On October 10, 2024, the parties filed their respective replies in support of their Summary Judgment Motions, (see "PPAS MSJ Reply", Dkt. No. 351; "Zohar MSJ Reply", Dkt. No. 348), and their Motions to Exclude, (see "PPAS MTE Reply", Dkt. No. 352; "Zohar MTE Reply", Dkt. No. 347).

## II. MOTIONS TO EXCLUDE EXPERT TESTIMONY

### A. LEGAL STANDARD

Rule 702 governs the admissibility of expert testimony and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient

16

> facts or data; (c) the testimony is the product of
> reliable principles and methods; and (d) the
> expert's opinion reflects a reliable application of
> the principles and methods to the facts of the case.

Fed. R. Evid. 702; see also Daubert v. Merrell Dow Pharms.,
Inc., 509 U.S. 579, 588 (1993).

Pursuant to Rule 702, to determine whether expert
testimony is admissible, a court assesses "three issues: (1)
the qualifications of the expert, (2) the reliability of the
methodology and underlying data employed by the expert, and
(3) the relevance of that about which the expert intends to
testify." Washington v. Kellwood Co., 105 F. Supp. 3d 293,
304 (S.D.N.Y. 2015). First, when assessing an expert's
qualifications, "courts compare the area in which the witness
has superior knowledge, education, experience, or skill with
the subject matter of the proffered testimony." United States
v. Tin Yat Chin, 371 F.3d 31, 40 (2d Cir. 2004). A trial court
"must consider the totality of a witness's background when
evaluating the witness's qualifications to testify as an
expert." Arista Records LLC v. Usenet.com, Inc., 608 F. Supp.
2d 409, 422 (S.D.N.Y. 2009) (internal quotation marks
omitted).

Turning to reliability and relevance, a district court
must "ensur[e] that an expert's testimony both rests on a
reliable foundation and is relevant to the task at hand."

Daubert, 509 U.S. at 597. Expert testimony should be excluded based on reliability concerns only "if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC, 571 F.3d 206, 214 (2d Cir. 2009) (internal quotation marks omitted). Under the Daubert standard, the trial court thus "functions as the gatekeeper for expert testimony." Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997). This gatekeeping obligation "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999).

In the Second Circuit, there is "a presumption of admissibility of evidence." Borawick v. Shay, 68 F.3d 597, 610 (2d Cir. 1995). When admitting or excluding expert evidence, a trial judge has "broad discretion unless his decision is clearly wrong." United States v. Bilzerian, 926 F.2d 1285, 1295 (2d Cir. 1991). Moreover, "[a] minor flaw . . . will not render an expert's opinion *per se* inadmissible, [but rather] '[t]he judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions.'" Amorgianos

v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002) (quoting In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 746 (3d Cir. 1994)). "As the Supreme Court has explained, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" Id. (quoting Daubert, 509 U.S. at 596).

Further, "Daubert and its progeny . . . do not apply straightforwardly in the context of bench trials." 720 Lex. Acquisition LLC v. Guess? Retail, Inc., No. 09 Civ. 07199, 2014 WL 4184691, at *10 (S.D.N.Y. Aug. 22, 2014).[9] This rule holds because in a bench trial, as here, "there is no risk of jury confusion." Simmons v. Garland, No. 21 Civ. 01728, 2024 WL 1468239, at *3 (E.D.N.Y. Mar. 20, 2024); see also Victoria's Secret Stores Brand Mgmt., Inc. v. Sexy Hair Concepts, LLC, No. 07 Civ. 05804, 2009 WL 959775, at *8 n.4 (S.D.N.Y. Apr. 8, 2009) ("In the context of a bench trial, . . . there is no possibility of prejudice, and no need to protect the factfinder from being overawed by 'expert' analysis."). Accordingly, "[w]hile standards for admissible evidence are not out the window entirely in a bench trial,

---

[9] The parties waived their right to a jury trial. (See Croscill Agmt. § 10.11.)

all doubts at a bench trial should be resolved in favor of admissibility." <u>Com. Funding Corp. v. Comprehensive Habilitation Servs.</u>, Inc., No. 01 Civ. 03796, 2004 WL 1970144, at *5 (S.D.N.Y. Sept. 3, 2004) (internal quotation marks omitted).

### B.   <u>PPAS'S MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DAVID LORRY</u>

The Trust offers the expert testimony of David Lorry ("Lorry") in support of its Summary Judgment Motion. (<u>See</u> "Lorry Report", Zohar Ex. 122.) PPAS moves to exclude the Lorry Report pursuant to Rule 702 and <u>Daubert</u>. (<u>See</u> PPAS MTE Mem.) For the reasons below, PPAS's Motion to Exclude is **GRANTED** in part and **DENIED** in part.

Lorry is a Senior Consultant at Brattle – a financial consulting firm - in the Securities Group and Bankruptcy & Restructuring Practice. (<u>See</u> Lorry Report ¶ 7.) Previously, he was associated with the Versa Capital Funds ("Versa") and related entities, where he was involved in more than forty agented loan transactions in which Versa was lender, borrower, and/or agent. (<u>See</u> <u>id.</u> ¶¶ 8, 12.) Lorry holds a J.D. from the George Washington University Law School and a B.A. in Political Science from Duke University. (<u>See</u> <u>id.</u> ¶ 15.)

Lorry offers the following opinions. First, PPAS's actions, including holding loan draws in a comingled PPAS account, retaining Portfolio Companies' payments, and making loan disbursements to the Companies, deviated from the "customary ministerial [role] of an administrative agent." (Id. ¶ 70.) Second, Credit Agreements Section 9.5[10] applies only to regulated banks acting as administrative agents, not to non-bank agents. (See id. ¶ 86.) Third, PPAS's failure to remit funds it held for the Default Companies at the Zohar Funds' request caused approximately $12.6 million in damages and was "atypical and inconsistent with standard custom and practice." (Id. ¶¶ 97, 100.) Finally, PPAS's failure to remit Revolver paydowns caused damages ranging from approximately $4.5 million to $37.3 million under three calculation methods. (See id. ¶ 104-05.) The Court addresses each of PPAS's arguments to exclude Lorry's testimony in turn.

### 1.   Lorry's Qualifications

First, PPAS argues that Lorry is unqualified to opine on damages and industry custom related to complex investment vehicles because he has no experience in damages analysis or with non-bank/non-lender administrative agents. (See PPAS MTE

---

[10] Section 9.5 provides that "[t]he Agent . . . may accept deposits from, lend money to and generally engage in any kind of banking, trust, financial advisory or other business with the Borrower . . . as if it were not performing the duties specified herein." (Croscill Agmt. § 9.5.)

Mem. at 8-10.) The Zohar Trust counters that Lorry is qualified through his specialized knowledge gained from more than two decades in the financial industry and involvement in over forty agented loan transactions. (See Zohar MTE Opp'n. at 10-11.)

The Court finds that Lorry's experience with agented loan transactions qualifies him to opine on damages and industry practice. "Liberality and flexibility in evaluating qualifications should be the rule; the proposed expert should not be required to satisfy an overly narrow test of his own qualifications." Lappe v. Am. Honda Motor Co., 857 F. Supp. 222, 227 (N.D.N.Y. 1994), aff'd sub nom. Lappe v. Honda Motor Co. of Japan, 101 F.3d 682 (2d Cir. 1996). "[I]f an expert has educational and experiential qualifications in a field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." Edmondson v. RCI Hosp. Holdings, Inc., No. 16 Civ. 2242, 2020 WL 1503452, at *4 (S.D.N.Y. Mar. 30, 2020) (internal quotation marks omitted). That Lorry does not have experience with non-lender/non-bank administrative agents can be "properly explored on cross-examination and [goes] to his testimony's weight and credibility — not its admissibility." McCullock v. H.B. Fuller Co., 61 F.3d 1038,

1043 (2d Cir. 1995) (affirming that expert was qualified through "extensive practical experience," despite not having formal education relating to fume dispersal or experience with air quality studies).

Further, the cases PPAS cites for the proposition that Lorry is unqualified to offer damages opinions involve prospects in which the alleged damages were not unpaid fixed amounts, but intangibles whose value was harder to quantify, future lost profit damages requiring financial modeling, or categories of damage calculations "[i]ndisput[ably] . . . performed by actuaries." Mason v. AmTrust Fin. Servs., Inc., No. 19 Civ. 8364, 2020 WL 7425254, at *4 (S.D.N.Y. Dec. 18, 2020) (excluding non-actuary expert's testimony because "the calculation of values for incurred losses in the insurance industry is a task performed by actuaries"); see also Kozak v. Medtronic, Inc., 512 F. Supp. 2d 913, 917-19 (S.D. Tex. 2007) (orthopedic surgeon was unqualified to testify on future damages from misappropriation of trade secrets); LifeWise Master Funding v. Telebank, 374 F.3d 917, 928 (10th Cir. 2004) (affirming exclusion of expert's future lost profits damages model when expert "admitted that he had never used the methods" to create the model); Lamoureaux v. Anazaohealth Corp., No. 03 Civ. 1382, 2009 WL 1162875, at *3 (D. Conn. Apr. 30, 2009) (excluding expert's lost profits

damages model when expert admitted he was "not a damages model expert"); Freedman Normand Friedland LLP v. Cyrulnik, No. 21 Civ. 1746, 2024 WL 2218748, at *2 (S.D.N.Y. May 15, 2024) (excluding expert who "lacks any legal training and has never placed a valuation on a lawsuit"). "Although [PPAS] argue[s] that [Lorry] is unqualified to offer an opinion on [the Trust's] damages because he has never been employed as a modeling agent, such quibbles regarding a witness's qualifications or lack of specialization go to the weight of the expert's testimony, rather than to its admissibility." Edmondson, 2020 WL 1503452, at * 4. Hence, the Court will not exclude the Lorry Report on the basis that Lorry is unqualified.

2.    Lorry's Damages Calculations

Second, PPAS argues that Lorry used unreliable methods to calculate damages and that his damages calculations will not help the trier of fact.

First, PPAS claims that all of Lorry's damages calculations are unreliable because Lorry did not calculate "but-for" damages. (PPAS MTE Mem. at 10.) The Trust counters that Lorry assumed that but-for PPAS's breaches, the Zohar Funds would have received the Default Companies' funds in PPAS's account on October 9, 2017 (when Default Letters were sent), and the Portfolio Companies' paydowns of Revolvers.

(See Zohar MTE Opp'n. at 13.) The Court agrees that Lorry's methodology of calculating damages "on account of the funds not returned" and by assuming that "[e]ach payment not remitted represents a lost recovery" is reliable. (Lorry Report ¶¶ 98, 104.) See Orchard Enters. NY, Inc. v. Megabop Recs. Ltd., No. 09 Civ. 9607, 2012 WL 75407, at *1 (S.D.N.Y. Jan. 9, 2012) ("Under New York law, where a defendant breaches a contract by failing to pay money owed, the plaintiff is entitled to recover the unpaid amount due under the contract plus interest.").

Moreover, "[w]hen the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." CA, Inc. v. AppDynamics, Inc., No. 13 Civ. 2111, 2015 WL 1606638, at *2 (E.D.N.Y. Apr. 8, 2015) (quoting i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 852 (Fed. Cir. 2010) (internal quotation marks omitted)); see also Pryce v. Progressive Corp., 765 F. Supp. 3d 219, 232 (E.D.N.Y. 2025) ("[Defendant's] contention about the appropriate method of calculating the actual damages . . . may be raised and argued as a reason to discount the calculations set forth in the [expert] Reports. But it is not a basis to preclude . . . the testimony . . . .").

25

Regarding Lorry's calculation of damages as to the Default Companies' monies, PPAS contends that the calculation is unreliable because (1) it was predicated upon the "erroneous assumption[]" that funds in PPAS's account as of October 9, 2017, should have been remitted to the Zohar Funds and (2) Lorry did not consider that the Zohar Funds could have "later received monetary recoveries that could have offset" the calculated damages. (PPAS MTE Mem. at 13-14.) Further, Lorry calculated the Default Company damages using simple addition, which does not require expert opinion. (See id. at 13.) The Trust counters that Lorry was entitled to rely on the Trust's theory that the Default Companies' monies should have been remitted, PPAS has not argued that the Zohar Funds ever recovered on Default Company loans, and Lorry's calculation organized information from twenty-eight separate loan facilities and confirmed those figures against U.S. Bank daily cash files. (See Zohar MTE Opp'n. at 15-17.)

Although the Court finds that Lorry was permitted to rely on the Trust's theory that Default Company funds should have been remitted and that the Zohar Funds did not recover from the Default Companies after October 9, 2017, the Court holds that Lorry's calculations did not require specialized knowledge.

As an initial matter, "[w]hen facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts," and "a trial court [may not] exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Fed. R. Evid. 702, Advisory Committee Notes — 2000 Amendment. Hence, at the pretrial stage when the court has not "made clear that certain issues could not be disputed," "[a]n expert is permitted to accept a party's version of events in drawing conclusions." Simmons, 2024 WL 1468239, at *2 (declining to exclude expert opinion on the grounds that the expert accepted petitioner's testimony as true).

Although the Court finds Lorry's Default Company damages calculation to be reliable, this calculation did not require an expert. While "[c]ourts in this circuit have occasionally excluded expert testimony that consists only of 'basic calculations,'" courts have admitted expert testimony that "takes the ultimate form of basic arithmetic when the expert used specialized knowledge, either to identify the appropriate inputs for the relevant computation or to determine what kind of calculation was necessary." Alan L. Frank L. Assocs., P.C. v. OOO RM Inv., No. 17 Civ. 1338, 2021 WL 1906468, at *10 (E.D.N.Y. May 12, 2021) (listing cases).

Here, Lorry did not use his specialized knowledge to calculate damages as to the Default Companies. Rather, Lorry merely added Default Company funds in twenty-nine rows[11] of PPAS's Account Reconciliation Spreadsheet as of October 9, 2017, and confirmed those amounts against the U.S. bank ledgers. (See Lorry Report ¶ 99.) Conversely, in the cases the Trust cites, the expert relied on her specialized expertise to formulate the figures underlying the "rote calculations." Int'l Bus. Machines Corp. v. BGC Partners, Inc., No. 10 Civ. 128, 2013 WL 1775437, at *7 (S.D.N.Y. Apr. 25, 2013) (in formulating calculations, expert "eschew[ed] a fee discount," "bas[ed] his calculations on [defendant's] overdeployment of Informix software on 56 extra processors rather than the 446 unauthorized concurrent sessions," "employ[ed] historical prices for the software licenses," and "conclude[ed] that license fees for 2009 and maintenance fees for 2010 would provide appropriate compensation"); In re Scotts EZ Seed Litig., No. 12 Civ. 4727, 2017 WL 3396433, at *11 (S.D.N.Y. Aug. 8, 2017) (in formulating calculations, expert "reviewed the production of sales records" and "data that appear to show the number of wholesale packages" sold, then "calculated the average price per unit," and used the

---

[11] There are twenty-nine rows, not twelve, because some Default Companies had multiple loan facilities. (See Lorry Report ¶ 99.)

results of another expert's survey as "input in his damages calculation" (internal quotation marks omitted)).

Accordingly, the Court **GRANTS** PPAS's Motion to Exclude as to Lorry's damages calculation regarding the Default Companies' funds. (See Lorry Report ¶¶ 99-100.)

Additionally, PPAS contends that Lorry's damages calculations as to unremitted Revolver paydowns are unreliable because Lorry offers three potential damages calculations using three methodologies, ranging from less than $5 million to almost $40 million, without indicating which is most accurate. (See PPAS MTE Mem. at 16-17.) The Trust counters that the three damages calculations are proper because they use reliable methods and do not purport to measure the same thing. (See Zohar MTE Opp'n. at 18-19.)

The Court declines to exclude Lorry's Revolver damages calculations on the basis that Lorry used three calculations with different outcomes, as the results are not "inexplicably inconsistent." In re LIBOR-Based Fin. Instruments Antitrust Litig., 299 F. Supp. 3d 430, 468 (S.D.N.Y. 2018). Rather, Lorry explains that calculating damages from PPAS's alleged failure to remit Revolver payments is "inherently complex" because PPAS "re-advanc[ed] payments it received," such that the "damage analysis should account for the fact that PPAS recycled the same monies in and out of its account." (Lorry

Report ¶ 104.) Hence, as illustrated below, Lorry describes the methodology and factual assumptions underlying each calculation, and "there is nothing inherently improper about a damages expert presenting multiple alternative damages models." Scripps Health v. nThrive Revenue Sys., LLC, No. 19 Civ. 00760, 2021 WL 3372835, at *3 (S.D. Cal. May 10, 2021). The resolution of disputed facts at trial – namely, what the "paydowns" in PPAS's Account Reconciliation Spreadsheet were – will resolve which of the methods, if any, are appropriate. (See Section III.D.1.a.)

PPAS also attacks the three methods – "unremitted paydowns," "high-water mark of availability," and "draws v. advances" - on their own deficiencies.

Under the "unremitted paydowns" calculation, Lorry added the "paydowns" on the PPAS Account Reconciliation Spreadsheet that did not correspond to any activity on the U.S. bank ledgers, indicating that the sum was not remitted to the Zohar Funds. Lorry capped paydowns for each Portfolio Company at its loan commitment amount, since "in some instances, the recycling of dollars resulted in aggregate payments well in excess of the maximum commitment." (Lorry Report ¶ 108.) This damages calculation amounts to approximately $37.3 million. (See id. ¶ 110.) PPAS contends that the "unremitted paydowns" calculation should be excluded because (1) it uses simple

addition and (2) does not account for Portfolio Companies'
deposits to PPAS as offsetting their withdrawals, thus
artificially inflating damages. (See PPAS MTE Mem. at 18-19.)
The Trust concedes that "recycled dollars are an inevitable
challenge of calculating damages" on Revolvers, but counters
that for this reason, Lorry capped damages at each Company's
commitment amount and presented two other damages
calculations. (See Zohar MTE Opp'n. at 19-20.)

The Court finds that Lorry's "unremitted paydowns"
calculation did not merely use simple addition. Unlike the
Default Company damages calculation, Lorry did not only add
amounts of funds reflected in PPAS's Account Reconciliation
Spreadsheet as of a particular date. Rather, Lorry,
identified "paydowns" over time, compared each entry to the
Zohar Funds' U.S. bank ledgers, subtracted amounts reflected
in the Ledgers, and capped each Portfolio Company's damages
at the Revolver's limit. Thus, the Court will not exclude the
"unremitted paydowns" calculation on the basis that it does
not require expert opinion.

Further, "there is no reason to exclude [Lorry's]
opinion for not using the deposits to offset the withdrawals,
because it is not clear that such an offset is proper to
determine [the Trust's] damages." Cabot E. Broward 2 LLC
v. Cabot, No. 16 Civ. 61218, 2018 WL 11309826, at *4 (S.D.

Fla. July 26, 2018) (whether deposits "should offset at least a portion of the withdrawals . . . would go to the weight afforded to [the expert's] testimony"); see also Pryce, 765 at 232 (argument that damages expert's "methodology fails to account for insureds who have additional PIP coverage, and that the CFES Reports in some instances mismatch individual claimants and wage rates" goes to the weight afforded the expert testimony).

PPAS's attack on the "unremitted paydowns" calculation rests on the disputed fact of whether the funds in PPAS's account were unremitted loan paydowns or merely withdrawn loan funds that PPAS held for the Portfolio Companies. (See Section III.D.1.a.) As explained above, while this fact is still disputed, Lorry is entitled to rely on the Trust's version of events. See Simmons, 2024 WL 1468239, at *2. Hence, PPAS's arguments that Lorry did not properly exclude deposits from his calculation go to weight of the testimony, not its admissibility. Accordingly, the Court will not exclude Lorry's "unremitted paydowns" calculation on the basis that Lorry failed to offset withdrawals with deposits.

Next, under the "high-water mark of availability" calculation, Lorry found the greatest amount of availability on each Portfolio Company's Revolvers during the period covered by PPAS's Account Reconciliation Spreadsheet to

ascertain "when the net [borrowing and paydown] activity would have generated the highest amount of unremitted funds in the PPAS account." (Lorry Report ¶ 114.) These funds "should have been remitted to the Zohar Funds," but "PPAS instead treated [them] as availability." (Id. ¶ 111.) This damages calculation amounts to approximately $9 million. (Id. ¶ 114.) PPAS argues that the "high-water mark" calculation should be excluded because (1) the calculation does not measure Portfolio Company payments to PPAS, but rather the total amount that PPAS held, such that Lorry's calculation finds damages even when no payment to PPAS was made, and (2) the methodology relies excessively on hindsight because there was no way for PPAS to know at the time when it would hold the highest amount of funds for each Portfolio Company. (See PPAS MTE at 20-21.) The Trust counters that the highest amount of funds held for each Portfolio Company represents a "reasonable approximation of what should have been remitted to the Zohar Funds over time" and does not suggest that PPAS should have known at any particular day that the balance was at the high-water mark. (Zohar MTE Opp'n. at 20.)

As is the case regarding the "unremitted paydowns" calculation, whether the money in PPAS's account at the "high-water mark" consisted of loan repayments or deposits of drawn loan funds rests on a disputed fact that will be resolved at

trial. Likewise, PPAS's argument that the "high-water mark" of funds in its account did not consist solely of payments to PPAS goes to the weight of Lorry's testimony, not its admissibility.

Further, the Court finds that Lorry did not impermissibly rely on hindsight when calculating the "high-water mark" damages. Because, "[i]n New York, 'the general rule is that damages for breach of contract are computed at the time of breach,'" expert testimony on damages is excluded when it is "calculated with the benefit of hindsight." Moreno-Godoy v. Kartagener, 7 F.4th 78, 85-86 (2d Cir. 2021) (quoting J.M. Rodriguez & Co. v. Moore-McCormack Lines, Inc., 299 N.E.2d 243, 244 (N.Y. 1973)). Here, however, Lorry did not base the "high-water mark" figures on "what the actual economic conditions and performance were in light of hindsight." R.A. Mackie & Co., L.P. v. Petrocorp Inc., 329 F. Supp. 2d 477, 511 (S.D.N.Y. 2004) (internal quotation marks omitted). Rather, Lorry's calculations approximate what PPAS should have remitted to the Zohar Funds over time; they do not project future damages based on facts unavailable at the breach. Cf. Jakobovits as Tr. of Lite Tr. I v. PHL Variable Ins. Co., 645 F. Supp. 3d 95, 113 (E.D.N.Y. 2022) (excluding damages calculation in life insurance dispute where expert assumed facts "allow[ing] plaintiff to know which insureds

have died, a fact that was uncertain at the time of the alleged breach"). Thus, the Court declines to exclude the "high-water mark" damage calculation on the basis that it was calculated with hindsight.

Finally, under the "draws v. advances" calculation, Lorry assumed the only funds PPAS could provide to Portfolio Companies were proceeds from the Revolver draws in February and March 2016, described above in Section I.B. Lorry then summed the paydowns received through the date on which those Revolver draws would have been exhausted. (See Lorry Report ¶¶ 115-16.) This damages calculation amounts to approximately $4.5 million. (See id. ¶ 118.) PPAS contends the "draws v. advances" calculation should be excluded because Lorry did not account for offsetting deposits and withdrawals. (See PPAS MTE Mem. at 22.) The Trust counters that this calculation is "a reasonable approximation of damages" and that Lorry did not speculate about whether Portfolio Companies might have stopped paying down loans if they could no longer withdraw funds or whether the Companies could have accessed other funds to pay down the loans above what Lorry calculated. (Zohar MTE Opp'n. at 21-22.)

As explained above, the Court will not exclude the "draws v. advances" calculation on the basis that Lorry did not exclude offsetting deposits. Whether funds in PPAS's account

were unmitted loan paydowns or deposits of withdrawn loans
is a disputed fact, and Lorry is entitled to rely on the
Trust's version of events until the dispute is resolved. See
Simmons, 2024 WL 1468239, at *2.

Accordingly, the Court **DENIES** PPAS's Motion to Exclude
as to the Revolver damages.

### 3.   Lorry's Opinions on Industry Custom

Third, PPAS argues that Lorry's opinions that (1) PPAS
did not function like a typical administrative agent and (2)
Section 9.5 applies only to bank administrative agents are
irrelevant, since those opinions ask the Court to disregard
the Credit Agreements. (See PPAS MTE Mem. at 23-24; Lorry
Report ¶¶ 70-86.) The Trust counters that Lorry's opinions
provide context regarding how contract terms are frequently
used in the industry. (Zohar MTE Opp'n. at 22.)

Although experts may not offer legal conclusions, such
as what a contract means or whether a party breached, experts
may opine on relevant industry custom as informed by the
expert's experience. See, e.g., Pro. Consultants Ins. Co.
v. Emps. Reinsurance Co., No. 03 Civ. 216, 2006 WL 751244, at
*22 (D. Vt. Mar. 8, 2006) ("To the extent that the statements
are intended as facts concerning prevailing reinsurance
customs, they are admissible as expert opinion testimony. To
the extent that they may be read as opinions on the ultimate

legal issues before the Court, they are not admissible."). Further, experts may opine on what, in their view, is "consistent with industry customs or practices — though any opinion that opines on what the parties actually intended, said, or did in negotiating and drafting the [a]greement is inadmissible." Novartis Pharma AG v. Incyte Corp., No. 20 Civ. 400, 2024 WL 3608338, at *12 (S.D.N.Y. July 29, 2024).

Here, the Court finds that Lorry's opinions as to industry custom, how PPAS's actions were or were not consistent with industry custom, and how the industry interprets standard contractual provisions does not ask the fact finder to ignore the Credit Agreements.[12] If the Court finds contractual ambiguity, the opinions will assist the fact finder to determine the parties' intent. See Natwest USA Credit Corp. v. Alco Standard Corp., 858 F. Supp. 401, 413 (S.D.N.Y. 1994) ("When the terms of a contract are ambiguous, extrinsic evidence, including evidence of industry custom or practice, may be considered to determine the parties' intent."). Lorry's opinion that "PPAS's reliance on [Section 9.5] [is] misplaced" because that section applies only to

---

[12] The Court clarifies that Lorry's opinions as to whether PPAS acted in accordance with industry custom when it received default instructions are not excluded. While those opinions are in the "Damages" section of the Lorry Report, they are relevant opinions on industry custom supported by Lorry's experience in the agented loan industry. (See Lorry Report ¶¶ 94-98.)

bank administrative agents (Lorry Report ¶ 79), however, impermissibly concludes the parties' intent in drafting the Credit Agreements and is therefore excluded.

Accordingly, PPAS's Motion to Exclude is **GRANTED** to the extent Lorry's opinion regarding Section 9.5 hypothesizes the parties' intent in drafting the Credit Agreements. But PPAS's Motion to Exclude is **DENIED** as to Lorry's opinions on industry custom, whether PPAS's actions were consistent with industry custom, and the meaning of standard credit agreement terms within the industry.

### 4.   Lorry's Factual Narrative

Finally, PPAS contends that Lorry's factual narrative is partisan because Lorry ignored relevant facts. (See PPAS MTE Mem. at 24; see also PPAS MTE Reply at 10.) The Trust counters that the portion of the Lorry Report to which PPAS objects is the background section, not the opinion section. (See Zohar MTE Opp'n. at 24; Lorry Report ¶¶ 49-69.) Regardless, Lorry's opinions were based on the deposition testimony of PPAS witnesses, and PPAS identifies no evidence that would have changed Lorry's opinions. (See Zohar MTE Opp'n. at 25.)

It is "inappropriate for experts to act as a vehicle to present a factual narrative . . . in effect simply accumulating and putting together one party's 'story.'" Scentsational Techs., LLC v. Pepsi, Inc., No. 13 Civ. 8645,

2018 WL 1889763, at *4 (S.D.N.Y. Apr. 18, 2018), aff'd sub
nom. ScentSational Techs. LLC v. PepsiCo, Inc., 773 F. App'x
607 (Fed. Cir. 2019). This conclusion follows because
"[a]cting simply as a narrator of the facts does not convey
opinions that are based on an expert's knowledge and
expertise; nor is such a narration traceable to a reliable
methodology." Id.

Although within the "Background" section, the Court
finds that Lorry impermissibly testified about the action's
factual background in paragraphs 40-46 and 50-69. See In re
M/V MSC Flamina, No. 12 Civ. 8892, 2017 WL 3208598, at *8
(S.D.N.Y. July 28, 2017) (excluding "extensive factual
narrative" in expert report before bench trial). The Court
does not exclude paragraphs 47-49, however, because they
contain relevant industry background regarding the loan types
the Zohar Funds extended to the Portfolio Companies. (See
Lorry Report ¶¶ 47-49.) See In re Payment Card Interchange
Fee & Merch. Disc. Antitrust Litig., No. 05 MD 1720, 2022 WL
15044626, at *48 (E.D.N.Y. Oct. 26, 2022) (declining to
exclude "background section that [the expert] . . . includes
to describe the topics that are the subject of his expert
opinions").

Accordingly, the Court **GRANTS** PPAS's Motion to Exclude
paragraphs 40-46 and 50-69 of the Lorry Report on the basis

that they constitute factual narrative but **DENIES** PPAS's Motion to Exclude paragraphs 47-49.

*** 

In sum, the Court **GRANTS** PPAS's Motion to Exclude the Lorry Report as to (1) Lorry's opinion as to the parties' intent in drafting Section 9.5, (see Lorry Report ¶ 79), (2) Lorry's damages calculation as to the Default Companies, (see id. ¶¶ 99-100), and (3) the factual narrative of the case, (see id. ¶¶ 40-46, 50-69), but **DENIES** PPAS's Motion to Exclude as to (1) Lorry's opinions on industry custom, whether PPAS's actions were consistent with industry custom, and the meaning of standard credit agreement terms within the industry and (2) the Revolver damages.

### C.   THE TRUST'S MOTION TO EXCLUDE THE EXPERT TESTIMONY AND EXPERT REBUTTAL OF FREDERICK VAN ZIJL

PPAS offers the expert testimony of Frederick Van Zijl ("Van Zijl") in support of its Summary Judgment Motion. (See "Van Zijl Report", PPAS Ex. 8.) Further, PPAS offers Van Zijl's Expert Rebuttal Report in support of its Motion to Exclude the Lorry Report.[13] (See "Van Zijl Rebuttal", Dkt. No. 353-1.) The Trust moves to exclude the Van Zijl Report and Van Zijl Rebuttal pursuant to Rule 702 and Daubert. (See

---

[13] The Zohar Trust did not offer a rebuttal report of David Lorry.

Zohar MTE Mem.) For the reasons below, the Trust's Motion to Exclude is **GRANTED** in part and **DENIED** in part.

Van Zijl is the founder and President of RVZ Strategic Advisors, LLC, which provides financial advisory services on private equity and credit opportunities. (See Van Zijl Report ¶ 3.) Van Zijl has forty years' experience in the financial services industry and previously was Managing Director at Fortress Investment Group, Head of Leveraged Finance at Barclays Capital, and Managing Director at Goldman Sachs, & Co. in the Leveraged Finance Group. (See id. ¶¶ 1, 4-6.) Van Zijl holds an M.B.A in finance with honors from Columbia Business School and a B.S. in Finance and Economics from Florida State University. (See id. ¶ 9.)

Van Zijl offers the following opinions in his Report. First, he describes the general features of CLOs and the typical roles of parties in and documentation governing CLO transactions. (See id. ¶¶ 20-43.) Second, Van Zijl compares the Zohar Funds with "typical CLOs," opining that the Zohar Funds differed by, among other things, investing primarily in distressed loans, having a "stated strategy" to "exercise control of the [P]ortfolio [C]ompanies," and using a non-bank administrative agent. (Id. ¶ 52; see id. ¶¶ 44-68.) Third, that PPAS's Agency Fees and the Credit Agreements'

exculpatory and indemnification provisions were consistent with industry custom. (See id. ¶¶ 69-78.)

Further, in his Rebuttal, Van Zijl offers the following opinions. First, that Lorry failed to account for the Zohar Funds' "unique features" when Lorry opined that PPAS's actions were contrary to the customary ministerial role of administrative agents, since there was "an economic rationale behind the Zohar Funds' atypical structure in light of its stated business strategy." (Van Zijl Rebuttal ¶ 8; see also id. ¶¶ 9-12.) Second, that PPAS's request of wind-down costs was consistent with the Credit Agreements' indemnification provision (Section 9.7), which, contrary to Lorry's opinion, appeared to allow PPAS to "request that money be advanced . . . before completing – or even commencing – an indemnified action." (Id. ¶ 14; see id. ¶¶ 13-16.) Third, that Lorry's damages methodologies are speculative, unreliable, and flawed. (See id. ¶¶ 17- 115.)

The Court addresses each of the Trust's arguments to exclude Van Zijl's testimony in turn.

### 1.    The Relevancy of Van Zijl's Opinions

First, the Zohar Trust argues that the Court should exclude the following Van Zijl opinions as irrelevant: (1) typical features of CLOs, and the similarities and differences between the Zohar Funds and typical CLOs, (see

Van Zijl Report ¶¶ 15-18, 20-43, 47-65), (2) PPAS's Agency Fees as consistent with the industry standard, (see id. ¶¶ 18, 69-72), (3) the Zohar Funds' unique structure justified PPAS's non-ministerial conduct, (see Van Zijl Rebuttal ¶¶ 6, 8-12), (4) the Credit Agreements allowed PPAS to engage in banking activity with Portfolio Companies, (see Van Zijl Report ¶¶ 66-68), and (5) the Credit Agreements' indemnification provisions were grounds for PPAS to demand an advancement of wind-down costs, (see Van Zijl Rebuttal ¶¶ 13-16). (See Zohar MTE Mem. at 8.) PPAS counters that the above Van Zijl opinions contextualize the evidence within the industry, PPAS and the Zohar Funds' relationship, and PPAS's role under the Credit Agreements. (See PPAS MTE Opp'n. at 9-11.)

The Court finds that Van Zijl's opinions as to CLOs' typical features and how the Zohar Funds compared, (see Van Zijl Report ¶¶ 15-18, 20-43, 47-65), that PPAS's Agency Fees were consistent with the industry standard, (see id. ¶¶ 18, 69-72), and that PPAS's performance of non-ministerial duties was consistent with the Zohar Funds' unique structure, (see Van Zijl Rebuttal ¶¶ 6, 8-12), are relevant to adjudication of the parties' underlying dispute. As explained above in Section II.B.3, "expert opinions discussing . . . what is (or is not) consistent with (or typical of) industry customs and

practice . . . may reliably assist the trier of fact." Novartis Pharma AG, 2024 WL 3608338, at *6. Moreover, if the Court finds contractual ambiguity, expert opinion on whether interpretation of the Credit Agreements is reasonable and consistent with industry practice will assist the fact finder in determining the parties' intent. See, e.g., E.R. Squibb & Sons, Inc. v. Lloyd's & Cos., 241 F.3d 154, 174 (2d Cir. 2001) (expert opinion on insurance industry practice of including "a deductible that applies only in the event of non-concurrency" assisted the court in resolving contractual ambiguity).

To the extent Van Zijl opines on the Credit Agreements' meaning, however, his opinions are inadmissible legal conclusions. See Highland Cap. Mgmt., L.P. v. Schneider, 551 F. Supp. 2d 173, 181 (S.D.N.Y. 2008) ("[The expert] cannot testify as to ultimate legal conclusions."). Hence, Van Zijl's opinions that, under the Credit Agreements, "PPAS was entitled to accept deposits from, lend money to, and generally engage in any kind of banking" with the Portfolio Companies, (Van Zijl Report ¶ 66; see id. ¶ 68), and that some of the Credit Agreements "appear[ed] to contemplate and allow for situations in which PPAS could request that money be advanced . . . before completing – or even commencing – an indemnified action," (Van Zijl Rebuttal ¶ 14), are excluded.

44

But Van Zijl's opinions that (1) the Credit Agreements' banking provision was consistent with common model credit agreement provisions, (<u>see</u> Van Zijl Report ¶¶ 67-68), and (2) certain Credit Agreement provisions differed from industry norm, reflected the Zohar Funds' unique structure, and were consistent with the economics of administrative agency, (<u>see</u> Van Zijl Rebuttal ¶¶ 13-16), are relevant opinions of industry custom and are not excluded.

Accordingly, the Trust's Motion to Exclude is **GRANTED** to the extent Van Zijl opines on the Credit Agreements' meaning. (<u>See</u> Van Zijl Report ¶¶ 66, 68; Van Zijl Rebuttal ¶ 14.) The Court declines, however, to exclude the remainder of the challenged opinions on the ground that they are irrelevant.

### 2.    <u>Van Zijl's Qualifications</u>

Second, the Trust argues that because Van Zijl has no experience with non-bank/non-lender agents or any CLOs structured like the Zohar Funds, Van Zijl is unqualified to opine that (1) the Zohar Funds' unique structure justified PPAS's non-ministerial conduct, (<u>see</u> Van Zijl Rebuttal ¶¶ 6, 8-12), (2) the Credit Agreements' banking services provision follows common model provisions,[14] (<u>see</u> Van Zijl Report ¶¶ 67-

---

[14] The Zohar Trust also argued that Van Zijl is unqualified to offer the opinion in paragraph 66 of the Van Zijl Report. Because the Court has determined paragraph 66 is an inadmissible legal conclusion, the Court does not address the Trust's argument as to paragraph 66. (<u>See</u> Zohar MTE Mem. at 13.)

68), and (3) the Credit Agreements' indemnification provisions differed from industry norm, reflected the Zohar Funds' unique structure, and were consistent with the economics of administrative agency,[15] (see Van Zijl Rebuttal ¶¶ 13-16). (See Zohar MTE Mem. at 13.) PPAS counters that Van Zijl's lack of experience with agents like PPAS goes to his testimony's weight, not its admissibility. (See PPAS MTE Opp'n. at 17.)

The Court finds that Van Zijl is qualified to offer the preceding opinions. As explained above in Section II.B.1, "the proposed expert should not be required to satisfy an overly narrow test of his own qualifications," Lappe, 857 F. Supp. at 227, and "the court will not exclude the [expert] testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent," Edmondson, 2020 WL 1503452, at *4 (internal quotation marks omitted). Therefore, the Court declines to exclude the foregoing above opinions on the basis that Van Zijl is unqualified.

---

[15] Because paragraph 14 of the Van Zijl Rebuttal is an inadmissible legal conclusion, to the extent it opines that "some of the credit agreements for the portfolio companies at issue *did* appear to contemplate and allow for situations in which PPAS could request that money be advanced to the administrative agent before completing – or even commencing – an indemnified action," (Van Zijl Rebuttal ¶ 14), the Court does not address the Trust's argument that Van Zijl is unqualified to offer that opinion. (See Zohar MTE Mem. at 13.)

3.    <u>Factual Foundation</u>

Finally, the Trust argues that Van Zijl's opinions that (1) the Zohar Funds' unique structure justified PPAS's non-ministerial conduct, (see Van Zijl Rebuttal ¶¶ 6, 8-12), and (2) the Credit Agreements' banking services provision follows common model provisions, (see Van Zijl Report ¶¶ 66-68), are supported by insufficient data because Van Zijl did not consider the deposition of fact witnesses apart from Tilton. (See Zohar MTE Mem. at 15.) PPAS counters that Van Zijl considered a wide variety of sources and that he was not obligated to consider evidence identified by the Zohar Trust after the Trust received the Report and Rebuttal. (See PPAS MTE Opp'n. at 19.)

"Rule 702 does not demand that experts rely on all data that could be deemed relevant. It does not even require the expert to seek out the best possible source of relevant information." <u>Lawes v. CSA Architects & Eng'rs LLP</u>, 963 F.3d 72, 101 (1st Cir. 2020) (district court erred in excluding expert's testimony because he "missed certain data" when "there [was] no indication that [expert's] data insufficiently supported his opinions"). Thus, "[t]he appropriate response to the experts' choice of omissions is to test that opinion at trial through cross examination." <u>Fed. Trade Comm'n v. Quincy Bioscience Holding Co., Inc.</u>, 646

F. Supp. 3d 518, 529 (S.D.N.Y. 2022); see also Pfizer Inc. v. Teva Pharms. USA, Inc., 461 F. Supp. 2d 271, 279 (D.N.J. 2006) ("[Expert's] failure to consider all relevant documents may impact the validity of his opinions or the weight they should be accorded, but . . . does not . . . render[] his entire testimony inadmissible.").

Moreover, in the cases the Trust cites the expert's opinions had no foundation in the record or rested on assumptions plainly disproven by the record. See Davis v. Carroll, 937 F. Supp. 2d 390, 415-19 (S.D.N.Y. 2013) (excluding expert testimony that there were no "red flags" in disputed art purchases because expert departed from established methodology in appraising "reasonable offering prices," expert's assumption that gallery had right to sell the works lacked "any basis in the record," and expert could not support factual assertions in his deposition); U.S. Sec. & Exch. Comm'n v. Collector's Coffee Inc., No. 19 Civ. 4355, 2023 WL 8280531, at *3 (S.D.N.Y. Nov. 30, 2023) (excluding expert testimony where expert's opinions regarding "the nature of [defendant's] expenses assume the conclusions [expert] purports to reach," and expert "does not grapple with the considerable record evidence that contradicts these assumptions"). Therefore, the Court declines to exclude Van

Zijl's opinions described above on the ground that they lacked factual foundation.

* * *

In sum, the Court **GRANTS** the Zohar Trust's Motion to Exclude the Van Zijl Report and Rebuttal to the extent Van Zijl's opines on the Credit Agreements' meaning, (<u>see</u> Van Zijl Report ¶¶ 66, 68; Van Zijl Rebuttal ¶ 14), but otherwise **DENIES** the Trust's Motion to Exclude.

### III. <u>SUMMARY JUDGMENT MOTIONS</u>

PPAS and the Zohar Trust cross-move for summary judgment on liability on PPAS's Count II, a breach of contract claim resulting from the Zohar Funds' purportedly improper dismissal of PPAS as Administrative Agent, and the Zohar Trust's Counterclaim III, a breach of contract claim stemming from PPAS's alleged refusal to follow the Zohar Funds' directions upon Events of Default. (<u>See</u> PPAS MSJ Mem. at 13; Zohar MSJ Mem. at 11, 16.) The Trust does not seek summary judgment on any other claims or counterclaims. PPAS, however, moves for summary judgment on Counterclaims V and IV, or alternatively asks that Counterclaim IV be dismissed with prejudice because the Trust has abandoned it. (<u>See</u> <u>id.</u> at 21.) Further, PPAS requests that the Court dismiss with prejudice Counterclaims I-II and VI-VII because they are either moot or abandoned. (<u>See</u> PPAS MSJ Mem. at 16.)

PPAS's Count II and the Zohar Trust's Counterclaims II-VI allege breaches of the Credit Agreements. The parties agree that New York law governs their contractual claims. (See PPAS MSJ Mem. at 14; Zohar MSJ Mem. at 12, 24; see also Croscill Agmt. § 10.10.) Because the parties use the Croscill Agreement as an exemplar, the Court analyzes the breach of contract claims under the Croscill Agreement's language, unless the parties point to other Agreements. (See PPAS MSJ Mem. at 4 n.3; Zohar MSJ Mem. at 3 n.2.)

The Court first gives a recitation of the legal standards to analyze summary judgment and alleged breaches of contract under New York law, then turns to the claim and counterclaim on which the parties cross move for summary judgment, and finally addresses the remaining counterclaims on which PPAS alone moves for summary judgment or dismissal with prejudice. For the reasons below, both PPAS's and the Trust's Summary Judgment Motions are **DENIED** as to Count II and Counterclaims III and V, and the Court **DISMISSES** with prejudice Counterclaims I-II, IV, and VI-VII.

A.   LEGAL STANDARD: SUMMARY JUDGMENT

Rule 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under Rule 56,

the Court "must construe the facts in the light most favorable
to the non-moving party and must resolve all ambiguities and
draw all reasonable inferences against the movant." Kee
v. City of New York, 12 F.4th 150, 158 (2d Cir. 2021)
(internal quotation marks omitted). In this context, a
court's role "is not to resolve disputed issues of fact but
to assess whether there are any factual issues to be tried."
Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986).

   "The moving party bears the burden to demonstrate the
absence of any genuine issues of material fact." New York
v. Mountain Tobacco Co., 942 F.3d 536, 541 (2d Cir. 2019)
(internal quotation marks omitted). "A fact is material if it
'might affect the outcome of the suit under the governing
law.'" Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.,
LLC, 13 F.4th 247, 259 (2d Cir. 2021) (quoting Anderson
v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). If the
moving party satisfies its burden, the non-moving party must
provide specific facts showing that there is a genuine issue
for trial to survive the motion for summary judgment. See
Shannon v. N.Y.C. Transit Auth., 332 F.3d 95, 99 (2d Cir.
2003). "[T]he mere existence of some alleged factual dispute
between the parties will not defeat an otherwise properly
supported motion for summary judgment; the requirement is
that there be no genuine issue of material fact." Anderson,

477 U.S. at 247-48 (emphasis in original). Though a party opposing summary judgment may not "rely on mere conclusory allegations nor speculation," D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir. 1998), summary judgment is improper if any evidence in the record allows a reasonable inference to be drawn in favor of the opposing party, see Gummo v. Village of Depew, N.Y., 75 F.3d 98, 107 (2d Cir. 1996).

"The fact that both sides have moved for summary judgment does not guarantee that there is no material issue of fact to be tried and that one side or the other is entitled to that relief." Coutard v. Mun. Credit Union, 848 F.3d 102, 114 (2d Cir. 2017). The court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993) (internal quotation marks omitted). Thus, "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it." Id.

B.    LEGAL STANDARD: BREACH OF CONTRACT

To establish a breach of contract under New York law, a plaintiff must prove the following elements: (i) the existence of a contract; (ii) performance by the plaintiff; (iii) breach by the defendant; and (iv) damages suffered

52

because of the breach. See Anhui Joyful Mfg. & Trading Co. v. M.I.S.S. Sportswear, Inc., 774 F. Supp. 3d 675, 683 (S.D.N.Y. 2025). Summary judgment is appropriate "[w]here the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning." Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp., 84 F.3d 91, 98 (2d Cir. 1996) (internal quotation marks omitted).

"It is axiomatic under New York State law . . . that [t]he fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties." Lockheed Martin Corp. v. Retail Holdings, N.V., 639 F.3d 63, 69 (2d Cir. 2011) (internal quotation marks omitted). "The best evidence of what parties to a written agreement intend is what they say in their writing." Greenfield v. Philles Records, Inc., 780 N.E.2d 166, 170 (N.Y. 2002) (internal quotation marks omitted). The canons of contract construction "require that all provisions of a contract be read together as a harmonious whole, if possible." Kinek v. Paramount Commc'ns, Inc., 22 F.3d 503, 509 (2d Cir. 1994).

When a contract's meaning is disputed, "the threshold question is whether the contract is ambiguous." Lockheed Martin, 639 F.3d at 69. "Ambiguity is determined by looking within the four corners of the document, not to outside sources." JA Apparel Corp. v. Abboud, 568 F.3d 390, 396 (2d

Cir. 2009) (internal quotation marks omitted). Whether a "contract is ambiguous is a question of law for the court." L. Debenture Tr. Co. of N.Y. v. Maverick Tube Corp., 595 F.3d 458, 465 (2d Cir. 2010).

A contract is unambiguous "if the language it uses has a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion." Lockheed Martin, 639 F.3d at 69. A "written agreement that is complete, clear and unambiguous on its face must be [interpreted] according to the plain meaning of its terms, . . . without the aid of extrinsic evidence." L. Debenture Tr. Co., 595 F.3d at 467 (internal quotation marks omitted).

Conversely, a contract is ambiguous "if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context" of the entire agreement as a whole. Lockheed Martin, 639 F.3d at 69. "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations," Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir. 1989), unless each interpretation "may be said to be as reasonable as another," Seiden Assocs., Inc., v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992). Contract language is not ambiguous when an interpretation urged by one party would "strain[] the contract language

beyond its reasonable and ordinary meaning." Bethlehem Steel Co. v. Turner Constr. Co., 141 N.E.2d 590, 593 (N.Y. 1957).

To determine whether a contract is ambiguous, a court must accord the contractual language its plain meaning "and the contract should be construed so as to give full meaning and effect to all of its provisions." LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005) (internal quotation marks omitted). Further, "a contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties." Greenwich Capital Fin. Prods., Inc. v. Negrin, 903 N.Y.S.2d 346, 348 (N.Y. App. Div. 1st Dep't 2010) (internal quotation marks omitted).

Where the contract language creates ambiguity, "extrinsic evidence as to the parties' intent may properly be considered." JA Apparel, 568 F.3d at 397. However, "where there is relevant extrinsic evidence of the parties' actual intent, then the contract's meaning becomes an issue of fact." Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1094 (2d Cir. 1993) (internal quotation marks omitted); see also Consarc Corp. v. Marine Midland Bank, 996 F.2d 568, 574 (2d Cir. 1993) ("Resolving an ambiguous term in a written contract through extrinsic

evidence remains squarely within the province of the trier of fact.").

C.    CLAIMS ON WHICH THE PARTIES CROSS MOVE

The Court begins with the Trust's Counterclaim III, which alleges that PPAS breached Section 8.2 by refusing to follow the Zohar Funds' default instructions concerning the Default Companies. The Court addresses Count II afterwards because PPAS's argument on Counterclaim III forms the basis of its asserted injury in Count II.

1.    Counterclaim III: Default Instructions

The Zohar Trust's Counterclaim III alleges that PPAS breached Section 8.2 when PPAS refused to follow the Zohar Funds' default instructions as to the Default Companies. (See Third Amended Counterclaims ¶¶ 76-83.) The Trust argues that the Court should grant summary judgment in its favor because (1) PPAS had an unambiguous obligation to follow the Zohar Funds' default instructions under Section 8.2; (2) PPAS refused to immediately send default notices to the Default Companies or exercise the Zohar Funds' requested default remedies, including remittance of the Default Companies' money in PPAS accounts; (3) PPAS's breach was willful or grossly negligent, such that it was not exculpated under Section 9.4(b); and (4) the Zohar Funds were damaged because the Funds did not receive the Default Companies' cash held

by PPAS. (See Zohar MSJ Mem. at 16-25.) PPAS counters that
it should be granted summary judgment because, among other
things, the Zohar Funds never reinstated their default
instructions as to the Value Companies and, regardless, PPAS
was entitled to not commence the default instructions pending
indemnification for wind-down costs (*i.e.* costs to cover the
liquidation of the Default Companies). (See PPAS MSJ Opp'n.
at 16-18, 23; PPAS MSJ Mem. at 17-20.) The Court addresses
the parties' arguments in turn.

> a)    Section 8.2

In an Event of Default that is not caused by bankruptcy,
as here, Section 8.2 provides in relevant part that:

> [T]he Agent may, and at the request of the Required
> Lenders shall, by notice to the Borrower from time
> to time do any or all of the following: (i) declare
> the unpaid principal amount of the Loans and
> interest accrued thereon and all other Obligations
> to be immediately due and payable . . . or (ii)
> declare the Commitments terminated, whereupon the
> Commitments will terminate and any fee hereunder
> shall be immediately due and payable . . . .

(Croscill Agmt. § 8.2(a).) That section further provides
that, in all Events of Default:

> The Agent shall, at the request of or with the
> consent of the Required Lenders, (i) exercise all
> rights and remedies provided in the Credit
> Documents, (ii) exercise any right of counterclaim,
> setoff, banker's lien or otherwise which it may
> have with respect to money or property of the
> Borrower, (iii) bring any lawsuit, action or other
> proceeding . . . , (iv) enforce any and all Liens
> and security interests created pursuant to the

Credit Documents, and (v) exercise any other right or remedy . . . .

(Id. § 8.2(c).)

As an initial matter, neither party disputes that the Zohar Funds, through AMZM, declared Events of Default pursuant to Section 8.1 for the Default Companies based on those Companies' failure to pay interest payments. (See PPAS MSJ Mem. at 11; Zohar MSJ Mem. at 17; Croscill Agmt. § 8.1(a).) Further, the parties do not dispute that Section 8.2 obligated PPAS to follow the Zohar Funds' default instructions, including by sending notice to the Default Companies declaring unpaid obligations immediately due and enforcing the Zohar Funds' security interests. (See PPAS MSJ Mem. at 17; Zohar MSJ Mem. at 18.) The parties dispute, however, whether the Zohar Funds held their default instructions in abeyance for the Value Companies and, regardless, whether the Credit Agreements allowed PPAS to not begin the Zohar Funds' default instructions pending PPAS's requested indemnification for wind-down costs. (See Zohar MSJ Mem. at 21-22; PPAS MSJ Mem. at 17-20; Zohar MSJ Opp'n. at 21.)

      b)    Default Instructions as to the Value Companies

The parties dispute whether the Zohar Funds reinstated their default instructions as to the Value Companies. (See

58

PPAS MSJ Mem. at 20; PPAS MSJ Opp'n. at 16; Zohar MSJ Reply at 9.) Thus, the Court turns to the parties' letter exchange surrounding the Funds' default declarations, focusing on the discussion regarding the abeyance of default instructions. As explained below, the Court is not persuaded that there is no genuine dispute of material fact as to whether the Zohar Funds did or did not reinstate their default instructions regarding the Value Companies.

As detailed above in Section I.E, the Zohar Funds, through AMZM, sent Default Letters to Tilton, as PPAS's Manager, declaring Events of Default for the Default Companies on October 9, 2017. (See Default Ltrs. at 2.) AMZM, in accordance with Section 8.2, instructed PPAS "to comply immediately" with its instructions to (1) "send notice immediately" to the Nineteen Companies declaring all unpaid principal, interest, and other obligations immediately due and payable, and terminating any DDTLs or Revolvers; and (2) to "exercise all applicable rights or remedies provided in the Credit Documents." (Id.) Further, AMZM instructed that if "[PPAS] believe[s] complying with the instructions herein will cause harm to ongoing company operations so as to reduce recoveries to the [Zohar Funds], [the Funds] are prepared to . . . discuss such concerns." (Id. at 3.) On October 17, 2017, Tilton responded to the Default Letters, advising that

59

the five Value Companies – all Default Companies - would "garner greater value if allowed additional time to strengthen and then be sold in the ordinary course." (Oct. 17 Ltr. at 3.)

The parties continued to exchange letters through February 2018. (See "February 16 Letter" or "Feb. 16 Ltr.", PPAS Ex. 44.) On October 23, 2017, AMZM requested that PPAS disclose the Value Companies' financial statements and assets by October 23, 2017 – the same day the letter was sent. (See Oct. 23 Ltr. at 3.) "In the meantime, the Zohar Funds agree[d] to hold in abeyance" their instructions "to accelerate the repayment of [the Value Companies'] obligations and to exercise all rights and remedies as to enforcement." (Id.) On October 30, 2017, Tilton notified AMZM that the Value Companies would disclose their financial information subject to AMZM's execution of confidentiality agreements. (See "October 30 Letter" or "Oct. 30 Ltr.", Zohar Ex. 77 at 3.) On November 10, 2017, AMZM acknowledged that the Zohar Funds had held their default instructions in abeyance as to the Value Companies, but asserted that the Credit Agreements did not condition PPAS's delivery of financial information on the execution of confidentiality agreements. (See "November 10 Letter" or "Nov. 10 Ltr.", PPAS Ex. 47 at 3.) AMZM instructed that "if PPAS fails to comply with this request within seven

days [*i.e.* by November 17, 2017] . . . , the Zohar Funds reinstate their October 9 directions to accelerate repayment as to [the Value Companies] and direct PPAS to immediately take all actions to foreclose on their Collateral." (Id.)

On November 21, 2017 – after the deadline to provide financial information – Tilton reiterated that PPAS could not disclose the Value Companies' financial statements until AMZM entered into confidentiality agreements. (See "November 21 Letter" or "Nov. 21 Ltr.", PPAS Ex. 46 at 3.) On January 10, 2018, AMZM asserted that "PPAS is contractually obligated" to provide the Value Companies' financial information, but AMZM did not expressly reinstate the Funds' default instructions as to those Companies. ("January 10 Letter" or "Jan. 10 Ltr.", PPAS Ex. 48 at 3.)

On February 16, 2018, Tilton asserted that AMZM's refusal to enter into confidentiality agreements "prevent[ed] PPAS from disclosing, in good faith, the financial information." (Feb. 16 Ltr. at 3.) Further, Tilton stated that "AMZM has prudently elected *not* to reinstate its October 9 [default] instructions as to [the Value Companies]." (Id. (emphasis in original).) The Zohar Funds did not respond to the February 16 Letter.

The Court finds that there is a genuine dispute of material fact regarding whether the Zohar Funds reinstated

their default instructions as to the Value Companies. Although AMZM instructed in its November 10 letter that if PPAS failed to provide the Value Companies' financial information "within seven days," then "the Zohar Funds reinstate their October 9 directions," (Nov. 10 Ltr. at 3), the parties continued to exchange letters through February 16, 2018. During this approximately three-month letter exchange, AMZM never explicitly reinstated the Zohar Funds' default instructions. Indeed, in PPAS's February 16 Letter, PPAS stated that AMZM "elected *not* to reinstate" the default instructions, and the Zohar Funds did not respond. (Feb. 16 Ltr. at 3 (emphasis in original).) The Trust contends that the Funds could not respond because "Tilton cut off the Zohar Funds' default remedies with bankruptcy," (Zohar MSJ Reply at 10; see also Zohar MSJ Opp'n. at 9), but the Zohar Funds did not initiate Chapter 11 bankruptcy proceedings until March 12, 2018 – nearly one month after PPAS's February 16 Letter, (see Zohar Ex. 134). Further, the Trust provided the deposition testimony of Elizabeth LaPuma ("LaPuma") – AMZM's Managing Director – stating that she understood the November 10 Letter to have automatically reinstated the default instructions upon expiration of the November 17 deadline. (See Zohar Ex. 153 at 264:6-25.) But viewing the evidence in the light most favorable to PPAS, this testimony does not

explain why LaPuma continued to send letters to Tilton for months without ever mentioning the default instructions as to the Value Companies.

Accordingly, there is a genuine dispute of material fact regarding whether the Zohar Funds reinstated their default instructions as to the Value Companies. Therefore, the Court cannot grant summary judgment to PPAS on Counterclaim III as to the Value Companies on the ground that the Zohar Funds did not reinstate their default instructions. Thus, the Court turns to the indemnification provisions at issue.

c)    Indemnification Provisions

PPAS argues that the Credit Agreements' indemnification provisions permitted it to not commence the Zohar Funds' default instructions pending PPAS's requested indemnification for wind-down costs. (See PPAS MSJ Mem. at 17-18.)  Before analyzing whether wind downs were required, the Court addresses whether the Default Companies' indemnification provisions apply.

While all Credit Agreements contain an indemnification provision in which the lender (*i.e.* the Zohar Funds) agrees to indemnify the Agent (*i.e.* PPAS), the indemnification provisions are not identical. PPAS argues that it was not required to begin the Zohar Funds' default instructions pending indemnification based on a provision that allowed

PPAS to "cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished." (Croscill Agmt. § 9.7; see also PPAS MSJ Mem. at 17-18; PPAS MSJ Opp'n. at 17; PPAS MSJ Reply at 8.) However, this language is present in only nine of the twelve Default Companies' Credit Agreements.[16] Accordingly, the Court first analyzes the Credit Agreements that contain the "cease, or not commence" language, then analyzes the Credit Agreements with distinct indemnification provisions.

          (1)   The "cease, or not commence" Credit Agreements

Nine Default Companies' have Credit Agreements that contain identical indemnification provisions containing the "cease, or not commence" language. Section 9.7 provides, in relevant part, that:

> Each Lender . . . agrees to indemnify the Agent . . . to the extent that the Agent shall not have been reimbursed by any Credit Party,[17] for and against any and all liabilities . . . incurred by . . . [the Agent] in . . . performing its duties hereunder . . . ; provided, no Lender shall be

---

[16] The nine Default Companies with identical indemnification provisions are: (1) 180s Inc. (see "180s Inc. Agmt.", PPAS Ex. 187 § 9.7); (2) Best Textiles (see "Best Textiles Agmt.", PPAS Ex. 60 § 9.7); (3) Natura (see "Natura Agmt.", PPAS Ex. 112 § 9.7); (4) Netversant (See "Netversant Agmt.", PPAS Ex. 114 § 9.7); (5) Remco (see "Remco Agmt.", PPAS Ex. 117 § 9.7); (6) Scan Optics (see "Scan Optics Agmt.", PPAS Ex. 123 § 9.7); (7) Silverack (see "Silverack Agmt.", PPAS Ex. 126 § 9.7); (8) Spiegel (see "Spiegel Agmt.", PPAS Ex. 133 § 9.7); and (9) Croscill (see Croscill Agmt. § 9.7).

[17] The Credit Agreements define "Credit Party" to mean "each Person (other than the Agent or any Lender or any Affiliate or representative thereof) from time to time party to a Credit Document (including, without limitation, the Borrower)." (Croscill Agmt. § 1.1.)

> liable for any portion of such liabilities,
> obligations, losses, damages, penalties, actions,
> judgments, suits, costs, expenses or disbursements
> resulting from the Agent's gross negligence or
> willful misconduct. If any indemnity furnished to
> the Agent for any purpose shall, in the opinion of
> such the Agent, be insufficient or become impaired,
> the Agent may call for additional indemnity and
> cease, or not commence, to do the acts indemnified
> against until such additional indemnity is
> furnished . . . .

(Croscill Agmt. § 9.7.)

The parties dispute whether Section 9.7 applies to an evaluation of the underlying action. PPAS asserts that it was entitled to "not commence" the Zohar Funds' default instructions until the Funds furnished additional indemnity for wind-down costs, which PPAS contends were required to execute the Funds' default instructions. (See PPAS MSJ Mem. at 17-18.) The Zohar Trust argues that even if wind downs were required, Section 9.7 would not have applied because PPAS requested an advancement, not an indemnification of costs already incurred. (See Zohar MSJ Mem. at 23-25.) Further, the Trust contends that Section 9.7 required PPAS to incur costs and seek reimbursement from the Portfolio Companies before seeking reimbursement from the Zohar Funds. (See id. at 24.)

"The right to contractual indemnification depends upon the specific language of the contract." Roldan v. New York Univ., 916 N.Y.S.2d 162, 166 (N.Y. App. Div. 2d Dep't 2011).

65

Outside of the insurance context, "contractual defense obligations are generally treated like any other contractual provision." Allergan Fin., LLC v. Pfizer Inc., 67 Misc. 3d 1206(A), at *2 (N.Y. Sup. Ct.), aff'd as modified, 135 N.Y.S.3d 90 (N.Y. App. Div. 1st Dep't 2020).

First, the unambiguous threshold requirement of Section 9.7 is that the Zohar Funds "agree[] to indemnify the Agent . . . to the extent that the Agent shall not have been reimbursed by any Credit Party." Thus, the Court finds that Section 9.7 required PPAS to seek payment from the Portfolio Companies before the Zohar Funds' duty to indemnify was triggered. Second, the Court finds that Section 9.7 is ambiguous regarding whether "indemnification" pertains to reimbursement or advancement of costs.

"Clear and unambiguous terms should be understood in their plain, ordinary, popular and non-technical meaning." Lopez v. Fernandito's Antique, Ltd., 760 N.Y.S.2d 140, 141 (N.Y. App. Div. 1st Dep't 2003). Here, the term "reimbursed" is clear and unambiguous, whose plain meaning is "to pay back." Reimburse, http://www.Merriam-Webster.com (last visited Sept. 8, 2025); see also Dish Network Corp. v. Ace Am. Ins. Co., 21 F.4th 207, 211 (2d Cir. 2021) ("Courts may refer to the dictionary to determine the plain and ordinary meaning of contract terms." (internal quotation marks

omitted)). While the inclusion of the term "reimbursed" indicates that PPAS was required to incur costs and then seek repayment, first from the Portfolio Companies and then from the Zohar Funds, that interpretation is at odds with the clause allowing PPAS to "call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished." (Croscill Agmt. § 9.7.)

If the "cease, or not commence" clause allowed PPAS to not perform indemnified acts until it received additional indemnity, then PPAS must have been permitted to seek an advancement of costs before beginning the indemnified acts. Further, that provision allowed PPAS to not perform indemnified acts pending *additional* indemnity and refers to indemnity already "furnished to the Agent," implying that PPAS was to receive an advancement of costs prior to starting the indemnified acts and could seek additional indemnification if the originally furnished funds were insufficient.

Thus, the Court declines to interpret Section 9.7 as unambiguously requiring PPAS to incur costs and then seek reimbursement, as this interpretation would render the clause permitting PPAS to "cease, or not commence" nonsensical. See InterDigital Commc'ns Corp. v. Nokia Corp., 407 F. Supp. 2d

522, 530 (S.D.N.Y. 2005) ("[A] contract should be interpreted so as not to render its terms nonsensical." (collecting New York cases)); see also Marmer Bros. Const., LLC v. Midwest Steel, Inc., No. 99 Civ. 11681, 2000 WL 1341546, at *5 (S.D.N.Y. Sept. 18, 2000) ("[A]n interpretation that 'gives a reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect.'" (quoting Rothenberg v. Lincoln Farm Camp, Inc., 755 F.2d 1017, 1019 (2d Cir. 1985))). Likewise, the Court declines to interpret Section 9.7 as unambiguously permitting PPAS to seek an advancement of costs before beginning the indemnified acts, as this interpretation would render nonsensical the condition precedent that the lenders agree to indemnify the Agent "to the extent that the Agent shall not have been reimbursed by any Credit Party." (Croscill Agmt. § 9.7.) Therefore, the Court finds that Section 9.7 is ambiguous because its "specific language is susceptible [to] two reasonable interpretations," as the Section contains plain language supporting both parties' positions. Prospect Cap. Corp. v. Credito Real USA Fin. LLC, 702 F. Supp. 3d 178, 185 (S.D.N.Y. 2023) (quoting Donohue v. Cuomo, 184 N.E.3d 860, 867 (N.Y. 2022) (quotation marks omitted)).

"Summary judgment is generally proper in a contract dispute only if the language of the contract is wholly

unambiguous." <u>Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.</u>, 232 F.3d 153, 157 (2d Cir. 2000). Summary judgment may also be appropriate despite contractual ambiguity when "there is relevant extrinsic evidence" that "creates no genuine issue of material fact and permits interpretation of the agreement as a matter of law." <u>In re Coudert Bros.</u>, 487 B.R. 375, 390 (B.R. S.D.N.Y. 2013) (internal quotation marks omitted).

Here, the Zohar Trust does not point to any extrinsic evidence supporting its contention that the parties intended Section 9.7 to only cover reimbursement. (<u>See</u> Zohar MSJ Mem. at 23–24; Zohar MSJ Reply at 8–9; Zohar MSJ Opp'n. at 20.) PPAS cites only to the Van Zijl Report, in which Van Zijl opines that Section 9.7 is consistent "with the notion that administrative agents should be reimbursed for any out-of-pocket expenses" because their fees are only meant to cover the cost of servicing the loan. (Van Zijl Report ¶ 77; <u>see</u> PPAS MSJ Mem. at 19.) Therefore, there is a genuine dispute of material fact regarding Section 9.7's meaning that precludes summary judgment as to the nine Default Companies whose Credit Agreements contain that provision, as the Court cannot hold as a matter of law that Section 9.7 precluded PPAS's request for wind-down costs as to those Companies.

(2)   <u>The Remaining Three Credit Agreements</u>

IMG/Dana's, Hartwell's, and Acme's Credit Agreements do not contain indemnification provisions expressing the "cease, or not commence" language. (<u>See</u> "IMG/Dana Agmt.", PPAS Ex. 63 § 16.4; "Hartwell Agmt.", PPAS Ex. 91 § 15.4; "Acme Agmt.", PPAS Ex. 55 § 11.7.) PPAS contends that these provisions are "functional[ly] equivalent" to Section 9.7, but offers no further explanation. (PPAS MSJ Reply at 8 n.2.) The Zohar Trust does not address those Companies' indemnification provisions whatsoever.

As both PPAS and the Trust move for summary judgment on Counterclaim III, each bears the burden on its respective motion to show that "there is no genuine dispute as to any material fact" and that each is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>see</u> <u>also</u> <u>Celotex Corp.</u> <u>v Catrett</u>, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion . . . ."). Here, neither PPAS nor the Trust has met its burden to show that there is no genuine dispute of material fact regarding whether IMG/Dana's, Hartwell's, and Acme's indemnification provisions allowed PPAS to cease performance pending an advancement of costs, or if those provisions required PPAS to seek reimbursement after

performing. Hence, the Court cannot grant summary judgment as to these three Default Companies on the basis of their Agreements' indemnification provisions.

        d)    <u>Wind Downs</u>

In addition to disputes regarding the indemnification provisions' meaning, there are genuine disputes of material fact regarding whether wind downs of the Default Companies were required. It is undisputed that the Zohar Funds instructed PPAS to "foreclose[] promptly on all Collateral," but the parties disagree on what foreclosing on "all Collateral" required. (Default Ltrs. at 2.)

In evaluating the Zohar Trust's motion for summary judgment, the Trust "need *not* prove a negative" - *i.e.* that wind downs were not required. <u>In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.</u>, 735 F. Supp. 3d 249, 257 (E.D.N.Y. 2024) (emphasis in original). Rather, "where 'the burden of proof at trial would fall on the nonmoving party,' the moving party 'can shift the initial burden by pointing to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.'" <u>Id.</u> at 257-58 (quoting <u>McKinney v. City of Middletown</u>, 49 F.4th 730, 738 (2d Cir. 2022)); <u>see also Celotex</u>, 477 U.S. at 324 ("[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be

made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." (internal quotation marks omitted)).

Here, the Zohar Trust argues that there is no evidence that the Zohar Funds requested any wind downs, the Credit Agreements do not require wind downs, and PPAS has never identified any provision of the Credit Agreements that requires a wind down before a lender can enforce its security interest. (See Zohar MSJ Mem. at 8, 22-23.) PPAS asserts that its correspondence with the Zohar Funds shows that "the Funds affirmatively instructed PPAS to take actions that are hallmarks of wind downs." (PPAS MSJ Opp'n. at 18.) Therefore, the Court turns to the letter exchange described in Section III.C.1.b, but focusing on the discussion regarding the wind down of the Default Companies.

As detailed above, the Zohar Funds' October 9 Default Letters instructed PPAS to immediately send default notices to the Nineteen Companies and, if necessary "to satisfy promptly" the Companies' debts, "to exercise all applicable rights or remedies provided in the Credit Documents, including . . . foreclosing promptly on all Collateral . . . ." (Default Ltrs. at 2.) The Zohar Funds, through AMZM, also conveyed that the Funds were prepared to meet with PPAS "to the extent [PPAS] believe[s] complying

with the instructions herein will cause harm to ongoing company operations so as to reduce recoveries to the [Funds]." (Id. at 3.)

In the October 17 Letter, Tilton requested that AMZM confirm that it was "demanding (i) that PPAS send notices of default and acceleration" to the Nineteen Companies "(ii) that PPAS then, on behalf of the Zohar [Funds], begin the process of foreclosure to sell or liquidate the [C]ompanies." (Oct. 17 Ltr. at 2-3.) Tilton informed AMZM that "by law, once such notice is sent to the [C]ompanies at issue, they will no longer be able to operate" and "will need to immediately cease operations and terminate all vendor and employee relationships." (Id. at 3.) Further, Tilton advised that the Value Companies would "garner greater value if allowed additional time to strengthen and then be sold in the ordinary course," rather than "in a fire sale default and liquidation situation." (Id.) Tilton notified AMZM that the following Default Companies had already ceased operations and were winding down: Remco, Silverack, Spiegel, Best Textiles, Hartwell, and Netversant.[18] (Id.)

---

[18] Tilton also indicated that Galey, GLI, BMD, Chase St., Duro, and Fetco had ceased operations and were winding down, but the Zohar Trust does not seek relief as to those Companies. (See Oct. 17 Ltr. at 3; Zohar MSJ Mem. at 7 n.3.) Hence, of the twelve Default Companies, Acme was the only one that was not a Value Company or had already ceased operation.

In its October 23 Letter, AMZM requested that PPAS identify the "law" to which it referred when PPAS asserted that the Default Companies must cease operations "by law" once default notices were sent. (Oct. 23 Ltr. at 3; Oct. 17 Ltr. at 3.) In its October 30 Letter, PPAS confirmed that Silverack, Best Textiles, and Hartwell "continue[d] to wind down in the normal course." (Oct. 30 Ltr. at 3.) In its November 10 Letter, AMZM asserted that PPAS did not provide it any notice that several Default Companies were already winding down until PPAS's October 17 Letter and requested that PPAS inform AMZM within seven days of "the expected proceeds to be generated" from Remco, Silverack, Spiegel, Best Textiles, Hartwell, and Netversant. (Nov. 10 Ltr. at 2) AMZM reiterated the Zohar Funds' direction that PPAS "take all steps to foreclose on the Collateral, including equipment, intellectual property, and inventory." (Id. at 3.) PPAS contends that such "steps [are] associated with winding down companies." (PPAS MSJ Opp'n. at 8.) In its November 21 Letter, PPAS confirmed that AMZM had acknowledged that it was on notice that Remco, Silverack, Spiegel, Best Textiles, Hartwell, and Netversant were in wind-down mode. (See Nov. 21 Ltr. at 2.) PPAS reiterated that the Zohar Funds had "prudently elected to heed [Tilton's] advice against selling or liquidating" the Value Companies. (Id. at 3.)

Although this Court need only consider the cited materials, it may consider other materials in the record. See Fed. R. Civ. Pro. 56(c)(3). The Court notes that of the Default Companies, only Acme's, Hartwell's, and IMG/Dana's Credit Agreements define "Collateral" within the Agreement and, none of the Default Companies' Credit Agreements describe the fate of the Company if all its Collateral is sold.[19] Further, neither party's expert has addressed what foreclosure of all a borrower's collateral typically entails in the industry.[20]

Hence, the Court finds that the above letter exchange, as well as the absence of contractual evidence, raises genuine disputes of material fact regarding the parties'

---

[19] Nine of the twelve Default Companies' Credit Agreements define "collateral" by referencing other documents, which have not been provided to the Court. (See 180s Inc. Agmt. § 1.1; Best Textiles Agmt. § 1.1; Natura Agmt. § 1.1; Remco Agmt. § 1.1; Scan Optics Agmt. § 1.1; Croscill Agmt. § 1.1; Netversant Agmt. § 1.1; Silverack Agmt. § 1.1; Spiegel Agmt. § 1.1.) The Credit Agreements for Acme, Hartwell, and IMG/Dana define collateral without reference to outside documents. (See Acme Agmt. App'x A, § 5.1; Hartwell Agmt. § 1.1; IMG/Dana Agmt., Schedule 1.1.) None of those Credit Agreements, however, details what happens to the Company if all its collateral is sold. (See Acme Agmt. §§ 10.3.2-10.3.3; Hartwell Agmt. § 13.2(b)(xii); IMG/Dana Agmt. § 8.1(d).)

[20] In his Report, Van Zijl referenced Tilton's deposition testimony providing that wind downs were required in the context of Van Zijl's opinion that PPAS's Agency Fees, like administrative agency fees generally, were intended to cover only loan administration and not "costs incurred outside of normal operation." (Van Zijl Report ¶ 78.) In his Report, Lorry opined that lenders are typically not required to advance administrative agents wind-down costs, and that an administrative agent may facilitate the development of a wind-down budget. (See Lorry Report ¶¶ 94, 96.) In his Rebuttal, Van Zijl criticized Lorry's damages calculation because it did not consider wind-down costs. (See Van Zijl Rebuttal ¶¶ 7, 45-48.)

understanding of what foreclosing on all collateral required. Regarding the Zohar Trust's Summary Judgment Motion, construing the evidence in the light most favorable to PPAS, it is plausible that the Zohar Funds' instructions to foreclose on all collateral, "including equipment, intellectual property, and inventory," (Nov. 10 Ltr. at 3.), would require the Default Companies to "cease operations and terminate all vendor and employee relationships," as well as "securing the premises and hiring lawyers, investment bankers and/or liquidators," (Oct. 17 Ltr. at 3).

Regarding PPAS's Summary Judgment Motion, construing the evidence in the light most favorable to the Zohar Trust, it is plausible the wind downs were not required, given that PPAS has not pointed to any contractual provision requiring wind downs or prior instances in which PPAS executed default instructions by liquidating the Company in default. At bottom, neither party has presented any evidence to clarify what the collateral was and how the foreclosures should have proceeded. Thus, the Court cannot grant summary judgment on Counterclaim III to the Zohar Trust on the ground that wind downs were not required, or to PPAS on the ground that wind downs were required.

e)    <u>PPAS's Delayed Sending of Default Notices</u>

The Trust argues that PPAS breached Section 8.2 by refusing to send default notices to the Default Companies upon AMZM's instruction to "send notice immediately." (<u>See</u> Zohar MSJ Mem. at 18; Default Ltrs. at 2.) PPAS counters that it could not have breached Section 8.2 by failing to timely send default notices because (1) neither the Credit Agreements nor the Zohar Funds provided PPAS a deadline and (2) PPAS clarified and followed the Zohar Funds' instructions.[21] (<u>See</u> PPAS MSJ Opp'n. at 19-20.)

The Court finds that PPAS cannot be liable for any failure to send default notices to Remco or Spiegel, as PPAS sent default notices to those Default Companies on April 25 and July 13, 2017, respectively – before the Zohar Funds sent the October 9, 2017, Default Letters. (<u>See</u> Feb. 16 Ltr. at 23, 26.) Regarding the other ten Default Companies, it is

---

[21] PPAS also asserts that the Court cannot consider the Trust's argument because the Trust advances it for the first time in its Summary Judgment Motion. (<u>See</u> PPAS MSJ Opp'n. at 19.) The Court will consider the Trust's argument because this theory of liability is not a new claim. The case PPAS cites for support, <u>McNeil v. Aguilos</u>, 831 F. Supp. 1079 (S.D.N.Y. 1993), is inapposite. There, the <u>McNeil</u> court declined to consider claims raised for the first time on a summary judgment motion where the new claims were violations of "a laundry list of statutes" not included in the complaint. <u>Id.</u> at 1086. Here, conversely, the Trust's Counterclaim III alleged a breach of Section 8.2, and the Third Amended Counterclaims included that the Default Letters instructed PPAS to "send notice immediately" to the Nineteen Companies, but that PPAS responded by stating that the Companies would need to be wound down before any notices could be sent. (Third Amended Counterclaims ¶ 59; <u>see</u> <u>id.</u> ¶¶ 60, 78-79.) Hence, PPAS was on notice of this allegation, such that the Court's adjudication of it is not prejudicial to PPAS.

undisputed that PPAS did not send them default notices immediately upon receipt of the Default Letters.[22] (See "November 30 Letter" or "Nov. 30 Ltr.", PPAS Ex. 45; Feb. 16 Ltr.) But, as discussed above, whether PPAS permissibly delayed sending the default notices turns on whether wind downs and the indemnification provisions justified those delays, which will be determined at trial. Accordingly, the Court cannot determine whether PPAS's delayed sending of default notices breached the Credit Agreements at this juncture.

The Court notes that Section 8.2(a) provides that "by notice to the Borrower" the Agent, "at the request of the Required Lenders shall, . . . declare the unpaid principal . . . and interest accrued thereon and all other Obligations to be immediately due and payable, which shall become immediately due and payable." (Croscill Agmt. § 8.2(a).) This provision lends support to PPAS's position that the Zohar Funds' instructions to send default notices and "exercise all applicable rights and remedies provided in

_____

[22] PPAS sent default notices to Silverack, Best Textiles, and Hartwell on November 21, 2017, which PPAS forwarded to AMZM on November 30, 2017. (See Nov. 30 Ltr. at 6-14.) PPAS sent a default notice to Netversant on February 11, 2018, which PPAS forwarded to AMZM on February 16, 2018. (See Feb. 16 Ltr. at 20.) PPAS did not send the Value Companies or Acme default notices. Hence, PPAS sent default notices only to Default Companies that had already ceased operations and were winding down prior to October 9, 2017. (See Oct. 17 Ltr. at 3.)

the Credit Documents" were not severable, such that PPAS could not send the notices without triggering an obligation to "foreclose[] promptly on all Collateral," as the sending of the default notices would make outstanding amounts "immediately due and payable." (Default Ltrs. at 2; Croscill Agmt. § 8.2; see also Oct. 17 Ltr.)

        f)   Remittance of Company Funds

The Zohar Trust contends that PPAS breached Section 8.2 by not remitting monies that PPAS held for the Default Companies upon the Zohar Funds' default declarations. (See Zohar MSJ Mem. at 19.) PPAS counters that it could not have breached as to the Value Companies because the Zohar Funds never reinstated their default instructions as to those Companies. Further, PPAS claims that it was permitted to not remit the Default Companies' funds pending additional indemnity for wind-down costs. (See PPAS MSJ Opp'n. at 17-19, 23.) Because there are genuine disputes of material fact regarding the default instructions as to the Value Companies, wind downs, and the Default Companies' indemnification provisions, the Court cannot determine at this stage whether PPAS's refusal to remit the Default Companies' monies breached the Credit Agreements.

Although the Court cannot grant summary judgment regarding the Default Company funds, the Court addresses the

Zohar Trust's argument that PPAS was not permitted to hold the Default Companies' cash because PPAS was not a bank. Section 9.5 permits the Agent to "accept deposits from, lend money to and generally engage in any kind of banking, trust, financial advisory or other business with the Borrower . . . as if [the Agent] were not performing the duties specified herein." (Croscill Agmt. § 9.5.)

The Zohar Trust argues that Section 9.5 does not confer on PPAS the power to act as bank, including by holding cash for the Companies, because New York law prohibits corporations not formed under state or federal banking laws to engage in banking. See 9 N.Y. Jur. 2d Banks § 38 ("No corporation other than one formed under the state or federal banking laws may engage in banking.") (See Zohar MSJ Opp'n. at 24.) The Trust's position is unpersuasive. At issue here is whether Section 9.5 permitted PPAS to hold in its account drawn DDTL and Revolver funds for the Default Companies, not whether PPAS itself could act as a bank. (See Zohar SMF ¶¶ 66, 69.) Cf. 9 N.Y. Jur. 2d Banks § 39 (banks organized under New York law are generally authorized to, among other things, negotiate promissory notes; purchase accounts receivables; lend money on security; buy and sell currency; and become a member of a federal reserve bank).

Further, the Trust contends that "the market does not expect a provision like [Section] 9.5 to apply to non-bank agents." Rather, Section 9.5 is a model provision common in the industry, and, as many agents are banks, it provides that "whatever services the agent already offers, it may continue to offer." (Zohar MSJ Opp'n. at 25.) Although a court "considers the customs, practices, usages and terminology as generally understood in the particular trade or business" when determining whether a contract is ambiguous, Jordan v. Can You Imagine, Inc., 485 F. Supp. 2d 493, 503 (S.D.N.Y. 2007) (internal quotation marks omitted), ambiguity cannot be created by reference to industry custom when the term's plain meaning is otherwise unambiguous, see AG Cap. Funding Partners, L.P. v. State St. Bank & Tr. Co., 781 N.Y.S.2d 88, 90 (N.Y. App. Div. 1st Dep't 2004), aff'd as modified, 842 N.E.2d 471 (N.Y. 2005) (defendant "may not introduce evidence of custom or industry practice to subvert the agreement's plain meaning").

Here, the plain language of Section 9.5 permits the "Agent" to "accept deposits from . . . the Borrower." (Croscill Agmt. § 9.5.) See Lopez, 760 N.Y.S.2d at 141 ("Clear and unambiguous terms should be understood in their plain, ordinary, popular and non-technical meaning."). The Court finds that this language is unambiguous, such that the Court

does not consider the Trust's arguments regarding how the
industry would interpret Section 9.5. See Greenfield, 780
N.E.2d at 170 ("Extrinsic evidence of the parties' intent may
be considered only if the agreement is ambiguous, which is an
issue of law for the courts to decide.").

Accordingly, the Court finds that Section 9.5 permitted
PPAS to hold drawn funds on behalf of the Portfolio Companies.
This finding does not the end the inquiry, however, as the
genuine disputes of material fact listed above persist.

g)    Causation of Damages

While the Zohar Trust does not seek summary judgment as
to the amount of damages suffered, it contends that it
suffered an injury directly and proximately caused by PPAS's
breach. Specifically, the Trust contends that it never
received the monies that PPAS held on behalf of the Default
Companies, as well as other funds the Zohar Funds could have
received had PPAS enforced the requested default remedies.
(See Zohar MSJ Mem. at 25.) PPAS counters that the Trust
provided no support for its contention that but for PPAS's
breach, the Zohar Funds would have received the Default
Company cash that PPAS held. (See PPAS MSJ Opp'n. at 25.)

Because there are genuine disputes of material fact
regarding whether PPAS was entitled to not remit the Default
Companies' monies in PPAS's bank account, there is a genuine

dispute of material fact regarding whether PPAS injured the Funds.

    h)    Exculpatory Provision

    Although there are genuine disputes of material fact precluding the Court from entering summary judgment on the Zohar Trust's Counterclaim III, the Court briefly addresses the parties' arguments regarding the exculpation provision. The Default Companies' exculpation provision provides, in relevant part, that "[n]one of the Agent . . . shall be liable to the Lenders for any action taken or omitted by the Agent under or in connection with any of the Credit Documents except to the extent caused by the Agent's gross negligence or willful misconduct." (Croscill Agmt. § 9.4(b).)

    "Under New York law, contractual clauses limiting liability reflect the parties' allocation of risks and are generally enforceable." In re CCT Commc'ns, Inc., 464 B.R. 97, 106 (Bankr. S.D.N.Y. 2011) (citing Metropolitan Life Ins. Co. v. Noble Lowndes Int'l, Inc., 643 N.E.2d 504, 507 (N.Y. 1994) (herein "Metropolitan Life I")). New York law, however, prohibits parties from limiting their liability for gross negligence or willful misconduct. See Kalisch-Jarcho, Inc. v. City of New York, 448 N.E.2d 413, 416 (N.Y. 1983) ("[A]n exculpatory agreement, no matter how flat and unqualified its terms, . . . will not apply to exemption of willful or

grossly negligent acts."). Hence, the exculpation provision at issue mirrors New York law.

Gross negligence means "conduct that evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing." Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd., 611 N.E.2d 282, 284 (N.Y. 1993); accord Am. Tel. & Tel. Co. v. City of New York, 83 F.3d 549, 556 (2d Cir. 1996). "Willful misconduct" requires tortious intent, such as fraud, malice, a dishonest purpose, or bad faith. See Kalisch-Jarcho, Inc., 448 N.E.2d at 416–17; Metropolitan Life Ins. Co. v. Noble Lowndes Int'l, Inc., 600 N.Y.S.2d 212, 216 (N.Y. App. Div. 1st Dep't 1993) (hereinafter "Metropolitan Life II") ("'Willful' is a term of tort, not contract. . . . [I]t is synonymous with 'wanton' and 'reckless' . . . ."), aff'd, 643 N.E.2d 504 (1994). "[W]illful misconduct does not include the voluntary and intentional failure or refusal to perform a contract for economic reasons." In re CCT Commc'ns, 464 B.R. at 106; see also Metropolitan Life I, 643 N.E.2d at 509 (contractual breach was not willful because it was "motivated exclusively by [defendant's] economic self-interest").

First, the Zohar Trust argues that the Credit Agreements do not exculpate PPAS for the alleged breaches because PPAS's breaches were willful, or at least grossly negligent, as

PPAS's conduct was "part of an intentional strategy designed to maintain Tilton's control of the Companies." (Zohar MSJ Mem. at 20.) At the outset, the Court notes that the Zohar Trust has not explained whether the acts by which Tilton allegedly maintained control of the Portfolio Companies were breaches of the Credit Agreements, and, accordingly, whether PPAS can be found to have acted with willful misconduct or gross negligence if it acted within the Agreements' scope.

Specifically, the Zohar Trust asserts that just before the Tilton-controlled Patriarch Managers resigned, PPAS coordinated the drawing of "tens of millions of dollars of borrowing" that Portfolio Company executives had not requested, which gave Tilton control over the Zohar Funds' lending. (Zohar MSJ Mem. at 20; see also Zohar Exs. 84-85 (emails from Portfolio Company executives).) At the same time, the Trust asserts, PPAS changed its practice from remitting loan repayments to the Zohar Funds and instead began holding the funds in its own account. (See Zohar MSJ Mem. at 20-21; Zohar Ex. 50 at 298:19-300:13, 304:15-19 (deposition testimony of Renee Dudley, Vice President of Loan Administration); PPAS's Account Reconciliation Spreadsheet.) Likewise, PPAS changed its practice from facilitating borrowings and repayments through the Zohar Funds' trustee to "doing everything from [the] PPAS account." (Zohar Ex. 50

at 301:20 – 302:14.) By holding Company cash in PPAS's account, PPAS paid over $26 million to itself and other Patriarch entities as various fees, tax distributions, and payments to Tilton's other funds, rather than paying back the Zohar Funds. (See Zohar MSJ Mem. at 21; see also Zohar Ex. 75 (PPAS spreadsheet showing fee payments); Zohar SMF ¶ 59.)

The Trust further contends that when AMZM sought a temporary restraining order targeting the cash in PPAS's account, PPAS moved approximately $13.9 million of Company cash into other accounts that Tilton controlled but would have been outside the scope of the court order the Trust sought. (See Zohar MSJ Mem. at 21; Zohar SMF ¶ 86; Zohar Exs. 127, 129 (Emails from Tilton approving transfers of Company funds); Zohar Ex. 128 (Company employee email confirming transfer of funds)). Despite alleging that the foregoing amounts to willful misconduct, the Zohar Trust does not allege that the Portfolio Companies drawing their loan facilities or paying PPAS Agency Fees or taxes breached any provision in the Credit Agreements or other contracts.

Moreover, PPAS counters that there was no scheme for Tilton to maintain control of the Portfolio Companies, as Section 9.5 permitted PPAS to hold loan draws for the Portfolio Companies and Tilton controlled the Companies

through her roles at each, not through PPAS. (See PPAS MSJ Opp'n. at 24; PPAS MSJ Reply at 6.)

Accordingly, there is a genuine dispute of material fact as to whether the above actions permitted Tilton to maintain control of the Companies, and, as explained below in Section III.D.1.a, whether the funds PPAS held in its account were drawn loan funds or loan repayments that thus allowed PPAS to invalidly control the Zohar Funds' lending.

Second, the Trust argues that PPAS's excuses for nonperformance were baseless and a pretext, since wind downs of Default Companies were not required and PPAS had no right to advancement of wind-down costs under the indemnification provisions. (See Zohar MSJ Mem. at 20-22.) As detailed above, there are genuine disputes of material fact regarding whether wind downs were required and the meaning of the indemnification provision.

Given the numerous disputes of material fact identified above, the Court **DENIES** the Zohar Trust's and PPAS's Summary Judgment Motions as to Counterclaim III.

### 2.    Count II: Irrevocable Appointment

PPAS and the Zohar Trust cross move for summary judgment on PPAS's Count II, which alleges that the Zohar Funds breached the Credit Agreements when they attempted to remove PPAS as Administrative Agent. (See PPAS MSJ Mem. at 14; Zohar

MSJ Mem. at 11.) PPAS argues that the Court should grant it summary judgement on liability because the Credit Agreements' clear, unambiguous language provides for PPAS's irrevocable appointment and/or authorization as Administrative Agent. (See PPAS MSJ Mem. at 15; Croscill Agmt. §§ 9.1-9.2.) PPAS asserts that the Funds' breach injured it by (1) impeding PPAS's recovery of Agency Fees and (2) causing the Zohar Funds' to not indemnify PPAS for wind-down expenses. (See PPAS MSJ Opp'n. at 10.)

The Trust counters that PPAS's breach of contract claim should be dismissed because PPAS cannot show that the Zohar Funds' unsuccessful efforts to remove PPAS as Administrative Agent caused any injury, as PPAS continued as Administrative Agent until it chose to step down in connection with the Zohar Funds' bankruptcy. (See Zohar MSJ Mem. at 12.) Additionally, the Trust contends that PPAS cannot prevail on its breach of contract claim because (1) PPAS was a "faithless agent" and (2) PPAS materially breached the Credit Agreements first. (Zohar MSJ Opp'n. at 11.) The Court first addresses the parties' arguments regarding causation, and then turns to the Trust's remaining arguments.

a)    Breach of Section 9.1

First, the Court finds that the Credit Agreements irrevocably appointed PPAS as Administrative Agent and the

Zohar Funds breached the Agreements when it attempted to remove PPAS as Administrative Agent.

As amended, Section 9.1 states that "PPAS is hereby irrevocably appointed the Agent hereunder."[23] (Croscill Agmt. § 9.1; Croscill Amend. No. 1 at 10.) The Court finds that the preceding provision is unambiguous, insofar as PPAS's appointment as Agent is irrevocable. See Clarke v. TRIGO U.S., Inc., No. 22 Civ. 1917, 2023 WL 6806074, at *6 (S.D.N.Y. Oct. 16, 2023) (agreement "expressly containing an irrevocable waiver of defenses" was "unambiguous"); Rosehoff, Ltd. v. Cataclean Ams., LLC, No. 21 Civ. 399, 2022 WL 17252373, at *7 (W.D.N.Y. Nov. 28, 2022) (listing cases holding that the term "irrevocable" is unambiguous); Eurocredit Bank v. Citibank, N.A., No. 95 Civ. 7713, 1996 WL 556990, at *3 (S.D.N.Y. Oct. 1, 1996) ("[T]he term[] . . . 'irrevocable' [is] unambiguous upon an ordinary reading."); Maxam v. Kucharczyk, 29 N.Y.S.3d 683, 683 (N.Y. App. Div. 3d

---

[23] The Croscill Agreement was amended on June 2, 2011. (See "Croscill Amend. No. 1", Zohar Ex. 56.) Under New York law, the Court considers amendments to the contract in question when interpreting its provisions. See, e.g, PSCW, Inc. v. Monaco, 189 N.Y.S.3d 574, 576 (N.Y. App. Div. 2d Dep't 2023) (interpreting "the language of the lease, the option agreement, the lease amendment, and the option amendment" to determine contract's meaning); Sciascia v. Rochdale Vill., Inc., 851 F. Supp. 2d 460, 473 (E.D.N.Y. 2012) (determining parties' contractual obligations required the Court to consider "the contractual agreements between the parties, including the 2005 [collective bargaining agreement] and the relevant side letters, the [amendment], and the 2008 [collective bargaining agreement]").

Dep't 2016) (contractual provision requiring plaintiff to "permanently and irrevocably transfer ownership" was "unambiguous"). Thus, the Zohar Funds' attempted termination of PPAS breached Section 9.1. See Bank of N.Y. v. Tri Polyta Fin. B.V., No. 01 Civ. 9104, 2003 WL 1960587, at *3 (S.D.N.Y. Apr. 25, 2003) ("The two elements of a breach of contract claim are that (1) a contract existed between the parties; and (2) the defendant(s) committed an act in violation of that contract." (citing Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp., 98 F.3d 25, 31 (2d Cir.1996)).

    b)  <u>Injury</u>

While the Court finds as a matter of law that the Zohar Funds breached the Credit Agreements, there are genuine disputes of material fact regarding whether the breach alleged injured PPAS.

To succeed on a breach of contract claim under New York law, a plaintiff must "prove that a defendant's breach *directly and proximately caused* his or her damages." Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank, 392 F.3d 520, 525 (2d Cir. 2004) (emphasis in original); see also LNC Invs., Inc. v. First Fid. Bank, N.A. N.J., 173 F.3d 454, 464 (2d Cir. 1999) ("[C]ausation is required to recover damages for breach of contract."). Damages are therefore not recoverable if they are "so remote as not to be directly traceable to the breach"

or "the result of other intervening causes." Nat'l Mkt. Share,
392 F.3d at 526.

When a party moves for summary judgment only on liability
on a contractual breach claim, the movant must show that the
nonmovant's alleged breach injured the movant, even if the
exact calculation of damages is left for trial. See, e.g.,
Pryce v. Progressive Corp., No. 19 Civ. 1467, 2024 WL 5399694,
at *7 (E.D.N.Y. Feb. 11, 2025) (to prevail on summary judgment
on liability on breach of contract claim, movants "need only
demonstrate that [movants] were damaged by [nonmovant's]
breach, . . . while discrete issues arising from the
calculation of individual damages . . . may be bifurcated");
Merrill Lynch & Co. v. Allegheny Energy, Inc., No. 02 Civ.
7689, 2005 WL 832050, at *5 (S.D.N.Y. Apr. 12, 2005)
("[C]oncerns about proof of proximate cause" precluded
summary judgment on liability for contractual breach claim);
CapLOC, LLC v. McCord, No. 17 Civ. 5788, 2020 WL 1036044, at
*20 (S.D.N.Y. Mar. 3, 2020) (denying summary judgment on
breach of contract claim because of "triable issue[s] as to
whether [movant's] alleged breach of the . . . agreement
caused reliance damages").

In the case of cross motions for summary judgment on a
breach of contract claim, the plaintiff's "failure to prove
compensatory damages would not, however, entitle [the

defendant] to summary judgment" because "[t]hat damages are uncertain, or may not even exist, is an insufficient reason under New York law to grant [defendant's] motion for summary judgment." Acumen Re Mgmt. Corp. v. Gen. Sec. Nat. Ins. Co., 09 Civ. 01796, 2012 WL 3890128, at *11 (S.D.N.Y. Sept. 7, 2012). This finding obtains because "even if the breach of contract caused no loss or if the amount of loss cannot be proved with sufficient certainty, the injured party is entitled to recover as nominal damages a small sum fixed without regard to the amount of the loss, if any." Id. (quoting Hirsch Elec. Co. v. Cmty. Servs., Inc., 536 N.Y.S.2d 141, 143 (N.Y. App. Div. 2d Dep't 1988) (internal quotation marks omitted).)

PPAS asserts that the Zohar Funds' breach injured PPAS by (1) impeding PPAS's recovery of Agency Fees and (2) causing the Zohar Funds' failure to indemnify PPAS for wind-down costs. (See PPAS MSJ Opp'n. at 10.) The Trust counters that it should be granted summary judgment on PPAS's claim because PPAS cannot show that the Zohar Funds' unsuccessful efforts to remove it as Administrative Agent caused any unpaid Agency Fees or wind-down costs, as PPAS continued as Administrative Agent until it chose to step down in connection with the Zohar Funds' bankruptcy. (See Zohar MSJ Mem. at 12-13.) The Court addresses each category of damages in turn.

(1)  <u>Agency Fees</u>

Regarding the Agency Fees, PPAS contends that the uncertainty created by the Funds' attempt to remove PPAS as Administrative Agent followed by AMZM's "harassing" of the Portfolio Companies caused the Companies to withhold payments to PPAS until "it was clear that sending money to PPAS would not trigger potential exposure to liability." (PPAS MSJ Opp'n. at 13-14.) In support, PPAS offers Tilton's assertion that AMZM sent "threatening letters" to the Portfolio Companies and directed them to remit payments to AMZAS. (Tilton Decl. ¶¶ 13-14; <u>see also</u> PPAS. Opp'n. Ex.[24] 24 (email directing Portfolio Company to remit payments to AMZAS).) Consequentially, some Portfolio Companies determined that they were not comfortable paying Agency Fees to PPAS. (<u>See</u> Tilton Decl. ¶ 19.) PPAS asserts that this uncertainty persisted even after the Court instructed that PPAS continue to serve as Administrative Agent pending this litigation. (<u>See also</u> PPAS MSJ Opp'n. at 11.) The Default Letters, for example, contained a disclaimer stating that "this notice is without prejudice to AMZM's and the Zohar Funds' positions

---

[24] Citations to "PPAS Opp'n. Ex." correspond to the numbered exhibits submitted with the Declaration of Akiva Shapiro in opposition to the Zohar Trust's Motion for Summary Judgment. (<u>See</u> Dkt. No. 338.) Citations to page numbers therein correspond to the ECF page number.

that PPAS's role as Agent was properly terminated." (Default Ltrs. at 2 n.1.)

The Trust argues that the nonpayment of Agency Fees does not demonstrate any connection to the Zohar Funds' attempted termination of PPAS, as PPAS historically deferred Agency Fees due to the Portfolio Companies' underperformance. (See Zohar MSJ Mem. at 14.) In support, the Trust cites Tilton's May 10, 2023, deposition, in which she described a Portfolio Company's $300,000 payment as "back owed" Agency Fees, as well as a $4 million payment for "back fees" that PPAS "had deferred for a long time." (Zohar Ex. 8 at 277:15-17, 281:2-4.) The Trust also points to a PPAS spreadsheet that shows that PPAS continued to be paid Agency Fees after the attempted termination on June 17, 2016. (See Zohar Ex. 75 at 2-4.) Moreover, it is undisputed that AMZAS never received any Agency Fees. (See Zohar MSJ Mem. at 14; PPAS CMF ¶ 55.)

The Trust further contends that because Tilton controlled PPAS and the Companies after PPAS's attempted removal and caused the Companies to pay PPAS's fees, PPAS cannot show any connection between the termination attempt and any unpaid Agency Fees. (See Zohar MSJ Mem. at 14-15.) In support, the Trust points to a May 19, 2016, email – before the June 2016 termination – between Portfolio Company executives stating that "[C]ompanies are being forced to stay

94

current on the management and [A]gency [F]ees." (Zohar Ex. 86 at 3.) The Trust also provides a 2018 email from Patriarch's Controller stating that the "Board has authorized the payment of outstanding PPAS [A]gency [F]ees." (Zohar Ex. 99 at 2.) The Trust contends that Tilton is the person behind these directives. (See Zohar MSJ Mem. at 15.)

In light of the evidence presented by both parties, the Court finds that there is a genuine dispute of material fact regarding whether the Zohar Funds' breach of Section 9.1 caused any Portfolio Company to withhold Agency Fees from PPAS. Although PPAS contends that the attempted termination was the but-for cause of the delayed Agency Fee payments, there is evidence in the record that supports the Zohar Trust's theory that the delayed payments resulted from PPAS's practice of deferring Agency Fees prior to the termination attempt. First, that it is undisputed that PPAS deferred Agency Fees prior to the termination attempt and that PPAS was paid Agency Fees afterwards raises triable issues of fact regarding whether Portfolio Companies ceased making Agency Fee payments after the termination, and, if so, whether those non-payments were because of the termination attempt. (See Zohar Ex. 75 at 3 (showing "Agency Fees" payments made on June 20, 2018, March 27, 2019, November 4, 2019, and March 23, 2020).) Second, PPAS has not responded to the Trust's

assertion that any Portfolio Company's non-payment of Agency
Fees was at Tilton's direction, such that there are triable
issues of fact regarding whether any non-payment of Agency
Fees was due to the termination attempt or at Tilton's
direction.

(2) Wind-down Costs

Regarding the unpaid wind-down costs, PPAS claims that,
because the Zohar Funds attempted to terminate PPAS as
Administrative Agent, the Funds refused to advance PPAS wind-
down costs necessary to foreclose the Default Companies'
collateral. (See PPAS MSJ Opp'n. at 15.) In support, PPAS
offers Tilton's deposition testimony that the "constant
fighting" and "battles going on" caused the nonpayment of
wind-down costs. (PPAS Opp'n. Ex. 9 at 313:10-19, 314:8-23.)
Further, PPAS provides its supplemental responses and
objections to the Zohar Trust's Fourth Set of
Interrogatories, in which PPAS asserted that it sought
damages for the "unreimbursed costs, fees, and expenses of
winding down portfolio companies at the direction of the Zohar
Funds." (PPAS Opp'n. Ex. 32 at 7.)

The Trust counters that the Zohar Funds never requested
that any Default Company be wound down. Hence, any wind down
was done at Tilton's direction and Tilton should have borne
the cost, such that PPAS cannot show that the Funds' attempted

removal of PPAS caused the nonpayment of wind-down costs. (See Zohar MSJ Mem. at 15.) In support, the Trust points to PPAS's October 17 Letter, in which Tilton stated that she had borne wind-down costs in the past when the wind downs were made at her discretion. (See Oct. 17 Ltr. at 3.) Moreover, the Trust argues, PPAS has not produced any evidence to substantiate its approximately $6.5 million in claimed unreimbursed winddown costs. (See Zohar MSJ Mem. at 15.) Finally, the Funds attempted termination of PPAS could not have caused any unpaid wind-down fees, since any such costs were incurred because PPAS continued as Administrative Agent. (See id.)

There is a genuine dispute of material fact regarding whether the Zohar Funds' attempted termination of PPAS in June 2016 caused the Funds to refuse to pay for wind-down costs in October 2017 because, as detailed above in Section III.C.1.d, there is a genuine dispute of material fact regarding whether wind downs were required. Further, the Court notes that, even if wind downs were required, the question remains whether the Zohar Funds refused to pay wind-down costs because of the Funds' breach or because of PPAS's demand for $2 million per Default Company without a further breakdown of those costs. (See Oct. 17 Ltr. at 3.)

c)    Common-Law Agency

The Zohar Trust additionally argues that the Zohar Funds and PPAS were in a principal-agent relationship under New York law. As such, the Trust asserts, PPAS was a faithless agent because PPAS refused to remit key Portfolio Company information to AMZM and follow the Zohar Funds' default instructions. (See Zohar MSJ Opp'n. at 14-15.) Therefore, the Funds were permitted to end the agency relationship despite the irrevocable appointment clause in Section 9.1 without being subject to a claim for damages. (See id. at 11.)

To ascertain whether PPAS was a faithless agent, the Court must first determine whether PPAS and the Zohar funds were in a principal-agent relationship. An agency relationship arises under New York law "when there is agreement between the principal and the agent that the agent will act for the principal and the principal retains a degree of control over the agent." In re Parmalat Sec. Litig., 375 F. Supp. 2d 278, 290 (S.D.N.Y. 2005); see Restatement (Third) of Agency § 1.01 (2006) ("Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control . . . ."). "Where, as here, parties contend that an agency relationship is established by

98

contract, . . . a court will look to the language of that agreement to ascertain the relationship created between the parties . . . ." Steinbeck v. Steinbeck Heritage Found., 400 Fed. App'x. 572, 575 (2d Cir. 2010) (internal citation omitted).

"Under New York law, contractual disclaimers of fiduciary duty are enforceable when sufficiently explicit." Valentini v. Citigroup, Inc., 837 F. Supp. 2d 304, 326 (S.D.N.Y. 2011); see e.g. Kirschner as Tr. of Millennium Lender Claim Tr. v. JPMorgan Chase Bank, N.A., No. 17 Civ. 6334, 2020 WL 2614765, at *14-15 (S.D.N.Y. May 22, 2020), aff'd sub nom. Kirschner v. JP Morgan Chase Bank, N.A., 79 F.4th 290 (2d Cir. 2023)(dismissing breach of fiduciary duty claim against defendant "Administrative Agent" when credit agreement included a "specific disclaimer" of fiduciary duty "in the same section of the agreement that allegedly creates the agency relationship"). "[E]ffective disclaimers must explicitly reference fiduciary duties." LBBW Lux. S.A. v. Wells Fargo Sec. LLC, 10 F. Supp. 3d 504, 523 (S.D.N.Y. 2014).

Here, the Court finds that PPAS was not the Zohar Funds' common-law agent based on the disclaimer of fiduciary duty in Section 9.2. Section 9.2 provides that the "Agent shall have only those duties and responsibilities that are expressly

specified herein and the other Credit Documents," and that
the "Agent shall not have, by reason hereof or any of the
other Credit Documents, a fiduciary relationship in respect
of any Lender and nothing herein . . . is intended to . . .
impose upon the Agent any obligations . . . except as
expressly set forth herein." (Croscill Agmt. § 9.2.) This
disclaimer of fiduciary duty is "a clear and unambiguous
disclaimer" that is enforceable under New York law.
Valentini, 837 F. Supp. 2d at 326 (internal quotation marks
omitted) (disclaimer stating that "CFSC is not acting as
fiduciary for" the purchaser was unambiguous and enforceable
under New York law); see also LBBW Lux., 10 F. Supp. 3d at
510-11, 524 (disclaimer stating no party "is acting as a
fiduciary or financial or investment advisor for the
purchaser" was unambiguous and enforceable under New York
law).

The Zohar Trust relies on Samba Enterprises, LLC
v. iMesh, Inc. for the proposition that a contractual
disclaimer of an agency relationship does not preclude a
finding of agency. See No. 06 Civ. 7660, 2009 WL 705537
(S.D.N.Y. Mar. 19, 2009), aff'd sub nom. Samba Enters., Ltd.
v. iMesh, Inc., 390 F. App'x 55 (2d Cir. 2010). But in Samba,
the disclaimer at issue stated that the "Agreement is not
intended to create a relationship such as . . . agency" – the

disclaimer did not unambiguously disclaim fiduciary duty, unlike the disclaimers in the cases discussed above. Id. at *2. Further, the purpose of the contract in Samba was to engage the plaintiff software company to act on the defendant internet company's behalf by presenting candidates with whom the defendant could enter into bundling agreements. Id. at *2, 7.

Here, conversely, the purpose of the Credit Agreements was to set out terms for the loan facilities. In the Croscill Agreement, for example, Article IX governs the appointment of the Agent and its duties (although Section 8.2 pertains to the Agent's duties in an Event of Default), whereas Articles II-VIII pertain to the terms of the loans and their conditions precedent and subsequent, representations and warranties, affirmative and negative covenants, and Events of Default. (See Croscill Agmt. Arts. II-IX.)

Therefore, because PPAS was not the Zohar Funds' common-law agent based on the disclaimer in Section 9.2, the Funds' breach of the irrevocable appointment clause cannot be excused by the faithless agent doctrine.

d)    Prior Material Breach

The Zohar Trust further argues that PPAS's withholding of Portfolio Company financial information from AMZM constitutes a prior material breach of Section 9.11 that bars

PPAS's breach of contract claim. (See Zohar MSJ Opp'n. at 15-16.)

"Under New York law, when one party has committed a material breach of a contract, the non-breaching party is discharged from performing any further obligations under the contract." Apple Mortg. Corp. v. Barenblatt, 162 F. Supp. 3d 270, 288 (S.D.N.Y. 2016) (internal quotation marks omitted). A breach is material when it "goes to the root of the contract." In re Lavigne, 114 F.3d 379, 387 (2d Cir. 1997) (internal quotation marks omitted); see also Catlyn & Derzee, Inc. v. Amedore Land Devs., LLC, 19 N.Y.S.3d 348, 353 (N.Y. App. Div. 3d Dep't 2015) ("[A] party's obligation to perform under a contract is only excused where the other party's breach of the contract is so substantial that it defeats the object of the parties in making the contract." (internal quotation marks omitted)).

Section 9.11 provides that "the Agent shall promptly notify the Lenders of any notices, documents, requests, demands or other items the Agent received from the Borrower and promptly deliver or convey . . . such notices, documents, requests, demands or items to the Lenders." (Croscill Agmt. § 9.11.) On April 27, 2016 – after AMZM had become Collateral Manager on March 4, 2016 - the Zohar Funds informed PPAS that PPAS had breached Section 9.11 and directed PPAS to deliver

102

by April 29, 2016, all Portfolio Company documents received since January 1, 2016. (See Zohar Ex. 158 at 2-3.) On April 29, 2016, PPAS agreed to produce documents it had a "contractual obligation to provide" on "a rolling basis within a reasonable timeframe." (Zohar Ex. 159 at 2.) PPAS produced an initial batch of documents on May 5, 2016, reiterating that many of the Credit Agreements did not require PPAS to produce any documents. (See Zohar Ex. 161 at 2.)

Despite this initial production, the Trust contends, the Zohar Funds were forced to sue PPAS and the Patriarch Managers to obtain the Portfolio Companies' records (the "Books and Records Action"). (See Zohar MSJ Opp'n. at 6, 15; Zohar Ex. 154 (Books and Records Memorandum Opinion).) In that action, the Delaware Court of Chancery held that the Patriarch Managers' collateral management agreements obligated them to produce all property and documents of the Zohar Funds relating to collateral and to make books of account and records relating to collateral accessible for inspection. (See id. at 52.) The Delaware Court did not rule on PPAS's document production obligations, however, because those claims were either dismissed or withdrawn. (See id. at 21 n.81.)

The Zohar Trust asserts that PPAS's alleged breach was material because "information flow" from the Portfolio Companies to the Zohar Funds was one of PPAS's "core functions

as agent." (Zohar MSJ Opp'n. at 16.) Further, the Portfolio Companies' financial information was "crucial" for the Zohar Funds to "make lending decisions and determinations as to if, and when, to invoke their creditor rights," such that the Zohar Funds were "mak[ing] critical lending decisions in the dark" without it. (Id.)

PPAS counters that there was no breach because the Credit Agreements required the Portfolio Companies – not PPAS - to "furnish to the Agent and the Lenders" their financial information. (Croscill Agmt. § 5.1(a)(i)-(viii); see also PPAS MSJ Reply at 4.) Regardless, PPAS argues that the Trust offers no evidence that the purported breach was material, as the Trust does not identify what critical lending decisions it was forced to make without the Companies' financial information.[25] (See id. at 5.)

The Court finds that there are genuine disputes of material fact regarding whether PPAS's failure to provide financial documentation was a material breach of the Credit Agreements. Specifically, whether PPAS did not have Portfolio

---

[25] PPAS also claims that because its supposed failure to deliver documents is the same conduct at issue in the Zohar Trust's Counterclaim II, which the Trust is not pursuing, the Trust's "conceded dismissal" of Counterclaim II bars any such arguments. (Id. at 5.) The Court will not dismiss the Trust's affirmative defense on the basis that the Trust has abandoned the Counterclaim stemming from the same alleged conduct. See MathWorks, Inc. v. COMSOL AB, No. 06 Civ. 335, 2008 WL 11348447, at *1 (E.D. Tex. Oct. 10, 2008) (defendant permitted to assert affirmative defense of prior material breach despite abandoning counterclaims based on same conduct).

Company financial documents because the Companies did not furnish them to PPAS, as well as what lending decisions the Zohar Funds made without the benefit of the financial information.

Accordingly, because there are genuine disputes of material fact regarding (1) whether the Zohar Funds' breach of Section 9.1 injured PPAS and (2) whether PPAS previously materially breached the Credit Agreements by failing to remit financial information to the Funds, the Court **DENIES** the Zohar Trust's and PPAS's Summary Judgment Motions as to Count II.

      D.   <u>REMAINING COUNTERCLAIMS</u>

The Court turns to the Counterclaims on which PPAS alone moves for summary judgment: Counterclaim IV (breach of contract due to PPAS's purported amendment of the Credit Agreements by course of performance) and Counterclaim V (breach of contract due to PPAS's purported failure to promptly distribute funds received from the Portfolio Companies). (<u>See</u> Third Amended Counterclaims ¶¶ 86-89, 92-95; PPAS MSJ Mem. at 16, 20-25.)

Further, PPAS contends that Counterclaim IV, as well as the following Counterclaims, should be dismissed with prejudice because the Trust is no longer pursuing them: Counterclaim II (breach of contract due to PPAS's purported failure to deliver documents); Counterclaim VI (breach of the

Transcare Credit Agreement due to PPAS's purported failure to distribute funds received from the Transcare bankruptcy); and Counterclaim VII (conversion due to PPAS's purported failure to remit Agency Fees it collected after the attempted termination). (See Third Amended Counterclaims ¶¶ 70-75, 96-107; PPAS MSJ Mem. at 16.) Finally, PPAS asks that the Court dismiss Counterclaim I (declaratory judgment that the Zohar Funds have authority under the Credit Agreements to remove the Administrative Agent) as moot. (See Third Amended Counterclaims ¶¶ 64-69; PPAS MSJ Mem. at 16.) The Court first addresses the merits of Counterclaim V, then addresses the Counterclaims PPAS contends are moot or abandoned. For the following reasons, the Court **DENIES** PPAS's Summary Judgment Motion as to Counterclaim V and **DISMISSES** Counterclaims I-II, IV, VI-VII with prejudice.

1.  Counterclaim V: Remittance of Funds

Counterclaim V, like Counterclaim III, alleges that PPAS improperly held funds that should have been remitted to the Zohar Funds. (See Third Amended Counterclaims ¶¶ 79-81, 92-94.) But while Counterclaim III focuses on funds that PPAS held for the Default Companies that the Trust contends should have been remitted upon the default declarations, (see Zohar MSJ Mem. at 19), Counterclaim V focuses on funds that PPAS purportedly held for the Portfolio Companies after AMZM

became Collateral Manager. The Zohar Trust alleges that these funds were actually loan repayments that should have been remitted to the Zohar Funds – not drawn DDTLs and Revolvers as PPAS contends. (See Third Amended Counterclaims ¶ 93.) The Court addresses whether withholding the funds breached the Credit Agreements, the Trust's damages evidence, and the exculpation provision.

a)    Alleged Breach

As detailed below, there is a genuine dispute of material fact regarding whether the funds PPAS held were drawn Revolvers and DDTLs on the Portfolio Companies' behalf, or whether the funds were loan repayments that should have been remitted to the Zohar Funds under Section 2.14. The central issue is whether PPAS's Account Reconciliation Spreadsheet recorded borrowings and paydowns on the Companies' loan facilities, or withdrawals and deposits of fully drawn loans that PPAS held for the Companies pursuant to Section 9.5.

Section 2.14(d) provides that the "Agent shall promptly distribute to each Lender . . . all payments and prepayments of principal and interest due hereunder, together with all other amounts due." (Croscill Agmt. § 2.14(d).) The Zohar Trust argues that the Account Reconciliation Spreadsheet records payments that should have been remitted to the Zohar Funds under Section 2.14(d). That Spreadsheet has columns

107

labeled "borrowing" and "paydown" with dated entries, along with columns labelled "commitment," "funded," and "availability." (See PPAS Account Reconciliation Spreadsheet.) The Trust contends that the "borrowing" and "paydown" fields show Company draws of and payments on the loans, which were not remitted to the Zohar Funds, and that the corresponding "commitment" field shows the full amount of the loan, the "funded" field shows the total amount borrowed, and the "availability" field shows the remaining loan balance. (See Zohar MSJ Opp'n. at 23.) Further, the Spreadsheet divided "paydowns" between the Zohar Funds, which the Trust contends "would be nonsensical" if "PPAS believed it was accepting 'deposits' from the Companies." (Id.; see also PPAS's Account Reconciliation Spreadsheet at 68 (Netversant tab).) Additionally, the Trust asserts that the Portfolio Companies' borrowing requests demonstrate that the Companies understood that they were paying down their loans, not depositing money with PPAS, since the stated loan availability was higher in subsequent requests. (See Zohar Exs. 162-63 (Croscill borrowing requests).)

PPAS argues that the Account Reconciliation Spreadsheet, despite the column names, tracked the Companies' withdrawals and deposits of monies from the fully drawn loans that PPAS held for the Companies'. (See PPAS MSJ Reply at 10.) In

support, PPAS points to a Croscill employee's deposition testimony that he understood the Company's loan was fully withdrawn when he submitted borrowing certificates. Hence, the certificates did not actually represent a request to borrow from Croscill's loan, but rather a request to withdraw the cash that PPAS held. (See PPAS Ex. 186 at 53:15 – 55:11; PPAS MSJ Reply at 10 n.4.)

Additionally, PPAS cites evidence showing that the Portfolio Companies, with Tilton's approval, drew down their remaining DDTL and Revolver balances from mid-2015 to early 2016. (See PPAS Ex. 12 at 91:4-5 (Tilton's deposition testimony that she approved all borrowings); PPAS Exs. 29-32, 146-47(emails from Tilton approving borrowings).) Since the loans were fully drawn, PPAS argues, any Company requests to "borrow" were in fact requests to withdraw cash in PPAS's account. (See PPAS MSJ Mem. at 24.) Also, PPAS presents deposition testimonies, emails, and financial statements to support a determination that the Companies recorded the fully drawn loans as liabilities on their balance sheets, paid interest to the Zohar Funds on those amounts, and understood those monies to belong and be available to the Companies. (See PPAS Ex. 12 at 132:12-13 (Portfolio Companies recorded draws as liabilities); PPAS Ex. 19 at 62:22 – 63:3 (PPAS remitted $35,000 in interest to Zohar I); PPAS Exs. 21-22

(bank trustee records showing interest payments); PPAS Ex. 33 at 3 (PPAS employee email stating that drawn funds belong to the Company); PPAS Ex. 34 at 127:5-18 (draws were disclosed in audited financial statements); PPAS Ex. 35 at 7 (Croscill audited financial statement recording drawn Revolver as liabilities); PPAS Ex. 36 at 17 (Snelling audited financial statement recording drawn Revolver as long-term debt).)

The Court finds that there is a genuine dispute of material fact regarding whether the funds PPAS held were drawn loan facilities or payments that should have been remitted to the Zohar Funds under Section 2.14(d). Specifically, there is a genuine dispute of material fact regarding whether transactions recorded in PPAS's Account Reconciliation Spreadsheet merely reflected the movement of funds in and out of PPAS's account or draws and repayments of loan facilities. Further, the Court notes that neither the Zohar Trust nor PPAS has addressed whether the Portfolio Companies, apart from the Default Companies,[26] made any interest or principal payments to the Zohar Funds from AMZM's

---

[26] The Zohar Trust provides the Default Letter sent to Croscill identifying the interest period, due date, and amount of the missed interest payment that triggered the default declaration but does not identify other Default Companies' missed interest payments. (See Zohar Ex. 101 at 2.) Further, the Trust does not identify any other missed Default Company interest or principal payments preceding the Zohar Funds' default declarations. (See Zohar SMF ¶ 61.)

appointment as Collateral Manager on March 4, 2016, until
the filing of the Third Amended Counterclaims,[27] or which
specific principal and interest payments were not made that
should have been remitted. (See PPAS SMF ¶¶ 97-108; Zohar
SMF ¶¶ 39-44.)

        b)    Damages

PPAS contends that Counterclaim V must be dismissed for
the independent reason that the Zohar Trust has presented no
admissible evidence of damages, as the Trust relies
exclusively on Lorry's expert testimony. (See PPAS MSJ Mem.
at 24-25.) But the Court has denied PPAS's Motion to Exclude
as to Lorry's Revolver damages calculations. (See Section
II.B.2.) Accordingly, the Court will not grant PPAS summary
judgment on Counterclaim V on the basis that the Zohar Trust
has presented no admissible damages evidence.

        c)    Exculpatory Provision

PPAS contends that Counterclaim V must be dismissed for
the independent reason that the Zohar Trust has not pleaded
that PPAS's alleged breach involved gross negligence or
willful misconduct, such that it was not exculpated under the
Credit Agreements. (See PPAS.'s MSJ Mem. at 17.) The Zohar

---

[27] Counterclaim V alleges "[s]ince March 2016, PPAS has been collecting
payments from Portfolio Companies on [Revolvers] and [DDTLs] under the
Credit Agreements. However, PPAS has failed to distribute any of those
amounts to the Zohar Funds." (Third Amended Counterclaims ¶ 93.)

Trust counters with the arguments in its Summary Judgment Motion: PPAS's actions since 2016 evince Tilton's "scheme to weaponize PPAS to keep control of the Companies" and "siphon the Zohar Funds' monies to herself." (Zohar MSJ Opp'n. at 18.) For the reasons described above in Section III.C.1.h, the Court finds that there are genuine issues of material fact regarding PPAS's motivation for its conduct and whether any of the challenged actions allowed Tilton to control the Zohar Funds' lending.

Accordingly, because there are genuine disputes of material fact regarding whether (1) the funds PPAS held were drawn loan facilities or payments that should have been remitted to the Zohar Funds under Section 2.14(d) and (2) PPAS's actions constituted willful misconduct or gross negligence, the Court **DENIES** PPAS's Summary Judgment Motions as to Counterclaim V.

### 2.    Counterclaim I: Declaratory Judgment

The Court dismisses Counterclaim I as moot.

"Mootness is a doctrinal restriction stemming from the Article III requirement that federal courts decide only live cases or controversies . . . ." <u>In re Zarnel</u>, 619 F.3d 156, 162 (2d Cir. 2010). "Under the doctrine of mootness, a court no longer has subject matter jurisdiction to grant the relief requested when 'the issues presented are no longer live or

the parties lack a legally cognizable interest in the outcome.'" <u>US Airways, Inc. v. Sabre Holdings Corp.</u>, No. 11 Civ. 2725, 2015 WL 5188812, at *3 (S.D.N.Y. Sept. 4, 2015) (quoting <u>County of Los Angeles v. Davis</u>, 440 U.S. 625, 631 (1979)). Declaratory relief is available only when "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." <u>MedImmune, Inc. v. Genentech, Inc.</u>, 549 U.S. 118, 127 (2007) (internal quotation marks omitted).

Here, as the Zohar Funds have entered Chapter 11 bankruptcy, the declaratory judgment sought by the Zohar Trust "relates to past actions that will not impact the legal relations or rights of the parties." <u>US Airways</u>, 2015 WL 5188812, at *4. Therefore, the Court **DISMISSES** Counterclaim I with prejudice as moot.

### 3.   <u>Abandonment of Counterclaims II, IV, and VI-VII</u>

The Court finds that the Trust has abandoned Counterclaims II, IV, and VI-VII.

"Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." <u>McNeil-PPC, Inc. v. Perrigo Co.</u>, 2007 WL 81918, at

*13 (S.D.N.Y. 2007) (internal quotation marks omitted) (collecting cases); see also Jackson v. Fed. Exp., 766 F.3d 189, 196 (2d Cir. 2014) ("[A] partial opposition [to a summary judgment motion] may imply an abandonment of some claims or defenses."). Likewise, if a party informs the Court that it has abandoned a claim, the Court need not consider it. See Bartshe v. Comm'r of Vt. Dep't of Corr., No. 18 Civ. 166, 2020 WL 4754971, at *8 (D. Vt. July 17, 2020), report and recommendation adopted sub nom. Bartshe v. Baker, No. 18 Civ. 166, 2020 WL 4748054 (D. Vt. Aug. 14, 2020) ("[Plaintiff's] counsel informed the court that he was abandoning the retaliation claim. Accordingly, [plaintiff's] retaliation claim is deemed abandoned . . . .").

Here, the Trust has abandoned Counterclaims II, IV, and VI-VII. Regarding Counterclaims II and IV, the Trust concedes that it is "not pursing [those] claim[s] in this action."[28]

---

[28] PPAS argues that the time has passed for the Trust to voluntarily dismiss Counterclaim IV pursuant to Federal Rule of Civil Procedure 41(c), such that the Court must either grant summary judgment to PPAS on that Counterclaim or dismiss the Counterclaim pursuant to Federal Rule of Civil Procedure 41(b) ("Rule 41(b)"), which "operates as an adjudication on the merits." Fed. R. Civ. P. 41(b). (See PPAS MSJ Reply at 6.) Dismissals pursuant to Rule 41(b) constitute "harsh remedies that are appropriate only in extreme situations." Wynder v. McMahon, 360 F.3d 73, 79 n.10 (2d Cir. 2004) (internal modifications and quotations omitted). Further, in assessing whether dismissal pursuant to Rule 41(b) is appropriate, the Second Circuit considers five factors:

[1] the duration of the plaintiff's failures, [2] whether plaintiff had received notice that further delays would result in dismissal, [3] whether the defendant is likely to be prejudiced by further delay, [4] whether the district judge has taken care to strike the balance between alleviating court

114

(Zohar MSJ Opp'n. at 25; see also Zohar MTE Mem. at 10-11.)
Regarding Counterclaims VI and VII, the Trust does not address
in its Opposition that PPAS breached the Transcare Credit
Agreement or that PPAS wrongfully collected annual Agency
Fees that rightfully belonged to AMZAS after the termination
attempt. Accordingly, the Court hereby **DISMISSES**
Counterclaims II, IV, and VI-VII with prejudice because the
Zohar Trust has abandoned them.

* * *

In sum, the Court **DENIES** PPAS's Summary Judgment Motion
as to PPAS's Count II and the Zohar Trust's Counterclaims III
and V. Also, the Court **DENIES** the Trust's Summary Judgment
Motion as to PPAS's Count II and the Trust's Counterclaim
III. Further, the Court **DISMISSES** with prejudice the Trust's
Counterclaim I as moot and **DISMISSES** with prejudice the
Trust's Counterclaims II, IV, and VI-VII as abandoned.

---

calendar congestion and protecting a party's right to due
process and a fair chance to be heard . . . and [5] whether
the judge has adequately assessed the efficacy of lesser
sanctions.

Jackson v. City of New York, 22 F.3d 71, 74 (2d Cir. 1994) (internal
modifications and quotations omitted). Dismissal pursuant to Rule 41(b)
plainly is not warranted here. Further, courts routinely dismiss claims
if a party abandons them at the summary judgment stage. See, e.g., Zeng
v. Chell, No. 19 Civ. 3218, 2024 WL 244388, at *3 (S.D.N.Y. Jan. 23,
2024), reconsideration denied, No. 19 Civ. 3218, 2024 WL 3360570 (S.D.N.Y.
July 9, 2024) ("Moreover, the plaintiff's counsel explicitly abandoned
those claims at the argument on the [summary judgment] motion, . . . and
therefore those claims should be dismissed.").

## IV.  ORDER

For the reasons stated above, it is hereby

**ORDERED** that the motion (Dkt. No. 325) of plaintiff-counterclaim defendant Patriarch Partners Agency Services, LLC ("PPAS") to exclude the expert testimony of David S. Lorry is **GRANTED** in part and **DENIED** in part; it is further

**ORDERED** that that the motion (Dkt. No. 320) of defendant-counterclaim plaintiff Zohar Litigation Trust-A ("Zohar Trust") to exclude the expert testimony of Federick Van Zijl is **GRANTED** in part and **DENIED** in part; it is further

**ORDERED** that the motion (Dkt. No. 322) of PPAS for summary judgment is **DENIED** as to PPAS's Count II and the Zohar Trust's Counterclaims Count III and Count V; it is further

**ORDERED** that the motion (Dkt. No. 328) the Zohar Trust for summary judgment is **DENIED** as to PPAS's Count II and the Zohar Trust's Counterclaim Count III; it is further

**ORDERED** that the Zohar Trust's Counterclaims I-II, IV, and VI-VII are **DISMISSED** with prejudice; and it is further

**ORDERED** that the parties confer, and within fourteen days of the date of this Order, propose (1) a date for the start and duration of trial in this action and (2) a pretrial schedule in accordance with the Court's Individual Trial Procedures.

116

**SO ORDERED.**

Dated:    8 September 2025
          New York, New York

Victor Marrero
U.S.D.J.