USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/27/2026

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

PATRIARCH PARTNERS AGENCY SERVICES, LLC,

                              Plaintiff,

      - against -

ZOHAR CDO 2003-1, LTD., ET AL.,

                              Defendants.

**16-CV-4488 (VM)**

**ORDER**

**VICTOR MARRERO, United States District Judge.**

In connection with the bench trial held in this matter from March 16 through 20, 2026, the Court is in receipt of deposition designations from the parties pursuant to this Court's Trial Procedures VI(4). The Court has received deposition designations for the following individuals:

(1)  Thomas Macedonio (Ex. A);

(2)  Christopher Cover (Ex. B);

(3)  James Berry (Ex. C);

(4)  Sean O'Shea (Ex. D);

(5)  Dan Martin (Ex. E);

(6)  Aileen Daversa (Ex. F);

(7)  Scott DeRoss (Ex. G); and

(8)  Robert Kost (Exs. H and I).

The Court accordingly closes the evidentiary record in this matter.

2

**SO ORDERED.**

Dated:    27 March 2026
          New York, New York

Victor Marrero
U.S.D.J.

2

**Exhibit A**

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
16 Civ. 4488 (VM) (KHP)
- - - - - - - - - - - - - - - - - - - -x

PATRIARCH PARTNERS AGENCY
SERVICES, LLC,

                    Plaintiff-Counterclaim-
                    Defendant,

        -against-

ZOHAR CDO 2003-1, LTD., ZOHAR II 2005-1,
LTD., and ZOHAR III, LTD.,
            Defendants-Counterclaim-
            Plaintiffs,

        -and -

ZOHAR CDO 2003-1, LLC, ZOHAR 11 2005-1,
LLC, ZOHAR III, LLC, ALVAREZ & MARSAL
ZOHAR MANAGEMENT, LLC, and
ALVAREZ & MARSAL ZOHAR AGENCY
SERVICES, LLC,

**Key**
PPAS Designation
Trust Designation

                    Defendants.

- - - - - - - - - - - - - - - - - - - -x

                    September 28, 2017
                    10:08 a.m.
            ** CONFIDENTIAL **
            Videotaped Deposition of
THOMAS MACEDONIO, taken by
Defendants-Counterclaim-Plaintiffs,
pursuant to Notice, held at the offices of
GIBSON DUNN & CRUTCHER LLP, 200 Park Avenue,
New York, New York, before SHARON LENGEL, a
Registered Professional Reporter, Certified
Realtime Reporter, and Notary Public of the
State of New York.
            *    *    *

A P P E A R A N C E S:

GIBSON DUNN & CRUTCHER LLP
        Attorneys for Plaintiff-Counterclaim-Defendant
        200 Park Avenue
        New York, New York 10166

BY:   LAURA KATHRYN O'BOYLE, ESQ.
      GENEVIEVE B. QUINN, ESQ.

QUINN EMANUEL URQUHART & SULLIVAN, LLP
        Attorneys for Defendants-Counterclaim-Plaintiffs
        51 Madison Avenue
        New York, New York 10010

BY:   JONATHAN E. PICKHARDT, ESQ.
      BRIAN CAMPBELL, ESQ.

ALSO PRESENT:

        Stephen Kent, Videographer

              *     *     *

Page 3

MACEDONIO - CONFIDENTIAL

THE VIDEOGRAPHER:  Good morning. We are going on the record at 10:08 a.m. on September 28, 2017. Please note that the microphones are sensitive and may pick up whispering, private conversations, and cellular interference.  Please turn off all cellphones and place them away from microphones, as they can interfere with the deposition audio.  Audio and video recording will continue to take place until all parties agree to go off the record.

This is Media Unit 1 of the recorded deposition of Thomas Macedonio in the matter of Patriarch Partners Agency Services LLC versus Zohar CDO, et al., filed in the United States District Court, Southern District of New York, Case No. 116-CV-04488 (VM)(KHP).

This deposition is being held at Gibson Dunn & Crutcher LLP located at the MetLife Building.  My name is

MACEDONIO - CONFIDENTIAL

Stephen Kent from the firm Veritext New York, and I am the videographer. The court reporter is Sharon Lengel, also from the firm Veritext New York. I am not authorized to administer an oath.  I'm not related to any party in this action, nor am I financially interested in the outcome.

Counsel and all present in the room and everyone attending remotely will now state their appearances and affiliations for the record.  If there are any objections to the proceeding, please state them at the time of your appearance, beginning with the noticing attorney.

MS. O'BOYLE:  Laura O'Boyle with the law firm of Gibson Dunn & Crutcher LLP, and we represent the plaintiffs Patriarch Partners Agency Services.

MS. QUINN:  Genevieve Quinn with the law firm of Gibson Dunn & Crutcher, and we represent plaintiff Patriarch Partners Agency Services.

Page 5

MACEDONIO - CONFIDENTIAL

MR. PICKHARDT:  John Pickhardt, Quinn Emanuel Urquhart & Sullivan, on behalf of the witness as well as the defendants Zohar Funds and Alvarez and Marsal Zohar Management.

MR. CAMPBELL:  Brian Campbell also with Quinn Emanuel on behalf of the defendants.

T H O M A S   M A C E D O N I O, having first been duly sworn by Sharon Lengel, the Notary Public, was examined and testified as follows:

EXAMINATION

BY MS. O'BOYLE:

Q.    Good morning, Mr. Macedonio.

A.    Good morning.

Q.    Have you ever been deposed before?

A.    No.

Q.    I imagine your counsel covered some basic rules with you, but I'll just review with you so I'm sure we're on the same page.

MACEDONIO - CONFIDENTIAL

As you can see, this is being transcribed by a court reporter.  That means that you need to answer all of your questions verbally.  She can't transcribe shakes of the heads, nods, "uh-huhs."  So just answer yes or no.

At times, your attorney may object to a question I ask.  You can let him do so.  Unless he instructs you not to answer, you should then answer the question.

If you don't understand a question that I'm asking, you can tell me that you don't understand it, and I will try to rephrase it.

You can take a break at any time.  The only thing I request is that, if there's a question pending, you answer the question first, unless you need to ask your attorney something, in which case you can do so and let me know if you need to take a break.  Otherwise, I'll try to take them every hour or so.  But certainly, I want you to be comfortable.  If you need

MACEDONIO - CONFIDENTIAL

to get water, use the restroom, just let me know.

Is there any reason that you can't testify truthfully today?

A.    No.

Q.    What did you do to prepare for the deposition?

A.    Met with my lawyers yesterday.

Q.    Okay.  Can you speak just a tiny bit louder.

A.    Sure.  I met with my lawyers yesterday.

Q.    Okay.  And your lawyers being Mr. Pickhardt and Campbell?

A.    Yeah.  And another lawyer, Rex Lee.

Q.    And about how long did you meet with them for?

A.    About four hours.

Q.    And just one day you met with them?

A.    Yeah.

Q.    Did you discuss your testimony today with anyone else?

MACEDONIO - CONFIDENTIAL

A.     Not -- only to the extent that I was being deposed.

Q.     Okay.  And you discussed that with your colleagues at Alvarez & Marsal?

A.     Colleague, personal people, my family.

Q.     And when you met with your attorneys, did you review any documents?

A.     Yes.

Q.     Approximately how many documents?

A.     15 to 20.

Q.     Did any of those documents refresh your recollection about events that had occurred?

A.     Some of them.

Q.     Okay.  We're going to review some documents today, and I might ask you if that was one of the documents that refreshed your recollection.

A.     Sure.

Q.     In connection with this litigation, were you asked to search for and provide documents to your counsel?

Page 9

MACEDONIO - CONFIDENTIAL

A.   I'm not sure I understand the question.

Q.   You're aware that a lawsuit was commenced approximately a year ago by Patriarch Partners Agency Services?

A.   Yes, I am.

Q.   And are you aware that, as part of that lawsuit your company, Alvarez & Marsal, the company which you're employed, Alvarez & Marsal, produced certain documents?

A.   Yes.

Q.   And that included emails and letters and the like?

A.   Yes.

Q.   Were you asked to look through your files for documents that might be related to the issues in this case?

MR. PICKHARDT:   Objection. Vague as to files.

Q.   Were you asked to look through your emails?

A.   Somebody from our firm did a collection of all our emails.  So I didn't

MACEDONIO - CONFIDENTIAL

personally look through my emails.

Q.    Did you look through any files you might maintain in your desk, in a drawer?

A.    Personally, no.

Q.    Do you believe that you have any documents related to the issues in this case that might be located somewhere other than your email?

A.    I'm sure there are some electronically stored, yes.

Q.    Would those be electronically stored on your personal computer?

A.    Work computer.

Q.    Would they be stored in a shared drive folder on your computer?

A.    Yes.

Q.    Do you know whether those documents were collected as part of the search that was undertaken for documents in connection with this litigation?

A.    I don't know.

Q.    Do you have any hard copy documents that might be represented to the

MACEDONIO - CONFIDENTIAL

issues in this case?

MR. PICKHARDT:  Are you talking about unique from electronic copies?

Q.    I'm just asking now do you maintain hard copy documents in your office?

A.    Yes.

Q.    Do you believe that some of those hard copy documents might be related to issues in this case?

A.    I don't think so.

Q.    Do you regularly take handwritten notes?

A.    No.

Q.    How do you take notes when you attend a meeting?

MR. PICKHARDT:  Objection.

Q.    Do you take notes when you attend meetings?

A.    No.

Q.    You never take notes when you attend a meeting?

A.    You said regularly.

Q.    Okay.

MACEDONIO - CONFIDENTIAL

A.     On occasion --

Q.     Do you ever take notes when you attend a meeting?

A.     Yes.

Q.     And when you take notes when you attend meetings, how do you take those notes?

A.     I'll either write them down or write them on my computer.

Q.     Do you believe that you have any notes from meetings related to issues in this case?

A.     No.

Q.     Have you reviewed the complaint that was filed by Patriarch Partners Agency Services in this action?

MR. PICKHARDT:  I'm going to instruct the witness.  And I assume it's fine, Laura, that, when you're asking those questions about whether he's seen documents or what he's done, you're asking him outside of anything he may have done in prep for this case.  So prior to yesterday, has he

MACEDONIO - CONFIDENTIAL

seen documents or has he reviewed documents.

Q.    Sure.  Prior to yesterday, did you review the complaint that was filed by Patriarch Partners Agency Services in this action?

A.    I may have read it when it was filed, but I can't recall specifically.

Q.    Do you recall when it was filed?

A.    June I think of last year.

Q.    And are you aware that Alvarez & Marsal and the Zohar funds filed certain counterclaims in this action?

A.    Yes.

Q.    And have you reviewed outside of discussions you may have had with your counsel yesterday have you reviewed the counterclaims that were filed in this action?

A.    Again, I may have read it last year, but I can't be certain.

Q.    Can you just briefly describe your educational background starting with college.

MACEDONIO - CONFIDENTIAL

A.     Sure.  Did my undergraduate degree at Binghamton University in accounting; grad school at Fordham University in accounting.

Q.     And can you briefly describe your employment history?

A.     Started with PwC, worked there for about two and a half years, and came to Alvarez & Marsal almost two years ago.

Q.     And when did you start at PwC?

A.     August 2013.

Q.     And that was after you graduated from Fordham University?

A.     Correct.

Q.     You graduated from Fordham University in 2012?

A.     In the winter, yes.

Q.     In the winter of 2012.

A.     Yeah.

Q.     And approximately when did you start at PwC?

A.     August 2013.

Q.     Did you do anything from the December 2012 graduation until you started

MACEDONIO - CONFIDENTIAL

in August 2013?

A.    Studied and took my CPA exam.

Q.    And did you pass the CPA exam?

A.    I did.

Q.    Do you currently hold your CPA?

A.    I do.

Q.    And is that in New York?

A.    Correct.

Q.    And when you started at PwC, were you -- did you start adds an associate?

A.    Yes.

Q.    And what group were you in at PwC?

A.    I was in the audit group.

Q.    And did you audit any particular type of company?

A.    Industrial products group.  So it was transportation logistics.

Q.    Did you conduct audits of any distressed companies?

A.    There was a company that was in bankruptcy.

Q.    And what company was that?

MACEDONIO - CONFIDENTIAL

A.    OSG, Overseas Shipholding Group.

Q.    Did you conduct audits of any CLOs?

A.    No.

Q.    Generally speaking, what types of job responsibilities did you have as an associate in the audit group at PwC?

A.    Testing cash reconciliations, helping out testing revenue, testing PP&E, property, plant and equipment.

Q.    And at some point, you left PwC to join Alvarez & Marsal?

A.    Correct.

Q.    What prompted you to leave PwC?

A.    I didn't enjoy audit.  I wanted a change.

Q.    And what was your title when you started at Alvarez & Marsal?

A.    Associate.

Q.    And were you assigned to a specific group at Alvarez & Marsal?

A.    Yes.  The transaction advisory group.

Q.    And what does the transaction

MACEDONIO - CONFIDENTIAL

advisory group do?

A.    Financial due diligence.

Q.    Are most of the other associates in that group CPAs?

THE VIDEOGRAPHER:  Hold for sound.

(Pause)

BY MS. O'BOYLE:

Q.    Are most of the other associates in that group CPAs?

A.    Yes.

Q.    Generally speaking, what are your duties as an associate in the transaction advisory group?

A.    Deal with collecting data, turning it into a data book, reviewing trends in the P&L and balance sheet.

Q.    And how many clients do you currently serve as an associate in the transaction advisory group?

A.    Right now, the client -- project that I work on is the project.

Q.    Is that the only project you're currently working on?

MACEDONIO - CONFIDENTIAL

A.    As of right now, yes.

Q.    And when did you start working on that project?

A.    March 2016.

Q.    And since March of 2016 is that the only project you've worked on?

A.    No.

Q.    Did you -- when you started working on this project on the Zohar funds in March of 2016, were you simultaneous working on other projects?

A.    Not for the first couple of months.

Q.    At some point, you were assigned to other projects?

A.    Correct.

Q.    Those projects -- you rolled off of them.  They've ended, and now you're only working on the Zohar funds again.

A.    Correct.

Q.    How did you come to be staffed on the Zohar funds project?

A.    I was told by a member of my group that they needed help on this

MACEDONIO - CONFIDENTIAL

project, and I was one of the people chosen.

Q.    And who was that person?

A.    That told me?

Q.    Yes.

A.    Anthony Capporino.

Q.    Can you spell that?

A.    C-A-P-P-O-R-I-N-O, I believe.

Q.    And what was his title at that time?

A.    He's a managing director.

Q.    Managing dictator?

A.    Yeah.

Q.    Of the transaction advisory group?

A.    Correct.

Q.    Did he work on the Zohar funds project?

A.    No.

Q.    Is he an assignee partner or something of that nature?

A.    I'm sorry?

Q.    Does he handle giving associates or staff assignments on cases?

MACEDONIO - CONFIDENTIAL

A.    Not that I know of.

Q.    So why was he assigning you to work on the Zohar funds project?

MR. PICKHARDT:  Objection. Calls for speculation.

A.    I don't know.

Q.    When you first joined the Zohar fund team, how many other A&M employees were working on the team?

A.    About five.

Q.    And who were they?

A.    Liz LaPuma, Kris Talgo, Chris Cover, Aileen Daversa and myself.

Q.    And are those four individuals and yourself still members of the team today?

A.    Some of us are.

Q.    Who is no longer a member of the team?

A.    Kris Talgo and Aileen Daversa.

Q.    And when did they stop working on those projects, on the Zohar fund?

A.    Aileen was in November of 2016. And I'm not certain about Kris Talgo.

MACEDONIO - CONFIDENTIAL

Q.    And are they both still at A&M?

A.    Aileen is not.

Q.    When did Aileen leave A&M?

A.    I believe November of 2016.

Q.    Okay.  And do you have any understanding as to why Kris Talgo no longer working on the Patriarch -- sorry -- the Zohar fund projects?

MR. PICKHARDT:  Objection. Calls for speculation.

A.    I do not.

Q.    When did he stop working on the projects?

A.    I'm not certain.

Q.    Did you work directly with him on these -- on this project?

A.    Yeah.  It was a small team.

Q.    Okay.  Do you remember approximately when you stopped working directly with him on these -- on the Zohar fund project?

A.    I would say his role diminished in a few months after we started.

Q.    Okay.  And since you started

MACEDONIO - CONFIDENTIAL

working on the Zohar fund project, have there been any other A&M employees who have worked on the matter?

A.   Yes.

Q.   And can you, to the best of your recollection, identify those individuals?

A.   Sure.

Q.   Okay.

A.   Thomas Cook.

Q.   Okay.

A.   Kevin Sullivan, Tom Jones, Troy Harris, Adam Frenkel, Jamie Schwartz, and there might be a couple of others that I'm not remembering.

Q.   And those individuals currently are not working on the project.

A.   Correct.

Q.   Do you recall roughly when they stopped working on the project?

MR. PICKHARDT:   Individually?

Q.   Did they all stop around the same time or did it vary?

A.   For the most part.

Q.   And when was that?

MACEDONIO - CONFIDENTIAL

A.    I would say probably June 2016.

Q.    And do you have any understanding as to why those individuals stopped working on the project around June 2016?

A.    Because we had gone through the initial set of documents we had received.

Q.    And who do you -- do you report to a specific person in connection with the Zohar funds project?

A.    Yes.

Q.    And who is that?

A.    Liz LaPuma.

Q.    And has that been consistent since you started working on the project?

A.    Yes.

Q.    Does anyone report to you on this project?

A.    No.

Q.    Are you the junior-most member of the team?

A.    Yes.

Q.    Do you track the amount of time you spend working on the Zohar funds

MACEDONIO - CONFIDENTIAL

project?

A.    Yes.

Q.    And how do you track that time?

A.    I write it down.

Q.    Is there an electronic time management system that Alvarez & Marsal uses?

A.    We use Gresso.

Q.    Could you say that again?

A.    Gresso.

Q.    Gresso?

A.    Correct.

Q.    And are you required to enter into Gresso the time you spend working on these particular matters?

A.    On all projects.

Q.    On all projects?

A.    Correct.

Q.    And are you required to include a description of the task you're performing on that project on any given day?

A.    No.

Q.    How do you -- do you just enter

MACEDONIO - CONFIDENTIAL

the amount of time you work each day into the system?

A.    Correct.

Q.    So the amount of time and the client that you're working on.

A.    Correct.

Q.    And is there just one code for the Zohar fund projects or are there different codes?

A.    There are multiple codes.

Q.    And what are the different codes representative of?

A.    There's a general code and then there's a specific code for each fund if you do work specific to that fund.

Q.    So altogether, there's four separate codes for the Zohar fund projects?

A.    I believe there's five.

Q.    And what's the fifth?

A.    The fifth one was related to Bush case.

Q.    Could you say that again?

A.    It was related to the Bush case.

MACEDONIO - CONFIDENTIAL

Q.    The Bush case.

And what is the Bush case?

A.    Deals with Freddie Bush.  I'm not certain of much more than that.  I didn't charge any time to that one.

Q.    Did you perform any work on the Freddie Bush case?

A.    No.

MR. PICKHARDT:  Asked and answered.

A.    No.

Q.    Is the majority of the time that you've billed the Zohar funds matter billed to the general code?

A.    Yes.

Q.    Do you ever bill time to the specific codes?

A.    Yes.

Q.    And what type of work are you performing that you -- when you bill to the specific codes?

A.    Specifically the payment date waterfall that occurs.

Q.    Any other work that you perform

MACEDONIO - CONFIDENTIAL

that is billed to the general -- I mean, to the specific codes?

A.    When we do billing.

Q.    What do you mean when you say billing?

A.    We get invoices for our various vendors that help with the Zohar funds, and we have to pay those invoices.

Q.    So you're talking about billing related to work that's performed for the Zohar found.

A.    Correct.

Q.    Not the process of sending bills out to portfolio companies.

A.    Correct.

Q.    What type of vendors are helping with the work that you perform on the Zohar funds?

A.    Quinn Emanuel.

Q.    Any other vendors that --

A.    There's other law firms, yes.

Q.    So it's primarily law firms.

A.    Primarily, yes.

Q.    And you're responsible for --

MACEDONIO - CONFIDENTIAL

it's one of your responsibilities, dealing with the billing?

A.    Yes.

Q.    Any other consultants that A&M has engaged to work on Zohar fund issues?

A.    Yes.

Q.    What type of consultants -- what --

A.    Oh, you mean other than law firms.

Q.    Other than law firms.

A.    Not that I know of.

Q.    What other types of clients have you performed work for since you joined A&M other than the Zohar funds?

A.    A couple of restaurant -- my clients are private equity companies.  I'm sorry.

Q.    So you've worked on doing diligence on companies that your private equity clients are thinking of investing in?

A.    Correct.

Q.    And that's the only other type

MACEDONIO - CONFIDENTIAL

of work you've performed since you've been at A&M?

A.    Correct.

Q.    And most of the diligence has been into restaurants?

A.    Several of them, yes.

Q.    Any other projects involve distressed companies?

A.    No.

Q.    And are you paid a salary at A&M?

A.    I am.

Q.    Are you also paid a bonus?

A.    I am.

Q.    And do you have an understanding as to what the bonus is dependent on?

A.    Yes.

Q.    What is that?

A.    Your collections.

Q.    So as an associate, your bonus is dependent on your checks.

A.    That's part of what it's dependent on, yes.

Q.    And what does that mean?  Like,

MACEDONIO - CONFIDENTIAL

the hours you've billed?

    A.    Correct.

    Q.    Since you started working on the Zohar fund project in March 2016, to the present, do you have a rough estimate of how many hours you've billed to Zohar fund matters?

    A.    I could speculate a guess.

        MR. PICKHARDT:  I don't think she wants you to speculate.

    Q.    I don't want you to speculate.

    A.    Okay.

    Q.    Do you have -- this month, do you have a rough estimate of how much time you've billed to Zohar fund matters?

        MR. PICKHARDT:  Objection.  To the extent you know.  Again, she's not asking you to speculate.

    A.    I wouldn't be able to give you a hard fact number right now.

    Q.    Okay.  Are there -- is there an hours target over on a yearly basis at Alvarez & Marsal?

    A.    No, not that I know of.

MACEDONIO - CONFIDENTIAL

Q.    Do you know approximately how many hours you billed to all matters last year over the last billable year at Alvarez & Marsal?

A.    Again, I can't give you a hard fact number.  But I can --

Q.    Well, you provided -- what is the billable year at Alvarez & Marsal?

A.    The fiscal year ends on October 31st.

Q.    So it runs from November 1st to October 31st?

A.    Correct.

Q.    And are you given a report at the end of the fiscal year that breaks out the hours you've worked on different matters?

A.    It gives awe utilization percentage.  I'm not sure if it gives the total hours, but it definitely doesn't break it out by project.

Q.    And what does the utilization percentage reflect?

A.    So just based on, like, a

Page 32

MACEDONIO - CONFIDENTIAL

40-hour workweek.  If you're 100 percent utilized, you've billed 40 hours.

Q.    Do you recall what your utilization percentage was for the last billable year?

MR. PICKHARDT:  May I ask what the relevance of this line of questioning --

MS. O'BOYLE:  I'm trying to get a rough understanding as to how much time he has spent working on Zohar fund matters.  And since he doesn't recall specifically, I'm trying to figure out if we can back into it.

A.    I would say I've spent a substantial amount of time working on the Zohar fund project.

Q.    Generally speaking, around 40 hours a week?

A.    Between 35 and 40 probably, yes.

Q.    Okay.  That's helpful.  Thank you.

Were you involved in the engagement of the Zohar funds as a clients

MACEDONIO - CONFIDENTIAL

of Alvarez & Marsal?

A.    No.

Q.    Can you describe at a general level your understanding as to what services the Zohar funds engaged Alvarez & Marsal to perform?

MR. PICKHARDT:  Objection. Vague and calls for speculation.

A.    I'm not certain.

Q.    Did you ever speak with Elizabeth LaPuma about the assignment that A&M undertook -- was undertaking for the Zohar funds?

MR. PICKHARDT:  Objection. Vague.

A.    Yes.

Q.    Sorry.  You shook your head, but then you also answered "yes."  So I wanted to make sure I --

A.    I wasn't -- I'm not sure if you're referring to before we were engaged, after we were engaged.

Q.    After you were engaged, when you started working on the project.

MACEDONIO - CONFIDENTIAL

A.      Yes.   She told us what we were assigned to do.

Q.      And roughly speaking, what did she tell you you were assigned to do?

A.      To manage the collateral of the funds.

Q.      And when you joined the Zohar fund engagement, what types of tasks were you performing, I guess, during the initial period from, say, March to June of 2016?

MR. PICKHARDT:  You're asking specifically as to Mr. Macedonio.

MS. O'BOYLE:  Yes, as to Mr. Macedonio, correct.

A.      It began with just reviewing some documents of, like, Wall Street Journal articles, SEC filings that were available, just to get an understanding of the situation.

Q.      Are you referring to SEC filings in the action that was pending against Ms. Tilton and the Patriarch entities?

A.      I'm not specific what action it

Page 35

MACEDONIO - CONFIDENTIAL

related to, but there was --

Q.    Were they legal filings, or were they, like, SEC filings that you pulled from EDGAR?

A.    It was all publicly available information, if that's what you're asking.

Q.    Were they court documents?

A.    Some may have been.

Q.    Okay.  And what other type of work were you performing in that initial period?

Relevance

A.    We received some financial data for the portfolio companies, so we attempted to put together, to the best we could, data books for each company, showing the history of the financials.  We reviewed credit documents and put together summaries of those.

Q.    And were you assigned specific companies to focus on?

A.    Yes.

Q.    Do you recall what those companies were?

A.    Not right now.

MACEDONIO - CONFIDENTIAL

Q.   Was Intrepid one of the companies that you were assigned to?

A.   I can't be sure.

Q.   Was Croscill one of the companies you were assigned?

A.   I can't be sure.

Q.   Okay.  Did you ever work with Bryan Marsal on matters related to the Zohar fund engagement?

A.   Can you define what you mean by work with --

Q.   Did you ever participate or attend a meeting at which Mr. Marsal was present related to the Zohar fund engagement?

A.   Yes.

Q.   How many such meetings do you think you attended?

MR. PICKHARDT:  Objection.  Vague as to --

Q.   Since you started working on the Zohar fund matters, how many meetings have you attended regarding the matter which Mr. Marsal was present?

MACEDONIO - CONFIDENTIAL

MR. PICKHARDT:  You're talking about also including just internal meetings --

MS. O'BOYLE:  I'm talking about internal meetings regarding the Zohar fund matters.  Yes.

MR. PICKHARDT:  Okay.  Vague as to "meetings."  But you can respond.

A.    I would say around five, maybe eight.

Q.    When I say "meeting," do you understand that I'm talking about employees at A&M coming together in a room or an office to discuss the Zohar fund matter?

A.    Yes.

Q.    Okay.  Have you ever spoken with anyone at MBIA relating to the Zohar fund engagement?

A.    Yes.

Q.    And who have you spoken to at MBIA?

A.    I can name some of them.

Q.    Okay.  Why don't you just let me

MACEDONIO - CONFIDENTIAL

know who you recall speaking to.

A.    Keith Boreilli, Kristin Calandra, Dan Avitable, Jonathan Harris, Anthony McKiernan.

Q.    And how often or -- do you speak with individuals at MBIA on a regular basis regarding the Zohar fund matter?

MR. PICKHARDT:  And what's the relevance of this?  To this matter?

MS. O'BOYLE:  I'm trying to get an understanding as to his role vis-à-vis the --

Q.    Do you consider MBIA to be affiliated with the client?

MR. PICKHARDT:  Objection. Vague as to affiliated.

Q.    Who -- you were -- Alvarez & Marsal was engaged by the Zohar fund; is that correct?

A.    I believe so, yes.

Q.    And who do you understand to be -- what individuals do you -- do you understand to be part of the Zohar funds or clients -- members of the client group?

MACEDONIO - CONFIDENTIAL

MR. PICKHARDT:  Objection.
Compound.  Confusing.  Vague.

Q.    Let me step back.

You understand there's three Zohar funds; is that correct?

A.    Yes.

Q.    When you need to -- are you responsible for conveying information to the noteholders of the Zohar funds?

A.    No.

Q.    Do you have an understanding as to who the noteholders in the Zohar funds are?

A.    Yes.

Q.    For Zohar III, who do you understand those noteholders to be?

A.    I know a few of them -- Halcyon, Rabobank.  There's only two.

Q.    And do you have communications with individuals at any of those entities in connection with the work you perform for the Zohar funds?

A.    I have, yes.

Q.    And for Zohar II, who do you

MACEDONIO - CONFIDENTIAL

understand the noteholders to be?

A.    MBIA.

Q.    And do you have communications with individuals at MBIA regarding -- you've already testified that you have?

A.    I have.

Q.    Communications with individuals at MBIA.

Are you familiar with an entity called Alvarez & Marsal Zohar Management?

A.    Yes.

Q.    And what do you understand this entity to be?

A.    It was an entity set up for basically this project.

Q.    And do you have an understanding of an entity called Alvarez & Marsal Zohar Agency Services?

A.    Yes.

Q.    And do you have an understanding as to what that entity does?

A.    It was set up to be the agent on the Zohar loans.

Q.    Do you know when this entity was

MACEDONIO - CONFIDENTIAL

formed?

A.    I do not.

Q.    Were you involved in any way with the formation of this entity?

A.    No.

Q.    Are you an employee of this entity?

A.    Not that I know of.

Q.    Do you know whether this entity has any employees?

A.    I do not know.

Q.    Do you know whether this entity has any officers?

MR. PICKHARDT:  Objection.  Lack of personal knowledge.

A.    I do not know.

Q.    Do you perform work related to Alvarez & Marsal Zohar Agency Services?

MR. PICKHARDT:  Objection. Vague.

A.    Can you clarify?

Q.    Sure.  You said that Alvarez & Marsal Zohar Agency Services was an entity set up to be the agent on the Zohar loans.

MACEDONIO - CONFIDENTIAL

A.    Yes.

Q.    What is your understanding as to what it means to be the agent on the Zohar loans?

A.    To act as fiduciary between the lenders and the portfolio companies.

Q.    What do you mean to act as a fiduciary between the lenders and the portfolio companies?

A.    Standard principal agent-type relationship.

Q.    What is the basis of your understanding that the relationship between Alvarez & Marsal Zohar Agency Services and the Zohar funds is a standard principal agent type relationship?

MR. PICKHARDT:  I'm going to caution the witness that, to the extent that the source of your knowledge with respect to this area or any of the questions that you're being asked is derived from discussions you've had with counsel, it may be impinging on a potential of privilege.

Page 43

MACEDONIO - CONFIDENTIAL

So you should, you know, flag that, either identify it as privileged or we can step out of the room to talk about it, if you think that's the source of your knowledge.

A.    Can you repeat the question?

Q.    Sure.

What is the basis of your understanding that the relationship between Alvarez & Marsal Zohar Agency Services and the Zohar funds is a standard principal agent type relationship?

A.    My understanding is the fact that Alvarez & Marsal Zohar Agency Services is an agent, and the fund would be the principal.

Q.    And who at the principal is -- is there someone at the principal who is giving Alvarez & Marsal Zohar Agency Services instructions on what it is supposed to be doing?

A.    I don't know specifically.

Q.    Do you know what types of task Alvarez & Marsal Zohar Agency Services

MACEDONIO - CONFIDENTIAL

performs for the Zohar funds?

A.    I do not.

Q.    Do you know who at Alvarez & Marsal would have -- would know what types of services Alvarez & Marsal Zohar Agency Services performs for the Zohar funds?

MR. PICKHARDT:  Objection. Calls for speculation.

A.    I'm not certain.

Q.    Are you familiar with an entity called Patriarch Partners Agency Services?

A.    Yes.

Q.    And what is your understanding as to what that entity is?

A.    They were the agent on the loans.

Q.    And are you aware that, at some point, Alvarez & Marsal or Alvarez & Marsal Zohar Management attempted to terminate PPAS as administrative agent?

A.    Yes.

Q.    And do you recall when approximately when that occurred?

A.    Sometime in June of last year.

MACEDONIO - CONFIDENTIAL

Q.    Were you involved in any discussions about -- prior to the attempt to terminate PPAS were you involved in any discussions internally at A&M regarding terminating PPAS as an administrative agent?

MR. PICKHARDT:  Objection to form.

A.    I was not.

Q.    Do you have -- do you know who made the decision to terminate PPAS as administrative agent?

MR. PICKHARDT:  Objection. Calls for speculation.

A.    I'm not certain.

Q.    Have you had any discussions, since you've been working on the Zohar fund matters, about the work PPAS -- when I say PPAS, I am going to be referring to Patriarch Partners Agency Services --

A.    Sure.

Q.    -- the work that PPAS performed for the Zohar funds?

A.    Yes.

MACEDONIO - CONFIDENTIAL

Q.    And what was the nature of those discussions?

MR. PICKHARDT:  Again, I'm going to caution you potentially on privilege issues, but --

A.    Yeah.  As far as I can remember, it was all with our counsel.

Q.    Was this yesterday with counsel or at some earlier point in time?

A.    Both.

Q.    So all of your -- the entirety of your understanding about the work that PPAS performed for the Zohar funds comes from discussions with counsel.

MR. PICKHARDT:  I think that's a different question.

Q.    Do you have -- do you have any knowledge about the work that PPAS performed or performs for the Zohar funds that did not come from conversations with counsel?

A.    Yes.

Q.    And what conversations did that information come from?

MACEDONIO - CONFIDENTIAL

A.    They weren't conversations.

Q.    How -- where did that information come from?

A.    The credit agreements and documents.

Q.    So at some point, you reviewed the credit agreements and developed an understanding as to the type of work that PPAS was to perform for the Zohar funds?

A.    Correct.

Q.    And when did you review the credit agreements and develop that understanding?

A.    I would say that it's occurred periodically, but the first time I can recall would be the May/June period of 2016.

Q.    And do you recall -- what do you recall learning in your review of the credit agreements about the type of work that PPAS was to perform for the Zohar funds under the credit agreements?

A.    They were supposed to provide certain documents to the lenders.  I'm not

Page 48

MACEDONIO - CONFIDENTIAL

specific to anything else.  I don't recall.

Q.    You don't recall any other duties or obligations that PPAS had under the credit agreements other than what you state here, they were supposed to provide certain documents to lenders?

A.    Correct.  Yeah.  Provide certain documents and act as a fiduciary to the lenders, act on the lender's behalf, to clarify.

Q.    Do you recall seeing language in the credit agreements stating that PPAS' appointment as agent was irrevocable?

A.    Yes.

Q.    And do you recall having any discussions about that language internally at A&M?

A.    Only with counsel.

Q.    Do you recall roughly when those discussions occurred?

A.    Not specifically.

Q.    Was it prior to the purported termination of PPAS?

MACEDONIO - CONFIDENTIAL

A.    I can't be certain.

Q.    Was that counsel at Quinn Emanuel?

A.    Yes.

Q.    Were any other employees of A&M present during that conversation?

MR. PICKHARDT:  Are you suggesting there was one conversation?

Q.    During any of those conversations?

A.    Yes.

Q.    And who else was present?

A.    Liz LaPuma.

Q.    And anyone else?

A.    No one that I can be certain.  I can speculate.

Q.    So we're going to pull up a document on the screen.

A.    Sure.

Q.    Do you need a break or -- now is a good time.  We'll probably spend ten minutes with the documents.

MR. PICKHARDT:  Let's take a break.

Page 50

MACEDONIO - CONFIDENTIAL

MS. O'BOYLE:  We can go off the record.

THE VIDEOGRAPHER:  Okay.  We are now off the record.  The time on the video monitor is 10:49 a.m.

(Recess)

THE VIDEOGRAPHER:  We are now on the record.  The time on the video monitor is 11:00 a.m.

BY MS. O'BOYLE:

Q.  Mr. Macedonio, I am going to mark as Exhibit 1 a document bearing the Bates No. ZOHAR-PPAS-00058231, which has an attached Excel file, which is printed out here very, very small, and which we will pull up on the screen for you.   Relevance

MS. O'BOYLE:  Could you mark this as Exhibit 1.

(Exhibit 1, An email dated March 30, 2016, Bates ZOHAR-PPAS-00058231, was hereby marked for identification, as of this date.)

Q.  And this is an email from you to Ms. Daversa dated March 20, 2016.  And you

Page 51

MACEDONIO - CONFIDENTIAL

write, "Aileen, attached is my loan Relevance
summary on Intrepid.  Whenever you have
time to review, let me know any questions
or comments you may have."

Was one of the tasks that you
performed as a member of the Zohar fund
team the preparation of loan summary on
various portfolio companies?

A.    Yes.

Q.    And does this refresh your
recollection that Intrepid was one of the
companies that you performed a loan
summary on?

A.    It looks like that way.

Q.    And generally speaking, what was
the process you undertook when preparing a
loan summary?

A.    We looked at the credit
agreement, summarized pieces of it, and
then went through each amendment for the
company.

Q.    And do you know how the credit
agreement and the amendments came to be in
possession of A&M?

Page 52

MACEDONIO - CONFIDENTIAL

A.    We received them from the prior collateral manager.

Relevance

Q.    And who was the prior collateral manager?

A.    Various Patriarch entities.

Q.    So I know this is very small. So we have blown it up here.  We will be looking at the first tab.  And if you -- is that readable?  Or you want us to make is bigger?

A.    Bigger, please.

Q.    So if you scroll down to Row 34.

MS. O'BOYLE:  Start over on A, so he can see 34A.

Q.    So this says "Summary."  The header of this section says "Summary of current term all loan documents."  And then in Row 34, there is an entry that says "6/2/2011, 10 change in definition. Appointed agent amended to add word irrevocably."

MR. PICKHARDT:  So it looks to me like there is a heading between Row 4 and Row 34 that's being omitted

Page 53

MACEDONIO - CONFIDENTIAL

from the presentation.  It may not be relevant but there's another heading.

MS. O'BOYLE:  She can scroll up and show it to you if you want to start here.

Q.    So this is the relevant set of headings for this section.  And the columns that we're looking at are document date, amendment number, amendment date, and nature of amendment.

A.    Okay.

Q.    Do you have -- it's -- I know it's hard to work on electronic document. I'm happy to, at the break, blow up that specific section.  But it's just really hard to make it viewable with all of the headers and columns.

Relevance

MR. PICKHARDT:  Right.  I was just noting that it looked to me like there's a heading that says "Main Document No. 1" and a first amended and restated credit agreement.  I don't know whether that's a relevant heading under summary of general

Page 54

MACEDONIO - CONFIDENTIAL

terms.  So maybe you can leave that up as well as the headings below it, and you can lock that and then you can scroll.

MS. O'BOYLE:  Sorry.  What -- you want us to lock that row and scroll down?

MR. PICKHARDT:  I just wanted the witness to make sure -- because it looked before like the heading was "Summary of General Terms All Loan Documents."  I'm just noting there's a heading below that which is "Main Documents No. 1," I think, first amendment and restated credit agreement, January 11, 2007.  And then what you're asking about is under that heading.

MS. O'BOYLE:  Correct.

MR. PICKHARDT:  So I just wanted to make sure it wasn't misleading that everything was under "Summary of General Terms All Loan Documents."

MS. O'BOYLE:  Okay.

Page 55

MACEDONIO - CONFIDENTIAL

BY MS. O'BOYLE:

Q.    Do you recall preparing these loan summaries?

Relevance

A.    Yes.

Q.    Okay.

MS. O'BOYLE:  And maybe just go back up.  So the header that Mr. Pickhardt was pointing to says "Main Document No. 1 First Amended and Restated Credit Agreement January 11, 2007."

Q.    Do you know what that heading refers to?  It's the heading that's up on the screen.  It's easier for you to look at.

A.    That would be the credit agreement for Intrepid.

Q.    Okay.  And then we scrolled down and we looked before at the Amendment No. 10 where -- did you type in the entries into this spreadsheet?

A.    Yes.

Q.    So you noted that in Amendment No. 10, there was a change in definition,

Page 56

MACEDONIO - CONFIDENTIAL

and you state, "Appointed agent amended to add word irrevocably."    Relevance

A.    Correct.

Q.    Okay.  Were you asked to -- by anyone to review the credit agreements for provisions related to the appointment of the agent?

A.    Yes.

Q.    And who asked you to do that?

A.    Liz LaPuma.

Q.    And do you have any understanding as to why she asked you to do that?

MR. PICKHARDT:  Objection. Calls for speculation.

A.    I do not.

Q.    Did you have any discussions with Ms. LaPuma outside the presence of counsel regarding the irrevocable appointment of the administrative agent?

A.    I did not.

Q.    After you prepared this -- strike that.

MS. O'BOYLE:  Can you scroll

MACEDONIO - CONFIDENTIAL

down to Row 122.  And maybe make it so that he can see the header of this section as well.

Q.    So the header of this section is "Summary of Current Terms All Loan Documents."

Do you see that?

A.    Isn't that the -- yeah.  That's the heading of -- that's Row 4; right?

Q.    Oh, wait.

A.    That's the heading of the whole document.

Q.    Sorry.  Yes.  Sorry.  We're looking now at the box associated with Row 122.  And the header of that box is "Agency Provisions."

Do you see that?

A.    Yes.

Q.    Okay.  And do you see there is an entry, "Removal Rights"?

A.    Yes.

Q.    And it says, "NA.  Could not find any info on removal."

Do you see that?

Page 58

MACEDONIO - CONFIDENTIAL

A.    Yes.

Q.    And did you have discussions with anyone regarding the fact that there were no provisions in the credit agreement for the removal of the agent?

MR. PICKHARDT:  Objection. She's asking outside the presence of counsel.

A.    Only to the extent that it's in this document.

Q.    And you also identify here several other provisions in the credit agreements relating to the agent; is that correct?

A.    Yes.

Q.    I'm sorry.  I'm not trying to make you read that really small.  Whatever we can do to make this more workable, I'm happy to do that.  It's just it's --

MR. PICKHARDT:  What might be -- it's going to be too late to do it today.  But what might be helpful for the future is if -- when you print the exhibits, you can print it with the

MACEDONIO - CONFIDENTIAL
row numbers on the end columns so that we can follow on the document. Because I can't tell where in the document this is.
MS. O'BOYLE: Understood.
MR. PICKHARDT: And also identify what page of the printed --
A. Or if we can get, like, a screen right here (indicating).
Q. That you could look at. Okay. We can also see what we can do in the break to make it easier for ones we might show later.
Okay. I don't think we need to -- we're going to probably come back to this document later. I will try in the interim to get a better system for reviewing it.
So do you recall preparing credit -- loan summaries for any other portfolio companies?
A. Yes.
Q. Approximately how many portfolio companies did you prepare loan summaries

Relevance

Page 60

MACEDONIO - CONFIDENTIAL

Relevance

for?

A.    I'm not certain of the number.

Q.    More than five?

A.    Around five.

Q.    Around five.

And who else or were there other members of the Zohar fund team at A&M performing loans or preparing loan summaries?

A.    Yes.

Q.    And who else was doing that?

A.    Aileen Daversa, Chris Cover, Thomas Cook, Adam Frenkel, Kevin Sullivan, Jamie Schwartz -- I think that's it.

Q.    And do you recall whether the irrevocable language appeared in the credit agreements or amendments for each of the portfolio companies for which you prepared loan summaries?

A.    I'm not certain.

Q.    Do you recall whether any of the credit agreements that you reviewed contained provisions providing for removal rights of the agent?

MACEDONIO - CONFIDENTIAL

A.    I'm not certain.

Q.    Prior to your work on the Zohar fund engagements, had you -- did you have experience or had you in your employment either at PwC or A&M reviewed credit agreements?

A.    I reviewed -- I've definitely reviewed various legal loan type documents.  I don't know if, specifically, credit agreements would be the correct term.  Lease agreements, stuff like that.

Q.    Had you -- prior to your work on the Zohar fund matter, had you ever reviewed provisions of any agreement relating to the role of an administrative agent?

A.    Not that I can think of.

Q.    Do you have any basis for opining as to whether the irrevocable appointment of an agent is a common term in credit agreements?

MR. PICKHARDT:  Objection. Calls for speculation.

MS. O'BOYLE:  I'm asking whether

Page 62

MACEDONIO - CONFIDENTIAL

he has any basis to know one way or another.

A.    It would seem that it's uncommon.  But --

Q.    And why -- what is the basis for you stating that it would seem that it is uncommon?

A.    I mean, because all contracts can be changed, amended.  It would just seem odd for something to never be able to be changed.

Q.    And do you have any basis for saying that other than your general statement that it would be odd for something never to be able to be changed?

A.    No.

Q.    Did you -- actually, let's mark as Tab 9.  Tab 7 first.

        (Exhibit 2, An email dated June 14, 2016, Bates ZOHAR-PPAS-0002784, was hereby marked for identification, as of this date.)

Q.    I'm marking as Exhibit 2 a document bearing the Bates stamp

Page 63

MACEDONIO - CONFIDENTIAL

ZOHAR-PPAS-0002784 and one attachment thereto which bears the Bates No. ZOHAR-PPAS-00002795.

MS. O'BOYLE:  John, I will note for the record that, for several of the documents we're going to look at today, there was, like, 30-plus attachments of similar nature.  We pulled one exemplar.  If you would prefer, we print and mark the entire document, we're happy to do so going forward.  But we are only going to be talking about one letter attached thereto.  And for the sake of the trees, I was just trying to --

MR. PICKHARDT:  Okay.  I would suggest we deal with that on a document-by-document basis.

MS. O'BOYLE:  Okay.

MR. PICKHARDT:  Just note where it is excerpted, so that we can -- it's clear on the record that you're showing the witness an excerpt of a document.

Page 64

MACEDONIO - CONFIDENTIAL

MS. O'BOYLE:  Yes.  I will note on the record that I am showing the witness an excerpted document insomuch as the particular attachment here is -- I'm showing the entire attachment, but there were a multitude of other similar attachments.  And if you have any concerns or want me to pull the full document later, I'm happy to do so.

MR. PICKHARDT:  Okay.  We'll also see if the witness thinks it would be helpful to see the rest of the document.  I'll note, on the face of this document, there's no reason to believe that the witness received this email.  I assume, if there was some other part of the document that's indicated that this witness had seen it, then that would be included.  But for this particular document, I have no reason to believe that that would be the case.

MS. O'BOYLE:  No.  Other than

Page 65

MACEDONIO - CONFIDENTIAL

the cover email, there was nothing else that indicated he received it.

BY MS. O'BOYLE:

Q.    But I would just like to direct your attention to the attachment.  And this is a letter with the re line "Termination of Patriarch Partners Agency Services LLC as agent."

Have you ever seen this document before?

A.    Yes.

Q.    And when did you see this document?

A.    I saw it yesterday.

MR. PICKHARDT:  She's asking you outside of anything you may have seen in preparation.

A.    I'm sure I saw it soon after it was sent.

Q.    And did you play any role in drafting this document?

A.    Not that I can recall.

Q.    In what capacity would you have seen it soon after it was sent?

MACEDONIO - CONFIDENTIAL

MR. PICKHARDT:  To be clear, she's not asking you to speculate. She's asking you what you recall.

A.    For the most part, I've seen the majority of the letters the lawyer letters that have been sent by us and received by us.

Q.    Okay.  Do you recall that in or around June 14, 2016, Alvarez & Marsal sent a series of letters to the portfolio companies, stating that Patriarch -- PPAS was being terminated as agent?

A.    Yes.

Q.    Were you aware prior to these letters being sent that they were going to be sent?

A.    No.

Q.    So prior to June 14, 2016, did you have any understanding that Patriarch Partners Agency Services was going to be terminated as agent?

A.    Not that I can recall.

Q.    At some point, though, you became aware that A&M sent letters

Page 67

MACEDONIO - CONFIDENTIAL

purporting to terminate Patriarch Partners Agency Services; is that correct?

A.    Yes.

Q.    And did you participate in any discussions at A&M regarding the purported termination of Patriarch Partners Agency Services?

MR. PICKHARDT:    Prior to that time?  After that time?  At any point in time?

Q.    After -- after the letters were sent.

A.    I'm sure I did.

Q.    Do you recall specifically any such conversations?

A.    Not specifically.

Q.    When we reviewed Exhibit 1, we saw that Intrepid was one of the companies that you prepared a loan summary for; is that correct?

A.    Yes.  Sorry.

Q.    And Intrepid was one of the portfolio companies that you were assigned to analyze in your role on the Zohar funds

Page 68

MACEDONIO - CONFIDENTIAL

team; is that correct?

Relevance

MR. PICKHARDT:  Objection.
Vague.

A.    I was assigned to do the loan summary.  I can't be sure what else I was doing for Intrepid, if I did other stuff.

Q.    When you were -- you were assigned a series of portfolio companies to prepare loan summaries for.  I believe that was your testimony.

A.    Correct.

Q.    Do you recall performing any other work relating to that set of companies?

A.    So as I mentioned before, we did financial data book for each company of the financials that occurred.  But I can't be sure which ones I did it for and which ones other people did it for.

Q.    So what -- was the set of companies that you prepared the financials for the same as the set of companies you prepared the loan summaries for, or you're not sure?

Page 69

MACEDONIO - CONFIDENTIAL

A.    I'm not sure.

Relevance

Q.    Were you responsible for contacting any portfolio companies?

A.    I don't know that I would use the word "responsible."

Q.    Were you assigned the task of contacting any specific portfolio companies?

A.    Yes.

Q.    And do you recall which portfolio companies those were?

A.    No.

Q.    Do you recall -- or who assigned you the task of communicating or contacting portfolio companies?

A.    Liz LaPuma.

Q.    And do you recall roughly when that was?

A.    I believe it was soon after we took over as collateral manager stating to them that we're the new collateral manager, and we wanted to introduce ourselves.

Q.    And do you recall roughly when

**Page 70**

MACEDONIO - CONFIDENTIAL

you took over as collateral manager? Relevance

A.    It was March 2nd or 3rd.

Q.    And so you believe it was close to March 2nd or 3rd that you reached out to some set of portfolio companies to introduce yourself as collateral manager?

A.    It was within the first couple of months.

Q.    First couple of months.  Okay.

Did you have communications with any of the portfolio companies about Patriarch Partners Agency Services?

A.    I don't recall.

Q.    Can we just look back quickly at Exhibit 2, the letter --

A.    Sure.

Q.    -- that we were just looking at.

And I'd like to direct your attention to the second paragraph of the letter.  And the first sentence states, "The Zohar funds as the required lenders hereby notify all of the credit parties that they have terminated Patriarch Partners Agency Services, PPAS, as agent

MACEDONIO - CONFIDENTIAL

effective as of June 2016 and have further directed PPAS to cease functioning as agent immediately."

Do you see that?

A.    I do.

Q.    And this letter was being sent on behalf of Zohar I, Zohar II, and Zohar III; is that correct?

A.    It states Zohar I, Zohar II and Zohar III in the first sentence.

Q.    And did you have discussions with anyone representing Zohar I regarding the termination of Patriarch Partners Agency Services?

A.    Not that I know of.

Q.    Did you have discussions with anyone at Zohar II regarding the termination of Patriarch Partners Agency Services?

A.    Not that I know of.

Q.    Same question for Zohar III.

A.    Same answer.

Q.    Do you know whether anyone at A&M had discussions with anyone at Zohar

MACEDONIO - CONFIDENTIAL

I, II, or III regarding the terminations of -- termination of Patriarch Partners Agency Services as agent?

MR. PICKHARDT:  Objection. Calls for speculation.

A.    I don't know.

Q.    And do you see the second sentence states, "Notwithstanding any provisions in the credit agreement that may purport to make PPAS' appointment as agent irrevocable, basic principles of agency law give the Zohar funds the right to terminate PPAS as agent upon reasonable notice."

A.    Yes.

Q.    Do you know who drafted this sentence?

A.    I do not.

MR. PICKHARDT:  Calls for speculation.

MS. O'BOYLE:  I'm asking him whether he knows who drafted it.

MR. PICKHARDT:  Okay.  So it's a yes or no.

MACEDONIO - CONFIDENTIAL

A.     No.

Q.     Did you have discussions with anyone about this sentence?

A.     Not that I know of.

Q.     Not that you recall?

A.     Not that I recall.

Q.     And do you see the -- I'm now going to move to the next paragraph.

A.     Okay.

Q.     Do you see it states, "The Zohar funds as the required lenders further hereby notify all of the credit parties that they have appointed as successor agent Zohar II 2005-1 LTD an entity that meets the credit agreements requirements for successor agents."

Do you see that language?

A.     I do.

Q.     Did you draft that sentence?

A.     I did not.

Q.     Do you know who drafted that sentence?

A.     I do not.

Q.     Did -- in conducting your review

Page 74

MACEDONIO - CONFIDENTIAL

of the credit agreements, did you look at what the credit agreements requirements for successor agents was?

A.    I'm not sure.

Q.    You don't recall doing that one way or another?

A.    If I did, it would probably be in the loan summary.

Q.    Okay.  And do you see the next sentence states, "Alvarez & Marsal Zohar Agency Services LLC has in turn appointed Alvarez & Marsal Zohar Agency Services LLC as its subagent, and Alvarez & Marsal Zohar Agency Services LLC will immediately assume PPAS' former functions under the credit agreement."

A.    I see that.

Q.    Did you have any discussions about -- with anyone at A&M about Alvarez & Marsal and -- Alvarez & Marsal Zohar Agency Services being appointed subagent?

A.    Not without counsel.

Q.    Do you recall any provisions in the credit agreements providing for the

Relevance

Page 75

MACEDONIO - CONFIDENTIAL

appointment of a subagent?

A.    I do not.

(Exhibit 3, A credit agreement, Bates PPAS-SDNY-00010928, was hereby marked for identification, as of this date.)

Relevance

Q.    I've marked as Exhibit 3 a document beginning with the Bates Nos. PPAS-SDNY-00010928 and running through 00011032.    And it's entitled "Credit Agreement Among Intrepid USA, Inc."    And there are a number of other entities listed.

Do you see that?

A.    I do.

Q.    And is this one of the credit agreements that you reviewed in connection with your analysis of the Intrepid loan?

MR. PICKHARDT:    Objection.    I'm just going to object to the extent that it appears that there were amendments to this agreement.    You're not representing that this includes the entirety of the agreement;

Page 76

MACEDONIO - CONFIDENTIAL

correct?

MS. O'BOYLE:  Correct.

MR. PICKHARDT:  Okay.

A.    Yes.

Q.    So in connection with your -- the template -- the credit template -- the loan template that we reviewed, you would have reviewed this credit agreement and all of the amendments; is that correct?

A.    Can I check if the date is on there matches and give you a for-sure answer?

Q.    Sure.

A.    (Witness perusing document.)

So it looks like on this, the main document is first amended and restated credit agreement dated January 11, 2007.  So I can't be certain if this was one of the ones we received that I reviewed.

Q.    Okay.  So the entry that says main Document No. 1, what does that reflect?  What is that intended to represent on the summary?

Relevance

Page 77

MACEDONIO - CONFIDENTIAL

A.    The main -- the document.  So it's the first amended and restated credit agreement dated January 11, 2007.

Relevance

Q.    So based on that, your belief is that you reviewed that agreement and might not have reviewed this credit agreement.

A.    Correct.

Q.    Okay.  We'll pull that, and we will put this to the side.

Did you have any discussions with Aileen Daversa about the termination of PPAS as administrative agent?

A.    Not that I can recall.

Q.    Whether in the presence or not in the presence of counsel.

A.    Not that I can recall.

Q.    Do you know who at A&M had the primary responsibility for preparing the termination letters?

A.    I do not.

Q.    Do you know whether there is any written document in which -- I'm going to refer to Alvarez & Marsal Zohar Agency Services as AMZAS going forward so I don't

Page 78

MACEDONIO - CONFIDENTIAL

have to keep repeating that.

Do you understand what I'm saying when I'm referring to AMZAS?

A.    Sure.

Q.    Are you aware of any document in which AMZAS accepted their appointment as agent under any of the credit agreements with the portfolio companies?

Relevance

A.    Can you repeat the question?

Q.    Sure.  Are you aware of any document in which AMZAS accepted its purported appointment as administrative agent under the credit agreements with the portfolio companies?

A.    I am not.

Q.    Do you not know one way or another, or does such a document not exist?

MR. PICKHARDT:  Objection. Calls for speculation.

A.    I don't know.  I would base it off of the letter that was sent, to my knowledge, the letter that was sent terminating PPAS, Exhibit 2.

Page 79

MACEDONIO - CONFIDENTIAL

Q.    Looking back at that letter, was that letter signed by AMZAS?

A.    (Witness perusing document.)

Alvarez & Marsal Zohar management signed this.

Q.    And is Alvarez & Marsal Zohar management a separate entity from AMZAS?

A.    I believe so.

Relevance

Q.    Do you have any understanding as to why the Zohar funds or A&M were purporting to terminate PPAS as administrative agent?

A.    Yes.  Yes.

Q.    And, again, I don't want to interfere on discussions with counsel.

Does any of that knowledge come other than from discussions with counsel?

A.    No.

(Exhibit 4, An email dated June 14, 2016, Bates ZOHAR-PPAS-00002863, was hereby marked for identification, as of this date.)

Q.    I'm marking as Exhibit 4 a document bearing the Bates No.

MACEDONIO - CONFIDENTIAL

ZOHAR-PPAS-00002863 and one attachment to that document with the Bates No. ZOHAR-PPAS-0002872.  This is another example of the ZIP file with numerous similar letters, and we're attaching one.

MR. PICKHARDT:  Okay.

Q.    And I'll note that you do not appear on the cover email or as a copy on the letter.

Have you ever seen this letter before?

A.    Could I have a minute to --

Q.    Sure.  Yeah.  Take your time. Any time I hand you a document, feel free to take as much time as you need to review it.

A.    (Witness perusing document.)

MR. PICKHARDT:  And to be fair, she's asking you whether you recall having seen it before.  So take as much time as you need.

A.    (Witness perusing document.)

Can you repeat the question?

Q.    Sure.  Have you seen this letter

MACEDONIO - CONFIDENTIAL

before?

A.    Can I ask, is this letter different than the other one that we were looking at?

Q.    Yes.  You can compare.  This is a letter that was sent to Patriarch Partners Agency Services.

A.    Oh, okay.

Q.    And the prior letter that we looked at was a letter that was sent to Intrepid, counsel for Intrepid.

A.    I don't recall this letter.

Q.    You don't recall seeing this letter before.

A.    No.

Q.    Okay.

(Exhibit 5, An email dated March 28, 2016, Bates ZOHAR-PPAS-00028575, was hereby marked for identification, as of this date.)

Q.    I am marking as Exhibit 5 an email bearing the Bates No. ZOHAR-PPAS-00028575 through 28577.

Take your time to review it, and

MACEDONIO - CONFIDENTIAL

let me know once you've had a chance to do so.

A.      Okay.

(Witness perusing document.)

Okay.

Q.      Okay.  Do you recall receiving and sending the emails in this email string?

A.      Yes.

Q.      And the first email, I guess the oldest email, is an email from you to Louis Marucheau at U.S. Bank and Marcus Foster at U.S. Bank with a copy to Kris Talgo and Liz LaPuma; is that correct?

A.      Correct.

Q.      And why were you emailing U.S. Bank?

A.      Based on the email, Marcus from U.S. Bank had reached out that a partial payment was missed from Heritage Aviation. So I was emailing him to see if there was a master file that contains the expected interest payments and principal payments.

Q.      And U.S. Bank was the trustee;

MACEDONIO - CONFIDENTIAL

is that correct?

A.    Is the trustee, yes.

Q.    So at that time, U.S. Bank was the trustee, and it remains the trustee.

A.    Correct.

Q.    And March 18th was a few weeks after you had taken over as collateral manager; is that correct?

A.    Correct.

Q.    And Liz LaPuma emails you shortly thereafter and says, "FYI, the agent is Patriarch, so I guess that means Patriarch sent out the wrong invoice. Going forward, do we need to send out invoices?"

Do you see that?

A.    I see that.

Q.    And then the next email is from you to Liz LaPuma, and it says, "Can I assume the missed calls were from you?  Is this your office number?"

Do you recall having any discussion with Ms. LaPuma regarding A&M needed to send out invoices?

MACEDONIO - CONFIDENTIAL

A.     I don't recall.

Q.     Do you recall having any discussion with Ms. LaPuma regarding PPAS' preparation of invoices for the portfolio companies?

A.     I don't recall.

Q.     Do you recall Ms. LaPuma ever expressing any concerns about PPAS' performance of its duties to invoice the portfolio companies?

A.     Not without counsel present.

Q.     Do you recall whether the conversation with counsel present occurred around the time of this email?

MR. PICKHARDT:  Objection.  I think -- I'm not sure if he was seeking to establish that there was a conversation with counsel that covered that subject area or just saying that in responding to your questions he is talking about -- talking about any discussions without counsel.

MS. O'BOYLE:  Well, I asked whether he recalled ever -- recalled

Page 85

MACEDONIO - CONFIDENTIAL

Ms. LaPuma ever expressing any concerns about PPAS' performance of its duties to invoice the portfolio companies, and he said, "Not without counsel present."

BY MS. O'BOYLE:

Q.    Now, I don't want to pry into your conversations with counsel.

A.    Sure.

Q.    So I will ask the question slightly differently.

Do you recall having discussions with Ms. LaPuma about PPAS in the presence of counsel around this time period?

A.    I don't recall.

Q.    Do you recall at any time looking at invoices that PPAS prepared and sent to portfolio companies?

A.    Yes.

Q.    And when -- roughly when were you looking at such invoices?

A.    I'm not certain.

Q.    What was the purpose of looking at such invoices?

MACEDONIO - CONFIDENTIAL

A.    To gain an understanding of them.

Q.    Of the invoices?

A.    Yeah.

Q.    Did you ever have a discussion with anyone at PPAS about generating invoices?

A.    Not that I can recall.

Q.    At some point, did AMZAS start to generate invoices for the portfolio companies?

A.    I don't know.

Q.    Were you involved in -- strike that.

Have you ever seen an invoice that AMZAS prepared and sent to a portfolio company?

A.    Not that I can recall.

Q.    Were you on the Project Zenith email list?

A.    What do you mean by email list?

Q.    We'll mark as Exhibit 6 a document bearing the Bates Nos. ZOHAR-PPAS-00006605 to 6607.

MACEDONIO - CONFIDENTIAL

(Exhibit 6, An email dated July 26, 2016, Bates ZOHAR-PPAS-00006605, was hereby marked for identification, as of this date.)

Q.    And do you see that in the CC line of the top email -- well, sorry. Strike that.

Can you look at the lower email that's sent from Aileen Daversa to John Nix.

A.    Yes.

Q.    And there's a CC to Elizabeth LaPuma and Project Zenith.

A.    Yes.

Q.    Do you know who received emails that were directed to Project Zenith?

MR. PICKHARDT:  Objection. Calls for speculation.  Lack of foundation.

Q.    Are you familiar with a Project Zenith email address?

A.    Yes.

Q.    And what was that -- was that email address a specific email account or

MACEDONIO - CONFIDENTIAL

did it -- was it a compilation of individuals that received an email when it was directed to Project Zenith?

MR. PICKHARDT:  Objection to form.  Compound.

Q.    Do you understand my question?

A.    I do not.

Q.    Okay.  Was Project Zenith a standalone email account?

A.    It -- yes.

Q.    So when emails were sent to Project Zenith, who reviewed them?

MR. PICKHARDT:  Objection. Calls for speculation.

Q.    Do you know who reviewed the emails that were sent to Project Zenith?

MR. PICKHARDT:  Objection. Calls for speculation.

A.    I wouldn't -- "review" wouldn't be the term I would use.

Q.    Okay.  Did -- when --

A.    I know I was one of other people who have access to see that -- what that email receives, if that makes sense.

MACEDONIO - CONFIDENTIAL

Q.    Okay.  And did you regularly access to see what emails that email receives?

A.    Periodically, yes.

Q.    Who else had access to that email?

A.    Chris Cover.

Q.    So just the two of you?

A.    That's all that I'm certain of, yes.

Q.    Okay.  So is it a distribution list or is it just a single email?

A.    Single email.

THE VIDEOGRAPHER:  Counsel, be advised I can hear your whispering on the record.

MS. O'BOYLE:  Shanks.

Q.    Do you see the bottom email says, "Please find the attached invoice for interest due August 1, 2016, to May 1, 2016"?

A.    Yes.

Q.    Sorry.  "Due on August 1, 2016, for the period May 1, 2016, to

MACEDONIO - CONFIDENTIAL

July 31, 2016."

A.     Yes.

Q.     Dozen this refresh your recollection that A&M was sending out invoices to the portfolio companies?

A.     Based on this email, it seems like AMZAS, I guess, did, yes.

(Exhibit 7, An email dated July 25, 2016, Bates ZOHAR-PPAS-00010307, was hereby marked for identification, as of this date.)

Q.     I'm mark being as Exhibit 7 a document bearing the Bates No. ZOHAR-PPAS-00010307.

Do you see that?

Through 10310.  That's the end of the attachment.

A.     Okay.

Q.     Do you recall sending this email to Joe Granger at Croscill?

A.     I don't recall specifically, but I'm obviously the sender, so I'm sure I sent it.

Q.     Do you recall sending emails of

MACEDONIO - CONFIDENTIAL

this nature to various portfolio companies around July 25, 2016?

A.    Again, same answer.

Q.    You state in the email, "As you are aware, Alvarez & Marsal Zohar Agency Services has been appointed to serve as agent on behalf of," and then you list the Zohar funds; is that correct?

A.    That's correct.

Q.    Were you aware at the time that you sent this email that PPAS had commenced a lawsuit -- this lawsuit, asserting that A&M and the Zohar funds' termination of its agency was improper and that it remained the irrevocable agent?

A.    Yes.

Q.    Did you advise Mr. Granger that that lawsuit was pending at this time?

A.    I can't recall.

Q.    Do you recall ever advising Mr. Granger that that lawsuit was pending?

A.    I do not.

Q.    Why didn't you advise Mr. Granger that the lawsuit was pending?

MACEDONIO - CONFIDENTIAL

MR. PICKHARDT:  Objection.

A.    I don't know.

Q.    In the attached letter, you direct Croscill in paragraph 3 to "Please send to the below bank account all interest, commitment fees, and any principal payments owed to the Zohar fund"; is that correct?

A.    That's correct.

Q.    So you were directing -- sorry -- and the account name is Alvarez & Marsal Zohar Agency Services; is that correct?

A.    That's correct.

Q.    So you were directing Mr. Granger, representative of Croscill, to send all funds owed to the Zohar funds to AMZAS; is that correct?

A.    Yes.

Q.    And at no time did you advise him that Patriarch Partners Agency Services had commenced an action that it was asserting that it remained the agent; is that correct?

MACEDONIO - CONFIDENTIAL

A.    Not that I can recall.

Q.    You state in paragraph 2, "Refrain from making any future payments to Patriarch Partners Agency Services."

Is that correct?

A.    That's correct.

Q.    And, again, you don't state in that -- in that sentence or anywhere in this letter that Patriarch Partners Agency Services has commenced a lawsuit asserting that it remains the agent; is that correct?

MR. PICKHARDT:  Objection.  When you say you --

Q.    Sorry.  This letter that you sent does not anywhere state that Patriarch Partners Agency Services has commenced a lawsuit alleging that it -- asserting that it remains the agent; is that correct?

A.    I'd want to read the whole --

Q.    Take your time and read the letter.  That's fine.

A.    (Witness perusing document.)

Page 94

MACEDONIO - CONFIDENTIAL

Can you repeat the question?

Q.    Sure.

Does this letter state anywhere that Patriarch Partners Agency Services has commenced a lawsuit alleging that it is -- in which it alleges that it remains the agent?

A.    It does not.

Q.    I'm going back to the cover email.

A.    Sure.

Q.    You signed the email "Best, Alvarez & Marsal Zohar Agency Services."

Do you see that?

A.    I do.

Q.    Why were you signing the email "Alvarez & Marsal Zohar Agency Services"?

A.    Because this was being sent on behalf of Alvarez & Marsal Zohar Agency Services.

Q.    And were you acting as a representative of Alvarez & Marsal Zohar Agency Services when you sent this letter?

A.    Can you define representative?

MACEDONIO - CONFIDENTIAL

Q.    Did you understand yourself to be performing a function for Alvarez & Marsal Zohar Agency Services when you sent this letter?

A.    I don't recall if I was doing it as a representative of Zohar Agency Services.

Q.    Did you track your time separately for work that you performed for Alvarez & Marsal Zohar Agency Services?

A.    I did not.

Q.    Do you recall sending letters of this type to any other portfolio companies?

A.    I do not.

Q.    Do you recall receiving any communications from Mr. Granger or anyone at Croscill relating to this -- in response to this letter?

A.    I do not.

MS. O'BOYLE:    Okay.  We can go off the record.

THE VIDEOGRAPHER:    Okay.  We are now off the record.  The time on the

Page 96

MACEDONIO - CONFIDENTIAL

video monitor is 11:58 a.m.

(Recess)

THE VIDEOGRAPHER:  We are now on the record.  The time on the video monitor is 12:13 p.m.

BY MS. O'BOYLE:

Q.    Mr. Macedonio, at some point, did you learn that the portfolio companies were represented by counsel?

A.    Yes.

Q.    And do you recall when you learned that they were represented by counsel?

A.    Like, a date?

Q.    Like, month.

A.    No.

Q.    Date would be great, but month would be better.

A.    I don't recall.

Q.    Do you recall whether it was shortly after you -- Alvarez & Marsal was retained by the Zohar funds?

A.    I don't recall.

Q.    Do you recall reviewing any

Relevance

Page 97

MACEDONIO - CONFIDENTIAL

communications from counsel for the    Relevance

portfolio companies at any time?

A.    Yes.

Q.    And what communications do you

recall reviewing?

A.    I looked at the letter that we

received from Williams & Connolly, stating

that they were representing our portfolio

companies.

Q.    And do you recall whether this

letter was sent in or around May 2016?

A.    I don't recall.

Q.    Did you ever attend a meeting

with Williams & Connolly?

A.    No.

Q.    Do you know whether anyone on

your team attended a meeting with Williams

& Connolly?

A.    I don't know.

Q.    Do you know whether the letter

that Williams & Connolly sent advising

you -- or advising A&M that they were

representing the portfolio companies was

sent before or after the email marked as

Page 98

MACEDONIO - CONFIDENTIAL

Relevance

Exhibit 7 that you sent to Joe Granger?

A.    I don't recall.

Q.    Did you copy Williams & Connolly on the email that you sent to Joe Granger?

A.    I don't recall.

Q.    Can you look at the email and tell me --

A.    Sure.

Q.    -- whether you copied Williams & Connolly on the email?

MR. PICKHARDT:  Objection.  The document speaks for itself.

A.    Exhibit 7; right?

Q.    Correct.

A.    It looks like it's to Joe Granger, copying Project Zenith and Elizabeth LaPuma.

Q.    A little earlier today, we looked at letters that were sent to the portfolio companies stating that AMZAS was to assume the role of administrative agent on June 17th.

Do you recall looking at those letters?

**Page 99**

MACEDONIO - CONFIDENTIAL

Relevance

A.    Which exhibit was that?

Q.    I believe it is Exhibit 2.

A.    (Witness perusing document.)

Yes.

Q.    And did A&M undertake any preparations to be prepared to assume the role as administrative agent?

MR. PICKHARDT:  Objection.  Lack of foundation.  Calls for speculation.

A.    I don't recall.

Q.    Were you involved in any discussions about what AMZAS would need to do to assume the role as administrative agent?

A.    I don't recall.

Q.    Are you aware that one of the functions of the administrative agent is to invoice the portfolio companies?

A.    Yes.

Q.    And do you have any understanding as to whether AMZAS was prepared to assume the role of invoicing that portfolio companies on June 17, 2016?

MR. PICKHARDT:  I'm going to

Page 100

MACEDONIO - CONFIDENTIAL

instruct the witness to exclude from his answer any discussions that he had with counsel.

Relevance

A.    I don't recall.

Q.    Do you know whether AMZAS had the information that it needed to generate the invoices on June 17, 2016?

A.    I don't recall.

Q.    Do you have a general understanding as to when interest payments from the portfolio companies are due?

A.    Yes.

Q.    And when is that?

A.    It varies by company.

Q.    Are they generally due on the 1st of the month?

A.    Usually, the first business day, I think.

Q.    And the invoices are sent out sometime prior to the due date; shark?

MR. PICKHARDT:  Objection. You're asking -- vague as to what invoices you're referring to.

Q.    The invoices to the portfolio

**Page 101**

MACEDONIO - CONFIDENTIAL

Relevance

company for the interest that they had due.

A.    I don't know when they're sent out.

Q.    Does it make -- does it seem logical that they would be sent out at some time prior to the date that the funds were due?

MR. PICKHARDT:  Objection to form.  Relevance.

A.    It seems logical.

(Exhibit 8, An email dated July 25, 2016, Bates ZOHAR-PPAS-00006674, was hereby marked for identification, as of this date.)

Q.    I'm marking as Exhibit 8 a document bearing the Bates Nos. ZOHAR-PPAS-00006674 through 6683.  And that includes one attachment.

Take your time to review the document, and let me know when you're ready to answer questions.

A.    (Witness perusing document.)

Okay.

**Page 102**

MACEDONIO - CONFIDENTIAL

Q.    The top email is an email from Chris Cover to you and Ms. Daversa, and Relevance he's forwarding a series of emails with other individuals at A&M; is that correct?

A.    That's correct.

Q.    And those emails generally speaking are about the preparation of a letterhead for AMZAS; is that correct?

A.    Yes.

Q.    Do you recall receiving this email?

A.    I do not.

Q.    Do you have any understanding as to why on or around July 25, 2016, Elizabeth LaPuma was emailing about preparing letterhead for AMZAS?

MR. PICKHARDT:  Objection.  Lack of foundation.  Calls for speculation.

A.    I do not.

Q.    Do you know whether, prior to July 25, 2016, AMZAS had sent out any invoices?

A.    I do not.

Q.    Do you know whether, prior to

**Page 103**

MACEDONIO - CONFIDENTIAL

July 25, 2016, AMZAS had set up a bank account to receive payments from the portfolio companies?

Relevance

A.    I do not.

Q.    Do you know who at A&M would have that information?

MR. PICKHARDT:  Objection. Calls for speculation.

A.    I do not.

Q.    Do you believe Ms. LaPuma might have that information?

MR. PICKHARDT:  Objection. Calls for speculation.

A.    I don't know.

Q.    Of all of the individuals who you identified as working on the Zohar funds matter, are there -- is there anyone in that set of individuals who you think might have this information?

A.    I don't know for certain.

Q.    Would there be anyone else at A&M who might have that information other than those people?

MR. PICKHARDT:  Objection.

Page 104

MACEDONIO - CONFIDENTIAL

Calls for speculation.

Relevance

A.    I don't know.

Q.    So you have no knowledge as to who would have been involved in establishing a bank account for AMZAS.

A.    Not for certain.

Q.    And you have no -- or do you have any understanding as to who at A&M would have been involved in the preparation of invoices for AMZAS?

A.    I don't know.

Q.    Is it your belief that, as of June 17, 2016, AMZAS was prepared to perform the role of administrative agent?

MR. PICKHARDT:  Objection. You're asking him whether it is his belief today?

Q.    Sure.  Is it your belief that -- today that, as of June 17, 2016, AMZAS was prepared to perform the role of administrative agent?

MR. PICKHARDT:  I'm going to caution the witness that, to the extent your belief is predicated upon

Page 105

MACEDONIO - CONFIDENTIAL

discussions you had with counsel, this may be inextricably intertwined with privilege issues.

A.    I'm not certain.

Q.    Have you ever heard of a company called Cortland Global?

A.    I'm not sure.

Q.    Have you ever heard of an individual called Mike Fredian?

A.    No.

Q.    Do you know whether, as of June 17, 2016, AMZAS had advised the trustee that it would be assuming the role of administrative agent for the Zohar funds?

A.    I don't know.

Q.    Was there one individual or individual -- or several individuals on the Zohar funds team that were responsible for communicating with the trustee about various issues?

A.    I would say, yeah, it varied who discussed anything with the trustee.

Q.    Okay.  Which -- can you name

Relevance

Page 106

MACEDONIO - CONFIDENTIAL

everyone who you think may have                    Relevance

communicated with the trustee at one point

or another regarding issues relating to

the Zohar fund?

        MR. PICKHARDT:  I'm going to

    object to the extent you're asking

    whether he thinks may have.  To the

    extent you have knowledge or

    communications, he can testify as to

    those.  Otherwise, you're asking him

    to guess or speculate.

    A.    I know I spoke with the trustee.

    Q.    Do you know whether Ms. LaPuma

ever spoke with the trustee?

    A.    Yes.

    Q.    Do you know whether Mr. Cover

ever spoke with the trustee?

    A.    Yes.

    Q.    Do you know whether Mr. Marsal

ever spoke with the trustee?

    A.    I don't know.

    Q.    Do you know whether Ms. Daversa

ever spoke with the trustee?

    A.    I'm not certain.

**Page 107**

MACEDONIO - CONFIDENTIAL

Q.    Do you know whether AMZAS has its own email account?

Relevance

A.    I don't know.

Q.    Do you know whether AMZAS has its own filing system?

A.    Filing system?

MR. PICKHARDT:  Objection. Vague.

Q.    Is there -- are there share drives on the A&M computer?  A&M computer systems?

A.    Yes.

Q.    Do you know whether there's a separate file within the share drives where AMZAS-related information is stored?

A.    Yes.

Q.    And do you know when that was -- that file was set up?

A.    I do not.

Q.    Do you ever place information into that file?

A.    I'm not certain.

Q.    Do you know what type of information is maintained in that file?

Page 108

MACEDONIO - CONFIDENTIAL

A.    I do not.                           Relevance

Q.    Do you know whether A&M or AMZAS intended to hire any third parties or consultants to assist with the performance of its duties as administrative agent?

A.    When you say A&M, you mean any Alvarez & Marsal entity?

Q.    Why don't I start -- why don't I ask the question this way.

Do you have any understanding as to whether AMZAS intended to engage any third parties to assist with the performance of its duties as administrative agent?

A.    I do not.

Q.    Do you know who at A&M would have the most knowledge about issues related to AMZAS' performance of its duties?

A.    I do not.

Q.    Do you think there are individuals other than the individuals you identified at the beginning of the deposition who might have performed tasks

**Page 109**

MACEDONIO - CONFIDENTIAL

related to AMZAS' duties as administrative agent?  Individuals at A&M.

Relevance

A.    I'm not sure.

MR. PICKHARDT:  Objection to form.

(Exhibit 9, An email dated May 4, 2016, Bates ZOHAR-PPAS-00012525, was hereby marked for identification, as of this date.)

Q.    I'm marking as Exhibit 9 a document bearing the Bates Nos. ZOHAR-PPAS-00012525 to 12528.

Take your time to review the email, and look up when you're done.

A.    (Witness perusing document.)

Okay.

Q.    In the first email, the bottom most email on the chain, it's an email from you to John Nix.

Who is John Nix?

A.    The chief financial officer of Intrepid.

Q.    And you state, "Hi John, it was a pleasure to speak with you today

MACEDONIO - CONFIDENTIAL

regarding Intrepid."

Do you recall speaking to Mr. Nix on or around May 4, 2016?

A.    Not specifically.

Q.    Do you recall speaking to Mr. Nix at any time?

A.    I know we spoke with various portfolio companies.

Q.    You have no specific recollection of speaking with Mr. Nix?

A.    I do not.

Q.    Do you know why or do you recall why you were calling Mr. Nix on or around May 4, 2016?

A.    Based on the exhibit?

Q.    Based on your recollection.

A.    I do not.

Q.    Does reviewing the email refresh your recollection as to why you may have been calling him?

A.    I would be able to base my answer on what the email says, but it did not refresh my recollection.

Q.    So how would you answer the

MACEDONIO - CONFIDENTIAL

question based on what the email says?

MR. PICKHARDT:  Objection.
Relevance.  You're asking him -- the
document speaks for itself.

Q.    If you're just going to read
into the record the document, you don't
need to do that.  But you said, "I would
be able to base my email on what the
answer says, but it did not refresh my
recollection."

So other than what's stated in
the email, you have no specific
understanding as to why you were speaking
with Mr. Nix or what you spoke about.

A.    Correct.

Q.    Were you reaching out to Mr. Nix
on behalf of Alvarez & Marsal Zohar
management?

MR. PICKHARDT:  Objection.  Lack
of foundation you're asking what he
recalls?

MS. O'BOYLE:  Yeah.

Q.    Do you recall in what capacity
you were reaching out to Mr. Nix?

MACEDONIO - CONFIDENTIAL

MR. PICKHARDT:  Objection.
Asked and answered.

A.    I do not.

Q.    Do you see the subject of the email says "A&M Zohar management - contact"?

A.    I do.

Q.    Do you have an understanding as to what you meant when you wrote "A&M Zohar Management - contact"?

A.    A&M Zohar Management is one of the entities that were set up.

Q.    Set up for what purpose?

A.    The Zohar project.

Q.    And do you believe you were sending this email to provide Mr. Nix with your contact information as a representative of Alvarez & Marsal Zohar management?

A.    Based on the document, yes.

Q.    Okay.  And in the email, you state, "As we discussed, you can plan to receive an emailed letter from our lawyers, Quinn Emanuel, as, technically,

MACEDONIO - CONFIDENTIAL

the letter needs to come from the Zohars, as they are the entity owners."

Do you see that?

A.    I do.

Q.    What did you mean when you stated, "Technically, the letter needs to come from the Zohars, as they are the entity owners"?

MR. PICKHARDT:  Objection. Asked and answered.

A.    I am not certain.

Q.    What -- do you recall what letter you are referring to in this sentence?

A.    I do not.

Q.    Can you turn to the front page of the email.  You state in this email, "The letter will contain requests for information about your company -- financials, et cetera -- and if you have any questions about a specific request, please give me a call."

Do you see that?

A.    I do.

MACEDONIO - CONFIDENTIAL

Q.    Does that refresh your recollection as to what the emailed letter from your lawyers at Quinn Emanuel was going to include?

A.    It does not.

Q.    Do you know whether Quinn Emanuel ever sent a letter to Mr. Nix or anyone at Intrepid containing a request for information about the company?

A.    I'm not sure.

Q.    Do you know whether you sent this email before or after you learned that the portfolio companies were represented by counsel?

A.    I don't know.

(Exhibit 10, An email dated May 5, 2016, Bates ZOHAR-PPAS-00012570, was hereby marked for identification, as of this date.)

Q.    I'm marking as Exhibit 10 ZOHAR-PPAS-00012570 through 12572.   And that's inclusive of an attachment.

Take your time to review the email and the attachment.

MACEDONIO - CONFIDENTIAL

A.      (Witness perusing document.)

Okay.

Q.      This is an email from you to Tim Maynard at Denali; is that correct?

A.      Correct.

Q.      And you state, "Hi Tim, I hope this message finds you well.  As we discussed on the phone yesterday, please find attached an information request list from our A&M Zohar Management team as the collateral manager of the Zohar funds."

Do you see that?

A.      I do.

Q.      Do you recall sending this email to Mr. Maynard on or around May 5, 2016?

A.      I do not.

Q.      Did someone -- do you recall whether someone directed you to sends this email to Mr. Maynard?

A.      I do not.

Q.      Do you recall preparing the -- or did you prepare the attached request list?

A.      I don't recall.

MACEDONIO - CONFIDENTIAL

Q.    Do you recall preparing request lists of this nature to send to portfolio companies?

A.    I don't recall.

Q.    Do you have any understanding as to how the information included in this request list or how the requests included in this request list were developed?

A.    I don't know.

Q.    Did you have an understanding as to whether A&M Zohar Management had a right to request this information from the portfolio companies.

A.    I don't know.

Q.    Do you know whether this email was sent before or after you were advised that the portfolio companies were represented by counsel?

A.    I don't know.

Q.    Do you recall whether you received a response to this email?

A.    I don't know.

Q.    Did you ever visit any of the portfolio companies?

Page 117

MACEDONIO - CONFIDENTIAL

A.    I did not.

        (Exhibit 11, An email dated July 26, 2016, Bates ZOHAR-PPAS-00000917, was hereby marked for identification, as of this date.)

Q.    I'm marking as Exhibit 11 a document bearing the Bates Nos. ZOHAR-PPAS-00000917.  There are also two attachments that we have included, one bearing the Bates Nos. ZOHAR-PPAS-00000919 and one bearing the Bates No. 00000959.  Not all of the attachments to this -- I believe one from each of the ZIPs.  They were large files with many similar documents.  And this is an email from Chris Cover to EBennett@wc.com.

        Do you know who E. Bennett is?

A.    Ted Bennett.

Q.    Have you ever spoken with Ted Bennett?

A.    Not that I recall.

Q.    Have you ever spoken with anyone at Williams & Connolly about this case?

A.    Not that I recall.

MACEDONIO - CONFIDENTIAL

Q.    And CC is Lawrence Gresser, Stephen Sinaiko, and Elizabeth LaPuma.

Who is Lawrence Gresser?

A.    A lawyer.

Q.    And what firm is he affiliated with?

A.    Cohen & Gresser.

Q.    And was Cohen & Gresser counsel to Alvarez & Marsal?

A.    I'm not certain.

Q.    Were they counsel to the Zohar funds?

A.    I'm not certain.

Q.    Were they counsel to one of the Zohar funds or Alvarez & Marsal?

A.    I'm not certain.

Q.    Who is Stephen Sinaiko?

A.    He's a lawyer.

Q.    Is he also at Cohen & Gresser?

A.    Yes.

Q.    Do you know why Chris Cover was copying Lawrence Gresser and Stephen Sinaiko on here?

MR. PICKHARDT:   Objection.

MACEDONIO - CONFIDENTIAL

Calls for speculation.

A.      I do not.

Q.      And there's also a BCC line, and it shows Ms. Daversa and yourself; is that correct?

A.      That's correct.

Q.      And the email from Mr. Cover says, "Hi Ed, for information purposes, attached are letters intended for the companies with which you work on behalf of A&M Zohar Agency Services.  Please forward on to the company's respective officers to ensure receipt."

Do you see that?

A.      I do.

Q.      And if you turn to the first attachment, looking at the attached letter, the second page, the last paragraph, it states, "Notwithstanding the foregoing records available to us reflects that you have not made adequate payments of interest during one or more due periods in the last three months or otherwise have not met your payment obligations under the

Page 120

MACEDONIO - CONFIDENTIAL

credit agreement."

Do you see that?

A.    I do.

Q.    Did you perform analyses for any of the portfolio companies to determine whether or not they had made adequate payments of interest prior to July 25, 2016?

A.    I don't recall.

Q.    Do you recall doing that at any time?

A.    Do I -- can you repeat it?

Q.    Do you recall at any time performing an analysis to determine whether or not portfolio companies had made adequate payments of interest?

A.    Yes.

Q.    And how did you perform such an analysis?

A.    We looked at the credit agreement and amendments to figure out the terms of the loans and the basic math calculation.

Q.    Did you need any other

MACEDONIO - CONFIDENTIAL
information to conduct that analysis?

A.    What was -- cash actually
received, so the cash that was received to
determine if there was an inadequate
payment.

Q.    And how would you receive record
of the cash that was received?

A.    From the trustee.

Q.    And did you receive that
information?

A.    Yes.

Q.    And how -- did the trustee send
you that information?

A.    Yes.

Q.    And were those in daily cash
reports that were sent to you?

A.    Yes.

Q.    And did you have records of
payments that were made prior to the
time -- sorry -- payments that were made
to the trustee prior to the time that
Alvarez & Marsal became the collateral
manager as well?

A.    Why he.

Page 122

MACEDONIO - CONFIDENTIAL

Q.    And how did you have that information?

A.    From the trustee.

Q.    Were those from the trustee reports?

A.    From the daily cash files.

Q.    So you had daily cash files even prior to the time you started as --

A.    Can you clarify?

Q.    -- as collateral manager.

MR. PICKHARDT:  Objection to form.

Q.    So once you became collateral manager, you received daily cash files from the trustee; is that correct?

A.    Correct.

Q.    I asked whether you had records of payments that were made prior to the time that Alvarez & Marsal became the collateral manager as well.  And you said you did.

A.    Correct.

Q.    And I'm just trying to ascertain in what form you received that

MACEDONIO - CONFIDENTIAL

information.

Was that contained in the cash files, or was that contained in some other --

A. Correct. Cash files.

Q. So the cash files that you received while you were collateral manager had historical information contained therein.

A. Correct.

Q. And how far back did that information go?

A. I'm not certain.

Q. I'm sorry. Looking back at that paragraph, it says, "Accordingly, a payment default has occurred which may become an event of default according to the terms of the credit agreement."

Do you see that?

A. I do.

Q. Did you ever conduct analyses to determine whether an event of default had occurred under any of the credit agreements for any of the portfolio

MACEDONIO - CONFIDENTIAL

companies?

A.    Yes.

Q.    And how did you perform such an analysis?

A.    It was done with the loan summaries we prepared.

Q.    The loan summaries being one of the exhibits that we looked at on the screen?

A.    Correct.

Q.    And similarly, you would look at the credit agreement any amendments thereto to determine what the loan characteristics were and ascertain whether a payment had been made according to --

A.    And the --

Q.    -- those terms?

A.    And I believe the amendments stated events of default occurring or being waived.  So we were able to ascertain based on that.

Q.    So you could review the amendments to determine whether an events of default had been called and then

Page 125

MACEDONIO - CONFIDENTIAL

waived.

A. Yes.

Q. Has A&M called an event of default since it became collateral manager?

MR. PICKHARDT: Objection to the --

A. I don't recall.

Q. So you have no knowledge one way or another whether A&M has called an event of default since it became collateral manager.

A. I don't recall.

(Exhibit 12, An email dated May 10, 2016, Bates ZOHAR-PPAS-00026166, was hereby marked for identification, as of this date.)

Q. Okay. I'm marking as Exhibit 12 a email bearing the Bates No. ZOHAR-PPAS-00026166 and one attachment bearing the Bates No. ZOHAR-PPAS-00026169. And this is an email and one attachment which is an exemplar of many similar attachments in the ZIP file. And it's an

Page 126

MACEDONIO - CONFIDENTIAL

email from Mr. Macedonio, Mr. Macedonio to EBennett@wc.com dated April -- sorry -- May 10, 2016.

Do you recall sending this letter to Mr. Bennett?

MR. PICKHARDT:  Okay.  So this is -- this is not all the attachments; right?

Q.    Correct.  I'm sorry.

Do you recall sending this email to Mr. Bennett?

A.    I do not.

Q.    Do you recall at some point on or before April 10, 2016, conducting analyses to determine whether portfolio companies may not be in compliance with their payment obligations?

A.    I don't recall.

Q.    Do you think -- is that one of the jobs that you likely would have been assigned to perform?

A.    Is what one of the jobs?

Q.    Performing analyses to determine whether portfolio companies were not in

Page 127

MACEDONIO - CONFIDENTIAL
compliance with their payment obligations.

A.    Yes.

Q.    And would you have performed that analysis in the same manner we just talked about, by looking through the credit agreements and the amendments and the payments that have been made?

MR. PICKHARDT:  Objection.  The question is posing a hypothetical.

Q.    How did you perform this analysis, if you recall?

A.    We would have obtained the terms of the loans through the credit agreements and amendments and compared that to the cash that was received.

MS. O'BOYLE:  Why don't we break for lunch and go off the record.

MR. PICKHARDT:  Okay.

THE VIDEOGRAPHER:  We are now off the record.  The time on the video monitor is 12:50.

(Luncheon recess:  12:50 p.m.)

Page 128

MACEDONIO - CONFIDENTIAL

A F T E R N O O N   S E S S I O N

1:46 p.m.

THE VIDEOGRAPHER:  We are now on the record.  The time on the video monitor is 1:46 p.m.

BY MS. O'BOYLE:

Q.    Good afternoon, Mr. Macedonio.

Do you know who Steven Cohn is?  C-O-H-N?

A.    I'm not certain.  Do you know where he works?  Cohn?

Q.    Do you know who Daniel Feigenbaum is?

A.    Yes.

Q.    Who is he?

A.    He's an internal A&M lawyer.

Q.    Lawyer?

A.    Yeah.

Q.    And do you know who Joel Poretsky is?

A.    He's the general counsel for A&M.

Q.    But you're not familiar with the name Steven Cohn?

Page 129

MACEDONIO - CONFIDENTIAL

A.    Cohn?

Q.    C-O-H-N?

A.    Can I see the spelling or can I see it?

Q.    Sure.  We can mark as Exhibit 13.

(Exhibit 13, Limited Liability Company Agreement, Bates ZOHAR-PPAS-00032945, was hereby marked for identification, as of this date.)

Q.    I've marked as Exhibit 13 a document bearing the Bates No. ZOHAR-PPAS-00032945 to 00032951.  And it's entitled the "Limited Liability Company Agreement of Alvarez & Marsal Zohar Agency Services LLC."

Have you seen this document before?

A.    I don't recall.

Q.    If you turn to page 4 of this document, the Section 5.1, "Management of the Company," subpart B lists three names. It says, "The managers hereby confirm the appointment of the following persons as

Relevance

Page 130

MACEDONIO - CONFIDENTIAL

officers."  And that's where it says "Steven Cohn."

Relevance

A.    Yeah.  Steven Cohn.  Cohn.  Just the pronunciation I didn't get.

Q.    Oh, okay.

A.    But yeah.  I know who Steve is.

Q.    And who's Steve?

A.    He's the CFO of A&M.

Q.    Okay.  And in your work on the Zohar fund matter, have you ever worked with Steven Cohn?

A.    Can you be more specific?

Q.    Has Steven Cohn worked on the Zohar fund matters, to your knowledge?

A.    No.

Q.    What about Daniel Feigenbaum?

A.    No.

Q.    What about Joel Poretsky?

A.    No.

Q.    Do you have any understanding as to why they were appointed managers of AMZAS?

MR. PICKHARDT:  Objection.
Calls for speculation.

**Page 131**

MACEDONIO - CONFIDENTIAL

Relevance

A.   I don't know.

Q.   Sorry.  Why they were appointed officers of AMZAS.

A.   I don't know.

Q.   And do you see in the section immediately preceding that, subpart A, the last sentence says, "The members hereby elect Antonio C. Alvarez II and Bryan Marsal as managers"?

A.   I do.

Q.   To your knowledge, has Antonio Alvarez ever conducted work on the Zohar matters?

A.   Not to my knowledge.

Q.   To your knowledge, has Brian Marsal ever conducted work on the Zohar fund matters?

A.   Yes.

Q.   Do you have any understanding as to why Mr. Alvarez and Mr. Marsal were elected as managers of AMZAS?

MR. PICKHARDT:  Objection. Calls for speculation.

A.   I don't know.

Page 132

MACEDONIO - CONFIDENTIAL

Q.    Do you know who prepared this
document?

A.    I do not.

Relevance

Q.    Are you aware that one of the
claims that A&M is asserting in its
counterclaims is that PPAS has been
improperly withholding financial
information from A&M?

A.    I am.

Q.    Do you have any knowledge as to
what financial information about the
portfolio companies PPAS has in its
possession?

A.    I do not know.

Q.    Do you have any knowledge about
what financial information about the
portfolio companies PPAS has not turned
over to A&M?

A.    I don't know.

Q.    Do you understand that the
credit agreements for the portfolio
companies provide that the borrowers shall
provide financial information to certain
people?

Legal
Conclusion

Page 133

MACEDONIO - CONFIDENTIAL

A.    Yes.

Legal Conclusion

Q.    And do you have an understanding that the borrowers are required to provide financial information to the lenders?

A.    In certain situations, yes.

Q.    I'm marking as Exhibit 14 a document bearing the Bates Nos. ZOHAR-PPAS-00036907 through 36910.

(Exhibit 14, An email dated March 25, 2016, Bates ZOHAR-PPAS-00036907, was hereby marked for identification, as of this date.)

Q.    Take your time to review the document, and let me know when you've had a chance to do so.

A.    (Witness perusing document.) Okay.

Q.    The bottom most email is an email from Ms. Daversa to you and several others, copy to Ms. LaPuma with the subject "Urgent Request Re Project Zenith. Please respond by 12:00 tomorrow."

And Project Zenith was a term used for the engagement by the Zohar

MACEDONIO - CONFIDENTIAL

funds; is that correct?

A.    Correct.

Q.    And Ms. Daversa writes, "Hi Team, apologies for bothering you over the weekend, but we need to prepare a response to Patriarch tomorrow in which we would like to have the following information in order to prepare."

And then she asks that "For your assigned companies, could you please confirm who, i.e. agent, collateral manager, lender.  The borrower is obligated to provide financial information, i.e. audited financial statements, monthly and quarterly financial statements, forecast, et cetera, to."

Do you see that?

A.    I do.

Q.    Do you recall receiving this request?

A.    I do not.

Q.    You respond to Ms. Daversa a short time later, and you state, a few

Page 135

MACEDONIO - CONFIDENTIAL

lines down in the email -- sorry -- the first sentence states, "Hey, I didn't fully go through, but based on the loan document and the last amendment, the below is Intrepid."

And then you state a little further down, "Financial statements are required to be delivered to the agent and lenders."

Do you see that?

A.    I do.

Q.    So at least for Intrepid, financial statements -- the borrower portfolio company was required to deliver certain financial statements to the agent and the lenders; is that correct?

A.    Correct.

Q.    And are you aware of whether A&M sought to obtain financial statements directly from the borrowers?

A.    I'm not certain.

Q.    Did you ever reach out to portfolio companies and request that they provide you with financial information?

Page 136

MACEDONIO - CONFIDENTIAL

MR. PICKHARDT:  Are you saying does he have a recollection of doing it?

Q.    Do you have a recollection of doing that?

A.    I don't recall.

Q.    Do you recall reviewing emails earlier in this deposition --

A.    I do.

Q.    Let me finish my question.

A.    I'm sorry.

Q.    -- in which you requested certain documents from --

A.    I do.

Q.    -- from portfolio companies?

Okay.  I'm a little slow-talking sometimes.  Sometimes I'm too fast.

Do you have any understanding as to whether the portfolio companies agreed to provide in information to Alvarez & Marsal?

A.    I do not.

Q.    Are you aware of any financial information from the portfolio companies

MACEDONIO - CONFIDENTIAL

that Alvarez & Marsal has requested but
not received -- requested from the
portfolio companies but not received?

MR. PICKHARDT:  Objection to
form.

A.    Can you restate?

Q.    Yeah.  So I asked you whether
you had any understanding as to whether
the portfolio companies agreed to provide
information to Alvarez & Marsal, and you
said you did not, and then I said are you
aware of any financial information that
Alvarez & Marsal has requested from the
portfolio companies but has not received
from the portfolio companies.

A.    I'm not sure.

Q.    Are you aware of any discussions
between Alvarez & Marsal or counsel for
Alvarez & Marsal and the portfolio
companies or counsel for the portfolio
companies regarding the execution of a
confidentiality agreement relating to
portfolio company financial information?

A.    Can you restate?

Page 138

MACEDONIO - CONFIDENTIAL

Q.     Sure.

Are you aware of any discussions between Alvarez & Marsal and the portfolio companies regarding the execution of a confidentiality agreement that would cover financial information that the portfolio companies would provide to Alvarez & Marsal?

MR. PICKHARDT:  I'm going to instruct you to exclude from your answer whatever information you may or may not have learned from counsel.

A.     I do not recall.

Q.     Have you reviewed any portfolio company financial information in the course of your work on the Zohar funds project?

A.     I have.

Q.     And generally speaking, what type of financial information have you reviewed?

A.     By type you mean, like, type of document.

Q.     Yeah.

MACEDONIO - CONFIDENTIAL

A.   Or --

Q.   Yearly financial statements, quarterly financial statements, generally speaking, categories like that.

A.   Sure.  The documents we received from the prior collateral manager, which varied between being audited financial statements for some years, some management financials, some Patriarch template financials.

Q.   And do you have any reason to believe that the prior collateral manager did not provide to you all of the portfolio company financial information in its possession?

A.   In its possession?  I don't know.

Q.   So you don't have any knowledge one way or another whether the prior collateral manager provided you all the information in its possession.

MR. PICKHARDT:  Objection. Vague as to information.

Q.   All of the portfolio company

MACEDONIO - CONFIDENTIAL

financial information in its possession.

A.    I don't know that I could speak to what the prior collateral manager had, to know if I was --

Q.    So you don't know one way or another, because you don't know what the prior collateral manager had.

A.    Correct.

Q.    Are you aware of any request for portfolio company financial information -- strike that.

Did you perform analyses using the financial information about the portfolio companies that you did review?

A.    Yes.

Q.    And what types of analyses did you perform?

A.    As I stated earlier, we put together, like, a data book on each company, just containing the historical financial information.

Q.    And what was the purpose of preparing that data book?

A.    To be able to understand the

MACEDONIO - CONFIDENTIAL

company a little bit.

Q.    And did you have enough financial information about the portfolio companies to prepare a data book for all of the portfolio companies for which you prepared a data book?

A.    I wouldn't say enough.  No.

Q.    And why would you say you didn't have enough information?

A.    Because for certain portfolio companies there would be missing years. We might only have two years' worth of data, but we see a document that references, you know, like a credit agreement that the company was in existence ten years ago.  So --

Q.    So are you saying you had recent financials but not historical financials for some companies?

A.    I'm saying it varied for all companies.

Q.    Okay.  In the example you gave, where you said, "We might only have two years' worth of data, but we see a

Page 142

MACEDONIO - CONFIDENTIAL

document that references that the company was in existence ten years ago," can you just walk me through --

A.    Sure.

Q.    -- what you meant by that example.

A.    Like a credit agreement from 2006, but we have financial information for 2010 and 2011, and that's it.

Q.    Can you recall what portfolio company that example -- was that example related to a specific portfolio company?

A.    I don't know.

Q.    Was there any -- do you recall any portfolio companies for which you felt you did not have sufficient financial information to prepare the analyses that you were attempting to prepare?

A.    I don't recall.

Q.    Do you recall that, for some portfolio company, you had sufficient information to prepare an analysis?

A.    I don't recall.

Q.    You don't recall one way or

MACEDONIO - CONFIDENTIAL

another?

A.    I don't recall any specific example where there was complete information for a portfolio company.

Q.    And why did Alvarez & Marsal require complete financial information for portfolio companies for the purpose of performing its role as collateral manager?

MR. PICKHARDT:  Objection.

A.    I'm not certain.

Q.    Did anyone tell you why you were preparing the analyses of the portfolio companies?

A.    No.

Q.    Who directed you to prepare the analyses?

A.    Liz LaPuma.

Q.    But she didn't tell you what the analyses were going to be used for?

A.    No.

Q.    Did she tell you-- strike that.

Can you go back to Exhibit 1, which we looked at at the beginning of the deposition.  We printed the attachment out

**Page 144**

MACEDONIO - CONFIDENTIAL

in a bigger format.

A.     Okay.  Great.

Q.     So hopefully that makes it easier to read.

A.     So do I need this or just --

Q.     Yeah.  Hold on to that, and then we can staple them together at the end or paper clip them.  And we'll also pull it up.  As I explained to John, numbers are not embedded in the document.  So in order to make them viewable, we have to do some rejigging that we weren't able to do in the lunch break.

A.     Okay.

Q.     But hopefully, this bigger format will make it a little more readable for you.

MR. CAMPBELL:  Should we make this Exhibit 15 or 1A or --

MS. O'BOYLE:  Why don't we call it 1A, and we'll -- we'll just make sure that there are -- it's the identical document to the prior attachment.  It's just a bigger

MACEDONIO - CONFIDENTIAL

format.

MR. CAMPBELL: Yeah. I understand.

MS. O'BOYLE: So we can call it that.

BY MS. O'BOYLE:

Q. To this is a printout of the document that's also on the screen, and that document includes four separate sheets, all of which are included --

A. Okay.

Q. -- in this printout.

The first sheet is what we were looking at earlier today in which -- where you explained to us that you reviewed certain terms in the credit agreement and the amendments and pulled out specific terms in this document.

Now that we have the whole document before us, it's a little easier for me to ask you questions.

Was this template that you filled in provided to you in a blank format?

MACEDONIO - CONFIDENTIAL

A.    Define "blank format."

Q.    Were you provided this template to populate for each --

A.    Yes.

Q.    -- of the companies that you had responsibility?

Do you know who prepared the template?

A.    Not specifically.

Q.    So if you turn to the third full page, so -- or the third page.  So that's the fifth page.  They're double-sided.

A.    Got you.

Q.    That is the second sheet, which is Intrepid balance.

Do you see that?

A.    Yes.

Q.    And can you describe to me what this sheet reflects.

A.    This reflects the loan balances that were mentioned in the credit agreements and amendments.

Q.    And so was this prepared using just the information in the credit

MACEDONIO - CONFIDENTIAL

agreements?

A.    And the amendments.

Q.    And the amendments?  Yes.

A.    Yes.

MR. CAMPBELL:  I'm sorry to interrupt.  What page are we on?

MS. O'BOYLE:  So it's the third page of the document.

MR. CAMPBELL:  The third sheet?

MS. O'BOYLE:  The third sheet. Yeah.

MR. CAMPBELL:  And it says "Intrepid USA Inc." at the top?

MS. O'BOYLE:  Correct.

A.    I think they all have that.

Q.    And they all say page 9.  I promise, next time, it will be better.

So this was prepared solely utilizing the information the credit agreements and amendments.

A.    Correct.

Q.    Does this reflect any information about interest payments that may have not been made or is this just

MACEDONIO - CONFIDENTIAL

providing the details of the loans?

A.    Yeah.  This is just providing the terms and the information within the credit agreement and amendments.

Q.    Okay.  If you go to the next sheet of the Excel, which is the back of the fourth page in this printout, the tab is called "Financial Covenants."

Do you see that?

The tab down there is called "Financial Covenants."  The document begins, "Per the 7th amendment to the first amended and restated credit agreement."

A.    Yes.

Q.    And what does this reflect, if you recall?

A.    This is the covenants that were in the credit agreement.

Q.    Or the credit agreement as amended.

A.    As amended.

Q.    And the last tab, which is entitled "List of amendment type," do you

MACEDONIO - CONFIDENTIAL

see that?  It's the very last page of this document that has writing on it.  I'm sorry.  It's -- looks like this (indicating).

Do you see where it says "List change and definitions, commitment change," et cetera?

A.    Yes.

Q.    What is that list intended to reflect?

A.    I'm not sure.

Q.    And you'll see on the right side of this sheet, it says -- it looks like a screen shot from a LinkedIn page; is that correct?

A.    Correct.

Q.    For an individual named Kenneth Kozack?

A.    Correct.

Q.    Did you paste this information into the Excel?

A.    I assume so.

Q.    And do you know why you pasted Mr. Kozack's information into the Excel?

MACEDONIO - CONFIDENTIAL

A.    I do not.

Q.    Have you ever communicated with Mr. Kozack?

A.    I did not.

Q.    Generally speaking, this document, with the exception of this LinkedIn page, was prepared utilizing the credit agreements and the amendments.

A.    Correct.

Q.    And you received those from the former collateral manager.

A.    Correct.

(Exhibit 15, An email and attachment, Bates ZOHAR-PPAS-00000701, was hereby marked for identification, as of this date.)

Q.    I'm marking as Exhibit 15 a document bearing the Bates Nos. ZOHAR-PPAS-00000701 through 705 and an Excel attachment that was provided to us in native form.  And this has been printed out here and will also be pulled up on the screen.

And the top email is an email

MACEDONIO - CONFIDENTIAL

from Adam Frenkel on May 2, 2016, sent to Chris Cover and Thomas Cook, and you are copied on it; is that correct?

A.    That's correct.

Q.    And the attachment is entitled "Copy of Project Zenith portfolio overview 5/2/16"; is that correct?

A.    Correct.

Q.    Do you recognize the attachment to this document?  Take your time to review it.

A.    (Witness perusing document.)
      I do.

Q.    Did you prepare this document?

A.    I'm not certain.

Q.    Did you contribute portions of this document?

A.    Yes.

Q.    Do you know who else at A&M worked on this document?

A.    Not specifically.

Q.    Do you know why this document was being prepared?

A.    To be a summary document.

MACEDONIO - CONFIDENTIAL

Q.    A summary of what?

A.    Various points of information.

Q.    Of the collateral and the funds?

A.    Yes.

Q.    And if you look at the first page, which I just pulled up there, as well -- and we can blow it up, if that's helpful.  I know it's still small.

At the top, it says -- of the left-most column, it says, "Lin Tilton high-value companies."

Do you see that?

A.    I do.

Q.    And do you know what that -- what that means?

A.    These are companies that Lin Tilton was sent that had high value.

Q.    That Lin Tilton told you had high value or they were Lin Tilton companies that had high value?

A.    They were companies that were communicated to me that were identified by Lin Tilton to have high value.

Q.    Who communicated to you that Lin

MACEDONIO - CONFIDENTIAL

Tilton -- who communicated that to you?

A.    I don't recall.

Q.    I see Intrepid in this list.

Having this list before you, are there any companies that you -- actually, if you turn to the next page, it's blown up a little more.  It might be easier for you to read.  Sorry.  The following page after that.  "Lin Tilton high-value companies."

Are there any other companies on that list that you were assigned to analyze?

A.    I am not sure.

Q.    Do you recall any specific portions of this spreadsheet that you worked on?

A.    Of this tie-out spreadsheet?

Q.    And what is the tie-out spreadsheet?

A.    No, no, no.  I'm asking -- are you talking about this tie-out --

Q.    Oh, okay.  We can start there.

Did you work on this -- on the

**Page 154**

MACEDONIO - CONFIDENTIAL

tie-out spreadsheet?

A.    I'm sure I contributed, yes.

Q.    And what -- what information was used to prepare the tie out spreadsheet?

A.    The portfolio -- the file I received from the trustee, daily portfolio file.

Q.    So you received a file from the trustee called the daily portfolio file?

A.    I'm not sure what it's specifically called.

Q.    Okay.

A.    But there is a file we receive every day that contains the listing of the collateral, the debt obligations.

Q.    And this is separate from the daily cash file you receive.

A.    Correct.

Q.    Do you see the tabs, if you look up on the screen, there's a tab called "Team Jones," "Team Harris," and "Team LaPuma"?

Do you have an understanding as to what those three teams were?

MACEDONIO - CONFIDENTIAL

A.    Yes.

Q.    What -- I guess was the A&M team that worked on the Zohar fund engagement split up into three teams at some point?

A.    Yes.

Q.    And were those three teams Jones, Harris, and LaPuma?

A.    Yes.

Q.    And what team are you on?

A.    LaPuma.

Q.    And were the teams divided by portfolio company or for some other -- by some other distinguishing factor?

A.    It was just divided as a way to go through the documents and not duplicate work.

Q.    Okay.  And what was Team LaPuma responsible for?

A.    Going through those specific companies, documents.

Q.    So Team LaPuma went through a certain set of companies, Team Jones went through a certain set of companies, and Team Harris went through a certain set of

MACEDONIO - CONFIDENTIAL

companies.

A.    Correct.

Q.    Who else was on Team LaPuma?

A.    Chris Cover and Aileen Daversa.

Q.    And was Team LaPuma assigned to the Lin Tilton high-value companies?

A.    I'm not sure which ones are on which team.

Q.    Was this Project Zenith global portfolio overview updated on a regular basis?

A.    It was updated periodically.

Q.    And what would lead to it being updated?

A.    I'm not certain.

Q.    Additional information you received from the portfolio companies?

A.    I'm not sure.

Q.    I'm marking as Exhibit 16 a document bearing the Bates Nos. ZOHAR-PPAS-0030409 through -- that's it. And the Excel that was attached to it has the subject Heritage-Draft data book-4/21/2016 that was produced to us in

Page 157

MACEDONIO - CONFIDENTIAL

native form and we've printed out here to the best of the our ability and we'll also pull up on the screen.

(Exhibit 16, An email and attachment, Bates ZOHAR-PPAS-0030409, was hereby marked for identification, as of this date.)

A.     Thank you.

Q.     The cover email is an email from you to Aileen Daversa on May 3, 2016; is that correct?

A.     That's correct.

Q.     Do you recall preparing a data book for Heritage?

A.     I do not.

Q.     Do you recall preparing data books for any portfolio companies?

A.     I know I prepared them for some portfolio companies.  I'm not sure the specific portfolio companies.

Q.     And do you recall generally speaking how you prepared the data books?

A.     Yes.

Q.     And can you explain how you

Page 158

MACEDONIO - CONFIDENTIAL

prepared them?

A.    We looked through -- I looked through the financial information that we had received from the prior collateral manager and pulled in the data.

Q.    So this is simply data that is in financial statements that you received from the prior portfolio -- sorry -- the prior collateral manager?

A.    Generally, yes, either the management financials or Patriarch template.  It kind of varied.

Q.    And did you do -- conduct any analysis with that financial data?

A.    This was the analysis, putting this together.

Q.    So this compiles the information; is that correct?

A.    Compiles parts of the information.  I'm not sure what specific ones, though.

Q.    Is there any information in here that you generated as opposed to pulling from a document?

**Page 159**

MACEDONIO - CONFIDENTIAL

A.     I'm sure there's some formula calculations that are being done in this Excel sheet --

Q.     Were you attempting, for example --

A.     -- that weren't in --

Q.     I'm sorry.

A.     I'm sorry.  I'm sure there are some formulas within this Excel sheet that were done that weren't specifically in the document.

Q.     Were you attempting to prepare projections, for example, using prior financial information?

A.     No.  This is, I believe, all historical.  The only projections would have been stuff that Patriarch had in their template that said, like, budget.

Q.     When you're talking about that Patriarch had in their template, what template are you referring to?

A.     Patriarch has a financial template that they used for their companies, the companies.

MACEDONIO - CONFIDENTIAL

Q.   And that was something that was provided to A&M as the new collateral manager?

A.   In some certain -- in circumstances, yes.

Q.   Was that --

A.   Not for all companies, not for all periods, but yes, to some extent.

Q.   Do you know whether Patriarch had -- sorry.  Strike that.

For the companies in periods for which that information was not provided, do you know whether Patriarch had that information in their files and did not turn it over to you?

A.   I don't know.

Q.   And do you know why A&M was preparing these data books?

A.   To try and understand the companies.

Q.   And for what purpose was it trying to understand the companies?

A.   Because we managed the collateral.

**Page 161**

MACEDONIO - CONFIDENTIAL

Q.    You -- I think I showed you in Exhibit 1 you had a document that showed that you could calculate the amount that each company owed; is that correct?

A.    The amount of interest that a company owed?

Q.    The amount of interest that each company owed and the principal that they owe; is that correct?

A.    I know it mentioned the amount of interest that the company owed.  I don't know that we needed to calculate anything for the amount of principal that was owed.  That was pretty much a stated number on the trustee --

Q.    You knew the amount of the principal that was owed; is that correct?

A.    We knew based on what the trustee provided us with, what the principal was.

Q.    Okay.  And as collateral manager, you're -- part of your job was to record the interest that was collected each month; is that correct?

Prejudicial: Designated After Close of Trial

Page 162

MACEDONIO - CONFIDENTIAL

A.    The trustee recorded the interest that was collected each month.

Q.    And what was your responsibility with respect to understanding and conveying to your noteholders or the noteholders the amount of interest that was collected each month?

MR. PICKHARDT:  Objection to form.  Vague as to "your."

A.    Can you restate?

Q.    Did A&M have -- you stated that the trustee recorded the interest that was collected each month; is that correct?

A.    Correct.

Q.    And the trustee provided that information to you; is that correct?

A.    Correct.

Q.    And did you provide that information to the noteholders?

A.    No.

Q.    Why did you not provide that information to the noteholders?

MR. PICKHARDT:  Objection.  Foundation.  Are you asking whether

Prejudicial: Designated After Close of Trial

Page 163

MACEDONIO - CONFIDENTIAL

A&M -- why A&M didn't provide that to noteholders?

Q.    Yes.  Why did A&M not provide --

MR. PICKHARDT:  Objection. Foundation whether that was considered.

A.    I don't know.

Prejudicial: Designated After Close of Trial

Q.    Do you know whether A&M as collateral manager was required to provide that information to noteholders?

A.    I don't know.

Q.    Did you perform any calculations to reconcile the amounts that the trustee was reporting to you as collected from the portfolio companies every month with amounts that you expected should be due?

A.    Can you restate?

Q.    Sure.

The trustee, you stated, provided you information about what was collected from the portfolio companies every month; is that correct?

A.    Correct.

Q.    And did you -- did A&M based on

Prejudicial: Designated After Close of Trial

**Page 164**

MACEDONIO - CONFIDENTIAL

its review of the credit agreements and amendments have separately calculate the amount that should be due each month from the portfolio companies?

A.    Yes.

Q.    And did you reconcile that amount that should have been due with the amount that was received?

MR. PICKHARDT:  Objection. Vague as to reconcile.

Q.    Did you compare the two numbers?

A.    Yes.

Prejudicial: Designated After Close of Trial

Q.    And what did you do once you compared the two numbers?  What did you do if you determined the numbers were different?

MR. PICKHARDT:  Objection. Compound.

A.    What did I do if the numbers were different?

Q.    Okay.  Let me -- let me -- it was a compound question, because I was trying to clarify it with the second question.

**Page 165**

MACEDONIO - CONFIDENTIAL

You compared the two numbers; is that correct?

A.    Correct.

Q.    And if you compared the numbers and they were different, did A&M do something to determine why the numbers were different?

MR. PICKHARDT:  Objection.
Calls for --

A.    I don't know.

MR. PICKHARDT:  -- speculation.

Q.    Did you tell anyone within your team that the numbers you were receiving from the trustee did not match up with the numbers that you had calculated should be being received?

A.    Yes.

Q.    Who did you tell that to?

A.    Liz and our counsel.

Q.    And do you know what happened with that information once you conveyed it to Liz and your counsel?

MR. PICKHARDT:  I'm going to instruct the witness not to answer to

Prejudicial: Designated After Close of Trial

**Page 166**

MACEDONIO - CONFIDENTIAL

the extent your knowledge is --

A.    I do not.

MR. PICKHARDT:  Based upon
communications that occurred in the
presence of counsel.

Q.    Did you ever communicate that
information to noteholders?

A.    What information?

MR. PICKHARDT:  By "you," are
you talking about --

Q.    By "you," I mean you -- did you
ever have discussions with noteholders
regarding discrepancies in the amounts
collected and the amounts that you thought
should have been collected?

A.    Not that I can recall.

MS. O'BOYLE:  I'm marking as
Exhibit 17 an email bearing the Bates
Nos. ZOHAR-PPAS-00017192.  And the
email -- the Excel is not attached,
because it's something like a
thousand-plus pages.  We have pulled
it up on the screen.  We will send it
to the court reporter so that she has

Prejudicial: Designated After Close of Trial

Page 167

MACEDONIO - CONFIDENTIAL

a record of the full document.  This is a document that was produced by A&M.  And the attachment is entitled "Project Zenith FEB16 trustee report data book."

(Exhibit 17, An email and attachment, Bates ZOHAR-PPAS-00017192, was hereby marked for identification, as of this date.)

Q.    This states "Project Zenith Portfolio Overview Draft and Confidential Not For Distribution 3/16/2016."

Let's go to the next page, summary.

The first page is entitled "Summary."  Contains a listing of portfolio companies, identification of their industry, and other information.

Recognizing that you've not yet had a chance to look through the whole document, do you generally recognize this document?

A.    I'm not sure.

Q.    We're clicking on the tab

MACEDONIO - CONFIDENTIAL

entitled "Halcyon."  I'm not sure that I pronounced that correctly.  It says at the top "Zohar funds Halcyon data."

Do you have an understanding as to what Halcyon data means?

MR. PICKHARDT:  Objection. Calls for speculation.

MS. O'BOYLE:  I'm asking whether he has an understanding as to what that means.

MR. PICKHARDT:  You've asked him about a document he doesn't recall having seen before.  So you haven't laid a foundation as to having any basis to respond to that.

Q.    Okay.  Do you know what Halcyon is?

A.    Yes.

Q.    And does Halcyon have a relationship with the Zohar funds?

A.    Yes.

Q.    What is the relationship that Halcyon has with the Zohar funds?

A.    They are an investor in Zohar

MACEDONIO - CONFIDENTIAL

III.

Q.    And do you -- are you -- do you know whether, at some point, Halcyon provided data to A&M relating to the company -- the portfolio companies in the Zohar funds?

A.    I know they provided something, but I don't know what it was.

Q.    Did you ever review that data?

A.    Not that I can recall.

Q.    Do you know whether that data included certain information regarding the enterprise value of certain companies in the portfolio?

MR. PICKHARDT:  Objection. Mischaracterizes testimony.  He said that he received something.  You've been characterizing it as data.  I just want to be clear.  Do you know whether it was data or something else?

A.    I don't know specifically what it was.

Q.    Do you know who at A&M they provided that information to?

MACEDONIO - CONFIDENTIAL

A.    I do not.

Q.    Do you have any understanding as to what that information contained?

A.    I do not.

Q.    Have you ever -- so have you ever seen this page -- a page that looks like this in the spreadsheet?

A.    Not that I can recall.

Q.    Have you ever reviewed -- strike that.

Have you ever in your work on the Zohar fund project estimated enterprise values for any of the portfolio companies in the fund?

A.    No.

Q.    Do you know whether anyone at A&M that is done so?

MR. PICKHARDT:  Objection. Calls for speculation.

A.    I don't know.

Q.    Do you know -- have you ever reviewed valuation calculations of any of the portfolio companies done by any entities other than A&M in connection with

MACEDONIO - CONFIDENTIAL

your work on the Zohar funds?

A.    Can you restate?

Q.    Sure.

Have you ever reviewed
valuations of the portfolio companies
conducted by entities -- third parties?

A.    I have not.

MR. PICKHARDT:  Is Patriarch a
third party?

MS. O'BOYLE:  Is what?

MR. PICKHARDT:  Patriarch a
third party -- a third party from A&M?

MS. O'BOYLE:  Sure.

Q.    I guess, have you reviewed any
valuations prepared by Patriarch?

A.    Not that I can recall.

(Exhibit 18, Zohar II Status
Update, Bates ZOHAR-PPAS-0005911, was
hereby marked for identification, as
of this date.)

Q.    I'm marking as Exhibit 18 a
document bearing the Bates Nos.
ZOHAR-PPAS-0005911 through 59201.

A.    It's 202.

MACEDONIO - CONFIDENTIAL

Q.     Thank you.

And this is a -- it appears to be a PowerPoint presentation entitled "A&M Zohar II Status Update," and it's dated October 21, 2016; is that correct?

A.     It's titled "Zohar II Status Update" dated October 21, 2016.  I wouldn't say it's titled "A&M" --

Q.     Correct.  I saw.  "A&M Zohar II Status Update."  Got it.

Okay.  Have you seen this document before?

A.     I have.

Q.     Did you help prepare this document?

A.     I did.

Q.     Are there any specific parts of the document that you helped prepare, or did you generally help compile the information?

A.     There are specific parts.

Q.     And what specific parts did you prepare?

A.     I prepared page 21.  Do you want

MACEDONIO - CONFIDENTIAL

me to go through the whole thing?

Q.     If there's any other -- if looking at the index there's other ones -- portions that you specifically remember preparing, you can identify those.  That's helpful.  Otherwise, I'll ask you some questions about certain pages, and I'll ask you if you remember preparing those.

A.     Sure.  I prepared the note information and disbursements of monies.  That's all I can recall from looking at this.

Q.     And do you know who else worked on preparing this document?

A.     Yes.

Q.     And who was that?

A.     Liz LaPuma, Chris Cover, Aileen Daversa, and various legal counsels.

Q.     And do you know what the purpose was of preparing this Zohar II status update?

A.     To provide the information to the noteholders.

Q.     If you turn to page 5, the

MACEDONIO - CONFIDENTIAL

second bullet, it states, "The information provided to date by Patriarch and obtained from the portfolio companies and other sources is insufficient to perform complete recording" -- sorry -- "reporting as required by the Zohar indenture governing the Zohar funds."

Do you see that?

A.    I do.

Q.    Did you draft that bullet?

A.    I did not.

Q.    Do you know who drafted that bullet?

A.    I do not.

Q.    Do you have an understanding as to the basis for the statement in that bullet?

A.    I'm not certain.

Q.    Can you turn to page 20.

It's entitled "Information supplied by the trustee and other sources."

Do you see that?

A.    Yes.

MACEDONIO - CONFIDENTIAL

Q.    And it says, "AMZAS interacts frequently with the trustee and has requested all relevant documents available to the trustee."

Do you see that?

A.    I do.

Q.    And who at A&M was responsible for interacting with the trustee and obtaining relevant documents from the trustee?

MR. PICKHARDT:  Objection. Calls for speculation.

A.    It varied who spoke with the trustee.

Q.    Were you one of the individuals tasked with communicating with the trustee?

A.    I spoke with the trustee.  I wouldn't say I was tasked with speaking with the trustee.

Q.    Did the -- did the trustee provide you -- sorry.

The next bullet identifies five categories of documents -- trade tickets

MACEDONIO - CONFIDENTIAL

and support, restructure tickets, assignment agreements, CDO documents, and stock certificates.

Do you see that?

A.    I do.

Q.    And it says, "Patriarch provided to the trustee all of the documents that the trustee has in its possession, and the trustee represented they provided all of those documents to AMZAS."

Do you see that?

A.    I do.

Q.    Have you reviewed any of those categories of documents?

A.    Yes.

Q.    Which categories?

A.    I've seen trade tickets, assignment agreements, certain stock certificates.  I'm not sure what's specifically meant by "CDO documents." I'm not sure about restructure tickets.

Q.    And the next bullet says that the trustee also provides a daily updated cash file.

MACEDONIO - CONFIDENTIAL

We talked about that earlier; correct?

A.    Correct.

Q.    And that's something you were responsible for receiving from the trustee?

A.    The trustee sent it to me, yes.

Q.    The last bullet says, "AMZAS also performed lien searches."

Do you see that?

A.    I do.

Q.    Did you have responsibility in your role on the Zohar fund team for conducting lien searches?

A.    I did not.

Q.    Do you know who had that responsibility?

A.    We used an outside law firm.

Q.    Sorry?  Say that again.

A.    We used an outside law firm.

Q.    Okay.  What law firm was that?

A.    Mayer Brown.

Q.    If you can turn to page 31.  It says -- it's entitled "Role of the Agent."

MACEDONIO - CONFIDENTIAL

And the fourth bullet down says, "As agent, AMZAS has continued to perform the following tasks."

And there's four tasks or -- I'm sorry -- three bullets under there.

Can you read those three bullets.

A.    You want me to read them to you?

Q.    You can read them to yourself.

A.    Okay.

(Witness perusing document.)

Okay.

Q.    In your role on the Zohar fund team, did you perform any of the tasks described in those three bullets?

A.    Yes.

Q.    Which ones?

A.    "Attempt to set meetings with the portfolio company management."

Q.    And which portfolio companies did you attempt to set meetings with?

A.    I don't recall.

Q.    Any other tasks described in those bullets that you performed?

MACEDONIO - CONFIDENTIAL

A.      Not that I recall.

Q.      If you look at the, I guess, footer -- No. 1 footnote, it says, "Going forward, AMZAS intends to charge only for hours and fees expenses incurred while performing the duties of agent up to the maximum annual agency fees based on the credit agreements."

Do you see that?

A.      I do.

Q.      Were you involved in any discussions about AMZAS' intent to charge for hours and fees expenses incurred?

A.      I was not.

Q.      Do you know whether anyone at A&M tracked the hours they spent working for -- working on AMZAS matters separately?

MR. PICKHARDT:   Objection. Calls for speculation.

A.      I don't know.

Q.      You did not track your hours separately for work you were performing relating to AMZAS; correct?

MACEDONIO - CONFIDENTIAL

A.    Correct.

Q.    I think you said that you worked on or you prepared the following slide, Slide 32?

A.    Yes.

Q.    And what information did you use to prepare that slide?

A.    From the trustee -- from the waterfall payment date.

Q.    Have you reviewed any bank statements produced by PPAS in this litigation?

A.    I have not.

Q.    Have you reviewed any Excel charts that were prepared showing monies sent to and from trust that -- trustee that were produced in this litigation?

A.    Can you restate?

Q.    Have you prepared any Excel charts?

A.    Have I prepared?

Q.    Sorry.  Have you reviewed any Excel charts that were produced in this -- that were prepared by PPAS and produced in

Page 181

MACEDONIO - CONFIDENTIAL

this litigation reflecting money in from the portfolio companies and money sent to the trustee?

A.    Not that I can recall.

Q.    Can you turn to page 44.  And 44 and a number of the following pages include the title "Portfolio Composition" as of August 31, 2016.

Do you see that?

A.    I do.

Q.    Did you play any role in preparing these charts?

A.    Not that I can recall.

Q.    Do you have an understanding as to what these charts reflect?

A.    Yes.

Q.    And do these reflect the various loan facilities held by each of the funds -- I guess, in this case, Zohar II?

A.    Yes.

Q.    Can you turn to page 89.

And is this -- and this is entitled "Zohar II Financial Statements by portfolio company provided by all

Page 182

MACEDONIO - CONFIDENTIAL

Patriarch entities"?

A. Correct.

Q. Did you prepare this chart?

A. Not that I can recall.

Q. Do you know who prepared this chart?

A. I do not.

Q. Do you know whether the information in this chart is accurate?

A. I'm not sure.

Can we take a break?

Q. Yeah.

THE VIDEOGRAPHER: We are now off the record. The time on the video monitor is 2:48.

(Recess)

THE VIDEOGRAPHER: We are now on the record. The time on the video monitor is 3:05 p.m.

BY MS. O'BOYLE:

Q. Good afternoon. Your counsel noted that you have an answer from before that you wish to clarify. So I will give you an opportunity to do so.

Page 183

MACEDONIO - CONFIDENTIAL

A.    Correct.   On Exhibit 18, page 31, I didn't realize that it was saying as AMZAS, when I said that I attempted to set meetings with portfolio company management.

Q.    Sorry.   Let me just pull that up real quick.

So when you were attempting to set meetings with portfolio company management, you were not doing so as AMZAS.

A.    Correct.   I remember -- I was remembering as when we did it in -- when it was done in May, AMZAS.

Q.    And did you -- was there -- did you perform any work that you considered yourself to be performing as AMZAS?

A.    Not that I can recall.

Q.    So all of the work that you performed you were performing as AMZAS, to the best of your recollection.

A.    Yes.

Q.    And can you identify anyone at A&M who performed work as AMZAS?

Page 184

MACEDONIO - CONFIDENTIAL

A.    I cannot.

(Exhibit 19, An email and attachment, Bates ZOHAR-PPAS-00010404, was hereby marked for identification, as of this date.)

Q.    I'm marking as Exhibit 19 a document bearing the Bates Nos. ZOHAR-PPAS-00010404 through 10408.  That is the Bates number on the last attachment.  There is a lengthy Excel in the middle that was produced natively.  And this does not have Bates numbers.  But all of the attachments for this email are included in what I handed to you.

This is an email from Chris Cover to Ms. LaPuma and yourself dated 11/2/2016 entitled "For Tomorrow."

And it says, "LL and Tom, a few files attached for tomorrow.  1, Zohar team tasks; 2, financials example; and 3, latest financials LT top value."

Do you recall receiving this email and its attachments?

A.    I do not.

MACEDONIO - CONFIDENTIAL

Q.    At this time, were you, Ms. LaPuma, and Mr. Cover, the principal A&M employees, working on matters relating to the Zohar funds?

A.    And Aileen Daversa, I believe. I'm not sure what -- when her last day was, but I know it was in that month. So --

Q.    Okay.

A.    Not sure.

Q.    But she's not copied on this email.

A.    Correct.

Q.    And when he says "For tomorrow," do you know what was happening tomorrow?

A.    I do not.

Q.    If you turn to the first attachment, it says -- it's entitled "Team Zohar current and ongoing tasks."

Do you see that?

A.    Yes.

Q.    And I just want to walk through these. I'll do it as quickly as I can to ask whether you were involved in any of

MACEDONIO - CONFIDENTIAL

these tasks.

"Prepare monthly waterfall across the funds."

Was that something that you worked on?

A.    Yes.

Q.    And did you work on that in your role as AMZAS?

A.    Yes.

Q.    And what role did you play in preparing the monthly waterfall?

A.    I reviewed the indenture and worked with U.S. Bank, the trustee.

Q.    And were you responsible for approving the waterfall before it was --

A.    No.

Q.    -- finalized?

Who -- who approved the waterfall?

A.    Liz.

Q.    And did you -- do you recall that A&M had all of the information that it needed to approve the waterfall?

A.    Yes.

Page 187

MACEDONIO - CONFIDENTIAL

Q.    The next bullet is "Prepare future versions of the status updates."

Do you see that?

A.    I do.

Q.    Is that -- is the status updates referred to in that bullet documents, such as the PowerPoint we were reviewing a minute ago?

A.    Yes.

Q.    Have any future versions -- have any versions -- strike that.

Have any status updates been prepared since the October 2016 version that we looked at a few minutes ago?

A.    Not to my knowledge.

Q.    The next bullet is "Periodically tie-out and confirm cash activity and portfolio holdings with U.S. Bank."

Do you see that?

A.    I do.

Q.    And were you -- was this a task that you were involved with?

A.    Yes.

Q.    And what did you do to tie out

MACEDONIO - CONFIDENTIAL

and confirm cash activity and portfolio holdings with U.S. Bank?

A.     What I would do is make sure that the interest wire that U.S. Bank received matched the daily cash file that they provided us.

Q.     And how were -- how did you receive information about the interest wire?

A.     From U.S. Bank.

Q.     And this would be a separate piece of information that U.S. Bank would provide to you?

A.     Correct.

Q.     And did you have all the information that you needed to tie out and confirm cash activity and portfolio holdings with U.S. Bank?

A.     To tie out the cash activity, yes.

Q.     And why did you distinguish that from portfolio holdings?

A.     Because I'm not sure what we would have -- what I would have been tying

Page 189

MACEDONIO - CONFIDENTIAL

out for the portfolio holdings.

Q.    So you just don't understand what that part of the bullet means.

A.    Correct.

Q.    The next bullet is "Payment and monitor of each Zohar professional fee and expense accounts."

Do you see that?

A.    I do.

Q.    Did you have a responsibility for that task?

A.    I wouldn't say responsibility, but I was involved in monitoring it, I guess.  Yes.

Q.    And was that the billing number you were referring to at the beginning --

A.    Correct.

Q.    -- of the deposition relating to handling disbursements or payments to the various third parties who worked with A&M?

A.    Correct.

Q.    The next bullet is "Cataloging of invoices received and paid for all Zohar-related vendors."

Page 190

MACEDONIO - CONFIDENTIAL

Is that also similar to what we spoke about at the beginning, invoices from law firms and the like?

A.    Correct.

Q.    We can skip the next one.

"Document management, mainly U.S. Bank daily files at this point."

What did that bullet refer to?

A.    The cash file and the holdings file that U.S. Bank sent us on a daily basis.

Q.    Okay.  And the next bullet is "Calculate interest expected for all portfolio companies and compare to interest received each month."

Was that a task that you worked on?

A.    No.

Q.    Do you know who worked on that task?

A.    Yes.

Q.    Who?

A.    Chris Cover.

Q.    Okay.  "Prepare and send

MACEDONIO - CONFIDENTIAL

interest invoices for all portfolio companies each month."

Was that a task you worked on?

A.    No.

Q.    Do you know who worked on that task?

A.    I'm not certain.

Q.    Was that a task that AMZAS was performing?

A.    I'm not certain.

Q.    The next bullet is "Prepare and send default notices for portfolio companies who do not meet their obligations each month."

Was that a task that you worked on?

A.    No.

Q.    Do you know who worked on that?

A.    Yes.

Q.    Who?

A.    Chris Cover.

Q.    The next task is "Follow up with various portfolio company events that are occurring and will continue to occur."

MACEDONIO - CONFIDENTIAL

And then there's four specific bullets and then a bullet that just says "Others."

Do you see that?

A.   I do.

Q.   And was that a task that you worked on?

A.   Partially.

Q.   Which part of that task did you work on?

A.   The Gorham Paper & Tissue one and the Hawker Beechcraft one.

Q.   Did you have any involvement in the bullet relating to Transcare, the bankruptcy and disagreement over money paid to agent?

A.   I did not.

Q.   Do you have any understanding of what the disagreement over money paid to agent was?

A.   Slight understanding through discussions with counsel.

Q.   Okay.  The next bullet is "Periodically compare" -- sorry.

Page 193

MACEDONIO - CONFIDENTIAL

Just going back, do you know who at A&M had primary involvement for addressing issues related to the Transcare bankruptcy and disagreement over money paid to agent?

A.    I do not.

Q.    Going down, the next bullet is "Periodically compare U.S. Bank cash file with interest wires received by U.S. Bank via PPAS."

Do you see that?

A.    I do.

Q.    Is that different from the third bullet, which is "Periodically tie out and confirm cash activity"?

A.    No.  That seems to be the same.

Q.    And so the interest wires that you referred to, are those interest wires that PPAS sent to U.S. Bank and that U.S. Bank sent to you?

MR. PICKHARDT:  Objection to form.

A.    Correct.

Q.    The next bullet is "Calculate,

Page 194

MACEDONIO - CONFIDENTIAL

accrue, and invoice PIK balances by facility as applicable each month."

Do you see that?

A.    I do.

Q.    Do you know what that refers to?

A.    I do not.

Q.    Did you have any responsibility for that task, to your knowledge?

A.    I did not.

Q.    "Calculate other interest fees as instructed per the credit agreements."

Did you have any responsibility for that task?

A.    I did not.

Q.    Do you know who did?

A.    I do not.

Q.    The next is "Work with noteholders to provide information (redacted where necessary) allowable under the indentures."

Do you see that?

A.    I do.

Q.    Did you -- was that something that you were tasked with helping or with

MACEDONIO - CONFIDENTIAL

assisting with?

A.    I'm not sure.

Q.    Did you -- since you started working on the Zohar fund project, have you provided information to noteholders allowable under the indentures?

A.    Not that I can recall.

Q.    But you have had communications with the noteholders; is that correct?

A.    The -- yes.

Q.    And what types of communications have you had with them?  What is the nature of those communications?

A.    There has been instances where they've asked to see the waterfall that occurred, and we directed U.S. Bank to post it on their website or send it to them.

Q.    Anything else that comes to mind?

A.    Not that I can recall.

Q.    Next is "Organize files as agent and collateral manager in compliance with A&M retention policies."

MACEDONIO - CONFIDENTIAL

Do you see that?

A.    I do.

Q.    And what are the A&M retention policies referred to there?

A.    I'm not certain.

Q.    Do you know whether there were specific retention policies put in place for the Zohar fund matter?

A.    I know there was a, like, document prevention -- document that we had to sign to --

Q.    Like a litigation hold?

A.    -- preserve -- correct.  Yes. Litigation hold.

Q.    But in terms of a document setting forth policies for organizing files, are you aware of anything of that nature?

A.    No.

Q.    And then there's a bullet that says, "Field calls from prospective interest investors."

Do you see that?

A.    I do.

Page 197

MACEDONIO - CONFIDENTIAL

Q.   Did you have any responsibility in fielding calls from prospective interested investors?

A.   I did not.

Q.   Do you know who had responsibility for that?

A.   I do not.

Q.   Do you know whether any calls were received from prospective interested investors?

MR. PICKHARDT:  Calls for speculation.

A.   I know some were received.

Q.   And would those be investors interested in portfolio companies or notes?

A.   Both.

Q.   And when you said you know that some were received, were those -- do you know some were received with respect to interest in portfolio companies?

A.   Yes.

Q.   And do you know what portfolio companies those were?

Page 198

MACEDONIO - CONFIDENTIAL

A.    I know of some, but --

Q.    Could you just let me know which ones you know about.

A.    Duro.

Q.    Duro?  D-U-R-O?

A.    Correct.

Q.    Any others?

MR. PICKHARDT:  What's the relevance of this line of questioning?

MS. O'BOYLE:  A task that he knows about at --

MR. PICKHARDT:  But he didn't have any involvement in this.

MS. O'BOYLE:  So he can tell me what information he knows, and then I can ask the people --

BY MS. O'BOYLE:

Q.    Who -- do you know who fielded those calls?

A.    I don't know.

Q.    Who told you about those calls?

A.    That was with discussions with counsel.

MR. PICKHARDT:  Okay.  I'm going

Page 199

MACEDONIO - CONFIDENTIAL

to instruct him not to answer --

Q.    Okay.  If you start telling me stuff that you learned from counsel, you don't have to answer.

Okay.  Can we turn to the next attachment.

Do you know who drafted this document?

A.    I do not.

Q.    Do you recall any discussions about this document?

A.    I do not.

Q.    When it says, "We cannot appropriately value companies based on the financials provided," who does the "we" refer to?

A.    I'm not certain.

Q.    Did you -- are you aware of any efforts to value companies that were based on the financials provided?

A.    I am not.

Q.    We can skip the next attachment.

MACEDONIO - CONFIDENTIAL

(Exhibit 20, An email dated May 10, 2016, ZOHAR-PPAS-00029602, was hereby marked for identification, as of this date.)

Q.    I'm marking as Exhibit 20 a document, ZOHAR-PPAS-00029602, and the last attachment ends in 29621.  This is an email from -- well, it's an email string, and the top email is from you to Thomas Cook.  And the title is "Forward interest wires updated."

There's a string of emails below it, which appear to be from -- between you and the individuals at U.S. Bank; is that correct?

Take your time to read through it.

A.    (Witness perusing document.)

Is this cut off here on the second page?  It looks like it just stops at No. 5.

Q.    Yeah.  This is -- this is -- this is, I think, how it was provided to us.

MACEDONIO - CONFIDENTIAL

A.     Oh, it was?

Q.     Yeah.  Because the Bates number, if it's consecutive, it's like -- it looks like the answer is almost a cut-and-paste, is what it appears.  But --

A.     Got you.

Q.     The question I'm going to ask is simply is this an example of interest wire information that was sent to you by the trustee?

A.     Yes.

Q.     And was this regularly sent to you?

A.     Yes.

Q.     Okay.  Are you aware that, in this lawsuit, A&M and the Zohar funds are alleging that PPAS improperly failed to obtain the consent of the Zohar funds for certain oral or course of performance amendments?

MR. PICKHARDT:  I'm going to instruct him not to answer to the extent his knowledge is based upon discussions with counsel.  If you have

Page 202

MACEDONIO - CONFIDENTIAL

independent knowledge of it, that's fine.

A.      I don't recall.

Q.      Are you aware of any oral or course of performance amendments allegedly made by PPAS at any time?

A.      I am not.

Q.      Are you aware of any events of default of which -- strike that.

MS. O'BOYLE:  I think we're done.  Just -- could we just go off the record quickly.

THE VIDEOGRAPHER:  We are now off the record.  The time on the video monitor is 3:24 p.m.

(Recess)

THE VIDEOGRAPHER:  We are now on the record.  The time on the video monitor is 3:28 p.m.

MS. O'BOYLE:  I have no further questions.

(Continued on the next page to allow for signature line and jurat.)

**Page 203**

MACEDONIO - CONFIDENTIAL

MR. PICKHARDT:  We have no questions.

MS. O'BOYLE:  Thank you for your time.

THE WITNESS:  Thank you.

THE VIDEOGRAPHER:  Okay.  We are now off the record.  The time on the video monitor is 3:28 p.m.

(TIME NOTED:  3:28 p.m.)


_____
THOMAS MACEDONIO



_____
Subscribed and sworn to before me this _____ day of _____, 2017.
_____
Notary Public

Page 204

I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---------|----------------|------|
| THOMAS MACEDONIO | MS. O'BOYLE | 5 |

E X H I B I T S

| MACEDONIO | DESCRIPTION | PAGE |
|-----------|-------------|------|
| Exhibit 1 | An email dated March 30, 2016, Bates ZOHAR-PPAS-00058231 | 50 |
| Exhibit 2 | An email dated June 14, 2016, Bates ZOHAR-PPAS-0002784 | 62 |
| Exhibit 3 | A credit agreement, Bates PPAS-SDNY-00010928 | 75 |
| Exhibit 4 | An email dated June 14, 2016, Bates ZOHAR-PPAS-00002863 | 79 |
| Exhibit 5 | An email dated March 28, 2016, Bates ZOHAR-PPAS-00028575 | 81 |
| Exhibit 6 | An email dated July 26, 2016, Bates ZOHAR-PPAS-00006605 | 87 |
| Exhibit 7 | An email dated July 25, 2016, Bates ZOHAR-PPAS-00010307 | 90 |
| Exhibit 8 | An email dated July 25, 2016, Bates ZOHAR-PPAS-00006674 | 101 |

**Page 205**

I N D E X(Cont'd)

E X H I B I T S

| MACEDONIO | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 9 | An email dated May 4, 2016, Bates ZOHAR-PPAS-00012525 | 109 |
| Exhibit 10 | An email dated May 5, 2016, Bates ZOHAR-PPAS-00012570 | 114 |
| Exhibit 11 | An email dated July 26, 2016, Bates ZOHAR-PPAS-00000917 | 117 |
| Exhibit 12 | An email dated May 10, 2016, Bates ZOHAR-PPAS-00026166 | 125 |
| Exhibit 13 | Limited Liability Company Agreement, Bates ZOHAR-PPAS-00032945 | 129 |
| Exhibit 14 | An email dated March 25, 2016, Bates ZOHAR-PPAS-00036907 | 133 |
| Exhibit 15 | An email and attachment, Bates ZOHAR-PPAS-00000701 | 150 |
| Exhibit 16 | An email and attachment, Bates ZOHAR-PPAS-0030409 | 157 |
| Exhibit 17 | An email and attachment, Bates ZOHAR-PPAS-00017192 | 167 |

**Page 206**

I N D E X(Cont'd)

**E X H I B I T S**

| MACEDONIO | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 18 | Zohar II Status Update, Bates ZOHAR-PPAS-0005911 | 171 |
| Exhibit 19 | An email and attachment, Bates ZOHAR-PPAS-00010404 | 184 |
| Exhibit 20 | An email dated May 10, 2016, ZOHAR-PPAS-00029602 | 200 |

CERTIFICATION

I, SHARON LENGEL, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 3rd day of October, 2017.

_____

SHARON LENGEL, RPR, CRR

*       *       *

Page 208

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: PATRIARCH PARTNERS AGENCY v.
ZOHAR CDO 2003-1
DATE OF DEPOSITION: September 28, 2017
WITNESS' NAME: THOMAS MACEDONIO

| PAGE/LINE(S)/ | CHANGE | REASON |
|---|---|---|
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |

_____
THOMAS MACEDONIO
SUBSCRIBED AND SWORN TO
BEFORE ME THIS_____DAY
OF_____, 2017.
_____
NOTARY PUBLIC

MY COMMISSION EXPIRES_____

**Exhibit B**

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
16 Civ. 4488 (VM) (KHP)
- - - - - - - - - - - - - - - - - - - -x

PATRIARCH PARTNERS AGENCY
SERVICES, LLC,

Plaintiff-Counterclaim-
                    Defendant,
        -against-
ZOHAR CDO 2003-1, LTD., ZOHAR II 2005-1,
LTD., and ZOHAR III, LTD.,

                    Defendants-Counterclaim-
                    Plaintiffs,
        -and -
ZOHAR CDO 2003-1, LLC, ZOHAR 11 2005-1,
LLC, ZOHAR III, LLC, ALVAREZ & MARSAL
ZOHAR MANAGEMENT, LLC, and
ALVAREZ & MARSAL ZOHAR AGENCY
SERVICES, LLC,

                    Defendants.
- - - - - - - - - - - - - - - -x

**Key**
PPAS Designation

Trust Designation

                October 6, 2017
                10:07 a.m.

            ** CONFIDENTIAL **

            Videotaped Deposition of
CHRISTOPHER COVER, taken by
Defendants-Counterclaim-Plaintiffs,
pursuant to Notice, held at the offices
of GIBSON DUNN & CRUTCHER LLP, 200 Park
Avenue, New York, New York, before
SHARON LENGEL, a Registered Professional
Reporter, Certified Realtime Reporter, and
Notary Public of the State of New York.
            *       *       *

A P P E A R A N C E S:

   GIBSON DUNN & CRUTCHER LLP
      Attorneys for Plaintiff-Counterclaim-Defendant
      200 Park Avenue
      New York, New York 10166

   BY:  LAURA KATHRYN O'BOYLE, ESQ.
      GENEVIEVE B. QUINN, ESQ.

   QUINN EMANUEL URQUHART & SULLIVAN, LLP
      Attorneys for Defendants-Counterclaim-Plaintiffs
      51 Madison Avenue
      New York, New York 10010

   BY:  JONATHAN E. PICKHARDT, ESQ.

   ALSO PRESENT:

      Lee Bowry, Videographer

      Samantha Weiss, Intern

      *    *    *

Page 3

COVER - CONFIDENTIAL

THE VIDEOGRAPHER:  Good morning. We are going on the record at 10:07 a.m. on October 6, 2017.  Please note that the microphones are sensitive and may pick up whispering, private conversations, and cellular interference.  Please turn off all cellphones or place them away from the microphones, as they can interfere with the deposition audio.  Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Christopher Cover in the matter of Patriarch Partners Agency Services LLC versus Zohar CDO 2003-1 Limited, et al, filed in the United States District Court, Southern District of New York, Index No. 16-CIV-4488VMKHP. This deposition is being held at Gibson Dunn & Crutcher LLP located at 200 Park Avenue, New York, New York.

Page 4

COVER - CONFIDENTIAL

My name is Lee Bowry from the firm of Veritext New York, and I am the videographer. The court reporter is Sharon Lengel, also with Veritext New York. I am not authorized to administer an oath. I am not related to any party in this action, nor am I financially interested in the outcome.

Counsel and all present in the room will now state their appearances and affiliations for the record. If there are any objections to proceeding, please state them at the time of your appearance, beginning with the noticing attorney.

MS. O'BOYLE: Laura O'Boyle with the law firm of Gibson Dunn & Crutcher representing Plaintiff Patriarch Partners Agency Services LLC.

MS. QUINN: Genevieve Quinn with the law firm of Gibson Dunn & Crutcher representing Plaintiff Patriarch Partners Agency Services LLC.

MS. WEISS: Samantha Weiss of

Page 5

COVER - CONFIDENTIAL

the law firm of Gibson Dunn & Crutcher representing Plaintiff Patriarch Partners Agency Services LLC.

MR. PICKHARDT:  John Pickhardt, Quinn Emanuel Urquhart & Sullivan, on behalf of the defendants and counterclaim-plaintiffs Zohar Funds and Alvarez & Marsal entities.

THE VIDEOGRAPHER:  Will the court reporter please swear in the witness.

C H R I S T O P H E R  C O V E R, having first been duly sworn by Sharon Lengel, the Notary Public, was examined and testified as follows:

EXAMINATION

BY MS. O'BOYLE:

THE VIDEOGRAPHER:  Thank you. We may proceed.

Q.    Good morning, Mr. -- is it Cover or Cover?

A.    Cover.

Q.    Good morning.  Have you ever

Page 6

COVER - CONFIDENTIAL

been deposed before?

A.    I have not.

Q.    I'm going to just go over a few ground rules, which I imagine Mr. Pickhardt has covered with you.

You'll see that the court reporter is transcribing everything you say today.  That means you have to answer all your questions verbally.  She doesn't transcribe or can't transcribe nods and "uh-huhs" and "ums."  Even though I'm guilty of "ums," I'm going to practice not doing it.

Mr. Pickhardt may object to some of my questions.  I will let him object. At the conclusion of his objection, You should still answer the question unless he instructs you not to answer.  If you don't understand a question, you can ask me to rephrase it.  I will do my best to do so. You are welcome to take a break at any time.  I will work to kind of take regular breaks throughout the deposition today.  I do understand that you need to leave

Page 7

COVER - CONFIDENTIAL

around 3:30 today.

A.    That would be great.

Q.    We will do our best to do this efficiently and get you out of here as quickly as possible, hopefully by 3:30, and we will check in with Mr. Pickhardt at lunch to see what we can do to make this smooth and get you out of here as quickly as possible.

If you want to take a break, just let me or Mr. Pickhardt know.  My only request is that, if a question is pending, you finish the question before you take a break, unless there is a question relating to privilege that you need to discuss with your counsel.

Do you have any questions for me before we proceed?

A.    No.

Q.    Okay.  What did you do to prepare for this deposition?

A.    I met with our counsel yesterday.

Q.    And you are indicating

Page 8

COVER - CONFIDENTIAL

Mr. Pickhardt.

Q.    Did you meet with anyone else at Quinn Emanuel?

A.    Yes, with Ellie Merkel and Brian Campbell.

Q.    And approximately how long did that meeting last?

A.    Three, four hours.

Q.    And was that the only meeting you had with counsel to prepare for this deposition?

A.    Yes.

Q.    Did you have any discussions with any of your colleagues of Alvarez & Marsal regarding this deposition?

A.    Not outside of "good luck."

Q.    They told you good luck.

Are you aware that your colleague, Mr. Macedonio, was deposed last week?

A.    Yes.

Q.    Did you -- have you spoken with Mr. Macedonio about the testimony he gave last week?

Page 9

COVER - CONFIDENTIAL

A.    No.

Q.    Have you reviewed the transcript of his deposition?

A.    No.

Q.    Did you review any documents yesterday with your counsel?

A.    Yes.

Q.    Approximately how many documents, if you recall?

A.    10, 10 to 20.

Q.    Did you take any notes yesterday?

A.    No.

Q.    Have you reviewed the complaint that Patriarch Partners Agency Services filed in this action?

MR. PICKHARDT:  Are you asking him outside of what he did in preparation?

Q.    Sure.  Have you -- outside of preparation, have you reviewed the complaint filed in this action?

A.    I don't recall.

Q.    Outside your preparation, have

COVER - CONFIDENTIAL

you reviewed the counterclaim that Alvarez
& Marsal and the Zohar Funds filed in this
action?

A.    I don't recall.

Q.    Can you walk me through your
educational background, starting with
college.

A.    Sure.  I went to Pennsylvania
State University, studied accounting,
graduated from Penn State with a
bachelor's in accounting and also a
master's in accounting.

Q.    You received those both in the
same year?

A.    Yes, both in the same year,
technically, though it was a -- almost
like a four-plus-one program.

Q.    Okay.  So you were at Penn State
for five years.

A.    Correct.

Q.    And do you hold any professional
licenses?

A.    I am a certified public
accountant in New York State.

Page 11

COVER - CONFIDENTIAL

Q.    And is your certification current?

A.    Yes.

Q.    And can you walk me briefly through your employment history starting with your post-college employment.

A.    After Penn State, I started with KPMG LLP here in New York.  I worked in their -- primarily in their financial due diligence group, and spent about two years there and moved on to Alvarez & Marsal.

Q.    Did you focus on any specific category of companies when you were at KPMG?

A.    Primarily focused in middle market M&A diligence for private equity companies as our clients.

Q.    So the private equity funds were your clients.

A.    Correct.

Q.    And you were performing diligence on middle-market companies.

A.    Correct.

Q.    Did you perform diligence on any

Page 12

COVER - CONFIDENTIAL

distressed companies while you were at KPMG?

A.   I suppose it would depend on the definition of distressed, but certainly companies that had financial troubles.

Q.   And these were companies that your private equity companies were interested in acquiring?

A.   Correct, or selling potentially.

Q.   So you performed financial due diligence on companies that your clients were interested in selling as well as buying.

A.   Correct.

Q.   What would be the nature of the due diligence you would conduct when your client was interested in selling a company?

A.   It --

MR. PICKHARDT:   I'm going to -- what's the -- what's the relevance of this to this matter?

MS. O'BOYLE:   He's -- my understanding -- I can lay the

COVER - CONFIDENTIAL

foundation if you would like -- is that he similarly was performing diligence or analysis of companies for -- that were in the -- that are in the Zohar Funds portfolio.  So I'm trying to establish his experience doing so.

MR. PICKHARDT:  Okay.  And what's the relevance of that to the issues concerning PPAS?

MS. O'BOYLE:  You have alleged in this case that PPAS has not provided financial statements necessary to perform due diligence. So I am trying to establish what his experience is, what the documentation is that he needs to perform that diligence.

MR. PICKHARDT:  We have alleged that they have not provided financial statements that were contractually required.  I don't know that's -- you know, his history -- he's not here as an expert.  I'm not sure that his

COVER - CONFIDENTIAL

experience -- prior experience with respect to what he did on due diligence in respect of selling companies has any relevance to this proceeding.

MS O'BOYLE:  Are you instructing him not to answer?

MR. PICKHARDT:  I am.

MS. O'BOYLE:  Okay.

MR. PICKHARDT:  If you get into this in another way later when you're asking him about what he's done in connection with the agency, and it becomes relevant there, we can revisit it.  But at this point, I don't see there being any relevance to this matter.

MS. O'BOYLE:  So just to be clear, you're arguing that what A&M might do with financial information it receives from Patriarch or PPAS is not relevant to this action.

MR. PICKHARDT:  If you want to get into those questions, then we can

Page 15

COVER - CONFIDENTIAL

revisit this at that point. I'm not -- you know, as an abstract matter, I'm not sure I see the relevance of that. But if you want to get into Mr. Cover's current experience, and somehow there is a reasonable connection to -- you know, for him, his experience with respect to what he did on due diligence in selling companies to PPAS and Alvarez & Marsal Zohar Agency Services, you know, I'm happy to revisit this. But right now, he's not here as an expert. And I'm not going to have him testify as to what he did in respect to due diligence on selling companies, because I don't see the connection.

MS. O'BOYLE: I just want to make the record clear. It's my understanding that you've alleged in this case that PPAS did not provide sufficient financial information or acquired financial information, and that because of that, you are not able

Page 16

COVER - CONFIDENTIAL

to perform -- or A&M was not able to perform certain analyses that it needed to do to perform its duties as collateral manager.

I am asking generally.  I'm not asking about specific companies.  I have not asked about anything more than just his general experience performing that prior to joining Alvarez & Marsal, which I believe is not asking him to become an expert. It's relevant because it is a comparison point, I believe, for -- or it is relevant to, you know, whether he can describe or state his belief as to now, as to whether he currently has sufficient information to perform analyses at Alvarez & Marsal.  I'm not asking him about specific companies. I've asked him generally.  We can move on and revisit this later.

MR. PICKHARDT:  Okay.  Well, I'll tell you what.  I'll give you a little bit of latitude with respect to

Page 17

COVER - CONFIDENTIAL

a couple of questions in this area. But if we get into great detail, I'm going to instruct him not to answer. So if you want to re-ask the question, I'll give you a little bit of latitude.

MS. O'BOYLE:  I have to go back up to find it.

BY MS. O'BOYLE:

Q.    I asked what would be the nature of the due diligence that you would conduct when your client was interested in selling a company.

A.    I don't recall specific details of my work when they were selling, though I could speculate on what my client might want.

Q.    I'm not asking you to speculate. When you were performing due diligence in connection with a client interested in selling a company, were you reviewing financial information about that company?

A.    Yes.

COVER - CONFIDENTIAL

Q.    Were you preparing spreadsheets and data books and work books about such companies?

A.    Sure.

Q.    And what was the purpose of preparing such data books and work books about such companies?

A.    To not only understand the health of the company but to also review the accuracy of the accounting and finances.

Q.    Okay.  And what was your title at KPMG?

A.    I was an associate.

Q.    And when you left, you were still an associate?

A.    Correct.

Q.    And what prompted you to leave KPMG?

A.    It was work-life balance.

Q.    I hear you.

And did you join Alvarez & Marsal right after leaving KPMG?

A.    I did.

Page 19

COVER - CONFIDENTIAL

Q.    And what was your title at Alvarez & Marsal when you started?

A.    Senior associate.

Q.    And were you assigned to a specific group at Alvarez & Marsal?

A.    Yes.

Q.    What group was that?

A.    The transaction advisory group.

Q.    And are you currently a senior associate?

A.    Yes.

Q.    Sorry.  Just so I have the dates correct, when did you join Alvarez & Marsal?

A.    It was May 2015.

Q.    May 2015?

A.    Yes.  Around then.

Q.    Okay.

A.    May, June, something like that.

Q.    Generally speaking, what are your responsibilities as a senior associate in the transaction advisory group?

A.    Generally, it's a similar group

Page 20

COVER - CONFIDENTIAL

that I worked in at KPMG, so middle market M&A diligence, and senior associates are typically the employees on the ground, compiling all the data, pulling together analyses, understanding general trends, and then reporting that to a senior member on the team.

Q.    And how many -- how many clients do you currently perform work for?

A.    Can you be more specific?

Q.    Do you currently work -- you currently work on matters relating to the Zohar Funds; correct?

A.    Correct.

Q.    Other than matters relating to the Zohar Funds, are you currently working on any projects?

A.    Yes.

Q.    How many other projects?

A.    At this point in time?

Q.    Yes.

A.    Three.

Q.    And when did you start working on the Zohar Fund projects?

Page 21

COVER - CONFIDENTIAL

A.    It would have been March 2016.

Q.    And did someone at A&M assign you to work on those projects, the Zohar Fund projects?

A.    I'm not sure.

Q.    How did you come to start working on the Zohar Fund projects?

A.    I received a phone call that said are you available to work on this project.

Q.    And who placed that phone call to you?

A.    Senior member of the transaction advisory group.

Q.    And who was that senior member?

A.    Anthony Capporino.

Q.    Has he ever worked on the Zohar Funds project?

A.    No.

Q.    When you joined the Zohar Fund project in March 2016, were you working on any other matters?

A.    Yes.

Q.    Did you continue to work on

Page 22

COVER - CONFIDENTIAL

those matters once you took on the Zohar

Fund projects in March of 2016?

A.    I don't recall.

Q.    From, say, March 2016 through

July 2016, what percentage of your time

was devoted to matters relating to the

Zohar Funds?

A.    I don't recall that either.

Q.    Was it a majority of your time?

Minority of your time?

A.    I would expect majority.

Q.    So more than 50 percent.

A.    Now we're putting percent on it.

Yes.

Q.    And who do you currently report

to on the Zohar Fund matters?

A.    Liz LaPuma.

Q.    And have you reported to

Ms. LaPuma throughout your time working

okay the Zohar Fund matters?

A.    Yes.

Q.    And is there any other employees

of A&M that are senior -- that are

currently on the Zohar Fund projects that

COVER - CONFIDENTIAL

are senior to you?

A.   Currently, no.

Q.   Is Mr. Marsal a member of the Zohar Fund team?

A.   Yes.

Q.   Is he senior to you?

A.   Yes.

Q.   Wasn't a trick question.

A.   Apparently, I thought it was.

Q.   Is there anyone junior to you that is currently working on the Zohar Fund projects?

A.   By title, yes.

Q.   And who is that?

A.   Thomas Macedonio.

Q.   Other than Ms. LaPuma and Mr. Macedonio, Mr. Marsal, is there anyone else currently working on Zohar Fund matters, to your knowledge?

A.   To my knowledge, not at this time.

Q.   Do any of the other matters that you currently work on involve distressed companies?

COVER - CONFIDENTIAL

MR. PICKHARDT:  I'm going to caution the witness here.  He can answer that "yes" or "no."  But if we're getting into other projects, we're going to have to be very careful, as there obviously are potentially client confidentiality issues.

MS. O'BOYLE:  Understood.

A.    Yes.

Q.    And are you -- do those -- is your work on those projects related to purchasing or selling distressed companies?

A.    No.

Q.    Can you describe generally what the work on those projects with distressed companies is without revealing the specific nature of the client or anything that would implicate client confidentiality?

A.    It is a -- it's government performance improvement-type work.

Q.    Okay.  And you track the time

Page 25

COVER - CONFIDENTIAL

that you work on the Zohar Fund matters; is that correct?

A.    That's correct.

Q.    And do you enter your time every day or is it every week?  Or every month?

A.    Every -- every day, though it's submitted once a week.

Q.    And my understanding is that there's five separate billing codes for the Zohar Fund matters.

Is that your understanding as well?

A.    That's my understanding.

Q.    And do you bill time to each of those codes or have you over time billed to each of those codes?

A.    I believe I've only billed to four of them.

Q.    And that would be the general code and the code for each of the three funds?

A.    That's correct.

Q.    Were you involved in any way in the engagement of the Zohar Fund as a

COVER - CONFIDENTIAL

client for Alvarez & Marsal?

A.    No.

Q.    Going back to March 2016, can you describe the type of work you were performing at the inception of the engagement of Alvarez & Marsal by the Zohar Funds.

A.    I don't recall specifics.

Q.    Do you recall generally?

A.    Generally understanding the information we have received up to that point.

Q.    And did that involve reviewing documents that you had received from the Zohar Funds?

A.    Sure.

Q.    Any other types of task you recall performing in the kind of early stages of the engagement?

A.    Not at that time.

Q.    Did you prepare any analyses for -- of the companies?

A.    Of the --

Q.    Sorry.

COVER - CONFIDENTIAL

MR. PICKHARDT:  Objection to the form.

Q.   The portfolio companies that -- for which the Zohar Funds helped out.

MR. PICKHARDT:  Objection. Vague as to analyses.

Q.   Do you understand what I mean by "analyses"?

A.   I don't, no.

Q.   Did you review information about the portfolio companies and prepare any type of summary or spreadsheet compiling that data?

A.   What kind of information?

Q.   Did you ever review credit agreements?

A.   Yes.

Q.   Did you ever review financial statements and documents?

A.   At that time, I'm not sure.

Q.   But at some point, you -- during your work on the Zohar Fund matters, you have reviewed --

A.   Sure.

Page 28

COVER - CONFIDENTIAL

Q.      -- such information.

A.      Yes.

Q.      And what did you do or did you do anything or did you prepare any summaries after you reviewed the credit agreements?

A.      We did, yes.

Q.      And did you play a role in creating those summaries?

A.      Yes.

Q.      And did you prepare any summaries after reviewing the financial statements and information that you've reviewed?

A.      I'm not sure of the time period, but at some point.

Q.      At some point, you did.

I understand that Aileen Daversa is no longer at Alvarez & Marsal.

But prior to her departure, did you work with her on Zohar Fund matters?

A.      Yes.

Q.      Was she senior to you, junior to you, your level?

Page 29

COVER - CONFIDENTIAL

A.    Again, by title, she was senior in the transactions group.

Q.    Did you report to her?

A.    On what matters 1234.

Q.    On Zohar Fund matters.

A.    No.

Q.    Are you familiar with an entity called Alvarez & Marsal Zohar Agency Services?

A.    I am.

Q.    And if I refer to that entity as AMZAS in my questioning, will you understand what I'm referring to?

A.    Yes.

Q.    Did Ms. Daversa perform any work related to AMZAS?

A.    I don't recall.

Q.    Did you perform any work relating to AMZAS?

A.    Yes.

Q.    Did Mr. Marsal perform any work relating to AMZAS?

A.    I don't know.

Q.    Have you ever had any

COVER - CONFIDENTIAL

conversations with Mr. Marsal or in

Mr. Marsal's presence regarding AMZAS?

A.    I don't recall.

Q.    Did Ms. LaPuma do any work

related to AMZAS?

MR. PICKHARDT:  Objection.

Calls for speculation.  To the extent

you have personal knowledge, you can

answer.

A.    I would have to speculate.

Q.    I don't want you to speculate.

A.    I don't know.

Q.    Have you ever had any

conversations with Ms. LaPuma about AMZAS?

A.    Again, I don't recall any

specifics, but I could speculate.

Q.    I don't want you to speculate.

So you're telling me you don't

recall having any conversations with

Ms. LaPuma -- you can't answer that

question without speculating?

A.    Correct.

Q.    Okay.  Do you generally recall

having conversations and you just can't

COVER - CONFIDENTIAL

recall specific conversations, or do you not recall one way or another?

A.   I don't recall which entity it would have been.

Q.   And what other entity might it have been?

A.   We could have had discussions regarding AMZM.

Q.   And that is Alvarez & Marsal Zohar Management?

A.   Correct.

Q.   Are you an employee of Alvarez & Marsal Zohar Management?

A.   No.

Q.   Are you an employee of AMZAS?

A.   No.

Q.   Do you know whether AMZAS has any employees?

A.   I do not know.

Q.   Do you know whether Alvarez & Marsal Zohar Management has any employees?

A.   I do not know.

Q.   Are you aware of anyone -- any other individuals other than the

Page 32

COVER - CONFIDENTIAL

individuals I've named who may have done work for AMZAS or work related to AMZAS?

MR. PICKHARDT:  Objection. Calls for speculation.

MS. O'BOYLE:  I'm asking whether he's aware of anyone.  It's not asking for speculation.

A.    I don't recall.

Q.    What work do you recall performing relating to AMZAS?

A.    Specifically -- I don't recall any specific tasks.

Q.    Do you recall any general tasks?

A.    Potentially calculating interest due.

Q.    And this was interest due from the portfolio companies to the Zohar Funds?

A.    Correct.

Q.    Any other tasks?

A.    Not that I can think of.

Q.    Do you know when AMZAS was formed?

A.    I do not.

Page 33

COVER - CONFIDENTIAL

Q.    Were you involved in any way in the formation of AMZAS?

MR. PICKHARDT:  Objection. Vague as to formation.  You're talking about literally the corporate formation.

Q.    Sure.

Did you draft any of the corporate formation documents for AMZAS?

A.    I believe I assisted with some of the administrative.

Q.    Did anyone work with you on the administrative tasks that you are recalling?

A.    Outside of internal counsel, I don't recall.

Q.    And this is counsel at Alvarez & Marsal.

A.    Correct.

Q.    And what are the names of those -- those individuals?

A.    Dan Feigenbaum is one, Joel Poretsky is another, and Kevin K.

Q.    Do you recall when you worked

COVER - CONFIDENTIAL

with these individuals --

A.    I do not.

Q.    -- on administrative tasks?

A.    I do not.

Q.    Was it at some point after March 2016?

A.    Yes.

Q.    Was it sometime in 2016?

A.    Yes.

Q.    Did someone tell you to do these administrative tasks?

A.    I don't -- I don't recall.

Q.    How did you -- how did you know that you should start working on administrative tasks related to AMZAS?

A.    I would assume I was directed.

Q.    But you don't recall who directed to you do that.

A.    Correct.

Q.    Did you track your time spent working on matters separately on matters relating to AMZAS?

A.    I don't believe so.

Q.    Do you know whether there's any

Page 35

COVER - CONFIDENTIAL

billing code for AMZAS?

A.    I don't know the answer to that.

Q.    But you've never billed time to a separate code; is that correct?

A.    I don't believe so.

Q.    Do you know whether AMZAS has its own bank account?

A.    Yes.

Q.    And do you know when -- sorry.

What bank -- do you know what bank that bank account is at?

A.    I believe it's JPMorgan.

Q.    And has it ever had any other bank accounts?

A.    I don't recall.

Q.    Do you know when the JPMorgan account was set up?

A.    I don't recall.

Q.    Did you perform any task related to establishing that bank account?

A.    I don't recall.

Q.    Do you know why JPMorgan was selected to be the bank at which AMZAS opened a bank account?

COVER - CONFIDENTIAL

MR. PICKHARDT:  Objection.

Calls for speculation.

Q.    I'm asking whether you know.

A.    I don't recall.

Q.    Do you think you knew at one point?

A.    Potentially.

Q.    Do you recall having discussions with anyone -- any of your colleagues at Alvarez & Marsal about AMZAS' bank account?

A.    I don't recall.

Q.    Do you recall having discussions with any -- any individuals outside A&M regarding AMZAS' bank account?

A.    I don't recall.

Q.    Are there any separate offices at A&M for AMZAS?

A.    No.

Q.    Are you familiar with an entity called Patriarch Partners Agency Services?

A.    Yes.

Q.    And generally speaking, what is your understanding as to what Patriarch

COVER - CONFIDENTIAL

Partners Agency Services is?

A.    My understanding is that they -- PPAS was the agent on the loans of the credit agreements to which the Zohar Funds are lenders.

Q.    And are you aware that, on or around June 14, 2016, A&M sent letters purporting to terminate PPAS as administrative agent?

A.    I am aware --

MR. PICKHARDT:  I think she's asking outside of whatever you did in preparation for your -- I think she's asking outside of whatever you did in preparation for your deposition were you aware of that event.

A.    Yeah.  I'm aware those letters went out.  The timeline is -- I don't recall.

Q.    Okay.  And just to be clear, if you -- if, in your discussions with counsel yesterday, your recollection was refreshed, you can testify about that. You don't have to tell me what you two

Page 38

COVER - CONFIDENTIAL

spoke about, but you don't have to cabin

off the information that you --

A.    Sure.

Q.    -- were refreshed about

yesterday.

A.    Yeah.

Q.    Were you involved in drafting

those letters?

A.    I don't recall.

Q.    Do you recall seeing copies of

those letters before they went out?

A.    I don't recall.

Q.    Do you know who was involved in

drafting those letters, if it wasn't you?

MR. PICKHARDT:  Objection.

Calls for speculation.

A.    I don't recall.

Q.    Do you recall discussing those

letters with anyone else at Alvarez &

Marsal?

A.    I do not.

Q.    Do you recall knowing prior to

June 14, 2016, that Alvarez & Marsal was

going to seek to terminate PPAS as

COVER - CONFIDENTIAL

administrative agent?

A.     I don't recall the timeline.

Q.     Okay.

MS. O'BOYLE:   Can we mark as an Exhibit 21.

(Exhibit 21, AMZM's Responses and Objections to Plaintiff Patriarch Partners Agency Services LLC's First Set of Interrogatories, was hereby marked for identification, as of this date.)

Q.     I've marked as Exhibit 21 a document entitled "AMZM's Responses and Objections to Plaintiff Patriarch Partners Agency Services LLC's First Set of Interrogatories."

Mr. Cover, have you seen this document before?

A.     (Witness perusing document.)

I don't -- I don't recall.

Q.     There's certain portions of this document that are highlighted.  That highlighting was not in the version that was produced by your counsel.  But it's

COVER - CONFIDENTIAL

highlighted so that we can draw your attention to certain portions of it.

If you turn to page 8 -- I'm sorry.  Let's start at page 6.  You'll see at the top of that page, your name is listed.

Do you see that?

A.    I do.

Q.    Okay.  And, now, if you turn to page 8, if you look at that last portion that was highlighted, it says, "All persons listed in response to Interrogatory No. 1 were informed in advance of the decision to terminate PPAS as administrative agent."

Do you see that?

A.    I do.

Q.    Do you have any reason to believe that that statement is not true?

A.    I have no reason.

Q.    So you believe that it is likely that you were informed prior to June 14, 2016, that PPAS was going to be -- or that AMZM was going to seek to

Page 41

COVER - CONFIDENTIAL

terminate PPAS as administrative agent.

A.   That is likely, yeah.

Q.   Okay.  While we're looking at this document, can you turn back to page 6.  And you'll see there's a category that says "Third Parties" about a third of the way down the page.

Do you see that?

A.   Yes.

Q.   Have you had any discussions with Matt Mach about PPAS or AMZAS?

A.   I have not.

Q.   Do you know whether anyone at A&M has had discussions with Matt Mach about PPAS or AMZAS?

MR. PICKHARDT:  Objection to the extent it calls for speculation.

Q.   I'm asking whether you know.

A.   I do not know.

Q.   Have you had a discussions with George Lyons about PPAS or AMZAS?

A.   I don't know.

Q.   You don't recall?

A.   I don't recall.

Page 42

COVER - CONFIDENTIAL

Q.    Okay.  To make this go faster, because there's a number of third parties listed here, I'm just going to ask you to review the names to yourself, and if you -- if, upon reviewing those names, you recall speaking to any of those individuals about PPAS or AMZAS, could you identify it for the record.

MS. O'BOYLE:  And let the record reflect that he's reading the individuals listed in the "Third Parties" section of the response to Interrogatory No. 1, which starts on page 6 and ends at the top of page 8.

A.    (Witness perusing document.)
I don't recall having any conversations directly with any of these individuals.

Q.    Do you recall -- you said "directly."
Is there a distinction you're making -- do you recall indirectly having conversations or learning of conversations with any of these individuals?

Page 43

COVER - CONFIDENTIAL

A.     I don't -- I don't recall learning of any conversations regarding PPAS.

Q.     So I take it by that answer you don't know whether anyone at A&M had conversations with any of these individuals about PPAS or AMZAS.

A.     I don't recall any, no.

Q.     Is there anyone at A&M that was tasked with the primary responsibility for issues relating to AMZAS and the purported termination of PPAS?

MR. PICKHARDT:  Objection. Calls for speculation.

Q.     Do you know whether there was anyone at A&M that was tasked with that responsibility?

A.     I don't believe so.

Q.     You don't believe anyone was tasked with that responsibility or you don't --

MR. PICKHARDT:  He answered he doesn't believe he knows.

MS. O'BOYLE:  That's what I was

COVER - CONFIDENTIAL

asking.

Q.    You don't believe you know or you don't believe anyone was tasked with that responsibility?

A.    Yeah.  I don't believe I know the answer to that.

Q.    Do you think there's anyone at A&M who has more knowledge than you have regarding AMZAS or the termination of PPAS?

A.    I could speculate.

Q.    Sure.  I'm going to ask you to speculate, because you know very little and Mr. Macedonio has known very little.

So I'm wondering if there's anyone at A&M who has more knowledge or who you think may have more knowledge about PPAS or the termination of PPAS?

A.    The senior member -- members of the team.

Q.    And that would be Ms. LaPuma?

A.    Mm-hmm.

Q.    And would that also include Mr. Marsal?

COVER - CONFIDENTIAL

A.    Potentially.

Q.    So did you participate in any discussions, personal discussions at A&M, outside of the presence of counsel, whether internal or external, about the purported termination of PPAS as administrative agent?

A.    I don't recall any outside of counsel.

Q.    Do you recall participating in such discussions inside -- or with the presence of counsel?

A.    Not specifically.

Q.    Do you generally recall having such discussions in the presence of counsel?

A.    I'm sure they took place.

Q.    And why are you sure they took place?

A.    We discuss most matters with our counsel.

Q.    And when you're referring to your counsel, you're referring to Quinn Emanuel, internal counsel or both or

Page 46

COVER - CONFIDENTIAL

someone else?

A.    In this situation, it could have been different -- different counsels.

Q.    And can you identify all the counsel that you may have had such discussions with.

MR. PICKHARDT:  Objection. Again, this is all under the category of you're asking him to speculate?

Q.    I'm just trying to get information.  Yes, at this point, I'm asking you to speculate.

A.    Yeah.  I could -- directly related to AMZAS --

Q.    Yes.

A.    -- I could speculate that would primarily be Quinn Emanuel.

Q.    And -- sorry.

A.    And maybe internal counsel.

Q.    Okay.  Did you play any role in the decision to attempt to terminate PPAS as administrative agent?

MR. PICKHARDT:  Objection to the form of the question.  Embedded in the

Page 47

COVER - CONFIDENTIAL

question is a legal assumption which is in dispute in this matter.  You're asking him whether he had any involvement in the decision to attempt to terminate.  As you know it's our position that the termination actually occurred.  I don't assume you're asking him to adopt your legal position.

Q.    I'm not asking you to adopt my legal conclusion.  And for the purpose -- to make the questioning go easier, I will endeavor not to use "purported" and "attempt to terminate," understanding that that's obviously the position of Patriarch Partners Agency Services in this litigation, and the way I formulate my questions won't be used against us in the future.  I'm sure Mr. Pickhardt agrees.

Did you play any role in the decision to terminate PPAS as administrative agent?

A.    I don't recall.

Q.    Do you know who made the

Page 48

COVER - CONFIDENTIAL

decision to terminate PPAS as administrative agent?

A.    I don't know the answer to that.

Q.    Do you -- do you know why the decision was made to terminate PPAS as administrative agent?

MR. PICKHARDT:  Objection. Calls for speculation.

Q.    Strike that.

Do you know why -- why A&M decided to terminate PPAS as administrative agent?

MR. PICKHARDT:  Same objection. Calls for speculation.

Q.    I'm asking whether he knows.

MR. PICKHARDT:  He's already said he doesn't have any involvement.

You can answer to the extent you're able to without speculating.

A.    Yeah.  I don't -- I don't believe I was included in that decisionmaking.

Q.    Have you ever had any conversations about whether PPAS was

COVER - CONFIDENTIAL

adequately performing its duties as administrative agent prior to its termination as administrative agent?

MR. PICKHARDT:  I'm instructing the witness, you can respond to that question but only insofar as those questions were outside the presence -- those discussions were outside the presence of counsel.

A.   I don't recall any specific conversations.

MS. O'BOYLE:  John, are you instructing him to exclude from his answer any discussions with counsel about that topic, or are you just advising him not to provide details of those discussions occurred in the presence of counsel?

MR. PICKHARDT:  If you are only asking him sort of yes-or-no questions, I'm okay with him answering it "yes" or "no" if he recalls it, and then -- but just answer it "yes" or "no," and then instructing him not to

COVER - CONFIDENTIAL

divulge the substance of any.

Q.    Okay.  In the presence of counsel, have you had any conversations about whether PPAS was adequately performing its duties as administrative agent prior to its termination?

A.    Yes.

Q.    And did those conversations occur prior to June 14th or after June 14th?

A.    I don't recall.

Q.    Did you play any role in the decision to have AMZAS appointed as the successor agent?

Again, I'm not using "purported," even though that's what we mean.

A.    I don't recall.

Q.    Do you know whether Alvarez & Marsal had ever served as an administrative agent before?

A.    I don't know the answer to that.

Q.    Do you know whether any other entities were considered for the role of

Page 51

COVER - CONFIDENTIAL

successor agent to PPAS?

A.     I don't know the answer to that either.

MS. O'BOYLE:  Should we take a short break?

MR. PICKHARDT:  Sure.

MS. O'BOYLE:  Okay.  We can go off the record.

THE VIDEOGRAPHER:  Going off the record.  The time is 10:56 a.m.  This is the end of Media Unit 1.

(Recess)

(Exhibit 22, An email chain, Bates ZOHAR-PPAS-00002784, was hereby marked for identification, as of this date.)

(Exhibit 23, An email chain, Bates ZOHAR-PPAS-00002863, was hereby marked for identification, as of this date.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 11:12 a.m. This is the beginning of Media Unit 2.

Page 52

COVER - CONFIDENTIAL

BY MS. O'BOYLE:

Q.    Mr. Cover, during the break, did you discuss the substance of your testimony with your counsel?

A.    I did not.

Q.    I'm going to mark the next two exhibits as Exhibits 22 and 23.

A.    Am I hanging on to the old one?

Q.    Yes.

So Exhibit 22 is a document -- a cover email and one attachment.  The cover email, there is the Bates No. 00 -- sorry -- ZOHAR-PPAS-00002784.  The attachment bears the Bates No. 2787 to 2788.

Exhibit 23 is a document.  The cover email bears the Bates stamp ZOHAR-PPAS-00002863, and the attachment bears the Bates No. 0002934 to 2935.

MS. O'BOYLE:  John, as with last week, these were emails that had a number of virtually identical attachments.  We are including one exemplar here.  It is a different

Page 53

COVER - CONFIDENTIAL

exemplar than last time.  So this should remain -- this should maintain a separate exhibit number.

MR. PICKHARDT:  Okay.

Q.   Let me know when you've had a chance to review these documents.

A.   (Witness perusing document.)

MR. PICKHARDT:  And I assume, similar to the representation you made last week, that the cover emails don't reflect Mr. Cover being a recipient. There's nothing else in the document that has been excerpted that suggests that he's a recipient; correct?

MS. O'BOYLE:  That's correct.

A.   (Witness perusing document.)

Okay.

Q.   Okay.  Have you seen either -- the attachments to either of the letters before?

A.   I believe so.  I'm not sure about these specific letters.

Q.   You've seen letters --

A.   Form.

Page 54

COVER - CONFIDENTIAL

Q.     -- of this form; correct?

A.     Correct.

Q.     And did you draft letters of this type?

MR. PICKHARDT:  Objection to form.

A.     I don't recall.

Q.     Do you recall seeing -- let's start with Exhibit 22.

Exhibit 22 is an email from Aileen Daversa to EBennett@WC.com.

Do you know who EBennett@WC.com is?

A.     I do.

Q.     And who is he?

A.     Ted Bennett.  He works at Williams & Connolly.

Q.     Okay.  And do you understand that Ted Bennett represents the portfolio companies?

A.     Some of them, yes.

Q.     Are there portfolio companies that you understand Mr. Bennett does not represent?

COVER - CONFIDENTIAL

A.    I don't recall.

Q.    You qualified your previous answer with "Some of them, yes."

Why did you do that?

A.    I'm unclear whether or not he does represent every single portfolio company in all three Zohars.

Q.    But you understand that he represents some of the companies.

A.    Yes.

Q.    Attached to the first letter -- sorry.  Attached to the first email is a letter entitled "Termination of Patriarch Partners Agency Services as agent"; is that correct?

A.    Exhibit --

Q.    I'm looking now at Exhibit 22.

A.    Okay.  Yes.  That's correct.

Q.    And if you look at the attachment, it's a letter addressed to RM Acquisition LLC.

A.    That is correct.

Q.    And do you know what RM Acquisition LLC is?

COVER - CONFIDENTIAL

A.   Can you be more specific?

Q.   Does RM Acquisition LLC mean anything to you?

A.   Sure.  It's a borrower of the Zohar Funds.

Q.   Okay.  And does RM -- is that an abbreviation for something?

A.   I don't believe so.  It has a different operating name, if that's what you mean.

Q.   Okay.  What is the operating name?

A.   Rand McNally.

Q.   So RM Acquisition is a borrower of the Zohar -- of the Zohar Funds; correct?

A.   Correct.

Q.   And this is a letter that is sent to RM Acquisition re termination of Patriarch Partners Agency Services; correct?

A.   It appears so.

Q.   And is it your understanding that letters similar to this were sent to

COVER - CONFIDENTIAL

other portfolio -- portfolio companies who were lenders of the Zohar -- sorry -- borrowers --

A.    Yes, I believe so.

Q.    -- of the Zohar Funds; correct?

And did you review these letters or -- any of these letters -- strike that.

Did you review letters to any of these portfolio companies prior to the time they were sent?

A.    I don't recall.

Q.    Do you know who drafted these letters?

A.    I don't recall.

Q.    Did you discuss these letters with anyone at A&M?

A.    Likely in combination with counsel --

Q.    Okay.

A.    -- if I did.

Q.    Who -- who at A&M would have participated in those conversations, if you recall?

MR. PICKHARDT:  I'm going to

COVER - CONFIDENTIAL

object.  He said likely in combination.  It sounds like he was speculating.  I mean, to the extent you have a recollection, that's fine.  But she's not asking you to speculate.

A.    Yeah.  I don't recall the exact process of getting these letters out.

Q.    Okay.  Can we mark as Exhibit 24 the privilege log that was prepared by your counsel in this case.

(Exhibit 24, A privilege log, was hereby marked for identification, as of this date.)

Q.    Have you seen this document before?

A.    I don't believe so.

Q.    Okay.  It's a long document.  I will direct you to certain entries on this document.  This is a privilege log that was produced by Quinn Emanuel on behalf of defendants in this case.  It identifies documents that were not produced but were relevant.  They were not produced because your counsel asserted that they were

Page 59

COVER - CONFIDENTIAL

privileged.

A.    Okay.

Q.    I'd like to direct your attention to Entry 72, so the entry with "72" on the side.

Do you see that?

A.    Yes.

Q.    And if you look at the headers on the top, trying to match them up, you'll see that this was an email that was sent by Ms. Daversa to Mr. Pickhardt, Ms. LaPuma, Mr. Macedonio, and yourself.

A.    Okay.

Q.    And then it lists the custodian as Ms. Daversa, and the description is "Email chain reflecting and requesting legal advice of counsel in anticipation of litigation re draft agent termination letters."

Do you see that?

A.    I do.

Q.    And then there's two entries following that, Entry 73 and 74, that say, "Attachment to prior email reflecting

COVER - CONFIDENTIAL legal advice of counsel in anticipation of litigation re draft agent termination letter."

A.     Okay.

Q.     And if you just take a minute and flip through the following few pages, you'll see a number of entries that include Ms. Daversa, yourself, and Mr. Macedonio in which the phrase "draft agent termination letter" appears in the description.

A.     I see that.

Q.     It continues for several pages. There are some other subject matters in some lines.  But if you'll flip through the next, say, 10 to 15 pages you'll see that there's a number of entries and attachments with the description "draft agent termination letter."

A.     Okay.

Q.     Does seeing this in any way refresh your recollection that you might have had conversations, whether inside or outside the presence of counsel, with

COVER - CONFIDENTIAL

Ms. Daversa and Mr. Macedonio regarding the agent termination letters?

MR. PICKHARDT:  I'm going to object to the form of the question. You're asking him to speculate right in the middle of your question, which --

MS. O'BOYLE:  I'm asking whether this document refreshes his recollection.  Where in there am I asking him to speculate?

MR. PICKHARDT:  You asked whether --

MS. O'BOYLE:  You need to stop with the constant objections about speculation.  You're trying to instruct -- give him guidance.  I'm asking him a direct question based on a document.  There is nothing in my question that asks him to speculate.

MR. PICKHARDT:  You asked him does it refresh his recollection that he might have had conversations.  If you're asking him whether he might

Page 62

COVER - CONFIDENTIAL

have had conversations, you're asking is it potential; could you have had a conversation. That by its nature is asking him to speculation. If you ask him does looking at this document, which he said he has never seen -- I don't know how that could refresh your recollection. But if you're asking him how -- if this refreshes his recollection that the conversation occurred, I'm fine with that. You have no objection to that. But if you're asking him if this refreshes his recollection as to whether something might have happened, that is by its nature asking for speculation.

BY MS. O'BOYLE:

Q. Does seeing this document refresh your recollection that you had conversations, whether inside or outside the presence of counsel with Ms. Daversa or Mr. Macedonio, regarding the agent termination letters?

A. It doesn't refresh my memory

**Page 63**

COVER - CONFIDENTIAL

about any conversations.

Q.    Does it refresh your recollection --

A.    I could speculate based on these emails.

Q.    I'm not asking you to speculate.

Does it refresh your recollection that you received emails from Ms. Daversa attaching drafts of the termination letters?

A.    Again, not specifically.

Q.    Okay.  I just want to be clear that this document shows dozens of communications and draft agent termination letters that you received on June 14, 2016.

Okay.  Now, turning back to Exhibit 22, the attachment to the document.

A.    Okay.

Q.    If you'll look at the second paragraph, and you'll look at the second sentence, it says, "Notwithstanding any provisions in the credit agreement that

Relevance

COVER - CONFIDENTIAL

may purport to make PPAS' appointment as agent irrevocable, basic principles of agency log give the Zohar Funds the right to terminate PPAS as agent upon reasonable notice."

Do you see that?

A.    I do.

Q.    Did you draft that sentence?

A.    I don't recall.

Q.    Do you recall seeing provisions in any credit agreements stating that PPAS' appointment as agent was irrevocable?

A.    I recall seeing provisions --

Q.    Do you recall --

A.    -- that state that.

Q.    Do you recall seeing those provisions before these letters were drafted?

A.    I don't -- I don't recall.

Q.    Do you recall having any discussions about those provisions?

A.    I don't recall.

Q.    So other than seeing the term or

Page 65

COVER - CONFIDENTIAL

seeing that certain credit agreements stated that PPAS' appointment as agent was irrevocable, you don't recall anything else about the language in those credit -- any other discussions about -- sorry. Strike that.

Did you create summaries of credit agreements?

Relevance

A.    I believe I assisted in creating them.

Q.    And in the summaries of credit agreements, did you identify specific terms in the credit agreements?

A.    Well, naturally, the loan summaries summarized the clauses in the credit agreement.

Q.    Did you identify -- do you recall identifying or calling out in these summaries any terms or provisions relating to the agent's appointment?

A.    I don't recall specifically what we put in each of those loan summaries.

Q.    Do you recall generally whether the loan summaries included any discussion

Page 66

COVER - CONFIDENTIAL

of the agent?

A.    They likely would have, as we were thorough.

Relevance

MS. O'BOYLE:  Can we mark as Exhibit 25 a document bearing the Bates No. ZOHAR-PPAS-00046442.  It has two attachments that go through 46444. Those attachments were produced in native form.  We have printed them out in large format here in the hopes that we can review these more clearly.

(Exhibit 25, An email chain, Bates ZOHAR-PPAS-00046442, was hereby marked for identification, as of this date.)

Q.    I'm going to be asking you questions about the second attachment behind there.

Take your time to look at the document, if you would like.

A.    (Witness perusing document.)

You said the second attachment?

Q.    Yes.  The one --

A.    Second --

Page 67

COVER - CONFIDENTIAL

Q.   -- that says at the top "Rand McNally 2014 Grand Thornton Audited Financial Statement."

Relevance

And I'm going to be focusing your attention the most on pages 2 and 4 of the document.  I'm not going to be asking you questions right now about the first page, although you're welcome to look at it, if that helps.

A.   (Witness perusing document.)

Q.   And take as much time as you need.  But I'm going to be asking you some specific questions, and I'm not going to ask you about every --

A.   Okay.

Q.   -- cell in here.

So if, after I've asked you the question, you want to take more time, that's fine.  But it might be easier if I --

A.   Okay.

Q.   -- ask them first.

Okay.  Just looking quickly at the cover email that these documents were

COVER - CONFIDENTIAL

attached to, this is an email from you to Ms. LaPuma on September 8, 2016, "Subject: Rand McNally information."  And the email states, "Financials and loan summary for your meeting tomorrow if things get this detailed."

Relevance

          Do you see that?

     A.    I do.

     Q.    Do you recall sending this email to Ms. LaPuma?

     A.    Not -- not specifically.

     Q.    Do you have any understanding as to what the meeting you referred to in this email is?

     A.    I do not.

     Q.    Do you recall whether Ms. LaPuma met with anyone from Rand McNally on or around September 8, 2016?

     A.    I don't know.

     Q.    Do you have any understanding as to why you were sending this information to Ms. LaPuma on or about September 8, 2016?

     A.    I don't know if that's the same

Page 69

COVER - CONFIDENTIAL

question.  But --

Q.    Well, I'm asking you that question now.

Relevance

A.    I don't recall.

Q.    That's my question.

Do you know -- do you recall why you were sending this information to Ms. LaPuma --

A.    I do not.

Q.    -- on September 8th?

So looking at the second attachment, page 2, the top of this spreadsheet says "Rand McNally Loan Document Summary Draft."

Do you see that?

A.    I do.

Q.    Was this a document that you prepared?

A.    I don't recall specific companies I worked on.

Q.    Were you assigned specific portfolio companies to analyze on the Zohar Fund engagement?

A.    Not me personally.

Page 70

COVER - CONFIDENTIAL

Q.   Did you analyze specific portfolio companies on the Zohar Fund engagement?

Relevance

A.   At various points in times, I may have.

Q.   Are you aware of other individuals on the Zohar Fund engagement being assigned specific portfolio companies to analyze?

A.   At which point in time?

Q.   Ever.

A.   It would have changed over time.

Q.   Did you review credit agreements related to the Rand McNally loans?

A.   At some point, I may have.

Q.   Did anyone else on the team to your knowledge review credit agreements related to the Rand McNally loans?

A.   I would have to speculate.

Q.   I'm not asking you to speculate.

A.   Then I don't recall.

Q.   Okay.  Let's look at Row 15 on this page.

A.   I'm sorry.  Which one?

**Page 71**

COVER - CONFIDENTIAL

Q.      Row 15, and it's on page 2. Relevance

A.      Okay.

Q.      If you kind of track it across, you know, it says "RM LLC."  It's the borrower obliger.  Patriarch Partners Agency Services as administrative agent. Zohar I, II, and III are the lenders. Amendment 6 is the amendment being discussed in this row.  The amendment date is 6/2/2011.  The nature of amendment is agent clauses.  And the amendment description is agent changes, no other material changes added irrevocably to agent position and removed surplus requirement for bank, 250 million in capital assets.

Do you see that?

A.      I do.

Q.      Do you recall looking at credit agreements or amendment to credit agreements, whether for Rand McNally or other portfolio companies in the Zohar Fund portfolio, that included the word "irrevocably" in the agent -- "irrevocably

Page 72

COVER - CONFIDENTIAL

appointed" in the agent provision?   Relevance

MR. PICKHARDT:  Objection. Asked and answered.

A.    Yes, I do recall seeing those clauses.

Q.    Do you recall seeing it for Rand McNally?

A.    I don't recall specifically for Rand McNally.

MR. PICKHARDT:  Just note on this document.  I'm not sure if it's relevant to answering questions or not, but it looks like Column M is missing.

MS. QUINN:  It's hidden on the native.

MR. PICKHARDT:  Okay.

MS. O'BOYLE:  We're happy to pull the native up if you would like us to.

MR. PICKHARDT:  No.  That's okay.  I I'm just noting it for the record.

Q.    And if you look at page 4, at

Page 73

COVER - CONFIDENTIAL

Relevance

the bottom, there's a section entitled "Agency Provisions."

Do you see that?

A.    Yes.

Q.    And the last line of that -- on that page says, "Each lender irrevocably authorizes the agent to take such action on such lender's behalf and to exercise powers, rights, and remedies hereunder and under the other credit documents are specifically delegated or granted to the agent"; correct?

A.    Ignoring the first part of the sentence.  "Lenders authorize the agent to take such action on their behalf" --

Q.    Right.

A.    -- "to exercise powers, rights, and remedies."

I was just rereading the full clause that she was pointing out. "Lenders authorize the agent take such action on behalf of -- on behalf to exercise powers, rights, and remedies hereunder and under other credit

Page 74

COVER - CONFIDENTIAL

agreements as specifically delegated to the agent."

Relevance

Q.    And just to be clear, when I was reading that sentence, I was -- I say that I was reading the last line on that page. But that's --

A.    I'm sorry.  I missed that.

Q.    Do you recall whether summaries of these nature were created for each of the portfolio companies?

A.    I believe so.

Q.    And do you recall whether --

A.    Though I should complete that. I believe so for the documents we had at the time.

Q.    To create this type of document, did you review anything other than the -- or do you have any understanding as to whether any documents other than the credit agreements and associated amendments were reviewed?

MR. PICKHARDT:  Objection to form.

A.    I believe we would have also

Page 75

COVER - CONFIDENTIAL

reviewed the security agreements and any inter-creditor agreements.

Relevance

Q.    So you said you completed this so far for the documents we had at the time.

A.    Correct.

Q.    So you would -- when you stated that, did you mean you created these summaries for each lender for which you had documents based on the documents you had, or did you mean that if you didn't have a complete set of documents for a lender, you didn't even start to create such a summary?

MR. PICKHARDT:  Objection to form.  The use of the term "lender" there is a little confusing.

Q.    I apologize for that.  I'm sorry.  Each borrower.

A.    I'm sorry.

Q.    Do you understand my question?

A.    Sorry.

Q.    I'm trying to draw a distinction.

Page 76

COVER - CONFIDENTIAL

A.      Can you repeat that?

Q.      You said that you completed it so far for the documents we had at your time -- at the time.

What I'm trying to understand is did you first ascertain for each portfolio company whether you had a complete set of documents -- credit agreements, amendments, inter-creditor agreements, security agreements -- and then create this document, or did you create it based on whatever documents you had at the time?

Relevance

A.      We reviewed the documents we had in our possession in the process of creating these.  The reason why I caveated that was we may not have created a loan summary for every single portfolio company, because we may not have had documents for every portfolio company at that time.

Q.      Okay.  Are you aware of any portfolio companies for which you did not have documents sufficient to create this summary?

**Page 77**

COVER - CONFIDENTIAL

A.    I don't recall all of the summaries we made versus couldn't make.

Q.    Do you recall not being able to make a summary for any portfolio company?

MR. PICKHARDT:   I'm just asking just for clarification.   Are you talking about current portfolio companies?   There's current and there's historical portfolio companies.

Q.    Any portfolio -- okay.

Were you -- did you create these summaries for both current and historical portfolio companies?

A.    We may have.   I don't recall.

Q.    For either current or historical portfolio companies, do you recall not being able to make a summary for any specific company?

A.    Not specific company, though the reason we had these issues was a books and records issue with the prior collateral manager.

Q.    Okay.   My question is do you

Relevance

**Page 78**

COVER - CONFIDENTIAL

Relevance

specifically -- do you have a specific recollection of not being able to create this loan document summary for any specific portfolio company?

A.    No, I do not.

Q.    Do you recall having discussions about any of the agency provisions in any of the credit agreements with anyone at A&M at any time?

A.    I don't recall.

Q.    Do you recall even generally having any discussions?

A.    I would have to speculate that it's likely.  But --

Q.    Have you had any discussions with anyone at A&M about the duties of the administrative agent under the credit agreement -- agreements?

A.    I don't recall.

Q.    Do you know what the duties of an -- the administrative agent under the credit agreements are?

A.    I would need to review a credit agreement.

COVER - CONFIDENTIAL

Q. Do you have any -- without reviewing a credit agreement, can you name any duty that the administrative agent had under the credit agreements?

A. Sure. Generally, the agent would collect interest from the portfolio companies and deliver it to the trustee on behalf of the Zohar Funds. It would invoice interest due to the portfolio companies. It would provide updated financials to the lenders, along with many other covenants that were in the credit agreements, which gave the lenders knowledge and confidence in their investments. And that's -- I'm sure there's more, though, off the top of my head, it's --

Q. You stated provide updated financials to the lenders along with many other covenants that were in the credit agreements.

What other covenants are you describing there?

A. There were both affirmative and

Page 80

COVER - CONFIDENTIAL negative covenants in the credit agreements.

Q.    And did those covenants relate to the agent?

A.    I would need to review the agreement, but I believe so.

Q.    And did these covenants impose obligations on the agent?

MR. PICKHARDT:    Objection. Calls for a legal conclusion.  You asked him generally what he recalls. He said he would need to review the credit agreement.  Now you're going into detail as to generally?  I object to this line of questioning.

Q.    Without reviewing a credit agreement, do you have any understanding as to whether the covenants imposed obligations on the agent?

A.    I don't recall.

Q.    Okay.  Let's mark as Exhibit 26.

Relevance

**Page 81**

COVER - CONFIDENTIAL

(Exhibit 26, Credit agreement, Relevance Bates PPAS-SDNY-00020557, was hereby marked for identification, as of this date.)

Q.    I've marked as Exhibit 26 a document bearing the Bates Nos. PPAS-SDNY-00020557 to 20634.  And this is the credit agreement among RM Acquisition as borrower and other parties; is that correct?

A.    That is correct.

Q.    And turning to page 41 of that document.

A.    Okay.

Q.    Do you see Article 5, "Affirmative Covenants"?

A.    I do.

Q.    And do you see 5.1(a), "Basic Reporting Requirements"?  "The borrower shall furnish to the agent and the lenders."  And then there's six categories of documents?

A.    I see that.

Q.    Is that the covenant that you

Page 82

COVER - CONFIDENTIAL

were referring to in your prior answer?

A.    I'd like to read.    Relevance

Q.    Yeah.  Take your time.

A.    (Witness perusing document.)

I'm sorry.  What was the -- what was the initial question?

Q.    Is that the covenant that you were referring to in your prior answer?

A.    Yes.

Q.    Can you look now at the document I've previously marked as Exhibit 23.  And this is an email from Aileen Daversa to creditnotices@patriarchpartners.com, copying Elizabeth LaPuma.  And this attaches a letter entitled "Termination of Patriarch Partners Agency Services LLC as agent."

A.    I see that.

Q.    If you look at the third paragraph.

A.    Okay.

Q.    I believe it's four sentences in.  It starts, "Both."

"Both Zohar II and AMZAS have

Page 83

COVER - CONFIDENTIAL

agreed to accept their appointments in

writing and will immediately assume PPAS'

former functions under the credit       Relevance

agreement and applicable law."

          Do you see that?

          MR. PICKHARDT:  It's four lines

     in?  Is that what you said?

          MS. O'BOYLE:  I said four

     sentences.

          MR. PICKHARDT:  Oh, four

     sentences.  Apologies.

          MS. O'BOYLE:  Seven lines down.

          MR. PICKHARDT:  Got it.

     A.     Okay.

     Q.     Did you draft that sentence?

     A.     I don't recall.

     Q.     Are you aware of a document in

which Zohar I and AMZAS accepted their

appointments in writing?

     A.     I'm not aware.

     Q.     Do you believe such a document

exists?

          MR. PICKHARDT:  Objection.

     Calls for speculation.

Page 84

COVER - CONFIDENTIAL

A.    I don't --

Q.    Do you know one way or another  Relevance
whether such a document exists?

A.    I don't know.

Q.    So a few minutes ago, you
described to me duties that you recall the
agent being required to perform under the
credit agreements, and that was collect
interest, prepare and send invoices, and
provide updated financials, and I believe
you said along with many other covenants;
is that correct?

A.    That's correct.

Q.    Were you involved in preparing
AMZAS to perform the obligations as
administrative agent?

A.    Again, I could speculate, but I
don't recall --

Q.    You don't have a --

A.    -- specifically.

Q.    -- specific recollection of
taking steps to ensure that AMZAS was
prepared to perform the functions of
administrative agent.

Page 85

COVER - CONFIDENTIAL

A.    Nothing specific.

Q.    Do you generally recall taking such steps?

Relevance

A.    Again, I would have to speculate.

Q.    So you have no general recollection or specific recollection of anything you did to prepare AMZAS to perform the duties of administrative agent.

A.    I may -- I may have assisted with invoicing.

Q.    Do you recall --

A.    I'm not sure what you mean by "preparing."

Q.    So you described to me that one of the functions that the administrative agent has to perform is prepare invoices; correct?

A.    Yes.

Q.    And based on the letters we just reviewed, AMZAS stated that it was assuming the role of administrative agent as of June 17, 2010.

**Page 86**

COVER - CONFIDENTIAL

Relevance

A.    Okay.

Q.    Correct?

Do you know whether, as of June 17, 2000 -- sorry, 16.  Not 2010.

Do you know whether, as of June -- or on June 17, 2016, AMZAS had the ability to generate and send invoices to the portfolio companies?

A.    I don't recall the timing.

Q.    So do you recall that at some point AMZAS had the ability to generate and send invoices to the portfolio companies?

A.    Yes.

Q.    You just don't recall specifically what the timing was.

A.    Correct.

Q.    Do you believe it was prior to June 17, 2016, that AMZAS developed that ability?

A.    I don't recall.

Q.    Do you have a general understanding as to when -- whether interest is due -- the portfolio

**Page 87**

COVER - CONFIDENTIAL

companies' interest payments are due at

the beginning of each month?                Relevance

MR. PICKHARDT:  Objection to

form.

A.     Can you repeat that?

Q.     Sure.  You understand that

portfolio companies remit or are supposed

to remit interest payments to the Zohar

Funds on a monthly basis.

A.     It's often quarterly.

Q.     Okay.  On a quarterly basis.

A.     Yes.

Q.     Do you know whether it's due on

the 1st of the month, the 15th of the

month, the 30th of the month, for each

quarter?

A.     Typically --

MR. PICKHARDT:  Objection.

A.     Typically, the 1st of the month.

Q.     Okay.  So if AMZAS assumed the

role of agent as of June 17, 2016, is it

your understanding that there would be

some portfolio companies for which

interest was due on July 1, 2016?

Page 88

COVER - CONFIDENTIAL

MR. PICKHARDT:  Objection.
Misstates testimony.

MS. O'BOYLE:  I'm asking if
that's his understanding.

A.    There would be interest due    Relevance
July 1st.

Q.    Okay.  And do you know whether
AMZAS sent out any invoices prior to
July 1, 2016?

A.    I don't recall.

Q.    Okay.  You stated that you at
some point assisted in preparing invoices;
is that correct?

A.    Correct.

Q.    And can you describe to me the
process you took in preparing such
invoices.

A.    From what I can recall, it was
preparing or at least helping to prepare
an Excel file that would calculate the
interest due for each facility and then
potentially populating that into a -- some
form of a letter.

Q.    Okay.  And what information

Page 89

COVER - CONFIDENTIAL

would you or did you put into that    Relevance
spreadsheet?

A.    It would be all the loan characteristics for each of the loans in the portfolio.  But I don't recall if there were any that we did not calculate.

Q.    Okay.  For those that you did calculate, did you have or did A&M have all the information that it needed to calculate the interest due?

A.    Can you repeat that?

Q.    Sure.

For those -- you described preparing certain spreadsheets to calculate the interest due in order to prepare invoices.

Did -- and you say that it might not have been done for every company.

So my question is, for those companies for which you did create such spreadsheets, did A&M have all the information that it needed to calculate the interest due?

A.    We could calculate the interest

Page 90

COVER - CONFIDENTIAL

due based on the documents we had.   Relevance

Q.    Okay.  Did you ever have --

A.    To the best of my knowledge.

Q.    Okay.  Did you ever have concerns that the interest due that you were calculating was not correct?

MR. PICKHARDT:  Objection. Vague as to concerns.

Q.    Do you understand what "concerns" means?

A.    What --

Q.    Strike that.

Did you ever believe that the interest due that you were calculating was not accurate?

A.    There may have been.

Q.    So -- do you have any specific recollection of calculating interest due that you believed was not accurate?

A.    Well, we had reconciling issues even with the debt in some cases.  So that would, therefore, have reconciling issues with the amounts we would forecast for interest due.

**Page 91**

COVER - CONFIDENTIAL

Q.    Do you have a specific recollection of a reconciling issue for a specific portfolio company?

Relevance

A.    No, not specifically, no.

Q.    Do you recall whether that for those portfolio companies for which you had reconciling issues, you prepared invoices?

A.    I don't recall.

Q.    Do you recall at any time notifying a portfolio company to which you sent an invoice that the amount of interest due reflected in the invoice might not be accurate?

A.    I don't recall.

MR. PICKHARDT:   Objection. Lacks foundation.

Q.    So you have no recollection of when you prepared the first invoice for AMZAS to send to a portfolio company.

A.    I don't recall.

Q.    Do you know what -- do you recall anything else at A&M having a responsibility for preparing invoices for

Page 92

COVER - CONFIDENTIAL

AMZAS to send to portfolio companies?

A.    Others on the team likely worked on it.

Relevance

Q.    And what others?

A.    Again, I would be speculating.

MR. PICKHARDT:  Are you asking him to speculate?

Q.    No.  You said others on the team likely worked on it, but you have no specific recollection of anyone else on the team working on it?

A.    No, not without speculating.

Q.    Okay.  Don't speculate.

So I believe you stated that, in addition to preparing invoices, another duty or obligation of PPAS -- sorry -- of the administrative agent under the loan agreements was to collect interest from the portfolio companies; correct?

A.    Correct.

Q.    And can you describe your understanding of how the administrative agent would collect interest from the portfolio companies.

**Page 93**

COVER - CONFIDENTIAL

A.    Are you asking me how PPAS did it?

Q.    Do you know how PPAS did it?

A.    I do not.

Q.    Do you know how AMZAS did it?

MR. PICKHARDT:  Objection.  Lack of foundation.

Q.    Has AMZAS collected any interest from portfolio companies?

A.    I don't know the answer to that.

Q.    Does AMZAS have a bank account set up to collect interest from portfolio companies?

A.    I believe I answered that, yes.

Q.    I asked you whether -- previously whether they had a bank account.  And now I'm asking whether that bank account was for the purpose of accepting interest payments from the portfolio companies.

And your answer is yes?

A.    Yes.

Q.    Okay.  And I think you also described a function of the administrative

COVER - CONFIDENTIAL

agent as transferring any interest collected to the trustee; is that correct?

A.   Correct.

Q.   And did you ever have any discussions with the trustee about AMZAS assuming the role of administrative agent?

A.   Not that I can recall.

Q.   Do you know whether anyone else at A&M had discussions with the trustee?

A.   Not that I can recall.

Q.   So you can't specifically recall but you don't know one way or another or you don't think anyone had discussions with the trustee?

A.   Well, I could speculate --

Q.   I'm not asking you to speculate. Your answers are just a little unclear.

I'm trying to understand -- I asked you do you know whether anyone else at A&M had discussions with the trustee. Your answer was "Not that I can recall."

So by that, you are saying that you don't recall anyone having discussions with the trustee?

COVER - CONFIDENTIAL

A.    Correct.

Q.    Okay.

MS. O'BOYLE:  John, we've been going about another hour.  I'm thinking we can do another 20 minutes of questioning and take a lunch break, but I want to make sure you guys are okay with proceeding.

MR. PICKHARDT:  Do you want a short break now?

THE WITNESS:  Yeah.  Maybe five-minute break.

MS. O'BOYLE:  Sure.  We can go off the record.

THE VIDEOGRAPHER:  Going off the record.  The time is 12:05 p.m.

(Recess)

THE VIDEOGRAPHER:  We are back on the record.  The time is 12:13 p.m.

BY MS. O'BOYLE:

Q.    During the break, did you discuss the substance of your testimony with your counsel?

A.    No.

**Page 96**

COVER - CONFIDENTIAL

Q.    Your counsel just stated that you wish to clarify a previous answer.

Did you discuss that with him before returning to the room?

A.    I mentioned that.

Q.    Did you tell him what you wanted to clarify?

A.    I mentioned that I recalled something to add to a previous question.

Q.    Okay.  And would you like to let us know what you recall?

A.    Yeah.  It was -- I don't remember the exact question.  But it was in regards to what either I or AMZAS did to prepare for being the agent.

Q.    Okay.

A.    One thing that I do remember working on is working with a subagent.

Q.    Okay.

A.    To potentially handle some of the administrative roles of being an agent.

Q.    Okay.  And was that agent or subagent Cortland Global?

Relevance

Page 97

COVER - CONFIDENTIAL

A.    Yes.  Yes.

Q.    Segues nicely, because that was the next topic.

Relevance

A.    Perfect.

Q.    Did AMZAS ever enter into an engagement letter or with Cortland Global?

A.    I don't believe an engagement letter was ever fully executed.

Q.    Was the engagement formalized in any way?

A.    I believe there was a confidentiality agreement.

Q.    Is Cortland Global currently the subagent for AMZAS?

A.    I don't know the answer to that.

Q.    Do you know whether AMZAS or A&M have paid Cortland Global any amount for its services?

A.    I don't believe so.

Q.    Do you recall when you first -- sorry.

Did you have any discussions with Cortland Global?

A.    Yes.

Page 98

COVER - CONFIDENTIAL

Q.    And do you recall when you first had communications with Cortland Global about serving as a subagent?

Relevance

A.    I don't recall.

Q.    Do you recall who at Cortland Global you spoke to?

A.    I believe I had one or two contacts, but I don't recall the names.

Q.    You don't recall the names of anyone you spoke to at Cortland Global.

A.    No.

Q.    Do you know whether any of your colleagues at A&M had communications with Cortland Global regarding serving as a subagent for AMZAS?

A.    I believe Liz would have.

Q.    Were you in any meetings or on any telephone calls with Ms. LaPuma and individuals from Cortland?

A.    I don't recall that.

Q.    I'm going to mark as Exhibit 27 a document bearing the Bates No. ZOHAR-PPAS-00025838.  It has an attachment, and that attachment ends in

Page 99

COVER - CONFIDENTIAL

25853.

(Exhibit 27, Credit Agreement, Bates ZOHAR-PPAS-00025838, was hereby marked for identification, as of this date.)

Q.    You can take your time to look at the document.

Relevance

A.    (Witness perusing document.)

Q.    I'm going to start at the bottom most email of the chain.  So whenever you're ready, let me know.

A.    (Witness perusing document.)
Okay.  I've read that one email.

Q.    Okay.  Do you -- do you recall -- or do you know why AMZAS was looking to retain Cortland Global as a subagent?

A.    I'm not sure I know the full answer, other than they would be much more efficient at some of the administrative roles.

Q.    Had A&M worked with Cortland Global previously?

A.    I don't know the answer to that.

**Page 100**

COVER - CONFIDENTIAL

Q.    Do you recall speaking to any other entities who were potential candidates to serve as subagents for AMZAS?

Relevance

A.    I don't recall personally speaking to any others.

Q.    Do you know whether there were any other entities that anyone at A&M spoke to?

A.    I don't know that.

Q.    Did -- do you know how Cortland was selected as a candidate to serve as subagent?

A.    I don't know.

Q.    So the bottom email is an email from lora.pelequin@cortlandglobal.com to you and Ms. LaPuma, CC to legal@cortlandglobal.com and someone named Beata Konopko?

Do you see that?

A.    I see that.

Q.    Who is or do you recall having conversations with Lora Peloquin at Cortland Global?

**Page 101**

COVER - CONFIDENTIAL

A.    Yes.  I think she was my main contact.

Relevance

Q.    Okay.  And in that email, Ms. Peloquin says, "Thank you for the call this morning.  Per our discussion, please forward your NDA to the above group.  We are very excited for the opportunity and look forward to seeing the portfolio and next steps.  Please let me know if there is anything additional I can provide in the interim."

Do you recall having a call with Ms. Peloquin on or around June 10, 2016?

A.    I don't recall the substance of that call.

Q.    Do you recall having any calls with Ms. Peloquin?

A.    On that date?

Q.    Ever.

A.    Yes.  I know I had calls with her.

Q.    Okay.  And do you recall the substance of any calls you've had with Ms. Peloquin?

Page 102

COVER - CONFIDENTIAL

A.    Not specifically, no.

Q.    Do you recall whether Ms. LaPuma was on any of the calls you had with Ms. Peloquin?

Relevance

A.    I don't recall.

Q.    Do you recall whether anyone else in A&M was on any of the calls with Ms. Peloquin?

A.    I don't recall.

Q.    Do you know whether this call you -- sorry.

Do you know whether the call that Ms. Peloquin describes in this email was the first call you had with Ms. Peloquin?

A.    Coy speculate, but I don't -- I don't know for sure.

Q.    Do you have any recollection of communicating, whether by email or phone or otherwise, with Ms. Peloquin prior to June 10, 2016?

A.    I don't recall.

Q.    So in the next email up, you reply to Ms. Peloquin.  You say, "Hi Lora,

Page 103

COVER - CONFIDENTIAL

great speaking with you this morning.  I have attached a draft NDA for you and your team's review."  And then the email continues.

Relevance

Do you see that?

And on the top of the following page, you say, "In the meantime" --

A.    Hang on a second.  I'm just read willing the last one.

Q.    Yes.

A.    (Witness perusing document.)

Okay.  Now I'm with you.

Q.    Oh, I'm sorry.  I'm just looking at the top of -- the continuation of that email to the top.

A.    Oh, okay.

Q.    You say, "In the meantime, could you please provide a ballpark estimate for Cortland to provide subagent services. Happy to discuss on the phone if you need more information to quote a range."

Do you see that?

A.    Yes.

Q.    Do you recall ever receiving an

**Page 104**

COVER - CONFIDENTIAL

estimate from Cortland to provide subagent services?

Relevance

A.    I don't recall.

Q.    You don't recall one way or another, or you did not receive one?

A.    I don't recall ever receiving one.

Q.    Then there is a series of emails in this string regarding the NDA in which it appears that you are exchanging marked and clean versions.

A.    Yes.

Q.    And then if you turn to the page with the Bates number which is the number on the bottom right ending in 2845 -- sorry -- 25845.

A.    Okay.

Q.    Do you see that?

Do you see at the top of that -- you might have to turn to the prior page to see the date you sent it.  It's an email from you to several individuals at Cortland.  And you state -- and Ms. LaPuma copied.  And you state, "Pursuant to the

Page 105

COVER - CONFIDENTIAL

signed NDA, please see the attached Jewel of Jane, LLC (Jane Cosmetics) credit agreement and amendments."

Relevance

Do you see that?

A.    Yes.

Q.    Do you recall why you were sending Ms. -- or these individuals at Cortland a Jewel of Jane credit agreement and amendments?

A.    I believe it was a part of their review to understand some of the work it would take to provide their services.

Q.    Okay. Do you recall having any discussions with anyone at Cortland Global about the Jewel of Jane credit agreement after this date?

A.    No, I don't recall.

Q.    Do you recall whether you sent Cortland Global any other credit agreements than the Jewel of Jane credit agreement?

A.    I don't recall.

Q.    Do you believe, if you sent Cortland Global any other credit

**Page 106**

COVER - CONFIDENTIAL

agreements or information, it would have
been by email?

Relevance

A.    Yes, it would have.

Q.    Okay.  So going to the next
email up, it's an email from Emily Ergang
at Cortland Global to you and several
others.

Do you recall having any
discussions with Ms. Ergang, last name
Pappas?

A.    I do not.

Q.    Okay.  And Ms. Ergang writes to
you with some questions and comments about
the credit agreement that you sent; is
that correct?

And then you respond --

A.    Sorry.  I'd like --

Q.    Oh, yeah.

A.    I'd just like --

Q.    Go ahead and review.

A.    -- to review.

(Witness perusing document.)

Okay.

Q.    And you reply on the Friday,

Page 107

COVER - CONFIDENTIAL

June 17th, and you say, "Hi Emily, thanks for reviewing.  It may make sense to jump on a call to walk through some of these, but more importantly to provide a general update."

Relevance

Do you see that?

A.    I do.

Q.    Do you recall at some point after sending this email having a call with individuals from Cortland Global to walk through these issues and provide a general update?

A.    I don't recall.

Q.    Do you know or -- sorry.

What were you referring to when you stated general update in this email?

A.    I don't recall.

Q.    Do you recall discussing with anyone at Cortland Global the termination letters that you sent to the portfolio companies and to Patriarch Partners?

A.    I don't recall having that conversation.

Q.    Moving up a few emails to the

**Page 108**

COVER - CONFIDENTIAL

Relevance

page with the Bates No. 00025839, you email Ms. Peloquin and Ms. Ergang on June 17th, and you say, "Do you guys have a sample or scrubbed invoice we could review?"

Do you see that?

A.    I do.

Q.    Why were you asking Ms. Peloquin and Ms. Ergang for a sample invoice or scrubbed invoice on June 17th?

A.    I think we were understanding their capabilities and if they had a better process for invoicing.

Q.    Do you recall whether AMZAS was intending to have Cortland Global send out invoices to the portfolio companies?

A.    I recall that we were considering it.  I don't know what decisions were made.

Q.    Do you know whether Cortland Global ever sent out invoices to the portfolio companies?

A.    I don't believe so.

Q.    Do you know whether Cortland

**Page 109**

COVER - CONFIDENTIAL

Global has -- had any contact with the  Relevance
portfolio companies in connection with
this engagement?

MR. PICKHARDT:  Objection to
form.  Vague as to engagement.

Q.    In connection with its work as
subagent or potential subagent for AMZAS.

A.    I don't know.

Q.    Do you think they may have?

MR. PICKHARDT:  Objection.
Calls for speculation.

A.    I don't think they would have,
especially not -- we would -- to my
knowledge, we would not have instructed
them to reach out.

Q.    Okay.  And then the top email,
it's an email from Ms. Peloquin to you and
Emily Ergang.  And attached is a sample
invoice.  And she says, "We will create a
template for the Alvarez to be used for
the initial notices.  And once the deals
are set up in our system, these will be
automated."

Do you see that?

**Page 110**

COVER - CONFIDENTIAL

Relevance

A.    I do.

Q.    Do you know whether Cortland ever created a template for AMZAS for notices or invoices to be sent to the portfolio companies?

A.    I don't recall if they ever did.

Q.    Do you know whether A&M -- sorry.

Did you ever provide information to Cortland sufficient for them to generate invoices, such as loan characteristics and payment dates?

A.    I don't -- I don't recall.

Q.    Do you think you may have?

A.    I don't remember if we sent anything else other than this example credit agreement.

(Exhibit 28, An email chain, Bates ZOHAR-PPAS-00000821, was hereby marked for identification, as of this date.)

Q.    I'm marking as Exhibit 28 a document bearing the Bates No. ZOHAR-PPAS-00000821 through 859.  This is

**Page 111**

COVER - CONFIDENTIAL

Relevance

a long string of emails.  Similar to our last discussion, I'm going to start at the back and move our way up.  But take your time to review it, if you would like, and we can proceed.

A.     (Witness perusing document.)

Okay.

Q.     Mr. Cover, you've taken some time to read that document.

Do you recall the series of emails reflected in this document?

A.     It certainly jogs my memory.

Q.     Okay.  Starting at the first email, which is towards the back of the document, the content of it appears on the Bates number ending in 856.  This is an email from Mike Fredian to you on June 28, 2016.

Who is -- do you recall having conversations with Mr. Fredian or Fredian?

A.     Yes.

Q.     And at some point, did he become your primary contact at Cortland Global or were you communicating with him in

**Page 112**

COVER - CONFIDENTIAL

conjunction with Ms. Peloquin?

A.    Mr. Fredian was their operations contact.  So it was my understanding that he was -- he would be the one doing the day-to-day loan administration, overseeing the loan administration.

Q.    Do you know whether Cortland Global had experience in loan administration?

A.    I believe they did.

Q.    And what is the basis of that belief?

A.    I -- my understanding was this was something they were very competent in.

Q.    And was that based on discussions with people at Cortland Global or some other discussions?

A.    I don't recall the discussions.

Q.    So Mr. Fredian writes to you, "Hi Chris, I just want to touch base about a few things."  No. 1 says, "KYC docs for Key Bank account.  Any update on providing those docs?"

Do you know what the Key Bank

Relevance

**Page 113**

COVER - CONFIDENTIAL

account that he is referring to in this email is?

A.    Yes.  The Key Bank was the bank account Cortland -- the bank that Cortland often used for this type of work.  And they were in the process of setting up that bank account.

Q.    Do you know whether a Key Bank account was ever set up for the AMZAS work that Cortland was going to be performing?

A.    I believe it was set in motion.

Q.    Do you believe it was ever opened?

A.    I don't recall if it was ever finalized.

Q.    I think earlier today you testified that AMZAS had a JPMorgan Bank account; is that correct?

A.    That's correct.

Q.    Do you know whether that account was ever opened?

A.    I believe it was, yes.

Q.    At some point, did AMZAS decide -- sorry.  Strike that.

Relevance

Page 114

COVER - CONFIDENTIAL

Relevance

Do you know whether AMZAS was intending to have a Key Bank account and a JPMorgan Bank account?

A.    I don't know the answer to that.

Q.    Do you recall whether, at some point, a decision was made to open the JPMorgan account as opposed to the Key Bank account?

A.    Yes.

Q.    Do you know why that decision was made?

A.    Based on this email chain, there were contract issues, though -- with the Key Bank account, though I don't know what took place after that.

Q.    Okay.  But to the best of your recollection, a Key Bank account was never opened?

A.    I think I said I don't recall what happened to it.

Q.    Okay.  You described contract issues.

What were those contract issues?

A.    Based on this email chain, there

**Page 115**

COVER - CONFIDENTIAL

were bank documents that Key Bank needed, and our counsel, internal counsel, couldn't agree on certain terms.

Relevance

Q.    Okay.    Item 2 in this email is "Master Agency Agreement."  And it says, "Emily sent an update last night which includes language on the short-term paying agent function."

Do you know what he was referring to when he said "short-term paying agent function"?

A.    I would need to look at this agreement.  I don't recall this specifically.

Q.    Okay.  Do you recall at some point looking at a master agency agreement?

A.    I was likely the middleman between Emily and our internal counsel.

Q.    Okay.

A.    So I may have looked at it, though I'm not a lawyer.

Q.    Lucky you.

Do you know whether a master

**Page 116**

COVER - CONFIDENTIAL

agency agreement was ever entered into with -- between A&M or AMZAS on the one hand and Cortland Global on the other? Relevance

A.   I don't recall if it was ever executed.

Q.   Item No. 3 says, "7/1 payment date."  It says, "Based on our conversations last week, A&M will be handling the 7/1 payment date, both notices and money movement.  Please confirm."

Do you see that?

A.   I see that.

Q.   Do you recall that A&M handled the 7/1 payment date?

MR. PICKHARDT:  Objection. Vague as to "handling" or "handled."

Q.   In -- let me rephrase that.

In parens here, it states, "Both notices and money movement."

Do you see that?

A.   I see that.

Q.   Do you have any understanding as to what Mr. Fredian was referring to when

**Page 117**

COVER - CONFIDENTIAL                    Relevance

he stated "notices and money movement"?

MR. PICKHARDT:  Objection.

Calls for speculation.  But --

A.    Yeah.  I could speculate.

Q.    Okay.  Do you -- I'm not asking
you to speculate.

A.    Okay.

Q.    Do you recall whether A&M
handled the invoicing for the 7/1 payment
date or AMZAS?

A.    I don't recall.

Q.    Do you recall whether AMZAS
handled the receipt of funds from the
portfolio companies and/or the transfer of
funds to the trustee for the 7/1 payment
date?

MR. PICKHARDT:  Objection.  Lack
of foundation.  Assumes facts not in
evidence.

Q.    You can answer.

A.    Can you repeat that?

Q.    Sure.

Do you recall whether AMZAS
handled the receipt of funds from the

Page 118

COVER - CONFIDENTIAL

portfolio companies and/or the transfer of funds to the trustee for the 7/1 payment date?

Relevance

MR. PICKHARDT:  Objection.  Lack of foundation.  Assumes facts not in evidence.

A.    That would assume that there were payments.

Q.    Okay.  Did AMZAS receive any funds for the 7/1 payment date?

A.    I don't know.

Q.    Did AMZAS send out any invoices for the 7/1 payment date?

A.    I don't recall.

MS. O'BOYLE:  The court reporter just let me know that the tape is about to end, so I have more questions on this topic, but why don't we break for lunch, and we will resume.

MR. PICKHARDT:  Okay.

THE VIDEOGRAPHER:  Going off the record.  The time is 12:44 p.m.  This is the end of Media Unit 2.

(Luncheon recess:  12:44 p.m.)

**Page 119**

COVER - CONFIDENTIAL

A F T E R N O O N   S E S S I O N

1:20 p.m.

THE VIDEOGRAPHER:  We are back on the record.  The time is 1:20 p.m. This is the beginning of Media Unit 3.

BY MS. O'BOYLE:

Q.    Good afternoon, Mr. Cover.

A.    Good afternoon.

Q.    During our lunch break, did you discuss the substance of your testimony with counsel?

MR. PICKHARDT:  Laura, I'm going to interrupt for a second.  You've asked that a couple of times.  I've allowed you to ask that.  What's the basis for your inquiring into the substance of communications with counsel?

MS. O'BOYLE:  I'm asked -- I'm permitted to ask whether he discussed it with you.  I'm not going to ask what he discussed.  But I'm permitted to ask that.

MR. PICKHARDT:  You know, I'm

Page 120

COVER - CONFIDENTIAL

going to instruct him not to answer.
I think it's an inappropriate
question.  You can't get into the
substance.

        MS. O'BOYLE:  I'm not asking for
the substance.  I'm asking a yes-or-no
question.

        Are you instructing him not to
answer?

        MR. PICKHARDT:  Okay.  Do you
want to answer that, just "yes" or
"no."

        A.    Yes.

        Q.    Okay.  When we broke, you were
discussing Exhibit No. 28.  And we had
spoken about the bottom-most email, the
first email in the chain, and now I'm just
going to move to the next email, which is
an email from you to Mr. Fredian.
        A.    Sorry.  What's the Bates?
        Q.    It's -- if you look at the
bottom of page, the Bates number ending
854 to 855.  It's an email from you to
Mr. Fredian on June 28th.

Relevance

**Page 121**

COVER - CONFIDENTIAL

Relevance

A.    Okay.

Q.    And you say, "Hi Mike, unfortunately, I don't have too much on updates for you.  Our counsel is still working to get comfortable on a few things, which we expect to be finalized this week.  We will alert you guys as soon as we get word.  Once we do, we will forward along our KYC docs and sign the MSA ASAP.  Unfortunately, we don't have much insight into planning for the 7/1 notices yet.  Once we get the green light, we can work with you guys on timing and strategy to set up the first round of notices."

Do you see that?

A.    I do.

Q.    Can you without revealing the substance of any communications with your counsel tell me what the few things you were working to get comfortable or your counsel was working to get comfortable with?

A.    I don't recall what those few

Page 122

COVER - CONFIDENTIAL

things were.

Q.    So turning now to the document ending in Bates No. 852.  On July 7th, Relevance Mike Fredian emails you and says, "Hi Chris, just checking in.  Has there been any movement on the items below?"

Do you see that?

A.    I do.

Q.    And you respond -- if you go to the Bates ending 851, on July 13th, you respond, "Hi Mike, hope all is well.  I've just gotten word that we've received the thumbs up from a few critical parties regarding AMZAS taking over as agent."

Do you see that?

A.    I do.

Q.    What did you mean when you wrote, "We've received the thumbs up from a few critical parties regarding AMZAS taking over as agent"?

A.    I don't recall.

Q.    What critical parties were you referring to in that sentence?

A.    I'm not sure.

**Page 123**

COVER - CONFIDENTIAL

Q.    Do you recall whether, prior to July 13, 2016, A&M had not received all of the relevant approvals from all necessary parties to take over as agent?

A.    I don't know the answer to that.

Q.    Do you recall having any discussions about approvals required by A&M to take over as agent?

A.    I don't recall.

Relevance

Q.    Do you have any understanding as to whether the credit agreements required in the approvals for A&M to take over as agent?

A.    The credit agreements have clauses typically that require the required lenders to approve any certain changes.

Q.    Certain changes to the agent or certain changes of any nature?

A.    Of any nature, though the agent is one of them.

Legal Conclusion; Relevance

Q.    And when you say "the credit agreements have clauses typically," are you referring to the credit agreements

Relevance

Page 124

COVER - CONFIDENTIAL

Relevance

that you reviewed for the portfolio companies in the Zohar Funds, or are you talking about credit agreements generally?

A.    Speaking only to the Zohar Funds.

Q.    And do you recall having discussions with -- strike that.

Do you know who the required lenders were for any of the credit agreements?

A.    I would need to look at two things:  One, a credit agreement for a specific company; and two, depending on how that credit agreement instructs required lenders to be calculated, we would likely need debt or certain metrics as of a period of time.

Q.    Do you recall undertaking the analysis you just described to determine who the required lender is with respect to any of the credit agreements at any time?

A.    Yes.  I believe I helped in that.

Q.    And were you doing that in

Page 125

COVER - CONFIDENTIAL

connection with the appointment of AMZAS as agent?

Relevance

A.    I would only be able to speculate the reasoning why I was doing that task.

Q.    So you don't have -- you don't recall any reason why you might have been performing that task.

A.    Correct.

Q.    Do you recall whether A&M had the approval of the required lenders as of or prior to July 13, 2016, to assume the role of administrative agent?

A.    I'm sorry.  Can you repeat that?

Q.    Yeah.  Do you recall whether A&M had the approval of all required lenders as of or prior to July 13, 2016, to assume the role of administrative agent?

MR. PICKHARDT:  Objection to form.  Vague as to "all required lenders."

A.    Yeah.  I don't know the answer to that.

Q.    Do you recall whether A&M had

Page 126

COVER - CONFIDENTIAL

received approval from any lender as of July 13, 2016, to assume the role of an administrative agent?

Relevance

A.    I don't know.

Q.    Did you participate in any discussions about necessary approvals from required lenders for A&M or AMZAS to assume the role of administrative agent?

A.    I don't recall specifically.

Q.    Do you recall speaking to any noteholders about -- for -- noteholders for any of the Zohar Funds about AMZAS assuming the role of administrative agent?

A.    I don't recall doing that, no.

Q.    Do you know whether anyone at A&M -- sorry.

To your knowledge, has anyone at A&M had such discussions with any of the -- with any of the noteholders for the Zohar Funds?

A.    I don't know if I -- I don't know.

Q.    Can you turn to the document -- sorry -- the page in the document before

Page 127

COVER - CONFIDENTIAL

you that ends in Bates No. 843.    Relevance

A.    Okay.

Q.    And in that email -- sorry. That is an email from you to Mike Fredian copying Jessica Mead.  The date is July 26, 2016, and you say, "Hey Mike, I spoke to Jessica about those this morning. Our counsel is focusing on the agent account agreement to finalize the bank account, but I hope to get MAA comments from them by end of the week as well."

Do you recall whether, as of July 26, 2016, a bank account had been opened for AMZAS?

A.    I don't recall.

Q.    Do you recall what the agent account agreement was?

A.    Again, I think that was -- I don't recall the substance of it, but I think I was the middleman between counsel and Cortland's counsel.

Q.    Okay.  Do you recall whether the agent account agreement related to the bank account that would be receiving

Page 128

COVER - CONFIDENTIAL

interest payments from the portfolio companies?

A.    Based on this email, that makes sense.

Q.    Okay.  You state in the next Relevance paragraph, "Also, as an FYI, we sent ou Aug 1 notices this week and will keep you updated on September 1st timing.  Ideally, we will have you guys in a good position by then to notice on behalf of AMZAS."

Do you recall sending out August 1st notices during the week of July 26, 2016?

A.    I don't recall specifically sending those out, no.

Q.    Do you recall whether the August 1st notices were the first notices that AMZAS had sent out?

A.    I don't recall.

Q.    Turning to the next email from Jessica Mead to you and Mike Fredian dated July 26, 2016, it states, "Chris, further to our call today, the bank isn't able to process any activity for the account,

**Page 129**

COVER - CONFIDENTIAL

Relevance

including receipt of wires without the agent agreement in place.  Please let us know if you have any comments so we can go over" -- sorry -- "so we can get that over to them as soon as possible."

Do you see that?

A.    I do.

Q.    Do you know what bank Jessica is referring to in this email, or Ms. Mead?

A.    I believe she's talking about the Key Bank account.

Q.    So on July 26, 2016, Ms. Mead informs you that Key Bank, to the best of your recollection, in the bank identified here, isn't able to process any activity for the account, including the receipt of wires; is that correct?

A.    That appears to be correct.

Q.    And looking at the email directly above that, which is from you to Ms. Mead, copying Mr. Fredian, you say, "Thanks, Jessica.  See attached for our counsel's comments on the Key Bank document."

Page 130

COVER - CONFIDENTIAL

Relevance

Do you see that?

A.    I do.

Q.    Does that refresh your recollection in any way or confirm your recollection that the bank referred to in the prior email is Key Bank?

A.    Yes.

Q.    Can you turn to the page in that document ending in 838.

A.    Okay.

Q.    If you look at the email from you to Ms. Mead and Mr. Fredian on July 27th, the first paragraph I'm looking at the last sentence of that paragraph. You state, "Since we don't anticipate money needing to be moved in the short term we likely will not have to sign off on any transactions."

Do you see that?  Take your time and read the whole email if you would like.

A.    (Witness perusing document.)
Yes.  I see that.

Q.    Do you recall what you meant

Page 131

COVER - CONFIDENTIAL

when you wrote "since we don't anticipate money needing to be moved in the short term"?

Relevance

A.    I don't recall.

Q.    Do you recall what money you were referring to in that sentence?

A.    I don't.  And I don't recall Section 4.  I'm not sure what this is regarding.

Q.    Okay.  Can you turn to the email ending 825 -- sorry.  The document -- sorry.  The Bates -- the page with the Bates number ending in 825.

A.    Okay.

Q.    And this email, which is on August 5th, you write, "Mike, could you please confirm that Cortland Global" -- sorry -- "that Cortland will not have any issues conflicts working with a JPMorgan checking account."

Do you see that?

A.    I do.

Q.    Do you recall having any discussions other than this email with

Page 132

COVER - CONFIDENTIAL

Relevance

Mr. Fredian or anyone at Cortland opening a JPMorgan checking account?

A.    I don't recall anything else out of this -- this email.

Q.    So you don't recall whether they told you at any point whether they had or did not have any issues or conflicts.

A.    I don't recall.

Q.    And turning to the first email or the top-most email on the first page of this document, which ends in Bates No. 821, this is an email from you to Mr. Fredian on January 1st -- sorry -- January 5, 2017.  And in the second paragraph, you state, "Latest I've heard is that the agent role will be disputed in court in March.  It is my understanding that we've been asked to hold off from performing agent duties until that decision is made."

Do you see that?

A.    I do.

Q.    What was the basis of your understanding that you've been asked to

**Page 133**

COVER - CONFIDENTIAL

hold off from performing agent duties    Relevance

until that decision is made?

MR. PICKHARDT:  I'm going to

caution the witness with respect to

divulging the substance of anything he

discussed with counsel.  If you think

this came from counsel, you can say

that, but I'm just going to caution

you to not say anything further.

A.    Yeah.  I would have been

instructed.

Q.    Okay.  By your counsel.

MR. PICKHARDT:  You asked what's

the source of the information.  He's

not saying he's instructed by counsel.

But if the source was counsel, that's

as much as he can respond to.

Q.    Understood.

So the source of your

understanding was from communications with

counsel.

A.    I was -- I was either instructed

by counsel or senior members of my team on

behalf of counsel.  I --

**Page 134**

COVER - CONFIDENTIAL

Q.    Okay.  You don't recall which --

A.    Who it came from I don't recall.

Q.    Okay.  So as of January 5, 2017, is it your understanding that AMZAS was not performing agent duties?

A.    Based on this email, that would be my understanding.  I can't recall the exact date.

Q.    Okay.

(Exhibit 29, An email chain, Bates ZOHAR-PPAS-00000917, was hereby marked for identification, as of this date.)

Q.    So I'm marking as Exhibit 29 a cover email that bears the Bates No. ZOHAR-PPAS-00000917.  I think we included two attachments to -- three attachments to this -- two letters and then an invoice. As I explained previously, this email included a ZIP file that had dozens of similar attachments of a similar nature. Generally speaking you can tell it included payment notices and invoices exemplars of which we've included.

Page 135

COVER - CONFIDENTIAL

Q.    Do you see that?    Relevance

A.    I do.

Q.    And this is an email from you to Mr. Bennett on July 26, 2016.

Do you see that?

A.    Yes.

Q.    And you say, "Hi Ed.  For information purposes attached are letters work on behalf of A&M services.  Please forward to the companies' respective officers to ensure receipt."

Do you see that?

A.    I do.

Q.    And I think you may recall when we were reviewing the email marked as Exhibit 28 the long email we were just reviewing with Cortland, you had noted to Mr. Fredian in that email that you had served initial notices the week of July 26th.

A.    Which page is that?

Q.    That's a good question.

843.

A.    Got it.

Page 136

COVER - CONFIDENTIAL

Relevance

Q.    Do you believe these are the notices that you were referring to in the email with Mr. Fredian?

A.    I would say yes, but the timing doesn't seem to line up.

Q.    And you're observing that the email from you to Mr. Bennett is -- was sent at 3:56 and your email to Mr. Fredian was sent at 3:00 p.m.; is that correct?

A.    Yes.  Correct.

Q.    Okay.  Do you think --

A.    Although --

Q.    Do you think there may have been other notices that you've sent the week of July 26th?

A.    Not to my knowledge.

Q.    Okay.  If you turn to the -- I guess it's the second attachment.  It's the document that ends in 967.

Do you see that?  Sorry.  To the -- to the notices email with Mr. Bennett.

A.    Got it.  Okay.

Q.    So this is a letter dated

**Page 137**

COVER - CONFIDENTIAL

July 25, 2016, to MD Helicopters; is that correct?

Relevance

A.    That's correct.

Q.    And in this letter, you state that AMZAS has been appointed to serve as agent on behalf of certain funds.  And then you state, "AMZAS has accepted such appointment in writing and effective June 4, 2016, it is duly authorized to exercise all rights, powers, discretion, privileges and duties administrative agent under the credit agreement dated 7/8/2005."

Do you see that?

A.    I do.

Q.    Do you have -- do you recall what happened or whether anything happened on or around June 4th that made AMZAS duly authorized to exercise all rights under the credit agreement?

A.    I don't recall.

Q.    And does seeing this letter refresh your recollection in any way as to whether there was a writing in which AMZAS

Page 138

COVER - CONFIDENTIAL

accepted its appointment as administrative

agent?                                    Relevance

A.    It does not.

Q.    And then the letter goes on. "In accordance with the Credit Agreement, we hereby direct you as follows, effective immediately:  1.  Provide all books, records and other information and reports, including your respective monthly, quarterly, and annual reports required under the Credit Agreement, to AMZAS via the following email address: Projectzenith@alvarezandmarsal.com."

Do you see that?

A.    I do.

Q.    Do you recall whether you sent this letter directly to MD Helicopters in addition to sending it to Mr. Bennett?

A.    I don't recall, but I would guess the credit agreement would require you --

MR. PICKHARDT:  She's not asking you to guess.  She's asking whether you recall.

Page 139

COVER - CONFIDENTIAL

A.    I don't recall.

Q.    Your cover email to Mr. Bennett says, "Please forward on to the companies' respective officers to ensure receipt."

Is that correct?                    Relevance

A.    That's correct.

Q.    And you don't advise Mr. Bennett in that cover email, do you, that you will separately sent these letters to any portfolio companies, do you?

A.    That's correct.

Q.    But you don't recall one way or the other whether you actually did so.

A.    I don't.

Q.    Paragraph 2 says, "Refrain from making any future payments to Patriarch Partners Agency Services, LLC.  Note that ARK II CLO 2001-1 LTD and ARK Investment Partners II, LP, have elected not to appoint AMZAS as agent and thus will invoice separately."

Do you see that?

A.    I do.

Q.    Do you have any understanding as

Page 140

COVER - CONFIDENTIAL

to what ARK II CLO 2001 and ARK Investment Partners are?

A.    They appear to be other lenders under this credit agreement dated July 2005.

Relevance

Q.    And do you recall having any discussions about whether those other lenders would appoint AMZAS as agent?

A.    I don't recall any discussions.

Q.    And then turning to Point 3, you say, "Please send to the below bank account all interest, commitment fees, and any principal payments owed to the Zohar Funds, including any amount in arrears." And you identify bank name Key Bank National Association, an account number, an ABA number, and an account name.

Do you see that?

A.    I do.

Q.    Do you recall where you received information -- the information regarding the account number, the ABA number, and the account name?

A.    I don't -- I don't recall.

**Page 141**

COVER - CONFIDENTIAL

Relevance

Q.    Do you recall or does this refresh your recollection in any way as to whether, as of July 25th, AMZAS had opened an account at Key Bank national association?

A.    No.  I don't recall if it --

Q.    Can you turn back to Exhibit 28. It's the one that you're holding.  Over to the right page.  Can you look at the page with the Bates No. Ending in 842 and that is an email we looked at before where Ms. Mead tells you the bank isn't able to process any activity for the account including receipt of wires without the agreement in place.

Lack of Personal Knowledge; Speculation; Relevance

A.    Okay.

Q.    Does this in any way refresh your recollection as to whether, as of July 26, 2016, Key Bank was not able to process activity for the AMZAS account including the receipt of wires?

A.    It appears the account was not opened as of that date.

Q.    Did you ever notify Mr. Bennett

Page 142

COVER - CONFIDENTIAL

or anyone at Williams & Connolly that, in fact, the bank account that you had identified in your -- in the letters you had sent to him was not opened and could not receive wires?

Relevance

A.    I -- I don't recall.

Q.    Did you ever notify any individuals of any of the portfolio companies that the bank account identified in your letters had not been opened and could not receive wires as of July 26, 2016?

A.    I don't recall.

Q.    And turning to the next attachment, which ends 1014, this appears to be an invoice to MD Helicopters; is that correct?

A.    That's correct.

Q.    Do you recall generating invoices of this type around July 26, 2016?

A.    I don't know about me specifically at this time period.

Q.    Do you recall ever generating

Page 143

COVER - CONFIDENTIAL

Relevance

invoices --

A.    Yes.

Q.    -- of this nature?

And do you think you generated invoices of this nature after this date, before this date, around this date, or do you not recall?

A.    I don't recall.

Q.    Who else at A&M or AMZAS had responsibility for generating invoices?

MR. PICKHARDT:   To the extent you know.

Q.    If you know.

A.    Again, I don't recall exactly, though I think it was myself, Aileen Daversa, and Tom Macedonio, though when and how who did what I don't recall.

Q.    Understood.

(Exhibit 30, An email chain, Bates ZOHAR-PPAS-00017145, was hereby marked for identification, as of this date.)

Q.    I've marked as Exhibit 30 a document bearing the -- an email that

**Page 144**

COVER - CONFIDENTIAL

bears the Bates No. ZOHAR-PPAS-00017145 and one attachment to that email bearing the Bates No. 17170 as in the prior emails this included a ZIP file of numerous documents of a similar nature.

Relevance

We have included one document here, and it is an invoice to MD Helicopters; is that correct?

MR. PICKHARDT:  Are you asking him whether he recalls it or just to identify the document?

Q.    Is the attachment to this document an invoice to MD Helicopters on AMZAS' letterhead?

MR. PICKHARDT:  Objection.  The document speaks for itself.

Q.    You can answer.

A.    Yes, I see it.

Q.    Okay.  And looking at the cover email, the bottom-most email on that string is an email from you to Mr. Bennett on August 25, 2016, copying various individuals.  And you say, "Hi Ted, on behalf of A&M Zohar Agency Services,

Page 145

COVER - CONFIDENTIAL

please find the attached interest invoices intended for the companies you represent. Please forward on to the companies' respective officers to ensure receipt."

Relevance

Do you see that?

A.    I do.

Q.    And turning now to the invoice. Turn to the back page of the invoice.  The bank name listed is JPMorgan Chase Bank, N.A., and there's an ABA and account number and account name listed; is that correct?

A.    Yes.

Q.    And I think you stated earlier today that you recall that AMZAS opened at some point an account at JPMorgan Chase bank.

A.    Correct.

Q.    And I think the invoice that we just looked at in Exhibit 29 included Key Bank wire instructions.

A.    Correct.

Q.    So at some point -- sorry.

Do you recall why the wiring

COVER - CONFIDENTIAL

instructions changed from the invoice that you sent on or around July 26th to the invoice you sent on or around August 25th?

A.    I believe we were having those same contract issues.

Relevance

Q.    With Key Bank?

A.    With Cortland/Key Bank.

Q.    And did those issues ultimately result in you -- sorry.  Strike that.

Did those issues prevent you from ultimately opening an account at Key Bank?

MR. PICKHARDT:  Objection. Vague as to "open."

A.    Yeah.  I don't believe I was a part of the final decision to opt for one bank or the other.

Q.    Okay. Do you recall whether you had any -- strike that.

Did one of your responsibilities as a member of the Zohar Funds team include reaching out to portfolio companies?

A.    It may have.

**Page 147**

COVER - CONFIDENTIAL

Q.    Do you recall reaching out to any portfolio companies at any time in connection with your work for the Zohar Funds?

Relevance

A.    When we first took over as collateral manager, I recall the team making calls to introduce ourselves as the new manager.

Q.    And you recall participating in some of those calls.

A.    Sure.

Q.    Do you recall any specific companies that you participated in calls for?

A.    Not specifically, no.

(Exhibit 31, An email chain, Bates ZOHAR-PPAS-00000643, was hereby marked for identification, as of this date.)

Q.    I've marked as Exhibit 31 a document, an attachment bearing the Bates No. ZOHAR-PPAS-00000643 through 646.

Take your time to review the document.

**Page 148**

COVER - CONFIDENTIAL

A.      (Witness perusing document.)

Okay.

Relevance

Q.      This is an email from you to ebrodbeck@180s.com dated May 5, 2016.

In that email, you state, "Hi Ernie, I hope this message finds you well. As our team indicated on the phone yesterday, please find attached an information request list from the A&M Zohar Management team as the collateral manager of the Zohar Funds."

Do you recall speaking with Ernie Brodbeck at 180s on or around May 4, 2016?

A.      I don't remember that call.

Q.      Do you recall sending this email to Mr. Brodbeck attaching a list of information that A&M was requesting as collateral manager of the Zohar Funds?

A.      Not specifically, no.

Q.      Do you recall any discussions around this time with any portfolio companies regarding requests for information?

**Page 149**

COVER - CONFIDENTIAL

A.      Not outside of this request.      Relevance

Q.      Do you recall -- sorry.

Did you learn at some point that the portfolio companies were represented by counsel?

A.      Sorry.  Repeat that.

Q.      Did you learn at some point in time that the portfolio companies were represented by counsel or that some portfolio companies were represented by counsel?

MR. PICKHARDT:  Objection. Asked and answered.

Q.      That's a fair point.

I think you -- earlier today, you testified that you recall learning that, at some point, that some portfolio companies were represented by counsel.    Relevance

Do you know whether you learned that fact before or after you sent this email?

A.      I don't know.

Q.      Do you recall ever reviewing any correspondence from the -- any -- from

Page 150

COVER - CONFIDENTIAL

Relevance

counsel for the portfolio companies stating that they were representing portfolio companies?

A.    One more time.

Q.    Do you recall ever seeing or reviewing any letters from counsel for the portfolio companies stating that they were representing the portfolio companies?

A.    Yes.  I think I would have received that.

Q.    And do you think you would have received that directly from counsel for the portfolio companies or was it forwarded to you from someone internal at A&M?

A.    No.  I don't recall.

Q.    Okay.  I'm going to mark as Exhibit 32 a letter dated May 5, 2016, from Williams & Connolly to Elizabeth LaPuma.

(Exhibit 32, A letter dated May 5, 2016, was hereby marked for identification, as of this date.)

Q.    Is this -- do you recall

**Page 151**

COVER - CONFIDENTIAL

Relevance

reviewing this letter at some point in time?

A.    Yeah.  Let me just read through it.

Q.    Yeah.  Take your time.

A.    (Witness perusing document.)
Yeah.  I recall this letter.

Q.    Okay.  And do you -- did Ms. LaPuma provide this letter to you?

A.    I don't recall.

Q.    Okay.  Do you recall having any discussions after you saw this letter about the contents of this letter?

A.    I don't recall anything specific.

Q.    Did Ms. LaPuma ever instruct you not to reach out to portfolio companies directly but rather to direct communications through counsel?

A.    Yes.  I believe we were instructed to do so.

Q.    You were instructed to communicate through counsel?

A.    Through Williams & Connolly.

Page 152

COVER - CONFIDENTIAL

Q.    Do you recall when she gave you that instruction?

Relevance

A.    I do not.

Q.    Did you follow that instruction?

A.    To the best of my knowledge.

Q.    Do you recall whether that instruction was given to you some time in the May time -- in the May timeframe?

A.    I don't recall that.

Q.    Do you recall whether it was given to you in connection with your receipt of this letter?

A.    I don't recall that.

Q.    After you -- sorry.  Strike that.

        (Exhibit 33, An email chain, Bates ZOHAR-PPAS-00001122, was hereby marked for identification, as of this date.)

Q.    I've marked as Exhibit 33 a document an attachment bearing the Bates No. ZOHAR-PPAS-00001122 through 1125.

        Take your time to review the document.

Page 153

COVER - CONFIDENTIAL

A.    (Witness perusing document.) Relevance

Okay.

Q.    This is an email from you to mberlin@remcony.com.

Do you see that?

A.    Yes.

Q.    Okay.  And you're attaching a payment notice; is that correct?

A.    That is correct.

Q.    And is Remco NY a portfolio company for the Zohar Fund?

A.    Remco Maintenance.  It's a portfolio company.

Q.    Sorry.  Remco Maintenance.

And did you copy Mr. Bennett or anyone from Williams & Connolly on this email?

A.    On this email, I don't see any copy.

Q.    Do you recall why you didn't copy Mr. Bennett or anyone from Williams & Connolly on this email?

A.    I would note this is --

MR. PICKHARDT:  She's asking if

**Page 154**

COVER - CONFIDENTIAL

Relevance

you recall.

A.    I don't recall.

Q.    You stated you were going to note something.

What were you going to note?

A.    I was going to say I note what I could guess based on this email.  But I don't remember at the time why I would not have CCed Mr. Bennett.

Q.    Do you recall whether you sent this email before or after Ms. LaPuma gave you the instruction to communicate with portfolio companies only with counsel?

A.    I don't recall.

Q.    Do you recall having any discussions with Mr. or Mrs. Berlin at Remco regarding the -- this email or the attachment to this email?

A.    I don't recall any conversations.

Q.    Do you recall when PPAS commenced this litigation?

A.    I don't.

Q.    Do you recall whether it was

**Page 155**

COVER - CONFIDENTIAL

Relevance

before or after July 26, 2016?

A.    I don't recall.

Q.    Do you recall that they commenced it -- this litigation shortly after AMZAS sent the letters purporting to terminate?

A.    I don't.

(Exhibit 34, An email chain, Bates ZOHAR-PPAS-00010377, was hereby marked for identification, as of this date.)

Q.    I've marked as Exhibit 4 an email and attachment with the Bates No. ZOHAR-PPAS-00010377 through 379.  This is an email from Mr. Gresser to Ms. LaPuma copying Mr. Sinaiko.  I note that you are not -- you do not appear to be a sender or recipient on this email.

I request that you review the email, in particular, the attachment to the email, and let me know whether you've ever seen the attachment to this email before.

A.    (Witness perusing document.)

**Page 156**

COVER - CONFIDENTIAL

Relevance

I don't recall if I ever saw this letter.

Q.    You don't recall one way or another.

MR. PICKHARDT:  Asked and answered.

Q.    Correct?

A.    Correct.

Q.    Okay.  Let's take a ten-minute break.

THE VIDEOGRAPHER:  Going off the record.  The time is 212 p.m.  This is the end of Media Unit 3.

(Recess)

THE VIDEOGRAPHER:  We are back on the record.  The time is 2:29 p.m. This is the beginning of Media Unit 4.

BY MS. O'BOYLE:

Q.    Did you discuss the substance of your testimony with your counsel during the break?

A.    Yes.

Q.    Okay.

**Page 157**

COVER - CONFIDENTIAL

Relevance

(Exhibit 35, An email chain, Bates ZOHAR-PPAS-00009558, was hereby marked for identification, as of this date.)

Q.    I've marked as Exhibit 35 an email bearing the Bates No. ZOHAR-PPAS-00009558 to 9559.  I have not marked any exhibits to this email.

This email is -- has the subject "Visit Best Textiles Rand McNally" -- sorry -- "Visit Info - Best Textiles & Rand McNally."  It's from you to Ms. LaPuma on September 7, 2016.

Take your time to review the document, and let me know when you've had a chance to do so.

A.    (Witness perusing document.)

Yes.

Q.    Do you recall sending this email to Ms. LaPuma?

A.    I do not.

Q.    Do you recall why you were sending information to Ms. LaPuma around September 7, 2016, regarding Best Textiles

Page 158

COVER - CONFIDENTIAL

and Rand McNally?

Relevance

A.    I do not.

Q.    Do you recall whether Ms. LaPuma at any time made efforts to visit Best Textiles or Rand McNally?

A.    I don't recall.

Q.    So you have no recollection as to why you were providing Ms. LaPuma on September 7, 2016, an address and a contact for Best Textiles and Rand McNally along with a copy of the visitation verification clause in the credit agreements.

A.    I don't recall.

Q.    Do you know whether Ms. LaPuma -- strike that.

Are you aware that one of the claims that A&M, AMZAS, and Zohar Funds are asserting in this litigation is that PPAS has been improperly withholding financial information regarding the portfolio companies from A&M and the Zohar Funds?

A.    I believe it would be AMZM.

**Page 159**

COVER - CONFIDENTIAL

Q.    Okay.  Substitute AMZM into my question, and then try to answer it.    Relevance

A.    Yes.  One more time.

Q.    Do you have any knowledge about what financial information PPAS has in its possession -- financial information about the portfolio companies PPAS has in its possession?

MR. PICKHARDT:  Objection to form.

A.    I do not.

Q.    Do you know whether the credit agreements provide that the portfolio companies provide financial information to the lenders?    Speculation; Legal Conclusion; Relevance

MR. PICKHARDT:  Calls for a legal conclusion.

A.    I would have to read a credit agreement, but I could speak to generally what I've seen.    Speculation; Legal Conclusion; Relevance

Q.    Okay.  What have you generally seen?

A.    Generally, the lenders do have rights.  In some cases, only agents have

Page 160

COVER - CONFIDENTIAL

Speculation; Legal Conclusion; Relevance

rights to financials.

Q.    Okay.  Do you recall at any point in time being asked to analyze credit agreements to determine whether the portfolio companies were required to provide information to the lenders?

Relevance

A.    I don't recall specifically, no.

(Exhibit 36, An email chain, Bates ZOHAR-PPAS-00036911, was hereby marked for identification, as of this date.)

Q.    I've marked as Exhibit 36 a document bearing the Bates No. ZOHAR-PPAS-00036911 to 36913?

(Exhibit 37, An email chain, Bates ZOHAR-PPAS-00036895, was hereby marked for identification, as of this date.)

(Exhibit 38, An email chain, Bates ZOHAR-PPAS-00036905, was hereby marked for identification, as of this date.)

A.    Okay.

Q.    Okay.  On the bottom of the

**Page 161**

COVER - CONFIDENTIAL

Relevance

first email on this string is an email from Aileen Daversa.  Can't view the recipients based on how it was produced to us, but I note that you are copied on an email above that.  So presumably or so you at some point received this bottom email either originally from Ms. Daversa or through that forwarded email.

Ms. Daversa in the second paragraph says, "For your assigned companies, could you please confirm who i.e. agent, collateral manager, lender the borrower is obligated to provide financial information to."

Do you see that?

A.    I do.

Q.    And your name appears in the list below or -- sorry.

There's -- it says "Chris - MD Helicopters."

Do you believe that was referring to you?

A.    I do.

Q.    And do you recall Ms. Daversa

**Page 162**

COVER - CONFIDENTIAL

Relevance

requesting at some point in late March 2016 that you confirm who the borrower is obligated to provide financial information to?

A.    I'm sorry.  What was the question?

Q.    Sure.

Do you recall -- do you recall receiving this email or request from Ms. Daversa of the nature described herein in late March?

A.    I don't -- I don't recall this email.

Q.    Do you recall at any point looking at the credit agreements for MD Helicopter and determining who the borrower was obligates to provide financial information to?

A.    I don't recall specifically looking at MD.

Q.    I'm handing you two exhibits marked as 37 and 38.

The first email bears the Bates No. ZOHAR-PPAS-00036895 to 96.  That's

Page 163

COVER - CONFIDENTIAL

what I've marked as Exhibit 37.  And the

Relevance

next bears the Bates No.

ZOHAR-PPAS-00036905 to 06, and that's what

I've marked as Exhibit 38.  These are both

emails that you've sent on March 25, 2016,

to Ms. Daversa.

Let me know when you've had a

chance to look at them.

A.    (Witness perusing document.)

Okay.

Q.    Does looking at Exhibit 27

refresh your recollection in any way that

you looked at the credit agreements for MD

Helicopters and analyzed who the borrowers

were required to furnish financial

information to?

A.    It doesn't refresh my memory.

Q.    Do you have any doubt that you

sent the email marked as Exhibit 27?

A.    I do not.

Q.    Do you have any doubt that you

sent the email marked as Exhibit 28?

A.    I do not.

MR. PICKHARDT:   38?

**Page 164**

COVER - CONFIDENTIAL

Q.    38.

MR. PICKHARDT:  And 37?

MS. O'BOYLE:  That's correct.

Q.    And in both Exhibit 37 and Exhibit 38, you state, "Borrower shall furnish to the agent (PPAS) and lenders." And then you identify the lenders; is that correct?

A.    Yes.

Q.    And then you identify for each of them certain information that the borrowers are required to furnish; is that correct?

A.    That's correct.

Q.    Are you aware of -- that A&M -- I'm sorry.

Do you know whether A&M sought financial information directly from the portfolio companies at any time?

A.    I don't recall.

Q.    Do you recall any -- do you recall learning at any point that the portfolio companies through their counsel agreed to provide certain financial

Relevance

**Page 165**

COVER - CONFIDENTIAL

information upon the execution of a confidentiality agreement?

A.    One more time.

Q.    Sure.

Do you recall learning at any point that the portfolio companies through their counsel agreed to provide certain financial information to A&M or AMZM upon the execution of the confidentiality agreement?

A.    I recall hearing of that, though I don't have details around that.

Q.    What do you recall hearing about that, to the extent it did not come from communications with counsel?

A.    It would be largely with counsel.  I don't recall anything outside of that.

Q.    Is there anything that you recall learning outside of the presence of counsel about that issue?

A.    I don't believe so, no.

Q.    Do you know whether A&M, AMZM, AMZAS ever agreed to sign a

Page 166

COVER - CONFIDENTIAL

confidentiality agreement?

MR. PICKHARDT:  I'm going to, again -- you should only provide a response if you know of that outside of what may or may not have been with counsel.

A.     I don't know.

Q.     Did A&M receive any financial information from any portfolio companies?  Sorry.  Strike that.  About portfolio companies whether directly from the portfolio companies themselves or from another source?

MR. PICKHARDT:  Objection to form.  Vague.

A.     Could you rephrase that?

Q.     Sure.

Do you know whether A&M received any financial information or financial documentation such as financial statements, budgets, those types of documents from the Zohar Funds as the prior collateral manager?

MR. PICKHARDT:  Objection.  From

Page 167

COVER - CONFIDENTIAL

the Zohar Funds?

Q.    Sorry.  From Patriarch.

MR. PICKHARDT:  Objection to form.

A.    In which capacity?

Q.    In any capacity.

A.    We did receive some financials, yes.

Q.    Okay.  And did you review any of the financials that you received --

A.    I did --

Q.    -- from Patriarch?

A.    -- review some, yes.

Q.    Do you know whether A&M received any financial documentation from portfolio companies, directly from portfolio companies at any time?

A.    I don't recall.

Q.    Did you personally prepare any analyses or summaries using the financial -- portfolio company financial information that you received from Patriarch?

A.    I certainly helped prepare

Page 168

COVER - CONFIDENTIAL

those.

Q.    Okay.  Do you recall in or around March of this year receiving some financials for LVD that were produced by PPAS in connection with this litigation?

A.    I recall reviewing a set of financials.  But I don't recall which company.

Q.    Do you recall reviewing a set of financials that were produced in this litigation?

A.    Yes.

Q.    And what did you perform any analyses with the financials that you reviewed?

A.    I don't recall.

Q.    Did you use them to update any analyses?

A.    I don't recall.

Q.    Do you recall anything that you did upon reviewing those documents?

A.    I don't.

Q.    Did you discuss the contents of those documents with anyone?

**Page 169**

COVER - CONFIDENTIAL

A.    I don't recall.

Q.    Prior to reviewing those documents, did counsel show you the protective order that was entered by the Court in this case?

A.    I don't recall.

(Exhibit 39, An email chain, Bates ZOHAR-PPAS-00032370, was hereby marked for identification, as of this date.)

Q.    I've marked as Exhibit 39 a document bearing the Bates No. ZOHAR-PPAS-00032370 with numerous attachments running through 32400.

And by numerous, I mean two attachments.

And this is an email from you to ingrid.bagby@cwt.com, copying Ms. LaPuma and Mr. Pickhardt.  And the subject is "Zohar - MD Audit & New ARK Commitments."

Who is Ingrid Bagby?

A.    I don't know her title.

Q.    Do you know where she works?

A.    At Cadwalader.

COVER - CONFIDENTIAL

Q.    And do you know who Cadwalader represents?

A.    I believe they represent MBIA.

Q.    Does Cadwalader represent A&M?

A.    I don't know.

Q.    Do you have any reason to believe Cadwalader represents A&M?

A.    I have no knowledge.

Q.    In the course of performing your duties as a member of the Zohar Funds team, do you communicate regularly with individuals at Cadwalader?

A.    No.

Q.    Do you have any recollection of why you were sending Ms. Bagby the MD Helicopter fiscal year 2015 audit in early May 2016?

MR. PICKHARDT:  I'm going to caution you, in responding to the extent you do have a recollection, to exclude the substance of anything you learned from counsel in connection with that.

A.    Yeah.  I don't recall.

Page 171

COVER - CONFIDENTIAL

Q.      Separate from communications with Cadwalader, in the course of performing your duties as a member of the Zohar Fund team, do you communicate regularly with individuals at MBIA?

A.      Occasionally.

Q.      And who at MBIA do you communicate with?

A.      Typically, Keith Borielli.  And that's under our role as Zohar I collateral agent.

Q.      Do you communicate with individuals at MBIA as your role as AMZAS?

A.      I don't believe so.

Q.      And by you, I was referring to you personally.

Do you know whether anyone at A&M communicates with individuals at MBIA in your role as AMZAS?

A.      I don't.

Q.      Do you regularly provide MBIA with financial information regarding the portfolio companies?

A.      I do not.

Page 172

COVER - CONFIDENTIAL

Q.    Do you know whether anyone at A&M regularly provides MBIA with information regarding the portfolio companies?

A.    Not to my knowledge.

Q.    Apart from this email that you sent to Ingrid Bagby at Cadwalader, do you recall forwarding any financial documentation regarding the portfolio companies to MBIA?

A.    I don't recall.

Q.    Do you think you might have?

MR. PICKHARDT:  Objection. Calls for speculation.

A.    I don't know.

Q.    Okay.  Do you recall forwarding financial documentation regarding the portfolio companies to any members of the Zohar III controlling class?

A.    I don't recall doing so.

(Exhibit 40, An email chain, Bates ZOHAR-PPAS-00032634, was hereby marked for identification, as of this date.)

Page 173

COVER - CONFIDENTIAL

Q.    I've marked as Exhibit 40 an email from you to Michele Maman and an attachment, and it bears the Bates No. ZOHAR-PPAS-00032634 through 32726.

I'm not going to quiz you about the attachment.  I might ask you about specific questions.  I know we're in a time crunch.

So do you recall -- sorry.

Do you recognize the attachment to this email?

A.    I do.

Q.    Did you assist in any way in preparing this attachment?

A.    I did.

Q.    Do you recall sending this to -- strike that.

Who is Michele Maman?

A.    She's also counsel at Cadwalader.

Q.    Okay.  Do you recall Ms. Maman requesting that you send her a copy of this report?

A.    I don't recall this email, no.

Page 174

COVER - CONFIDENTIAL

Q.   What as a general -- generally, I guess we can look at the index to make it easier or table of contents --

A.   Okay.

Q.   -- which is page 3 to 4.

Are there any specific sections of the report that you recall contributing to or drafting?

A.   I would say the grunt work was largely shared.  So I may have helped in most of these areas.

Q.   Okay.  And who else do you recall working on this presentation?

A.   It would be myself, Tom Macedonio, and Aileen.

Q.   Okay.  Did Ms. LaPuma work on this?

A.   Yes.

Q.   Okay.  Did she review the work you did or do you recall her actually drafting sections of this report?

A.   I don't recall.

Q.   Did Mr. Marsal work on this report?

**Page 175**

COVER - CONFIDENTIAL

A.    He certainly had an overview.

Q.    Meaning he reviewed it?

A.    Yeah.  Meaning he was overseeing.

Q.    Do you recall having any conversations with Mr. Marsal about this report?

A.    Not specifically, no.

Q.    If you look at page 5 of this report.

A.    Okay.

Q.    The second bullet states, "The information provided to date by Patriarch and obtained from the portfolio companies and other sources is insufficient to form complete reporting as required by the Zohar indenture governing the Zohar Funds."

Did you draft that bullet?

A.    I don't recall that.

Q.    Do you have any understanding as to the basis for that bullet?

A.    I would need to understand the indenture.

Page 176

COVER - CONFIDENTIAL

Q.    Did you ever review the indenture?

A.    In part.

Q.    Do you recall what reporting was required by the indenture?

A.    I do not.

Q.    Do you -- did you ever review trustee reports that were issued prior to A&M assuming the role of collateral manager?

A.    Review, yes.

Q.    To your knowledge, has A&M ever prepared any trustee reports -- sorry.

Have any trustee reports been issued since A&M became collateral manager?

A.    Not to my knowledge.

Q.    Do you have any understanding as to why trustee reports have not been issued since A&M became collateral manager?

A.    I don't know.

Q.    Okay.

COVER - CONFIDENTIAL

(Exhibit 41, An email chain, Bates ZOHAR-PPAS-00010404, was hereby marked for identification, as of this date.)

Q.    I've marked as Exhibit 41 a document bearing the Bates No. ZOHAR-PPAS-00010404 with attachments running through 10408.  And I'm going to focus on the first attachment.

Feel free to peruse the document, if you'd like.

A.    (Witness perusing document.)

Okay.

Q.    Okay.  I can proceed.  Or you want to spend more time?

A.    Let me just go through this a second.

Q.    Yeah.  Sure.

A.    You're speaking of this one (indicating)?

Q.    Correct.

A.    Okay.

(Witness perusing document.)

Okay.

Page 178

COVER - CONFIDENTIAL

Q.     Okay.  So just going back for a minute to the cover email, this is an email from you to Ms. LaPuma copying Thomas Macedonio on November 2, 2016.  And you say, "LL and Tom, a few files attached for tomorrow."  And then you list -- you describe the attachments.

Do you recall what was happening on November 3, 2016, that you were sending these documents in advance of?

A.     I don't recall.

Q.     Do you recall preparing the first attachment to this email?

A.     I do not.

Q.     Okay.  I'm just going to ask you about a few of the bullets on this list.

The second bullet says, "Prepare future versions of the status updates."

Do you see that?

A.     I do.

Q.     And do you understand status updates to mean documents similar to the status update you were reviewing in exhibit -- attached to Exhibit 40?

**Page 179**

COVER - CONFIDENTIAL

A.    I do.

Q.    Have you prepared any versions of the status update since October 2016?

A.    No.

Q.    Do you know why additional status updates have not been prepared by A&M since October 2016?

A.    I'm not aware of.

Q.    And then moving down six bullets from that, it says, "Calculate interest expected for all portfolio companies and compare to interest received each month."

Do you have responsibility for performing this task currently?

A.    Typically, yes.

Q.    And how do you perform that task?

A.    We use a -- I use a file prepared that has most of the loan characteristics -- debt balances, et cetera -- that tells me what interest I expect to see from a company.  I compare that to cash received according to the trustee.

Page 180

COVER - CONFIDENTIAL

Q.    And what do you do with that -- with that information -- sorry -- strike that.

What do you do once you have calculated interest expected and compared it to the interest received do you present that information to anyone?

Relevance; Not Testimony

A.    Typically, I'll prepare default letters if I see that a company has missed or paid less than I expected based on the credit agreements.

Q.    And do you send those default letters to the companies?

A.    I send them to Williams & Connolly.

Q.    Do you do anything else with the information that -- or any variances you identify between interest you would expect and the interest you would receive?

A.    I'm not sure -- typically, there's not large variances unless the company is not paying substantial amounts.

Q.    And when you're sending the default notices to Williams & Connolly,

Page 181

COVER - CONFIDENTIAL

are you doing that as AMZM or as AMZAS?

A.   I don't recall which -- which entity.

Q.   Are there any tasks that you currently perform that you understand yourself to be performing as AMZAS?

A.   Not to my knowledge.

Q.   Looking at the bullet -- the next bullet under "Calculate interest," it says, "Prepare and send interest invoices for all portfolio companies each month."

Is that a task that you perform?

A.   Sorry.  Which bullet?

Q.   So it's the ninth bullet down.

A.   I helped do that.

Q.   Do you currently continue to help do that?

A.   No.

Q.   Does anyone continue to prepare and send interest invoices for all the portfolio companies each month, anyone at A&M or AMZAS or AMZM?

A.   Not to my knowledge.

Q.   Do you have any understanding as

Page 182

COVER - CONFIDENTIAL

to why you stopped doing that?

A.    I don't.

Q.    The next bullet:  "Prepare and send default notices."  I believe we talked about in connection with your calculation of interest and variances.

Looking at the next bullet: "Follow up with events that are occurring and will continue to occur."

And there's five bullets beneath that.

Are you responsible for following up with any of the portfolio company events identified here?

A.    I had followed up with Duro.

Q.    Duro?  D-U-R-O?

A.    Yeah.  The third one down.

Q.    Did you have any responsibility for following up regarding Transcare?

A.    I did not.

Q.    Do you have any understanding as to what the disagreement over money paid to agent is?

A.    I don't recall that.

Page 183

COVER - CONFIDENTIAL

Q.     Moving down two more bullets, "Calculate, accrue, and invoice PIK balances by facility as applicable each month."

Do you know what that refers to?

A.     I believe that refers to, depending on the credit agreement, certain balances of unpaid interest would accrue additional interest.  And that's what that would be referring to.

Q.     And do you work on that task?

A.     I don't recall working on that task.

Q.     Moving down two more bullets, it's "Work with the noteholders to provide information redacted where necessary allowable under the indentures."

Have you provided noteholders with any information allowable under the indentures?

A.     We've certainly provided updates, material updates.

Q.     Updates other than the update that we reviewed in Exhibit 40?

Page 184

COVER - CONFIDENTIAL

A.    Sure.

Q.    And were those oral or written or both?

A.    Potentially both.

Q.    And generally speaking, what type of information is provided in those updates?

A.    I'd be speculating.

Q.    Do you participate in -- to the extent that the updates are oral, have you participated in providing oral updates to the noteholders?

A.    I have, but on a very limited basis.

Q.    Okay.  And what types of updates have you provided?

A.    Generally litigation updates, where things stand.

Q.    Have you provided any updates regarding this litigation?

A.    I don't believe so.

Q.    The next bullet says, "Organize files as agent and collateral manager in compliance with A&M retention policies."

COVER - CONFIDENTIAL

Do you see that?

A.    I do.

Q.    Do you know what is being referred to by A&M retention policies?

A.    I don't recall what that bullet is about.

Q.    Okay.  And the last bullet is "Field calls from prospective interested investors."

Have you fielded any calls from prospective interested investors?

A.    Yes.

Q.    Which interested investors have you fielded calls from?

MR. PICKHARDT:  I'm going to instruct him not to answer.  What relevance does that have?

MS. O'BOYLE:  I think we went over this last time.

MR. PICKHARDT:  I think I instructed him not to answer.  What relevance does it have?

Q.    Have you provided information regarding the portfolio companies to any

Page 186

COVER - CONFIDENTIAL

interested investors?

A.      Not to my knowledge.

Q.      Okay.  Are you aware of any funds that were distributed by the portfolio companies to PPAS for the benefit of the Zohar Funds that were not transmitted to the trustee?

A.      No, I'm not aware.

Q.      Are you aware of any amendments to the credit agreements for which PPAS was required to obtain the consent of the lenders but failed to do so?

A.      Can you repeat that?

Q.      Sure.

Are you aware that A&M is alleging in this litigation that PPAS failed to obtain consent of the Zohar Funds for certain oral or course of performance amendments?

MR. PICKHARDT:  I'm going to instruct you not to answer to the extent your knowledge is based upon discussions you've had with counsel. If you know that outside of any

Page 187

COVER - CONFIDENTIAL discussions with counsel, you can answer.

A.    Yeah.  I don't know of any -- anything outside of counsel.

Q.    Okay.

A.    Discussions.

Q.    Leaving that question aside, I'm now asking you the factual question as to whether you are aware of any course of performance or oral amendments that were made by PPAS without the consent of the Zohar Funds.

MR. PICKHARDT:  I instruct you to exclude from your answer anything you've learned from counsel.  But if you have any knowledge outside of anything you learned from counsel, you can answer.

A.    I have no other knowledge outside of discussions with counsel.

Q.    Have you discussed with counsel any specific amendments -- without asking about which amendment that was, has there been a discussion about specific

COVER - CONFIDENTIAL

amendments that were made improperly?

MR. PICKHARDT:  I'm instructing him not to answer that.

MS. O'BOYLE:  Well, you've alleged in this case that amendments were improperly made.  They have never been identified to them.  You're now shielding all discovery into them.

MR. PICKHARDT:  If he had something independent from what he's learned from counsel.  But whatever he hears from counsel is discussions with counsel.

MS. O'BOYLE:  I don't understand the underlying fact to be privileged.  If you're instructing him not to answer, you can instruct him not to answer.

MR. PICKHARDT:  I'm instructing him not to answer.

MS. O'BOYLE:  Okay.

MR. PICKHARDT:  Look, again, if he has knowledge outside of what he learned in discussions with counsel,

Page 189

COVER - CONFIDENTIAL

that's fine, or if he's probably seen documents that are independent of counsel, that's fine.  But if you're talking about -- asking him to relay what he has heard from counsel, I'm instructing him not to answer.

BY MS. O'BOYLE:

Q.    Are you going to take your counsel's advice?

A.    Yes.

Q.    Okay.  Outside of communications with counsel, have you had discussions with anyone at A&M regarding any amendments that were made by PPAS at all, whether proper or improper?

MR. PICKHARDT:  Objection to form.

A.    Amendments made by PPAS?  I'm not sure I understand.

Q.    Are you aware -- let me -- are you aware -- well, let me just read to you a sentence from the complaint that was filed by A&M in this -- or the counterclaims filed in this action.

Page 190

COVER - CONFIDENTIAL

"Prior to its removal of administrative agent, PPAS routinely purported to amend or modify the loans orally or by course of performance in order to reduce the amounts of interest owed to the Zohar Funds."

Are you aware, through any discussions, outside of your discussions with counsel, of any loans that PPAS amended or modified orally or by course of performance in order to reduce the amounts of interest owed to the Zohar Funds?

A.    I'm not aware of any outside of discussions with counsel.

Q.    Do you know whether PPAS had the authority under the credit agreements to amend or modify loans?

MR. PICKHARDT:  Objection. Calls for a legal conclusion.

Q.    You can answer if you can.

A.    I would need to review the credit agreement.

Q.    Okay.  Outside of reviewing the credit agreement, you have no

COVER - CONFIDENTIAL

understanding as to whether or not PPAS

had the authority to amend or modify

loans.

A.    I don't recall.

Q.    Did you ever communicate with

anyone from PPAS or have you ever

communicated with anyone from PPAS?

A.    Not that I can recall.

Q.    Have you ever taken any efforts

to negotiate compliance with PPAS --

sorry -- compliance by PPAS of its

obligations under the credit agreements?

MR. PICKHARDT:  Objection to

form.  Confusing.

Q.    You can answer my question if

you understand it.

A.    Yeah.  Could you restate it?

Q.    Sure.

Have you ever taken any steps to

negotiate compliance by PPAS of its

obligations under the credit agreements?

MR. PICKHARDT:  By "you," I

assume you're asking Mr. Cover.

MS. O'BOYLE:  Yes.  I would like

Page 192

COVER - CONFIDENTIAL

to ask you, but I won't.

A.      I don't recall.

Q.      Do you know whether anyone at A&M has taken such steps or efforts to negotiate compliance by PPAS?

A.      Not that I can recall.

Q.      Are you familiar with someone named Olga Goutnik?

A.      Yes.

Q.      Who is she?

A.      She was the administrative assistant for Liz.

Q.      Okay.  She's no longer at Alvarez & Marsal?

A.      She is.

Q.      Okay.

A.      She's just now administrative assistant for another employee.

Q.      Okay.  Do you know who Deer Park Road Management is or what that entity is?

A.      I don't recall.

MS. O'BOYLE:  I think I'm done, but could we just go off the record. I can confer with my colleagues for a

Page 193

COVER - CONFIDENTIAL

minute, and then we'll confirm.

MR. PICKHARDT:  Sure.

THE VIDEOGRAPHER:  Going off the record.  The time is 3:17 p.m.

(Recess)

THE VIDEOGRAPHER:  We are back on the record.  The time is 3:22 p.m.

BY MS. O'BOYLE:

Q.    I have no more questions, Mr. Cover.  Thank you very much for your time today.

A.    Thank you.

BY MR. PICKHARDT:

Q.    Mr. Cover, I have a couple of brief questions.

Do you recall Ms. O'Boyle asking you questions about whether Ms. LaPuma had ever requested that you communicate with portfolio companies through Mr. Bennett?

A.    I do.

Q.    When you had that communication with Ms. LaPuma, which she told you to communicate through Mr. Bennett, did you understand it to apply to Alvarez & Marsal

Relevance; Hearsay

Page 194

COVER - CONFIDENTIAL

Zohar Agency Services?

Relevance; Hearsay

A.    I did not.

Q.    Do you ever recall a discussion with Ms. LaPuma in which she told you or requested that when communicating on behalf of Alvarez & Marsal Zohar Agency Services, that all those communications go through Mr. Bennett?

A.    I don't recall that taking place.

Q.    Thank you.  I have no further questions.

BY MS. O'BOYLE:

MS. O'BOYLE:  I just have a little bit of followup on that.

Q.    Did Ms. LaPuma tell you one way or another whether her instruction applied to Alvarez & Marsal Agency Services?

A.    I don't recall being instructed in regards to AMZAS.

Q.    And why did you not -- or why do you not understand her instruction to apply to Alvarez & Marsal Zohar Agency Services?  Was it for any reason other

Page 195

COVER - CONFIDENTIAL

than that she didn't include that entity

when discussing this with you?

A.    I don't recall the timing of it.

Q.    Okay.  At any point, did you

develop an understanding as to why her

instruction did not apply to Alvarez and

Zohar Agency Services?

A.    I don't recall.

Q.    So were all communications that

you had with portfolio companies after the

date of Ms. LaPuma's instruction made in

your role as or in the role of Alvarez &

Marsal Zohar Agency Services?

A.    I'm not sure I understand.

Q.    Sure.

After your discussion with

Ms. LaPuma, did you ever reach out to

portfolio companies directly?

A.    I don't recall.

Q.    Did Ms. LaPuma limit her

instruction specifically to Alvarez &

Marsal Zohar Management?

A.    I don't know if I would say

limit.  My recollection is we were told

Page 196

COVER - CONFIDENTIAL

from one of the exhibits from Ted Bennett to no longer contact the companies as AMZM.  To my recollection, Ms. LaPuma directed me not to do that.

Q.    And that -- I believe -- are you referring to the May 5th letter from Mr. Bennett that we reviewed earlier?

A.    Which exhibit is that?

Q.    It was Exhibit 32.

A.    Yes.  Exhibit 32.

Q.    And that is dated May 5, 2016?

A.    Correct.

Q.    Do you know when AMZAS was formed?

A.    I don't recall.

(Exhibit 42, An email chain, Bates ZOHAR-PPAS-00059860, was hereby marked for identification, as of this date.)

Q.    I've marked as Exhibit 42 an email and attachments bearing the Bates No. ZOHAR-PPAS-00059860 through 59871. It's an email from you to Mike Fredian and Jessica Mead, and it's attaching a

COVER - CONFIDENTIAL certificate of formation for AMZAS and a Zohar Agency Services EIN.

If you look at the first attachment, it's the certificate of formation. And I'll just direct your attention to the second page of that attachment.

The last sentence of that says, "In witness whereof, the undersigned has executed the certificate of formation of AMZAS this 20th day of May 2016."

A.   Okay.

Q.   So does this refresh your recollection that AMZAS was formed after Mr. Bennett sent his letter on May 5, 2016?

A.   I have no reason to disagree with that.

Q.   And --

A.   Using these two documents.

Q.   At any point, did you ask Ms. LaPuma whether her instruction that was previously given with respect to AMZM should apply to AMZAS?

Page 198

COVER - CONFIDENTIAL

A.    I don't recall having that conversation.

Q.    I have no further questions.

MR. PICKHARDT:  I have no further questions.

THE VIDEOGRAPHER:  We are off the record at 3:29 p.m.  And this concludes today's testimony given by Christopher Cover.  The total number of media units used was four and will be retained by Veritext New York.

(TIME NOTED:  3:29 p.m.)

_____
CHRISTOPHER COVER

_____
Subscribed and sworn to before me this _____ day of _____, 2017.
_____
Notary Public

Page 199

I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---------|----------------|------|
| CHRISTOPHER COVER | MS. O'BOYLE | 5 |
| | MR. PICKHARDT | 193 |
| | MS. O'BOYLE | 194 |

E X H I B I T S

| DEPOSITION | DESCRIPTION | PAGE |
|------------|-------------|------|
| Exhibit 21 | AMZM's Responses and Objections to Plaintiff Patriarch Partners Agency Services LLC's First Set of Interrogatories | 39 |
| Exhibit 22 | An email chain, Bates ZOHAR-PPAS-00002784 | 51 |
| Exhibit 23 | An email chain, Bates ZOHAR-PPAS-00002863 | 51 |
| Exhibit 24 | A privilege log | 58 |
| Exhibit 25 | An email chain, Bates ZOHAR-PPAS-00046442 | 66 |
| Exhibit 26 | Credit agreement, Bates PPAS-SDNY-00020557 | 81 |
| Exhibit 27 | Credit Agreement, Bates ZOHAR-PPAS-00025838 | 99 |
| Exhibit 28 | An email chain, Bates ZOHAR-PPAS-00000821 | 110 |

Page 200

I N D E X(Cont'd)

E X H I B I T S

| DEPOSITION | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 29 | An email chain, Bates ZOHAR-PPAS-00000917 | 134 |
| Exhibit 30 | An email chain, Bates ZOHAR-PPAS-00017145 | 143 |
| Exhibit 31 | An email chain, Bates ZOHAR-PPAS-00000643 | 147 |
| Exhibit 32 | A letter dated May 5, 2016 | 150 |
| Exhibit 33 | An email chain, Bates ZOHAR-PPAS-00001122 | 152 |
| Exhibit 34 | An email chain, Bates ZOHAR-PPAS-00010377 | 155 |
| Exhibit 35 | An email chain, Bates ZOHAR-PPAS-00009558 | 157 |
| Exhibit 36 | An email chain, Bates ZOHAR-PPAS-00036911 | 160 |
| Exhibit 37 | An email chain, Bates ZOHAR-PPAS-00036895 | 160 |
| Exhibit 38 | An email chain, Bates ZOHAR-PPAS-00036905 | 160 |

**Page 201**

I N D E X (Cont'd)

E X H I B I T S

| DEPOSITION | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 39 | An email chain, Bates ZOHAR-PPAS-00032370 | 169 |
| Exhibit 40 | An email chain, Bates ZOHAR-PPAS-00032634 | 172 |
| Exhibit 41 | An email chain, Bates ZOHAR-PPAS-00010404 | 177 |
| Exhibit 42 | An email chain, Bates ZOHAR-PPAS-00059860 | 196 |

Page 202

CERTIFICATION

I, SHARON LENGEL, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 9th day of October, 2017.

_____

SHARON LENGEL, RPR, CRR

*      *      *

**Page 203**

**ERRATA SHEET**
**VERITEXT/NEW YORK REPORTING, LLC**

CASE NAME: PATRIARCH PARTNERS AGENCY
SERVICES v. ZOHAR CDO 2003-1
DATE OF DEPOSITION: October 6, 2017
WITNESS' NAME: CHRISTOPHER COVER
PAGE/LINE(S)/    CHANGE        REASON
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____
____/_____/_____/_____

_____
CHRISTOPHER COVER

SUBSCRIBED AND SWORN TO
BEFORE ME THIS_____DAY
OF_____, 2017.

_____
NOTARY PUBLIC
MY COMMISSION EXPIRES_____

# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATRIARCH PARTNERS AGENCY SERVICES, LLC

                Plaintiff-Counterclaim-Defendant,

v.

ZOHAR CDO 2003-1, LTD., ZOHAR II 2005-1, LTD., and

ZOHAR III, LTD.,

                Defendants-Counterclaim-Plaintiffs,

and

ZOHAR CDO 2003-1, LLC, ZOHAR II 2005-1, LLC, and

ZOHAR III, LLC,

                Defendants

--------------------------------

                        (CONFIDENTIAL)
            ORAL AND VIDEOTAPED ZOOM DEPOSITION

                        JAMES T. BERRY

                        June 23, 2023

                        9:02 a.m.


                    Esquire Deposition Solutions

                     1235 North Loop West

Key
PPAS Designation             Houston, Texas

Trust Designation


                 Veronica Drechsel, RPR, CSR



A P P E A R A N C E S

For the                          MICHAEL L. NADLER, ESQ.
Plaintiff-Counterclaim-          GIBSON, DUNN AND CRUTCHER
Defendant:                       200 Park Avenue
                                 New York, New York 10166
                                 (212) 351-2306
                                 mnadler@gibsondunn.com

For the                          ANA LOPEZ, ESQ.
Plaintiff-Counterclaim-          GIBSON, DUNN AND CRUTCHER
Defendant:                       200 Park Avenue
                                 New York, New York  10166
                                 (212) 351-3947
                                 allopez@gibsondunn.com

For the                          ELLISON WARD MERKEL, ESQ.
Defendants-Counterclaim-         QUINN, EMANUEL, URUQHART AND
Plaintiffs:                      SULLIVAN, LLP
                                 51 Madison Avenue
                                 21st Floor
                                 New York, New York  10010
                                 (212) 849-7362
                                 ellisonmerkel@quinnemanuel.com

For the                          DESTINY ROSE MURPHY, ESQ.
Defendants-Counterclaim-         QUINN, EMANUEL, URUQHART AND
Plaintiffs:                      SULLIVAN, LLP
                                 51 Madison Avenue
                                 21st Floor
                                 New York, New York 10010
                                 (212) 849-7422
                                 destinyrosemurphy@quinnemanuel.
                                 com

For the                          HANNAH ODENTHAL, ESQ.
Defendants-Counterclaim-         QUINN, EMANUEL, URUQHART AND
Plaintiffs:                      SULLIVAN, LLP
                                 51 Madison Avenue
                                 21st Floor
                                 New York, New York 10010
                                 (212)849-7080
                                 hannadodenthal@quinnemanuel.com

Also Present:                    Brian Hood, Videographer
                                 Carolyn Schiff, Patriarch
                                 Partners Agency Services

                                 INDEX



EXAMINATION OF JAMES T. BERRY:                          PAGE

By Ms. Merkel                                             6
By Mr. Nadler                                           146

DEPOSITION     EXHIBITS:                                PAGE

 Exhibit 1      Tab 63 Combined 2017.04.11              21
                Trustee_Ap3673781 2016 Afs

 Exhibit 2      Tab 09 2016.02.26 TRUSTEE_AP3680997     28
                Daily borrowing email Feb. 26, day
                of big draw

 Exhibit 3      Tab 01 2013.01.30 TRUSTEE_AP3696759     43
                PPAS Snelling DACA

 Exhibit 4      03 COMBINED 2016.02.08                  50
                TRUSTEE_AP3790766 Snelling 2016
                planned financials do not reflect
                big drawdown interest

 Exhibit 5      Tab 04 2016.02.10 TRUSTEE_AP3641855     58

 Exhibit 6      Tab 05 2016.02.12 TRUSTEE_AP3681107     63

 Exhibit 7      Tab 11 2016.02.29 TRUSTEE_AP3789470     71

 Exhibit 8      Tab 08 2016.02.23 TRUSTEE_AP3789770     76

 Exhibit 9      Tab 07 2016.02.23 TRUSTEE_AP3789763     88

 Exhibit 10     Tab 06 2016.02.23 TRUSTEE_AP3789755     92

 Exhibit 11     Tab 60 2016.02.26 PPAS-SDNY-00052774    100

 Exhibit 12     Tab 61 2016.03.07 PPAS-SDNY-00052789    102

 Exhibit 13     Tab 56 2017.11.13 TRUSTEE_AP3736778     104

 Exhibit 14     Tab 17 2016.04.04 TRUSTEE_AP3785984     107

 Exhibit 15     Tab 18 2016.05.17 TRUSTEE_AP3782479     114

 Exhibit 16     Tab 20 2016.05.24 TRUSTEE_AP3641169     116

DEPOSITION     EXHIBITS                                 Page



```
Exhibit 17    Tab 20 2016.05.24 TRUSTEE_AP3641169    117

Exhibit 18    Tab 32 combined 2017.03.02             119
              TRUSTEE_AP3763442

Exhibit 19    Tab 34 2017.03.30 TRUSTEE_AP3761357    122

Exhibit 20    Tab 36 combined 2017.03.31            123
              TRUSTEE_AP3761257

Exhibit 21    Tab 36 combined 2017.03.31            130
              TRUSTEE_AP3761257

Exhibit 22    Tab 55 COMBINED 2017.11.07            134
              TRUSTEE_AP3687760

Exhibit 23    Tab 50 2017.10.23 TRUSTEE_AP3738963    139
```



Oral and Videotaped Zoom Deposition

June 23, 2023


THE VIDEOGRAPHER:  Good morning, Counselors.

We are now on the record.  The time is approximately 9:02 a.m., Central Daylight Time, on June the 23rd, 2023.  This begins the video conference deposition of Jim Berry, taken in the matter of Patriarch Partners Agency Services, LLC versus Zohar, filed in the United States District Court, Southern District of New York, Case Number 16-CV-4488-VMKHP.

My name is Brian Hood, and I'll be your remote videographer today, and the court reporter is Veronica Drechsel.  We represent Esquire Deposition Solutions.

As a courtesy, will everyone who is not speaking, please mute your audio, and please remember to unmute when you are ready to speak.

Will everyone present, please, identify themselves for the record and state whom you represent, after which time the Witness will be sworn in.

Thank you.

MS. MERKEL:  Good morning.  Ellison Merkel from Quinn, Emanuel, Urquhart and Sullivan.  I'm also joined by Destiny Rose Murphy and Hannah Odenthal, also from Quinn Emanuel, and we represent the Zohar litigation trustee.



MR. NADLER:  All right.  Good morning.  This is Michael Nadler from Gibson, Dunn and Crutcher.  I'm joined with my colleague -- joined by my colleague, Ana Lopez.  We represent Patriarch Partners Agency Services, and we're also joined by patients's in-house litigation counsel, Carolyn Schiff.

THE REPORTER:  And Mr. Berry, will your raise your right hand for me, please.

(The Witness is duly sworn.)

THE REPORTER:  Thank you.

You may proceed.

MS. MERKEL:  Thank you.

JAMES T. BERRY,

having been first duly sworn to state the whole truth, was examined and testified as follows:

EXAMINATION

BY MS. MERKEL:

Q.    Good morning, Mr. Berry.

A.    Good morning.

Q.    You just heard me introduce myself, but just for the purposes of doing it directly to you, I'm Ellison Merkel. I'm a lawyer for the Zohar litigation trust, and I'll be asking you questions this morning.

A.    Good morning.

Q.    Good morning.  Could you, please, state your name



and home address for the record.

A.     I am James T. Berry, and I reside at 6427 Malcolm Circle, Dallas, Texas 75214.

Q.     Right.  And is that the location that you are Zooming in from today?

A.     It is.

Q.     And just because we're virtual, I wanted to confirm that you're alone in the room where you're sitting right now.

A.     I am alone in the room.

Q.     Okay.  And can you confirm that for -- during the time that you're answering my questions, your phone will be either off or away, and you'll close any other programs that might be popping up, notifications, and -- and things like that on your computer?

A.     I have done my best.

Q.     Okay.  Appreciate that.

So I want to go over some ground rules for the deposition today.

You understand that you've just taken an oath to give truthful testimony, correct?

A.     I do.

Q.     And that's the same oath that you would swear if you were in a courtroom giving testimony at a trial.

Do you understand that?

A.     Yes.



Q.     And is there any reason you can't give truthful testimony this morning?

A.     No, there is not.

Q.     Okay.  As you know, we have a court reporter, who is on the line with us, so in order for her to take down an accurate record, I just ask that any of your responses be verbal.  So instead of nodding or saying "uh-huh," the way you might normally, if you could give, you know, full "yes" or "no" answers or other verbal responses, that would be appreciated.

A.     Understood.

Q.     Okay.  Thank you.  And then, the other ground rule I wanted to go over is to ask you to, please, let me finish my questions before you start giving your answers, even if you know where I'm going, just so the court reporter can take down the full question and the full answer.

And then, want to make sure, as well, that if you don't understand any question that I ask you this morning, please, ask me to clarify it or restate the question.  If you don't do that, I'll assume you've understood my question as I posed it.

Does that sound fair?

A.     Yes, it does.  And I understand the other instruction.

Q.     Great.  Given your time limitations this morning, we're going to try to limit the number of breaks we take, but



that said, of course, it's not an endurance contest.  If you have -- you know, if you want to take a break, just ask for one, and the only thing we'd ask is you answer any pending questions before we go on a break.

A.    Understood.

Q.    Great.  What did you do to prepare for today's deposition?

A.    I met briefly with Mr. Nadler to review some facts of the case.  And I also met briefly with one of your partners, just to -- to establish my interest in the case or my -- my relevance for testimony.

Q.    Okay.  And when did you meet with Mr. Nadler?

A.    Yesterday.

Q.    And was that virtually?

A.    It was.

Q.    For how long did you meet?

A.    More than an hour.

Q.    But less than two hours or how long?

A.    I couldn't say exactly.  I didn't have a clock on it, but -- but more than an hour.

Q.    Okay.  Did you review any documents during that session?

A.    I believe we -- we looked at a document or two, mostly verbal, though.

Q.    Okay.  Did any of the documents or either of the



documents that you looked at refresh your recollection about events that took place in the past?

A.    One of them did, to some extent.

Q.    And what was that?

MR. NADLER:  Sorry to interrupt, but I was objecting on the grounds you're asking for privilege information.

MS. MERKEL:  I'm sorry, Mr. Nadler, I couldn't hear you very well.

MR. NABLER:  Oh.

MS. MERKEL:  Yeah.

MR. NABLER:  Sure, I can move a little closer.  I was objecting on the grounds of privilege, and would just instruct the Witness not to answer.

MS. MERKEL:  Well, you know he's testified that the document refreshed his recollection, which is the basis on which I can inquire about the document, so I'd ask you to reconsider that instruction.

MR. NADLER:  You said refresh -- it refreshes his recollection, only to some extent.

MS. MERKEL:  I don't think that's a basis to instruct on privilege, so I'm going to ask the question again.

Q.    (BY MR. ELLISON)  Mr. Berry, what was the document you saw that refreshed your recollection as to events that took place in the past?

A.     It --

MR. NADLER:  And again, I'm going to object on privilege.

MS. MERKEL:  Are you instructing the Witness not to answer?

MR. NADLER:  I am.  We can take this up offline in a break, if you'd like, but again, he didn't -- he said it refreshed his recollection only to some extent.

MS. MERKEL:  Okay.  If it refreshes his relect -- recollection to any extent, I'm entitled to inquire about it, but for the sake of timing, I'll move on, and we can address it at a break.

Q.     (BY MS. MERKEL)  Mr. Berry, was anyone else present at that preparation session that you mentioned yesterday?

A.     I believe an associate of Mr. Nadler's was present, as well.

Q.     Okay.  Have you discussed this deposition today with anyone that you haven't already mentioned?

A.     I have not.

Q.     Okay.  Mr. Berry, at some point in time, you worked for a company called Snelling Staffing; is that right?

A.     I did.

Q.     When did you first come to work there?

A.     I believe it was in the late fall of 2013.



Q.    Okay.  And what was your role when you first joined the company?

A.    I was the Chief Financial Officer.

Q.    And did you continue in that role throughout your time at Snelling?

A.    Yes.

Q.    How long were you at Snelling?

A.    I left in the spring of 2018.

Q.    All right.  And what was Snelling's business?

A.    Snelling was a staffing agency.

Is that a familiar term to you.

Q.    Yes.  Although, for the sake of the record, I would as you to --

A.    It provided temporary -- it provided temporary personnel staffing.  It was a franchised business, and it had a number of locations through the United States.

Q.    And the staffing that it provided, was it for a particular industry or type of staffing?

A.    Num -- numerous industries, but principally, in light industrial staffing.

Q.    What were your responsibilities as the CFO of Snelling?

A.    Typical CFO responsibilities; accounting, financial reporting, auditing, cash management.  I also had the responsibility for information technology.



Q.    Okay.  Did you interact with Patriarch Partners personnel in that role.

A.    I did.

Q.    Who did you interact with?

A.    My principle contact was Vincent DeVito, and then, there were a number of other people.

Q.    Okay.  And what was patients's role vis-à-vis Snelling during this time period you were there.

A.    Patients was -- was the private equity firm, and so therefore, the -- the manager to -- so to speak, of Snelling.  That was its principle role.

Q.    Okay.  And what did you understand Mr. DeVito's role to be with respect to Snelling?

A.    Mr. DeVito was the liaison person with a number of portfolio companies of which Snelling was one.  And I think he had six or eight portfolio companies that he was the liaison. I don't want to call him a partner because I don't know what his official title was, but he was -- he was the liaison principal.

How is that?

Q.    Did you have a occasion to interact with Ms. Tilton while you were at Snelling?

A.    Occasionally.

Q.    When might you have interacted with her?

A.    We, generally, had an annual meeting at her offices



in New York or at another place that was convenient for her, to review the year's results, discuss the plans for the coming year, those -- those sorts of things.

Q.    Okay.  When you interacted with Mr. DeVito, did you understand him to be working for a particular patients Partners' entity, such as Patriarch Partners Agency Services or Patriarch Partners Management Group?

MR. NADLER:  Objection, to the extent it calls for a legal conclusion.

MS. MERKEL:  You can go ahead and answer, Mr. Berry.

THE DEPONENT:  I'm sorry.  Did you -- was there an objection, or should I answer the question?

MS. MERKEL:  Unless your counsel instructs you not to answer, he can pose objections --

THE DEPONENT:  Okay.

MS. MERKEL:  -- and you still need to answer.

A.    The question, as I heard it was:  What -- what company did Mr. DeVito represent?  And I would say Mr. DeVito was our principal liaison, so he could represent, you know, a number of different interests or -- or, you know, reasons for discussing things with them.

Q.    (BY MS. MERKEL)  Okay.  And so you understand that, you know, Patriarch, at times, was acting in its capacity as a management company providing managerial services, and at



other times, might have been acting in its capacity as agent for the Zohar funds?

A.    Correct.

Q.    What about Carlos Mercado, did you have occasion to interact with him?

A.    I did.  Carlos came later, as I recall, in the organization that's -- I wouldn't know exactly when, but I did occasionally interact with him.

Q.    What was your understanding of Mr. Mercado's role?

A.    I don't really recall what his -- what his role was.  I apologize.

Q.    No, no problem.  What about Renee Dudley, did you have any interactions with her?

A.    I did have occasional interactions with Renee Dudley.  Renee worked principally in the area with debt for Patriarch.  So we -- we handled debt funding and interest payments with Renee.  She was -- she was a lower-level employee.

Q.    Okay.  Any other names of Patriarch personnel that you interacted with that you can recall?

A.    Brian Stephen was the counsel that we interacted with for legal matters.  I am sure there were other folks, but those -- those were the principle people that I -- that I interacted with.

Q.    Okay.  So you mentioned one of your roles as CFO



was cash management.

Were you responsible or actually withdraw?  Let me ask it this way.

Were you a signatory on Snelling's bank accounts?

A.      I could sign on Snelling's bank accounts, yes.

Q.      And were you chiefly responsible for managing the use of cash that Snelling had available?

MR. NADLER:  Objection; form.

A.      I had a staff that did the day-to-day work, but yes, I was responsible for that.

MR. NADLER:  Mr. Berry, I just ask if you could retell.  I -- I finished the -- the objection, I think we spoke over a little bit there.

MS. MERKEL:  Yeah, Mr. Nadler, your audio is very poor.  It's really -- you're a little bit underwater sounding, so I don't know if you want to try to reconnect, but it's tough to hear that you're objecting.

MR. NADLER:  Okay.  I tried moving the computer closer.  Maybe that will help.

THE DEPONENT:  That's better.

MR. NADLER:  Is it?  Okay.  But I was just saying I objected and I think you spoke over me a little bit.  So if you just wait until I finish the objections.  And apologizes if you couldn't hear me because of the audio.

Q.      (BY MS. MERKEL)  Okay.  So in February of 2016,



which is the period I want to focus on, so couple years after you joined Snelling, what bank accounts did Snelling have?

A.    I would not be sure that I know.  We -- at -- at one time we had a relationship, a commercial banking relationship with Wells Fargo bank.  So we had Wells Fargo bank accounts, but the period of time at which we were using them, I -- I couldn't be certain of.

Q.    Okay.  Well, let me ask it this way, did you have one chief cash management account that was used for day-to-day cash needs of the Company?

A.    We had several accounts for -- for various purposes.

MR. NADLER:  Objection; vague.  And again, Mr. Berry, I ask that you could allow me a moment to object --

THE DEPONENT:  Sure.

MR. NABLER:  -- before you answer.

THE DEPONENT:  Sure.

Q.    (BY MS. MERKEL)  What were the various purposes for which you had those accounts?

A.    We had a -- a clearing account for incoming funds, receipts from customers, which we have a lockbox account.  We had a disbursement account for outgoing disbursements and we had a payroll account.  Those would be three that I am certain that we had.  There may have been other accounts beyond that.

Q.    And when you described a "lockbox," what does that



mean exactly?

A.   That's an account where a -- where a customer will mail a payment directly to a post office box, the post office box is clear by the Bank, the Company doesn't actually touch the money.  And in this case, Wells Fargo would directly apply those payments, they would send us an electronic record of the payments and -- and we would apply them to our books.

Q.   And would you leave cash in the lockbox account or would you sweep cash out of the lockbox account into some other account?

A.   Again, the Company had no custody of the funds.  So the Company was never touching the money in the lockbox account.

Q.   I see.  So what was it used for?

A.   The Bank -- the Bank, actually, has custody of the funds.  They -- they would go every day, empty the lockbox, clear the checks and provide us an electronic transcript of -- of incoming funds.

Q.   And so did the -- was the Bank in control of those funds --

A.   Yes.

Q.   -- Wells Fargo?

A.   Yes.  And they applied every day against our -- against our receipts account.  And then we would have an outgoing account that was on a pay-as-you-go basis, so all



checks that cleared or other kind of, type of electronic debits that cleared through the outgoing account would be added to the -- to the bank line.  So that's a -- that's a very standard, you know, cash management -- commercial cash management arrangement.

Q.     So, you know, forgive me because I am going to -- I am sure I am going to show my ignorance in these questions, but it seems to me that that arrangement means that you are only ever receiving your customer receipts up to the amount that you are paying out.

What happens if your receipts are greater than your disbursements?

A.     You have a --

MR. NABLER:  Objection --

A.     You have an integrated --

MR. NADLER:  Objection to the extent it misstates his prior testimony, but you can go ahead, sir.

Q.     (BY MS. MERKEL)  You can go ahead, Mr. Berry.

A.     Okay.  So to the extent that -- that your -- that your receipts are in -- are less than your disbursements for a given day, an amount is added to your commercial line of credit.  So your -- your line of credit fluctuates up and down, your revolving line of credit fluctuates up and down, just like a credit card.

Q.     I see.  And if your receipts exceed your



disbursements, would any excess receipts be applied to pay down that revolving credit line?

A.   Correct.

Q.   And that would be done automatically by the Bank; is that correct?

A.   Yes.

Q.   Okay.  That's very helpful.  So I think those are two accounts that you described; essentially, a lockbox account and a disbursements account; is that correct?

A.   Yes.

Q.   Were there other accounts that you recall Snelling making use of in around February 2016?

A.   I mentioned a payroll account similar --

Q.   Okay.

A.   -- similar to a disbursement account, but it's specifically for payroll.  Since temporary staffing was our business, we had a separate payroll account.

Q.   How was that funded?

A.   Same -- same way as -- as any other disbursement, through -- through the line of credit.

Q.   And so to the extent you recall, in February 2016, all of those accounts were with Wells Fargo; is that correct?

A.   I couldn't be certain when our -- when our relationship with Wells Fargo was terminated.

Q.   Okay.  Well let's -- we'll take a look at some



documents that -- that may help refresh your recollection on that.  But I want to turn to Snelling's debt.

You mentioned a line of credit that would be automatically, essentially, drawn down to handle disbursements.

Was that a line of credit that you had with Wells Fargo?

A.     It was.

MR. NADLER:  Objection; excited -- misstates his prior testimony.

Q.     (BY MS. MERKEL)  Okay.  And Snelling had other debt outstanding in 2016, correct?

A.     It had -- it had subordinated debt with the Zohar funds, it did.

Q.     Okay.  And do you recall the form of the debt with the Zohar funds?

A.     I don't -- I'm sorry, I don't understand the question.

Q.     So let me -- let's take a look at an exhibit that might help.

MS. MERKEL:  Can we pull up Tab 63?  And we will mark this as Berry Exhibit 1.

(Berry Exhibit 1 marked.)

MR. NADLER:  And Counsel, I would ask if you could e-mail us the document, and we can e-mail to Mr. Berry, as well, so he has -- so he and we have the ability to look at the



document in its entirety.

MS. MERKEL:  So what I would suggest is rather than e-mailing it, that we drop it in the chat, which should just make it a little bit faster.

DR, is that something you can do?

MS. MURPHY:  Doing it right now.  So everyone should be able to see my screen, which has the exhibit, and it should be in the chat.

MR. NADLER:  Okay.  Great.  Thank you.

Q.    (BY MS. MERKEL)  So Mr. Berry, feel free, obviously, to pull up the PDF yourself.  We'll also scroll to the relevant material.

This is an e-mail from April of 2017, and it attaches the Snelling 2016 issued audit report.

A.    Okay.

Q.    (BY MS. MERKEL)  And we are going to be going to Page 14 in that report.

A.    Okay.  All right.

Q.    And so you can see, Mr. Berry, that this document lists Snelling's long-term debt at December 30th, 2016, and December 25th, 2015.

Do you see that?

A.    I do.

Q.    And under that heading, it lists, first, a bank credit facility.



Do you see that?

A.     I do.

Q.     Do you understand that to refer to the Wells Fargo facility that we were just discussing?

A.     I -- I -- I'm am trying to read the financials here.  I am sure that it describes who that's with.  Let's see.  Yes, as I understand it from the financials, the bank credit facility is the Wells Fargo facility.

Q.     Thank you.  And the lender revolver, do you understand that to refer to a revolving credit facility with the Zohar funds?

MR. NADLER:  Objection; vague.

A.     Am I to answer the question or...

Q.     (BY MS. MERKEL)  Yep, you can answer.

A.     All right.  Yes, I -- I think that that was the facility with -- with -- with the -- whichever entity was the lending entity, and it's not clear here what the name -- what the name of it was, but yeah.

Q.     Did you understand the lender to refer to one or more of the Zohar funds?

MR. NADLER:  Objection; vague as to time frame when you are asking that, to your understanding.

MS. MERKEL:  Mr. Nadler, you can just limit your objections to form.

Q.     (BY MS. MERKEL)  To the extent it helps you



Mr. Berry, as discussed, this document refers to December 30th, 2016, and December 25th, 2015.

So I am asking specifically what this document refers to?

MR. NADLER:  You asked for his understanding.  It's unclear if it was his understanding now or his understanding then.

Q.    (BY MS. MERKEL)  You can answer, Mr. Berry.

A.    Yes, I mean, the -- because they are all titled lender, it appears that their -- those would be with one or more of the Zohar funds.

Q.    And so in addition to a $3,000,000 revolver with the Zohar funds, Snelling also had four term loans with the amounts listed here; is that correct?

A.    Appear -- appears so from looking at the financial statements, yes.

Q.    And it also references under the heading lender loans the companies VIE.

What does that refer to?

A.    VIE, as I understand it in this context, is a -- a -- some kind of variable interest entity, I don't -- I would have to read the document more carefully to understand what that was.  I don't recall specifically.

Q.    Okay.  Looking at this document, it does appear that between 2015 and 2016, the amount on Zohar Term Loan C



went up by $2,000,000.

Is that consistent with your recollection?

A.    I don't recall, but I do see it here on the financial statement, so yes.

Q.    Okay.  And similarly, Term Loan D, was put into place over that time period in the amount of 1,000,000.

Is that consistent with your recollection?

A.    Again, I don't recall the specifics --

MR. NABLER:  Mr. Berry, if you could wait until --

THE DEPONENT:  Yes.

MR. NABLER:  -- I've had an opportunity to --

THE DEPONENT:  Sorry about that.

MR. NABLER:  Objection; misstates the document.

You can go ahead and answer.

A.    Looking at the document, it appears that there was an increase.

Q.    (BY MS. MERKEL)  So you described how the Wells Fargo bank credit facility would be used in the ordinary course.

Did Snelling routinely make use of the Zohar revolving credit facility?

MR. NADLER:  Objection; vague.

THE DEPONENT:

A.    Am I -- am I to answer the question?  I'm just --

Q.    (BY MS. MERKEL)  Yes, please.



A.      These instructions --

Q.      Unless he literally instructs you not to answer, you can just go ahead and --

A.      Got it.  Sorry.

I -- it appears that we were using the lender facility at this time, yes, in 2016 there were amounts outstanding.

Q.      (BY MS. MERKEL)  For what purposes did you use that revolver?

A.      I'm sure just general corporate purposes.  The -- the business that I described in the past.

MS. MERKEL:  Okay.  So let's take that document down for a second.

Q.      (BY MS. MERKEL)  I want to ask for a minute, return to asking about the Wells Fargo credit facility, just to make sure we're -- I am not asking about Zohar now, just asking about Wells Fargo.

Was there any way for Snelling to access funds from that credit facility, other than the bank's automatic application of those funds to the disbursement account?

MR. NADLER:  Objection; vague.

A.      Was there -- I'm sorry, could you restate this question, please?

Q.      (BY MS. MERKEL)  Sure.  So I think you described earlier that if there were disbursements that exceeded

receipts, the Bank would -- Wells Fargo would automatically apply funds from the revolver to, essentially, meet those disbursements; is that correct?

A.    Right --

MR. NABLER:  Objection --

A.    -- up to availability.

MR. NADLER:  Mr. Berry, again, if you could wait until I object.

Objection; misstates his prior testimony.

MS. MERKEL:  And if you could just limit your objections to form objections, which is what you're entitled to do, and you're kind of disrupting my questions by constantly interjecting that way.

Q.    (BY MS. MERKEL)  So, Mr. Berry, was there any other way for Snelling to access the funds in the revolving credit facility with Wells Fargo, for example, by initiating a request for funds?

MR. NADLER:  Objection; vague.

A.    I couldn't be certain whether -- whether we would do that or not.  I would -- I couldn't be certain.

Q.    (BY MS. MERKEL)  Do you recall any instance of -- of making a request for funds outside of the application of funds to the disbursement account?

MR. NADLER:  Objection; vague.

A.    I don't recall any.



Q.    (BY MS. MERKEL)  Did Wells Fargo -- withdraw.

Did Snelling have a Deposit Account Control Agreement for the Wells Fargo accounts?

A.    We did.

Q.    And who had control over those accounts?

A.    I'd have to look at the document to be sure. Deposit control agreements are pretty standard for revolving credit facilities.

Q.    Who -- do you recall who the parties were to the agreement?

A.    I don't.  I would have to look at the agreement.

Q.    Okay.  So sitting here today, you don't recall any instance in which, for example, you reached out to Wells Fargo and initiated a borrowing request for funds in the Wells Fargo revolver?

A.    I -- I would have to see a document that -- that would -- would help me understand that question.  I don't recall at this point.

Q.    Okay.  All right.  Let's take a look at another document then.  And we may circle back to that issue, but for now, let's pull up Tab 9, please.  And we will mark this as Berry Exhibit 2.

(Berry Exhibit 2 marked.)

MR. NADLER:  And Ms. Murphy, again, I'd ask if you just drop it into the chat, as well.

MS. MURPHY:  I will every time.  Sorry.  I just got a couple of windows going at once.

MR. NADLER:  Okay.  No problem.  Understood.

Thank you.

MS. MURPHY:  You should all be able to see, and it is in the chat.

Q.    (BY MS. MERKEL)  So Mr. Berry, this is an e-mail from Anna Crenshaw to yourself dated February 26th, 2016.

A.    Uh-huh.

Q.    Who is Ms. Crenshaw?

A.    Anna Crenshaw was our cash manager.  So she was day-to-day person who -- who handled cash with the banks and with Patriarch.

Q.    Okay.  And the subject of her e-mail is:  "Daily Projection 2016.xlsx."

Do you see that?

A.    I do.

Q.    And she copies some information into the e-mail, as well.

Is this a -- was this a standard e-mail that she would send to you on a daily basis?

A.    Whether daily or not, periodically, yes, I would get this e-mail from her.

Q.    What was the purpose of this e-mail?

A.    This is to suggest what we are going to disburse,



which then eventually will be a draw on the -- on the line when those amounts cleared through the -- through the accounts.

Q.    Okay.  So if we look at AP-43k in her e-mail, does that refer to accounts payable?

A.    Yes.

Q.    And so that would be just a mix of general amounts owed by Snelling to various recipients; is that correct?

A.    Yes.

Q.    And "PR," does that refer to payroll?

A.    Correct.

Q.    And Taxes, it says "8k".

Do you see that?

A.    I do.

Q.    To whom did Snelling pay taxes?

A.    Numerous federal, state and local agencies.

Q.    Okay.  You paid taxes directly; is that correct?

A.    We did.

Q.    "Management Fees, 84k."  And she says, "Okay to send yet?"

Do you see that?

A.    I do.

Q.    Are those management fees that were being paid to Patriarch?

A.    I couldn't be certain from this, but, you know, either -- either to Patriarch or to the Bank.  I'd have to --



to see more documentation to understand.

Q.    So Snelling paid management fees to Wells Fargo?

A.    There were different fees to Wells Fargo, yes, but again, I -- I'd have to speculate, just from what's here.

Q.    Okay.  But Snelling did also pay management fees -- whether or not this refers to them --

A.    Right.

Q.    -- as a general matter, Snelling paid management fees to Patriarch, right?

A.    We did.

Q.    Okay.  Were there any other entities to whom Snelling paid management fees?

A.    I couldn't be certain of the actual entity.

Q.    Okay.  When you say you "couldn't be certain of the actual entity," is there any entity outside of the Patriarch family of companies --

A.    No, I mean, if you are using Patriarch in a broad sense, it would have been -- if it -- if it's Patriarch, it would have come to one of the Patriarch entities.

Q.    Okay.  And are there any entities outside of Patriarch to whom Snelling would be paying management fees?

A.    I -- I couldn't be certain.  Unlikely.  I mean, management fees seem fairly standard, but again, without the detail, I couldn't be certain.

Q.    Okay.  She also lists an interest payment of 272k.



To whom was that interest payment being made?

A.    Without more detail, I couldn't say for sure who -- who was receiving the interest.  It could have been Wells Fargo, or it could have been one of the various debt instruments that we just looked at.

Q.    With the Zohar funds, correct?

A.    Correct.

Q.    And then, it lists "agency fee".

Was that payable to Patriarch, as well?

A.    I -- again, I couldn't be certain.  I could speculate.

Q.    Is your best understanding that it would have been to Patriarch?

A.    I --

Q.    -- or what your --

A.    I don't have an understanding --

MR. NADLER:  Objection -- (inaudible) -- Mr. Berry.

You can answer.

THE DEPONENT:  Right.

Q.    (BY MS. MERKEL) I'm sorry.  You can answer, Mr. Berry.  I'm not sure if I caught what your answer was there.

A.    I -- I couldn't -- just looking at this e-mail, I couldn't be certain.

Q.    (BY MS. MERKEL)  Okay.  Was there any company, other than Patriarch, to whom Snelling paid agency fees?

A.    Without more detail, I couldn't be certain.

Q.    Can you recall, sitting here today, any other company to which Snelling paid agency fees during this time period?

MR. NADLER:  Objection; asked and answered.

A.    Am I to answer?

Q.    (BY MS. MERKEL)  Yes.

A.    I don't recall any other company.

Q.    And then, "Amex," I assume that's to pay the company's credit card bill?

A.    Correct.

Q.    And "401(k)" is to contribute to the company's 401(k); is that right?

A.    Correct.

Q.    What is the Lockton Quarterly fee?

A.    Lockton was our insurance broker and -- and provided various insurance coverages for us.  So they were our agent, and they charged various fees.  Appears to be a fee to them.

Q.    And then she lists "Lockbox-307k."

So is that referencing the amount that has come in to the Lockbox during the relevant period?

A.    That would be my understanding from looking at this e-mail.

Q.    Okay.  And she writes at the top, "We have 125k we



can borrow today if we wanted to and still be at 2 million."

Do you see that?

A.    I do.

Q.    What do you understand her to be saying in that e-mail?

A.    I think that what -- the way that I would interpret that is that on the -- whatever the 2 million is, that there is some availability there, and we have these various amounts that need to be disbursed.  We have $307,000 of native receipts. And so which one of these -- these items appear to total more than 307 plus 125, so what do you want me to pay.

Q.    I see.  And what is the 2 million refer to?

A.    I -- I couldn't be certain.  Availability on some -- on some credit facility.

Q.    Okay.  And so how would -- withdrawn.

Assuming you would then decide, you know, which of these disbursements you wanted to make, how was that communicated to the Bank?

A.    We wouldn't communicate this to the Bank.

Q.    Well, how -- if -- if -- not all of these disbursements were capable of being paid, how would the Bank know which disbursements to apply funds to?

A.    Well, we wouldn't -- we wouldn't disburse money that we didn't have availability for.  We would -- we would just -- we would prioritize the payables if we had to.  I'm --



and I'm -- I didn't add these up, just to see how that worked but --

Q.    Yeah.

A.    I mean, you're not -- what you're basically saying is we're managing the cash to the availability that we have. As I interpret this document, what she is saying is here are things that we need to pay.

Q.    And so how would you communicate the disbursements that needed to be paid to Wells Fargo?

MR. NADLER:  Objection; asked and answered.

A.    We didn't communicate the disbursements to be made. We just managed them.  We would not make disbursements that were outside of our -- our expected availability.

Q.    (BY MS. MERKEL)  Okay.  I'm just trying -- I'm just trying to understand how the interaction with Wells Fargo on these bank accounts worked.

I had understood previously that you were suggesting that there was an automatic application of credit facility funds to disbursements in the account.  And so I'm just trying to understand how that would occur, or whether you would simply instruct Wells Fargo the amount that you wanted to draw down from the revolver to apply it to your disbursements?

MR. NADLER:  Objection to the extent it misstates prior testimony.

A.    Yeah, I don't -- I don't think that's an accurate



representation.  I don't think we had to make a communication to Wells Fargo what we were disbursing.

Q.    (BY MS. MERKEL)  Okay.  I mean, I don't --

A.    Automatically, whatever cleared on a given day, they would automatically increase our line by that amount, whatever -- whatever was paid down was automatically applied.  But we didn't send this -- as I recall, we did not have to send this level of detail to the -- to the Bank.

We didn't have to have their authorization to pay amounts.  We just -- we never wanted to be over our line.  If -- if we -- if we borrowed in excess of our availability on any given day, we were going to receive an immediate repayment request.  So we couldn't -- as responsible managers of cash, we couldn't do that.

Q.    Yeah.  And look, I'm just trying to get an accurate understanding of what did you do.  So if I've got something wrong, you know, please --

A.    Right.

Q.    -- correct me.

A.    So I'm trying to do that.

Q.    Yeah.

A.    Just as -- well, let me use an example that might be simpler.  Your -- your pay is deposited into your checking account.  You know how much money you have in your checking account, but you don't ask the Bank in you want to write a



check on your checking account.  You just know how much you have in your checking account, and you write the check.

Q.    Understood.

A.    Yeah.

Q.    And so --

A.    And so this is --

Q.    I'm sorry.

A.    We had control of the that and it's our job to be sure that we don't have either overdraft or disbursement account or borrow money in excess of what the Bank would consider to be available.

Q.    Okay.  Thank you.  That really helps clarify.

So you would make whatever disbursements you had sufficient cash to make, taking into account what was in the lockbox and what was available on your credit facility.

Is that fair?

A.    Correct.

Q.    And what would happen if you did overdraw your credit facility?

A.    Bad things.

Q.    You don't recall ever doing that?

A.    I am not saying it never happened, but I mean, there would be a polite call at first from your -- from your Wells Fargo representative, there would probably be some fees associated with that, and a request to, please, repay or



explain how the -- you are going to come back in compliance, because that's a -- that's an event of technical default of your credit agreement.

Q.    And so looking at these disbursements that had to be done, in terms of the mechanical payments, you know, writing a check to each of these different recipients or electronically transferring fees, was that something you had responsibility for or Ms. Crenshaw is -- would be responsible for doing it?

A.    I had the ultimate responsibility for it.  Ms. Crenshaw's group executed most of that work and advised on what, you know, availability was and what payables need to be paid.

Q.    Did you ever draw down the Zohar revolver line for purposes of needing disbursements?

MR. NADLER:  Objection; vague.

A.    I'd have to see, you know, more detail.  I would have to see more detail to answer that question.

Q.    (BY MS. MERKEL)  Sitting here today, do you ever recall having done that?

A.    I don't have a specific recollection of doing that, no.

Q.    Am I correct in understanding that -- withdrawn.

When the amount borrowed from your resolve -- revolver needed to increase in order to meet disbursements that you were making, did Snelling have to make any formal requests



for that increase in borrowings?

MR. NADLER:  Objection --

A.     Which revolver are we talking about?

MR. NADLER:  Mr. -- Mr. -- Mr. Berry, if you could allow me to object.  And objection to the extent it misstates prior testimony, but you can go ahead, sir.

A.     Which -- which revolver are we talking about?

Q.     (BY MS. MERKEL)  Wells Fargo.

A.     Wells Fargo.  We did -- I'm sorry, state the -- the question again so I can be sure I answer it correctly.

Q.     (BY MS. MERKEL)  Sure.

MS. MERKEL:  And I would just ask, Mr. Nadler, to limit your objections and stop interrupting the questions that I am asking.

Q.     (BY MS. MERKEL)  My question was:  When you were increasing the amount of your borrowings from the Wells Fargo revolver in order to meet disbursements, did you have to make a formal request to borrow additional funds?

MR. NADLER:  Same objection.

A.     We did not have to make a formal request.  We had to provide a periodic calculation of our availability under the -- under the credit facility.  And I couldn't tell you how often we had to do that, but, you know, we -- we needed -- we needed to maintain a cushion of availability, because it was -- when -- when you disburse amounts and when lockbox receipts



are -- are, you know, being forecast, there's not -- there is some variability in the timing of all that.

Q.     (BY MS. MERKEL)  What format did that forecast take?

A.     Well, we made a weekly cash forecast that covered 13 weeks at a time.  That was our principle basis for forecasting receipts and disbursements.

Q.     And was that for internal purposes or did you provide some form of that to Wells Fargo?

A.     I can't recall if we provided it to Wells Fargo, but we certainly used it internally.

Q.     And do you recall what cushion you were targeting to leave in your facility?

MR. NADLER:  Objection; vague.

A.     I don't know that we had a specific cushion. Again, like I said, we -- we were always trying to be sure there was enough availability that if, you know, receipts or disbursements were -- the timing, you know, was uncertain, that there would be enough available on the -- on the credit facility to -- to not -- you know, not have any -- any event of default.

Q.     (BY MS. MERKEL)  Who was your primary relationship at Wells Fargo during this time period?

MR. NADLER:  Objection; vague.

A.     We had a -- we had a group of people who serviced



our account, I don't recall the names.

Q.     (BY MS MERKEL)  And how frequently would you speak to Wells Fargo?

A.     Anna would have spoken with Wells Fargo pretty -- fairly frequently.  You know, I probably spoke with them less frequently.

Q.     Would it be once a week, once a month?

A.     I might have spoken to Wells Fargo once a quarter, just speculating.  Anna probably would have spoken to them weekly and certainly monthly.

Q.     And on what topics would you personally have spoken to Wells Fargo about?

A.     General outlook for the business, the -- our -- any compliance issues that might be coming up, they did have fairly tight controls on collateral around receivables, so occasionally there would be some -- some questions about some of that.  Just general administration of the credit facility. And then, you know, periodically every several years we had to renew the credit facility, so there would be a -- an underwriting process.

Q.     What was the process for renewing the credit facility?

A.     I mean, again, the credit facility was existing when I arrived at Snelling.  I think we renewed it once under my tenure, and then, you know, fairly standard underwriting,



corporate documents, financial projections, audited financial statements, those sorts of things.

Q.    Did Patriarch play a role in that process?

MR. NADLER:  Objection; vague.

A.    I can't recall what Patriarch's specific role was. I am certain that they were consulted on the -- on the status of the refinancing, yes.

Q.    (BY MS. MERKEL)  When you say, "consulted on the status of the refinancing," what do you mean?

A.    On the extension and refinancing of the credit facility, what we've been talking about, they would have been -- we would have had the principle responsibility for initiating and executing that refinancing, but Patriarch would have, you know, reviewed the terms and conditions of the offer, credit extension, they would have -- I can imagine that they would have reviewed the legal documents at some point, if there were any guarantees from Patriarch, which I don't recall if there were or not, you know, they would have reviewed the form and the substance of guarantees.

Q.    Did they have to approve the decision to refinance?

A.    I am certain that they did.

MR. NADLER:  Objection; vague.  And Mr. Berry, again, I would ask if you could allow me --

THE DEPONENT:  Uh-huh, sure.

Q.    (BY MS. MERKEL)  We talked for a moment about



DACAs, and so now I will pull up an example to hopefully

refresh your reflection a little bit.

MS. MERKEL:  Let's pull up Tab 1.  We'll drop it in the chat, as well, and we'll mark it as Berry Exhibit 3.

(Berry Exhibit 3 marked.)

THE DEPONENT:  I am trying to get it up in the chat here.  Hang on, just one second.

MS. MERKEL:  Yeah, no problem.

THE DEPONENT:  I don't see it in the chat.  Is it in there?  Oh, there we go.  That's 2.  Okay.  And this is a -- okay.  All right.

Q.    Okay.  So this is a Deposit Account Control Agreement, signed by Snelling Employment, LLC, Patriarch Partners Agency Services, LLC, and Wells Fargo Bank National Association.

Do you see that?

A.    Let me get to the signature page.  Hang on a second.

MR. NADLER:  Objection; misstates the document.

THE DEPONENT:  I'm sorry.

MS. MERKEL:  Can you clarify what misstatement you think has been made about this document?

MR. NADLER:  Yeah, absolutely.  You said that this signed by all three of those parties.  It wasn't.  The signature page clearly shows that this was not a fully executed



contract.  Wells Fargo did not sign this document on the last page.

MS. MERKEL:  I see.

Q.    (BY MS. MERKEL)  Mr. Berry, I think you can still respond to the question.

A.    What -- what -- I'm sorry, what was the question again?  My -- my apologies.

Q.    Do you recognize this to be the Deposit Account Control Agreement between Snelling Employment, LLC, Patriarch Partners Agency Services, LLC, and Wells Fargo Bank National Association?

A.    The --

MR. NADLER:  I am going to make the same objection. Just misstates the document, Mr. Berry --

MS. MERKEL:  You can limit your objection to form.

Thank you.

MR. NADLER:  And Ms. Merkel, I would recommend that you look at the objections raised by your partner, Mr. Pickhardt, at prior depositions in this case in which he did not do that, and explain the basis of his objections.

Q.    (BY MS. MERKEL)  You can answer, Mr. Berry.

MR. NADLER:  And I am raising the same objections as to --

MS. MERKEL:  Okay.  You have made your objection. Please, allow the witness to answer.



Q.      (BY MS. MERKEL)  Would you like me to restate the question?

A.      Yes, please.

Q.      Do you recognize this to be the Deposit Account Control Agreement between Snelling Employment, LLC, Patriarch Partners Agency Services, LLC, and Wells Fargo Bank National Association?

A.      This appears to be a form --  a form of that document, but as -- as noted, it's not -- it's not executed and I don't know, you know, whether this was the final form or not.

MR. NADLER:  And I stated same objection, but it did not appear in the real -- just so the transcript is clear.

Q.      (BY MS. MERKEL)  Was it your understanding that some form of Deposit Account Control Agreement was in place between these parties for the duration of the time that Snelling had a account open at Wells Fargo bank?

A.      There was a deposit control agreement in place, yes.

Q.      Okay.  And to the extent that Patriarch has not produced the final version of that document, we would certainly request that it be produced.

MR. NADLER:  And I would note that this document appears to have been produced by the Trustee, for the record, but we will take that under advisement.

MS. MERKEL:  Sure.



Q.      (BY MS. MERKEL)  What is the purpose of this Agreement, as you understand it, Mr. Berry?

MR. NADLER:  Objection; the (inaudible) misstates the document.

Q.      (BY MS. MERKEL)  You can answer.

A.      Okay.  Deposit control agreement allows the function of the lockbox that I described earlier to be executed by the bank.

Q.      So you can see at the top of this Agreement, "Patriarch Partners Agency Services" is defined as the "Secured Party".

Do you see that?

A.      I do.

Q.      And under Section 2 it states --

MS. MERKEL:  Can we scroll down?

Yeah, thank you DR.

Q.      (BY MS. MERKEL)  It states:  "Bank Secured Party and Company each agree that Bank will comply with instructions given to Bank by Secured Party directing disposition of funds in the Collateral Accounts, quote, disposition instructions, end quote, without further consent by a Company."

Do you see that.

A.      I do.

Q.      So was your understanding that Patriarch also had control over the accounts that Snelling had at Wells Fargo



bank?

MR. NADLER:  Objection to form, and objection to the extent it calls for a legal conclusion.

Q.    (BY MS. MERKEL)  You can answer, Mr. Berry.

A.    Okay.  The Paragraphs 1, 2, you know, outline different responsibilities and different secured interests in -- in the assets.  So it appears that there is some level of collaboration between the two lenders.

Q.    Well, in Paragraph 2 it does indicate that:  "Bank, Secured Party and Company each agree that Bank will comply with instructions given by the Secured Party without further consent of the Company."

Was that consistent with your understanding that Patriarch could direct the disposition of funds in Snelling's Wells Fargo bank accounts?

MR. NADLER:  Objection, that misstates the document, and misstates the prior testimony as to what this document is.

A.    And again, this is -- this is not an executed document.  It's -- it's -- has the signature of my predecessor's CFO on it.  I'm not immediately familiar with the specifics.

Q.    (BY MS. MERKEL)  Okay.  But you did testify --

A.    I'm not familiar with whether this document was the exo dent document under which we were operating.



Q.    Okay.  No problem.

MS. MERKEL:  Let's take this document down.

Q.    (BY MS. MERKEL)  I think you did testify, though, correct, Mr. Berry, that there was a DACA in place for your Wells Fargo accounts, correct?

A.    There was.  There was.  I'm not -- I'm not trying to be difficult.  I'm just trying to be specific.

Q.    And was it your understanding that Patriarch was a party to the DACA that you had in place for your Wells Fargo accounts?

A.    I -- I --

MR. NADLER:  Objection; vague.

You can go ahead, sir.

A.    I see that Patriarch is a signatory to the document, yes.

Q.    (BY MS. MERKEL)  And was it your understanding that Patriarch had the -- the ability to direct use of funds in the Snelling bank accounts at Wells Fargo?

MR. NADLER:  Objection; calls for legal conclusion.

A.    You want me to answer?

Q.    (BY MS. MERKEL)  Yes, please.

A.    Yeah.  I -- I'm not aware that Patriarch directed the -- the funds, but I -- again, these events have been a long time since -- since, so my recollection is -- is vague on this point.

Q.      (BY MS. MERKEL)  Well, let's break it down a little bit.

Did you -- do you recall Patriarch ever directing the use of funds in the Wells Fargo account?

A.      I don't have a specific recollection of that, no.

Q.      Were funds in the Wells Fargo account, in any of your Wells Fargo accounts, utilized to pay down Zohar debt?

A.      I don't -- I don't have any basis to -- to be able to answer that question.

Q.      Well, you would have been aware during your time at Snelling whether your money in the Wells Fargo accounts was --

A.      I would have been aware of them, yes, but that's been quite a number of years.

Q.      So you don't recall whether or not those funds were used to pay down Zohar debt?

A.      I don't.  And I am happy to look at doc -- specific documents, if you want to show me something, and -- and try to be specific about it.

Q.      Sure.  I just wanted to make sure I understood when you said you didn't have any basis to answer, whether that was a memory issue --

A.      No.

Q.      -- or some other issue?

A.      I don't have a specific recollection of that.

Q.      Okay.  And is it fair to say that you don't know



one way or the other whether Patriarch had the ability to direct the use of funds in the Wells Fargo accounts?

MR. NADLER:  Objection to form; vague.

A.    Patriarch was the signatory reviewing the document, just -- just strictly from reading the document, it would appear that there is some -- some ability.

Q.    (BY MS. MERKEL)  Okay.  Let's take a look at Tab 3, please, and I believe we're marking this Berry Exhibit 4.

(Berry Exhibit 4 marked.)

BY MS. MERKEL:  We'll put it in the chat for you, as well, Mr. Berry.

THE DEPONENT:  Thank you.

Q.    (BY MS. MERKEL)  This is an e-mail that you sent to Wells Fargo, copying Mr. DeVito and Ralph Peterson at Snelling, on February 8th, 2016.

A.    Okay.

Q.    And we'll -- feel free to look at whatever part of the document you want to.

Just focusing on the cover e-mail, is this a form of the plan financials that you were describing in your testimony a little bit earlier?

MR. NADLER:  Objection to the form of this document.  It's incomplete.

MS. MERKEL:  It should have all the attachments.



Does it not?

MR. NADLER:  I apologize if I'm wrong, but it looks like it just attaches a spreadsheet, whereas the attachment line suggests there should be two different attachments.  And so, again, the same objection, being that on the face of the document it appears to be incomplete.

MS. MERKEL:  Okay, we can take that up -- DR, we can still see your computer.

We can take that up on a break, but our understanding is that this is the complete version of the document.  If it's not, we'll -- we're are happy to replace it.

MR. NADLER:  Okay.  And agree, we can take that up offline.  I just wanted to preserve the objections for the record.

MS. MERKEL:  Okay.

Q.    (BY MS. MERKEL)  So I'll restate my original question, which is just whether this is an example of the planned financials that you were describing in your earlier testimony?

A.    Right.  Our -- we typically would provide our -- our upcoming plan year financials to the Bank.

Q.    Okay.

A.    And I -- I believe that was required by the credit agreement.  It was required.

Q.    You copied Mr. DeVito.



Would he have signed off on these financials before you sent them to Wells Fargo?

A.    He would have reviewed them, yes.

Q.    Okay.  And who is Mr. Peterson at Snelling?

A.    He was the -- he was the CEO of the -- of Snelling, presumably, at this time.

Q.    Okay.

A.    One of -- one of the CEOs.

Q.    Was he the only CEO at this time?

A.    There was only one CEO at a time.  There just were several over.

Q.    Okay.

A.    -- over my tenure.

Q.    Just for the -- the purposes of completeness, who were the CEOs during the time you were there?

A.    I don't have all the names.  David Allen was the first CEO who hired me.  Ralph Peterson succeeded him after Mr. Allen resigned.  There were -- there was another gentleman, whose name I don't recall, and then, Lee Elkinson was the final CEO before I departed.

Q.    All righty.  In these planned financials, would you attempt to project what interest payments you would need to make over the course of the year on any of your various debt facilities?

A.    Yes.  The -- the planned financials clearly show



there's a net interest line that's projected there.

Q.    Okay.  Can you show me where you're looking?

A.    It on page -- it's on the first page, toward the bottom of the page, where it shows "EBITDA to net income reconciliation," on first line there, below "EBITDA" is net interest.

Q.    And how would you calculate these net interest figures?

A.    They're projections from the amount of borrowings that are -- that are assumed on -- later on in the document.

Q.    And where do we see that later in the document?

A.    On -- I'm trying to get to the pages here.  Sorry.

On Page 3, in the Liabilities section, you can see various -- in the current liabilities, you can -- and in the long-term liabilities, you can see various financial instruments shown there.

MR. NADLER:  Mr. Berry, I just ask when you're referring to documents by page number, if you could use the page numbers that are in the lower right-hand corner, just so the record's clear.

THE DEPONENT:  Yeah, sorry.  I apologize.  There isn't a page number in the lower right-hand corner for this. It is marked Trustee AP3790768.

MS. MERKEL:  Great.  Thank you very much.

MR. NADLER:  That -- that's what I meant by the



numbers.

THE DEPONENT:  Is that a page number?

MR. NADLER:  Yeah, that's what I said.

THE DEPONENT:  Very good.

MS. MERKEL:  To lawyers, that's a page number.

THE DEPONENT:  I was looking for something that said Page 3.

A.     But you can see that there are various types of credit facilities shown there.  So there would have been a calculation offline that would have -- would have calculated the presumed interest under those -- those various credit amounts.

Q.     (BY MS. MERKEL)  Thank you.  So under current liabilities it lists the revolving credit facility.

Do you see that?

A.     I do.

Q.     Does that refer to the Wells Fargo credit facility?

A.     I would assume.  I mean, I don't have a way to validate that from looking at the document, but that would be my assumption, yes.

Q.     Okay.  Then, it refers to "ST debt and current maturities of LT debt."

Is that short-term debt in current maturities of long-term debt?

A.     Correct.


ESQUIRE
DEPOSITION SOLUTIONS

Q.    And how are the -- how is this category differentiated from the other debt, the other long-term debt that Snelling was holding?

MR. NADLER:  Objection; vague.

A.    I don't -- I don't know the specific makeup of that.  I'd -- you know, obviously, I'd have to have more detail to be able to answer that question accurately.  I can -- I can give you a guess, if you want, but it -- it would just be that.

Q.    Yeah, I mean, I guess, I'm -- you know, the rule in a deposition is if you have a best understanding --

A.    Yeah.

Q.    -- if you can give me your best understanding, that would be great.

A.    Sure.  Well, you can see that the capital, the long-term capital leases are being paid down.  So that's going to be a component of the those maturities.  And, you know, there would be some other short-term debt of some type that was being paid down, or -- or increasing, not available, it looks like during this period, we showed some increases, but again, I'd have to -- I'd have to see more detail to understand what -- what was in that projection.

Q.    I see under total current liabilities, the next -- the subheading under Noncurrent maturities of LT debt, is Term Loan A.

Do you see --



A.    I do.

Q.    -- that heading?

Previously, we looked at a document showing that in 2016, Snelling had outstanding Term Loans A, B, C and D with Zohar.

Do you recall that?

MR. NADLER:  Objection; misstates the document.

A.    I do recall that in the financial statements, yes.

Q.    (BY MS. MERKEL)  Is there a reason why only Term Loan A would be reflected here and not any of B, C or D?

A.    This is the last formal projection.  This isn't a, you know, a gap -- gap presentation.  It's -- we -- for purposes of -- of this document, we grouped all of those items together.

Q.    I see.  Thank you.

Who, besides yourself, was responsible for putting these documents together?

A.    We had a financial planning manager, who, you know, worked on some of these documents at different times.  And then, others of my financial staff would have -- would have had input into the projections, yes.

Q.    So there came a time when Patriarch ceased to be the collateral manager for the Zohar funds.

Do you recall that?

MR. NADLER:  Objection; vague.



A.    I know that that -- that happened at some point, yes.

Q.    (BY MS. MERKEL)  Okay.  And was that -- was that an event that you made any preparations for at Snelling?

A.    I don't know that we would have made preparations for that.  I don't -- I can't -- I can't be certain.

Q.    Did you believe that Patriarch, no longer acting as the collateral manager for the Zohar funds, was going to affect Snelling's ability to borrow?

MR. NADLER:  Objection; vague.

A.    There -- there was a lot of noise around the Patriarch association.  It did make it somewhat more difficult, and we did have an upcoming renewal on our credit facility.  It had -- it -- it added to difficulties.

Q.    (BY MS. MERKEL)  When you say an upcoming renewal on your credit facility, do you mean the Wells Fargo credit facility?

A.    Yes, the Wells Fargo credit facility.

Q.    And so what time period -- during what time period, did you have that renewal upcoming?

A.    I can't -- I couldn't be certain.

Q.    But you recall it being around the time that the -- that Patriarch was anticipated to be removed as collateral manager?

A.    I'd have to see the time line of the events --



MR. NABLER:  Objection.

A.      -- right.

MR. NADLER:  Just so the record's clear, it looks like the transcript didn't pick up my objection that it misstated his former testimony.

THE REPORTER:  I apologize, Mr. Nadler.  This is the court reporter.  I saw your lips moving, but there was no audio coming through.

MR. NADLER:  No problem.  Doing this by Zoom, is pretty imperfect, so we all get that.  I just wanted to make sure the record covered that objection.

Q.      (BY MS. MERKEL)  Let's pull up Tab 4, and we will mark it as Berry Exhibit 5.

(Berry Exhibit 5 marked.)

Q.      (BY MS. MERKEL)  And we will put this in the chat, too, so you can have a look at the full document.

A.      Thank you.

Q.      So we will look at the first e-mail in the chain, Mr. Berry, which is sent from yourself to Vincent DeVito, February 10th, 2016, copying Ralph Peterson.

Was Mr. Peterson the CEO at this time?

A.      The first -- the first item, just to be clear, that I am seeing is from them to Ralph and me.

Q.      Oh, I'm sorry, when I said --

A.      Not from -- not from me.



Q.    When I am referring to the first e-mail in the chain, I actually mean the last --

A.    Oh, the last.

Q.    -- e-mail.  Yeah.

A.    Okay.  I'm sorry.  Let me --

Q.    Yeah, if you could just read that.

A.    Yes.  Yes, this is from me to Vin DeVito and copying Ralph Peterson.

Q.    And you give a recap of the Wells call.  And in it you say, "It was very positive in general on the annual plan deliverable.  They are going to review our question about agency fees and get back shortly.  They did reference the recent announcements by Lynn regarding the Patriarch restructuring and have several questions for you when you are back."

Do you see that?

A.    I do.

Q.    Does the Patriarch -- what does the Patriarch restructuring refer to?

A.    I have to assume it's something to -- to do with -- with these events.

Q.    Their replacement of Patriarch as the collateral manager?

A.    Right.  But I mean, again, I am speculating.  There is not specifics here, but...



Q.      Okay.

A.      I would have understood what that meant at the time, but I am a little vague on it now.

Q.      Do you recall any other Patriarch restructuring that you discussed with Wells Fargo?

A.      I don't.

Q.      Okay.  So Mr. DeVito writes back and -- and asks a couple of questions and you respond, "No, they didn't mentioned any funding issues, but did question the continuity of PPAS and how collateral manager change would be effective."

        Do you see that?

A.      Yes, I do.

Q.      Does that refresh your recollection that the restructuring being discussed was, in fact, the collateral manager change?

A.      It does.

Q.      Okay.  And you write, "Gerry Gabrielle asked many times about the continued availability of the $3,000,000 standby line.

        Do you see that?

A.      I do.

Q.      What is Gerry Gabrielle?

A.      He was one of the Wells Fargo account managers that we deal with.  One of the more senior managers that I would have dealt with directly.



Q.    And you write, "We defer to you on both these issues."

Do you see that?

A.    I do.

Q.    And Mr. DeVito writes back at the bottom of the next page, he says, "Why?  You know the answer.  Go back and let them know or forward this e-mail.  As I explained before, PPAS is the Agent, there is no change, the collateral manager change doesn't impact funding as the funds are committed and with our trustee as per Snelling loan agreement."

Do you see that?

A.    I do.

Q.    And he says, "We have been through this so many times and you guys don't understand and defer to me I don't know what I need to do to explain it over, and over, and over again."

Do you see that?

A.    I do.

Q.    So Mr. DeVito was quite adamant that the funds would be committed and were with the trustee as per Snelling loan agreement, right?

A.    Appears -- appears so from this document, yes.

MR. NADLER:  Objection to form.

Q.    (BY MS. MERKEL)  And do you recall Patriarch reassuring you that the funds would remain committed?


ESQUIRE
DEPOSITION SOLUTIONS

A.    I don't have a specific recollection of that, but it appears that they are reassuring me here.

Q.    Do you recall how you learned that Patriarch was being replaced as collateral manager?

MR. NADLER:  Objection; vague.

A.    I don't have a specific recollection of that, no.

Q.    (BY MS. MERKEL)  Why were questions being raised at this time as to whether PPAS would continue as agent?

A.    Just looking at this e-mail, the one from Vin where he -- where he makes his statements, I think that he -- you know, there was some concern by the Bank that the $3,000,000 standby line would continue to be available.

You know, they -- they took a certain amount of comfort that there was -- there was additional borrowing capacity that wasn't -- you know, that was outside of Wells Fargo's credit agreement, that there was -- there was other borrowing capacity.  And --

Q.    At this --

A.    -- and there was some question on -- in their minds, that, you know, the change in the collateral manager might impact that -- that money being available for PPAS.

Q.    And did you understand there to be concern, as well, as to whether PPAS was going to be replaced as the Agent on these loans?

MR. NADLER:  Objection; vague.




A.      I mean, I couldn't speculate as to what Wells Fargo's concerns were.  I think -- I think Wells Fargo was concerned out the availability of the $3,000,000 standby line, for -- for sure.

Q.      (BY MS. MERKEL)  Did you have any concerns yourself as to whether PPAS was going to remain as the Agent?

A.      I don't recall my specific level of concern about that, no.

Q.      Was your expectation that your relationship with Patriarch, and when I say "your," I mean Snelling's dealings with Patriarch, would remain unchanged when Patriarch was replaced as the collateral manager?

MR. NADLER:  Objection; vague.

A.      I think there was a period of uncertainty.  I think, you know, obviously, commercial relationships exist better on a -- on a certain basis.  And this was a period of transition.  So there was naturally some uncertainty as to how things would operate going forward.

Q.      (BY MS. MERKEL)  Let's pull up Tab 5, and we will mark it as Exhibit 6.

(Berry Exhibit 6 marked.)

MR. NADLER:  Counsel, if you are moving on to a new document, we have been going a little under an hour and a half, I don't know if this is a good time to take a break, but at some point soon.  I don't know how long you plan to spend on



the next document.

MS. MERKEL:  If it's all right with the Witness it's a pretty short document and it's just on a related topic. So I can do that and take a break.

MR. NADLER:  I am fine to do that.

MS. MERKEL:  Okay.

Q.    (BY MS. MERKEL)  So this is a document we will put in the chat, as well --

A.    Thank you.

Q.    -- from just two days later, February 12th, 2016.

And it begins with an e-mail from Anna Crenshaw to yourself, another daily projection where she indicates borrowing 400k to get to bank balance -- to get bank balance to 1 million.

Do you see that?

A.    I do.

Q.    And you write back, "Looks good.  We can go down midweek, but until the PPAS stuff is cleared up, I always want to hold enough cash going into the weekend that we have enough to pay the Monday payroll taxes without having to borrow if needed be."

Do you see that?

A.    I do.

Q.    What PPAS stuff are you referring to here?

A.    Well, I would assume that it's more of that



uncertainty that we discussed a minute ago.

Q.    And so was the uncertainty whether PPAS would continue as your agent on your loans?

A.    I -- I can't be certain, but, I mean, obviously, my concern is with available cash here.

Q.    Okay.

A.    Typically, we paid -- we paid payroll on Friday, but -- but payroll taxes were funded on Monday.  So we needed to have enough funding available on Monday, but there wouldn't be deposits cleared until the end of the day, so we needed -- you know, we needed available funds.

Q.    And so would you effectuate that by delaying disbursements after a payroll went out?

A.    Well, we can't delay disbursements for packness [phonetic].  They -- they just go get the money, so you just need to have availability.

Q.    Yeah.

A.    The -- the -- the stuff that's being discussed here relates to the PPAS borrowings.  They did not operate the same way that Wells Fargo did.  We had to make a draw request from PPAS for funds.  And then that was deposited into our account for operations, or payroll, or whatever we were using it for. But it was -- it did not operate automatically as Wells Fargo did, because they weren't -- they weren't getting daily pay-ups and pay-downs at this time.



MS. MERKEL:  Okay.  So I want to turn to that question, but why don't we go ahead and take a break and we can return to it when we come back.

THE DEPONENT:  Very good.  Thank you.

MS. MERKEL:  How long would you like to go off the record for?

MR. NADLER:  Five, ten minutes.

THE DEPONENT:  Yeah.

MR. NABLER:  If that works for the Witness.

THE DEPONENT:  Works for me.  Thank you.

THE VIDEOGRAPHER:  We are going off the record at 10:26 a.m., Central Daylight Time.

(Short break, 10:26 a.m. to 10:38 a.m.)

Q.    (BY MS. MERKEL)  Okay.  Welcome back, Mr. Berry.

So right before the break you indicated that the PPAS borrowings did not operate the same way that Wells Fargo borrowings did, correct?

MR. NADLER:  Objection; misstates prior testimony.

Q.    (BY MS. MERKEL)  Is that --

A.    I would like to differentiate the way the borrowings worked, yes.

Q.    And you indicated that you had to make a draw request from PPAS for the funds in the Zohar revolving credit facility; is that right?

A.    That's my recollection, yes.



Q.    And what form did that request take?

A.    I -- I couldn't be certain.  I don't have a recollection of the exact form.

Q.    Did -- were you responsible for making that request or someone else at Snelling?

A.    I would say that likely Anna Crenshaw made the request on a regular basis.

Q.    To whom would she direct the requests?

A.    I am not certain who -- who received them.  I'd have to see one of the draw requests to -- to know.

Q.    How frequently did you draw down the Patriarch revolver?

A.    I don't -- I don't recall the frequency.

Q.    Was it weekly, monthly?

Can you give me a ballpark at all?

MR. NADLER:  Objection --

A.    Yeah, I really don't recall the frequency.

MR. NADLER:  Mr. Berry, again, I would ask if you could allow me to object, but vague as to time frame.

Q.    (BY MS. MERKEL)  When you drew down the Patriarch revolver, which bank account would the funds be deposited into?

A.    I couldn't be certain of that.

Q.    Were the funds put in your -- the account from which you paid out disbursements?

A.    I -- I couldn't be certain of what account it was



deposited into.

Q.    Did you have a specific account that was utilized for that purpose?

MR. NADLER:  Objection; vague.

A.    Again, I couldn't be certain what the -- what specific account was used to -- to receive draw proceeds from -- from the Patriarch facility.

Q.    (BY MS. MERKEL)  Is that because you don't recall?

A.    I do not recall.

Q.    And -- but it would have to be one of the accounts that you testified about earlier?

MR. NADLER:  Objection --

A.    Again, I don't have a basis to -- to answer.

Q.    (BY MS. MERKEL)  And just to be clear, you don't have a basis because you don't recall; is that right?

A.    I don't recall.

Q.    At the time you would have been familiar with the bank accounts that --

A.    I would have been at the time, yes.

Q.    Okay.  And you had to pay interest on funds that were drawn from the Patriarch revolver, correct?

A.    We did.

Q.    Do you recall the interest rate?

A.    I don't.

Q.    Was it higher than your revolver with Wells Fargo?



MR. NABLER:  Objection; vague as to time frame.

A.    I don't recall what the -- what the basis for the interest rate was.

Q.    Did you consider the Patriarch revolver to be a back up to the Wells Fargo revolver?

MR. NADLER:  Objection; vague and ambiguous as to time frame.

Q.    (BY MS. MERKEL)  You can answer.

A.    In general, yes, the -- the Patriarch funds would have been -- would have been at this time utilized as a back up, as long as Wells -- Wells Fargo was -- was easier to work with from a daily -- a daily operations standpoint.

Q.    How so?

A.    Well, just the -- we have described quite a bit of detail about how the -- how the operations were automatic in nature with Wells Fargo.

Q.    When you made the request for funds -- to draw down funds from Patriarch, did you have to explain what you were going to use the funds for?

A.    I'm certain we would have had to provide a reasonable explanation for why funds needed to be drawn, yes.

Q.    And --

MR. NADLER:  And just for the record, it doesn't look like the transcript included my objection that the question was vague as to the time frame.



Q.    (BY MS. MERKEL)  Just because of your counsel's persistent objections on this topic, I am just trying to ask about your use of the revolver during your time at Snelling.

Was there a time while you were CFO of Snelling when your practices for the Patriarch revolver changed?

A.    There was a point at which the Wells Fargo facility was terminated, and we renegotiated the facility with Patriarch and that became our principle operating lender.  So yes, during that time there was a significant change in the way that we interacted.

Q.    And so all of your answers prior to now have been relating to the period prior to that change and the closure of the Wells Fargo facility; is that right?

A.    Yes.

Q.    Okay.  Did Patriarch ever decline to fund requests to borrow on the revolver?

A.    I don't recall -- I don't recall yes or no on that.

Q.    Did they ever limit the amount you could draw to something less than you had requested?

MR. NABLER:  Objection; vague.

A.    Again, I don't -- I don't have a specific recollection of that, no.

MR. NADLER:  Again, I apologize if the volume is -- is there is a problem with volume, but I objected vague and it doesn't look like the transcript caught that.



Q.    (BY MS. MERKEL)  Was another reason that the Patriarch revolver was a back up that it was more expensive credit than the Wells Fargo revolver while the Wells Fargo revolver was in place?

MR. NADLER:  Objection; vague.

A.    Again, I think I testified earlier that I -- I wasn't sure what the interest rates on the two -- the two items were, so I kind of answered that question before.

Q.    (BY MS. MERKEL)  Let's take a look at Tab 11, and I think this is now Berry Exhibit 7, but somebody can correct me if that's wrong.

THE REPORTER:  That's correct.

MS. MERKEL:  Thank you.

(Berry Exhibit 7 marked.)

Q.    (BY MS. MERKEL)  So Mr. Berry, Exhibit 7 is an e-mail exchange between yourself and Anna Crenshaw --

A.    Uh-huh.

Q.    -- February 29th -- starting on February 29th, 2016.

Do you see that?

A.    Uh-huh.

Q.    And she sends a daily projection e-mail similar to one's we've looked at before, notes, "Lockbox 1 million" at the bottom and then states, "No borrowing for today, low balance is 2,041."



Do you see that?

A.    Uh-huh.

Q.    Do you understand that to mean 2,041,000?

A.    Yes.

Q.    And what loan balance is being referred to there?

A.    I -- I don't know.  It's not clear from this document.

Q.    You respond to her and write, "Until further notice I would like to borrow daily all that we can and still maintain availability around 2 million."

Do you see that?

A.    I do.

Q.    And so why were you giving Ms. Crenshaw this instruction?

A.    I don't know.  I -- I don't know the specifics of that.

Q.    She writes back, "Okay.  We will have a million we can borrow tomorrow."

Do you see that?

A.    I do.

Q.    Is that because the lockbox is a million, the loan balance is approximately 2 million, and so once the lox box is applied you would have a million in additional availability before you reach a $2 million cushion?

MR. NADLER:  Objection; vague.



A.     That's -- that's how I would interpret this.

Q.     (BY MS. MERKEL)  Okay.  And you don't have any memory as to why you're -- you were giving the instruction around this time to borrow down to an availability of around 2 million?

MR. NADLER:  Objection; misstates the document and asked and answered.

A.     I don't have a -- I don't have a specific recollection, no.

Q.     (BY MS. MERKEL)  Mr. Berry, to your understanding, did my question misstate the document in some way?

A.     I don't recall what -- what we're saying.  You'd have to refresh my --

Q.     Sure.  So my question was:  You don't have any memory as to why around this time you were giving the instruction to borrow down to an availability of around 2 million?

MR. NADLER:  Objection to the form.  You are asking him to explain my objections.  I'm --

MS. MERKEL:  I am asking him if my understanding of the document is the same as his.  I certainly invite him to explain if he has a different understanding.

MR. NADLER:  That wasn't your question.  You are certainly welcome to ask him that, but that wasn't what you asked him.



MS. MERKEL:  No, I am asking him that now.

A.    Am I free to answer?

Q.    (BY MS. MERKEL)  Please.

A.    I don't have a specific recollection of the circumstances of why I gave this direction at that time.  I am certain at that time I -- I had a reason for that, but it's not clear, initially, to me why I gave that direction.

Q.    And can you just describe for me, in your own words, what the direction was that you were giving here?

A.    As it -- as it states here in the document, "Until further notice I would like to borrow daily all we can and still maintain availability around 2 million."

Q.    And that availability was availability in your line of credit of around 2 million?

MR. NADLER:  Objection; vague.

A.    Whatever document -- whatever availability we are talking about here, yes, on a -- on a -- on a line of credit.

Q.    (BY MS. MERKEL)  All right.  I think we discussed a little earlier an e-mail exchange that you were having in a similar time frame, February 2016, regarding a Wells Fargo call.  We can pull it back up if -- if that would be helpful.

Do you recall the e-mail I am discussing where you reference a discussion with Gerry Gabrielle?

A.    Let me see if I can find it.  I'm sorry.

Q.    No problem.



A.    Let me go back and look in the chat documents here.

MR. NADLER:  And just so the record is clear, it was -- I don't remember the Exhibit Number, but it's the file name that starts with 04.

MS. MERKEL:  Let me just find the exhibit number for you.

THE REPORTER:  It's Exhibit Number 5, I believe.

MS. MERKEL:  Thank you.  Yes, that's correct.

It's marked as Tab 4, if it's easier to find that in the chat.

Q.    (BY MS. MERKEL)  So Mr. Berry, during this time period when you were having this call with Wells Fargo, was this around the time period when you were looking to reup the credit facility with Wells Fargo?

A.    I don't have -- I think I testified earlier that I don't recall what the timeline of events was when --

Q.    And I --

A.    -- when the credit facility came for renewal.

Q.    Thank you.

And I guess I am just trying to ask whether this e-mail exchange refreshes your recollection that you were having conversations about renewal around this time period?

A.    I -- I can't be certain whether -- whether this was the renewal time frame or not.

Q.    Okay.  During this time period, were you giving any



consideration to the possibility of paying down and closing your Wells Fargo account?

A.    No, I don't -- I don't think we were considering doing that.  It wouldn't -- it wouldn't have been our preference to do that, let's put it that way.

Q.    Okay.

MS. MERKEL:  Let's pull up Tab 8, which we will also mark as Exhibit 8, Berry Exhibit 8, and we will drop that in the chat, as well.

(Berry Exhibit 8 marked.)

Q.    (BY MS. MERKEL)  So Mr. Berry, starting with the e-mail --

THE DEPONENT:  Hang on one second.  I'm sorry.  I am having some difficulty getting the --

MS. MERKEL:  Oh, sure.

THE DEPONENT:  My Internet logged off here for a second.  Let me get reconnected here.

MS. MERKEL:  Okay.

THE DEPONENT:  Okay.  This -- I am going to have to -- to take a pause here.  I apologize.  I am having a little Internet issue here.

MS. MERKEL:  Okay.  No problem.  Let's go off the record.

THE DEPONENT:  Just, can we go off the record for a second?



THE VIDEOGRAPHER:  We are going off the record at 10:55 a.m., Central Daylight Time.

(Short break, 10:55 a.m. to 10:56 a.m.)

THE VIDEOGRAPHER:  Back on the record at 10:56 a.m.

Proceed, Counsel.

Q.    (BY MS. MERKEL)  Okay.  So, Mr. Berry, do you have the document in front of you now?

A.    I do.

Q.    And starting with the first e-mail in the chain, which is an e-mail from Gerard Gabrielle to yourself on February 23rd, 2016.  Mr. Gabrielle is attaching agreements and pay off letter.

Do you see that?

A.    I do.

Q.    And you forward them to Mr. DeVito, copying Mr. Peterson and Keith Clark and write, "Here are the requested items from Wells loan documents and pay off letter."

Do you see that?

A.    Yes.

Q.    You write, "The pay off letter is blank, pending determination of the funding date and required amounts at that time."  There is another sentence and then you write, "I also have Wells working on a continuation for treasury management services in interim.  There are some wrinkles with changing the bank relationships, which we should discuss when convenient for



you."

Do you see that?

A.     I do.

Q.     Does this refresh your recollection that you were considering paying down and closing the Wells Fargo account at this time?

A.     My recollection is somewhat different from that.  I think we were requested to pay off the Wells Fargo facility by Wells Fargo.  I think they determined that they were going to, you know, close the facility.

Q.     And --

A.     So I -- I don't think that was -- I want to just be clear that that was not our preference.  That was not the Company asking to do that.

Q.     What was your understanding of why Wells Fargo was making that request?

A.     It was Wells Fargo's business decision to -- to not continue the -- the relationship.

Q.     And did you have an understanding of their -- the reasoning behind their business decision?

MR. NABLER:  Objection --

A.     I think they had several relationships.

MR. NADLER:  And I --

A.     Go ahead.

MR. NADLER:  I objected asked and answered, and



again, the transcript didn't reflect that.

MS. MERKEL:  What was --

MR. NADLER:  Berry, I would ask if you could allow me -- give me a moment to object (inaudible).

THE DEPONENT:  Sure.

Q.    (BY MS. MERKEL)  What was your understanding of those reasons?

A.    I -- I think that Wells Fargo decided that they didn't want to continue with this relationship and they also, it's my understanding from -- from things that I heard in the marketplace that they had decided to reduce their exposure to the staffing industry, in general.  They were concerned about there credit exposure to that industry.

Q.    Were you aware of any factors specific either to Snelling or to Patriarch that factored into their decision?

A.    I am sure that they had their business reasons for why they -- why they chose to do that.

Q.    And I am just asking for what you knew about those business reasons?

A.    I don't -- I can't speculate as to what their reasons would have been.

Q.    No one ever communicated to you what their reasons were?

MR. NADLER:  Objection; asked and answered.

A.    I mean, again, they chose to -- to -- they chose to

terminate the relationship.  That wasn't our preference, I am sure they had their reasons for that.

Q.    (BY MS. MERKEL)  Who told you that that was their decision?

A.    I believe Gerry Gabrielle communicated that to me, and there is several people on this e-mail chain that were various Wells Fargo people that I dealt with.

Q.    And what did he tell you when he communicated that?

A.    I don't have a specific recollection.

Q.    Okay.  So you -- Mr. Peterson writes back to your e-mail and says, "Will Wells continue with the bank services even with us pulling the line?"

Do you see that?

A.    I can't find it, but I --

Q.    It's on the bottom of the first page.

A.    Bottom of the first page.  Okay.

The first page from the top.

Q.    The first page in the PDF at the bottom e-mail.

A.    Yeah.  Got you.  "Will Wells continue," I see that, yes.

Q.    So he writes, "Will Wells continue with the bank services even with us pulling the line?"

Do you see that?

A.    I do.

Q.    So Mr. Peterson, to your recollection, when he



said, "us pulling the line," is actually referring to Wells Fargo cutting off the line?

A.    Yes.

Q.    And he said -- and you write back, "That is what we are asking them to do."

So you were asking Wells to continue providing bank services without a revolving credit facility; is that correct?

A.    Yes.

Q.    And --

MR. NADLER:  And Counsel, I apologize, but I believe Keith Clark was a lawyer for Snelling.  So this -- these e-mails are privileged.  I know that they were produced by the trustee, but I believe this internal communication would all be privileged.

MS. MERKEL:  I mean, I don't see Mr. Keith -- Mr. Clark being asked for or providing any legal advice in these exchange -- in this exchange.  So I'm not sure that I -- I agree with that.

If you want to identify some place where you think there is legal advice being requested or provided, let me know.

MR. NADLER:  Well, there's discussions, for example, in the e-mail that Mr. Berry sends at 1:40 p.m. about whether or not a new -- a new treasury manage agreement is necessary.  There is discussion earlier on about -- in the e-mail from Mr. Berry about some wrinkles with changing bank

relationships.  I don't -- I think that those could all be easily interpreted as addressing legal issues.  And it notable, again, that there is a -- there is a lawyer for -- for -- I believe for Snelling.

And Mr. Berry can clarify if I'm right or not about who Keith Clark is, but I think he is a lawyer for Snelling on these e-mails discusses these contract negotiations and contract issues.

Q.    (BY MS. MERKEL)  Mr. Berry, was Keith Clark a lawyer for Snelling?

A.    Keith Clark was the general counsel of Snelling during my tenure.

MR. MERKEL:  So, I mean, I don't agree.  I don't see any legal advice being requested or provided in this e-mail exchange or, frankly, any legal issues being discussed.  You know, I don't want to trample on the privilege.  If you want to make an objection, this and the prior privilege objections you've raised are reasons for me to hold open the deposition.

So I can hold open the deposition and we can work it out or I can proceed with questioning.  So it's kind of up to you.

MR. NADLER:  I am just thinking this in realtime. I suppose to the extent that there is a privilege here, it wouldn't be Patriarch's, it would be Snelling's.  I don't know if Snelling's even exists as a going concern today, but it



wouldn't be my place to waive Snelling's privilege on their behalf.

So I think for present purposes, I am content to reserve the rights.  If you want to keep asking the questions about this document, we can figure out the privilege issues offline at a later time.  But to the extent there is a privilege issue, again, it's Snelling's, I suppose.

MS. MERKEL:  Yeah.  I agree with that.

Q.    (BY MS. MERKEL) Okay.  All right.  So with that reservation, Mr. Berry, I want to focus on Mr. Peterson's response to your e-mail where he says, "Understood.  Hopefully they will let us know soon."  And he says it's the Lockbox that is the real issue.

Do you see that?

A.    I do.

Q.    What is your understanding of what Mr. Peterson was saying about the Lockbox?

A.    Well, I think -- I think, you know, Snelling -- my -- my assumption reading the words that are here is he's concerned that the customer impact -- the Snelling customer impact of where people send their payments could be administratively complex.  That's my -- that's my interpretation of this, and that -- that preserving things in a -- in a status quo environment would be preferable.

Q.    So you respond, "That and how money moves back and

forth with Patriarch."

Do you see that?

A.    Yes.

Q.    What did you -- what were you referring to?

A.    I just think keeping the bank -- the bank accounts intact, you know, simplified things moving money back and forth because we already had wiring instructions set up and such.

Q.    And so does this re -- refresh your recollection that you would use your Wells Fargo accounts to receive -- send and receive money to Patriarch?

A.    I can't, you know, determine that specifically from this, but I -- it -- it -- I can't determine that specifically from this.

Q.    When you repaid -- so focusing on the Patriarch revolver for a moment.

A.    Uh-huh.

Q.    When you drew down the Patriarch revolver and then wanted to repay it, what was your process for repaying?

MR. NADLER:  Objection; vague, and vague as to time frame.

Q.    (BY MS. MERKEL) And I am asking about before it became the primary revolver?

A.    I would assume --

MR. NABLER:  Same --

THE DEPONENT:  Go ahead.  Sorry.



MR. NADLER:  I was just going to say same objections, but I apologize for speaking over you.

A.    Our process, I assume we would notify Patriarch that we were going to make a pay-down, and -- and make a repayment by -- by wire.

Q.    (BY MS. MERKEL)  Okay.  Do you know whether or not Snelling had a cash sweep account that Patriarch could access?

A.    Cash sweep account that Patriarch could access.  I don't know that.

Q.    And what --

A.    I would have to know what time frame we are talking about, before of after the -- we ceased operations with Wells Fargo.

Q.    Any -- either time period.

Do you recall there being any time period where Snelling had a sweep account that Patriarch could access?

A.    I don't recall the specifics of how -- how things worked after the -- the Wells Fargo termination.

MR. NADLER:  And again, for the record, the transcript doesn't reflect that I objected as to the question being vague.

THE REPORTER:  This is the court reporter.  I would just like to ask Mr. Berry, if you could pause after the question because I do see Mr. Nabler's mouth moving, but I can not hear what he's saying.



MR. NADLER:  Yeah, I think it's just an issue with Zoom, sometimes that if one person is speaking, the audio, the way the program is set up it doesn't allow you to, kind of hear multiple audio channels at the same time.

THE DEPONENT: I will -- I will do my best.

Q.    (BY MS. MERKEL)  Prior to the Wells Fargo termination, was there a cash sweep account?

A.    Again --

MR. NADLER:  Objection.

A.    Yeah, I don't have a recollection.

MR. NADLER:  And just for the record, the objection was vague.  The transcript reflects objection, but doesn't specify the ground.

Q.    (BY MS. MERKEL)  The DACA in place for the Wells Fargo account gave Patriarch the amount -- the ability to remove funds from your accounts, correct?

MR. NADLER:  Objection; calls for legal conclusion.

Q.    (BY MS. MERKEL)  You can answer, Mr. Berry.

A.    I'm -- I'm not -- I can't be certain as to whether they -- they had the ability to remove funds or not.  They certainly were -- appeared to be a party to the document, the DACA that you showed me.

MR. NADLER:  And just for the record, I objected both on legal conclusion and as to the question being vague.

MS. MERKEL:  Mr. Nadler, respectfully, specifying



the grounds of your objection is one thing, but constantly interrupting a truncated time period that I already have to go back and make sure the record is clear as to the various grounds on which you are objected is totally improper and using up time on the record.

MR. NADLER:  Ms. Merkel, I am entitled to preserve my objections for the --

MS. MERKEL:  You are entitled to say objection to form.  That's getting reflected on the record.  Constantly interrupting to say that you have objected to every question on the basis that it's vague is not a productive use of our time here.

MR. NADLER:  Ms. Merkel, I'm -- I'm entitled to preserve my objections for the record.  If you have an issue with the fact that Zoom doesn't work well for that purpose, again, we can take that up offline.

MS. MERKEL:  Respectfully, Zoom works fine for the purpose.  The fact that you are having audio problems and feel the need to specify every type of objection that you're making and then come back and correct it later is what I am taking issue with.

MR. NADLER:  The audio issues are because of Zoom.  Again, we can -- we don't need to beat this dead horse.  We can take this up offline.

Q.    (BY MS. MERKEL)  Ultimately, Wells Fargo did not



follow through at this time on cutting off the revolving credit facility, correct?

A.    I don't recall when -- when we terminated the relationship with Wells Fargo.

Q.    Okay.

MS. MERKEL:  Let's pull up Tab 7, which we will mark as Exhibit 9.

(Berry Exhibit 9 marked.)

Q.    (BY MS. MERKEL)  Are you able to see that document, Mr. Berry?

A.    I am doing that right now, yes.

Thank you.

MR. NADLER:  Just for the record, again, I note Keith Clark is on here.  So again, you can proceed, but I just want to note the same Snell -- possible Snelling issue.

Q.    (BY MS. MERKEL)  Okay.  So this is an offshoot of the same e-mail exchange, but here on February 23rd, 2016, Mr. DeVito writes, "The bank accounts will continue for now."

Do you see that?

A.    I'm sorry, are we all the way at the bottom?

Q.    Sorry, we are not -- so we are three e-mails up in the chain.

A.    Three e-mails.

Q.    So middle of the second page.

A.    Okay.  Middle of the second page.  Let's see then,



"The bank accounts will continue for now."  Yes, I see that.

Q.    And you write back, "Okay.  Thanks, Dan.  That helps.  We will be sure we have a separate treasury management agreement in place with Wells.  As we approach the funding date, we will have some procedural questions."

Do you see that?

A.    I do.

Q.    What do you mean by "funding date"?

A.    Again, I -- I haven't been specific on the timeline because I don't recall the -- the exact time of the events, but at some point, we negotiated a different credit agreement with -- with Patriarch, with -- with additional availability to allow us to pay off the Wells Fargo loan and to terminate that facility.

Q.    And so is it your memory that in February of 2016, you were discussing that possibility?

A.    Again, I -- I can't be specific with respect to the time frame, just that those events occurred.

Q.    And whose decision was it that you would -- whose ultimate decision was it to pay down the Wells Fargo loan?

A.    We had no -- I mean, Wells Fargo terminated our -- our credit facility and asked us to repay the loan, as I recall.  So I -- we didn't really have a choice to do that.  So we would have -- we would have either been unable to continue our business operations within a few days without an available



credit facility, or the company would have gone into some kind of, you know, operating default.

Q.    Okay.  So let's look at Page 1 of your e-mail.

A.    Okay.  Is that at the bottom one?

Q.    I'm sorry.  It's the Bates -- the top e-mail in the chain --

A.    Top e-mail.

Q.    -- page 1 --

A.    Page 1.

Q.    Yeah --

A.    Okay.  Got it.

Q.    -- at the --

So you write to Mr. Peterson and you say, "Vin is not the person we need to be working with, but if you won't make the right person available, we have no choice but to go through him."  And you continue, "It is not the same as having a bank as our lender, contrary to Vin's earlier statement."

Do you see that?

A.    I do.

Q.    You write, "There are extra steps to get money to/from PPAS/us, and they have to be handled with precision, or we could have an oops, which we cannot afford to do."

Do you see that?

A.    I do.

Q.    What do you mean when you write:  "It is not the

same as having a bank as our lender, contrary to Vin's earlier statement"?

A.    I think it was my earlier testimony that the -- most of the Wells Fargo administration happened automatically. Although, we provided documentation to them on a routine basis, pay-ups and pay-downs under of the facility, operated largely automatically.

And I think I testified earlier that in a different way, the PPAS facility required active management.  We had to lay out a need for borrowings and -- and, you know, reconcile pay-downs.  So there were extra steps to -- to working with -- with PPAS as our -- as our primary lender.

Q.    What was involved in reconciling pay-downs?

A.    Well, again, I don't -- I don't have the specifics here in front of me, but I'm sure that we provided a -- you know, a rendition of activity on the -- on the cash accounts before we -- we could borrow.  Again, I -- I'm certain we're going to get to that at some point.

Q.    Okay.  Sorry.  So when you said "reconciling pay-downs," and I had understood you to meant -- mean something specific to paying Patriarch back.

A.    Well, the --

Q.    Was that misunderstanding --

A.    Well, this was a revolving account and, you know, as it's -- as we have covered, the -- you know, the lending



relationship changed at some point when -- when Wells Fargo went out of picture.  I can't say that it was at this time, but -- but there was a lot of uncertainty at this time.

Q.      So when -- and accepting that we're not sure if it was at this time or at a later time that Wells Fargo was paid down --

A.      Uh-huh.

Q.      -- when Wells Fargo was paid down and Patriarch became the primary lender, did the processes you just described for requesting borrowings and paying them back change?

MR. NADLER:  Objection; vague.

A.      Yeah, I can't be -- I can't be certain what -- how the process has changed.  I don't have a specific recollection of that, but I'm -- I'm certain that there were changes.

Q.      (BY MS. MERKEL)  Did you set up a relationship of automatic drawdowns, the way you had had that -- -- the way you had done with Wells Fargo?

A.      I don't have a clear memory of how -- how the -- how the pay-ups and pay-downs worked.

MS. MERKEL:  Okay.  Let's look at Tab 6, which we'll mark Exhibit 10.

(Berry Exhibit 10 marked.)

MR. NADLER:  Again, Ms. Merkel, you can proceed, but this one reflects -- does seem to reflect Keith Clark weighing in.  Again, if he extends privilege, it's Snelling's



privilege, so I'm not taking a position on that, just preserving the issues for the record.

MS. MERKEL:  Yeah, that's fine.  You know, I just -- I'm struggling to see anything that would be -- would constitute legal advice in this e-mail, but it seemed to me he's acting in a business capacity, but certainly fine to reserve the question.

Q.    (BY MS. MERKEL)  So Mr. Berry, do you have the document in front of you?

A.    I do.

Q.    This is, again, on offshoot of the same chain of e-mails.

I want to focus, for now, on your e-mail at 2:53 p.m. in the middle of the first page of the PDF.

A.    The first page, sorry.  2:53 p.m.

Q.    So this is the page ending in 755 on the bottom right?

A.    Yeah.  755.  Okay.  (Reading document)  Oh, okay. Got it.

Q.    You write:  "Here are the minimum questions which require clarification at this point."

Do you see that?

A.    I do.

Q.    And it appears you are claiming to send these questions to Vin at Patriarch for clarification, correct?



A.    I can't tell from the e-mail who -- who the original was to.  It looks like I forwarded the e-mail on to Keith Clark at 4:17, or he responded at 4:17 at some point.

Q.    When you write -- okay.

A.    The 2:53 e-mail, I don't know who that went to.

Q.    Okay.  So in the e-mail at the top of the second page --

A.    The second page.  Okay.

Q.    -- Mr. DeVito writes to you --

A.    Let me see.

Q.    -- and -- and says, "List your questions in e-mail now and I will handle."

Do you see that.

A.    Yeah.  Let's see.  Well, it's -- yeah, okay.

Q.    Did you -- you saw that e-mail from Mr. DeVito?

A.    I'm still looking for it.  I apologize.

Where is it in the second page?

Q.    At the very top.

A.    At the very top.  Okay.  I see, "List your questions now and I will handle."  Yes, it starts on first page.  I've got it.  Okay.  Got it.

Q.    So would you agree with me that the next e-mail appears to be your effort to put together the minimum questions which require clarification to send on to Vin?

A.    Right.  So that's what I'm sending on to Keith.



Q.    Okay.  And so you write:  "How does the daily transfer process work is probably the main question since the accounts are staying in place for now."

Do you see that?

A.    Yes.

Q.    And you write:  "Is it daily net borrowing/pay-down?"

Do you see that?

A.    Yes.

Q.    And so does that refer to the method you've been using with Wells Fargo?

A.    Yes.

Q.    So, essentially, asking Patriarch, well, we set it up the same we've been doing it with -- with Wells Fargo; is that correct?

A.    Right.  I mean, I think this whole e-mail is about how is the loan administration going to work.

Q.    Yep.  And then in the next bullet point, you write: "Assuming that, do we initiate" -- withdrawn.

Is the assumption for a net borrowing/pay-down arrangement that Patriarch will have control over a Lockbox account, such that, they would have the ability to treat all your incoming receipts in that account as pay-down of the credit facility?

MR. NADLER:  Objection; vague.



A.    I think that's the question I'm asking here, or that I want to get clarified.  And that's what the -- that's what the nature of these questions is about, how -- how will the daily administration of credit facility operate.

Q.    (BY MS. MERKEL)  And do you recall whether, ultimately, the arrangement you reach was net borrowing/pay-down?

A.    I don't recall.

Q.    Okay.  But fair to say that as of this time, you did not have a net borrowing/pay-down arrangement with Patriarch?

A.    At the time -- at the time up to the termination of Wells Fargo, we did not have a daily pay-up, pay-down relationship with Patriarch.

Q.    Okay.  In the next bullet point you write: "Assuming that, do we initiate outgoing transfers to PPAS when there is a pay-down for a day, is it the same account to which we send interest?"

Do you see that?

A.    Yes.

Q.    "If not, please let us know where to direct the pay-down transfers."

Do you see that?

A.    Yes.

Q.    I guess -- as of this time, you obviously, did have



a revolver in place with Patriarch, right?

MR. NADLER:  Objection; vague.

A.     As I've told you, the time line is -- is not clear to me, but we did negotiate a -- a changed credit facility for Patriarch to become our primary lender, which included the revolving credit features, yes.

Q.     (BY MS. MERKEL)  But prior to that negotiation, did you have a revolving credit facility in place with Patriarch?

A.     We had a credit facility, but we didn't -- it was not utilized in the same way.  And I think I've given some -- some detail about that before.

Q.     Yes.  Understood.  But prior to the negotiation, so in the first period of time during which you were using that credit facility, wouldn't you have already established some process for paying down the facility?

MR. NADLER:  Objection; vague.

A.     I don't have the specifics of that.  As I said, our relationship changed from -- from Patriarch being the back-up lender to being our primary lender when our -- when our primary daily trade lender terminated their facility.  So there was a change in -- in processes at that time.

Q.     (BY MS. MERKEL)  And prior to that change, had Snelling ever drawn down on the Zohar Patriarch credit facility?



A.      I can't --

MR. NADLER:  Objection; vague.

A.      I don't have that information.  I can't testify as to that.

Q.      (BY MS. MERKEL)  You don't know whether or not that happened?

A.      I don't know whether we've ever done anything, right.

Q.      Okay.  And here, you say, you ask:  "Is it the same account to which we send interest?"

Does that imply to you that you had never made a paydown to Patriarch prior to this changed arrangement.

MR. NADLER:  Objection; vague.

A.      I mean, we can make interest payments without making the paydown.

You understand the distinction, right.

Q.      Sure.  I guess, what I'm struggling with is why you wouldn't have -- why you wouldn't know what account to make paydown payments to at this point in time?

A.      We have several different term -- term loan facilities, which we -- we covered before.  I don't know who the party is who's receiving the interest and whether or not they want it segregated or they want it comingled.  So we're -- again, we're just asking where the money needs to be sent.

Q.      (BY MS. MERKEL)  Understood.



A.    We did not have clear operating guidance as to how we would -- would be operating the daily loan administration, and we're -- we were asking those questions.

Q.    Prior to this point in time, had you ever made a payment on any Patriarch loan facility that was not an interest payment?

A.    I -- I can't be certain of that.

Q.    Are you aware of any payments, other than interest payments, that Snelling had made prior to this time?

MR. NADLER:  Objection; asked and answered.

A.    Again, I don't have any -- I don't have any recollection of the specifics.

Q.    (BY MS. MERKEL)  So you're not aware of any payments specifically that Snelling --

MR. NADLER:  Objection.

Q.    (BY MS. MERKEL) -- other than interest payments to Patriarch?

MR. NADLER:  Objection; asked and answered.

And apologies for speaking over you.  I thought you were done with the question.

A.    Again, I am not -- I am not -- I don't have a mem -- a specific recollection of making payments, other than interest.

Q.    (BY MS. MERKEL)  Okay.  So this e-mail exchange is taking place on February 23, 2016.

Do you see that?

A.    Yes.

Q.    And were you aware that three days later a borrowing of $2,000,000 was made on Snelling's Patriarch credit facility?

MR. NADLER:  Objection; assumes facts not in evidence, and objection; vague.

A.    I am not -- I am not aware of that, no.

MS. MERKEL:  Let's pull up Tab 60, and we will mark this as Exhibit 11.

(Berry Exhibit 11 marked.)

Q.    (BY MS. MERKEL)  Okay.  Do you have this up in front of you, Mr. Berry?

A.    I do.

Q.    Great.  So this is an internal e-mail exchange, Patriarch Partners.  I am focused on Renee Dudley's e-mail, which is the first e-mail in the chain.  It runs from the page ending 76 to the page ending 77.  This is an e-mail from Renee Dudley on February 26, 2016, sent to Lynn Tilton.

Do you see it?

A.    Uh-huh.

Q.    And she writes, "Lynn, this is a friendly reminder regarding the borrowings from Z3 which will be held in PPAS. Please advise if you will approve the borrowings below."  And then she includes a table.  The second to last row in the table



lists Vincent DeVito under reviewer, and under borrower lists Snelling Staffing, LLC, FKA Zohar SS Acquisition, LLC.

Do you see that?

A.    I do.

Q.    And it lists a delayed draw term loan in the amount of $2,000,000.

Do you see that?

A.    I do.

Q.    And it lists the balance after today's borrowing is just under $3,000,000.

Do you see that?

A.    I see that.

Q.    Under the table there is a number of headers for various companies and under Snelling Staffing, LLC, FKA Zohar SS Acquisition it states, "Snelling Staffing, LLC, FKA Zohar -- Zohar SS Acquisition is requesting $2,000,000 under their DDTL C facility.  If approved, the DDTL C facility will be the 2,906,968.79."

Do you see that?

A.    I do.

Q.    Did you make that request?

A.    I don't have any recollection of that.

Q.    You don't recall requesting to draw down $2,000,000 from the Patriarch term loan at this --

A.    I don't.  I have no recollection of this.



800.211.DEPO (3376)
EsquireSolutions.com

Q.      Okay.

MS. MERKEL:  And let's take a look now at Tab 61, which we will are mark Exhibit 12.

(Berry Exhibit 12 marked.)

Q.      (BY MS. MERKEL)  Do you have it in front of you, Mr. Berry?

A.      I do.

Q.      Great.  So I am interested, again, in a similar form e-mail sent by Renee Dudley, this time on March 6th, 2016.

A.      Hold on a second.  I apologize, I am trying to get the document here --

Q.      No problem.

A.      -- in the chat.  I thought I had it open.  Doesn't look like it opened.  Okay.  Okay.  And this is the -- okay.  Yeah, okay.  Got it.

Q.      Okay.  So you can see, again, Ms. Dudley sends a list of borrowing requests to Ms. Tilton and says, "Please review and let us know if we have your permission to affix your signatures to the issue of orders that will be sent to the trustees."

Do you see that?

A.      I do.

MR. NADLER:  Objection; lack of foundation as to these documents he is not on.

Q.      (BY MS. MERKEL)  And the third row from the bottom



lists, again, Vincent DeVito as the reviewer and Snelling Staffing, LLC, FKA Zohar SS Acquisition, LLC, as the borrower.

Do you see that?

A.    I see it.

MR. NADLER:  Same objection.  And Counsel, if it's easier, if you're okay with it, I'll just have a standing question instead of objecting to each question about the documents he is not on.

MS. MERKEL:  Sure.

Q.    (BY MS. MERKEL)  So under borrowing for Zohar III, this lists $3,000,000 being borrowed, correct?

A.    That's what I am reading on the document.

Q.    Okay.  And it says, "Balance after today's borrowing 3 million," correct?

A.    That's what the document says, yes.

Q.    Did you make a request to borrow $3,000,000 from the Patriarch revolving credit facility on or before March 6th, 2016?

MR. NADLER:  Objection.

A.    I have no recollection.

Q.    (BY MS. MERKEL)  Okay.  You don't recall doing that?

A.    I don't have a recollection, yes or no, I have no recollection of that.

MR. NADLER:  And just for the record, the objection



there was vague.

Q.     (BY MS. MERKEL)  Do you have -- are you aware of anyone else at Snelling making a request to draw down $3,000,000?

A.     I'm not aware of that.  But again, I don't have any recollection of it.

Q.     When did you first come to learn that $5,000,000 had been drawn down from your revolving credit facility?

A.     I don't have a recollection of when I became aware of that.

Q.     Was it not significant to borrow $5,000,000 over the course of three weeks?

MR. NADLER:  Objection; vague.

Q.     (BY MS. MERKEL)  Certainly, that's something you would have been well aware of or wanted to have been well aware of at the time, right?

A.     At some point I would have become aware of a borrowing of that magnitude, yes.

MS. MERKEL:  So let's pull up Tab 56, and we will mark this as Exhibit 13.

(Berry Exhibit 13 marked.)

THE DEPONENT:  Is that document in the chat?

MS. MERKEL:  I think we are just putting it in.

THE DEPONENT:  Okay.  Thank you.  Thank you.  Sorry.



THE DEPONENT:  No.  Definitely want to make sure you get the document.  So it should be listed as Tab 56.

THE DEPONENT:  Okay.  I don't see it quite yet.

MS. MERKEL:  It should be there now, 56, 2017/11/13.

THE DEPONENT:  I don't see it.  Oh, 11/13.  I'm sorry, it came in a minute ago.  Okay.  All right.  Okay.  Got it.

MS. MERKEL:  Okay.  Great.

Q.    (BY MS. MERKEL)  So this is an e-mail from yourself to Anna Crenshaw copying Biju Varnan?

A.    Uh-huh.

Q.    The subject line is Recash Forecast and it's a e-mail, this is now several months later.

Do you see that, November 13th, 2017?  In fact, it's a year -- a year and a half later --

A.    More -- more than a year later.

Q.    -- more than several months later, yeah.

A.    Correct.

Q.    Okay.  And so you write to Ms. Crenshaw, "The PPAS loan balances are incorrect.  The 3 million revolver and the term loans are 43 million combined.  Also, the revolver amount has been outstanding since early 2016, if I recall correctly."

Do you see that?

A.    Uh-huh.



Q.      "I believe we discovered the draw during the 2015 audit process."

        Do you see that?

A.      I do.

Q.      Does this refresh your recollection that you had learned of the revolver draw down of $3,000,000 during the 2015 audit process?

A.      I don't have any direct recollection of that, but again, I am reading it here and -- and I see what's written.

Q.      You didn't have any contemporaneous knowledge that that $3,000,000 was being drawn down, right --

        MR. NADLER:  Objection --

Q.      -- Mr. Berry?

        MR. NABLER:  Objection; asked and answered.

A.      Again, I don't have a recollection of the specifics around this --

Q.      (BY MS. MERKEL)  Did you --

A.      -- this incident.

Q.      You agree with me that this e-mail reflects that you did not discover that draw down until a subsequent audit process, right?

A.      I -- I can read what the e-mail says, yes.

Q.      And you agree with my interpretation of that e-mail?

A.      Again, I don't know what I knew.  It -- it -- it



states that we discovered this during the audit process, yes.

Q.    Once those amounts had been drawn down -- we looked at about a total of $5,000,000 in draw downs, you had to pay -- Snelling had to pay interest on those amounts, right?

A.    We would have paid interest on any amounts that were outstanding, yes.

Q.    Okay.

MS. MERKEL:  Let's look at Tab 17, please, and we will mark this as Exhibit 14.

(Berry Exhibit 14 marked.)

Q.    (BY MS. MERKEL)  All right.  Mr. Berry, do you have the document pulled up?

A.    I do.

Q.    Okay.  Great.  So I just want to start by looking at the e-mail from yourself to Mr. DeVito.  We are now rewinding back in time to April of 2016.

A.    Right.

Q.    And the subject line is, "Snelling Zohar Delayed Draws."

Do you see that?

A.    I do.

Q.    You write, "Vin, you asked me to think about uses for the delayed draw funds.  Snelling doesn't have an immediate use for the 3 million in additional borrowings."

Do you see that?



A.     I do.

Q.     "However, given the strategic plan we're presenting for 2016 to 2018, does have potential reacquisitions over the period, and as these funds can likely not be accessed at a later date, I'd say let's draw them and apply them to our ABL at Wells for now."

Do you see that?

A.     I do.

Q.     What is the "ABL at Wells"?

A.     That's the -- that's the credit facility at Wells.

Q.     Okay.  You write, "Snelling would want to be able to apply the funds to the line so that it only costs the net amount."

Do you see that?

A.     I do.

Q.     "If PPAS is going to continue to hold the funds, we would most likely not be interested and we're looking those -- to get those funds applied to wells ASAP."

Do you see that?

A.     I do.

Q.     So your view was, you shouldn't be paying interest on two revolving credit facilities at the same time, correct?

A.     I'm reading the e-mail here, and I don't recall the specifics of this, but the -- reading the e-mail, just what's written, it seemed like we didn't have an immediate use for the



funds.

Q.    And so your proposal was to pay down the credit line at Wells so that you would only be incurring interest on one credit facility as opposed to two drawn credit facilities, correct?

A.    Correct.

Q.    And you told him, "If PPAS is going to continue to hold the funds, we would most likely not be interested," correct?

A.    Well, I mean, that's -- that's what the e-mail says, yes.

Q.    Okay.  And Mr. DeVito writes back, "Jim, I can put up for board consideration, but paying down 9 percent debt for 3.5 percent debt and then running the risk of Wells putting up a revolver block is a strong possibility."

Do you see that?

A.    Sorry, I am trying to read the document here.  I think I am on the wrong document.  I'm sorry.

Where is this?

Q.    Yeah, sure.  And just for clarity, this document --

A.    Sorry, this was in the chat?

Q.    Yep, it was in the chat.  It was document 17.

A.    Okay.  Let's -- let me -- I see it now.

Q.    Okay.

A.    Okay.  You asked me to take a look.  Okay.  Put up



for board consideration, but paying down 9 percent debt for 3.5 percent debt -- yeah, okay.  Okay.

Q.    Okay.  So it was Tab 17 in the chat, it's Exhibit 14, and I am on the page that has a Bates ending in 985.

A.    Uh-huh.

Q.    Okay.  And Mr. DeVito writes back to you, and he also copies Brian Stephen.

Who is Mr. Stephen?

A.    Mr. Stephen was counsel for Patriarch.

Q.    He writes, "Jim, I can put up for board consideration, but paying down 9 percent debt for 3.5 percent debt and then running the risk of Wells putting up a revolver block is a strong possibility."

Do you see that?

A.    Yes.

Q.    What do you understand Mr. DeVito to be expressing here?

A.    I think he's expressing concern that Wells - if we -- if we paid down -- if we borrowed money and -- and used it to pay back the 9 percent debt, and allowed our borrowings to be higher on our Wells Fargo credit line, he is concerned that -- that they might -- you know, that they might reduce or -- or restrict our ability to borrow to a point that would be problematic for the company.



Q.    So was the 9 percent debt the Wells Fargo debt, as you understand it?

A.    No, I think the 9 percent debt is the Patriarch debt.

Q.    I see.  And so they would be unhappy for you to incur more expensive debt to pay down their less expensive credit line; is that --

MR. NADLER:  Objection; vague.

A.    I don't know what the objection was, but well -- what Vin is expressing here is that he is concerned that Wells would somehow, you know, block our ability to borrow for ongoing money if we borrowed money to repay the -- the Zohar funds.

Q.    (BY MS. MERKEL)  But the alternative was the company had to incur 3.5 percent interest on one credit line and 9 percent interest on the other credit line, as opposed to at least taking out one of the interest payments, correct?

A.    Correct, which was what was proposed in the first --

Q.    Right.  You were say -- you were objecting to that dual payment, correct?

A.    I think we were saying --

MR. NADLER:  Objection --

A.    -- that we -- it was an alternative to reduce interest expense, yes.



THE DEPONENT:  Sorry, I talked over somebody there.

MR. NADLER:  Yeah, that was me objecting that it was mischaracterizing the document.

Q.    (BY MS. MERKEL)  So if you look at the next e-mail from you to Mr. DeVito, you write, "Okay.  Well, if they are available for draw later, there is no use for them in the near term."

Do you see that?

A.    Okay.  I -- I do see that, yes.

Q.    Okay.

MR. NADLER:  Objection; misstates the document.

You skipped a couple e-mails in there, I think.

THE DEPONENT:  Yeah.

MS. MERKEL:  I'm sorry.  Fair enough.

Q.    (BY MS. MERKEL)  There were a couple of e-mails back and forth, and then on April 4th, 2016, at 5:43 p.m. you write back to Mr. DeVito, and then I've quoted what you said in the first sentence of the e-mail, correct?

A.    Uh-huh.

Q.    And then you -- you write, "I'd say let's reverse the draw and draw them only when needed."

Do you see that?

A.    I do.

Q.    "Agree we don't want to access higher cost capital without a specific return source identified," right?



A.    That's what I wrote, yes.

Q.    What did you mean by, "We don't want to access higher cost capital without a specific return source identified"?

A.    In other words, we don't want to borrow money at a higher cost of capital, unless we have a, you know, business purpose for drawing that.  If we don't have a -- if we don't have a immediate use.

Q.    And he writes back, "They are drawn.  Can't reverse the draw."

Do you see that?

A.    I see that.

Q.    Why couldn't Snelling just pay back the $3,000,000?

A.    I'm not -- I don't recall the specifics of why that wasn't feasible.  It seems like Vin stated it pretty straightforwardly there.

Q.    Well, he says you can't reverse the draw.

But was it his decision whether or not the 3 million would be paid back?

Speculation

MR. NADLER:  Objection; calls for a legal conclusion.

A.    I can't answer that.

Q.    (BY MS. MERKEL)  Was it your understanding that Snelling had the authority to repay funds that it had borrowed if it had wanted to?

Speculation



MR. NADLER:  Objection; calls for a legal conclusion.

A.    I -- I -- from this I don't have -- I don't have an understanding of -- of swhat our ability to -- to borrow and repay was on these.

Q.    (BY MS. MERKEL)  You stated, you know, your understanding that Vin stated pretty straightforwardly here.

Are you referring to his statement that you can't reverse the draw?

A.    Correct.

Q.    Is that --

A.    Term loans, generally, once drawn can't be repaid and then reborrowed.  That's the -- why they are called term loans, they don't -- they are not a revolving facility.  So his -- his point that they can't reverse the draw if it's already been drawn is entirely consistent with that.

Q.    I see.  Okay.

MS. MERKEL:  Let's take a look at Tab 18, and we will mark this as Exhibit 15.

(Berry Exhibit 15 marked.)

Q.    (BY MS. MERKEL)  All right.  So Mr. Berry, Exhibit 15 is an e-mail from yourself to Joe Quezada on May 17th, 2016.

Do you see that?

A.    Uh-huh.

Q.    Who is Joe Quezada?



A.      Joe is our corporate controller.

Q.      The subject line of your e-mail is, "May SCF Reclass Reminder."

Do you see that?

A.      Right.

Q.      And you write, "Reminder that in May you are going to reclass the 3 million Patriarch AR offset to the Zohar draw to financing activities."

Do you see that?

A.      I do.

Q.      Forgive my accounting ignorance, but can you explain what that sentence means?

A.      Statement of cash flow is -- is divide into three sections; operating activities, investing activities and financing activities.  It appears that in Joe's interim financial statements -- unaudit -- unaudited financial statements, he had -- he had classified the Patriarch receivable as either an operating or investing activity, and I was reminding him that it -- it was a financing activity.  Even though it was an account receivable, it was related to a financing.

Q.      You write, "Until we receive cash proceeds, this shouldn't be reported as a cash flow statement impacting transaction, in my opinion."

Do you see that?



A.      Yes.

Q.      So as of this time, Snelling hadn't received the -- any of the cash proceeds from the 3 million in cash that was drawn down from Patriarch, correct?

A.      That -- that's what I would take away from this e-mail.

Q.      It was being held in a bank account that belonged to Patriarch, correct?

MR. NADLER:  Objection; vague.

A.      Yeah, I can't tell that from this -- from this where it was being held, but we -- it -- what I was commenting on was that we didn't re -- we had not received cash proceeds at that time.

Q.      (BY MS. MERKEL)  Do you recall, generally, that it was being held by Patriarch?

A.      I don't have a recollection one way or another.

Q.      Okay.

MS. MERKEL:  Let's look at Tab 20, which we will mark Exhibit 16.

(Berry Exhibit 16 marked.)

Q.      (BY MS. MERKEL)  This is an e-mail exchange between yourself and Mr. DeVito, copying Mr. Peterson.  On May 24th, 2016 you send Mr. DeVito a copy of Snelling cash forecast weekend 5/20/2016.  In your third bullet point in the e-mail to Mr. DeVito you write, "Clarification is needed on



status and expected receipt timing of 3 million draw proceeds."

          Do you see that?

A.     I do.

Q.     So as of this time, you had not received the 3 million in draw proceeds.  Fair?

          And when I say "you," I mean Snelling had not received the 3 million in draw proceeds, correct?

A.     Appear -- appears not.

Q.     And he writes back, "The proceeds continue to be held at agent as previously discussed."

          Do you see that?

A.     I do.

Q.     Does that refresh your recollection that the proceeds were being held by Patriarch Partners Agency Services?

A.     That's what that is stating, yes.

          MS. MERKEL:  Let's do Exhibit 23 -- I'm sorry, Tab 23 and we will mark it as Exhibit 17.

          (Berry Exhibit 17 marked.)

          MS. MURPHY:  This one is going to come in two documents, it's a PDF and then an Excel file.

Q.     (BY MS. MERKEL)  And for what it's worth, Mr. Berry, obviously, you are free to open whatever you want, but we will be focused on the PDF cover e-mail.

A.     Okay.  Let me get those open.  Okay.  I have the document.



Q.      Okay.  So I am focused on the PDF cover e-mail, which is from yourself to Anna Crenshaw on October 11th, 2016.

Do you see that?

A.      Uh-huh.

Q.      Your subject line and attachment are Snelling Cash Forecasts WEE 10/7/2016, and you write, "Note draw on 3 million line of credit with Patriarch in beg balance, as well as 6 million available with PPAS."

Do you see that?

A.      I do.

Q.      What are you communicating to Ms. Crenshaw?

A.      If you don't mind, I need to look at this.

Yeah, I guess what I am saying is that by then we knew that the $3,000,000 had been drawn so it needs to be shown in the beginning balance as outstanding, and then -- and then money is available with PPAS.

Q.      And so it says 6 million is available with PPAS.

A.      Uh-huh.

Q.      Do you see that?

A.      I do.

Q.      Are those amounts that have been drawn down on various lines of credit that PPAS is holding for Snelling?

A.      I couldn't be certain from this.

Q.      Do you independently recall PPAS having -- having held 6 million in funds drawn down on Snelling's behalf?



A.    I don't have any immediate recollection of that one way or another, no.

Q.    Okay.

MS. MERKEL:  Let's see take a look at Tab 32, and we will mark this Exhibit 18.

(Berry Exhibit 18 marked.)

MR. NADLER:  Counsel, I know we are pressed for time, given Mr. Berry's impending cut off in 30 minutes.  We have been going for about 90 minutes.  I'm fine to keep going, but I don't know if anybody, the Witness or anybody else needs a break.

MS. MERKEL:  Yeah, we need -- we need the time, unfortunately.

So, Mr. Berry, are you all right to continue?

MR. NADLER:  If -- if you guys could give me like two minutes to run down the hall, I would appreciate that, while you are pulling the exhibit up and I will come right back.

MS. MERKEL:  Okay.

THE VIDEOGRAPHER:  We are going off the record at 11:59 a.m., Central Daylight Time.

(Short break, 11:59 a.m. to 12:01 a.m.)

THE VIDEOGRAPHER:  We are back on the record at 12:01 p.m., Central Daylight Time.

Thank you, counsel.



MS. MERKEL:  Thank you.

MR. NADLER:  So earlier we -- I instructed the Witness not to answer a question.  After refreshing recollection, we are going to withdraw that objection.

If you want to ask him about that, feel free.

MS. MERKEL:  Okay.  Great.  I will.  But right now I am going to focus on the document in front of us, which is Exhibit 18.

Q.    (BY MS. MERKEL)  Mr. Berry, you are e-mailing Joe Quezada, again, on March 2nd, 2017, with the subject line and attachment Audit Report Draft, and then there is some other text in the -- in the name of the file.

Do you see that?

A.    Yes, I do.

Q.    Okay.  Great.  And you write to him, "Take a look at a couple of suggestions in the debt footnote.  I think this improves the description of the draw of the delayed draw funding."

Do you see that?

A.    I do.

Q.    And so you also -- I guess I shouldn't have omitted the fact that the attachment also contains the words, "JTB debt, FM comments."

Do you see that?

A.    Yes.



Q.    Do you understand the attachment to this document to be a reflection of your edits to the debt footnote as described in this cover e-mail?

A.    It appears -- it appears to be that, yes.

Q.    And so let's take a look at the attachment, which has a beginning Bates of 3443.  And we are going to be looking at Page 15, which if you look at the longer number on the bottom right it ends in 457.

A.    Okay.  I see that.

Q.    Okay.  So this is Note 7, long-term debt continued.

Do you see that?

A.    Yes.

Q.    This is the note that you had edited?

A.    Right.  I mean, it's not a -- it's not a red line, so I can't tell what the edits are.

Q.    Okay.  If you look at the third paragraph down, you write, "In March 2016 the Agent of the Company's lender agent, a related party, resigned as collateral manager of the lender, and an unaffiliated entity became a successor collateral manager.  The Agent continues to serve as payment and disbursement agent of the lender and all funds flow between the company and the lender are handled by the Agent."

Do you see that?

A.    I do.

MR. NADLER:  Mr. Berry, he just said he didn't



write -- he can't tell what he wrote here.

Q.      (BY MS. MERKEL)  It continues, "The lender credit agreement contains delayed draw provisions for the term loan."

Do you see that?

A.      I do see that.

Q.      As a component of the transition of collateral managers, 3 -- it says 3,000, then --

A.      This is in thousands, yes.

Q.      Yes, so that refers to 3 million, correct?

A.      Yes.

Q.      "3 million of the delayed draw commitments were drawn by the Agent with the proceeds being held in reserve by the Agent for the Company's benefit."

Do you see that?

A.      I do.

Q.      "These amounts are included in receivables from related parties on the Company's balance sheet as of December 30th, 2016."

Do you understand this section to be the description of the draw of the delayed draw funding that you are referencing in the cover e-mail?

A.      I think that's the -- a general understanding, yes.

MS. MERKEL:  So let's now look at Tab 34, and we will mark that Exhibit 19.

(Berry Exhibit 19 marked.)



A.      Okay.

Q.      (BY MS. MERKEL)  Okay.  So this is an e-mail exchange on March 30th, 2017.  Starting with your e-mail back on March 21st, 2017, which is at the bottom of the first page of the PDF and carries over on to the second page, you write, "Vin and Brian, just rounding back on this, Snelling finance drafted the footnotes to the financials internally based on the prior year report with an attempt to update disclosures for the delay in draw proceeds and related receivable from PPAS."

Do you see that?

A.      Yes, I see that.

Q.      Okay.  And Mr. Stephen writes back two e-mails later and says, "Jim, we are going to need to discuss the draft.  The new footnote disclosure is inaccurate."

Do you see that?

A.      Yes.

Q.      Okay.  Do you recall Mr. Stephen instructing you to update this note?

A.      I don't have that recollection.  I mean, I read it here on the page, but I don't -- I don't recall that.

MR. NADLER:  For the record I objected that the question was vague.

MS. MERKEL:  Okay.  Let's look at Tab 36, and we will mark it as Exhibit 20.

(Berry Exhibit 20 marked.)



Q.      (BY MS. MERKEL)  This is an e-mail dated March 31st, 2017, to Joe Quezada and attaches and has the subject:  Audit Report Draft.  We are at 8/31/2017.

Do you see that?

A.      I do. S

Q.      And you write, "With changes we made in my office."

Do you see that?

A.      I do.

Q.      And we will turn to the attachment, which has a beginning Bates ending in 258.  And we'll be looking at Page 13 ending in 272.

A.      Okay.

MR. NADLER:  I apologize, what page was that?

MS. MERKEL:  It's Page 13 Bates stamped 272.

MR. NADLER:  Thank you.

A.      Okay.

Q.      (BY MS. MERKEL)  Okay.  This is, again, Note 7 on long-term debt.

Do you see that?

A.      Uh-huh, I do.

Q.      And the third paragraph down now reads, "The lender credit agreement contains delayed drop provisions for the term loans.  In March 2016, 3 million of the delayed draw term loan commitments were drawn by the Company with the proceeds being held in reserve at the Agent for the Company's benefit."



Do you see that?

A.    I do.

Q.    So the language that Patriarch required be revised changed the description of the delayed draw term loan as having been drawn by the Agent to having been drawn by the Company, right?

MR. NADLER:  Objection; lacks foundation and assumes facts not in evidence.

Q.    (BY MS. MERKEL)  I mean, you can look back at the prior document.  We just read it.

Do you need me to restate my question, Mr. Berry?

A.    No, I'm -- I'm sorry, I am reading the prior thing to see what changed.

Q.    Okay.

A.    So I can be responsive to the question.  Okay.

Q.    Okay.

A.    Restate that.  I'm sorry, say the question again. I apologize.

Q.    Sure.  So my question was:  The language that Patriarch required to be revised changed the description of the delayed draw term loan as having been drawn by the Agent to having been drawn by the Company, right?

MR. NADLER:  Objection; lack foundation of Patriarch prior to anything to be revised.

A.    Right.  I mean, I see that there was a change.  I



don't know whose change it was, but I -- I see that it was changed from Agent to Company, yes.

Q.    (BY MS. MERKEL)  The initial draft that you authored indicated that the delayed draw term loan was drawn by the Agent, right?

MR. NADLER:  Objection; misstates his testimony. He clearly said he didn't know what he wrote here.

MS. MERKEL:  Please don't coach your witness through objections.

A.    I would have made the same remark.  I -- I don't know what -- what I contributed to that.  I made -- I made edits as I referenced, but I can't tell what the edits were that I made.

Q.    (BY MS. MERKEL)  And so your testimony is you don't know the origin of the revisions between these two drafts; is that correct?

A.    I am saying that there was a revision and it -- the document went through several reviews, including a review of Patriarch.

Q.    Okay.  And you don't know whether or not Patriarch required you to change it from having been drawn by the Agent to having been drawn by the Company?

A.    I don't have a specific recollection of -- of why that change was made.

Q.    Did Patriarch direct you to remove the language



that stated that that draw was a component of the transition of collateral managers?

MR. NADLER:  Objection; vague.

A.     I don't have a specific recollection of how -- how the -- what the impotence of the change was that was made.

Q.     (BY MS. MERKEL)  Did Patriarch direct you to remove the description of the fact that Patriarch had resigned as collateral manager during this time?

MR. NADLER:  Objection; vague.

A.     Again, I don't recall what the conversation with Patriarch was.

Q.     (BY MS. MERKEL)  Is there someone else who you believe would have made these changes to the note?

A.     Again, there was a collaborative process to draft the financial statements that included review by Patriarch, but I don't recall who made what changes at what time.

Q.     The next paragraph in this note states, "The credit agreement with the lender also includes a revolving credit facility lender revolver with a maximum availability of $3,000,000."

Do you see that?

A.     I do.

MR. NADLER:  Which draft are you looking at, ma'am. I apologize.

MS. MERKEL:  This is still Exhibit 20.

MR. NADLER:  Is that the later draft or the earlier draft?

MS. MERKEL:  The later draft.

MR. NADLER:  Thank you.

Q.    (BY MS. MERKEL)  You write, "The company initiated a draw of the lender revolver, the proceeds from which are being held in a reserve at the Agent for the Company's benefit."

Do you see that?

A.    I do.

MR. NADLER:  Objection; misstates his testimony that he wrote this.

Q.    (BY MS. MERKEL)  Just to be clear, as of this time Snelling had $6,000,000 in cash being held at the Agent, right?

A.    That -- that's what I would read from -- from this read of the financials.  Also, I would correct and say I -- I wouldn't say that I wrote -- you know, your beginning statement was that I wrote.  I would say, again, I will remind you that the drafting of financial statements is a collaborative process.

Prejudicial: Designated After Close of Trial

Q.    (BY MS. MERKEL)  As the CFO, did you have any obligation to sign the financial statements?

A.    I signed a representation letter for the financial statements, yes.

MR. NADLER:  Objection; vague.  And, again, I'd ask



that you give me an opportunity to object before answering.

And for the record, the objection was vague.

Q.    (BY MS. MERKEL)  And Snelling didn't have any utilization or business use for that $6,000,000 at this time, correct?

MR. NADLER:  Objection; vague.

A.    What it -- what it would appear is that the amounts were available for our use.

Q.    (BY MS. MERKEL)  But that wasn't my question. My question was whether Snelling had any business use for the $6,000,000?

A.    It doesn't appear at this time that there was a -- there was a need for the funds to be drawn.

Q.    What was the business purpose of these draw downs that totaled $6,000,000?    Speculation

MR. NADLER:  Objection; vague.

A.    I have no direct memory of why -- why the amounts were drawn at this time.    Speculation

Q.    (BY MS. MERKEL)  Were they drawn so that Patriarch could take extra cash before they lost control of the Zohar funds to their new collateral manager?

MR. NADLER:  Objection; asked and answered.

A.    I -- I have no -- no recollection of that.

MS. MERKEL:  Let's pull up Tab 58, and I believe we are marking this Exhibit 21.



(Berry Exhibit 21 marked.)

Q.    (BY MS. MERKEL)  This is an e-mail exchange between Joe Quezada and Kevin McGahey.

Do you know what Kevin McGahey is?

A.    I have no idea who Kevin McGahey is.  This is long after my tenure that Snelling was over.

Q.    Okay.  Fair enough.

The first -- the third e-mail in the chain, so the bottom of the first page of the PDF, Mr. McGahey writes to Mr. Quezada and writes, "I think I see where it originated. There was 3 million added to the term loans in March 2016 and 3 million in August 2016 for the revolver that posted with an offset to Rec/due from Patriarch."

Do you see that?

A.    I do.

Q.    And he writes, "That 6 million was cleared when they paid Wells Fargo in November of 2017."

Do you see that?

MR. NADLER:  Objection.

A.    I do.

MR. NADLER:  Objection; misstates the document and lack of foundation.

Q.    (BY MS. MERKEL)  So there is a couple of responses.  Mr. McGahey asks:  "Why do we carry a 3 million term loan and 3 million revolver with a due from PP for over a



year before they funded it to Wells Fargo?"

Do you see that?

MR. NADLER:  Objection.

And it's easier, probably, if I just have a standing objection to the foundation for the document.

MS. MERKEL:  That's fine.

Q.    (BY MS. MERKEL)  Do you that, Mr. Berry?

A.    I see the -- what is written, yes.

Q.    And Mr. Quezada writes back:  "Patriarch held the funds a their bank.  I guess there was an opportunity to take extra cash before they lost control of the funds to Alvarez."

Do you see that?

A.    I see it.

Q.    "We had additional debt that we were paying interest and receivable because we had not actually received the cash."

Do you see that?

A.    I see it.

Q.    Do you have any basis to disagree with Mr. Quezada's description of why you carried -- Snelling carried a $3 million term loan and a $3 million revolver for a year before paying Wells Fargo back?

A.    Well, I think -- I think it was -- it was clear that there was -- you know, my speculation would be that it was clear that there was some uncertainty as to when we would need



to repay Wells Fargo.  It was not at all clear that we were going to be able to maintain a relationship with them.  I think there -- there is a -- you know, there is some backstop business purpose there to have the funds available.

Q.    But Mr. Berry, we saw you suggest that those funds be repaid to Wells Fargo, and Patriarch said no, right?

A.    On a short-term basis, I think it -- it could have been done, but again, I think that it's -- it's reasonable to speculate that the -- the relationship with Wells Fargo got increasingly difficult over this time.

Q.    Do you recall, specifically, when it became difficult?

A.    I don't recall.  I've said that several times that I don't recall --

Q.    And so you don't recall --

MR. NADLER:  Ms. Merkel, if you would let him finish answering your question.

Q.    (BY MS. MERKEL)  Do you have more you want to say on that?

A.    So all I was going to say is, I -- I've said several times that I don't recall the specific timeline of -- of what happened and what time.  These events were long ago. And now, somebody is speculating about, you know, why -- why things were done.  You know -- he -- he says "I guess."  He's making a speculation.



Q.    And so you're speculating some alternative explanation; is that right?

A.    I am.  I would say there -- there could be multiple alternative explanations that would be plausible.

Q.    Okay.  And you don't know why --

A.    I don't have a specific recollection of that, and I think I've said that a couple times.

Q.    Do you recall that these funds -- these funds being used to repay Wells Fargo in October of 2017?

MR. NADLER:  Objection; vague.

A.    I do believe we used the Patriarch funds, some -- some combination of Patriarch funding to repay the Wells Fargo loan when it -- when it didn't -- when it matured or when it was recalled.

Q.    (BY MS. MERKEL) And do you recall whether it was recalled by Wells Fargo or Patriarch directed you to move to a different bank?

A.    I don't recall.

Q.    And so -- and you have no reason to disagree with me that that took place --

A.    That a repayment took place?

Q.    -- that the 17 -- that the repayment took place approximately 17 or 18 months after the draw was initially made?

A.    I don't -- again, I can't say what the timing was.



I think I've said several times that I don't recall the specifics of the timing of the -- of the transactions.

Q.    I just need to confirm what you know and what you don't, Mr. Berry.

A.    Again, I don't know the specifics of the timing of transactions.

Q.    Okay.  And you don't recall the specifics of why the decision was made to repay Wells Fargo; is that right?

MR. NADLER:  Objection; asked and answered.

A.    I believe we -- we had increasing levels of difficulty with Wells Fargo, yes.

Q.    (BY MS. MERKEL)  Did Wells Fargo, ultimately, make the decision that you would repay them, or did Patriarch make that decision?

A.    I -- I believe that we had an increasing level of difficulty with Wells Fargo.  My guess is that they were insisting that we repay the loan, but again, I don't have the specifics in front of me.  It's been a long time.  My memory is -- is somewhat vague on the point.

Q.    Okay.  Let's take a look at Tab 55.

MS. MERKEL:  And are we up to Exhibit 22?

THE REPORTER:  Yes, ma'am.

MS. MERKEL:  Thank you.

We will mark this as Berry Exhibit 22.

(Berry Exhibit 22 marked.)

Prejudicial: Designated After Close of Trial



Q.     (BY MS. MERKEL)  Mr. Berry, Exhibit 22 is an e-mail from Brian Stephen to yourself, copying Vincent DeVito with a subject line:  Request letter.  And Mr. Steven writes to you:  "Jim, I attach a request letter from Snelling to its manager requesting to access the 5.95 million that is being held in a restricted account."

Do you see that?

A.     I do.

Q.     And if you look at the attachment, you can see, there's a letter, a Dear Sir or Madame letter stating:  "Snelling Staffing, LLC request that the company's manager disburse 5,950,000 to the applicable account as set forth on Exhibit A attached hereto."

Do you see that?

MR. NADLER:  I would just object to the extent the document's incomplete.  It looks like there should be two exhibits, and I can't tell if there are or not.

Q.     (BY MS. MERKEL)  Do you see that, Mr. Berry?

A.     I see -- I'm sorry.  Say -- say your question again or your statement again.

Q.     Do you see the attachment that is a header of Snelling Staffing?

Do you have it in front of you?

A.     Attachment, Snelling Staffing, yes, I do.

Q.     And it says:  Dear Sir or Madame, Snelling



Staffing, LLC, the Company requests that the company's manager disburse 5.95 million to the applicable account as set forth on Exhibit A, attached hereto."

Do you see that?

A.    I do.

Q.    And Exhibit A says the payee's Ark Angels, LLC.

Do you see that?

A.    I do.

Q.    And the purpose is listed as ABL pay-down.

Do you see that?

A.    I do.

Q.    Why was Ark Angels the payee for this amount?

A.    I have no recollection of this.

Q.    Do you understand this to be the exchange by which Wells Fargo was paid down?

A.    Again, I don't -- I don't have a specific recollection of these entities.

Q.    Was the 6 -- the 5.95 million that was being held at PPAS, did Snelling make any request to access those funds between the time they were drawn down in February and March of 2016 and this point in time in November --

MR. NADLER:  Objection --

Q.    (BY MS. MERKEL) -- 2017?

MR. NADLER:  Objection; vague.

A.    I -- I've said again, that I don't -- I don't



recall the specifics of the timeline.

Q.    (BY MS. MERKEL)  Okay.  So if records showed that Snelling had not made any use of these funds, you wouldn't have any basis to disagree with that.

Is that fair to say?

A.    I would say I don't have -- I don't have knowledge of that without looking at specific records.

Q.    Was it typical for you to receive request letters from Patriarch?

MR. NADLER:  Objection; vague.

A.    I think this -- this entire transaction was somewhat atypical.  We're paying off a credit line.  That doesn't -- that's not an everyday occurrence.

Q.    (BY MS. MERKEL)  Had you ever otherwise received a request letter like this from Patriarch?

MR. NADLER:  Vague.

A.    I have no recollection of that one way or another.

Q.    (BY MS. MERKEL)  Would it have -- was it ever your practice to prepare request letters like this?

MR. NADLER:  Objection; vague.

A.    It doesn't appear that -- that this would be something that I would have prepared, no.

Q.    (BY MS. MERKEL)  But setting aside this example of a request letter, are you aware of or do you recall ever preparing a request letter at Snelling to access the funds



being held at PPAS?

A.     I don't have a recollection of that one way or another, no.

MR. NADLER:  And so I just note, Mr. Berry has a prior commitment in, like, two minutes.

MS. MERKEL:  I understand that.  Listen, I'm not done with my questions.  I haven't been able to circle back on the privilege issue.  So you know, I -- I think you had originally told us, Mr. Berry, that your conflict was at 1:00 p.m. Central.  If it's at 12:30, we'll, obviously, you know, will respect your conflict, but we'll need to hold the deposition open.

MR. NADLER:  And we'll take that under advisement, but my understanding is it was 12:30, as I think reflected in the e-mails between Quinn Emanuel and Gibson Dunn once we began representing Mr. Berry, but that he made this conflict known to you when you first scheduled the deposition for today.

MS. MERKEL:  Yeah, what I'm saying is when he first made it known to us, he said 1:00 p.m., I am suggesting that if we can take an extra five or ten minutes now, that might help.  But if that's not possible, again, we understand, we're going to hold --

THE DEPONENT:  I tell you what, can go off the record for a minute and let me call my -- my next appointment and see if I can delay for a few minutes.  I'm happy to do



that, if it's -- if it really is just a few minutes.

MS. MERKEL:  Thank you.  That would be great.

THE DEPONENT:  Okay.  Let me go off the record for a second.

THE VIDEOGRAPHER:  We are going off the record at 12:29 p.m., Central Daylight Time.

(Short break, 12:29 p.m. to 12:33 p.m.)

THE VIDEOGRAPHER:  We are back on the record at 12:33 p.m.

Q.    (BY MS. MERKEL)  Okay.  Mr. Berry, I'd like to show you Tab 50, which I believe we'll mark as Berry Exhibit 23.

(Berry Exhibit 23 marked.)

A.    Okay.  Let me get it opened here.  Okay.

Q.    (BY MS. MERKEL)  So starting at the bottom of the chain, this is an e-mail from Carlos Mercado to yourself, copying Ben DeVito and Alicia Staggers on October 23rd, 2017, and he writes:  "Attached is the documentation for the establishment of new BBVA account."

Do you see that?

A.    Uh-huh, I do.

Q.    Do you recall opening a new account at BBVA?

A.    I know at some point we transferred our banking relationships, including our -- our commercial bank away from Wells Fargo.



Q.      And who made the decision to transfer it to BBVA?

A.      I don't recall who made the decision.

Q.      In this e-mail, Mr. Mercado is providing you with the instructions; correct?

MR. NADLER:  Objection; vague.

A.      I mean, it appears that -- that he was involved in that, yes.

Q.      (BY MS. MERKEL)  Did you understand Patriarch to have an existing relationship with BBVA?

MR. NADLER:  Objection; vague.

A.      I don't know what their -- I don't know what their relationship was.

Q.      (BY MS. MERKEL)  Do you know whether --

MR. NADLER:  Just for the record, the objection was vague, not form.  The transcript got it wrong.

Q.      (BY MS. MERKEL) Do know whether they opened this account on Snelling's behalf?

MR. NADLER:  Objection; vague.

A.      I mean, again, I don't -- I don't have a specific recollection of all this.

Q.      (BY MS. MERKEL)  Is there some reason you're aware of why the 5.95 million that was in the Snelling operating account needed to be transferred to a new account on October 23, 2017?

A.      Again, I'm not -- I'm not aware of why that was



done.  I'm not -- it's not entirely clear to me whether they say "Snelling operating account," whether that's a Wells Fargo account or what -- what that means, exactly.

Q.    So let's look at the next e-mail or a couple of e-mails up in the chain.  The e-mail from Ms. Crenshaw at 1:15 p.m., on October 23rd, which is at the bottom of the first page in the PDF.

A.    Okay.

Q.    She writes:  "The money went into our -- our account that I opened.  It appears that Lynn has opened another account in Snelling's name with her as the signor that she wants the money moved to."

Do you see that?

A.    I do.

Q.    And you write:  "See e-mail to Carlos just now from me, then contact him to understand why this was done."

Do you see that?

A.    I do.

Q.    She writes back:  "So Lynn can have control of the money.  Basically, we are moving it to account in Snelling's name that we don't have access to without going through Patriarch."

Do you see that?

A.    I do.

Q.    She writes, "Lynn is the only signer."



800.211.DEPO (3376)
EsquireSolutions.com

Do you see that?

A.    I do.

Q.    Does this refresh your recollection as to what was being done with this money at this time?

A.    I mean, I still -- I can read what's here.  I don't -- I don't have a recollection of this entire exchange.

Q.    Okay.  And you write back, "And that is only for this money that's earmarked for Wells.  Not for ongoing ops."

Do you see that?

A.    Yes.

Q.    And that doesn't refresh your recollection as to what was being done here, does it?

A.    Again, I -- I see what's written here.  The -- this was quite a long time ago.  A lot of activity at this time, I don't recall this specific exchange.

Q.    And so it's correct that you don't recollect anything specific happening at Snelling that necessitated this change, right?

A.    I don't have a recollection one way or another, no.  And it's not clear to me whether this continued for some period of time or it was just an interim thing.  I mean, it's -- I am just not clear about the specifics here.

Q.    We talked a little bit earlier about the fact that Vin gave you, you know, a clear indication that the delayed draw term loan could not be undone, essentially, once it --



once it been drawn, right?

MR. NADLER:  Objection; misstates prior testimony.

A.     I do -- I do recall that note from Vin, yes.

Q.     (BY MS. MERKEL)  And there was also about $2.95 million that had been drawn on a revolving credit facility, right?

MR. NADLER:  Objection; vague as to time.

A.     Again, I -- I don't -- I don't recall the time -- the time line, but, you know, in reviewing the financials it appeared that there was approximately 6 million outstanding in the financials that you showed me earlier.

Q.     (BY MS. MERKEL)  Right.  And those financials also referred to approximately 3 million that was in a revolving --

A.     Yes.

Q.     -- facility with Zohar; right?

A.     Yes.

Q.     Did you ever consider paying down the revolver?

MR. NADLER:  Objection; vague.

A.     Again, I don't -- I don't have a specific recollection of that, no.

Q.     (BY MS. MERKEL)  Obviously, a revolver, typically, could be paid down at any time, right?

A.     Yes, that -- the name would imply that you could pay it down at any time.

Q.     And so why would Patriarch -- excuse me, why would



Snelling incur interest expenses on $3,000,000 drawn from a revolving credit facility for an 18-month period when it had no business use for those dollars?

MR. NADLER:  Objection; lacks foundation.

A.      Again, I don't have a specific recollection of that.

Q.      (BY MS. MERKEL)  And what about for the delayed draw term loan, do you have any recollection as to why Snelling paid interest on those funds for a year and a half?

A.      Again, I don't -- I don't have a specific recollection of that.

Q.      I asked you at the start of the deposition what you had done to prepare, and you mentioned that you when you spoke with your counsel yesterday you looked at a couple of documents that may have refreshed your recollection.

Do you recall that?

A.      I do. S

Q.      What were the documents that you looked at?

A.      They were a couple of e-mails.  Not -- not e-mails that we reviewed today, I don't think, but I mean, we reviewed a lot of documents and I kind of forgotten exactly.  But it was -- it was fundamental material related to the same things we have been discussing today.

Q.      Okay.  And as to what did they refresh your recollection?



A.    Again, it just -- it -- I -- I didn't recall really any of these transactions, and it just -- it kind of gave me a fundamental recollection of the -- the lineup of the Wells Fargo loan and the -- and the -- and the take over of that by Patriarch.  Just reminded me that that had happened.

Q.    Okay.  But just to make sure our testimony is clear, you don't recall exactly how the repayment of the Wells Fargo loan came to pass; is that correct?

A.    Well, again, I think we just reviewed the -- the materials that allowed the Wells Fargo loan to be paid off.

Q.    And do you have a recollection as to whether it was Patriarch's decision, Wells Fargo's decision or Snelling's decision?

MR. NADLER:  Objection; vague.

A.    I don't have a specific recollection of that, no.

Q.    (BY MS. MERKEL)  Okay.  Okay.

MS. MERKEL:  Thank you very much, Mr. Berry.  I think we're finished with our questions for today.

THE VIDEOGRAPHER:  This is the videographer --

MR. NADLER:  Before we --

THE VIDEOGRAPHER:  Yes, go ahead.

MR. NADLER:  Sorry.  Mr. Berry, I just have a couple very quick questions for you.

THE VIDEOGRAPHER:  Proceed, Counsel.

MR. NABLER:  All right.



EXAMINATION

BY MR. NADLER:

Q.   Okay.  Mr. Berry, if you could pull up -- I apologize, I don't have the exhibit number, but it's the file number that was 55.  It's in one of the recent ones we looked at --

A.   Yes.

Q.   From Brian Stephen on November 7, 2017.

A.   I see that.  I have it.

MS. MERKEL:  It's Exhibit 22.

MR. NADLER:  I'm sorry?

MS. MERKEL:  Exhibit 22.

MR. NADLER:  Thank you.

Q.   (BY MR. NADLER)  And you see that he describes in this e-mail the attachment -- or one of the two attachments as a letter from Snelling to its manager?

A.   Yes.

Q.   If you could just scroll down to the second to last page of that document.  It ends in, if you look in the bottom right corner, 762.

A.   Yes.

Q.   And this looks to be -- it's unsigned, but a draft letter from yourself, correct?

A.   Yes.

Q.   And it looks like it was intended to have a counter



signature from -- reading from the document, Lynn Tilton,

comma, manager, comma, Snelling Staffing, LLC.

Do you see that?

A.     I do see.

Q.     Was Lynn Tilton the manager of Snelling?

A.     That's my understanding, yes.

Q.     Is it your understanding Ms. Tilton had that role

for the entirety of your tenure as CFO?

A.     Yes.

Q.     And in that capacity, was it your understanding

that the CEO of Snelling reported to Ms. Tilton?

A.     Yes.

Q.     And you reported to the CEO?

A.     Correct.

Q.     So effectively, in her -- in her capacity as

manager, Ms. Tilton was your boss's boss?

A.     Yes.

MR. NADLER:  All right.  Nothing further.

THE VIDEOGRAPHER:  This is the videographer.  We

ask at this time that all participants please stay connected

briefly to provide transcript and video orders prior to going

off the record.

Beginning with Quinn Emanuel, we are showing a

standing, order expedite, rough and video sync.

Is that correct?



MS. MERKEL:  I am not going to change anything that was --

THE VIDEOGRAPHER:  Understood.  Understood

Mr. Nadler?

MR. NADLER:  If we have a standing order, then same.

THE VIDEOGRAPHER:  I'm not -- I am not showing a standing order.

MR. NADLER:  Okay.  Then we would love to get a expedited copy of the transcript as soon as it's available.

Oh, and one other thing for the record, we looked at a few documents designated as confidential.  Until the parties have had time to review the transcript, I would ask that the entire transcript be considered confidential under the protective order in the case.

THE VIDEOGRAPHER:  Thank you.  And did you need any copy of video today?

MR. NADLER:  Yes, that would be great.

THE VIDEOGRAPHER:  Okay.  And Ms --

MS. MERKEL:  Sorry, we will just reserve rights on the confidentiality.

THE VIDEOGRAPHER:  Understood.

MR. MERKEL:  Mr. Videographer, could we let Mr. Berry go since I understand --

THE VIDEOGRAPHER:  Yes.



MS. MERKEL:  -- he has a conflict and resolve this off the record.

THE VIDEOGRAPHER:  Understood.  This concludes the video conference deposition of Jim Berry.  We are going off the record on June the 23rd, 2023 at 12:45 p.m., Central Daylight time.

Thank you, Mr. Berry.

THE DEPONENT:  Thank you, folks.

MS. MERKEL:  Thank you, sir.

THE VIDEOGRAPHER:  And Ms. Schiff, did you need anything today?

MR. NADLER:  All right.  It doesn't look like she is still --

THE VIDEOGRAPHER:  She's -- she's dropped off, yes.

MR. NADLER:  She must have dropped off at some point.  She is -- she is Gibson and Dunn's client, so we can interface with her, if necessary.

THE VIDEOGRAPHER:  Understood.  Thank you, Counsel.

(Deposition concluded at 12:45 p.m.)



CHANGES AND SIGNATURE

WITNESS NAME:  JAMES T. BERRY

DATE OF DEPOSITION:  June 23, 2023

PAGE        LINE          CHANGE              REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____



I, JAMES T. BERRY, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____
JAMES T. BERRY
16-CV-4488-VMKHP

THE STATE OF_____)

COUNTY OF_____)

Before me, _____, on this day personally appeared JAMES T. BERRY, known to me (or proved to me under oath or through _____) (description of identity card  or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____, 2023.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF_____
COMMISSION EXPIRES:_____



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATRIARCH PARTNERS AGENCY SERVICES, LLC

             Plaintiff-Counterclaim-Defendant,

v.

ZOHAR CDO 2003-1, LTD., ZOHAR II 2005-1, LTD., and

ZOHAR III, LTD.,

             Defendants-Counterclaim-Plaintiffs,

and

ZOHAR CDO 2003-1, LLC, ZOHAR II 2005-1, LLC, and

ZOHAR III, LLC,

             Defendants

---------------------------------


                    REPORTER'S CERTIFICATION
                  DEPOSITION OF JAMES T. BERRY
                         June 23, 2023


        I, Veronica A. Drechsel, Registered Professional
Reporter, Certified Shorthand Reporter in and for the State of
Texas, hereby certify to the following:

        That the witness, JAMES T. BERRY, was duly sworn by
the officer and that the transcript of the oral deposition is a
true record of the testimony give by the witness;

        That the deposition transcript was submitted on

_____ to the witness or to the attorney for the

witness for examination, signature and return to me by



_____;

That the amount of time used by each party at the deposition is as follows:

MICHAEL L. NADLER, ESQ. - 00 HOURS: 01 MINUTE(S)

ANA LOPEZ, ESQ. - 00 HOURS: 00 MINUTE(S)

ELLISON WARD MERKEL, ESQ. - 03 HOURS: 24 MINUTE(S)

DESTINY ROSE MURPHY, ESQ. - 00 HOURS: 00 MINUTE(S)

HANNAH ODENTHAL, ESQ. - 00 HOURS: 00 MINUTE(S)

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

MICHAEL L. NADLER, ESQ., Attorney for Plaintiff-Counterclaim-Defendant.

ANA LOPEZ, ESQ., Attorney for Plaintiff-Counterclaim-Defendant.

ELLISON WARD MERKEL, ESQ., Attorney for Defendants-Counterclaim-Plaintiffs.

DESTINY ROSE MURPHY, ESQ., Attorney for Defendants-Counterclaim-Plaintiffs.

HANNAH ODENTHAL, ESQ., Attorney for Defendants-Counterclaim-Plaintiffs.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in


ESQUIRE
DEPOSITION SOLUTIONS

the outcome of the action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

Certified to by me this 25th day of June, 2023.

_____
Veronica A. Drechsel, Texas CSR No. 8277
Expiration Date: November 30, 2023
Esquire Deposition Solutions
Firm Registration No. 286
1700 Pacific Avenue, Suite 1000
(214) 257-1436



FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original deposition was/was not returned to the deposition officer on _____;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to _____, Custodial Attorney;

That $_____is the deposition officer's charges to the Plaintiff for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein on and filed with the Clerk.

Certified to by me this _____ day of _____, 2023.

_____
Veronica A. Drechsel, Texas CSR No. 8277
Expiration Date: November 30, 2023
Esquire Deposition Solutions
Firm Registration No. 286
1700 Pacific Avenue, Suite 1000
(214) 257-1436



**Exhibit D**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

PATRIARCH PARTNERS AGENCY          16 Civ. 4488
SERVICES, LLC,                     (VM) (KHP)

    Plaintiff-Counterclaim
    Defendant,

  -v-

ZOHAR CDO 2003-1, LTD., ZOHAR II
2005-1, LTD, and ZOHAR III, LTD.,

    Defendants-Counterclaim
    Plaintiffs,

  -and-

ZOHAR CDO 2003-I, LLC, ZOHAR II
2005-I, LLC, ZOHAR III, LLC,
ALVAREZ & MARSAL ZOHAR
MANAGEMENT, LLC, and ALVAREZ &
MARSAL ZOHAR AGENCY SERVICES,
LLC,

    Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**Key**

PPAS Designation

Trust Designation

CONFIDENTIAL, SUBJECT TO PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF

SEAN O'SHEA

June 27, 2023

1:06 p.m.

1500 Centre Parkway, Suite 100

Atlanta, Georgia

Marcella Daughtry, RPR, RMR
Georgia License No. 6595-1471-3597-5424
California CSR No. 14315



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

                      APPEARANCES OF COUNSEL

   For the Plaintiffs:

        GIBSON, DUNN & CRUTCHER LLP
        MR. MICHAEL L. NADLER
        MS. SETON O'BRIEN (via Zoom)
        200 Park Avenue
        New York, New York 10166
        212.351.4000
        mnadler@gibsondunn.com


   For the Defendant Zohar:

        QUINN EMANUEL URQUHART & SULLIVAN, LLP
        MS. HANNAH ODENTHAL
        MR. BRIAN CAMPBELL
        51 Madison Avenue
        22nd Floor
        New York, New York 10010
        hannahodenthal@quinnemanuel.com
        briancampbell@quinnemanuel.com


   Also Present:

        John Parkman, videographer



                          INDEX OF EXAMINATION

WITNESS:  SEAN O'SHEA


EXAMINATION                                                          PAGE

BY MS. ODENTHAL                                                        7

BY MR. NADLER                                                        101


FURTHER EXAMINATION

BY MS. ODENTHAL                                                      143




                                  *   *   *



INDEX TO EXHIBITS

EXHIBITS                                                      PAGE

Exhibit 146    E-mail chain from Chen Zou to      19
               Jean Luc Pelissier 5/3/16
               TRUSTEE_AP5931343 to 31347
               (Confidential)

Exhibit 147    Stipulation and Proposed           20
               Protective Order

Exhibit 148    E-mail chain from Sean O'Shea to   33
               Chen Zou 5/18/16
               TRUSTEE_AP5917829 to 17832
               (Confidential)

Exhibit 149    E-mail chain from Chen Zou to      43
               Sean O'Shea 6/7/16
               TRUSTEE_AP5928479 to 8490
               (Confidential)

Exhibit 150    E-mail chain from Keith O'Leary    78
               to Steven Berrent 5/19/2016
               TRUSTEE_AP5930304 to 30306
               (Confidential)

Exhibit 151    E-mail chain from Chen Zou to      80
               Sean O'Shea 7/27/16
               TRUSTEE_AP5912320 to 12321
               (Confidential)

Exhibit 152    E-mail chain from Sean O'Shea to   82
               John McIlwaine 9/16/16
               TRUSTEE_AP5913319 to 3323
               (Confidential)

Exhibit 153    E-mail from Arriann Mathurin to    84
               Jean Luc Pelissier 11/22/16
               TRUSTEE_AP5916106 to 16108
               (Confidential)

Exhibit 154    E-mail chain from Renee Dudley     87
               to Chen Zou 4/4/16
               PPAS-SDNY-00050935 to 50945
               (Confidential)



INDEX TO EXHIBITS

EXHIBITS                                                           PAGE

Exhibit 155        E-mail from Tendai Masaya to        91
                   Sean O'Shea 6/1/16
                   TRUSTEE_AP5918697
                   (Confidential)

Exhibit 156        E-mail chain from Sean O'Shea       92
                   To Chen Zou 12/12/16
                   TRUSTEE_AP5909232 to 09235
                   (Confidential)

Exhibit 157        eMag Solutions, LLC and             98
                   Subsidiary Consolidated
                   Financial Statements
                   December 31, 2016
                   PATRIARCH-BK-00000806 to 822
                   (Confidential)

Exhibit 158        E-mail chain from Sean O'Shea to   117
                   Chen Zou 5/19/16
                   TRUSTEE_AP5917840 to 5917844
                   (Confidential)

* * *



THE VIDEOGRAPHER:  This begins the video-recorded deposition of Sean O'Shea in the matter of Patriarch Partners Agency Services vs. Zohar CDO 2003-1, Ltd., et al.

Today's date is Tuesday, June 27th, 2023.  The time on the video monitor is now 1:06 p.m.

Would counsel present please state your names and affiliations for the record, after which the court reporter will swear in the witness.

MS. ODENTHAL:  I am Hannah Odenthal from Quinn Emanuel for the Zohar Litigation Trustee, joined by Brian Campbell.

MR. NADLER:  Michael Nadler from Gibson Dunn & Crutcher on behalf of Patriarch Partners Agency Services, hopefully shortly to be joined remotely by Seton Hartnett O'Brien, also from Gibson Dunn, also for Patriarch Partners Agency Services.

SEAN O'SHEA, called as a witness herein, having been first duly sworn by the shorthand reporter to speak the truth and nothing but the truth, was examined and testified as follows:

\>>>
\>>>
\>>>



                              EXAMINATION

BY MS. ODENTHAL:

    Q    Mr. O'Shea, you heard me say I'm Hannah
Odenthal, but it's probably better just to directly
introduce myself.  I represent the Zohar Litigation
Trustee, which is the successor to the Zohar funds.  And
I am joined by Brian Campbell.

         Can you please state your name and home address
for the record.

    A    Yeah.  It'S Sean O'Shea.  Address -- home
address is 3591 Stewart Road, Doraville, Georgia 30340.

    Q    Have you ever been deposed before?

    A    No.

    Q    So I'll just go over a couple quick ground
rules.  When I ask questions, if you could just give a
verbal response versus nodding your head or shaking your
head "No," just so we have a clear record of your
responses.

         If I ever ask a question that you don't
understand, just ask me to clarify and I'll rephrase.

         And at any time that you need a break, feel
free to ask for it.  We'll also take regular breaks, but
you can also just request one.

         The only thing that I would ask is that you
answer the question that I just asked before we go on a



break.

A    All right.

Q    Does that all make sense?

A    Yeah.

Q    So what did you do to prepare for today's deposition?

A    Nothing in particular, other than really just driving down here, because there's not a lot of records or information retained from when I worked with Patriarch Partners or for eMag under Patriarch Partners.

Q    So I take that to mean you didn't review any documents?

A    No.

Q    Did you discuss this with anyone else?

A    No.  The -- other than mentioned that I -- scheduling that I had a deposition.  That was about the extent of it.

Q    Okay.  So to start with, can you tell me about your professional history before eMag.

A    Yeah.  So I was in public accounting with what's now BDO.  It used to be BDO Seidman for about five years.  Then about a year in audit, a year in litigation -- a half-year in litigation support, a half-year in appraisal evaluation, two years in tax.

Then I went to go work for a small privately

held software company called TeleMate Software, and that was probably -- that was probably done -- I would say '90 to '94 was -- '94/'95 was the public accounting.  '95 to around 2001 was TeleMate.  At the dot-com boom and bust, the TeleMate was acquired by a public company called Verso Technologies, V-e-r-s-o, and rolled into there with doing business planning and merger and acquisition management, a combination, you know, just folding entities into the other for financial operations.

After a period of time there, I think it was around -- now I've got to remember when I went to go work for a company called Edgenet.  That was when I went to go work with a former CFO at -- at Verso probably around -- let me see -- 20 -- geez, I'm trying to remember all this.  It's like a seven-year stint there.

And then after Edgenet I worked for a company called Prophix in -- actually in sales for about 9, 12 months.  I'm much better at finance than sales, so I left with them.

And -- and when I was in the midst of that, that was when I came for -- I think the stint sometime around that time frame with Patriarch Partners for the CFO for eMag position came up and engaged on that.  And that was from -- it was 26 (sic), 2015, something like that.  I know it was like a February/March start, and



finished around December.  It was about a ten-month time I was there.

Q    And you said that your -- your title at eMag was CFO?

A    Yes.

Q    Who was the CFO before you started?

A    Before I started, I believe the person's name was Steve Berrent.

Q    Does the name Tre Sasser --

A    Oh, I'm sorry.  I was thinking CEO.  CF -- yeah, Tre Sasser.  Correct.  Tre Sasser preceded me on the CFO front.  I'm sorry.  That's correct.

Q    Do you know why Tre Sasser left?

A    No.  The -- I -- I did wind up -- we both interviewed for a similar job, and he won on that one for a CFO position at another company.  After that opened up, somehow eMag managed to find me, it was in case that rolled around, but small world of technology in Atlanta.

But, no, we had -- we had a conversation, like a small, like, you know, hand-off conversation meeting, you know, lunch at one point in terms of just some of the -- you know, a little bit of the background on where things stood operationally when he left.  That was about it.  It was a couple contacts here and there.  And then there was probably a couple of three, four phone calls



with him over the course of three or four months going, "What is this?  I need background on it."  And he kind of gave a little direction in terms of history, and that was about it.

Q   So when you would call Mr. Sasser on those occasions, he had information to help --

A   It was more like a little bit of background in terms of, you know, like, there was a number of kind of settlements or holdovers associated with vendors that were owed money, and it was a case we were trying to figure out what was the history on this one, who did we give them priority to, what had we said previously about who was getting paid what, you know, and just trying to keep the peace in a very tight cash flow situation.

Q   So you already mentioned Patriarch Partners, so you're familiar with that entity?

A   Yes.

Q   And are you also familiar with an entity called Patriarch Partners Agency Services or PPAS?

A   I'd say not specifically, but I would say probably indirectly, because the -- that entire office in New York was kind of the hodgepodge of all of those things.  So there were folks that had a lot of titles across a lot of entities, and so I'm pretty sure I encountered Agency Services in the back-and-forth between



the folks that were managing, you know, that and debt service and the, you know, directions for being able to engage in projects and those things.

Q   When you interacted with people from Patriarch Partners, was it ever unclear to you which of the various entities they were affiliated with?

MR. NADLER:  Objection.  Vague.

THE WITNESS:  In terms of which -- I mean, I would say there were a number of titles of folks that I worked with.  Whether they were Patriarch Partner Agency Services or -- you know, no one really announced which entity they were with when working with.  This is the title, this was their role, and we were working within that.  But it wasn't like the halo of like, well, I work for Patriarch Partners, and I work for Zohar, and I work for, you know, Agency Services.  It was just all, you know, the folks that were in the -- in the loop in terms of the authority set.

Q   BY MS. ODENTHAL:  Do you also recall an entity called Patriarch Partners Management Group or PPMG?

A   In the alphabet soup, not -- not in particular.

Q   Okay.  Do you also -- do you remember a Patriarch Partner entity that was at one point the collateral manager of the Zohar funds?

A   I recall there was a -- and the -- the party



changed there was, but there was someone who was in charge of kind of like, you know, the fund debt servicing, you know, management and the -- the schedule of amounts owed and balances due that was -- you know, which entity in the Patriarch Partners group, you know, I couldn't remember the exact name or detail of it.  Like I said, you know, it's been a little bit, but, you know, do what I can.

Q   So just to keep the record clear, if I refer to these different entities today, I'll use PPAS, PPMG, or the Patriarch Collateral Managers.  Will you generally understand that terminology?

A   Yeah, I think so.  Yes.

Q   And if at any point you need me to clarify which entity I'm talking about or what the question means, just let me know.

A   Sure.

MR. NADLER:  Just so the record is clear, it might make sense just to spell out one more time which is which.

MS. ODENTHAL:  Sure.  Patriarch Partners Agency Services will be PPAS.  Patriarch Partners Management Group will be PPMG.  And the Patriarch Partners that functioned as Collateral Manager at one point will be the Patriarch Collateral Managers.



Q   BY MS. ODENTHAL:  So, in general, do you remember who you interacted with from any of the Patriarch entities?

A   The one regular was a guy named Jean Luc, who was kind of one of the, you know -- advisor adjuncts at one point was probably like interim CEO as we rotated those over the course of months.  It was a pretty heavy turn when I was there.

And there was a -- I do not remember the name of the -- the person who was -- I dealt with on a lot of the collateral document side.

And then there was the occasional interaction with Lynn, and there was one other guy.  He retired, I think, around the midst of when I was in it.  And I can't remember -- I can't recall his name either.  It might have been George, but that's just...

Q   Does Keith O'Leary sound familiar?

A   Ah.  That could be it.  I think that -- yeah, I believe it's between Jean Luc and Keith O'Leary.  If Keith O'Leary is the one who retired or -- you know, and it was around the midst of the time that I was -- I was on task there, then, yeah, that's the guy.

Q   And you mentioned some interactions with Lynn Tilton.  And under what circumstances would you interact with Ms. Tilton?



A    Interview.  She had a -- some confab up in New York that all the entity groups were invited up to at one point.  And there was probably one or two calls around kind of a board question that might have occurred.  But, you know, it's -- you know, because of the way that the authority structure was very lined out, there were a lot of direct questions that had to either go to Lynn or go through someone to get to Lynn to get something signed off on that happened.

Q    So what did you understand her role to be?

MR. NADLER:  Objection.  Vague.

THE WITNESS:  Well, Lynn Tilton's role was -- she was effectively the lead of the board of directors of the entity, so she had the hiring and firing authority independently of the CEO and the CFO, and approval authority over any significant contract longer than a year.  And, you know, the -- you know, was the -- that's who we also did our, you know, regular reporting to for weekly status report on, you know, cash flow and operations.

Q    BY MS. ODENTHAL:  Do you remember interacting with someone named Chen Zou?

A    That -- something close to that.  I remember I -- I remember a name similar to that that was the -- you know, call it the -- on the -- on the debt side in



terms of the back-and-forth on some of the draws and interest payments and timing on that.

Q   Did you have an understanding what entity Chen Zou worked for?

A   No.  It was, you know, one of them, but, you know, the...

MR. NADLER:  I apologize.  The realtime keeps stopping following.  I don't know if there's anything -- we can go off the record, obviously, not to waste the time, but just to fix that.  I don't know if you guys are having the same issue.

THE VIDEOGRAPHER:  We are going off the record.  The time is now 1:20 p.m.

(The deposition was at recess from 1:20 p.m. to 1:27 p.m.)

THE VIDEOGRAPHER:  We are back on the record.  The time is now 1:27 p.m.

Q   BY MS. ODENTHAL:  Mr. O'Shea, I was just asking you about someone named Chen Zou.  So I just have a couple more names to see if you remember interacting with them.

Do you remember interacting with someone named Carlos Mercado?

A   The name is familiar, but I can't remember in what capacity.



Q    Okay.  And Renee Dudley?

A    I'm not so sure on that one.

Q    Do you recall what loan facilities eMag had?

MR. NADLER:  Objection.  Vague as to time frame.

MS. ODENTHAL:  I can -- I can rephrase.

Q    BY MS. ODENTHAL:  What loan facilities eMag had when you started?

A    I think there was just the one -- you know, there was one source of, kind of, these tranches of funds, as I recall; it was a bit convoluted.  The other thing that I -- and it was a, you know, a cash-forward situation.  We were trying to make sure we were making -- sorry.  Sorry.  Cash-forward situation.  We had to pay cash forward for interest payments, and so there was a lot of structure around making sure that we had enough cash to make interest payments on a regular basis into the debt facility, which is on hand.

Q    And were these facilities through the Zohar funds?

MR. NADLER:  Objection.  Vague.

THE WITNESS:  My understanding was that there was -- you know, there was the -- there was collateralized debt obligation structure, and that there was, you know, a series referred to as the "Zohar funds."



So it was -- my understanding was something in that structure, but, you know, the specific one, I couldn't remember which fund it was.

Q   BY MS. ODENTHAL:  Do you recall eMag having loans through other lenders besides the Zohar funds?

A   No, I do not.

Q   So what source of funds would eMag turn to if receipts weren't sufficient to pay obligations?

MR. NADLER:  Objection.  Vague.

THE WITNESS:  The -- we were -- there was a lot of effort to basically, you know, through business and collections to, you know, make the obligations for, you know, payroll, rent and interest -- interest being primary.  So there were -- some of them would stretch things, you know, in terms of, you know, executives on paychecks to be able to make sure interest was made because there wasn't much other source for funding into the environment.

Q   BY MS. ODENTHAL:  And did you, at eMag, provide financials to the lenders?

MR. NADLER:  Objection.  Vague.

THE WITNESS:  We had a monthly -- so we had a weekly update that we put on e-mail to, I think, Lynn Tilton and Jean Luc.  And then there was a monthly compilation that was submitted to analysts and Lynn



Tilton, is what I recall.

Q   BY MS. ODENTHAL:  Did you understand these to be submitted to the lenders when you sent those?

MR. NADLER:  Objection, vague.

THE WITNESS:  I'm gonna say, no, it was submitted in to Patriarch Partners as a -- as a -- as a whole to kind of be processed by as opposed to like to one particular entity.

(Deposition Exhibit 146 was marked for identification.)

Q   BY MS. ODENTHAL:  Mr. O'Shea, this is an e-mail from -- it's dated May 3rd, 2016, and the top e-mail in the chain is from Chen Zou to you, Jean Luc Pelissier, Steve Berrent, and Keith O'Leary.

Do you recall this e-mail?  You can take a -- a few moments to skim the e-mail.

A   Thank you.  I would say, yeah, I recognize it from flashbacks to that event or of the process.  So yeah, I recognize the -- the e-mail and it -- some of the, you know, processes around funding and, then, yeah, the -- some of the structure stuff here.  But that was...

Most of this was probably centered around the drafting of the response for it and more along the business line, which would have been where Steve Berrent would have been probably helping to flesh out some of the

details of what was going to go to Lynn under this.

MR. NADLER:  Counsel, I advise, have you guys shown him the protective order?  Has he signed the protective order?  Otherwise, he can't see confidential documents.

MR. CAMPBELL:  I know he's on the e-mail.

MR. NADLER:  I believe, I have to check the language of the protective order.  I'm not sure --

MR. CAMPBELL:  Why don't we go off the record real quick.

MR. NADLER:  Sure.

THE VIDEOGRAPHER:  We are going off the record.  The time is now 1:34 p.m.

(The deposition was at recess from 1:34 p.m. to 1:48 p.m.)

THE VIDEOGRAPHER:  We are back on the record.  The time is now 1:48 p.m.

Q    BY MS. ODENTHAL:  Mr. O'Shea, is that the confidentiality in this case that you just signed?

A    Yes, that is.

Q    You can mark that as Exhibit 147.

(Deposition Exhibit 147 was marked for identification.)

Q    BY MS. ODENTHAL:  So turning back to the e-mail from May 3rd, you were mentioning that it was for the



business line.  What -- what did you mean by that?

A   It was just effectively the -- the debt facility, that if we were going to have any funding occur, that there had to be effectively an authorization from Lynn for whatever was going to be drawn down to be able to put funding that wasn't coming from our operations.

Q   And this -- is this funding from the facilities listed on the last page of the e-mail?

A   I don't know.  That's the structure of the capital.  I couldn't tell you off of -- well, this is a request for funding.  I couldn't tell you which funding it specifically was going to be drawn from other than that there was going to be a request to Lynn to receive funding from whatever the available debt facility was at the time.

Q   On Jean Luc's e-mail, which is on the first page, he mentions "Chen and I have spent the last two weeks to review the business with all constituents."

Were you part of this review of eMag's business?

A   There was -- there was regular, I would say just weekly meetings on the state of the business.  So there would have been, you know, there would -- as a part of -- as the weekly meetings on that, and there were more

than one occasion where Jean Luc came in and we sat down and went through what was going on.

So I would say, you know, yeah, yes -- yes, there was, you know, some review associated with the overall business and where things were headed and what the options were.

Q   And what was your role in these meetings?

A   My role was to, you know, compile and produce the financial results, note what the cash position was, and, you know, that was my -- I was basically in charge of cash flow in and out, collections, billings, invoicing, payroll.

Q   In general, what was eMag's business?

A   EMag was in the data recovery business, primarily focused in the recovery of data and information off of linear backup tape.  That was where the area of specialty was.  There had been some branches of business into the e-discovery realm that a couple different attempts that did not take very well, but that was kind of the redirection the business was looking to take beyond the core intellectual property centered around their methods for extracting data from old backup tapes.

Q   When you started at eMag, was the company in a certain amount of financial distress?

A   Yes.



Q   And is it fair to say that eMag was not profitable in 2016?

A   I would say operationally, if you didn't have the overlay of interest payments and debt structure and the overhang of the existing vendor payments, then operationally it was probably pretty close to break even or profitable, but there was a fair amount of existing obligations that took away the cash flow to be able to do anything with it beyond survive.

Q   Did eMag have a plan to become more profitable and fix these cash flow issues?

A   Yeah, there was a lot of efforts to be able to increase the top line to drive revenue bigger in terms of trying to put more efforts into the e-discovery business. There was one vendor that we had not done well with, and they were pivoting to another vendor.  There was -- there -- I think Recommind, spelled R-e-c-o-m-m-i-n-d, which was, you know -- again, trying to pivot into the e-discovery business.  There was sales efforts to do that, but they weren't as successful or as much traction as the tried-and-true data recovery business.

Q   I think you mentioned you left eMag in December?

A   Correct.

Q   And did eMag return to profitability while you



were there?

A   We had a -- we had a -- gotten a pretty decent-sized contract with a -- it was -- it was a government agency with -- for a data recovery project that put in a large chunk of cash flow that allowed for some, you know, provision of -- of equipment and being able to, you know, cover some cash flow.

But, you know, in the -- in the scheme of the overall fiscal year, probably not.  In the scheme of, like, the final quarter, it was probably pretty close, but quarter to quarter.

Q   And also looking in Jean Luc's e-mail there, it says, "The company continues to underperform and will run out of liquidity during the month of May."

Is it consistent with your recollection that eMag was forecasting running out of cash to pay its obligations?

A   Yes.

Q   Did eMag prepare audited financials for 2015?

A   Man, I'm trying to remember.  I do not recall.

Q   Would audited financials have been provided to you when you started as CFO?

A   They were not.

Q   What was provided to you to get up to speed when you started?



A    A -- one-pager, of, kind of, what I called the "Rules of Authority" in terms of what you had for decision-making capability, the current cash position and outstanding obligations, and a rundown on the priorities of what cash had to be handled.

Q    So if you will turn to the last page in the e-mail where it shows the capital structure snapshot.

A    Uh-huh.

Q    This is consistent with what you mentioned earlier with a number of loan facilities through one or more of the Zohar funds.  Do you recall any other loans other than the ones listed here?

MR. NADLER:  Objection.  Misstates his prior testimony and vague.

THE WITNESS:  I don't recall any other debt facility set.  We had a -- an -- of the outstanding and the commitment, there was an availability of -- you know, there was the debt that was there and there was the amount that was available for -- for -- for borrowing under that.

And that was extremely constrained and -- which is why there was this back-and-forth, I guess, with Lynn to be able to get approval to, you know, draw on funds.

And that was the standard -- yeah, that was -- that was the only debt facility available.  The only



SEAN O'SHEA  Confidential                                    June 27, 2023
PATRIARCH PARTNERS V. ZOHAR CDO 2003-1                              26

other thing that came available, which was just as I was -- as I was leaving, this would have been around November -- November, December, there was a back-and-forth regarding something about winding up things with the fund and a cash distribution and that there was a large chunk of cash that was distributed into eMag.

I don't know if that occurred as I left or after I left in terms of what was going to be coming forward, but it was some number around 12 or 18 million dollars.

Q   BY MS. ODENTHAL:  So looking at this snapshot, each of the facilities had the same number outstanding as committed; correct?

A   Correct.  That was the visibility that I had into it.

Q   And you also mentioned that there was availability on these loans?

A   The --

MR. NADLER:  Objection.  Misstates prior testimony.

THE WITNESS:  The -- the availability was, kind of, determined by effectively petitioning Lynn and the analyst for, you know, what draw would be available for us to be able to get over some cash flow hump.

Q   BY MS. ODENTHAL:  Did eMag track the number -- the potential availability for which you could request from Lynn?

MR. NADLER:  Objection, vague.

THE WITNESS:  There wasn't really a tracking of availability, because, effectively, we were told there wasn't anything available.  It was this -- you know, it was the -- you know, in terms of where it would come through or how -- how something would get structured, there wasn't like a direct, this is the facility and what's available under the facility.

Q   BY MS. ODENTHAL:  So looking at this chart, the lenders for eMag are Zohar 1, Zohar 2 and Zohar 3, correct?

MR. NADLER:  Objection.  Misstates the document.

THE WITNESS:  The -- well, the way it's -- in terms of pivoting, the way that I really looked at it was a function of these revolvers in the facilities that were listed.  The ownership structure was really not kind of relevant to the request in terms of where it was -- you know, in terms of what the ownership structure was as much was there facility available and were there funds available for us to be able to draw on.

Q   BY MS. ODENTHAL:  But regardless of which



facility it was, it would have been one or more of the Zohar funds as the -- as the lender?

MR. NADLER:  Objection.  Vague.

THE WITNESS:  I'm going to have to say I don't know because I don't know the structure of how it was put together in terms of the -- you know, I was not privy to the ownership structure or the way that the CDOs and facilities were created, which is the -- sorry.  That's the abbreviation for collateralized debt obligation. That the way the -- the CDO funds were structured, other than that was the original top of the structure -- that was the original type of structure.  But the -- you know, the -- the foundation and timing on it was -- you know, didn't have the details.

Q   BY MS. ODENTHAL:  Did you ever interact with the Zohar funds as lenders?

A   Not that I recall.

Q   Do you know why not?

A   No.  The structure we had was always going through basically Jean Luc, the analyst, and Lynn for funding and reporting.

Q   Was that structure surprising to you when you started?

MR. NADLER:  Objection.  Vague.

THE WITNESS:  When I say the structure was -- I



had not encountered it before, but the -- the -- the business structure of how Lynn had built things in terms of the lending and ownership of the entities and the way in which she did business, was, you know, I would say, you know, savvy enough in terms of what her business direction was.  But, again, the -- the mechanics of it were complex, to say the least, and it was -- everything was very siloed, in terms of access to information and to funding and options for really being able to do business without the approval of Lynn.

Q   BY MS. ODENTHAL:  When you say that you hadn't encountered the structure before, does that mean in previous positions you had generally had a direct line of communication with lenders?

MR. NADLER:  Objection.  Misstates his prior testimony and vague.

THE WITNESS:  I would say I hadn't encountered the structure where the person who was owning business also manages the lender effectively independently.  It was an interesting structure that you could buy a business and fund it and, with the tranches of funding, be able to mitigate the risk, you know, based on people's tolerance for risk in a layered collateralized debt obligation that, you know, in the end, the debt gets paid.  And if the business is successful, it's owned by

Lynn.  If the business imploded, then it came back on -- on the lender.  But depending on how it was structured with the various layers, it was a fairly inventive form of financing.

Q   BY MS. ODENTHAL:  Did you understand Patriarch to manage the lender while you were at eMag?

MR. NADLER:  Objection.  Vague.

THE WITNESS:  I understood Lynn to manage the fund and Lynn to manage Patriarch and, you know, that she had control of the entities separately, but not that it was Patriarch managing the lender.

Q   BY MS. ODENTHAL:  Turning back to this capital structure snapshot, what is a revolver?

A   Revolver would be a facility where we're borrowing out and paying back without like a fixed -- a fixed increment of payment, like a bond.  So you've got where you're drawing down and you're -- and you're paying back in increments.  In many cases, it was just interest payments out to cover and the associated amount that was drawn down and available in terms of the revolver and what we could borrow on it.

Q   And what was a DDTL?

A   I don't remember.  That's -- that's alphabet soup to me.  I could -- yeah, I mean, I could probably come across something with the abbreviation on it, but,



otherwise, it's not sticking in my head.

Q   Does "delayed draw term loan" sound familiar?

A   Yes.

Q   And looking at this chart here, what was the interest rate on eMag's debt?

A   On this chart here, I have no clue.

Q   Do you understand L plus 250 to relate to an interest rate?

A   Like I say, in that context, you know, yeah, if you're talking LIBOR plus 250 is basis points.

Q   And does LIBOR plus 250, is that lower than the market interest rate for the debt of a company like eMag?

MR. NADLER:  Objection.  Lack of foundation. He just said he doesn't know what the interest rate was.

THE WITNESS:  You know, I would say given the companies that Lynn acquired were resuscitation cases, they were usually not in the best of shape when she acquired them.  If they got off the ground, they did great.  If they didn't, they usually didn't do very well.

So in that kind of risk, you are going to pay a higher interest rate.  So 250 basis points plus LIBOR's, you know, it's not overly aggressive in terms of interest rate, but it's obviously not going to be a prime interest rate.

Q   BY MS. ODENTHAL:  Do you have any understanding



why eMag's interest rate was set this way?

A   No.

MR. NADLER:  Objection.  Misstates his prior testimony.  Again, he said he doesn't know what the interest was.

THE WITNESS:  The -- you know, the -- all these structures were in place before I arrived.

Q   BY MS. ODENTHAL:  And then if you will look at the common equity ownership chart at the bottom, it shows Zohar 2, 70.19 percent.  Was it consistent with your understanding at the time that Zohar 2 owned 70 percent of eMag's equity?

MR. NADLER:  Objection.  Misstates the document.

THE WITNESS:  I would say no.  The -- the -- the -- you know, the equity ownership was really never reflected in the context of -- I'm going to call it the operational management of debt and cash.

Q   BY MS. ODENTHAL:  And turning back to the -- the first page of this, Jean Luc had mentioned that it was being prepared to go to Lynn today or tomorrow morning at the latest.  Do you recall if this update was passed along to Ms. Tilton?

A   I don't -- you know, I don't know what the final form -- you know, I'm not -- I don't recall what



the final form of what was presented to Lynn relative to this, you know, draw or conclusion.  You know, there was a lot of -- there was a lot of turmoil around that time. I'm not sure, but that was sometime around -- around this time frame, I believe, is when Steve Berrent left as CEO. It was sometime around the May/June time frame, I thought.  But, again, it's been a while.

(Deposition Exhibit 148 was marked for identification.)

Q   BY MS. ODENTHAL:  This is Exhibit 148, which is an e-mail dated May 18th.  You can take a few moments to read it.

A   Yep.  Okay.

Q   Do you recall sending this e-mail?

A   I would say, yeah, I've -- I have sent it.  I recall the context of this in terms of the -- you know, we were -- the -- this would have been -- I don't know if this was after Berrent had left, and they were saying, we would like you to sign the funding certificate, and I went --

THE REPORTER:  To sign the?

THE WITNESS:  To sign the funding certificate.

And, you know, the -- giving the timing of my tenure, I needed some confirmation that there were no outstanding items before signing on it to be able to make



that representation.

Q   BY MS. ODENTHAL:  So prior to May 18th, or prior to when Steve Berrent left, he would have been the one executing funding certificates?

A   Yes.  Well, the -- he had -- he had executed one previously to -- to that point.  Once Berrent left, there was a point where I don't think -- well, Berrent was on this at the time.  But, yeah, as a part of the credit agreement, this was a case where I got a form where I'm putting on a signature and putting in a representation and would confirm that there were no open items or areas that would be an inaccurate representation, signing on behalf of the entity.

Q   And in the first line you mentioned "I just started here on March 23rd."

Does that refresh your recollection that that was your start date at eMag?

A   Yeah.  I knew it was February/March.  So, yeah, that was the -- that would be the time frame.

Q   And just before saying that, you noted, "I do not have a complete set of documents for the amended and restated credit agreement."

What was the amended and restated credit agreement?

A   The -- there was the credit agreement and these



associated funding certificates.  And the component was that, you know, if we're -- if I'm trying to deliver and sign off and provide authorization underneath the agreement, that I needed to have a full copy of the agreement on our files to make sure that we were indeed complying with the covenants and the, you know, associated constraints and that it was all there.

So, you know, I was making sure that there was a -- call it complete book of certificates to be able to close out the history of the -- of the lending.

Q   So the amended and restated credit agreement governed the Zohar funds loans to eMag?

MR. NADLER:  Objection.  It calls for a legal conclusion.

THE WITNESS:  I'm going to say I don't recall, in terms of the structure.  I know my -- my focus in getting the agreement would have been to look through for obligations, interest rates, terms of payment, default conditions, to be able to make sure that we were complying with the structure of the agreement.

In terms of the structure of the lender under the agreement, I don't know.

Q   BY MS. ODENTHAL:  So if you turn to the funding certificate, the attachment to the e-mail, in the first paragraph it references the amended and restated



agreement.  Is that the same document you were referencing in your e-mail?

A   Yes.

Q   And then if you turn to the final page, it's requesting 81,250 to go to an account name under Patriarch Partners Agency Services and requesting 5,690 to be wired to an account named Patriarch Partners Management Group.  Do you see that?

A   Yes.

Q   And did you understand these funds to be requested from the Zohar funds facilities?

MR. NADLER:  Objection.  Misstates the document.

THE WITNESS:  I understood them to be drawn under the credit agreement.

Q   BY MS. ODENTHAL:  And do you know why you didn't have the complete set of documents for this credit agreement?

A   The -- I don't know why other than my supposition is that there was a lot of turnover at the CFO and the CEO role, executive role and that.  And so me having the history of documents and how they were kept between what was e-mailed back and forth versus what was signed versus what was scanned, it took some time to piece together that -- the history of documents to be



able to come up with where things stood.

Q   Looking at the second paragraph in the e-mail that you wrote to Chen Zou, you start with, "As the credit analyst for eMag Solutions."  So did you understand Chen Zou to be a credit analyst?

A   Yes, that was the role that she was described at was the -- was the credit analyst.

Q   And where did you get that understanding from?

A   Jean Luc.

Q   And what did you understand her -- Chen Zou is a woman?

A   Yeah.

Q   What did you understand her role to be as credit analyst?

A   Her role was managing the -- the debt position interest amounts due, the ins and outs and the management of what was happening on the credit facility side.

Q   Did you understand her to work as a credit analyst for eMag's lenders?

A   It wasn't clear.

Q   In the last paragraph of the e-mail, you ask Chen Zou to confirm various items, like whether eMag was current on its interest payments, its financial reporting, and its financial covenants.  Do you see that?

A   Uh-huh.



Q    Why did you want Ms. Zou to confirm that?

A    Because of the sign-off and the certificate on the funding certificate which was that -- you know, making a testament that it was -- we were in compliance with the credit agreement and the borrowing and funding and having no default defense, you know, I didn't have enough data to know where we were on that point, so I needed clarification that that was indeed the case if we were going to be making that representation.

Q    And did you understand that eMag was required to provide different forms of financial reporting to the lenders?

MR. NADLER:  Objection.  Vague.

THE WITNESS:  I am trying to remember.  There was --

MR. NADLER:  And objection.  It calls for a legal conclusion.

But -- sorry -- you can go ahead.

THE WITNESS:  You know, I remember we had something about being about in terms of where we were from a audit or sign-off standpoint and where we had to engage for audit, but I do not remember where we were on the timing of it.  It was a -- there was a -- there was something around, but we were working to secure auditors to be able to bring financials up to speed.  I do not



remember who it was we wound up engaging, and I don't recall if they were done by the time I left or we were still in the process of it.

You know, the -- the record-keeping and the books coming in were jumbled and inconsistent, and it took time to be able to piece together just where things stood and continued during my tenure to try to assemble, you know, a picture of what was happening.

Q   BY MS. ODENTHAL:  Okay.  We've been going for almost an hour and a half.  Should we take a break and go off the record.

A   Yeah, I can.

MR. NADLER:  It works for me if it's good for the witness.

THE VIDEOGRAPHER:  We are going off the record. The time is now 2:20 p.m.

(The deposition was at recess from 2:20 p.m. to 2:28 p.m.)

THE VIDEOGRAPHER:  We are back on the record. The time is now 2:28 p.m.

Q   BY MS. ODENTHAL:  Mr. O'Shea, a few moments ago you testified that the equity ownership wasn't reflected in the operational management of debt and cash.  What did you mean by that?

A   I'm sorry.  Ask -- say that one more time.



Q   You said that the equity ownership wasn't reflected in the operational management of debt and cash.

A   The -- the structure when we were dealing with these funding requests, it was merely a function of the credit agreement in terms of the debt side.  So the, you know, equity structure of the ownership was described that it was, you know, owned by Patriarch Partners, was who owned the -- the entity, and so that was the limit of the -- of the equity structure of eMag as opposed to it having, you know, multiple entities it reported to.

Q   And when you say that -- that that is how it was described, who described it that way?

A   That would be, I guess, Keith O'Leary and, I don't know, maybe Lynn in terms of the context of explaining how it is that things were structured.

Q   Did you have any independent knowledge as to which entity owned eMag's equity?

A   No, other than what may have come across in terms of, like I say, documents and credit structures and those items.  There's was no other independent verification in terms of the ownership of the structure.

Q   So your understanding was based on what you heard from Mr. O'Leary and potentially Ms. Tilton?

A   Correct.

Q   If you will turn back to the e-mail that we



were looking at, we had been talking about eMag's financial reporting before the break.

MR. NADLER:  Sorry.

Which e-mail?  There were two.

MS. ODENTHAL:  This would be tab 148 or Exhibit 148.  Sorry.

Q   BY MS. ODENTHAL:  So while you were at eMag, did the company provide financial reporting to its lenders?

MR. NADLER:  Objection.  Vague.

THE WITNESS:  We provided regular financials to the -- you know, I call it a tranche of folks in terms of like the credit analyst and Jean Luc and Lynn Tilton.

Q   BY MS. ODENTHAL:  Did you provide it to anyone outside of those people?

A   No.

Q   Do you know why not?

A   We were -- the -- all the information at Patriarch was kept very strict and held close and confidential, and financial matters were not discussed outside of the entity.

Q   So now if you will look at the initial e-mail in this chain that prompted your response, Chen Zou sent you agency fees for 81,250 and a Texas franchise tax of 5,690.  And then on the top of the next page, it notes



the total amount and that it will be coming from DDTLD.

So is it your understanding that Chen Zou was instructing eMag to pay agency fees and Texas franchise taxes from that loan facility?

MR. NADLER:  Objection.  Misstates the document.

THE WITNESS:  Yeah, we were -- my understanding is we were drawing on the -- on the credit agreement, the revolver, to be able to -- to make the payments for agency and, you know, franchise taxes described.

Q   BY MS. ODENTHAL:  And who received agency fees from eMag?

MR. NADLER:  Objection.  Vague.

THE WITNESS:  The agency fees, again, in terms of that I guess alphabet soup of management entities, you know, there was a -- you know, there was the -- eMag is the entity, and then there were the fees that were paid for, you know, agency management of the entity underneath Patriarch Partners.  And so there was regular amounts that had to be funded for the agency fees, you know, and our interest and then, of course, some of these other entity-related fees.

Q   BY MS. ODENTHAL:  So the agency fees here would have gone to P-P-A-S or PPAS?

MR. NADLER:  Objection.  Misstates prior



testimony.

THE WITNESS:  It would have gone to -- you know, agency fees, I'm gonna -- I would -- I would presume PPAS, but I'm not going to be able to distinctly say that that's what it was without actually looking at the document that was signed off on because the -- again, recollection is not that good.  It was a lot of -- a lot of numbers.  So the agency fees, you know, in this case aren't stated in terms of other than just agency as opposed to which agency.

Q   BY MS. ODENTHAL:  If you turn to the back page of --

A   Yeah, Patriarch Partners Agency Services.  So, yeah -- so that -- sorry -- Patriarch Partners Agency Services would be what was described on the doc in terms of where the agency fees were paid.

Q   And the item below that for the Texas franchise taxes, who were those going to based on this?

A   Patriarch Partners Management Group.

Q   Sorry about this.

MR. NADLER:  The Binder gets broke in transit?

MS. ODENTHAL:  Yep.  Looks like it.

(Deposition Exhibit 149 was marked for identification.)

Q   BY MS. ODENTHAL:  So Exhibit 149 is an e-mail



chain from Chen Zou to you on June 7, 2016.  You can take a few moments to look it over.

MR. NADLER:  Counsel, just so the record is clear, do you mind just reading the Bates numbers when you introduce the documents?

MS. ODENTHAL:  Yeah, no problem.  This exhibit begins at TRUSTEE_AP5928479 and ends in TRUSTEE_AP -- it's getting in the way -- TRUSTEE_AP5928490.

MR. NADLER:  And, Mr. O'Shea, those are just the numbers that are in the right corner.

THE WITNESS:  I got it.  Having had some contact with e-discovery when I was working with eMag, I am familiar at least a little bit.

MR. NADLER:  That makes a lot of sense.  Most witnesses don't come into depositions having any idea what a Bates number is, so...

Q    BY MS. ODENTHAL:  Do you recall this e-mail exchange?

A    Yes.

Q    And do you recall why you were requesting records about February 2016 transactions from Chen Zou?

A    Yes, the -- the -- this was again being asked to, you know, sign and execute on a doc that said that there was a full set of everything.  And I was making sure I had a full set of everything associated with it.



And the -- you know, I could not find a copy of this amendment 23 that had been referred to in terms of when it was executed or what happened and when.  And so, you know, I was going -- until I -- you know, there's not going to be a -- you know, execution on another doc until I've got all the docs that theoretically lined up with that thing.

And so I was trying to find -- I was going, "Who signed it?"  So that was the -- that was the back-and-forth on that, which meant that I needed a complete set of documents.  If I'm authorizing that I got a complete set of documentation, I have to make sure I can reconcile what we're saying it is that we owed.  So that was the -- that was the back-and-forth on that.

Q   In the first e-mail on this chain, so all the way at the back before the attachment, you asked Chen for a roll-forward schedule for all debt and credit facilities.  What is that?

A   So at this point we were -- I think we were actually finally engaging for part of the audit set, and so we had to have the -- you know, the -- to be able to state what the debt was at the time, you know, what the -- you know, what it was in points of time.  So it was a roll forward of being able to establish how much drawn was outstanding at points in time during the year



and at fiscal intervals for reporting.

And so, you know, I was going through the -- the details of, you know, how do we get to where we say the balance is, and I was trying to, you know, track down, you know, where it was.  We were saying if it was executed -- well, I don't have a copy, so where's the copy?

Q   Looking up the e-mail chain, Chen Zou then sends you an attachment, "See attached file."

And in response you note in point one there, you say, "I have a copy.  I have a copy of the executed funding notice from February 11th for the $75,000 of borrowing that was received by eMag Solutions via wire transfer on February 11th.  The transaction history provided by you shows an effective date of February 5th. I do not understand the six-day difference."

Do you see that in the chain?

A   Yeah, this is I was trying to -- you know, I'm trying to reconcile what's showing from our bank history against the documentation, and was trying to just reconcile any gaps and timing of -- of funding because if you are trying to put something -- compile for an audit, you want to make sure you've got all the gaps explained, if there is a gap and why, I'd say, "Well, where did the money go if it wasn't from point A to point B?  If it's

supposed to wire the same day, it's like, why the delay? It wasn't a holiday, so I'm trying to understand."

I was basically piecing together the support for where the debt stood at the time.

Q   And when you referred to an "executed funding notice," what would that be?

MR. NADLER:  I'm sorry.  Where is the phrase you just read?

THE WITNESS:  By "executing funding notice," that's going to be --

MR. NADLER:  I just found it.  No worries.

THE WITNESS:  Sorry.  I used the context executed funding notice in the May 3rd back-and-forth at the 10:10 a.m. e-mail.

And that's probably -- that's going to be probably me using the same nomenclature for a funding certificate of a similar draw that would have occurred before I got there.  But, again, I'm trying to piece together timing and cash flow and bank statements of where the cash came from and where it went.

Q   BY MS. ODENTHAL:  So similar to the attachment on Exhibit 148?

A   Yes.

MR. NADLER:  Objection.  Vague.

THE WITNESS:  The -- similar the -- the funding



certificate that is the document to be executed that's attached to the e-mail on Exhibit 148, yes.

Q   BY MS. ODENTHAL:  And was that document required under the credit agreement to initiate a borrowing?

MR. NADLER:  Objection.  Vague.  And objection; calls for a legal conclusion.

THE WITNESS:  Our process was for -- for -- we had to have a funding certificate to be able to draw funds down.  That was -- this was the form that was presented for us to be able to draw funds.

Q   BY MS. ODENTHAL:  Do you recall ever drawing funds without using that form?

A   No.

Q   And so was it your understanding, based on documentation that you had, that eMag had issued a funding notice on February 11 and received funds on February 11?

A   I think what was going on here was that with this exhibit, that was the -- the commitments and loans and the amount of draws, I was trying to reconcile that exhibit against the history that I had of what had been requested and what had been paid.  So if I'm -- if I was saying that I had -- you know, that I had a discrepancy, that is what I was outlining.



Q   So just focusing on point one in your May 3rd e-mail where you say, "$75,000 borrowing that was received by eMag Solutions via wire transfer on February 11th," is it your understanding that you had the executed funding notice for that -- for that funding, and then a wire transfer for that same amount on February 11th, that same day?

A   Let's see.

MR. NADLER:  Objection to the form of the question.

THE WITNESS:  Yeah.  So this is a function of me trying to -- yeah, I was -- this -- this back-and-forth was fettered around being able to be prepared if we were to engage an outside audit firm for eMag.  Once they go, you know, we're not getting an audit done if this doesn't line up; so let's figure out what's going on.  And I was having issues with the detail that was provided for what the outstanding balance was and our timing of the supporting documentation of the requests and the timing of the money issued.

The -- the component there was where if there was a draw that was above what we had available, and then it was like, well, if it's not -- the conclusion was like, well, if we haven't gotten the cash, is the cash being -- being held, you know, by an agency on our behalf



for, you know, draw after the fact.  But, you know, is that available cash that would be reflected on -- you know, do we have cash availability that we just don't have access to?

Q   BY MS. ODENTHAL:  Understood.

Did you -- did you ever receive an explanation from Chen Zou or anyone else at Patriarch for why there was this six-day difference in the documents?

MR. NADLER:  Objection.  Misstates his testimony, I believe.

THE WITNESS:  So she had said that she had -- I had --

MR. NADLER:  And lacks foundation.

Sorry.  Lacks foundation, but you can go ahead.

THE WITNESS:  So, yeah, I had noted here on the 3rd that I had a copy of the notice on the funding of -- of the 11th for receipt via wire transfer on the 11th and that -- I say the transition, actually, that they were showing me had an effective date of the 5th.  And I went, that doesn't line up.  I don't have -- I've got, you know, an executed and a that.  You're telling me this happened six days earlier.  It's like, this doesn't line up; so fix your schedule, you know.  Either tell me what I am missing or fix the schedule, because I'm not going to sign off on it if you are telling me it was the 6th



and I've got documentation that says it's the 11th.

Q   BY MS. ODENTHAL:  Do you recall how that was resolved?

**Prejudicial: Designated After Close of Trial**

A   I don't.  You know, it's like -- ultimately, I have had the, you know, trail of where it stood.  I think by this time, I think they had finally acknowledged the 11th, but then we were going -- I'm going, well, what's the 1.34 or 1.394?  It's like...

Q   So focusing for a minute just on point two in that same e-mail, you note, "A repayment of $20,000 was wired to Patriarch on February 26th.  This payment of principal is not reflected in the transaction detail.  How is this $20,000 repayment to be accounted for?"

Is it consistent with your recollection that eMag made a $20,000 principal repayment in February of 2016?

A   Yeah.  So that -- the February 26th would have been prior to when I started, but we would have had the bank history; so I'm tracing bank history and trying to understand what this -- you know, I mean, this payment that wires out.  And it's like, if your -- you know, if in the documentation that was -- we had or what I had for reference indicated it was a payment of principal, I'm saying, well, then it was a payment of principal.  I don't see it reflected in the statement you are giving



me.  Where did it go?  It was -- is this classified incorrectly on my end because it wasn't a payment of principal; it was something else and someone recorded it wrong?  Or do you just not have it recorded in the right place in the tranches of how you were managing this thing?  Cash in, cash out needs to balance.

Q   So when you said that it was in your records, how was it recorded what a payment was for?

A   Oh, boy.  That's a good question.  And I don't recall.  I don't remember the specifics of, you know, how we maintained -- you know, our accounting was kept in QuickBooks.  The -- but the -- you know, the schedules and sets of activity, there would have been, you know, the banking and what we had recorded, in terms of the descriptions.  So the documentation that I had available indicated what I was saying is like, this is what I've got.  What do you have that lines up or doesn't?  Because, you know, until I can get this thing to balance, I'm not happy.

Q   And do you recall how that was resolved?

A   I think we got past that point of indicating whether it was like -- whether it was principal payment or agents.  I think we resolved the 20,000, and then it was, you know -- then I was getting bent out of shape here on amendment 23, going, it's like, who the heck



signed this thing?  You know, where did this come from?

And then when that finally, you know, came through, in terms of whenever it was actually finally -- you know, it was dated as of.  But, you know, again, signed by -- signed by Steve Berrent, which he had authority to do, but I don't remember if that was on the last day he was there or not.

Q    When -- during your time at eMag, do you recall making other principal repayments?

A    The -- the structure was -- I'm going to call it odd, in terms of the -- the flow of cash, in terms of what was, you know, these -- like this 20,000 element. It was like, was that -- you know, was that a borrow from that or was that like a -- was that from somewhere else, an in and out.  Like I say, you know, I don't know -- think there was officially a debt facility, but I don't know where that cash comes in and comes out from.

You know -- you know, at some point, I think, Jean Luc had groused at me about whether you're getting -- in terms of funding and timing and where we are going to make principal payments and interest payments and, you know, we are going to have to get, you know, this money from -- from Lynn.  It was like, you know, whether that money was from Lynn or whether it was from a debt facility and it was a -- you know, that was



-- that was one of these items that just wasn't clear. I'm not sure how much of that was associated with before I got there versus, you know, when I get there.

I'm -- I'm a stickler for having, you know, a legal document tie and put together, which is why there was this diatribe back and forth between Chen going, this doesn't line up and we've got to make this work.  You know, it did not give me a lot of comfort that I was having to spend this amount of effort to be able to make things connect.

Q   So just to clarify, you -- do you remember making other principal repayments, or you don't recall?

A   I don't re- -- yeah.  The -- you know, I -- all I seem to remember was us having to make regular, you know, interest payments on the debt.  In the context of a principal payment, you know, I wouldn't -- didn't make sense in the context of the amount of interest that we were paying and managing cash flow.  So that's -- you know, in context, that's why it would probably confuse me if I had something flagged as a principal payment for 20 grand when I've got an outstanding balance of this size. You know, saying I'm paying back 20 grand of principal, I don't understand.

So, again, this is me trying to figure out, you know, how does this relate to the scheme of this whole,



you know, debt schedule.  Why is it listed if it's called that and I've got debt, so.

Q   Was it your understanding that repayments of principal would affect the amount of interest due?

A   Like I said, I don't think I ever encountered a case where I was repaying principal; that we were dealing with, you know, interest payments.  And so the context of what was, you know, I guess, called a principal payment, you know -- you know, I'm not coming to mind where I was dealing with a principal payment.  When I was trying to trace something back and I had a -- you know, a repayment that was called a principal repayment, and it was before I got there, I'm going, I don't understand.  News to me. How do we get there?

So that's, again, trying to get an understanding of how that fit in the structure of what we were operating with under the credit agreement.

(Court reporter clarification.)

MS. ODENTHAL:  Can we go off the record?

THE VIDEOGRAPHER:  We are going off the record. The time is now -- excuse me, sorry -- 2:56 p.m.

(Off-the-record discussion.)

THE VIDEOGRAPHER:  We are back on the record. The time is now 2:56 p.m.

Q   BY MS. ODENTHAL:  Turning to the third point



that you raise in that e-mail, you say, "Transaction history provided by you shows an additional borrowing on February 5th in the amount of 1,394,000 that was not received by eMag Solutions."

Do you see that?

A   Yep.

Q   So is it accurate to say that, to the best of your knowledge, there had been a borrowing for that amount on February 5th but the funds were not provided to eMag?

A   That was what I was inferring from the -- the -- the trail of history that I had gotten.  So I was trying -- I was trying to reconcile.  You know, it's like, if this is what we are stating, I don't have this -- you know, I need to understand the support to be able to tie this out for the balance sheet between February and March.  How did this cash move?  What is it related to?  Where does it go in the balance sheet?

And -- yeah.  So then I've got -- as I pound on that, and then Chen comes back, "Checked with legal team.  Learned we did not have any legal" --

THE REPORTER:  Wait.  You've got to slow down.

THE WITNESS:  I'm sorry.  I checked with Chen.  And in the e-mail on June 7th, she comes back and says that, "Understood you want a supporting document for this



draw transaction, but I checked with our legal team and learned that we did not have any legal documents executed with this purpose because the amendment is used to cover this.  And I think the invoice agent sends (inaudible) --

THE REPORTER:  You've got to just --

THE WITNESS:  Sorry.  I'm quoting from -- I'm trying to get my head wrapped around this, so just bear with me.

You know, the conclusion that was given was that, well, since you can see that the late draw C is fully funded, that that's the support you are looking for.  And I was -- I was not satisfied with the answer. So the thread continued on, you know, where is the detail for this, because, you know, I -- this -- this was kind of an area where, if I don't have an accounting or understanding of how the funds are flowing, how am I supposed to represent it?

Q   BY MS. ODENTHAL:  So you say after -- a little bit later in that paragraph, you ask for a copy of the supporting executed funding notice for this transaction. Why did you think that there would be an executed funding notice?

A   Because our procedures, since I had been there, had been that any time there was a funding, there was a request executed for the funding to occur.  It just



didn't randomly occur.  So someone has to make a funding request for the funding to happen.

So I would say if that's the process, there has to be support under the agreement to be able to have the funds move.  So that was the -- that was my approach to being able to reconcile what was going on.  I need supporting documentation for the transaction.

Q    And do you know why eMag was paying interest on $1.394 million if they weren't -- if those funds weren't in eMag's accounts?

MR. NADLER:  Objection.  Assumes facts not in evidence.

THE WITNESS:  The -- I know we had -- we had an interest calculation and payment that was due that was calculated by the analyst.  So, procedurally, I'm going through that when I first get there.  Then I'm going through and trying to identify what's the position and where do we stand?

So, effectively, we are paying interest according to the calculation from the analyst with the presumption that it is correct.  And then I'm going through and trying to reconcile those amounts, calculating the interest and how it reconciles.  Because if it's going to be prepared to be able to engage an auditor, you need to have the supporting documentation.



Q   BY MS. ODENTHAL:  So if eMag is -- was being charged interest on this amount, would you have expected to have access to the funds?

MR. NADLER:  Objection.  Vague.

THE WITNESS:  Given the authority structure that was there with Lynn Tilton and the ability to access and spend funds, the -- it was not clear that that -- those funds were directly accessible accept through the board or through Lynn.

Q   BY MS. ODENTHAL:  The next e-mail in this chain is also by you to Chen, and it's over a month later on June 7th.  You follow up on the request for supporting documentation.  Is it correct that Ms. Zou didn't respond to your May e-mail requesting documentation for that borrowing?

A   Well, she sent me amendment 23, but it wasn't a signed copy.  It was -- you know, "Here is the form of amendment 23."

And I went, "It's not executed.  I need an executed copy of this agreement."  Because until it's signed, all I know is if it's a draft.  So it's like -- you know, an unsigned document doesn't mean anything to me as a -- as a source of support.  An auditor sure is not going to buy off on it.

So I'm trying to -- I was getting probably a



little bit hot under the collar with her in terms of trying to getting documentation to support my trail.

Q    And amendment 23 was sent on June 7th in response to your follow-up, correct?

A    Yeah, that was when -- then here's the one that -- yeah, then it was -- I said, you know, Masaya -- "Who signed it?"  And then that -- then the one signed by, you know -- by Steve Berrent appeared.

Q    In Ms. Zou's e-mail, she noted, "The supporting documents already provided to eMag are the amendment 23 resolutions, amendment 23 commitment settlement amendment, and manager resolution.  You reviewed these docs and also eMag signed the amendment and sent it back to Patriarch.  This is the same process we did for all of the companies."

Do you recall what the commitment settlement agreement was?

MR. NADLER:  I think you misread it.  It's commitment settlement amendment you mean.

MS. ODENTHAL:  Oh, yes, commitment settlement amendment.

THE WITNESS:  So is this the trail from June 7th at 1:45?

Q    BY MS. ODENTHAL:  Yes.

A    Okay.  So, yeah, this -- I -- what I received



here at 1:45 was like this is her explanation for the request, and then I -- I fired back going, "Who signed it?"  I don't have -- you know, it's like this still doesn't -- this still doesn't add up for me, and here's what doesn't make sense.

I was -- I was going through the schedule and the -- and the references, because it's like I'm going, this -- I was trying to, you know, reconcile, you know, all the supporting documentation for the tranches to be able to, you know, confirm that I've got a clear presentation of what is being represented if something is being signed off on subsequently.

Q   And did it ever add up to you, the numbers?

A   I think in the end -- once I got the signed amendment 23 that was actually executed by Steve, it was like, okay, now we have a full tranche of how this all lines up.  So I think we finally got it resolved in the end, but it was a slog to get there.

Q   And were you ever provided a funding notice?

A   Was I ever provided a funding notice for -- I mean --

Q   For the 1.394 million.

A   I -- I don't recall.  I think the element here was that the use of this amended and restated credit -- credit agreement which says this is the outstanding



balance and details was effectively saying this is the position from that point going forward for reconciliation.

So that becomes the foundation for it.  Because if you have, you know -- if you amend and restate the balance and saying this is what's due, then that's what I'm hanging my hat on.

Q    In that same e-mail, Chen Zou, towards the end of the second paragraph, says, "I checked with our legal team and learned that we did not have any legal doc to be executed for this purpose because the amendment is used to cover this."

Did you understand that to mean that --

A    Right, this is where I was -- Okay.  Yes.  So I'm saying, "Hey, where is the 1.394?"

It's like, well, we don't have the 1.394.  The amendment is using to be able to restate what the whole value is and that clears everything up.  And I went?

(Court reporter clarification.)

THE WITNESS:  What the whole value is and to tie -- and to wrap everything up in terms of the balance due, what the -- what the outstanding balance is and amounts are, which would include the 1.394.

And -- and that's why I was hammering heavy on it.  It's like, well, I have that amendment 23.  But I



don't know who executed it, which is, then, finally --
oh, Steve Berrent signed it.  Okay.  So that's -- now
it's been -- now I have an executed amendment between
Berrent and Patriarch that says this is what the debt
balance is.

So from a history standpoint, you know, I've
got a benchmark of what the actual value of debt that's
owed between eMag and the lender is.

Q   BY MS. ODENTHAL:  But no executed funding
notice?

A   No.

Q   And you've mentioned amendment 23, which is
attached to this e-mail.  Do you recall the commitment
settlement amendment?

A   I don't recall it.

Q   Had you reviewed amendment 23 before this
e-mail exchange with Chen Zou?

A   No.

Q   Also in Chen Zou's e-mail she says, "I think
the" -- "I think from the invoice the agent sends to the
company every month, you can tell that it is fully
drawn."

Did -- do you see that?

A   Yeah, I -- yeah, yes, I saw that statement in
there.  Again, that's -- I might dispute with her.  The



position was -- it was like, oh, that's just -- the schedule says it's correct.

I'm going, "Yeah, well, that's the schedule.  I need the documentation that supports the schedule because -- just because you sent me an Excel spreadsheet doesn't mean that's the number."

Q   And so did you understand the invoices to be a definitive documentation of --

MR. NADLER:  Object.

Q   BY MS. ODENTHAL:  -- the loans?

MR. NADLER:  Objection.  Vague.

And apologies for speaking over you.  I thought you were done.

THE WITNESS:  I -- so I understood the -- the invoices and the -- and the statements to be, you know, a representation of the calculation of interest owed and, you know, and what the balances were at the time.

But when I get into doing -- you know, prepping for audit, then I have to agree -- I have to have supporting documentation to agree to what that statement is giving me.  And that was what a lot of this back-and-forth was about -- was having documentation to support the statement.  I guess, you know, you can make an Excel spreadsheet and say anything.

Q   BY MS. ODENTHAL:  Looking now at your response



to Chen Zou that you sent on June 7th, 2016.  So we are still on June 7th.

You say in the second paragraph, "The schedule in Exhibit 2.10 B in amendment 23, aside from having the wrong referenced, the original schedule and the credit agreement only shows commitments and outstandings as of October 29th, 2015, in the case of DDTLC.  That amount is 709,000 commitment and 708,000 outstanding."

Do you see the paragraph that I'm referring to?

A    Uh-huh.  Yeah.

Q    Did you ever see an amendment dated after amendment 23 in October 2015 reflecting a commitment amount of more than 709,000 for DDTLC?

A    I -- I don't remember if there was another amendment that was put forth after 23.  This is -- I know it was around, again, sometime in the October/November time frame there was this -- you know, this sudden -- this, you know, amount availability of this chunk of cash that came in at the end that was, like, okay, wherever that came from in terms of wrapping up the funds.  Nice that you are going to tell us now and, you know, it -- it just -- it made things convoluted at best.

You know, around that time, I had another colleague who reached out to me in terms of job at



another company.  And I felt that was probably a good opportunity to be thankful to not have to spend an excessive amount of time trying to reconcile a debt balance.

Q   So is it fair to say around this time you were feeling frustrated in your position?

A   I was -- I was -- I was frustrated and -- you know, I was frustrated, and I was uncomfortable with the details being provided in terms of trying to follow the amendments and supporting documentation and saying, well, here is the balance, and here is the balance.  Oh, wait, no, here is the balance.  It was, like, okay.  You are having supporting documentation that keeps showing this, but it keeps on coming along.

Sorry.  I keep -- I keep getting supporting documentation to support what's coming along, but the story keeps changing.  And so by level of confidence in terms of, you know, what's next starts to diminish.

Q   So you say -- you mentioned a chunk of cash that came in.

A   Yeah.

Q   Was that the 1.394 million?

A   No.  No, this was -- there was -- towards -- the dates are vague because I was -- I know I left in December.  So this is sometime probably between



September and November, again.  You know, Jean Luc comes in with an explanation that there's something that's being done to, you know, wrap up or made a disbursement of funds underneath the debt structure.  And, well, we've been told we have no funds available.

Suddenly we have some chunk of cash that was going to be, you know, deposited, put in, and made available.  And it was somewhere in the -- in the mid-teens.  I don't remember if it was 18 -- if it was 12 or 18 million, but it was a good solid double-digit million number.  And that was a surprise.

Q   When you said earlier that the story kept changing, was that the story coming from Patriarch?

MR. NADLER:  Objection.  Vague.

THE WITNESS:  Well, I say when the story kept changing, I would say the -- you know, the -- you know, I'm following a trail of transaction to support, you know, interest payment, structure of debt, what our obligations are.

And, you know, you get to the point of reconciliation and it doesn't quite balance, and then, you know, an amendment comes through that, you know, resets that value and where things are at and everything is clean and clear from, you know, that point of forward.

It was like, okay.  You know, that's enough to



be able -- transactionally, it looked valid.  And, you know, things seemed to all tie together.  So that was the statement of where things were.

But the process of what it took to get to that point was excessive, in my opinion, just for what it would normally take to be able to just get things lined up.  There's a lot of entities, and there was a lot of, you know, management.  And it was stretched pretty thin.

So, again, you know, I don't know, you know, what level of frustration or detail might have been happening on the other end.  On my end, you know, I was trying to make sure that I had everything to line up our obligations and outstanding amounts.

Q   BY MS. ODENTHAL:  So looking back at the amendment 23 that's attached to -- and this is dated in October 29, 2015, at the top of the exhibit on the final page.  It's all the way at the back.

A   Yeah, I'm -- yeah.  Presuming this is the -- yeah, the executed copy that was included with the e-mail.

Q   To the best of your knowledge, what was the lender's commitment on DDTLC as of October 29, 2015?

MR. NADLER:  Objection.  Vague.

THE WITNESS:  I have -- I have to rely on what the details were on the amendment in terms of what the



position was.  I don't -- you know, it's at -- predated my experience.  And, you know, it was, you know, the statement of, you know, the management company and the lender certifying what they were agreeing to was the -- was the balance and where things stood to have a foundation for roll-forward on what the debt balance was.

Q   BY MS. ODENTHAL:  So if you look at the exhibit, it lists 709,000 as the commitment amount on Delayed Draw Term Loan C.

A   Yeah, 709,000.

MR. NADLER:  Is there a question?

MS. ODENTHAL:  I'm just confirming that he says --

THE WITNESS:  Yeah, Delayed Term Loan C, commitments of 709,000; outstanding, 708,000.

Q   BY MS. ODENTHAL:  Did you ever get an understanding how eMag could have 2.177 million outstanding on a facility with a commitment of 709,000?

A   No.

MR. NADLER:  Sorry.  Where -- where do you see 2.177 million?

MS. ODENTHAL:  If you look back at Exhibit 146, that is the outstanding on Delayed Draw Term Loan C in the capital structure snapshot.

MR. NADLER:  Sorry.  One second.  I'm just



trying to follow along.  As of a different date.

MS. ODENTHAL:  The question was as of October 2015.

MR. NADLER:  Right.  But the other document you are talking about has a different date.

THE WITNESS:  Yeah.  That says --

MR. NADLER:  Wait.

THE WITNESS:  That is as of April 30th, 2016. So the outstanding in commitment, if it was adjusted at that point, you know.  Again, if it was amended and restated, you know, again, I -- you know, there were -- once you get to amendment 23, I start to lose track of whatever else it is that might have been done in the whole course of this thing.

Q   BY MS. ODENTHAL:  So just, I guess, setting aside the 2.1 number, we don't need to look at that.

A   Yeah.

Q   Did you have an understanding how there could have been an amount drawn for 1.394 million from a facility that only had 709?

MR. NADLER:  I'm sorry.  Where is that coming?

MS. ODENTHAL:  The e-mail from Mr. O'Shea.

MR. NADLER:  Which?  There have been several.

MS. ODENTHAL:  This current exhibit.

MR. CAMPBELL:  What exhibit number are you on?



MR. NADLER:  149.

MS. ODENTHAL:  149, the first page.

THE WITNESS:  Well, that was -- I think that was kind of my point of when I was trying to audit this thing on my response on June 7th at 2:55 p.m., where I said, you know, you've got -- it says you've got 709 commitment and 708 outstanding.  And, you know, the -- you know, you show a balance of 2.177.  I'm going, the remainder of 1.394.  I was going, where is the request?  That was what I was going for.  It was like, I don't have it in my bank account.  I'm kind of laying into her going, where is my money?

MR. NADLER:  I'm just going to object that this misstates the document.  The 1.394 doesn't say anything about the same facility we're reading about on Exhibit 2.10 B.

MS. ODENTHAL:  In the fourth paragraph down from Mr. O'Shea, it says, "The remainder of the amount of 1.394 million between those proceeds received."

MR. NADLER:  Oh.

MS. ODENTHAL:  And then it says "DDTLC."

MR. NADLER:  Sorry.  I was looking at the wrong page.  I'm sorry.

THE WITNESS:  So I had received an attached statement that showed a balance of 2.117, and I was



saying that did not reconcile with my commitment, according to the read and restated.  Where is the difference?  I needed support either where the -- you know, was it misrecorded?  Was it in the wrong slot?  It didn't make sense, which is why I was having that conversation.

Q   BY MS. ODENTHAL:  And, to your knowledge, was this resolved, this discrepancy?

A   Well, she had -- this was a case where I got the 23, and 23 still has the 708, 709 on it.  So, you know -- you know, I said I needed -- I said I needed supporting documentation for transactions that had been recorded for both tranches of DDTLC, as well as DDTLD.  So if there was another tranche that was added into the explanation, I needed the support for it, if there was an increase in the -- you know, because if I had a statement that lines up with what was on the e-mails from the May, which said that there was an out -- a commitment and outstanding of 2.117 and the documentation was saying that it was committed through 708, I -- I'm not happy.  It doesn't balance.

Q   Did you ever receive anything that made it balance?

A   There was a lot of -- we were going back and forth on this, you know, hot and heavy.  I -- I thought



and we had -- we had gotten something that had restated or identified that that was, you know -- that we had gotten this thing tied out.  That was -- it was a slog, and that was probably the point when I finally got all that done, that it was like, I just -- you know, I'm about done with this.

But, you know, I -- you know, I think we got that number lined up and, you know -- but it was -- you know, I -- you know, I don't recall, you know, past this point of, you know, where we finally got it resolved.  I don't think it was left hanging open; so I think we got something to support it that said here's what the outstanding balances are.  But, you know, unless I see the signed amendment, I don't recall.  Those are just numbers I don't keep in my head.

     Q   Looking at the fifth paragraph down, you said, "There has to have been an executed request for this 1.394 million funding to have occurred for the funds to have been added to the outstanding loan balance."

          And then in paragraph 6, you say, "I need supporting documentation the transaction to be able to record this event on the books of eMag Solutions LLC. This transaction will need to be recorded in accordance with FASB ASC 470."

          MR. NADLER:  Objection to the extent it



misstates the document by omitting text in between.

THE WITNESS:  The -- right.  So this is -- this is where I was saying I've got -- I'm going to round here.  I've got $1.4 million that you are saying I have, and apparently I had -- I had some point where someone said, well, just reflect it as cash held by lender's agent.

I went, not unless I've got something that supports it.

Q    BY MS. ODENTHAL:  Who instructed you?

A    I am going to -- it would have been either Chen or Jean Luc.

Q    And at the beginning of paragraph 6, you mention you have instructed this to be reflected on the balance sheet as cash by the agent, but before that you note, "eMag does not have 1.394 million in its bank account."

What did you mean by that?

A    It means that we didn't have it in control in our accounts.  In other words, we didn't have it where we could sign and draw on that cash.  It was not sitting in the bank accounts that we had signatory over; so it was not reflected in any cash statement that I had that was a part of my accounting.

So I'm going, if there's 1.3 being held by



agent, I need something that supports that balance, where it's being held, where is the supporting documentation.

Q   So is it fair to say you didn't consider the PPAS account to be eMag's bank account?

MR. NADLER:  Objection.  Calls for a legal conclusion and misstates his prior testimony.

THE WITNESS:  I -- I had a outstanding balance that I had to reconcile where this cash that was drawn, that was -- that was, you know, to be re- -- instructed -- I was instructed to be reflected call it "cash held by lender's agent" that I needed support for it.  I needed a bank statement.  I needed something to support this obligation.  Because as an accounting, it doesn't balance.  It makes an accountant nervous.  It doesn't work.

Q   BY MS. ODENTHAL:  What -- what bank accounts did eMag have at this time?

MR. NADLER:  Objection.  Vague.

THE WITNESS:  The bank accounts that -- there were two or three accounts.  There was an account over in the UK, because we had UK operations.  And there was a operating account that was at a local bank, and I don't recall if we had a secondary operating account that was used as kind of, you know, sweeper or draw.  But the -- you know, of the accounts that I had control or signatory



over and got statements on, I didn't -- it didn't add up.

Q   BY MS. ODENTHAL:  Do you recall what bank those accounts were with?

A   No, I don't.  And, unfortunately, I've dealt with a lot of banks over a lot of time.  Yeah.  I -- I do not recall who we were banking with at the time.

Q   At the bottom of your e-mail, you noted, "I need supporting documentation for the transactions that are to be recorded for both this tranche of DDTLC as well as for DDTLD."

Do you recall whether DDTLD was also lacking in documentation?

A   I don't recall specifically.  I would -- given the way that I structure my requests and my e-mails, if I'm asking for supporting documentation for that and for the other one, I -- I am still trying to reconcile totals on balances to obligations.  I'm still trying to get this balance sheet to work.

Q   Do you recall anything provided for DDTLD?

MR. NADLER:  Objection.  Vague.

THE WITNESS:  I don't recall.  I -- I don't remember, you know, where things stood in terms of DDTL, you know, during -- excuse me.  I don't recall for tranche D versus tranche C what the, you know, balance or sets were, you know.



Q    BY MS. ODENTHAL:  Moving to the top e-mail from Chen Zou, she said, "I am talking to the legal team to see any other docs to be provided to ease your concern. I am working with the lawyer to create a document that I will send to you shortly once it is done.  I hope this will resolve the issue."

Did Ms. Zou ever provide this documentation?

A    I can't recall a document specifically, but if I hadn't gotten it resolved, I probably would have walked out the door sooner.  So I think we got it resolved in the end, but I don't remember.

Q    So you don't remember any specific documents?

A    I -- yeah, I -- well, I don't -- I don't remember what the -- the block of documents that, you know, followed on on that, you know, structure afterwards.  The -- yeah.  I don't remember.

MR. NADLER:  I'm not sure how long we've been going on the record.  I think it's maybe over an hour.  I don't know if this is a good time for a break, if you are planning another document now.  But, again, I'm not sure how long we've actually been on.  I think Brian came back about an hour ago, but I might have that wrong.

MR. CAMPBELL:  Now's a good time.

MS. ODENTHAL:  Yeah, we can take a break.

THE VIDEOGRAPHER:  We are going off the record.



The time is 3:32 p.m.

(The deposition was at recess from 3:32 p.m. to 3:41 p.m.)

THE VIDEOGRAPHER:  We are back on the record. The time is now 3:41 p.m.

(Deposition Exhibit 150 was marked for identification.)

Q   BY MS. ODENTHAL:  Mr. O'Shea, I am handing you an e-mail that will be Exhibit 150, and that starts at TRUSTEE_AP5930304 and ends at TRUSTEE_AP5930306.  And take a moment to review the e-mail.

So the base e-mail here is from you on May 18th, 2016 to O'Leary at UIC.  That's Keith O'Leary?

A   Yes.

Q   And do you recall sending this e-mail?

A   Yeah.  I mean, the -- the time frame of this would have been when we were in a budget or planning cycle.

MR. NADLER:  And I'm just gonna object to lack of foundation to asking the witness about the document because he's not on all of it.  But if I can just have a standing objection, I don't have to repeat the objection each time.

MS. ODENTHAL:  That's fine.

Q   BY MS. ODENTHAL:  So you sent this e-mail with



the subject "eMag Financial Projection," and then Keith O'Leary responded on May 19th.  And he says in point 2, "I don't know if you need to change the model.  I will confirm with JLP.  The companies are being forced to stay current on management and agency fees.  So assuming you do not need to pay -- to pay them might not be okay for the model."

Do you remember being forced to stay current on these fees?

MR. NADLER:  Objection.  Vague.

THE WITNESS:  I recall we had a very, I guess, focused element on keeping current on interest payments, and that we had, when cash flow was tight enough, that we would have a -- we would have a deferral, or there was some moments where some of the agency fees had been deferred, you know, over -- over time.  And then occasionally there would be a borrowing that would true up on some of the agency fees, to bring that current for the end of the year, for the -- or for the period for the agency.

Q   BY MS. ODENTHAL:  Do you remember someone specific telling you to stay current on these fees?

A   The instruction in terms of staying current on the fees would originally come from Keith O'Leary.

Q   And why were these fees not included in your



original financial projection?

A    It was a -- I recall it was a pretty tight financial projection in terms of trying to manage revenue and a path to being cash flow positive and what could, you know, operationally work.  And so one of the components that was in that was making the assumption that, you know, to date or at the time we were not, I believe, paying the -- the fees.  And so from a cash flow perspective, we did not include them in the projection. I don't recall if we accrued them and -- in terms of as payable or if we just left them off for the purposes of trying to deal with the -- the period of that forecast.

Q    Do you recall updating this financial model to include these fees?

A    I don't remember if we updated it with that or not.

(Deposition Exhibit 151 was marked for identification.)

Q    BY MS. ODENTHAL:  Mr. O'Shea, this is Exhibit 151, and it starts at TRUSTEE_AP5912320 and ends at TRUSTEE_AP5912321.  Take a moment to review the e-mail.

A    All right.

Q    So in this e-mail you are attaching an updated projection in 13WCFF.  Is that 13-week cash flow?



A    Yeah.   13-week cash flow forecast.

Q    And you note --

MR. NADLER:  Just objection to misstating the document.  There is no attachment here.

MS. ODENTHAL:  Sorry.  I meant to say it attaches.  It's attached to the base e-mail.

MR. NADLER:  Yeah.

MS. ODENTHAL:  It's referenced as an attachment.

MR. NADLER:  I just wanted the record to be clear.

MS. ODENTHAL:  Fair.

Q    BY MS. ODENTHAL:  Okay.  So second paragraph, you say, "The projection does not reflect the effect of the cash held by PPAS on behalf of eMag in order to reflect the operational cash position and flow."

Why was the cash held by PPAS not included?

A    Because we did not have access to it.

Q    And in the next paragraph you say, "The current cash balance is expected to become insufficient for operations and critical payments on Tuesday, August 23rd, provided we collect an outstanding payable of 55K from Winston and Strawn."

So you noted the current cash balance was expected to become insufficient.  Did you consider the



1.394 million available to help make these payments?

MR. NADLER:  Objection.  Vague.

THE WITNESS:  No.  The -- we did not consider the cash held by PPAS as available to us for expenditure. It was not in our bank account.  We had no control over it to be able to do things like make payroll and rent.

Q   BY MS. ODENTHAL:  Could you have submitted a request to use the funds?

A   Effectively, no.  We were -- you know, if -- Jean Luc would have to get authorization from Lynn to be able to release that cash.

(Deposition Exhibit 152 was marked for identification.)

Q   BY MS. ODENTHAL:  This is Exhibit 152 starting at TRUSTEE_AP5913319 and ending in 5913323.

A   All right.

Q   So in the e-mail from John McIlwaine?

A   McIlwaine, yes.

Q   McIlwaine.  Who was John McIlwaine?

A   John McIlwaine was the fifth CEO that I worked with at eMag over the course of five months.

Q   So in his draft, in the third -- no, sorry -- fourth bullet point down, it says, "eMag has currently blank of availability held at PPAS on behalf of the company and under control of the board."



Do you see that?

A    Yeah.

Q    And then you respond, "As of 9/16, $1,421,811.54 of cash held by PPAS on behalf of eMag"?

A    Right.

Q    Were you tracking the funds held at PPAS?

MR. NADLER:  Objection.  Vague.

THE WITNESS:  As a part of the cash flow element, yeah.  Once this -- I'm going to call it cash held on behalf came available through this trail, it was like, okay.  So I got to keep it on the books somewhere.

So there was -- you know, that number -- I don't remember if I was just tracking it for my own ins and outs or if I was also just getting a -- pinging the analyst going, what's the number now?  Because of the precision of it, I would think I'm getting -- I was getting some detail from the analyst to purport what the amount that's being held by PPAS on behalf.

Q    BY MS. ODENTHAL:  The analyst being Chen Zou?

A    Yeah.  Chen Zou, and I don't -- at some point -- I can't remember if Chen Zou was the analyst that followed or there was an analyst that followed Chen Zou at the time.  But I know -- I know I had two analysts over the course of my tenure.  I just don't remember which one was which when.



(Deposition Exhibit 153 was marked for identification.)

Q   BY MS. ODENTHAL:  This is Exhibit 153 starting at TRUSTEE_AP5916106 and ending in 5916108.  And I'll give you a moment to review this, Mr. O'Shea, but I'll note that you are not on this e-mail.

MR. NADLER:  For that reason, I'll ask for a standing objection to foundation grounds to anything about this document.

THE WITNESS:  Okay.

Q   BY MS. ODENTHAL:  So on November 22nd, 2016, Arriann Mathurin sent this e-mail to Jean Luc and Chen Zou, cc'ing Financial and Investment Law.  Do you know who Arriann Mathurin is?

A   I'm not familiar, no.

Q   So she sends, directed at Jean Luc, "Please find a notice of waiver for certain interest under your Credit Agreement as of March 2, 2016 for the following companies," and lists eMag.

So then if you'll turn to the attachment, there's a schedule.  Do you see the schedule?

A   Yep.

Q   And roughly how much past due interest owed by eMag to the Zohar funds does this schedule reflect?  Over 1 million?

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

MR. NADLER:  Object to form.

THE WITNESS:  Close to it.  Close to a million.

Q   BY MS. ODENTHAL:  Did you receive this waiver from Jean Luc?

A   So this is around the time that this tranche of other cash was talking about being released.  Again, timing before or after that.  So I don't know about the actual credit waiver, but that was where just the whole who owes what and what's available for cash and funding was just really weird around that time.

I think at that point I was pretty close to -- pretty close to notice and working out when I was leaving out of there in December.  But at the -- that was -- yeah.  So I'm -- I'm pretty sure there was some component in this whole process where we talked about being able to waive some of the interest as a part of the structuring. But I don't know if I ever -- I don't think I ever saw the actual notice of waiver.

Q   Do you recall when those conversations were about waiving interest?

A   No.  The -- the -- like I say, it was sometime in like this -- I want to call it somewhere between the October/December time frame that there was this kind of like restructuring tranche, you know, release of -- of funds into eMag that made that held on behalf a much

larger number that was a surprise.

But there wasn't a lot that we could do with it because, under the structure, it was at the behest of the board, in terms of when it could be used.

Q   So the additional funds that came into eMag around that time were held by the agent?  Held by PPAS?  Excuse me.

MR. NADLER:  Objection.  Misstates prior testimony.

THE WITNESS:  I don't know.  The -- there was never a receipt of those funds into accounts that were controlled or accessible by the CEO or the CFO of eMag. They were just an amount that was made available and was going to adjust the related statements of cash balance held on behalf of and all those fun numbers.

Q   BY MS. ODENTHAL:  Do you know if you were ever informed of the roughly $1 million waived?

A   I don't remember.  I don't remember, you know. Again, the -- the process of that whole, I don't know, restructuring, finishing up tranche or whatever kind of threw the whole who owes what what and what cash is available.  It made it, you know, kind of crazy to begin with.

So I -- you know, I don't remember if this was communicated or not.



(Deposition Exhibit 154 was marked for identification.)

Q   BY MS. ODENTHAL:  This is Exhibit, I believe, 154.  The Bates is PPAS-SDNY-00050935 through 50945.  Do you recall receiving this e-mail?

A   You know, I -- I remember, you know, in terms of that there were occasions, yeah, like this where they didn't have the numbers right for the interest payments and other stuff showed up because the statement wasn't correct.

Q   So the updated invoice here was sent on April 4, 2016.  Do you see that?

A   Yeah.

Q   And turning to the invoice itself, on the first page, what is the date for this invoice?

A   April 1st.

Q   April 1st, 2016?

A   Correct.

Q   And as of April 1st, 2016, how much did eMag owe in interest on the loan facility 18-04 RL?

A   Well, on --

MR. NADLER:  Objection to the extent that the question misstates the document.

THE WITNESS:  Yeah, on -- well, on RL is -- well, it's stating principal, interest, and fees is

211,983.  So the interest component, the current due is inferred, but it's not -- it's not clear in terms of the actual amount that's -- that's due as to amount of what has to be remitted and what was being applied in interest as principal is not a function of the invoice.

Q   BY MS. ODENTHAL:  So turning to the second page, and this, at the top, refers to 018-04?

A   Uh-huh.

Q   And do you see on this page cash interest owed on this facility?

A   Uh-huh.

Q   And how much --

A   Yes.

Q   -- was owed as of this invoice?

A   On this structure detail, it's 211,847.77.

Q   And then the paging is a little strange on this invoice.  So if you will look at the Bates in the bottom corner and go to the page ending in 50941.

A   Uh-huh.

Q   And this is for the facility 018-06 DDTL?

A   Yep.

Q   How much cash interest was owed as of this invoice?

A   47,079.37.

Q   And then flipping forward one page to the page



with the Bates 50943, this is for the facility 018-09,

Delayed Draw Term Loan D.

     A    Yep.

     Q    And how much was due on this?

     A    $1,220.28.

     Q    So for this facility, it reflects "none" as

past due?

     A    For that facility, it's reflecting none as past

due, that is correct.

     Q    And the previous two that we looked at did have

past due interest?

     A    Correct.

     Q    Do you recall when the waiver of this past due

interest occurred?

     A    I do not.

     Q    And was there any documentation of waiver of

past due interest at the time it was waived?

          MR. NADLER:  Objection to form.  Excuse me.

Objection.  Vague.  And I don't know what the right

objection is because I just know when it happened.

          THE WITNESS:  They -- I don't recall, you know,

in terms of the -- you know, the document that has the --

the waiver as of March 6th on the credit agreement that,

you know, was to be passed along to eMag per the

instructions.  I don't recall if that was forwarded to us



or not.  You know, being dated in September, in terms of when it was executed, you know, that is after this invoice statement when interest was continuing to be accrued and stated.  So as a retroactive waiver of interest, you know, that's, you know, a function of however the debt gets restructured or adjusted.

Q   BY MS. ODENTHAL:  Do you understand this to have been a retroactive waiver?

MR. NADLER:  Objection.  Vague.  And objection to the extent it calls for a legal conclusion.

THE WITNESS:  Yeah.  I understand this to be a retroactive waiver that took place effective September 8th, 2016, under this agreement.

Q   BY MS. ODENTHAL:  So you are not aware of any document predating this April invoice that waives past due interest?

A   I am not.

Q   Turning back to Exhibit 153, if you'll go to the attachment and look at the schedule again, is all the past due interest on this page interest owed to the Zohar funds?

MR. NADLER:  I'm sorry.  Where were you?  I apologize.

MS. ODENTHAL:  The schedule to Exhibit 153, the last page.



MR. NADLER:  Okay.  Thank you.

THE WITNESS:  Under the schedule attached, they are all listed as owed to the Zohar funds.

Q   BY MS. ODENTHAL:  Did PPMG or PPAS waive their past due fees?

MR. NADLER:  Objection.  Vague.

THE WITNESS:  I don't recall if they waived any of the -- the fees.  Yeah, I don't have -- I don't have a recollection of them ever -- ever having a fee, an agency fee waived.

MS. ODENTHAL:  Tab 21.

(Deposition Exhibit 155 was marked for identification.)

Q   BY MS. ODENTHAL:  Mr. O'Shea, this is Exhibit 155, and the Bates is TRUSTEE_AP5918697.  I will give you a minute to review.

A   Yep.

Q   Who was Tendai Masaya?

A   Tendai was, you know, another person in the entity of Patriarch of one of -- many of the ones that would send a notice such as this.

Q   Did you know anything more about his or her role?

A   No.

Q   And as of June 1, 2016, Tendai Masaya was



sending a list of balances due to the various Patriarch entities, correct?

A   Yes, that's what's stated on here.

Q   And these total to just shy of 1.3 million?

A   Correct.

Q   And how did you factor these fees into your cash needs?

A   They were for our projection purposes.  They were put on hold or left out, because there was no cash flow to be able to pay these and maintain operational and maintain interest payments.  So the -- you know, in the event that you had enough positive cash flow to actually cover everything and then had some left over, it would be expected that you would project to make payments.  But from a cash flow standpoint, I didn't see an opportunity where it was going to be paid in the time that I was projecting.

Q   So is it fair to say these fees just continued accruing?

A   Yes.

(Deposition Exhibit 156 was marked for identification.)

Q   BY MS. ODENTHAL:  This is Exhibit 156.  It starts at TRUSTEE_AP5909232 and ends at 5909235.

A   Okay.



Q    So the base e-mail in this chain is December 12, 2016 from Carlos Mercado to Chen Zou, and Mr. -- Mr. Mercado says, "The amounts below show the outstanding balances eMag has with PPMG and PPAS.  Please request a funding certificate to execute a partial payment in the amounts shown."

Do you see that?

A    Yes.

Q    Then Chen forwards this to you and says, "Please send me the funding certificate dated as 12/13/16 with a total amount 1 thousand 68 -- 168,750."  Sorry.

A    Yes, I see that.

Q    So who would receive this 168,750?

MR. NADLER:  Objection.  Vague.

Q    BY MS. ODENTHAL:  In the funding certificate?

A    In this funding certificate, it's coming to eMag's operating account.

Q    And what -- do you see the reference on the -- the line?

A    Funding management and agency fees.

Q    So who do you understand would ultimately receive these funds?

A    That a -- that money would come in and then a check or a wire would be sent out to Patriarch Partners for that amount.



Q   So this reflects a payment from eMag to Patriarch for a portion of past due fees?

MR. NADLER:  Objection.  Misstates the document and his prior testimony.

THE WITNESS:  Well, this reflects the funding for the receipt of cash to pay these fees.  The fee payment would have happened subsequently, probably around -- this is around the time that I had already given notice, which is probably why John McIlwaine is signing this instead of me, and the -- but, you know, that would have been a subsequent, you know, payment out of the NBT operating account to Patriarch after the funds were received.  So it would have bounced through eMag.

Q   Why is that?

MR. NADLER:  Objection. Vague.

THE WITNESS:  The -- eMag owes the funds to Patriarch Partners.  The funding is a draw that's being borrowed by eMag.  EMag is then using those funds and paying Agency Services as opposed to the lender.

Q   BY MS. ODENTHAL:  Were the Zohar funds senior secured lenders to eMag?

MR. NADLER:  Objection. Vague.  And objection to the extent it calls for a legal conclusion.

THE WITNESS:  I don't recall under the credit agreement how the security was structured in terms of the



equity or intellectual property or components in the event after liquidation.

Q   BY MS. ODENTHAL:  Do you know if PPAS and PPMG were secure lenders?

A   I do not.

MR. NADLER:  The same objections.

Q   BY MS. ODENTHAL:  Do you know why the past due interest owed to the Zohar funds was waived when the past due fees to PPMG and PPAS were not waived?

A   I do not.

Q   If eMag's 1 million in past due interest to the Zohar funds had not been waived, could the funds held by PPAS been used to pay that amount?

MR. NADLER:  Objection.  Vague.  And objection to the extent it calls for a legal conclusion.

(Court reporter clarification.)

THE WITNESS:  Sorry.  Ask the question one more time.

Q   BY MS. ODENTHAL:  If the 1 million in past due interest to the Zohar funds was not waived and was still outstanding, could the funds held by PPAS been used to pay that interest?

Speculation; Hypothetical

MR. NADLER:  The same objections.

THE WITNESS:  In theory, it could have been used to pay those obligations.  In -- in practice, the

Speculation; Hypothetical



funds weren't really -- it was a function of those were -- those were a function of the -- of the board in terms of whether -- how that money could be spent or accessed.

Speculation; Hypothetical

Q    BY MS. ODENTHAL:  So here the funds ultimately would have gone to PPAS and PPMG?

MR. NADLER:  Objection.  Misstates his prior testimony.

THE WITNESS:  The -- the -- well, the funds weren't -- you know the -- the funds weren't effectively -- you know, they could have.  But again in terms of direction of the payment of it, there was no availability to disburse the funds.  So I can't -- I can't make a conjecture as to how -- what priority a payment would have been made, had the cash been made available.

Speculation; Hypothetical

Q    BY MS. ODENTHAL:  So this -- this 168,750 in the -- in the funding certificate that's reflected, those funds went to -- after going through the PPAS account, went to PPMG and PPAS?

MR. NADLER:  Objection.  Misstates his prior testimony and lacks foundation.

THE WITNESS:  I'm going to say without seeing the transaction, I would presume that that is what happened, because that follows the pattern of


ESQUIRE
DEPOSITION SOLUTIONS

consistently how these draws and payments were made.  But without the documentation, I couldn't testify to a surety of it.

Q   BY MS. ODENTHAL:  This funding certificate that's attached, it is easiest to see in the final paragraph, starting with the "undersigned hereby certifies," it's drawing on DDTLC.  Do you see that?

A   Uh-huh.  Yes.

Q   And how did you know which facility to -- to execute the request for?

MR. NADLER:  Objection.  Misstates the document.  He didn't execute this.

THE WITNESS:  Well, it was given -- you know, I received the document and John McIlwaine executed it, but the -- the certificate was prepared by Patriarch Partners -- I don't know if it was Management or Agency Services.  But this was pre-prepared and in advance for signature.  We did not prepare the certificate.  Excuse me.  When I say "we," I mean "eMag."

Q   BY MS. ODENTHAL:  Can we good off the record.

THE VIDEOGRAPHER:  We are going off the record.  The time is now 4:21 p.m.

(The deposition was at recess from 4:21 p.m. to 4:32 p.m.)

THE VIDEOGRAPHER:  We're back on the record.



The time is now 4:32 p.m.

(Deposition Exhibit 157 was marked for identification.)

Q   BY MS. ODENTHAL:  Mr. O'Shea, this is Exhibit 157, and this begins at PATRIARCH-BK-00000806, and it ends in 822.

A   Yeah.

Q   Mr. O'Shea, were you involved with creating these audited financials before you left eMag?

MR. NADLER:  Objection.  Vague.

THE WITNESS:  No.  The -- I know we were talking about in terms of compliance preparation for doing an audit, but the auditors were engaged after I left.  I believe after I left, Angela Easum may have taken on as CFO, and I do recall a conversation they had engaged Frazier & Deeter to do -- to do the audit, yeah. But I was not involved in the preparation of the audited financials.

Prejudicial: Designated After Close of Trial

Q   BY MS. ODENTHAL:  When you were doing preparation for the audit, what did that entail?

A   Well, I wasn't -- oh, sorry.  In terms of preparing for the audit, my -- my -- the component was getting, you know, the balance sheet and financials straight that you could have something that could actually be audited as opposed to preparing for an audit



once an engagement letter had been signed.  This is just a case of if we're gonna have an audit, we have to have all these ducks in a row.  So it was more of just the groundwork to have what you needed to be able to be audited.  So that was my general focus.

The actual engagement of the auditors happened after I had left.

Q   If you'll turn to page 8 -- and this is using the -- their internal numbering system.  Under the heading "Cash Held By the Agent," it says, "Cash held by the agent -- by agent represents cash held within an account of Patriarch Partners Agency Services, PPAS, an affiliate of one the members, and is available to the company at the company's request subject to approval by the company's board of directors.  This amount represents borrowings on long-term debt that the lenders have funded to PPAS but the company has not yet requested access to."

Do you see that language?

A   I do.

Q   And based on your time at eMag and documents you reviewed, did you understand eMag to have requested PPAS to hold funds?

MR. NADLER:  Objection.  Vague.  And lacks foundation.

THE WITNESS:  In terms of the request to hold


ESQUIRE
DEPOSITION SOLUTIONS

funds, you know, eMag as -- as an entity, the -- you know, the cash being at the discretion of the board and where the board decided to have, you know, cash available and the structure of authority to access that cash, determined that structure.  So it was -- it wasn't within the authority of the CEO or the CFO to be able to put a structure like that in place.  That was at the discretion of the board.

          (Court reporter clarification.)

     Q    BY MS. ODENTHAL:  So none of the company officers requested the funds to be held at PPAS?

          MR. NADLER:  Objection.  Misstates his prior testimony.  And lack of foundation.

          THE WITNESS:  You know of the -- you know, the officers -- during the tenure that I was at eMag, there wasn't a request by the officers of -- you know, as the CEO or CFO, for funds to be held by PPAS.

          MS. ODENTHAL:  Nothing further.

          MR. NADLER:  I'm going to ask if we can take maybe a 15-minute break so I can gather my thoughts.  I'm going to have a few questions, but I don't think we will need to detain you much longer.  I just want to make sure I'm organized so I can be succinct.

          THE VIDEOGRAPHER:  We are going off the record. The time is 4:37 p.m.



(The deposition was at recess from 4:37 p.m. to 4:55 p.m.)

THE VIDEOGRAPHER:  We are back on the record. The time is now 4:55 p.m.


                        EXAMINATION

BY MR. NADLER:

Q    Hi, good afternoon, Mr. O'Shea.  My name is Michael Nadler from Gibson Dunn & Crutcher representing Patriarch Partners Agency Services.

You and I have never met before today, right?

A    That's correct.

Q    We have never spoken before today?

A    That is correct.

Q    Never discussed this case before today?

A    That is correct.

Q    When did you first learn about this litigation?

A    From a subpoena that I received on my doorstep about a month ago.  Then, I recall a -- a phone call that was on my -- my voicemail from, you know, a week earlier. It was like, oh, there's something about -- ah.  I came back to it.  And then I got serviced -- got a notice about a month ago or something on my doorstep.

Q    Who was the voicemail from, if you recall?

A    I don't remember.



Q   Do you remember if it was from somebody at the law firm of Quinn Emanuel?

A   I would say, probably, yes because that -- then the follow-up would have been when I actually got the subpoena and the follow-up on that front.

Q   Do you recall anything about what the voicemail said?

A   No.  Something to the effect of maybe contact me regarding something on, you know, litigation between -- at which point, I probably went, oh, God, I will deal with it a little bit later.

Q   So you were eagerly awaiting that follow-up call?

A   Absolutely, yeah.

Q   And so did you speak to somebody from the Quinn Emanuel law firm about it after that?

A   Yeah, I contacted -- because there were -- the subpoena was just trying to coordinate in terms of timing on this thing.  So the conversations were around just the timing of this event.

Q   Okay.  Do you recall who specifically you spoke with?

A   Last name Campbell, maybe.  But --

Q   Would that be the gentleman sitting here probably.



A    Yeah.  Sorry.  There we go.  Again, you know, sorry.  That's the way that it goes.

Q    Do you recall -- I think you said conversations, plural -- how many times you spoke to Mr. Campbell?

A    Well, it was probably a couple of times, just in terms of coordinating, because, originally, I would've said, "Yeah, we're good for the 9 o'clock on -- on the 27th."  And then I had a board meeting scheduled for 9 o'clock the exact same day.  So we had to push dates, and then we were a few back-and-forths trying to reset timing and location.  And here we are.

Q    Okay.  Did you ever discuss with Mr. Campbell anything about the substance of this litigation?

A    No.  Other than the parties involved, and it was, you know -- litigation between.  And that was about it.

Q    Did Mr. Campbell or any of his colleagues provide you any documents other than the subpoena itself in connection with this litigation?

A    No.

Q    You weren't given any documents to review or refresh your recollection?

A    Nope.

Q    And so have you read any of the -- any of the



court filings in this case?

A   No.

Q   And did you speak with anybody other than Mr. Campbell from the Quinn Emanuel law firm -- or sorry. Let me rephrase that question.

Did you speak to anybody from the Quinn Emanuel law firm other than Mr. Campbell?

A   I think I had a voicemail reach out to the -- another name on the item.  And then -- then I got contacted on that front.  So -- but there -- I think it was the only conversation but...

Q   Okay.  And so fair to say you didn't, kind of, speak about the substance of the litigation with anybody from Quinn Emanuel, correct?

A   That is correct.

Q   Okay.  Moving on to your -- your testimony today.  You -- you referenced "the board" a few times.  I think you used that phrase.

A   Uh-huh.  Yes.

Q   That -- that was reference to the board of eMag, correct?

A   Correct.

Q   Who comprised the board of eMag during your tenure there?

A   Lynn Tilton.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Q   Was that also -- in that capacity, was that also known as being the manager of eMag?  Does that ring a bell?

A   No.

Q   But you understood Lynn was -- Ms. Tilton was the board of -- of eMag?

A   Yes.

Q   And in that capacity, I think you testified earlier, she had authority to make decisions on behalf of eMag?

MS. ODENTHAL:  Object to form.

THE WITNESS:  The -- the -- again, the structure was a -- of limited realms.  There were -- there were -- there was a authority structure that managed the amount of decision that could be made in terms of within the CEO and CFO role.

There were certain amounts of leeway in terms of the amount of transaction or authority or commitment that could be made that did not require the authority of the board to move forward.

So there was -- but most significant decisions around, I would say, the broad structure of obligations and -- were made or had to run through the board.

Q   BY MR. NADLER:  Again, the board being Ms. Tilton?



A    The board being Lynn Tilton.

Q    Okay.  And understanding that, I guess, there were several CFO -- or excuse me -- several CEOs during your tenure, did you report to the CEO, whoever that might have been at the time?

A    The structure of eMag was that the CEO and the CFO were appointed independently by the board, by Lynn Tilton.  So there was -- you know, at -- the CEO couldn't fire me, and I couldn't fire the CEO.

Q    Got it.  And so would it be fair to say the CFO, meaning yourself, and the CEO, whoever it might -- it might have been at any given time both reported to Ms. Tilton in her capacity as eMag's board?

A    Correct.  With the -- the intersection being that there was the -- Lynn Tilton was not someone that we interacted with directly, because she was busy managing a lot of different things.  So you generally had someone who was -- I would call an overseer-manager, like Jean Luc Pelissier, who was like the lead intermediary between eMag and the board.

Q    So you might have been dealing with other people who you understood as acting on Ms. Tilton's behalf in her capacity as the board of eMag?

        MS. ODENTHAL:  Objection.  Form.

        THE WITNESS:  I wouldn't say on -- well, when



you say "on behalf," you know, they had -- they had roles of management for their portfolios that they -- they managed, but the -- ultimately anything that was a decision under the authority went to Lynn for approval.

Q   BY MR. NADLER:  Okay.  And "on behalf" may have been poor phrasing.  But you understood that they were aiding her that capacity, the various intermediaries, as you referred to them?

MS. ODENTHAL:  Object to the form.

THE WITNESS:  The -- that the -- you know, the intermediaries, you know, I guess, you would call it the portfolio manager, you know, was, you know, to help, you know, facilitate, you know, transacting and managing the company.

Q   BY MR. NADLER:  And you said it was to help facilitate transacting and managing the company.  It was to help Ms. Tilton do so, correct?

A   Correct.

Q   Now, you began working at eMag in -- I think it was March of 2016, right?

A   Correct.

Q   I think we saw a document --

A   March 23rd was my first day.

Q   Exactly.  Exactly what I was just looking up. March 23rd.  So you weren't -- what were you doing up



until that time or immediately -- what were you doing immediately prior to that time?

A   Well, prior to that, I was in probably about 45 days of job search.  I had previously finished up with my run with Prophix, which was P-h-r-o-i-x (sic), as -- anyways, which was a -- a financial -- financial tool software sales environment.

Q   And so prior to -- you weren't personally involved in any financing transactions that eMag engaged in prior to March 23rd, correct?

A   That is correct.

Q   And so you wouldn't have firsthand knowledge of any decisions that any officers of eMag made in connection with those financing transactions prior to March 23rd, right?

MS. ODENTHAL:  Object to form.

THE WITNESS:  The only -- only through interpreting or reading the trail of documents that are -- were the amended and restated credit agreement that was the basis of the lending.

Q   BY MR. NADLER:  Understood.  But you weren't there at the time when those documents are executed?

A   That is correct.

Q   And you don't have firsthand knowledge of why those documents were executed when they were executed?



A    That is correct.

Q    And are you aware in February 2016, so before your tenure at eMag, that certain Patriarch entities stepped down as collateral manager for the Zohar funds that had been replaced by an affiliate of Alvarez & Marsal?

A    I -- I recall -- I recall that there -- during, like, the tenure issue, at the beginning or in the process of, that -- the -- Alvarez & Marsal became one of the components in the process of working through the debt management.  But all of it was run -- or managed -- all of the interactions were run through Patriarch Partners between, you know, Chen and Jean Luc and the related folks there.

Q    But given that you weren't employed by eMag prior to March 2016, you don't have any knowledge as to how eMag's practices might have changed once Alvarez & Marsal became -- what was the phrase used? -- one of the components of the process?

MS. ODENTHAL:  Object to form.

THE WITNESS:  I, you know -- I -- no, I do not.

Q    BY MR. NADLER:  And you left eMag in or about December of 2016?

A    Correct.

Q    And so roughly eight or nine months?



A    Yeah, about nine months.

Q    And so during the entirety of your tenure there, Alvarez & Marsal served as the collateral manager and Patriarch Partners Agency Services served as the administrative agent, correct?

MS. ODENTHAL:  Object to form.

Q    BY MR. NADLER:  I can rephrase the question because you seem --

A    Yeah.

Q    So we already talked about Alvarez & Marsal. So why don't we just focus PPAS.

PPAS never stepped down as collateral -- excuse me -- administrative agent during your tenure at eMag, correct?

A    Correct.

MS. ODENTHAL:  Object to form.

Q    BY MR. NADLER:  All right.  Do you still have the documents in front of you that you were shown earlier?

A    Yes.

Q    If you could turn to Exhibit 146.  It's the Bates number is TRUSTEE_AP 5931343.

A    Got it.

Q    Now, I believe you testified that this is -- this document reflected a, quote, "a request for



funding," end quote, a back-and-forth with whom to be able to get approval to, you know, draw on funds.  Do you recall testifying about this document?

A   Yes.

Q   Looking at this document, nowhere on the face of it does it ask for funds to be provided to eMag, does it?

MS. ODENTHAL:  Object to form.

THE WITNESS:  The only item it has is the draft of what Jean Luc has, which says that the company continues to underperform and will run out of liquidity during of the month of May.

Q   But it doesn't propose a solution to that scenario does it?

MS. ODENTHAL:  Object to form.

THE WITNESS:  It does not provide a solution. It merely says that the company will run out of liquidity within 30 days in the best case.

Q   BY MR. NADLER:  And so -- and so there is no request anywhere here for money to be -- for eMag to borrow or access money, is there?

MS. ODENTHAL:  Object to form.

THE WITNESS:  Not within the e-mail, no.

Q   BY MR. NADLER:  And looking at Jean Luc Pelissier -- did I pronounce that right, if you know?



A   I believe so.

Q   All right.  Looking at Mr. -- easier Jean Luc. Looking at Jean Luc's e-mail, he starts the e-mail with "Chen and I are preparing an update to go to Lynn today or tomorrow morning."

Do you see that?

A   Yes.

Q   Do you know for a fact one way or the other whether or not an update went to Lynn on Tuesday, May 3rd, 2016, or Wednesday, May 4th, 2016?

A   I don't know specifically when they managed to meet with Lynn in terms of requests for, you know, funding or solutions to what next steps Lynn wanted to take in terms of the management of the entity.

Q   And I -- I think you said you don't know when they met -- when they met with Lynn.

I'm asking a slightly different question.  So this, as I understand it, is a draft of an e-mail that was going to be sent to her.

Do you know, sitting here today, one way or the other whether or not any version of this e-mail was actually sent to Ms. Tilton?

A   I do not know what version of this might have been sent to Ms. Tilton.

Q   And do you know for certain, sitting here



today, whether or not any version of this was sent to Ms. Tilton?

A   I do not.

Q   And so you don't know for a fact whether or not -- assuming something was sent to Ms. Tilton, it might have been edited further after the document we looked at today?

MS. ODENTHAL:  Object to form.

THE WITNESS:  I think there is a high probability that the -- there was further editing before it was put to Lynn Tilton.

Q   BY MR. NADLER:  You can set that one aside.  I think.  Yeah.

If you could look at Exhibit 148.

MS. ODENTHAL:  What's the Bates?

Q   BY MR. NADLER:  Oh, sure.  Thank you.

It is TRUSTEE_AP 5917829.  It's an e-mail from you to Chen Zou on May 18th, 2016.

A   Uh-huh.  Yeah, got it.

Q   And do you recall being asked questions about this document earlier today?

A   I do.

Q   And do you recall being asked questions about the attachment to this document earlier today?

A   Yes.



Q    And the attachment to this document is a form with the heading "Funding Certificate" that has -- that is undated, correct?  It says May_2016?

A    Correct.

Q    And there is a signature block at the bottom of the page that says eMag Solutions by, underscore, name, colon, title, colon.

Do you see that, sir?

A    Yeah.

Q    Does that suggest to you that this was a draft document rather than an executed funding certificate?

MS. ODENTHAL:  Object to form.

THE WITNESS:  Yes, this was a -- this was a -- a -- a form to be completed and executed.

Q    BY MR. NADLER:  The same question as before.

Do you know, sitting here today, for a fact whether or not this -- a version of this funding certificate was actually executed and submitted?

A    I'm pretty sure it was.

Q    You say you are pretty sure.

As a fact under oath, do you recall that positively?

MS. ODENTHAL:  Object to form.

Q    BY MR. NADLER:  Or are you speculating?

MS. ODENTHAL:  Object to form.



THE WITNESS:  There were a few funding certificates that were executed by me in this process around this time frame, so there was a form of a fund certificate similar to this in the time frame that it was executed by me.

Q   BY MR. NADLER:  Understood.  But my question, again, is little bit different.

A   Uh-huh.

Q   Do you recall -- and I apologize.  I'm not trying to be tricky about this.  I understand that you recall there were funding certificates at times.

This draft has specific amounts on the last page with the account name Patriarch Partners Agency Services and another specific amount for Patriarch Partners Management Group, right?

A   Correct.

Q   You were asked questions about those specific supposed transactions.

Do you recall that?

MS. ODENTHAL:  Objection.  Misstates testimony.

THE WITNESS:  Yes.

Q   BY MR. NADLER:  Sitting here today, do you know for a fact whether or not you or anybody else ever executed a funding certificate for those specific transactions?



MS. ODENTHAL:  Object to form.

THE WITNESS:  In terms of -- I'm going to say -- you know, I'm going to say that I'm pretty confident that they were executed.  That the dollars amounts may have changed slightly from a process standpoint, but there were -- there were transactions that occurred.  You know, in that -- in that cycle.  Whether it was specifically -- because this is an unfilled draft without having the specific final dates and timing of what was executed, you know, I can't tell you if something else drifted by the time this settled out, because we were still in the I need information to be able to complete this.

Q   BY MR. NADLER:  And I think that's all I'm trying to establish.  And just so the record is clear, so you don't know if this exact document was executed in this form?

MS. ODENTHAL:  Object to the form.

THE WITNESS:  I don't know if this -- well, this exact document would not have been executed because it would have had other information filled in on it to be able to be completed.  Because it doesn't have the insert -- it's in a draft mode, so it is a structure of -- of to be completed, but it's the form and structure of what -- similar to what would ultimately have been

completed.

Q   BY MR. NADLER:  And you say "similar to," but possibly not identical?

MS. ODENTHAL:  Object to form.

THE WITNESS:  I would say absolutely not identical.

Q   BY MR. NADLER:  All right.  Thank you.

And going back if you could look at -- you are looking at the -- the cover e-mails.

Okay.  I'm going to hand you a document, so we can just continue with the same numbering.  I forgot what we were up to, 158.

MR. CAMPBELL:  It should be 158.

MR. NADLER:  This can be marked as Exhibit 158, please.

And I'll ask you to keep that one handy as well.

(Deposition Exhibit 158 was marked for identification.)

Q   BY MR. NADLER:  And for the record, Exhibit 158 is an e-mail from Mr. O'Shea to Chen Zou with several cc's, May 19, 2016, the Bates number is TRUSTEE_AP5917840.

Do you see that?

A   Yes.



Q   And if you go to the first page or the earliest e-mail in this chain of e-mails, do you recognize this as the same e-mail chain we were just looking at?

A   Yes.

Q   And so when you were being asked questions about this earlier today, did you recall that, in fact, there was more to this e-mail chain that you weren't shown at the time?

MS. ODENTHAL:  Object to form.

THE WITNESS:  Because the transaction was not complete, yeah, I would expect there would be more to -- to the e-mail trail, because the funding still had to be done.

Q   BY MR. NADLER:  Fair to say when you were asked questions about this -- or when you were asked questions about Exhibit 148 earlier today, you didn't recall exactly what the rest of the e-mail chain looked like?

MS. ODENTHAL:  Object to form.

THE WITNESS:  Yeah.  Sorry.  Rephrase that again.

Q   BY MR. NADLER:  Sure.

Earlier today you were asked questions about Exhibit 148, and I think we just -- you just confirmed a moment ago that Exhibit -- sorry -- was it 158 -- is a more complete version of that e-mail chain.



MS. ODENTHAL:  Object to the form.

Q  BY MR. NADLER:  My --

MS. ODENTHAL:  I'm sorry.

Q  BY MR. NADLER:  My question was, when we were looking at Exhibit 148 earlier, did you recall what the remainder of this e-mail chain actually contained or what it actually said?

A  You know at -- at the time that the -- that we were referring to that, no -- you know, I did not -- I did not recall the remainder of the e-mail chain; that is correct.

Q  And if you look, there's an e-mail from -- I apologize -- is it Mr. or Mrs. Zou?

A  I think it's -- I think it's Ms. Zou.

Q  Ms. Zou.

There's an e-mail from Ms. Zou at 9:10 a.m. on May 19th.  Do you see that?  It's the first e-mail that we didn't look at earlier.

A  Yep.

Q  And she writes to you, "I discussed your questions with our internal compliance team.  The language you referenced -- excuse me -- these languages you reference below are used for borrowing.  But as the borrowing is done already, the legal team will remove these language from the funding certificate."



        Do you see that?

   A    Yeah.

   Q    And so going back to some of my earlier questions, does that refresh your recollection that the funding certificate you were asked questions about was not the final form of the funding certificates that were actually used?

        MS. ODENTHAL:  Object to form.

        THE WITNESS:  Yeah, so again, that's following the trail of, again, why I questioned the amount of disclosure and then -- you know, revised certificate and then funding here.  And then there's my subsequent question in terms of if it's -- you know, that if it was borrowed in full, what was the purpose of the paragraph? Fully drawn amount, you know, and so then this is -- yeah, it was revised.  This funding versus borrowing certificate.

   Q    BY MR. NADLER:  And I'm not sure if you answered the question I actually asked.  I apologize. But so I'll just reask it.

        And so does this remind you that the funding certificate you looked at earlier as part of Exhibit 148 was not the final form of the funding certificates that were actually used?

        MS. ODENTHAL:  Object to form.



THE WITNESS:  Correct, for this -- for this transaction, this was -- for this -- for this transaction of funds received by eMag, this was the -- the form involved from what it was originally proposed to what it finally became.

Q   BY MR. NADLER:  And after Ms. Zou told you that, or wrote to you, that some of this language is used for borrowing but the borrowing is done already, you write back to her on Thursday, May 19th, 10:16 a.m., "That makes much more sense since you have said that the full amount was already borrowed on DDTLD, their certificate format did not make sense."

Do you see that?

A   Yep.

Q   And sitting here today, any reason to doubt that the amount had been borrowed prior to this date?

MS. ODENTHAL:  Object to form.

THE WITNESS:  There would be no reason to doubt the amount had already been -- been borrowed.  Just in case we're -- you know, the -- yeah, you know, part of the -- trying to file documents line up with what -- line up with the transaction that is taking place.

Q   BY MR. NADLER:  And you can set those both aside.

If you could pull out Exhibit 149.  For the



record, this was TRUSTEE_AP 5928479.  The top e-mail here is an e-mail from Chen Zou to Sean O'Shea with several people cc'd on June 7th, 2016.

Do you have that document, sir?

A   I do.

Q   And do you recall earlier today you were asked -- well, withdrawn.

If you could look to the page ending in Bates number 481, and let me know when you are there.

A   Yeah.

Q   And here, this is an e-mail from you to Ms. Zou kind of raising questions about various transactions that occurred in February of 2016.  Do you see that?

A   Yep.

MS. ODENTHAL:  Object to form.  Sorry.

Q   BY MR. NADLER:  And do you recall being asked questions about those transactions and this correspondence earlier today?

A   Yes.

Q   And just to be clear, all of these transactions being addressed here on February 11th, February 5th, February 26th, and then February 5th again, that was all before you started at eMag, right?

A   That is correct.

Q   If you could turn to the front of this



document -- or excuse me -- the first page of this document, the one ending in Bates number 479.

A    Uh-huh.

Q    And there's a discussion here about borrowing or -- I apologize; I'm just trying to see -- see what the language of the document is -- a request for 1 -- 1,394,000 in funding.

Do you recall being asked about that amount earlier today?

A    Yes.

Q    And you were asked a couple of questions about how it could be that there was funding in the amount of approximately 1.4 million if, according to the last page of this document, the amount outstanding under Delayed Draw Term Loan C was only 709,000.  Do you see that?

MS. ODENTHAL:  Object to form.

THE WITNESS:  Yep, that's the question that I'm asking Chen in this e-mail.

Q    BY MR. NADLER:  Well, where in the e-mail does it say that the entirety of the 1.4 million was borrowed on the Delayed Draw Term Loan C as opposed to any of the other facilities or some combination of facilities?

A    So --

MS. ODENTHAL:  Object to form.

THE WITNESS:  -- what I note here is I say that



additionally in the exhibit, the credit agreement only shows commitments and outstandings; in the case of DDTLC, of a 709,000 commitment and a 708,000 outstanding.

If I then skip down to the second -- two paragraphs down, it says:  The remainder of the amount of the 1.394 million between those proceeds received by eMag Solutions, LLC and the borrowings -- on the borrowings on the DDTLC statement you attach that shows a balance of 2.117.  There has to be an executed request for this funding to have occurred to have been added to the outstanding balance.

So in -- somewhere in this structure of the back-and-forth, she gave me a schedule that had a balance of the 2.117 in it.  Otherwise, I would not have referenced it.

Q   BY MR. NADLER:  Well --

A   And that was the point that caused me to say the math -- it doesn't math.  Where is the 1.394 million?

Q   And I apologize for speaking over you.  I thought you were done.

A   Yeah.

Q   So I see the -- the language you are referring to here.  We haven't seen today what the -- the statement that Ms. Zou attached, correct?

A   Correct.



MS. ODENTHAL:  Object to form.

Q   BY MR. NADLER:  And so when you say -- when you testified a moment ago as to kind of the context of this e-mail, you're inferring that to be the case from the face of the e-mail, right?

MS. ODENTHAL:  Object to form.

THE WITNESS:  Right.

Q   BY MR. NADLER:  Do you specifically remember receiving an attachment that said that 1.4 million dollars had been drawn down on --

A   In the trail on April 11th, it says, "Please see attached file for 01" -- "018-08 DDTLC."

Q   I'm sorry, where are you?

A   I'm on the AP 5928482.  At the top, April 11th, 5:23 p.m.

Q   Yes.  No, I -- I see that, but we haven't looked at whatever document was attached.

A   Right.  What I am saying is that --

MS. ODENTHAL:  Object to form.

THE WITNESS:  -- that attachment would have been the support, which is what I was questioning why it had 2.117 versus the 7.09 that was included on the amendment.

Q   BY MR. NADLER:  I apologize for speaking over you.



MS. ODENTHAL:  Counsel, will you be producing that document?

MR. NADLER:  Well, you produced this document, and so I don't know if the Trustee has this e-mail chain or not, but you produced this entire e-mail chain that we're looking at here.  And so Mr. --

MS. ODENTHAL:  Patriarch Partners is --

MR. NADLER:  We can discuss this offline, but I'd appreciate it if you --

MR. CAMPBELL:  We'd like to get the -- we'd like to get the request on the record, please.  Go ahead.

MR. NADLER:  And we'll take it under advisement.  But again, this was a document produced by you, not us.  And so --

MR. CAMPBELL:  But the one that you are asking the witness about here, the April 11th, 5:23 p.m. e-mail from Chen Zou to Sean O'Shea, the one that you are asking about and you're noting the absence of that attachment, we -- we do not have that document.  You have that document, and we are asking if you will be producing it.

MR. NADLER:  I don't know whether we have it or not, but considering the -- that Quinn Emanuel produced, I believe, a terabyte of data from the portfolio companies, and this was an e-mail sent to Mr. Shea's eMag e-mail address, it's just as likely you have it as we do.



And so again, we can take your request under advisement, but again, you've produced voluminous materials from the portfolio company, so I presume you have this document and didn't just show it to the witness today.

And so going back to my question --

MR. CAMPBELL:  For the record, you presume incorrectly.  We would like to see that document.

MR. NADLER:  As would I, and perhaps the witness would.

Q   BY MR. NADLER:  And going back to my questioning, Mr. O'Shea, you don't know what this document actually says, does it?

MS. ODENTHAL:  Object to form.

Q   BY MR. NADLER:  Excuse me.  Let me rephrase the question.

A   I'm going to say, I don't -- I don't remember what the document actually says because again the -- the -- but the -- when you are saying the structure of my response would indicate that I had an anomaly between one statement that had been provided versus the amendment that was provided, and I was trying to reconcile the difference because they did not agree.

Q   Understood as to the inference you are drawing.

My only point is you are drawing an inference



based on seeing this e-mail chain from seven years ago, sitting here today, right?

MS. ODENTHAL:  Object to form.

Q   BY MR. NADLER:  The answer to my question, sir?

A   Yes, I am -- I am on the -- based on -- based on the e-mail chain and the flow of the information that is provided or referenced in the e-mail chain.

Q   And with -- setting inferences aside, do you have any specific memory as to a document that you saw that reflected that 1.4 million dollars had been drawn down on DDTLC?

MS. ODENTHAL:  Object to form.

THE WITNESS:  Well, I -- I never -- so --

Q   BY MR. NADLER:  Let me rephrase the question. I can withdraw the question.

A   I never saw anything that actually showed the 1.4 million drawdown.  That was the problem, that I didn't see how we got from 709 to 2.177.

Q   All right.  Well, let me reframe the question a little bit.

You don't remember what this missing attachment we're fighting about said, do you?

A   I would say I do not -- I do not remember what -- you know, a lot of -- just like this here, I'm not going to remember the form of this (indicating) of



this structure that was on 158 in terms of the actual agency fees that were accrued until I had seen it.

Q   Understood.  And this isn't meant to be a memory test.

A   So memory test -- I don't remember exactly what was on the -- on the attachment, you know, but the -- the -- the flow of the -- of the structure of -- of this dialogue, you know, indicates to me that that structure would have had 2.117 on it as the DDTLC amount because there is no other reason I would have been arguing with Chen on it.

Q   Yeah, I can --

A   Yeah.

Q   Again, I completely understand the inference you are making.

A   But I -- I don't recall the specific structure and nature of the document.

Q   All right.  Thank you.  That was -- that was all I was trying to establish.

If you could go to Exhibit 152.

MS. ODENTHAL:  What's the Bates on that?

Q   BY MR. NADLER:  It is TRUSTEE_AP 5913319.  It's an e-mail from Mr. O'Shea to John McIlwaine and Jean Luc Pelissier -- If I pronounced either of those correctly -- on September 16, 2016.



Do you have that document, sir?

A   I do.

Q   And do you recall being asked questions about this document as well?

A   Yes.

Q   And Mr. McIlwaine in his September 16th e-mail, the fourth bullet point -- well, let me take a step back.

The subject of Mr. McIlwaine's e-mail is "Draft Writeup For Lynn," correct?

A   Correct.

Q   I assume "Lynn" is Lynn Tilton, as far as you are aware?

A   That is correct.

Q   And the fourth bullet here says, "eMag has currently dollar sign XXXXX availability held at PPAS on behalf of the company and under the control of the board."

Do you see that?

A   Yes.

Q   And you then write back, "As of 9/16, approximate 1.4 million of cash held by PPAS on behalf of eMag."

Do you see that?

A   Yes.

Q   And so you're responding to Mr. McIlwaine's



e-mail plugging in the right number for the amount of what he includes as several X's, right?

A    Correct.

Q    And so you are saying that that is the availability held at PPAS on behalf of the company and under the control of the board, right?

MS. ODENTHAL:  Object to form.

THE WITNESS:  Correct.

Q    BY MR. NADLER:  And we discussed this a little bit earlier, but again "the board" there refers to Ms. Tilton?

MS. ODENTHAL:  Object to form.

THE WITNESS:  Yes.

Q    BY MR. NADLER:  And if the board provided authorization, that money or some subset of that money would be transferred to eMag for its use, correct?

MS. ODENTHAL:  Object to form.

THE WITNESS:  Correct.

Q    BY MR. NADLER:  Okay.  And so that was something that you as CFO or Mr. McIlwaine as CEO could have requested of the board, correct?

MS. ODENTHAL:  Object to form.

THE WITNESS:  Yes, you could always -- you could -- you can ask for anything.  Whether it gets approved or not is a different matter, yes.



Q   BY MR. NADLER:  Understood.

But the company's officers could at any time have made a request to the company's board asking for the money held at PPAS on behalf of the company, correct?

MS. ODENTHAL:  Object to form.

THE WITNESS:  At any time, yes.

Q   BY MR. NADLER:  You can set that aside.

If you would look at Exhibit 153.  It's TRUSTEE_AP 5916106.  This is an e-mail from Arriann Mathurin to Jean Luc Pelissier and Chen Zou cc'ing financial and investment law.

And, Mr. O'Shea, you do not appear on this e-mail.  Do you have that document, sir?

A   I do.

Q   Do you recall being asked questions about this document and the attachment to this document?

A   I do.

Q   And you were asked whether or not the attachment, this interest waiver, whether or not that was ever sent to you, and you testified, "I don't think I ever saw the actual notice of waiver."

MS. ODENTHAL:  Object to form.

Q   BY MR. NADLER:  When you said you don't think you ever saw it, is it possible you saw it at the time and just don't remember it eight years later?



A   It's --

MS. ODENTHAL:  Object to form.

THE WITNESS:  -- possible that there is a copy in my e-mail and is a part of, you know, the process of all of the -- I'm going to call it the restructuring or periods of cash that that was part of what we went through.  It's just that was -- there was a lot of churn on the debt statement, and it was interesting to keep up with.  So I -- you know, I -- I'm not sure if I finally had a copy of that final form without, I'm going to say diving further into, you know, the history of e-mails of where things finally settled out.

Q   BY MR. NADLER:  All right.  And so just to be clear, it's possible you have it.  You are just not sure one way or the other?

A   It is possible, yes.

Q   All right.  You can set that one aside.

If you take out Exhibit 154.  This is Bates number PPAS-SDNY-00050935.  It's an e-mail from Renee Dudley to Sean O'Shea and others on April 4th, 2016.

Do you have that document, sir?

A   I do.

Q   If you could go to the page ending Bates number 50943, and let me know when you are there.

A   I am there.

ESQUIRE
DEPOSITION SOLUTIONS

Q   And do you recall being asked questions about this document and why it reflects no interest past due on facility 018-09 Delayed Draw Term Loan D?

MS. ODENTHAL:  Object to form.

THE WITNESS:  I remember asking in terms of interest owed, not in terms of past due or current due.

Q   BY MR. NADLER:  Do you remember testifying about this document that it reflected that there was no interest due as of April 2016?

A   Well --

MS. ODENTHAL:  Object to form.

Q   BY MR. NADLER:  No interest past due.

A   I -- I recall, I guess, we were talking about that there was total interest due.  I don't know if we cited on terms of past due according to the statement. But the statement does reflect that there is no past due amount cited on the statement.

Q   If you could go to the next page of the document.  Do you see it says -- it's this page is -- and just for the record ending in 944, it's a continuation of the invoice for the same facility Delayed Draw Term Loan D?

A   Uh-huh.  Yes.

Q   And the facility activity is described as the principal of that -- of that delayed draw term loan, the



principal increasing on those dates.

Do you see that?

A   Yes.

Q   And it increases by roughly $530,000, give or take?

A   515, but yeah.

Q   And that's why you were CFO and I'm a lawyer.

Do you have any recollection of why the interest -- or excuse me -- why the principal was increased at this time?

MS. ODENTHAL:  Object to form.

THE WITNESS:  The -- in terms of the -- the increase on 3/3/2016, so that, you know, predates me. You know, other than, you know, a draw taking place under when Tre Sasser was CFO would be the most likely thought was there, but without seeing the actual, you know, documentation and transactions, I cannot specifically tell you what was the source of the principal increase.

Q   BY MR. NADLER:  And relatedly, the page we were looking at a minute ago reflecting a past due of zero, that -- so let me take a step back and withdraw that.

So this invoice is dated April 1, 2016, right?

A   Correct.

Q   You had been on the job for about a week?

A   Correct.



Q   And any transactions reflected on this invoice were undertaken under your predecessor, maybe several predecessors?

MS. ODENTHAL:  Object to form.

THE WITNESS:  Well, the -- probably under my -- under my predecessor and then, of course, the actions, what accrues from a timing standpoint, you know.

Q   BY MR. NADLER:  You mean the current due?

A   During tenure, you know, of the -- of the one week, but yeah.

Q   So meaning of the current due here of, you know, $1,200, probably a quarter of that accrued on your watch is what you are saying?

A   Yeah, and the -- of the -- again, depending on, you know, the tranches and -- and funding, you know, in terms of, you know, what was current versus past due, the interest application, that was, you know, billed and invoiced and paid was, you know, determined and set by, you know, Patriarch Partners, the amalgamation of partners and services and management, so these were provided as to be paid in this form and applied accordingly.

We didn't have a discretion of this is getting applied against this.  It was like remit this cash, and this is the way it's going to be applied.



Q   Understood.

But I think just to be clear, you don't have personal knowledge of the transactions underlying this invoice.  That happened before you joined the company, right?

MS. ODENTHAL:  Object to form.

THE WITNESS:  Only -- only to the extent that, you know, that it's reflected -- was reflected in the cash that I was trying to audit and reconcile for determining what the balance of debt was relative to the executed documents.

Q   BY MR. NADLER:  Okay.  And on that note, you mentioned, you know, I think you used the phrase that it was a slog to reconcile it.  You used a couple other phrases.  It took a lot of effort to reconcile it.  Fair to say?

A   Yes.

Q   And I think you said that you -- your recollection is ultimately it was reconciled or you would have been out the door even sooner, right?

MS. ODENTHAL:  Objection.  Misstates testimony.

THE WITNESS:  My -- the -- the -- ultimately the numbers tied out to the, you know, final executed, you know, documents that was -- I think it was ultimately tied out, you know, but it was -- it was an extended



effort to find everything to make that line up.  And I'm not sure if we had any follow-on amendments that were the things to make that all line up when it was done, if there was anything that was out of place.

Q   BY MR. NADLER:  Okay.  During your testimony, I believe you said that management was stretched pretty thin.

You know, the -- how many CEOs were there during your tenure at eMag?

A   Five.

Q   Do you know how many CEOs there had been in the preceding five years, ballpark?  If -- you know, you don't need the exact number, if you don't have it handy.

A   About four or five.

Q   What about CFOs prior to you in the same five-year period?

A   Didn't so much track the -- encounter the other CFOs, so I was aware of Tre Sasser prior to that, and then, you know, my tenure.

Q   And you don't know how long Mr. or Mrs. Sasser was there?

A   Mr. Sasser.  No, I don't -- it's -- you know, a couple of years comes to mind, but that's -- I can't be specific on that.

Q   You are not sure?



A    I'm not sure.

Q    Okay.  If you could look at Exhibit 157.  This is PATRIARCH-BK-0000806.  It is eMag's 2016 consolidated financial statements.

Do you have that document, sir?

A    I do.

MS. ODENTHAL:  Can I -- I'm sorry.  Our -- our realtime is about to die.  Do we have a charger?

(Off-the-record discussion.)

Q    BY MR. NADLER:  You testified earlier this document postdates your tenure at eMag, right?

A    Correct.

Q    And going back to the discussion we were just having a moment ago of the effort it took to track down all the documents -- all the documentation for the financial statements to be reconciled, is that something that Frazier & Deeter, the accounting firm that provided this independent audits report, would they have looked at that documentation?

Speculation; Foundation

MS. ODENTHAL:  Object to form.

THE WITNESS:  They would have looked at a form of a reconciliation of the -- of the debt, and as I completed in December, I think I had two or three, four weeks of contract work that I did to help finish off some schedules to have them some foundation that we used for

Speculation; Foundation



SEAN O'SHEA  Confidential                              June 27, 2023
PATRIARCH PARTNERS V. ZOHAR CDO 2003-1                          140

the audit, but whether that particular schedule was used in the audit or not, don't know, but there was at least something that was done to help bring that together and home so they would have a foundation for being able to provide the audit.

Speculation; Foundation

Q    BY MR. NADLER:  And if they didn't have what they viewed as necessary documentation for their audit, they wouldn't have signed off on the audit presumably, right?

MS. ODENTHAL:  Object to form.

THE WITNESS:  I think you would have probably, the opinion probably would have been different.  They would have signed off on it, but I think they would have in terms of -- I think there would have been a different opinion, if there was -- if things didn't line up on the financials.

Speculation; Foundation

Q    BY MR. NADLER:  And speaking of that opinion, that's on page 2 -- or excuse me -- the page ending in Bates number 809; is that right?

A    Yeah, pages -- well, pages 1 and 2 form the opinion.

Q    Well, there's the -- if you look at page 809, it says "Opinion" in bold in italics?

A    Yep.

Q    And under that it reads, "In our opinion, based



on our audits and the report of the other auditors, the
consolidated financial statements refer to above present
fairly in all material respects the financial position of
eMag Solutions LLC and subsidiary as of December 31,
2016," and then it goes on from there.

Speculation;
Foundation

Do you see that?

A    Yes.

Q    And do you have any reason to doubt that
opinion?

MS. ODENTHAL:  Object to form.

THE WITNESS:  I wouldn't have any reason to,
you know, to doubt the opinion of the -- of the auditor.
I would presume that they did their audit in accordance
with standards, as would happen with any CPA firm would
be able to put their name on the opinion.

Speculation;
Foundation

Q    BY MR. NADLER:  And they have professional
obligations to do the audit properly, I presume?

MS. ODENTHAL:  Object to form.

THE WITNESS:  Right.  Ultimately, you know, the
other component of the opinion is that management is
responsible for the preparation for the presentation of
the consolidated financial statements.  So while the

Speculation;
Foundation

auditors are saying they think it presents fairly, it is
ultimately management's responsibility for the
presentation of the financial information, as in the case



of any audit.

Q   BY MR. NADLER:   "Management" meaning the CEO and CFO and all the other officers of the company?

Speculation; Foundation

MS. ODENTHAL:  Object to form.

THE WITNESS:  Correct.

Q   BY MR. NADLER:  And preparing the materials that were submitted to the auditors was part of what you were doing when you are were trying to compile all the documentation?

Speculation; Foundation

MS. ODENTHAL:  Object to form.

THE WITNESS:  Right.  There was the part of the covenants of the debt was that you had to have an audit. I believe that there was a waiver that was made to waive the 2015 audit under the -- under the debt covenants, but then they had to have one for 2016, so there was, you know, an effort made to have things prepared so that there could be an audit for 2016.

Speculation; Foundation

Q   BY MR. NADLER:  Understood.  And my question was part of that effort was part of what we've talked about with your efforts to -- to document and find documentation?

A   To have numbers to audit, yes.

Q   Yeah.  All right.  That's all I was saying.

A   Yeah.

Q   I have nothing further.  Thank you.



FURTHER EXAMINATION

BY MS. ODENTHAL:

Q   I just have a couple of further questions.

When you interacted with Patriarch personnel who helped facilitate managing the company, did you have an understanding as to whether they were assisting Lynn Tilton in her capacity on the board of eMag or her capacity as the manager of PPAS or the manager of PPMG or the manager of any other Patriarch entity?

A   It was -- it was never defined in terms of which entity any of the actions were taken from.  It was Patriarch as one whole blob as opposed to this agency, that agency, this agency.  The documentation that was signed on, obviously, stated individual agencies and payment, but the interaction in bulk was Patriarch as a whole.

Q   And was there differentiation between Lynn Tilton as a Patriarch entity and Lynn Tilton as on the board of eMag?

MR. NADLER:  Objection.  Vague.

THE WITNESS:  I would say in that context, there was items that were taken to Lynn in the context of a board request or board action versus, you know, just reporting to Lynn in that context versus other interactions where if she was having a Patriarch-wide



event that wasn't in the context of being there.  But most interactions with Lynn from eMag were in the context of her role as the board.

Q   BY MS. ODENTHAL:  And was that documented, or how did you reach that understanding?

A   It's really a function of the -- the management structure between how someone like Jean Luc would manage the portfolio up to Lynn and are reporting -- and we had, you know, reporting that we would send to Lynn and copy Jean Luc on weekly, you know, for what had to, you know, go out in terms of status on, you know, cash flow and position and, you know, weekly update.

Q   And did Chen -- Chen Zou support Lynn Tilton in the board capacity or in any other capacity?

A   I think Chen Zou worked on the -- like I say, the analyst side for the entity.  So it was in support of the board in that you had a manager like Jean Luc and, then, you had an analyst like Chen Zou.  And between those two, those were the consolidating information source to Lynn on, you know, the status of the company and, you know, presumably recommendations for decision.

Q   So you testified that you started on March 23rd, 2016?

A   Uh-huh.

Q   And when you started, were you required for the



role of CFO to familiarize yourself with transactions that happened before you started?

MR. NADLER:  Objection.  Vague.

THE WITNESS:  I was -- yeah, I -- the nature of the job is you have to -- we had to understand what the outstanding book and balance and operational, you know, procedures were.  So there was some familiarization in terms of the existing debts, settlement structures, payments, obligations, rules of authority, you know, within, like I say, the current operational context, you know.  EMag was a company that's had a long history and had a lot of transactional overhead that made for a long sorted story to how it got to where it was at the time.

So there was a lot of history that you had to unpack to understand the relevance of what you were dealing with from an ongoing obligation of dealing with settlements from previous leases that were, you know, avoided through court case, active people suing you for things, and then other structured settlements that had been put in place to keep vendors at bay.

Q   BY MS. ODENTHAL:  And were you required to sign off on financials based on transactions from before your tenure?

MR. NADLER:  Objection.  Vague.

THE WITNESS:  No, I didn't actually -- I'm



going to say sign off on any, you know -- we presented the financial information that we had in terms what you would call a sign-off relative to, like, a signature for an audit.  I did not do a signature for, like, a representation for an audit for a third party.

Q   BY MS. ODENTHAL:  But you prepared financials that would incorporate these prior transactions?

A   Yes, we would prepare, you know -- there's -- so -- there was ongoing financial reporting to the board to Lynn Tilton.  So that would have been -- yeah, that would have incorporated, you know, history and transactions and everything that had been incorporated that was in the systems at the time.

Q   You were asked about Exhibit 158.  If you could pull that up.  And if you'll turn to the page ending in 5917?

A   Hang on a minute.  I'm still looking for --

Q   Oh, sorry.  My apologies.

MR. NADLER:  I think it's that one right there.

THE WITNESS:  That was the one you --

MR. NADLER:  Correct.

THE WITNESS:  Yeah, so this is - it was a spare copy.  It's probably buried in here somewhere, but, yes, Exhibit 158, this is the TRUSTEE_AP 5917840.

Q   BY MS. ODENTHAL:  Yes.  That's correct.  So if



you'll turn to the page ending in 7842.

A    Uh-huh.

Q    And on May 19th, 2016, at 10:16, you e-mailed Chen Zou and said, since you have said that the full amount -- that full amount was already borrowed on DDTLD.

Do you see that?

A    Yes.

Q    And do you recall seeing any documentation supporting the drawdown of the loan facility?  Or were you simply told by Chen Zou?

MR. NADLER:  Objection to form.

THE WITNESS:  The -- this is a -- what was provided by Chen Zou in terms of the -- what they had as -- what they said were the records for the borrowing and the amounts.

Q    BY MS. ODENTHAL:  So you don't remember a specific document?

MR. NADLER:  Objection.  Misstates prior testimony.

THE WITNESS:  No, and I would have received -- I received, you know, in terms of the documents, it would have been a schedule.  It would have been e-mailed to me, and the -- in the thread of the things.  Let's see.

So yeah, I got the -- Chris came back.  I had questions in terms of the set, and then we came back to



the conclusion that it was funding versus borrowing.  So I got to say that was -- that was -- it was always a convoluted process.

MS. ODENTHAL:  Nothing further.

MR. NADLER:  I'm all set as well.

THE VIDEOGRAPHER:  Just a moment.  We're going off the record.  The time is now 6:00 p.m.  This concludes today's deposition.

(A short recess ensued.)

THE VIDEOGRAPHER:  We're back on the record. The time is 6:02 p.m.

Did you want a copy of the video?

MR. NADLER:  Yeah, that would be great for Gibson Dunn.  Thank you.

THE VIDEOGRAPHER:  And for -- you all have a standing order, I believe?

MS. ODENTHAL:  Yes, thank you.

MR. NADLER:  And one other thing for the record, the witness was shown several documents designated as confidential, so I would ask that the entire transcript be designated as confidential until the parties have had a chance to review it for confidentiality purposes.

MS. ODENTHAL:  Yeah.  Yes.  Sorry.

THE VIDEOGRAPHER:  We are going off the record.



The time is now 6:03 p.m.  This concludes the deposition.

THE REPORTER:  Did you need an expedited copy?

MR. NADLER:  Yeah, that would be great.

THE REPORTER:  They are getting it in a day.
Did you want it too?

MR. NADLER:  Sure.  Yeah.

(The deposition concluded at 6:03 p.m.)



CERTIFICATE OF REPORTER

STATE OF GEORGIA      )
                      )
COUNTY OF DEKALB      )

                I, Marcella Daughtry, a Certified Reporter in the State of Georgia and State of California, do hereby certify that the foregoing deposition was taken before me in the County of DeKalb, State of Georgia; that an oath or affirmation was duly administered to the witness, SEAN O'SHEA; that the questions propounded to the witness and the answers of the witness thereto were taken down by me in shorthand and thereafter reduced to typewriting; that the transcript is a full, true and accurate record of the proceeding, all done to the best of my skill and ability;

        The witness herein, SEAN O'SHEA, has requested signature.

        I FURTHER CERTIFY that I am in no way related to any of the parties nor am I in any way interested in the outcome hereof.

        IN WITNESS WHEREOF, I have set my hand in my office in the County of DeKalb, State of Georgia, this 27th day of June, 2023.


_____
Marcella Daughtry, RPR, RMR
GA License No. 6595-1471-3597-5424
California CSR No. 14315



Patriarch Partners Agency v. Zohar CDO 2003-1, Ltd., et al.
J9796417

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the above-captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the_____day

of _____20__.


_____
SEAN O'SHEA



DEPOSITION ERRATA SHEET
J9796417

Page No.____Line No.____Change to:_____

_____

Page No.____Line No.____Change to:_____

_____

Page No.____Line No.____Change to:_____

_____

Page No.____Line No.____Change to:_____

_____

Page No.____Line No.____Change to:_____

_____

Page No.____Line No.____Change to:_____

_____

Page No.____Line No.____Change to:_____

_____

Page No.____Line No.____Change to:_____

_____

Page No.____Line No.____Change to:_____

_____

Page No.____Line No.____Change to:_____

SEAN O'SHEA

Signature:_____



DEPOSITION ERRATA SHEET

J9796417

Page No.____Line No.____Change to:_____

_____

Page No.____Line No.____Change to:_____

_____

Page No.____Line No.____Change to:_____

_____

Page No.____Line No.____Change to:_____

_____

Page No.____Line No.____Change to:_____

_____

Page No.____Line No.____Change to:_____

_____

Page No.____Line No.____Change to:_____

_____

Page No.____Line No.____Change to:_____

_____

Page No.____Line No.____Change to:_____

_____

Page No.____Line No.____Change to:_____

_____

Page No.____Line No.____Change to:_____

SEAN O'SHEA

Signature:_____



# Exhibit E

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK


PATRIARCH PARTNERS AGENCY

SERVICES, LLC,

Plaintiff-Counterclaim-Defendant

vs                          16 Civ. 4488 (VM)(KHP)

ZOHAR CDO 2003-1, OTD., ZOHAR

II 2005-1.LTD., AND ZOHAR, LTD.,

Defendants-Counterclaim-Plaintiffs,

and

ZOHAR CDO 2003-1, LLC, ZOHAR

2005-1, LTD., and ZOHAR III, LLC,

Defendants.

_____/

**Key**
PPAS Designation
Trust Designation

The Above-Captioned Video-Recorded Zoom Deposition of

DAN MARTIN

9:08 a.m. - 1:50 p.m.

June 28, 2023




REPORTED BY:

STEVEN POULAKOS, RPR

JOB NO:  J9792189



The above-captioned video-recorded deposition of DAN MARTIN was held via Zoom videoconference on Wednesday, June 28, 2023, commencing at 9:08 a.m., before Steven Poulakos, Notary Public.

REPORTED BY:  Steven Poulakos, RPR



APPEARANCES:

ON BEHALF OF THE PLAINTIFF, PATRIARCH PARTNERS

AGENCY SERVICES:

AKIVA SHAPIRO, ESQUIRE

ANTHONY CRUZ, ESQUIRE

Gibson Dunn

200 Park Avenue

New York, New York  10166

Telephone:  212.351.3830

Email:  ashapiro@gibsondunn.com


ON BEHALF OF LITIGATION TRUST A:

DESTINY ROSE MURPHY, ESQUIRE

BRIAN R. CAMPBELL, ESQUIRE

Quinn Emanuel Urquhart & Sullivan, LLP

51 Madison Avenue

22nd Floor

New York, New York  10010

Telephone:  212.849.7000

Email:  destinyrosemurphy@quinnemanuel.com




ALSO PRESENT:  BRIAN HOOD, THE VIDEOGRAPHER



INDEX

Deposition of DAN MARTIN

June 28, 2023

Examination by:                                          Page

Ms. Murphy                                                  7

Mr. Shapiro                                                99

Ms. Murphy                                                134


Exhibit No.                                            Marked

Exhibit 159    2015 audited financial statements        19

Exhibit 160    An email                                  22

Exhibit 161    An email with attached invoice            29

Exhibit 162    An email with an attached invoice         30

Exhibit 163    An email                                  31

Exhibit 164    An email with an attachment               35

Exhibit 165    An email                                  43

Exhibit 166    An email                                  45

Exhibit 167    An email chain                            48

Exhibit 168    A borrowing request                       52

Exhibit 169    A borrowing request                       52

Exhibit 170    An email chain                            70

Exhibit 171    An email chain                            73

Exhibit 172    An email chain                            76

Exhibit 173    An email with an attachment               81

Exhibit 174    An email chain                            85



Exhibit Index (Continued)

Exhibit No.                                       Marked

Exhibit 175    An email                              87

Exhibit 176    An email                              89

Exhibit 177    An email chain                       115

Exhibit 178    An email chain                       117


               PREVIOUSLY MARKED EXHIBITS

Exhibit 91     An email                              40

Exhibit 92     An email                              40

Exhibit 100    An email                              78

Exhibit 108    A borrowing certificate              95



800.211.DEPO (3376)
EsquireSolutions.com

P R O C E E D I N G S

- - -

THE VIDEOGRAPHER:  Good morning, counselors.  We are now on the record.  The time is approximately 9:08 a.m. eastern daylight time on June 28th, 2023.  This begins the video conference deposition of Dan Martin taken in the matter of Patriarch Partners Agency Services, LLC versus Zohar filed in the United States District Court for the Southern District of New York, Case Number 16-CV-448A VMKHP.

My name is Brian Hood.  I am your remote videographer today and the court reporter is Steven Poulakos.  We represent Esquire Deposition Solutions.

As a courtesy, will everyone who is not speaking please mute your audio and please remember to unmute when you're ready to speak.

Will everyone present please identify themselves for the record and state whom you represent after which time, the witness will be sworn in.  Thank you.

MS. MURPHY:  My name is Destiny Rose Murphy.  I'm from Quinn Emanuel Urquhart & Sullivan representing Litigation Trust A.  Also from QE this morning is Brian Campbell.



MR. SHAPIRO:  Good morning.  This is Akiva Shapiro from Gibson Dunn representing the plaintiff, Patriarch Partners Agency Services.

Whereupon,

DAN MARTIN,

called as a witness, having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION BY MS. MURPHY

Q        All right, Mr. Martin.  I think we're ready to start.  Can I have you just state your full name and your address for the record, please?

A        My full name is Danny K. Martin, but I go by Dan and I currently reside at 506 Ambelside Drive, Winterville, North Carolina.

Q        Wonderful.  Thank you.

I'm going to go over a few ground rules for our deposition today.  Obviously normally we'd be in the room for this kind of thing, but since we're not, I have to ask:  Are you alone in the room right now?

A     Yes.

Q        Wonderful.  And is your phone off and away?

A     It is.

Q        Great.  And I know we've got a number of screens in our lives, but have you done the best you



can to make sure no notifications will be going off?

A     Yes.

Q     Great.  Thank you.

Have you been deposed before, sir?

A     I have not.

Q     All right.  Well, the way this works is the court reporter will be taking down everything that you and I say.  So I ask that in response to questions, you give a verbal yes or no.  Sort of normal um-hmm or nod that we might use in common parlance tends to get not put on the record which can be troubling.

I'll also be asking you a series of questions today.  If at any point you don't understand a question or you want it to be clarified, let me know.  If you don't say anything, I'll presume you understood, but please feel free to ask me to restate or clarify if you have any kind of disclarity.

Please try not to speak over me even if you know where I'm going.  The court reporter can only hear one person at a time very well.  So let me finish my question and then you go right ahead.  It will be easier for the court reporter.

Feel free to let's take breaks when we need them.  I'll try to remember to put a break in every hour or so, but if you need a break for any reason



whatsoever, please just let me know.  I'll ask you to answer any pending questions, but then we'll be happy to take a break.

And lastly as you can see, there are lots of other lawyers on our Zoom today.  Mr. Shapiro might object to some of my questions.  So I ask that after I ask the question, don't immediately jump into your answer.  Give him the opportunity to put his objection on the record if he's got one and then you can go ahead and answer.  If he objects, it doesn't mean you can't answer.  It's just he's got to put it on the record.

Does that all sound good to you?

A     Okay.

Q     All right.  We're going to do that little procedural thing we said we were going to.

Have you -- are you aware that there is a confidentiality order in this case?

A     Yes, I received it.

Q     Great.  Did you review it?

A     I did.

Q     And do you agree to be bound by its terms?

A     Yes.

Q     Wonderful.  Thank you very much, sir.  All right.  Let's jump in.

Did you do anything to prepare for today's



deposition?

A      I did not.

Q      Fantastic.  Let's jump into your role.
What -- at what point were you employed by the company Croscill?

A      I was actually employed by Ex-Cell Home Fashions was my true employer, but we provided management services for Croscill through our administrative department.  We were asked to do that when the company was formed just as a part of creating synergy between two portfolio companies.

So even though I wasn't perform -- I mean, I wasn't employed by them, my office performed back office accounting and finance activities for Croscill.

Q      Understood.  Thank you.

When about did you start working on Croscill matters?

A      As soon as the company was formed, immediately.

Q      Did you ever have a title there or was it just a title at Ex-Cell?

A      If I remember correctly, and it has been a few years, I think there was actually -- the titles that we had for Ex-Cell were also the same titles for Croscill.



Q    Gotcha.  So what was your title at Ex-Cell?

A    At the very beginning, it was -- I think in 2008, it was controller, but then later I think in 2010, it became vice president of finance.

Q    Understood.  When did you leave this group of companies?

A    In October of 2018.

Q    Gotcha.  Did -- what were all of the companies included in that list?  You've said Ex-Cell.  You've said Croscill.  Were there any others?

MR. SHAPIRO:  Objection, vague.

Go ahead.  You can go ahead.

THE WITNESS:  Okay.  The -- the -- towards the latter part of my tenure there, we were asked to help with the final -- I don't guess final, but help with another portfolio company.  I'm trying to remember the name of it.  But it -- but it just eludes me.  I can't remember the name, but there was a small portfolio company that all of their employees had left and we were asked to also help manage those -- that company.

BY MS. MURPHY:

Q    Is it possible that company was called Acme?

A    It was.  That's it.



Q    Great.  Were there any other companies that you had responsibilities for at this time?  Sorry, sir.  Can you hear me?

MS. MURPHY:  I'm not able to hear Mr. Martin.

THE WITNESS:  Can you hear me now?

BY MS. MURPHY:

Q    Oh, yes I can.  Were there any other companies that you had responsibilities for around this time?

MR. SHAPIRO:  Vague.

THE WITNESS:  Other than the -- I mean, and the Ex-Cell was a group of companies, but Ex-Cell, Croscill and then Acme.  I think that was all of them.

BY MS. MURPHY:

Q    And Ex-Cell, do you know what companies were included in that group?

A    It would have been Ex-Cell Home Fashions, Inc. and then its parent company was Glenoit Corporation I believe was the name and Glenoit Universal Limited was the ultimate parent company.

Q    Gotcha.  Can you --

A    And there was some foreign -- some foreign subsidiaries.

Q    Understood.  Can you talk a little bit what



about your responsibilities were at Croscill?  What did you do for Croscill?

A        Well, as the vice president of finance, my responsibilities were the supervision of all the finance activities, the personnel that performed all financial activities, bookkeeping, recordkeeping, administration, commercial banking, lending relationships, legal relationships, all of that, just, you know, the full administration of the, you know, of the company, working -- working with the CEO and -- and of course with the portfolio people.

Q       That's quite a lot.  Did you have similar responsibilities for Acme?  What were your responsibilities there?

A        Acme was a little -- was a little different simply because when we tried to -- to gather the information on that, we had to, you know, work with the previous employees of them.  And we finally were able to come up with a set of financial records, but it -- it never was that same kind of -- because they weren't an operating entity.

It was really simply keeping that final set of records and helping with maybe filing some final tax returns and some final benefit plan returns and things like that, but there were no current operations at that



point.

Q      Understood.  So Acme was doing no business by the time you helped them?

A      To my knowledge, I think that's correct.

Q      Gotcha.  Do you remember when you started helping with Acme, around what time?

A      I really do not have a date -- date frame on that.

Q      That's no problem.  I appreciate it.  All right.  So you mentioned that as part of your responsibilities with Croscill, you interacted with I think you called them the portfolio manager people. I'd like to ask you about some of the people you worked with.  When you interacted with people from Patriarch Partners, do you remember who you interacted with?

A      There was always a -- I guess a credit -- head credit or portfolio manager.  You know, for many -- for a long period of time, my primary contact I think was a gentleman named Vincent Devito and there were times when maybe for -- I would deal, you know, via email with other people in the Patriarch organization, some of the people that weren't, you know, in their accounting and their loan -- loan departments.

Q      So how did you interact with Vincent



Devito?

A    I guess he acted or the way that I viewed that at that point was he was kind of my contact at Patriarch if I had questions or -- and we would be submitting our -- you know, through our loan agreements, we would have to submit requests for borrowings through his office.

Q    Gotcha.  And you understood him to work for Patriarch Partners; is that correct?  I just want to distinguish.  There's a lot of -- lot of companies.

A    You know, I actually don't know if he was employed by Patriarch Partners or by Patriarch Partners Agency Services.  I really don't know which one he was employed by.

Q    Just so you know, I might call Patriarch Partners Agency Services PPAS if that's okay with you.

A    Absolutely.

Q    Did you also work with someone named -- I might say this wrong -- I believe it's Pankaj Amin?

A    I honestly can't remember that name.  If it would -- if I did, it would have had to have been on a very limited basis or I think I would remember, but I don't remember that.

Q    Understood.  What about someone named Lynn Tilton?



A    Well, Lynn, of course was the manager I guess for Croscill.  Very limited.  If I did interact with Lynn, it would have been maybe on a few conference calls over the entire term of my dealing with Croscill, but very little direct contact.

Q    Gotcha.  Did you interact with anyone from PPMG which is I believe Patriarch Partners Management?

A    I guess my answer would be it is possible if maybe the management group had some attorneys or anything that we had to deal with for any, you know, for any of our operations.

Q    But no specific people come to mind?

A    I don't have any specific people, but it has been a while ago.

Q    Yes, I understand.  I appreciate.  What about someone named Carlos Mercado?

A    My understanding he was the controller for Patriarch Partners and there were times that we had some communications, but it would have been -- it would have been pretty -- pretty minor and pretty rare.

Q    Understood.  And the same question.  Do you remember a Renee Dudley?

A    Renee was one of the people that I remember dealing with when we were trying to -- with our line of credit that we were managing and she was kind of -- I



think worked in their loan management group and she would help, you know, any time we had any questions, you know, making sure that our records and the Patriarch records were in balance.  We would work with Renee.

Q     Understood.  Well, great.  Thank you.

I'm going to shift questions a little bit and we're going to start talking about the details of some of these companies.  So you've already talked a little bit about the responsibilities that you had at Croscill.  It sounds like you were in charge of sort of helping them manage their loans and borrowing; is that correct?

A     I was responsible for making the borrowing request on a weekly basis or at other times when we, you know, when we needed operating capital.

Q     Gotcha.  Hold on one second.  I need to transfer a link over here.  There we go.  Do you remember what loan facilities Croscill had around 2016?

MR. SHAPIRO:  Vague.

Go ahead.

THE WITNESS:  I do remember that Croscill had a line of credit that was to be used for operations and that had been established from the very beginning of the Croscill, you know, entity that, you know, that



we would borrow against for operations.

BY MS. MURPHY:

Q        Was that line of credit a revolving loan?

A        It was a revolving loan.

Q        Great.  And did -- do you remember Croscill having any other loan facilities apart from the revolving?

A        If I remember correctly at some point, it was -- we were made aware that there was a kind of delayed draw term loan that was available and I believe that we ended up putting that in -- you know, the disclosure of that in our financial statements and our annual audit at some point.

Q        I see.  And anything apart from that? We've got a delayed term loan and a revolver.  Anything else?

A        Not that I remember.

Q        Okay.  I'd like to show you a document.

MS. MURPHY:  Brian, could you put up tab one, please?

BY MS. MURPHY:

Q        So the way we're going to be doing documents today is it will get shown on the screen and then also we'll have a copy put in the chat for you. So you're welcome to open it on your computer if you'd



like or you can just view on the screen, whatever is best.

A    Okay.

Q    Can you see the document now that's been dropped in?

A    I see a document in the chat, but it won't -- let me see if I can download a copy.

(Martin Exhibit 159 was marked for purposes of identification.)

BY MS. MURPHY:

Q    It looks like we've got it up on the screen now too.

A    Okay.  Let me get out of this.  Okay.  So that would have been the transmittal of the 2015 audit -- audited financial statements.

Q    Great.  I'm glad you can see it.

MS. MURPHY:  For the court reporter, we will mark this as Exhibit 159 at Bates stamp Trustee AP 1942942.

BY MS. MURPHY:

Q    So as can see, sir, this document is an email transmitting as you said the 2015 statements and then it's also got an attachment.

MS. MURPHY:  Brian, if I can ask you to scroll to the page labeled number 9 in the lower



right-hand corner.

BY MS. MURPHY:

Q    Mr. Martin, I'm going to ask you a question about this note 4 here.  So feel free to read all of note 4.  It should be visible on your screen and let me know when you're ready.

A    Okay.

(Reviewing document.)

Okay.

Q    Fantastic.  So as you can see, the last sentence of that sort of thick paragraph on the page mentions the 2.5 million delayed draw term.  I think that's the one you referred to earlier.  But the first sentence of this paragraph references a long-term debt in the amount of just under 24 million.  Do you remember that term loan, that large term loan?

A    I'm trying to remember if that was -- I can't say that I know the specifics unless -- I mean, if -- unless it was a note related to the establishment of the company originally.  That's the only thing I can think of.

Q    Gotcha.  Well, thank you.

MS. MURPHY:  Brian, would you scroll to the next page?

BY MS. MURPHY:



Q       I just want to confirm with you, sir.  Go ahead and read that first paragraph which is the continued portion of note 4 on debt.

A       (Reviewing document.)

Okay.

Q       You'll see the first sentence says the loan agreement above also provides the company with a $10 million working capital revolving line of credit from an affiliate of the member.  And then later on in the paragraph, it writes in March 2016, the entire unused balance of the working capital revolving line of credit was drawn down by an affiliate member.

Does that -- is that your recollection of the revolving credit?  Do you think that you were remembering this 10 million?

A       It is, yes, ma'am.

Q       Great.  Thank you.

I am going to -- oh, so you said that the 10 million there was used for sort of day-to-day funding.  Do you remember, what did Croscill use this delayed draw term loan for, this 2.5?

MR. SHAPIRO:  Objection, form.

Go ahead.

THE WITNESS:  I do not have any -- any knowledge of that.



BY MS. MURPHY:

Q     Okay.

MS. MURPHY:  Brian, you can go ahead and take down that exhibit.  I think we'll move in.

BY MS. MURPHY:

Q     So let's talk about -- you said that you were responsible for making the borrowing requests for Croscill.  Let's talk about that.  How did you initiate a borrowing request for Croscill say in January of 2016?

A     I would have had to submit a -- an email with -- with the request.  And if I remember correctly, the request, you know, had to have certain information in it that -- that was required by PPAS I think is who I had to make the request to because if I understand correctly, they were the agent that administered the revolving line of credit, so -- and there were various -- at one point, I know -- and I'm not sure if that was in 2016, but we were -- you know, we would have to say if -- if our request was within our cash flow forecast and some questions like that.

Q     Great.  Let's look at an example of that.

MS. MURPHY:  Brian, would you put up tab 4, please?

(Martin Exhibit 160 was marked for purposes



of identification.)

MS. MURPHY:  And it's also in the chat for everybody.  For the court reporter, I believe our last exhibit number was 159; is that correct?  I think this one will be Exhibit 160.

THE COURT REPORTER:  Yes.

MS. MURPHY:  Oh, fantastic.  And that's Bates Trustee_AP1944101.

BY MS. MURPHY:

Q     So, Mr. Martin, is this email an example of the kind of email you were just talking about, a borrowing request from Croscill?

A     Yes, ma'am.

Q     Great.  And I'd like to ask you some questions about what's going on here.  So this information that you provided, it looks like there's three questions, is the company's current loan balance in line with the original budget, is it in line with the historical 13 week cash forecast and was the balance forecasted for 13 weeks in line with the budget.  Was that the standard information that you would have to put in your borrowing requests?

A     Yes.

MS. MURPHY:  And, Brian, would you scroll to the attachment, please?



BY MS. MURPHY:

Q    As you can see, there's an attachment here titled form of borrowing certificate dated the same day.  Was it standard for you to attach a borrowing certificate with these requests?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  It was required.

BY MS. MURPHY:

Q    It was required.  Understood.  And it looks like this borrowing certificate includes some information like the amount that you're borrowing and the aggregate outstanding principal amount on the loan that you're borrowing from.  Was that information required to be transmitted as well?

A    Yes.

Q    Were your borrowing requests always submitted by email like this with an email with substantive information and an attached borrowing certificate?

A    Yes.

Q    Were there any other ways that you requested borrowing like over the phone or something like that?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  I do not believe so.



BY MS. MURPHY:

Q       And I see you signed this borrowing certificate, maybe E signed it down here at the bottom. Were there any other specific signatories for borrowing certificates or was it always you?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  I don't believe that there were anybody else that completed these, but I guess I did the majority of them or almost all of them.  I guess it could have been done by our CFO at one time maybe if he had to if I was away or something, but I think, you know, on a day-to-day basis, it was my responsibility.

BY MS. MURPHY:

Q       Gotcha.  What was that CFO's name, do you remember?

A       Well, we had several CFOs during the Croscill tenure, so I don't, you know, I don't know what time period, you know, that would be.

Q       No problem at all.

MS. MURPHY:  And then, Brian, could you scroll back up and let's look at the email again?

BY MS. MURPHY:

Q       The last sentence of this first paragraph here reads the purpose of the company's borrowing



800.211.DEPO (3376)
EsquireSolutions.com

request is primarily for $100,000 in inventory.  Can you talk about what Croscill usually used these funds for?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  I mean, inventory would have of course been the biggest, you know, item to use cash for for Croscill given that they imported the product that they sold.  And so we would, you know, be making wires to foreign vendors and those kind of things.  So the majority of it would be for -- for inventory.

BY MS. MURPHY:

Q     Understood.  Do you remember any other substantial things that you would use revolving funds or funds on other loans as well for?

A     Well, there would -- I mean, any kind of operating expenses of the company that needed to be paid would also have to be borrowed through the revolving line of credit.

Q     Understood.  After you sent this email, what happened?  What were the next steps before Croscill got the money it had requested?

A     From my standpoint, there would -- there would not have been any steps that I would have had to do.  I'm not sure what the steps were on the receiving end of this, you know, what their loan administration



had to go through to finalize it.

But if I remember correctly, we -- and I'm not even sure if -- I can't remember whether Patriarch Partners would have advised us that it was approved or whether they would just wire the money, you know, to our operating account and whether we just monitored that.  Just I can't remember offhand the answer to that question.

Q    That's okay.  That's very helpful.  So were these borrowing requests ever not approved?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  I really can't answer that question.  I can't remember whether we ever had a case where they denied it or not.

BY MS. MURPHY:

Q    Is it fair to say that right now today you do not remember a specific instance where a borrowing request was not approved?

A    That is correct.

Q    Thank you.

And then one last question on this exhibit.  This exhibit looks to me like it's a borrowing request against a loan.  Was -- were you ever -- before 2016, did Croscill have any cash that was being held at the agent that you were borrowing out of?



MR. SHAPIRO:  Objection, vague.

THE WITNESS:  I do not -- I do not remember and don't really know the answer to that.

BY MS. MURPHY:

Q     That's all right.

MS. MURPHY:  Brian, can we take down this exhibit for now?

BY MS. MURPHY:

Q     And then I'm going to transition over a little bit and ask you a few questions about Acme.  Do you remember what loan facilities Acme had access to when you became the person who was helping to take care of that company?

A     I don't remember the specifics of it, but I do know it was a little bit more complicated than the Croscill one as far as I think there were several different term loans that had different amounts.  But I think there were multiple loan tranches if I remember correctly, but I don't remember the specifics of each one.

But I do remember us trying to at the very beginning understand and get all those into balance and make sure that we had an understanding of -- you know, so that we could, you know, have them recorded in our general ledger and for the records.



Q    Understood.  You mentioned that Acme had a couple of different term loans.  Do you believe that Acme also had a revolver or was it just term loans?

A    I don't remember that, but if they did, I think it would have been -- I can't remember.

Q    That's all right.

MS. MURPHY:  Brian, could we put up tab 5?

(Martin Exhibit 161 was marked for purposes of identification.)

MS. MURPHY:  I believe this exhibit will be Number 161.  And it is at Bates PPASSDNY00049896.

BY MS. MURPHY:

Q    Mr. Martin, this is an email and then an attachment showing an invoice for Acme's loans, interest on Acme's loans.  Do you remember getting this kind of email?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  I can remember emails like this.

MS. MURPHY:  Brian, would you scroll to the first page of the attachment, please?

BY MS. MURPHY:

Q    So at least this invoice which was sent to the company in October of 2016 shows a revolving credit loan, a term loan and a delayed draw term called C.



MS. MURPHY:  And then, Brian, I'm sorry to do this to you.  Could you put up tab 6 next, please?

(Martin Exhibit 162 was marked for purposes of identification.)

MS. MURPHY:  That will be Exhibit 162, Bates PPASSDNY00050132.

BY MS. MURPHY:

Q     This is another invoice sent to you by Renee Dudley.  It's from August of 2016.  And if you scroll to the first page of the attachment, it reflects a delayed draw term loan called B.  Do you remember generally this being the loan setup for Acme?

Do you have any specific memory of these loans?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  I don't have specific memory of the loans, but I do recognize the statements as something that we would have received.

BY MS. MURPHY:

Q     Great.  Thank you.

So Acme's got all these loans.  Did you initiate borrowings for Acme on these loans?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  It's possible that we did. Again, Acme was a little different.  It didn't have



daily operations.  So I honestly can't remember if we were actually making these payments or not.

MS. MURPHY:  Brian, could you put up tab 7?

(Martin Exhibit 163 was marked for purposes of identification.)

MS. MURPHY:  I believe that's going to be Exhibit 163 at Bates Trustee_AP2177340.

BY MS. MURPHY:

Q        Mr. Martin, this is an email from you to Vincent Devito in June of 2016.  And it says Acme is requesting funding of $34,000 and -- $34,009 -- excuse me -- and 56 cents from its term loan DDTLB.  Do you recognize this form of email?

A        I do.

MS. MURPHY:  And, could we scroll down, Brian, to the attachment as well, please?

BY MS. MURPHY:

Q        We've got a funding certificate attached here which references this same request from the DDTLB. Do you remember sending these kinds of emails to request borrowings for Acme?

Relevance; Improper Counter

MR. SHAPIRO:  Objection, vague.

BY MS. MURPHY:

Q        And feel free to ask Brian to scroll if you'd like to see any other part.

Relevance; Improper Counter



THE WITNESS:  Yeah.  Just scroll -- please scroll down just a little bit.  Okay.  So I recognize the document.

MS. MURPHY:  Could we scroll up to the email, please, Brian?

Relevance; Improper Counter

BY MS. MURPHY:

Q     It sounds like you don't remember sending a lot of these borrowing requests; is that fair?

A     For Acme, that is correct.

Q     Do you remember if when you sent borrowings, this is generally how you did it for Acme?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  I would -- I would expect that -- I mean, my recollection is the borrow -- any borrowing request always followed the same form.

BY MS. MURPHY:

Relevance; Improper Counter

Q     Understood.  Did you send borrowing requests for other companies that you had responsibilities for like Ex-Cell and Glenoit?

A     They actually did not have a loan agreement.  We were -- actually handled their operations out of a factoring agreement.

Q     Gotcha.  So these types of requests you were only sending for Croscill and Acme; is that correct?



800.211.DEPO (3376)
EsquireSolutions.com

DAN MARTIN                                      June 28, 2023
PATRIARCH PARTNERS vs ZOHAR CDO 2003-1                33

A        Correct.

Relevance; Improper Counter

Q        And in general for Acme, you understood that you had to send an email with this kind of information and an attached borrowing certificate; is that correct?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  To my recollection, yes.

BY MS. MURPHY:

Q        Now, you've mentioned that you don't remember making a lot of borrowings for Acme.  Do you know what the borrowings for Acme would have been used for?

Relevance; Improper Counter

MR. SHAPIRO:  Objection, vague and misstates prior testimony.

THE WITNESS:  I really do not have specific remembrance of the specific borrowing.

Relevance; Improper Counter

MS. MURPHY:  That's okay.

Can we scroll please to the last page of this exhibit, Brian?

BY MS. MURPHY:

Q        We've got some details here that look like they are related to what this borrowing request is for.  It says payee number one is Croscill Home.  They're getting 17 grand for the California proposition 65 settlement is how I read that.  And payee number two is



it looks like LKP Global Law.  They're getting about $17,000 for legal.

Relevance; Improper Counter

Do you have any memory -- does this refresh your recollection at all about what Acme might make borrowings for?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  If I remember correctly, the reason that you would see the payee being Croscill Home, LLC is Acme did not actually have an operating -- we would use the Croscill Home operating cash account to write checks for Acme in certain cases and then we would get reimbursed for that.  That's the first one if my recollection is correct.

BY MS. MURPHY:

Q      Understood.  And what sorts of things would Acme need Croscill to write checks for?

Speculation

A      I honestly just can't -- I don't have a specific recollection of everything that it could be for.

Q      Do you have a specific recollection of any, just any examples?

A      Not specific items.

Q      Okay.  That's all right.

MS. MURPHY:  Brian, you can go ahead and take that tab down.



BY MS. MURPHY:

Q        I'm going to shift into -- I'm going to move away from asking you about these borrowing requests and ask you a little bit more about what some other responsibilities you had at Croscill.  Did you create cash flow forecasts for Croscill?

Relevance

A        We did.

Q        And what was in those cash flow forecasts?

A        It would -- it would show what -- we always had to have a 13 week forecast that would show what we expected our cash needs to be over the next 13 weeks.  And it would show the various expenditures that we expected to make and what our resulting revolving line of credit balance would be.

Q        And how did you put those together the cash flow forecasts?

A        It was done primarily through historical -- you know, using estimates based on historical data, what our expenses would be on a monthly, weekly basis and, you know, using just our best estimates of what they would be.

Q        Great.

MS. MURPHY:  Can we put up tab 8, please, Brian?

(Martin Exhibit 164 was marked for purposes



of identification.)

BY MS. MURPHY:

Q      I believe this will be Exhibit 164 at Bates Trustee_AP1876933.  Now, this exhibit is a little bit funky.  As you can see, the first page is an email and then this email has an attachment.  So if we scroll down, it has what we call a cover page that shows that the attachment has been produced as an Excel as you would expect.

And we can put the Excel spreadsheet in the chat if you'd like to look at it so that you can see it in the native, but I'm actually just going to ask you questions about the email here.  So you're welcome to look at the Excel if you'd like.  So do you recognize this kind of email?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  Yes.  It looks like a regular email that we would have sent with -- with the weekly forecasts.

BY MS. MURPHY:

Q      So is this the email in the cash flow forecast that we were talking about just a second ago?

A      Yes, ma'am.

Q      Now, I see that the last sentence here is the revolver availability on May 14th, 2016, is



2.5 million and 2.5 million was forecasted for the same week in the prior week's forecast.  Now, obviously this cash flow forecast was generated -- looks like the date of this email is February 22nd, 2016.  So is that availability from May 14th your forecast for how much Croscill intends to borrow in the next 13 weeks?

MR. SHAPIRO:  Objection, assumes facts not in evidence.

Go ahead.

THE WITNESS:  The -- the revolver -- say the question -- can you ask the question one more time?

BY MS. MURPHY:

Q    Absolutely.  Sorry.  That was a bit of a long one.  So we've got this revolver availability here at 2.5 million and that looks to me like it's projected from May 14th even though this was created in February of 2016.  Does that availability reflect how much Croscill intended to have available on its revolver due to the borrowings that Croscill intended to make in this period?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  All this is doing is this -- this is saying that we're issuing or that we issued a forecast in February that had to go out 13 weeks.  So at the end of the 13 weeks would be the 5/14 I'm sure.



And we're saying that on 5/14, the availability would -- that's what it would be in that forecast and that that's the same amount we forecasted the week before.

BY MS. MURPHY:

Q     Understood.  Thank you.  Please forgive my ignorance here.  I was not a business major, so I appreciate you walking me through it.

Were these kinds of cash flow forecasts generally accurate in your experience at Croscill?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  I think accurate is a subjective -- subjective term.  I think we did the best -- with the information that we had, we tried to put out the best forecast we could.

BY MS. MURPHY:

Q     I understand that and I appreciate.  My budget gets that way too sometimes.

Would you -- looking at this document which is from February 22nd of 2016, seeing that this projects a revolver availability of 2.5 million 13 weeks away, would you be surprised to learn that Croscill actually borrowed down its entire revolver within just a couple of weeks of this?

MR. SHAPIRO:  Objection, assumes facts not



800.211.DEPO (3376)
EsquireSolutions.com

in evidence and vague.

THE WITNESS:  My -- my recollection is that there was a draw down during some point in time of the revolver.

BY MS. MURPHY:

Q     I think then let's talk about that.  I'm going to skip forward a little bit.  Were you aware at the time that on February 26th of 2016, a borrowing was made for the full DDTLB facility for Croscill which was $2.5 million?

MR. SHAPIRO:  Objection, vague and making representations about facts that aren't in evidence.

THE WITNESS:  At some point, we were made aware of it, but I'm not sure at what point we were made aware of it.

BY MS. MURPHY:

Q     All right.  Now, I just asked you about the DDTLB.  Were you made aware at some point that the full revolver was drawn down on -- maybe on March 7th?

MR. SHAPIRO:  Objection, vague and again counsel's testifying.

THE WITNESS:  At some point, we were -- the -- Croscill was made aware that that did occur so that we could record it in the accounting records.

BY MS. MURPHY:



Q    Gotcha.  I'm going to show you a couple of emails that you're not on, so I'm not going to ask you to tell me what's going on, but I just want to show them to you.

MS. MURPHY:  Brian, could you put up tab 9 and maybe have on standby tab 10 so that we can look at both of them?

Court reporter, for the record, these are previously marked Exhibits 91 and 92.  So we don't need to mark them afresh.

(Martin Exhibit 91 was previously marked for purposes of identification.)

(Martin Exhibit 92 was previously marked for purposes of identification.)

MR. SHAPIRO:  I object.  As counsel just said, the witness isn't anywhere on these documents, so there's no basis for any testimony from him about them.

MS. MURPHY:  Brian, could you scroll down to the third page of tab 9?  Thank you.

BY MS. MURPHY:

Q    So in this chart here which is an email from Renee Dudley to Lynn Tilton, we've got a list of borrowing requests from February 26, 2016.  This chart reflects a borrowing with the borrower labeled here as Croscill.  That's the 2.5 million on the delayed draw



term loan B.  Did you ever see emails like this?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  No recollection of any emails like this.

BY MS. MURPHY:

Q    Did you ask for the 2.5 delayed draw term loan B to be drawn?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  I do not -- I do not remember asking for that to be drawn.  At the same token, it is -- I think it is possible that we could have been requested to make that -- to make that draw just as a matter of documentation for the company.  I can't specifically recall whether we had -- whether we, you know, did or did not do that.

BY MS. MURPHY:

Q    You said that it's possible that you could have been requested to make the draw as a matter of documentation for the company.  Who would have requested that of Croscill?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  I'm just saying that I think that there was -- at least in the case of Croscill, I think everything that we did, there seemed to always be, you know, documentation of what we did.  So it

wouldn't surprise me if there was a borrowing request. I just don't remember whether we did it -- whether we did or not.

BY MS. MURPHY:

Q    Understood.  Thank you.

I'd like to show you tab 10 now which is an email very similar to this one.  This is previously marked Exhibit Number 92.

And if we scroll a little bit down to the end of the first page, you can see this is a very similar chart.  It's a list of borrowing requests. This one is from March 7th and if you look one, two, three, four lines down in that chart, you can see that Croscill has a borrowing request of $2,469,313 -- 313.59 which brings the balance after today's borrowing on this revolver to 10 million.

This is the other borrowing that I asked you if you remember it happening at March 7th.  Do you believe that Croscill, the company requested that this borrowing happened on March 7?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  Again, I would not be -- I don't have specific memory of it, but I would not be surprised if we were not asked to submit a borrowing request.



BY MS. MURPHY:

Q       Understood.  I'd like to -- go right ahead.
Sorry.

A       I'm just saying as I said, as a matter of
documentation and recordkeeping, I would not be
surprised if there was not a request for this prepared.
I just don't remember specifically.

Q       That's fair.

MS. MURPHY:  Let's look at tab 12, please,
Brian.

(Martin Exhibit 165 was marked for purposes
of identification.)

MS. MURPHY:  What exhibit number is this?
I think we're at 165 now; is that right?  Yeah, 165.

THE COURT REPORTER:  Yes, yes.

MS. MURPHY:  Bates number is 1944308.

BY MS. MURPHY:

Q       Now, this is an email from you on March 7th
which is looks to me like a borrowing request kind of
like the one we looked at before.  And you're
requesting $225,000 down on the revolver.  And if we
scroll down, you can see you've attached a form of
borrowing certificate just like the last one we looked
at with the same request and noting that the
outstanding principal amount on the revolver is about



7.5 million.

So this request is made by you on March 7th which is the same day as the request that we just saw which we can show you again if you'd like which maxed out the revolver.  Do you know why the borrowing request that you made was not the one that was processed on that day?

MR. SHAPIRO:  Objection, vague and again counsel's testifying.

THE WITNESS:  And I do not -- one thing I do not remember that this request was not honored because I would -- I would have expected that this was an ordinary borrowing request that would have been approved.

BY MS. MURPHY:

Q     Understood.

A     I don't remember that it was not approved.

Q     Gotcha.  So is it your memory that on March 7th, the company requested $225,000 and got it and understood that to be their borrowing request for the day?

A     That would be my -- my recollection.

Q     Do you ever remember making --

MR. SHAPIRO:  Sorry.  I just objected to the last question.



MS. MURPHY:  Thank you.  Sorry.  We didn't hear that one.

BY MS. MURPHY:

Q     Do you remember the company, Croscill ever making borrowing requests and being told that more money had been drawn for it than it had requested for that day?

A     I do not have a recollection of that.

Q     And I'd like to show just one more exhibit and then I think we've been going for about an hour, so I think it's about time for a break, but I'll show you one more thing.

MS. MURPHY:  Could we put up tab 11, please, Brian?

(Martin Exhibit 166 was marked for purposes of identification.)

MS. MURPHY:  I believe this is now Exhibit 166 and that's Bates Trustee_AP1942942.

MR. SHAPIRO:  I think we're up to 168. Sorry to interject.  I just want the record to be clear.

MS. MURPHY:  Oh, thank you.  I think actually we're at 166 because two of the ones I showed were previously marked.

MR. SHAPIRO:  Okay.  My mistake.  Thanks.



MS. MURPHY:  No worries at all.  Hopefully it will be easier later on to have a continuous record.

BY MS. MURPHY:

Q    So, Mr. Martin, what you see here is an email that you sent in June of 2016 and you've got the audited financials.  I'd like to go to page 9 of these. Excuse me.  Page 10.  That was my mistake.

So we've been talking about this March draw down that happened that maxed out the revolver and I actually think we've -- I've shown this to you before, this sentence that says in March 2016, the entire unused balance of the working capital revolving line of credit was drawn down by an affiliate of the member and such funds are being held in an account maintained by the administrative agent for the lenders.

Is that your memory that at some point in March of 2016, an affiliate of the member and not the company requested all those funds to be drawn down?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  My memory is that I do remember that transaction that the entire balance was drawn down and that the funds were maintained in a separate account that was maintained by the agent for the lender, but I do not remember any specifics about the actual request.



BY MS. MURPHY:

Q       Got it.  Thank you, sir.

MS. MURPHY:  All right.  I think it's a good time for a break.  Could we go off the record?

THE VIDEOGRAPHER:  We're going off the record at 10:07 a.m. eastern daylight time.

(Deposition recessed at 10:01 a.m.)

(Deposition resumed at 10:21 a.m.)

THE VIDEOGRAPHER:  We're going back on the record at 10:21 a.m. eastern daylight time.

Proceed, counsel.

MS. MURPHY:  Thank you.

BY MS. MURPHY:

Q       So before the break, I asked you some questions about some specific draws from Croscill.  Now I'm going to ask you some questions about some specific draws from Acme.  When you started helping out with Acme, did you understand that Acme had availability on loans that it could draw from?

A       I don't have specific recollection of what the availability was when we first started.  I just don't have specific memory of that.

Q       That's okay.  Do you remember if there was or was not availability or do you just not remember at all?



A       I really don't remember.

Q       That's all right.  I think I just want to show you --

MS. MURPHY:  Can we put up, please, tab 13, Brian?

(Martin Exhibit 167 was marked for purposes of identification.)

MS. MURPHY:  This is a bit of a long email chain.  I believe we are at Exhibit 167.  That's Bates Trustee_AP2177214.

Let's go to the first email in the chain which is at the bottom of this long email chain, Brian.

MR. SHAPIRO:  Ms. Murphy, if you don't mind waiting until the document is put into the chat because I don't see it yet.

MS. MURPHY:  Oh, sure.  Sorry about that.

Brian, would you mind dropping it into the chat?

MR. SHAPIRO:  There we go.  Thanks.

BY MS. MURPHY:

Q       Great.  So the first email in this chain is November 28th, 2017.  It's from Tonya Engles to Renee Dudley and you're CC'd, Mr. Martin.  And Tonya says, hi, Renee.  Can you send the Acme and Croscill loan balances for revolver DDTLB and DDTLC?  Do you remember



who Tonya was?

A     She was one of the employees in our administrative office.

Q     Gotcha.  And if we scroll up a bit, the next email is very long.  It goes over two pages, but let's go up to the top of that email.  Renee responds and she includes a bit of information.  She says Acme revolver balance is zero dollars available as of September 20 to date and $3 million balance.  Acme DDTLC, 1 million fully drawn.

And then for the Croscill revolver balance, she has got a long list of numbers which I presume was used to reconcile any differences between the systems. But I'd actually ask -- like to ask you a question about your response to Renee.  So if we can scroll up just a little bit more.

So you email and say why are you saying the Acme DDTLC is fully drawn?  Carlos indicated the funds were still being held in Patriarch account just like the Croscill revolver.  What did you mean by that?

MR. SHAPIRO:  Objection.

If you can recall.

BY MS. MURPHY:

Q     And feel free to ask Brian to scroll if you'd like to read any more.



THE WITNESS:  Please go back down to the previous one where -- I mean, I do recognize that we were using these emails to try to keep our records in balance to make sure everybody had the same revolver balances.  Acme DDTLC was fully drawn.  I don't -- I don't remember specifically what the -- why that I asked the question, but evidently in our records, we weren't showing that as fully drawn.  But I can't be specific about it.

BY MS. MURPHY:

Q      I understand.  Thank you.

We talked about when you started helping out with Acme that you were trying to put together records I think you said.  What kind of recordkeeping were you trying to put together for Acme?

A      Just a -- we received some data from their -- I'm not sure if it was their controller for Acme or what his position was, but before he left, he forwarded to us boxes of records and a trial balance and different documents that we had to go through and get those entered into our system so that we could maintain, you know, a set of books and records.  And it was -- it was just not a very smooth transition.

I think -- I think in the end, we -- you know, after some work, we felt like that we had



captured everything.  Nothing is probably ever a hundred percent, but we -- I think we were able to decipher the information and get it put into our system.

Q      And you said that you received that data from -- you said you think it was their controller.  Did you receive any data from Patriarch or did all of your information come from previous Acme employees?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  I don't -- I don't remember specifically getting anything directly from Patriarch.

BY MS. MURPHY:

Q      Gotcha.  So -- okay.  I appreciate it.  Thank you.

A      The -- the only thing I remember getting from Patriarch is they did at some point share a schedule of the Acme loan structure, you know, so that we could make sure we had recorded, you know, the different loans that were outstanding.

Q      I see.

A      And match those up with the general ledger that we received from whoever was keeping their books before.

Q      Gotcha.  So when Patriarch gave you that schedule, did it reflect that Acme had loans that it


ESQUIRE
DEPOSITION SOLUTIONS

could draw on?

A     I cannot remember what specifics about it.

Q     Okay.  I'd like to ask you -- we talked about those two big Croscill draws earlier, the one in March and the one in February.  And I believe you said that you learned at Croscill at some point that those draws had occurred; is that accurate?

MR. SHAPIRO:  Objection, vague and misstates prior testimony.

THE WITNESS:  We did -- we did -- were made aware of it.  I'm not sure if it was -- how, you know, that that was communicated, but at some point, we were made aware of it.

BY MS. MURPHY:

Q     Okay.  I'd like to try to figure out if we can remember where.  So I'm going to show you a couple of documents and see if it refreshes your recollection at all.

MS. MURPHY:  Brian, could you put up tab 14 and then I'm going to show tab 15 right after it, so we'll go ahead and get two ready?

(Martin Exhibit 168 was marked for purposes of identification.)

(Martin Exhibit 169 was marked for purposes of identification.)



BY MS. MURPHY:

Q     Tab 14 will be Exhibit 168 which is stamped with Bates 1942396.  It's an email August 15th of 2016.  So this is a borrowing request email.  We've seen a few of these now and I'd like to scroll down to the borrowing certificate in this one.

And do you see here in the third paragraph, Mr. Martin, where it says the undersigned hereby certifies as follows?  Prior to giving effect to the funds requested hereby and without giving effect to any repayments made or to be made on the delivery date, the aggregate outstanding principal amount of the loans of tranche RCA on and as of the delivery date is 9,137,845.73.

Would it be fair to say that if this is the funding certificate that you were sending at this point, you did not know that the revolver had been fully drawn?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  I don't believe that's the case because if I'm not mistaken at this point in '16, we had already issued our audit report which reflected that it already happened.

BY MS. MURPHY:

Q     So why then -- do you recall why this



funding certificate would not reflect the full draw if Croscill knew that the full draw had occurred?

MR. SHAPIRO:  Objection, vague and misstates prior testimony.

THE WITNESS:  I can't answer that.

BY MS. MURPHY:

Q    You just don't recall?

A    Specifically I cannot -- my recollection would be that we were -- that we were still borrowing against -- I can't -- I can't remember how we were -- how we were maintaining this balance that we were indicating was the outstanding revolver.  There was a method.  I just can't remember what it was.

Q    That's all right.  So would it be true then that this statement in the funding certificate is not accurate?

MR. SHAPIRO:  Objection, misstates his prior testimony.

THE WITNESS:  I'm not sure how to answer that.

BY MS. MURPHY:

Q    That's fair.  Obviously this is a borrowing certificate you signed.  It looks like many others.  If Croscill knew that it -- that the revolving loan had been fully drawn at this point, then was there an



aggregate outstanding principal amount of just over 9 million at this point in time?

MR. SHAPIRO:  Objection, calls for speculation.

THE WITNESS:  I can't answer that.

MS. MURPHY:  Brian, can we pop to -- actually, before we move.

BY MS. MURPHY:

Q    So at this point in August of 2016, was PPAS as agent holding cash for Croscill?

A    That -- that would be my recollection.

Q    Okay.  Can you help me understand how Croscill was handling the cash that was held at the agent?  Did Croscill treat that cash as though it had not yet been borrowed down from the revolver?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  Without being able to -- I couldn't answer that without being able to see some other records, but --

BY MS. MURPHY:

Q    Could you tell me then what records would help you know?  What would you want to look for to figure that out?

A    Well, I guess what I'm saying without having the -- the history of -- of the entire flow of



transactions around that time that the -- that the draw down was made, it's hard for me to remember how we -- how we worked or how we went forward with the -- with the borrowings and so forth.

Q       Understood.  Okay.  I want to show you tab 15.

MS. MURPHY:  Brian, would you pop it up?

BY MS. MURPHY:

Q       This will be Exhibit 169, Bates Trustee_AP1942386.  This is another borrowing email, our favorite kind of email.  As you can see, this one is sent August 17 and the previous one, the one that we just looked at, that was August 15th.  So this is two days later.

I'll represent to you that I don't have one for August 16th in my records.  I'm not saying it doesn't exist, but this is the next one according to my records.

And if we scroll down to the attachment here, the funding certificate, we can see that now the aggregate outstanding principal amount of the revolver as listed in this funding certificate is the full 10 million that the revolver had down on it.

Now, we can flip back if you'd like to do the math.  I'm certainly no math whiz, but if we look



at the numbers from the prior exhibit, the borrowing request from the prior exhibit had the aggregate outstanding at about 9.1 million and this borrowing request is requesting 750.  So if I remember my addition right, we don't add up to the 10 million being fully requested between the last borrowing request and this one.

So I'm interested in why now as of August 17 the $10 million amount is reflected as the aggregate outstanding.  Do you have any memory around this time of changing this funding certificate to reflect the full 10 million?

MR. SHAPIRO:  Objection, vague and misstates -- well, I guess misstates prior testimony, testifies.

THE WITNESS:  Can you scroll up just a little bit?  So, no, the other way.  Down.  I mean, I'm sorry.  Down.  So if this was submitted with my signature on it, then I would -- I would say that we did -- you know, that this was issued and that -- and we're saying that the full 10 million has been drawn.

BY MS. MURPHY:

Q        And do you remember why --

A        But at the same token, my recollection is that the -- the loan was drawn down -- I mean, was --



there was a draw down to the 10 million, but we were requesting the 750 from the agent.  So whether the agent already had those funds or not, that's a different issue.

Q    I see.

A    So the loan could be 10,000.  The -- I mean, our audit report said that the funds were being held by the agent.  So our request is for those to be delivered to our operating account.  So whether that -- that does not -- so at that point, it is saying that the -- that the actual loan tranche, the revolving credit agreement is at $10 million which evidently was a fact at that time.

And I don't remember exactly when that did happen, but it had to happen prior to this unless I misread the previous documents that when -- in our audit report that was issued prior to this date that said the funds were drawn down and it -- so I'm not really sure why we changed it on these specific dates to have it read that way.

Q    I think you're right about that, sir.  We don't need to put it up, but I'll represent to you that in paper here, I'm looking at Exhibit 166 which is the audited financials for Croscill for 2015 that you sent to Vin Devito in June of 2016 and that has the language



that we looked at a couple of times.  There it is.
Look at that.

A       That it was --

Q       That it had been drawn.

        MR. SHAPIRO:  Objection, vague.

BY MS. MURPHY:

Q       So it looks like Croscill knew that the
draw had occurred at least as of -- let's see.  These
financials are dated May 23, 2016.  Is that fair to
say?

A       The date of this audit report, yes.

Q       Yes.  That's on --

A       Right.

Q       -- the second page of the attachment.  We
have got a date there.

        So just to be clear, you -- is it fair to
say that you are not sure why as of August 15th of
2016, Croscill was still reflecting in its funding
certificates that there was not a full draw on the
revolver?

        MR. SHAPIRO:  Objection, speculation,
misstates the prior testimony.

        THE WITNESS:  I'm not sure why that we
continued to do that up until it was changed.

BY MS. MURPHY:



Q        Okay.  And --

A        The only thing I can say is I'm positive we were computing that balance somehow from some information and that would probably -- I'm not sure if that meant that the difference was what was being held or -- but I'm not sure.

Q        Understood.  And is it fair to say that you do not remember why in mid-August which is 8 -- we see they change between 8/15 and 8/17.  You don't remember anything specific occurred that caused this change in your funding certificate?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  I do not remember anything specific.

BY MS. MURPHY:

Q        And this funding certificate from August 15 which has the 9,137,000 number, to your understanding of this document, does that funding certificate reflect that the revolver was not fully drawn down?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  My answer would be is that we were -- we were completing the funding certificates based on a methodology that we had certainly been advised to do --

BY MS. MURPHY:



Q     By --

A     -- by Patriarch Partners Agency Services or we would not have prepared them that way.

Q     I see.  So your understanding of why this August 15th funding certificate reflects the $9.1 million amount is because this computation was -- was given to Croscill by PPAS; is that correct?

A     I don't think it was --

MR. SHAPIRO:  Let me just -- sorry. Objection, vague and misstates the prior testimony.

Go ahead.

THE WITNESS:  I don't think the number was given to us.  I think we had to maintain a rolling balance of what we had actually used that had actually been transferred to our operating account if I remember correctly.

BY MS. MURPHY:

Q     I see.

A     But not reflect any funds held by the agent.  That's -- that's my recollection.

Q     I understand.  So if I'm understanding correctly, I just want to make sure I get this right, I think what you're saying is that this $9.1 million amount as you remember it reflects how much money Croscill had actually requested and received up to this



point; is that correct?

A       That would be my theory as to why it is that way.

Q       Okay.  But at this point, of course, Croscill knows that the full $10 million has been drawn down.  So for whatever reason, it looks like Croscill is submitting borrowing requests that are listing an outstanding principal amount that does not treat the funds that are held at the agent as having been borrowed; is that correct?

MR. SHAPIRO:  Objection, misstates the document.

THE WITNESS:  This borrow -- this funding certificate does not reflect that the full revolver had been drawn.

BY MS. MURPHY:

Q       Gotcha.  And then the next one, the August 17th one does reflect that the full borrowing has been drawn down; is that correct?

A       Yes.

Q       Gotcha.  But we can -- we can do the math here.  It looks to me like from between these two, Croscill had not actually requested the full 10 million at this point in time.  Do you believe that at this point in time, August 17th, Croscill had actually



requested and received the $10 million in full in cash?

A    I do not --

MR. SHAPIRO:  Objection, vague and misstates the document.

Go ahead.

THE WITNESS:  Yeah.  I can't answer that. I don't -- I think this is reflecting that the tranche has been -- that was at $10 million on this date, but I can't tell from this document what all of the requests were.

BY MS. MURPHY:

Q    That's totally fair.  We might need to see some bank accounts which I don't have to show it to you.  So that's all right.  So let's step away from these.  There was a lot of questions on two documents, but I appreciate your patience with us.

So do you know what business purpose the two Croscill draws were for, the one on February 26 and the one on March 7th?  What was that money for?

Speculation

MR. SHAPIRO:  Objection, calls for speculation.

THE WITNESS:  Did you say February?

BY MS. MURPHY:

Q    Yeah.  There's two of them.  One happened on February 26 and one happened on March 7th.  They



were the two big ones we talked about earlier.  Do you know what that money was drawn for?

Speculation

A        You're talking about --

MR. SHAPIRO:  Objection, vague and calls for speculation.

THE WITNESS:  You're talking about the draws that maxed out the revolver and the one that drew down on the DDTL?

BY MS. MURPHY:

Q        Yes, sir.

A        I have no knowledge of -- that the funds were used for anything that -- our understanding was or the way it was presented to the company as it was reflected in the -- in the audit report that the funds were requested by the agent from the lender and -- and that -- that they were holding the funds.  So that was still to provide operations by the -- provide funding for the operations.

So it was -- and I'm not sure that, you know, from our standpoint or from the company's standpoint and from the audit report, it would seem that there was enough evidence that, you know, that the agent or at least that the agent, you know, had the authority to do that.

I don't know, but you would think that if



we presented it that way, there was -- if the manager for Croscill, you know, wanted to draw the complete loan down that they had the authority to do that, you know, or at least that's the way it's presented in the audit report.

Speculation

Q    Gotcha.  But it sounds like when that money was drawn down in March and February, is it true that the company did not have a use for that money at the time, was not trying to immediately apply it to some sort of cost or something?

MR. SHAPIRO:  Objection, vague and calls for speculation.

THE WITNESS:  I wouldn't have -- I have no -- I was never specifically told why it was done, just that it did occur so that we could record it and keep track of it.

BY MS. MURPHY:

Q    Gotcha.  And when those draws happened, did they increase the interest expense that Croscill had to pay?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  I would expect that it would, but I don't specifically, you know, have knowledge of -- that that happened, but I would expect that it would.



BY MS. MURPHY:

Q      Gotcha.  And you said that that money was being held at the agent after it was drawn.  Did Croscill have free access to that cash that was held at the agent?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  If -- if the -- if the funds were held in a -- any kind of bank account that we did not have signatory on which I do not believe that we had signatory on those accounts, then we would have not had immediate access to it.

BY MS. MURPHY:

Q      So how did Croscill get access to that cash?

A      We would still have to submit a borrowing request indicating what expenses that we needed to pay and that's the funding that we would receive.

Q      I see.  So you were submitting borrowing requests for draws from the loans and then after the money was drawn, you were submitting borrowing requests for -- just to get the cash from the agent; is that right?

A      Yeah.  We were -- I guess we were still operating and submitting borrowing requests calculating whether we had actually received all of the 10 million



yet.  You know, for our operations is -- that's the only thing I can recollect, but then as we saw at some point and maybe that's a technicality that we were still submitting our funding certificates calculating this balance that, you know, that we had not -- that we had not fully utilized in operations, you know.  And then we were told, well, you know, for whatever reason, this is not the correct way to fill this out.  So then we had to start doing the 10 million full had been drawn.

So -- and that may have been from a review by -- by, you know, a legal review or something of what we were submitting and, you know, then if we were informed that that's not the proper way to do it, we would have changed it.

Q     Gotcha.  That makes sense to me.  So it sounds like Croscill was calculating in its borrowing requests and its borrowing certificates how much the company understood itself to be borrowing, to be using and then at some point, you were told, you know, because all of this has actually already been borrowed, you need to reflect that in the funding certificate.  Is that what you're getting at?

A     I'm saying that would be -- that would be my guess why we changed it on a particular day.



Q   Understood.  That makes sense.  And I think you said that -- well, I'll just ask you again because I'm not sure what you said.  Did you say that Croscill had to pay increased interest on these funds after they were drawn down?

MR. SHAPIRO:  Objection, asked and answered.

THE WITNESS:  I don't know the answer to that without seeing an interest statement or something, but you would -- I would speculate that, yes, if the full loan was drawn, then interest would have to be paid on that.

MR. SHAPIRO:  Just object and instruct -- I can't instruct the witness.  He's not my witness, but recommend that the witness not speculate.

You're here to testify to what you know and don't know, not to take guesses.

THE WITNESS:  Okay.

BY MS. MURPHY:

Q   I appreciate you helping us walk through it, sir.

MS. MURPHY:  Actually, let me go find the right -- Brian, could we go back to tab 3, please?

MR. SHAPIRO:  I'm sorry.  What -- do you know what exhibit number that is?



MS. MURPHY:  We might not have shown it.  I don't have it written.

MR. CAMPBELL:  It's a new exhibit.

MS. MURPHY:  Thank you.  So this will be Exhibit 169, I believe.

BY MS. MURPHY:

Q     Mr. Martin, this is an interest invoice for Croscill.  It's from November of 2016.

MS. MURPHY:  And, Brian, if we could scroll, please, to the last page of the attachment.

BY MS. MURPHY:

Q     So this page of the invoice collects the interest for the delayed draw term loan B which is the 2.5 million that was drawn in February 2016.  As I understand this invoice, it is reflecting interest that is accruing on the accruing balance which is the 2.5 million that has been drawn.

So my understanding of this invoice is that Croscill was being invoiced for that 2.5 because it had been drawn and thus was accruing interest.  Is that how you understood these invoices to reflect interest information?

A     Yes.

Q     Great.  I'm going to jump back forward.  Sorry.  I went a little out of order in my documents



here, so I need to just jump forward.

Now, we've talked about what the money was used for.

MS. MURPHY:  Can we skip to tab 16, please, Brian?

(Martin Exhibit 170 was marked for purposes of identification.)

BY MS. MURPHY:

Q    This will be Exhibit 170 at Bates Trustee_AP1936965.  This is an email chain from Margaritta Topielski?

A    Topielski.

Q    Oh, thank you.  Topielski.  Who is Margaritta?

A    She was the CFO at that time.

Q    Got it.  And she's reaching out to Vin Devito who I believe you said was the -- I think you called him the portfolio manager for Croscill; is that right?

A    He was our representative.  I can't remember what exact title he had, but he was our -- the person that we would go through with any dealings on our -- on our loans with Patriarch or with the agent, with the agent, yeah.

Q    The agent.  Gotcha.  And she is



presenting -- she says use the accounting transactions as we have it in the books now, and she has term loan 2.5 million drawn on February 26.  And then she has two -- three -- excuse me -- book entries under that which show that $75,000 was borrowed in it looks like December of 2016 which reduced the amount due from the agent by $75,000 and it looks like there was also an interest payment.

So as of the sending of this email which is Tuesday, March 14th, 2017, it looks like the vast majority of the term loan had not yet been used by Croscill, over $2 million of it at least.  Is that consistent with your recollection of how Croscill used this loan?

A     Yeah.  I don't -- I don't have any recollection of this email.  I don't -- I don't have any recollection of the 2.5 million except that we -- that we had indicated that it had been drawn.

Q     Understood.  You don't have a recollection of making requests for that cash; is that correct?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  I do not remember that.

BY MS. MURPHY:

Q     Okay.  That's fair.  Now, we've talked a little bit about it already, but I'd like to ask you



some questions about the audit process for Croscill --

A       Okay.

Q       -- in 2016 or -- excuse me -- for the 2016 year which is in 2017.  So were you involved in Croscill's yearly audits?

A       Absolutely.

Q       What -- what did you do for Croscill's yearly audits?

A       Well, again, the collection of the data for our outside audit firm would have been performed by my employees in our accounting department.  Various employees would, you know, be responsible for their own areas to submit information to our outside auditors. My responsibility was, you know, was more -- I would have reviewed the audit report and been involved in any discussions with the auditors on specific items that they had questions on and -- or anything like that.

Q       Did you also communicate with Patriarch during the audit process?

A       I don't have any recollection of having to communicate with them during the middle of the audit, but of course we would have submitted it after -- and there may have been -- I'm not sure if they reviewed the audit report before we issued it or not.  I can't remember that, but I can't remember any specifics about



having to talk to them during the middle of the audit.

Q    Okay.  Well, I'd like to look at some emails that are during and about this audit time and just see what you remember about this audit.

MS. MURPHY:  So let's go to tab 17, please, Brian.

(Martin Exhibit 171 was marked for purposes of identification.)

MS. MURPHY:  I believe this will be Exhibit 171, Bates Trustee_AP1936987.  And, Brian, could you scroll to the first email in this chain?

BY MS. MURPHY:

Q    Mr. Martin, I'm going to give you time to read the whole thing.  So just let Brian know when to scroll to the next email.

A    (Reviewing document.)

MR. SHAPIRO:  Let me just reflect for the record that the witness apparently throughout the deposition has just been relying on counsel to look at certain pages of the document and doesn't have access to or has not been opening documents and reading them in full which again is his choice and your choice, counsel, but I just want the record to reflect that.

MS. MURPHY:  Counsel, that is incorrect. All of the documents have been in the chat and so Mr.



Martin has had access to the entirety of every document for the entire deposition.

MR. SHAPIRO:  My understanding -- I could ask him about it when I question -- is that he has not been opening them and just been relying on your scrolling through the documents and selecting certain pages, but we can address that later.

THE WITNESS:  (Reviewing document.)

BY MS. MURPHY:

Q     Mr. Martin, you let us know if you'd like the document on the screen to scroll or if you'd like to look at your own copy.  Let us know if you'd like us to move this.

A     So in the chat, would this be the last document in there?

Q     Yes.  This is the one that starts with -- the file starts with number 17.

A     So when I -- when I try -- it's telling me I have to save the file in order to open it.

Q     Yes, that's probably true.  You would need to save it to your local computer, save it to your desktop or your downloads file and then you'd be able to open it.

A     Okay.  Okay.

(Reviewing document.)



Okay.  So this is our CFO communicating with -- with Patriarch evidently -- I mean, with Patriarch regarding the questions that our auditor had wanted to discuss.  Okay.  So what -- so I'm sorry about the question you had.

Q     No.  It's okay.  I hadn't even asked one yet.  Just making sure you can read everything you wanted to read.  So we see I think it was Ms. Topielski, she's forwarding an email it looks like to be from Anchin and she says -- we can see here that Anchin notes the receivable from Patriarch is currently classified by the company as a current asset and they say, please provide support as to the current classification.  The amount has not been repaid in over a year and consideration should be given to classify such amounts as noncurrent assets.

My question is just do you remember there being issues with Croscill's audit regarding the draw down funds being classified as current assets?

MR. SHAPIRO:  Objection, vague and misstates the document.

THE WITNESS:  Can you repeat the question?

BY MS. MURPHY:

Q     Yes, absolutely.  I said do you remember there being any issues regarding the draw down funds



being classified as current assets during Croscill's audit?

MR. SHAPIRO:  Same objections.

THE WITNESS:  The only -- my recollection would be that we had it recorded that way and it was just a question from the auditors.  I can't -- I can't remember if we actually changed it in the audit report or not.  I'd have to see that to see whether we changed it.

BY MS. MURPHY:

Q     Got it.  Do you know why the auditors were questioning that classification?

A     I do not.

Q     Okay.

MS. MURPHY:  Let's go to tab 18, please, Brian.

BY MS. MURPHY:

Q     And, again, we'll have this one on the screen and it's in the chat if you'd like to open your own copy so you can read it without having us scroll. Whatever is best for you.

(Martin Exhibit 172 was marked for purposes of identification.)

MS. MURPHY:  This will be I believe Exhibit 172 and it is marked Bates Trustee_AP1937111.



800.211.DEPO (3376)
EsquireSolutions.com

BY MS. MURPHY:

Q      And take your time, but let me know, Mr. Martin, whenever you've had a chance to look over this document.

A      (Reviewing document.)

Okay.

Q      So I understand you're not on this email chain.  I'm not going to ask you about the specifics of this email chain, but I'll note here in this first page that we see of the PDF an Anchin auditor named Mark Fetterbush writes, we need the attorney for PPAS (you advised us that they are the administrative agent holding the money) to provide documentation showing the all caps legal basis that Croscill owes the money that PPAS took from the lenders.

And then in response, this is at the very top of this page, Kevin Dell from Patriarch Partners writes, PPAS has provided letters that address these issues.  Do you know who Kevin Dell was?

MR. SHAPIRO:  Objection.  As counsel noted, the witness is not on this document and has no basis to testify regarding them.

THE WITNESS:  Kevin Dell was an attorney with Patriarch.  I'm not sure which Patriarch entity actually he was employed by, but he was an attorney or



he is an attorney.

BY MS. MURPHY:

Q    Gotcha.  And Kevin says, PPAS has provided letters that address these issues.  Did you ever see a letter from PPAS addressing what legal basis PPAS had for holding the money that Croscill had been given from its loans?

MR. SHAPIRO:  Same objection.  There's no basis for the witness to testify about anything on this document.

THE WITNESS:  I do not have specific recollection of a letter of any kind or anything explaining that.

BY MS. MURPHY:

Q    Do you have an idea of what legal basis PPAS had for holding the money?

MR. SHAPIRO:  Objection, calls for speculation and a legal conclusion.

THE WITNESS:  No.

BY MS. MURPHY:

Q    Okay.

MS. MURPHY:  Let's go to tab 19, please, Brian, and this document that we're about to put up has been previously marked.  It's Exhibit 100.

(Martin Exhibit 100 was previously marked



for purposes of identification.)

MS. MURPHY:  It's at Bates Trustee_AP1937102 and it's up on the screen now and also in the chat for you.

BY MS. MURPHY:

Q    Let me know when you've had a chance to look at this one, Mr. Martin.

A    (Reviewing document.)

MR. SHAPIRO:  Objection on this document. The witness is not on it.  There's no basis for asking questions about it.

THE WITNESS:  Okay.

BY MS. MURPHY:

Q    So as Mr. Shapiro has noted, I know that you're not copied on this email.  Do you recall ever seeing this email?

A    I do not recall.

Q    Do you remember there being discussions with Anchin about the funds held in the agent account during this audit?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  Yes.  I remember there were discussions and Ms. Topielski of course was my superior.  And I'm sure that she informed me that -- that -- I guess I can't say I remember it, so -- but I



do know that during the audit, there were questions

for -- that we needed to get answered.  I do remember

that before we can finalize the audit.

BY MS. MURPHY:

Q    So I think when we talked right at the

beginning of this question set that you said that you

and your team communicated information to the auditors

and put together documents for them; is that correct?

A    Correct.

Q    So here there's a list of questions from

the auditors.  I'm looking at the email that is

March 18th, 2017.  It's the first page of the PDF.

There's a list of questions and the first

three ask for agreements or other documents.  So the

first one says we would like to be provided with any

agreements or other documents that support

characterizing the drawing as a loan payable by

Croscill to the lender with a corresponding asset due

from PPAS.

The second one says we would like to be

provided with any agreements or other documents, if

any, that support the company's ability to access the

drawn down funds upon its request.  And I'm skipping a

sentence here just for time.  And the next one says we

would like to understand whether there exists any

agreement or other document that requires funds drawn from the lenders to be remitted by PPAS in its agent capacity to Croscill.  Next I would like to be provided with those agreements or documents.

Do you remember you or your team gathering any such agreements or documents to be transmitted to the auditors around this time?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  No.  My group would not have responded to this.  The question was posed to Patriarch.

BY MS. MURPHY:

Q     I see.  So your group was not requested to give legal basis documents; is that correct?

A     Correct.

Q     Got it.  All right.  Let's move on.

MS. MURPHY:  Can I show tab 21, please, Brian?

(Martin Exhibit 173 was marked for purposes of identification.)

MS. MURPHY:  This would be I believe Exhibit 173 because the previous exhibit had already been marked.  This is Bates stamped Trustee_AP1936436 and it's an email with a one page attachment.



BY MS. MURPHY:

Q      Let me know when you've had a chance to look it over, Mr. Martin.

A      (Reviewing document.)

Okay.

Q      Have you seen this letter before that is attached to this email?

A      I do not have specific memory of seeing it.

Q      This letter is signed by Lynn Tilton as the sole manager of Patriarch Partners Agency Services and there's a signed line for Joseph Granger, the CEO of Croscill.  Did you work with Joe Granger?

A      Yes, ma'am.

Q      You said previously I think that Ms. Topielski was your boss.  Was Joe Granger her boss?

A      Yes.

Q      Gotcha.  There is a lot of information in this letter.  Verifies and confirms that there's some amounts held by the agent and that those amounts will remain in the bank account until they are made available to the company at the company's request. This letter does not reference any documentation reflecting PPAS being established as Croscill's bank. And I'm wondering do you remember there being any documentation that would establish a banking



relationship between Croscill and PPAS?

MR. SHAPIRO:  Objection.  The witness testified that he has no knowledge of this email chain or document.  There's no basis to question him about it and counsel misstated what the document does say and is again testifying.

THE WITNESS:  I don't have any recollection of there being a banking relationship between the agent and Croscill.  They were -- my recollection is that they were acting as the agent for the line of -- lines -- the different lines of credit and how they managed those funds was not -- I don't have any specific recollection of any -- anything other than that relationship.

BY MS. MURPHY:

Q    Understood.  Thank you.

I'm going to -- I'm going to break my question down into a couple of set questions to address Mr. Shapiro's comment.  Do you agree looking at this letter now that this document does not reflect PPAS operating as Croscill's bank account?

MR. SHAPIRO:  Objection.  The document speaks for itself and I'm not sure how this reflects what he understands or knows now.

MS. MURPHY:  That's fine.  I'll withdraw



the question.

THE WITNESS:  My understanding or when I read this document, it does not say that.  It says that the funds are held in an account controlled by PPAS which was my understanding from the beginning that that's where the funds were held.

BY MS. MURPHY:

Q     Gotcha.  Let's -- let's put this document away.  I'm sorry it's been a bit confusing.  Is it correct that you do not recall there being a banking relationship between Croscill and PPAS?

A     I do not --

MR. SHAPIRO:  Objection.  The question calls for a legal conclusion.

THE WITNESS:  I do not recall any type of banking relationship between PPAS and Croscill.

BY MS. MURPHY:

Q     Great.  Thank you.

I know that we're getting close to a time for a break here, so I'm trying to find an easy stopping point.  Give me just one second.

MS. MURPHY:  Actually, let's just take a break now.  Is that okay for everybody?  It's been a little over an hour since our last one.

THE VIDEOGRAPHER:  We're going off the



record at 11:27 a.m. eastern daylight time.

(Deposition recessed at 11:27 a.m.)

(Deposition resumed at 11:40 a.m.)

THE VIDEOGRAPHER:  We're going back on the record at 11:40 a.m. eastern daylight time.  Proceed, counsel.

MS. MURPHY:  Brian, could you please put up tab 24?

(Martin Exhibit 174 was marked for purposes of identification.)

MS. MURPHY:  I believe this will be Exhibit 174 which is Bates Trustee_AP1941703.

BY MS. MURPHY:

Q     And, Mr. Martin, feel free to check it out on your computer if you'd like, have us scroll and just me know when you've had a chance to review.

A     (Reviewing document.)

Okay.

Q     Great.  So this email string starts with you sending a borrowing request email and then Mr. Devito responds to your borrowing request email. And he says, Lynn has requested your cash flow forecast and the timing of when you will pay the revolver back to the agent imposed $8.8 million cap from the proposed 9.2 million level post this borrowing.  Do you see



that?

A        Yes, ma'am.

Q        Did you understand there to be an agent imposed cap on the amount that Croscill could borrow?

A        Yes.  It was to my understanding is that it was necessary to have a cap so that there would always be available funds for unforeseen, you know, events that could happen.  And so the agent did not want the company to max out the, you know, the borrowings and not have any availability.

Q        Is it your understanding that you were paying interest at this point on the full $10 million that had been drawn at the -- from the revolver?

THE COURT REPORTER:  Mr. Shapiro, you're muted.

MS. MURPHY:  I can hear him just fine.

MR. SHAPIRO:  Thank you.  Sorry.  I said calls for -- objection, calls for speculation.

THE WITNESS:  I can't answer that to certainty.  I can't -- I don't have specific recollection of it.

BY MS. MURPHY:

Q        Understood.  Give me just one second.  How was the $8.8 million cap communicated to Croscill?

A        I don't have specific recollection of when



that was communicated or whether it was verbally or by email.  I don't -- I don't specifically remember.

Q    Okay.  No problem.  I think I'd just like to move to tab 25 then.

MS. MURPHY:  I believe tab 25 will be Exhibit 175.

(Martin Exhibit 175 was marked for purposes of identification.)

MS. MURPHY:  That's Bates marked Trustee_AP1891305.

BY MS. MURPHY:

Q    And let me know when you've had a chance to check this one out.

A    (Reviewing document.)

Okay.

Q    So this document shows Carlos Mercado emailing you and he says, Dan, the board has authorized the payment of outstanding PPAS agency fees in the amount of $200,000 to be withdrawn from Acme DDTLC proceeds held by PPAS.  Then he says please provide the direction letter for the transfer at your earliest convenience.  Do you see that?

A    Yes, ma'am.

Q    And then you respond we'll get borrowing requests prepared today for tomorrow funding.  Do you



see that?

A        Yes, ma'am.

Q        Was it common for an employee from Patriarch to direct Acme's use of funds?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  Would you repeat the question?

BY MS. MURPHY:

Q        Yes, absolutely.  How about I restate it?

Do you remember when Mr. Mercado asked you to prepare a borrowing for this request?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  I remember -- I don't specifically remember it, but I see the document and know that I got it.

BY MS. MURPHY:

Q        Do you remember any other instances where a Patriarch employee directed you to make a borrowing request?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  Not -- I don't specifically remember specific instances.

BY MS. MURPHY:

Q        This document has to do with Acme.  Do you remember any instances where someone from Patriarch



DAN MARTIN                                        June 28, 2023
PATRIARCH PARTNERS vs ZOHAR CDO 2003-1                      89

directed you to create a borrowing request for any Croscill loans?

A       I don't specifically remember any cases.

Q       Let's move to tab 26.

(Martin Exhibit 176 was marked for purposes of identification.)

MS. MURPHY:  This will be Exhibit 176, Bates marked Trustee_AP2177241.

BY MS. MURPHY:

Q       And it's up on the screen and in the chat. So let me know when you've had a chance to check it out.

A       (Reviewing document.)

Okay.

Q       So I think we've seen an example of this kind of email before.  Am I correct that in this email, you and others at Croscill are ensuring that your accounts match the Patriarch accounts for how much Croscill has borrowed?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  This was a method to ensure that we both had the same transactions recorded given that there were sweeps from our lock box to -- against the loan and borrowings and there would occasionally be small differences.  Either something was recorded, you



know, in error or -- and so we were constantly checking to make -- especially at the end of a period to make sure that we were in balance.

BY MS. MURPHY:

Q      That makes sense to me.  I actually want to ask you about that lock box.  I notice here in the second email from the top of the first page, it's from Tonya to you.

A      Um-hmm.

Q      It says Acme's loan balance is incorrect and then she's got some differences in numbers and dates in the next sentence.  And then she says the sweep to Patriarch was 314,171.89, not 314,171.80.  Do you see that?

A      Yes.

Q      So what was the lock box and sweep arrangement for Croscill?  What was happening there?

A      All collections accounts re -- any collection of invoices for accounts receivable was deposit -- was directed towards a lock box account that was controlled under a DACA agreement and would sweep to PPAS every day.

Q      How long had that -- strike that.

When did that start happening, the lock box and the sweeps?



MR. SHAPIRO:  Objection, vague.

THE WITNESS:  I don't know a specific date that it started, but my recollection is that it was set up that way from the beginning.

BY MS. MURPHY:

Q    Understood.  So am I correct in saying that the lock box and the sweeps existed before Croscill's loans were drawn down in full?

A    Yes.

Q    So I want to talk about that time period. Before the loans were drawn down in full where Croscill was making borrowing requests and pulling amounts of the money out of the loan, the sweeps that happened daily from the lock box, did those serve to make payments on the revolver for Croscill?

A    Yes.

Q    Did you understand that to continue after the loans had been drawn down in full that the lock box sweeps were still making payments on the revolver?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  It was reducing the -- it was reducing the balance.

BY MS. MURPHY:

Q    Of the revolver?

A    It was reducing the -- it was reducing the



calculated balance.

Q    I see.  Did Acme have a similar lock box and sweep set up?

A    I actually -- I actually don't remember.  I mean, Acme was such a small operationally wise.  There were some transactions and from looking at this schedule, I can see that there were some small collections, so -- but I'm not sure.

Q    Why did Croscill transition from applying its lock box sweeps to pay down its revolver to applying those lock box sweeps to just the amount of cash that was being held by the agent?

MR. SHAPIRO:  Objection, calls for speculation.

THE WITNESS:  That was -- my recollection is that it -- that that was just trying -- we were just trying to keep track of the two totals, what was -- what the -- what the loan funds that we had received versus what the funds held by the agent were.  So the application of it was against the amount we had drawn.

BY MS. MURPHY:

Q    Understood.  Let me -- let me break this down step by step.  So as I understand it, before the loans were drawn down in full, when the lock box was swept, any money that had been in the lock box that day



would be applied to pay down Croscill's revolver; is that correct?

A       That's my understanding.

Q       And then after the loans had been drawn down in full, I believe that changed and instead any money that was took out of the lock box was not used to pay down the revolving loan, but was instead just placed into PPAS's account and Croscill kept a tally of how much cash Croscill had and how much PPAS had; is that correct?

A       That is my understanding.

Q       So why was that change made from Croscill's lock box sweeps being made as payments on the loan to Croscill's lock box sweeps being held at the agent?

        MR. SHAPIRO:  Objection, calls for speculation.

        THE WITNESS:  I do not know the answer to that.

BY MS. MURPHY:

Q       Do you believe that Croscill requested that change?

        MR. SHAPIRO:  Objection, calls for speculation.

        THE WITNESS:  I do not have recollection of a specific request to change any -- to make a change.



BY MS. MURPHY:

Q       Okay.  I understand.  And I think you said that Croscill had a DACA agreement, a deposit account control agreement; is that correct?

A       Yes.

Q       Did you help to set up that DACA?

A       I do not believe so.

Q       Do you know who would have helped set up that DACA?

A       I don't -- I don't have a recollection of that.

Q       No worries.  But you know that Croscill had a DACA?

A       Correct.

Q       And do you believe that that DACA was with PPAS as agent?

A       I don't know.  I don't have specific knowledge of who was on the agreement, but I know there was an agreement that allowed them to sweep -- allowed the agent to sweep the account.

Q       Gotcha.  Do you know if Acme had a DACA?

A       I do not.  I do not know.

Q       Okay.  Under the lock box setup that Croscill had with the agent, was the amount of money that Croscill -- strike that.



I've turned myself around.  Was Croscill's borrowing limited by the amount of money that was swept into the agent's account at all?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  I think that the borrowing was limited by the imposed cap.  I don't -- I don't recollect that it was based on the amount collected.

BY MS. MURPHY:

Q    But the amount collected reduced the amount that Croscill had pulled from the agent and so kept Croscill under the cap; is that right?

A    The collections offset the amount that had been borrowed previously.

Q    Gotcha.  Thank you very much.  That makes sense to me.

All right.  I think let's look at one last tab.

MS. MURPHY:  Can we see tab 27, please, Brian?

(Martin Exhibit 108 was previously marked for purposes of identification.)

MS. MURPHY:  This document has been previously marked as Tilton Exhibit 108.  So we will not give it a new number.

BY MS. MURPHY:



Q    And, Mr. Martin, it's in the chat and on the screen.  It's a borrowing certificate like we've seen a few times now.  Let me know when you've had a chance to check it out.

A    (Reviewing document.)

Okay.

Q    So this borrowing certificate from you which is for October 17th, 2017, I'm reading the email here, the cover email.  It says Croscill is requesting funding of $1,425,000 from its term loan DDTLB.  The company's request if approved will bring the term loan to $2.5 million with remaining availability of zero. Do you see that?

A    Yes, ma'am.

Q    So remaining availability of zero.  Does that mean that Croscill was requesting to move all of the money that was currently held at the agent?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  I do not know whether there was another borrowing that utilized the remainder of the funds.  I can only see this specific request.  So I do not know the -- so I don't want to speculate.

BY MS. MURPHY:

Q    Understood.  What does the remaining availability of the zero dollars mean then?



A      Again, I'm not going to speculate what it means without seeing -- without knowing whether there was another borrowing request for the remainder.

Q      Okay.  And the remainder you're talking about is the --

A      The difference between the 2.5 million and the million 425.

Q      Gotcha.  Yes.  So --

A      But if there was a request previously for that number, then, yes, the remaining availability would mean that it all had been drawn.

Q      Gotcha.  So I think you're just saying you are not sure if the remaining availability was actually zero here; is that correct?

A      Yes.

Q      Okay.  That's fine.  Do you know why this amount of money was moved on this date?

A      On this date?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  I do not know why it was moved on this date any specific reason.

BY MS. MURPHY:

Q      This email says the purpose of the company's borrowing request is for working capital purposes.  Do you see that?



A       Yes, ma'am.

Q       Now, I think you said earlier that -- sorry.  Strike that.

Do you know if you were instructed to make this borrowing request?

MR. SHAPIRO:  Objection, vague.

THE WITNESS:  I have no specific recollection of what prompted the request.

MS. MURPHY:  Okay.  That's no problem.  How about we take a break for lunch?  I would recommend 30 minutes and I think once we get back from lunch, I will wrap up very, very quickly.

MR. SHAPIRO:  Okay.  We will have some -- or I will have some questions as well, but that sounds fine.

MS. MURPHY:  Great.  Does that work for you, Mr. Martin?

THE WITNESS:  Yes, ma'am.

MS. MURPHY:  All right.  We'll see everybody back just a little after 12:30.

THE VIDEOGRAPHER:  We're going off the record at 12:03 p.m. eastern daylight time.

(Recessed at 12:03 p.m. for lunch.)



A F T E R N O O N   S E S S I O N

(Reconvened at 12:36 p.m.)

THE VIDEOGRAPHER:  We're going back on the record at 12:36 p.m. eastern daylight time.

BY MS. MURPHY:

Q     Mr. Martin, I hope you had a good quick lunch.  We've talked a lot today about the February and March draw downs that maxed out some loan facilities.  What is your belief as to why those funds were drawn?

MR. SHAPIRO:  Objection, calls for speculation, vague.

THE WITNESS:  Yeah.  I don't -- I don't have any specific knowledge of any reason that it was -- that I was made aware of.

MS. MURPHY:  All right.  Well, I think that's all for us.  Mr. Shapiro, do you want to take over?

MR. SHAPIRO:  Sure.  Thank you.

EXAMINATION BY MR. SHAPIRO

Q     Thank you, Mr. Martin, for your time today and your patience with all the questioning and the objecting and all that.  So I appreciate it.  I will try to be brief here.  So let me just start I think going back to some things that were -- that you discussed earlier in your testimony.

Throughout your testimony you were asked what you did or what you understood, what you knew.  Am I correct in understanding that when you answered those questions you were speaking about yourself personally, Dan Martin, what you knew or did or understood?

A    Yes.

Q    Okay.  You don't speak for the company Croscill?

A    No.

Q    And your boss, if I understood you testimony correctly, was the CFO who at least for some period of time was Margaritta Topielski; is that right?

A    Yes.

Q    Okay.  Was there anyone who else was the CFO and your boss -- was there anyone else who was the CFO at Croscill while you were working there?

A    Yes.  There was Cliff Campbell, Andrew Skobe.  There was a temporary CFO for a short period of time, and I can't recollect his name, but I think that's all.

Q    Okay.  And those individuals Ms. Topielski, Mr. Campbell, Mr. Skobe, they were the ones that were ultimately responsible for the company's finances for its reporting from the financial accounting side; is that right?



A   They would have had ultimate responsibility, yes.

Q   Okay.  And you don't know what they did know or didn't know about any particular transactions, right?

A   I have no specific knowledge of anything they knew, correct.

Q   And you don't know with respect to any specific transaction whether they authorized it or not, you don't know one way or the other?

A   I do not.

Q   Okay.  And then those individuals reported to the CEO who was Joseph Granger the CEO of Croscill; is that right?

A   At a certain point Joe Granger was the CEO.

Q   Okay.  Well, what time period was he the CEO, do you recall?

A   I don't know the specifics of it of his tenure there, but during that period that we reviewed those documents that he was on, but there were -- there was a CEO before that.

Q   During the time that you were at Croscill?

A   Yes.

Q   Okay.  And whether it was up to Mr. Granger or any other CEO at Croscill, you don't know what they



knew or didn't know or understood or didn't understand about any particular transaction, correct?

A    Correct.

Q    Or about any particular action that was taken by the company or not taken by the company, correct?

A    Correct.

Q    And you don't know whether they authorized any particular transaction or particular action or not, you just have no idea?

A    I do not know.

Q    Okay.  And then the CEO, whether Mr. Granger or someone, else reported to Lynn Tilton, Ms. Tilton was the manager of the company; is that right?

A    Yes.

Q    Okay.  And so you don't know with respect to Ms. Tilton what she knew or didn't know or understood or didn't understand with respect to any particular transaction about Croscill, correct?

A    Correct.

Q    And you don't know what actions or transactions she authorized, correct?  Let me rephrase that.

You don't know one way or the other whether


DEPOSITION SOLUTIONS

she authorized any particular transaction or not?

A      Correct.

Q      Okay.  And if either Ms. Tilton as the manager of Croscill or Croscill's CEO or Croscill's CFO had known about or authorized any particular transaction, you would have no reason to believe that that wasn't an appropriately authorized transaction on behalf of company, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  I would have no knowledge that if it was not authorized.

BY MR. SHAPIRO:

Q      And you also spoke a number of times or referenced throughout the testimony about what we, using the word "we" did or knew.  Again, when you speak of "we" you're really just speaking about your own personal understanding and knowledge at your time in Croscill, correct?

MS. MURPHY:  Object to form.

THE WITNESS:  Correct.

BY MR. SHAPIRO:

Q      You were asked some questions at the beginning of the deposition about the protective order that you had received and you reviewed it and you signed it.  Do you remember those questions?



When did you or -- when did you receive the protective order, do you recall, a copy of the protective order?

A      It would have been in an email late yesterday.

Q      Okay.  And do you recall -- withdrawn.

Do you recall what the email said?

A      It explained that there was a protective order and according to the terms of the protective order there was supposed to be an attachment to it that I needed to sign, but there was no attachment and I could reply by email that I understood that any documents that were confidential were not to be disclosed and that I could comply by email.

Q      I didn't mean to cut you off.  Go ahead. Did you reply to that email?

A      I did.

Q      What did you say?

A      I said, I agree to comply with the restricted -- I can look it up and see my exact wording, but I think it was, I agree to the confidentiality restrictions.

Q      And then prior to that email had you received any emails from lawyers for the litigation Trust, from lawyers from Quinn Emanuel?



A       I had received -- from Quinn Emanuel I had received copies of the subpoenas, the original subpoena and then the one that changed it to a Zoom call.

Q       Okay.  And it looks like you're looking at your computer screen?

A       At my email, yeah.

Q       Yeah.

MR. SHAPIRO:  So I would just ask -- Ms. Murphy, you know, we would as that any communications, written communications, with Mr. Martin be produced to us in short order after the deposition.

MS. MURPHY:  We'll take that under advisement.  Thank you.

BY MR. SHAPIRO:

Q       So separate from email communications, did you have any phone calls with lawyers from Quinn Emanuel manual on behalf of the Litigation Trust?

A       I had a -- I had a phone call I believe from Mr. Pickhardt.  I'm not sure how to pronounce that.  And on that known call he asked if I would be willing to participate in a Zoom call and the purpose of that I was told was to determine whether he thought -- or whether a subpoena would be necessary to take the deposition.  That was my understanding.

Q       About how long did you speak to



Mr. Pickhardt in that phone call, do you recall?

A       Fifteen minutes, maybe.  Maybe a little longer.

Q       Okay.  Do you recall -- or did he tell you anything about the nature of the case, any background about the case that you recall?

A       The only background that he said is it was a Croscill related matter.  He didn't give any other specifics about who the plaintiff was, who the defendant was, or what the case was about.

Q       I guess when you spoke for 15 minutes or so.  So do you recall what else he asked you or what else you told him?

A       My best -- my recollection was some of kind of the same questions that were asked today, you know, what did I do at Croscill, was I responsible for, you know, working with Patriarch on the lending and borrowing request and things like that.  Those kind of questions.

Q       And do you recall anything that he told you about their side's view of the case?

A       No, nothing.

Q       Okay.  To your knowledge, was anyone else on that phone call?

A       To my knowledge, I know of no one else that



was on that phone call.

Q    Were there -- you mentioned the Zoom. We'll return to that in a minute.  Were there any other phone calls that you had with lawyers from Quinn Emanuel?

A    No, no more phone calls.  I don't recall any other phone calls.

Q    Okay.  And so then you had said he had asked for the call to determine -- well, to determine if it was worth having a Zoom, if I understand correctly?  Did you end up having a Zoom with Mr. Pickhardt?

A    We did.

Q    Go ahead.  Approximately when was that?

A    Can I look at my calendar just for a second?  Let me see if I can remember.  The email with the subpoena was on 6/2 and it said it was the day before.  So it had to be June 1.  I don't see it on my calendar, but the email says, thank you for speaking with us yesterday.  And this was dated June the 2nd. So I'm not -- I just don't see it on my calendar.  Oh, I'm sorry.  It was Tuesday -- Tuesday, June -- May the 30th.  Tuesday, May the 30th.

Q    And was there anyone else you recall on the Zoom besides yourself and Mr. Pickhardt?



A    Just a second.

Q    Sure.  Take your time.

A    I'm just trying to get my calendar right here.  On 5/23.  Okay.  So it was Tuesday, May the 30th, and I got that on 5/23.  So, yeah, had to be -- but the actual Zoom was on May 30th.

Q    Okay.  And do you recall if there was anyone else besides yourself and Mr. Pickhardt on that Zoom?

A    I'm trying to remember.  I can't remember.

Q    Okay.  Putting aside what the names of the individuals were, do you recall if there was anyone else on the call besides you and him, on the Zoom rather?

A    My recollection is maybe there was one other person.

Q    How long did the Zoom with Mr. Pickhardt last for?

A    I can't recall.  I think it was set up for an hour.  I don't know if it lasted that long.  I honestly can't remember.

Q    Do you recall if it was more than half an hour?

A    I think it was between a half hour and an hour.



Q    And did Mr. Pickhardt tell you anything during that Zoom about the case -- withdrawn.

What do you recall that Mr. Pickhardt told you on that Zoom?

A    On the Zoom call it was again questions about my functioning with Croscill and I believe it was even a question about Acme and there was sharing of a document, you know, so those same like a borrowing request or something, and just as a matter of is this the kind of same thing, questions, you know, do you recall these kinds of documents.

And, again, my response is, you know, I see the document and I know that we did those kind of things.  Do I remember that specific one?  Well, of course not, but there was those -- the sharing of a few documents like that on the Zoom call.

Q    Do you recall how the documents were shared?  Were they emailed to you?  Were they --

A    They were just screen shared, yeah.

Q    Okay.  And approximately how many documents did you look at with Mr. Pickhardt?

A    I really don't remember.  It wasn't a tremendous number.  It was just a few.

Q    Okay.

MR. SHAPIRO:  And, Ms. Murphy, we'd also



ask that we be provided with copies of any documents that were shown to Mr. Martin during that Zoom conference of him in late May.

             MS. MURPHY:  I understand.  We'll take that under advisement.

BY MR. SHAPIRO:

     Q     To your knowledge, was the zoom recorded?

     A     Not to my knowledge.

             MR. SHAPIRO:  I would ask also, Ms. Murphy, to discuss -- I won't put you on the spot now, but we would like an answer in short order about whether the Zoom was recorded and if it was we would request a copy of the recording.

             MS. MURPHY:  I understand.  I don't believe it was, but we'll take it under advisement.

BY MR. SHAPIRO:

     Q     And what did Mr. Pickhardt say to you, if anything, at the end of that Zoom?  Where did you guys leave things?

     A     I think where he -- where he left it was that internally they would determine whether they thought that a deposition would be necessary and then I think there was the question about if there was where would be a reasonable place to have it and a couple of questions like that.



And I had told him that I could, you know, could be in Raleigh if I needed to, and there was some discussion about, you know -- and then they changed it to the Zoom call.

Q     Do you have any understanding about why it was changed from Raleigh for an in-person deposition to a Zoom deposition?

A     After I got the first email with the first subpoena I think what I did is I responded that I would accept an email subpoena under the condition that it was in Raleigh and not in Atlanta because the original subpoena said Atlanta, and then I think there was a response that there was -- that it could be done do it via Zoom as opposed to being in Raleigh.

So then I received another -- that same day I received another subpoena, or, I'm sorry, I received it -- I think that my response was that I could do -- that the Zoom would work fine, and then on June the 16th I received the revised subpoena that it would be a Zoom call.

Q     Right.  Is it your understanding that it was your decision to do it by Zoom or that that was the lawyers' decision and they just informed you of it?

A     I -- the discussion was -- it was put the question to me, another option that may simplify the



logistics is to conduct the deposition via Zoom.  This would require you to have an office.  Would this work for you?  If that works will you confirm your accepting the subpoena?

So that was -- that was the conversation, and so I said, well, sure I can do it via Zoom.  So it was just a question, would that work for you?

Q    Your understanding were you asked the question:  Did you prefer to have it taken in person or by Zoom or you were not asked that question?

A    It was not posed in that fashion.  It was just, would a Zoom call work.

Q    Okay.

A    Did I have a place I could do a Zoom call and so forth.

Q    Thank you, Mr. Martin.  You were asked another question about the process of the deposition today.  I'm sure you recall at some point I interjected and noted that the documents -- it looks like or is my understanding was that you were not opening the documents that were being shown and that you were relying on counsel to scroll through them, and it seemed that -- that was at tab 17, Exhibit 171.

It seemed that after that point you started opening up the documents.  Do I have that right?  Up to



a certain point until I said something about the fact that the documents could be assessed, you're relying access and their scrolling to review them?

A     Up until that point I was just looking at what was on the screen.  I thought it was just quicker that way than trying to save the document.

Q     Your choice.  I understand what happened.

And after that point in time then you started downloading the document and reviewing them in full before the questions were asked?

A     Correct.

Q     Another question about your answers, I want to make sure I understand and we all understand what you meant when you answered certain things.  There were a number of questions that you answered that you didn't recall whatever it was, what the question was.

Am I right in understanding that when you said you don't recall that just meant you didn't remember one way or the other whether something happened?  You had no recollection of it one way or the other?

Relevance;
Speculation;
Incomplete
Counter

MS. MURPHY:  Objection to form.

THE WITNESS:  When I would say I didn't recollect I meant, yes, I just the not have a specific memory of that event or document.



DAN MARTIN                                          June 28, 2023
PATRIARCH PARTNERS vs ZOHAR CDO 2003-1                         114

BY MR. SHAPIRO:

Q        Okay.  But it could be that contemporaneously at the time you wouldn't have known about it or remembered it, but as you're sitting here today you don't remember one way or the other?

A        I do not remember right now.

Relevance; Speculation; Incomplete Counter

Q        Right.  Okay.  Sorry to beat a dead horse.

A        It's okay.

Q        That means that at some other point in the past you may have remembered that, just sitting here today you didn't remember it, right?

MS. MURPHY:  Objection to form.

THE WITNESS:  I don't know whether -- it means I don't know whether, whether or not.

BY MR. SHAPIRO:

Q        Thank you.  Do you recall some questions about Acme and the particular I think there was some questioning about whether Acme had active operation at a certain point in time.

Do you recall at what point in time Acme -- withdrawn.  Do you recall that Acme did have active operations at a certain point in time?

A        I do not believe that they were active during the time that we were managing their operation. I don't recall that they were -- that -- my



recollection is that it was the final collections out of maybe a few receivables, but if there were any kind of transaction it was a closeout of their inventory or something like that, but it was not an ongoing operation.

Q    Okay.  I guess sorry my question I think was not clear by what I meant by "operation."

So let me just ask it this the way:  Do you recall that there was some inventory last -- that they were trying to sell through in the 2017 time period?

MS. MURPHY:  Objection to form.

THE WITNESS:  I just can't remember the specifics of that.

BY MR. SHAPIRO:

Q    Okay.  I'll show you a document and see if it refreshes your recollection.

Speculation

MR. SHAPIRO:  Anthony, if we could put tab 69 into the chat.

(Martin Exhibit 177 was marked for purposes of identification.)

MR. SHAPIRO:  I don't know if the court reporter -- I don't know if you're marking the exhibits as defendant or trust Exhibit numbers or just matter Exhibit numbers so I can now whether to look?

MS. MURPHY:  I think we talked about it



DAN MARTIN                                          June 28, 2023
PATRIARCH PARTNERS vs ZOHAR CDO 2003-1                        116

before Vin's deposition and Ms. Rosemen and Mr. Pickhardt suggested that we should all just try to do consecutive ones.  I think that they had the idea to maybe start you're all's exhibit numbers like 400 so there would be a gap, but that might have just been for the depos you all would be taking.  I think our last exhibit number so far is 176 if you'd like to take the next one.

MR. SHAPIRO:  Thank you.  So let's mark this as Exhibit 177.

BY MR. SHAPIRO:

Q      Take a moment or as long as you need to look at the document.  Just let me know when you're ready.

A      (Reviewing document.)

Okay.

Q      I'm just going to direct your attention to the second email down in the chain on the screen as well, and I'll note for the record this is Exhibit 177.  It's the Bates number starting Trustee score A 2060888.

The second email down is an email from you to Kevin Dell offering copying Ms. Topielski, Mr. Devito and Ms. Tanks dated January 22nd, 2018.  And you see that you write, yes, Acme consumes the final a federal return and also an NC franchise return since

Relevance; Hearsay

they had inventory in NC for 2017 Acme has very little sales.  Just NC refers to North Carolina, right?

A       Yes, sir.

Q       Does this refresh your recollection that in 2017 Acme did have some sales and inventory?

A       From this email I believe they did.

Q       You have no reason -- I understand it's six years later.  You have no reason to believe that this -- that that was not accurate when you wrote it?

A       No, no.  Correct, correct.

MR. SHAPIRO:  If we could pull up tab 40, Anthony.

(Martin Exhibit 178 was marked for purposes of identification.)

MR. SHAPIRO:  If we could mark as Exhibit 178, the email chain with starting Bates number Trustee_AP1861464.

BY MR. SHAPIRO:

Q       And, Mr. Martin, take a moment to look that over?

A       Is this 40 or 40B?

Q       This is, sorry, 40 is the email, the top email, 40A and 40B are the attachments to this email. So we will discuss the attachments as well.

A       Okay.


800.211.DEPO (3376)
EsquireSolutions.com

MR. SHAPIRO:  If we could just mark the entire chain with its attachment as that 178.  I think it will be easier than separately marking the attachments.

BY MR. SHAPIRO:

Q        Let me know when you're ready, Mr. Martin.

A        (Reviewing document.)

Okay.  I've got them open.

Q        Great.  I'm just going to direct your attention to the second page of the cover email ending in Bates 465.

Do you see that that's one of those funding request emails from you to Mr. Devito and others.  It says, please see attached funding certificate and direction letter form for Acme for Friday, November 4th, 2016.

Do you see that?

A        Yes, sir.

Q        Okay.  And then there's a funding request for $21,537.25.

Do you see that?

A        Yes, sir.

Q        Okay.  And I'm just going to now point you to that first Exhibit A, if you open that up.  Do you see that that's attached funding certificate?  That's



for --

A      Yes.

Q         -- for the amount as of this $21,537.25? And if I could direct your attention similarly to the third paragraph subpoint B it says, the undersigned -- well, withdraw that.

Do you see that you signed this funding certificate?

A      Yes, sir.

Q      Okay.  So then subpart B says, the undersigned shall use the proceeds of funds requested hereby strictly in accordance with the terms and conditions of the present agreement.

Is it your understanding that when you made these funding requests for Acme that they were appropriate and authorized under the governing documents.

MS. MURPHY:  Objection to form.

THE WITNESS:  It would have been my belief when I signed this that because I had a list of the expenses that these would be paid for, or that these funds would be used for that they were being used in the normal course of business.  So I would have had no reason to believe that that was going against any loan documents.



800.211.DEPO (3376)
EsquireSolutions.com

BY MR. SHAPIRO:

Q    Sure.  And that was your normal practice was to have expenditures that those funds were going to be used for when you asked that they be withdrawn, right?

MS. MURPHY:  Objection to form.

THE WITNESS:  Right.

BY MR. SHAPIRO:

Q    Okay.  I'm glad you said that because that leads to my next question which is if you open up Exhibit attachment B, and that's the payment request. Let me know when you have that.

A    Yes, sir.

Q    So this is what you were just talking about, the specific expenses for Acme that those 21,000 and some what dollars were going to be used for, right?

A    Yes, sir.

Q    And these are normal appropriate business expenses, to the best of your knowledge?

MS. MURPHY:  Objection to form.

THE WITNESS:  These -- at that point in time these were normal operating expenses for Acme?

BY MR. SHAPIRO:

Q    And you see that the last item there is the 12,000 some odd dollars for inventory.  With that prior

email that you were looking at that we were looking at that was inventory that that was still being transacted in connection with, right?

A    Can you say that again?  You were a little muffled.

Q    I'll restate that one.

Do you see that last item on Exhibit B, it's 12,000 some add dollars, and the purpose is inventory.

Do you see that?

A    Yes, sir.

Q    And the Efficiary Bank [sic] Bank, Shanghai Pudong, Pudong Development Bank.  Does this -- and for the account name, Ningbo Easy Houseware Co. Limited.

Do you have any understanding of -- withdrawn.

Does this refresh your recollection that the company was still purchasing inventory at this point?

A    From looking at this document, it doesn't -- it doesn't -- I still do not have specific recollection of inventory purchases.  As I said, when I see a document like this then I believe that they did have some activity, but I just don't have that specific recollection of it.



800.211.DEPO (3376)
EsquireSolutions.com

Q      Sure, no.  Totally understand it's many years later.  I just want to make sure that I'm reading this document the same way you are.  You read this last item to mean that there's some 12,000 some add dollars that's going to be spent by Acme on inventory?

MS. MURPHY:  Objection to form.

THE WITNESS:  I would read it that way.

BY MR. SHAPIRO:

Q      Mr. Martin, do you have or did you have at the time that you were at Croscill familiarity with the credit agreement between Croscill and Zohar Funds and PPAS?

A      I would have had -- I mean, I did have at that time knowledge of the credit agreements and because there were, you know, provisions in there that we had to comply with and reporting deadlines and different things like that.  So I would have been, you know, somewhat familiar I guess with the credit agreements.

Q      And you joined in 2010; is that right?

A      No.  I was there in 2008 when --

Q      2008, I'm sorry.

A      Yes, I was there, yeah, from the very beginning, yeah.

Q      Do you have any recollection of an



amendment to the credit agreement that was dated June 2nd, 2011?

A    Again, I don't have specific recollection of that.

Q    Was William Austin the CFO, at that time, do you recall?

A    He was.  Bill Austin was.

Q    And, to your knowledge, did he have the authority to sign documents on behalf of the company?

MS. MURPHY:  Objection to form.

MR. SHAPIRO:  I'll withdraw that.

BY MR. SHAPIRO:

Q    Was it your understanding that PPAS, Patriarch Partners Agency Services, acted as the administrative agent on the loans that Croscill had with the Zohar funds?

A    That was my understanding, yes.

Q    And it was your understanding that they served in that role from when you started all the way until when you left, right?

A    Yes.

Q    There was a prior email that you looked at with Ms. Murphy that referenced the board of Croscill. Do you have any understanding or -- withdrawn.

The board of Croscill is Ms. Tilton, right?



A       My understanding was that Ms. Tilton was the manager of Croscill.

Q       You don't have any understanding one way or the other about the composition of the board?

A       No.

Q       Now, you were asked some questions and shown some documents regarding the audit process for Croscill, audit for the year -- for the 2015 year ending I guess January 3rd, 2015.

Do that I have correct.  Do you remember that?

A       I do remember some questions about one of the audits.

Q       Okay.  I'm looking at the document again, realize that I got the date wrong.  So let me start over again.

Do you remember looking with Ms. Murphy at the audit-related document, the financial statements, for Croscill for the years ended January 2nd, 2016, and January 3rd, 2015?  And you can look up Exhibit 159 if you have it, you know, if that's helpful.

A       What number?

Q       We can put it back in the chat.  It's either tab 11 or Exhibit 159.

A       I was trying to find it in the chat, but --



800.211.DEPO (3376)
EsquireSolutions.com

Q     The numbering is, you know, by tab number that's different.  Don't worry about it.  We'll get it back in.

A     Did you say it was tab 11?

Q     I do believe.

A     I don't have a tab -- I see it now.

Q     Okay.  I'm just trying to orient us time-wise.  That's just the first thing.  So we're all talking about the same financial statement.

Do you see we're talking about and you were talking with Ms. Murphy about the audit process that resulted in these financial statements dated and for the years ended January 2nd, 2016 and January 3rd, 2015.

Do you see that?

A     Yes, sir.

Q     And do you recall discussing with Ms. Murphy that Anchin raised some questions in the process of their conducting the audit and preparing the financial statement?

A     I remember seeing a -- copies of e-mails that had some questions from the audit manager for Anchin.

Q     And your understanding of, in your role or background, is it common for auditors to raise



questions during the audit process?

MS. MURPHY:  Objection to form.

THE WITNESS:  In my experience auditors have raised, always raised questions in the audit process.

BY MR. SHAPIRO:

Q    That's their job I guess?

A    Yeah.

Q    And then it sounded like after they raised some questions that you had spoken with Patriarch about the questions that they had raised; is that right?

MS. MURPHY:  Objection to form.

THE WITNESS:  If there were any questions related to -- and on some of those -- on most of those emails I was not even a party to those emails, but in any case if there were any questions from auditors about our financing arrangements with PPAS the company would, of course, had to communicate with them about it.

BY MR. SHAPIRO:

Q    Right.  And it's your understanding whatever questions they had were satisfactorily resolved because they did, in fact, sign off on your financial statement at the end of that process, right?

MS. MURPHY:  Objection to form.

THE WITNESS:  They did issue their audit report, and they also disclosed in this report the transactions with affiliates and those kind of things.

BY MR. SHAPIRO:

Q     Exactly right.  So they and you, the company, disclosed those transactions, the $2.5 million draw and the 2.4 somewhat million dollar draw, that you had been discussing with Ms. Murphy, those were disclosed in the audited financial statements, correct?

A     I --

Q     Sure.  I can point you to the page if it's easier.

A     I see it.  It's under the debt footnote. It does talk about the balance of the working capital revolver being drawn.

Q     And you see specifically it says that that happened in March 2016?

A     Yes.

Q     And in the previous page -- on the previous page under the discussion of long-term debt, the last sentence of the first long paragraph under debt is Bates ending 953 it says, in February 2015 the members asked for additional term loans for the company in the amount of $2.5 million, the same term described above.

Do you see that?



A       Correct.

Q       Okay.  So again the company disclosed that draw in its audited financial statement?

MS. MURPHY:  Objection to form.

THE WITNESS:  The -- this audit report for 2015 is disclosed as 2016 transaction.

BY MR. SHAPIRO:

Q       So basically at the earliest possible opportunity the company disclosed those transactions?

MS. MURPHY:  Objection to form.

THE WITNESS:  Disclosed them to who?

BY MR. SHAPIRO:

Q       To their auditors.

A       Oh, correct.

Q       And the auditors reviewed the transactions and signed off on the financial statements?

MS. MURPHY:  Objection to form.

THE WITNESS:  The financial statement would not have had any impact of that in 2015 because it was a 2016 transaction.  I think the questions actually come -- if I'm not mistaken, the questions were related to the next year's audit.

BY MR. SHAPIRO:

Q       A hundred percent.  What I'm getting at, and maybe I should have put in it plainer terms, you



agree with me.  This is a 2015 financial.  So there wasn't even a need to talk about 2015 transactions and yet the transactions were disclosed to the auditor and they were discussed in the financial statement it seems to me at the earliest possible opportunity?

MS. MURPHY:  Objection to form.

THE WITNESS:  Can you just repeat the question again?

BY MR. SHAPIRO:

Q     Sure.  I will break it down.  So as you said this is the 2015 calendar year financial statement and so there wasn't even a need to mention anything, discuss anything about what happened in December or March 2016 in the financial statements, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  I do not agree with that.

BY MR. SHAPIRO:

Q     Okay.

A     Because it's important for the audit report as a whole to disclose anything significant that had happened between the date of the financial statement and the date the report is issued.

Q     Okay.  Fair enough.

A     And the report was not issued until May or whatever the date of the audit report is.



Q      I understand you now, but this was the first -- maybe I'll put it this way.  To your knowledge, this is the first financial statement after the February or March transactions that the company finalized?

MS. MURPHY:  Objection to form.

THE WITNESS:  You're talking about audit report?

BY MR. SHAPIRO:

Q      The audited financial statement, yes.

A      This would have been the first audited financial statement that were issued after those transactions.

Q      Okay.  And those transactions are disclosed in these audited financial statements, right?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes.

BY MR. SHAPIRO:

Q      Okay.  And just one last question on this. If you turn to page 1 of the financial statement, and Anthony will set it up there as well.

You're familiar with Anchin Block & Anchin?

A      Yes.

Q      And that's a reputable well-respected accounting firm that conducts audits for companies,



right?

MS. MURPHY:  Objection to form.

THE WITNESS:  I believe they are reputable CPA firm.

BY MR. SHAPIRO:

Q      That's why Croscill chose them for to audit their financial reports, right?

MS. MURPHY:  Objection.

THE WITNESS:  Right.

BY MR. SHAPIRO:

Q      And they -- and if you see -- first if you turn to page 3 this is, sorry, page 2, I'm sorry Anthony, this statement is -- these first couple of pages are signed by electronic obviously, but Anchin Block & Anchin.

Do you see that?

A      Yes, sir.

Q      And you see the opinion at the top, in our opinion the financial statements refer to above present fairly in all material respects the financial position of Croscill Home, LLC as of January 2nd of 2016 and January 3rd, 2015, and the results of their operations and their cash flows for the year's end and in accordance with accounting principals generally accepted in the United States of America, and you have



DAN MARTIN                                                  June 28, 2023
PATRIARCH PARTNERS vs ZOHAR CDO 2003-1                             132

no reason to doubt or question Anchin's conclusion that
its financial statements were compliant and correct in
all material respects, right?

MS. MURPHY:  Objection to form.

THE WITNESS:  I have no reason to believe
that these financial statements were not.

BY MR. SHAPIRO:

Q    And if you just -- last question on this.
Now back to page 1, Anthony, because the last line on
page 1.

It says, we, meaning Anchin, believed that
the all the evidence we have obtained is sufficient and
appropriate to provide a basis for our audit opinion.

You have no reason to question that their
belief that they did a proficient and appropriate audit
and that the evidence that they obtained provided a
sufficient basis for their audit opinions, right?

MS. MURPHY:  Objection to form.

THE WITNESS:  I have no reason to believe
that they did not obtain enough evidence to issue an
opinion.

BY MR. SHAPIRO:

Q    My question I think was not a great
question.  I'll ask it in the affirmative which is:  To
your understanding, the company provided Anchin with



sufficient evidence to form a basis for its opinion and to conclude it's audit, right?

MS. MURPHY:  Objection to form.

THE WITNESS:  The company provided information for the audit, yes, and -- but it would have been left up to them to determine whether it was sufficient for them to issue an opinion.

MR. SHAPIRO:  Fair enough, and they're the auditor, and you have no reason to question their conclusion in that regard, right?

MS. MURPHY:  Objection to form.

THE WITNESS:  I have no reason to question it.

MR. SHAPIRO:  If we could just take a literally two-minute break I think I'm done, but I just want to look my notes over quickly.

THE VIDEOGRAPHER:  We're going off the record at 1:34 p.m.

(Deposition recessed at 1:34 p.m.)

(Deposition resumed at 1:41 p.m.)

THE VIDEOGRAPHER:  We're back on the record at 1:41 p.m. Eastern Daylight time.

Proceed counsel.

MR. SHAPIRO:  No further questions for Mr. Martin from Patriarch Partners Agency Services.



MS. MURPHY:  The Trust has just a few more questions.

FURTHER EXAMINATION BY MS. MURPHY

Q    Mr. Martin, when Mr. Pickhardt sent the initial subpoena to you via email, did he tell that you we can find a location in Raleigh to conduct the deposition?

A    He did.

Q    And later was the idea of conducting the deposition by Zoom posed to you as another option?

A    It was.

Q    Okay.  Thank you.  And then speaking about the financials, the audited financials that we were just looking at a second ago, we can probably pull those up.  They're at tab 11 there which --

A    I have opened it.

Q    Great.

MS. MURPHY:  I was going to say, I appreciate you, Mr. Cruz, dropping it back down.

BY MS. MURPHY:

Q    So these financial statements were presented as of January 2, 2016, correct?

A    Correct.

Q    And the February and March 2016 drawdown transactions that we've been talking a lot about today,



they had not occurred as of the date of which these financial statements are presented and certified, correct?

A    That is correct.

Q    And the discussion of the February and March transactions, the big drawdown, only occurred in a note to the financial statements, correct?

A    They are reflected only in the notes, correct.

Q    And the balance sheets in those financial statements is presented as of January 2, 2016, only; is that correct?

A    That is correct.

Q    So in order to audit the balance sheets for this audit the auditors would not need to scrutinize the February and March 2016 transactions; is that correct?

A    That's because it was a significant event after the end of the year but prior to the issuance of the audit report, they would have, if they had knowledge of it and the company is required, of course, to disclose to their auditor any significant subsequent events after the balance sheet date, they would be interested in it.

Now, they would not have to -- to my



knowledge, would not have to make any adjustment -- you know, they wouldn't have to obtain audit evidence at that point, I don't think, to change, you know, the presentation.  It's just a footnote disclosure.

Now, if -- I guess, yeah.  They would be interested in it, but to the extent that they -- they would have to determine to what extent they needed to look at those transactions, but, you know, that had been disclosed to them.

Q    Gotcha.  Thank you.  And the auditors, in fact, did raise questions about those transactions in 2017 in the course of the audit for the 2016 fiscal year; is that correct?

A    I believe that is the document that we looked at that it was for the next year's audit.

Q    Great.

MS. MURPHY:  All right.  No more questions from us.

MR. SHAPIRO:  No redirect.

THE VIDEOGRAPHER:  Thank you, counsel.  At this time we ask that all participates please stay connected briefly to provide transcript and video orders prior to going off the record beginning with Quinn Emanuel which was showing a standing order expedite, rough, video sync?



MS. MURPHY:  Yes, sir, thank you.

THE VIDEOGRAPHER:  And for Mr. Shapiro?

MR. SHAPIRO:  Same, please.

THE VIDEOGRAPHER:  Thank you, and our court reporter may have additional questions before we go off the record.

THE COURT REPORTER:  Mr. Martin, are we reading and signing or waiving signature?

MR. CAMPBELL:  This is Brian Campbell from Quinn.  Are you table hear me?  Mr. Martin, what that means is generally when you're deposed you have the opportunity to -- when the transcript is finalized you have the opportunity to read the transcript, identify any, you know, typos or errors in the transcript and make corrections.

The typical time for doing that is I believe 30 days.  So that's an option that you have, and if this works for you what we'll do is when the final transcript comes in we'll send it to.  You're entitled to review it.  You're entitled to make corrections, if you like.  You're not under any obligation to, and then so if you want to you can send us back the corrections, but you're not required to.

THE WITNESS:  Okay.

MR. CAMPBELL:  To answer your question,



Steven, is we'll provide it to Mr. Martin and if he has any corrections we'll send it back to you.

THE COURT REPORTER:  Thank you.

THE VIDEOGRAPHER:  Thank you.  This is the videographer.  I'll take us off the record.  This concludes the videoconference deposition of Dan Martin. We're going off the record on June the 28th, 2023, at 1:47 p.m. Eastern Daylight time.

Thank you Mr. Martin and thank you counsel.

(Deposition was concluded at 1:50 p.m.)



CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me.

Any additions or corrections that I feel are necessary will be made on the Errata Sheet.

_____

Dan Martin

_____

Date

(If needed, make additional copies of the Errata Sheet on the next page or use a blank piece of paper.)



ERRATA SHEET

Case: PPAS V Zohar

Witness: Dan Martin                    Date: 06/28/2023

PAGE/LINE            SHOULD READ            REASON FOR CHANGE

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____



CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

        I, Steven Poulakos, registered Professional Reporter, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

        IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 28th day of June 2023.

My commission expires:

August 20, 2023



_____

NOTARY PUBLIC IN AND FOR

THE STATE OF MARYLAND

**Exhibit F**

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
16 Civ. 4488 (VM) (KHP)
- - - - - - - - - - - - - - - - - - - -x
PATRIARCH PARTNERS AGENCY
SERVICES, LLC,

                    Plaintiff

        -vs.-

ZOHAR CDO 2003-1, LTD., et al.,

                    Defendants.

- - - - - - - - - - - - - - - - - - - -x

Key
PPAS Designation           July 25, 2023

Trust Designation
                            10:41 a.m.

                    ** CONFIDENTIAL **

        Videotaped Deposition of AILEEN DAVERSA, taken
by Plaintiff pursuant to Notice, held at the
offices of McELROY DEUTSCH, MULVANEY & CARPENTER
LLP, One State Street, Hartford, Connecticut,
before SANDRA SEMEVOLOS, a Registered Merit
Reporter, Certified Realtime Reporter, and Notary
Public of the State of Connecticut.

2

A P P E A R A N C E S:

For Plaintiff, Patriarch Partners Agency Services:
       GIBSON DUNN & CRUTCHER LLP
       200 Park Avenue
       New York, New York 10166
       212.351.4000

BY:  AKIVA SHAPIRO, ESQ.
BY:  CARSON WHITEHURST, ESQ.

For the Witness Aileen Daversa:
       COHEN & GRESSER, LLP
       800 Third Avenue
       New York, New York  10022
       212.957.7069

BY:  NATHANIEL P.T. READ, ESQ.


For the Witness Aileen Daversa, Alvarez & Marsal
Zohar Management, Alvarez & Marsal Zohar Agency
Services, and Zohar Litigation Trust A:

       QUINN EMANUEL URQUHART & SULLIVAN, LLP
       51 Madison Avenue
       New York, New York 10010
       212.849.7000
BY:  BRIAN CAMPBELL, ESQ.
BY:  HANNAH ODENTHAL, ESQ.


Also Present:
       Brian Capouch, Videographer

Page 3

3

INDEX

EXAMINATION

Witness Name                                          Page

Aileen Daversa

   By Mr. Shapiro ......................... 6


                  PLAINTIFF'S EXHIBITS

              (Marked For Identification)

Exhibit 208 Marked ......................... 56
Email from Thomas Macedonio to Aileen Daversa
and Christopher Cover dated March 10, 2016,
Bates Numbers ALVAREZ_PPAS0000047 through
ALVAREZ_PPAS0000051 and attachments

Exhibit 209 Marked ......................... 85
Email from Thomas Macedonio to Ms. LaPuma and
others, copying Ms. Daversa, Bates Numbers
ALVAREZ_PPAS0001244 through
ALVAREZ_PPAS0001250 and attachment

Exhibit 210 Marked ......................... 103
Email sent 7/26/2016 from Mr. Cover to
ebennett@wc.com, copying various people and
BCCing Ms. Daversa and others, Bates Numbers
ZOHAR-PPAS-00000917 through
ZOHAR-PPAS-00001024, including attachments


Exhibit 211 Marked ......................... 119
Email from Project Zenith to Thomas Macedonio
dated September 29th, 2016, and follow-on
correspondence, Bates Numbers
ZOHAR-PPAS-00017145 through
ZOHAR-PPAS-00017183

Exhibit 212 Marked ......................... 125
Email from Ms. LaPuma to Ms. Daversa and
others dated October 3rd, 2016, Bates Numbers
ZOHAR-PPAS-00043138 through
ZOHAR-PPAS-00043145 and including attachments

Page 4

4

INDEX (continued)

Exhibit 213 Marked ......................... 130
Email from Ms. LaPuma to Ms. Daversa dated
October 4th, 2016, Bates Numbers
ZOHAR-PPAS-00043136 through
ZOHAR-PPAS-00043137

Exhibit 214 Marked ......................... 132
Email from Ms. Daversa to Ms. LaPuma and
others, dated October 4, 2016, Bates Numbers
ZOHAR-PPAS-00047827 through
ZOHAR-PPAS-00047853, with attachments

Exhibit 215 Marked ......................... 136
Document titled Zohar III Status Update,
Alvarez & Marsal Zohar Management, LLC,
October 21st, 2016, Bates Number
ZOHAR-PPAS-00059203 through
ZOHAR-PPAS-00059295

PREVIOUSLY MARKED EXHIBITS

Exhibit 31 Previously Marked ............... 81
Exhibit 177 Previously Marked .............. 8
Exhibit 189 Previously Marked .............. 101
Exhibit 190 Previously Marked .............. 63
Exhibit 193 Previously Marked .............. 90
Exhibit 194 Previously Marked .............. 94
Exhibit 204 Previously Marked .............. 133

(Exhibits 208 through 215 were attached to transcript.)

CONFIDENTIAL - AILEEN DAVERSA          5

(Deposition Commenced at 10:41 a.m.)

THE VIDEOGRAPHER:  We are now recording.  This is the beginning of Media Number 1 in the deposition of Aileen Daversa.  Today's date is July 25th, 2023.  The time on the monitor is 10:41 a.m.  The case is Patriarch Partners Agency Services, LLC versus Zohar CDO, 2003-1 Ltd., et al.

My name is Brian Capouch, the court reporter is Sandra Semevolos.  We represent Veritext, Incorporated.  Videotaping will continue until all parties agree to go off the record.

Counsel, please state your appearance for the record after which the court reporter will swear in the witness.

MR. SHAPIRO:  Akiva Shapiro with Gibson Dunn & Crutcher for the Plaintiff, Patriarch Partners Agency Services, and with me is my colleague, Carson Whitehurst.

MR. READ:  Nathaniel Read from Cohen & Gresser for the witness, Ms. Daversa.

MR. CAMPBELL:  Brian Campbell from Quinn Emanuel Urquhart & Sullivan on behalf of the witness, Alvarez & Marsal Zohar Management, Alvarez & Marsal Zohar Agency Services, and Zohar

CONFIDENTIAL - AILEEN DAVERSA                6

Litigation Trust A.  And with me is Hannah Odenthal.

THE VIDEOGRAPHER:  Thank you.

Swear in the witness, please.

A I L E E N   D A V E R S A,

Being first duly sworn and/or affirmed, was examined, and testified on her oath as follows:

THE REPORTER:  Thank you, ma'am. Please state your full name and address for the record.

THE WITNESS:  Aileen Daversa.  2 Bishop Road, Number 203, West Hartford, Connecticut, 06119.

THE REPORTER:  Please proceed.

EXAMINATION

BY MR. SHAPIRO:

Q.    Good morning, Ms. Daversa.

A.    Good morning.

Q.    Thank you for taking the time to do this.

I don't know if you've been deposed

Page 7

CONFIDENTIAL - AILEEN DAVERSA                    7

before, have you?

    A.    No.

    Q.    Okay.  So, just go over a few ground rules.

    A.    Sure.

    Q.    As you know, the court reporter is taking down my questions and your answers, so if you try to answer verbally, that would be good for the record.

        If you don't understand a question that I ask, feel free to ask me to clarify.

    A.    Okay.

    Q.    And if your attorney objects, unless he tells you not to answer, you still have to answer the question.  So, I'm going to ask the question, he may object, and then, you know, try to keep the question in mind and answer it --

    A.    Okay.

    Q.    -- unless he tells you not to do so.

    A.    Okay.

    Q.    You understand you are under oath --

    A.    Uh-huh.

    Q.    -- testifying as if you were in court.

        Is there any reason that you can't

Page 8

CONFIDENTIAL - AILEEN DAVERSA                8

testify truthfully and completely today?

A.    No.

Q.    Okay.  Oh, and last thing, if you need a break at any time, let me know.

A.    Okay.

Q.    No problem.  Whenever you need it.

MR. SHAPIRO:  Take the protective order out.

(Exhibit 177, previously marked.)

BY MR. SHAPIRO:

Q.    Ms. Daversa, I'm going to hand you a document that's previously been marked Exhibit 177 in this case.

And just to note for the record and for counsel, we were not able to print the documents that have the exhibit stamps on them from the last depositions; it was very recently.  But I will try to note when something has been previously marked and not enter it again.

So, you have in front of you, Ms. Daversa, a protective order in this case, which basically just indicates that there are certain confidential information.  You may see documents that are marked confidential and that there are

Page 9

CONFIDENTIAL - AILEEN DAVERSA                9

certain limitations on who you can talk to about that. You know, of course, you can talk to your attorneys, but third parties, generally speaking, you can't.

Do you agree to be bound by the protective order? Obviously take as much time as you need to look at it and ask -- consult with your counsel.

A.    I think so.

THE WITNESS:  Do I need to read this whole thing?  Just confidentiality?

MR. READ:  No, it's a standard protective order and as long as you are comfortable with it.

THE WITNESS:  Yeah, I mean, I won't talk to anyone about it besides you guys.

BY MR. SHAPIRO:

Q.    Okay, great.

A.    Thanks.

Q.    And then I'm going to be using some terms, some acronyms throughout the course of the day. So, just to make sure we are all on the same page, and if you don't recognize any of these, let me know. I think they are all terms that are going

CONFIDENTIAL - AILEEN DAVERSA           10

to be fairly familiar to you, if maybe from a few years ago.  But A&M is Alvarez & Marsal.

A.    Yeah, I remember that one.

Q.    AMZM is Alvarez & Marsal Zohar Management --

A.    Okay.

Q.    -- which we will talk about.  We'll get into it when we get into it.  AMZAS is Alvarez & Marsal Zohar Agency Services.

A.    Okay.

Q.    Do you have a recollection or understanding of the difference between the AMZM and AMZAS?

A.    No.  I didn't -- I wasn't involved in setting up those entities, so I don't -- and it's so long ago, so I may need a refresher if it's relevant to any questions.

Q.    Okay, no problem.  And then P-P-A-S, or PPAS is Patriarch Partners Agency Services.

A.    Okay.

Q.    Do you have a recollection of that entity, distinct from other Patriarch Partners entities?

A.    I remember the entity.  How it relates to

Page 11

CONFIDENTIAL - AILEEN DAVERSA                11

the other entities, I don't recall, and what their

specific role was.

Q.    Okay.  So, we may talk about that as

well.  But in any event, P-P-A-S or PPAS is

Patriarch Partners Agency Services.  And then I may

refer to "the funds," and if I say, "the funds"

without specifying what funds, that's the Zohar

funds.

A.    Yes.

Q.    So, does that make sense?

A.    Yes.

Q.    And if you do the same, if you use those

terms --

A.    I probably won't because I don't remember

them all.  Well, I remember Zohar and A&M, but the

acronyms for the others, yeah.

Q.    Well, maybe as we, you know, look at some

documents --

A.    And PPAS, I can remember.

Q.    Yeah.  As we look at some documents, it

may start to refresh your recollection; you may use

those terms as well, but I guess we'll all be on

the same page if you do.

So, what did you do to prepare for

CONFIDENTIAL - AILEEN DAVERSA          12

today's deposition?

A.    I had a phone call with -- a Zoom call with counsel, this group here.  Do I have to name their names?

Q.    No.

A.    Okay.  Just to understand just, like, the rules you laid out here and do a little bit of practice.

Q.    Okay.  And about how long did you speak with them?

A.    I think it was like three-and-a-half hours.

Q.    And when was that?

A.    This is how good my memory was.  It was last week.  Do we know the exact date?  I don't remember the exact date.

MR. READ:  It's up to you.  If you don't remember, that's fine.

A.    I don't remember.

Q.    Okay, that's fine.

A.    It was within the week.  It was maybe Friday; I don't remember.

Q.    No problem.  And did you look at any documents when you were --

Page 13

CONFIDENTIAL - AILEEN DAVERSA          13

A.    Yes.

Q.    -- on the Zoom call?

Did any of the documents that you looked at refresh your recollection about the --

A.    Not really.

Q.    Just one other thing in terms of the, kind of, ground rules, if you could wait until I finish my question --

A.    Finish, okay.

Q.    -- and then answer.  Even if you know where I'm going.

A.    Yeah.

Q.    You know, just so the record is cleaner that way.

A.    Sorry.

Q.    Yeah, no problem.

And then other than that one Zoom call with counsel sometime last week, did you speak with counsel any other times in preparation for the deposition?

A.    Not in preparation, just more coordination.

Q.    Okay.  If you recall, approximately when did you engage your current counsel to represent

Page 14

CONFIDENTIAL - AILEEN DAVERSA          14

you for the deposition?

A.    Officially, I signed an engagement letter -- I actually remember this because it was Saturday or Sunday of the week prior.

Q.    Meaning not this Saturday or Sunday that just --

A.    No.

Q.    -- occurred, but the one before that?

A.    Prior, yeah.

Q.    Okay.  And you said, "officially," do you remember when officially you --

A.    I mean, it was signing an engagement letter, but I don't -- I mean, if you pull up the engagement letter, I could read the date on it, but it was -- I know it was over the weekend because I was out of town and I needed my computer in order to do it, so I think it was Saturday or Sunday.

Q.    And do you recall when -- withdrawn.

Do you recall how you first came in -- withdraw that as well.

Do you recall when you first had conversations with your current counsel about representing you in the deposition?

A.    I mean, it was shortly -- well, first, it

Page 15

CONFIDENTIAL - AILEEN DAVERSA                    15

was with Brian, and it was shortly after I got the papers or whatever you call it, where they subpoenaed me.  So, I reached out to my former employer, and they connected me with Brian.

Q.    And to your understanding, does Quinn Emanuel represent you currently?

A.    Nate officially represents me, but I think Brian is secondary.

Q.    Okay.  I mean, I know it's to some extent, you know, might not be -- what you know you know.  What you don't know you don't know.  So, you know, that's fine.

But just to your understanding, does Quinn Emanuel represent you?

A.    Yes, yes.

Q.    And do you have an engagement letter with Quinn Emanuel?

A.    No.

Q.    So, why do you -- what's the basis for thinking that they represent you?

MR. READ:  I just have to caution you because --

THE WITNESS:  Yes.

MR. READ:  He is not asking you to

Page 16

CONFIDENTIAL - AILEEN DAVERSA                16

disclose the substance of any communications you

had with any of your lawyers, whether it's me or

Quinn Emanuel.

THE WITNESS:  Right.

MR. READ:  So, if you can answer the

question without giving him that --

THE WITNESS:  Okay.

MR. READ:  -- then you should

answer.  But if you can't, then I don't think you

can answer.

THE WITNESS:  Okay.

Yeah, I don't know if I can answer.

BY MR. SHAPIRO:

Q.    And when do you believe that Quinn

Emanuel began representing you?

A.    I really don't know.  I mean, if you

define that as being when I had my first

conversation with them, I guess that would be when

it happened.

Q.    Did anything change in the representation

from that first conversation to now?

A.    No, no.

Q.    And are you familiar with somebody named

Chris Clark, Christopher Clark?

CONFIDENTIAL - AILEEN DAVERSA                17

A.     Yes.

Q.     How do you know him?

A.     I don't really know him.  He was an option to represent me potentially.  So, I had one conversation with him.

Q.     And to your understanding, did he ever represent you?

A.     No.

Q.     Other than meeting with counsel, did you do anything else to prepare for the deposition?

A.     No.

Q.     Did you -- have you reviewed any documents separate from that one meeting with counsel relating to Zohar or AMZM in the last couple of months?

A.     No.

Q.     Have you had any conversations with anyone about the time that you were at AMZM in connection with the Zohar funds in the last couple of months?

A.     I had one conversation or a couple conversations with Liz LaPuma, all around just refreshing my memory.  Once I got the papers, like, what does this have to do with?  And again,

Page 18

CONFIDENTIAL - AILEEN DAVERSA            18

coordination.  It was more coordination.

Q.    And do you recall approximately how long after you first got the subpoena that you spoke to Ms. LaPuma?

A.    Almost immediately.  Maybe the next day.

Q.    Did you call her or she called you?

A.    I reached out to her.

Q.    Okay.  What do you recall from that conversation?

A.    More just, this is what it is, refreshed, you know, the timing.  There weren't any details. And more discussion about just coordinating, like who I have to talk to at A&M, who do I get for counsel.  That's it.

Q.    Yeah.  You had said that the conversations were in part around refreshing your memory.

What -- what was refreshed about your memory?

A.    Just which case this related to.

Q.    Were you familiar with the case before you had spoken with Ms. LaPuma?

A.    No.

Q.    Did you know that there was litigation

CONFIDENTIAL - AILEEN DAVERSA          19

between PPAS and the Zohar funds?

A.    Yes, 'cause I remember I had left A&M prior to Liz leaving A&M, and at one point she reached out because way back when you guys were calling me as a witness.  So, that's my only recollection of it.

Q.    And do you recall approximately when that earlier conversation or conversations with Ms. LaPuma happened?

A.    Yeah.  It was probably around July or August 2017.

Q.    And at that time she reached out to you?

A.    Yes.

Q.    What do you recall of those conversations?

A.    I mean, other than letting her know that it wasn't a good time in my life to be a witness; I have a lot going on, that's about it.

Q.    Did you speak to her about the case at that point?

A.    No.

Q.    When did you leave A&M?

A.    My dad was pretty sick, and you'll see in my resumé if you looked at it, I was fortunate

Page 20

CONFIDENTIAL - AILEEN DAVERSA            20

enough to be able to go back to my high school.  I was at the time on their board and the president of the alumni association, so they hired me as director of alumni relations.  So, it got me home with my dad, you know, until he passed away and help my mom out, so...

Q.    Around when was that?

A.    When -- 2017.

Q.    When you left?

A.    Oh, I left December, I think 2016.

Q.    Okay.

A.    The end of December.

Q.    And do you recall -- the lawsuit was filed a number of months before that, so while you were still there.

Do you recall that happening?

A.    No.

Q.    Were you involved in any conversations that you can recall after the lawsuit was filed about the allegations?

A.    No.

Q.    Okay.  And were you involved in any conversations about any counterclaims that were filed by the funds or by A&M?

Page 21

CONFIDENTIAL - AILEEN DAVERSA          21

MR. CAMPBELL:  Objection.

Just to caution the witness that to the extent you recall any conversations you had with counsel at that time, omit those from your answer.

THE WITNESS:  Okay.

MR. CAMPBELL:  But if you have a separate recollection, then you can speak as to that.

THE WITNESS:  Okay.

No, I don't have any recollection.

BY MR. SHAPIRO:

Q.     And just to clarify, because I had asked whether you were involved in any conversations about counterclaims, so as a yes or a no answer, please include conversations with counsel.

Were you involved in any conversations?

A.     Not that I recall.

Q.     I'm going to bring you forward, again, to the recent conversation or conversations with LaPuma after you got the subpoena earlier this year, 2023.

You had said it was one or two conversations.  Do you -- if you think about it for

Page 22

CONFIDENTIAL - AILEEN DAVERSA          22

a moment more, can you recall whether it was one or two?

A.     Oh, it was definitely more than one, yes.

Q.     Do you recall how many?

A.     Maybe two or three.

Q.     And what was the occasion?  So, you had the initial conversation, you called her, said you got the subpoena, what's this about.

A.     Yeah.

Q.     What was the occasion for, let's say, the second call, the time you called?

A.     Just determining representation.

Q.     Okay.  And you guys decided you were going to be represented by the same person.

A.     Yes.

Q.     I mean, was there -- what was the reason for that?

A.     Just the abundance of caution.  There is nothing, I mean, more than that.

Q.     Well, I don't mean why you were represented by counsel.

A.     Oh, that's --

MR. READ:  Yeah, yeah, see --

THE WITNESS:  Sorry.

CONFIDENTIAL - AILEEN DAVERSA          23

MR. READ:  That's okay.

THE WITNESS:  I was like --

MR. READ:  That's okay.  The question was vague.  But let him ask the next question.

THE WITNESS:  Okay, sorry.

MR. READ:  You're fine.

BY MR. SHAPIRO:

Q.    Yeah, yeah, no.  Was there a reason that you and Ms. LaPuma -- withdrawn.

Was there a reason that you decided you wanted to be represented by the same person or firm as Ms. LaPuma?

MR. READ:  And so, again here, this is a place where to the extent you received legal advice or talked to lawyers about this issue, you have to exclude that from your answer.

THE WITNESS:  Okay.

MR. READ:  I'm not -- again, I don't know whether there is more to it than that, but if there is, then you can share that.

THE WITNESS:  Repeat the question again.  Sorry.

BY MR. SHAPIRO:

Page 24

CONFIDENTIAL - AILEEN DAVERSA        24

Q.    Sure.  Was there a reason that you decided you wanted to be represented by the same person or firm as Ms. LaPuma?

A.    I think just administratively it was easier to have one person.

Q.    Was that, if you know or if there was -- if there is an answer, was that your decision or her decision to be represented by the same person or firm?

A.    I equally made the decision.

Q.    Okay.  And are you paying your own legal fees in connection with the deposition?

A.    No.

Q.    Who is paying your fees?

A.    I believe it's the trust.  I'm not positive.

Q.    Okay.  Is that something that's in your engagement letter?

A.    Yes.

Q.    And across those -- well, withdrawn.

So, how about the third conversation, if there was one.  Do you recall what the occasion for that conversation was?

A.    It was probably around just hiring

Page 25

CONFIDENTIAL - AILEEN DAVERSA                25

counsel because that's really all we talked about.

Q.    And what do you recall Ms. LaPuma telling you about what the case was about?

A.    We really actually didn't get into a lot of details, so I don't --

Q.    In a non-detailed level, what do you recall?

Hearsay

A.    Yeah, I mean, I really came out of the conversation still not understanding, because I forgot -- I mentioned this earlier -- that I didn't do any research, but I did pull, when I first got the subpoena to refresh my memory, I went on PACER and looked at the case.  But then I understand it evolved into something else, and I didn't quite understand nor was she able to -- so I presented that to her, saying this is my understanding and she said, it's changed.  But we didn't really get into the details as to why it changed.

Q.    Okay.  And do you recall what document you had pulled when you went on PACER?

A.    Just the initial complaint.

Q.    Is there -- you're not a lawyer; right?

A.    No, but I spend a lot of time with them.

Q.    Not too many nonlawyers --

Page 26

CONFIDENTIAL - AILEEN DAVERSA                26

Hearsay

A.    I play a lot on TV.

Q.    Not too many nonlawyers want to go on PACER and pull filings.

A.    I do bankruptcy work, so we are on that all the time.

Q.    Okay.  Aside from the conversations with Ms. LaPuma and conversations with your attorney, did you talk to anyone else about the deposition or the events of the lawsuit in the last few months?

A.    I mean, I only emailed my former boss at A&M just to get -- figure out how to navigate who and get counsel.  That's the only other, you know, correspondence or communication.

Q.    And who was your former boss at A&M?

A.    Steve Wallace.

Q.    Do you know what his title is?

A.    He just got promoted.  I think he's CO -- or COO.

And if you call him a boss, like he was -- it's tricky who you define as your boss, but that's who I reached out to.

Q.    Okay.  And did A&M approve of the selection of counsel?

A.    I think so.  Or they wouldn't be here.

Page 27

CONFIDENTIAL - AILEEN DAVERSA          27

Q.    Or I guess they wouldn't be paying the bill, I guess, if they weren't happy with it.   Hearsay

A.    Right.

Q.    Why don't we talk a little bit about your educational and work background before you got to A&M.

A.    Uh-huh.

Q.    Did you go to undergraduate?

A.    Yes.

Q.    Where did you go?

A.    Bowdoin College.

Q.    And what did you major in?

A.    I had a double major in economics and biology.

Q.    That's probably not one you see every day.

A.    No.  I thought I was premed and I changed my mind.

Q.    And for the economics major, what kind of classes -- what classes did you take that you recall?  Just generally speaking.

A.    Like macroeconomics, microeconomics.  I mean, that's really -- I mean, this case goes back far enough, but that's really going back.

Page 28

CONFIDENTIAL - AILEEN DAVERSA          28

Q.   Fair enough.

A.   I could probably tell you more biology classes.

Q.   Somewhat less relevant.

A.   Yes.

Q.   And did you graduate from Bowdoin College?

Hearsay

A.   Yes.

Q.   What was the degree in?  Was it a B.A. in those fields; is that right?

A.   Yeah.  Or it might be a B.S.  I don't remember.  It was one of the two, yeah.

Q.   And then did you go to graduate school?

A.   I did.

Q.   Where did you go?

A.   Northeastern University.

Q.   And what did you major in there?

A.   I had a Master's in Accounting and a Business Administration.  So an MBA and a Master's in accounting.

Q.   You graduated with those degrees?

A.   Yes.

Q.   And did you have a specialty within the MBA?

Page 29

CONFIDENTIAL - AILEEN DAVERSA          29

A.    No.   I mean, other than the accounting.

Q.    Did you take classes there or courses in restructuring --

Hearsay

A.    No.

Q.    -- or bankruptcy?

A.    No.

Q.    Anything related to distressed companies?

A.    No.

Q.    Did you have classes in finance?

A.    Yes.

Q.    Did you take any classes relating to credit agreements, other loan documents?

A.    I don't recall.  We had legal, like a law component to the classes, but I don't recall.

Q.    When you say "a law component to the classes," are you saying you had specific classes that were in law or --

A.    Yeah.  So, we had -- I mean the whole premise of the program was paid for by the firm I ended up, Coopers & Lybrand, was to prepare me for the CPA exam, and there is a law component to the CPA exam.

Q.    Do you recall how many classes were specifically in the legal field or covering legal

```
                                            Page 30

             CONFIDENTIAL - AILEEN DAVERSA        30
```

topics?

A.    No.                              Hearsay

Q.    And then within the classes that were not specifically legal in nature, were there also coverage of legal topics?

A.    I don't think so.

There would have been, you know, finance and marketing and your general MBA-type classes, and accounting, a lot of accounting.

Q.    Do you recall within the legal-related classes, any of them come to mind that you recall?

A.    I mean, not that I recall.

Q.    All right.  After or separate from Northeastern University, Master's in Accounting and an MBA, did you do any other graduate work?

A.    No.  Certification work for job-related stuff, but not graduate school work.

Q.    What certification work did you do?

A.    You know, you have to do -- to keep my CPA, I have to do CPE.  And then also it's dated now, I'm not current, but I got my CIRA certification.

Q.    What is that?

A.    Oh, gosh, I knew you were going to ask

CONFIDENTIAL - AILEEN DAVERSA          31

that.  Certification, I think, Insolvency & Restructuring something or other, Certification Insolvency and Restructuring.  I forget what A stands for.  It's a while.  I'm not current on it with my CPEs.

Hearsay

Q.    But CPA, you are current?

A.    No.

Q.    The Certification Insolvency & Restructuring --

A.    Advisor.

Q.    -- Advisor.

A.    There you go.  I knew you'd say it.  I think that's right.

Q.    We won't hold you to the exact, you know --

A.    This is when I, like, Google.

Q.    Yeah, no worries.

      When did you receive that certification?

A.    Gotta be like in 2006 maybe.  And that's just a rough guess.

Q.    Do you recall what body --

A.    Actually, it was right around -- when was 9/11?

            MR. READ:   2001.

Page 32

CONFIDENTIAL - AILEEN DAVERSA          32

Q.     2001.                                    Hearsay

A.     Yeah, because I remember -- it was around that time frame because I remember I was in the course when that -- one of the courses when that happened, so...

Q.     And what certifying body or entity issues that certification?

A.     I think it's CIRA.  I think it's -- I can't remember the name of the organization, but it's well-known within the restructuring space.  A lot of people have that certification.

Q.     What was the reason that you went to get this CIRA certification?

A.     Just to promote my career and get credentials.

Q.     Had you been working in the insolvency and restructuring space before?

A.     Yes.

Q.     As part of the CIRA certification, did they cover legal topics?

A.     Yes.

Q.     Do you recall what kinds of topics they covered?

A.     Around bankruptcy and understanding

Page 33

CONFIDENTIAL - AILEEN DAVERSA          33

bankruptcy.  That's all I recall.  I'm sure there were others, but I don't recall the specifics.  Hearsay

Q.    Okay.  Do you recall whether you studied or reviewed credit agreements and other loan documents in connection with the CIRA certification?

A.    I don't recall.

Q.    So, why don't we go back to after you graduated with the MBA.

Was there any work that you did between undergraduate and the graduate degree?

A.    No.  I biked across the United States.

Q.    Okay.  Sounds like fun.  Also torture, but fun.

A.    I might have -- I did some consulting work for my father who was an entrepreneur, but pretty much went -- like a year's time went straight to grad school.

Q.    So, what was your first job after grad school?  Relevance

A.    I worked in audit at Coopers & Lybrand.

Q.    And how long were you there for?  What years were you there for?

A.    '96 to -- oh, I also did an internship

Page 34

CONFIDENTIAL - AILEEN DAVERSA          34

when I was in grad school, if that counts.  That <span style="color:red">Relevance</span>
was at Coopers.  But then '96, I think I was only
there three years, roughly.

Q.      And where did you go after that?

A.      I wish I had my resumé.

I went to a company called CMGI, which
was the internet bubble company I went to.

Q.      What do they do?

A.      They owned a whole bunch of internet
companies, like Lycos, and I'm trying to think -- I
can't remember the other names, but they were like
a high flying, you know, $300 stock.

Q.      How long were you there for?

A.      Only about a year.

Q.      What happened?

A.      So, they -- when I was there with a guy
from Bain, we created this group to help management
figure out what to do with all their portfolio
companies which had a restructuring twist to it.
And then they -- my former firm recruited me back
to go into the restructuring business, so I went --
the firm was acquired by PwC, so when I went back,
it was PwC.  And I went back to the restructuring.
Because the writing was on the wall that the

Page 35

CONFIDENTIAL - AILEEN DAVERSA            35

company wasn't -- you know, wasn't going to be around forever.

Relevance

Q.    Yeah.  And what was your title or what was your job at CMGI?

A.    I think it was a financial analyst.  Or senior financial analyst.  Something like that.

Q.    And then, so you were back at Coopers & Lybrand?

A.    Lybrand.

Q.    Lybrand.  Lybrand?

A.    Lybrand.  You don't know Coopers & Lybrand?  I must be much older than you.

MR. READ:  It's generational.  Coopers & Lybrand.

A.    It's one of the Big 8.

Q.    Okay, yeah.

A.    That went to the Big 6.

Q.    Not in my day, sorry.

A.    Now maybe the Big 4.  I don't know what they are now, but yeah.  L-y-b-r-a-n-d.

Q.    Got it.

And how long were you there the second time around?

A.    So, it was PwC the second --

Page 36

CONFIDENTIAL - AILEEN DAVERSA                36

PricewaterhouseCoopers the second time.   Relevance

Q.      Them I know.

A.      Yeah, yeah.   They got acquired by FTI when I was there, so whenever that changed, and then I was at FTI as a result.   I don't remember exactly how long.   Maybe 2006 or so I stayed at FTI.   2005 maybe.

Q.      What was your job at PwC?

A.      I was -- I ended up at the end -- like, I started as a manager and then ended up as a managing director in the restructuring practice.

Q.      And do you recall approximately when that promotion happened?

A.      No.   This was, I mean -- yeah.

Q.      What were the general responsibilities as a manager at PwC within -- am I right that it was within the restructuring group?   Relevance

A.      Yeah, exactly.   And then it went to FTI and FTI is all restructuring too.

Q.      What were the general -- your general responsibilities as a manager at PwC within the restructuring group?

A.      To, I mean, I guess help execute on restructuring projects, whether it was out of court

Page 37

CONFIDENTIAL - AILEEN DAVERSA          37

or in court.                    Relevance

I mean, do you want to go into the specifics of what I did or --

MR. READ:  No, he doesn't.

THE WITNESS:  No, okay, okay.

MR. READ:  That would be completely irrelevant.  He wouldn't waste time on that.

BY MR. SHAPIRO:

Q.    Am I understanding correctly, PwC was serving more in a consultant function and not in an accountant function in that role?    Relevance

A.    Yeah, consulting, yeah, yeah.

I mean, yeah, it was audit initially, but then when I went back, it was more management consulting, I guess you would call it.

Q.    In that role, did you do any analyses of the companies that you were studying's credit agreements or other loan documents?

A.    Yes, yes.

Q.    What -- what would be a typical --

MR. READ:  Hold on a second.

Could you read that question and answer back?

Because you answered before he

Page 38

CONFIDENTIAL - AILEEN DAVERSA          38

finished his question.

THE WITNESS:  Oh, I'm sorry.

MR. READ:  And I'm not sure that you answered the question that was asked.

THE WITNESS:  Okay.

MR. READ:  Could you read the question and answer back, Sandie?  Thank you.

(Record read by the court reporter.)

MR. READ:  Is that an accurate answer?

Relevance

THE WITNESS:  Yes.

MR. READ:  That you did analyses of credit agreements and loan documents?

THE WITNESS:  Yeah, I mean, we would have to do that in the context of looking at -- you know, understanding the agreement and understanding if we were going to negotiate a new, you know, debt agreement for the company when they were restructuring, so understanding -- now, what analysis, what you mean by analysis may be different than what I mean by analysis, but I certainly looked at loan documents in that context, and also doing things like understanding the debt covenants and are we in violation of the debt

Page 39

CONFIDENTIAL - AILEEN DAVERSA          39

covenants, you know, how much borrowing capacity do we have in terms of modeling and that type of stuff.

BY MR. SHAPIRO:

Q.    Okay.  So, I don't want any, you know, lack of any vagueness here or lack of clarity, so what do you mean by "analyses" in that context?

Relevance

A.    That's -- that's what I mean, in that context.  Understanding debt covenants, understanding the borrowing capacity, understanding how to calculate the debt covenants.  And, you know, when I say "capacity," like, you know, asset-based lending, how much of the inventory can you borrow against, that type of thing, so you can calculate how much, you know, they could borrow.

Q.    And did you analyze or review other aspects of the credit agreements?

A.    I'm sure we did.

Q.    What would a typical project be in connection with the review of credit agreements and other loan documents, what would the tasks be?

MR. CAMPBELL:  Objection to form.

MR. READ:  Really, very far afield here, but go ahead, it's only 25 years ago.  Go

CONFIDENTIAL - AILEEN DAVERSA          40

ahead.

THE WITNESS:  Now we're going way back.

Sorry, can you repeat the question? Because I already forgot it.

MR. SHAPIRO:  Sure.

Do you want to read it back?

THE WITNESS:  Sorry.

(Record read by the court reporter.)

A.    I don't know if there was a typical project.

Relevance

BY MR. SHAPIRO:

Q.    All right.  So, now take me forward to FTI, around when did you go there?

A.    To FTI?

Q.    Uh-huh.

A.    It was acquired.  Whenever it was acquired by PwC, which I can't tell you the date, I mean, we just went with the acquisition.

Q.    Just very generally, are we talking mid-2000s, 2010?

A.    I think so, yeah.

Q.    I mean, we can obviously look it up, but I just kind of want to orient myself.

Page 41

CONFIDENTIAL - AILEEN DAVERSA               41

A.      It might be easier if you put my resumé in front of me.

MR. READ:  He chose not to do that.

THE WITNESS:  Yeah.

Q.      Okay.  So, what was your role at FTI?     Relevance

A.      Same, managing director.  When I gave you the managing director title, that was at FTI, not at PwC.

Q.      Okay.  Well, I guess, how did your responsibilities change from when you were a manager to when you were a managing director?

A.      They didn't.  I mean, maybe I had more oversight, but really everyone in restructuring kind of rolls up their sleeves and does everything.

Q.      So, when you were at FTI, you once again were analyzing credit agreements and other loan documents in part?

A.      Yes.

Q.      And where did you go after FTI?

A.      I went back to PwC.

Q.      Oh, man, this is hard to keep track of. I guess everyone wanted you, and that's a good thing.

A.      Yeah -- no, I went back.  I wanted to get

Page 42

CONFIDENTIAL - AILEEN DAVERSA                    42

off the road, and I went back and I had a really Relevance

cool position where I worked for the leaders of the

firm, and I did internal reorg projects.  So, I

worked with a big project.  After they did their

merger, they didn't do a good job of really merging

the firms, and I worked with a big project,

McKinsey, to help align the whole organization, cut

out costs, so it was kind of a fun -- and I did

some other ancillary projects, but that was the big

one.

     Q.    So, that was primarily internally focused

within PwC?

     A.    Exactly.

     Q.    Did you do any external reorganization or

restructuring projects while you were at PwC?

     A.    Yeah.  They pulled me back into it.

     Q.    What kinds of work did you do?

     A.    It was -- I got pulled on the

Smurfit-Stone restructuring, prepping them for

bankruptcy.

     Q.    What kind of company was that?

     A.    Paper products.  Like cardboard.  They

made boxes.  Packaging, packaging.

     Q.    And did you review loan documents --

Page 43

CONFIDENTIAL - AILEEN DAVERSA          43

withdrawn.                                    Relevance

Did you review credit agreements and other loan documents in connection with the Smurfit-Stone project?

A.    I don't recall.

Q.    Any other restructuring or insolvency related projects that you recall while you were at PwC?

A.    No, because I went to A&M.  Because I wanted to go -- like -- well, I went to A&M.  I don't have to explain why.

Q.    Why did you go to A&M?

A.    Oh, you're going to ask me.

MR. READ:  As night follows day.

A.    Well, these are, like, easy questions.

Because, I mean, PwC was operating a small restructuring practice within a bigger firm, and it was kind of the cycle.  So, they were popular, but they were never gonna be -- because of conflicts and whatnot -- a true, like, restructuring practice.  So, I said, if you are forcing me back into restructuring, I want to go to somewhere that does, you know, restructuring as their primary business.

Page 44

CONFIDENTIAL - AILEEN DAVERSA                44

Q.      And what was your role at A&M when you first joined?

Relevance

A.      Manager.

Q.      What were your responsibilities as a manager at A&M?

A.      Same, executing on various restructuring and other projects, helping execute the projects.

Q.      And did you review credit agreements and other loan documents in connection with executing those projects at A&M?

A.      I believe so, but I don't recall exactly. Derivative agreements aren't loan documents, right?  No.  I worked on Lehman Brothers for a while and I got an education on derivatives.

Q.      I take it, you did review derivative agreements in connection with the Lehman Brothers --

A.      Yes, yes, yes.

Q.      But let me just finish the question.

A.      Sorry.

Q.      I take it, you did review derivative agreements in connection with the Lehman Brothers project at A&M?

A.      I did review for certain -- you know, I

Page 45

CONFIDENTIAL - AILEEN DAVERSA          45

don't remember exactly what I was reviewing for, but yes, I reviewed derivative agreements and Relevance related claims.

Q.    Do you recall other projects where you reviewed legal agreements, whether they were credit agreements or not?

A.    Yes.

Q.    What is another project where you reviewed legal agreements?

MR. READ:  I'm just going to caution you.  There is a protective order, but these are other clients that I assume don't relate to this case, if that's what you have in mind.  So, maybe just be mindful of the confidentiality obligations you might have.

THE WITNESS:  Right, right.

Yeah, Lehman is wide open in terms of -- I mean, I've done a ton of contract reviews. So, I'm just trying to think.  I mean, up to recently, we do a lot of contract reviews at my current firm, but it's pulling out basic, you know, it's just factual stuff, pulling out.  So, I can't think of any specific clients, but it's certainly part of the -- can be part of the role, especially

Page 46

CONFIDENTIAL - AILEEN DAVERSA          46

when you're doing, like, bankruptcy reporting. Relevance

BY MR. SHAPIRO:

Q.    So, do you recall specifically on the contract reviews piece of it, do you recall any other projects while you were at A&M where you did contract reviews?

A.    I mean, if we're talking about the Zohar case, we looked at contracts and pulled out certain clauses.

Q.    Okay, yeah, put that aside.

A.    Okay, aside from that?  I'm sure I did. I just -- I mean, eight years.  I was there for eight years.  I don't recall specifically.

Q.    Was there a process that you either were taught or developed in order to conduct a contract review?

A.    I mean, there's always a process.

Q.    Okay.  I guess I'm asking, is there some general A&M process for conducting a contract review?

A.    I don't recall.

Q.    Do you recall -- withdrawn.

Is there a specific process for each contract review that you engage in?  Is that -- am

CONFIDENTIAL - AILEEN DAVERSA          47

I understanding that correctly?

A.    I mean, it depends on -- like, I can tell you recently, like the one I'm working on right now, if that's helpful.  Like, it's not A&M.  It's not helpful.  Because I can't remember.  I mean, I --

Q.    In general --

A.    I mean, there's a process.  You have a list of documents, right?  Like, you probably list out -- I'm just theorizing, you know, all the -- all the contracts.  You have your population.  And then there are certain terms you want to pull from those documents and, like, probably the name of the contract, the counterparty and other, you know, relevant terms, and you pull those specifically out of the contract and put it in a summary format.

Q.    At the front end, you decide what -- withdrawn.

At the front end, do you decide what categories of terms or provisions you're going to focus on when you do the review?

MR. CAMPBELL:  Objection to form. Speculation.

A.    I mean, I would say that with any

Page 48

CONFIDENTIAL - AILEEN DAVERSA                48

project, you have a scope of what you want to look at and it may vary, depending on the project.

Q.    Yeah.  I guess that's really what I'm getting at, which is, do you typically sit down at the front end of the project and decide these are the issues that we're going to focus on in conducting the review of loan documents?

A.    I wouldn't say -- it just depends on the project.  There might be instances where you start out on one path, and when you have a better understanding of what you're looking at, you might want to look for other data points.

Q.    Yeah, my question is actually even more basic.  Before that, not what the specific focus or scope is on a given project, but just, do you typically sit down at the front end of a project and decide there are certain issues that you're going to focus on in conducting a review of loan documents?

MR. READ:  Objection to the form.  Asked and answered.

MR. CAMPBELL:  And counsel, just, apologies to interrupt, can we agree that for my additional clients, we join in Mr. Read's

Page 49

CONFIDENTIAL - AILEEN DAVERSA                49

objections?

MR. SHAPIRO:  Sure.

THE WITNESS:  I still need to answer, right?

MR. CAMPBELL:  Yes.

MR. READ:  If you have anything more to add, you should answer.

THE WITNESS:  And again, I forgot the question but --

MR. READ:  Why don't you read it back, Sandie, please.  Thank you.

THE WITNESS:  Yeah, sorry.

(Record read by the court reporter.)

A.    Yeah.  What's catching me is, "the front end of the project," that part of your question, because it's not always typical.  Like, I mean, it's typical at the beginning of any project that you kind of have your set of issues, you know, that you're going to focus on, when I say scoping.  So, I don't -- just the front end and the typical, like we could have looked at -- you know, we could have been on a project and determined that you need to -- all of a sudden, you know, counsel wants us to review something, like in my current situation

Page 50

CONFIDENTIAL - AILEEN DAVERSA                50

where I do bankruptcy work, and then you review it
in the middle of the project.

Q.    Okay, understood.  So, you are saying
there's a plan --

A.    It's not typical.  Like, there is always
a plan at the beginning of a project, yeah.

Q.    And then you adapt along the way?

A.    Yeah, exactly, exactly.  That's fair.

Because you don't always know what you're
getting into because every client is different and
there is a different set of issues.

Q.    And did your role change at A&M over the
time that you were there?

A.    I mean, I was still a consultant working
on a variety of different projects.  They weren't
all -- I mean, I spent most of my time working on
Lehman Brothers as a consultant.

Q.    But you didn't, you know, I'm just --

A.    Oh, I changed --

Q.    The answer might be no, but did you
change roles --

A.    Oh, yeah, I changed.  I did some due
diligence work, yeah, when I was there.  And that's
when I was doing the due diligence work how I got

Page 51

CONFIDENTIAL - AILEEN DAVERSA                51

pulled into this project, the Zohar project.

Q.    Okay.  Well, you are one step ahead of me.

So, how did you get pulled into the Zohar project?

A.    I just got assigned to it.

Oh, I actually -- yeah, I got assigned to it, but -- yeah, I got assigned to it, so...

Q.    Do you recall who assigned you?

A.    No.

Q.    And when, approximately, did you start working on Zohar funds-related matters?

A.    I don't know.  I gotta guess, if I left in 2016, maybe it was 2000 -- the beginning of 2016, but I really don't know.

Q.    Were you involved at all in A&M's pitch for the Zohar funds matter?

A.    No.  Not that I recall.  But no, I don't think so.

Q.    Who else that you recall did you work with on the Zohar funds matter at A&M?

A.    That's where I don't recall.  Just Liz, but I can spit out a couple names just from my prep work, but I don't remember.  I couldn't remember

Page 52

CONFIDENTIAL - AILEEN DAVERSA                52

prior to that.  Like, without seeing an email, I couldn't recall who worked with me on the project. Liz is really the only one.

Q.    Okay.  Well, if your prep work refreshed your recollection about --

A.    That was just one.  It's just Jamie Schwartz is one that comes to mind and Chris Cover, but -- and Paula Gamache.  Gamache?  I don't know if I have that right.  Those are three that I was like oh, yeah, I worked with them.  But I couldn't prior recall, other than Liz.

Q.    Have you spoken with any of the three people that you mentioned about the Zohar funds matter since you left A&M?

A.    No.

Q.    And was Ms. LaPuma your supervisor on the Zohar funds project?

A.    Yes.

Q.    So, what -- I guess what were your -- withdrawn.

What were your responsibilities on the Zohar funds project for A&M?

A.    That, I don't recall, the specifics.

Q.    Do you recall how soon or how long after

Page 53

CONFIDENTIAL - AILEEN DAVERSA                53

A&M was hired that you got brought onto the project?

A.    No.

Q.    Do you recall -- withdrawn.

Do you have any recollection regarding drawdown requests that portfolio companies made?

A.    No.

Q.    Okay.  No recollection of who approved drawdowns?

A.    No.

Q.    Okay.  Or who had the authority to?

A.    No.

Q.    Did you have any involvement in reviewing the Zohar funds trustee reports?

A.    Yes.

Q.    What do you recall about your involvement in that project?

A.    I don't recall anything.

Q.    Just that you were involved in it?

A.    Yes.  Like, I couldn't even tell you what the report looked like, you know.

Q.    Do you have any recollection about what you were looking at the report to try to find?

A.    No.

Page 54

CONFIDENTIAL - AILEEN DAVERSA                54

Q.    Just that you did review the reports?

A.    Yes.

Q.    Do you have any recollection of yourself -- withdrawn.

Do you have any recollection of being involved in outreach to portfolio companies in the early days after A&M was hired?

A.    No.  I mean, vaguely, but not really.  I couldn't give you specifics.

Q.    Do you recall --

A.    If it even was, like, directly to the portfolio company, I don't recall.

I do -- the only thing I -- I'm just thinking back.  I mean, if it's reaching out, the only thing I vaguely remember is working on an ambulance company --

Q.    Okay.

A.    -- that they owned and there was interaction, but I don't -- you know, that's about it that I can recall specifically.

Q.    What do you recall of the interactions relating to the ambulance company?

A.    I don't recall the interactions.  I just know that I remember being in Bankruptcy Court.  I

Page 55

CONFIDENTIAL - AILEEN DAVERSA          55

remember -- that's about it, you know, I can't recall unfortunately.

Q.    Do you recall reviewing credit agreements and other loan documents in connection with that ambulance company?

A.    No.

Q.    You don't know whether you did or not?

A.    Right, exactly.  Like, I don't recall the nature of what I was doing.

Q.    And do you have any recollection about a dispute between AMZM and Patriarch Partners Agency Services relating to payments coming out of that bankruptcy process?

A.    No.

THE WITNESS:  How long have we been doing this?

MR. READ:  Yeah, do you want to take a break?

THE WITNESS:  Yeah, maybe.  Is that okay?

MR. SHAPIRO:  Yes.

MR. READ:  Yes.

THE WITNESS:  Sorry, I'm thinking my coffee --

Page 56

CONFIDENTIAL - AILEEN DAVERSA          56

THE VIDEOGRAPHER:  Okay.  I'm going to go off the record.  The time is 11:37.

(Recess taken from 11:37 a.m. to 11:57 a.m.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 11:57.

MR. SHAPIRO:  Welcome back.

If we can mark this as Exhibit 208, please.

(Exhibit 208, Email from Thomas Macedonio to Aileen Daversa and Christopher Cover dated March 10, 2016, Bates Numbers ALVAREZ_PPAS0000047 through ALVAREZ_PPAS0000051 and attachments, marked for identification.)

BY MR. SHAPIRO:

Q.    The court reporter is handing you a document that's been marked as Exhibit 208, which is an email from Thomas Macedonio to yourself and Christopher Cover dated March 10, 2016, Bates Number Alvarez PPAS 47 with attachment -- sorry, 47 through 51 with attachments in native format.

Just take a moment to look the document over.

Page 57

CONFIDENTIAL - AILEEN DAVERSA                57

A.    The document number?

Q.    Yeah.

A.    Yeah, it's 208.  I'm just going to review.

Q.    Sure.

(Pause.)

A.    I wasn't part of any of these emails; this is all new.

Q.    Yeah, I think you are only on the top email.

A.    The first one.

Q.    Exactly.

A.    Yeah, I don't remember any of the other stuff, but okay.

And then this lovely exhibit.  I'm glad you printed it out big, so I can read it.

Are there two exhibits?  Or one for -- okay, Zohar III and one for Zohar II.  Okay.

Q.    Otherwise we would have had to bring a magnifying glass --

A.    I know.

Q.    -- and put that into evidence.  I wouldn't want to do that.

A.    Aye yai yai.  Okay.

Page 58

CONFIDENTIAL - AILEEN DAVERSA                58

Q.    Okay.  Do you recognize this top email forwarding documents to you?

A.    No.

Q.    Okay.  Do you have any reason to believe that you didn't receive it as indicated on the document?

A.    No.

Q.    As you looked at the exhibits that are attached, do you have any recollection of why -- number 1, do you have any recollection what they are, the exhibits?

A.    No.

Q.    I think you had said you thought one was for Zohar II and one was for Zohar III.

A.    Yes.

Q.    What was the basis for that?

A.    Just by reading the attachment on the email.

Q.    The file names of the attachment?

A.    Yeah.  I don't know which is which. There is no title on them, but --

Q.    And do you have any recollection of --

A.    -- they look the same.

Q.    -- why you were being forwarded -- well,

CONFIDENTIAL - AILEEN DAVERSA        59

withdrawn.

Do you have any recollection of what the -- what IDs, the issuer IDs are?

A.    No.

Q.    If you look at the attachment, do you see there is a column, Issuer ID, a number, four or five digits, and then an Issuer Name?

A.    Yes.

Q.    Do you have any recollection of there being issuer ID numbers for various companies in connection with the --

A.    No.

Q.    -- Zohar funds?

A.    Sorry, I cut you off.  No.

Q.    And do you have any recollection of requesting or there being conversations around requesting issuer IDs or borrower IDs in connection with the Zohar funds project?

A.    No.

Q.    You don't remember what you used those ID numbers for?

A.    No.

Q.    If you look at that top email forwarding to you, would you agree that at least by March

CONFIDENTIAL - AILEEN DAVERSA          60

10th, 2016, you were on the Zohar funds project?

A.    I mean, based on -- just based on looking at the email, that's the only thing I can verify. But if I was sent an email on March 10th, I must have been working on it.

Q.    Did you have any role in the formation of AMZM, the Zohar Management entity that served as the collateral manager for the Zohar funds?

A.    No.  The only maybe ancillary thing I did was help put together a business plan.  But I don't know -- it wasn't specific to those entities.  It was just asset management.  But I don't know anything about the formation.

Q.    What do you recall about putting together a business plan in connection with the Zohar funds?

A.    That it was a long document, but I really -- I mean, a typical business plan, but I remember doing research related to it, but, I don't -- you know, I couldn't tell you specifics.

Q.    What was the purpose of the business plan?

A.    Just to, with any business plan, to put a plan in place for management to look at and determine if it's a good path forward.

Page 61

CONFIDENTIAL - AILEEN DAVERSA            61

Q.    For management of the Zohar funds assets?

A.    No, no, management of A&M.

Q.    Oh, okay.

A.    Yeah, this was a business plan for a business unit within A&M, which I believe these funds were part of, but I don't know.  I don't have a recollection of how they were formed.

Q.    And you made certain projections about what A&M would recover in connection with the Zohar funds engagement; is that --

A.    No, no.  This is separate.  This is just looking at an asset management business within A&M.

Q.    Okay.  What --

A.    Not specific --

Q.    I'm sorry if I'm not getting it.

What's the connection to the Zohar funds?

A.    I think -- well, there is no connection other than AMZ -- what is the asset?

Q.    AMZM.

A.    AMZM, was that the asset management business?

Q.    That's Alvarez & Marsal Zohar Management.

A.    Management.  I think they may have fallen under this overarching business plan.  It was all

Page 62

CONFIDENTIAL - AILEEN DAVERSA            62

market analysis and stuff like that.  Nothing

specific to Zohar.

Q.    You recall earlier we were talking about loan review projects that you had done at other Relevance companies and at A&M and you had referenced the project that you had done for the Zohar funds or in connection with the Zohar funds; do you recall that?

A.    Uh-huh.

MR. READ:  Objection to the form.

Go ahead.

A.    Yes.

Q.    What do you recall about how that project came to be?

A.    I don't really have any recollection.

Q.    What do you recall about the project?

A.    I really don't have a great, you know, recollection of the details, what we worked on, other than seeing, you know, here, but...

Q.    How about the generalities?  Do you have any recollection of, generally speaking, what that project entailed?

A.    Vaguely.  Like, I remember, like, we talked about the trustee reports, but I don't

Page 63

CONFIDENTIAL - AILEEN DAVERSA            63

remember what I looked at in them, but I remember the concept of the trustee reports.  I don't really have a recollection of looking at loan documents, other than obviously we did, but I don't recall other than seeing it now.

(Exhibit 190, previously marked.)

Relevance

BY MR. SHAPIRO:

Q.    Ms. Daversa, I'm handing you a document that's been previously marked Exhibit 190.  As I said before, we didn't bring the stamped version, so I just wrote with my pen Exhibit 190 on the top.

A.    What do I do with this?

Q.    You can set that to the side, yeah.

If you were excited about the other large form document, get ready for some more fun.

A.    Okay.  Give me a second.

Q.    Sure.  Take your time to review.

A.    Oh man, okay, I forgot they owned that company.

Q.    Do try to keep them in that order, because it's going to be hard to navigate certain things if you don't.

A.    Okay.

THE WITNESS:  Do I need to read

Page 64

CONFIDENTIAL - AILEEN DAVERSA                64

everything here or do I --

MR. READ:  No.

THE WITNESS:  -- just understand what it is?  Okay.  Oh, boy.  This, if I need to read anything off this, it's not going to be possible.  I might need a magnifying glass.  Okay.

MR. READ:  Why don't you -- I mean, you can just let him ask the next question.

THE WITNESS:  Yeah, okay.  All right.  Let me just quickly flip and see what --

MR. READ:  It's a lengthy document. I don't think you'll have time to --

THE WITNESS:  Go through it all?

MR. READ:  -- go through all these tiny --

THE WITNESS:  Okay.  So, I guess if you point me to certain things, I can review it more closely then.

MR. SHAPIRO:  Sure.  That works.

THE WITNESS:  Than trying to go through the whole thing.  Okay.

BY MR. SHAPIRO:

Q.    So, just first take a look at the top page, the front page.  It's an email from you to

Relevance

Page 65

CONFIDENTIAL - AILEEN DAVERSA                65

Mr. Macedonio and Mr. Cover dated March 30th, 2016, with the Bates Number ZOHAR-PPAS 58208.  Even though it was -- it's in evidence, just to make the record clear, with attachments it goes through 58239.

Relevance

And do you see in that top email the subject is Draft Loan Reviews?

A.    Yes.

Q.    It's the loan review project that we were discussing earlier.

A.    I don't know what project specifically we were discussing earlier, but yeah, it does say, Draft Loan Reviews.

Q.    Okay.  I meant the loan reviews that you did in connection with the Zohar funds.

A.    I believe so.  I don't -- I mean, I don't recall specifics, but --

Q.    We will look at the documents in more detail.  And you see it attaches, 1, 2, 3, 4 -- eight messages.

A.    Yeah.

Q.    Okay.

A.    1, 2, 3, 4 --

Q.    And then, just to orient you --

Page 66

CONFIDENTIAL - AILEEN DAVERSA                66

A.    -- 5, 6, 7, 8 -- yes.

Q.    Each of those is an email with an attached spreadsheet.

A.    Got it, okay.

Q.    So, that may help navigate.

Does this document look familiar to you, the top email?

A.    No.

Q.    Okay.  Any reason to believe it's not an email from you to those individuals as indicated?

A.    No.

Relevance

Q.    And if I can just have you turn, I believe it's the second underlying email, it starts on Bates Number 58211.

A.    Hold on.  The March -- the one from Adam Frankel?

Q.    Yes --

A.    Okay.

Q.    -- exactly.  Email from Adam Frankel to yourself dated March 28th, 2016.

Who is Adam Frankel; do you recall?

A.    No.

Q.    And if you turn to the last page of the cover email, which is 58216 in the Bates numbering.

Page 67

CONFIDENTIAL - AILEEN DAVERSA           67

A.    Okay.

Q.    You see that there's a -- all the way at the bottom -- original appointment sent on Wednesday, March 23rd from yourself to a variety of people, including you, Ms. LaPuma and others, Subject, Project Zenith Loan Review Regroup, and then the When is Thursday, March 24th, 2016; Where, conference Room 8A.

A.    Yes, I see that.

Q.    And we actually were just talking on the break about the in-person meetings back in the day when you would go over -- folks would get together and look over documents.

Do you have any recollection of getting together with a bunch of people in March 2016 to do a loan review in connection with the Zohar funds?

A.    No.

Q.    Do you recognize Project Zenith as the name that A&M or AMZM gave to the Zohar funds project?

A.    No.

Q.    I'll represent to you that Ms. LaPuma said that that was the name, but --

A.    I trust it; I just don't remember.

Page 68

CONFIDENTIAL - AILEEN DAVERSA          68

Q.     Do you recall, putting the specific date aside, do you recall any in-person meetings in connection with the loan review or the review of the credit agreements and the loan documents for the portfolio companies in connection with the Zohar funds?

MR. READ:  Objection to the form.

A.     No.

Q.     Do you recall any telephone conferences amongst the individuals at A&M assigned to the Zohar funds project about or relating to the review of credit agreements and other loan documents for the Zohar funds portfolio companies?

A.     No.

Q.     Do you have any reason to doubt that you did in fact have a meeting on Thursday, March 24th, 2016 in connection with the loan review in conference room 8A?

MR. READ:  Objection to the form.

A.     I mean, no, based on reading this, assuming I was there and not sick, I mean, I have no other recollection of the meeting.

Q.     And if you look one page prior, it's Bates Number 58215, it's an email from yourself to

Relevance

Page 69

CONFIDENTIAL - AILEEN DAVERSA          69

Ms. LaPuma and a variety of others on Thursday, March 24th.  The subject, again, is Re Project Zenith Loan Review Regroup.

Want to take a moment to read that email?

A.    Sure.

(Pause.)

A.    Okay.

Q.    Did you or the AMZM team create a template for the loan review in connection with the review of portfolio company credit agreements and other documents?

A.    I don't recall, but based on this email, it appears.  But I don't recall the specifics about creating it or who created it.

Q.    In other credit agreement and loan document review projects that you've done, have you created a template for the review of the documents?

A.    I mean, me personally?  Yes.  Probably.

Q.    What goes into a template in that context?

MR. CAMPBELL:  Objection to form.

You can answer.

A.    It depends on the project.  I mean, you would have the basics, like the name, the

Relevance

Page 70

CONFIDENTIAL - AILEEN DAVERSA          70

counterparty, but it really depends on the       Relevance

specifics of the project.

Q.    Does the template typically cover the key terms you want to highlight in the credit agreement and related documents?

MR. READ:  Objection to the form.

A.    I mean, again, the typical -- there really isn't a typical, but I would think any loan review you would want key terms to highlight, so you can look, like, on a summary level.

Q.    It seemed like a very basic question, but when you do a review of credit agreements and other loan documents, your purpose is not to take every term in the credit agreement and put it into a summary, but instead to pick out the key terms.

A.    Right.  Like, in my email, which we talked about earlier, one of the key things we were pulling are covenants, which is important to understand, just as an example.

Q.    If you look at the email a couple of pages higher-up on the chain, it's Bates Number 58212, it's the second page.

A.    Okay.

Q.    An email from you to Mr. Frankel on

Page 71

CONFIDENTIAL - AILEEN DAVERSA          71

Saturday, March 26th, 2016, and if you see, you give him a variety of comments.

A.     I see that.

Q.     It looks like a list of nine comments and then some other changes you made.

A.     Yes, I see that.

Q.     Why were you the one giving comments to Mr. Frankel?  Withdrawn.

Does this refresh your recollection about what role you played in this project?

A.     It refreshes my recollection.  I don't recall the specifics.  But by reading this, it looks like I was overseeing and making, I would think, with so many people looking at documents, creating some consistency across our review.  So, that's probably the role I was playing, so that there was consistency and they understood, you know, yeah, consistency.

Q.     Will you just look at Number 6 on page 58213?  It's the next page -- yeah, you're looking at it there.

A.     "Please summarize intercreditor."  That one?  Yeah.

Q.     Is this -- withdrawn.

Relevance

Page 72

CONFIDENTIAL - AILEEN DAVERSA          72

Do you recall that the team was reviewing the credit agreements as well as other related agreements and documents?

Relevance

A.    No.

Q.    We talked about focusing on the key terms.

Am I reading this correctly, Number 6, that part of the project involved summarizing the agreements and their relevant terms?

A.    I mean, based --

MR. CAMPBELL:  Objection to form. This refers to a different type of agreement.

A.    Could you please repeat the question?

Q.    Sure.  Am I understanding Number 6 correctly -- withdrawn.

Taking a look at Number 6 and then thinking about the project as a whole, am I understanding that part of the loan review project involved summarizing the relevant agreements and their relevant terms?

MR. CAMPBELL:  Objection to form.

A.    Based on reading this, I think that's probably a good interpretation, but I don't recall the specifics.  But it appears that we were looking

Page 73

CONFIDENTIAL - AILEEN DAVERSA          73

at the intercreditor agreements, too.     Relevance

Q.     And just more general --

A.     And amendments.   Sorry.

Q.     And just more generally, in a project like this, you are looking to summarize the relevant terms; right?

          MR. READ:  Objection to the form.

A.     Looking to summarize whatever terms we defined that we wanted to summarize.

Q.     Do you have any recollection of the specific terms that were considered key terms in connection with the -- with your review or your team's review of the credit agreements and other loan documents for the Zohar funds project?

A.     I don't recall.

Q.     Do you recall who was involved in the decision as to what terms to focus on?

A.     No.

Q.     Turn your attention to later in the packet, I think it's actually the last email before the last spreadsheet.

A.     Okay.

Q.     The top email is ZOHAR-PPAS 58236.

A.     Sorry, what's the document?

Page 74

CONFIDENTIAL - AILEEN DAVERSA                74

Q.     58236.

A.     Yeah, I have it.

Q.     Email from Jamie Schwartz to yourself --

A.     Yes.

Q.     -- dated March 28, 2016.

You see the subject is, once again, Re Loan Review Status.  This one has attachments, Project Zenith Croscill Loan Docv3.xlsx.

A.     Yes, I see that.

Q.     And if you want to turn to the last page of the cover email, it says Bates Number 58238.

A.     Okay.

Q.     And look at the bottom there, there is an appointment from yourself to Ms. LaPuma, yourself and others, Subject:  Loan Review Status; When: Wednesday, March 30th, 2016, 9:30 to 10:30 a.m.; Where:  TBD.

Do you have any recollection of a phone call or meeting at that time in connection with the loan review?

A.     No.

Q.     And if you look at the email that's right above that, the top of that page -- well, it actually starts, I guess, on 58237 with the From

Page 75

CONFIDENTIAL - AILEEN DAVERSA          75

and To lines from yourself to Ms. LaPuma and others.

A.    Okay.  Wait, hold on.  I went the wrong way.  Okay.

Q.    Yeah, just take a moment to read that email if you would.

A.    Sure.

(Pause.)

A.    Okay.

Q.    So, this, I guess, is an example -- withdrawn.

Is this an example of what we were talking about earlier, that the scope of the project is iterative; as you go through you may add certain topics that you are interested in and depending on what the initial round of review shows?

A.    Correct.

Q.    Do you recall if you conducted this loan review for all of the Zohar funds portfolio companies?

A.    I do not recall.

Q.    Does Team LaPuma ring a bell to you?

A.    No.  Not at all.  Is it written

CONFIDENTIAL - AILEEN DAVERSA                76

somewhere?

Q.      No, not here.

A.      Okay.  That's funny.

Q.      Well, according to Ms. LaPuma, you were on Team LaPuma.  But don't -- it doesn't matter. Just has to do with the loan --

A.      Okay.  Glad to be part of the team.

Q.      It just had to do with the loan review, not the --

A.      Yeah, I don't remember.  That's funny.

Q.      Do you recall why you decided to add a Conditions Precedent Indebtedness section to the loan review template?

A.      No.

Q.      Do you recall why you decided to add an Approval of Waivers and Amendment section to the loan review project?

A.      No.

Q.      Do you recall why you had an Agency section or why you decided to include an Agency section in the loan review project?

A.      No.  Are you done with this one?

Q.      At least for now.  Probably, yes.  I don't want to make any promises.

CONFIDENTIAL - AILEEN DAVERSA                77

A.    Okay, no, I can move it out of the way.

MR. READ:  You can set it aside.

MR. SHAPIRO:  Clip it maybe.

THE WITNESS:  Okay, there you go.

BY MR. SHAPIRO:

Q.    Were you involved in the creation of AMZAS --

A.    No.

Q.    -- Alvarez Marsal -- okay.

And do you remember anything about why A&M or -- withdrawn.

Do you have any recollection about why a separate entity was created called Alvarez & Marsal Zohar Agency Services?

A.    No.

Q.    Do you have any general understanding of the different roles that a collateral manager and administrative agent may play in connection with loans from a lender to a borrower?

MR. READ:  Object to the form.

You mean just generally speaking or in connection with the Zohar funds?

MR. SHAPIRO:  Generally speaking.

THE WITNESS:  Generally speaking.

Page 78

CONFIDENTIAL - AILEEN DAVERSA                78

Not the specifics of the Zohar funds.

BY MR. SHAPIRO:

Q.    What do you understand about the different roles that a collateral manager and an administrative agent may play?

MR. READ:  Objection to form.

Sorry, Brian.

A.    I mean, I guess maybe I don't understand specifically, but just in reviewing loan documents, an admin agent is generally, you know, representing the borrowers, if there is multiple borrowers.  The collateral agent is probably the person that's holding the actual collateral.  That's my basic understanding of it.

Q.    Do you have an understanding about what the specific role was or tasks that the administrative agent --

A.    No.

Q.    -- generally conducts?

MR. CAMPBELL:  Objection.

A.    No.  I mean, other than, like, a collateral agent is probably doing audits of the collateral, I would think, to make sure the collateral is good.  The admin agent, I mean, yeah.

CONFIDENTIAL - AILEEN DAVERSA          79

I mean, without reading a specific document, it's hard for me to -- I'm not like a loan bank person, so...

Q.    Do you have any understanding of what specific role the administrative agent played in connection with the Zohar funds?

A.    No.

Q.    Do you have any understanding of whether -- withdrawn.

Do you have any recollection of a decision made to purportedly terminate Patriarch Partners Agency Services as the administrative agent for the Zohar funds?

A.    No.

Q.    Were you involved in any way in the decision to purportedly terminate PPAS as administrative agent?

A.    No.

Q.    Do you have any understanding of the terms of PPAS's appointment as administrative agent?

A.    I don't recall.

Q.    Did you know at the time when you were working at A&M?

CONFIDENTIAL - AILEEN DAVERSA          80

A.     I may have, but I don't recall.

Q.     And do you have any recollection of the purported appointment of AMZAS as administrative agent for the Zohar funds?

A.     No.

Q.     You don't know why -- withdrawn.

Do you have any recollection of the purported basis or reasons for terminating PPAS as administrative agent?

A.     Yeah, I don't recall.

Q.     And do you have any recollection of the purported legal basis for appointing AMZAS as administrative agent for the Zohar funds?

MR. CAMPBELL:  Just --

A.     I don't recall.

MR. CAMPBELL:  That's fine.

THE WITNESS:  What's on your screen?

MR. READ:  This?

THE WITNESS:  Yes.

MR. READ:  That's the transcript.

THE WITNESS:  I was wondering what he was looking at.

MR. READ:  Yes.  What they call the real-time.

Page 81

CONFIDENTIAL - AILEEN DAVERSA          81

MR. SHAPIRO:  You thought there was somebody in New York City feeding me my lines or something?

THE WITNESS:  Yeah, I was like, what's going on?  Like a little earpiece.  And I'm like, you're not touching it either, so it's like -- obviously my first deposition.

BY MR. SHAPIRO:

Q.     Do you have any recollection about AMZM's requests for information to the portfolio companies in the early months of its engagement?

A.     No.

Q.     And do you have any recollection of AMZM's requests for information to any Patriarch entity in the early months of AMZM's engagement?

A.     No.

(Exhibit 31, previously marked.)

BY MR. SHAPIRO:

Q.     I'm going to hand you a document that's been marked as Exhibit 31, previously.  It's an email from Mr. Cover to an ebrodbeck@180s.com copying yourself and others, dated May 5th, 2016, Bates Number ZOHAR-PPAS 643 through 646.

Just take a moment to look that over.

Page 82

CONFIDENTIAL - AILEEN DAVERSA                82

(Pause.)

A.    Okay.

Q.    Does this refresh your recollection that AMZM as the collateral manager of the Zohar funds was requesting information from portfolio companies in the May of 2016 time period?

A.    No.  But other than reading it, I mean. I don't recall doing this.

Q.    That doesn't trigger any memory or recollection?

A.    Uh-uh.

MR. CAMPBELL:  Just for clarity, in the transcript you said no?

THE WITNESS:  That it doesn't -- no, yeah, it doesn't.  I have no memory.

MR. CAMPBELL:  I think you said "uh-uh", so I just wanted to --

THE WITNESS:  Oh, I'm sorry, sorry. I forget.

MR. READ:  That's okay.

THE WITNESS:  No.

BY MR. SHAPIRO:

Q.    And you don't have any -- withdrawn.

Do you have any recollection of whether

Page 83

CONFIDENTIAL - AILEEN DAVERSA          83

there came a point in time in which A&M or an A&M entity was purporting to act as the administrative agent for the Zohar funds?

A.    No.

Q.    So, you have no idea when, if ever, that began and when, if ever, that ended?

A.    No.

Q.    And were you involved in any correspondence between counsel for the portfolio companies on the one hand and counsel for A&M or the Zohar funds on the other, relating to information requests and other requests of the portfolio companies?

A.    Not that I recall.

Q.    Do you recall any conversations with Ms. LaPuma on the topic of reaching out to portfolio companies?

A.    No.

Q.    You don't recall any conversations about the portfolio companies' counsel directing that all future communications with AMZM go through his office?

A.    No.

Q.    Do you have any understanding of the

Page 84

CONFIDENTIAL - AILEEN DAVERSA                84

relationship with --

THE REPORTER:  I'm sorry.  Please state that again.

Q.    Do you have any understanding of the relationship between the Zohar funds and the portfolio companies, their portfolio companies?

Relevance

MR. READ:  Object to the form.

Relevance

A.    I don't recall.

Q.    Do you recall that the Zohar funds lent money to certain companies and that those companies owed money to the Zohar funds?

A.    Yes, I do recall that.

Q.    Do you recall efforts by AMZM to determine how much money had been lent to the various portfolio companies?

A.    No.

Q.    Do you recall efforts by AMZM to determine how much money was owed by the various portfolio companies to the Zohar funds?

A.    No.

Q.    I guess you don't have any recollection of efforts by AMZM to determine how much interest was owed by the various portfolio companies.

A.    No.

Page 85

CONFIDENTIAL - AILEEN DAVERSA        85

Relevance

Q.    Did you have any involvement in conversations within AMZM about how to calculate how much interest was owed by the portfolio companies?

A.    No.

Q.    Did you have any involvement in conversations within AMZM about whether to treat any portfolio companies as in -- as in default for non-payment or not full payment of interest owed?

A.    I don't recall.

MR. SHAPIRO:  Let's mark Exhibit 209, a document dated June 20th, 2016, an email from Thomas Macedonio to Ms. LaPuma and others, copying Ms. Daversa with the Bates Numbers ALVAREZ-PPAS 1244 through 1250 and attachment.

(Exhibit 209, Email from Thomas Macedonio to Ms. LaPuma and others, copying Ms. Daversa, Bates Numbers ALVAREZ_PPAS0001244 through ALVAREZ_PPAS0001250 and attachment, marked for identification.)

BY MR. SHAPIRO:

Q.    Take a moment to flip through the email and the attachment.

Page 86

CONFIDENTIAL - AILEEN DAVERSA                86

(Pause.)

A.     Okay.  I didn't read all of this, but --

Q.     Take a look at the top email.  Do you recall receiving this email?

A.     No.

Q.     Do you have any reason to believe it's not an email you received as indicated on the front?

A.     No.

Q.     Does this refresh your recollection about conversations with Ms. LaPuma or others on the AMZM team about the amount of interest that was owed by portfolio companies to Zohar funds?

A.     No.

Q.     If you turn to the second page, which is the first attachment, the letter from Williams & Connolly, dated June 8, 2016.  The Bates is 1246.

If you look at the second paragraph there, and specifically the first and second sentences.  It says, "AMZM seems to misapprehend the process by which my clients are invoiced regarding their debts to the Zohar funds.  Invoices are generated by the funds' administrative agent under the relevant credit agreements, Patriarch

CONFIDENTIAL - AILEEN DAVERSA                87

Partners Agency Services, PPAS, and sent to my clients."

Does that refresh your recollection that PPAS was the entity that was serving as administrative agent for the funds at that time?

A.   No.

Q.   And you don't recall any conversations about whether AMZM or some A&M entity should send invoices to the portfolio companies or not?

A.   No.  I was more of a doer, you know, sending letters; I don't remember the conversations.

Q.   And in the last sentence of that same paragraph, the second paragraph on the June 8th letter, it says in the parenthetical, "It appears from your letters that AMZM may be calculating interest in a different manner than PPAS."

You don't have any recollection of conversations about whether AMZM was correctly calculating the interest due?

A.   No.

Q.   And do you recall whether you or anyone you were working with -- withdrawn.

Do you recall how you or anyone you were

Page 88

CONFIDENTIAL - AILEEN DAVERSA                88

working with attempted to calculate the interest that was due to the Zohar funds from portfolio companies?

A.    No.

Q.    Would you have been involved in that project?

A.    I assume so, but I don't -- I mean, I don't recall.

Q.    Would you have been involved in conversations about whether to treat payments received as or were not received as in default -- withdrawn.

Would you have been involved in conversations about whether to treat portfolio companies as in default based on payments received or not received?

A.    Yes.

MR. CAMPBELL:  Objection to form.

A.    I don't recall.

Q.    If you turn to the attachment, that last large sheet, do you know who created this attachment?

A.    No.  Other than I could theorize from the email maybe Thomas, but I don't recall.

Page 89

CONFIDENTIAL - AILEEN DAVERSA          89

Q.    You can put that aside.  I just have one more document and then we can break for lunch --

A.    All right.

Q.    -- if that works for you guys.

A.    Perfect.

MR. SHAPIRO:  All right.  Let's break.

THE VIDEOGRAPHER:  Going off the record, the time is 12:55.

(Whereupon, the witness was excused and a luncheon recess was taken at 12:55 p.m.)


* * *

AFTERNOON SESSION

1:39 A.M.

THE VIDEOGRAPHER:  We are back on the record.  The time is 1:39.


A I L E E N   D A V E R S A,

having been previously duly sworn and/or

affirmed, testified further on her oath as

follows:


EXAMINATION

Page 90

CONFIDENTIAL - AILEEN DAVERSA                90

BY MR. SHAPIRO (continued):

Q.    Welcome back.  Good afternoon.

Before we broke for lunch, we were discussing -- well, I was asking some questions about some various things you remembered or didn't remember, one of them was the decision to terminate or purportedly terminate Patriarch Partners Agency Services as the administrative agent for the Zohar funds, and I think you had said you didn't recall much of that or anything about that.

A.    Correct.

(Exhibit 193, previously marked.)

BY MR. SHAPIRO:

Q.    Okay.  I'm going to hand you a document and see if that perhaps refreshes your recollection.

I'm handing you a document that's previously been marked Exhibit 193, which is an email from yourself to ebennett@wc.com dated June 14, 2016, Bates ZOHAR-PPAS 2784 through 2862 with attachments.

Take a moment to look that over.

(Pause.)

A.    Okay.  I didn't look at every letter, but

Page 91

CONFIDENTIAL - AILEEN DAVERSA          91

I get the gist of what's in here.

Q.    I want you to take a look at the top email, which is from you to ebennett@WC.com.

Do you recall sending this email?

A.    No.

Q.    Do you have any reason to believe you didn't send it as indicated on the face of the document?

A.    No.

Q.    Do you know who ebennett@wc.com is?

A.    I don't recall.

Q.    Do you see the subject of the email is Termination of Patriarch Partners Agency Services, LLC as Agent - Notification to Borrowers, and the attachments are AMZM borrower letters, June 14th, 2016.zip.  And then you write, "Ed, please see the attached letters.  Kind regards, Aileen."

And if you'll flip, for example, to the first of those letters, which is addressed to RM Acquisition, LLC, Care of Edward J. Bennett, Williams & Connolly, regarding termination of Patriarch Partners Agency Services, LLC, as agent, and it's signed by Ms. LaPuma.

Does this refresh your recollection --

Page 92

CONFIDENTIAL - AILEEN DAVERSA          92

the email and the letter refresh your recollection about the purported termination of PPAS by AMZM or the funds?

A.    Obviously, I sent the letters.  But I don't recall the creation of them or whether I just sent them out.

Q.    If you look at the second paragraph of that first letter, the one Bates Number 2784, the Zohar funds are -- the first line, quote, The Zohar funds as request -- required lenders, hereby notify all of the credit parties that they have terminated Patriarch Partners Agency Services, LLC, PPAS, as agent, effective as of June 17th, 2016.

Does that refresh your recollection about the termination or any involvement in that?

A.    No.

Q.    And if you look one sentence further on, in that same paragraph it says, quote, Notwithstanding any provisions in the credit agreement that may purport to make PPAS's appointment as agent irrevocable, basic principles or agency law give the Zohar funds the right to terminate PPAS as agent upon reasonable notice. End quote.

Page 93

CONFIDENTIAL - AILEEN DAVERSA          93

Do you have any understanding of what the basic principles of agency law that are referred to there are?

A.     No.

Q.     Do you have any understanding or recollection of the provisions in the credit agreement that purport to make PPAS's appointment as agent irrevocable?

A.     No.

Q.     And the next paragraph, same page, 2787 still, says that the Zohar funds, I'm paraphrasing, but the Zohar funds, and now I'm quoting, quote, have appointed as successor agent Zohar II 2005-1, Ltd., an entity that meets the credit agreement's requirements for successor agents.

Did you have any involvement in the purported appointment of Zohar II as a successor agent?

A.     No.

Q.     Do you have any recollection about conversations about that?

A.     No.

Q.     Do you have any recollection about conversations about whether the Zohar funds

Page 94

CONFIDENTIAL - AILEEN DAVERSA                94

entities met the credit agreement's requirements for successor agent?

A.    No.

Q.    Did you have direct interactions with the Zohar funds or AMZM's lawyers in connection with the Zohar funds engagement?

A.    I don't recall.

Q.    Do you know whether AMZM had internal AMZM lawyers that were assigned to the Zohar funds project?

A.    I don't --

MR. READ:  Objection to form.

A.    I don't recall.

Q.    And do you know who -- withdrawn.

Do you know what lawyers, if any, Ms. LaPuma consulted in connection with her conclusion that basic principles of agency law give the Zohar funds the right to terminate PPAS as agent?

A.    I don't.

MR. READ:  Objection to form.

(Exhibit 194, previously marked.)

BY MR. SHAPIRO:

Q.    I'm handing you a document that's been

Page 95

CONFIDENTIAL - AILEEN DAVERSA                95

previously marked Exhibit 194, which is an email from yourself to creditnotices@patriarchpartners.com dated June 14th, 2016, with the Bates Number ZOHAR-PPAS 2863 through 2941, including attachments.

Take a moment to look at that.

(Pause.)

A.    Okay.

Q.    If you see, there's various letters to Patriarch Partners Agency Services attached regarding the termination of Patriarch Partners Agency Services, LLC, as agent.

First of all, do you recall sending the cover email?

A.    No.

Q.    Any reason to believe that you didn't send it as indicated on the face of the document?

A.    No.

Q.    Why did Ms. LaPuma have you sending these letters to Patriarch Partners Agency Services?

A.    Because I was working for her.  She asked me to do it.  I mean, sorry.  We need to communicate with the other side, I guess.

Q.    And seeing that you were the one that

CONFIDENTIAL - AILEEN DAVERSA          96

sent out the letters to the portfolio companies as well as the one that sent out the letters to Patriarch Partners Agency Services doesn't refresh your recollection about any role that you played in deciding to send the letters?

A.    No, no.

Q.    Or in the drafting of the letters?

A.    No.  I don't recall being involved in that.

Q.    And you don't recall any conversations with Ms. LaPuma on the topic of whether to purport to terminate PPAS as administrative agent?

A.    No.

Q.    And you don't recall any conversation with her in connection with drafting letters that conveyed that purported termination?

A.    No.  I mean, I'd be pretty impressed if I wrote this.  I mean, serious, like a lawyer.  Like, I don't recall.  I mean, maybe I did, but I don't know.

Q.    I mean, I guess my question isn't so much did you actually put the words on the page.

A.    Oh, okay, sorry.

Q.    But more if any recollection comes to

CONFIDENTIAL - AILEEN DAVERSA          97

mind about the decision to terminate PPAS or conversations with Ms. LaPuma about that.

A.      No, no.

Q.      And do you recall following -- withdrawn.

Do you recall follow-on correspondence with Lynn Tilton or anyone at Patriarch Partners --

A.      No.

Q.      -- with --

MR. READ:  Let him finish his question.

A.      Sorry, sorry.

Q.      That was pretty broad.  I didn't specify so I guess now it's a pretty broad answer to a pretty broad question.

Were you involved in conversations with a company called Cortland Global -- withdrawn.

Does the name Cortland Global ring a bell?

A.      Vaguely.  I think they are a furniture company.

Q.      Must be a different Cortland Global.

A.      Oh, okay.  Yeah, no, I don't recall them.

Q.      Were you involved in conversations with Ms. LaPuma or others at AMZM about possibly

Page 98

CONFIDENTIAL - AILEEN DAVERSA          98

engaging a subagent on behalf of the Zohar funds?

A.    No.

Q.    You weren't involved or you don't recall?

A.    I don't recall.  Sorry.

Q.    And you don't recall any conversations or information about a decision whether to have an A&M entity act as agent?

A.    No.

Q.    No.  Do you recall hearing during your time -- withdrawn.

Do you recall being informed during your time at AMZM that there had been a directive from the court in this case, the case we're here about today, regarding whether AMZM should continue to or should purport to act as the administrative agent during the pendency of the action?

A.    No.

(Exhibit 187, previously marked.)

BY MR. SHAPIRO:

Q.    I'm handing you a document that's previously been marked Exhibit 187, which is an email from Mr. Cover to yourself and Mr. Macedonio dated July 25th, 2016, Bates ZOHAR-PPAS 6674 through 6683, including the attachment.

CONFIDENTIAL - AILEEN DAVERSA          99

Just take a moment to look that over.

(Pause.)

A.    Okay.

Q.    Do you recall receiving this email from Mr. Cover?

A.    No.

Q.    Do you have any reason to believe you didn't?

A.    No.

Q.    Do you recall -- if you see the conversation in the emails that follow is around the creation of AMZAS letterhead.  You are not copied on any of them --

A.    No.

Q.    -- except for the top email --

A.    Correct.

Q.    -- from Mr. Cover.  But looking at these, does this refresh your recollection about conversations in July 2016 within AMZM or within A&M about creating AMZAS specific letterhead?

A.    No.

Q.    Do you recall that there came -- withdrawn.

Do you recall there came a time during

Page 100

CONFIDENTIAL - AILEEN DAVERSA          100

which Ms. LaPuma and others at AMZM wanted to send letters to the portfolio companies in the name of AMZAS?

A.    No.

Q.    Did you -- withdrawn.

How did you account for your time working on the Zohar funds matters when you were working at A&M?

A.    I don't recall.  You mean like accounting, like, putting it in the billing system?

Q.    Uh-huh.

A.    Yeah, I don't recall.

Q.    Do you recall whether there was a Zohar fund specific number, billing number?

A.    I don't recall, but the way typically we do something, there should have been, but I don't recall specifically.

Q.    Do you recall if there was more than one billing number connected to the Zohar fund engagement or not?

A.    No.

Q.    And you I guess -- withdrawn.

You don't recall whether there was an AMZAS specific billing number or not?

Page 101

CONFIDENTIAL - AILEEN DAVERSA          101

A.    No.

Q.    Were you involved in any efforts to set up a bank account for AMZAS?

A.    Not that I recall.

Q.    Does KeyBank ring a bell to you?

A.    No.

(Exhibit 189, previously marked.)

BY MR. SHAPIRO:

Q.    I'm handing you a document that's previously been marked Exhibit 189.  It's an email from John Nix to yourself dated July 26, 2016, Bates Numbers ZOHAR-PPAS 6605 through 6607.

If you look at the second email, which is on page number 6606, you see an email from yourself to John Nix, with the subject AMZAS - Interest Invoice- Due August 1st, 2016.  And it says, Please find the attached invoice for interest due on August 1st, 2016 for the period May 1st, 2016 to July 31st, 2016.

Do you know who John Nix is?

A.    No.

Q.    Do you recall sending this email or receiving the email back from him?

A.    No.

CONFIDENTIAL - AILEEN DAVERSA        102

Q.    No reason to believe you didn't, though?

A.    No.

Q.    Does this refresh your recollection that you were sending interest invoices out in connection with the Zohar funds engagement?

A.    Not really.  I mean, vaguely.

Q.    Well, what do you -- what does it bring to mind?

A.    Really nothing.  I mean, vaguely recalling that there was a lot of communications, but like back and forth with letters, but I don't really recall any specifics.

Q.    And if you look at that top email, Bates 6605, do you see Mr. Nix is identified as the chief financial officer of Intrepid USA Healthcare.

A.    Uh-huh.

Q.    Does Intrepid ring a bell as a Zohar funds portfolio company?

A.    Maybe if that's the one that had the ambulances, but I don't remember.  I don't.  I think they might have been the ones with the ambulances, but I could be totally wrong.

Q.    Do you recall receiving requests from the portfolio company representative asking that all

Page 103

CONFIDENTIAL - AILEEN DAVERSA        103

future communications be directed to Ted Bennett or John Murray at Williams & Connolly?

A.     No.

Q.     And this doesn't refresh your recollection about conversations within A&M or AMZM about whether to reach out to the portfolio companies directly or not?

A.     No.

Do you mind if I take a break after this document?

Q.     Sure, no problem.

A.     Just to --

(Exhibit 210, Email sent 7/26/2016 from Mr. Cover to ebennett@wc.com, copying various people and BCCing Ms. Daversa and others, Bates Numbers ZOHAR-PPAS-00000917 through ZOHAR-PPAS-00001024, including attachments, marked for identification.)

MR. SHAPIRO:  If we can mark as Exhibit 210 an Email from Mr. Cover to ebennett@wc.com, copying various people and BCCing

Page 104

CONFIDENTIAL - AILEEN DAVERSA            104

Ms. Daversa and others with the subject, AMZAS

Payment Notices and Invoices, Bates Numbers

ZOHAR-PPAS 917 through 1024, including attachments.

(Pause.)

THE WITNESS:  Okay.

BY MR. SHAPIRO:

Q.    Do you recall receiving the top email?

A.    No.

Q.    No reason to believe you didn't?

A.    No.

Q.    Do you see the attachments are identified
in the top email as AMZAS Payment Notices, 7/25/16,
and then a separate attachment AMZAS Invoices,
August 1st, 2016?

A.    Yes.

MR. CAMPBELL:  Just to clarify the
transcript, did you say AMZAS or --

MR. SHAPIRO:  I did say AMZAS, yes,
sorry.

MR. CAMPBELL:  Okay.

MR. SHAPIRO:  Or at least I meant
to.

BY MR. SHAPIRO:

Q.    Do you recall anything about AMZAS

Page 105

CONFIDENTIAL - AILEEN DAVERSA        105

sending these letters to portfolio companies in July 2016?

A.    No.

Q.    You see if you look at the first letter, they are all pretty much the same, the first letter, which is Bates Number 919 --

A.    Yes.

Q.    -- in point 2, it says -- the intro says, In accordance with the credit agreement, we hereby direct you as follows, effective immediately, and then in point 2, Refrain from making any future payments to Patriarch Partners Agency Services, LLC, PPAS.

Do you recall any conversations about directing the portfolio companies to refrain from making any future payments to PPAS?

A.    No.

Q.    Do you know what the basis was for that directive?

A.    No.

Q.    Do you know if there were any conversations with -- withdrawn.

Do you know if there was a legal basis for that directive?

**Page 106**

CONFIDENTIAL - AILEEN DAVERSA          106

A.    No.   I probably -- I don't recall.

Q.    And you see at the bottom of that same page, 919, it says, Please send to the below bank account all interest, commitment fees and any principal payments owed to the Zohar funds including all amounts in arrearage, and it gives bank account information, like KeyBank, and account number, and account name is Alvarez & Marsal Agency Services.

Does this refresh your recollection about anything in connection with KeyBank and whether there was an account set up for AMZAS?

A.    No.

Q.    And you don't recall any internal conversations within AMZM, with Ms. LaPuma or Mr. Cover about whether that account had in fact come online or not at the time this letter was sent?

A.    No.

Q.    Were you involved in any conversations about -- withdrawn.

We had looked at some, at least one prior correspondence which purported to say that portfolio companies, certain portfolio companies

Page 107

CONFIDENTIAL - AILEEN DAVERSA          107

were in default for not paying interest or full interest.

Were you involved in any conversations or do you recall any conversations about whether to treat defaults as events of default under the credit agreements?

A.    No.

MR. READ:  Object to the form.

Q.    Just so it's clear, were you not involved in any or you don't recall if you were?

A.    I don't recall being involved.

MR. SHAPIRO:  All right.  We can take a break.

THE WITNESS:  Awesome.

THE VIDEOGRAPHER:  Going off the record, the time is 2:07.

(Recess taken from 2:07 p.m. to 2:22 p.m.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 2:22.

BY MR. SHAPIRO:

Q.    Welcome back.

A.    Thank you.

Q.    I'm going to take you out of the Zohar funds world for a second and just ask about, in

Improper Expert Testimony by a Lay Witness; Speculation; Hypothetical

Page 108

CONFIDENTIAL - AILEEN DAVERSA          108

your experience involved in restructuring and insolvency, have you ever been involved in a company that was going through a wind-down or an insolvency?

Improper Expert Testimony by a Lay Witness; Speculation; Hypothetical

MR. CAMPBELL:  Objection to form.

And, counsel, Ms. Daversa is not here as an expert witness.  She is here as a fact witness.

THE WITNESS:  Do I still need to answer?

MR. CAMPBELL:  Yes, you can answer.

A.    Yes.  In different capacities.

BY MR. SHAPIRO:

Q.    Are you familiar with the various costs that can be incurred by a company going through a wind-down?

A.    Yes, I --

Improper Expert Testimony by a Lay Witness; Speculation; Hypothetical

MR. CAMPBELL:  Objection.  Counsel, I'm just going to object to this entire line of questions on the same basis.

A.    Yes, I put together wind-down, like, models, liquidation models as part of -- for bankruptcy.

Q.    So, what come to mind as some of the

Improper Expert Testimony by a Lay Witness; Speculation; Hypothetical

Page 109

CONFIDENTIAL - AILEEN DAVERSA          109

costs associated with that process?

A.    Just winding down a general business?

Q.    Uh-huh.

A.    Professional fees, you know -- I don't know.  Labor, how long -- whatever you need to shut down the business, the labor, anymore rent that's left and how you exit a lease.  I don't know.  If you have to auction off assets, auction, you know, the cost of commissions and whatnot for those individuals.  I'm trying to think.  Bank fees, if you could distribute something.  Claims agent.  I work for a claims agent now.  You may have to pay them to help with the claims process.  Is that enough?

Q.    Whatever comes to mind.

A.    That's all I could think of.

Q.    In terms of professional fees, what did you have in mind?

A.    I mean, depending on the situation, you might have lawyers.

Q.    You might.

A.    Financial advisors potentially.  And then, like I said, if you have like an auction house, I don't know if that's considered

Improper Expert Testimony by a Lay Witness; Speculation; Hypothetical

Page 110

CONFIDENTIAL - AILEEN DAVERSA                110

professionals or not, but like a Gordon Brothers or something like that if you were winding down inventory.

Q.    Costs associated with preserving the inventory possibly?

A.    That too, yeah.

Q.    And preserving the real estate, if there is any?

A.    I mean, it depends, yeah, if you were doing -- right, if you want to maximize the value. But usually, liquidation, you are just kind of winding down.  I mean, Lehman Brothers was one big liquidation, but they maximized the value of those assets or tried to.

*Improper Expert Testimony by a Lay Witness; Speculation; Hypothetical*

Q.    And is there -- withdrawn.

What are some other examples of liquidations that you've been involved in?

MR. READ:  And again, I'm just going -- I know there is a protective order, but however, you want to be mindful that you not disclose confidential engagements --

THE WITNESS:  Okay.

MR. READ:  -- that have nothing to do with this case.

CONFIDENTIAL - AILEEN DAVERSA          111

THE WITNESS:  Got it.

MR. READ:  That wouldn't be appropriate.

THE WITNESS:  Okay.  Can I talk about them generically?

MR. READ:  Sure, sure.  I just -- you know, again, we don't --

THE WITNESS:  Yeah, it's hard to -- I mean, I don't know how -- I mean --

MR. READ:  I want you to be -- you know, I don't know all your different obligations --

THE WITNESS:  Yeah, yeah.

MR. READ:  -- to former and current clients.

THE WITNESS:  No, that's fair.

MR. READ:  And it wouldn't be appropriate for you to disclose information that would be in breach of any confidentiality obligations you might have --

THE WITNESS:  Uh-huh.

MR. READ:  -- Ms. Daversa.  So, you can talk about public matters; you can speak generally, but I just --

Page 112

CONFIDENTIAL - AILEEN DAVERSA                112

THE WITNESS:  Yeah.

MR. READ:  -- you know, but just to keep that in mind.

THE WITNESS:  Okay.

MR. READ:  Again, I don't know why he is asking you these questions, to be blunt. They have nothing to do with why you are here --

THE WITNESS:  Got it.

MR. READ:  -- as a fact witness. But you can answer generally --

THE WITNESS:  Okay.

MR. READ:  -- or not.

A.    Okay.  Yeah, I mean, I guess I could speak generally to what I've done in those instances, but I can't, I guess, other than Lehman being -- everyone knows was a big wind-down essentially, that's like -- my other cases would be hard to talk to specifically.

BY MR. SHAPIRO:

Q.    I'm not asking specifically.  I'm just asking what companies you were involved in with respect to wind-downs.

A.    Meaning employers I worked for or the actual client?

Page 113

CONFIDENTIAL - AILEEN DAVERSA          113

Q.    The actual company that was in a wind-down situation.

MR. READ:  Right, that's why I gave you the instruction I did.

A.    Yeah, I don't think I can -- I mean, other than the big -- if you consider Lehman a wind-down, you know, liquidate -- you know, ultimately getting rid of all their assets, I can't really name specific ones.

Q.    You believe you are under some sort of obligation not to do so?

A.    I don't know without going back and reviewing.  Like, I really don't know.

MR. CAMPBELL:  Counsel, this is entirely irrelevant to the case.  She's not here in an expert capacity.  There is no reason to badger the witness about other engagements that she has that may have been confidential.

MR. SHAPIRO:  I mean, I don't appreciate counsel coaching the witness not to answer my question, so I'm trying to get to see if there is a factual basis for her not answering it or not.

MR. READ:  Well, I'm on the verge of

Page 114

CONFIDENTIAL - AILEEN DAVERSA            114

instructing her not to answer.  So, you know, we can have this discussion for as long as we want.

MR. SHAPIRO:  Sure, we can have her come back again if you want.

MR. READ:  Sure, I'd be happy to discuss this with the judge at any time.  Sure.

But for now, I'm not instructing you not to answer.

THE WITNESS:  You're not not instructing me to answer?

MR. READ:  I think what she said is that she doesn't -- the record will reflect that she said that she's not certain of exactly the confidentiality obligations.  It's not at all within the scope of what she's here to talk about today.

THE WITNESS:  And frankly --

MR. READY:  So, I don't think it's appropriate for you to put this witness in that position where she would potentially be violating obligations that she has to her current employer, former employers, current clients, former clients, about something that's completely irrelevant to the case.

Page 115

CONFIDENTIAL - AILEEN DAVERSA          115

You were going to say, though.

THE WITNESS:  You know, I can recall being involved in liquidations, but may not necessarily name the company either too, like putting together liquidation analyses to support certain scenarios.

BY MR. SHAPIRO:

Q.    Do you believe that there are confidentiality obligations that you personally have to former employees that prevent you from disclosing the names of companies that you've been involved in liquidation of?

MR. CAMPBELL:  Objection, form.

A.    Probably, unless it's public record that it was like a Chapter 7 liquidation, which I haven't really been involved in, like unless it's something public.

Q.    Well, have you been involved in any that were public --

A.    Lehman.

Q.    -- other than Lehman?

A.    Not that I can recall.

Q.    Okay.

A.    I mean, I've worked on hundreds of cases

Page 116

CONFIDENTIAL - AILEEN DAVERSA          116

but I'm trying to think.  Not off the top of my head.

Q.    Okay.  When you say you worked on hundreds of cases, that's hundreds of --

A.    Not liquidations, just in general.

Q.    How many liquidations have you worked on?

A.    Oh, gosh, I don't know.  Not a lot.  It wasn't a big part of what I did.

Q.    I mean, between 10 and 20?

A.    Oh, no, less than that.

Q.    More than 20?

A.    Less than that.  Yeah, less than that.

But liquidation is one thing.  With every bankruptcy you do, you have to do a liquidation analysis, so I'm always -- I'm kind of grouping that in too when you ask the question the cost to wind down a business.  That gets factored in when you are doing that -- what you need as part of the bankruptcy plan so...

Q.    And in that situation, are companies usually able to pay for those various costs that you listed?

MR. READ:  Objection to the form.

A.    It depends on the situation.

Improper Expert Testimony by a Lay Witness; Speculation; Hypothetical

Page 117

CONFIDENTIAL - AILEEN DAVERSA          117

Q.    Okay.

A.    I mean, you can't like --

Q.    Who is responsible for those costs?

A.    The estate.

Q.    In a situation where there's been no bankruptcy filed, who is responsible or do you know --

A.    Whoever --

Q.    It depends on the agreements?

A.    It depends.

MR. CAMPBELL:  Objection.

A.    Yeah, I can't say.  I mean, it really depends.  I've had -- I mean, banks pay for our fees in the past or the debtor paying for the fees. It just depends on who hired you.

*Improper Expert Testimony by a Lay Witness; Speculation; Hypothetical*

Q.    We were talking before the last break about letters that were sent out by A&M or an A&M entity purporting to terminate PPAS as the administrative agent for the Zohar funds.

A.    Uh-huh -- yes.

Q.    Do you recall -- withdrawn.

Were you involved in any follow-on correspondence between counsel following that purported termination?

Page 118

CONFIDENTIAL - AILEEN DAVERSA          118

A.    Not that I recall.

Q.    Do you recall that a lawsuit was filed within a few days of --

A.    No, I don't recall that.

Q.    Just let me finish my question, please.

A.    Sorry, sorry.

Q.    Do you recall that a lawsuit was filed within a few days after the purported termination?

A.    No.  Is that this lawsuit, this specific one?  Yeah, no.

Q.    Yeah, it is this one.

Well, do you recall any lawsuit that was filed --

A.    No.

Q.    -- within a few days?

A.    I just remember there being a lot of just general litigation, but I don't -- you know, associated with Patriarch, but I don't remember the specific one.

Q.    Do you recall that you received any kind of notice to preserve documents in connection with the filing of this lawsuit?

A.    No.

Q.    And when you said you -- earlier on in

**Page 119**

CONFIDENTIAL - AILEEN DAVERSA          119

the deposition, you had said that when you had first gotten the deposition notice earlier this year you had gone on PACER and looked at the complaint --

A.    Yes.

Q.    -- in this case.

A.    Yes.

Q.    Did that trigger any memory of filing the lawsuit?

A.    No.

MR. SHAPIRO:  If we could mark as Exhibit 211 an email from Project Zenith to Thomas Macedonio dated September 29th, 2016, and follow-on correspondence with the Bates Numbers ZOHAR-PPAS 17145 through 17183.

(Exhibit 211, Email from Project Zenith to Thomas Macedonio dated September 29th, 2016, and follow-on correspondence, Bates Numbers ZOHAR-PPAS-00017145 through ZOHAR-PPAS-00017183, marked for identification.)

BY MR. SHAPIRO:

Q.    Exhibit 211 has been handed to you, and

Relevance

Page 120

CONFIDENTIAL - AILEEN DAVERSA         120

if you take a look the top email, it attaches AMZAS invoices due September 1st, 2016, and you see that that top email was sent from you.

Relevance

A.    I guess we had some sort of project email, right?

Q.    Yeah, that's what I was going --

A.    It says Project Zenith.

Q.    Project Zenith, yes, that's what I was going to point out.  It looks --

A.    But my name showed up, so I don't know.

Q.    It looks like you are at least on that --

A.    Email chain I guess.

Q.    -- email chain or in that email group since when you sent an email it said it came from Project Zenith; right?

A.    Yeah, that's what I'm assuming.  Yeah, that's what it looks like, why my name would be below it.

Q.    No reason to think you didn't send this?

A.    I don't think so, no.  I mean --

Q.    You don't recall?

A.    I don't recall, no.

Q.    And if you look at the email below it, which is also on 17145, that's from Mr. Cover --

Page 121

CONFIDENTIAL - AILEEN DAVERSA          121

A.     Uh-huh.

Q.     -- to ebennett@wc.com, copies a few people --

A.     Not me.

Q.     -- including Ms. LaPuma.  Right, but Project Zenith so...

A.     Oh, yeah, there's Project Zenith, okay. So I must have been; I can only assume.

Q.     You see that August 25th email from Mr. Cover, it says, Hi Ted.  On behalf of A&M Zohar Agency Services, please find the attached interest invoices intended for companies you represent. Please forward on to the companies' respective officers to ensure receipt.

You don't recall receiving that email?

A.     No.

Q.     And take a flip through these invoices. There's about 35 pages of invoices that are directed to various companies, 180s, ACME, Best Textiles, American Doors, etc., Croscill.

A.     Yes.

Q.     Do you recognize those as Zohar funds portfolio companies?

A.     I don't recall.  There's very few, like

Page 122

CONFIDENTIAL - AILEEN DAVERSA          122

MD Helicopters, I remember that one.  But I wouldn't be able to specifically recall that they were a Zohar fund or if they were part of a fund. There's only certain ones that stick out that I remember, just because MD was a bigger one.

Q.    Any others stick out as you flip through?

A.    I don't think so.  For whatever reason, I don't know why, the Croscill Homes one sticks out, but I don't know why.  Dura sticks out, I do remember that one.  Is this important?  Do you want to know all the ones?

Q.    I've got another three hours to kill, so I might as well find out.

A.    Oh, no, three more hours.

MR. READ:  Really?

Q.    Okay.

A.    Gorham Paper, I remember.  But you know, I don't -- I just remember the names.  It's not like I have any, like, anything more than that. And I don't see that company that I thought was the ambulance company.  Nothing is ringing a bell for that, unless it was that Intrepid.  So, I recognize some of them.

Q.    Okay.  And just take a look at the first

Page 123

CONFIDENTIAL - AILEEN DAVERSA          123

invoice, just a sample --

A.    Yeah.

Q.    -- which is the 17148.  It's an invoice dated August 25th, 2016.

A.    Uh-huh.

Q.    Invoice number AMZAS 128, and you see it has Alvarez & Marsal Zohar Agency Services, LLC, letterhead at the top there?

A.    Yes.

Q.    Does this refresh your recollection that AMZAS was sending at least this set of invoices to portfolio companies purportedly as administrative agent?

Relevance

A.    I don't recall that, but reading this document, it appears that way.

Q.    And if you look a little bit farther below the chart, there's wire instructions.

A.    Uh-huh.

Q.    "Please note the change in bank account name and number."

Does that refresh your recollection about or remind you of any conversations about which bank account the portfolio companies should be directed to send --

Page 124

CONFIDENTIAL - AILEEN DAVERSA            124

A.    No.

Q.    -- payments?  Okay.

Do you see the account, there's various bank names and bank account numbers.

A.    Uh-huh.

Q.    It says Account Name, Alvarez & Marsal Zohar Agency Services, LLC.

Does this refresh your recollection that AMZAS was directing portfolio companies to send interest payments to it instead of PPAS?

A.    No.  It does not refresh my memory.

Q.    You can put that aside.

A.    Okay.

Q.    Did there come a time when you and others at AMZM on the Zohar funds team worked on a status update for the Zohar funds stakeholders?

A.    Not that I recall, but I'm sure we did reporting.

Q.    And what reporting do you recall doing?

A.    I don't recall.  I'm just saying in general, that's something we would have done.

Q.    Were there conversations about whether to have -- withdrawn.

Do you have an understanding that there

Page 125

CONFIDENTIAL - AILEEN DAVERSA          125

was a trustee for the Zohar funds, US Bank?

A.    I don't recall that, but those are probably the trustee reports that I remember.

Q.    Do you have any understanding of why there were no trustee reports issued once AMZM became the collateral manager?

MR. CAMPBELL:  Objection to form.

A.    No.

Q.    You don't remember anything about putting together a big thick status update for the stakeholders in October 2016?

A.    No, but I'm sure I did, because that's what you do at a -- what you do at A&M, you do PowerPoints.  Like, I don't remember the specifics, but I'm sure I was involved in putting some presentation together.

MR. SHAPIRO:  I'm going to mark as Exhibit 212 an email from Ms. LaPuma to Ms. Daversa and others dated October 3rd, 2016, with the Bates Numbers ZOHAR-PPAS 43138 through 43145 and including attachments.

(Exhibit 212, Email from

Ms. LaPuma to Ms. Daversa and others

dated October 3rd, 2016, Bates

Page 126

CONFIDENTIAL - AILEEN DAVERSA          126

Numbers ZOHAR-PPAS-00043138 through ZOHAR-PPAS-00043145 and including attachments, marked for identification.)

BY MR. SHAPIRO:

Q.    Ms. Daversa, just take a moment to look over Exhibit 212.

A.    Okay.

Q.    Does this refresh your recollection that you were involved in the creation of the AMZM Status Report in October 2016 for the Zohar funds stakeholders?

A.    No.  I mean, it looks like I was on the email, but I don't, like, you think I would recall a 91-page document, or whatever you said, but --

Q.    I just think I just said a thick document.  It's not this one, there's a thicker version.  We'll get there, don't worry.

A.    I just don't specifically, you know, remember.

Q.    Okay.  If you see the subject on the top page, on page 43138, is AMZM Status Report - Draft, and then it has a date, and then the attachments are AMZM Status Report, the same draft,

Page 127

CONFIDENTIAL - AILEEN DAVERSA          127

10_3_16v3(2).pptx.

Just to sort of orient ourselves, if you turn to the attachments, for example, the first page, which for some reason is Slide Number 0, but it's Bates 43139.

A.   Okay.

Q.   And you'll see there is LE14 in a little box inside.

A.   Yes.

Q.   And then LE6.  And then if you turn the page to 43140, there's an LE14, and it has a date, time and text.  So, for example, "LE14, don't like citing judge, FYI so took off quotes."

Am I understanding that those are comments in the or on the PowerPoint?

A.   I mean, it looks that way to me.

Q.   And these look to be Ms. LaPuma's comments?

A.   I can't say.

Q.   Just because --

A.   She wrote the email.

Q.   -- she wrote the email and her initials are EL, and this is LE with the number so...

A.   I mean, it seems like a logical

Page 128

CONFIDENTIAL - AILEEN DAVERSA          128

assumption, but I can't say for sure.

Q.    And if you look, again, on the first page of the PowerPoint.

A.    Uh-huh.

Q.    Right above LE6, it says, "AMAS sent potential interest payment default letters."

A.    Yes, I see that.

Q.    And if you look on the comment that appears to be associated with LE6 on the next page, it says, "Wasn't this the agent who did this, not AMZM?"

Do you see that?

A.    Yeah -- yes.

Q.    It appears to be Ms. LaPuma asking you and Mr. Cover and Mr. Macedonio, wasn't this the agent who sent out potential interest payment default letters.

MR. READ:  Objection to form.

MR. CAMPBELL:  Objection to form. Mischaracterizes the document.

A.    I mean, I can read what the words say on the paper, but I can't really interpret.

Q.    If you look at the Slide Number 1, which is on Bates Number 43141.

Page 129

CONFIDENTIAL - AILEEN DAVERSA                129

A.    Okay.

Q.    At the top, there's an LE7 comment.

A.    Hold on, I'm on the wrong page.  Okay.

Q.    And you see it says, A&M, and then it's blocked out by the comment bubble.

A.    Uh-huh.

Q.    "AMZAS to serve as the Zohar funds as agent on the loans owned by Zohar and on which Zohar was agent."

Do you see that?

A.    Yes.

Q.    I think if you flip to the next page, which is Slide 3 on the slide and Bates 43142.

A.    Okay.

Q.    The LE7 is blocked out, but it appears to be the top line there.  It says, "To define."

A.    Okay.

Q.    So, if you could just put that to the side, although we may refer back to it, so just keep it close.

A.    Okay.

MR. SHAPIRO:  We'll mark this Exhibit 213, an email from Ms. LaPuma to Ms. Daversa dated October 4th, 2016, Bates Numbers

CONFIDENTIAL - AILEEN DAVERSA        130

43136 through 43137, please.

(Exhibit 213, Email from Ms. LaPuma to Ms. Daversa dated October 4th, 2016, Bates Numbers ZOHAR-PPAS-00043136 through ZOHAR-PPAS-00043137, marked for identification.)

BY MR. SHAPIRO:

Q.    Take a moment to look at that.

(Pause.)

Q.    Do you recall receiving this email and sending the email that follows to Ms. LaPuma?

A.    No.

Q.    Any reason to believe it's not what it appears to be?

A.    No.

Q.    Do you see the email that you sent, which is the second email down on 43136?  You write, "Hi Liz, just to close the loop on some of your attached comments."  And the subject line is AMZM Status Report Draft 10_3_16v3(2).

Does that appear to be discussion of the same version of the status report?

A.    It seems to be, yes.

Page 131

CONFIDENTIAL - AILEEN DAVERSA        131

Q.    And you say with respect to LE6, "We had not been appointed agent at that point so those communications came from AMZM."

Do you see that?

A.    Yes.

Q.    Do you recall anything about that comment to you or your response to her comment?

A.    No.

Q.    Any reason to believe that you weren't saying something truthful at the time?

A.    No, I don't think so.

Q.    And then LE7, you write, "What do we need to define?"

Do you see that?

A.    Uh-huh.

Q.    And then, she writes back in the top email, "A&M, also we need to confirm who is parent and who sub is does A&M what hold AMZAS.  Maybe best to now say AMZAS was set up to serve as agent so no definition needed.  Also also define what you mean by default letters on page before."

Does this refresh your recollection about conversations with Ms. LaPuma about how to characterize the relationship between A&M and AMZAS

CONFIDENTIAL - AILEEN DAVERSA          132

in the October 2016 status report?

A.     No.

Q.     You don't recall anything about conversations along those lines?

A.     No.

Q.     And you don't recall conversations about -- withdrawn.

MR. SHAPIRO:  Let's mark as Exhibit 213 an email from Ms. Daversa to Ms. LaPuma and others dated October 4, 2016, with Bates Numbers ZOHAR-PPAS 47827 through 47853, with attachments.

THE REPORTER:  I believe this is 214.

MR. SHAPIRO:  214, my mistake, I'll correct that.

(Exhibit 214, Email from Ms. Daversa to Ms. LaPuma and others, dated October 4, 2016, Bates Numbers ZOHAR-PPAS-00047827 through ZOHAR-PPAS-00047853, with attachments, marked for identification.)

BY MR. SHAPIRO:

Page 133

CONFIDENTIAL - AILEEN DAVERSA          133

Q.    Sorry, let's correct the record, that was Exhibit 214.  Thank you.

Take a moment to look at this email and the attachments.  You see the attachments described as AMZM Status Report Draft 10_4_16, no Appendix v5.pptx.

Do you remember sending this email?

A.    No.

Q.    Any reason to believe you didn't?

A.    No.

Q.    And this is dated October 4th.  The last one we looked at was October 3rd and the email with Ms. LaPuma was, it looks like the early morning of October 4th.

Does this refresh your recollection that you were deeply involved in the creation of the October 2016 AMZM status report for the Zohar funds?

A.    No.

MR. READ:  Objection to form.

A.    I mean, other than obviously I was involved, but I don't recall any details.

(Exhibit 204, previously marked.)

BY MR. SHAPIRO:

Page 134

CONFIDENTIAL - AILEEN DAVERSA        134

Q.    Okay.  I'm handing you a document that's previously been marked Exhibit 204 titled Zohar II Status Update, Alvarez & Marsal Zohar Management, LLC, October 21st, 2016.  Bates Number is ZOHAR-PPAS 59111 through 59202.

(Pause.)

Q.    Do you recall this document?

A.    No.

Q.    Did you review any Zohar status updates in preparing for the deposition?

A.    No.  I mean --

MR. READ:  If you remember.

MR. CAMPBELL:  Objection.

A.    I mean, we --

MR. READ:  You can answer yes or no as to whether you remember viewing any status updates in prep.

A.    Oh yes.  So, we, I mean, we looked at this document when we prepped, but I don't recall putting it together.  So, my recollection is from like last week of pulling this document.

You know, it was up on a screen, so I really didn't, you know, look through it.

Q.    And reviewing it there in prep didn't

CONFIDENTIAL - AILEEN DAVERSA          135

refresh your recollection about anything about the document or the creation of it?

A.    No.

Q.    And you don't recall anything --withdrawn.

You don't recall any conversations with Ms. LaPuma or anyone else --

A.    No.

Q.    -- around what to include in the document?

A.    No.

Q.    What not to include in the document?

A.    No.

Q.    The wording of the status update?

A.    No.

Q.    And what topics to cover?

A.    No.

All I can remember is sitting in her office, but I don't remember what we talked about. That's all I can think about, is, like, being in her office, but details of anything, I don't know.

Q.    What do you recall about sitting in her office?

A.    Just sitting in her office.  That's it.

Page 136

CONFIDENTIAL - AILEEN DAVERSA          136

I mean, I really --

Q.    Doing what?

A.    Like sitting, like just talking, but I don't know what we were talking about.  You know, I just remember being in her office.  Like, if you are asking me to remember something, that's all I remember.  But I don't remember, like, talking about the document, what we were talking about, you know.

Q.    You remember sitting in her office in connection with the --

A.    Just in general.

Q.    -- Zohar status update?

A.    No, no.  Not in connection with the Zohar.

MR. SHAPIRO:  Let's please mark as Exhibit 215 a document titled Zohar III Status Update, Alvarez & Marsal Zohar Management, LLC, October 21st, 2016, with the Bates Number ZOHAR-PPAS 59203 through 59237 -- I'm sorry, through 59295.

(Exhibit 215, Document titled Zohar III Status Update, Alvarez & Marsal Zohar Management, LLC,

Page 137

CONFIDENTIAL - AILEEN DAVERSA          137

October 21st, 2016, Bates Number ZOHAR-PPAS-00059203 through ZOHAR-PPAS-00059295, marked for identification.)

BY MR. SHAPIRO:

Q.    Looking at Exhibit 215, does this refresh your recollection about creating a separate Zohar III Status Update distinct from the Zohar II Status Update we just looked at?

A.    No.

Q.    Do you have any understanding as to why both Exhibit 215 and Exhibit 204 that we looked at are dated October 21st, 2016, but both say Revised 10/27/2016 in the lower right-hand corner?

A.    I do not.

Q.    And do you have any recollection about any conversations with Ms. LaPuma or anyone else about what to put in the Zohar III Status Update --

A.    No.

Q.    -- and what not to include in the Zohar III Status Update?

A.    No.

Q.    Any edits or revisions to the Zohar III Status Update?

Page 138

CONFIDENTIAL - AILEEN DAVERSA          138

A.      No recollection.

Q.      No comments to that document?

A.      I don't recall.

Q.      This is October -- late October 2016. You left AMZM -- withdrawn.

This is late October 2016.  You left A&M in, you said, December 2016.

A.      I think it was December, yes.

Q.      Okay.  Do you recall anything between this date and when you left that happened in connection with the Zohar funds engagement?

A.      I don't.

Q.      Other than the things that we've talked about, do you recall anything else about the engagement with Zohar funds from your time at AMZM?

A.      I do not.

Q.      Other than Ms. LaPuma, was there anyone senior to you on the Zohar funds engagement at A&M?

A.      I don't think so.  I mean, we had that project team together.  I don't remember everyone's level on that project team.  So, when you say "senior," I don't know what you mean by that.  I think it was just Liz and I, but that group of people that helped in the email, I don't remember

Page 139

CONFIDENTIAL - AILEEN DAVERSA          139

their levels.

Q.    When you say it was just Liz and you, what do you mean?

A.    Well, you asked if there was anyone more senior than Liz between -- that's how I interpreted it.

Q.    Yes, between you and Liz in seniority.

A.    I don't think so, but I don't know everyone's level that was on the team.

Q.    But from your recollection, there was no one more senior to you than Liz or except for Liz on the Zohar funds engagement?

A.    I don't think so.

MR. SHAPIRO:  No further questions.

THE WITNESS:  Okay.

MR. CAMPBELL:  No questions here.

MR. READ:  No questions.

Thanks for your time, Aileen

THE VIDEOGRAPHER:  Okay.  I'm going off the record.  The time is 3:04.

THE REPORTER:  In terms of transcript orders, can you please state them.

MR. CAMPBELL:  Can we get a rough and then an expedited final.  Is two days okay?

CONFIDENTIAL - AILEEN DAVERSA         140

THE REPORTER:  Okay.

MR. SHAPIRO:  Same, a rough and expedited, yes.

(Time Noted:  3:04 p.m.)

141

CERTIFICATION

I, SANDRA SEMEVOLOS, a Notary Public for and within the State of Connecticut, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me, and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 26th day of July, 2023.

SANDRA SEMEVOLOS, RMR, CRR, CRC, CSR #74

Notary Public

My Commission Expires:  September 30, 2025

142

Brian Campbell, Esq.,

briancampbell@quinnemanuel.com

July 26, 2023

RE: Patriarch Partners Agency Services v. Zohar CDO 2003-1, Ltd.

7/25/2023, Aileen Daversa (#6016175)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at cs-ny@veritext.com

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

Page 143

143

Patriarch Partners Agency Services v. Zohar CDO 2003-1, Ltd.

Aileen Daversa (#6016175)

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____  _____

Aileen Daversa                                    Date

Page 144

144

Patriarch Partners Agency Services v. Zohar CDO 2003-1, Ltd.

Aileen Daversa (#6016175)

ACKNOWLEDGEMENT OF DEPONENT

I, Aileen Daversa, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____    _____

Aileen Daversa                          Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20___.

_____

NOTARY PUBLIC

**Exhibit G**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In Re:                          ) Chapter 11
ZOHAR III, CORP.,               )
                 Debtor.        ) Case No. 18-10512(KBO)
_____ )
                                )
DAVID DUNN, as Litigation       )
Trustee for Zohar Litigation    )
Trust-A;                        )
                 Plaintiff,     )
v.                              )
                                ) Adv. Pro No.
PATRIARCH PARTNERS, LLC;        )  20-50534(KBO)
PATRIARCH PARTNERS VIII, LLC;   )
PATRIARCH PARTNERS XIV LLC;     )
PATRIARCH PARTNERS XV, LLC;     )
PHOENIX VIII, LLC; OCTALUNA LLC;)
OCTALUNA II LLC; OCTALUNA III   )
LLC; ARK II CLO 2001-1, LIMITED;)
ARK INVESTMENT PARTNERS II, LP; )
ARK ANGELS VIII, LLC; PATRIARCH )
PARTNERS MANAGEMENT GROUP, LLC; )
PATRIARCH PARTNERS AGENCY       )
SERVICES, LLC; and LYNN TILTON, )
                                )
        Defendants, and         )
                                )
180S, INC.; GLOBAL AUTOMOTIVE   )
SYSTEMS, LLC; INTREPID U.S.A.,  )
INC.; IMG HOLDINGS, INC.;       )   ** CONFIDENTIAL **
SCAN-OPTICS, LLC; STILA STYLES, )
LLC; SNELLING STAFFING, LLC; and)
VULCAN ENGINEERING, CO.,        )
                                )
        Nominal Defendants.     )
_____ )

**Key**
PPAS Designation
Trust Designation

VIDEOTAPED DEPOSITION OF SCOTT DEROSS

Thursday, October 9, 2025

Charlotte, North Carolina

Reported by:  Christine A. Taylor, RPR

Job No.:  J13590855



On October 9, 2025, commencing at 9:11 a.m., the videotaped deposition of SCOTT DEROSS was taken pursuant to notice and pursuant to the Federal Rules of Civil Procedure, on behalf of the Defendants, at the offices of Alston & Bird, 1120 South Tryon Street, Suite 300, Charlotte, North Carolina.

* * *



APPEARANCES:


Representing the Plaintiff:

        Quinn Emanuel Urquhart & Sullivan, LLP
        By:  Destiny Rose Murphy, Esquire
             295 5th Avenue, 9th Floor
             New York, New York  10016
             212.849.7000
             destinyrosemurphy@quinnemanuel.com


Representing the Defendants:

        Gibson Dunn
        By:  David M. Kusnetz, Esquire
             Ana Lopez, Esquire
             200 Park Avenue
             New York, New York  10166
             212.351.4000
             dkusnetz@gibsondunn.com
             allopez@gibsondunn.com


Representing the Witness:

        Alston & Bird
        By:  Elizabeth Buckel, Esquire
             Patrick Hayden, Esquire
             90 Park Avenue, 15th Floor
             New York, New York 10016
             212.210.9400
             elizabeth.buckel@alston.com


Also Present:

        Andrew Smith, Videographer



C O N T E N T S

                                                                           PAGE

EXAMINATION BY MR. KUSNETZ                                                     8

EXAMINATION BY MS. MURPHY                                                    381

EXAMINATION BY MS. BUCKEL                                                    385


                                    * * *


                            E X H I B I T S

  EXHIBIT              DESCRIPTION                           PAGE

Exhibit 1      Zohar CDO 2003-1 Limited Indenture,     85

               11/13/2003

               PP-ADV_0000288 - 533

Exhibit 2      Collateral Administration Agreement    106

               PP-ADV_0029257 - 279

Exhibit 3      trustee report - Zohar II 2005-1,      129

               Limited - 3/31/12

               PP-ADV_0041278 - 41319

Exhibit 4      trustee report - Zohar III, Limited    145

               PP-ADV_0045647 - 45695

Exhibit 5      11/4/2008 E-mail String                173

               PP-ADV_0400087 - 109

Exhibit 6      Indenture - Zohar III, Limited         181

               PP-ADV_0027151 - 27387



| Exhibit 7 | Excel Spreadsheet | 197 |
|---|---|---|
| | PP-DEL2-000332953 | |
| Exhibit 8 | 1/7/2016 E-mail string with | 212 |
| | attachment | |
| | PP-INT-00004689 | |
| Exhibit 9 | 3/11/2014 E-mail string | 223 |
| | TRUSTEE_AP6587980 - 6587982 | |
| Exhibit 10 | 9/3/2015 E-mail string | 235 |
| | TRUSTEE_AP6588104 - 6588106 | |
| Exhibit 11 | 12/20/11 E-mail String | 251 |
| | PP-ADV_0888051 - 054 | |
| Exhibit 12 | 4/5/2016 E-mail String | 266 |
| | ZOHAR-PPAS-00027148 - 27158 | |
| Exhibit 13 | 1/4/2017 E-mail and attachment | 290 |
| | USBANK00000007 - 16 | |
| Exhibit 14 | Zohar II Status Update, October 21, | 298 |
| | 2016 | |
| | ZOHAR-PPAS-00059111 - 59202 | |
| Exhibit 15 | 9/3/2015 E-mails with attachments | 320 |
| | TRUSTEE_AP5957659 - 7710 | |
| Exhibit 16 | 3/4/2016 E-mails | 331 |
| | ALVAREZ_PPAS0001279 | |
| Exhibit 17 | 3/7/2016 E-mail with attachments | 339 |
| | ALVARZ_PPAS0001281 - 1330 | |
| Exhibit 18 | First Amended Interpleader | 344 |



                    Complaint

Exhibit 19      6/16/2016 E-mails with attachment      349

                    ZOHAR-PPAS-00012414 - 12419

Exhibit 20      8/17/2017 Gibson Dunn Letter to        365

                    Brett Jaffe

                    PP-ADV_5154131 - 4132



P R O C E E D I N G S

* * *

THE VIDEOGRAPHER:  Good morning.  We are now going on the record.  The time on the monitor is 9:11 a.m.  Today's date is Thursday, October 9, 2025.

This is the videotaped deposition of Scott DeRoss being taken in the matter of David Dunn versus Patriarch Partners, LLC, et al., pending in the United States Bankruptcy Court for the District of Delaware.

This deposition is being taken at Vantage South End, 1120 South Tryon Street, Suite 300, Charlotte, North Carolina 28203.

My name is Andrew Smith, legal videographer representing Esquire Deposition Solutions, and our court reporter is Christine Taylor, also with Esquire.

Will counsel, starting with our noticing attorney, please identify themselves after which our court reporter will swear in the witness.



MR. KUSNETZ:  I'm David Kusnetz from the law firm of Gibson Dunn & Crutcher. I'm here on behalf of Lynn Tilton and the Patriarch entities, and I'm joined by my colleague, Ana Lopez, also of Gibson Dunn.

MS. MURPHY:  I'm Destiny Rose Murphy. I'm from Quinn Emanuel Urquhart & Sullivan.  I represent the Plaintiff, David Dunn, as the Trustee for Litigation Trust-A.

MS. BUCKEL:  I'm Elizabeth Buckel from the firm Alston & Bird.  I represent the witness, Scott DeRoss.  And with me is my colleague, Patrick Hayden.

* * *

SCOTT DeROSS,

having first been duly sworn, was examined and testified as follows:

* * *

EXAMINATION

BY MR. KUSNETZ:

Q.   Good morning, Mr. DeRoss.

A.   Good morning.

Q.   You're appearing today pursuant to a revised subpoena dated September 25th, 2025;



correct?

A.   I believe so.

Q.   Did you ever see a copy of the subpoena?

A.   No.

Q.   Okay.  Have you ever been deposed before?

A.   Yes.

Q.   How many times?

A.   Once.  I think once.  I know once for sure.  I can't remember if I was deposed earlier in this Zohar transaction, but once.

Q.   Do you -- do you recall if it was in related to this transaction or something else?

A.   No, the one I'm thinking of was not. It was not related to this.

Q.   Okay.  And what was the general subject matter of it, without revealing the details?

A.   It was a transaction where -- I can't remember.  It was a credit default swap, a synthetic transaction where one of the counterparties terminated the credit default swaps in the deal, and there was a dispute surrounding the -- that.



Q.   Gotcha.  And did it relate to any responsibilities of U.S. Bank as trustee?

A.   We were the trustee on the transaction, and the parties were pointing fingers at U.S. Bank.

Q.   Understood.

Was U.S. Bank a party to the litigation?  Like, were they sued, for example?

A.   I believe we were a party to the transaction -- to the litigation, yes.

Q.   Okay.  And just, again, no inside details, but do you remember just the name of the litigation?

A.   The transaction name is Tourmaline CDO-1.

Q.   Like the gem?

A.   Yes.

Q.   Okay.  Tourmaline CDO-1.  Okay. Thank you.

Well, you've been deposed before. How long ago was that?

A.   What year are we in?

Q.   2025.

A.   It was, like, 2008.

Q.   Okay.



A.    2009.

Q.    Pre-COVID?

A.    Something -- something along those lines.

Q.    Gotcha.  Yeah, it was like the COVID fog; right?  Everything before that.

A.    It was before COVID, yeah.  Way before.

Q.    All right.  Well, I'm just going to give you a few ground rules just to refresh your memory.  Okay?

A.    Yes.

Q.    Please answer all questions verbally. No head shakes, nods.  If you're going to say yes, say "yes."  Don't say "uh-huh," for example. We want to make a clean record for the court reporter.

At times, your attorney may object. And with the exception of when your attorney instructs you not to answer, you still have to answer my question.  So she may object, then you still have to answer the question.

Does that make sense?

A.    Yes.

Q.    Okay.  If you don't understand a



question, please let me know, and I will endeavor to clarify it.  So you can ask for clarification whenever it makes sense for you.  Okay?

A.    Okay.

Q.    But if you don't ask for a clarification, I'm going to assume you understood the question as asked; is that fair?

A.    Yes.

Q.    Try not to talk over me, and I'll try not to talk over you so we can have a clean record; is that fair?

A.    Yes.

Q.    And the court reporter is taking all of this down.

And you understand that you're under oath during this deposition; correct?

A.    Yes.

Q.    Same oath that you would swear if you were in court, for example.

A.    Yes.

Q.    And if you need to take a break at any time, just let me know.  I only ask that if there's a question pending, you finish answering the question, and then we take a break; is that fair?



A.    Yes.

Q.    Okay.  We just talked about how you're under oath.

Is there any reason why you can't testify truthfully today?

A.    No.

Q.    Okay.  And this is an awkward question, but I have to ask it.  Are there any medications that you're taking that would prevent you from answering truthfully today?

A.    No.

Q.    Okay.  I may refer to documents by, like, Bates Number.  Do you know what that means?

A.    I've heard the term.  I don't know really what it means.

Q.    It's an artificial number that the parties stamp onto documents.  So it's not original to the document.  And that's just for tracking each page in the litigation.

Does that ring a bell, perhaps?

A.    Vaguely.  I mean, I've been through this once before.  So sort of, yeah.  I understand that.

Q.    All good.  Well, just to say, if you see numbers on the bottom right-hand corner of a



page that don't look like there were there originally, I'll represent to you that that's what that -- what that is.

A.    Okay.

Q.    Let's -- let's start by talking a little bit about some of the key terms in this case.

Are you aware, sir, of this lawsuit prior to having received your deposition notice?

A.    Yes.

Q.    Okay.  How did you become aware of this litigation?

A.    I've been involved with this transaction since 2015, and I've been in contact with legal counsel on all of the various happenings with it.

Q.    Okay.  And "in contact with legal counsel," you're referring to the Alston & Bird law firm?

A.    Yes.

Q.    Okay.  Have you worked with these two attorneys here today?

A.    Yes.

Q.    For how long, in connection with this litigation?



A.    I've been working with Patrick since prior to the litigation, but since 2015 --

Q.    Okay.

A.    -- I would say.

Q.    Understood.  And when I say "this litigation," I'm referring right now to this bankruptcy proceeding called -- the adversary proceeding that the videographer read out.

Do you understand that?

A.    Yes.  I think I roped them all together in my mind.  But I do understand that there's this stuff going on related to bankruptcy.

Q.    Understood.  Okay.

So you're aware that since at least 2016, 2015, there's been litigation involving the Zohar funds?

A.    Yes.

Q.    Okay.  And would you stay up -- would you -- without -- without divulging any communications you've had with counsel, would you follow it or would you wait to hear from your counsel to follow-up litigation?

A.    I would wait to hear.  I have not been following it.



Q.   Okay.  You don't have a Google alert or --

A.   No.

Q.   Okay.  And you recall that in or around 2015, 2016, the Securities and Exchange Commission sued Ms. Tilton; correct?

A.   Yes.

Q.   And do you recall any of your colleagues being interviewed by the SEC in connection with their investigation of the Zohar funds?

A.   No.

Q.   Okay.  You're not aware that any of your colleagues were -- were interviewed?

A.   No.

Q.   Okay.

A.   No.

Q.   You were not interviewed?

A.   No.

Q.   Okay.  Did you attend any of the proceedings in New York?

A.   No.

Q.   But did you receive updates as to how the litigation was going?

A.   No, I don't -- I don't believe so.



SCOTT DEROSS  Confidential                         October 09, 2025
David Dunn vs Patriarch Partners                                17

Q.   Did you receive an update as to what the ultimate result was of the SEC case?

A.   Yeah.  I think -- I think I recall having conversations with maybe Patrick, but I --

Q.   Without divulging --

A.   -- don't generally remember.

Q.   Okay.  And what was the outcome of the SEC litigation?

A.   I believe she won.  I don't -- I don't recall, honestly.

Q.   Okay.  No reason to believe she lost; correct?

A.   That's correct.

Q.   Okay.  And when you say you believe she won, meaning all charges dismissed by the SEC, is that fair to say?

A.   I think that's fair to say, yes.

Q.   Okay.  All right.  So we'll come back to that.  But let's talk through some key terms just so that we can level set a little bit.

I'm going to use these terms as they relate to the Zohar indentures.  First, you're familiar with the Zohar funds; correct?

A.   Zohar I, yes.

Q.   You're familiar that there are three

Relevance



Zohar funds?

A.    Yes.

Relevance

Q.    Let's start there.  Why did you say Zohar I?

A.    Zohar I is the only transaction I actually worked on.

Q.    Uh-huh.

A.    I know that the three were roped together in this bankruptcy case.  So from that point on, right, all three would be.

Q.    And did your colleagues at U.S. Bank work on the other two Zohars?

A.    Yes.  The Zohar II and III were done out of our office in Chicago.

Q.    Okay.  Any reason why?

A.    I believe Zohar I was closed with -- it might have been State Street, and U.S. Bank ended up buying that business out of Boston.  And then I believe the II and III were done possibly either at LaSalle Bank or Bank of America, which then merged with U.S. Bank.  So we had offices doing different deals in different parts of the country.  And they stayed there.

Q.    Gotcha.  So after all the mergers, and there were many, the offices that were



originally handling each different Zohar fund kept handling them?

A.    Aside from Zohar I, which was transferred down to Charlotte at some point.

Q.    Understood.  Okay.  And we'll get back to your rule on that, but that's helpful context.

All right.  So are you familiar with the -- with the term "collateral manager" as it relates to the Zohar funds?

A.    Yes.

Q.    Okay.  And do you recall that the collateral managers for each of the Zohar funds were either Patriarch VIII -- Patriarch Partner LLC VIII, Patriarch Partner LLC IX, or Patriarch Partner LLC -- no, I'm sorry.  VIII, IX, and X, I think, or was it XV?

MS. LOPEZ:  VIII, XIV, XV.

BY MR. KUSNETZ:

Q.    VIII, XIV, and XV.  My colleague knows way better than me.  Patriarch Partners LLC VIII, Patriarch Partners LLC XIV, and Patriarch Partners XV.

A.    I'm familiar with the fact that there were entities set up to be the collateral



management entity, but we simply know them as Patriarch.

Q.   Okay.  Ms. Destiny Rose mentioned she's here on behalf of Litigation Trust-A.  Are you familiar with what entity that is?

A.   No.  I am aware they created different trusts for when they came out of bankruptcy.  I don't know the specifics of the various trusts.  Sorry.

Q.   Okay.  So you -- so sitting here today, you don't know exactly who she represents?

A.   No.  Well, again, I know that they were trusts created that came -- that took the assets over from II and III out of bankruptcy. So I have a general understanding that happened. I just I don't know -- we've never spoken.  I don't know.

Q.   And that's totally fine.  And did you -- did you, in connection with working here at U.S. Bank, ever interface with the Litigation Trust before today?

A.   No.

Q.   Okay.  The trustee of the Zohar funds, are you familiar with that term?

A.   Yes.



Q.    Okay.  And you are part of the team Relevance
at U.S. Bank?  That was the trustee for Zohar I;
correct?

A.    Yes.  Technically speaking, I was
part of the team for all three, but we were just
in different locations.

Q.    Understood.

A.    We are one U.S. Bank.

Q.    One U.S. Bank.  Is that the -- is
that -- is that a slogan that market came up
with?

A.    Yeah.  Sorry.

Q.    All right.  We'll come back to the
team.

Portfolio companies.  Are you
familiar with what they are in connection with
Zohar funds?

A.    Yes, I believe that's the collateral.

Q.    Okay.  And are you familiar with the
Octalunas entities?

A.    I believe the Octaluna entities held
the preferred shares transactions.

Q.    And do you understand that Patriarch
Partners was replaced by AMZM as the collateral
manager at one point in time?



A.    Is that Alvarez?

Relevance

Q.    Yes.

A.    Yes.

Q.    Okay.  Sorry.  Just fumbling with all these names.

A.    That's okay.

Q.    And did you ever interface with AMZM?

A.    Yes.

Q.    Okay.  We'll talk about that in a minute.  Okay.

Are you being -- actually, withdrawn.

So do you understand that Ms. Destiny Rose here is the representing the plaintiffs in this litigation?

A.    Plaintiff?  What is a plaintiff?  I'm sorry.

Q.    Oh, the people who brought the case.

A.    Okay.  Yes.

Q.    Okay.  And we're representing the defendant.

A.    Sorry.  I watch TV.  I should know this.

Q.    I can make this deposition like Suits if you'd like.  You know, I might get sanctioned.

Let's -- let's move on.  Are you



being compensated for testifying today in any way?

    A.   No.

    Q.   What did you do to prepare for today's deposition?

    A.   I briefly met with Liz and -- I'm sorry, I don't know if she goes by Liz.

    MS. BUCKEL:  I go by Liz, Elizabeth. Both are fine.

    THE WITNESS:  And Patrick yesterday. And then in July, we met briefly prior to the first time this was scheduled.  And I believe Elise was part of that one.

    MS. BUCKEL:  Yes.

    THE WITNESS:  And maybe Alex briefly.

BY MR. KUSNETZ:

    Q.   And you recall this deposition was previously scheduled and then --

    A.   Yes.

    Q.   -- rescheduled due to weather-related issues?

    A.   Yes.

    Q.   So in all, to prepare for this deposition, including the one that almost happened back a few months ago, how many times



did you meet with your attorneys?

A.    Twice.

Q.    Twice.  Once before the initial date and then once before today's date?

A.    Yes.

Q.    And how long were -- was each meeting?

A.    20 minutes.

Q.    20 minutes per meeting?

A.    Give or take.

Q.    Okay.  Were they in person or by videoconference?

A.    Videoconference.

Q.    Okay.  Were there any nonlawyers beside yourself present during those meetings?

A.    No.

Q.    Did you review any documents during those meetings?

A.    No.  I don't believe we reviewed any documents.  We just talked.

Q.    Okay.  And I don't want to know what you talked about because that's privileged.  So there were no documents that refreshed your recollection of anything during those meetings?

A.    I thought Liz showed me one document.



I can't remember what it was, whether it was a trade or something.  There was something that was put on the screen.  I can't remember what it was.  That was the first prep.

Q.    Understood.  No documents that refreshed your memory before this deposition?

A.    No.

Q.    Is your memory fresh?

A.    I don't know how to answer that.  I mean, this deal is so old.  It's as fresh as it can be, I suspect.

Q.    Okay.  Did you speak with anyone besides your lawyers about this deposition?

A.    No.

Q.    Your wife doesn't know you're here?

A.    My wife knows I was going to the deposition.  Sorry.  Yes.

Q.    Okay.  Did you bring any documents with you today to this deposition?

A.    No.

Q.    Any notes with you today?

A.    No.

Q.    Okay.  Let's talk about your background.  So your LinkedIn profile says that you have 17 years of trust experience.  Is that

still accurate?

A.   I don't know.  I started late '90s.
1997, '98, something like.

Q.   Uh-huh.

A.   In the corporate trust division of
Citibank.  So whatever -- I can't remember the
last time I updated my LinkedIn profile.  But
somewhere in that range is probably correct.

Q.   So that's when the -- you count from
that until today; correct?

A.   If you're asking me about trust
experience, yeah.  I've worked in corporate trust
divisions in banks pretty much my whole career.

Q.   Understood.  Whole career post
graduating from Hofstra?

A.   Yes.

Q.   Okay.  And you graduated with a
degree in banking and finance; is that correct?

A.   Yes.

Q.   And from February 1996 to
January 1998, you were at Citibank's corporate
trust division?

A.   Yes.

Q.   Okay.  And what was your role there,
briefly?



A.   I was a vault custodian for part of the time, and then the -- I worked in transfer and payments for a while.  And then I moved over to what we called deal administration at the time.  So I was like a support person for transactions.  I would process trades and reconcile cash.

Q.   Okay.  And then you left Citibank to go to U.S. Trust.  And you were there from 1998 to September of 2001?

A.   Yes.

Q.   And what was your role, briefly, there?

A.   I was considered a -- assistant secretary, which was like a first-level officer. Essentially an account manager.

Q.   Okay.  And you were an account manager for what kind of clients?

A.   We worked -- it was a specific group that managed -- they're called tender option bonds, municipal derivative programs.

Q.   Okay.  And after September 2001, you moved to the Bank of New York, and you were there until June of 2005; is that correct?

A.   That's right.  The Bank of New York



acquired the corporate trust business of U.S. Trust, so we moved over.

Q.   So you didn't leave U.S. Trust, you just started working for Bank of New York when it was acquired?

A.   That's right.

Q.   Okay.  And what was your role there?

A.   It was the same -- it was the same product type.  It was just at a different bank. So I was an account manager, I think I might have been an AV -- assistant vice president at that point.  But same role, same transactions.

Q.   And as assistant vice president, is that, like, a senior role?

A.   It's a junior officer position.  It's just a pay grade bump.  My roles and responsibilities didn't change.

Q.   Understood.  Okay.

And then from June 2005 to the present, you've been at U.S. Bank; is that correct?

A.   I moved to Charlotte in 2005 and took a job at Wachovia.  And within six months, U.S. Bank acquired that business, so sort of merged that together.



Q.   Understood.  And when you were at Bank of New York, where were you working?

A.   Well, that happened right after 911.

Q.   Yeah.

A.   So I was -- we moved to a number of different buildings.  I inevitably ended up on 101 Barclay Street.  But we were in -- I think I was on Church Street for a while.  I was right at a site outside of Penn Station for a while.  I was in -- I don't know why.  They moved us three or four times to different offices.

Q.   So New York?

A.   In New York City, yes, sir.

Q.   And then you moved down to Charlotte to join Wachovia; correct?

A.   Yes.

Q.   All right.  And when was Wachovia acquired by U.S. Bank?

A.   I believe that was -- I want to say September of '06, something like that.

Q.   Understood.  Okay.

A.   It was finalized and we moved.

Q.   And so when you went to Wachovia, what was your role there?

A.   That was a group that specifically



worked on CDO transactions.

Q.   On CDO transactions.

Did you also work on CLO transactions?

A.   Yes.  I -- sorry, I rope those together, but yes.  They were actually CLO transactions, honestly.

Q.   Okay.

A.   But we called it CDO back then. Everything was CDO.

Q.   And after Wachovia was acquired by U.S. Bank, did your role change?

A.   Not for, I don't know how many years it was.  But it didn't change for about six or eight years.  My timeline might be off there. But I did eventually change roles to the -- to the team that I work on now.

Q.   Okay.

A.   But that happened around 2014-ish. Something like that.  2015, 2014.

Q.   What's the name of that team?

A.   I work on -- it's called the deal team.

Q.   Okay.  What does that mean?

A.   The deal team is -- there are five of



us, and we basically take the lead on negotiating the contracts.  We see a deal from start to finish in terms of closing.  We assist the account managers and coordinate with the various support teams around the bank to get the deal onboarded and negotiate the docs and get it closed.

Q.   So when you say "negotiate the docs," does that include something called an indenture?

A.   Yes.

Q.   Okay.  And does that also include the other agreements that flow from the indenture?

A.   I don't really have input on a lot of the ancillary docs.  But aside from the indenture and maybe the Collateral Administration Agreement.

Q.   Okay.

A.   That would probably be it.

Q.   Collateral Administration Agreement, commonly referred to as a CAA; correct?

A.   Yes.

Q.   All right.  So if I use that term, you know what I'll be talking about?

A.   Yes.

Q.   All right.  So in 2014 you joined   Relevance



this deal team, but that also related to CLOs; correct?

Relevance

A.    Yes.

Q.    All right.  So fair to say that you've been at U.S. Bank -- you've been in your current role at U.S. Bank, which was previously Wachovia, since 2005; correct?

A.    Yes.

Q.    So you have 20 years of experience working in trusts related to CLO transactions; correct?

A.    Yes.

Q.    Fair to say you're very experienced in this type of field?

A.    I think so, yes.  I learn something new every day, but yes.

Q.    So let's talk about when you joined -- when you moved to the deal team in 2014.

Around that time did you become involved in the Zohar fund transactions?

A.    I became involved in the Zohar transactions sometime in 2012.  The person who was managing the transaction at the time left the bank, who was actually my boss at the time.



Q.    What was his name or her name?

A.    His name was Brand Hosford.

Q.    How do you spell his last name?

A.    H-o-s-f-o-r-d.

Q.    Okay.  Do you recall why he left the firm?

A.    He was -- his job was discontinued, I believe.

Q.    Okay.  Did it -- his discontinuance relate at all to the Zohar funds?

A.    No.

Q.    Okay.  And when Mr. Hosford left, did you assume his role?

A.    For this transaction, yes.

Q.    Which transaction?

A.    Zohar I.

Q.    For Zohar I, okay.

Relevance

So you became involved with the Zohar I transaction as of 2012; correct?

A.    Around 2012.  Give or take.  Something like that.

Q.    Okay.  And you were not on the deal team, though, at that time?

A.    I believe the deal team existed.  I may have been transitioning, but it was -- I



wasn't fully -- I didn't fully assume the responsibilities that I have now under that team. I still had some transactions in my name in those days.

Q.   What does that mean, just so I understand?

A.   It means I was still sort of -- I was wearing two hats.  I was an account manager, I was also trying to transition to this new team. There were a lot of transactions.  It takes a long time to -- to offload them to -- to other people.  So there was a transition period a couple of years, but I still had -- I still ran deals.

Q.   Understood.  So was Mr. Hosford the account manager of the Zohar fund transaction?

A.   Yes.

Q.   Okay.  Was that the most senior role with respect to the team at U.S. Bank who was working on the Zohar transaction?

A.   Brand was the manager of the Charlotte office.  So he was -- he was the manager of the, you know, account managers.

Q.   Okay.  And was Mr. Hosford --

A.   In Charlotte, sorry.  Not of all --



you know, not in the entire group.  Just in Charlotte.

Q.    In Charlotte?

A.    Yeah.

Q.    Understood.  Okay.

So let's talk about the team of folks who were involved with -- at U.S. Bank were involved with the trust responsibilities with respect to the Zohar funds.

Who was on your team in 2012, to the best of your knowledge?

A.    Well, to be clear, I didn't have, like, a team of people in terms of when I'm, you know, wearing my account manager hat.  There are different groups within the bank that, you know, did not report to me that touched the transaction.

Q.    Okay.

A.    So analytics people.  There are deal administrative people.

Q.    So analytics, deal administrative.

What else?

A.    I would just say my role as an account manager.  There are other support teams that do other functions, but not -- it's more on



a global level.  So I would believe that that's an accurate way to describe it.

Q.   So you would say that there were, like, three different divisions within U.S. Bank where individuals from those divisions worked on the Zohar funds, and that was --

A.   That -- that's -- sorry.  That's right.  Yes.

Q.   Okay.  And that would be analytics, deal administration, and account management; correct?

A.   Yes.

Q.   Okay.  And you were under the account management team?

A.   Yes.

Q.   All right.  So who was on the account management team in 2012?

A.   So it was myself, I believe Crystal was there.

Q.   Do you recall her last name?

A.   Crudup, C-r-u-d-u-p.

Q.   Uh-huh.

A.   Greta.

Q.   Do you recall her last name?

A.   Barthell.



Q.   Can you spell that for the record.

A.   B-a-r-t-h-e-l-l.

Q.   Uh-huh.

A.   I'm trying to remember who else was around at that time.  I think that was it back in those days.  We're talking about 2012; right?

Q.   Yeah.  When you first joined.

A.   There have been a lot of people that have come and gone.  But I still know these people, so they come to mind.

Q.   Do they still work here at U.S. Bank?

A.   Yes.

Q.   And then how did you come to join this team exactly, like what was the impetus to you joining this team?

Relevance

A.   I had always -- this is the role I was hired at at Wachovia, which moved over to U.S. Bank.  It never changed.

Q.   Understood.  And then how did you get involved specifically with the Zohar I deal?

A.   I was assigned it when my -- the prior account manager left the bank.

Q.   Right.  And did you step into his shoes then?

A.   Yes.



Q.   Okay.  So were you the lead of the account manager team?

A.   No.

Q.   Okay.  So it's you, Crystal, and Greta?

A.   Okay.  I see.  I'm sorry.  Our manager -- when Brand left, we got a new manager.

Q.   Okay.

A.   Her name was Suzanne Lane.

Q.   Suzanne, what's her last name?

A.   Lane, L-a-n-e.

Q.   Suzanne Lane?

A.   She was out of New York.  She was not in Charlotte.  But she managed our team.  I believe she managed some other account managers and other locations.  I can't recall.

Q.   Okay.  And do you recall what her responsibility was with respect to the Zohar funds?

A.   Other than she was the manager of an account manager that was responsible for the funds, she had no day-to-day dealings with the transactions.

Q.   Okay.  And did you, Crystal and Greta have day-to-day dealings with the tran- -- Zohar



transactions?

A.   So Greta and Crystal did not.  But I had quarterly dealings with the transactions when they paid.  I was -- there wasn't really much that I can recall in terms of a day-to-day responsibility, if that's a thing.

Q.   Okay.  And why did Crystal and Greta not have any responsibility with respect to -- have any day-to-day dealings with the Zohar transactions?

A.   Because the account managers have 50 or 100 transactions under their names.  They -- you know, we all have our own -- we have our own transactions that we cover that are, you know, under our names.  We generally don't, unless somebody's out or sick or whatever, touch other people's stuff.

Q.   So you don't recall Greta or Crystal, for example, directly interfacing with the collateral manager or the noteholders?

A.   No, definitely not.

Q.   Okay.  And I don't know if I used that term before, "noteholders."  Do you know what I'm referring to when I say "noteholders"?

A.   Yes.

Relevance



Q.    What's that?

A.    The owners of the liabilities in the transactions.

Relevance

Q.    Okay.  And do you know who some of the -- we'll come back to your team.

Do you know who the noteholders were for the Zohar funds, for each of the funds?

A.    I know that MBI -- yeah, MBIA was a noteholder in Zohar I.  As well as a Patriarch entity was the holders of the preferred shares. I don't recall who the others were --

Q.    Okay.

A.    -- honestly.  I don't remember. Natixis maybe.  I don't know.

Q.    Do you recall Barclays being involved?

A.    No.

Q.    Any reason to believe Barclays wasn't a noteholder?

A.    No.

Q.    Do you recall Varde, V-a-r-d-e, being involved?

A.    No.

Q.    Any reason to believe they were not a noteholder?



A.   No.

Q.   Do you recall SEI being involved?

A.   No.

Q.   Any reason to believe they weren't involved --

A.   No.

Q.   -- or a noteholder?

A.   No.  There was no reason for me to believe that they weren't.

Q.   Do you recall Bardin Hill being involved as a noteholder?

A.   No.

Q.   Any reason to believe they weren't?

A.   No.

Q.   Okay.  All right.  Let's -- so we know who the noteholders are.  Let's go back to your team.  So I think you said Crystal and Greta did not interact on a -- you know, on a normal basis with the collateral manager and the noteholders; correct?

A.   Correct.

Q.   Did you interact with the collateral managers and the noteholders?

Relevance

A.   I would talk to Carlos once a quarter when they would confirm the amounts being paid



out in the waterfall.

Relevance

Q.    Okay.  Let me take a step back.

When you say Carlos, you mean Carlos Mercado?

A.    Yes.  Carlos is the -- our contact at the collateral manager --

Q.    Okay.

A.    -- that we would work with.

Q.    He was at Patriarch; correct?

A.    Yes.

Q.    Okay.  Now, you said that you were involved with the Zohar transactions on a quarterly basis; is that correct?

A.    Yes.

Q.    Okay.  And why quarterly?

A.    The transactions pay quarterly.  So every quarter, there was a noteholder payment that would go out.

Q.    Uh-huh.

A.    So I would plug in the rates and update the note balances, and either myself or one of the -- I believe one of the members of the analytics team would send over a draft waterfall to Patriarch for approval.

Q.    Okay.  So what was -- so you said you



would -- the transactions would pay quarterly, and you were involved in those transaction -- in disbursing the payments; correct?

Relevance

A.   Correct.

Q.   Okay.  And you were also involved in keeping track of the payments; correct?

A.   What do you mean by that?

Q.   Fair.  Fair to say.

You said you updated note balances, plug in the rates.  What does that mean specifically?

A.   Well, they're floating rate obligations.  So they were based on LIBOR, plus the spread.  So every quarter you would have to go in and pull the LIBOR, plug it into the spreadsheets, calculate the note interest due.

Q.   For each particular note?

A.   Yes.

Q.   Okay.  And so were you involved in calculating the note interest that was due?

A.   Yes.

Q.   What is -- what does that mean, calculating the note interest due?  Break that down for me.

A.   So they were floating rate notes.



They have a reference rate, which was LIBOR at the time, and they have a spread.  So LIBOR changes.  These were -- I believe these were all based off of three-month LIBOR.  So every three months, the LIBOR would change.

Relevance

So it would be LIBOR plus the spread times the days times the par amount of the note would calculate your interest due on the note.

Q.    Okay.  So it was multiplying the LIBOR rate, plus the spread, times the par amount of the note?

A.    Times days, times 360.  Yes.

Q.    Gotcha.  Okay.  So, sorry, just so we have a clear record.  What is that calculation? I totally butchered it, so --

A.    Well, it's a simple note.  Interest calculation on a note.  It's par times the rate, which is LIBOR, plus the spread --

Q.    Uh-huh.

A.    -- times the days in the period, divided by 360.

Q.    Okay.  And is that, like, basic math?

A.    Yes.

Q.    Okay.  And you had to do that for each note; correct?



A.    Yeah.  I would have -- yeah, sorry. I would have a spreadsheet that would -- I would just plug in the LIBOR rate, and all of the other information would already be there.

Relevance

Q.    Uh-huh.

A.    The notes had been paying down.  So I would have to go into our system and just update what the current balance on the note was from being paid down last time.

Q.    So you could see what the expected interest payment for each of the notes was on a quarterly basis; correct?

A.    Yes.

Q.    Okay.  In fact, you calculated that; correct?

A.    Yes.

Q.    Okay.  All right.  So we will come back to that.  So still want to go back to your team.

Was that also Crystal or Greta's responsibility as well?

A.    Not on the Zohar transaction.  But they had their own transactions, which they would do the same thing.

Q.    Understood.  Okay.  That's helpful.



And were there times -- so as you testified, you calculated what the expected interest payment was for the notes on a quarterly basis; correct?

A.   Correct.

Q.   And were there times where the interest that was received by the bank did not equal what the expected interest payment was?

A.   No, not that I'm aware of.  Sorry.

Q.   And to be clear, you're talking about the notes.  You're not talking about interest payments right now with respect to the borrowers; correct?

A.   That's right.

Q.   Okay.  So let's talk about -- we'll talk about that in a second.

With respect to the amounts that would come in, those would come in from the borrowers; correct?

A.   That's right.

Q.   Okay.  So walk me through that process, how would it work and what you did.

A.   I didn't do anything in terms of that.  But I can speak to it at a high level.

Q.   Yeah, please.

Relevance



A.   So the loans have agents which    Relevance
provide notices to the bank, or to the manager
who would then forward it on to the bank.  That
would tell us, similar to the notes they would
have spreads plus reference rates that we would
update in our systems.  That would tell us what
to expect on the underlying loans.

          And as those amounts came in, we have
deal administrative teams that track that cash
and enter it into the system, and the money flows
into the principal and interest accounts for the
deals -- for the deal.

Q.   Understood.  Do you recall who was on
that administrative team that you just
referenced?

A.   No.  That -- those teams are high
turnover.  So -- there's probably 200 names on
that list over the years.  I -- I do not recall.
I'm sorry.

Q.   Understood.  Understood.

          So just so I understand, the
administration -- administrative teams would
track the payments from the borrowers and enter
it into the system; correct?

A.   Correct.



Q.   Okay.  So they could tell what was being paid on a monthly or quarterly basis by borrowers; correct?

Relevance

MS. MURPHY:  Objection to form.

THE WITNESS:  Correct.

BY MR. KUSNETZ:

Q.   Okay.  And did you need to see that information in connection with your role as an account manager?

A.   No.  I would only look at the ending interests and principal balances in the accounts as of the cutoff date for the -- the quarterly payments.

Q.   Okay.  Understood.

So you told me your team back in 2012.  Did your team change over the next several years while you were involved in the transaction?

A.   Yes.

Q.   Okay.  So who else was on your team?

A.   Chris Hagen, recently just left.

Q.   How do you spell his last name?

A.   H-a-g-e-n.

Q.   Okay.

A.   And we're talking about 2012 or talking about --



Q.   The whole -- the whole period, yeah. If you can tell me how -- just so I understand who's on your team.

A.   I'm going to struggle with that.  I mean, again, there's been a lot of turnover over the years.  I don't remember.  2012.  I -- I don't know.

Q.   Okay.

A.   I'd have to think about that and go back and research.  I can't -- there's been so many.  These are high turnover jobs --

Q.   Yeah.

A.   -- except for me, apparently.

Q.   Yeah.  I was going to say 20 years.

So did your role on the account manager team change at all between 2012 through the life of your involvement with the Zohar funds?

A.   Yes.

Q.   Okay.  Can you describe that for me?

A.   Once I became a deal team member, I had -- I no longer had -- I was no longer considered an account manager.  I no longer had responsibilities for day-to-day transactions.

Q.   Uh-huh.



A.    I manage at a client level.  So I manage closing processes for various client relationships.

Q.    So how did that impact your responsibilities with respect to the Zohar transactions?

A.    Well, I don't believe Zo -- Zohar transactions were never assigned to a new person. So my name stayed on this one.  But I only got involved with it when I needed to speak with counsel, and, you know.  So I really -- I didn't really do much, other than the -- my name was still on it.

Q.    When you say you didn't do --

A.    Well, I apologize.  When my role changed, all of my accounts were taken off of my plate in terms of an account management role, except for the Zohar I transaction.

Q.    So you maintained your account management role on the Zohar transaction after you also joined the deal team; correct?

A.    Yes.

Q.    Okay.  And how long did you maintain your account management role with respect to the Zohar transactions?



A.   I still have it.

Q.   Okay.  Will that be your epitaph as well?  Will it be on your grave?

MS. MURPHY:  Objection to form.

BY MR. KUSNETZ:

Q.   It's just -- it's on ours.

A.   I suspect so.

Q.   So do you have any day-to-day responsibilities with respect to the Zohar funds today?

A.   No.  The only thing I do now is -- is forward a legal bill to a deal administrative person to pay from time to time.

Q.   Whose legal bill?

A.   Alston Bird.

Q.   Okay.  So thinking back to 2012, tell me about how your role with respect to the Zohar transactions evolved -- actually, withdrawn.

Thinking back to 2012, tell me how the account management team's role with respect to the Zohar transactions evolved.

A.   I don't understand the question.  I'm sorry.

Q.   Sure.  Sure.

Today you're just forwarding legal       Relevance



bills.                                        Relevance

In 2012, you were interacting with Patriarch on a quarterly basis.  So in between, just generally, how did the role of the account manager at U.S. Bank change with respect to its work for the Zohar funds?

A.   So as of 2012, the transaction was still alive.  It was still making quarterly payments.  It was still making monthly reports.  So I was still doing the quarterly payments from 2012 and up until 2015 when the transaction went into default, and we went through the whole liquidation process.  I was involved in all of that stuff.

But I would just do the quarterly payments up until it went into default.  And then we started working on, you know, the default stuff related to liquidation and all of the stuff that happened after that.

Q.   Understood.  So is it fair to say that the account manager's role with respect to the Zohar transactions remained the same until the fund went into default?

A.   Yeah.  Yes.

Q.   Okay.



A.    I think that's right.

Q.    So let's talk about this default stuff, as you titled it.

Is -- what happened, to the best of your recollection, with respect to the default of the fund?

A.    I believe we hit the maturity date. We had to draw on the insurance policy, which triggers an event of default.  And then from then on, there on out, the controlling party took control, directed a liquidation.  And there were several filings to stop that.  Inevitably that happened.  We had an auction.  Nobody bid except for the insurer, credit bid.  And then I believe the deals went into bankruptcy after that.  It's sort of a blur, honestly.

Q.    Okay.  So let's -- let's break that down a little bit.  Leading up to the maturity date, were you aware of any efforts by the collateral manager to work with the insurer to restructure the transaction?

A.    I was aware that they were -- they were trying to have conversations to do that.  I wasn't involved directly in any of the conversations.



Q.   And just thinking back, what were you aware of with respect to those conversations?

A.   I just know that they were trying to -- they wanted to extend the maturity dates.

Q.   And who's "they"?

A.   The manager.

Q.   So the collateral manager wanted to extend the maturity date?

A.   I believe so, yes.

Q.   If the collateral manager was able to extend the maturity date, what would that mean?

A.   It would mean there would not have been an event of default, I suspect, on the maturity date that we -- we were dealing with.

Q.   And when you mentioned the "insurer," are you referring to MBIA?

A.   Yes.

Q.   Okay.  Have you worked with MBIA on other transactions besides the Zohar transaction?

A.   No.

Q.   So first time working with MBIA was with respect to the Zohar funds; correct?

A.   I believe so.  The insurance rep was an old concept.  I believe this was the only deal I can recall that they were -- they were on.



Q.   Okay.  Gotcha.

And do you know if MBIA wanted to extend the maturity date of Zohar I?

A.   Well, it never happened.  So I assume that they did not want to.

Q.   Okay.  Did they ever explain to you why they did not want to?

A.   No.

Q.   Okay.  Do you have an understanding as to why they would not want to?

A.   No.

Q.   Okay.  So when there was a default, what was your specific role?

A.   I believe we created a notice to investors to make folks aware that this was happening.  We sent a note to the issuer.  We then sent a notice back to the trustee declaring the event of default.  And we notified noteholders.

Q.   And when you said "we notified noteholders," meaning the trustee?

A.   The trustee.

Q.   Okay.  And so U.S. Bank?

A.   Yes.

Q.   Okay.  And then, when you took steps



to liquidate the collateral, what does -- what does that mean?

        A.   So typically when a -- when a transaction goes into default and the controlling party directs a liquidation, a liquidation agent is hired and a public auction is held.

        Q.   Okay.  And you said there were several filings to stop that.  What's your recollection of what that means?

        A.   I recall that the manager was not happy about the process.  And they -- they filed things with the courts to stop it.

        Q.   To stop the liquidation?

        A.   To stop -- yes.

        Q.   Do you recall why the collateral manager wasn't happy with the process?

        A.   Not exactly, no.  I just recall that they were not happy with the overall process.

        Q.   "They" meaning Lynn Tilton and Patriarch Partners?

        A.   Yes.

        Q.   Sitting here today, you don't recall what some of the reasons why they were unhappy?

                MS. MURPHY:  Objection.  Form.

                THE WITNESS:  I don't recall,



honestly.  They just -- the overall process that we were going through was just not to their liking.  I don't know.

BY MR. KUSNETZ:

Q.  Who designed the overall process for the liquidation?

A.  The process for liquidation is spelled out in the indenture, and it's a process that's been followed hundreds of times over the years for similar type transactions.  I was involved with probably 10 or 12 of them prior to this.  But it was a common 2000 -- post 2008 crisis scenario for a lot of CLOs that went into default and needed to be liquidated.

Q.  So you're saying that the default here, in your recollection, was linked in part to the 2008 financial crisis?

MS. MURPHY:  Object to form.

THE WITNESS:  No, I'm not saying that.  I'm just saying that the auction process that we went through was similar to others we had done in the past for other types of defaults.

BY MR. KUSNETZ:

Q.  Understood.  Did you have -- when I



say "you," I'm sorry, did U.S. Bank design the
exact procedures that went into the auction of
the collateral?

          A.    No.

                MS. BUCKEL:  Object to form.

                THE WITNESS:  No, those procedures
          are in the indenture.
BY MR. KUSNETZ:

          Q.    Okay.  In terms of information being
shared, did U.S. Bank determine what information
was to be shared with potential bidders?

          A.    I don't believe we determined that,
but we would provide the information that we had
to a liquidation agent.

          Q.    Okay.

          A.    And they, I believe, have portals
that they use to, you know, send information out
to the market.

          Q.    Okay.  And who was the liquidation
agent?  Do you recall?

          A.    Jim Finkel.  I can't remember the
name of the firm.  I can't remember the name of
the firm.  Sorry.

          Q.    What's the person's name?

          A.    Jim Finkel.



Q.    F-i-n --

A.    K-l-e [sic], I think.

Q.    Finkel, okay.  Was it Duff?

A.    Duff & Phelps.  Sorry.

Q.    I wasn't trying to trick you.  I was also --

A.    It was there, I just --

Q.    I know, me too.

Understood.  Okay.  So in terms of, like, the logistics of the auction itself, not the overarching, you know, procedures, I'm talking about the logistics, that was determined by Duff & Phelps, not U.S. Bank?

A.    No.  The procedures for an auction are -- are in the indenture.  And Duff & Phelps was, I guess, experienced with conducting the auction.  They had contacts in the market.  They had a portal that they used to, you know, put all the information needed in order to give potential bidders a view into the collateral.

Q.    Understood.  Okay.

During the -- sorry, withdrawn.  Up to the period before the default of Zohar I, what were your interactions with MBIA?

A.    None.  I don't recall having much



interaction with MBIA at all until the transaction went into default and we had to draw on the insurance policy.

Q.    And so explain to me how that interaction with MBIA transitioned from none to some.

A.    Well, the transaction required a draw on their insurance policy.  So we had to start conversations with them to let them know what the amounts were going to be.  And there was a notice that goes to them.  So we must have sent them a notice demanding payment of whatever the amounts were at the time that we needed.

Q.    Uh-huh.  How would you calculate what was due?

A.    It's just principal plus interest.  I can't recall if the insurance draw -- you know, there are other things in the waterfall.  There are expenses.  I can't recall if the insurance policy just draws on the principal and interest due or everything.  I think it's just the principal and interest due on a note, so --

Q.    Understood.  And how extensive were your interactions with MBIA during that time right after the default?



A.   I don't remember what the frequencies were, but certainly there were frequent conversations with MBIA.

Q.   And what were those conversations?

A.   Just keeping them up to date with what was going on.  I don't really recall, honestly.  They had to send a very large sum of money.  So I recall Keith -- being in contact with Keith Borelli, I believe his name was at the time.

Q.   How do you spell his name?

A.   B-o-r-e-l-l-i.

Q.   Do you remember being involved -- being in contact with anyone else at MBIA?

A.   There were other people at MBIA that were on phone calls, but I don't recall the names, honestly.

Q.   Do you recall interacting with anyone named Dan Avitabile?

A.   No.

Q.   Anthony McKiernan?

A.   Yeah.  That name sounds familiar.  Is he the CEO?  There was a name I can't remember.  That name does sound familiar.  I don't recall having any direct conversations with him.  I



believe my conversations were always with Keith.

Q.    What was Keith's role at MBIA at the time?

A.    Keith was like a controller, I believe.  I mean, I may not have that right.  I don't really recall.  I think he was some kind of -- maybe a controller.

Q.    Okay.  And you said you had conversations with them because they wanted to know what was going on.  What does that mean, specifically?

MS. MURPHY:  Objection to form.

THE WITNESS:  Just that the transaction was in default.  We were going to need a large sum of money on -- on the maturity date.

BY MR. KUSNETZ:

Q.    So you testified that, "I don't remember what the frequencies were.  Certainly there were frequent conversations with MBIA."

So just to give me -- please give me an understanding of, like, what the frequent conversations were with MBIA at the time?

A.    I honestly don't remember.  This was a big deal, I recall.  This was a very big deal



for MBIA.  So I know I spoke to Keith more often than I had in the past around that particular time frame.  I don't -- it wasn't every day.  I mean, it might have been once a week leading up to the maturity or so.  I -- I don't really honestly recall.

Q.   So let me break that down.  So do you recall interfacing with MBIA before the maturity date with respect to Zohar I?

A.   Yes.  There was a time right up -- I don't remember what the exact time frame.  But we knew there wasn't going to be enough money to make the redemption payment.  And the draws under the liquidity facility have -- there's time frames involved with that.  I forget what they are.  But we had to send them notice, you know, X amount of days prior to the maturity date.  So it would have been the weeks leading up to the maturity date.  We would have been --

Q.   Okay.

A.   -- discussing.

Q.   So when you say we knew there wasn't going to be enough money to make a redemption payment, what does that mean exactly?

A.    It means we knew there wasn't enough



money in the accounts to make the redemption payment.  I don't remember any, you know, specific conversations with Patriarch.  But there was never enough money in there to -- we knew there wasn't going to be enough money.  I don't recall how that kind of played out to be honest with you.

Q.   Do you recall when you knew that there wasn't going to be enough money?

A.   I don't recall when.  But it certainly would have been in the months leading up to the maturity.

Q.   Okay.  When discussions were being had between the collateral manager and MBIA about extending the maturity?

MS. MURPHY:  Objection to form.

THE WITNESS:  I don't know if those discussions were -- I don't know how close they were to the maturity date.  I knew that those conversations were happening. I don't recall the timing on that. Possibly.

BY MR. KUSNETZ:

Q.   Okay.  So you said that -- withdrawn. You testified that you started interacting with



MBIA in the weeks leading up to the maturity date; correct?

A.    That sounds -- yes.

Q.    So before that time, did you interact with MBIA in connection with the Zohar funds?

A.    I don't remember having a lot -- any interactions with MBIA up until the transaction was going into default.

Q.    Okay.  You don't recall them reaching out to you to get information on interest that was being paid?

A.    I don't recall any -- any specific conversations.  That's -- it's possible that could have happened.  I just -- I don't recall any of that.

Q.    Okay.

A.    I'm sorry, I just don't.

Q.    That's fine.  So you mentioned the waterfall before.  What is that with respect to the Zohar transactions?                Relevance

A.    So Section 11 in the indentures have a priority of payments that you follow on a quarterly basis, which essentially disburses the principal and interest cash that's in the collections accounts to pay expenses and pay the



noteholders.                                    Relevance

Q.   And the priority of payments is the waterfall; correct?

A.   Yes.

Q.   Okay.  And what was your specific role with respect to the waterfall?

A.   All I would do was plug in the interest rates, I would update the note balances, I would update any expenses that we may have had on file.  Those are all part of the priority payments.

Q.   Understood.

A.   And I would send it to Carlos, or Patriarch Partners for review and approval.

Q.   Explain to me what that was like.  So you would calculate the waterfall and then you would send it to Carlos Mercado at Patriarch; correct?

A.   Correct.

Q.   And what was the nature of your interactions with Mr. Mercado in connection with that?

A.   He would review the interest calculations.  It was possible that my day count was off here and there.  There's usually some



kind of back and forth with that stuff. Relevance

He would review the expenses, maybe he'd add some or subtract some.  It would be -- I don't recall a lot of back and forth, but it's typical to have some back and forth with the collateral managers on these -- these types of, you know, processes.  And that would be it.

He would approve it, and I would -- I had a routine that I went through to process these things, to give them to our ops team to make them -- to make them happen.

Q.   And when you say "make them happen," you mean payments to the noteholders?

A.   Yes.

Q.   Understood.  Okay.

Before you mentioned there were three divisions, really, at U.S. Bank who worked with the Zohar funds.  The account manager.  And what were the other two?

A.   Analytics.

Q.   Uh-huh.

A.   Did I say three?  There's analytics, there's deal administration, and there's account management.  So there's three.

Q.   Okay.  So let's talk about deal



administration.  I think we started talking about that earlier.

Relevance

What was their role with respect to the Zohar funds?

A.   Deal administrators process trades, they reconcile cash, that's really it.  I mean, at a high level.

Q.   What does processing trades and reconciling cash mean specifically with respect to the Zohar funds?

A.   Well, when the deals were -- prior to the reinvestment period, they would have been trades.  They would have been buying and selling assets.  So Patriarch would send a, you know, initial order or trade ticket to either disburse or receive in funds for a particular asset, and the deal administrator would make the updates to the database in terms of whatever the -- whatever was happening with that particular asset, add it to the system.  Either disburse cash or receive cash if it was a sale.

Q.   Okay.  And did the administration team have any role with respect to interest payments that were being made by the borrowers?

A.   Yeah.  So the deal administration



team would also track the payments coming into the accounts for the underlying collateral, and make -- you know, book those entries to the <span style="color:red">Relevance</span> system to record them.

Q.    How would they track them?

A.    So each borrower or each loan has an agent bank assigned to it that sends notices to the bank in terms of what -- what's expected, principal and interest.  Those are updated into the system and creates a receivable.  So when those monies hit the account, the deal administrators would match them all and book them to the appropriate collection account.

Q.    And what's -- what's the receivable?  What does that mean in this context?

A.    Either an interest payment or a principal payment.

Q.    How much interest or principal were due on a quarterly or monthly basis?

A.    On an underlying collateral, a borrower, yes.

Q.    Okay.  What was the name of the system that they would use to enter it in when you referenced?

A.    We were -- CDO Suite is the current



system, which I believe has been in place since 2009.  They were using Wall Street Office prior to that.

Relevance

Q.    Okay.  Wall Street Office?

A.    Yeah.  That's specific to Charlotte.

I think -- the Chicago office might have been using the CDO Suite the whole time. They had their own version of it.  But anyway, in regards to Zohar I, Wall Street Office, CDO Suite.

Q.    And for CDO Suite, is that like S-u-i-t-e?

A.    S -- yes, S-u-i-t-e.

Q.    Okay.  Do you have any experience working in CDO Suite?

A.    I don't.  I have view-only access. So I can pull up the main page of a deal and see -- I can see the liabilities.  I probably can run some reports.  I just don't -- I don't even know how.  It's not part of my job description. But I have access to it.

Q.    Okay.  "View-only," meaning you can't edit it; correct?

A.    That's correct.

Q.    Okay.  Could you view the receivables

Relevance



for the loans?                          Relevance

A.    I probably could.   I never had a reason to do that in my job function, but I probably could.   Yes.

Q.    Okay.   And if you wanted to review the receivables, what format would that be in?

MS. MURPHY:   Objection.  Form.

THE WITNESS:   I could probably -- there are accrued interest reports, probably principal reports in there that I could probably run.   I never did.   Just not part of my role.

BY MR. KUSNETZ:

Q.    Okay.   And would those accrued interest reports or principal interest reports detail how much was expected and how much was received?

MS. MURPHY:   Objection to form.

THE WITNESS:   Yes.

BY MR. KUSNETZ:

Q.    Okay.

MS. BUCKEL:   Would it be a good time for a break coming up?

MR. KUSNETZ:   Yeah.   I just have a couple more questions on this.



Is that okay?

THE WITNESS:  Sure.

BY MR. KUSNETZ:

Q.   I think you mentioned trade tickets; is that correct?

A.   Yes.

Q.   Okay.  Tell me a little bit more about the trade tickets.

A.   A trade ticket is something we receive from a collateral manager to book a trade or a buy and a sell for a particular piece of collateral that's coming in or going out of the transaction.

Q.   Okay.  Would the trade tickets include the terms of the loan?

A.   I don't know if the trade ticket itself -- some do, some don't.  Again, I don't actually receive them as part of my job function, but I have seen various trade tickets.  Some do.  Some do not.  I don't recall if these particular ones did.

But the teams would be reaching out to the collateral manager to get more details, as needed.  If they didn't have everything they needed to set up the loan.



Q.   Okay.  And the trade tickets would be for all commitments; correct?

A.   Buys and sells, yes.

Q.   Okay.  What about anything that gets restructured?

A.   There was communications regarding restructures.  I don't -- I don't know.  I guess you could call that a trade ticket.  There was communications to our groups for restructures, and, you know, all of the various things that can happen with a loan, certainly, yes.

Q.   Okay.  Do you recall what kinds of communications those were?

A.   I mean, they may have looked like a trade ticket.  I don't know.  They were certainly e-mail communications with Excel files or a PDF attached to them that would have the details.

Q.   Okay.  Who would send that to you?

A.   They would be received from Patriarch.  I can't remember if it would come from a specific person.  They had a group, Patriarch Agency Services, I believe, that would send that stuff.  I can't recall if it was a specific person, or whether or not it would come through some sort of generic e-mail address.



Q.    Okay.  Did you ever receive those restructuring notices?

A.    No.  I don't believe I was on any of those communications.  Go directly to the deal administrative teams.

Q.    How do you know they exist?

A.    I've seen copies of various trade-looking tickets in the files and through discovery over the years.  So I know things exist like that.  I just don't know.

Q.    Understood.  So fair to say U.S. Bank was notified by Patriarch with respect to restructurings of loans; correct?

MS. MURPHY:  Object to form.

MS. BUCKEL:  Object to form.

THE WITNESS:  Yes.  That's -- that's the way it works in every transaction.

BY MR. KUSNETZ:

Q.    So that's how it worked in the Zohar funds and how it works in other transactions that you're familiar with?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes.

MR. KUSNETZ:  Okay.  All right. Let's take that break.



THE VIDEOGRAPHER:  Time on the monitor is 10:23 a.m.  We are off the record.

(Recess taken from 10:23 a.m. until 10:37 a.m.)

THE VIDEOGRAPHER:  Time on the monitor is 10:37 a.m.  We are back on the record.

BY MR. KUSNETZ:

Q.   Okay.  Mr. DeRoss, you mentioned there was an analytics department within    Relevance
U.S. Bank that also interfaced with the Zohar funds; correct?

A.   Yes.

Q.   Okay.  What was their responsibility and role with the respect to the Zohar funds?

A.   So analytics would run the reports on a monthly basis.  And they would -- they would work with the collateral manager on determining whether or not there were defaults in collateral.

I believe in this deal there's different categories that the loans needed to be classified as.  And the -- the analytics team would get that information from the collateral manager and plug it into the system.

Q.   When you say "get that information,"



meaning get the categorization from the    Relevance

collateral manager?

A.    Yes.  Yes.

Q.    Okay.  Do you recall some of the individuals who were on the analytics team?

A.    Yeah.  Becky.  Her name is -- she's Chinese.  I think her name is Kaiyan, K-a-i-y-a-n.

Q.    Okay.

A.    Last name Ng, N-g.  But she goes by Becky.

Q.    So it is Kaiyan.  E-n --

A.    K-a -- what did I say?  K --

Q.    -- a-i-y-a-n.

A.    a-y-a-n [sic].  Sorry.

Q.    Yeah.  And --

A.    Last name is Ng, N-g, but she goes by Becky.

Q.    She goes by Becky.  Okay. Cool.
Who else?

A.    Okay.  I don't remember if there were any other analytics people that touched Zohar in our office.  There was probably somebody in the Chicago office.  I just -- I don't know who that was.


ESQUIRE
DEPOSITION SOLUTIONS

Q.   Okay.

A.   Again, Becky would have been from -- I don't know the exact date this transaction was moved to Charlotte, but probably sometime around 2009, 2010, through -- she left the bank about six years ago, something like that, five years ago.

Q.   Okay.  So through essentially 2020?

A.   Right.

Q.   Okay.

A.   Sounds right.

Q.   And what was her title, do you recall?

A.   I believe she was the vice president. I --

Q.   Okay.  And did she lead the analytics team?

A.   No.

Q.   Okay.  Who led the analytics team with respect to the Zohar transactions?

A.   Oh, Seung Jae.  The analytics lead was Seung Jae Keh.  Goes by Jay.

Q.   Okay.  How do you spell his name?

A.   I think S-u-e-n-g [sic]; Jae, J-a-e.

Q.   Uh-huh.



A.    Keh, K-e-h.

Q.    K-e-h was his last name.  Okay.  And he was the analytics lead with the respect to the Zohar transactions?

A.    He was the analytics lead for the entire analytics group for the bank.  So that covered all the offices.  So Chicago, Texas, New York, Charlotte.  I think that's it.

Q.    And would he interface with the collateral manager?

A.    No.

Q.    Okay.  And who was in charge of interfacing with the collateral manager at U.S. Bank?

A.    Would have been Becky.

Q.    It would have been Becky.  And Becky reported to him?

A.    Yes.

Q.    And do you recall any other folks on the analytics team?

A.    In those days, in Charlotte, Jen Price.

Q.    Okay.

A.    I think her last name might have been Albright at the time.



Q.   Okay.  And anyone else?

A.   There were other team members.  I don't recall their names.  I don't recall that they touched the Zohar transaction.

Q.   Would you interface with any folks on that team during your time on the Zohar transactions?

A.   I would talk to Becky quarterly.  We would, you know, collaborate for the quarterly waterfall.  Because a lot of -- some of the numbers that went into that would come from her.

Q.   What numbers were those?

A.   So the fee basis, which calculates the fees, which relied on knowing what the default numbers were, Becky would input those into the model based on conversations with Patriarch.

Q.   Okay.  Okay.  That's very helpful. Let's talk a little bit more about some of U.S. Bank's responsibilities generally as a trustee with respect to the Zohar funds.

U.S. Bank's responsibilities included providing notices of default to the collateral manager should a default occur; correct?

A.   Yes.

Relevance



Relevance

Q.   Okay.  And is that a common response -- withdrawn.

Is that responsibility similar to what you would do for other CLO transactions?

A.   It is.  And I apologize.  The -- the notices go out to the noteholders and other notification parties.  So it's not just the collateral manager.  But that is a typical role of responsibility, sure.

Q.   Okay.  And is it -- was it also U.S. Bank's responsibility to provide notices of default to the ratings agency?

MS. MURPHY:  Objection.  Form.

MS. BUCKEL:  Can I just object.  When you say "U.S. Bank," do you mean U.S. Bank as trustee of the Zohar funds?

MR. KUSNETZ:  Yes.  Thank you.

MS. BUCKEL:  Remember the witness is testifying in his individual capacity.

MR. KUSNETZ:  Absolutely, yes.  Yeah. Let me rephrase.  Thank you, Ms. Buckel.

BY MR. KUSNETZ:

Q.   Was it U.S. Bank's responsibility as trustee for Zohar funds to provide notices of default to rating agencies?



MS. MURPHY:  Objection to form.

THE WITNESS:  I don't recall if these deals were being rated at that time.  But certainly it's typical to provide notice to a rating agency if they're a noticed party in the indenture.

BY MR. KUSNETZ:

Q.  Okay.  Was it part of U.S. Bank's responsibilities as trustee for the Zohar fund to provide notice to the collateral manager of any delayed payments of interest?

Relevance

MS. MURPHY:  Objection.  Form.

THE WITNESS:  I don't know if that was a responsibility, but certainly the manager would have received cash files on a daily basis that would have showed them whether or not something came in.

BY MR. KUSNETZ:

Q.  So the manager also had cash files; correct?

A.  The manager had -- would receive cash files from us.

Q.  Okay.

A.  Account statements or whatever you want to call them.



Q.    Okay.  So the trustee would send cash files to the collateral manager of the interest and principal payments; correct?    Relevance

A.    Correct.

Q.    Okay.  And that was part of your -- that was part of U.S. Bank's responsibility as trustee of the Zohar fund to do that; correct?

A.    I think that falls under collateral administration.  But, yes, it's typical that we would -- we would provide that data.  That stuff goes out every morning.

Q.    Okay.  And when you say it goes out every morning, who sends that out?

A.    I believe it's automated nowadays. Years ago we used to e-mail it.  Nowadays, there are automated cash files that go out.  And if they're not going to any cash file, they're directed towards our automated -- sorry, online systems called Pivot didn't exist back then in the form that it does now.  But a lot of managers don't even receive stuff anymore.  They can just go into the system and look.

Q.    And was that part of the analytics team, administrative team or the account management team's duty to do it?



A.    That usually falls into deal administration.

Relevance

Q.    Okay.  And it was U.S. Bank's responsibility as trustee to the Zohar funds to make payments in accordance with the waterfall; correct?

A.    Correct.

Q.    To the noteholders?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes.

BY MR. KUSNETZ:

Q.    And it was U.S. Bank's responsibility as trustee to the Zohar funds to prepare reports about the collateral and provide those to noteholders and investors; correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes.  Correct.

BY MR. KUSNETZ:

Q.    And those reports were also provided to ratings agencies; correct?

A.    If applicable, yes.

Q.    Okay.

A.    I forget with these transactions what rating agencies these were on, but yes.

Q.    And do you recall what the names of



Relevance

those reports were?

A.    Monthly report, we usually refer to it as.  It's the issuer's report really in Section 10.  But we -- we refer to them as trustee reports.

Q.    Okay.  So if I refer to those as trustee reports, you'll understand what I'm referring to?

A.    Yes.

Q.    Okay.  And that was monthly and quarterly?

A.    Yes, quarterly.  We call it a note valuation report, but yes.

Q.    Okay.  Besides the responsibilities that I just mentioned and that you previously testified, are there anything else that I'm missing that were typical of -- withdrawn.

Any other responsibilities of U.S. Bank as the Zohar funds trustee?

MS. MURPHY:  Objection.  Form.

THE WITNESS:  No.  Other than, you know, a trustee's role in the transaction is to hold the collateral and cash, so...

MR. KUSNETZ:  Okay.  I'd like to show you our first exhibit.  We'll mark it as



exhibit -- as DeRoss 1.

Bates Number is PPADV_0000288.  And it says it is the Zohar CDO 2003-1 limited indenture dated as of November 13, 2003.

(DeRoss Exhibit 1 marked for identification.)

BY MR. KUSNETZ:

Q.   Mr. DeRoss, as you'll see on the bottom, there's PPADV and then some numbers.

Do you see that?

A.   Yes.

Q.   So that's the Bates Number we were talking about.  So that was added to the document just for ease of reference; okay?

A.   Okay.

Q.   Have you seen this document before?

A.   Yes.

Q.   Okay.  What is this document?

A.   This is the indenture.

Q.   What does that mean?

A.   This is the governing document for the Zohar transaction.

Q.   Okay.  And who's listed here as trustee on the cover page?

A.   U.S. Bank NA.



Q.   All right.  And you see MBIA Insurance Corporation is listed here as the credit enhancer?

A.   Yes.

Q.   Okay.  What is your understanding of the credit enhancer?

A.   The credit enhancer provides insurance coverage for the Class A notes.  I believe -- A-1, 2 and 3, I think.  Yeah.

Q.   Okay.  And in connection with your role as an account manager on the Zohar transactions for U.S. Bank, did you need to familiarize yourself with the terms of this indenture?

A.   From time to time I could -- I would probably look for a defined term or two here and there.  But this transaction I had already -- it was out of reinvestment by the time I got it.  So I didn't really need to dig in here too much, other than when we went into default.

Q.   Okay.  And do you recall who from U.S. Bank was involved in negotiating the terms of this indenture?

A.   Is this signed?  I believe I recall the signature was Eric Donaghey.



Q.    This version, I don't believe is signed.

A.    I believe I -- I believe there's a signed version of this, and Eric Donaghey, who's head of compliance group.  Still in Boston.

Q.    Still in Boston.

Okay.  How do you spell his last name?

A.    D-o-u-g-h-n-a -- I don't know.

Q.    That's fine.  That's fine.

A.    Irish.  Boston.

Q.    I'll go with it if you will.

A.    I think Dawn Zonotti was another name that may have been involved with closing this transaction.

Q.    And then I'll have to ask you try and spell it.  I'm sorry.

A.    Okay.  I think it's Z -- Z-o-n-o-t-t-i.  I think that's right.  Z-o-n-o-t-t-i.  I think it's Zonotti.

Q.    Okay.  And the responsibilities that we just went through with respect to U.S. Bank in connection with this role as trustee for the Zohar funds, those would be found here in the indenture; correct?

Relevance



A.   Correct.

<span style="color:red">Relevance</span>

Q.   Okay.  Now, you mentioned you didn't have to go into the indenture often because the fund was out of the reinvestment period; correct?

A.   Yes.

Q.   What does that mean?

A.    It means there weren't -- they were no longer really doing anything.  Buying/selling assets would have stopped.  The waterfall with all the document language was already built.  So I really just look at that.  You know, honestly, I didn't need to go into this document very often, other than, again, when we went into default.  Because all they did was make quarterly payments.  So I would just be updating rates, putting in some expenses.  The details of the priority payments in Section 11 would have been all put into the spreadsheets that we used to make the payment and run waterfalls.

Q.   You're referring to Section 11 of the indenture; correct?

A.   Yes.

Q.   Okay.  And you became involved in the Zohar transactions for U.S. Bank in 2012; is that --

<span style="color:red">Relevance</span>



A.    Around 2012, yes.

Q.    Okay.  And this indenture is dated as of November 20, 2003; correct?    Relevance

A.    Correct.

Q.    So fair to say that a lot of the procedures had already been baked in before you got there?

A.    Yes.

Q.    Okay.  Did you recall amending any procedures with respect to how things were done?

A.    No.

Q.    Okay.

A.    I don't.

Q.    And you're aware there were two other Zohar funds; correct?

A.    Yes.

Q.    Zohar -- okay -- II and III?

A.    Yes.

Q.    And those also had indentures; correct?

A.    Yes.

Q.    And you said the Chicago office of U.S. Bank had the primary responsibility with respect to those Zohar funds; correct?

A.    Yes.  Correct.



Q.   Primary responsibility for account management, administration and analytics, or some combination of that?

Relevance

A.   All of it, correct.

Q.   Okay.  How much visibility did you have into what was -- into U.S. Bank's work with respect to Zohar's II and III?

A.   None.

Q.   Okay.  Okay.  Let's just take a quick spin through it.  If you go to the Bates Number that's 410.  Do you see a Section 6.14?

A.   Yes.

Q.   Okay.  "Certain duties related to delayed payments of proceeds."

Do you see that?

A.   Yes.

Q.   Okay.  Have you seen this section before, sir?

A.   No.

Q.   Okay.  And why not?

MS. MURPHY:  Objection to form.

THE WITNESS:  I have never read this indenture cover to cover.  So I don't know every specific section.

BY MR. KUSNETZ:



Q.   Understood.  So you focus on the sections that were the most relevant to your duties at U.S. Bank; correct?

A.   Correct.

Q.   Okay.  And with respect to the duties of the trustee enumerated here in 6.14, who at U.S. Bank would be responsible with respect to the delayed payment of proceeds?

Relevance

MS. MURPHY:  Objection to form.

THE WITNESS:  So the manager would get a daily cash file.  So they would -- they would be notified every day of cash coming in and out of the deal and what was paid and not paid.

BY MR. KUSNETZ:

Q.   And --

A.   So the deal administrative team would send a cash file every day that details cash.

Q.   So the deal administrative team would have the cash file, and they would send that to the collateral manager; correct?

A.   Yes.

Q.   Okay.  So fair to say the deal administration team would handle the duties related to delayed payment of proceeds in 6.14?



MS. MURPHY:  Objection to form.

THE WITNESS:  Yes.

BY MR. KUSNETZ:

Q.  Okay.  All right.  Let's move to 6.18.  That's on Bates Number ending 411.

Do you see Section 6.18 is "Duties and responsibilities of trustee following payment in full of the notes"?

Relevance

A.  Yes.

Q.  Okay.  And where it says the trustee in the first sentence, "Following the payment in full of the notes, the trustee shall retain the collateral intact, collecting cause the collection of proceeds thereof and make and apply all payments and deposits and maintain all accounts in respect of the collateral in accordance with the priority of payments and the other provisions of this indenture.  In return, therefore, will continue to receive its fees and reimbursement of its expenses as trustee, and have all of its rights provided for hereunder until the liquidation of the collateral and the final distribution of the proceeds of such liquidation in accordance with the priority of payments and issue an order."



Do you see that?

Relevance

A.    I do.

Q.    Okay.  This relates to your responsibilities at U.S. Bank; correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes.

BY MR. KUSNETZ:

Q.    This is the payments that flow through the waterfall; correct?

A.    Yes.  This describes what happens after the notes are paid off, I believe.

Q.    Okay.

A.    And by "notes," we're talking about the senior notes, not -- because this is assuming the preferred shares are -- were still outstanding.

Q.    Understood.  Let's turn to page 460.

A.    Okay.

Q.    It's a large document.  I'm sorry.

A.    No, I'm familiar with these.  Okay.

Q.    Are these indentures -- let's start with that.

Are these indentures -- with respect to the CLOs that you typically work with, are they typically long and detailed like this one?



A.   They are all very similar to this format.  Not much has changed in that regard.

Q.   Okay.  Understood.

Let's talk about Section 10.13, Accountings.

Do you see Subsection A, "Monthly Accountings"?

A.   Yes.

Q.   Okay.  So do you see where it says, "Not later than the eighth business day after the last day of each calendar month, commencing on the last day of the first calendar month ending after the initial payment date, and excluding any month as to which a note valuation report is rendered, the issuer shall compile and provide to each rating agency the trustee, the preference share paying agent, the collateral manager, each hedge counterparty, the credit enhancer and the holders of the notes, the monthly report."

And the defined term is the monthly report.  Do you see that?

A.   I do.

Q.   Okay.  And if you go under Section A, it lists what the monthly report contains.

Do you see that?



A.   I do.

Q.   Okay.  And that includes the aggregate principal balance of the CDO obligations; correct?

A.   Yes.

Q.   The balance of investments and cash?

A.   Yes.

Q.   Okay.  Interest collection?

A.   Yes.

Q.   The nature and source of any proceeds in the collection amounts?

A.   Yes.

Q.   Interest proceeds, principal proceeds, and sale proceeds?

A.   Yes.

Q.   Okay.  Without having to read all of them, they include -- they go from 1 all the way down to 35, which is on page 463?

A.   Yes.

Q.   So a lot of information; correct?

A.   Yes.

Q.   Okay.  And these monthly reports are part of the -- what we called the trustee reports earlier; correct?

A.   Correct.



Q.   Okay.  And it was the analytics team who was responsible for preparing the trustee reports within U.S. Bank?

Relevance

A.   Correct.

Q.   Okay.  Let's go -- let's turn back to page 401, Section 6.1.

A.   Okay.

Q.   And do you see where it says, "Article 6, The trustee.  Section 6.1, Certain duties and responsibilities"?

A.   Yes.

Q.   So this speaks to the certain duties and responsibilities of the trustee for Zohar I; correct?

A.   Yes.

Q.   Okay.  And there's several duties here; correct?  Do you see that?

A.   Yes.

Q.   Let's go to the next page, page 402.

Do you see one of the duties here under Subsection F is that "The trustee shall, upon reasonable but no less than three business days, prior written notice to the trustee, permit any representative of a holder of a note or of the credit enhancer during the trustee's normal



business hours to examine all books of account records, reports, and other papers of the trustee relating to the notes; to make copies and extracts therefrom," and then parenthesis, "the reasonable out-of-pocket expenses incurred making any such copies or extracts to be reimbursed the trustee by such holder or the credit enhancer," closed parenthesis, "and to discuss the trustee's actions as such actions related to the trustee's duties with respect to the notes where the trustee's officers and employees responsible for carrying out the trustee's duties with respect to the notes."

Do you see that?

A.   Yes.

Q.   Okay.  So it was U.S. Bank's    Relevance

responsibility in connection with its role as trustee of the Zohar funds to maintain records relating to the collateral; correct?

A.   Correct.

Q.   And any noteholder or MBIA, as the credit enhancer, for example, could be permitted to examine books of account records and report relating to the notes; correct?

A.   Correct.



Q.    Do you recall any noteholder requesting access to the books of account records and reports?                                   Relevance

A.    Only one.  The Patriarch Partners came into our office and did a record -- books and records inspection.  So I -- I would -- they were the pref shareholder; right?  So that's the only books and records inspection I ever recall.

Q.    Okay.  And did your role as account manager touch at all on maintaining books and records?

A.    Yeah, sure.

Q.    Tell me about it.

A.    Well, we have file system where the Excel waterfalls are all kept.  And we have deal folders on the servers where we keep all of the documents.  And essentially anything related to this transaction would be -- would be stored in those folders.  This transaction goes back a long time.  So there were also hard copies of stuff that were kept in file rooms.  So we also maintained that stuff.

Q.    But as a member of the account manager team, the maintenance of books and records was under the account manager's purview;



correct?                                        Relevance

A.    I don't -- I mean, we had a shared responsibility because the deal administrative teams and analytics teams were all, you know, working these transactions and receiving information and storing it into the various drives of the system, making entries into the systems.  So I think collectively we all had that responsibility.

Q.    And so when you said Patriarch made a books and records request, you were aware of that; correct?

A.    Yes.  They came to our offices.

Q.    And were you present during -- when they came to your office?

A.    Yes.

Q.    What do you recall about it?

A.    I recall sitting at a table with stacks of papers.  A lot of it were printouts of the cash files, I believe.

You know, I don't recall exactly everything that was there.  But all of the transaction documents, all of the account transactional data, was probably other stuff there.  I don't know.  It was --



Q.   Okay.  Do you recall when that was roughly?

Relevance

A.   Sometime between 2000 and -- I don't, honestly.  2009 -- sometime between 20 -- it was 2009 and -- no, I'm sorry.  Sometime between 2012 and 2015.

Q.   Understood.

A.   That's the date.  Sorry.

Q.   And that was with respect to Zohar I?

A.   Yes.

Q.   Okay.  During your period as account manager for Zohar I at U.S. Bank, which was trustee to the Zohar funds, you do not recall any of the noteholders making books and records requests --

A.   No.

Q.   -- correct?

A.   Correct.

Q.   And during your period as account manager for Zohar I at U.S. Bank, which was trustee of the Zohar funds, you do not recall MBIA making any books and records requests; correct?

A.   By books and records request, are you referring to what I just described to you, coming



to our office and inspecting our books and Relevance looking at stuff.  I don't recall any of that.  I can't tell you that they didn't request information from time to time.  They probably did.  I don't recall anything specific.

Q.    Well, let's look again at Section F here in 6.1, "To examine all books of account records, reports, and other papers of the trustee relating to the notes."

You see that?

A.    I do.

Q.    That's pretty broad; right?

A.    It is very broad.

Q.    That's kind of like everything; right?

A.    Right.  So I would say the only time I recall that ever happening was when Patriarch came to our offices and they did that.

Q.    Right.  And you don't recall any noteholder --

A.    No.

Q.    -- requesting that?

A.    No.

Q.    And you don't recall MBIA requesting books of account records, reports, and other



papers of the trustees relating to the notes?

A.    I do not.                    Relevance

Q.    You don't recall the noteholders -- just for the record, you do not recall the noteholders requesting books of account records, reports, and other papers of the trustee relating to the notes?

A.    No.

Q.    And had they requested access to the books of account, records, reports, and other papers of the trustee relating to the notes, would U.S. Bank have granted them access pursuant to the trust -- pursuant to the indenture?

A.    Yes.

Q.    And having responsibility for Zohar I, it would have surprised you if this books and records request was made by the noteholders and MBIA and you weren't aware of it; correct?

A.    Yes.  I don't know who else they would have gone to at the trustee for that information.  So, yeah, I would be surprised.

Q.    So they would have come to you; correct?

A.    It would have ended up in my lap



regardless if they came directly to me or to the bank in some other capacity, but it would have come across my desk for sure.

Relevance

Q.    Interesting.  Okay.  That's really helpful to know.  So many different operations.

A.    Right.  You know, and, again, we're not talking about discovery or anything like that.

Q.    No.

A.    Okay.  Good.

Q.    I'm not talking about litigation, but thank you for clarifying.

A.    Okay.

Q.    To your knowledge, the noteholders and MBIA did not make any requests to examine all books of account, records, reports, and other papers of the trustee relating to the notes for Zohar II and Zohar III; correct?

A.    I'm not aware of it.  I didn't work on those transactions, but I'm not aware.

Q.    You're not aware?

A.    I'm not aware of it.

Q.    Okay.  So the trustee had a number of duties with respect to -- sorry.  Withdrawn.

U.S. Bank had a number of duties with



respect to its role as trustee of the Zohar fund; correct?

A.   Correct.

Q.   Okay.  And in order to execute on those duties, the trustee had to be detail oriented; correct?

Relevance

MS. BUCKEL:  Objection.

THE WITNESS:  Yes.

BY MR. KUSNETZ:

Q.   I mean, you guys kept records; correct?

A.   Yes.  Yeah.

Q.   You're also handling a lot of money on behalf of the Zohar funds; correct?

A.   Correct.

Q.   You're overseeing the flow of a lot of cash in and out of the Zohar funds; correct?

A.   Correct.

Q.   And you would agree that you're a detail-oriented individual; correct?

A.   I try to be.

Q.   I mean --

A.   Yes.

Q.   -- you said there's a decent amount of turnover on the Zohar teams, but not you;



correct?

Relevance

A.    Correct.

Q.    Okay.  So fair to say you did a good job in connection with your role as a trustee for the Zohar funds?

A.    I hope so.

Q.    Have you heard otherwise?

A.    No.

Q.    And you take this job seriously; correct?

A.    I do, yes.

Q.    And you take it seriously with respect to your role as trustee for the Zohar funds, but also with respect to trustee for other CLOs; correct?

A.    Correct.

Q.    And you work in a professional manner?

A.    Correct.

Q.    And do you hold yourself to the highest of professional standards?

A.    Yes.

Q.    And there's no allegation by any of the parties to this indenture that you or anyone at U.S. Bank did not; correct?



Relevance

A.   I'm not aware of any, no.

Q.   Let's talk a little bit more about the trustee as role -- the trustee's role with respect to the Zohar funds.  We mentioned there was, in addition to the indenture, something called a collateral administration agreement.  Do you recall that?

A.   Yes.

Q.   Let's look at that.

MR. KUSNETZ:   I'm going to mark as DeRoss Exhibit 2 a document titled "Collateral Administration Agreement." Bates Number PPADV_0029257.

(DeRoss Exhibit 2 marked for identification.)

BY MR. KUSNETZ:

Q.   Do you recognize this document, Mr. DeRoss?

A.   Yes.

Q.   Okay.  This is a Collateral Administration Agreement; correct?

A.   Correct.

Q.   Okay.  Now, this particular Collateral Administration Agreement pertains to, if you look at the top, Zohar III.  Do you see



that?

Relevance

A.    I do.

Q.    And do you see that it mentions that the collateral administrator, which is also defined as the trustee, was LaSalle Bank National Association?

A.    I see.

Q.    Okay.  And did LaSalle Bank come to be part of U.S. Bank?

A.    No.  I think -- I think they became part of Bank of America.  And then the bank bought that business from Bank of America.  I don't know if that answers your question, but I don't believe there was a direct LaSalle to U.S. Bank.  I think it was LaSalle merged with Bank of America, and then U.S. Bank bought that business from them.

Q.    Okay.

A.    I think that's right.

Q.    So is it fair to say that the obligations of LaSalle, in connection with Zohar III, were assumed by U.S. Bank when it bought that business?

A.    Correct.

Q.    Okay.  So essentially when it bought



that business, U.S. Bank became the trustee for Zohar III; correct?

A.   Correct.

Q.   And Zohar -- and U.S. Bank was also the trustee for Zohar II; correct?

A.   Correct.

Q.   Okay.  Let's look at the Collateral Administration Agreement.

Was there a Collateral Administration Agreement for each of the Zohar funds?   Relevance

A.   There should be, yes.

Q.   Okay.  You would have been surprised if there was not?

A.   I would be surprised.

Q.   Okay.  And that's a common -- I think you testified that a Collateral Administration Agreement is a common governing document for CLOs; correct?

A.   Correct.

Q.   Okay.  So let's look at the first page.  Is it fair to say that this Collateral Administration Agreement governs the relationship between the issuer and the trustee?

A.   I think it -- yes, I mean, the trustee wears many hats, right.  The trustee does



its work under this agreement through its role as a collateral administrator.  That gets weird, but ...

Relevance

Q.   And Zohar III is defined here as the issuer, correct, at the top?

A.   Yes.

Q.   Okay.  So if you go down to see this "whereas" clause is on the -- on that first page.

A.   Yeah.  Yes.

Q.   All right.  And if you go to down to the fourth "whereas" clause, you see, it says, "Whereas, the issuer wishes to engage LaSalle to perform on its behalf certain initiative duties of the issuer with respect to the collateral pursuant to the indenture and the terms of this agreement."

Do you see that?

A.   Yes.

Q.   So the Zohar fund was engaging LaSalle, which later became part of U.S. Bank, to perform its role as trustee; correct?

A.   To perform its role as collateral administrator under this agreement.

Q.   Yes.

A.   Yes.



Q.   And when I say, "trustee and Relevance collateral administrator," is there any daylight between those?

A.   Well, there are -- again, it's -- the bank wears different hats in these transactions; right.  A trustee is a trustee.  The collateral administrator does different things.  But it all rolls up to U.S. Bank.

Q.   Right.  And -- and that's helpful.

If I refer to -- if I use the word "trustee," will you understand what I'm referring to?

A.   Yes.

Q.   Okay.  Let's look at the next "whereas" clause.  "Whereas, LaSalle is prepared to perform on behalf of the issuer certain specified obligations of the issuer, and certain other services as specified herein upon and subject to the terms of the indenture in this agreement.  But without assuming the obligations and liabilities of the issuer or collateral manager under the transaction documents."

Do you see that?

A.   Yes.

Q.   So pursuant to the CAA, U.S. Bank



performed obligations of the Zohar funds on the Zohar funds' behalf; correct?

MS. BUCKEL:  Object to form.

THE WITNESS:  Yes.

MR. KUSNETZ:  Okay.

MS. MURPHY:  Can we do objection for one is objection for all?

MR. KUSNETZ:  Sure.

BY MR. KUSNETZ:

Q.   And that's standard in many of the CAAs that you've reviewed before; correct?

A.   Yes.

Q.   Okay.  Let's go to the next page. Bates ending in 258.

If you look at the top, do you see it says, "Powers and duties of the collateral administrator and the collateral manager"?

A.   Sorry.  I see it.

Q.   Okay.  Do you see where it says in the first sentence in 2(a) "The collateral administrator shall act as the collateral administrator and agent for the issuer pursuant to the terms of this agreement until its resignation or removal pursuant to Section 7 hereof"?



Do you see that?

A.　Yes.

Q.　Okay.　So based on this, is it fair to say that U.S. Bank, as collateral administrator, was an agent for the Zohar funds --

MS. MURPHY:　Objection to form.

BY MR. KUSNETZ:

Q.　-- pursuant to this agreement?

A.　Yes.

Q.　And is it your understanding that as an agent to the Zohar funds, the collateral administrator owed fiduciary duties to the funds; correct?

MS. MURPHY:　Objection to form.

MS. BUCKEL:　Objection to form.

THE WITNESS:　No, we do not -- I don't believe we're considered a fiduciary in these types of transactions.

BY MR. KUSNETZ:

Q.　What's your understanding of "fiduciary"?

A.　Fiduciary is a decision-making entity.　And our roles in these transactions are more administerial.　We take directions from



parties.  And we only do what's -- what's described in these documents.  That's my understanding.

I think a fiduciary is a more broader decision-making type of an entity.  It's not a term we use in these -- in this world.

Q.   Okay.  If you look -- on the fiduciary point, I'm asking you just as a layperson based on your understanding of fiduciary.  Do you understand that?

A.   Yes.

Q.   And you're not a lawyer; correct?

A.   Correct.

Q.   Okay.  Would it surprise you if noteholders have testified in prior proceedings that the trustees owed the noteholders a fiduciary duty?

A.   It would not surprise me.

Q.   Why would that not surprise you?

A.   I think there's a misunderstanding in the marketplace in these types of transactions and others like them, the role of a -- of a trustee in these -- we do these transactions for one basis point.  We don't sign up for that type of risk.  We stand between sophisticated parties



that make the decisions, and we take their direction to act.

Q.    And the noteholders in -- of the Zohar funds were sophisticated parties; correct?

A.    I believe so.

Q.    Would it surprise you that noteholders have testified in prior proceedings that they look to the trustee to ensure that the information the trustee published was accurate?

MS. BUCKEL:  Object to form.

THE WITNESS:  It would not surprise me.

BY MR. KUSNETZ:

Q.    And it was an obligation of the trustee to publish accurate information; correct?

MS. BUCKEL:  Object to form.

THE WITNESS:  I'm sorry, is there --
the question that noteholders have said
these things or -- are you saying --

BY MR. KUSNETZ:

Q.    Well, my next -- my question is different.  It's an obligation of the trustee to publish accurate information with respect to the data that they receive; correct?

MS. MURPHY:  Objection to form.



THE WITNESS:  Yes.  It's an obligation of the trustee to publish accurate information to the best of its knowledge, based on the information it has.

BY MR. KUSNETZ:

Q.   So if you go to Section 2(b) on the same page.  It says, "The collateral administrator shall perform the following functions."

Do you see that?

A.   Yes.

Q.   Okay.  Now, there are -- this list continues all the way to page ending in 262.

Do you see that?

MS. MURPHY:  Sorry, just under B?  B cuts to C on the next page.

MR. KUSNETZ:  No.  Sorry.  Let me explain.

BY MR. KUSNETZ:

Q.   The functions of the collateral administrator, which are under section B, section C, section D, and section E, span one, two, three, four -- about ten pages.

Do you see that?



A.    Yeah, I do.  Yes, I do.

Q.    So fair to say the trustee had a lot to do; correct?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Objection to form.

THE WITNESS:  Correct.

BY MR. KUSNETZ:

Q.    Right.  Many of these duties involve calculations or determinations; correct?

A.    Correct.

Q.    And those were calculations and determinations made by the trustee; correct?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Object to form.

MS. MURPHY:  Are you referring to something specific in this document?

MR. KUSNETZ:  Question stands.

THE WITNESS:  Correct.

BY MR. KUSNETZ:

Q.    And the trustee would independently make calculations and determinations; correct?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Object to form.

THE WITNESS:  The trustee would make these calculations based on inputs from

ESQUIRE
DEPOSITION SOLUTIONS

the collateral manager.

BY MR. KUSNETZ:

Q.    So they would take inputs from the collateral manager?

A.    That's right.

Q.    And they would take inputs from the collateral itself; correct?

A.    Correct.

Q.    Right.  Like the cash?

A.    Stuff we already have on -- in the system, right.  Cash available, par balances, I mean, there's a million things, right.  But you take the stuff that you know and take the stuff that you need from the collateral manager, and you put that together and you make these calculations.

Q.    Right.  And it was the trustee who made the calculations; correct?

A.    The trustee would produce the calculations in a report that would go to the collateral manager for review and approval, yes.

Q.    Right.  Because these ten pages of enumerated functions were the powers and duty under the responsibility of the trustee; correct?

MS. MURPHY:  Objection to form.



THE WITNESS:  Correct.

BY MR. KUSNETZ:

Q.   Okay.  So fair to say that it was --
in making calculations, determinations, you
weren't just copying and pasting figures received
from the collateral manager; correct?

MS. MURPHY:  Object to form.

MS. BUCKEL:  Object to form.

THE WITNESS:  No.  The -- excuse me.
The collateral manager would not be
providing the results per se.  But they
would be providing the inputs that we
needed to make the calculation.

BY MR. KUSNETZ:

Q.   Right.

A.   I don't think you could say we were
cutting and pasting.

Q.   Yeah.  Fair to say your job as a
trustee is not a cut and paster?

A.   Correct.

MS. BUCKEL:  Object to form.

BY MR. KUSNETZ:

Q.   Fair to say you had analytics
department in a deal administration department
whose job it was to carry out many of these



tasks?

A.    Correct.

Q.    And your account manager, management department also carried out many of these tasks; correct?

A.    I guess it depends on which ones you're talking about.

Q.    Relating to the priority of payments, for example?

A.    Correct.

Q.    Okay.  Now, I understand that you began working on Zohar I at U.S. Bank in 2012.  Are you aware, though, how U.S. Bank came to be involved in Zohar I as a signatory to the indenture?

A.    I was not around for that.  But I assume it happened the same way any other transaction.  Collateral manager approached a -- or maybe one of our salespeople went into their office.  But someone made a pitch to someone at some point for a trustee role and we were hired.

Q.    Have you made pitches in other CLOs to serve as a trustee?

A.    Personally, no.  I don't -- we have a salesperson that we -- that does that for us.



Q.   Do you assist the sales department with that?

A.   No.

Q.   Do you know what's in those pitches?

A.   Yes.  Just fee -- fee -- fee amounts for the basic services that we would provide.

Q.   And do you advertise services that are unique to U.S. Bank?

MS. MURPHY:  Objection to form.

THE WITNESS:  No.

BY MR. KUSNETZ:

Q.   Do you advertise your expertise in connection with making pitches?

MS. BUCKEL:  Object to the form.

MS. MURPHY:  Objection to form.

THE WITNESS:  Again, I'm not a salesperson.  I assume he has a pitch -- a presentation that he puts together.  I've never actually attended one, but I'm sure that happens.

BY MR. KUSNETZ:

Q.   Okay.  I understand.

My understanding is that the first monthly trustee report for Zohar I prepared by U.S. Bank was in September of 2004.  Do you have



any reason to doubt that?

A.   No.

Q.   And the first monthly trustee report for Zohar II was prepared by ABN AMRO.  Have you heard of that entity?

A.   I've heard of the entity.  I don't know how it relates to these transactions.

Q.   Okay.  And do you know how ABN AMRO -- how the transition came to be from ABN AMRO to LaSalle to U.S. Bank?

A.   I don't.

Q.   Okay.  Do you have any reason to doubt that the first monthly trustee report for Zohar II was August 31, 2005?

A.   No.

Q.   And do you have any reason to doubt that the first monthly trustee report for Zohar III was in September -- was September 30, 2007?

A.   No.

Q.   Okay.  Do you have any reason -- withdrawn.

With U.S. Bank as the trustee for Zohar I, they prepared the monthly trustee reports from the beginning; correct?



            MS. BUCKEL:  Object to form.

            THE WITNESS:  Yeah.  I believe we

      were -- it was U.S. Bank NA from the

      start, yes.

BY MR. KUSNETZ:

      Q.   And then do you have any reason to

doubt that August 31, 2011, was the first

Zohar II monthly trustee report prepared by

U.S. Bank?

      A.   No.

      Q.   And do you have any reason to doubt

that July 31, 2011, was the first Zohar III

monthly trustee report prepared by U.S. Bank?

      A.   No.

      Q.   And so when U.S. Bank became the

trustee of Zohar II and III, that was shortly

before you joined the team in 2012 to work on the

Zohar fund transactions; correct?

      A.   Yes.

            MS. BUCKEL:  Object to form.

            THE WITNESS:  That's right.

BY MR. KUSNETZ:

      Q.   Do you recall how much compensation

U.S. Bank received in connection with its role as

trustee on these transactions?



A.    I believe -- I don't know II and III. I know on Zohar I, I think it was -- was it 2-1/2 basis points maybe.  I don't -- it was higher than we get now.  So I think it might have been like 2.5 bps.

Q.    And what is -- how is that calculated?

A.    It's calculated off of the -- it's usually either called a fee basis amount or par amount of collateral.  I forget what it's called in these deals, but it's typical of a bank to get paid of the size of the collateral put.

Q.    Understood.  But you don't have a dollar figure for me of how much you've been paid during the life --

A.    No.

Q.    -- of U.S. Bank's role as trustee for Zohar I?

A.    No.  No, I don't.

Q.    Okay.  Do you have like a ballpark?

A.    During the life?  No.  I mean, I don't know -- I don't know.

Q.    Okay.  We're going to get to the trustee report and process in a bit.  But I just want to follow on some of the questions that I



was asking you earlier about U.S. Bank.

You stand by your work at U.S. Bank with respect to the work that was done for Zohar -- for the Zohar funds; correct?

A.   Yes.

Q.   And you, sir, never questioned the accuracy and the integrity of the work done by U.S. Bank in connection with its role as a Zohar fund trustee; correct?

A.   Correct.

Relevance

Q.   To your knowledge, no one at MBIA has questioned the integrity of the work done by U.S. Bank as Zohar fund trustee; correct?

A.   Not that I am aware of, no.

Q.   And, to your knowledge, no one at Bardin Hill has questioned the integrity of the work done by U.S. Bank as Zohar fund's trustee?

A.   Correct.

Q.   Are you familiar with the entity, Bardin Hill?

A.   No.

Q.   I think we talked about this earlier, but --

A.   Yeah.

Q.   -- any reason to doubt that Bardin



Hill is a Zohar III noteholder?

A.   No.

Q.   Okay.  I'll just ask broadly, I Relevance guess.  To your knowledge, not one noteholder to any of the Zohar funds questioned the integrity of the work done by U.S. Bank as a Zohar fund trustee; correct?

A.   Not that I'm aware of, correct.

Q.   For Alvarez & Marsal, I'll refer to them as AMZM.  To your knowledge, no one at AMZM questioned the integrity of the work done by U.S. Bank as a Zohar fund trustee; correct?

A.   Correct.

Q.   To your knowledge, no party to the indenture sought to remove U.S. Bank as the trustee; correct?

A.   Correct.

Q.   U.S. Bank could have resigned as the trustee; right?

A.   Correct.

Q.   But U.S. Bank did not; correct?

A.   We did not.

Q.   And U.S. Bank was never terminated as trustee for any of the Zohar funds; correct?

A.   Correct.



Q.   Did U.S. Bank ever hold notes of the Zohar funds?

A.   No.

Q.   Okay.  Let's go back to the trustee reports.  This is going to be a decent section of my examination.  So we can keep going, we can take a break, whatever you prefer to do.

A.   I'm fine to keep going unless folks want to take a break.

MS. BUCKEL:  We can keep going.

Hopefully by the time you're done, lunch will be here.

MR. KUSNETZ:  There we go.  Works for me.

BY MR. KUSNETZ:

Q.   What is the -- so we talked about trustee reports; right?  There's monthly, Relevance quarterly.  What is the purpose of the trustee reports, to your understanding?

A.   It's to show the investors what's happening in the portfolio.  In a nutshell, that's really it; right?

I'll look through to see what the collateral is, what the performance metrics are.

Q.   What are some of the performance



metrics, to your knowledge?                    Relevance

A.    So my -- there are, I guess, OC, IC tests.  It's a whole list of tests.  I don't know off the top of my head.  But there's a bunch of stuff in that monthly report section that are all testing of some sort of metric that are of interest to investors.

Q.    And did you have any role in the calculation of the OC or IC tests?

A.    No.

Q.    And what department had a role in doing that in U.S. Bank?

A.    That would have been analytics.

Q.    Analytics, okay.

And do you know what the OC test is, sitting here today?

A.    I know what an OC test is.  We could look at the definition of this one, but ...

Q.    What does it refer to, just generally?

A.    An OC test is a -- is a ratio of collateral to debt.

Q.    And what's an IC test?

A.    IC test is a -- shows you the interest that you're receiving versus the



interest that you owe -- you have to pay.

Q.   Understand.  And there are certain thresholds that had to be met with respect to those tests; correct?

A.   Correct.

Q.   And is that common with respect --

A.   Correct.

Q.   -- to CLOs?

A.   Yes.

Q.   Okay.  And this particular CLO involved distressed assets; correct?

A.   I don't -- I don't -- I mean, I don't know if there was a strategy.  I don't know if we called it distressed assets, but I think so.  I don't really know.

Q.   Were you aware of the types of companies that were in the portfolio or the collateral?

A.   I was aware that they were all related to Patriarch in some form or another.

Q.   When you say "related to Patriarch," what do you mean?

A.   They were portfolio companies that were either, I guess, owned or managed by Patriarch Partners in some capacity.



Q.    Okay.

A.    I believe they were all that way.  I don't know if they were all.  I think they were all.

Q.    Understood.  All right.  So let's look at a trustee report.                Relevance

MR. KUSNETZ:  I'll mark this as DeRoss Exhibit 3.

(DeRoss Exhibit 3 marked for identification.)

BY MR. KUSNETZ:

Q.    This is Bates Number PPADV0041278.  This is a trustee report titled monthly report for Zohar II 2005-1 Limited dated as of March 30, 2012.

Do you see that?

A.    Yes.

Q.    Okay.  And do you see on the left, top left it says "U.S. Bank"?

A.    Yes.

Q.    So fair to say U.S. Bank prepared this trustee report for Zohar II?

A.    Yes.

Q.    Okay.  Have you seen trustee reports before in connection with your role at U.S. Bank?



Relevance

A.    Yes.

Q.    And have you seen trustee reports with respect -- from the Zohar funds with respect to your role at U.S. Bank?

A.    For Zohar I, yes.

Q.    Okay.

A.    I have not seen these.  But generally they all look similar.

Q.    Right.  And who determines the format of these reports?

A.    I don't know, honestly.  This format would have been on every -- I mean, this comes from a system that they used at the time.  So the format for every report would have been -- would have looked like this.  The contents would vary, obviously, depending on what's in the indenture.

Q.    But fair to say these trustee reports for the Zohar funds were similar in format to trustee reports from other CLOs that you've worked with during your 20 years of experience?

A.    It's fair to say that, yes.

Q.    Okay.  And so fair to say that the noteholders who received these reports would see that they are consistent in format with reports from other CLOs that those noteholders might be



invested in; correct?

Relevance

MS. MURPHY:  Objection to form.

THE WITNESS:  That U.S. Bank was

trustee for, yes.

BY MR. KUSNETZ:

Q.    Yeah.  Okay.

And what was the program that
generated these trustee reports?

A.    You know, this is -- our Chicago team
had some fancier technology.  I think it was
something called -- yeah, you know, things are
different now.

But I think there was something
called CDO Report Writer that ran in the
background that ran these things.  I don't know.
Don't quote me on that.  But, inevitably, the
data came from CDO Suite.

Q.    From CDO Suite; right?

A.    Right.

Q.    Okay.  And CDO Suite was the -- was
the database that included all of the transaction
information that we discussed earlier; correct?

A.    Correct.

Q.    Okay.  That was the database that you
had access to visually only; correct?



A.    Correct.

Q.    Okay.  And so looking at this report for Zohar II, fair to say it looks similar to the reports you've seen for Zohar I; correct?    Relevance

A.    Correct.

Q.    Okay.  Now, let's walk through it a little bit, just to help me understand it.

Let's turn to the fifth page of this report, which is Bates Number 282.  Okay.  Do you see that the heading on this page is "Coverage and Quality Tests"?

A.    Yes.

Q.    Okay.  And do you see that there's a reference beneath it for interest coverage ratio test and a overcollateralization ratio test?

A.    Yes.

Q.    And these are references to the OC and IC tests that you mentioned earlier?

A.    Yes.

Q.    Okay.  And these coverage of quality tests were also present with respect to Zohar I; correct?

A.    Correct.

Q.    Okay.  And just moving to the left -- to the right side of the page, do you see where



at the top it says, "Prior, Current, Trigger, Max/Min, Result"?

Relevance

A.    Yes.

Q.    Okay.  So the number under "Prior," what does that represent, just generally?

A.    I'm guessing that was from the last report --

Q.    Okay.

A.    -- cycle.

Q.    And under "current," what does that represent?

A.    That, I believe, would be reflective of what's in the numbers in this report.

Q.    Okay.  And "trigger," what does that represent?

A.    That's the limit they need to maintain.

Q.    And that limit is pursuant to the indenture?

A.    Yes.

Q.    Okay.  And then when we see "Max/Min," what does that represent?

A.    I don't know what -- what that means, honestly.

Q.    And "result," what does that mean?



A.   That means that the current is not hitting the trigger, so it's a passing test.

Relevance

Q.   So if the current was beneath the trigger, would that be a fail?

A.   Yes.

Q.   Okay.  Understood.

And it was U.S. Bank whose -- it was the responsibility of U.S. Bank to calculate the IC and OC tests for the Zohar funds; correct?

MS. BUCKEL:  Object to the form.

MS. MURPHY:  Object to the form.

THE WITNESS:  Correct.

BY MR. KUSNETZ:

Q.   And let's look -- there are some other tests beneath it.

Do you see that?

A.   Yes.

Q.   These are the collateral quality test summary.  I know it's hard to read that.

Are you familiar with these tests as well?

A.   Vaguely.  I can't explain to you what each individual one is.  But it's all ratings related.  They're -- you know, it's all averages of ratings.



Relevance

Q.    Okay.  And the weighted average spread test, do you know what that is, for example?

A.    I don't know exactly what it does. But it's -- it's looking at all of the spreads of all of the different pieces of collateral and giving an average.

Q.    Uh-huh.

A.    I'm not sure what it tells you.

Q.    And do you know what the diversity test is, for example?

A.    There are different collateral buckets for ratings.  You know, high, low.  I'm guessing that that's an average of -- of those. I'm not really sure, honestly.  I don't -- I never really got into this -- the weeds of this stuff in my job function.

Q.    Understood.  That was the analytics team; correct?

A.    Yes, sir.

Q.    Okay.  And before producing these trustee reports, U.S. Bank would confirm the accuracy of the IC and OC test calculations; correct?

MS. MURPHY:  Objection to form.



THE WITNESS:  We would confirm it with the manager, yes.

Relevance

BY MR. KUSNETZ:

Q.   So you would, before the report is published, show the results of your calculations to the manager; correct?

A.   Correct.

Q.   When I say "you," I mean U.S. Bank --

A.   Yes, correct.

Q.   -- not you specifically.  Okay.

So just for a clean record, so before the -- each trustee report was published, U.S. Bank would show the collateral manager the results of its calculations of the OC and IC tests; correct?

A.   Correct.

Q.   Okay.  Let's go to page 21, which is Bates Number 41298.  Do you see this is a page titled "Intra Period Collection Account Detail"?

A.   Yes.

Q.   Okay.  What does this page show in general?

A.   This shows -- I'm not sure what this is, interest to principal.  But this is collections coming into the collection account.



These are -- looks like security IDs.  They're not listing out the individual assets.  But Relevance these -- all these - all of these relate to a specific asset.  And these amounts to the right of it are all amounts received during this due period.

Q.    Okay.

A.    Collection period, due period, they call it.

Q.    So let's go down column by column. So security ID, fair to say that's the identification for the particular asset; correct?

A.    I believe so, yes.

Q.    So that could be a loan made by a issuer?

A.    Correct.

Q.    Correct?  Okay.

And then you see there's something that says "payment status."

And underneath in the legend it says "S Scheduled."  Do you know what "S" means with respect to scheduled?

A.    I'm sorry.  Oh, payment.  I -- I'm not sure what that means, honestly.

Q.    Okay.  You see it says "payment



800.211.DEPO (3376)
EsquireSolutions.com

date"?

Relevance

A.   Yes.

Q.   Next column.  Okay.  I'm just going to go column by column.

A.   Oh, okay.

Q.   Okay.  So this indicates a payment was made by this particular security on March 1 of 2012; correct?

A.   Correct.

Q.   Okay.  And then do you see there's a -- the next three columns are all under the heading "Interest"?

A.   Yes.

Q.   Okay.  And there's a "prior balance," "current amounts received," and "ending balance"?

A.   Yes.

Q.   Okay.  Do you know what "prior balance" means?

A.   I'm not sure what -- what that's doing, honestly.

Q.   Fair to say that the total interest collected would be what's the ending balance?

A.   Yes.

Q.   Okay.  And then there's a column -- there are three -- the next three columns are



under the heading --                    Relevance

A.   Oh, I'm sorry.  You know what, prior balance is probably the balance at the end of the last period.  And then it's showing the amounts received in this period and then the ending balance.  Sorry.  That's what that means to me.

Q.   Understood.  And then the next three columns are "principal."

Do you see that?

A.   Yes.

Q.   Okay.  Same thing, "prior balance," "current amounts received," "ending balance."

See that?

A.   Yes.

Q.   Then there's a final column that says "total collected."

Is that interest and principal?

A.   I would -- that's what I would believe it means, yes.

Q.   Okay.  So this was information that was -- sorry.  Withdrawn.

So the collection account detail of interest payments and principal payments, that comes from U.S. Bank's internal records; correct?

A.   Correct.



Q.    That comes from the payments being made directly to U.S. Bank; correct?     Relevance

A.    Correct.

Q.    Okay.  And then U.S. Bank would -- would aggregate that data and put it in the trustee report; correct?

A.    Correct.

Q.    So the purpose of this particular page was to inform the recipients of the trustee reports, such as noteholders, for example, of how much interest and how much principal are being collected?

MS. BUCKEL:  Object to form.

THE WITNESS:  Correct.

BY MR. KUSNETZ:

Q.    And that would be on a monthly basis, quarterly basis; correct?

A.    Right.  I mean, the details of the monthly report, this is probably a requirement to include, but yes.

Q.    Right.  The indenture lays out the types of information --

A.    Yeah.  Yes.

Q.    -- received by the noteholders.  Okay.



So this continues on several pages Relevance listing a number of different security IDs and interest and principal.  Do you see that?

A.   I do.

Q.   Okay.  Let's go to page 26, which is Bates Number ending in 303.

Do you see where it says, "current asset characteristics" at the top?

A.   Yes.

Q.   Okay.  And then it says -- there's two sections.  One for Category 1 and then one for Category 4.  Do you see that?

A.   Yes.

Q.   What does this page depict generally?

A.   This shows the assets that fall under Category 1.  That must be a defined term in the indenture.  Category 4.  This is showing Category 1 and 4 assets that are in the deal.

Q.   Okay.  And are you aware what Category 1 or 4 means?

A.   I don't know specifically what they mean.  I know they're defined in -- actually, they're probably defined in the indenture.  I don't honestly know.

Q.   Okay.  Well, let's look, for example,



at the Zohar I indenture.  I'm going to mark that as DeRoss Exhibit 4.

MS. MURPHY:  I believe it's 1.

MR. KUSNETZ:  Oh, it's 1.  Sorry.

It's 1.  Sorry.  My bad.  Withdrew that.

Just keeping you on your toes.

BY MR. KUSNETZ:

Q.  So go back to Exhibit 1.  Do you have it in front of you?  Yes, that's correct.  I know it says 4 on it.  That's what is confusing me.

A.  Indenture.

Q.  But it says Exhibit DeRoss 1.

A.  Yes, I see that.

Q.  Yeah.  It was previously marked in another case.  If you go to page 304, do you see that there are definitions of each category, Category 1, Category 2, Category 3, and Category 4?

A.  Correct.

Q.  So fair to say the indenture has the definitions of what each category means?

A.  Yes.

Q.  Okay.  You see, for example, that Category 4 is a CDO obligation that is current?

A.  Yes.



Q.   Okay.  So when the trustee report categorizes certain securities as Category 4, it's being categorized as current; correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Well, the categories come from the manager.  So the trustee doesn't make that determination.

BY MR. KUSNETZ:

Q.   Yeah, no, I'm not -- I'm not asking that.  I'm saying --

A.   I think that's yes.

Q.   I'm saying when the trustee report -- oh, you know what, and that was a good clarification.  Let me fix that.

When the trustee report lists those securities under Category 4, it is listing those securities that have been categorized as current; correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  I mean, if that's what this definition says, yes.

BY MR. KUSNETZ:

Q.   Okay.  And it was the collateral manager who made the determinations as to which securities fell into which categories; correct?



A.    Correct.

Q.    Okay.  And it was the trustee report that then disclosed which facilities were in each particular category; correct?

A.    Correct.

Q.    For Zohar III -- sorry, withdrawn.

For Zohar I and II, would it surprise you that they used similar categories, Categories 1 through 4, to categorize the securities?

A.    It wouldn't surprise me.

Q.    Okay.  For Zohar III, the categories were either defaulted, nonperforming, noncurrent, or current.  Are you aware of that?

A.    No, but --

Q.    Okay.  Meaning they did away with the numbers, but they had --

A.    Okay.  Right.  Sorry.

Q.    Okay.  Do you understand that?

A.    I do understand.

Q.    Okay.  I might as well just mark it just so we can show you it.

MR. KUSNETZ:  Mark as DeRoss        Relevance

Exhibit 4 Zohar III trustee report.

MS. MURPHY:  Are we coming back to this one?



MR. KUSNETZ:  We may.

(DeRoss Exhibit 4 marked for identification.)                     Relevance

BY MR. KUSNETZ:

Q.   The Bates Number here is PPADV0045647.  Do you see this is a Zohar III monthly trustee report?

A.   Yes.

Q.   And this is as of January 31, 2012?

A.   Yes.

Q.   This was issued by U.S. Bank; correct?

A.   Correct.

Q.   Just to orient you, let's go to page 22, which is Bates Number ending in 668.

A.   Okay.

Q.   Okay.  And do you see at the top heading it says, "current asset characteristics"?

A.   Yes.

Q.   So what this page is depicting is -- sorry, withdrawn.

What this page is disclosing are the securities that are categorized as current; correct?

MS. MURPHY:  Objection to form.



THE WITNESS:  Current in terms of -- sorry, as in these are the current assets in the portfolio?  Is that what --

BY MR. KUSNETZ:                                    Relevance

Q.   These are the characteristics current assets.  Do you see that?

A.   I do.

Q.   Okay.  And if you go to page 44, which is ending in 690.

A.   690.

Q.   Look at the heading at the top.  This is a list of those investments that are defaulted, noncurrent, and nonperforming.

Do you see that?

A.   I do.

Q.   So we have the defaulted and noncurrent and then we have the current.  Do you see that?

A.   I do.

Q.   Okay.  So instead of calling it Category 4 and Category 1, they're calling it current or --

A.   Okay.

Q.   -- defaulted.  Do you see that?

A.   I see.



Q.    And that's for -- just for Zohar III?

A.    Yes.

Relevance

Q.    Okay.  Do you understand why that change was made?

A.    No.

Q.    Okay.  Okay.  Let's turn back to Zohar II monthly report, which I believe was DeRoss Exhibit 3.

I told you guys we would come back to it.

MS. MURPHY:  Just keeping my stacks. Got to keep my stacks.

MR. KUSNETZ:  I know.

BY MR. KUSNETZ:

Q.    Let's go to page 31, which is Bates Number ending in 308.  Are you there?

A.    I am.  Sorry.

Q.    Okay.  That's totally fine.

All right.  And so this is -- do you see that there are -- this page is divided into Category 1 and Category 4?

A.    Yes.

Q.    Okay.  And do you see the headings are "Funded Balance, Unfunded" -- well, actually, instead of reading all of them, let's go through



each one.                                          Relevance

Do you see where it says "Funded Balance"?

A.    Yes.

Q.    Okay.  What does that refer to?

A.    Some loans could be delayed draw type loans, which means they're not fully funded at close.  And then they'll draw on them as they need cash, is my understanding of how that works. So you'll have a funded and unfunded balance.

Q.    Okay.  And so these numbers depict the funded balance for each of these different securities; correct?

A.    It looks that way, yes.

Q.    Okay.  And then "Unfunded Exposure Balance," what does that mean?

A.    I'm not sure what that means.  Maybe that's the remaining unfunded piece that they can draw possibly.

Q.    Okay.  Do you know what "PIK Balance" refers to?

A.    PIK stands for payment-in-kind, I believe.

Q.    Okay.

A.    I'm not a hundred percent sure what



that does.  I believe if it doesn't pay interest, they'll add that interest to the balance.  So PIKs or CREETs.  I believe that's what that means. Relevance

Q.   And then "Coupon Type," do you know what that means?

A.   Yeah.  These all look like floating. You can have fixed or floating rate coupons.

Q.   And then "Applicable Index"?

A.   Yeah.

Q.   And what is -- what's the significance of having these different indices here?

A.   So these look like -- so LIBOR is a reference -- so it used to be a reference.  So you -- it would look to one month LIBOR in some cases or the six month.  This means -- this tells me that these were monthly payers.  And then six months, semiannual payers.  It usually coincides with that.  I've never seen an eight-month -- it looks like an eight-month payer.  Sorry.  My eyes are just not --

Q.   They are very small.  It's not you.

A.   I guess those are 6s, sorry.

Q.   Okay.



A.   But that tells me which LIBOR the loan agent would look at to calculate the Relevance interest due on that loan.

Q.   Understood.  So "Index Rate," next column, what does that refer to?

A.   I'm not sure what that is, honestly.

Q.   Okay.  And then you see there's a column that says "Spread"?

A.   Yes.

Q.   Okay.  What does that refer to?

A.   That would be the spread over the reference rate.  Again, which, in this case, is LIBOR.  So I would take the LIBOR plus the spread to determine the all-in rate.  I'm not sure how the index rate ties into those.

Q.   And the all-in rate and the cash coupon rates here, this is essentially the interest rate; correct?

A.   Yes.

Q.   Okay.  So if I refer to the interest rate that each security was paying, you'll know I'm referring to that?

A.   Yes.

Q.   Okay.  There's a noncash pay interest rate.  Are you familiar with that?



A.    I'm not sure what that means.

Relevance

Q.    Okay.  And there's a "Payment Frequency" column.  Do you see that?

A.    Yes.

Q.    What does that signify?

A.    That's the frequency in which the, I guess, the loans pay.  So I'm surprised to see a quarterly next to one month.  Maybe that was the terms of that particular loan.  Normally I don't expect that to say "monthly."

Q.    Right.

A.    But --

Q.    And looking down that column, some are quarterly, some are monthly, some are annually.  Do you see that?

A.    Yes.

Q.    Okay.  And, to your knowledge, this information was reflected in all trustee reports; correct?

MS. BUCKEL:  Object to form.

THE WITNESS:  I'm not sure what each requirement -- this is -- seems typical, but I'm not sure of every trustee report. It could have exactly this --

BY MR. KUSNETZ:



Q.   Okay.  No reason to doubt that this information was not --

Relevance

A.   No.

Q.   -- in the trustee reports for Zohar I, II, and III; correct?

A.   Correct.

Q.   Okay.  So what this page does is it tells the noteholder -- discloses to -- withdrawn.

What this section of the trustee report does is discloses to noteholders how much interest is each securities expected to pay and at what frequency; correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Correct.

BY MR. KUSNETZ:

Q.   And it also discloses how much the loan facility has been funded; correct?

A.   Yes.

Q.   Okay.  And the interest payment activity, as we saw on the prior page, is also disclosed in terms of the current collection.

Do you remember -- recall that?

A.   Yes.

Q.   Okay.  So this page says what should



be expected in terms of interest payments for each security.  And then the prior page we looked at looked at what actually was collected; correct?

Relevance

MS. MURPHY:  Objection to form.

THE WITNESS:  Correct.

BY MR. KUSNETZ:

Q.    So noteholders had access to the funded balance amounts of the loan facilities as well as the interest rates that were applied to those same loan facilities as well as the payment frequency for those loan facilities; correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Correct.

BY MR. KUSNETZ:

Q.    And you would agree that with that information a noteholder could calculate the approximate amount of interest that a loan facility owed on a given month or quarter or annual basis?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Objection to form.

BY MR. KUSNETZ:

Q.    Correct?

A.    I would agree, correct.



Q.   Okay.  And by reviewing the interest payment activity, right, of what was currently collected in the reports, the noteholders could determine whether full or partial interest was being paid; correct?

Relevance

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Objection to form.

THE WITNESS:  Correct.

BY MR. KUSNETZ:

Q.   Right.  They would compare that to the information on this page; correct?

A.   Correct.

MS. MURPHY:  Objection to form.

BY MR. KUSNETZ:

Q.   So you agree that noteholders could determine if there was a gap between actual interest payments received and what was due on the interest for that quarter?

MS. MURPHY:  Objection to form.

THE WITNESS:  I believe so, yes.

BY MR. KUSNETZ:

Q.   And for that month or for that year?

MS. MURPHY:  Objection to form.

THE WITNESS:  Correct.

BY MR. KUSNETZ:



Q.   And so we're only talking about what's on the face of these trustee reports; correct?

Relevance

A.   Yes.

Q.   Right.  I'm not talking about any spreadsheets or anything else.  I'm talking about just the trustee reports themselves?

A.   Correct.

Q.   Correct?

So it's fair to say that noteholders could detect any gap in interest payment activity on the face of the trustee reports; correct?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Object to form.

THE WITNESS:  I think so, yes.

BY MR. KUSNETZ:

Q.   Would you have any reason to doubt it?

A.   No.

Q.   Because it would just be a basic math calculation; isn't that correct?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Objection to form.

THE WITNESS:  Correct.

BY MR. KUSNETZ:



Q.   And what would be that math calculation?  How would you take the information on this page to find out what the expected interest payment was?

A.   You could calculate the interest due on this funded balance times the interest rate times, I guess, the days in the period and match that up to what was received.

Q.   Right.  So you would take that, and that's basic math; right?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes, I believe so.

BY MR. KUSNETZ:

Q.   Okay.  And -- well, is it -- it's not --

A.   I believe so.  On its face, I mean, we don't know what's in the underlying credit agreements for these particular that may tell a different story.  But on its face, yes, seems like simple math.

Q.   Right.  And so if you see -- if a noteholder saw that there was a -- if a noteholder could detect that there was a gap between the interest that was received and the interest that was expected, then it can do that



by virtue of looking at the trustee reports;
correct?

          MS. MURPHY:  Objection to form.

          THE WITNESS:  Correct.

BY MR. KUSNETZ:

     Q.   And it wouldn't surprise you that
noteholders have previously testified that they
could detect gaps in interest payments received
versus what was expected by the face of the
trustee reports; correct?

          MS. BUCKEL:  Objection to form.

          THE WITNESS:  It would not surprise
     me.

BY MR. KUSNETZ:

     Q.   And that's because it's true;
correct?

          MS. BUCKEL:  Objection to form.

          MS. MURPHY:  Objection to form.

          THE WITNESS:  Yes, I believe so.

BY MR. KUSNETZ:

     Q.   And so Category 4 are current
obligations; correct?

          MS. MURPHY:  Objection to form.

          THE WITNESS:  I believe so, yes.

BY MR. KUSNETZ:



Q.   Right.  And Category 1 is defaulted obligations; right?

A.   Correct.

Q.   So looking at Category 4, for example, a noteholder could tell from the face of the trustee report that -- what the interest was expected for the Category 4 obligation; correct?

A.   Correct.

Q.   And a noteholder could tell from the face of the trustee report what was -- what interest was received for a Category 4 obligation; correct?

A.   Correct.

Q.   And so if the interest that was received for a Category 4 obligation was lower than what was expected for that period for a Category 4 obligation, a noteholder could tell just from the face of the trustee report that a Category 4 obligation would not be paying full interest for that period; correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Correct.

BY MR. KUSNETZ:

Q.   And, again, that's just from looking at the face of the report and doing basic math;

ESQUIRE
DEPOSITION SOLUTIONS

right?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes.

MR. KUSNETZ:  Okay.  So I think this is a good time to take a break.  Do we know if lunch has arrived?

MS. BUCKEL:  I will go check.

MR. KUSNETZ:  Okay.  Let's go off the record.

THE VIDEOGRAPHER:  Time on the monitor is 12:10 p.m.  We are off the record.

(Recess taken from 12:10 p.m. until 12:58 p.m.)

THE VIDEOGRAPHER:  Time on the monitor is 12:58 p.m.  We are back on the record.

BY MR. KUSNETZ:

Q.  Hi, Mr. DeRoss.  Did you have a nice lunch?

A.  Yes, sir.

Q.  Thank you very much to your counsel for providing lunch.

So we were talking about the trustee reports when we last left off.  Do you recall?

A.  Yes.



Q.   Now, you had referred earlier in your testimony to folks at U.S. Bank working with the collateral manager in terms of comparing calculations and data before publishing the trustee reports; is that correct?

A.   Yes.

Q.   Okay.

THE VIDEOGRAPHER:  Your arm is rubbing against your mic.  There you go.

MR. KUSNETZ:  Okay.  Let me re-ask it in case it's all garbled.

That question is the whole case right there.

THE WITNESS:  Okay, yeah.

MR. KUSNETZ:  Right, Destiny Rose. That's it.

MS. MURPHY:  Yeah.

BY MR. KUSNETZ:

Q.   How did the trustee work with the Relevance collateral manager prior to the publishing of the trustee reports, to your knowledge?

A.   To my knowledge, I wasn't copied on the communications.  But I believe the analyst would send data file over to the manager that had all of the collateral and all of the attributes



and all of the classifications that we had on file from the last report.  And they would -- well, in terms of the categories, they would <span style="color:red">Relevance</span> update her or he, whoever it may be at the time, as to what the new, if any, classifications were.

There are ratings in there.  So I guess any ratings, changes that needed to be made.  Basically they would review the data for anything that didn't agree with their records and shoot it back to our team and we would make the updates and spit out the report.

Q.   So Patriarch had its own records and the trustee had its own records and discrepancies were discussed, if any?

A.   Yes.

Q.   And reconciled; correct?

A.   I believe so, yes.

Q.   Trustee disclosed -- sorry, withdrawn.  The trustee would discuss cash flow activity with the collateral manager?

A.   I mean, we would provide them with the cash activity.  We will --

Q.   And the trustee would provide interest projections to the collateral manager?

A.   We could.  I don't know if that



was -- yeah, I guess on a -- on a nonpayment
date, we would be projecting interest for the IC
test.                                          Relevance

So, yes, we would project out
interest, you know, based on what -- what we had
in our system.

Q.   And you said it a little low, so I
just want to be clear.  You would be projecting
interest for the IC test, you said?

A.   I believe because we would have all
the -- if we were given all the interest
accruals, we would put all the rates in and we
would be able to provide an interest projection
for expected interest to be received.

Q.   Understood.  Okay.  And which
department prepared the interest projections
within U.S. Bank?

A.   So that would be -- again, it's just
updating the system.  That's the deal of the
administration team.

Q.   Right.

A.   They would, you know, take notices
from the agent, populate it into the system, and
update the records for the interest accruals.

Q.   That was in their purview is what



you're saying?

Relevance

A.    Yes.

Q.    Understood.  Okay.  Would you share a draft -- sorry, withdrawn.

Would U.S. Bank share a draft trustee report prepared by U.S. Bank with the collateral manager before the reports were published?

A.    Yes.

Q.    Okay.  And that -- was that done for every trustee report to the best of your knowledge?

A.    Yes.

Q.    And you said "yes" with some emphasis.  Why?

A.    It's typical.  Typical for us to run the report, send it to the manager for approval before it gets published.

Q.    And that's typical of many CLO deals that you've worked on in your 20 years?

A.    It's typical of all of the CLOs that I've worked on, yes.

Q.    Okay.  And what's the purpose of that?

A.    I mean, we consider the manager has the final say in the report.  So we look for that



signoff to publish.

Relevance

Q.    And is it fair to say that in connection with preparing the trustee reports, U.S. Bank relied on information that it was receiving independently of the collateral manager as well as information it was receiving from the collateral manager?

A.    There are certain things independently that we would know as far as collections, money that's hitting the accounts, yes, and we would also rely on information from the collateral manager.

Q.    Understood.  And to the best of your understanding, U.S. Bank received all information that it needed to do its job as the trustee for the responsibilities in the indenture; correct?

A.    I believe so, yes.

Q.    Do you recall any time where U.S. Bank as trustee requested information from the collateral manager that the collateral manager refused to provide?

A.    No.

Q.    So there was never a time, to your knowledge, that Patriarch refused to provide information to the trustee upon the request of



the trustee?                              Relevanc

A.    I don't believe so.

Q.    Would -- would that have stood out to you if that was the case?

A.    Depending on what it was, yes -- I -- I would imagine, in certain circumstances, I don't know what those are, but yes.

Q.    Right.  And it was you who interfaced with Patriarch when they made a books and records request, for example?

A.    Yes, I was -- I was at that meeting.

Q.    Okay.  Patriarch didn't have access to the trustee's internal database; correct?

A.    Correct.

Q.    Did MBIA?

A.    No.

Q.    Did MBIA, after the default, have access to it?

A.    No.

Q.    What about any of the noteholders?

A.    No.

Q.    Who at U.S. Bank, in its role as trustee of the Zohar funds, communicated with folks at the noteholders?

A.    I'm sorry.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Q.   Let me redo the question.  Not a good one.

Who at U.S. Bank would communicate with representatives of the noteholders?

A.   I mean, that would be me, if needed, but I don't recall that ever happening.  Other than Patriarch is holder of the preferred shares and MBIA is holder of the senior notes.

Q.   So it would be you because you're the account manager; correct?

A.   Yes.

Q.   Okay.  And so you've been account manager of the Zohar funds with respect to -- specifically to Zohar I since 2012; correct?

A.   Yes.

Q.   And there's not been one instance that you can recall sitting here today where you've had to communicate with a noteholder directly?

A.   I can't think of anything specific. I know Natixis was involved in one of these transactions -- in the one transaction.  Trying to see if I see them.  Or maybe they were the underwriter.

So I -- no, I think no.  There was a



third party.  I think it was -- might have been the underwriter at the time.  Maybe it was Natixis that used to reach out from time to time. But I didn't have active communications with noteholders.

Q.   Okay.  What would you discuss with Natixis generally?

A.   I forget.  There was a dispute early on in this -- in this transaction that had to do with fee -- unpaid -- a range of fees, if I recall.  I wasn't directly involved in that, but I remember that coming up from time to time.

I don't really remember what the -- I think they may have been owed some -- potentially owed some fees, either from closing or at some point in the life of the deal that they may have thought they never got.  I wasn't involved in it. But I do remember them reaching out for something.  I don't remember what exactly.

Q.   Okay.  And you previously talked about your communications with MBIA in the lead up to the default and then after the default; correct?

A.   Yes.

Q.   Okay.  But prior to this lead up of




the default in Zohar I, you don't recall communicating with people at MBIA in connection with your role as account manager of the Zohar I transaction; correct?

A.   Correct.  I don't remember having any, you know, regular conversations with anybody really, other than the manager from time to time.

Q.   Okay.  Were there any attorneys representing other parties, so not your attorneys that you spoke with, in connection with your work on the Zohar funds?

A.   No.  I mean, there were attorneys that got involved when we went into default and looked at the litigation.  There were attorneys for the issuer that were angry about their bills being unpaid.  So they used to reach out.  But other than that kind of stuff, I don't recall anything.

Q.   So let's break that down a little bit.  So attorneys that got involved when Zohar I got in default.  Attorneys for which entity did you interface with?

A.    I don't remember if it was Maples or Walkers, the -- you know, the Cayman issuer lawyers.



800.211.DEPO (3376)
EsquireSolutions.com

Q.    The Cayman lawyers?

A.    I believe.

Q.    Did you get to go down to Cayman to discuss it with them?

A.    No, I never get to go see them.

Q.    I know, right.

A.    But they were representing the issuer, they were --

Q.    Yeah.

A.    -- providing notices and doing stuff that they do.  And I believe at a liquidation there were a lot of unpaid bills.

Q.    Unpaid bills to whom?

A.    To the law firms that represented the issuer.

Q.    And the issuer was Zohar I?

A.    Yes.

Q.    Okay.  And why would they reach out -- why would these Cayman firms reach out to you about unpaid bills?

A.    Because they know that's where the invoices get sent, and they know that's where the money comes from.  But we don't make the call to release the money.  So that was the conversation.

Q.    Okay.  So who would you refer them



to?

A.    Well, I wouldn't refer them to anyone.  I think at that time the deal had been in default and we needed to wait until we, you know, did a liquidation.  And then that's usually when expenses get paid.

Q.    Understood.  Okay.

Did you -- in connection with the default, were there any other law firms, to your recollection, beyond these Cayman firms that you interfaced with?

A.    I mean, there were a lot of law firms involved.  I don't remember interfacing directly with anyone.  I know there a lot of lawyers involved.

Q.    Did you interface with the lawyers involved with helping the auctioneer put together the auction?

A.    I didn't interface with them directly.  That would -- Alston & Bird would have done that.  But there was a firm -- I can't remember.  But there were other law firms involved in that process.  Our lawyers prepared the auction materials and shared it with them. I'm sure they commented, and then I'm sure there



was back and forth there.  But ...

Q.   But you didn't interface directly, is what you're saying?

A.   No.

Q.   Okay.  That's helpful.

Okay.  And so you said the default, and then you said the litigation.

There were attorneys that got -- withdrawn.

You testified, "I mean, there were attorneys that got involved when we went in default and the litigation."

So what litigation are you referring to exactly?

A.   I guess I'm referring to the liquidation, the litigation surrounding the liquidation.

Q.   Okay.

A.   The auction.  There was lots of law firms involved in that.

Q.   And were there any non-Cayman firms that you recall interfacing with?

A.   Again, I didn't interface directly with them, but there was a firm that represented MBIA, I believe.  There was, you know, a firm



that represented Patriarch.  I don't remember if there were any noteholder lawyers involved.  I don't think so.  But ...

Q.   I'm just going to read a few names of noteholders, and you can tell me yes or no, if you recall interfacing with them at all during your time as account manager for Zohar I.

A.   Okay.

MS. BUCKEL:  Asked and answered.  We went through this before.

MR. KUSNETZ:  I have a few more names I forgot to list.  But I understand your point.

BY MR. KUSNETZ:

Q.   We -- like, for example, we discussed Varde, you said no.

So here's another one, Rabobank?

A.   No.

Q.   Credit Value Partners?

A.   No.

Q.   Halcyon Capital?  Halcyon?

A.   Halcyon.  No.  No, I don't recall those.  The notes were physically registered notes.  I don't remember any of those names on notes.



Q.    Do you remember Goldman Sachs?

A.    Not as a registered owner, no.

Q.    Okay.  So going back to the interactions between the trustee and the collateral manager, you recall that the trustee and the collateral manager would discuss if there were any discrepancies prior to the publishing -- in the data of the trustee reports prior to the publishing of those trustee reports; correct?

A.    Yes.

Q.    Okay.  And that was a common thing to do?

A.    That is a common practice.

Q.    Common to the industry?

A.    Until today, yes.

Q.    Okay.  So let me just show you an example of that, and you can let me know if this is -- if -- I will show you a document.  You will let me know if it's an example.

MR. KUSNETZ:  Let's do DeRoss Exhibit 5.  Bates Number PPADV_0400087.

(DeRoss Exhibit 5 marked for identification.)

MS. BUCKEL:  A long one.

BY MR. KUSNETZ:



Q.   Okay.  It's a long e-mail chain. Don't worry, we're not going to go through the entire one.

Sir, do you see this is an e-mail chain, the first e-mail on the -- in the chain here on the first page, which is actually the last e-mail on the chain, is dated November 4, 2008, and it's sent from Karen Wu and Patriarch to Craig Healy at U.S. Bank and to other folks at Patriarch, as well as Becky N-g at U.S. Bank.

Do you see that?

A.   I do.

Q.   Okay.  And you are not on this e-mail; correct?

A.   Correct.

Q.   Okay.  The subject matter of the e-mail is, "Zohar I September monthly report."

Do you see that?

A.   Yes.

Q.   Okay.  So, first, this was before your time working on the Zohar transaction; correct?

A.   Correct.

Q.   Okay.  And Becky is the individual we previously discussed as being on the analytics



team; correct?

A.   Yes, correct.

Q.   And what about Craig?

A.   I think Craig was analytics.  I haven't heard that -- seen that name in a long time.

Q.   Okay.  And the Zohar I September monthly report, that's a reference to the Zohar I September monthly trustee report; correct?

A.   Correct.

Q.   And looking at this e-mail, do you see that, just at the top, Karen Wu from Patriarch is giving comments or remarks as she uses on the report?

A.   Yes.

Q.   Okay.  And she enumerates there's five different remarks, and she's informing U.S. Bank of what some triggers were, of what some default dates were, all-in rates.

You see that?

A.   Yes.

Q.   Okay.  Is this the type of -- of -- is this -- is this e-mail that you're seeing here representative of the types of communications that the U.S. Bank would have with Patriarch in



terms of resolving discrepancies before publishing a trustee report?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes.  I would believe, yeah.

BY MR. KUSNETZ:

Q.  Yeah.  Nothing -- I mean, this looks like a normal conversation between a trustee and a collateral manager; correct?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Objection to form.

THE WITNESS:  Yes, it does.

BY MR. KUSNETZ:

Q.  Okay.  And looking down from Craig's e-mail to Ed Divgi at Patriarch, D-i-v-g-i, do you see in the second paragraph he says, "In regards to the discrepancies between borrower names, please make sure trade tickets sent over have consistent borrower names.  This would help eliminate these errors when we have new borrowers set up in our system."

Do you see that?

A.  Yes.

Q.  Okay.  So this is Craig from U.S. Bank asking Patriarch to ensure the trade



tickets have consistent borrower names.

Do you see that?

A.   Yes.

Q.   What are the trade tickets again?

MS. MURPHY:  Objection form.

THE WITNESS:  Trade tickets -- sorry. Trade tickets are usually buys and sells of collateral.  I guess it could be changes in restructuring.  But I view that as buys and sells.

BY MR. KUSNETZ:

Q.   Okay.  And then if you go to page 91, you'll see an e-mail from Craig Healy to Karen Wu at Patriarch.  Craig Healy at U.S. Bank to Karen Wu -- sorry, withdrawn.

You'll see an e-mail from Craig Healy at U.S. Bank to Karen Wu of Patriarch, October 29, 2008.  You see that?

A.   Wednesday?

Q.   Yeah.

A.   Yes.

Q.   All right.  Do you see that Craig is sending trustee fee, management fee, and then he's mentioning that a file that -- that you sent, so Patriarch had sent, had some missing



pages.  Do you see that?

A.   Yes.

Q.   Okay.  And then do you see that Karen Wu responds right above it with respect to the missing pages, "Oops.  You're right.  In the first page, two changes we have are best textiles should have spread of 8 percent, not 0 percent."

Do you see that?

A.   Yes.

Q.   Okay.  Is this an example of U.S. Bank pointing out a discrepancy or an issue with the data from Patriarch, for example?

MS. BUCKEL:  Objection.  Form.

THE WITNESS:  It seems that way, yes.

BY MR. KUSNETZ:

Q.   Okay.  So it went both ways. U.S. Bank would point things out and Patriarch would point things out; correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes.

BY MR. KUSNETZ:

Q.   Okay.  And this was to work together to provide an accurate trustee report; correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes.



BY MR. KUSNETZ:

Q.   And this process happened every month before the monthly trustee report was published; correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes.

BY MR. KUSNETZ:

Q.   And this happened every quarter before the quarterly trustee report; correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes.

BY MR. KUSNETZ:

Q.   All right.  And the goal here was to ensure the trustee and the collateral manager had consistent, accurate data; correct?

MR. KUSNETZ:  Objection to form.

THE WITNESS:  Correct.

BY MR. KUSNETZ:

Q.   To your knowledge, did the trustee ever miss a quarter with respect to publishing a quarterly report?

A.   I don't believe so.

Q.   To your knowledge, did the trustee ever miss a month in publishing its monthly report?



A.    I'm not aware of any.

Q.    Okay.  Trying to be as efficient as possible.

MS. MURPHY:  There's still time for barbecue.

MR. KUSNETZ:  That sounds true.  It was a good lunch though, so I don't know if I have room for barbecue.  But I guess there is always room for barbecue, especially in the Carolinas.

BY MR. KUSNETZ:

Q.    Okay.

A.    Are you finished with this e-mail exchange?

Q.    I am finished with that e-mail exchange.  You can put it aside.

So in terms of the collateral manager, you agree that the indenture provided the collateral manager with discretion to make certain decisions; correct?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Object to form.

THE WITNESS:  I believe the management agreement does that, but yes.  The -- in theory, I guess, yes, I agree



with that.

BY MR. KUSNETZ:

Q.   I mean, is it -- would it be standard for there to be in trustee -- sorry, withdrawn.

Let's look at an indenture.  And just so that we're not dealing with hypotheticals.

MS. MURPHY:  Same one or do --

MR. KUSNETZ:  Going to do -- let's see.  It's going to be a new indenture.

Just to cover it.  This is indenture for among Zohar III Limited and the Bates Number is PPADV0027151.  And this will be marked as DeRoss Exhibit 6.

(DeRoss Exhibit 6 marked for identification.)

BY MR. KUSNETZ:

Q.   So we previously looked at the indenture for Zohar I, for example, do you recall that?

A.   Yes.

Q.   This is the indenture for Zohar III? Does it look like that to you?

A.   It does.

Q.   Okay.  And you see that the trustee here is LaSalle?



A.   Yes.

Q.   Okay.  And as we previously discussed, that's -- at one point LaSalle -- at one point U.S. Bank transitioned to being the trustee in acquiring a business of LaSalle; correct?

A.   Correct.

Q.   Okay.  And you see that this is dated April 6, 2007?

A.   Yes.

Q.   Okay.  Now, looking at -- let's -- Article 7, which is covenants, and that starts on page 123.  I want to direct you to page 128, Relevance which is Section 7.7(a) of the indenture.

MS. MURPHY:  Sorry, 128?

MS. LOPEZ:  Page at the top.

MR. KUSNETZ:  Oh, yeah, at the top?

MS. MURPHY:  Different page numbers at the top and bottom.

MR. KUSNETZ:  Yeah.

MS. LOPEZ:  At the top.

MR. KUSNETZ:  Sorry.

MS. BUCKEL:  What's the Bates Number?

MR. KUSNETZ:  The Bates Number is ending in 27284.



BY MR. KUSNETZ:

Q.   Do you recall -- withdrawn.

Relevance

It states here in Section 7.7(a), "Zohar obligors, or the collateral manager on behalf of such person, may, without the consent of the holders of any notes, enter into any amendment, forbearance or waiver of or supplement to any underlying instrument, included in the collateral, so long as such amendment, forbearance, waiver or supplement does not contravene the provisions of any transaction document or contravene any applicable law or regulation."

Do you see that?

A.   I do.

Q.   Now, does this say that without the consent of the noteholders, Patriarch as collateral manager may enter into any agreement, forbearance or waiver or supplement to any instrument in the collateral?

MS. BUCKEL:  Objection to form.

MS. MURPHY:  Objection to form.

THE WITNESS:  I believe the words do say that.

BY MR. KUSNETZ:



Q.   Okay.  And that provides -- that is an example of the collateral manager having Relevance discretion under the terms of the indenture to enter into amendments, forbearance, waivers or supplements?

MS. BUCKEL:  Objection to form.

MS. MURPHY:  Objection to form.

THE WITNESS:  Correct.

BY MR. KUSNETZ:

Q.   And if you look at the next sentence, it says, "For the avoidance of doubt and notwithstanding anything else contained herein, the parties hereto acknowledge and agree that the collateral will consist of stressed and distressed loans that may be the subject of extensive amendment workout structuring and/or other negotiations.  And as a consequence thereof, the issuer or the Zohar subsidiary may receive by way of amendments, modifications, and exchanges and/or supplements to such collateral, equity kickers, exchange securities and/or the relevant underlying interests in loans, debt securities, letters of credit or leases that do not satisfy the provisions of the definition of collateral investment and/or the eligibility



criteria."                                          Relevance

Do you see that?

A.   Yes.

Q.   Okay.  So does this refresh your recollection that the Zohar funds had -- that the collateral -- withdrawn.

Does this refresh your recollection that the collateral of the Zohar funds consisted of stressed and distressed loans?

A.   It does.

Q.   Any reason to believe that the collateral of Zohar I consisted of anything other than stressed or distressed loans?

A.   No.

Q.   Same thing with Zohar II?

A.   If this provision exists there, I would not doubt that it -- it were true.

Q.   Okay.  And what this provision does is when it says "for the avoidance of doubt" what's your understanding of that language?

MS. MURPHY:  Objection to form.

THE WITNESS:  To make it clear.

BY MR. KUSNETZ:

Q.   So what the indenture does in 7.7(a) is it makes it clear to all the parties that the



collateral consists of stressed and distressed loans; correct?

Relevance

MS. MURPHY:  Objection.  Form.

MS. BUCKEL:  Objection.  Form.

THE WITNESS:  Correct.

BY MR. KUSNETZ:

Q.  It makes clear -- sorry.

And the indenture in 7.7(a) makes clear to all the parties that this collateral of stress and distressed loans may be subject of extensive amendment work out restructuring and/or other negotiations; correct?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Objection to form.

THE WITNESS:  Yes.

BY MR. KUSNETZ:

Q.  So fair to say that the stressed and distressed loans were -- withdrawn.

So fair to say that 7.7(a) is informing the parties to this indenture that the stressed and distressed loans are not always going to be static; correct?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Objection to form.

THE WITNESS:  Yes, correct.



BY MR. KUSNETZ:                                    Relevance

Q.   Right.  And it's the collateral manager, who is Patriarch in this instance, who has the discretion to amend, forebear, waive or supplement these loans; correct?

A.   Correct.

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Objection to form.

BY MR. KUSNETZ:

Q.   And U.S. Bank was aware that loans were amended, there was forbearance and there were waiver of terms?

MS. BUCKEL:  Objection to form.

BY MR. KUSNETZ:

Q.   Correct?

MS. BUCKEL:  Objection to form.

MS. MURPHY:  Objection to form.

THE WITNESS:  U.S. Bank received -- I think they would call them change orders, to update collateral attributes, change rates.  So, you know, yes, I believe that's what that was accomplishing.

BY MR. KUSNETZ:

Q.   Okay.  So U.S. Bank was aware, through the information that was provided it,



that there were extensive amendments, work-out restructuring or negotiations with respect to the collateral of stressed and distressed loans; correct?

Relevance

MS. MURPHY:  Objection --

MS. BUCKEL:  Objection to form.

MS. MURPHY:  Objection to form.

MS. BUCKEL:  That was a misstatement.

THE WITNESS:  Yes.

BY MR. KUSNETZ:

        Q.    Okay.  Do you understand my question?

        A.    I do.  I do.  It's -- it's the changes that they were making to the -- to the underlying loan.

        Q.    Was disclosed to U.S. Bank; correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Well, I don't know if anybody -- if they said, hey, we're doing this under Section 7.7.  They would just say we're the agent, here's some new data to put into the system.

BY MR. KUSNETZ:

        Q.    And the new data could be a work out --

        A.    Correct.



Q.    -- or a revision or an amendment; correct?                              Relevance

A.    Correct.

MS. MURPHY:  Objection to form.

BY MR. KUSNETZ:

Q.    Okay.

MS. BUCKEL:  And just for the record, when you're referring to U.S. Bank, it's U.S. Bank as trustee?

MR. KUSNETZ:  Yes, as trustee.

BY MR. KUSNETZ:

Q.    Do you know what obligations the trustee had in the face of events of default?

MS. MURPHY:  Objection.  Form.

THE WITNESS:  Not off the top of my head, but Section 5.5 usually, somewhere around there, I think.

BY MR. KUSNETZ:

Q.    That's pretty close.  That's pretty go.  Let's go to Section 5.  So you're in the right ballpark for sure.  That's page 100 at the top, but it's -- at the bottom the Bates is 27256.

Okay.  So do you see Article 5 is "Events of Default; Remedies"?



A.    Yes.

Q.    Okay.  So fair to say you guessed right that it was Article 5?

A.    I knew it was Section 5, somewhere.

Q.    There you go.

And "Event of Default" is defined here in the indenture in several ways.

Do you see that?

A.    I do.

Q.    So there are several different events that could constitute an event of default; correct?

A.    Correct.

Q.    Okay.  And so one of them is, if you look at E, an event of default could mean, "default in the performance or breach of any covenant or agreement of any Zohar obligor in this indenture," in parentheses, "other than the covenant to satisfy any of the collateral quality tests, any of the Class A coverage tests or the failure of any Zohar obligor to comply with any other covenant or agreement for which another remedy or consequence is provided by this Section 5.1."

Do you see that?



A.   Yes.

Q.   Okay.  And then it continues, "Or in any note purchase agreement or the failure of any representation or warranty of any Zohar obligor made in this indenture."

Do you see that?

A.   Yes.

Q.   Okay.  It continues -- let's see --

Okay.  And do you see in the middle of the paragraph it says, "and the continuation of such default, breach or failure for a period of 30 days after any of the issuer, co-issuer, Zohar subsidiary or the collateral manager have actual knowledge thereof or after notice thereof shall be given by the registered or certified mail or overnight courier to the Zohar obligors and the collateral manager by the trustee or to the co-issuers, the collateral manager and the trustee by the controlling class."

Do you see that?

A.   Yes.

MS. MURPHY:  You said "shall be given" and it's "have been given."

MR. KUSNETZ:  "Have been given."

Thank you for the correction.

BY MR. KUSNETZ:

Q.    "Specifying such default, breach or failure, and requiring it to be remedied and stating that such notice is a" -- in quotes, "notice of default" -- closed quotes, "hereunder," semicolon.

Do you see that?

A.    Yes.

Q.    Okay.  So there is an obligation here on the trustee to issue a notice of default.  Do you see that?

Relevance

A.    Yes.

Q.    Okay.  And was that part of your responsibility at U.S. Bank?

A.    I would have sent the notice.

Q.    Okay.  And would the notice of default specify the event that qualifies as the default?

A.    Yes.

Q.    Okay.  And as we discussed, U.S. Bank, as trustee of the Zohar funds, were aware from the face of the trustee reports, for example, of partial interest payments; correct?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Objection to form.



THE WITNESS:  Correct.                Relevance

BY MR. KUSNETZ:

Q.   And the trustee did not consider those partial interest payments events of default that would require notice of default under Article 5; correct?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Objection to form.

THE WITNESS:  Correct.

BY MR. KUSNETZ:

Q.   All right.  So after there were partial interest payments made by the loans to the trustee, the trustee did not issue notices of default; correct?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Objection to form.

THE WITNESS:  Correct.

BY MR. KUSNETZ:

Q.   And after there were deferrals of interest payments, for example, the trustee did not consider those to be events of default that would require a notice of default be issued; correct?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Objection to form.



THE WITNESS:  Correct.                    Relevance

BY MR. KUSNETZ:

Q.    And you don't recall, in your role as account manager with the responsibility of sending out notices -- notices of default, sending a notice of default for partial interest payments or deferrals of interest payments; correct?

A.    Correct.

MS. BUCKEL:  Objection to form.

BY MR. KUSNETZ:

Q.    And that's because the collateral manager had the discretion to do that; correct?

A.    I believe so, yes.

MS. MURPHY:  Objection to form.

BY MR. KUSNETZ:

Q.    Okay.  Now, let's talk about loan categorization.  So, again, the collateral manager made the determination as to whether the loan would be categorized as 1, 2, 3, or 4 in Zohar I or II or as current, performing, noncurrent, nonperforming in Zohar III; correct?

A.    Correct.

Q.    That was not U.S. Bank?

A.    Correct.



Q.    Okay.  And so just to put a pin in this, you don't recall in your role as account manager at -- actually, withdrawn.

The trustee did not consider the categorization of a loan as Category 4, which was current, even though that same loan had made a partial interest payment to be an event of default; correct?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Objection to form.

THE WITNESS:  Correct.

BY MR. KUSNETZ:

Q.    Right.  You didn't -- if there was a partial interest payment made by a loan and that loan was categorized as Category 4 by Patriarch, the trustee did not consider that an event of default, that would necessitate a notice of default; correct?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Objection to form.

THE WITNESS:  Right.  I mean, we're talking about defaults on an underlying loan and not necessarily on the CLO; right?

BY MR. KUSNETZ:



Q.   Or on the -- I'm talking about defaults, generally, in terms of --

A.   Yeah.

Q.   -- the performance, breach or covenant of any of the Zohar parties.

A.   Okay.  I see.  Yes.

Q.   So just to be clear, if there was a partial interest payment made by a loan that had been category -- that had been categorized as Category 4 by Patriarch, that -- the trustee did not consider that to be a default; correct?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Objection to form.

THE WITNESS:  Correct.

BY MR. KUSNETZ:

Q.   Did MBIA ever direct the trustee to send a notice of default for the incorrect categorization of loans?

A.   No, not that I'm aware of.

Q.   Did any of the noteholders direct the trustee to send a notice of default for incorrect categorization of loans?

A.   Not to my knowledge.

Q.   And it was you, sir, as the account manager who was in charge of sending out notices



of default; correct?

A.    Correct.

Q.    So if there was, you would have heard about it; correct?

A.    Correct.

Q.    Okay.  Let's move on to another section.  Mr. DeRoss, did you bring reading glasses today?

A.    No, I don't wear reading glasses.

Q.    I'm about to test your eye skills.

A.    My eyes are the other.  I need distance.

Q.    I'm going to show you what's been marked as DeRoss Exhibit 7.

(DeRoss Exhibit 7 marked for identification.)

MR. KUSNETZ:  The Bates Number is PPDEL2-000332953.  Okay.  I represent to you that this document is an Excel file produced natively to us.  And so this is a printout of it.

And then, Ana, what was this again.

MS. LOPEZ:  Basically like a non-long version of it.

MR. KUSNETZ:  This is a bigger font.



MS. LOPEZ:  Yeah, exactly.

MR. KUSNETZ:  This is larger font.

BY MR. KUSNETZ:

Q.   But according to your sworn testimony, you don't need reading glasses so you should be able to read.

MS. MURPHY:  Do you have larger font for the rest of us?  Thank goodness.

MR. KUSNETZ:  Can I just get a copy? You can see what my copy looks like.

BY MR. KUSNETZ:

Q.   Mr. DeRoss, why don't you look at it for just a second.

A.   I see it.

Q.   I'm going to represent to you, Mr. DeRoss, that the metadata for this particular spreadsheet indicates that it was created in December 2009.  Do you have any reason to disagree with that?

Relevance

A.   No.

Q.   Okay.  Do you recognize this document?

A.   This looks like a data file, what we would call a data file or an extract from CDO Suite.



Q.   And this is prepared by U.S. Bank through CDO Suite software --

Relevance

A.   Yes.

Q.   -- correct?

A.   Yes.

Q.   And, colloquially, it's called a data file within U.S. Bank?

A.   Extract, data file.  I just call them data file.

Q.   Okay.  So this data file reflects a number of things.  Describe generally what you think this reflects.

A.   It reflects asset level detail, you know, names of the obligors, it's got some identifications.  I see contract amounts, which are outstanding.  It looks like there's rates in there and spreads and start and finish dates.  It looks like those -- probably accrual periods. Cash amounts.

I see, you know, spreads and -- is that -- LIBOR information, funded, unfunded, a basic data file.  This was what I would expect to see on here.

Q.   Okay.  This is a standard format of an extract that comes from CDO Suite?


DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

A.   Yeah.  I mean, some of them are quite larger.  I mean, there's -- there's -- this looks like a lot of data points.  And there were probably more somewhere.  I don't know.  But ...

Q.   Okay.

A.   This is --

Q.   But you -- I mean, you would recognize this as a --

A.   Typical extract.

Q.   -- data file?

A.   Yeah.  This looks like typically data extract file.

Q.   Looking at the headings.  If you go, I want to say, towards the left, just off the middle, there's a heading that says "contract interest received."

Do you see that?

A.   Maybe.  Where are you about?

Q.   Here on the -- did I say left or right?  I think I might have said left.

MS. MURPHY:  You said left.

BY MR. KUSNETZ:

Q.   All right.  Well, hopefully the court reporter will expunge that as evidence I don't know my left and right.  Let's withdraw that and



let's start over.

If you go to the right side of the page, and it's close to the center, there's a column that's titled "contract interest received."

Relevance

Do you see that?

A.    Yes.  Yes, I found it.

Q.    Okay.  What does that refer to?

A.    It looks like that's interest that was received on a particular contract as of a specific date range, possibly.  I'm trying to see the date ranges.  I don't know if it's a specific date range or as of a date.

Q.    And one of the columns here, the one next to it, for example, says, "Contract next payment date."  Right?

A.    Yes.

Q.    Okay.  And as we -- and if you look to the right, there's a column that says "contract interest due" --

A.    Yes.

Q.    -- "month."  Do you see that?

A.    I do.

Q.    Okay.  And do you see that there's a bunch of numbers underneath that?


ESQUIRE
DEPOSITION SOLUTIONS

A.   Yes.

Q.   So what does that column refer to?

Relevance

A.   To me, that looks like interest that's due on all these various contracts, which contracts are assets, obligors for this.

Q.   Okay.  And so -- and just to make it larger, if you look at this page, this is -- they're not numbered.  The one that says "contract interest" due at the top.  It's almost the last one.  This is a blown-up version of these two columns here.

A.   Is that this?

Q.   Yeah.

A.   What page are you looking at?

Q.   They're not labeled because it's from a spreadsheet.

A.   Okay, sorry.

Q.   But we blew it up.  It's toward the back.

A.   Which -- I'm sorry --

Q.   It says "contract interest received," "contract interest due."

Those are the columns that I'm referring to.

MS. BUCKEL:  Do you want --



THE WITNESS:  You got it.  All right. Sorry.  Thank you.  Got it.

MR. KUSNETZ:  Okay.  For the record, Counsel provided him with the page.  No objection to that, for sure.

BY MR. KUSNETZ:

Q.  So now that you can see this better, what are these two columns telling you, "contract interest received" and "contract interest due"?

A.  Well, exactly what it says.  I mean, it looks like there's a receivable column that shows what's due, and there's a column that tells what, as of whatever date this is, has been received thus far.  I think that's what it tells me.

Q.  Okay.  So this data file, which is an extract from the CDO Suite software used by U.S. Bank shows interest received, interest due, and disparities as well; correct?

A.  I think so.  I don't know what this particular report is, you know, what date it was run.  I don't know what it really was trying to do.  But, yes, that's what it seems to show.

Q.  Okay.  And this is the data on interest received and interest due that U.S. Bank

Relevance



kept in the regular course of its business;

correct?

Relevance

        A.   Yes.

             MS. MURPHY:   Objection to form.

BY MR. KUSNETZ:

        Q.   Okay.  And this data file was used to

prepare the trustee reports; correct?

             MS. BUCKEL:   Objection to form.

             THE WITNESS:   The reports are pulled

        from this data, yes.

BY MR. KUSNETZ:

        Q.   Right.  So the -- so --

        A.   This is behind the scenes.

        Q.   Okay.  That's fair to say.  So fair

to say so that the data file that we're looking

at here is an example of the data file that

supplies the information to the trustee report;

correct?

        A.   Correct.

        Q.   Okay.  Such as the interest received

and interest due; correct?

        A.   Correct.

        Q.   Okay.  And again, this was created in

the ordinary course of U.S. Bank's business?

This wasn't bespoke in any way; correct?



MS. MURPHY:  Objection to form.

MS. BUCKEL:  Objection to form.

THE WITNESS:  Correct.  These are run -- you know, they run them all the time, I guess.

Relevance

BY MR. KUSNETZ:

Q.   Okay.  And would U.S. Bank share these data file extracts with Patriarch's -- with Patriarch, the collateral manager?

A.   I assume that they would send them. I don't really know if they would look at these. But certainly these are sent to collateral managers.  And there -- these data files are posted to the trustee report website in conjunction with the report for investors.

Q.   Yeah.  So let's -- so --

A.   The raw data essentially.

Q.   So this raw data was provided to noteholders; correct?

A.   These are usually posted to the website in conjunction with the report.  So I don't know if this particular one was, but yes. But it's typical.

Q.   These data file extracts which support the numbers in the trustee report would



be posted and available to noteholders?

Relevance

A.    Yes.

Q.    Correct?

MS. MURPHY:  Objection to form.

Okay.

BY MR. KUSNETZ:

Q.    Okay.  And that what was a regular thing, that wasn't just random occasions; correct?

A.    Correct.

Q.    Okay.  So noteholders regularly had access to these data files that showed interest received and interest due; correct?

A.    Correct.

Q.    Okay.  And if a noteholder for some reason couldn't access this data file, they could have requested it from the trustee; correct?

A.    Correct.

Q.    This would be part of the books and records that we discussed; correct?

A.    Noteholders are entitled to access to their website.  So I don't know if that's a books and records thing.  But we would grant noteholders access to the website if they requested it and they could prove they are a



holder, yes.

Relevance

Q.   Yeah.  But even beyond that, like, let's say they couldn't access the website, I'm saying if they wanted to deal with Patriarch, they would just come in and look at --

A.   I'm sorry.

Q.   -- the data?

A.   Yes.

Q.   So just for a clear record.  If a noteholder wanted to request the books and records from the trustee, as we previously discussed, this was one of the pieces of data that would have been available to them; correct?

A.   Yes.

Q.   And, again, you don't recall a noteholder during your entire time as account manager for Zohar I ever requesting this particular data; correct?

A.   Correct.

Q.   Right.  I mean, they didn't need to because they kind of had it; right?

MS. MURPHY:  Objection to form.

THE WITNESS:  If they had access to the website, they would have that access --



BY MR. KUSNETZ:                                    Relevance

Q.   So if the noteholder had access to the website, they would have had this anyways; correct?

A.   Yes.

Q.   All right.  Let's move on to a different document.

MS. MURPHY:  Before we move on.  You represented this was from December 2009, and I can't find that in the metadata.

Could you tell me what metadata you're looking at?

MS. LOPEZ:  The sheet name.

MS. MURPHY:  Yeah.  So the primary date time is January 2009 for this document.

MR. KUSNETZ:  January 2009?

MS. MURPHY:  Yeah.

MS. LOPEZ:  The sheet name says December 2009.

MS. MURPHY:  I see that it says 2009-012.  I will just flag, for the record, I think.  I'm not sure this is from December 2009.

BY MR. KUSNETZ:



Q.   So just so the witness understands, counsel for the trust is saying that perhaps this data file is from January 2009 and not December 2009.

Relevance

Do you understand that?

Does that change any of your answers that you just gave just now?

A.   No.

Q.   Okay.  Because, again, this is a standard data file extract; correct?

A.    That's right.  I don't know what this -- what report this relates to, but this is what an extract would look like.

Q.   Right.

A.   Are you finished with this?

Q.   We're finished with this one.  You passed the eye exam.

A.   I'm assuming people don't actually look at those and they feed them into the systems.

Q.   Why -- okay.

So, Mr. DeRoss, who would be sending these daily extracts from U.S. Bank to Patriarch, for example?

A.   That would come from analytics.



Q.   Like Becky, for example?

A.   Yes.

Q.   Okay.  What are cash flow reports?

A.   I don't -- I don't know.  Other than, like, there's the transactional activity is the only thing I can think of that would fit that.

Q.   Or a cash sheet?

A.   Cash sheet.  There's a daily cash sheet with all the activity in the accounts that used to go out.

Q.   Okay.  Tell me more about the cash sheet.

A.   Cash sheet is just a list of the accounts and all the activity that happened in it.  They were run daily, and it shows priority balance.  Similar to what we saw in the report. It just shows all the cash activity in and out of the accounts.

Q.   And that was data that U.S. Bank had that it -- that it disclosed to Patriarch on a daily basis?

A.   Yes.

Q.   Okay.  And is that -- was that a normal and ordinary function of U.S. Bank being trustee to the Zohar funds?



A.    Yes.

Q.    Okay.  And that was a normal -- is that a normal expectation in the world of CLOs and --

A.    Every deal has a cash sheet.

Q.    Okay.  So I'm --

MR. KUSNETZ:  Are we ready to show the document?

BY MR. KUSNETZ:

Q.    Okay.  So I'm going to show you what's going to be marked as DeRoss Exhibit 8. It is an e-mail.

MS. LOPEZ:  This is an e-mail.  We have one hard copy this.

MR. KUSNETZ:  Don't worry.  We're not going to look -- we're not going to go through the hard copy.  I just want to show you it.  Okay.  But this is -- we didn't want to kill too many trees, just one entire tree.  This would have been a forest.

MS. LOPEZ:  I will e-mail you the document.

BY MR. KUSNETZ:

Q.    Bates Numbers PPINT_00004689.  Okay.


800.211.DEPO (3376)
EsquireSolutions.com

And this is an e-mail that's sent from Ria Newton, R-i-a, N-e-w-t-o-n, at U.S. Bank to Guillaume Fillebeen, G-u-i-l-l-a-u-m-e, F-i-l-l-e-b-e-e-n, at Patriarch, CC'ing Becky from U.S. Bank.

(DeRoss Exhibit 8 marked for identification.)

THE WITNESS:  I hadn't seen that name in years.

BY MR. KUSNETZ:

Q.  Which name did you -- have you not seen in years?

A.  I used to call him Guillaume.  Your pronunciation is --

Q.  You call him Guillaume?  That's the New Yorker in you, I think.

A.  Yeah.

Q.  Okay.  So hold on one second.  Let me get my copy.

Okay.  So Ria Newton, who's that?

A.  So Ria still works with the bank. She was a deal administrator at this time.  She now works on what we call a review team, which is behind the scenes compliance and support.  Ria is still around.



Q.    Okay.  And Becky, that's who's on the analytics team you discussed previously, CC'd?

A.    Yes.

Q.    Now, something called daily extracts is CC'd as well.  Do you know what that is?

A.    I don't know if they're referring to the extracts, that one that we just looked at, or these cash sheets.

Q.    Well, it's actually -- it's a Listserv.  If you look at the document directly below, there's a -- sorry, the e-mail directly before, from Guillaume Fillebeen, it says, "CC: Daily Extracts, dailyextract@Patriarchpartners.com."

Do you see that?

A.    Oh, I do see that.  I don't know what that is.

Q.    That's fine.

A.    But I'm assuming that's the group that gets -- they probably created a group to get the daily cash sheets.

Q.    Okay.  Ria e-mails Guillaume from Patriarch.  This is January 7, 2016.  A attachment that's "Zohar_CCS.XL."

Do you see that?



800.211.DEPO (3376)
EsquireSolutions.com

A.   Yes.

Q.   Okay.  If I represent to you that that monstrosity that you're seeing underneath the e-mail, that is, for the record, 3, 4 inches high --

A.   I remember.

Q.   -- is the -- is the attachment.

A.   Yeah.  This is old school.

Q.   But we did new school for them.  We just e-mailed it to them.

Do you see Ria writes, "Hi.  Please see update cash sheet with December 31 activity"?

A.   Yes.

Q.   Okay.  So what do you understand that sentence to mean?  Obviously, you're not included on this e-mail.  But just by your -- by your general knowledge.

A.   I think this was a running spreadsheet that we used to keep.  And it just listed all the cash -- she was probably updating this manually.  Well, no, I'm sorry.  That can't be right.  This must -- this must be a dump from SEI, which is the cash system.

Q.   SCI?

A.   SEI.



Q.   SEI.  Okay.

A.   Which is different from CDO Suite. This is actually where the cash accounts are held.  Actually bank accounts.

Q.   Okay.

A.   So although we mirror those in CDO Suite, this is -- they are actually on a bank, you know, non, you know, that's a bank system.

Q.   Not related to SEI, the noteholder; correct?

A.   Right.

Q.   Okay.  Because that would be a whole other --

A.   No, it's not.  This is an old cash database --

Q.   Okay.

A.   -- that lots of banks probably used.

Q.   Okay.  But looking at this -- this seems like -- this appears to be a standard cash sheet?

A.   This is a running cash sheet, yes, sir.  I see all the accounts listed here and all the transactions, descriptions, and dates.

Q.   Okay.  And this was common -- documents like this, this cash sheet, were sent



in the ordinary course of business every day to Patriarch; is that correct?

A.   Yes.

Q.   Okay.  And -- okay.  And this would be updated -- these cash sheets would be updated by the trustee and then sent to Patriarch on a daily basis; correct?

A.   These -- nobody should be updating these, other than taking in the cash that's coming into the accounts.  This is just a dump of what's -- the activity in the accounts.  Nobody is typing this in.  I don't know if that's what you were asking.

Q.   No.  I was asking -- I was just basically saying that this was update -- these cash sheets are updated on U.S. Bank's end in and then sent to Patriarch on a daily basis?

A.   Right.  These run every day, and they're sent every day.

Q.   Okay.

A.   They don't look like this anymore.

Q.   And this would allow Patriarch to confirm -- or actually withdrawn.

These cash sheets sent by the trustee would allow Patriarch to reconcile the cash



information here with Patriarch's own records; correct?

A.    Yes.  This is showing them all of the cash activity that's happening in the accounts.

Q.    Okay.  And this is an example of that Patriarch trust reconciliation process that occurred on a daily basis; correct?

A.    Yeah.  Yes.

Q.    Okay.  You can put that aside.

If you recall on the trustee reports, there were security IDs which, as we discussed, reflected the specific loans at issue.

A.    Yes.

Q.    Correct?  Okay.

Do you recall if there was a key that -- that defined what each of those security IDs referred to?

A.    I -- there must be on the main setup screen or somewhere, when they're setting up those loans.  There must be -- I don't understand why -- I think that's common in some reports where they leave out the names of the assets.  I didn't know -- I don't think that happened to Zohar I, honestly.  But there must be a key somewhere or was at some point.



Q.    Would it surprise you if that key was available to noteholders?

MS. MURPHY:  Objection to form.

THE WITNESS:  I don't know.  I don't know why it wouldn't be, but I just don't know why they listed a key there instead of the asset name.

BY MR. KUSNETZ:

Q.    Okay.  And do you know -- withdrawn.

The website that you discussed previously, the trustee website --

A.    Yes.

Q.    -- is there a formal name for it?

A.    We call it Pivot now.

Q.    Pivot Now?

A.    We call it Pivot now.  It used to be called something else.  It's called Pivot.

Q.    It's called Pivot?

A.    Yeah.

Q.    Not Pivot Now?

A.    No.

Q.    Do you recall what it was called between 2012 and 2020?

A.    I think it was called Trust Now Essentials years ago.  It's evolved over a long



period of time.

Q.   Okay.  Is it a standard website used by trustees for multiple types of CLOs?

A.   Most CLO trustees and other product types have similar websites.  I don't know if it's a standard one.  But, yeah, it's common in the marketplace for trustees to make these types of reports and information available through a similar system.

Q.   What's the purpose of having this website?

A.   So you don't have to e-mail reports out to investors and you can post, you know, lots of information out there and -- I don't know. It's a -- it's a nice place to be able to park data that investors, and rating agencies, or whoever wants to see it.

Q.   So it's a convenient way for noteholders to have on demand access to important information regarding the Zohar funds; correct?

MS. BUCKEL:  Object to form.

THE WITNESS:  Yes, I would agree with that.

BY MR. KUSNETZ:

Q.   Okay.  So the website that we just



discussed provided noteholder with on demand access to detailed information regarding interests received and interests expected; correct?

MS. MURPHY:  Object to form.

MS. BUCKEL:  Object to form.

THE WITNESS:  In the reports.  It wasn't -- like, there wasn't a place where they can go and see like real-time activity on the -- these cash sheets are not posted there.  But information in the reports and a lot of the cash activity was there.

BY MR. KUSNETZ:

Q.   Not the cash sheet, but the -

A.   The monthly report.

Q.   The monthly report, but also the data file extract; correct?

A.   Yes.

Q.   All right.  And as we discussed, the data file extract had those columns regarding interests?

Relevance

A.   Yes.

Q.   Received and expected?

A.   Yes.



Q.    Okay.  So noteholders could see on an on-demand basis the interest that was received and the interest that was expected that underlied each trustee report; correct?                    Relevance

A.    Yes.

MS. MURPHY:  Objection to form.

BY MR. KUSNETZ:

Q.    Okay.  Were there any restrictions on how frequently noteholders could download from the website?

A.    Not that I'm aware of.

Q.    Okay.  And how frequently was the website updated?

A.    Monthly reports are posted monthly. Quarterly note vals and reports are posted quarterly.

Q.    Okay.  So as a new report is posted, it gets updated on the website; correct?

A.    Yes.

Q.    Actually, withdrawn.

As new reports are posted, the website gets updated; correct?

A.    Yes.

Q.    Okay.  So because of this website, you -- withdrawn.



So because of this website, U.S. Bank didn't have to e-mail out the trustee reports all the time; correct?

Relevance

A.    I don't know that that was its sole intent, but it's a nice result of having such a website.

Q.    Right.  Right.  It was --

A.    Years ago we used to e-mail them.

Q.    Right.  It's a way for the trustee to ensure that all the stakeholders to the Zohar funds had access to important information regarding the collateral; correct?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Object to form.

THE WITNESS:  Correct.

BY MR. KUSNETZ:

Q.    Okay.  And let's look at a document that concerns a conversation between you and Mr. Keith Borelli at MBIA.  I think we talked about that previously.

A.    Yes.

Q.    I'm going to show you what is going to be marked as DeRoss Exhibit 9.  It's a document with the Bates Number Trustee_AP 6587980.



(DeRoss Exhibit 9 marked for identification.)

BY MR. KUSNETZ:

Q.   And if you go to the last page, which is the first e-mail in the e-mail chain, does that make sense?

A.   Yes.

Q.   Okay.

A.   I'm sorry.  This page; right?  The last --

Q.   The final page is an e-mail from Keith Borelli sent March 4th --

A.   Yes.

Q.   -- 1:55 p.m. to Scott DeRoss as U.S. Bank, subject Zohar 2005.

This is an e-mail that you received; correct?

A.   Yes.

Q.   And would you have received this e-mail in the ordinary course of your business as account manager for Zohar I?

A.   An e-mail asking for when the next report is due, yes.

Q.   Okay.

A.   That's -- that happens.



Q.   What is the -- the subject is Zohar 2005.  What does that refer to?

A.   Oh, I don't know.  I'm assuming he's talking about 2003-1.  I don't know why it says 2005.

Q.   Because Zohar 2005 was a reference to Zohar II; correct?

A.   Yeah.  I don't know that they were a part of that.  I'm assuming he meant 2003. But -- oh, yeah, no, that's all right.  I was looking to see if there was another e-mail on here from one of the other team members, but just us.  This must relate to 2000 -- Zohar I.

Q.   Okay.  So Keith is e-mailing you on March 4, 2014, asking, "Hi Scott, can you tell me when the next Zohar 2005 trustee report will be coming out?  Thanks, Keith."

Do you see that?

A.   I do.

Q.   And your testimony is that you believe him to be talking about Zohar 2003, which is Zohar I, not Zohar 2005; correct?

A.   Correct.

Q.   Because the Chicago office of U.S. Bank would have fielded inquiries likely



regarding --

A.   Correct.

Q.   -- Zohar II; right?

A.   Yes.

Q.   You respond on March 11, 2014, so seven days later, and you CC Becky from U.S. Bank, "Hi Keith.  We're waiting for Patriarch to release it."

Why did you choose to CC Becky and bring her into this e-mail chain?  Do you recall?

A.   Yeah.  Well, Becky is the analytics person or was the analytics person who would have post -- been posting the report.  Working on the -- you know, getting the signoffs for the release.

So I would -- I looped her in to let her know that someone was looking for the report.

Q.   Gotcha.  Did do you recall MBIA frequently e-mailing you or others at U.S. Bank and asking for when the next trustee report comes out?

A.   No.  I don't recall this being frequent.  At least not for me.

Q.   Okay.  Now, did the trustee reports come out at regular intervals?



A.   Every month.

Q.   Every month.  But was there ever a discrepancy as to like the day of the month that it came out?

A.   I guess it's possible.  If we got signoff later, you know, it wouldn't necessarily happen on the same day every month.  So it's possible that there would be discrepancies in the dates when they were actually posted.

Q.   Understood.  Okay.  And when you write, "Hi Keith.  We're waiting to Patriarch for release it," what does that mean?

A.   It means I probably called Becky to find out, you know, why the report wasn't available yet.  And she probably said -- told me that they were -- they hadn't released it yet.  So ...

Q.   And why would Patriarch have to release anything?

A.   As the collateral manager, we would -- we would get their approval before we posted the report.

Q.   So you would have sent -- withdrawn.

So U.S. Bank would have sent the collateral manager the draft trustee report;



correct?

A.    Correct.

Q.    Then you were waiting for them to finish their review; correct?

A.    Correct.

Q.    Okay.  And then you reply to your own e-mail almost 20 minutes later saying, "Looks like we got approval.  I'll be posting shortly."

Do you see that?

A.    Yes.

Q.    And so that's a reference to approval from Patriarch; correct?

A.    Yes.

Q.    And you said, "I'll be posting shortly."

So did that -- was that a reference to you posting the trustee report that's referenced here on the website?

A.    Yeah, it looks that way to me, yes.

Q.    Was it your job to -- you, yourself -- post it on the website?

A.    I don't know if it was a -- I had access to do it, and I -- I had, in the past, posted stuff.  So if Becky was busy, I may have just posted it for her, but I forget.  We all



used to just, you know, post when we could, I guess.

Q. You all chipped in as a team, that kind of stuff?

A. Yeah.

Q. And then Keith writes to you one minute later. "Can you let me know when you post?" Do you see that?

Go to the next page at the bottom.

A. Oh, yes, I see it.

Q. Bates 980.

Is it common for MBIA to ask you for previews as to when -- actually, withdrawn.

Is it common for MBIA to ask for when reports were going to be posted?

A. I don't recall that being a thing. Certainly we have gotten investor inquiries into one reports. That's typical. I don't recall if that was a regular thing for MBIA.

Q. Okay. So, like, this e-mail chain that we're looking at, to the best of your recollection, was not a regular type of e-mail correspondence that you had with MBIA; correct?

A. I don't believe it was.

Q. Okay. Does -- do you recall this



e-mail chain at all sitting here today --

A. No.

Q. -- from 2014?

A. I don't.

Q. Okay. You reply then about 20 minutes later, "Sorry, I'm just realizing that the latest DTD 2-7 is already posted out there." And then you include a screenshot. So let's break that down.

You're realizing that the latest DTD -- what does that refer to?

A. Dated. The latest report dated as of February 7.

Q. That's an abbreviation for "dated"?

A. Yes, I believe so.

Q. All right. All right. Learn something new. I was, like, what is that --

A. My abbreviation. I don't know if that's just me being lazy.

Q. It's fine. So the latest report dated February 7 you're saying is already posted?

A. That's -- yes, that's what I said.

Q. So does that mean that MBIA failed to check the website, and instead went to you first when they could have gotten their information by



checking the website?

MS. MURPHY:  Objection to form.

THE WITNESS:  It's possible.  Or maybe Becky posted it before I got to it. Yeah, I don't know.

BY MR. KUSNETZ:

Q.   Does the website show the date when things were posted?

A.   I don't know.  I mean, I'm sure it's buried in the system somewhere.  I don't know if it's, like, viewable, honestly.

Q.   Okay.  So let's look at this screenshot.

Is this -- the tab at the top of that says, "Welcome to Trust Investor Reporting."

Do you see that?

A.   Yes.

Q.   Okay.  So that's like the --

A.   Yeah, that's what I was -- I think we called Trust Now Essentials.  But, yeah, TIR, Trust Investor Reporting.

Q.   Okay.  That's like the name of the website?

A.   That was at the time, yeah.

Q.   Okay.  And at the top it says,



"Recent report date."  Do you see that?

And that's the February 7, 2014.

A.    Yes.

Q.    Okay.  And it says, "Contact Scott DeRoss."  Do you see that?

A.    I'm sorry, where?

Q.    At the -- I'm sorry, at the --

A.    Yes.  Sorry, I see it.

Q.    And that's the reference to you being the contact person; right?

A.    Yes.

Q.    And so -- and I'll come back to that in just a second.

If you go to the right-hand column, it says, "Zohar CDO 2003-1, Limited."

Do you see that?

A.    Yes.

Q.    So this is a screenshot referring to Zohar I; correct?

A.    Yes.

Q.    So Mr. Borelli was incorrect when he was talking about Zohar 2005.  He was really referring to Zohar 2003; correct?

A.    I believe so.

Q.    Which is Zohar I; right?



A.   Yes.

Q.   Because it makes sense, because you were the account manager for Zohar I?

A.   Yes.

Q.   Okay.  So for Zohar I, which it says under deal name here on the right-hand column, you were the contact on the website; right?

A.   Yes.

Q.   Okay.  And it doesn't surprise you that you were the contact; correct?

A.   No.  I was the account manager at the time.

Q.   Yeah.  And let's look at the different headings here.  It says, "Periodic Reports."  And then underneath it, it has "Quarterly trustee reports," and the dates of the reports.  Do you see that?

A.   Yes.

Q.   And then there's, like, a "select all" button.  Do you see that?

A.   Yes.

Q.   And there's, like, little buttons underneath it for PDFs?

A.   Yes.

Q.   And so that's, like, to download each



of those files; correct?

A.    It is, correct.

Q.    And if you look on the right-hand side, there's an ability to do what's called a "bulk download."

Do you see that?

A.    I do.

Q.    Okay.  So all of these trustee reports were downloadable to those who had access to this website; correct?

A.    Correct.

Q.    And that included MBIA and the noteholders; right?

A.    Correct.

Q.    And now there's another tab that says "Deal Documents."  What's that?

A.    That's where the transaction documents would be posted.  Indenture, I don't know.  Probably indenture and OM.

Q.    And then the next column, is that P and L?

A.    P and I.

Q.    Yeah.  What's P and I factors?

A.    Principal and interest.  So on every payment date, there was some automatic feed that



came from our payment system, so they could --
the payment factors would be there.  Like rates
per thousand, I think, and -- for the notes.

Q.    For the notes of -- not the
underlying collateral for the notes?

A.    No.  Just the actual liabilities, the
notes.

Q.    Okay.  And you helped prepare that as
part of the waterfall function; correct?

A.    Yes.

Q.    Okay.  Then "Investor Notices."

Do you see that?

A.    Yes.

Q.    What was in there?

A.    Just any notifications that may need
to be posted to the site for investors.

Q.    So if there was a notice of default,
for example, would that be something in there?

A.    It would be.

Q.    Okay.  "Investor Relations," what's
that?

A.    I don't know what that is.  I think
that might have a contact.  We had a person that
acted as, like, a central point of contact for
investors at that time.  I think that might be --



it might have been blank at this point.  But ...

Q.   Okay.  And you copied and pasted that into this e-mail, correct, to the best of your recollection?

A.   Yeah.  Yes.

Q.   Okay.  All right.  Let's move to another document.  I'm going to mark as DeRoss Exhibit 10, it's another e-mail chain.  Bates Number Trustee_AP6588104.

(Exhibit 10 marked for identification.)

BY MR. KUSNETZ:

Q.   This is an e-mail chain between you, Scott DeRoss, and Keith Borelli at MBIA, copying Becky from U.S. Bank.

And if you go to the first e-mail in the chain, which is on the second to last page, which is page ending in 105, the first e-mail was sent by you to Mr. Borelli on September 3, 2015.

Do you see that?

A.   I do.

Q.   And because you were sending this e-mail, you got the subject line correct; isn't that right?

A.   Yes.



Q.   And the subject line is "Zohar 2003"; correct?

A.   Yes.

Q.   Which is a reference to Zohar I; right?

A.   Yes.

Q.   So you e-mail Keith Borelli, "Hi, "Keith.  My apologies.  I was available yesterday.  Becky and I can make ourselves today for a call.  Can you send us a list of things you were looking at so we may prepare.  Once we see that, we can set a time."

Do you see that?

A.   Yes.

Q.   Okay.  Did you send this e-mail in the ordinary course of your business as account manager for -- for the trustee regarding Zohar I?

A.   Yes.

Q.   Okay.  Do you recall sending this e-mail?

A.   No.

Q.   Okay.  Does this indicate that Mr. Borelli tried to calling you first before you e-mailed him?

A.   He may have.



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Q.   How often did Mr. Borelli from MBIA call you, to the best of your recollection?

A.   Not -- not very often.

Q.   So this was a rare occurrence; correct?

A.   Well, I'm looking at the dates here, and this is right around -- right -- I mean 20 -- 2015, so that's right around when we went into default, I think.  So this is when things -- I started hearing from Keith, I think, yes.  I would say.

Q.   Okay.

A.   I don't recall ever hearing from Keith in the years prior.

Q.   Right and so --

A.   If that's the question.

Q.   -- this is consistent with your testimony that as -- around the time of the default of Zohar I, you began hearing from MBIA; correct?

A.   Yes.

Q.   And you asked him for a list of things that he's looking for so that you can prepare; right?

A.   Yes.  That's --



Q.   Right.

A.   -- typical of me, I just -- what do you -- what do you need.

Q.   Well, it's good practice, is it not?

A.   Yes.  No, I just -- I don't like to go into phone calls blind, so I like to get an understanding of what he's looking -- what they're looking for.

Q.   If you your lawyer told you to do that, you were trained well.  But I'm not --

A.   No, I --

Q.   I don't want to know about the discussions with the attorney.

A.   -- don't believe that's what happened.

Q.   Okay.  So Keith replies to your e-mail about an hour later and says, "Hi Scott. We would like to discuss the following generally and how they are calculated."

And then he mentions note valuation and the date is August 20, 2015.  And then there's "Sub CM fee" and "cash reserve account."

Do you see that?

A.   I do.

Q.   So the reference to the note



valuation and August 20, 2015, is the reference to the quarterly trustee report; correct?

A.   Yes.

Q.   Okay.  And then "sub CM fee," what is that?

A.   Subordinated collateral management fee.

Q.   Then "cash reserve account" what's that?

A.   I don't know.  I believe there was a mechanism to make deposits to the cash reserve through the waterfall.  So there was probably some calculation in that file that did that.

Q.   Okay.  And then looking below, he has a section for monthly report, August 10, 2015. Do you see that?

A.   Yes.

Q.   So he's looking for that particular monthly trustee report; correct?

A.   Yes.

Q.   And with respect to that monthly trustee report, he says P.7.  Is that page 7?

A.   Page 7, I believe.

Q.   Okay.  "Unfunded revolver" and "delayed term loan amount."



What's your understanding of those terms?

A.    Certain types of collateral are like delayed draw or revolvers, which means they're not fully funded at close.  The revolvers kind of go up and down.  The delayed terms are drawn to their full commitment over a period of time.  And, sorry, the revolvers revolve.

Q.    Okay.

A.    So certain types of collateral act that way and there are mechanisms for them in the reports.

Q.    And then the next line, it says, also on page 7, "Cost of unsettled commitments."

Do you see that?

A.    Yeah.  Yes.

Q.    Okay.  What are unsettled commitments?

A.    I believe those are pending -- well, I would view those as pending trades.

But, you know, in the context of Zohar I, I don't know how that would make sense because they weren't trading.  So that could mean commitments, unfunded commitments, that have not yet been drawn upon.


ESQUIRE
DEPOSITION SOLUTIONS

Q.   Okay.

A.   That's the only way I could make sense of that.

Q.   Do you recall why MBIA was looking for that?

A.   No.

Q.   Okay.  And would it surprise you that Zohar I defaulted in November of 2015?

A.   No.

Q.   Okay.  So that would explain why MBIA is now reaching out to you a couple of months in advance; right?

A.   I believe so, yes.

Q.   That's consistent with your testimony; right?

A.   I believe so, yes.

Q.   So -- sorry, just back to this, do you -- do you recall why MBA was interested in learning more about how these were calculated?

A.   Honestly, I don't recall the gist of these conversations.  But I don't remember anything after this.  So I imagine we gave him whatever information he needed.

Q.   So you replied, "Thanks, Keith.  That is helpful.  What time works for you?  I'll put



something on the calendar."

He asked about 1:00 p.m.  And then you said, "3:00 p.m. because Becky is booked."

You see that?

A.   Yes.

Q.   Do you recall actually having a phone call with Mr. Borelli?

A.   I don't recall the actual phone call, but I don't doubt that we did.  I suspect we had one.

Q.   Okay.  And why was Becky necessary for this phone call?

A.   Becky is the analytics person. Again, she would have been more plugged into what was happening with those things that he was looking for in the report.  So I would usually rope in an analytics person.

Q.   And she also was, as part of the analytics team, the person who made these calculations that went into the trustee report; correct?

A.   That's right.  She would have tied out with the manager on those points.  So -- helpful to have someone on the call that knows what they're talking about.



Q.   Exactly.  That's why I have Ana whenever I'm talking to someone.

All right.  So this type of communication with Mr. Borelli was -- was more -- sorry.  This type of communication with Mr. Borelli, phone call or e-mail asking questions, was occurring in the lead up to the Zohar I default; correct?

A.   I believe so.

Q.   Okay.  But do you not -- withdrawn.

You do not recall having these types of conversations with Mr. Borelli prior to the default -- prior to the lead up of the default of Zohar I; correct?

A.   I don't recall any.  I can't say that he never called for something.  You know, but I don't -- I don't recall anything.

Q.   It would have stood out to you; correct?

A.   I think so, but I don't know.

Q.   Okay.  Do you recall any instance where U.S. Bank refused to answer a noteholder's questions related to the Zohar funds?

Relevance

A.   No.

Q.   And here you weren't refusing to



answer his question; correct?

A.    Correct.

Q.    You were setting up a call; right?

A.    Correct.

THE VIDEOGRAPHER:  Just be mindful of your mic on your --

BY MR. KUSNETZ:

Q.    And if noteholders were to send e-mails like this to you, you would have responded the same way; correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Looking for a report, yes.

BY MR. KUSNETZ:

Q.    No, this is different.

A.    Oh, I'm sorry.

Q.    This is asking about how things are calculated and understanding them generally; right?  Do you see that?

A.    Yes.  I think so.  Probably.  I don't remember getting any e-mails from investors like that, but ...

Q.    Yeah.

A.    Probably.

Q.    Investors didn't ask how these types



of calculation -- investors didn't ask about how these aspects of the trustee reports were calculated; correct?

A.   Not to my knowledge.  Not to say that it never happened.  Maybe somebody would, you know, call Becky directly or -- I don't know. I'm not aware of anything.

Q.   Right.  You were the account manager; right?

A.   Yes.

Q.   It was Mr. Borelli who had reached out to you in that prior e-mail chain; correct?

A.   That's right.

Q.   Okay.  And it was Mr. Borelli who appears to have called you; correct?

A.   Yes, correct.

Q.   Okay.  Mr. DeRoss, do you know what an officer's certificate is?

A.   Yes.

Q.   What's that?

A.   Well, it could be a number of things. But, generally speaking, in terms of the CLO transactions, it's a direction from an authorized person on behalf of the issuer.  So usually in these cases signed by the collateral manager.



And they are directions for us to settle trades, pay expenses, you know, it could be a number of things.

Q.   Okay.  So did these certificates certify generally that the loan commitment satisfied the eligibility criteria under the relevant indenture?

MS. MURPHY:  Objection to form.

THE WITNESS:  I believe in the Zohar I transaction, they did, yes.

BY MR. KUSNETZ:

Q.   Okay.  Any reason to believe that they did something different with respect to Zohar II and III?

A.   No.

Q.   Okay.  So Patriarch would provide these certificates to the trustee; right?

A.   Yes.

Q.   Okay.  And then the trustee would issue the amounts in the certificate to the relevant issuer; correct?

A.   Correct.

Q.   Okay.  And did you play a role in that process?

A.   No.  I have wire approval authority.



I didn't always approve wires.  Generally, the people inputting the wire would go to their direct manager.  But I could have.  I have the ability to approve wires.

Q.   Okay.  Let's look back at Exhibit 6, if you don't mind.  That's the Zohar III indenture.  We're going to turn back to Section 6, which is page 112.  And I'll get you the Bates in just a second.

A.   6.1?

Q.   Yeah.  The Bates is PPADV_0027268.

A.   Oh, I'm way off.  Sorry.  I thought you said Section 6.

Q.   Section 6, Article 6.  Section 6.1.

A.   Zohar 2003-1.

Q.   Yeah.  Zohar -- it's Zohar III.  It is the one that is labeled Exhibit 6 on your -- on the bottom right-hand corner.

A.   I went to the wrong one.  Apologies.
Zohar III.  I got it.

Q.   Okay.  So that's Bates Number is 27268.  The pagination on the top is 112.

A.   Got it.  Okay.

Q.   Okay.  I'm going to direct -- you're there?



A.   I am.

Q.   All right.  I'm going to direct your attention to 6.1(a)(ii).  Okay?

A.   Yes.

Q.   So let's look at this.

"In the absence of bad faith on its part, the trustee may conclusively rely as to the truth of the statements and the correctness of the opinions expressed therein upon certificates or opinions furnished to the trustee and conforming to the requirements of this indenture."

Do you see that?

A.   Yes.

Q.   But there's a caveat; right?

A.   Yes.

Q.   And it continues, "Provided that in the case of any such certificates or opinions, which by any provision hereof, are specifically required to be furnished to the trustee, the trustee shall be under a duty to examine the same, to determine whether or not they substantially conform to the requirements of this indenture."

Do you see that?



A.    Yes.

Q.    Okay.  So under Article 6, Section 6.1 A(ii), the trustee had a duty to examine the certificates to determine whether or not they substantially conformed to the requirements of the indenture; correct?

A.    Correct.

MS. BUCKEL:  Objection to form.

MS. MURPHY:  Objection to form.

BY MR. KUSNETZ:

Q.    And if the officer certificate did not conform to the requirements of the indenture, the trustee was required to notify the party delivering the certificate, if that certificate or opinion did not conform; correct?

MS. BUCKEL:  Objection to the form.

MS. MURPHY:  Object to the form.

THE WITNESS:  Correct.

BY MR. KUSNETZ:

Q.    "And if a corrected form" -- this is all in the same paragraph -- "was not delivered to the trustee within 15 days after such notice from the trustee, the trustee had to notify the noteholders"; correct?

MS. MURPHY:  Objection to form.



THE WITNESS:  Correct.

BY MR. KUSNETZ:

Q.   Okay.  So, Mr. DeRoss, U.S. Bank never notified Patriarch that its officer certificates did not conform to indenture requirements; correct?

MS. BUCKEL:  Objection to form.

THE WITNESS:  Not to my knowledge, sir, no.

BY MR. KUSNETZ:

Q.   It would have surprised you if they did; correct?

MS. BUCKEL:  Objection to form.

THE WITNESS:  Yes.

BY MR. KUSNETZ:

Q.   And is this notification requirement a common feature of CLOs, in your expertise?

MS. MURPHY:  Objection to form.

THE WITNESS:  I believe that Section 6.1 is pretty consistent.

MR. KUSNETZ:  Okay.  Okay.  We can put that document aside.

Where do I want to go next?  Okay.

We're going to mark the next exhibit, which is DeRoss 11.  It's -- the Bates



Number is PPADV0888051.

(DeRoss Exhibit 11 marked for identification.)

MR. KUSNETZ:  It was previously marked as Tilton Exhibit 78.

BY MR. KUSNETZ:

Q.   So this is an e-mail sent by John Sloan at MBIA on December 20, 2011, to Patrick Mottley at U.S. Bank, CC'ing Peter Thanoukos and Lynn Tilton.  And the subject is "Zohar II 2005-1."

Do you see that?

A.   I do.

Q.   Okay.  Who's Patrick Mottley at U.S. Bank?

A.   He doesn't work there.  I haven't heard that name in a lot of years.  He was in our Chicago office.

Q.   Chicago office?

A.   Yes.

Q.   And so --

A.   As well as here.

Q.   -- is that why he's receiving an e-mail regarding Zohar II, for example?

A.   Yes.



800.211.DEPO (3376)
EsquireSolutions.com

Q.    Okay.  And who's Peter Thanoukos, T-h-a-n-o-u-k-o-s?

A.    Big greek population out there.  Also from our Chicago office.

Q.    Okay.

A.    I've not heard that name in years.

Q.    Did you ever interface with Patrick or Peter?

A.    No.  I believe they -- they've been gone a long time.  I don't -- I remember the names.  I don't -- I didn't really work directly with them, that I can recall.

Q.    Okay.  This is an e-mail from MBIA, an individual there called Jonathan Sloan.

Have you ever heard that name before?

A.    I've heard the name.  Sounds familiar.

Q.    Okay.  And John just says, "Please see attached.  Thanks, John."

Do you see that?

A.    I do.

Q.    Okay.  It's a little abrupt; right?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes.

BY MR. KUSNETZ:

ESQUIRE
DEPOSITION SOLUTIONS

Q.   Okay.  Let's look at the attachment.
It's this letter here on MBIA letterhead.

Do you see that MBIA's catch phrase
at the time was "Wisdom in action"?

MS. MURPHY:  Objection to form.

THE WITNESS:  I see it.

BY MR. KUSNETZ:

Q.   Okay.  I see it, too.

This letter is dated December 11,
2011.  Do you see that?

A.   Yes.

Q.   And it's a letter directed to Patrick
Mottley at U.S. Bank; correct?

A.   Yes.

Q.   And the subject line is "Zohar II."
You see that?

A.   Yes.

Q.   Have you ever seen this letter
before?

A.   I don't -- I don't think so.

Q.   Okay.  This is a letter where, if you
look at the first paragraph, MBIA writes to
U.S. Bank saying it's writing to "ensure that the
trustee does not release funds to settle certain
outstanding lending commitments in violation of



the indenture."

Do you see that?

A.    I'm sorry.  Oh.

Q.    This is the bottom of the first paragraph.  You see that?

A.    Yes, I see it.

Q.    Did you ever receive a letter like this for Zohar I?

A.    I don't recall seeing one, no.

Q.    Do you ever recall MBIA directing you to ensure that you do not release funds to settle outstanding lending commitments?

A.    No.

Q.    Okay.  It would have stood out to you if you got a letter like this --

A.    Yes.

Q.    -- from MBIA "Wisdom in Action"; correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes.

BY MR. KUSNETZ:

Q.    Okay.  Now, looking at -- looking at this, the second paragraph, MBIA continues that "The Zohar II reinvestment period ended on or about January 20, 2010."



Do you see that?

A.   Yes.

Q.   Okay.  And MBIA writes, "And it is MBIA's expectation that Patriarch did not cause Zohar II to enter into any new lending commitments after that date."

Do you see that?

A.   Yes.

Q.   Okay.  What does that mean, to the best of your understanding?

MS. BUCKEL:  Objection to form.

The witness has no personal knowledge of this.

MR. KUSNETZ:  Understood.  Just the language of "new lending commitments after the reinvestment period," what does the witness understand that, to the best of his knowledge, if any?

MS. MURPHY:  I join in the objection.

THE WITNESS:  So I understand that reinvestment periods end on certain dates, and they're not -- you know, that really restricts or halts trading activity.

In certain deals there are exceptions to that as to what they're allowed to



settle.  So sometimes if there are pending trades that they've committed to prior to the end, it may settle after.  But generally, to me, that means trading stops after the end of the reinvestment period.

BY MR. KUSNETZ:

Q.   Okay.

A.   With few exceptions, I guess.

Q.   And was that your knowledge --withdrawn.

The next paragraph says, "The monthly trustee reports reflect that Patriarch has set aside more than 63.1 million on account of lending commitments that have been outstanding for more than 90 days."

And they define that as the "unsettled commitments."

A.   I see it.

Q.   Okay.  And MBIA continues in the next sentence, "The settlement requirements are not satisfied."

Do you see that?

A.   Yes.

Q.   Okay.  Do you know if MBIA --withdrawn.



Do you see that Patriarch on the third page -- on the second page of this letter is CC'd here?

A.    I do.

Q.    All right.  And Ms. Tilton was CC'd on the e-mail that attached this letter; correct?

A.    Correct.

Q.    Okay.  Do you have any knowledge of how this dispute got resolved?

A.    No.  I don't -- I don't remember this.  Honestly, I was not plugged into it.

Q.    Okay.

A.    From what I recall.  This looks like something that would have stuck out.

Q.    Do you have any recollection of Patriarch explaining to U.S. Bank and MBIA that it believed commitments could be settled after the reinvestment period ended so long as they were committed prior to the end of the reinvestment period?

A.    No.  Not on this string, no.

Q.    What's your understanding of what I just said in the sense of commitment settling after reinvestment period so long as they're committed prior to the end of the reinvestment



period?

MS. BUCKEL:  Object to form.

THE WITNESS:  Well, if they trade an asset, but it hasn't settled yet, I believe that's -- that's what that means; right?

So you traded it on December 1, the period ended on the 3rd, however, this thing doesn't settle until the 15th.

BY MR. KUSNETZ:

Q.    Okay.

A.    So there are deals that allow that type of activity.  I don't know what these -- if that was what this was.  But it's common in current CLOs for that -- that stuff to happen.

Q.    Would it surprise you that the trust never sent -- sorry, withdrawn.

Would it surprise you that the trustee never sent any notices of default related to this committed unsettled fund issue with respect to its officers certificates?

MS. BUCKEL:  Objection.  Form.

THE WITNESS:  Sorry.

BY MR. KUSNETZ:

Q.    Would it -- I'll rephrase.



Would it surprise you that the trustee never sent any notices of default related to this committed unsettled fund dispute?

MS. BUCKEL:  Object to form.

MS. MURPHY:  Object to form.

THE WITNESS:  No, I guess it doesn't surprise me.  No.  I would need more information.  I don't know where this went.  But I don't believe this constitutes a default.

BY MR. KUSNETZ:

Q.  Right.  This does not constitute a breach of the requirements of the indenture; correct?

MS. MURPHY:  Object to form.

THE WITNESS:  Right.  I don't believe so.

BY MR. KUSNETZ:

Q.  Okay.  Now, is it safe to say that if the trustee, U.S. Bank, was improperly settling funds that had been committed prior to the end of the reinvestment period, the trustee would have been required to provide notice of that; correct?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Objection to form.



THE WITNESS:  I don't -- I don't know if that constitutes a default.  I don't -- I don't know.

BY MR. KUSNETZ:

Q.  Okay.  The trustee was aware of committed and unsettled funds as reflected in the trustee reports; correct?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Object to form.

THE WITNESS:  It appears so, yes.

BY MR. KUSNETZ:

Q.  Would it surprise you if they were not?

A.  It would surprise me.

Q.  So if the trustee agreed with MBIA here, there would have been a notice of -- from the trustee of noncompliance?

MS. BUCKEL:  Object to form.  This is speculation.  He --

THE WITNESS:  I don't know if there would have been -- sorry.  I don't know if there would have been a notice of noncompliance.  I don't know what it would have been.  But certainly I would have been referred to counsel to find out what



the next steps are.  I don't know what they did or didn't do.

MR. KUSNETZ:  Okay.  All right.  Let's move off of this document.

MS. BUCKEL:  Is this a good time for a break?

MR. KUSNETZ:  Yeah.

THE VIDEOGRAPHER:  Time on the monitor is 2:45 p.m.  We are off the record.

(Recess taken from 2:45 p.m. until 3:06 p.m.)

THE VIDEOGRAPHER:  Time on the monitor is 3:06 p.m.  We are back on the record.

BY MR. KUSNETZ:

Q.   Good afternoon, Mr. DeRoss.  Let's go to a new topic.  Alvarez & Marsal.  In March of 2016, Patriarch entities resigned as the collateral manager to the Zohar funds; correct?

Relevance

A.   Yes.

Q.   And do you recall that Alvarez & Marsal took over thereafter?

A.   Yes.

Q.   Okay.  Do you know who appointed Alvarez and Marsal?



Relevance

A.    I believe it was MBIA.

Q.    Okay.  After Alvarez & Marsal took over as collateral manager, did you interface with them in connection with your role as trustee?

A.    Yes.

Q.    As working for the trustee for Zohar I?

A.    Yes.

Q.    Did you interface with AMZM as often as you interfaced with Patriarch, while they were collateral manager?

A.    I guess it was -- if I recall correctly, it was probably maybe a little bit more in the beginning.  They were -- you know, just -- we had a lot of conversations with them. I don't remember.  Other than just getting them up to speed about what -- you know, what's what. I don't know really how to describe it.  But they took over and they would approve reports in place of Patriarch and that was really it.

Q.    Okay.  And who did you liaise with at Alvarez & Marsal?

A.    The only name I -- there were three people.  There was a woman named Liz LaPuma, I



believe.

Q.    Uh-huh.

Relevance

A.    And there were two guys.  I don't remember their names.  I can't remember.  I believe there were three people that --

Q.    Okay.

A.    -- we used to -- we were in contact with.

Q.    And were members of the trust's team -- trustee's team, such as the analytics team, for example, communicating with Alvarez & Marsal on a daily basis?

A.    I believe so.  I don't know if it was daily, but some sort of frequency.  Yeah.

Q.    And they were doing that pursuant to their responsibilities under the indenture; correct?

A.    "They" meaning Alvarez.

Q.    No.  "They" meaning --

A.    Yes.  Anything that we were sending to Patriarch was now happening with Alvarez.

Q.    Okay.  So things that you used to send to Patriarch, those same things you were now sending to Alvarez; correct?

A.    Correct.



Q.   Okay.  Did your role as account   Relevance
manager change when Alvarez & Marsal assumed
control -- sorry -- assumed the role as Zohar
collateral manager?

A.   No.

Q.   Do you know what services the Zohar
funds engaged Alvarez & Marsal to perform?

A.   I mean, they were a replacement
collateral manager.  I don't know -- I don't
remember reading through their management
agreement.  I doubt it was as detailed as the
existing one.  So I really don't remember what.

Q.   Do you know if the Zohar funds
engaged Alvarez & Marsal to assist with the
pursuit of litigation against Patriarch?

MS. MURPHY:  Object to form.

THE WITNESS:  I don't think so.

BY MR. KUSNETZ:

Q.   Would it surprise you if they did?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes, I don't know what.

BY MR. KUSNETZ:

Q.   Why would it surprise you?

MS. MURPHY:  Objection to form.

THE WITNESS:  I guess I don't know.



I don't know either way what -- you know, why they would do that.

BY MR. KUSNETZ:

Q.    Do you know if Alvarez & Marsal served as administrative agent for the Zohar funds?

A.    I don't know.  I don't think so.

Q.    Just before a month ended and a trustee report was going to be issued, the usual practice was the trustee would send an e-mail to Patriarch regarding the monthly cutoff balances; correct?

A.    Yes.

Q.    Okay.  What are the monthly cutoff balances again?

A.    Probably principal and interest, cash balances.

Q.    And so after Alvarez & Marsal took over as collateral manager in early March 2016, did U.S. Bank then send the monthly cutoff balances to Alvarez & Marsal?

A.    Probably.  I don't -- I don't know exactly how the flows went, but I assume they would have.

MR. KUSNETZ:  Okay.  Let's look at a    Relevance



document.  This is going to be DeRoss

Exhibit 12.                                    Relevance

                (DeRoss Exhibit 12 marked for

identification.)

                MR. KUSNETZ:  Bates number is

        Zohar-PPAS-00027148.

BY MR. KUSNETZ:

        Q.    Do you recognize Thomas here?

        A.    I do.  I recognize that name, yes.

        Q.    Okay.  He was one of the two guys,

you think?

        A.    Yes, for sure.

        Q.    Okay.  So let's look at the first

e-mail in this chain.  So if you can go to the

second to last page of this e-mail chain.  Okay.

                You'll see an e-mail from Becky at

U.S. Bank to Chris Cover, Aileen Daversa, Thomas

Macedonio, copying you, Scott DeRoss, and Ria

Newton at U.S. Bank.  Do you see that?

        A.    Yes.

                MS. MURPHY:  Is this an e-mail and

        then the rest of these are attachments?

                MR. KUSNETZ:  Yes.  Talking about the

        e-mail.

                MS. MURPHY:  There's e-mails in the



attachments.  That's what I was looking

at.  Sorry.                                    Relevance

                    MR. KUSNETZ:  Inception.  E-mails

            within the e-mails.

BY MR. KUSNETZ:

            Q.    I'm talking about the e-mail chain.
Do you see where --

            A.    I see.

            Q.    Okay.

            A.    She sent some balances.

            Q.    And the -- so sorry.  What do you
see?  What does this e-mail suggest?

            A.    This looks like cash balances.  And I
guess this is what you refer to as cutoff
paragraphs, principal balance.

            Q.    Well, the subject here is, "Zohar I,
March 31, 2016, monthly cutoff balances."
                    Do you see that?

            A.    Okay.  I do see that, yes.

            Q.    And this information was previously
shared on a monthly basis with Patriarch while
they were the collateral manager; correct?

            A.    I believe so.  I don't know if it was
in this exact format, but probably.

            Q.    But the same underlying data;



correct?

Relevance

A.    Yes.

Q.    Okay.  So what Patriarch got, AMZM is getting; correct?

A.    Yes.

Q.    Okay.  And Becky says, "Hi, Eileen, Christopher, and Thomas."

So Eileen, is that another person that you interfaced with?

A.    I don't remember that name, but I -- I guess so.

Q.    Okay.  And Chris Cover, is he the other guy --

A.    Chris Cover, that name does sound familiar, yes.

Q.    So he's one of the two guys --

A.    I believe so, yeah.  Chris and Thomas, I remember.

Q.    Okay.  She says, "I show that the C" -- sorry.  Withdrawn.

Becky from U.S. Bank says, "I show that the Zohar CDO I monthly cutoff was on March 31, 2016.  In the past, I usually send this e-mail that shows the monthly cutoff balances for Zohar CDO I."



See that?

A.    Yep.

Q.    So is that a reference to what she used to do with the collateral manager?

A.    Appears so, yes.

Q.    With Patriarch as a collateral manager?

A.    Yes.

Q.    Thank you.  And next sentence, "The manager would confirm or let me know if there were any discrepancies."

Do you see that?

A.    Yes.

Q.    And the manager she's referring to is Patriarch; correct?

A.    Yes.

Q.    So she is -- so Becky from U.S. Bank is educating AMZM on what the manager would do after receiving monthly cutoff balances; correct?

A.    Yes.

Q.    Okay.  Helping AMZM get up to speed; correct?

A.    Yes.

Q.    Okay.  So I Becky then says in the next sentence, "Can you please see attached Zohar

Relevance



I, III, March 31, 2016, monthly report balances and let me know if you agree so I can begin working on the draft of the monthly report."

Relevance

Do you see that?

That's the next sentence.

A.    Oh, yes.

Q.    Okay.  And the monthly report is a reference to the monthly trustee report; correct?

A.    Correct.

Q.    And then if you look at the next sentence, "FYI, this monthly report is scheduled to be due on Tuesday, April 12, 2016."

Do you see that?

A.    Yes.

Q.    So what does "due" mean in this -- in this context?

A.    The report -- the indenture has a monthly due date report.  So the date it's supposed to be posted and made available to investors.

Q.    Okay.  Meaning -- so this e-mail is sent on April 5, she needs -- sorry.

This e-mail -- withdrawn.

This e-mail was sent by Becky on April 5.  And what Becky is saying is that she



needs Alvarez & Marsal as the new manager to confirm if there are any discrepancies or not?

A.   Yes, I would agree.   Relevance

Q.   Sorry.  In order to release the report in time for the deadline?

A.   Yes.

Q.   Okay.  And then there's this chart underneath it, you know, it mentions a number of things, "aggregate, principal balance, principal account, interest account, unfunded revolvers."

Do you see that?

A.   Yes.

Q.   Okay.  So what is this little chart?

A.   This is a pull from the -- you know, from the information that's in CDO Suite as of the cutoff date, based on -- well, I don't know if some of this is from the last cutoff.  But the current information that we have in the system.

Q.   Okay.

A.   All of those things.

Q.   And she writes at the end, "I've attached some backups for you."

Do you see that?

A.   Yes.

Q.   Do you know what she's referring to



by "backups"?  Is there a colloquial definition of "backups"?

A.    I'm guessing by backups if she's referring to these reports, which come from Patriarch.  The agency services team.

Q.    Okay.  We'll get to that --

A.    I believe.  I don't --

Q.    Totally fine.  We'll get to that in just a second.

A.    Yeah.

Q.    But let's move to the next e-mail in the chain.  So we go to the first page, Bates 148.  Thomas Macedonio replies, a few hours later, saying to Becky directly.  So you were --

A.    Sorry.  Did I pass all this stuff?

Q.    No, no.  Stay on the first page of the exhibit.

A.    First page.

Q.    So he replies to Becky three hours later.

A.    Uh-huh.

Q.    You see that?

A.    Yes.

Q.    But he does not include you on the e-mail.  Do you see that?



800.211.DEPO (3376)
EsquireSolutions.com

A.    I do.

Q.    Okay.  He says, "Hey, Becky.  It was great talking with you today.  I'm going to look at these balances tomorrow and we can plan to discuss tomorrow afternoon.  As mentioned on the call, if you could forward me some of the various changes you've received in the past, that would be great."

Do you see that?

A.    Yes.

Q.    Do you know what "various changes" Mr. Macedonio is referring to?

MS. MURPHY:  Objection to form.

THE WITNESS:  I'm wondering if he's referring to these attachments, which are changed forms that look like -- I know that these come from --

BY MR. KUSNETZ:

Q.    Okay.

A.    -- the agency team at Patriarch.

Q.    All right.  And then Becky replies 13 -- 16 minutes later.  It says -- and in doing so, she copies everyone on the prior e-mail chain and says, "Hi, Thomas, it was really nice to speak with you as well.  I'm actually out of the



office tomorrow, but I will be back on Thursday if you would like to discuss anything.  Maybe we can schedule something for Tuesday, if that's okay.  Here are a few change forms and e-mail that I mentioned on today's call.  Let me know if you need anything else.  Thanks so much."

You see that?

A.   Yes.

Q.   Okay.  Is it standard practice for Becky to -- withdrawn.

Is it standard practice for U.S. Bank employees to keep all of the participants on an e-mail chain, on the e-mail chain and not cut them off?

MS. MURPHY:  Objection to form.

THE WITNESS:  I don't know if that's a rule or not.  But I think -- I would do the same thing.  I would have copied everybody back in.

BY MR. KUSNETZ:

Q.   Right.  No need to have a private one-on-one; correct?

A.   I can't see why.

Q.   Right.  And Becky was on the analytics team, and you were on the account



manager team; right?

A.   Yes.

Q.   And so as the account manager, you needed visibility into these requests for information by AMZM; correct?

A.   Yes.

Q.   Okay.  Now, let's look at the attachments.  Okay.

So first one here on Bates Number 7151.  You see that?

A.   Yes.

Q.   And it's -- the borrowers, Iconic American Trucks.  Do you see that?

A.   Yes.

Q.   Okay.  And it's a Facility Characteristics Change Form; right?

A.   Yes.

Q.   What is that?  What is a Facility Characteristics Change Form?

A.   This looks like it's changing one of the characteristics of the loan from performing to nonperforming.

Q.   Okay.  And the date was February 2016.  Do you see that?

A.   Yes.



Q.   Okay.  And do you see the portfolio manager here, Scott Whalen.  Do you see that?

A.   Yes.

Q.   Okay.  And Scott Whalen was a Patriarch employee; correct?

A.   I didn't know him, but I believe that's right.

Q.   Okay.  So this is a form saying performing for to nonperforming -- sorry.  This -- this Facility Characteristics Change Form documents that this particular facility was recategorized from Category 4 performing to Category 1.

Do you see that?

A.   Yes.

Q.   Okay.  So Category 4 current, and Category 1 noncurrent; right?

A.   Yes.

Q.   Okay.  And if you look at one of the other attachments, the next one, for example, 7152, this is another Facility Characteristics Change Form showing for TransCare a change from Category 4 to Category 1.

Do you see that?

A.   Yes.



Q.   Okay.  So these are documents that U.S. Bank had previously received from Patriarch when they were the collateral manager; correct?

A.   I believe we received these from the agency team, but, yes, they came from Patriarch.

Q.   Okay.  But you're saying from the --

A.   I believe --

Q.   -- agency?

A.   -- they generated from the agency team.

Q.   The PPAS?

A.   PPAS, Patriarch Agency Services, I think.

Q.   Understood.

And then if you look at the next one, which is 153, do you see that?  It says, "Restructure/Refinance Reconciliation Form."

What's that?

A.   This looks like a restructure of an existing loan for all three deals.

Q.   Okay.

A.   I can't read some of the some stuff.

Q.   The borrower at the top here is Galey.  Do you see that?

A.   Yes.



Q.   G-a-l-e-y.  And the date of the Restructure/Refinance is February 10, 2015.  See that?

A.   Yes.

Q.   Okay.  And then just looking at Zohar I, for example, it shows what the loan commitment was and then what's outstanding; right?

A.   Yes.

Q.   And then -- and then it shows what the change is.  Do you see that, where it has "difference"?  That's a row saying "difference."

A.   Yes.

Q.   Okay.  So what does this signify?

A.   This looks like a notice from an agent telling us that these characteristics of these particular loans have changed.

Q.   Okay.  This is not a recategorizing this particular loan from 4 to 1 or anything like that; correct?

A.   Yeah, I don't know if that's what it does.  I assume it -- it looks like that's proposed, and maybe lead manager entity would either approve or not approve that.  I'm not sure how that -- how that worked.

Q.   Right.  The difference is the amount



forgiven as a result of the restructuring; is that correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  I don't know if that's what that means -- sorry.  Is there something this is forgiven on here?  I'm sorry.

BY MR. KUSNETZ:

Q.  Well, that's the "difference" row, as far as my understanding.  But if there's nothing here that you can see that, I understand.

A.  Yeah, I don't know if that's what that means.  But, clearly, they're changing amounts and changing the loan amounts.

Q.  Right.  And this form was received by U.S. Bank, specifically, look at the bottom, Becky and Patrick; correct?

A.  Yes.

Q.  Okay.  All right.  So with respect to AMZM on providing signoff, are you aware if AMZM provided signoff for -- in time for the April 12, 2016, deadline for this particular monthly trustee report?

A.  I don't know -- sorry.  I don't know if they gave it in time, but I believe they would



have -- Becky would have continued to seek it.

Q.    But US -- U.S. Bank had all of the information that it needed to complete the draft report; correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  It appears so.  I don't know.

BY MR. KUSNETZ:

Q.    And you were asking -- sorry.  And -- withdrawn.

And Becky from your team was asking the new collateral manager to check for discrepancies; correct?

A.    Yes.

Q.    Okay.  So nothing preventing you from generating a draft; correct?

A.    Correct.

Q.    But you had to wait on the signoff from AMZM before you can release the trustee report; correct?

A.    Typical, correct.  Yes.

Q.    Okay.  So going forward, fair to say that U.S. Bank continued to have all the information it needed to complete drafts of the trustee reports; correct?



MS. BUCKEL:  Objection to form.

THE WITNESS:  I don't know if we had all the information.  But certainly we had information to get a draft out.  I don't know how complete the initial drafts of the reports were.  But ...

BY MR. KUSNETZ:

Q.    Well, when you would send them to Patriarch while Patriarch was collateral manager, they were complete reports, they were complete drafts; correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Based on the information we had, they were as complete as -- as they could be, yes.

BY MR. KUSNETZ:

Q.    Based on the information you had; right?

A.    Yep.

Q.    And based on the information you had, that information was sufficient to generate a draft for Patriarch to check for discrepancies; correct?

A.    Yes.

Q.    Okay.  And so it's fair to say that



after Patriarch was no longer the collateral manager, AMZM was the collateral manager.  You're not aware that U.S. Bank did not have the necessary information to compile draft trustee reports for AMZM to sign off on; correct?

A.   Correct.

Q.   Okay.  Are you aware that U.S. Bank stopped producing trustee reports to noteholders after AMZM took over, March 2016?

MS. BUCKEL:  Objection to form.

THE WITNESS:  I don't remember.  I know it was a -- I believe it was a rocky start.  So I don't remember what happened there.  But it wouldn't surprise me.

BY MR. KUSNETZ:

Q.   What was rocky about it?

A.   Well, they -- I don't think that they had all the information that they needed to possibly be making these signoffs.  And if I recall correctly, I don't think they wanted to sign-off.

Q.   And why didn't they want to sign-off?

MS. BUCKEL:  Objection to form.

THE WITNESS:  Well, they weren't -- they weren't a manager.  So I don't know.



They were coming into this blind, so I don't know that they had all the information they needed.

BY MR. KUSNETZ:

Q. They didn't have experience as a collateral manager?

A. Well --

MS. MURPHY: Objection to form.

THE WITNESS: -- I shouldn't say that. I don't really know that. They didn't have experience with these transactions, so I don't believe that they had everything that they needed to -- to make these decisions as fast as they needed to.

BY MR. KUSNETZ:

Q. But your analytics department, as we previously saw, was available to Alvarez & Marsal to provide them information; correct?

MS. MURPHY: Objecting to form.

THE WITNESS: Our intention is to be helpful, so she wanted to get these reports done, yes, sir.

BY MR. KUSNETZ:

Q. She wanted to get the reports done to



hit the deadline of when they were due to be distributed; correct?

A.   That's right.

Q.   Okay.  So the only thing preventing U.S. Bank -- withdrawn.

After Alvarez & Marsal became the collateral manager, the only thing preventing U.S. Bank from issuing the trustee reports was -- was waiting on Alvarez & Marsal to approve each report; correct?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Objection to form.

THE WITNESS:  I don't remember these exact scenarios.  But that would make sense to me.  If we were waiting on a signoff it would definitely hold up the report.

BY MR. KUSNETZ:

Q.   So had you gotten AMZM's signoff, you would have been able to disperse the reports; correct?

A.   I believe so, yes.

Q.   Okay.  So AMZM withholding its signoff on these reports is what caused these reports not to be dispersed; correct?



MS. MURPHY:  Objection to form.

MS. BUCKEL:  Objection to form.

THE WITNESS:  Again, I don't remember these exact scenarios.  But if she didn't get signoff, she wouldn't have posted the report.  So she probably would have waited.

BY MR. KUSNETZ:

Q.  Right.  And it's not just she.  I mean, you; right?  I mean, you posted reports as well; correct?

A.  Yes.

Q.  If you don't get signoff from the collateral manager, you're not posting it; right?

A.  No, I prefer not to.  No, I don't recall the situation.

Q.  Has there ever been a time where you've posted without signing off?

A.  I don't recall that.  It's a pretty normal process.  So we would normally get signoff.

Q.  After AMZM became the collateral manager in March of 2016, were you aware of any of the indentures having been amended?

Relevance

A.  No, I don't think so.



Q.   If an indenture was going to be amended, the trustee would need to know about it; correct?

Relevance

A.   We would normally be a party to that, sir, yes.

Q.   Right.  So it's fair to say that after Alvarez & Marsal took over as collateral manager in March 2016, there were no amendments to the trustee report -- sorry, there were no amendments to the indentures; correct?

A.   I don't believe so.

Q.   Okay.  In fact, you know that there were not; correct?

A.   I'm not aware of any.

Q.   And you would have had to be aware of it; correct?

A.   I would have -- well, certainly for Zohar I, I would have been a signer.  I -- I don't -- you know, Zohar II and III, I wouldn't have been involved in.  But I'm not aware of any.

Q.   Right.  And as we previously discussed with respect to the indentures, the trustee had certain responsibilities that were specific to the trustee; correct?

MS. MURPHY:  Objection to form.



THE WITNESS:  Yes.

Relevance

BY MR. KUSNETZ:

Q.    And those responsibilities included dispersing trustee reports to the stakeholders; correct?

A.    Yes.

Q.    To noteholders, for example?

A.    That's right.

Q.    Okay.  So AMZM's decision not to provide signoff to issue trustee reports violated that basic provision of the indenture to provide reporting to noteholders on a monthly basis; correct?

MS. BUCKEL:  Objection.  Form.

MS. MURPHY:  Objection.  Form.

THE WITNESS:  It certainly would have held them up.  I don't remember the scenario.  But if they never signed off, it certainly would have held that process up.

BY MR. KUSNETZ:

Q.    Well, if they never signed off, then there were -- there was no monthly reporting; correct?

A.    The report would have existed, it



just wouldn't have been posted, correct.    Relevance

Q.    It would have existed in your files?

A.    Yes, sir.

Q.    Okay.  Does that mean that if Patriarch, for example, wanted to look at the report, it would be able to request it as a part of its books and records request?

MS. BUCKEL:  Objection to form.

THE WITNESS:  I think that would be applicable to a books and records request, sure.  I don't remember if that was a thing.

BY MR. KUSNETZ:

Q.    Draft reports for -- would be applicable?

MS. BUCKEL:  Objection to form.

THE WITNESS:  I don't see why not.  I think it's pretty broad, books and records, right, I -- I would expect that we would produce that.

BY MR. KUSNETZ:

Q.    Okay.

MS. BUCKEL:  Objection.

BY MR. KUSNETZ:

Q.    Although trustee reports were no



Relevance

longer being issued on a monthly basis or
quarterly basis, did U.S. Bank still continue to
record cash flow from borrowers?

A.   Yes.  I don't think -- that would not
have stopped.

Q.   So the data that U.S. Bank --
withdrawn.  So the data that U.S. Bank received
to produce these trustee reports continued to
flow to U.S. Bank even though no trustee reports
were being issued; correct?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Objection to form.

THE WITNESS:  I believe so.

BY MR. KUSNETZ:

Q.   Okay.  So if there were draft trustee
reports, who are they provided to?

MS. BUCKEL:  Objection to form.

THE WITNESS:  Well, it would have
gone to the manager.

BY MR. KUSNETZ:

Q.   Okay.

A.   Alvarez.

Q.   Would it have gone to MBIA?

A.   No, I don't believe it would have
gone to MBIA.



Q.    Would it have gone to any of the noteholders for Zohar III?

A.    We usually don't send drafts to noteholders, no.

Q.    Do you recall ever sending a draft, even while Patriarch was the collateral manager of a trustee report to anyone but Patriarch?

A.    I don't believe so, no.

Q.    That would be out of the norm -- ordinary course of business; correct?

A.    Yeah.  I think it would be.  I -- you know, I can't say that it never happened, but I can't think of a scenario where that happened.

MR. KUSNETZ:  Okay.  All right.
Let's go to -- let's look at another
document.  It's going to be DeRoss
Exhibit 13.
(DeRoss Exhibit 13 marked for identification.)

BY MR. KUSNETZ:

Q.    This is Bates numbered U.S. Bank 7.
Okay.  This is an e-mail from Becky at U.S. Bank sent on January 4, 2017, to Thomas Macedonio at Alvarez & Marsal copying Elizabeth LaPuma, L-a-P-u-m-a; you, Scott DeRoss; and Morris

Relevance



Osmanovic, O-s -- Osmanovic from U.S. Bank?

A.    Yes.

Relevance

Q.    Do you see that?

A.    Yep.  Yes.

Q.    Okay.  Who is Morris Osmanovic?

A.    Morris was on the daily administrative team at the time.

Q.    Gotcha.  Okay.  So we've got everyone represented.  We have the analytics team, the deal administration team, and the account manager team on this e-mail; correct?

A.    Yes.

Q.    Okay.  Did he have any -- "he" being Morris, did he have any supervisory authority on the deal administration team?

A.    No.  I believe he was -- he was just a deal administrator assigned to the deal --

Q.    Gotcha.  Okay.

A.    -- at the time.

Q.    And you see the subject here is Zohar I cutoff balances?

A.    Yes.

Q.    And the date is for December 30, 2016?

A.    Yes.



Q.   Okay.  So this is several months into Alvarez & Marsal being the collateral manager; correct?

Relevance

A.   Yes.

Q.   Right.  Becky e-mails Thomas saying, "Please see attached balances of the Zohar I as of cutoff on December 30, 2016, with attached backup files."

Do you see that?

A.   Yes.

Q.   Okay.  And then she says, "Balances stayed pretty much consistent with last month."

Do you see that?

A.   Yes.

Q.   Is it common to provide commentary on the balances by --

MS. BUCKEL:  Objection to form.

BY MR. KUSNETZ:

Q.   -- U.S. Bank?

A.   I don't think so.  I don't know.

Q.   And she's requesting Thomas to agree with the balances so she can run the first draft of the report; correct?

A.   Yes.

Q.   So even before you can draft the



report, you need a confirmation from the collateral manager of the balances?

Relevance

MS. BUCKEL:  Objection to form.

THE WITNESS:  I don't know, honestly. I don't know why they would need that.  I guess she was doing that with Patriarch, so she's doing it here.

BY MR. KUSNETZ:

Q.   Did -- did she do that with Patriarch?

A.   I'm guessing she just continued to do what she was doing in the past.  So possibly.  I really -- I really don't know.

Q.   Okay.  All right.  Well, and then there's a chart here with -- with the different balances; correct?

A.   Yes.

Q.   And this is similar to that chart that we saw in the prior e-mail that Becky sent to Alvarez & Marsal; correct?

A.   Correct.

Q.   Okay.  Now, let's look at one of the attachments here to this e-mail.  If you go to last attachment, Bates Number U.S. Bank 12.  You see a draft U.S. Bank trustee report for



December 30, 2016?

Relevance

A.    Yes.

Q.    Okay.  And again, this is a draft.
You see "DRAFT" in all caps?

A.    Yes.

Q.    Okay.  Do you -- you were on this
e-mail.  So you received this document; correct?

A.    If I was on the e-mail, yes.

Q.    Okay.  You would have received it in
the ordinary course of business?

A.    They don't always copy me on this
stuff.  But, yeah, yes.

Q.    Okay.  And do you recognize this
draft trustee report?

A.    This looks like a typical report from
our office.  This is not all here.

Q.    Right.  This report was never
released to noteholders; correct?

A.    I don't know.

Q.    Do you know if U.S. Bank released any
trustee reports that were final after Alvarez &
Marsal took over as collateral manager?

A.    I don't know.  Honestly, I'd be
surprised if we didn't.  But --

Q.    Well, I mean, this is for Zohar I;



correct?

A.    Yes.

Relevance

Q.    So Zohar I is under your purview;
correct?

A.    Yes.

Q.    You are the account manager to Zohar
I at this time, which is -- you received the
e-mail in January of 2017; correct?

A.    Yes.

Q.    Okay.  And so part of your job as
account manager, right, is to ensure that the
trustee is doing what it needs to do under the
indenture; correct?

A.    Correct.

Q.    Right.  And there is a requirement to
produce trustee reports; correct?

A.    Correct.

MS. BUCKEL:  Objection to form.

BY MR. KUSNETZ:

Q.    So would it surprise you that there
were trustee reports issued by Zohar I -- issued
by U.S. Bank regarding Zohar I after Alvarez &
Marsal took over as collateral manager?

A.    I'm sorry --

Q.    Let me rephrase.



Would it surprise you that there were not trustee reports issued by Alvarez & Marsal?

Sorry.  Would it surprise you that there were not trustee reports issued by U.S. Bank regarding Zohar I after Alvarez & Marsal took over as collateral manager in March 2016?

Relevance

A.   It would surprise me.  I don't remember what was happening during that time.  Probably chaotic but --

Q.   Well, this, sir, is -- this is January of 2017; right?

A.   Yeah.

Q.   So this is like several months after Alvarez & Marsal took over; right?

A.   Yes.

Q.   Right.  We looked back at that prior document that Becky was sending the backup data to Alvarez & Marsal.  And that was just like a month or so after Alvarez & Marsal took over as collateral manager; correct?

A.   Yes.

Q.   But this is not that; right?

A.   I'm sorry, not --

Q.   This isn't a month after Alvarez &



Marsal took over?

Relevance

A.    When did they take over again?

Q.    March of 2016.  Does that sound right to you?

A.    Yeah, sounds right.

Q.    So are you saying -- I think your testimony was chaotic.  So is it fair to say that Alvarez & Marsal's term as collateral manager was chaotic from March of 2016 through the date of this e-mail, January 2017?

MS. BUCKEL:  Object to form.

MS. MURPHY:  Object to form.

THE WITNESS:  I don't know if that was the right word to use.  But it wasn't as smooth as it had been in the past in terms of getting reports out for sure.

BY MR. KUSNETZ:

Q.    It wasn't as -- so after Alvarez & Marsal became collateral manager, it wasn't as smooth as getting reports out to the noteholders and stakeholders as it was when Patriarch was the collateral manager; correct?

A.    That's correct.

Q.    And sitting here today, you don't know if this draft trustee report was ever



finalized and circulated?

A.    I don't know.  Yeah.  Sorry.

Relevance

Q.    Okay.  Put that away for a second. Let's do DeRoss Exhibit 14.

(DeRoss Exhibit 14 marked for identification.)

BY MR. KUSNETZ:

Q.    Bates Number Zohar-PPAS-00059111. Have you seen this document before?

A.    No.

Q.    Okay.  And just for the record, this is titled "Zohar II Status Update, Alvarez & Marsal Zohar Management, LLC" dated October 21, 2016.

Do you see that?

A.    Yes.

Q.    Okay.  And this has the Alvarez & Marsal logo on it; correct?

A.    Yes, looks like it.

Q.    This is not a U.S. Bank report; correct?

A.    Correct.

Q.    So this is a status update.  Do you know what a Zohar status update is, sir?

A.    No.



Q.   Neither do I.

MS. MURPHY:  Object to the commentary.

BY MR. KUSNETZ:

Q.   Do you recall if U.S. Bank assisted Alvarez & Marsal in preparing this document?

A.   I do not.

Q.   Okay.  Do you know what role U.S. Bank played in the preparation of this document?

MS. BUCKEL:  Object to form.

THE WITNESS:  No.

BY MR. KUSNETZ:

Q.   Do you know if U.S. Bank approved the release of this report?

MS. BUCKEL:  Object to form.

THE WITNESS:  No.

BY MR. KUSNETZ:

Q.   Do you know if U.S. Bank confirmed the accuracy of what's in this report?

MS. BUCKEL:  Object to form.

THE WITNESS:  No.

BY MR. KUSNETZ:

Q.   Do you know who the recipient of this status report was?



A.   No.

Q.   Okay.  Let's go to page 38 of the report, which is Bates Number 59149.  Do you see that this says, "Information supplied by the trustee"?

A.   Yes.

Q.   Okay.  And do you see where it says underneath, "All of the documents in the trustee's possession were provided by Patriarch while they were a collateral manager.  The trustee has represented that they have in turn provided all of these documents to AMZM as collateral manager totaling approximately 700 documents.  The document types are summarized below."

Do you see that?

A.   I do.

Q.   Is it true that all the documents in the trustee's possession was provided by Patriarch?

MS. BUCKEL:  Object to form.

THE WITNESS:  I don't know if all.  I don't know.

BY MR. KUSNETZ:

Q.   Well, the trustee independently



obtained information separate and apart from Patriarch; correct?

MS. BUCKEL:  Object to form.

THE WITNESS:  What information are you talking about?  Like, we -- we would have the doc -- the transaction documents; right?

I mean, there's certain things that obviously we would have, that we would have had from closing.

BY MR. KUSNETZ:

Q.   Well, for example, payments came directly to you; correct?

A.   Cash, yes.

Q.   Right.  So -- and you would be sending, for example, cash flow sheets to Patriarch.  Not the other way around; correct?

A.   Correct.

Q.   Okay.  So that's not exactly accurate; correct?

All the documents in the trustee's possession were provided by Patriarch?

MS. BUCKEL:  Object to form.

MS. MURPHY:  Object to form.

THE WITNESS:  Is it specific to this



list or like -- I don't know.

BY MR. KUSNETZ:

Q.   However you read it.  I'm asking generally.

MS. MURPHY:  Objection to form.

THE WITNESS:  I mean, I don't know how they received information.  I know we probably sent them some stuff.  But ...

BY MR. KUSNETZ:

Q.   That's not my -- that's not my question.  My question is just reading the first sentence here, do you agree with this sentence that all of the documents in the trustees's possession were provided by Patriarch?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Object to form.

THE WITNESS:  No, I don't think that that's completely accurate.  Depending on what documents we're talking about, I guess.

BY MR. KUSNETZ:

Q.   Okay.  And then looking here at this chart, "Trustee files provided to AMZM as of September 7, 2016."

Do you see that?



A.   Yes.

Q.   Okay.  It says total trustee documents 900 and -- sorry, 694.

Do you see that?

A.   Yes.

Q.   Are these standard files that the trustee had in its database --

MS. BUCKEL:  Objection to form.

BY MR. KUSNETZ:

Q.   -- at the time Patriarch was the collateral manager?

MS. BUCKEL:  Object to form.

THE WITNESS:  I don't know if they all were.  I'm looking through this.  I mean, I don't know that we had all the underlying credit agreements and amendments and things for all of the underlying assets.

BY MR. KUSNETZ:

Q.   Okay.

A.   Trade tickets, probably yes, CDO documents.

Q.   Do any of these types of documents --

A.   Probably --

Q.   I'm so sorry.  I didn't mean to



interrupt you.

A.   Sorry.  I'm just rambling.  Looking through this list.  I don't know.

Q.   Do any of these types of documents here, see the list here, do any of them stand out to you as surprising and unique?

MS. BUCKEL:  Object to form.

MS. MURPHY:  Object to form.

THE WITNESS:  No.  The only things that I don't think that we had consistently were like these operating agreements they mentioned and -- like the underlying documents, as they relate to the collateral, I don't believe we had all of that.  I believe the manager had all of that information.

BY MR. KUSNETZ:

Q.   Let's go to page 151.  Do you see that it says "Appendix B Portfolio Composition"?

A.   Sorry.

Q.   Oh, it says Bates Number 151.

A.   Oh, mic fell off here.

Sorry, I am struggling with this page.  It's stapled.

MS. MURPHY:  It looks like this, sir.



MR. KUSNETZ:  151, yeah.

THE WITNESS:  I don't know.

BY MR. KUSNETZ:

Q.   It's the -- the page of the document would be page 40.  There's no actual 40.  It's like a -- it's just a section header.  There you go.

A.   Struggling here.  I see it.

Q.   Okay.  See this says, "Appendix B Portfolio Composition"?

A.   Yes.

Q.   Okay.  Let's go to page 153.  So within that section of Appendix B Portfolio Composition, this says, "Portfolio composition as of August 31, 2016."

Do you see that?

A.   Yes.

Q.   Okay.  And it says under the title, "All debt balances, with the exception of PIK balances, are reported by Patriarch in the February 2016 trustee report and adjusted for trustee cash activity since the as-of date of that report through August 31, 2016."

You see that?

A.   Yes.



Q.    Then, "The PIK balances are provided by the trustee as of August 31, 2016."

So let's just break down that first sentence in italics, okay.  The chart below lists, "Debt balances by portfolio company."

Do you see that?

A.    Yes.

Q.    Okay.  And that's as of August 31, 2016?

A.    Yes.

Q.    Okay.  So the debt balances here are those debt balances that were reported by Patriarch all the way back in February of 2016, in the February 2016 trustee report; correct?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Objection.

THE WITNESS:  That's what it says.

BY MR. KUSNETZ:

Q.    But that they are also adjusted for trustee cash activity since the as-of date of that February 2016 report; correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  That's what it says, yeah.

BY MR. KUSNETZ:



Q.    Okay.  So what does that mean?  What do you understand that to mean?

A.    Looks like they took information from a February report and added activity through August 31st.

Q.    What is cash activity?  What is -- sorry, withdrawn.

What is trustee cash activity?

A.    That must be the transactional activity that's happening in the accounts.

Q.    And that means interest payments, for example; correct?

A.    Could mean, yes.

Q.    So --

A.    And this -- I'm sorry.  This is outstanding -- when -- if you're -- -- they're referring to, like, unfunded commitment, that's more of a principal thing, I think.

Q.    Okay.  And what does outstanding balance mean?

A.    Current outstanding.

Q.    And if you go to page 155, a couple pages later, this shows debt balances by loan facility, portfolio composition as of August 31, 2016.



Do you see that?

A.    Yes.

Q.    Okay.  And if you look at the italicized language underneath the heading, it, again, says that "All debt balances are" -- "here below are reported by Patriarch in the February 2016 trustee report, and adjusted for trustee cash activity since the as-of date of that report through August 31, 2016."

Do you see that?

A.    Yes.

Q.    Okay.  So this is, again, a combination of what was in the February 2016 trustee report, plus the cash activity that the trustee had in its possession up through August 31, 2016; correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  It looks that way, yes.

BY MR. KUSNETZ:

Q.    Okay.  And let's look at this chart. I mean, we see here "Manager ID."

Do you see that?

A.    Yes.

Q.    Okay.  So these are the security IDs that we saw in the formal official trustee



reports issued by U.S. Bank for many years; correct?

A.   They look the same.

Q.   Right.  And this mentions total commitment for each of those facilities.

You see that?

A.   Yes.

Q.   And outstanding balance; correct?

A.   Yes.

Q.   An unfunded commitment?

A.   Yes.

Q.   And PIK balance?

A.   Yes.

Q.   Right.  So similar information at the facility level as what the trustee reports used to disclose to the Zohar stakeholders when the trustee reports were publicized to the stakeholders; correct?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Objection to form.

THE WITNESS:  I think so, yes.

BY MR. KUSNETZ:

Q.   Do you know if this information, this portfolio composition debt balances by loan facility, including the total commitments and



outstanding balances, were disclosed to Patriarch?

MS. BUCKEL:  Objection to form.

THE WITNESS:  I don't know.

BY MR. KUSNETZ:

Q.   Well, this was not a report, as you testified, issued by the trustee; correct?

A.   Correct.

MS. MURPHY:  Asked and answered.

MS. BUCKEL:  Objection to form.

BY MR. KUSNETZ:

Q.   This was an Alvarez & Marsal report; right?

A.   Correct.

Q.   Okay.  As of this time, August -- well, October 2016, depicting August 31, 2016, data, there were no trustee reports being published to Patriarch; is that correct?

MS. BUCKEL:  Objection to form.

BY MR. KUSNETZ:

Q.   By U.S. Bank?

A.   I don't recall that.  If you know that and it's true, I don't doubt it.  But I don't know.

Q.   So someone is getting this detail,


DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

total commitment outstanding balance; right?

MS. MURPHY:  Objection to form.

THE WITNESS:  I don't know who they were distributing this to.  I don't recall this -- us being on -- a recipient of this.

BY MR. KUSNETZ:

Q.   Okay.  Do you know if this type of Zohar status update was mandated by the indenture?

MS. MURPHY:  Objection to form.

THE WITNESS:  I don't believe that it is.

BY MR. KUSNETZ:

Q.   This is a unique document; is it not?

MS. MURPHY:  Objection to form.

THE WITNESS:  Well, I don't know if this is their own internal purposes.  Because I don't know what this is and what it was used for.

BY MR. KUSNETZ:

Q.   Okay.  If you go to the first page of this document, so that's ending in Bates 112.  Okay.

Do you see the first sentence is



"This update is only being made available subject to the terms of a nondisclosure agreement"?

Do you see that?

A.   Yes.

Q.   Did the parties to the Zohar fund have to sign an NDA every time they received a trustee report?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Object to form.

THE WITNESS:  No.

BY MR. KUSNETZ:

Q.   I mean, in fact, they need to receive a trustee report; right?

Those trustee reports were posted on a website to which they all had access; correct?

MS. BUCKEL:  Objection to form.

MS. MURPHY:  Objection to form.

THE WITNESS:  Correct.

BY MR. KUSNETZ:

Q.   And "they" meaning all the Zohar stakeholders; correct?

A.   Correct.

Q.   You never made anyone sign an NDA to get a trustee report; correct?

MS. MURPHY:  Objection to form.



THE WITNESS:  They don't -- no, not NDAs.  They typically have to prove that they're a beneficial owner before they have access, but there's nothing really -- there's no magic to that.  It's not an NDA.

BY MR. KUSNETZ:

Q.   Not an NDA; right?  Okay.  You can set that aside.

So as this indicates, the reference to trustee cash activity means U.S. Bank was still receiving cash from the loans; is that correct?

A.   I believe so, yes.

Q.   Okay.  And U.S. Bank was receiving this payment activity independently of Alvarez & Marsal; correct?

A.   Yes.  I believe we were receiving it from Patriarch -- well, we were receiving it into the cash accounts.

Q.   Right.

A.   But I think -- I don't remember what happened with the agency services, honestly.

Q.   But US -- sorry.  I'm so sorry.

A.   No.  I was going to say I don't



recall if Alvarez took over as agency on noncollateral and we were getting notices from them, or if agency -- Patriarch Agency Services continued to send us the details of cash that we were to receive and continue to book that as normal.

Q.   Okay.

A.   But we were certainly still receiving cash on the underlying collateral.

Q.   Did -- did U.S. Bank report its payment activity that it received to Patriarch Partners after Alvarez & Marsal took over as collateral manager?

MS. BUCKEL:  Object to form.

THE WITNESS:  I don't recall, honestly.  Possibly.  There were still a holder.  I don't know.  It's possible.  I don't recall.

BY MR. KUSNETZ:

Q.   Did you ever receive an instruction not to provide information to noteholders?

MS. BUCKEL:  Object to form.

THE WITNESS:  No.

BY MR. KUSNETZ:

Q.   Okay.  Did U.S. Bank ever have any --



to the best of your knowledge, did U.S. Bank have any conversations with MBIA regarding investigation of any claims against Patriarch?

MS. BUCKEL:  Object to form.

THE WITNESS:  That does not sound familiar, no.

BY MR. KUSNETZ:

Q.  To the best of your knowledge, did U.S. Bank have any conversations with AMZM where -- regarding the investigation of claims against Patriarch?

MS. BUCKEL:  Object to form.

THE WITNESS:  I don't believe so.

BY MR. KUSNETZ:

Q.  Did you ever hear of any litigation benefits obtained by AMZM for not having produced trustee reports after March of 2016?

MS. BUCKEL:  Object to form.

THE WITNESS:  I don't understand the question.  I'm sorry.

BY MR. KUSNETZ:

Q.  Did anyone ever say, we're not doing the trustee reports because it won't be good for us in this litigation that we have with Patriarch?



MS. BUCKEL:  Object to form.

THE WITNESS:  No, I don't recall anything like that.

BY MR. KUSNETZ:

Q.  Okay.  But you recall that AMZM was engaged in litigation with Patriarch; correct?

MS. BUCKEL:  Object to form.

THE WITNESS:  I believe I'm aware of that.  I don't know what the substance of that was.

BY MR. KUSNETZ:

Q.  Okay.  Did Patriarch ever ask for trustee reports after March 2016, to the best of your knowledge?

A.  I don't know.  It's possible.  But I don't recall any specific requests.

Q.  Okay.  Per the terms of the indentures, they had a right to this information; correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  They were a noteholder, certainly, yes, sir.

BY MR. KUSNETZ:

Q.  And the indentures weren't amended after March of 2016, to the best of your



knowledge; correct?

A.    Not that I'm aware of, no.

Q.    Right.  And those indentures are clear about the rights of the noteholder to obtain this type of information; correct?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Objection.

THE WITNESS:  So after AMZM took over as collateral manager, nothing changed with respect to the noteholders contractual rights to obtain information; correct?

MS. BUCKEL:  Object to form.

MS. MURPHY:  Object to form.

THE WITNESS:  Not to my knowledge, no.

BY MR. KUSNETZ:

Q.    Okay.  Let's talk about borrowing requests.  Did the trustee receive or review borrowing requests before approving the issuance of funds --

MS. BUCKEL:  Object to form.

BY MR. KUSNETZ:

Q.    -- to borrowers?

A.    So, I mean, I wouldn't have been



plugged in to any of that.  If we got a signed issue order and it was in good form, that borrowing request would have happened.

Q.   Right.  So the borrowing request came in the form of a -- of an issue order; correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  That's the way I recall them being, yes, sir.

BY MR. KUSNETZ:

Q.   Well, I mean --

A.   That's the way they're done, yeah. Yes.

Q.   What's your understanding of an issue order, just for the record?

A.   It's a written direction from an authorized person, which is the collateral manager in this case.

Q.   So the collateral manager would send a written authorization in the form of an issue order to the trust for the trust to release funds to a particular borrower; correct?

A.   Correct.

Q.   That was a standard practice?

A.   Yes.

Q.   Okay.  You needed a formal issue



order; correct?

A.   We needed a signed direction, yes. And -- yes, it would be in the form of an issue order.

Q.   Okay.  Are you aware that from 2015 to early 2016, the portfolio companies fully drew down on their Zohar facilities?

MS. MURPHY:  Objection to form.

THE WITNESS:  No.  I mean, I don't -- I don't recall specifics of that.

BY MR. KUSNETZ:

Q.   Was that not within your purview?

A.   No, because that wouldn't have been something that came across my desk.

Q.   What department within U.S. Bank would --

A.   That it would have been deal administration.

Q.   Okay.

A.   Would have got an actual order, I guess, to loan money.

Q.   After -- after Alvarez & Marsal took over as collateral manager, did Alvarez & Marsal issue issuer orders to you?

A.   I don't believe so.  I don't recall



ever getting one.

Q.   But you do recall getting them from Patriarch; correct?

A.   I recall seeing issuer orders from Patriarch, yes.

Q.   While they were the collateral manager?

A.   Yes.

MR. KUSNETZ:   Okay.  All right. Let's do DeRoss Exhibit 15.

(DeRoss Exhibit 15 marked for identification.)

BY MR. KUSNETZ:

Q.   It's Bates Number Trustee_AP5957659.

Okay.  This is an e-mail from Becky at U.S. Bank sent September 3, 2015, to Keith Borelli at MBIA copying you, Scott DeRoss and lesliedeross@usbank.

A.   Yep.  That's a thing.

Q.   Who is Leslie DeRoss?

A.   She's my wife.

Q.   Is she involved in the Zohar funds too?

A.   No.  She -- at this time, she was a manager of the operational teams that supported



CDO.

Q.    Supported CDO broadly?

A.    Yes.

Q.    Okay.  And what role, if any, did she have with respect to the Zohar funds?

A.    Nothing.

Q.    Well, she received an e-mail to CC. Was that a mistake from Becky?

A.    It's possible.  I don't know why they would have copied her, quite honestly.

Q.    Okay.

A.    I do get e-mails for her and vice versa.

Q.    Will you be in trouble at home if I have to depose Leslie as a result of this document?

A.    I think you should -- I think you should do that.

Q.    Oh, I should do that?  Okay.

We'll see if we can get that redacted from the transcript.  Looking at this, at this e-mail, again, this is in September 2015.  So Patriarch is still collateral manager at this point; correct?

A.    I believe so, yes.



Q.   This is pre-March 2016?

A.   2015, yeah, that's right before we went to default, yes, sir.

Q.   Becky's -- do you recall receiving this e-mail?

A.   No.

Q.   Okay.  Would you have received it in the ordinary course of business?

A.   No.  No.  I think just under the circumstances, she started -- she would have just started copying me on stuff.

Q.   Let me -- let me just -- when I say receiving it in the ordinary course of business, that's kind of like a legal term of art.  Meaning like you received this in connection with your role at U.S. Bank; correct?

A.   Yes.

Q.   Okay.  Now, what I think you were trying to say was it was not necessarily common for you to receive this type of e-mail; correct?

A.   They didn't copy me in on everything.

Q.   Yeah.

A.   But given the circumstances surrounding this deal and the timing, I imagine that's what why she copied me in.



Q.   Right.  Because this is around the time of -- this is leading up to the default of Zohar I; correct?

A.   Yes.

Q.   Okay.  All right.  So Becky's e-mailing Keith, "Hi Keith.  I have attached the backup for the unfunded/revolver amounts as of July 31st and August 10th, (Excel files attached.)"

And sentence, "So using the example that we spoke about on the phone, Croscil Home unfounded -- unfunded balance."  C-r-o-s-c-i-l. And then there's a chart here.  Do you see that?

A.   I do.

Q.   Okay.  And what does this chart depict?

A.   This looks like activity on a specific loan, Croscil Home.

Q.   Okay.

A.   And it looks like it relates back to the earlier e-mail that he sent wanting to have a conversation.

Q.   So you think this relates to the -- well, if you go to the next page, which is Bates 660, you'll see that this is a continuation of



that e-mail exchange --

A.   Yes.

Q.   -- that we saw that was in a prior exhibit; correct?

A.   Yes.

Q.   Okay.  So Becky's referencing an example we spoke about on the phone.  Is that an example provided by U.S. Bank or requested of U.S. Bank?

MS. MURPHY:  Objection to form.

THE WITNESS:  I'm not sure I understand the question.  But we must have discussed --

BY MR. KUSNETZ:

Q.   Whose example was it, yours or theirs that they wanted to see?

MS. MURPHY:  Objection to form.

THE WITNESS:  He must have asked us for an example of activity on a loan.  I don't know if -- it must have been a specific one.

BY MR. KUSNETZ:

Q.   Okay.

A.   But he must have been looking to see the transactional activity of this particular



loan, I guess for a specific date range.  I don't know.

Q.   So it shows at the top here of this chart the unfunded balance to Croscil Home as of July 31, 2015; correct?

A.   Yes.

Q.   Okay.  And that's $2.9 million?

A.   Yes.

Q.   And then it shows some activity during the month of August; correct?

A.   Yes.

Q.   And the first line says, "Paydown."

What does that refer to?

A.   Principal payment.  So back to the deal, money coming in.

Q.   Okay.  And what is the next line?

A.   Oh, wait.  Maybe I had that reversed.

I think that's right.  I think that's the loan paying down some of its principal.

Q.   Okay.

A.   I don't know.  If I had this on a spreadsheet, I could see if it's being added or subtracted.

Q.   Would it only be principal or could it be principal and interest.  What do you --



A.   I would assume it's only principal. When you -- if you use the term "paydown," I kind of attach that to a principal repayment.

Q.   So she makes reference -- "she" meaning Becky makes reference to unfunded/revolver amounts.  Could this be revolver activity?

A.   That's what it looks like, yes.

Q.   What is revolver activity?

A.   It's when you have a revolving loan when you can draw and pay down the balance. Like, the balance can go up and down.  Revolvers act that way.

Q.   Understood.  And so this is -- leading up to the maturity date of Zohar I, there is still revolver activity at least with respect to this particular portfolio company, Croscil Home.  You see that?

A.   Looks like that way, yes.

Q.   Okay.  And what does borrowing mean in the next line down?

A.   It means when they draw, request money from the company, I guess.

Q.   Okay.  And then there's a August 10th unfunded balance.  Do you see that at the --



A.   Oh, yes.

Q.   About $3.9 million?

A.   Yes.

Q.   So in about ten days, the unfunded balance for Croscil increased about $100,000, is that fair to say -- sorry, a million dollars?

A.   A million dollars.

Q.   A million dollars?

A.   Yes.

Q.   Thank you.  Okay.  So these are -- Becky's referring to these paydowns and borrowings that were booked on your system.

Do you see that?

A.   Yes.

Q.   Okay.  And that they were communicated to us by the collateral manager. Meaning Patriarch communicated to U.S. Bank these paydowns and borrowings, and what's depicted here is from U.S. Bank's recording of that; correct?

A.   Yes.

Q.   Okay.  And to your knowledge, were these funds released to borrowers after the borrowing request was made?

A.   If a borrowing request was made, that money would have come into the deal; right?



Do I have that reversed?  I don't know.

Q.   Okay.  So you see there's a number of attachments here?

A.   I do.

Q.   Okay.  Let's look at page 665.

A.   665.

Q.   See, this is a document issued by Patriarch Partners Agency Services?

A.   Yes.

Q.   Okay.  This one is, for example, regarding Hartwell Industries.  Do you see that?

A.   Yes.

Q.   And do you see that this document shows that the borrower has requested a borrowing?

A.   Yes.

Q.   Okay.

A.   And I think I had them reversed. That looks like money goes out.

Q.   And so this has for Zohar I, Zohar II, Zohar III.

You see a chart here?

A.   Yep.  Yeah.

Q.   So this shows how much is coming out



of Zohar I, II, and III in connection with this borrowing?

A.   Yes.

Q.   Okay.  And if you look at the next page, 666, also Hartwell Industries, same facility, 802-04.  The borrower has requested a principal payment.

What does that mean?

A.   That -- okay.  So that looks like they're repaying the loan.  So that's money coming back into the deal.

Q.   Right.  And so -- and they're repaying for Zohar I, Zohar II, and Zohar III; correct?

A.   Correct.

Q.   Okay.  So all of these borrowings leading up to the default of Zohar I are documented; correct?

A.   Yes.

Q.   And there's that borrowing request backup, and that's being provided by PPSA, Patriarch Administrative Services; correct?

A.   Yes.

THE VIDEOGRAPHER:  Be mindful of the mic.



BY MR. KUSNETZ:

Q.   And U.S. Bank would not have released these funds to the borrowers if they were not properly documented; correct?

MS. MURPHY:  Objection.

THE WITNESS:  I don't believe so, yes.

BY MR. KUSNETZ:

Q.   It would have surprised you if they released these funds to borrowers if the -- there was not proper documentation; correct?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Objection.

THE WITNESS:  Correct.

BY MR. KUSNETZ:

Q.   So this isn't just Patriarch disbursing money; it has to go through you first; correct?

MS. MURPHY:  Objection.

MS. BUCKEL:  Objection to form.

THE WITNESS:  Correct.

BY MR. KUSNETZ:

Q.   And you need backup in order to do that; correct?

MS. MURPHY:  Objection.



MS. BUCKEL:  Objection to form.

THE WITNESS:  Correct.

MR. KUSNETZ:  Let's do DeRoss Exhibit 16.

Relevance

(DeRoss Exhibit 16 marked for identification.)

BY MR. KUSNETZ:

Q.    Bates Number is Alvarez_PPAS 0001279.

Okay.  This is a e-mail -- this is an e-mail chain.  The first e-mail in the chain is from Chen Zou at Patriarch Partners on March 4, 2016, sent to a number of people.  There's an e-mail address of Patriarch.team@usbank.

Do you see that?

A.    Yes.

Q.    What's that?

A.    That looks like a group e-mail that was set up.

Q.    Okay.

A.    I don't know who the participants are.

Q.    Are you part of that Listserv?

A.    I don't -- I don't know if I was or not, honestly.

Q.    Would that --



A.   That may be the Chicago team.  I see Lou and -- looks like the Chicago team copied here, so ...

Q.   Do you see the subject is Zohar I, II, III?  You see that?

A.   Yes.

Q.   So that would include Zohar I; correct?

A.   It does.

Q.   Okay.  And you see it says, "Zohar I, II, III, borrowings and repayment and issue orders, March 4, 2016"?

A.   Yes.

Q.   Okay.  Now, let's look at some of the names here for U.S. Bank.

Omar Flores.  Who's that?

A.   I don't know.

Q.   Okay.  Christopher Simanic?

A.   Simanic.  Chris is still with us. Yeah, he was -- he might have been a deal administrator at that time.  He's an account manager/manager now.

Q.   But he was in deal administration at the time --

A.   I believe so.



Q.    -- to the best of your knowledge?

A.    Yes, I believe so.

Q.    Okay.  And that's S-i-m-a-n-i-c.

David Platt, P-l-a-t-t.  Who's that?

A.    I don't know that name.

Q.    Okay.  Ria Newton, we've already seen before; correct?

A.    Yes.

Q.    Louis Marucheau?  Who's that?

A.    Marucheau.

Q.    Marucheau.

A.    Lou was my -- was -- played the same role that I did for the Zohar transactions out of Chicago.  So Lou was an account manager in Chicago.

Q.    For which Zohar transactions?

A.    II and III.

Q.    II and III.  Okay.

A.    I don't know if he was the account manager, or he managed the account managers that ran it.  But he was a contact for the Chicago office.

Q.    He was a peer reviewer for the other Zohars; correct?

A.    Yes.  Yes.



Q.    And that's spelled M-a-r-u-c-h-e-a-u.

A.    That's right.

      Lou is no longer with the bank.

Q.    Okay.  And Taylor Potts, P-o-t-t-s.
Who's that?

A.    Taylor Potts is an account manager in
Chicago.

Q.    Okay.  And Marcus Foster,
F-o-s-t-e-r, at U.S. Bank?

A.    I don't know that name.

Q.    Okay.  CC'd on this is loan
administration at Patriarch Partners and
accounting at Patriarch Partners.

      Do you see that?

A.    Yes.

Q.    Did you ever correspond with loan
administration or accounting at Patriarch?

A.    I don't -- I don't believe so.

Q.    Okay.  But I don't see you on this
e-mail; correct?

A.    Correct.

Q.    And to the best of your knowledge,
you're not on the Patriarch.team@usbank.com
Listserv?

A.    No, I don't believe so.  I don't know



if that -- that address still exists, but I don't recall being a part of that.

Q.    And were you -- who was responsible for acting on issue or orders for Patriarch within U.S. Bank?

Relevance

A.    Well, the deal administration team would process them.

Q.    Okay.

A.    They would send the money.  Or receive -- or, you know, receive or send the money.

Q.    And you recognize some of the folks here as being on the deal administration team but in other locations; correct?

A.    Yes.

Q.    Okay.  So this was sent from Patriarch on March 4, 2016, to a number of folks at U.S. Bank; correct?

A.    Yes.

Q.    And it says, "Please see attached borrowings and repayments as Zohar I, II, III issuer orders.  Please advise once funds have been released."

Do you see that?

A.    I do.



Q.   Okay.  Then Louis forwards that e-mail about four hours later, but counting for the time difference, I'm not sure exactly, but same day, to Liz LaPuma, saying, "Hi, Liz. Please see the attached issuer orders for revolver payments today.  Do you approve sending these out?  Please note we get these typically every day."

Relevance

See that?

A.   I do.

Q.   Okay.  Lou was on the account managing side of U.S. Bank but for Zohar's II and III at this time; correct?

A.   Correct.

Q.   Okay.  So in your recollection for Zohar I, did you typically get issuer orders for revolver payments every day?

A.   I didn't see them come through.  But I'm sure they -- I'm sure they did.

Q.   You wouldn't be surprised if they came in every day, just maybe not to your knowledge?

A.   Correct.

Q.   Okay.  Because they're more relevant to the deal administration team; correct?



A.    Correct.                                     Relevance

Q.    Okay.  And then Elizabeth replies several hours later, "Approved."

Do you see that?

A.    I do.

Q.    Now, CC'd on her e-mail is a guy named Kevin Kay.

Do you know who that is?

A.    I don't.

Q.    Okay.  Or Kris Kay -- so Kevin Kay, K-a-y, and then Kris, K-r-i-s, Talgo, T-a-l-g-o, from Alvarez & Marsal.

Do you see that?

A.    I do.

Q.    Do you know who that is?

A.    I don't recognize those names, no.

Q.    Okay.  And then your CC'd here.  You see that?

A.    Yeah.  Yes.

Q.    Okay.  Now, I don't have this mail chain in front of me in terms of the -- electronically, but would it have been Louis who would copy you onto this chain after you weren't on it before or would you expect it would be Elizabeth LaPuma to copy you?



MS. BUCKEL:  Object to form.

MS. MURPHY:  Object to form.

THE WITNESS:  I'm assuming Lou wrote me in.

Relevance

BY MR. KUSNETZ:

Q.   Do you recall having one-on-one e-mail correspondences with Elizabeth LaPuma at this time?

A.   I'm sure we e-mailed back and forth. I don't remember about what.

Q.   But it would make -- just to -- it would make sense that it would be Lou who would be copying you and not Ms. LaPuma; is that correct?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Objection to form.

THE WITNESS:  In this context?

BY MR. KUSNETZ:

Q.   In this context.

A.   Yes, I believe Lou is letting -- you know, making me aware that these exist, and he's going to the new manager for approval.

Q.   Okay.  And when you say "the new manager," so as of this date, March 4th, 2016, Alvarez & Marsal is the --



A.    They must have, yes.

Q.    -- collateral manager.

Okay.  And U.S. Bank required their approval to release the funds just like they required Patriarch's approval to release the funds to borrowers; correct?

A.    Yeah, that sounds right.

MR. KUSNETZ:  And let's go to another similar exhibit.  This will be DeRoss 17.  Bates Number Alvarez_PPAS 1281.

(DeRoss Exhibit 17 marked for identification.)

BY MR. KUSNETZ:

Q.    Okay.  This is an e-mail chain.  But the initial e-mail is reneedudley@patriarch to a number of folks at U.S. Bank, similar people as the prior e-mail that we saw.

A.    Yes.

Q.    But it does not appear that you are copied on it.  Do you see that?

A.    Yes.

Q.    Okay.  And this is on March 7, 2016. The subject is, "Zohar I, II, III, borrowings and repayment issuer orders March 7, 2016."

Do you see that?

Relevance



SCOTT DEROSS  Confidential                                October 09, 2025
David Dunn vs Patriarch Partners                                        340

Relevance

A.    Yes, I do.

Q.    So the prior one that we looked at had the same subject line, except it said March 4th, 2016; correct?

A.    Yes.

Q.    And so three days, later there's another e-mail just like this; right?

A.    Yes.

Q.    Does that comport with Lou's e-mail to Liz LaPuma saying, "We typically get these every day"?

A.    It does.

Q.    Okay.  And, in fact, the same language is included in Renee's e-mail as it is in Chen Zou's e-mail; right?  "Please see attached borrowings, repayments."

Do you see all that?

A.    I do.

Q.    "Please advise once funds have been released."

Do you see that?

A.    I do.

Q.    Okay.  And then what Lou is doing is he's now forwarding this e-mail to Elizabeth LaPuma and Kris Talgo and Kevin Kay at



Relevance

Alvarez & Marsal and CC'g you; correct?

A.    Yes.

Q.    Okay.  And he writes, "Hi" -- and this is on same day in the afternoon, March 7, 2016, "Hi Liz.  Please see the attached borrower request.  Please let us know if you approve."

You see that?

A.    I do.

Q.    Okay.  And if you look at the attachments -- for example, if you go to -- if you flip through them, you will see that there are similar backup documentations for these borrowing requests.  Do you see that?

A.    I do.

Q.    Okay.  And, again, this is -- these borrowing request issuer orders with the backup here is the type of documentation that U.S. Bank needed in order to release funds to the borrowers; correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes.  This is typical of a -- of this type of collateral.

BY MR. KUSNETZ:

Q.    And U.S. Bank would not have released these funds without Alvarez & Marsal's expressed



David Dunn vs Patriarch Partners                              342

Relevance

authorization; correct?

A.   I don't believe that we would, no.

Q.   Right.  And this e-mail that you're CC'd on from Lou to Elizabeth LaPuma is asking her for her approval of the borrowing requests; right?

A.   Yes.

Q.   So if she didn't respond, U.S. Bank, in the ordinary course, would not approve the borrowing request; correct?

MS. BUCKEL:  Object to form.

THE WITNESS:  I don't think so.  I don't know what happened here, but --

BY MR. KUSNETZ:

Q.   So any drawdowns after AMZM took over were properly -- had to be properly authorized by AMZM; correct?

MS. MURPHY:  Objection.  Form.

MS. BUCKEL:  Objection.  Form.

THE WITNESS:  I believe so, yes.

BY MR. KUSNETZ:

Q.   Okay.  Do you know if AMZM continued to release funds at the request of borrowers?

A.   I believe so.  I have -- I don't recall any issues with them not doing that.



800.211.DEPO (3376)
EsquireSolutions.com

Q.    Okay.  Let's take a quick break and then we're very close to the end, if that's okay.

THE VIDEOGRAPHER:  Time on the monitor is 4:30 p.m.  We're off the record.

(Recess taken from 4:30 p.m. until 4:52 p.m.)

THE VIDEOGRAPHER:  Time on the monitor is 4:52 p.m.  We are back on the record.

BY MR. KUSNETZ:

Q.    Okay.  Let's change to a different subject, Mr. DeRoss.  Moving to the period after the Zohar I default, okay?

A.    Okay.

Q.    Are you -- I'm focusing on April 2016, around the time that Alvarez & Marsal became the new collateral manager, okay?

A.    Okay.

Q.    Mr. DeRoss, are you familiar with what's called an interpleader action that U.S. Bank filed on April 22, 2016?

A.    Maybe.  I'm not sure.

Q.    All right.  Well, let's just show you the --

A.    Yeah.



Q.   -- the complaint.

We are not going to go through it.

A.   Okay.

Q.   Just to just to refresh your recollection.

MR. KUSNETZ:  This is going to be DeRoss Exhibit 18.  There's no Bates Number.

(DeRoss Exhibit 18 marked for identification.)

BY MR. KUSNETZ:

Q.   Okay.  Mr. DeRoss, do you see that this is the first amended interpleader complaint filed in the Supreme Court of the State of New York County -- sorry, in the State of New York, County of New York.  Do you see that?

A.   I do.

Q.   If you see the parties here, the plaintiff is U.S. Bank National Association.  Do you see that?

A.   I do.

Q.   The interpleader plaintiff.  And the interpleader defendants are three Patriarch Partner entities and Alvarez & Marsal Zohar Management, LLC.



Do you see that?

A.    I do.

Q.    And those three Patriarch Partner entities, those are the entities that were the collateral managers for each of the three Zohar funds; correct?

A.    Correct.

Q.    Okay.  No reason to disagree?

A.    No reason to disagree.

Q.    Okay.  So U.S. Bank in April of 2016 sued the Patriarch collateral managers and the current collateral manager, Alvarez & Marsal; correct?

A.    Appears that way.

Q.    Okay.  Do you know what an interpleader is?

A.    I believe I've seen a couple of these in my day.  I believe it's when there's a dispute over who to pay, you know, we're not really quite sure what action to take.

Q.    That's precisely it.  Fair to say that U.S. Bank filed this action to seek an adjudication from the Court on how to apportion collateral management fees to either Patriarch or Alvarez & Marsal?



A.   The fees, yes, I recall.

Q.   Okay.  Do you recall being involved at all in the preparation of this lawsuit, yes or no?

A.   No.

Q.   Okay.  And, again, I am not going to ask for any privileged information.  So if I get close to it or anything, obviously please caution me because that's not my goal.

Did -- are you aware of U.S. Bank having any conversations with MBIA about the interpleader complaint before U.S. Bank filed it?

A.   No.

Q.   Are you aware of U.S. Bank having any conversations with Alvarez & Marsal about the interpleader action before filing it?

A.   No.

Q.   Was U.S. Bank, to the best of your knowledge, encouraged by MBIA to bring the interpleader action?

MS. BUCKEL:  Object to form.

THE WITNESS:  No, I don't believe so.

BY MR. KUSNETZ:

Q.   To the best of your knowledge, was U.S. Bank encouraged by AMZM to bring the



interpleader action?

MS. BUCKEL:  Object to form.

THE WITNESS:  No, I don't believe so.

BY MR. KUSNETZ:

Q.  Okay.  Was this -- so this interpleader action was brought April 22, 2016; right?  The copy you have is the amended one?

A.  Okay.

Q.  But any reason to doubt?

A.  No.

Q.  Okay.  That's just weeks after Alvarez & Marsal became the new collateral manager; correct?

A.  I believe so, yes.

Q.  Okay.  And did Alvarez & Marsal instruct U.S. Bank to file this complaint, to the best of your knowledge?

A.  No, I don't believe so.

MS. BUCKEL:  Object to form.

BY MR. KUSNETZ:

Q.  But would you be the one to -- would you -- withdrawn.

Could they have instructed -- withdrawn.

Could Alvarez & Marsal have



800.211.DEPO (3376)
EsquireSolutions.com

instructed U.S. Bank to bring this action without you knowing?

MS. BUCKEL:  Object to form.

THE WITNESS:  I guess that's possible.  I don't know.  I remember this interpleader.  I don't remember like what the happening surrounding it were, honestly.

BY MR. KUSNETZ:

Q.    You don't remember how it came to be?

A.    Yes, sir, that's right.

Q.    Okay.

A.    I know it's around some fees, but I don't -- I just can't recall the substance of it.

Q.    Okay.  Following the filing of the interpleader action, the Octaluna equities made information requests of the trustee.

Do you recall that?

A.    I'm not sure.

Q.    Do you remember the Octalunas as being the preference shareholders of the Zohar funds?

A.    Yes.

Q.    Okay.  Do you recall that at some point the Octaluna entities were also the



taxpayers for the Zohar funds?

A.    I remember discussions surrounding that.  I'm not sure I understood what that meant. But I remember some correspondence or letters or something from Lynn about payment of taxes, I think.

Q.    Okay.

A.    It does --

Q.    It rings a bell?

A.    -- ring a bell, certainly, but I don't --

Q.    All right.  So I'm going to show you what's going to be marked as DeRoss Exhibit 19. It's an e-mail chain that attaches a letter.  The Bates Number is Zohar-PPAS-12414.

(DeRoss Exhibit 19 marked for identification.)

BY MR. KUSNETZ:

Q.    This is an e-mail sent by Thomas Macedonio of Alvarez & Marsal to you, Scott DeRoss, Taylor Potts at U.S. Bank, and copying you and Marucheau at U.S. Bank on June 16, 2016. Subject is, "June 15 Patriarch letter."

Do you see that?

A.    I do.


ESQUIRE
DEPOSITION SOLUTIONS

Q.   Okay.  And you would have received this in the ordinary course of business; correct?

A.   Yes.

Q.   Okay.  Thomas writes, "Scott, I know you were copied on the initial e-mail from Patriarch which contained the attached letter."

And you see that?

A.   Yes.

Q.   Okay.  And then he writes in the next paragraph, "I want to see if either of you could provide some information regarding the below two questions to help us get a better understanding. Do you have a listing of all the holders of each of the different debt tranches?"

Do you see that?

A.   Yes.

Q.   And the second question is, "Do you know what the tax liability is for the funds mentioned in the letter."

See that?

A.   Yes.

Q.   Okay.  And you reply, "Hi, Tom" -- and you reply just minutes later.

"Hi, Tom.  Do you have a listing of all the holders of each of the different debt



tranche -- tranches?  We would have holder info, yes.  Do you know what the tax liability is for the funds mentioned in the letter?  I don't know the answer to this one."

So you're saying yes, you know the answer to the first question, but you don't know the answer to the second question?

A.   Yeah.  I probably just pasted in, and my answers were probably in red.  But that's right.

Q.   Okay.  So yes to the first question, no to the second; correct?

A.   Correct.

Q.   Okay.  And then what's attached is this letter to Patriarch Partners dated June 15th.  Okay?

A.   Yes.

Q.   2016.  And I'll represent to you that that was a Wednesday.  Okay?

A.   Okay.

Q.   And you see that this letter is being sent to U.S. Bank National Association?  You see that?

A.   Yes.

Q.   As well as the Zohar funds; correct?



A.   Yes.

Q.   Okay.  And as you go to the next page, as well as Alvarez & Marsal; correct?

A.   Yes.

Q.   Okay.  So let's look at this letter. Just -- we're going to look at parts of it.

If you look at the second paragraph of this letter, Ms. -- I'm sorry.  The letter is written -- if you look at the last page -- by Ms. Tilton.  That's her signature; correct?

A.   Yes.

Q.   Okay.  And she's writing, as you can see on the signature page, on behalf of the Octaluna entities; correct?

A.   Yes.

Q.   Those were the preference shareholders; correct?

A.   I believe so, yes.

Q.   Now, she writes, on the second paragraph, "Octaluna LLC, Octaluna II LLC, and Octaluna III LLC, the Octalunas, the longstanding preference shareholders and taxpayers for the three Zohar funds demand the following information pursuant to the Zohar funds' respective preference share paying agent



agreements dated as of November 3, 2003, January 12, 2005, and April 6, 2007."  And in parentheses, the PSPAAs as the defined term, "and the relevant law."

Do you see that?

A.    I do.

Q.    Okay.  And so does this indicate that, per Ms. Tilton, the Octalunas were the longstanding preferred shareholders and taxpayers for the three Zohar funds?

A.    I know they were the preference shareholders.  I don't -- I don't think I ever understood what, like, the taxpayers meant, honestly.

Q.    Okay.

A.    I've not seen that in any other transaction.

Q.    Well, Mr. Macedonio, when he e-mails you a copy of this letter, which you had received originally per his e-mail, he asks, "Do you know what the tax liability is for the funds mentioned within the letter?"

A.    Yeah, he asked --

Q.    He asked that; right?

A.    He did ask that, yes.



DEPOSITION SOLUTIONS

Q.   Okay.  He didn't say I don't know what she's talking about.  She's not the taxpayer; right?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Objection to form.

THE WITNESS:  He didn't say that?

BY MR. KUSNETZ:

Q.   I'm -- did he say that?

A.   No, I don't think -- he didn't say that.

Q.   Right.  He's asking about what the tax liability is, and you don't know the answer; correct?

A.   I do not know the answer.

Q.   Okay.  So you have no reason to believe that Ms. Tilton was not the taxpayer for the three Zohar funds as to this time; correct?

MS. BUCKEL:  Object to form.

THE WITNESS:  No.  No reason.

BY MR. KUSNETZ:

Q.   Okay.  Moving to the next paragraph, Ms. Tilton writes, "As an initial matter, since A&M has been the collateral manager for the Zohar funds, no monthly trustee reports, no valuation reports or financial statements have been



issued."

Do you see that?

A.   Yes.

Q.   Okay.  And so this is Ms. Tilton saying to you and the Zohar funds and Alvarez & Marsal that as of June 15, 2016, a few months after Alvarez & Marsal had taken over as collateral manager, no trustee reports or financial statements have been issued; correct?

A.   Yes.

Q.   Do you have any reason to believe that she is incorrect in that statement?

A.   No.

Q.   Okay.  And so that means that draft statement that we saw earlier, that was not released; correct?

MS. BUCKEL:  Objection to form.

THE WITNESS:  It appears so.  I vaguely remember the happenings here.  I just remember not -- they were not able to get signed off from Alvarez on those reports for those months.  I don't remember how this played out, honestly.

MS. MURPHY:  Wasn't that draft statement dated after this e-mail?



MR. KUSNETZ:  Perhaps.  I don't recall.

BY MR. KUSNETZ:

Q.    If there were draft statements, they were not released per the final --

A.    I don't believe we would have posted drafted statements out to --

Q.    Okay.

MR. KUSNETZ:  If it was, I apologize.  And I appreciate the clarification.

BY MR. KUSNETZ:

Q.    She continues, "As the preference shareholders of each of the Zohar funds pursuant to Section 7.1 of the PSPAAs, we demand that the trustee reports and note valuation reports for March, April and May 2016, respectively, be provided no later than Friday, June 17, 2016."

Do you see that?

A.    Yes.

Q.    Okay.  So Ms. Tilton, on behalf of the Octalunas, is asking for the three prior monthly trustee reports, for example; correct?

A.    Correct.

Q.    Okay.  "We further demand," she writes, "that the issuer and/or collateral



manager provide copies of the quarterly fund
financial statements for each of the Zohar funds
due in March, April, May of 2016.  Also no later
than June 17, 2016."

          Do you see that?

     A.   Yes.

     Q.   Does U.S. Bank have any role with the
preparation of the financial statements of the
Zohar funds?

          MS. BUCKEL:  Object to form.

          THE WITNESS:  No, I believe we used
     to just mail them out when we received
     them from Patriarch, I believe.

BY MR. KUSNETZ:

     Q.   But you didn't prepare them; correct?

     A.   No.

     Q.   "You" meaning U.S. Bank?

     A.   U.S. Bank.

     Q.   I understand you're not here on
behalf of U.S. Bank, but on behalf of you
yourself.  She then writes, "The failure to
produce such monthly reports and financial
statements are a clear breach of the Zohar fund
indentures."

          Do you see that?


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

A.    Yes.

Q.    Okay.  That's correct; correct?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Objection to form.

THE WITNESS:  If that's what the indentures require, yes.

BY MR. KUSNETZ:

Q.    Okay.  Moving on to the next page of this document, do you see that the last full paragraph, which begins, "In light of the foregoing"?  Do you see that?

A.    Yes.

Q.    You see the first sentence is italicized?

A.    I do.

Q.    Okay.  So when someone puts something in italics, it's usually to emphasize something; correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  I think so.

BY MR. KUSNETZ:

Q.    Well, if it's the only thing that's italicized in this entire letter, it is fair to say that Ms. Tilton was trying to emphasize this particular sentence; correct?



MS. MURPHY:  Objection.  Form.

THE WITNESS:  I don't know what she was trying to do, but sure.

BY MR. KUSNETZ:

Q.  Well, it stands out?

A.  It stands out.  It does.

Q.  She writes, "In light of the foregoing, please be aware that if the information requested above is not provided by this Friday, the Octalunas will no longer assume the liability of taxpayer for the funds."

Do you see that?

A.  Yes.

Q.  Okay.  So here Ms. Tilton is notifying U.S. Bank, the Zohar funds, and Alvarez & Marsal that if the trustee reports and financial statements are not provided in the next two days, the Octalunas will no longer assume the liability of -- of taxpayer for the funds; correct?

A.  Correct.

Q.  Okay.  That implies that the Octalunas were, in fact, the taxpayer for the funds as of this time; correct?

A.  She said they were.  I have no reason



to doubt that.

Q.   Okay.  She then writes, "It is simply unfair and inequitable to expect the Octalunas to continue to bear that substantial tax burden while at the same time refusing to provide essential information necessary to prepare the tax returns."

Do you see that?

A.   I do.

Q.   Okay.  Do you have any reason to disagree with Ms. Tilton's statement that I just read?

MS. MURPHY:  Objection to form.

THE WITNESS:  Which statement?  I'm sorry.

BY MR. KUSNETZ:

Q.   That it's simply unfair and equitable to expect the Octalunas to continue to bear the substantial tax burden while at the same time refusing to provide essential information necessary to prepare tax returns?

A.   I don't understand the tax burden placed on those entities, so I -- if she says so, I have no reason to disagree.

Q.   Okay.  U.S. Bank did not, however,



provide the information that the Octalunas

requested --

          MS. BUCKEL:  Object to form.

BY MR. KUSNETZ:

    Q.   -- correct?

    A.   Well, she's requesting it from the
issuer and the collateral manager.  But, no, I
don't believe we did.

    Q.   Well, to be fair, she's also
requesting it directly to U.S. Bank; correct?

    A.   Okay.

    Q.   Just look at first sentence of this
letter.  "To U.S. Bank."

    Do you see that?

    A.   Yes.

    Q.   Okay.  But in addition to the Zohar
funds and Alvarez & Marsal; correct?

    A.   Correct.

    Q.   Okay.  So U.S. Bank, to your
knowledge, did not provide the requested
information that was enumerated in this letter to
the Octalunas; correct?

          MS. BUCKEL:  Object to form.

          THE WITNESS:  I don't believe we did.

BY MR. KUSNETZ:



Q.   Okay.  Do you recall any instruction by anybody not to comply with this letter?

MS. BUCKEL:  Object to form.

THE WITNESS:  No.

BY MR. KUSNETZ:

Q.   I'm going to ask you a yes-or-no question.  Did you discuss this letter with your attorneys, yes or no?

A.   I -- it has to be yes.  I want to say I don't remember, but obviously this came to me.  This would have been something I -- definitely, yes, would have discussed with counsel.

Q.   Okay.  Because this letter is -- is alleging a clear breach of the Zohar fund indentures that's her language; correct?

MS. BUCKEL:  Object to form.

MS. MURPHY:  Object to form.

THE WITNESS:  It is her language.

BY MR. KUSNETZ:

Q.   Okay.  So when you hear something like that, you run to the lawyers usually?

MS. BUCKEL:  Object to form.

MS. MURPHY:  Object to form.

THE WITNESS:  Yes.

BY MR. KUSNETZ:



Q.   Okay.  That's good advice.

So it's fair to say that the recipients of this letter, the trustee, the Zohar funds and Alvarez & Marsal understood, at least as of this date, which was June 15, 2016, that if they did not provide the requested information, the Octalunas would no longer assume liability as taxpayer for the Zohar funds; correct?

MS. MURPHY:  Objection.  Form.

MS. BUCKEL:  Objection to form.

THE WITNESS:  That's what the letter says, yes.

BY MR. KUSNETZ:

Q.   So is it fair to say that they were put on notice that this was going to happen; correct?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Objection to form.

THE WITNESS:  It seems that way by the letter, yes.

BY MR. KUSNETZ:

Q.   Right.  I mean, in fact, that notice was in all italics; correct?

MS. MURPHY:  Objection.  Form.

THE WITNESS:  It is.



BY MR. KUSNETZ:

Q.    And stood out; correct?

MS. MURPHY:  Objection.  Form.

THE WITNESS:  Yes.

BY MR. KUSNETZ:

Q.    And do you recall any conversations within U.S. Bank about this decision not to provide the requested information?

A.    I don't recall any conversations about this letter, honestly.

Q.    And did the Octalunas, in fact, end its position at the taxpayer for the Zohar funds?

A.    I don't recall any -- anything further after this, I guess.  I don't --

Q.    Are you familiar with the -- with something referred to as checking the box with respect to being a taxpayer?

A.    No.

MS. BUCKEL:  Objection to form.

BY MR. KUSNETZ:

Q.    So you don't understand the term, an election to check the box and no longer be a taxpayer; correct?

A.    No.

Q.    You're not a tax lawyer, are you?



A.    No.

Q.    Okay.  So this was a request in 2016; correct?

A.    Yes.

Q.    Okay.  So let's go to 2017.  Do you recall Ms. Tilton also requested information from U.S. Bank in 2017 in connection with the preparation of the Zohar funds, 2016 tax returns?

A.    I don't recall.  Is there another letter?  I don't recall on that one.

Q.    Well, I will show you.  This is going to be marked DeRoss Exhibit 20.  Bates Number PPADV 5154131.

(DeRoss Exhibit 20 marked for identification.)

BY MR. KUSNETZ:

Q.    All right.  This is a letter sent on Gibson Dunn letterhead from Randy Mastro.

Do you see that?

A.    Yes.

Q.    On August 17, 2017, and it's addressed to Brett Jaffe at Alston & Bird.  Do you see that?

A.    Yes.

Q.    Who's Brett Jaffe?



A.   Brett was a senior partner at Alston Bird at the time.  I believe he replaced Michael Johnson who started the journey on this transaction.  Brett took over when he left.

Q.   And did he represent the trustee in connection with Zohar fund transactions?

A.   Yes.

Q.   Okay.  So in writing a letter to Mr. Jaffe, he was --  Mr. Mastro was writing the letter to the trustee; correct?

A.   To the trustee's counsel, yes.

Q.   Okay.  That's fair.  So let's look at the letter.  The subject is tax filings for Zohar I, II, and III.  Do you see that?

A.   Yes.

Q.   Okay.  And the letter states that we represent Lynn Tilton, sole director and officer of each of the Zohar funds, and write to you in your capacity as counsel to U.S. Bank.

Do you see that?

A.   Yes.

Q.   In your capacity as -- in its capacity as trustee for the Zohar funds; right?

A.   Yes.

Q.   Okay.  And it -- he writes, "In



connection with Ms. Tilton's preparation and filing of the Zohar funds 2016 tax returns, she requires certain information regarding the Zohar funds actual income and expenses.  Please provide by Friday, August 24, 2017, information relating to the following for the period ending in December 31, 2016."

Do you see that?

A.    Yes.

Q.    Okay.  And the following information included, "Total collected interests in any other income."  Right?

A.    Yes.

Q.    Okay.  And that is information that the trustee receives independently of the collateral manager; correct?

A.    Correct.

Q.    So that is information that is within the custody of U.S. Bank; correct?

A.    Yes.

Q.    Okay.  So that indicates that for tax year 2016, Ms. Tilton did not have the collected interest and any other income from the Zohar funds; correct?

MS. MURPHY:  Objection.  Form.



MS. BUCKEL:  Objection.  Form.

THE WITNESS:  It appears so according to the letter.

BY MR. KUSNETZ:

Q.  Okay.  Would she have demanded it if she had that information?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Objection to form.

THE WITNESS:  No.

BY MR. KUSNETZ:

Q.  The additional information related to trustee fees, collateral management fees, agent fees, credit enhancement fees, legal and other professional service fees, corporate registration fees and taxes and any other fees or expenses paid or accrued by the Zohar funds.

Do you see that?

A.  Yes.

Q.  Okay.  And all that information was necessary in the -- and that information was viewed by Mrs. Tilton as necessary to prepare the Zohar funds 2016 tax returns; correct?

MS. MURPHY:  Object to form.

MS. BUCKEL:  Object to form.

THE WITNESS:  According to the



letter, yes.

BY MR. KUSNETZ:

Q.   Right.  In Ms. Tilton's view;
correct?

A.   Yes.

Q.   I'm not asking you to opine on what
you need to file for taxes?

A.   I understand.

Q.   And so this is, you know, just over a
year later from the letter that we looked at just
now; correct?

A.   Yes.

Q.   Okay.  And U.S. Bank did not provide
the Octalunas or Ms. Tilton with the information
requested in the August 17, 2017, letter?

MS. BUCKEL:  Object to form.

BY MR. KUSNETZ:

Q.   Correct?

A.   I don't recall.  I mean, we would
have confirmed with counsel how to proceed.  I
don't know if we did or didn't.

Q.   Okay.  Do you recall -- and this is a
yes-or-no question -- any conversations with your
counsel regarding a decision to or not to provide
the requested information in this letter?  That's



a yes or a no question?

A.   No.

Q.   Okay.  Would you have been --
considering that this letter relates to Zohar I,
would you have expected to have been notified of
this letter?

A.   Yes.

Q.   Do you recall being notified of this
letter?

A.   I don't recall, honestly.  I don't
doubt that I -- I probably was, but I don't
recall it.

Q.   I mean, this was several years ago;
right?

A.   It's a lot of years ago.  I mean, I
don't -- I suspect they would have shared it with
me.

Q.   It would have surprised you if they
did not; correct?

A.   Correct.

Q.   Okay.  And do you recall any
conversations with anyone outside of U.S. Bank
regarding the decision to or not to provide the
Octalunas with requested information -- the
information that was requested in this letter?



A.   No.

Q.   Okay.  So we can move off of that.

MS. MURPHY:  Is there a time on the record?

MR. KUSNETZ:  Okay.  We previously -- sorry.  Are we going off the record to make the --

THE VIDEOGRAPHER:  I'm checking.  You can go --

MR. KUSNETZ:  Okay.  Great.  Let's continue.

BY MR. KUSNETZ:

Q.   Are you aware -- sorry, withdrawn.

We previously discussed that the SEC made charges against Lynn Tilton and Patriarch; correct?

A.   Yes.

Q.   In connection with the Zohar funds; right?

A.   Yes.

Q.   Okay.  And do you recall that the SEC made --

MR. KUSNETZ:  What is it?

THE VIDEOGRAPHER:  Almost six and a half.



BY MR. KUSNETZ:

Q.   All right.  Let me -- do you recall that the SEC made allegations of wrongdoing related to disclosures in the trustee reports including alleged mischaracterization of loans and the consequent effect on the OC ratio test?

A.   I don't recall the specifics of that filing.  I know there was something going on with the SEC, but I don't recall specifically what was.

Q.   Did you ever read the SEC complaint?

A.   No.

Q.   Did you ever read the decision rendered by the judge about whether or not Ms. Tilton was going to be liable after the trial based on that complaint?

A.   No.

Q.   Okay.  You have no reason to doubt that the judge of the SEC proceedings summarized the SEC's allegations as that Ms. Tilton improperly categorized the funds loan assets in the strongest category when many, if not most of the loans, should have been Category 1 in Zohar I or II or defaulted investments in Zohar III and that as a result of the improper categorization,



Zohar II and III never failed their OC ratio tests?

MS. BUCKEL:  Object to form.

MS. MURPHY:  Join.

BY MR. KUSNETZ:

Q.    So the question is:  You have no reason to doubt that that was the -- the SEC judge's summary of what the SEC charged Patriarch with; correct?

MS. BUCKEL:  Object to form.

THE WITNESS:  No reason to doubt.

BY MR. KUSNETZ:

Q.    Okay.  And when I'm mentioning, like, mis- -- alleged mischaracterization of loans, Categories 1 and 2 and defaulted investments and all of that, that relates to what we discussed in the trustee reports earlier today?

MS. BUCKEL:  Object to form.

MS. MURPHY:  Object to form.

THE WITNESS:  Yes.

BY MR. KUSNETZ:

Q.    And do you recall what the -- what the SEC judge found?

A.    No.

Q.    Do you have any reason to doubt that



the SEG found -- that the SEC judge found, in its ultimate conclusions, that it is concluded that the violations alleged in the order instituting proceedings are unproven, thus this proceeding will be dismissed?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Objection to form.

THE WITNESS:  I have no reason to doubt that.  I believe it was a favorable -- I do recall a favorable outcome of that --

BY MR. KUSNETZ:

Q.  Well, I mean --

A.  -- situation, yes.

Q.  This is -- this is a statement that the proceedings will be dismissed.  Is that favorable or is that complete victory?

MS. MURPHY:  Objection to form.

MS. BUCKEL:  Objection to form.

THE WITNESS:  I guess victory.  I don't know.

BY MR. KUSNETZ:

Q.  Well, if the violations alleged in the SEC's complaint are unproven, what does that mean to you as a layperson?



MS. MURPHY:  Object to form.

MS. BUCKEL:  Object to form.

THE WITNESS:  Right.  It means they didn't make their case.  She won.

BY MR. KUSNETZ:

Q.  Right.  And this was after, are you aware, a two-week trial?

MS. BUCKEL:  Objection.  Form.

THE WITNESS:  I don't know.

BY MR. KUSNETZ:

Q.  I was there.  It was a long time.

A.  Were you?

Q.  Yeah.  In any event, so are you aware that the SEC decided not to appeal this ruling?

MS. BUCKEL:  Object to form.

THE WITNESS:  No.

BY MR. KUSNETZ:

Q.  Okay.  And so are you aware that by virtue of the SEC not appealing this ruling, finding that the alleged violations were unproven in the dismissal of the action against Ms. Tilton and Patriarch, that the conclusions in this decision rendered by the judge are the final -- is the final decision by the Securities and Exchange Commission?



MS. BUCKEL:  Object to form.

MS. MURPHY:  Objection to form.

THE WITNESS:  I have no reason to doubt the validity of that, the outcome of that case.  I'm sorry.  Does that answer your question?

BY MR. KUSNETZ:

Q.  My -- sort of.  I'm just saying, you have no reason to doubt that because the SEC decided not to appeal this, the findings here in the written decision of the SEC judge became the final decision of the Securities and Exchange Commission of the United States?

MS. MURPHY:  Objection to form.  I see no relevance to his answer.

MS. BUCKEL:  Objection to form.  Yeah.

BY MR. KUSNETZ:

Q.  Please answer the question.

A.  I would agree that, yes, they agreed to it.

Q.  Okay.  So, again, would I -- a fee allegation by the SEC was that Ms. Tilton improperly categorized the funds, loan assets in the strongest category when they should have been



categorized as like Category 1 or defaulted; correct?

MS. MURPHY:  Objection to form.  The witness has testified he has never read the SEC Complaint or the decision and has no knowledge of this.

BY MR. KUSNETZ:

Q.  You have no reason to doubt that that again was one of the key allegations by the SEC?

A.  I have no reason to doubt it.

Q.  Okay.  Now, do you know why we are sitting here in this room today?

A.  I know that there's some other litigation happening surrounding the trusts and the manager.

Q.  Okay.

A.  I don't really know the specifics.

Q.  Are you aware that this litigation was brought by in two separate lawsuits that have been consolidated?

A.  I don't know.

Q.  Are you aware that this litigation was brought by MBIA and the Zohar litigation trust?

A.  I don't think I knew MBIA was



involved.

Q.   Okay.

A.   I understand that the litigation trusts were -- there was something going on with them and the manager entities.

Q.   Okay.  And are you aware that the Quinn Emanuel law firm, which Ms. Destiny Rose is a part of, is the law firm for MBIA and the Zohar litigation trust?

A.   I do now.

Q.   Okay.  And have you ever seen any of the complaints in this case?

A.   No.

Q.   Okay.  So you have no reason to doubt that the central allegation of MBIA's lawsuit is the is that by misrepresenting the performance of loans and manipulating the overcollateralization ratio, Tilton, Patriarch Partners and the Patriarch manager defendants also avoided detection of defendant's fraudulent self-dealing scheme and thereby perpetuated their ability to loot the insured Zohar funds of assets?

MS. MURPHY:  Objection to form.

BY MR. KUSNETZ:

Q.   No reason to doubt that that's in the



MBIA Complaint?

MS. BUCKEL:  Objection to form.

THE WITNESS:  No reason to doubt.

BY MR. KUSNETZ:

Q.  And that sounds exactly like what the SEC had alleged; correct?

MS. BUCKEL:  Objection to form.

MS. MURPHY:  Objection to form.  He has testified he has not looked at either one of those documents.

THE WITNESS:  Sounds familiar.

BY MR. KUSNETZ:

Q.  It's pretty similar; right?

MS. BUCKEL:  Objection to form.

THE WITNESS:  Yes.

BY MR. KUSNETZ:

Q.  So the SEC alleged that Ms. Tilton manipulated the over-collateralization test and MBIA here is alleging that Ms. Tilton manipulated the over-collateralization test; correct?

MS. BUCKEL:  Objection to form.

MS. MURPHY:  Objection to form.

THE WITNESS:  I have no reason to doubt those facts.

BY MR. KUSNETZ:



Q.   A the SEC made a final -- has a final order that Ms. Tilton, in fact, did not; correct?

MS. BUCKEL:  Objection to form.

MS. MURPHY:  Objection.  Form.

THE WITNESS:  I believe they did based on our prior discussion.

BY MR. KUSNETZ:

Q.   So do you know why we're sitting here today?

A.   Well --

MS. MURPHY:  Objection.  Form.

THE WITNESS:  There's still litigation surrounding those facts, I guess, or topics.  I don't know.

BY MR. KUSNETZ:

Q.   I don't know either.

MS. MURPHY:  Objection to the commentary.

MR. KUSNETZ:  No further -- no further questions.  I reserve the time for rebuttal should there be any questions from opposing counsel.

MS. MURPHY:  I do have just a few questions.  I am going to go right into them.



THE WITNESS:  Okay.

MS. MURPHY:  Do you want a break?

THE WITNESS:  No.

EXAMINATION

BY MS. MURPHY:

Q.   I'm Destiny Rose Murphy.  I represent the plaintiff.  We haven't chatted a ton today. I'll be super quick.

Am I correct that you did not work on Zohar II or Zohar III transactions?

A.   Correct.

Q.   So have you reviewed Zohar II indenture?

A.   No.

Q.   Have you reviewed the Zohar III indenture?

A.   No.

Q.   Are you specifically aware of the contents of the trustee reports created for Zohar II?

A.   No.

Q.   Are you specifically aware of the contents of the trustee reports created for Zohar III?

A.   No.



Q.   Okay.  I would like to ask you a couple of questions about two of the exhibits you were shown earlier today.

The first one was marked Exhibit 5. It's this little set of e-mails.  The Bates number ends in 0087.

MS. BUCKEL:  Right here.

THE WITNESS:  I just --

MS. BUCKEL:  I saw it.  I had to help.

BY MS. MURPHY:

Q.   Just to make sure we are looking at the same thing.  At the top is an e-mail from Karen Wu.  Is that what you're looking at?

A.   Yes.

Q.   Okay.  Do you recall testifying about this exhibit earlier today?

A.   Yes.

Q.   Do you recall testifying -- I'm not quoting you -- in some substance that you thought this was a general kind of e-mail that got sent?

A.   Yes.

Q.   You are not copied on the e-mails in this exhibit; correct?

A.   Correct.



Q.    Were you generally copied on this kind of e-mail?

A.    No.

Q.    So do you personally have knowledge of this kind of e-mail?

MR. KUSNETZ:  Objection to form.

THE WITNESS:  No.

BY MS. MURPHY:

Q.    Okay.  That's all on that one.

And then the other one that I would like to ask you about is Exhibit 7, which I think will be easy to find because it's the long one. Bates ending in 332953.  Is there -- this is your eyesight.

A.    Oh, wait, here it is.  Folded one.  I think this is it.  Yes.

Q.    Okay.  Both looking at the long one?

A.    Long one.

MR. KUSNETZ:  This is part of it. Just as a blown up version just for your reference.

MS. MURPHY:  Feel free to look at either.

BY MS. MURPHY:

Q.    Okay.  Do you recall being asked



questions about this exhibit today?

A.   Yes.

Q.   Can you remind me, did you call this a data file?

A.   I did.

Q.   Okay.  And this data file, was this an export of the system that U.S. Bank used to track certain facilities?

A.   This looks like it is, yes.

Q.   Okay.  I believe you said that you had view only access for reports like this; is that correct?

A.   This is.

MR. KUSNETZ:  Objection to form.

THE WITNESS:  So I have view only to the database.  This is an actual like report run from the database.  I wouldn't normally run something like that, so I don't -- I might have access to it, but I just didn't do it in the normal course of my job functions.

BY MS. MURPHY:

Q.   Understood.  Okay.  So were you personally inputting data that gets popped out in this kind of a report?



          A.   No.

               MR. KUSNETZ:  Objection to form.

     BY MS. MURPHY:

          Q.   Did you create these columns of
     information?

          A.   No.

          Q.   Did you work with them regularly?

          A.   No.

               MR. KUSNETZ:  Objection to form.

     BY MS. MURPHY:

          Q.   So do you have personal knowledge of
     how or why they were changed?

               MR. KUSNETZ:  Object -- objection to
          form.  Changed?

               MS. MURPHY:  Uh-huh.

               THE WITNESS:  No.

               MS. MURPHY:  Okay.  That's all I
          have.

               MS. BUCKEL:  I just have one
          question.

                    EXAMINATION

     BY MS. BUCKEL:

          Q.   Liz Buckel for the witness.  I just
     have one question, Mr. DeRoss.  Under the terms
     of the Zohar I indenture, did the trustee have a



duty to verify or confirm the accuracy of the information it received from the collateral manager?

A.   No.

MS. BUCKEL:  Thank you.

MR. KUSNETZ:  No further questions. I'd like to designate transcript as confidential per the terms of the protective order.

THE VIDEOGRAPHER:  And just for the record, if you have a standing order, you can say that, but please say your name and what you want for the video order.

MR. KUSNETZ:  David Kusnetz, Gibson Dunn, standing order.

MS. MURPHY:  Destiny Rose, Quinn Emanuel standing order.

THE VIDEOGRAPHER:  This concludes the videotaped deposition of Scott DeRoss. Total number of media units today is four. The time on the monitor is 5:32 p.m. and we are off the record.

THE COURT REPORTER:  Mr. Rusnetz, do you need this expedited as well?

MR. RUSNETZ:  Yes, we will take next



day as well.

* * *

- - -

(Read and sign reserved.)

- - -

(Deposition concluded at 5:32 p.m.)

- - -



SIGNATURE OF DEPONENT

I, the undersigned, SCOTT DEROSS, do hereby certify that I have read the foregoing deposition transcript and find it to be a true and accurate transcription of my testimony, with the following corrections, if any:

PAGE          LINE                    CHANGE/REASON

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____

SCOTT DEROSS



CERTIFICATE OF REPORTER

I, Christine A. Taylor, Registered Professional Reporter and Notary Public for the State of North Carolina at Large, do hereby certify:

That the foregoing deposition was taken before me on the date and at the time and location stated in this transcript; that the deponent was duly sworn to testify to the truth, the whole truth and nothing but the truth; that the testimony of the deponent and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed; that the foregoing deposition as typed is a true, accurate and complete record of the testimony of the deponent and of all objections made at the time of the examination to the best of my ability.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof.  Witness my hand, this 10th of October, 2025.

_____

Christine A. Taylor,
Registered Professional Reporter
Notary Public 19960530077
State of North Carolina



# Exhibit H

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT COURT OF DELAWARE
------------------------------------------------------------x
IN RE: ZOHAR III CORP.,          Chapter 11
                                 Case No. 18-10512(KBO)
          Debtor.
------------------------------------------------------------x

DAVID DUNN, as Litigation Trustee for
Zohar Litigation Trust-A,

          Plaintiff,

     -against-                   Adv. Pro. 20-50534 (KBO)

PATRIARCH PARTNERS, LLC et al.,

          Defendants,

     -and-

180S, INC. et al,

          Nominal Defendants.
------------------------------------------------------------x

**Key:**
Stipulated Designations

                    * CONFIDENTIAL *


           VIDEOTAPED DEPOSITION OF ROBERT KOST

                    200 Park Avenue

                  New York, New York


                    May 13, 2025

                     11:25 a.m.


Reported By:
Cheryll Kerr, CSR
Job No.: J12851767



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1405 of 2249

ROBERT KOST  Conf.                                     May 13, 2025
DUNN V. PATRIARCH PARTNERS                                    2

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT COURT OF DELAWARE
-------------------------------------------------------------x
IN RE: ZOHAR III CORP.,              Chapter 11
                                     Case No. 18-10512(KBO)
              Debtor.
-------------------------------------------------------------x

DAVID DUNN, as Litigation Trustee for
Zohar Litigation Trust-A,

              Plaintiff,

      -against-                      Adv. Pro. 20-50534 (KBO)

PATRIARCH PARTNERS, LLC et al.,

              Defendants,

      -and-

180S, INC. et al,

              Nominal Defendants.
-------------------------------------------------------------x


                    * CONFIDENTIAL *


      VIDEOTAPED DEPOSITION OF ROBERT KOST, held at

the offices of Gibson, Dunn & Crutcher, LLP, located

at 200 Park Avenue, New York, New York, before

Cheryll Kerr, CSR, a Certified Shorthand Reporter

and a Notary Public, on Tuesday, March 13, 2025,

at 11:25 a.m.



APPEARANCES:

COUNSEL FOR PATRIARCH STAKEHOLDERS:

GIBSON, DUNN & CRUTCHER LLP
BY:   DAVID KUSNETZ, ESQ.
BY:   JOSEPH LoPRESTI, ESQ.
200 Park Avenue
New York, NY 10166
Phone: (212) 351-4000
Email:  dkusnetz@gibsondunn.com
Email:  jlopresti@gibsondunn.com


COUNSEL FOR PLAINTIFF DAVID DUNN AS TRUSTEE
FOR LITIGATION TRUST A:

QUINN EMANUEL URQUHART & SULLIVAN, LLP
BY:   DESTINY ROSE MURPHY, ESQ.
295 5th Avenue, 9th Floor
New York, New York 10016
Phone:  (212) 849-7422
Email:  destinyrosemurphy@quinnemanuel.com


    - and -

YOUNG CONAWAY STARGATT & TAYLOR, LLP
BY:  RYAN M. BARTLEY, ESQ.
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Phone:  (302) 571-6600
Email:  rbartley@ycst.com


Also Present:

Jake McAfee, Videographer



INDEX

EXAMINATION BY                                                      PAGE

Direct examination by Mr. Kusnetz                                    10

Cross-examination by Ms. Murphy                                     359


EXHIBITS

FOR ID              DESCRIPTION                                    PAGE

Exhibit 1           Deposition transcript of Robert               168

                    Kost dated February 7, 2020


Exhibit 2           Email dated November 11, 2019                 193

                    from Pratik Desai to Mike

                    Katzenstein and John Greene,

                    Bates Zohar_Farnan0000198


Exhibit 3           Deposition transcript of Robert               230

                    Kost dated April 12, 2018


Exhibit 4           One-page document entitled                    256

                    "Illustrative Equity Analysis,

                    Jefferies Banking Conservative

                    View of Equity Value," Bates

                    Jefferies_Subpoena_0000175


(Continued)



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1408 of 2249

ROBERT KOST  Conf.                                        May 13, 2025
DUNN V. PATRIARCH PARTNERS                                          5

                         EXHIBITS (Cont.)

  FOR ID               DESCRIPTION                      PAGE

  Exhibit 5            Transcript of hearing before      290

                       the Honorable Karen B. Owens,

                       United States Bankruptcy Judge

  Exhibit 6            Motion of Lynn Tilton for         301

                       Approval of Timeline and

                       Guidelines Regarding

                       Monetization of the Group A

                       Portfolio Companies

  Exhibit 7            Notice of Motion, hearing date    306

                       January 10, 2020 at 10:00 a.m.

  Exhibit 8            MBIA Insurance Corporation's      310

                       Statement in Support of Debtors'

                       Preliminary Objection to Motion

                       of Lynn Tilton for Approval of

                       Timeline and Guidelines Regarding

                       Monetization of the Group A

                       Portfolio Companies

  (Continued)



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1409 of 2249

ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                      6

EXHIBITS (Cont.)

| FOR ID | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 9 | Preliminary Statement and Response of Zohar III Controlling Class in Response to Motions Seeking Monetization Procedures Filed by Debtors and Patriarch | 313 |
| Exhibit 10 | Transcript of court proceeding before Honorable Karen D. Owens dated February 20, 2020 | 326 |
| Exhibit 11 | Deposition transcript of Chris Hendrickson dated February 10, 2020 | 333 |
| Exhibit 12 | Complaint, Case No. 18-10512 (KBO) | 341 |
| Exhibit 13 | Order Establishing Certain Guidelines and Milestones in Furtherance of the Monetization Process for the Group A and Group B Portfolio Companies | 348 |

(Continued)



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

                              EXHIBITS (Cont.)

FOR ID              DESCRIPTION                            PAGE

Exhibit 14          Email dated March 21, 2020 from          351

                    Lynn Tilton to Michael Katzenstein

                    and Joseph Farnan and attachment


Exhibit 15          Email dated March 26, 2020 from          354

                    Lynn DeGregorio to

                    jgreene@bardinhill.com and

                    Matthew McQuade, Bates

                    BardinHill_0012063 through

                    BardinHill_00012065


                        ***      ***      ***



R. Kost - Confidential

THE VIDEOGRAPHER:  Good morning.  We are going on the record.  The time is 11:25 a.m.  Today's date is May 13, 2025.

Please note that the microphones are sensitive and may pick up whispering and private conversations.

Please mute your phone at this time.  Audio and video reporting will continue to take place unless all parties agree to go off record.

This is Media Unit 1 of the video-recorded deposition of Robert Kost, taken by counsel for plaintiff [sic] in the matter of Zohar III Corporation versus Patriarch Partners, et al...

Excuse me, Counselor.  Which district court is this filed in?

MR. KUSNETZ:  This is in the District of Delaware Bankruptcy Court.

THE VIDEOGRAPHER:  District of Delaware Bankruptcy Court, Case No. 18-10312 (KBO), Advance Pro. No. 20-50534 (KBO).

The location of this deposition is Gibson, Dunn & Crutcher, 200 Park Avenue, New



Case 1:16-cv-04488-VM-KHP Document 419 Filed 03/27/26 Page 1412 of 2249

ROBERT KOST Conf. May 13, 2025
DUNN V. PATRIARCH PARTNERS 9

R. Kost - Confidential

York, New York.

My name is Jake McAfee, and I am the videographer. The court reporter is Cheryll Kerr, and we're from the firm Esquire.

I am not authorized to administer an oath. I am not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance.

Counsel and all present will now state their appearances and affiliations for the record, beginning with the taking attorney.

MR. KUSNETZ: For the record, it's defendants who are taking this deposition. My name is David Kusnetz, from the law firm Gibson, Dunn & Crutcher.

I'm joined here by Joe LoPresti, my colleague, and we are here on behalf of Lynn Tilton and the Patriarch entities.

MS. MURPHY: My name is Destiny Rose Murphy. I'm from Quinn Emanuel Urquhart & Sullivan. We represent the plaintiff, David



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1413 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                           10

                    R. Kost - Confidential

          Dunn as the trustee for Litigation Trust A.

               MR. BARTLEY:  Ryan Bartley, Young Conaway

          Stargatt & Taylor, also on behalf of the

          plaintiff.

               THE VIDEOGRAPHER:  Will the court

          reporter please swear in the witness.

R O B E R T   K O S T

called as a witness, having been duly

sworn, was examined and testified

as follows:

               THE SHORTHAND REPORTER:  Would you please

          state your full name and address for the

          record for us?

               THE WITNESS:  Yes.  My name is Robert

          Kost, K-O-S-T.  I live at 9 Thistle Lane in

          Rye, New York 10580.

               THE SHORTHAND REPORTER:  Thank you.

          Counsel, please proceed.


                    DIRECT EXAMINATION

                  BY MR. KUSNETZ:


     Q.   Good morning, Mr. Kost.

     A.   Good morning.



R. Kost - Confidential

Q.    I just want to state for the record that we're starting about an hour late here because the original videographer for Esquire was in a car accident, and so we're very grateful to have a replacement videographer.

Thank you for coming on short notice, and we hope the original videographer is okay.  I also want to thank you, Mr. Kost, for your patience as well.

Let's start with your history in terms of prior depositions.

You've been deposed before; isn't that correct?

A.    Yes.

Q.    How many occasions?

A.    Several times in these cases.

Q.    Can you be more specific?

A.    I was trying to think about it.  Two, maybe three times.

Q.    Okay.  And it was in this proceeding and related proceedings, correct?

A.    Yes.

Q.    Okay.  Let's start with some ground rules for the deposition.

I'm going to be asking questions.  Please answer them verbally and clearly.  Don't use an "uh-huh"



                    R. Kost - Confidential

instead of a "yes."  Don't nod your head instead of a

"yes" or a "no," that kind of thing.

        Is that fair?

        A.    Agreed.  Yes.

        Q.    Okay.  At times, the attorneys present may

object.  If they object, listen to their objection, but

you still have to answer the question unless they

instruct you not to answer.

        Does that make sense?

        A.    Yes.

        Q.    Okay.  Usually, that instruction comes with

an instruction not to answer because of attorney-client

privilege.

        Are you familiar with that?

        A.    Yes.

        Q.    Okay.  To be clear, I'm not trying to get at

any attorney-client privileged information, okay?

        A.    Okay.

        Q.    And so if I do ask you a question and you

think it's getting at attorney-client privileged

information that's giving you pause, feel free to say

that, okay?

        A.    I will.

        Q.    If you don't understand my questions, please



R. Kost - Confidential

let me know and I'll rephrase.

If you don't ask me to rephrase, I will assume that you understood my question.

Is that fair?

A.    Yes.

Q.    If you need to take a break at any time, you'll let me know.  My only ask is that if there's a question pending, you finish answering that question and then we take the break.

Is that fair?

A.    That's fine.

Q.    Okay, but if you gotta go, you gotta go, so I'm cool with whatever you need.

And is there any reason that you can't testify truthfully today?

A.    No.

Q.    Okay, and I'm going to ask you this question. It's awkward, but it's literally asked at every deposition.

Are you taking any medications or is there anything that you're taking that would affect your ability to testify truthfully today?

A.    No.

Q.    Okay.  You understand, sir, that you're under



R. Kost - Confidential

oath today?

A.    Yes, I do.

Q.    All right.  Same as if you were testifying in court, correct?

A.    Yes.

Q.    Okay.  You're here pursuant to a deposition subpoena; isn't that correct?

A.    Yes.

Q.    Okay.  And is Quinn Emanuel and Young Conaway representing you in your individual capacity?

A.    No.  I -- I believe it's indirectly through my prior work as the chief monetization officer.

Q.    Okay.  Are you being compensated today for sitting for a deposition?

A.    I actually don't know.  It's potentially under my directors and officers indemnification agreement, but I haven't really looked into it.

Q.    Which indemnification agreement are you referring to?

A.    So as -- as part of the bankruptcy and the plan of reorganization, there was a directors and officers indemnification agreement that covered at least three people:  Joe Farnan -- Judge Farnan -- Mike Katzenstein, and myself, and it indemnifies us for



R. Kost - Confidential

expenses that we would incur as part of, I guess, litigation after the -- after the end of the bankruptcy.

Q.    Understood.  And do you intend to bill for your services today?

A.    I just read the agreement yesterday, and so I actually don't know.

Q.    Okay.  Did Young Conaway and Quinn Emanuel represent you at your prior depositions?

A.    Yes.  Young Conaway did.

Q.    But not Quinn Emanuel?

A.    No.  At that point, during the bankruptcy, Young Conway was debtor's counsel.

Q.    Okay, and who was Quinn Emanuel at the time?

A.    I don't -- I don't know if they had a role. They may have.  I know the role subsequent to the bankruptcy was as counsel to David Dunn, the trustee --

Q.    Uh-huh.

A.    -- for the litigation entities that emerged after the bankruptcy.

Q.    Do you understand that to be the Litigation Trust?

A.    Yes.

Q.    Okay, so you've heard that term before?

A.    Yes.



800.211.DEPO (3376)
EsquireSolutions.com

R. Kost - Confidential

Q.    When was the first time that you had interactions with Quinn Emanuel?  And not to ask you to divulge any of your communications.  I'm just asking you a general date.  When was the first time you interacted with Quinn Emanuel?

A.    With respect to --

Q.    With respect to --

(Indistinguishable crosstalk.)

MR. KUSNETZ:  Let me rephrase.

BY MR. KUSNETZ:

Q.    When was the first time that you interacted with the law firm Quinn Emanuel in connection with this case or the related cases to the bankruptcy?

A.    I -- I can't recall whether they were involved in these bankruptcies previously.

My most recent interaction was -- I don't know -- a couple weeks ago, when I received the subpoena, and I reached out to Young Conaway, and Young Conaway said -- Ryan Bartley said that he would look into it as to who would represent me at my deposition, and you'd have to ask Young Conaway or Quinn Emanuel how it was decided that had both Young Conaway and Quinn Emanuel would be here at my deposition.

Q.    And when you had that conversation with



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1420 of 2249

ROBERT KOST  Conf.                                      May 13, 2025
DUNN V. PATRIARCH PARTNERS                                        17

R. Kost - Confidential

Mr. Bartley, did Mr. Bartley say at that conversation that he was representing you?

MS. MURPHY:  Objection to form.

THE WITNESS:  No.

BY MR. KUSNETZ:

Q.   Okay.  Can you then tell me what was discussed at that conversation?

MS. MURPHY:  I think I will instruct you not to answer, grounds for attorney-client privilege.

MR. KUSNETZ:  I just asked if he was told that Mr. Bartley would be representing him.

He said that he did not get that answer from Mr. Bartley, so at that point in time, I don't understand Quinn -- either Quinn Emanuel or Young Conaway to be representing the witness.

What do you understand about that?

MS. MURPHY:  I understand that some communications can be privileged if they are seeking the attorney-client relationship.

BY MR. KUSNETZ:

Q.   Were you seeking an attorney-client relationship with Young Conaway at the time?



800.211.DEPO (3376)
EsquireSolutions.com

R. Kost - Confidential

A.   It's my understanding that I'm sitting here because I was the chief monetization officer of the Zohar debtors and I'm covered by an indemnification agreement, and Quinn Emanuel is here on behalf me pursuant to my role as chief monetization officer. That's my understanding.

Q.   Okay, but do you recall having a conversation with Mr. Bartley about any topics related to this deposition?  "Yes" or "no"?

MS. MURPHY:  Objection to form.  At any time?

BY MR. KUSNETZ:

Q.   On that phone call.

A.   When you say "topics," are you talking topics related to me being at a deposition?

Q.   Uh-huh.

A.   My recollection is that Mr. Bartley was going to go back and talk to the other lawyers at both Quinn Emanuel and Young Conaway to figure out who would be sitting here with me at this deposition, and that's why Destiny Rose Murphy is here for Quinn Emanuel.  That's my understanding.

Q.   Understood.  Thank you.

What did you do to prepare for your deposition?



R. Kost - Confidential

A.    I met yesterday with Ms. Murphy and Mr. Ryan for about four hours to prepare for this deposition.

Q.    Okay.  In person?

A.    Yes.

Q.    Where was that?

A.    At Quinn Emanuel.

Q.    At their offices?

A.    Yes.

Q.    Okay, and how many times did you meet with either Mr. Bartley or Ms. Murphy in connection with preparing for your deposition?

A.    Just once, yesterday.

Q.    Okay, and no one else from either law firm was there?

A.    No.

Q.    Was anyone else in the room during that prep?

A.    No.

Q.    Just three of you guys?

A.    Yes.

Q.    Okay.  Did you look at any documents during that prep session?

A.    Yes.

Q.    Okay.  Did any of those documents refresh your recollection as to your work in connection with the



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1423 of 2249

ROBERT KOST  Conf.                                        May 13, 2025
DUNN V. PATRIARCH PARTNERS                                        20

                     R. Kost - Confidential

Zohar funds?

     A.    No.

     Q.    They did not refresh your recollection?

     A.    No.

     Q.    So none of those documents reminded you of
the things you did in your role as the chief
monetization officer of the debtors?

               MS. MURPHY:  Objection to form.

               THE WITNESS:  Not really.

BY MR. KUSNETZ:

     Q.    When I say "refresh your recollection," what
do you understand me to mean?

     A.    Something that I had previously forgotten and
then I remembered.

     Q.    Okay, so are you telling me that all the
documents that you reviewed during your prep session
were documents that you remembered?

               MS. MURPHY:  Objection to form.

               THE WITNESS:  No.  In fact, some of the
          documents I had never seen.

BY MR. KUSNETZ:

     Q.    Documents you'd never seen?  Okay.

     So are you saying there were documents you did see
before?



R. Kost - Confidential

MS. MURPHY:  Objection to form.

BY MR. KUSNETZ:

Q.    Are there documents that you did see before your deposition prep?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes.  There was --

MS. MURPHY:  Instruct the witness not to disclose the content of what he was shown.

THE WITNESS:  I guess there was one email that had my name on it.

BY MR. KUSNETZ:

Q.    Okay.  Did you review your prior deposition testimony in preparation for this deposition?

A.    No.

Q.    Did you review any declarations that you may have filed in connection with the bankruptcies?

A.    No.

Q.    Okay.  Did you review any declarations filed by other people in preparation for this deposition?

A.    No.

Q.    Okay.  Did you review anyone else's deposition testimony in preparation for this deposition?

A.    No.

(Thereupon, an informal discussion was



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1425 of 2249

ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                    22

R. Kost - Confidential

held off the record with the shorthand

reporter.)

BY MR. KUSNETZ:

Q.    Did you speak with anyone other than counsel
in connection with this deposition?

A.    No.

Q.    Did you tell your family where you are going
today?

A.    My wife.

Q.    Okay.  I imagine you didn't discuss anything
substantive with her about this deposition?

A.    No.

Q.    Okay.  When was the last time you spoke with
Mike Katzenstein?

A.    I don't remember the day, but my role as
chief monetization officer ended in February or March of
2023, and I have not spoken to Mike Katzenstein since.

Q.    In any --

MR. KUSNETZ:  Withdrawn.

BY MR. KUSNETZ:

Q.    You haven't spoken with Mike Katzenstein at
all regarding any topic since then?

A.    No.  That's correct.

Q.    Okay.  What about same question for



R. Kost - Confidential

Judge Farnan.  When was the last time?

A.    I'm sorry.  Can I go back and correct that?

Q.    Please.

A.    January or February of 2022 is when my role ended with the Zohar debtors --

Q.    Uh-huh.

A.    -- and I retired from the industry in May of 2023.

Q.    Understood.  We'll come back to that.

But back to my question for Judge Farnan.  When was the last time you spoke with him?

A.    Probably, give or take, in the same time frame.  January, February, March of 2022.

Q.    Okay.  What about anyone from FTI?

A.    I seem to recall I may have bumped into Conor Tully and -- sometime in 2022 or 2023 at one of those industry cocktail parties.

Q.    Okay.  Did you discuss anything related to this case when you bumped into him?

A.    No.

Q.    You didn't commiserate?

A.    I was going to -- maybe I could change "no" to "Are you still working on the Zohar cases," but nothing of substance.



R. Kost - Confidential

Q.    Nothing beyond that?

A.    No.

Q.    Okay.  What about Houlihan Lokey?  When was the last time you spoke with anyone from Houlihan Lokey?

A.    It would probably be the same time, January, February, March of 2022 with Houlihan with respect to this case.

Q.    Okay.  While we're on that subject, what do you recall regarding the end of your term as the chief monetization officer for the debtors?

A.    What do you mean by -- I mean, that's kind of a vague, open-ended question.

Q.    Could be.  Well, my question is:

How did your term as chief monetization officer of the debtors come to end?

A.    In the fourth quarter of 2021, we had been successful in selling a number of portfolio companies up to that point, and as we made progress towards putting a plan of reorganization together, the decision was made by Mike Katzenstein and/or others to reduce the expense burden of the estate.

And as my role was winding down, my -- I agreed to end my role in the first quarter of 2022, and the remaining sale processes that I was working on were



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1428 of 2249

ROBERT KOST  Conf.                                         May 13, 2025
DUNN V. PATRIARCH PARTNERS                                          25

R. Kost - Confidential

transitioned to the FTI team.

Q.   Okay, so when you say Mr. Katzenstein "and others" made this decision, who were the others?

A.   I mean, he may have made it on his own. You'd have to ask -- the decision on his own.  It was my understanding there was a decision by the parties of interest, the creditors, to reduce the expenses, and everybody was -- you know, asked to cut back on their time and expenses, and as my role was winding down, it was just natural to transfer those responsibilities to the FTI team that was already working on the case.

Q.   To Mr. Katzenstein and his team?

A.   Yes.

Q.   What about to Houlihan Lokey?

A.   Houlihan probably also did have some role in the sale process at that point in time.

We were at that point -- and you'd have to go through portfolio company by portfolio company. Houlihan probably would have had more of a role on MD Helicopters.

FTI would have taken the smaller Group A companies and most of the Group B companies that were relatively small/very small.

Q.   Okay.  As of the fourth quarter of 2021, why



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1429 of 2249

ROBERT KOST  Conf.                                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                                      26

R. Kost - Confidential

was your role winding down, as you testified?

A.    We had been successful in selling a number of the portfolio companies by that point, and several of the others either were in holding patterns or there was no imminent sale process that was likely.

And then, again, it was a decision to reduce expenses, and I was one of those expenses that Mike Katzenstein decided to reduce.

Q.    Understood.

Did you sell all of the Group A companies at that time?

A.    Are you asking me, personally?  Like I or -- or are you saying 100 percent of the Group A companies? I'm not sure of the question.

Q.    I'm saying 100 percent, but I'm referring to you as -- you know, I think you were talking about "we" sold, "we were successful in selling the companies," so the "we."

MS. MURPHY:  Objection to form.

MR. KUSNETZ:  Let me -- let me rewind that.

BY MR. KUSNETZ:

Q.    Who is the "we" in "We were successful in selling the companies"?



R. Kost - Confidential

A.    It was a group effort by all the professionals of the Zohar debtors' estates.

Q.    Okay, and while you were the chief monetization officer -- if I refer to that, by the way, as "CMO," will you understand what I'm saying?

A.    Yes.

Q.    Okay.  While you were the CMO of the debtors, did all of the Group A companies get sold?

A.    No.

Q.    Which ones were not sold?

A.    By the end of 2021, I think we would still have had MD Helicopters.  I think we closed Universal in December of 2021.

We still had Intrepid, Stila.  I'm probably missing one or two, but those are the major Group A companies that were still remaining.

Q.    Understood.

At any time prior to your termination as the CMO, did Mr. Katzenstein mention to you that he needed to cut costs?

A.    I wouldn't use the terminology "cut costs." It was Mike Katzenstein's job to make sure the debtors were spending their resources appropriately.

Q.    Okay.  Did he ever mention the possibility of



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1431 of 2249

ROBERT KOST  Conf.                                        May 13, 2025
DUNN V. PATRIARCH PARTNERS                                         28

                    R. Kost - Confidential

eliminating your role as CMO prior to when you were

first informed that you would -- your role would be

eliminated?

        A.      Not that I recall.

        Q.      Okay, so the first time that the topic of

your role ending as CMO occurred was when

Mr. Katzenstein told you that you were -- he was going

to terminate your position, correct?

        A.      That's correct.

        Q.      When did he tell you that he was going to

terminate your position?

        A.      I think the word "terminate" my position is a

little strong.

        Q.      Okay.

        A.      In the fourth quarter, it was determined that

all the professionals would reduce to the best of their

ability, and in particular because we had reduced the

number of portfolio companies, the expenses to the

estate.

        And for me specifically, I was really a one-man

band.  The way it worked -- my retention was as an

individual as the CMO.  At points in the case, I had one

or two junior people working for me, but for the most

part, I worked on my own as a CMO.



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1432 of 2249

ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                    29

R. Kost - Confidential

And by the first quarter of 2022, it was a good point in the case to transition those remaining responsibilities to Mike Katzenstein and his team and to also Houlihan Lokey, to an extent.

Q.    There was some overlap between what you did and what Houlihan Lokey did with respect to services for the debtors, correct?

A.    A small overlap.

Q.    Okay, and when you mentioned your team, you did, in fact, have a team of people assisting you at Goldin Associates, correct, with respect to your CMO responsibilities?

A.    I had one or two analysts help me during the four years, and their billings would be negligible.

Q.    Okay.  I didn't ask about their billings.

I'm just saying you did have folks at Goldin Associates helping you in your role as CMO, "yes" or "no"?

MS. MURPHY:  Objection to form.

THE WITNESS:  I'll answer your question slightly differently, which is I had one or two analysts that assisted me during the case, and you can check the billing records.  I -- I wouldn't expect them to be more a couple



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1433 of 2249

ROBERT KOST  Conf.                                           May 13, 2025
DUNN V. PATRIARCH PARTNERS                                          30

R. Kost - Confidential

hundred hours over four years.

BY MR. KUSNETZ:

Q.    Okay, so the vast majority of the work billed by Goldin Associates during your term as CMO was related to the hours that you expended in that engagement?

A.    Yes.

Q.    Okay.  On the -- on the amount received by Goldin Associates, are you aware of the total amount that the debtors paid to Goldin Associates for your work as CMO?

A.    I don't recall the amount.  I used to know the number, but I don't know anymore.

Q.    Do you have a ballpark?

A.    I don't.

Q.    Is it more than five million?

A.    I wouldn't think so.

Q.    Is it less than two million?

A.    It's probably between two and five.

Q.    Between two and five million?

A.    Yes.

Q.    How was --

How were you compensated personally for your work As the chief monetization officer?

A.    So our billings -- as chief monetization



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1434 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                          31

R. Kost - Confidential

officer, I was also a senior managing director at Goldin.

Q.   Okay.

A.   And we would bill the debtors' estates, and the payment was made to Goldin Associates.

(Thereupon, an informal discussion was held off the record with the shorthand reporter.)

BY MR. KUSNETZ:

Q.   And once Goldin Associates received payment from the estate, did you get a percentage of those payments?

A.   No.  I was paid an annual salary and a bonus that was determined by Jay Goldin, who owned the firm.

Q.   Was your bonus at all tied to the amount of billings related to the -- your work as CMO?

MS. MURPHY:  Objection to form.

THE WITNESS:  I don't know.  I would assume that Jay Goldin took into account how hard I worked on the Zohar case and the other cases I worked on at the same time.

BY MR. KUSNETZ:

Q.   You mentioned working hard on the Zohar case. When you say that, you mean in connection with your role



R. Kost - Confidential

as the CMO?

A.    Yes.

Q.    And do you recall how many hours you billed in connection with your role as a CMO during your entire tenure?

A.    Thousands.

Q.    Can you give me a ballpark?

A.    I can't.  It's in the public -- it's in the record.

Q.    Right.  More than a thousand?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes.  Definitely.

BY MR. KUSNETZ:

Q.    Okay.  Sitting here today, can you just give me a range?

MS. MURPHY:  Objection to form.

THE WITNESS:  3- to 5,000 hours.

BY MR. KUSNETZ:

Q.    That's helpful.  Thank you.

And you testified that the analysts at Goldin who assisted you only billed in comparison a few hundred hours; is that correct?

A.    Yes, that's my recollection.

Q.    Do you remember how many hours Mark Kirschner



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1436 of 2249

ROBERT KOST  Conf.                                                May 13, 2025
DUNN V. PATRIARCH PARTNERS                                                 33

R. Kost - Confidential

billed when he was the chief restructuring officer?

A.    I don't.  Just to be clear so we're on the same page, my firm was retained by Lynn Tilton prior to the Chapter 11 bankruptcy, and after the Chapter 11 bankruptcy, pursuant to the negotiations with Ms. Tilton with the other creditors, it was determined that they would end Goldin's services as financial advisor to the debtors.

So our firm was actually terminated, and Mark Kirschner's role was terminated as chief restructuring officer.  I then pitched Judge Farnan and the debtors again for the role of chief monetization officer and was selected to be the chief monetization officer, so I was effectively hired twice, for lack of a better word.

Q.    And when you were hired as the chief monetization officer, was Goldin Associates the party that was being hired with you serving -- doing the work, essentially?

A.    I think if you look at the retention order, it -- it -- it says both.  It says Goldin Associates and specifically Robert Kost as the chief monetization officer.

Q.    And you were given the ability to use associates at Goldin Associates to help you with your



R. Kost - Confidential

role as CMO in connection with that engagement, correct?

A.    I think my understanding was more that I was the chief monetization officer.  My career is in distressed mergers and acquisitions, so 38 years, I've done hundreds of deals.  They were hiring me for my knowledge as to how to interact and hire other investment bankers to run -- and to run the sale processes from a much more senior, high level.

It was pretty clear to me that they weren't hiring my firm to have dozens of young people working on the transaction.  I leveraged the FTI team if and when I needed people to work on sale processes.  And --

Q.    Please continue.

A.    And later on, Houlihan Lokey became involved to a certain extent overseeing some of -- "overseeing" is not the right word.

Providing their input on some of the transactions which would have been more in the 2020, 2021.  I don't even remember when they were retained.

Q.    But you didn't delegate to Houlihan Lokey, correct?

A.    No.

Q.    Houlihan Lokey worked directly with whom?

A.    They worked much more closely with Mike



R. Kost - Confidential

Katzenstein and the FTI team.

Q.    Did Houlihan Lokey, to your knowledge, also leverage the FTI team in connection with the sale process?

A.    I don't know.

Q.    You don't know if Houlihan Lokey asked folks at FTI for assistance with certain projects in connection with the monetization process?

A.    First of all, Houlihan Lokey has a completely different fee structure, and so whether they brought more or less junior resources to the table was kind of -- it didn't necessarily impact their -- their fee structure.

I was hourly.  I think they were -- they were more fixed fee with a success fee.  So I don't know how they determined whether to use a Houlihan employee or an FTI employee.

Q.    Totally understood.  That wasn't exactly the answer to my question, though, so just do you --

Are you aware of Houlihan Lokey employees asking FTI employees to support Houlihan's work in connection with the monetization process?

MS. MURPHY:  Objection to form.

THE WITNESS:  I would be speculating.  I



R. Kost - Confidential

don't know.

BY MR. KUSNETZ:

Q.    Do you think they did?

          MS. MURPHY:  Objection to form.

          THE WITNESS:  It's possible.

BY MR. KUSNETZ:

Q.    Would it surprise you if they did or did not?

A.    I think -- I think we all worked relatively well together, the Houlihan team, the FTI team, myself, and there was a lot of -- you know, cross-work, for lack of a better word.

Q.    What do you mean by "cross-work"?

A.    Assistance.

Q.    So you would call up Houlihan and ask for some assistance?

A.    I might call one of the Houlihan guys and say, "Hey, you know, I'm working on this deal.  They're asking X.  What do you think?"

Q.    So you would ask Houlihan Lokey what they thought about certain deals in connection with the monetization process, correct?

          MS. MURPHY:  Objection to form.

          THE WITNESS:  If I'm looking for additional information, yes.



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1440 of 2249

ROBERT KOST  Conf.                                                May 13, 2025
DUNN V. PATRIARCH PARTNERS                                               37

R. Kost - Confidential

BY MR. KUSNETZ:

Q.    So you felt like you could pick up the phone and call them, correct?

A.    Yes.

Q.    Did they pick up the phone and call you?

A.    Yes.

Q.    How often did they consult with you?

A.    My -- so my role, again, was focused solely on the sale of the portfolio companies.  Houlihan worked on all kinds of other topics, some of which I may not even have known.

So my interaction with Houlihan would have only been related to the sale of the portfolio companies.

Q.    And that's the overlap that you spoke of, correct, where Houlihan and you overlapped in connection with the sale of the portfolio companies, correct?

A.    Yes.  They were not specifically -- it was my role to oversee the sale processes of all of the portfolio companies -- well, until such time as maybe something happened, like filing bankruptcy.

In some instances, Houlihan would take over certain roles when my role of actually selling the portfolio company was put on hold or changed, and we could go through every one of them if you wanted, and maybe we



R. Kost - Confidential

will, but they each are different for different reasons.

Q.    Understood.

With respect to Houlihan Lokey doing a number of things in addition to the sale -- in addition to assisting with the sale process, what is your recollection of those other things?

A.    So Houlihan was -- would work closely with Mike Katzenstein on the mediation issues, on financings, to the extent any of the portfolio companies needed financing or new financing.

They, I believe, were -- you know, involved with Dura, once Dura filed for bankruptcy.  They were involved with MD Helicopters, once our sale process was suspended, to help Mike Katzenstein develop a plan or a strategy with respect to the debtors' interest in MD Helicopters.  And they probably had other roles that I'm not aware of.

Q.    Understood.

With respect to MD Helicopters and, as you testified --

(Thereupon, an informal discussion was held off the record with the shorthand reporter.)

THE VIDEOGRAPHER:  We're going to go off



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1442 of 2249

ROBERT KOST  Conf.                                        May 13, 2025
DUNN V. PATRIARCH PARTNERS                                        39

R. Kost - Confidential

record.  This concludes Media Unit No. 1.  The time is 12:04.

(Recess taken at 12:04 p.m.)

(Resumed at 12:06 p.m.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 12:06, and this is the start of Media Unit No. 2.

BY MR. KUSNETZ:

Q.    Mr. Kost, before we went off the record, we were talking about Houlihan Lokey and the services they were providing to Mr. Katzenstein, correct?

A.    Yes.

Q.    And you testified that with respect to MD Helicopters, "once our sale process was suspended to help Mike Katzenstein develop a plan or strategy with respect to the debtors' interest in MD Helicopters," referring to Houlihan Lokey.

Do you recall testifying to that?

A.    Yes, that's my recollection.

Q.    Okay, so when you mention the suspension of the sale process, what specifically are you referring to?

A.    I worked actually with Ms. Tilton to interview bankers, and Moelis was an investment banker



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1443 of 2249

ROBERT KOST  Conf.                                      May 13, 2025
DUNN V. PATRIARCH PARTNERS                                        40

R. Kost - Confidential

that had been identified early before we even -- I was even retained, and Moelis was selected to be the investment banker to run a sale process for MD Helicopters.

And we ran that process in 2018 and early 2019, to the best of my recollection, where we ran a process that resulted in indications of interest, which we did receive, and we pursued those indications of interest. That's the first sale process, as I would term it.

Q.    You mentioned "suspension of sale processes." What do you mean by "suspension"?

A.    So we received a number of indications of interest.  Again, my recollection would be 2019.  And we thought we had some interested parties that we could move on to Phase II of a sale process with a data room and management presentations with the goal of moving on to definitive documentation.

After we received the indications of interest, and we had just started Phase II -- during Phase II -- the early parts of Phase II -- our most interested potential buyers decided to end their interest in pursuing a transaction, and for that reason, because we lost our top three most likely buyers, Ms. Tilton decided to suspend the sale process.



R. Kost - Confidential

Q.    Was that the only reason why she decided to suspend the sale process?

MS. MURPHY:  Objection to form.

THE WITNESS:  Well, it's obviously a very complex situation.

BY MR. KUSNETZ:

Q.    Right.

A.    At the same time, MD Helicopters was having some financial issues.  I can't remember specifically the dates.  I don't know when the United States got kicked out of Afghanistan.  When -- when the Taliban took over Afghanistan, that was the largest market for MD Helicopters and all the service revenue and all the revenues coming from the Department of Defense, and that obviously had a negative impact on the -- the sale process.

Q.    At the time of the -- of the U.S. getting kicked out of Afghanistan, was Ms. Tilton -- did she hold a role at MD Helicopters?

A.    She was the CEO and director until a date that I don't recall.

Q.    March 2020?  Would that sound correct?

A.    Yes, that sounds right.

Q.    Do you recall when the withdrawal from

R. Kost - Confidential

Afghanistan was?

A.     I don't.

Q.     Would it be after March 2020?

A.     I don't recall.

          (Pause.)

BY MR. KUSNETZ:

Q.     When Ms. Tilton decided to suspend the sale

process for MD Helicopters after you lost the three most

likely buyers, do you recall whether Moelis, the

investment bank, agreed with her decision?  "Yes" or

"no"?

          MS. MURPHY:  Objection to form.

          THE WITNESS:  I don't recall

     specifically, but they could have, and we were

     all extremely disappointed that we had lost

     our three most likely buyers, yes.

BY MR. KUSNETZ:

Q.     When you say "we," meaning you, Ms. Tilton,

and Moelis?

A.     I would say everybody.

Q.     Who is everyone?

A.     Everybody.

Q.     Like who?

A.     The debtors, the creditors, the advisors, the



R. Kost - Confidential

lawyers, Ms. Tilton, Moelis, me.

Q.    Mr. Katzenstein?

A.    Mr. Katzenstein.

Q.    Mr. Farnan?

A.    Everybody.

Q.    Okay.  And that was through no fault of your own, correct?

A.    I -- I -- I mean, we never got a good answer as to why each of the three most likely buyers walked away.  It was -- who knows exactly why they walked away?  Moelis asked them, and it's in the record somewhere, or you can depose the Moelis bankers as to why.

Again, I think each of the three lead buyers had their own reasons, some of which they probably didn't tell us.  Again, it was a complex situation.  You know, I can recall the MD Helicopter market was at the low end of the attack helicopter market, and it's just kind of a messier end of the market, and some of our likely buyers maybe -- I had heard thirdhand that -- you know, selling a helicopter to third world countries is hard -- you know, harder than you would expect.  It's not like selling it to the United Kingdom.

It's -- you have to get the minister of defense in a small country to agree.  This is one example.  There



R. Kost - Confidential

were any number of examples as to why the top three interested parties -- each decided To withdraw their bid.

Q.    Understood.

And when the top three parties decided to withdraw their bid, is it your testimony that it was -- you were responsible for that decision?

A.    I wasn't -- I mis- -- I don't understand your question.

Q.    My question is:  Is it your fault, sir, that those three bidders withdrew their bids?

A.    Is it my fault?  No, it's not my fault.

Q.    Is it Moelis's fault?

A.    I couldn't say as to whether it was their fault or not.  You know, I don't know how or what they said to all the bidders all the time.  I don't -- I don't per se blame Moelis, no.

Q.    You don't blame Moelis?

A.    No.

Q.    Do you blame Ms. Tilton?

A.    I don't blame Ms. Tilton per se except for she was the CEO of a company that she had done a wonderful job building, but also MD Helicopters had issues that the buyers clearly didn't like and they



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1448 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                            45

                    R. Kost - Confidential

weren't willing to pay for.

        Q.    But you don't know what those issues were,
correct?

        A.    I just said it.  There were a lot of complex
reasons.  They obviously didn't agree with how we looked
at the value.  Other buyers -- one of our lead buyers
made comments to the effect that they were -- couldn't
believe that the margins were true, that there wasn't
enough support or back office or staff, that it was run
too leanly.  I mean, there were hundreds of --

        Again, I don't know exactly.  You'd have to ask the
three lead buyers why they walked away.

        Q.    Okay, but sitting here today, you do not know
all the reasons why they walked away, correct?

        A.    I know only the reasons that were conveyed to
me by Moelis.

        Q.    By Moelis?  Okay.

        Did you ever talk to Ms. Tilton about why they
walked away?

        A.    I -- I recall Ms. Tilton being on some of the
phone calls.  We often had phone calls that included
Moelis and Ms. Tilton, so she would have known the same
reasons or heard the same stories/reasoning.

        Q.    Understood.



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1449 of 2249

ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                    46

R. Kost - Confidential

And you interfaced with Moelis frequently in connection with the sales process for MD Helicopters, correct?

A.    Yes.

Q.    You called them?

A.    Yes.

Q.    You emailed them?

A.    Yes.

Q.    Did they call and email you?

A.    Yes.

Q.    And there was never an occasion where they stonewalled you, correct?

A.    I wouldn't use the word "stonewalled."  We had a very interactive relationship during the first sale process.  It changed later, and when we kind of were thinking about doing the second sale process -- after Alan Carr took over as the independent director, he was really the -- more integral with to the relationship with Moelis, and we -- I can't remember the reason why -- had less of a role during the second sale process.  But during the first sale process, yes.

Q.    Who had less of a role during the second sale process?

A.    I did.  I had much less of a role after



800.211.DEPO (3376)
EsquireSolutions.com

Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1450 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                           47

R. Kost - Confidential

Alan Carr took over as independent director.

Q.    And is it fair to say Houlihan's role increased while your role decreased at that time?

A.    Yes.

Q.    And did you ever understand why your role decreased at that time?

A.    Because we weren't running a sale process at that point.  We were thinking about running a sale process, and at some point, the financial restatement issue came up, which completely put the sale process on hold for a while.

Q.    What do you mean by "the financial restatement issue"?

A.    It came to our attention that the financials and the accounting standards that were being used to calculate revenue and expense recognition may not have been appropriate, and I believe KPMG was retained or brought in -- or somebody was brought in to look at the financials, and ultimately, a major financial restatement took place.

Q.    Do you recall when that was?

A.    I'm going to say 2021, maybe.

Q.    Understood.

When Mr. Carr took over as independent director,



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1451 of 2249

ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                      48

                    R. Kost - Confidential

that was after Ms. Tilton resigned from her role at

MD Helicopters, correct?

        A.    Yes.

        Q.    So you're saying the dynamic of the

monetization team changed after Ms. Tilton resigned,

correct?

        A.    Well, I would say that the sale process

dynamic changed after our most interested buyers

withdrew their -- their bids.

        Q.    But your interactions with --

                MR. KUSNETZ:  Withdrawn.

BY MR. KUSNETZ:

        Q.    Your role on the MD Helicopters sales team,

let's call it, changed, though, after Ms. Tilton

resigned from her role at MD Helicopters, correct?

        A.    Yes.  So my role as a CMO is to run and

oversee sale processes.  There was no ongoing sale

process.  It was on hold, and Mike Katzenstein and the

team and the lawyers and ultimately Alan Carr tried to

figure out what to do now.  Do we go back to those

buyers?  Do we change the business?  Do we -- what do we

do?

        And that wasn't my role, to figure out the strategy

as to how to prepare MD Helicopters for a sale process.



R. Kost - Confidential

I oversee the bankers when they are going into a sale process.

Q.    So are you saying that as your role as CMO, you did not -- it was not your role to --

MR. KUSNETZ:  Withdrawn.  Let's start that again.

BY MR. KUSNETZ:

Q.    Are you saying that as CMO, it was not your role to figure out a strategy about how to prepare a portfolio company for sale?

A.    No, I'm not saying that.

I'm saying that there were many issues at MD Helicopters that needed to be resolved before you could even begin to figure out a sale process.

And again, I can't remember the sequencing, but Ms. Tilton leaving at CEO left you with a depleted management team.  The revenues were declining.

I can't remember when the Afghanistan war issue had an impact on -- on the revenues happened.  I can't remember exactly the date of financial restatement. None of those were helpful for a sale process.  Those were FTI issues.

Q.    What do you mean by "FTI issues"?

A.    That was Mike Katzenstein's job to try to



R. Kost - Confidential

figure out the debtors' response to all of those

unfortunate circumstances at MD Helicopters.

Q.   But why weren't you involved in those

discussions?

A.   Well, I was involved in some of them for

sure, but others -- just financial restatement -- just

not my job, and --

You know, understanding why and what Moelis thought

-- you know, why they thought that the bidders left the

process, how we might get them back -- those were things

that I would be involved with.  Sale process issues.

Q.   Understood.

(Pause.)

BY MR. KUSNETZ:

Q.   So when you testified that it wasn't your

role to figure out the strategy as to how to prepare

MD Helicopters for a sale process, are you saying, sir,

that your role was limited to interfacing with the

investment bankers in connection with restarting the

sales process?

MS. MURPHY:  Objection to form.

THE WITNESS:  I don't know if I said

that.  If you're saying I said that, then --

then maybe I misspoke.



R. Kost - Confidential

Of course my role is to prepare a company for a sale process, but if you have issues that are discrete, like having no CEO, it's not my job to figure out how to get a new CEO. It's not my job to figure out -- wasn't my job how to figure out how to restate the financials.

BY MR. KUSNETZ:

Q.    Was it your job to figure out how to -- how and when to start contacting -- you know, potential interested new parties?

A.    Yes.

Q.    Okay, and so would you consider that as having a role in the sale process for MD Helicopters?

A.    Yes.  I would work closely with Moelis, who would be --

The whole point of the -- how we operated was we retained investment bankers jointly to be the investment banker for a portfolio company, and they would make recommendations as to the appropriate sale process.

I would work on our side with FTI and the counsel and Judge Farnan to figure out what we thought with respect to, for example, Moelis's recommendation as to a process and timing.


800.211.DEPO (3376)
EsquireSolutions.com

R. Kost - Confidential

Q.    Understood.  Okay.

When you say, "We would retain investment bankers," you did not retain the investment banker; is that correct?

A.    No, that's correct.  What I meant by that statement is in the beginning, Lynn Tilton and I would interview a number of investment bankers for a specific portfolio company, and that specific portfolio company would actually retain the investment banker.

Q.    And it was Ms. Tilton's signature that was on the engagement letter, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes, because I think she had either roles as a CEO or director, but yes, I think hers was on most of them.

BY MR. KUSNETZ:

Q.    Okay.  Your name was not on them, correct?

A.    No.

Q.    And you did not have any role in the negotiations of the engagements, correct?

A.    I was knowledgeable of all of the engagement letters and I think was -- I had my -- my input with Ms. Tilton and the portfolio companies as to whether we should or should not engage a specific bank and what



R. Kost - Confidential

their engagement letter might look like.

Q.    But you were not involved in negotiating the terms of their engagements, correct?

A.    There were a few that I had a role, but many of them, especially earlier, during the first year or so, Ms. Tilton did more of the negotiating.

Q.    Okay.  Did she do a good job negotiating?

A.    I -- I think most of the engagement letters were what I would call market terms.

Q.    Let me actually be more precise.

Isn't it true that all of the engagement letters were, in your opinion, commercially reasonable?

MS. MURPHY:  Objection to form.

THE WITNESS:  I can't think of one at the moment that would be commercially unreasonable.  I thought they were generally commercially reasonable, yes.

BY MR. KUSNETZ:

Q.    Do you recall giving testimony at your prior depositions that when shown individual engagement letters for portfolio companies, you testified that you found them to be commercially reasonable?

A.    I don't recall saying it, but yes, that -- I can't think of one at the moment that was -- that was



R. Kost - Confidential

not.

Q.    Okay, so you cannot think of a single engagement --

MR. KUSNETZ:  Withdrawn.

BY MR. KUSNETZ:

Q.    You cannot think of the terms of a single engagement that you found to be commercially unreasonable that Ms. Tilton negotiated with the investment bankers in connection with the monetization process, correct?

A.    That's correct.

Q.    Ms. Tilton wanted your input in connection with hiring these investment bankers, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes.  We had a good working relationship during the first year or two.  It became strained later on, but we still jointly did interviews of investment banks, even when our relationship was strained.

BY MR. KUSNETZ:

Q.    So despite a strain in your relationship, you and Ms. Tilton worked together to interview investment banks, correct?

A.    Yes.



R. Kost - Confidential

Q.    And you occasionally attended pitches that the investment banks put on for -- for their potential engagements for specific portfolio companies, correct?

A.    Yes.

Q.    Did you attend all of the pitches?

A.    I wouldn't say all.  In --

In the beginning, I think there were two or three investment banks that were hired or in -- in the process of being retained that I didn't -- I wasn't involved in the -- in the pitches.

Q.    Understood.

In terms of identifying the investment banks, it was Ms. Tilton who identified the list of investment banks, correct?

A.    We often jointly put together a list.

Q.    There was a list that preceded you being hired as CMO, correct?

A.    I generally recall that there was a list, that there were some investment banks that she had identified for some of the portfolio companies.

Q.    And you didn't disagree with any of her selections, correct?

A.    I don't recall specifically.  I know there were names I added --



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

R. Kost - Confidential

Q.    But --

A.    -- to the list.

Q.    But in terms of the list that she prepared of investment banks for the particular portfolio companies to be sold during the monetization process, you did not disagree with the ones that she proposed, correct?

A.    I -- I don't recall if there was any names that I specifically disagreed with.

Q.    Sitting here today, you don't recall disagreeing with her names that she proposed for investment banks, correct?

A.    I know we prepared lists jointly.  She came up with names, I came up with names, and we agreed on the list.  I don't recall whether I crossed out any of her names or she crossed out any of mine.

Q.    With respect to the list of investment banks that was prepared before you were appointed CMO, for those investment banks, you did not disagree with any of those selections on the list, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  I can't say that.  I don't recall.

BY MR. KUSNETZ:

Q.    You don't recall?



Case 1:16-cv-04488-VM-KHP     Document 419     Filed 03/27/26     Page 1460 of 2249

ROBERT KOST Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                         57

R. Kost - Confidential

A.    No.

Q.    Would it have surprised you if you disagreed with any of the names on that list?

MS. MURPHY:  Objection to form.

THE WITNESS:  I would be speculating as to whether or not I crossed off a name or two from her list.  I don't recall.

BY MR. KUSNETZ:

Q.    So you don't recall a situation where you have crossed off a name from her list of investment bankers, correct?

A.    That was six years ago.  I don't recall.

Q.    Right.  It would surprise you if you did, right?

MS. MURPHY:  Objection to form.

THE WITNESS:  No.  I may have crossed off a name.

BY MR. KUSNETZ:

Q.    Do you recall ever telling Ms. Tilton that you wanted to cross off a name?

MS. MURPHY:  Objection to form.

THE WITNESS:  No.  I would tell you if I did.  I don't recall.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1461 of 2249

ROBERT KOST  Conf.                                           May 13, 2025
DUNN V. PATRIARCH PARTNERS                                          58

R. Kost - Confidential

BY MR. KUSNETZ:

Q.    Do you know if there's a single email that you've sent to Ms. Tilton where you've objected to a particular investment banker for a particular portfolio company?

A.    I don't recall.

Q.    Would it surprise you if there was one?

MS. MURPHY:  Objection to form.

THE WITNESS:  I -- I may have -- no, I may have crossed off a name, but I don't recall.

BY MR. KUSNETZ:

Q.    What do you mean like "crossed off a name"? What does that mean?

A.    She would come up with a name.  You know, she might have five names and I had four names, and we agreed on three each, six, and so effectively, two of hers got crossed off.

Q.    So you're saying that you would come to the table with investment banks that you were proposing to serve as the investment banks for portfolio companies during the monetization process?

A.    Yes, absolutely.

And especially later, after that initial three,



R. Kost - Confidential

four-month period.

Q.   What three, four-month period?

A.   I was retained as CMO in middle of 2018, and she had already identified investment banks for a couple companies, for example, Denali and Oasis, and maybe we only used her names.  I -- I can't remember at this point.

Q.   Do you recall a single investment bank that was eventually hired to support the sale of a portfolio company that came from your recommendation alone?

A.   I'd have to go through every one of them. I -- I think Donnelly Penman on behalf of GAS was one of my names.  I'd have to go through each of them and see.

Q.   Understood.

And when you would consult with Ms. Tilton about the particular investment banks that should be hired to support the sale process for these portfolio companies, you worked cooperatively, correct?

A.   Yes.  I mean, again, just to be clear, this is what I do for a living.  I know more about these investment banks and the people than I think she thinks -- she thinks she does, so I just want to be clear about that.

Q.   You're saying you know more than Ms. Tilton



R. Kost - Confidential

about investment banks?

A.    I know a lot about investment bankers and hiring investment bankers, yes.

Q.    But you're able to make a judgment as to whether you know more than she does?

A.    I will strike that from my comment.

Q.    Okay.  Thank you.

But fair to say you -- I actually want to touch on your experience.  You previously testified -- and this was -- you know, back in 2020 -- that you had -- I think it was 30 years of experience with investment banking; is that correct?

A.    Yes, at least.

Q.    And so after 2020 -- you said you retired in 2023 from investment banking?

A.    Yes.

Q.    So fair to say you have -- you know, over 30 years of experience, then, in terms of working in investment banking?

A.    Yes.

Q.    Lots of relationships with the market, correct?

A.    Yes.

Q.    Know who the key players are?



R. Kost - Confidential

A.    I know a lot of people in the industry.

Q.    Well, during your more than 30 years of experience, you knew who some of the more prominent investment banking companies were, correct?

A.    Absolutely.

Q.    And a number of investment banks are also specialized for particular industries, correct?

A.    Yes.

Q.    Some specialized for health care, right?

A.    Yes.

Q.    Some specialized for aerospace?

A.    Yes.

Q.    Some specialized for industrials?

A.    Yes.

Q.    Some specialized for metals?

A.    Yes.

Q.    And a number of these portfolio companies that were selected by Ms. Tilton had specialties that related to the portfolio companies they are selected for, correct?

A.    Yes.

Q.    And that includes, for example, Ziegler with respect to health care, right?

A.    Yes.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

R. Kost - Confidential

Q.    And they were selected for Intrepid, right?

A.    Yes.

Q.    And Lazard for Hussey Copper, correct?

A.    Yes.

Q.    They had a specialty in Lazard's business area, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  I mean, having worked at Lazard for a decade, it was tangential.

There's really no copper smelter bankers.  But Matt Dalton was an excellent banker.

BY MR. KUSNETZ:

Q.    He's an excellent banker and he had expertise in selling companies in the same industries as Hussey Copper, correct?

A.    Yeah, tangential.

Q.    Well, was he not an appropriate choice, in your opinion?

A.    No, I thought he was a great choice.  I'm just saying I don't know if he had done a copper deal, copper smelter deal.

But my point is yes, he was a very good banker.

BY MR. KUSNETZ:

Q.    Understood.  Understood.



R. Kost - Confidential

Q.   Founders and Eugene Bazemore had prior experience in the industry that Vulcan was in, correct?

A.   Yes.

Q.   And you agreed with that choice?

A.   Yes.  I did not know -- I had never heard of Founders before.  It was a very small, niche business, and I had no problem with Founders being selected.

Q.   Understood, and you engaged with Mr. Bazemore in connection with the Vulcan sale, correct?

A.   Yes.

Q.   And you found him to be competent?

A.   Yes.

Q.   You thought he did a good job?

A.   Yes.  It was a tough situation.

Q.   Vulcan was a tough situation, correct?

A.   Yes.

MS. MURPHY:  Would it be a good time for a break?

MR. KUSNETZ:  Sure, if it's a good time for you to take a break.

THE WITNESS:  Sure.

THE VIDEOGRAPHER:  We're going to go off record.  The time is 12:36, and this concludes Media Unit No. 2.



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1467 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                          64

R. Kost - Confidential

(Recess taken at 12:36 p.m.)

(Resumed at 12:46 p.m.)

THE VIDEOGRAPHER:  We are back on record. The time is 12:46, and this is the start of Media Unit No. 3.

BY MR. KUSNETZ:

Q.    Okay.  Mr. Kost, when we were talking about MD Helicopters, you had mentioned that the American withdrawal from Afghanistan was a negative development for the company, correct?

A.    Yes.

Q.    Are you aware that the American withdrawal from Afghanistan occurred in the summer of 2021?

MS. MURPHY:  Objection to form.

THE WITNESS:  That -- I don't know the date, but that sounds like it could be right.

BY MR. KUSNETZ:

Q.    Do you recall it was during the Biden administration?

MS. MURPHY:  Objection to form.

THE WITNESS:  Sounds right, yes.

BY MR. KUSNETZ:

Q.    And that was a year -- over a year after Ms. Tilton had resigned from her role at MD Helicopters,



R. Kost - Confidential

correct?

A.    Yes.

Q.    It's not Ms. Tilton's fault that Afghanistan fell, correct?

A.    No.  I didn't blame her, no.

Q.    That's a definitive answer.  I would have expected it to be "not to my knowledge," but no.  Okay. Thank you.  That's helpful.  Okay, so ...

Regarding your expertise, over 30 years of experience in investment banking, correct?

A.    Yes.

Q.    Okay.  What else would you say describes your qualifications for the role as CMO?

A.    My experience is that I have run dozens -- many dozens -- of M&A sale processes, most of them with what I'll call are story companies or distressed companies or bankrupt companies.

That's my specialty, so I've been on -- and I've been on both sides.  I've run the sale processes.  I've represented potential buyers of troubled companies, and I just have a lot of experience in how to run a sales process.

Q.    Understood, and so when you were taking on this role as the chief monetization officer, you were



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1469 of 2249

ROBERT KOST Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                     66

R. Kost - Confidential

confident in your ability to deliver, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  I don't know what you mean by "deliver."

I was very confident that I could do the role, which is -- it's a tremendous amount of work to run and oversee a sale process.

Now, again, to be clear, I didn't run the sale process.  We hired investment banks for each of the portfolio companies to run the sale process.

It was my job to oversee and work very close -- not work closely, but to understand what the investment bankers were doing, what their strategy was, and understand their timing.  Everything that goes into a sale process was -- it was my job to understand what they were doing.

BY MR. KUSNETZ:

Q.   You were the eyes and ears for the debtors with respect to the sales process, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes, that's one way to say it.



R. Kost - Confidential

BY MR. KUSNETZ:

Q.    And you deferred to the bankers on their decisions about how best to run the sales process for each portfolio company, correct?

A.    No, I wouldn't say that we deferred to them. I think if there was something that we disagreed with, we would bring it to their attention.

Q.    But you relied on them, the investment bankers, to run the sale processes for the portfolio companies, correct?

A.    That's correct.  They ran the sale process.

Q.    And they were selected for their particular expertise in running the sales processes as relevant to the portfolio companies, correct?

A.    That's correct.

Q.    In addition to your experience, do you -- you mentioned that you retired in 2023.

Did you retire from all work or just from Goldin Associates?

A.    I have not worked since 2023.

Q.    In any capacity?

A.    No professional capacity, no.  I sit on some boards of not-for-profits.

Q.    What -- what boards do you sit on?



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1471 of 2249

ROBERT KOST  Conf.                                              May 13, 2025
DUNN V. PATRIARCH PARTNERS                                            68

R. Kost - Confidential

A.    Well, I was on the Carver Center board in Port Chester, and now I'm on a committee for the Manursing Island Club.

Q.    Which island?

A.    Manursing.

Q.    Where is that?

A.    It's a club in Rye.

Q.    Okay.  Are you a member of that club?

A.    Yes.

Q.    Is that like a tennis club or golf club kind of thing?

A.    Tennis and beach.

Q.    Tennis and beach?  Is that near the American Yacht Club?

A.    It's next to the Westchester --

Q.    Next to the Westchester --

A.    -- Beach Club.

Q.    Okay.  Beautiful location.

Next time, if we do this deposition, would you mind hosting it there on the veranda or --

A.    That would be great.

             MS. MURPHY:  Object to the suggestion we're doing the deposition again.

             MR. KUSNETZ:  I was waiting for you to



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1472 of 2249

ROBERT KOST  Conf.                                      May 13, 2025
DUNN V. PATRIARCH PARTNERS                                        69

R. Kost - Confidential

pick up on that one.

BY MR. KUSNETZ:

Q.    All right.  So do you --

Are you sitting on any for-profit boards?

A.    No.

Q.    And are you an investor --

MR. KUSNETZ:  Sorry.  Withdrawn.

BY MR. KUSNETZ:

Q.    Are you advising any for-profit companies today?

A.    No.

Q.    Why did you retire in 2023?

A.    My firm, Goldin Associates, was acquired by Teneo, T-E-N-E-O, and I worked for three years at Teneo, and during that period, Teneo was changing its business model for our financial advisory group, and the changes were moving away from what I did, and I decided after 38 years to retire.

Q.    Understood.

So were you working at Teneo while you were the chief monetization officer?

A.    Yes.  I believe we filed a revised order or something with respect to our retention and had it transferred from Goldin to Teneo.



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1473 of 2249

ROBERT KOST  Conf.                                      May 13, 2025
DUNN V. PATRIARCH PARTNERS                                      70

R. Kost - Confidential

Q.    Understood.

When your role as CMO came to an end, that was relayed to you by Mr. Katzenstein directly, correct?

A.    Yes.

Q.    How did he relay that to you?  Verbally or in writing?

A.    I believe verbally only.

Q.    Was it in a phone call or an in-person meeting?

A.    I just don't recall.

Q.    You don't recall the conversation --

MR. KUSNETZ:  Sorry.  Withdrawn.

BY MR. KUSNETZ:

Q.    You don't recall how the conversation took place with respect to when you were informed that your role as chief monetization officer would end?

MS. MURPHY:  Objection to form.

THE WITNESS:  It -- it wasn't -- it was gradual.  Mike didn't call me and say, "You're terminated."

Mike called me up and said -- you know, "You're working less hours.  We have less sales processes ongoing.  You know, we're trying to cut back the expense burden for the



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1474 of 2249

ROBERT KOST  Conf.                                        May 13, 2025
DUNN V. PATRIARCH PARTNERS                                        71

R. Kost - Confidential

estate."

Basically -- I'm paraphrasing -- he said something to the effect of "You should begin to wind down and transition your role to the other advisors."

BY MR. KUSNETZ:

Q.    And the other advisors included Houlihan Lokey, correct?

A.    Yes.

Q.    And when you said "It was gradual," you mean that the writing was on the wall that your role as CMO was coming to an end, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  My recollection -- and I could be wrong -- was that these discussions started in the fourth quarter of 2021, and by January, February, March of 2022, that was like the final --

I can't remember what my final period was.  I'm going to say it was February of 2022.

BY MR. KUSNETZ:

Q.    Understood.

But you weren't shocked by that phone call from



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1475 of 2249

ROBERT KOST  Conf.                                                May 13, 2025
DUNN V. PATRIARCH PARTNERS                                                 72

                    R. Kost - Confidential

Mr. Katzenstein, correct?

        A.     I wouldn't use the word "shocked."  I was

disappointed, because I felt like there was still work

to be done.

        Q.     Right.

        A.     But we were also moving toward a plan of

reorganization, which ultimately, I think, happened in

summer of 2022, so three or four months after I

finished.

        Q.     And you felt there was more to be done

because two of the most valuable portfolio companies had

not yet been sold, right, MD Helicopters and Stila?

                MS. MURPHY:  Objection to form.

                THE WITNESS:  That's right, and -- that's

        right.

BY MR. KUSNETZ:

        Q.     And Intrepid also had not been sold at that

point?

        A.     I was going to say I think there were others.

        Q.     Right.

        A.     Yes.

        Q.     And the Group B companies as well, correct?

        A.     That's correct.

        Q.     There was still more to do?



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1476 of 2249

ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                     73

R. Kost - Confidential

A.    Yes.

Q.    When you mentioned this restructuring that happened several months after you -- after you no longer served as the CMO, what are you referring to exactly?

A.    The confirmation of a plan of liquidation for the Zohar debtors.

Q.    Did you have any role in that restructuring?

A.    No.

Q.    Did you have any role in preparing for it?

A.    Not that I can recall.

Q.    Did you know it was coming as of the end of your term as CMO?

A.    Yes.

Q.    What did you know?

A.    That we were trying to get to a plan which ultimately, I think, was technically called a plan of liquidation.

Q.    Do you know why you were trying to do that?

A.    Because we wanted to wrap up the bankruptcy.

Q.    When you say "we," who is "we"?

A.    The other advisors to the debtors.  Young Conaway, FTI, myself.

Q.    And Houlihan?

A.    And Houlihan.



Case 1:16-cv-04488-VM-KHP  Document 419  Filed 03/27/26  Page 1477 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                          74

R. Kost - Confidential

Q.    And what specifically was your role in those discussions relating to preparing for the reorganization?

MS. MURPHY:  Objection to form.

MR. KUSNETZ:  Restructuring.  Withdrawn.

THE WITNESS:  I did not have a role with preparing the plan of reorganization or plan of liquidation.

BY MR. KUSNETZ:

Q.    Okay, but you were part of the discussions in advance of the plan of liquidation, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Very limited and tangentially.

BY MR. KUSNETZ:

Q.    And what was the bounds of your -- of the --

MR. KUSNETZ:  Withdrawn.

BY MR. KUSNETZ:

Q.    When you say "tangentially," please describe in a little more detail like what the bounds were of your knowledge of this liquidation plan.

A.    We had weekly update calls and either biweekly or monthly board calls, and it would have been a topic for review or update or summation during, for



                    R. Kost - Confidential

example, the weekly calls.

        Q.    So you would hear --

                MR. KUSNETZ:  Withdrawn.

BY MR. KUSNETZ:

        Q.    Were you the person giving the update on the

plan for liquidation at those meetings or those calls?

        A.    Me?  No.

        Q.    Who was the person or entity giving the

updates on the plan of liquidation for those calls?

        A.    I don't -- I don't recall.  I don't recall --

I don't recall.

        Q.    Was it Young Conaway?

                MS. MURPHY:  Objection to form.

                THE WITNESS:  Probably.

BY MR. KUSNETZ:

        Q.    Was it Houlihan?

                MS. MURPHY:  Objection to form.

                THE WITNESS:  Possibly.

BY MR. KUSNETZ:

        Q.    Was it Mr. Katzenstein?

                MS. MURPHY:  Objection to form.

                THE WITNESS:  Possibly.

BY MR. KUSNETZ:

        Q.    It wouldn't have been Mr. Farnan, though,



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1479 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                              76

R. Kost - Confidential

right?

MS. MURPHY:  Objection to form.

THE WITNESS:  He might have had

questions.

BY MR. KUSNETZ:

Q.    But he wasn't the one who was running that
process, correct?

A.    No.

Q.    Who was running that process?

MS. MURPHY:  Objection to form.

THE WITNESS:  Well, I'd be speculating
that it was being led by Young Conaway from
the legal perspective and FTI and possibly
Houlihan from -- you know, the economics
perspective.

BY MR. KUSNETZ:

Q.    Understood.  Not part of your purview,
though?

A.    No.

Q.    But you were allowed to listen in, correct?

A.    I -- to the extent it was discussed on a
weekly update call, yes, I might have -- I would have
heard.

Q.    You weren't screened off of that part, right?



800.211.DEPO (3376)
EsquireSolutions.com

R. Kost - Confidential

A.    No.

Q.    Okay.  I know we've talked a lot about the end.  Let's talk a bit more about the beginning.

When Goldin was first hired and retained by Ms. Tilton, when did you first hear about that retention?

A.    My recollection is that somebody at Gibson Dunn reached out to Mark Kirschner as to whether we would be interested in pitching for the role of chief restructuring officer and financial advisor to Ms. Tilton's CLO.  That's my first recollection.

Q.    Were you part of the pitch?

A.    Yes.

Q.    Did you pitch your specific role as a chief monetization officer?

A.    That terminology didn't come into existence until the settlement agreement with Ms. Tilton later.

Q.    So what was your title for the settlement agreement but after Goldin was retained with respect to the monetization process?

A.    Can you repeat the question?

Q.    What was your title before the official CMO title was bestowed upon you?

A.    So Goldin ultimately was retained as chief



R. Kost - Confidential

restructuring officer and financial advisor to the company.  Wasn't in bankruptcy.  Our understanding of the situation was that you would have to either negotiate with the creditors to come up with a deal -- transaction, or we would have to sell off the portfolio companies.

And my background being in restructuring and M&A, I was added to the team.  Mark Kirschner added me to the team, and I was part of the pitch from an investment banking/restructuring/sale/M&A perspective, and Mark was specifically identified as the chief restructuring officer candidate, the CRO.

Q.    Understood.

So you did not have a specific title that was envisioned for you at the time when Goldin was retained, correct?

A.    Correct.

Q.    Who came up with the title chief monetization officer?

A.    I don't know.  That was part of the settlement negotiations.

Q.    How many times has someone referred to you as the chief marketing officer, though?

A.    That has been known to happen, yes.



R. Kost - Confidential

Q.    Is that a title, chief monetization officer, that you've heard used before in connection with selling off portfolio companies?

A.    No, I have not.

Q.    Relatively bespoke title?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes, I -- I would think so.

BY MR. KUSNETZ:

Q.    Well, this sales process was pretty bespoke, wasn't it?

A.    Very much so.

Q.    This was not your run-of-the-mill M&A sales process, correct?

A.    No.  CLOs aren't supposed to file for bankruptcy.

Q.    Right, and this was the first time you had worked on a CLO bankruptcy, correct?

A.    That's correct.

Q.    And it was actually the first time that you had sold portfolio companies for a CLO, correct?

A.    I think there have only been three CLO bankruptcies, and two of them are Zohar's.

Q.    But my question is still this was the first time that you were selling portfolio companies for a



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1483 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                          80

R. Kost - Confidential

CLO, correct?

A.    It's the first time probably anybody's sold companies for a CLO, and my first time also.

Q.    And that -- if this was the first time that anyone was doing anything like this, fair to say there's a lot of complexity?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes, there's definitely a lot of complexity in this -- in this case.

BY MR. KUSNETZ:

Q.    Lot of unknowns that you --

MR. KUSNETZ:  Withdrawn.

BY MR. KUSNETZ:

Q.    Lot of unforeseen complications in terms of the sales process?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes, you could say that.

BY MR. KUSNETZ:

Q.    And you were hired and retained as chief monetization officer in part because of your expertise in the field of investment banking, correct?

A.    Yes, investment banking, M&A, and also distressed.

Q.    And how many months after Goldin was first



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1484 of 2249

ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                      81

R. Kost - Confidential

retained were you retained as the CMO officially?

A.    I don't remember the dates.  The Zohars file for bankruptcy, I think in May of 2018, and the settlement was signed, I'm going to say, in the summer of 2018, so Goldin was then terminated.

And relatively shortly thereafter -- days, weeks, probably -- I pitched for the role of CMO.

Q.    And you pitched to whom?

A.    For sure, Judge Farnan, and I can't recall if Mike Katzenstein was there or not, whether he was retained.  He must have been.  I just can't remember.

Q.    And what is your understanding of why you remained involved in the sales process when Goldin itself was terminated?

A.    Well, the important part is Mark Kirschner was CRO, and he was terminated, and Mike Katzenstein was retained as CRO.

I had been working -- I don't know how many months it was -- understanding the situation to be for the role of CMO.  I -- I had been trying to understand what the portfolio companies looked like, how you might go to market.

So I think that gave me a little bit of an additional reason for Judge Farnan to consider me.  I



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1485 of 2249

ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                    82

R. Kost - Confidential

don't know what Judge Farnan thought as to why he ultimately decided to pick me as the CMO over somebody else.  In fact, I don't even know who else he interviewed.

Q.    Understood.

Do you have any understanding why Mr. Kirschner was replaced by Mr. Katzenstein just months after he was first appointed?

A.    My understanding is that the creditors who were party to the settlement negotiations with Ms. Tilton thought because we were picked by Ms. Tilton that we weren't -- I don't know what the word would be -- independent or they just wanted somebody new.

Q.    They thought you guys were beholden to Ms. Tilton?

MS. MURPHY:  Objection to form.

THE WITNESS:  I don't know what people thought, but that's what I've heard.

BY MR. KUSNETZ:

Q.    That was the impression that you got, though?

A.    That's as good as any.

Q.    As good as any what?  Sorry.

A.    Impression.

Q.    That you got?



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1486 of 2249

ROBERT KOST  Conf.                                           May 13, 2025
DUNN V. PATRIARCH PARTNERS                                          83

                      R. Kost - Confidential

    A.    That I got.

    Q.    About what the creditors were thinking when they wanted to replace Mr. Kirschner with Mr. Katzenstein, correct?

    A.    I don't recall them giving us a reason as to why we were terminated.  I know we were terminated, and I don't know whether somebody told us or whether we surmised --

    Q.    Right.

    A.    -- that that was the reason.  I don't know.

    Q.    Why did they feel -- the creditors -- with you staying on even though Mr. Kirschner was replaced?

              MS. MURPHY:  Objection to form.

              THE WITNESS:  Well, first of all, Mark
         Kirschner could not have done the role of
         chief monetization officer, and so they were
         looking for a person -- a -- one person --
         chief monetization officer.

              And I don't know who else they
         considered, but my background, I thought, was
         tailor-made for this kind of situation.

BY MR. KUSNETZ:

    Q.    But you don't --

    You don't consider yourself --



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1487 of 2249

ROBERT KOST  Conf.                                        May 13, 2025
DUNN V. PATRIARCH PARTNERS                                         84

R. Kost - Confidential

MR. KUSNETZ:  Sorry.  Withdrawn.

BY MR. KUSNETZ:

Q.    You did not consider yourself beholden to Ms. Tilton when you were hired, correct?

A.    No, I -- and again, we are -- we're professionals.  I would have thought that we would have acted in our professional and fiduciary duties.

I mean, obviously this was before bankruptcy, and then in bankruptcy -- you know, it would have been the same.  In my mind, there would have been no issues.

Q.    And you thought Mr. Kirschner was a good choice for CRO, correct?

A.    Yes, I think -- yeah, I think Mark Kirschner is excellent.

Q.    He has a sterling reputation, correct?

A.    Yes.

Q.    Well-respected, long-time industry player, correct?

A.    Yes.

Q.    And to your knowledge, did Mr. Kirschner do anything during his time as CRO that warranted his replacement?  "Yes" or "no"?

MS. MURPHY:  Objection to form.

THE WITNESS:  I don't know, because I



Case 1:16-cv-04488-VM-KHP Document 419 Filed 03/27/26 Page 1488 of 2249

ROBERT KOST Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                      85

R. Kost - Confidential

don't know who actually made the decision in the negotiations to have us terminated.

We were -- we weren't in the meetings where it was discussed that we should be terminated.

MR. BARTLEY: Can I just interpose? This settlement was the result of a mediation in 2018, so just -- Mr. Kost, be careful that you're not divulging discussions that occurred in the mediation.

BY MR. KUSNETZ:

Q. I'm asking you based on your understanding, and if the understanding to you was supplied by a lawyer in connection with the provision of legal advice, then I understand the caution. So let me just be very clear, okay? And I'm --

To your knowledge, did Mr. Kirschner do anything during his time as CRO that warranted his replacement? "Yes" or "no"?

MS. MURPHY: Objection to form.

THE WITNESS: I can't think of anything as to why -- no, I don't know. I can't recall.



                      R. Kost - Confidential

BY MR. KUSNETZ:

     Q.    Was he working hard to understand --

               MR. KUSNETZ:  Withdrawn.

BY MR. KUSNETZ:

     Q.    Was he --

     Was Mr. Kirschner dedicated to his role as CRO for
the months that he was in that position?  "Yes" or "no"?

     A.    Yes.

               MS. MURPHY:  Objection to form.

BY MR. KUSNETZ:

     Q.    He worked hard, correct?

     A.    Yes.

     Q.    As you expected him to, correct?

     A.    Yes.

     Q.    Okay.  Consistent with your prior work with
him at Goldin Associates, right?

     A.    Yes.

     Q.    He treated this with the -- this engagement
with the seriousness that he treated his other
engagements at Goldin, correct?

     A.    That's my recollection.

     Q.    Did you know Mike Katzenstein before his
selection as CRO to replace Mr. Kirschner?

     A.    I knew his name and I -- I know we had met a

R. Kost - Confidential

couple times over the last couple decades.

Q.    But he was no Mark Kirschner, right?

MS. MURPHY:  Objection to form.

THE WITNESS:  I'm not -- that's -- I'm not going to answer that.

BY MR. KUSNETZ:

Q.    Why not?

MS. MURPHY:  Objection to form.

THE WITNESS:  I don't even know what you're asking.  That doesn't even make any sense.

BY MR. KUSNETZ:

Q.    What do you think I'm asking?

MS. MURPHY:  Objection to form.

THE WITNESS:  Mike Katzenstein has an outstanding reputation in the industry as a CRO, as does Mark Kirschner.

BY MR. KUSNETZ:

Q.    And does he have the longevity of Mark Kirschner in this industry?

A.    That's actually a funny question because he's still working in his 80s, so the answer is no, because he's in his 80s.

No.  They both have excellent backgrounds and



R. Kost - Confidential

reputations.

BY MR. KUSNETZ:

Q.    Fair to say that Mr. Kirschner --

MR. KUSNETZ:  Withdrawn.

BY MR. KUSNETZ:

Q.    Fair to say that in your view, based on your 30-plus experience in this industry, Mr. Katzenstein was not a better candidate than Mr. Kirschner, correct?

A.    I -- I don't know how to answer that.  Mike Katzenstein had his skill sets.  He had a lot of excellent people that worked for him.  I think we brought a lot to the table and we had excellent people.

It's just they're just different firms and different organizations, and so I can't answer who's better or who's not.

Q.    Understood.

Did you view yourself as reporting to Mr. Katzenstein in your role as CMO?

A.    I definitely -- I reported to Mike Katzenstein directly on a day-to-day basis, and also to -- obviously to Judge Farnan, who was the director, so I don't know which one was a dotted line and which one was a solid line.

Q.    Was Mr. Katzenstein your superior in terms of



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1492 of 2249

ROBERT KOST  Conf.                                May 13, 2025
DUNN V. PATRIARCH PARTNERS                                 89

R. Kost - Confidential

how the representatives of the debtors were organized?

MS. MURPHY:  Objection to form.

THE WITNESS:  My view of my role was to work very closely with Mike Katzenstein, and I guess you could say in a sense, I reported to him.

BY MR. KUSNETZ:

Q.   Did you report to Mr. Kirschner when he was still chief restructuring officer?

A.   The nature of the role of a CRO is to be the person in charge, the chief restructuring officer, so yes, I would have reported to Mark Kirschner, and at the end of the day -- you know, I think -- I feel like I reported to Mike Katzenstein.

Q.   Understood.

And you also reported directly to Judge Farnan?

A.   Yes, I -- we both reported to Judge Farnan.

Q.   Did you report to Judge Farnan through Mr. Katzenstein or did you also report to Judge Farnan directly?

MS. MURPHY:  Objection to form.

THE WITNESS:  I would say both.

BY MR. KUSNETZ:

Q.   And you mentioned as one of the reasons for



R. Kost - Confidential

why --

MR. KUSNETZ:  Withdrawn.

BY MR. KUSNETZ:

Q.    You mentioned as part of the job that you were hired for was to negotiate with creditors.  Do you recall saying that?

A.    No, I don't recall saying that.

Q.    No?  Okay.  Let's see what you said about creditors.

In any event, in connection with Goldin Associates being hired to lead the -- to --

MR. KUSNETZ:  Sorry.  Withdrawn.

BY MR. KUSNETZ:

Q.    In connection with Goldin Associates being hired to serve in the chief restructuring officer role and the support role that you played prior to your formal appointment as chief monitoring -- monetization officer, was negotiations with the creditors a part of what you were being hired to do?

A.    Yes, it's a -- yes.

Q.    Explain that a little bit more.

A.    When we were retained by Ms. Tilton before the bankruptcy, Mark was going to act in the role of chief restructuring officer and I was going to be a

Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1494 of 2249

ROBERT KOST  Conf.                                      May 13, 2025
DUNN V. PATRIARCH PARTNERS                                        91

R. Kost - Confidential

financial advisor assisting Mark.

My view at that time would have been that we would have assisted her with coming up with a strategy to either -- or both -- negotiate with creditors or sell businesses or both.

It was -- we didn't know what the strategy would be when we were retained.

(Pause.)

MR. KUSNETZ:  I found it, but it's all good.  Let's put that on the record.  Thank you, Joe.

BY MR. KUSNETZ:

Q.   So were you saying that your role vis-à-vis the creditors changed after you were officially named chief monetization officer?

A.   Yes.  Goldin and my role were terminated.

Q.   Right.

A.   FTI was hired.  Mike Katzenstein became the CRO and would have been responsible for everything, including negotiating with creditors.

Pursuant to the settlement agreement, which I've agreed is unusual to have the role of somebody called a chief monetization officer, which is a person, I pitched for that role to lead -- to become a chief monetization



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1495 of 2249

ROBERT KOST  Conf.                                           May 13, 2025
DUNN V. PATRIARCH PARTNERS                                          92

R. Kost - Confidential

officer to implement the settlement agreement which called for the sale of the Group A companies.

That was my role.  I pitched to be the chief monetization office.

Q.    And part of that role would include negotiating with the creditors, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  I actually did not see that as my role.

BY MR. KUSNETZ:

Q.    In fact, Mr. Katzenstein and Mr. Farnan and yourself, as representative of the debtors, reported to the creditors; isn't that correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  I don't know what you mean by that.  We were advisors to the estate.

BY MR. KUSNETZ:

Q.    To the estate?

And so if I refer to "the debtors," do you know who I'm talking about?

A.    The three Zohar entities.

Q.    Right, and what was Mr. Farnan's title?

A.    He was the independent director at each of those entities.



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1496 of 2249

ROBERT KOST  Conf.                                      May 13, 2025
DUNN V. PATRIARCH PARTNERS                                        93

R. Kost - Confidential

Q.    Right, and who were the creditors for those entities?

A.    They were different for each of those legal entities.

Q.    And what were they?

A.    Well, MBIA was the sole creditor at Zohar I. MBIA wrapped all of the creditors at Zohar II and in effect was the sole creditor at Zohar II.

Q.    Yeah.

A.    And there were a variety of creditors at Zohar III.

Q.    And with MBIA as the sole creditors for Zohars I and II, Mr. Farnan took instruction from MBIA in order to make them whole; isn't that correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  I'm sorry.  Which name did you say?

BY MR. KUSNETZ:

Q.    Farnan.

A.    Farnan?  Judge Farnan was the independent director of the three Zohar legal entities.  I don't know what you mean by he "took direction from the creditors."  I don't know what that means.

Q.    Did he have to answer to the creditors?



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1497 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                           94

R. Kost - Confidential

MS. MURPHY:  Objection to the form.

THE WITNESS:  Well, we're in bankruptcy, so we're -- he has a fiduciary duty to maximize the value of the estate reporting to the bankruptcy court, so the creditors were a party of interest.

BY MR. KUSNETZ:

Q.  So you're saying Mr. Farnan had a fiduciary duty to maximize the value of the estate, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  I'm not a lawyer, but that's my interpretation.

BY MR. KUSNETZ:

Q.  Did you also have a duty to maximize the value of the estate in connection with your role as the chief monetization officer?

MS. MURPHY:  Objection to form.

THE WITNESS:  I -- yeah, my goal was to maximize the value of the estate, yes.

BY MR. KUSNETZ:

Q.  And was that Mr. Katzenstein's goal as well, to the best of your knowledge?

A.  You'd have to ask him.  I don't know.  I assume so.



R. Kost - Confidential

Q.    When you say you "assume so," why do you assume so?

A.    All professionals in a bankrupt estate should work to maximize the value of the estate for the creditors.

Q.    That's the goal, right?

A.    That's the goal.

Q.    No other goals?

A.    There may be other goals, but that's --

Q.    There are no other goals in connection with maximizing the value of the estate?  Is that your testimony?

        MS. MURPHY:  Objection to form.

        THE WITNESS:  Again, it's not quite that simple, but an overarching principle is to maximize the value of the estate.

        Sometimes highest and best offer, for example, is not actually value maximizing.

BY MR. KUSNETZ:

Q.    Right, so there are occasions where during a sales process, the highest and best offer is not the maximal value for that particular company, correct?

A.    That's correct.

Q.    That -- the highest and best offer and the



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1499 of 2249

ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                        96

R. Kost - Confidential

value that derives from that is tied to the mechanics of the sales process, correct?

A.    In a perfect world, it would be highest and best.  It doesn't always happen.  That's correct.

Q.    Right, and because it's not a perfect world, it is the nature --

MR. KUSNETZ:  Withdrawn.

BY MR. KUSNETZ:

Q.    It is the mechanics of the sales process that can result in a company not being sold for maximum value, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  I'm not sure what you're exactly asking.

BY MR. KUSNETZ:

Q.    Okay.  It was kind of unclear.  Let me rephrase.

When you said "In a perfect world, it would be highest and best.  It doesn't always happen.  That's correct" --

So we don't live in a perfect world, right?

A.    Correct.

Q.    As part of us not living in a perfect world, the constraints of a sales process can result in a



800.211.DEPO (3376)
EsquireSolutions.com

R. Kost - Confidential

company not being sold for maximum value, right?

MS. MURPHY:  Objection to form.

THE WITNESS:  I think where I'm not understanding your question is a sale process may not lead to the best value, but that doesn't mean it's not -- you didn't attempt to maximize value.  I mean I think they're two different concepts.

BY MR. KUSNETZ:

Q.   Yeah, I'm not talking about attempting to maximize value or what people were trying to do or not.

What I'm trying to say is just is a broad statement.

The constraints of a sales process can lead to an outcome where maximum value of a company is not achieved, "yes" or "no"?

MS. MURPHY:  Objection to form.

THE WITNESS:  Again, your hypothetical is relating -- assumes you had a presupposition as to what the maximum value would be and it ended up with a value that was lower than what you initially thought would be a maximum value.  That can happen, yes.

(Thereupon, an informal discussion was



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1501 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                          98

R. Kost - Confidential

held off the record.)

BY MR. KUSNETZ:

Q.    You said, "I assume that a presupposition about what" --

MR. KUSNETZ:  Let me rephrase.

BY MR. KUSNETZ:

Q.    As part of my question where I said, "The constraints of a sales process can lead to an outcome where maximum value of a company is not achieved, 'yes' or 'no,'" you replied that you would have to have a presupposition of what the value was anticipated to be and then that was different from what the value eventually was, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  If I understood your question, it had a sense of relativeness to it, what is maximum value.

And if you changed the constraints, I think as you termed them, you wouldn't maximize value, but relative to what?  That's what I'm trying to understand.

BY MR. KUSNETZ:

Q.    Okay.  Understood.

So if there was an anticipated maximum value of a



R. Kost - Confidential

company at the beginning of a sales process, isn't it true that the constraints of -- particular constraints of a sales process can lead to a company not achieving that value when it's ultimately sold, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes, if the facts change, the value would change, and it could be lower, yes.

BY MR. KUSNETZ:

Q.   And "facts" meaning the particular constraints of a sales process, right?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes.

BY MR. KUSNETZ:

Q.   Now, in terms of this particular sales process, when you were first hired in connection with your role at Goldin Associates, was it based on your expertise -- I think you testified in distressed -- the sales of distressed companies?

A.   My expertise?

Q.   Uh-huh.

A.   So in my -- my -- my view, my background is out-of-court restructurings and Chapter 11s representing both debtors and creditors, and the solution in those



R. Kost - Confidential

situations is often M&A -- distressed M&A, of which I have a tremendous amount of experience selling or buying companies that are in distress or Chapter 11.

Q.   Understood.

And when you say "companies that are distressed," what do you mean by that, in your expertise?

A.   Yes, so in this particular case, some of the companies -- the portfolio companies were in better shape than others, but they were all owned by the Zohar entities, which were in Chapter 11, which had a very debatable but negative impact on the sales process because it was owned by a bankrupt entity.

So at best, it was a good company owned by a bankrupt entity.  At worst, it was a bad company owned by a bankrupt entity subject to litigation.

I had a lot of skills understanding how buyers would look at those situations.

Q.   Do you have a lot of expertise where good companies are owned by bankrupt companies and selling those good companies?

A.   Yes.

Q.   What's an example of that before this Zohar process?

A.   Oh, there's a lot.  Owens Corning.  I sold



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1504 of 2249

ROBERT KOST  Conf.                                      May 13, 2025
DUNN V. PATRIARCH PARTNERS                                      101

R. Kost - Confidential

off half a dozen of their subsidiaries.  Wonderful company.  Just happened to be in bankruptcy for asbestos claims.

Q.    This was a subsidiary that you sold?

A.    Yeah, we sold off subsidiaries.

Q.    Okay.

A.    Guaranteed Reassurance was a failed insurance company that owned six, eight, 10 portfolio companies that I sold.

Q.    And were those companies -- some of them in good shape?

A.    Some were good and some were not so good.

Q.    So what you're saying is you had experience with the state of play here; is that right?

A.    Yes.  What I'm trying to say is a regular way investment banker doesn't always have the understanding and sensitivity for troubled companies or distressed companies or bankrupt companies.

They normally only sell companies that are nowhere near distress or bankruptcies.

Q.    When you say "a regular way investment banker"?

A.    Yes.

Q.    Or "normal way"?  I forget what you said.



R. Kost - Confidential

A.     Either.  Regular way or normal.

Q.     So when you refer to "a regular way investment banker," you're referring to like a big investment bank, correct?

A.     I mean, for example, Lazard is a big investment bank, but they have a very good group that also does distressed M&A.  But, for example, Matt Dalton is in the regular M&A side of Lazard.

Every bank -- many of the midsized banks have what I'll call "regular way bankers" and may be distressed/you know, troubled situation bankers.

Q.     And with respect to Houlihan Lokey, were you interfacing with their -- what you would call "regular way bankers"?

A.     The Houlihan team were more restructuring advisors with -- some of them probably had M&A distressed experience.

Q.     So not all of them were distressed, troubled situation bankers at Houlihan, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  No, they were all restructuring bankers.  I just can't recall how much distressed M&A experience they had.



R. Kost - Confidential

BY MR. KUSNETZ:

Q.   Understood.

Were there folks at Houlihan that you interacted with that had a great deal of distressed M&A experience?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yeah, what I'm saying is I don't recall how much M&A -- distressed M&A experience, for example, Dan Tobin had.  I don't know.

BY MR. KUSNETZ:

Q.   Did you ever interact with him in your 30 years of experience in this industry prior to the Zohar bankruptcy?

A.   No, I had not met him before.  I had met Fred Vescio, V-E-S-C-I-O, Dan's boss.

Q.   Right, but you had not met Dan is what you're saying?

A.   No.

Q.   All right.  Had you heard of Dan prior to the Zohar bankruptcy?

A.   Not that I can recall.

Q.   Okay, but you had known Fred prior to the -- Fred Vescio prior to the Zohar bankruptcy?

A.   I -- yes, somehow.  I don't recall.



                    R. Kost - Confidential

Q.     You'd heard of him?

A.     Yes.

Q.     Understood.

             MR. KUSNETZ:  Let's take that break for
        lunch.

             THE WITNESS:  Okay.

             THE VIDEOGRAPHER:  We're going off
        record.  The time is 1:36 p.m., and this
        concludes Media Unit No. 3.

             (Recess taken at 1:36 p.m.)

             (Resumed at 2:25 p.m.)

             THE VIDEOGRAPHER:  We are back on record.
        The time is 2:25 p.m., and this is the start
        of Media Unit No. 4.

BY MR. KUSNETZ:

Q.     Okay.  Good afternoon, Mr. Kost.

A.     Hello again.

Q.     Oh, we're starting at hello?  Okay.

A.     Good afternoon.

Q.     Here we go.

     Let's talk a little bit about the investment
bankers that were retained to lead the sales process,
okay?

A.     Okay.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

R. Kost - Confidential

Q.    So is it fair to say that your focus, working on this monetization process, was to take a practical banker perspective on how you would go about maximizing value for the stakeholders, correct?

A.    That's a generally fair summary, yes.

Q.    And that perspective is based on your 30-plus years of experience in the industry, correct?

A.    Yes, to create a sale process that would hopefully maximize value.

Q.    And when you say "create a sale process," it was not just you creating the sale process, right?  It was the bankers who led the sales process, and then you assisted them, as did Ms. Tilton, correct?

A.    Correct.  The investment bankers for the portfolio company would make a recommendation as to the best sale process, which we often followed.

Q.    You relied on their expertise, correct?

A.    Yes.  Unless we disagreed.

        (Pause.)

BY MR. KUSNETZ:

Q.    When you say "unless we disagreed," meaning if there was a disagreement, you would express that disagreement to the bankers, correct?

A.    Yes.  If there was an area where I thought



R. Kost - Confidential

maybe I disagreed with the investment banker, I would discuss it internally on our side.  Obviously, Ms. Tilton probably didn't need to discuss with anyone if she had a disagreement.  And we might talk about it. We might ask the investment banker for more information as to why -- you know, they had that recommendation, and then we'd decide to either agree or not agree.

(Thereupon, an informal discussion was held off the record with the shorthand reporter.)

BY MR. KUSNETZ:

Q.    How often did these disagreements occur while you were CMO?

A.    Probably infrequently.  I -- I think we hired some very good investment bankers who, as you said, knew what they were doing and put together some -- you know, excellent sale processes.

(Pause.)

BY MR. KUSNETZ:

Q.    When you say they put together "sale processes," one aspect of the sales process was to put together what's called a "confidential information memorandum," correct?

A.    Yes.



R. Kost - Confidential

Q.    Also referred to as a "confidential information presentation," right?

A.    Yes.

Q.    But if you're old school, you call it a "CIM," not a "CIP," right?

A.    Correct.  There's one or two banks who prefer "CIP" for some reason.

Q.    Who does that?  Who prefers CIP?

A.    I can't remember.  It might have been Jefferies.  Somebody does.

Q.    Yeah.  Probably Houlihan too, right?

A.    I don't recall.

Q.    I'm kidding.

So in terms of this CIM -- we'll call it a CIM until we have to refer to it as a CIP.  Don't worry. Everyone is very particular about term, by the way.

A.    Agreed.

Q.    The investment banker prepares the CIM in the first instance, correct?

A.    Yes.  The investment banker usually works very closely with the management team, collects information, does interviews, but oftentimes takes the laboring oar to write the text, for lack of a better word -- text, pictures, charts, whatever goes into a



R. Kost - Confidential

CIM.

Q.     Understood.

And the investment bankers then share the draft of the CIM with Ms. Tilton and yourself, correct?

A.     Yes.

Q.     That was the ordinary course with respect to the monetization process for these portfolio companies, correct?

A.     Yes.  I -- I can't think a situation where they didn't share drafts with us, yes.

Q.     Right, so you were given an opportunity to comment on these CIMs, correct?

A.     Yes.

Q.     And Ms. Tilton would review the CIMs, in your recollection, correct?

A.     Yes.  I -- again, I'm trying to think if there was a situation -- I can't think of one -- where she didn't or wouldn't have reviewed the CIM.  And she, as you know, is -- was the CEO or she knew the companies very well and would definitely review the CIMs.

And I -- I would review the CIMs.  I was not as much changing the text in the CIMs.  I was looking at the CIMs from a higher perspective.

Q.     From the practical banker perspective?



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1512 of 2249

ROBERT KOST  Conf.                                                May 13, 2025
DUNN V. PATRIARCH PARTNERS                                              109

R. Kost - Confidential

A.    Yes.

Q.    And let's talk more about Ms. Tilton's review of the CIMs.

So she would look at the CIMs also from her perspective as having management roles at these portfolio companies, correct?

A.    Yes.

Q.    And so it is important for management to help inform what goes into the CIMs, correct?

A.    Yes.  It can be very helpful.

Q.    And the information that goes into a CIM is information that is then given to potential buyers, correct?

A.    Yes.

Q.    So it is important for that information to be true, correct?

A.    Yes.

Q.    And it's important for that information to be relied upon by the bankers -- sorry -- by the buyers, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes.  I don't know if you're trying to make a legal distinction or not, but it would not be good to have



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1513 of 2249

ROBERT KOST  Conf.                                        May 13, 2025
DUNN V. PATRIARCH PARTNERS                                        110

R. Kost - Confidential

something in a CIM that in the next phase of due diligence they found to be not true.  That would be bad.

BY MR. KUSNETZ:

Q.    Right.  Not -- not giving you a lawyer's distinction?

A.    You used the word "reliance."  I wasn't sure.

Q.    Yeah.

A.    You caught me off guard.

Q.    You've had enough of these.

And so in terms of the information that would go into the CIM, Ms. Tilton was helpful in furnishing information about these companies, right?

A.    Yes, I -- I would say that she had more of a role in writing -- even rewriting -- some CIMs than she did in others.  I -- I think there may have been some that she did not, in fact, offer comments or writing.

Q.    But there were times when she had extensive comments to the CIMs; is that correct?

A.    Yes, there were.

Q.    And those were comments principally about what?

MS. MURPHY:  Objection to the form.

THE WITNESS:  I don't recall specific



R. Kost - Confidential

comments, but I --

I can recall there were information memorandums where she clearly had comments.

BY MR. KUSNETZ:

Q.   And those comments added value, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  I don't know what "added value" means.  If you just rewrite a sentence to make it, in her mind, better, yes.

BY MR. KUSNETZ:

Q.   Did her comments improve the CIMs?

MS. MURPHY:  Objection to form.

THE WITNESS:  Probably.

BY MR. KUSNETZ:

Q.   Do you have a recollection of a time where her comments did not improve the SIMs?

A.   I can't -- I mean, she made many, many comments, and I -- some probably were good comments.  Some the bankers probably said, "Why is she making that comment?"  It's such a broad question.

Q.   Sure.

A.   She made comments --

Q.   Right?

A.   -- no doubt.  Some probably were taken and



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1515 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                        112

                    R. Kost - Confidential

some were not.

        Q.    And that's interesting.

        So you're saying that when Ms. Tilton proposes

comments to the CIMs, the bankers can decide whether to

take them or not, right?

                MS. MURPHY:  Objection to the form.

                THE WITNESS:  I would presume that the

            investment banker would seriously consider

            taking Ms. Tilton's comments and would want to

            have a good reason not to take her comments.

BY MR. KUSNETZ:

        Q.    But at the end of the day, it is the banker's

name on the CIM, correct?

        A.    That's correct.

        Q.    Right, so if it's Lazard was working on the

CIM, it is Lazard's CIM, correct?

        A.    That's correct.

        Q.    If it's Moelis working on the CIM, it's

Moelis's CIM, correct?

        A.    Yes.

        Q.    So the investment banker has to be confident

of the information that's in the CIM because they're

putting their name on it, right?

                MS. MURPHY:  Objection to the form.



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1516 of 2249

ROBERT KOST  Conf.                                                May 13, 2025
DUNN V. PATRIARCH PARTNERS                                              113

                    R. Kost - Confidential

                    THE WITNESS:  Yes, except for the huge

            first page disclosure on the first or second

            page that says "Oh, by the way, all the

            information in here, we can't attest to and

            was provided by management."

BY MR. KUSNETZ:

    Q.    Right, but they have to be comfortable that

that information is reliable from management, correct?

    A.    To the best of their ability.

    Q.    To the best of their ability, right?

    A.    Yes.

    Q.    Not necessarily --

                    MR. KUSNETZ:  Withdrawn.

BY MR. KUSNETZ:

    Q.    And did you sit in on any calls or meetings

with management as specific facts were discussed

about -- about whether they should be in the CIMs or

not?

    A.    Yes.

    Q.    So there were discussions about "Do we

include this?  Do we not include this?" in the CIMs,

correct?

    A.    Yes.

    Q.    And Ms. Tilton was part of those discussions?



800.211.DEPO (3376)
EsquireSolutions.com

R. Kost - Confidential

A.    Yes, many times.

Q.    Many times?  And the bankers were part of those discussions?

A.    Yes.

Q.    You were part of those discussions?

A.    Sometimes.

Q.    And was there anyone else who was part of those discussions, to your knowledge?

(Pause.)

MR. KUSNETZ:  Let me withdraw that question.

BY MR. KUSNETZ:

Q.    Was there anyone else other than folks at Patriarch who were part of those discussions?

(Pause.)

THE WITNESS:  Possibly later in the sales processes.

Maybe in 2021, one or more FTI guys might have joined, but for the vast majority of the processes early, it would have been the investment banker, Lynn, and myself.

MR. KUSNETZ:  Right.

(Pause.)



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1518 of 2249

ROBERT KOST  Conf.                                         May 13, 2025
DUNN V. PATRIARCH PARTNERS                                        115

R. Kost - Confidential

BY MR. KUSNETZ:

Q.    And for each of the processes of developing the CIM, that was --

MR. KUSNETZ:  Actually, withdrawn.

BY MR. KUSNETZ:

Q.    Each of the sales processes for the portfolio companies was tailored to a particular portfolio company, correct?

A.    Yes.

Q.    They were bespoke, correct?

A.    The formatting and layout might be similar, but the numbers and the text would be specific.

Q.    Okay, and the process of designing the sales process was up to the investment banker to design and implement, correct?

A.    Could you reread your question?

Q.    Sure.  Fair to say that for each of the sales processes for the portfolio companies, they were tailored to the particular portfolio companies that were at issue, correct?

A.    Yes.  The sale processes --

There aren't that many ways, but they would be tailored for a specific portfolio company.

Q.    And it was the investment banker who was



R. Kost - Confidential

responsible for designing and then implementing the sales process, correct?

A.    Yes.  The investment banker would design and recommend the process, and Lynn and myself would listen to the presentation and maybe have comments, but then they were ultimately responsible for implementing the agreed-upon sale process.

Q.    Understood.

The investment banks would prepare the data rooms, correct?

A.    Yes.

Q.    You did not prepare the data rooms?

A.    No.

Q.    Fair to say it is the investment bank that is running the sales process for each portfolio company?

A.    That's correct.

Q.    And in terms of the preparation of the CIMs, as you testified, you were given the opportunity to sit in on meetings discussing what would go into the CIMs, correct?

A.    I was given the opportunity to review drafts of the CIMs with a focus -- my focus was not to nitpick the language in a CIM, but to really more understand the messaging and marketing and what they were including in



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1520 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                           117

R. Kost - Confidential

the CIM.

Q.    And you would also focus on the reasonableness of the financial projections in the CIMs, correct?

A.    Could you reread the question?

Q.    You would focus on the reasonableness of the projections -- financial projections in the CIMs, correct?

A.    I thought you used the word "reasonableness."

I would review the financial information and the projections included in this document, which is -- it can be looked at as a selling tool.

Q.    Right.

A.    And you would -- you're trying to sell a story, and future financial performance is part of that story, and it would include audited GAAP numbers and it would include projections that were prepared typically by management with the assistance or review of the investment bankers.

Q.    With respect to the financial projections, though, isn't it true that you would sit with management and go through every line of their financial projections and request supporting information for the assumptions, knowing that an interested buyer would do the same?



R. Kost - Confidential

A.    It's not the fact or the case that I would do that.  The investment banker for the portfolio company would do that, knowing that in Phase II due diligence, that's the first thing the buyer would look to try to ascertain.

My role was to look at those financial projections and try to -- I'm not going to do an underlying audit. I'm not sitting with management to understand every assumption, but does it hold water?  Does it make sense? Is it a good story?  Is it something that we would want to give to a buyer?

Q.    But you would take steps to get an understanding of the reasonableness of the financial projections, correct?

A.    Yes.  I've done a lot of fairness opinions in my career, so when you keep using the word "reasonableness," I think of it as a standard.  I think it was part of my role to understand the assumptions that were part of the underlying projections, but I don't think I did enough information to determine reasonableness to that standard.

Q.    Understood.  You were not auditing these financial statements?

A.    No.



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1522 of 2249

ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                       119

R. Kost - Confidential

Q.    Right, so maybe the better way to put it is: You would take steps to understand the assumptions that were underlying the financial projections, correct?

A.    Yes, I under -- I tried to understand the -- the basis for the more important or key assumptions.

I mean, obviously there could be hundreds or thousands of assumptions for -- that supported a projection model.

Q.    So like an example of a key one would be projected EBITDA, right?

A.    Yes, but projected EBITDA is the result of dozens or hundreds of assumptions.

Q.    Right, but that's a key financial projection, right?

A.    It's a key -- yes, it's a key piece of the story.

Q.    Of the financial story --

A.    Right.

Q.    -- of the portfolio company?

A.    Right, but my point is you don't project EBIDTA.  You project revenues and expenses that gives you EBITDA.

Q.    Right.

A.    So the assumptions for revenue and costs are



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1523 of 2249

ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                      120

                    R. Kost - Confidential

what are important.

    Q.    But there was also projected EBITDA for
future years listed at these CIMs, correct?

    A.    Yes.

    Q.    Okay, and so those projections are key
financial information that are part of the CIMs,
correct?

    A.    Yes.  That's correct.

    Q.    Okay, and you would work to understand --

            MR. KUSNETZ:  Withdrawn.

BY MR. KUSNETZ:

    Q.    You would try to understand --

            MR. KUSNETZ:  Withdrawn.

BY MR. KUSNETZ:

    Q.    You would take steps to understand the
assumptions inherent in the projections for future
EBIDTA, correct?

            MS. MURPHY:  Objection to form.

            THE WITNESS:  I think it's just
        semantics, but --

BY MR. KUSNETZ:

    Q.    Sure.

    A.    -- I would -- I would learn more about the
assumptions as to how they were projecting revenue and



R. Kost - Confidential

costs, which would result in EBITDA.

Q.    That's fair.

And was there ever a time where you informed the investment bankers or management or Ms. Tilton that you were not comfortable with a particular portfolio company's financial projections?

(Pause.)

THE WITNESS:  I -- I don't recall specifically.

The way I would look at it is it would be more akin to I would see their projections, and if it seemed overly rosy, I would say, "Really?"  And we would try to delve into it.

But at the end of the day, it's just like the first page of the CIM.  The investment banker's relying upon management to prepare the projections that are included in the CIM.

BY MR. KUSNETZ:

Q.    Let's take your example, though.  Let's say you see a projection and you go, "Really?"  What happens then?

A.    I would ask for more information or ask the investment banker, "What do you guys think?  Do you -- do you think that's real and defensible?  Do you think



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1525 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                           122

R. Kost - Confidential

that's something that the buyer during due diligence can support?"

Q.    I mean, those are tough questions, right?

A.    They're very tough questions.  At the end of the day, the CIM is, in one sense, you are -- I think everybody realizes you put the best face on a CIM, but it has to be defensible.

Q.    Right.

A.    Not necessarily reasonable, but defensible.

Q.    I know.  I've got to work on my terminology.

But what you're saying is important, though, right, in that tough questions were asked during the preparation of these CIMs, correct?

A.    Yes.  I think people put in a lot of hard work to prepare a CIM -- the CIMs.

Q.    Right.  Management, you, Ms. Tilton, and the investment bankers, correct?

A.    Yes.

Q.    Now, was there a time, though, sitting here today -- looking back -- I know it's been a while, but looking back, was there a time where you raised a question about a rosy projection and you were uncomfortable with the final work product that was in the CIM?



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1526 of 2249

ROBERT KOST  Conf.                                                      May 13, 2025
DUNN V. PATRIARCH PARTNERS                                                       123

R. Kost - Confidential

(Pause.)

THE WITNESS:  I reviewed most of the CIMs -- maybe all, but probably most, and I'm pretty sure Ms. Tilton also reviewed most, if not all, and they were reviewed by obviously all of the investment bankers.

And maybe some of them today or back then, I would have considered optimistic, but we agreed that they were ready to be finalized and sent to buyers.

BY MR. KUSNETZ:

Q.    All of the projections were defensible, correct?

A.    I would say -- I would hope so.

Q.    How about I ask it this way?

To the best of your knowledge, your recollection was that all of the projections in the final versions of the CIMs were defensible, correct?

A.    I don't have a basis to, in fact, come to that conclusion.

Q.    Well, let me put it this way:

If you, Mr. Kost, in your review of a CIM had questions about financial projections, you testified that you would ask questions, correct?



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1527 of 2249

ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                      124

R. Kost - Confidential

A.    Yes.

Q.    And those questions had to be answered, correct?

A.    Yes.

Q.    They couldn't just ignore you, right?

A.    That's correct.

Q.    You were the chief monetization officer and oversaw this process, correct?

A.    That's correct.

Q.    And so was there ever a time where you raised a question about a financial projection being overly rosy?  "Yes" or "no"?

MS. MURPHY:  Objection to form.

THE WITNESS:  I -- I don't recall.  The only way I can answer it is to say that possibly I thought they were optimistic.

At the end of the day, it would be the buyer who would come and do due diligence, and it would screw up the process if they weren't defensible, using your terminology.

BY MR. KUSNETZ:

Q.    Right.  Do you recall a single instance of a financial projection in a CIM not being defensible?

A.    Again, I didn't determine the defensibility.



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1528 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                         125

R. Kost - Confidential

I would rely upon the investment bankers to put forth a CIM filled with information that was true, accurate, and defensible in due diligence.

So I'm not opining on the CIM or the defensibility of the projections.  I think there were some that I would have deemed today that were optimistic at the time, which is different.  That doesn't say they're wrong or they're indefensible.  They were just at that point in time, they were -- they potentially could have been optimistic.

Q.    And you're saying that in hindsight, correct?

A.    I can't recall what I thought about each CIM six years ago.

Q.    Okay.

A.    Five years ago.

Q.    But if you were uncomfortable with the finished work product of the CIM, you would have made it known, correct?

MS. MURPHY:  Objection to the form.

THE WITNESS:  I, for lack of a better word, agreed with the finalization of many, if not all, of those CIMs, and they went out as they finally went out.

Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1529 of 2249

ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                    126

R. Kost - Confidential

BY MR. KUSNETZ:

Q.    Understood, and you can't think a single instance, sitting here today, where you did not agree with the final version of the CIM, correct?

A.    I can't recall a situation where I didn't support sending -- sending out the final CIMs.

Q.    Okay.  To the --

A.    To the buyers.

Q.    -- buyers?  Thank you.  That's helpful.

In your capacity as the CMO, you were able to raise any concerns about the conduct of the monetization process to Mr. Katzenstein or Mr. Farnan, correct?

A.    Yes.

Q.    You were also able to raise any concerns directly with Ms. Tilton, correct?

A.    I would say that my relationship with Ms. Tilton became more strained as we went on in the process, and it was easier in the beginning to reach out to her.  But if I had issues, I would reach out to her even later in the process.

Q.    But you agree that she always got back to you in a timely manner, correct?

A.    Ms. Tilton was generally responsive, yes.

Q.    I mean, very busy, correct?



R. Kost - Confidential

MS. MURPHY:  Correct.

A.    Very busy.

Q.    But if you left a voicemail, if you sent an email, you got a response in a timely manner, correct?

A.    I think that's generally true.

Q.    Maybe not immediate, but timely, correct?

A.    Yes.  I don't know what the definition of "timely" or "immediate" is, but yes, Mrs. -- Ms. Tilton was responsive.

Q.    Was responsive?  You never felt like you were being stonewalled, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  I think there were times later in the process that I would have liked to have more interaction with Ms. Tilton, maybe in 2021 --

BY MR. KUSNETZ:

Q.    Well --

A.    -- than I did, but --

Q.    That's a -- that's an interesting point, so let's -- let's think about the March 2020 period -- like the period leading up to that and then the period after that.

So the period leading up to March 2021, Ms. Tilton



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1531 of 2249

ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                    128

R. Kost - Confidential

was still the sole director and manager of these portfolio companies that were up for sale.  It's fair to say that you and Ms. Tilton --

MR. KUSNETZ:  Actually, withdrawn.  Let me find the language that you used.

BY MR. KUSNETZ:

Q.   It's fair to say that you had sufficient interaction with Ms. Tilton, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Again, I don't know what the definition of "sufficient" for this purpose is, but I had more interaction with Ms. Tilton during 2019, for example, than I did in 2021.

BY MR. KUSNETZ:

Q.   And you would have preferred to have more interaction with Ms. Tilton after March of 2020, correct?

A.   I'm not sure I could say -- say it that way. I just had more interaction with her in 2019.

Q.   So you testified, "I think there were times later in the process that I would have liked to have more interaction with Ms. Tilton, maybe in 2021."

Do you recall saying that a few minutes ago?



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1532 of 2249

ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                    129

R. Kost - Confidential

A.    Yes.

Q.    So I'm trying to unpack that a little bit, and so what I'm trying to say is:

It was after she was no longer --

MR. KUSNETZ:  Withdrawn.

BY MR. KUSNETZ:

Q.    It was after Ms. Tilton was no longer the sole director and manager of the portfolio companies that are up to sale where you, at some points, believed that you wanted more interaction with her than you had in the past, correct?

A.    Again, I wouldn't say I wanted more.

I would say I probably dealt more directly with the investment bankers later in the process than on phone calls with Ms. Tilton and the bankers, for example.

I didn't have many discussions with Ms. Tilton directly after, maybe, 2019/2020.  We usually were on group calls with the investment bankers.

Q.    But while Ms. Tilton was the sole director and manager of these portfolio companies that were up for sale -- this is pre-mid-March 2020 -- you did have frequent, direct conversations with Ms. Tilton, correct?

A.    Yes.  Again, I don't know what "frequent" -- our definition is, but yes, I had one-on-one calls with



R. Kost - Confidential

Ms. Tilton earlier in the processes.

Q.    And enough one-on-one calls where you were satisfied with the amount of access that you had to Ms. Tilton, correct?

A.    But even more important to me was access to the investment bankers, and I had access to the investment bankers.  And yes, I also had access to Ms. Tilton.

Q.    Okay.

A.    I considered access to the investment bankers also very important.

Q.    Right.  Considering your oversight role, right?

A.    Yes.

Q.    And with respect to Ms. Tilton after March of 2020, when she was no longer the sole director and manager of these portfolio companies, did you find that you were getting less feedback --

MR. KUSNETZ:  Actually, withdrawn.

BY MR. KUSNETZ:

Q.    Did you find that you had to interact now with the new directors and managers for the portfolio companies?

A.    Yes, that's correct.  I spent more time now



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1534 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                           131

R. Kost - Confidential

talking to the investment bankers and the new independent directors.

Q.   Is it fair to say you spent more time talking to the new independent directors of the portfolio companies after March 2020 than you did with Mrs. Tilton at that time?

MS. MURPHY:  Objection to form.

THE WITNESS:  I think that's generally true.  I mean, we'd have to go company by company.

I feel like Stila, for example, was one where I still talked to Ms. Tilton more after that March 2020 date.

BY MR. KUSNETZ:

Q.   Did Ms. Tilton remain in the leadership of that company after March 2020?

A.   I think she did.

Q.   So assume she did, right?

A.   Uh-huh.

Q.   That would an affirmation compared to the other portfolio companies in Group A that were up for sale, right?

A.   I think that yes, that's true.

Q.   Okay, so Stila aside, generally for these



R. Kost - Confidential

portfolio companies that were up for sale in Group A, it's fair to say that after March 2020, in that time period, you had more interaction with the new independent directors of those companies than you did with Ms. Tilton, right?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes, that's correct.

BY MR. KUSNETZ:

Q.    Okay, and did you have a role in appointing the new independent directors for the portfolio companies?

A.    No, I did not.

Q.    Did you advise on potential candidates for the new independent directors for the portfolio companies?

A.    I don't recall doing that.

Q.    You don't recall someone saying, "Hey, is so-and-so good for Vulcan?  Is so-and-so good for Hussey?"

A.    It's possible, but I don't recall.

Q.    Okay, but that wasn't part of your responsibility as the CMO to weigh in on the independent directors of the portfolio companies, correct?

A.    That's correct.  It was not.



R. Kost - Confidential

Q.    Important for you to weigh in on the bankers for the portfolio companies, but not the independent directors, right?

A.    That's correct.

Q.    And notwithstanding that, you still had to interact with these independent directors as part of your role in connection with the sales process, right?

A.    Yes, I did interact with the independent directors after they were retained.

Q.    Right, and they took some time getting up to speed on the companies that they were now independent directors of, correct?

A.    That seems likely.

Q.    And do you know who had the responsibility to appoint these -- these -- not gentlemen.  I guess there were some ladies as well.

Do you know who --

            MR. KUSNETZ:  Were there?  I don't think so.

            MS. MURPHY:  I don't think there's a single one.

            THE WITNESS:  No, I don't recall one.

BY MR. KUSNETZ:

Q.    I'll ask the question.



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1537 of 2249

ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                      134

R. Kost - Confidential

Do you recall a single female independent director or manager for a portfolio company after Ms. Tilton resigned?

A.    I do not.

MR. KUSNETZ:  Why don't we pause.

THE VIDEOGRAPHER:  We're off the record. The time is 3:01, and this concludes Media Unit No. 4.

(Recess taken at 3:01 p.m.)

(Resumed at 3:06 p.m.)

THE VIDEOGRAPHER:  We are back on record. The time is 3:06, and this is the start of Media Unit No. 5.

BY MR. KUSNETZ:

Q.    Okay, so we were talking about the new independent directors for the portfolio companies. My question is:  Do you know who was responsible for appointing these gentlemen?

MS. MURPHY:  Objection to form.

THE WITNESS:  My recollection is that Mike Katzenstein had the final say, probably in discussions with Judge Farnan, but I don't know.



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1538 of 2249

ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                      135

R. Kost - Confidential

BY MR. KUSNETZ:

Q.    But fair to say it was Judge Farnan and Mr. Katzenstein who would have the final say over who would sit on the -- sit as the independent director for the portfolio companies after Ms. Tilton's resignation, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  That's my recollection.

BY MR. KUSNETZ:

Q.    You have no reason to think otherwise, right?

A.    That's correct.

Q.    And are you aware that the creditors had a say in who would sit on -- who would sit as the independent director for these portfolio company?

A.    I guess I recall they had some input or say. I don't know to what extent.

Q.    Right, and it's fair to say that if they did not want someone to sit as the independent director for a portfolio company, that person would not sit as the independent director for the portfolio company, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  I actually don't know the answer to that question.



                    R. Kost - Confidential

BY MR. KUSNETZ:

    Q.    Okay.  In terms of the independent directors
to the portfolio companies, some of them were
Mr. Katzenstein's friends; isn't that correct?

            MS. MURPHY:  Objection to form.

            THE WITNESS:  I don't know who his
        friends are.  I would say differently that
        he -- they may have been people that he knew
        from the industry.

BY MR. KUSNETZ:

    Q.    So he had a pool of people who he pulled
from, correct?

            MS. MURPHY:  Objection to form.

            THE WITNESS:  It's actually a relatively
        smaller universe than you might think.

BY MR. KUSNETZ:

    Q.    Please --

    A.    Independent directors in the restructuring
space for bankrupt companies or troubled situations.

    Q.    Understood.  But there wasn't like an
application process, to the best of your knowledge,
correct?

            MS. MURPHY:  Objection to form.

            THE WITNESS:  I don't recall being



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1540 of 2249

ROBERT KOST  Conf.                                        May 13, 2025
DUNN V. PATRIARCH PARTNERS                                        137

R. Kost - Confidential

involved in the process, so I don't know the answer.

BY MR. KUSNETZ:

Q.   But you were -- you -- you had board meetings, correct, for the debtors?

A.   Yes.

Q.   And you sat in on those board meetings, correct?

A.   Yes.

Q.   And during any of those board meetings, was there a discussion about an application process to appoint the new independent directors for the portfolio companies?

MS. MURPHY:  Objection to form, and we'll just caution the witness if counsel was a part of that discussion, please include that in your answer.

THE WITNESS:  I just don't recall the discussions as to the selection process for the independent directors.

BY MR. KUSNETZ:

Q.   Doesn't stand out to you?

A.   I just don't recall.

Q.   Okay.  Do you recall any instance where the



R. Kost - Confidential

selection choice for an independent director was discussed?

A.    Yes, I recall individuals being discussed for those positions periodically, but I couldn't tell you which one.

BY MR. KUSNETZ:

Q.    Right, and they had varying levels of competence; isn't that correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  I -- I wouldn't be able to comment on the way you phrased the question of "varying levels of competence."  They had different skill sets.

BY MR. KUSNETZ:

Q.    Right.  Some of them made decisions with respect to the sales process that you did not agree with, correct?

A.    I -- I think there were times where we had disagreements, yes.

Q.    Some of them made decisions to terminate certain bankers that you did not agree with, correct?

A.    You'd have to refresh my memory as to which -- what you're talking about.

(Pause.)



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1542 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                        139

                    R. Kost - Confidential

BY MR. KUSNETZ:

    Q.    Do you recall any situation in which an
independent director tried to blame an investment banker
for a sales process that didn't work out?

            THE WITNESS:  I don't know what you mean
        by "blame," so -- yeah, I mean, we had
        processes that didn't go as we expected, so
        I'm -- I can't recall specifics as to what an
        independent director said, but ...

BY MR. KUSNETZ:

    Q.    In your opinion, was an investment bank
responsible for the lack of a sale for any of the
portfolio companies?

            MR. KUSNETZ:  Let me withdraw.

BY MR. KUSNETZ:

    Q.    In your opinion, was any investment banker to
blame for the failed sale of a portfolio company?

            MS. MURPHY:  Objection to form.

            THE WITNESS:  Would I blame an investment
        banker for a failed sale?  Offhand, I can't
        recall a situation.

BY MR. KUSNETZ:

    Q.    With respect to the Zohar monetization
process?



                    R. Kost - Confidential

        A.    That's correct.

        Q.    You can't think of a single instance where
you would blame the investment banker for the failed
sale of a portfolio company, correct?

              MS. MURPHY:  Objection to form.

              THE WITNESS:  I mean, I'm happy to go
        through each one of them.  We had a lot of
        failed processes, and I wish they turned out
        differently.  Do I blame the investment
        banker?  Offhand, I can't say there's one that
        I would blame.

BY MR. KUSNETZ:

        Q.    How many portfolio companies did you --

              MR. KUSNETZ:  Withdrawn.

BY MR. KUSNETZ:

        Q.    How many different portfolio companies had
sales processes that you were involved in?

        A.    Most of them.

        Q.    How many?

        A.    MD Helicopters is one, DuraOne, GAS,
Snelling, Intrepid, Universal, Vulcan, Gorham, Hussey,
PDP.  I feel like I'm missing one, but ...

        Q.    Did you say Stila?

        A.    Stila.



R. Kost - Confidential

Q.    You missed one --

A.    Yeah.

Q.    But hey, you got Gorham, so --

A.    Did we actually go to market on Stila, though?  We may not have technically gone to market on Stila.

Q.    But you had a -- my question was involved in the sales process.

A.    Oh, yes.

Q.    So just broadly.

A.    Yes, broadly, Stila.

Q.    So of those companies that you just listed -- without the aid of any documents, I might add -- do you recall the sales process for any of those companies in which you would place the blame on the investment banker for the failed sale?  "Yes" or "no"?

MS. MURPHY:  Objection to form.

THE WITNESS:  No, not in a classical sense of blame.  I wish GAS had gone better.  I wish Vulcan had gone better.  I wish -- you know, there's a lot of things that I wish had kind of turned out differently, but I guess I don't blame the investment banker.



R. Kost - Confidential

BY MR. KUSNETZ:

Q.    Okay, so with GAS, you don't blame the investment banker is what you're saying?

A.    I was disappointed.

Q.    With the investment banker or with the sales process?

A.    More with the sale process.

Q.    With GAS, who was the investment banker?

A.    Donnelly Penman.

Q.    They were the one that you proposed, correct?

A.    Yes.

Q.    Okay, but so you were not blaming Donnelly Penman, correct?

A.    I don't know what you mean by "blame," but no.

Q.    You said "in the classical sense," so that's what I mean.

A.    Yes.  No, not in the classical sense.

Q.    Okay.  Who was the investment banker for Rand?  Did you mention Rand?

A.    I did not.  Good catch.

Q.    I knew it.

Who was the investment banker for Rand?

A.    I think it was Peter J. Solomon.



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1546 of 2249

ROBERT KOST  Conf.                                May 13, 2025
DUNN V. PATRIARCH PARTNERS                                143

R. Kost - Confidential

Q.    Did you blame them for the fact that a sale did not occur during the monetization process?

A.    No.  I -- I was more disappointed.

Q.    In them?

A.    No, in the sale process.

Q.    In the sale process?  But you were not disappointed in P. J. Solomon?

A.    No, they -- I wouldn't blame them in the classical sense.  They worked very hard.

Q.    Okay.  You wouldn't blame Founders in the classical sense for the sales process with Vulcan, for example?

A.    They were probably not as strong of an investment bank as some of the others, but no, I guess I would not blame them.

Q.    Right.  You would not blame Moelis for the -- what happened with the sales process with respect to MD Helicopters, correct?

A.    I guess not, no.

Q.    Is there in your oversight of the monetization process, did you agree --

            MR. KUSNETZ:  Withdrawn.

BY MR. KUSNETZ:

Q.    In your oversight of the monetization


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1547 of 2249

ROBERT KOST  Conf.                                        May 13, 2025
DUNN V. PATRIARCH PARTNERS                                       144

R. Kost - Confidential

process, you agree that Ms. Tilton played her role in that process in line with standard market practices, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Again, that's such a vague question.

BY MR. KUSNETZ:

Q.    Let me make it more specific.

Ms. Tilton's selection of the investment banker for the portfolio companies was in line with standard market practice, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes, I think I have -- I don't recall any situation or problem with the selection of the investment bankers and Ms. Tilton's role.

BY MR. KUSNETZ:

Q.    Understood.

And during the monetization process -- do you know what I --

MR. KUSNETZ:  Sorry.  Withdrawn.

BY MR. KUSNETZ:

Q.    During the first monetization process, before the Court entered an order regarding a timeline for a



                    R. Kost - Confidential

second process, do you know what period I'm referring to

whether I say "the first monetization process"?

        A.    Yes.  I don't remember what month that order

was, but yes, I understand what you're saying.

        Q.    Right.  Okay.  So prior to that order, which

occurred in March of 2020, there was a mini-trial,

essentially, in February of 2020, correct?

        A.    Yes.

        Q.    And then looking back, there were competing

proposals in December and January -- December 2019,

January 2020 -- about how to proceed with a second sales

process, correct?

                MS. MURPHY:  Objection.

                THE WITNESS:  Are we talking about a

        specific portfolio company?

BY MR. KUSNETZ:

        Q.    No.  With respect to the timing of the sale

process.

        A.    The way I looked at it was we had timelines

for each of the portfolio companies, and there was a

disagreement with the timelines and ultimately, Judge

Owens stepped in, and there was an agreement to create

new -- a new timeline for many but not all of the

portfolio companies that we still owned.



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1549 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                            146

                      R. Kost - Confidential

        Q.    When you say "we still owned," who do you
mean owned?

        A.    The debtors.

        Q.    Are you opining on the ownership of the
portfolio companies?

        A.    I am definitely not opining on the ownership.

        Q.    Okay.

        A.    They were assets of the debtors' estates.

        Q.    Okay.  I like that better.

              MR. KUSNETZ:  Do you like that better,
        Destiny Rose?

              MS. MURPHY:  I do not.

              MR. KUSNETZ:  Okay.

BY MR. KUSNETZ:

        Q.    Now, in terms of -- we're going to get to all
of that, by the way.  I'm just trying to create a little
bit of -- I guess some signposting along the way, okay?

        A.    Okay.

        Q.    So before the dispute over the timelines for
selling some of the portfolio companies, would you say
that you and Ms. Tilton were generally aligned on how to
conduct the sales process?

        A.    I think we were generally aligned in the
early days as to retaining investment bankers.  We had



R. Kost - Confidential

identified portfolio companies that we wanted to go earlier rather than later, and we executed that plan for many of those that we were in alignment on.

Q.   How about this?  That's very helpful.

If I refer to the "timeline dispute," do you know what I'm referring to?

A.   In my view -- and again, I don't remember the time periods --

Q.   Yeah.

A.   -- I feel like there was a period where we couldn't come to an agreement on the timelines for specific companies, and we had to go to court, and Judge Owen ultimately ruled and there was a formal order with timelines -- milestones and timelines in it.

I'm going to say that was sometime in 2020, late 2020.

Q.   March 2020 for when she issued that order? Does that sound right to you?

A.   I thought that's when Ms. Tilton left as CEO.

Q.   Fair to say that --

A.   Is that similar --

Q.   -- that's a coincidence?

MS. MURPHY:  Objection to form.

THE WITNESS:  Could be.  Again, I'm not a



R. Kost - Confidential

lawyer.  That wasn't my -- job.

BY MR. KUSNETZ:

Q.   That's totally fine.  We'll get to it in a chronological way.

I'm going to refer to the period of time that you're referring to, which is where they were competing ideas for the timeline of some of the portfolio companies and the Court had to step in as the "timeline dispute," okay?

So if I refer to "the timeline dispute," you have an idea of what I'm referring to, correct?

A.   Yes.

Q.   Okay.

A.   Was that really March 2020?

Q.   Yes.

A.   And COVID all at the same time?

Q.   Oh, yeah.

A.   I don't remember that, but okay.

Q.   There was a lot going on, right?

MR. BARTLEY:  It was a hundred years ago.

MR. KUSNETZ:  I know.  Different world.

BY MR. KUSNETZ:

Q.   So we'll get to that.

But pre-timeline dispute, fair to say you and



R. Kost - Confidential

Ms. Tilton were aligned on how to run the sales process, correct?

A.    Generally.

Q.    And you and Ms. Tilton were aligned on your goal of maximizing the value of the portfolio companies, correct?

A.    Again, I would -- I'd rather go through company by company, because I can't think of it in terms of -- like Dura's got issues.  We disagreed.  It ends up filing for bankruptcy.  That's 2019.  That's pre-timeline.  I don't think we were in full agreement on that.

So I think it's a little more complex than what you just said.

Q.    Okay.  Well, you may have had disagreements about the best way to achieve maximum value, but is it fair to say that prior to the timeline dispute, you and Ms. Tilton were aligned that the ultimate goal of the sales process was to maximize the value of the portfolio companies?  "Yes" or "no"?

MS. MURPHY:  Objection to form.

THE WITNESS:  I don't think that is true.

I think we may have had differences of opinion on timing, and so if you're talking about



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1553 of 2249

ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                    150

R. Kost - Confidential

maximized value but in a present value sense -- and again, I think it's more complex than that.  I think we were probably pushing for a few more sales to move more quickly than she wanted.

So, I mean, if you -- if you're implying that present -- maximized value but three years out, I think there were cases where we disagreed.

BY MR. KUSNETZ:

Q.    Right, on the timing, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Well, you were talking about maximized value.

BY MR. KUSNETZ:

Q.    I am.  Let me ask, I guess, a more precise question.

You testified in April of 2018 that your focus is working on the Zohar cases on the sale process and you look at it from a more practical banker perspective on how we would want to go about this to maximize value for the debtors.

Do you see -- do you recall that testimony?

A.    I don't, but that sounds like something I



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1554 of 2249

ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                      151

R. Kost - Confidential

would say.

Q.    Okay.  You don't contest that you gave that testimony?

A.    No.

Q.    Okay.  I'm not trying to trick you.

Now, is it fair to say that Ms. Tilton's focus on the Zohar monetization process was how to go about maximizing the value of the portfolio companies for the stakeholders?

MS. MURPHY:  Objection to form.

THE WITNESS:  I can't say that in a blanket sense, because she had her own personal interests that she obviously would have looked out for.

Again, each of the portfolio companies was owned to a different extent by her or her entities.  Again, I know there's a dispute over ownership, but we looked at it as -- I look at it as there were different levels of debt at each of the portfolio companies.  She had more stakes in some and no stakes in others.

So I had -- I have no view or opinion as to whether she actually sought to maximize



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1555 of 2249

ROBERT KOST  Conf.                                              May 13, 2025
DUNN V. PATRIARCH PARTNERS                                           152

R. Kost - Confidential

value for any specific portfolio company.

BY MR. KUSNETZ:

Q.    Looking at it more broadly, though, aside from specific interests that she had in specific portfolio companies, the way that Ms. Tilton engaged with the sale process pre-timeline dispute, in your opinion, was aligned with your goal of maximizing the value of the portfolio companies, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Again, it's such a broad statement.  I -- I don't know how I can say that.

BY MR. KUSNETZ:

Q.    Okay.  We can get more specific.

The goal of the investment bankers were to maximize the value of the companies that they were selling, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Generally, yes.

BY MR. KUSNETZ:

Q.    In fact, their engagements in many cases were designed to incentivize them to maximize value, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes.  Investment bankers --



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1556 of 2249

ROBERT KOST  Conf.                                            May 13, 2025
DUNN V. PATRIARCH PARTNERS                                         153

R. Kost - Confidential

they will be paid more, generally, for the higher sale price.

BY MR. KUSNETZ:

Q.    Right, through a success fee, correct?

A.    Correct.

Q.    They would be paid a percentage in many cases of what the company was ultimately sold for, right?

A.    That's correct.

Q.    And it was Ms. Tilton who negotiated those engagement letters, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes.

BY MR. KUSNETZ:

Q.    And you agreed that all of the engagement letters that you reviewed for the -- for the investment banks to sell the portfolio companies were commercially reasonable, correct?

A.    Yes.

Q.    And the way that these engagement letters were structured was to maximize value of the company that was being sold, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes.



R. Kost - Confidential

BY MR. KUSNETZ:

Q.    And Ms. Tilton had a list --

MR. KUSNETZ:  Withdrawn.

BY MR. KUSNETZ:

Q.    Ms. Tilton drew up a list of investment bankers that you agreed with in terms of being the right candidates for the sales process of the portfolio companies, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Can you reread the question?

BY MR. KUSNETZ:

Q.    Ms. Tilton drew up a list of investment bankers that you agreed with in terms of being the right candidates for the sales process of the portfolio companies, correct?

A.    Yes.

MS. MURPHY:  Objection to form.

BY MR. KUSNETZ:

Q.    And you had your own suggestions of investment banks too, correct?

A.    That's correct.

Q.    And your suggestions were aligned with your goal to maximize the value of the sale of these



R. Kost - Confidential

portfolio companies, correct?

A.    Yes.  I thought we picked some very good investment banks to be the investment bankers.

Q.    To give you the best chance to maximize value, correct?

A.    Yes.

Q.    Now, you testified that you reported to the Zohar board, correct?

A.    Yes.

Q.    And the Zohar board was Judge Farnan, correct?

A.    Yes, and I think I also testified I reported to Mike Katzenstein.

Q.    Right, and Mike Katzenstein -- he was -- he was not technically "the board" of the Zohar debtors; is that correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  That's correct.  He was the chief restructuring officer.

BY MR. KUSNETZ:

Q.    Right, and the Zohar debtors had creditors, correct?

A.    Yes.

Q.    And you testified MBIA was the sole creditor



R. Kost - Confidential

for Zohar I and then the sole creditor for Zohar II at some point, correct?

A.    At some point by virtue of their monoline insurance, yes.

Q.    Right, and Zohar III had multiple creditors, correct?

A.    Yes.

Q.    Who was the primary creditor, in your view, for Zohar III?

MS. MURPHY:  Objection to form.

THE WITNESS:  That would be Bardin Hill.

BY MR. KUSNETZ:

Q.    Okay.  Did you have experience with MBIA prior to your role as CMO?

A.    I -- possibly.  Yes, but I just don't recall the timing.  I represented the general obligation bondholders of Puerto Rico, and MBIA was one of the largest creditors in the case.

Q.    They had a lot of exposure to Puerto Rico, right?

A.    Yes.

Q.    Were you adverse to MBIA in -- in that particular engagement?

A.    No.  We're all creditors.



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1560 of 2249

ROBERT KOST  Conf.                                        May 13, 2025
DUNN V. PATRIARCH PARTNERS                                      157

R. Kost - Confidential

Q.    Now, with respect to Bardin Hill, did you have any relationship with them prior to your role as CMO?

A.    No.  I did not know Bardin Hill.

Q.    You didn't know who they were until you became CMO, correct?

A.    Not to my recollection.

Q.    Never heard of them?

A.    I don't think so.

Q.    In your 30 years of experience as an investment banker, you didn't hear about Bardin Hill?

MS. MURPHY:  Objection to form.

THE WITNESS:  No.

BY MR. KUSNETZ:

Q.    What does that say about Bardin Hill?

MS. MURPHY:  Objection to form.

THE WITNESS:  I don't think it says anything about Bardin Hill.

BY MR. KUSNETZ:

Q.    Not a key player, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  I do tend to know more of the bigger players, and I did not know Bardin Hill.



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1561 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                         158

R. Kost - Confidential

BY MR. KUSNETZ:

Q.    Okay, and with respect to these creditors, did you also know -- sorry.

Did you interact with any of the other creditors to Zohar III prior to your role as CMO?

A.    I'm having a hard time remembering the names of the other Zohar III creditors, so I'd have to say at this point I -- I just don't recall.

Q.    Why would you agree that Bardin Hill was the primary creditor for Zohar III?

MS. MURPHY:  Objection to form.

THE WITNESS:  It's my recollection that they had one of the larger positions.

BY MR. KUSNETZ:

Q.    Understood.

And it was the job of the debtors' representatives to answer to the creditors, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Again, I'm not sure of your terminology of "answer to."  They were parties of interest and they were creditors of the estate.

BY MR. KUSNETZ:

Q.    And the Zohar debtors had to listen to the



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1562 of 2249

ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                    159

R. Kost - Confidential

creditors of the estate, correct?

                MS. MURPHY:  Objection to form.

                THE WITNESS:  They didn't have to, but
there was interactions, which is typical.

BY MR. KUSNETZ:

    Q.    There were interactions with the creditors
that did not include Ms. Tilton, correct?

    A.    Could you rephrase your question?

    Q.    The representatives of the debtors interacted
with the creditors in ways that did not include
Ms. Tilton, correct?

    A.    That's probably true.

    Q.    Do you recall that there was an ad hoc
creditors committee of the debtors' board?

    A.    Yes, I guess we did call them something like
that.

    Q.    Ms. Tilton wasn't on it, right?

    A.    I don't believe so, no.

    Q.    Would it have surprised you if she was on it?

    A.    Yeah.  No, I don't think she was.

    Q.    Okay, and the members of that ad hoc
creditors committee to the Zohar board was MBIA and
Bardin Hill, correct?

    A.    That's my recollection.



800.211.DEPO (3376)
EsquireSolutions.com

R. Kost - Confidential

Q.    Do you recall any other parties on that ad hoc creditors committee?

A.    No.

Q.    Do you recall the individuals from MBIA who sat on the creditors committee?

A.    Anthony --

Q.    McKiernan?

A.    -- McKiernan.

I don't know who technically sat on it, but it would likely have been either or both Anthony McKiernan and Dan Avitable, A-V-I-T-A-B-L-E.

Q.    Do you recall Christian Cavalieri was on it?

A.    That rings a bell.

Q.    Okay.  What about Keith Borelli, B-O-R-E-L-L-I?

A.    Yes.

Q.    Anyone else from MBIA?

A.    So again, I don't -- I am going to just clarify I don't think they "sat" on the committee.  I think MBIA had representatives and there was a subset of those people that would be at any meeting that technically was an ad hoc committee meeting.

Q.    That's a fair clarification.  So using that clarification, anyone else from MBIA who would sit --



R. Kost - Confidential

anyone from MBIA who would -- who would represent MBIA in those meetings?

A.    It would be Anthony and Dan, primarily.

Q.    Primarily?  And what about for Bardin Hill?

A.    John Greene and Pratik, and I probably would say we saw Pratik more than John.

Q.    Pratik Desai?

A.    Yes, Desai.  I was trying to think of his last name.

Q.    And were these meetings in person?

A.    My recollection is some were in person and some by phone.

Q.    And if they were in person, where were they held?

A.    The other reason why I'm hesitating is I try to recall.  There were other meetings that were not, I think, what you're terming "ad hoc."  There were many -- again, I wasn't part of some of the mediations and other discussions where they would have been in attendance.

So that's what I -- I think it's -- you're being -- there were many meetings that included participants from MBIA and Bardin Hill.  If you're trying to refer specifically to what we called an "ad hoc" creditor committee meeting --



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1565 of 2249

ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                      162

R. Kost - Confidential

Q.    Yeah.

A.    -- sometimes we even did those -- you know, separately in a phone call.

Q.    Understood.

And during those meetings, there were occasions where counsel was not present, correct?

A.    Yes.

Q.    Focusing on the occasions where counsel was not present, do you recall what types of topics were discussed generally?

A.    If the lawyers were not there, they were general economic or sales process updates from a very high level.

Q.    Understood.  Updating on how the sales process is going with particular companies?

A.    And -- yes, and I'll stress from a very high level.

Q.    Okay.  Why are you stressing from a high level?

A.    Just because I think it's important.

Q.    Why?

A.    Because they were not -- they were not involved in my sale processes.

Q.    They didn't tell you what to do with respect



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1566 of 2249

ROBERT KOST  Conf.                                                May 13, 2025
DUNN V. PATRIARCH PARTNERS                                                163

R. Kost - Confidential

to the sales process is what you're saying?

A.    That's correct.

Q.    But they received updates from you directly about the sales processes, correct?

A.    From a general and high-level perspective.

Q.    Right.  They had their own opinions about the sales processes, correct?

A.    Can you clarify what you mean by "opinions"?

Q.    Well, do you recall that during the timeline dispute, Bardin Hill and MBIA had separate proposals about how the process should unfold for selling the portfolio companies?

A.    Yes, generally I recall that.

Q.    So they had their own opinions about the sales process, correct?

A.    They did have opinions, yes.

Q.    Okay.  Did they ever express those opinions to you during those ad hoc creditor meetings?

A.    Well, generally, my recollection would be that they would like us to move more quickly.

Q.    That was a consistent theme, move more quickly --

A.    Yes.

Q.    -- correct?



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1567 of 2249

ROBERT KOST  Conf.                                      May 13, 2025
DUNN V. PATRIARCH PARTNERS                                      164

R. Kost - Confidential

And why did then want you to move more quickly, to the best of your knowledge?

A.    Because it was better than moving more slowly.

Q.    Why would it be better than moving slowly?

A.    They had been involved with the Zohars for -- especially MBIA for a long time, and they wanted to get repaid.

Q.    And they wanted to be repaid quickly, correct?

A.    More quickly.

Q.    Right.  They were not satisfied with the pace of repayment, correct?

A.    I think I would agree with that.

Q.    It's fair to say, yes?

A.    Yes.

Q.    And so their top priority was moving the sales process along quickly, correct?

                MS. MURPHY:  Objection to form.

                THE WITNESS:  Yes.  I would also add the comment that -- but not at any cost.

BY MR. KUSNETZ:

Q.    Okay.  That's fair.

A.    They'd like to maximize their recovery also.



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1568 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                         165

R. Kost - Confidential

Q.    They wanted to maximize their recovery as quickly as possible, correct?

A.    That's a fair way to say it.

Q.    Glad we can agree.

With respect to the topics that were discussed in the creditor committee, do you recall some topics being hands-off?

MS. MURPHY:  Objection to form.

(Pause.)

THE WITNESS:  I -- I would say it in a different way, which is I recall us focusing almost exclusively on the sales processes and the operations of the companies.

BY MR. KUSNETZ:

Q.    They had questions about the operations of the companies?

A.    Again, from a very high level.

Q.    And you would answer those questions?

A.    From a very high level.

Q.    Who else from the debtors attended these meetings?

A.    It was typically somebody from FTI and myself.

Q.    Not always Katzenstein?



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1569 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                          166

R. Kost - Confidential

A.    Not always.

Q.    Who else would attend?

A.    Probably would have been Conor Tully, if it wasn't.

Q.    Anyone else?

A.    But Mike was there a lot.

Q.    Mike?

A.    Katzenstein was at a lot of meetings.

Q.    So Mike Katzenstein or Conor Tully?  No one else, you think?  Sure?

A.    I mean, I seem to recall other people in the room, but I just can't recall who they are.

Q.    Got you.  Understood.

          (Thereupon, an informal discussion was
      held off the record with the shorthand
      reporter.)

          THE VIDEOGRAPHER:  We're going to go off
      record.  The time is 3:43, and this concludes
      Media Unit No. 5.

          (Recess taken at 3:43 p.m.)

          (Resumed at 3:59 p.m.)

          THE VIDEOGRAPHER:  We are back on record.
      The time is 3:59, and this is the start of
      Media Unit No. 6.

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1570 of 2249

ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                   167

                    R. Kost - Confidential

BY MR. KUSNETZ:

    Q.    Mr. Kost, we are talking about the ad hoc

creditors committee, do you recall, before we broke?

    A.    Yes.

    Q.    Let's wrap up that conversation a little bit.

Let's talk about MBIA first.

    Do you recall that representatives of MBIA

specifically asked that you, Mr. Kost, not say anything

about valuation under any circumstances to them?  Do you

recall that?

    A.    I don't recall that specifically, but I -- I

also recall that I did not talk about valuation in any

of these meetings.

                    (Thereupon, an informal discussion was

            held off the record with the shorthand

            reporter.)

BY MR. KUSNETZ:

    Q.    I'm going to show you your February 2020

deposition transcript.

    A.    Can I ask you how many -- you'll know the

answer -- how many depositions I have done that you have

for this case?  Is this No. 3?

    Q.    I think this is three?

    A.    I think this is three.



R. Kost - Confidential

Q.    If this is four, then I have to fire him, because -- no.

A.    We couldn't remember whether it was three or four.

(An informal discussion was held off the record.)

(Thereupon, a document was marked by the shorthand reporter as Exhibit 1 for identification.)

BY MR. KUSNETZ:

Q.    Mr. Kost, I'm showing you what has been marked as Exhibit 1 to your deposition.

Do you see on the cover page it says "Deposition of Robert Kost, February 7, 2020"?

A.    Yes.

Q.    Do you recall giving testimony in a related proceeding to this one on February 7, 2020?

A.    I remember being deposed.  I just don't remember the date.

Q.    Does February --

A.    Sounds right.

Q.    -- 7, 2020 sound right to you?

A.    Yes, it sounds right.

Q.    Okay.  Let's turn to page 94 of your



R. Kost - Confidential

testimony.  You'll see it's the mini pages, so look for the little one that says 94.

MS. MURPHY:  It's 25.

MR. KUSNETZ:  Yes, thank you, Destiny Rose.

BY MR. KUSNETZ:

Q.    It says page 25 in the bottom right-hand corner of the actual... okay.

Directing you to page 94, and line 6:

"Question:  And did you discuss the estimates of value that were coming out of the sales process for specific companies?

"Answer:  No, we specifically did not.

"Question:  Okay.  So what type of issues did you discuss about being in the process for a specific company?

"Answer:  So it was really process updates.  We're writing a confidential information memorandum.  Just to clarify something, as you know, MBIA is a public corporation.  They specifically asked that I not say anything about valuation under any circumstances.

"Question:  I'm sorry.  I need to clarify that. Representatives of MBIA specifically asked you in your communication with them not to discuss valuation of any



R. Kost - Confidential

of the portfolio companies?

"Answer:  Yes."

Do you see that?

A.    Yes.

Q.    Okay.  So do you recall that MBIA specifically asked you not to say anything about valuation of the portfolio companies under any circumstances?  "Yes" or "no"?

A.    I knew they were a public company, and so that makes sense.

Q.    We'll get to that, but first, just to answer my question, "yes" or "no":  Did MBIA specifically ask that you not say anything to them about portfolio company valuations under any circumstances?

A.    Yes, that -- I seem to recall that.

Q.    Do you recall who said that to you?

A.    I don't.

Q.    Do you recall if that was Mr. McKiernan?

A.    I'd be speculating, but it probably was.

Q.    Right, and when Mr. McKiernan said that to you, did he explain why?

            MS. MURPHY:  Objection to form.

            THE WITNESS:  I don't recall him

        explaining why to me.  I think -- my



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1574 of 2249

ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                   171

R. Kost - Confidential

recollection is that it was explained to me by somebody else indirectly at some other time.

BY MR. KUSNETZ:

Q.   Meaning you wanted to understand why one of the creditors didn't want to know about the value of the companies that you were trying to sell for them, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Well, it's -- it's a little bit more complicated.

BY MR. KUSNETZ:

Q.   Please.

A.   As I said earlier, I wouldn't want to tell them about a sale process and the value expectations and/or, let's say, for example, indications of interest, because I wouldn't want anyone -- you know, really to know.  I mean, that's stuff we keep very confidential for an ongoing process.

So when you say I didn't tell them any valuations, I'm just trying to determine exactly what valuation you're talking about, and I think -- in my mind, it would be an expectation of proceeds in a sale process.

And with respect to MBIA as a public company, if, for example, I knew what MD Helicopters was worth and I



R. Kost - Confidential

had an expectation of a value and I told them that, they -- they clearly didn't want to know that, and it would be market moving for them as a public company.

Q.   Right, because they would have to disclose it?

A.   That's right.

Q.   And -- and so because they would have to disclose these valuations if they learned them, that's why they instructed you specifically not to tell them what the valuations were, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  As I just said, I don't actually recall them telling me that, but it doesn't surprise me.

And I wouldn't tell them anyway the valuation expectation for an ongoing sale process.

BY MR. KUSNETZ:

Q.   Right, but, sir, you --

I just need to get back because you're saying "I don't recall them telling me."

But, sir, do you find that your testimony was inaccurate back in February of 2020?

MS. MURPHY:  Objection to form.



R. Kost - Confidential

THE WITNESS:  No, I'm not saying that at all.  That's five years ago.  I just don't remember.

BY MR. KUSNETZ:

Q.   Right, but sitting here today, is that testimony inaccurate or accurate?

MS. MURPHY:  Objection to form.

THE WITNESS:  I would -- I -- I believe it to be accurate.

BY MR. KUSNETZ:

Q.   Right.

A.   I have no reason to believe that when I said that, I was being inaccurate.

Q.   And, in fact, you volunteered that information?  This was not a question, right?

A.   Uh-huh.

Q.   You said, "Just to clarify something," right?

A.   Right.  I -- I'm not disputing this.  I just don't remember testifying to that statement or them telling me that statement.

Q.   Okay, but you don't dispute that MBIA told you specifically not to tell them about valuations, correct?

MS. MURPHY:  Objection to form.



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1577 of 2249

ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                    174

                    R. Kost - Confidential

                    THE WITNESS:  I do not dispute that.

BY MR. KUSNETZ:

     Q.    Right.  And so you're saying it makes sense
because they're a public company, right?

     A.    Correct.

     Q.    And that's because as a public company, if
they learned about the valuation -- you used the example
of MBIA -- then they would have to disclose that on
their books, right?

                    MS. MURPHY:  Objection to form.

                    THE WITNESS:  That, I believe, was my
          understanding then and now.

BY MR. KUSNETZ:

     Q.    Right, and you based that understanding of
having 30 years of experience in this industry, correct?

     A.    That's correct.

     Q.    Right.  Like this is -- you're not just some
guy off the street?

     A.    No.  I believe that's all -- those are all
true.

     Q.    Right, and so let's talk a little bit about
that.

     So does that mean that when you got letters of
intent, you would inform MBIA that you got letters of



R. Kost - Confidential

intent but would not tell them what the valuation was or the proposed sale price, correct?

A.    I'm just trying to recall what we might have told them.  Again, it's a long time ago to remember specifics.

My -- my belief would be that I would, again, not tell them, for example, that we had 50 indications of interest and four were super high.  Like I wouldn't say that.

I would say something more general.  "We received a good number of indications."  That probably would be the extent of what I would say.

Q.    They didn't want the specifics, right?

A.    And they didn't want the specifics, and I didn't want to tell them the specifics.

Q.    Right, but if they wanted the specifics, they had a right to know, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  That, I don't know.

BY MR. KUSNETZ:

Q.    You did not -- you were never instructed that they had no right to know; isn't that correct?

MS. MURPHY:  Objection to form, and just caution the witness to exclude communications



R. Kost - Confidential

from counsel from your answer.

THE WITNESS:  I don't know what their rights were, sitting here today.

BY MR. KUSNETZ:

Q.   Okay, but they told you what they didn't want to know, correct?

A.   I can tell you now I would not have told them bid levels today, then, or any time for an ongoing process.

BY MR. KUSNETZ:

Q.   Right.  They didn't want to know, right?

MS. MURPHY:  Objection.

THE WITNESS:  And they didn't want to know.

BY MR. KUSNETZ:

Q.   Right, and so let's just under -- let's unpack this a little bit.

You said -- sorry.  The question was:  "What types of issues did you discuss about being in the process for a specific company?"

Okay?  That's lines 11 to 13.  Do you see that question on page 94?

A.   Yes.

MS. MURPHY:  Sorry.



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1580 of 2249

ROBERT KOST  Conf.                                         May 13, 2025
DUNN V. PATRIARCH PARTNERS                                        177

R. Kost - Confidential

BY MR. KUSNETZ:

Q.    So this is a question about issues regarding a specific company that you are discussing with MBIA. That is the question, okay?  Do you see that?

A.    Yes.

Q.    Your answer is:

"So it was really process updates.  We're writing a confidential information memorandum."

Okay?  I'm going to stop your response there. Okay?  Let's just take that first part of your response.

When you're saying "process updates," that is akin to what you said earlier, which is "I'd tell them we got levels of -- we got letters of intent"?

A.    I would even be more generic.  I mean, I don't recall the conversations, to begin with, so I'm speculating as to what I might have said.

But trying to understand what I said back in 2020 -- for example, we had finished a confidential memorandum.  It's done.  We're ready to go to market. We might be calling people in two weeks.  We might start negotiating -- negotiating NDAs.

Generic process stuff.

Q.    You received letters of intent?

A.    That could have been one of them, yes.



R. Kost - Confidential

Q.    Would that have been --

MR. KUSNETZ:  Withdrawn.

BY MR. KUSNETZ:

Q.    You -- sitting here today, you do not dispute that you could have told MBIA that there were letters of intent, correct?

MS. MURPHY:  Objection to form.

BY MR. KUSNETZ:

Q.    About specific companies, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  I -- I can't dispute that I might have said, "We received letters of intent."

BY MR. KUSNETZ:

Q.    Right.  That is a process update, correct?

A.    I would consider that a process update.

Q.    If a sales process resulted in a sale, would you let them know?

A.    If we had signed a binding agreement, yes.

Q.    Yeah, and there were binding agreements signed as -- during your term as CMO, correct?

A.    Yes.

Q.    Right?  Like, for example, Denali and Oasis, right?



R. Kost - Confidential

A.     Yes.

Q.     Okay, and so when Denali and Oasis had signed agreements, you let MBIA and Bardin Hill know, correct?

A.     I have no recollection.  I don't know.

Q.     Would it have surprised you if you didn't, sir?

A.     No, it would not surprise me.

Q.     It would not surprise you if you didn't let them know?

A.     Is this a double negative?

Q.     It could be.  Let's -- let me just say ...

For example, with respect to do Denali and Oasis, is it very likely that you let Bardin Hill and MBIA know that you closed sales with those companies?  "Yes" or "no"?

MS. MURPHY:  Objection to form.

THE WITNESS:  I'm just trying to think was there even an ad hoc committee at the time of Denali.  Denali was very early in the process.  That's the only reason why I hesitate is --

BY MR. KUSNETZ:

Q.     Okay.

A.     -- might not be a good example.



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1583 of 2249

ROBERT KOST  Conf.                                                  May 13, 2025
DUNN V. PATRIARCH PARTNERS                                                    180

R. Kost - Confidential

Q.    Are you questioning my question, sir?

A.    I'm not questioning your question.

Q.    How about this?  How about this:

Specifics aside, is it fair to say that it is very likely that you let MBIA and Bardin Hill know when you closed a sale with a portfolio company?

"Yes" or "no"?

            MS. MURPHY:  Objection to form.

            THE WITNESS:  It's quite possible, yes.

BY MR. KUSNETZ:

Q.    More likely than not, right?

            MS. MURPHY:  Objection to form.

            THE WITNESS:  It's quite possible.

BY MR. KUSNETZ:

Q.    That's not my question.  I'm asking you more likely than not?  "Yes" or "no"?

            MS. MURPHY:  Objection to form.

            THE WITNESS:  Is "more likely than not" 51 percent?  Is that what the definition is?

BY MR. KUSNETZ:

Q.    I think so.

A.    It's quite possible that more likely than not, if we had a signed purchase agreement, we would have told MBIA and Bardin Hill.



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1584 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                        181

R. Kost - Confidential

Q.   Yeah.  I mean, you literally told me earlier if we finished the CIM, we're ready to go to market, we got letters of intent.  You're not going to like put a bookend on it and be like, "Hey, we signed"?

A.   Uh-huh.

Q.   You can't do the "uh-huhs."

Wait, so you're saying you're not going to put a bookending on it is your testimony?  I said you're saying you're not going to put a bookending on it?

A.   No.  I'm saying it's more likely than not that we would tell them that we had a signed deal.

Q.   Right.  That kind of makes logical sense, right?

A.   Agreed.

Q.   Right.  So in terms of telling MBIA and Bardin Hill that you had a signed deal, I imagine at that point they would not like to know what the value was, correct?

A.   I -- I don't know.

Q.   Well, they're creditors, right?  You have to say "yes" or "no" or --

A.   Yes.

Q.   -- some other answer.  You can't do the head nod.  Okay.



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1585 of 2249

ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                    182

                    R. Kost - Confidential

     MBIA and Bardin Hill --

     A.    I thought it was a rhetorical.

     Q.    No, no.  None of this is rhetorical.

     MBIA and Bardin Hill are creditors, correct?

     A.    Yes.

     Q.    And they're looking to make a recovery,
correct?

     A.    Yes.

     Q.    They want money that is owed to them,
correct?

     A.    Yes.

     Q.    And they're interested, as you testified, in
being paid back quickly, correct?

     A.    Yes.

     Q.    So as part of being paid back quickly, they
want to know, if there is a sale of a portfolio company,
how much they're going to get, right?

     A.    Yes.

     Q.    Right?  They don't -- it's not that they
don't care how much they get, right?

     A.    I -- I'm just saying -- we wouldn't tell them
how much they would get.  If we told them, we would tell
them what the proceeds of the estate would be.

     Q.    You didn't calculate the waterfall is what



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1586 of 2249

ROBERT KOST  Conf.                                              May 13, 2025
DUNN V. PATRIARCH PARTNERS                                           183

                     R. Kost - Confidential

you're saying?

        A.    Correct.  I did not.

        Q.    That's not what I'm asking.

     I'm saying company is signed -- the purchase of a

company is signed.  You tell them at that point in time

how much the company was sold for, right?

        A.    It's more likely than not we would tell them.

        Q.    It would be reasonable to assume that,

correct?

        A.    Correct.

        Q.    Doesn't stand out in your mind that you would

be like "We closed a sale" and they said, "Oh, don't

tell me how much you sold it for"?

        A.    I'm not trying to be vague.  I just don't

remember --

        Q.    That would stand out to you, though --

        A.    -- when we told them.

        Q.    -- right?

             MS. MURPHY:  Objection to form.

             THE WITNESS:  Yes.  I just don't remember

        what we told them.

BY MR. KUSNETZ:

        Q.    Yes, that's my point, which is it would stand

out to you if they said, "Oh, don't tell me how much you



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1587 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                            184

R. Kost - Confidential

actually sold it for," correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  That's correct.

BY MR. KUSNETZ:

Q.    Right.  It would be kind of weird, right, if they said that?

A.    I -- I -- again, I'm not trying to be vague, but -- you know, sometimes we put out press releases when it was sold.  I don't know when we would have told them, but at some point, we would have told them.

Q.    Exactly.  That's what I'm trying to get at. Thank you, sir.

A.    Yes.

Q.    All right.  Let's talk a little bit about --
When we spoke about MBIA not --

MR. KUSNETZ:  Withdrawn.

BY MR. KUSNETZ:

Q.    When you testified that MBIA specifically instructed you not to let them know about any valuations during the sales process, your response was "It makes sense because they're a public company," correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  I recall somebody else explaining to me that that was a possible

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1588 of 2249

ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                    185

R. Kost - Confidential

rationale.

BY MR. KUSNETZ:

Q.    Right.  And that makes sense to you, that rationale?

A.    Yes.

Q.    Logical sense, at least?

A.    Yes.

Q.    Right.  But if they were not a public company, it wouldn't make sense to you, right?

MS. MURPHY:  Objection to form.

THE WITNESS:  If they were not a public company, they probably would have wanted to know.

BY MR. KUSNETZ:

Q.    Right.  A creditor in the ordinary course wants to know the value of the company that's being sold to satisfy the money that they're owed, correct?

A.    That makes sense, yes.

Q.    That would be normal, right?

A.    Yes.

Q.    Okay, but the only reason why MBIA, to your knowledge and to your understanding, didn't want to know and deviated from the norm is because they were a public company, correct?



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1589 of 2249

ROBERT KOST  Conf.                                        May 13, 2025
DUNN V. PATRIARCH PARTNERS                                        186

R. Kost - Confidential

A.    That's my understanding.

Q.    And they did not want to report these valuations on their books, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  That's my understanding.

BY MR. KUSNETZ:

Q.    Right, and that's because if a valuation came out lower than expected, they would have to disclose that to their investors, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  That makes sense.

BY MR. KUSNETZ:

Q.    Right?  And they --

MR. KUSNETZ:  Withdrawn.

BY MR. KUSNETZ:

Q.    So it was better for them to be intentionally blind to the valuations of these portfolio companies than to disclose the values to investors, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  As I stated, I don't know why or what their rationale was.  I think there's also a materiality threshold, so if it was a small, de minimus sale, it probably would not have made any difference.



800.211.DEPO (3376)
EsquireSolutions.com

R. Kost - Confidential

BY MR. KUSNETZ:

Q.    Right, but MD Helicopters, for example -- that's not de minimus, correct?

A.    Correct.

Q.    Okay, and so thinking about -- aside from de minimus, right, let's talk about sales that mattered, okay?

A.    Yes.

Q.    And I'm not using any sort of standard of materiality.  This is not law school.  You're not a lawyer, right?

A.    Correct.

Q.    Okay, so thinking about this, based on your explanation, this makes sense; they're a public company.

What you're essentially getting at is that MBIA judged it was better for them to be intentionally blind to the valuations of these portfolio companies during the sales process than having to disclose these valuations to investors, correct?

          MS. MURPHY:  Objection to form.

          THE WITNESS:  That's my understanding.

BY MR. KUSNETZ:

Q.    Right, and let's talk about Bardin Hill. Bardin Hill is not a public company, correct?



800.211.DEPO (3376)
EsquireSolutions.com

R. Kost - Confidential

A.    That's correct.

Q.    So did you receive a similar instruction from Bardin Hill to specifically not tell them about valuations of companies while they were in the sales process?

A.    Not that I can recall.

Q.    Right, because it stood out to you that MBIA told you that?

A.    I don't recall that today, but I testified to that in 2020.

Q.    And you don't dispute that?

A.    That's correct.

Q.    And when you testified in 2020, you offered it?  You said you offered it as a clarification, correct?

A.    That's correct.

Q.    Right.  Right, it wasn't like you got tripped up by a question and just kind of mistakenly said it, right?

A.    That's correct.

Q.    Right, and so my point is:

With respect to Bardin Hill, you did tell Bardin Hill valuations about the portfolio companies at the time of the sales process, correct?



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1592 of 2249

ROBERT KOST  Conf.                                May 13, 2025
DUNN V. PATRIARCH PARTNERS                              189

R. Kost - Confidential

MS. MURPHY:  Objection to form.

THE WITNESS:  I don't think I did, actually.

BY MR. KUSNETZ:

Q.   You don't think Bardin Hill knew how much companies were being potentially sold for?

MR. KUSNETZ:  Actually, withdrawn.

BY MR. KUSNETZ:

Q.   You don't think Bardin Hill knew what some of the offers to purchase some of these portfolio companies were?

MS. MURPHY:  Objection to form.

THE WITNESS:  So as I testified earlier, I would not want to tell anybody what my initial indications of interest were.  I would want to keep that as tightly held as possible. Even internally, we did that.

At what point would we give Bardin Hill an indication that it's bigger than a breadbasket, for example?  I don't recall.

BY MR. KUSNETZ:

Q.   You don't recall it?

A.   I don't -- again, there's many, many -- there's 12, 15 portfolio companies.  Did we at some



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1593 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                       190

R. Kost - Confidential

point say, "Hey -- you know, the sale of PDP's looking good and it's kind of in the ballpark of what you guys might like"?  I can't say we didn't say something like that.

But I don't recall, and I would not have done it, knowing just the way I operate --

Q.    Right.

A.    -- that if I had yesterday received three indications of interest for MD Helicopters, I don't think I would have run out and told Bardin Hill what they were.

Q.    But if you had -- these creditor --

MR. KUSNETZ:  Withdrawn.

BY MR. KUSNETZ:

Q.    These ad hoc creditor committees occurred from time to time, right?

A.    Yes.

Q.    On a regular basis?

A.    Time to time is pretty good.  Maybe every couple weeks or month.

Q.    Okay.

A.    Six weeks.

Q.    So not like once in a blue moon?

A.    No.


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1594 of 2249

ROBERT KOST  Conf.                                        May 13, 2025
DUNN V. PATRIARCH PARTNERS                                        191

R. Kost - Confidential

Q.    Right?  So my point is:

Before each creditor committee meeting, you would have updates on a sales process that included a dozen portfolio companies?  Things are constantly moving, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  There may be four or five in market at any given time, so maybe we would say generic updates on four or five portfolio companies --

BY MR. KUSNETZ:

Q.    Okay.

A.    -- at a given meeting.

Q.    Understood.

And for Bardin Hill as opposed to MBIA, you were not restricted by them in informing them of the values of those companies as the sales numbers came in, correct?

A.    I don't recall them saying they were restricted in any way.  I'm saying I, for the integrity of the sale process, would not have told them those numbers until I or we thought it was appropriate.

Q.    Right, and -- and what -- my question is to follow up on that is that at least for Bardin Hill,



R. Kost - Confidential

there was a threshold at some point when it was appropriate, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  I -- I just can't recall when we told them, but as we -- if we signed a letter agreement -- a purchase agreement, that seems like it might be something we would then tell them.

BY MR. KUSNETZ:

Q.   But even before, you did not have a restriction on you to inform them of a valuation that you had received, correct?

A.   Not that I'm aware of.

MR. KUSNETZ:  All right.  Let's take a break while we locate this document.

THE VIDEOGRAPHER:  Okay.  We're going to go off record.  The time is 4:28, and this concludes Media Unit No. 6.

(Recess taken at 4:28 p.m.)

(Resumed at 4:30 p.m.)

THE VIDEOGRAPHER:  We are going on record.  The time is 4:30, and this is the start of Media Unit No. 7.

MR. KUSNETZ:  Okay.  I'm going to mark


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

R. Kost - Confidential

the second exhibit.  This is Exhibit 2.

(Thereupon, a document was marked by the shorthand reporter as Exhibit 2 for identification.)

THE WITNESS:  Thank you.

BY MR. KUSNETZ:

Q.    This is Bates Zohar_Farnan0000198.

Mr. Kost, when I mention a Bates number, it's that number in the bottom right-hand corner.  That's not original to the document.  That's just stamps to keep track of the documents during the course of litigation.  Okay?

A.    Yes.

Q.    All right.  This is an email from Pratik Desai to Mike Katzenstein and Joe Farnan, cc'ing John Greene.

You are not on this email.  Do you see that?

A.    Yes.

Q.    Pratik Desai and John Greene are from Bardin Hill, right?

A.    Yes.

Q.    And Mike Katzenstein and Joe Farnan are debtors' representatives, correct?

A.    Yes.



R. Kost - Confidential

Q.    As are you, correct?

A.    Yes.

Q.    And you're not on the email, correct?

A.    That's correct.

Q.    And this email was sent on November 11, 2019, subject line "Hussey/Libertas."  Do you see that?

A.    Yes.

Q.    And Mr. Desai writes:

"Based on our meeting last week, it's my understanding that we should be in good position to get LOIs from the bidders this week.  As a reminder, our ABL matures on 11-15 without a signed LOI."

Do you see that?

A.    Yes.

Q.    Do you know what he's talking about there?

A.    Yes.

Q.    What was this ABL that's being referred to?

A.    It's my recollection that Bardin Hill stepped in as an ABL provider for Hussey Copper at some point, and they ultimately wanted to get a sale process completed so that they could be repaid.

Q.    How did they step in as ABL provider?  Do you recall?

A.    My recollection is that Wells Fargo was a



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1598 of 2249

ROBERT KOST  Conf.                                            May 13, 2025
DUNN V. PATRIARCH PARTNERS                                           195

R. Kost - Confidential

lender to several of the portfolio companies and ...

Q.   I'm listening.

A.   In the Hussey case, I don't recall when they stepped in, but they stepped in and became the ABL lender to Hussey at some point.

Q.   Understood.

And when Mr. Desai says, "Based on our meeting last week, it's my understanding that we should be in a good position to get LOIs from the bidders this week," is that any reference to a creditors committee meeting?

MS. MURPHY:  Objection to form.

THE WITNESS:  It's possible.  I don't know which meeting he's referring to, but it's possible.

BY MR. KUSNETZ:

Q.   Were you aware of Mr. Katzenstein and Mr. Farnan meeting separately with Bardin Hill outside of a creditors committee meeting?

A.   It would be very unlikely that Judge Farnan would have.  It's possible that Mike would have.

Q.   Why is it possible that Mike would have?

A.   Because Mike and I possibly could have been in the same meeting with Bardin Hill to give them updates.



R. Kost - Confidential

Q.    Is it possible that Mike was in a meeting without you to give Bardin Hill updates?

A.    That's also possible.

Q.    Okay, but no reason why it could not be a creditor committee meeting that's being referred to here in this email, right?

A.    It's possible.

Q.    Okay, so where Mr. Desai says, "As a reminder, our ABL matures on 11-15 without a signed LOI," he's saying that the payment due on this ABL by Hussey will be due four days later on November 15th if there's no signed LOI.  Do you see that?

MS. MURPHY:  Objection to form.

THE WITNESS:  I see that.

BY MR. KUSNETZ:

Q.    And the signed LOI is a condition to the ABL; isn't that right?

MS. MURPHY:  Objection to form.

THE WITNESS:  That's my recollection.

BY MR. KUSNETZ:

Q.    So the ABL would mature and Bardin Hill would need to be paid in four days if there was no signed LOI from Hussey, correct?

A.    Not exactly.



R. Kost - Confidential

Q.    Clarify, please.

A.    The ABL would mature.  Under the agreement, they would have a certain period to notice an event of default.  They would then have remedies, and you could negotiate a forbearance or a waiver.  You could file for bankruptcy.  You can do any number of things.

Q.    That's a fair point, so I'll be more specific.

The ABL --

        MR. KUSNETZ:  Sorry.  Withdrawn.

BY MR. KUSNETZ:

Q.    What Bardin Hill is telling the debtors' representatives is a reminder that their ABL will mature for Hussey in four days if there's no signed LOI, correct?

A.    That's correct.

Q.    They are not telling the debtors that --

Bardin Hill is not telling the debtors' representatives that they are planning to forbear on their ABL maturity to give Hussey more time to find the right LOI, correct?

        MS. MURPHY:  Objection to form.

        THE WITNESS:  That's correct.  There's also -- I don't read this as overly



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1601 of 2249

ROBERT KOST  Conf.                                            May 13, 2025
DUNN V. PATRIARCH PARTNERS                                          198

R. Kost - Confidential

threatening either, but they're making a point.

BY MR. KUSNETZ:

Q.    Do you read what I was saying as making a threat?

MS. MURPHY:  Objection.

THE WITNESS:  No.  You just made a reference to forbearance.

BY MR. KUSNETZ:

Q.    Yeah.

A.    Yeah.

Q.    Well, I'm saying -- did you understand my question to be is Bardin Hill being threatening?

A.    No.  They're reminding Mike Katzenstein that their ABL matures on 11-15.

Q.    Right, and what they're not saying is "Don't worry; we're going to forbear so that we can give Hussey more time to find the right LOI," correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes, and all I said was and they also don't say, "I'm going to send you a notice of default."

BY MR. KUSNETZ:

Q.    They're not saying that?



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1602 of 2249

ROBERT KOST  Conf.                                        May 13, 2025
DUNN V. PATRIARCH PARTNERS                                        199

                     R. Kost - Confidential

    A.    They're not saying either of those things.

    Q.    Understood.

    Did Bardin Hill ever forbear the payment due on the ABL for Hussey Copper?

    A.    I -- I don't recall what happened.

    Q.    But it would surprise you if they did, right?

    A.    Would it surprise me if they did what?

    Q.    If they did forbear?

    A.    No, it wouldn't surprise me if they forbeared.

    Q.    Really?  Why is that?

    A.    Because there's no upside for them to force us to file Hussey for bankruptcy in the middle of a sale process.  That has -- that's just something they wouldn't do.

    Q.    There's an upside to them for putting pressure on the process to get a sale done, correct?

            MS. MURPHY:  Objection to form.

            THE WITNESS:  Yeah, I -- I mean, I -- I don't think they would want us to -- I don't think they would call a default.

            That wasn't my job.  This wasn't my job, just for the record.



R. Kost - Confidential

BY MR. KUSNETZ:

Q.    What wasn't your job?

A.    Negotiating ABL forbearance and agreements with Bardin Hill.

Q.    I'm not talking about negotiations.  Do you see Mr. Katzenstein or Mr. Farnan negotiating here?

A.    You're asking me about an email --

Q.    Yes.

A.    -- from Bardin Hill to Mike and Joe about an ABL that matures on 11-15.

Q.    Right.

A.    In four days.

Q.    Right.

A.    I -- I didn't negotiate with them.  I didn't speak to them about it.  I was running a sale process. I wasn't involved with Bardin Hill in the Hussey transaction on the ABL.  Not my job.

Q.    Fair to say that the ABL maturity date had an impact on the sales process, correct?

A.    Could have.

Q.    Well, it did, in fact, put pressure on Hussey and the investment bankers to get a signed LOI faster than if there wasn't an ABL that was about to mature, correct?



R. Kost - Confidential

A.    Right.  In a perfect world, you wouldn't want a default under your ABL.

Q.    Right.  Who wouldn't want a default under their ABL?

A.    Hussey Copper.

Q.    And a buyer -- potential buyer of Hussey wouldn't want Hussey to default on an ABL; isn't that correct?

A.    I don't think a buyer would really care.

Q.    Why wouldn't they care?

A.    Why would they care?

Q.    I'm asking the questions.  Why wouldn't they care?  You're the one with 30 years of experience. Maybe I'm wrong.  Why wouldn't they care?

A.    First of all, they wouldn't know.  We'd have to tell them.

Q.    Right.

A.    And my recollection is that Zohar III was a significant owner of Hussey Copper, so why would you -- it doesn't make any sense for them to force us into a default.

And then they would have to exercise their remedies to try to seize the collateral, all during a sale process that only benefits Zohar III.  It just doesn't



R. Kost - Confidential

make any sense.

So I don't know how I -- my experience is that they would either have waived it or entered into a forbearance.

Q.    And you're not familiar with Bardin Hill waiving their ABL or entering into a forbearance; isn't that correct?

A.    That's true.  You're asking me about an email for a situation that I was not involved in.

Q.    Well, you were involved, sir.  You were on the creditors committee, right?

MS. MURPHY:  Objection to form.

THE WITNESS:  I wasn't on -- I met with the creditors.

BY MR. KUSNETZ:

Q.    Yeah, you met with the creditors committee --

A.    Yes.

Q.    -- and at this creditors committee, you would discuss updates to the sales processes, correct?

A.    Yes.

Q.    And what Mr. Desai from Bardin Hill is saying, based on our meeting last week -- which you have no reason to believe it's not a creditors meeting -- he's talking about that they should be in a good



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1606 of 2249

ROBERT KOST  Conf.                                              May 13, 2025
DUNN V. PATRIARCH PARTNERS                                            203

R. Kost - Confidential

position to get LOIs for Hussey Copper this week?

A.    Yes.

Q.    Right.  That is a specific update about a specific company's sales process, correct?

A.    Yes.

Q.    Okay, and he says, "As a reminder, our ABL matures in four days without a signed LOI," right?

A.    Yes.

Q.    Right, and you were aware of the ABL, correct?

A.    Yes.

Q.    You testified to that?

A.    Yes.

Q.    And the ABL had an impact on the sale of Hussey Copper, right?  It impacted the timing of that sale, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  I -- I wasn't involved, so I don't know if there was an impact.

I'm saying that I don't recall -- I don't recall it impacting us and signing an LOI faster or more slowly.

BY MR. KUSNETZ:

Q.    Right, but you recall that it created


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

R. Kost - Confidential

pressure to sign an LOI versus if there was no ABL, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  I don't recall that.

BY MR. KUSNETZ:

Q.    Really?

MS. MURPHY:  Objection to form.

BY MR. KUSNETZ:

Q.    You don't recall that the discussions over the ABL didn't prompt the investment bankers to act differently as opposed to if there was not an ABL with respect to the sale of Hussey Copper?

MS. MURPHY:  Objection to form.

THE WITNESS:  I don't -- I don't recall. It -- I just don't recall it accelerating the LOI process.

BY MR. KUSNETZ:

Q.    Do you recall putting pressure on the LOI process?

MS. MURPHY:  Objection to form.

THE WITNESS:  I don't.

BY MR. KUSNETZ:

Q.    You don't recall the investment bankers feeling pressured by the ABL?



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1608 of 2249

ROBERT KOST  Conf.                                      May 13, 2025
DUNN V. PATRIARCH PARTNERS                                       205

R. Kost - Confidential

MS. MURPHY:  Objection to form.

THE WITNESS:  I recall it being an issue. I think they were probably concerned that we would default on the ABL, but -- I mean, they're regular way bankers, and this doesn't bother me as a restructuring banker.

BY MR. KUSNETZ:

Q.    Doesn't bother you?

A.    No.

Q.    Okay, but what you're testifying is that it bothered the investment bankers, correct?

A.    It may have.

Q.    And it would be reasonable for it to likely bother the investment bankers, right?

A.    Yes, sure.  It's something that they would have wanted to have resolved.

Q.    Right, because it created pressure on the timing for signing an LOI, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Possibly.

BY MR. KUSNETZ:

Q.    Right, because if there was no deadline for the maturity of an ABL, then they wouldn't have to worry about the potential of a default, correct?



R. Kost - Confidential

A.    Right, from their perspective.

Q.    From their perspective.

And the investment bankers are running this process, correct?

A.    They are.

Q.    They are.  They're running the sales process, so the people running the sales process, the investment bankers, are likely worried --

MR. KUSNETZ:  Withdrawn.

BY MR. KUSNETZ:

Q.    The people running the sales process, the investment bankers, are likely concerned about the fact that this ABL is going to mature in four days unless there's a signed LOI, right?

MS. MURPHY:  Objection to form.

THE WITNESS:  That's true.

MR. KUSNETZ:  Right.

BY MR. KUSNETZ:

Q.    But you're saying doesn't bother you?

A.    What I'm saying is in a perfect world, you wouldn't have this situation.

Q.    Exactly, because it impact -- it creates an artificial pressure to sign an LOI, correct?

MS. MURPHY:  Objection to form.



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1610 of 2249

ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                     207

R. Kost - Confidential

THE WITNESS:  Or -- and since I wasn't involved in these discussions -- you would reach out to Bardin Hill and ask them to extend their deadline.

BY MR. KUSNETZ:

Q.    Right.  That would be something that would help alleviate the pressure to sign an LOI, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes, to the extent that you consider that pressure.

BY MR. KUSNETZ:

Q.    Right, and the investment bankers considered it pressure, correct?

A.    They might have.

Q.    Right.  It would be reasonable for them to do so, correct?

A.    It's reasonable.

Q.    Thank you.

Now, next line says:  "As BH has an interest in 95 percent of the proceeds of this transaction, I wanted to raise our views."

So does that speak to what you were saying earlier about how the Zohar III creditors would have gotten most of the proceeds from a Hussey sale?



R. Kost - Confidential

A.    Yes.

Can I have a minute to just read the email?

Q.    You can, absolutely.

A.    Thank you.

Q.    Absolutely.  Whenever I hand you a document, if you want to take a look at it, you're absolutely welcome to.

A.    Thank you.

(Pause.)

BY MR. KUSNETZ:

Q.    Did you read it?

A.    Yes.  Thank you.

Q.    Okay.  If you look at .1, Mr. Desai from Bardin Hill writes, "We should get the LOI signed this week.  Lynn and Lazard have had 12 months to go shop this company, and we will not receive any bids better than the revised bids this week."

Do you see that?

A.    Yes.

Q.    So Mr. Desai from Bardin Hill is saying to Mr. Katzenstein and Mr. Farnan that "We will not receive any bids better than the revised bids this week"?

A.    Yes.

Q.    Do you see that?



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1612 of 2249

ROBERT KOST Conf.                                           May 13, 2025
DUNN V. PATRIARCH PARTNERS                                           209

R. Kost - Confidential

A.    Yes.

Q.    Right, meaning that Bardin Hill had to know what the amount of that -- of those bids were that they received this week, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  That's -- you could read it that way.

BY MR. KUSNETZ:

Q.    Right, because how would they know if a bid -- if a revised bid is going to be better than any future bid and if you don't know what the number is, correct?

A.    Correct.

Q.    Right, and so does this refresh your recollection that Bardin Hill was informed of valuations during the sales process of portfolio companies?

MS. MURPHY:  Objection to form.

THE WITNESS:  It -- it does not.  I -- I don't know what the terms of the ABL gave them -- if it gave them any rights to the updates that were more fulsome and included the values.  I don't know.

BY MR. KUSNETZ:

Q.    So you're saying the ABL could have given



                     R. Kost - Confidential

them special rights to certain information that others

would not have?

     A.    I'm speculating, because I don't know the

answer.

     Q.    Okay.  Well, why don't we go with whether you

know or you don't know?

     A.    I don't know.

     Q.    Okay, but what's clear from this email is

that at least with respect to -- with respect to Hussey

Copper, Bardin Hill was aware of the amount of bids

during the sale process, correct?

               MS. MURPHY:  Objection to form.

               THE WITNESS:  I -- I don't know what they

          knew.  It -- you could read it generically

          that -- I don't know what specific -- specific

          number they were told.

               For example, it could have been "It's a

          bid that covers your debt."  I have no idea

          what the reference is.

BY MR. KUSNETZ:

     Q.    Right, but they would have known an amount or

a general amount to understand whether the revised bids

would be better than a future bid, correct?

               MS. MURPHY:  Objection to form.



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1614 of 2249

ROBERT KOST  Conf.                                      May 13, 2025
DUNN V. PATRIARCH PARTNERS                                    211

R. Kost - Confidential

THE WITNESS:  I think it implies that they did know a number.

BY MR. KUSNETZ:

Q.   Right, so let's go with that.

A.   Okay.

Q.   Thank you.

He then writes:  "To the extent the process requires an extension, we would like to discuss the considerations real-time."

Do you see that?

A.   Yes.

Q.   Okay, and that means an extension of the sales process, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  That seems to be what it's implying.

MR. KUSNETZ:  Okay.

(Pause.)

MR. KUSNETZ:  Okay.  You can put that aside.

BY MR. KUSNETZ:

Q.   Now, you were responsible for keeping the debtors' agents apprised of developments related to the monetization of the portfolio companies, correct?



R. Kost - Confidential

A.    Yes.

Q.    And you would prepare periodic reports; is that correct?

A.    Yes.

Q.    And were those reports written?

A.    Yes.

Q.    Were they PowerPoint presentations?

A.    So I believe my sales tracker was an Excel -- format of Excel presentation for most of the period up until -- I think sometime in 2021 we started to combine it with FTI's weekly report, and they imported my updated sales tracker information into their PowerPoint presentation.

Q.    When did you start making this sales tracker that you sent around?

A.    Probably in the very beginning, Day 1, within days or weeks of being retained.

Q.    And you continued to update that sales tracker and send it around after Ms. Tilton resigned from her roles as independent director and manager of the portfolio companies, correct?

A.    Yeah.  My recollection would have been almost weekly for the entire period.

Q.    Understood.  Did you share that update with



R. Kost - Confidential

Ms. Tilton on a weekly basis?

A.    I don't believe so.

Q.    Why not?

A.    I was an officer of the debtors, and -- I don't know.  It went to Mike Katzenstein and FTI and Joe Farnan.

Q.    Did it contain your reflections on the sales process?

A.    I wouldn't necessarily use the word "reflections."  The sales tracker is more factual in character.

Q.    Would it contain your observations, though?

A.    Yes, it -- yes, it could include observations.

Q.    And you did not want to share those observations with Ms. Tilton, correct?

A.    I wouldn't say that.

Q.    But sitting here today, you don't know why you didn't share it with Ms. Tilton, correct?

A.    I really -- I don't recall.

Q.    Okay.  Do you know if your weekly update went to the creditors?

A.    It definitely did not.

Q.    Okay.



R. Kost - Confidential

A.    Should not have.

Q.    Sitting here today, are you aware if it went to the creditors?

A.    I am not aware of any --

Q.    Would you --

A.    -- situation.

Q.    Would you be upset if it went to the creditors?

A.    Yes.

Q.    And why is that?

A.    It had a lot of information that was really for a very -- you know, tight group, for our eyes only.

Q.    And when you say "our eyes," you mean the debtors' eyes?

A.    Yes.

Q.    FTI, Farnan, you?

A.    And Young Conaway.

Q.    And Young Conaway?  And not Bardin Hill or MBIA, correct?

A.    That's correct.

Q.    What about Houlihan Lokey?  Did they end up receiving it at some point?

A.    Yes, they would have started to receive it after they were retained.



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1618 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                         215

R. Kost - Confidential

And just to clarify --

Q.    Please.

A.    -- the sale tracker or the summaries -- to be -- to be clear, and now it's coming back to me, there were two documents.  One is called the "sale tracker" and once was, for lack of a better name -- I don't know what it was called -- but think of it as a weekly summary update.  And the weekly summary updates were given to those parties -- our parties, the debtors' advisors.

Q.    And you drafted this summary -- weekly summary?

A.    Yes.

Q.    Just you?

A.    Yes.

Q.    Not your associates at Goldin?

A.    No.

Q.    What about your weekly tracker?

A.    Just me.

Q.    Okay.  You're good with Excel?

A.    Yes.

Q.    I would be surprised if you were not.

A.    It's pretty tedious, to be honest.

Q.    You could have had an associate do it,



R. Kost - Confidential

though, could you have not?

A.    As I said, we -- I really did not utilize junior staff members.

Q.    Mostly your hours?

A.    Just almost exclusively my hours.

Q.    All right.

(Thereupon, an informal discussion was held off the record with the shorthand reporter.)

BY MR. KUSNETZ:

Q.    Part of your --

MR. KUSNETZ:  Withdrawn.

BY MR. KUSNETZ:

Q.    The goal of the monetization process was to maximize the long-term value of the portfolio companies, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes.

BY MR. KUSNETZ:

Q.    And it was not to have a fire sale, correct?

A.    That's correct.  We were trying to avoid fire sales.

Q.    And fair to say a fire sale is a sale where the price is reduced in order to sell an asset quickly?

Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1620 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                          217

R. Kost - Confidential

A.    That's probably a fair description.

Q.    Okay.  Or to sell an asset quickly, a lower price than maximum value is accepted, correct?

A.    Yeah.  It's a basic description.

Q.    Okay, and it was also important to avoid giving buyers the perception that there was a fire sale with respect to this monetization process, correct?

A.    Yes.

Q.    Why was that important?

A.    We were very concerned that because the portfolio companies were owned by entities that were in bankruptcy, that the bankruptcy taint would harm value, destroy value.

Q.    Yep.

A.    Keep likely buyers away who just don't want to be involved in a bankruptcy sale.

And it wasn't technically a bankruptcy sale because the portfolio companies were not technically in bankruptcy, but it was a -- definitely a concern that we had throughout the case.

Q.    Right.  You were not selling traditionally distressed assets as you would if it was a bankruptcy sale, correct?

A.    It was unusual, yes.



800.211.DEPO (3376)
EsquireSolutions.com

Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1621 of 2249

ROBERT KOST  Conf.                                      May 13, 2025
DUNN V. PATRIARCH PARTNERS                                     218

R. Kost - Confidential

Q.    This was an unusual circumstance in that regard, correct?

A.    Correct.

Q.    Right.  There was occasionally portfolio companies that went into bankruptcy, but for the most part, they were not in bankruptcy, correct?

A.    That's true, too.  A number of them did go into bankruptcy and were bankruptcy sales.

Q.    Right, but not all of them?

A.    Not all of them.

Q.    Right.  And so if you are selling nondistressed assets, there's no need to sell them at a fire sale price, correct?

A.    Again, I think that statement's a little too simple for our context.

Q.    I don't have 30 years of banking experience.

A.    It's -- again, it kind of comes back to you need to have lenders.  There were -- for example, Wells Fargo just did not want to be involved anymore, even though some of these companies at that time weren't in bankruptcy.

Q.    And to avoid the perception of a fire sale, it was important to give portfolio companies a unique time frame so that these bankers could run a process



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1622 of 2249

ROBERT KOST  Conf.                                              May 13, 2025
DUNN V. PATRIARCH PARTNERS                                              219

R. Kost - Confidential

that would maximize value, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes.  My recollection is that we tried to have time frames that were more typical of normal sale processes.

BY MR. KUSNETZ:

Q.    And that you tried to also allow for unique circumstances with -- to --

MR. KUSNETZ:  Sorry.

BY MR. KUSNETZ:

Q.    And you tried to tailor unique time frames for particular portfolio companies based on circumstances that arose during the sales processes, correct?

A.    Yes.  I'm going to agree with that statement, with the caveat that we had pre-COVID and post-COVID, and that was a significant impact on our sale processes and our thinking.

Q.    Absolutely, and that was unforeseen?

A.    Very much so.

Q.    And Ms. Tilton was not responsible for the COVID crisis?

A.    Not to my knowledge.

Q.    I knew you were going to say that.



Case 1:16-cv-04488-VM-KHP  Document 419  Filed 03/27/26  Page 1623 of 2249

ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                      220

R. Kost - Confidential

Okay, and by allowing for that flexibility during that pre-COVID crisis time period, okay, for these portfolio companies, you are not artificially shortening the timeline for them to be sold, correct?

A.    That's my recollection, for those -- for those portfolio companies, yes.

Q.    Right.

Because if you had an artificially shortened timeline to sell these companies, that would create at least the perception of a fire sale, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  It could.

BY MR. KUSNETZ:

Q.    Right, especially if the buyers got wind that there might be a deadline, correct?

A.    That's correct.

Q.    Right?  And fair to say that having a deadline with respect to the sale of a company is -- is something that you want potential buyers to not be aware of, correct?

A.    Yeah.  You just don't let buyers know deadlines, even if you have them.

Q.    Right, and why?

A.    So -- just it's something -- yeah, you



R. Kost - Confidential

wouldn't want them to know you have any kind of pressure or time frame.

Q.    Not conducive to value maximization, correct?

A.    That's correct.

Q.    And so it's fair to say that different portfolio companies might take different amounts of time to sell based on their unique circumstances, right?

A.    Yes.

Q.    Even if it's a strong portfolio company, right?

A.    Yes.

Q.    Like Universal Instruments.  Strong company, right?

A.    Yes.

Q.    Do you recall that they had a good balance sheet?

A.    Very good company.

Q.    They had good revenue?

A.    Yes.

Q.    They had good products?

A.    Yes.

Q.    But during the sales process, they didn't attract the interest that you, Ms. Tilton, or the company itself anticipated, correct?



800.211.DEPO (3376)
EsquireSolutions.com

R. Kost - Confidential

A.    Well, we also didn't expect their EBITDA to go to zero during the sale process.

Q.    Right, and was that due to a problem at the company or was that due to macroeconomic factor?

A.    No, that was due to Trump tariffs, No. 1.

Q.    Yep.  Trump tariffs on China, right?

A.    Correct.

Q.    Do you recall that 50 percent of their sales was tied to China?

A.    I would have said higher.

Q.    Maybe higher?  Okay.  You recall that a very large percent of their sales, a majority of their sales, was tied to China?

A.    Yes.

Q.    Okay, and so tariffs on sales to China had a negative impact on the business?

A.    That's correct.

Q.    Spooked buyers, correct?

A.    Spooked?  I don't know if I'd use that word.

Q.    All right.

A.    Again, it was harmful to the sales process.

Q.    Right, it was harmful to the sales process. And that was a macroeconomic factor, correct?

A.    Yes.



                    R. Kost - Confidential

     Q.    Now, you're aware -- and I'm going to
mispronounce it -- CFIUS, C-F-U-I --

               MS. MURPHY:   CFIUS.

BY MS. MURPHY:

     Q.    CFIUS.

               MR. KUSNETZ:   Destiny Rose, this is your
          time to shine.   How do you -- how do you spell
          CFIUS?

               MS. MURPHY:   C-I-F-I-U-S [sic].

               MR. BARTLEY:   Committee on Foreign
          Investment in the United States.

               THE SHORTHAND REPORTER:   Thank you very
          much.

               (Thereupon, an informal discussion was
          held off the record with the shorthand
          reporter.)

BY MR. KUSNETZ:

     Q.    Are you aware of that thing?

     A.    Yes.

     Q.    Okay.   CFIUS -- if I say "CFIUS," will you
know what I'm talking about?

     A.    Yes.

     Q.    Okay.   CFIUS was an issue for UI, correct?

     A.    That's correct.

R. Kost - Confidential

Q.    Right?  Sale of that company to a potential foreign buyer would have triggered CFIUS review, correct?

A.    That's correct.

Q.    And that also had a negative impact on the sales process?

A.    The -- because of the structure of that industry, most of our likely buyers were Asian buyers, and CFIUS resulted in us not being able to sell it to a Chinese-related company.

So it reduced our buyer base.

Q.    Right.  Which makes the sale more --

A.    Not necessarily --

Q.    I'm sorry.  Continue, please.

A.    Not necessarily the price, but the number of buyers were reduced.

Q.    Right, which means that it introduced a challenge to the sales process, correct?

A.    Yes.

Q.    So UI was dealing with multiple macroeconomic challenges that were no fault of its own, correct?

A.    Correct.

Q.    Ms. Tilton didn't impose those tariffs?

A.    No.



R. Kost - Confidential

Q.    The bankers didn't impose those tariffs?  The company didn't impose those tariffs, right?

A.    That's correct.

Q.    You didn't impose those tariffs?

A.    No.

Q.    Not to the best of your knowledge?

A.    Not to the best of my knowledge.

Q.    Okay.  And so my point is even strong businesses like Universal Instruments might take longer to sell because of macroeconomic factors that were no fault of that business, correct?

A.    Correct.

Q.    Right?  And so if you had an artificial timeline to sell Universal Instruments and you were not getting the buyers and the bids you expected because of these macroeconomic factors, you would be selling Universal Instruments if some -- if you had to sell it at a price that did not maximize its intrinsic value, correct?

            MS. MURPHY:  Objection to form.

            THE WITNESS:  That's correct.  You would, in a perfect world, prefer to wait until Trump tariffs have ended and the EBITDA had improved.



ROBERT KOST  Conf.                                      May 13, 2025
DUNN V. PATRIARCH PARTNERS                                        226

                    R. Kost - Confidential

BY MR. KUSNETZ:

    Q.    Right, and any CFIUS issues had been resolved?

    A.    That would have been helpful also.

    Q.    Right.  Okay.  Now, in terms of --

    In terms of this artificial deadline that I'm mentioning, do you recall testifying that when you were designing this sales process --

            MR. KUSNETZ:  Sorry.  Withdrawn.

BY MR. KUSNETZ:

    Q.    Do you recall testifying that in the early days of the monetization process when you were figuring out how to oversee this that the goal was to conduct a regular, normal M&A process where you sought to maximize value as opposed to a rushed sale process which would arguably not maximize value?

    A.    That is something I generally recall.

    Q.    And you would stand by that today?

    A.    Yes, as a general statement.

    Q.    Right, and do you recall when you were setting up this sales process, that was the goal?

    A.    Yes.

    Q.    Right.  And because, as you've testified, a rushed sales process arguably does not maximize value,



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1630 of 2249

ROBERT KOST  Conf.                                        May 13, 2025
DUNN V. PATRIARCH PARTNERS                                         227

R. Kost - Confidential

correct?

A.    Yes.

Q.    Right, and so it's important, then, to give portfolio companies the flexibility to adjust their timeline in the face of unforeseen issues, correct?

A.    Yes.  Each of the portfolio companies had their own set of issues that we had to deal with throughout the monetization.

Q.    And it was important to give those companies flexibility, correct?

A.    Especially -- yes, if we could.

Q.    Right, and you shared this goal with Ms. Tilton to avoid the perception of a fire sale, correct?

A.    I -- I don't know if I shared it with Ms. Tilton.  I think that was a common goal for everybody in the engagement.

Q.    Okay.  Common goal for you, the bankers, and Ms. Tilton, correct?

A.    Yeah.

Q.    Okay.

        (Pause.)

BY MR. KUSNETZ:

Q.    Do you recall testifying previously that



R. Kost - Confidential

Ms. Tilton was not happy when you used the word "fire sale" in conversations with her?

A.    That does ring a bell, vaguely.  I don't recall specifically the -- the context.

Q.    You don't dispute that that -- that that occurred, correct?

A.    I -- no, I don't dispute that.

Q.    Okay.  It's also important when you're running a sales process to provide alternatives or backups to the sale of a company, correct?

A.    I'm not sure what you're asking.

Q.    Well, fair point.

Is it fair to say, sir, that as an alternative to selling a company at an unacceptable value, a company could seek to refinance its debt as an alternative?  Is that right?

A.    Yes, that would be true for a normal company, yes.

Q.    Right, and for some of these companies, that was an option; isn't that correct?

A.    Well, they were still owned by the debtors, and -- you know, as the judge made clear to us, we had to sell the companies at some point.

Q.    Right, or the companies could refinance



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1632 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                           229

R. Kost - Confidential

instead and pay off the debtors, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  I don't think they could do that.

BY MR. KUSNETZ:

Q.   No?  You don't recall efforts to refinance particular portfolio companies' debt?

MS. MURPHY:  Objection to form.

THE WITNESS:  It wouldn't -- there's still ownership issues of who owned the company, which was usually the Zohars.  Or Ms. Tilton.  Whoever.

BY MR. KUSNETZ:

Q.   Ownership issues aside, you specifically cited to the importance of having backup alternatives to the sale of a company, and one example was potential refinancing, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Are you saying that I testified to this already?

BY MR. KUSNETZ:

Q.   Yes.

A.   At a previous deposition?

Q.   Yes.



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1633 of 2249

ROBERT KOST  Conf.                                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                                       230

R. Kost - Confidential

A.    And am I talking about a Zohar portfolio company or hypothetically --

Q.    Are you asking me the questions?

A.    I don't know what you're asking, to be honest.

Q.    Well, if you would like me to help clarify, I'm happy to help clarify.

A.    Sure.  If you could read my testimony, that would be great.

Q.    Okay.  Sure.  Let's do that.

MR. KUSNETZ:  We're going to mark the next exhibit as Exhibit 3, please.

(An informal discussion was held off the record.)

(Thereupon, a document was marked by the shorthand reporter as Exhibit 3 for identification.)

BY MR. KUSNETZ:

Q.    Okay.  Mr. Kost, do you see that I've put in front of you as Exhibit 3 to your deposition a deposition transcript dated April 12, 2018, that says "Confidential Videotaped Deposition of Robert Kost"?

A.    Yes.

Q.    Okay.  Do you recall being deposed in April



R. Kost - Confidential

of 2018 in connection with litigation related to this matter?

A.    I don't remember that date.

Q.    But do you recall generally giving testimony in April of 2018?

A.    I do not.

Q.    Do you recall giving testimony only a short while after you were hired?

A.    I do not, actually.

Q.    Okay.  You've blocked it from your memory?

A.    I have, absolutely.

Q.    Okay.  Do you have any reason -- why don't you open this page?

Do you recall an examination by a Mr. Hoff from Cadwalader?

A.    Yes, rings a bell.

Q.    Okay.  Mr. Hoff stands out a little, right?  Okay.

A.    Yes.

Q.    I don't.  I look like a cookie-cutter lawyer, right?

A.    Trying to remember Mr. Hoff.

Q.    Don't answer that question.

Okay.  So fair to say you -- your memory is



R. Kost - Confidential

refreshed that you had a deposition at some point in 2018, correct?

A.    Yes, I don't dispute this.

Q.    And you don't dispute it was April of 2018? April 12th of 2018?

A.    No.

Q.    Now, that was actually close in time to when you were hired, correct?

A.    Very close.

Q.    When were you hired?

A.    Probably right around April 12th.

Q.    Sure it wasn't weeks earlier?

A.    Okay.  Two weeks earlier, a couple weeks earlier.

Q.    Okay.  You weren't hired on the same day as your deposition?

A.    No.

Q.    That would just be cruel, right?

A.    Yeah.

Q.    Not even Mr. Hoff would do that.

Okay, so let's look at page 228 of your transcript. Look at line 4, and going down from there, you testify:

"You know, we the" --

MS. MURPHY:  Just a second.  Please not



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1636 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                           233

R. Kost - Confidential

there.

MR. KUSNETZ:  I'm so sorry.

THE WITNESS:  Yes.

BY MR. KUSNETZ:

Q.    I'd like to give you time to get there.
That's important for the deposition.

Okay, so let's break this down a little bit.  You
give a very long answer here, so we're going to break it
into parts.

Line 4, you say, "There's a comment here that I'm
going to make, which is in the monetization procedures,
which is important and that is -- you know, we would
seek a refinancing, a financing or a sale.  You could
say it the other way around, a sale or a financing.  But
the point of -- and we talked about this -- we want to
not create a forced sale environment."

Do you see that?

A.    Yes.

Q.    Do you recall giving that testimony?

A.    Vaguely.

Q.    Okay.  Does that make sense to you, your
testimony?

(Pause.)



R. Kost - Confidential

BY MR. KUSNETZ:

Q.    We're going to keep going through this, but I'm just saying does that testimony I just read, sir, make sense to you?

A.    Just give me a minute to reread the ...

Q.    Sure.  I'm going to be focusing on pages 228 and 229, if that's helpful.  Do you want to read that first before I ask some questions?

A.    Yeah, that would be great.  Thanks.

MS. MURPHY:  You can read as much of it as you want.

BY MR. KUSNETZ:

Q.    Yeah, but those are the pages I'm going to ask you about.  Just...

(Pause.)

BY MR. KUSNETZ:

Q.    Let me know when you're finished.

(Pause.)

BY MR. KUSNETZ:

Q.    Just so I understand, are you reading beyond page 229?

A.    Yes.

Q.    Okay.  I am only going to ask you right now about pages 228 and 229.



R. Kost - Confidential

A.    I'm just -- I'm trying to understand the context.  This was seven years ago --

Q.    Yeah.

A.    -- and it was -- I think I'm still working -- I think I'm still retained by Ms. Tilton and the company.  Is this before we were -- am I the CMO now -- have I been rehired?

Q.    Listen, Mr. Kost.  I can't --

A.    I just --

Q.    I'm the one who has to ask the questions.  That's not really how this works.

But I will represent to you that my understanding is that Mr. Kirschner is still the CRO at this point in time, unless I'm corrected by opposing counsel here.

MR. BARTLEY:  No, that's correct.

MR. KUSNETZ:  Okay.

MR. BARTLEY:  This is before the settlement was --

MR. KUSNETZ:  Before the settlement.

BY MR. KUSNETZ:

Q.    With that knowledge, because I do have limited time --

A.    Uh-huh.  Okay.

Q.    -- I would like to just focus on these two



R. Kost - Confidential

pages, okay?

A.    Yes.

Q.    Okay, so let's go back to my question.

Do you recall testifying around the time that you were hired in 2018 that the goal was that you did not want to create a forced sale environment, "yes" or "no"?

MS. MURPHY:  Objection to form.

THE WITNESS:  I -- I don't recall that specifically, but that would make sense.

Early in the case, we would not have wanted to have a forced sale -- fire sale.

BY MR. KUSNETZ:

Q.    And so you're saying that at some point it changed and you did want to have a forced sale; is that correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Why do you say that?  I never said that.

BY MR. KUSNETZ:

Q.    Well, you gave me a caveat just now.  "At that point in time" is what you said.

A.    All right.  I meant no caveat.

Q.    Okay, so let's get a clear record, then.

Fair to say that your testimony is correct that you



R. Kost - Confidential

did not want to create a forced sale environment for the Zohar monetization process, correct?

A.    I don't recall this testimony.  I don't dispute this testimony.  We would not have wanted to create a forced or fire sale environment.

Q.    Right.  Are you equating "forced sale" and "fire sale"?

A.    Yes.

Q.    Okay.  Now, when you say "forced sale," you mean a sale by a certain date, for example, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  My definition would be a quicker sale, a shorter time frame.  Forced, fire sale, whatever the definition might be.

BY MR. KUSNETZ:

Q.    Right, and when you say "a shorter time frame," meaning like end date, correct?

A.    Accelerated, yes.

Q.    Okay.  Now, in terms of what some of your rationale is -- is you say here on lines 20 through 22:

"It also would send the market a message that these aren't necessarily forced sales," referring to the option of a refinancing.

Do you see that?



R. Kost - Confidential

A.    Yes.  This was very, very -- this was in the very, very beginning of the bankruptcy, and we did not want the market to think that we were going to engage in fire sales immediately.

Q.    And, in fact, at no point during the -- your engagement did you -- you -- want the buyers to think that there would be a fire sale, correct?

A.    That's true.  We would never want anyone to think it was a fire sale, but we might still have deadlines.

Q.    Right, right.  So it could be a fire sale without letting them know it's a fire sale, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  No.  We might have deadlines --

BY MR. KUSNETZ:

Q.    Right.

A.    -- that I would not tell them.

Q.    Right, exactly, meaning that you could essentially be having a fire sale without letting the buyers know that it was a fire sale, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Again, I wouldn't use the term "fire sale" per se.  I would say



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1642 of 2249

ROBERT KOST  Conf.                                             May 13, 2025
DUNN V. PATRIARCH PARTNERS                                              239

                    R. Kost - Confidential

          "deadlines."  I wouldn't tell them my

          deadlines.

                So then if that definition was a fire

          sale, I wouldn't want them to know that

          either.

BY MR. KUSNETZ:

     Q.   Right, so you were the one who used the

word -- the term "fire sale" when I used "forced sale,"

so it's not my words; it's your words, sir.

     So I'm just trying to get a clean record here,

just -- just a clean record.

     So you're saying it's important that --

                MR. KUSNETZ:  Withdrawn.

BY MR. KUSNETZ:

     Q.   So you're saying that -- that there could be

a situation where you could have a fire sale with

respect to this monetization process, but you would not

want to let the buyers know about it, correct?

                MS. MURPHY:  Objection to form.

                THE WITNESS:  I don't recall whether

          there was ever a desire to have any fire

          sales, but if there was going to be a fire

          sale with a short deadline, I wouldn't want

          anyone to know.



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1643 of 2249

ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                    240

R. Kost - Confidential

BY MR. KUSNETZ:

Q.    Right, and a short deadline would be a -- would be the -- one of the causal factors making it a fire sale, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Right.  We would have had to come to some conclusion that we needed a fire -- a quick, accelerated "fire sale."

BY MR. KUSNETZ:

Q.    Right, and as part of that would be a deadline to sell the company by, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes, again with the caveat that a deadline doesn't necessarily imply a fire sale.

BY MR. KUSNETZ:

Q.    Yeah, but that could be a factor in what results in a fire sale, correct?

A.    Yes.

Q.    Okay.

Now, understanding that, you want -- it's very important to send a message to the market that there is not a deadline to sell a company, correct?

MS. MURPHY:  Objection to form.



R. Kost - Confidential

THE WITNESS:  Correct.

BY MR. KUSNETZ:

Q.    And it's also important to have an alternative to put the -- to have an alternative such as like a refinancing to put an investment bank on notice that they have to clear a hurdle to get to a sale?

Do you see where you testify to that on lines 9 through 11?

A.    Yes, I -- I see that.  I -- I had forgotten all about this aspect of the case.  Years ago --

Q.    But you don't dispute it, right?

A.    No.

Q.    Right, and so what you're testifying is that if you give an investment bank a hurdle to get to a sale, it puts a little additional pressure on the investment bank that it's not just a -- you know, "Hey, we're going to sell it," meaning the company, "even if we get 50 bucks," right?

A.    I'm trying to recall from seven years ago.  I wouldn't say it was just investment banks.  I think the thinking was overall -- and I had forgotten how long ago this was.  We actually were thinking that there might be refinancing possibilities, and I -- I just -- I can't remember the context -- didn't last very long.

Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1645 of 2249

ROBERT KOST  Conf.                                      May 13, 2025
DUNN V. PATRIARCH PARTNERS                                       242

R. Kost - Confidential

But that was -- part of our thinking was we'll make a decision as to whether we're going to do a sale process or a refinancing or accommodations.

Q.    Understand.  And what you're saying here, though, is relying on your 30 years of expertise, that if you give an investment bank a hurdle, it puts a little additional pressure on the investment bank that it's not just we're going to sell this company if we get 50 bucks, right?

A.    Yeah, I -- I don't mean to be argumentative, but I don't see any reference to investment banks here.

Q.    Really?  All right.  Let's -- let's look at 229, line 12.  Do you see that?

A.    Okay.  I hadn't read that.

Q.    You read so much and you didn't see that?

A.    I went backwards.  I was trying to figure out where this comes from.

Q.    I'm not trying to trick you here.  I'm just using your language.

A.    You should have just pointed out that I said that.  I didn't hear you say that.

Q.    Oh, sorry.  I -- I thought it was clear because I was reading from it, but I will --

A.    No.  I literally thought you were just saying



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1646 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                             243

R. Kost - Confidential

it.

Q.    Oh, yeah?  Just saying like 50 bucks?  No, you said that.

A.    Now I know that.  I had no idea you were reading my own transcript.

Q.    So let's get back to it.  Because I'm not trying to trick you.  I'm just going by what you said, okay?

So let me ask the question, okay?  Are you -- are you ready for me to ask the question?

A.    Let me read 229.  I haven't read 229 yet.

Q.    What did you read?

A.    I told you, I went backwards.

Q.    All right.  I did say I'm reading 228 and 229.  I do have limited time, Mr. Kost.  Do you mind if I just read from here?

A.    Please.

Q.    Okay.

"In your deposition, you are relying on your 30 years of expertise in this field to testify that when you -- when there is a hurdle to get a sale, it puts a little pressure" -- sorry -- "additional pressure on the investment bank that is not just 'We're going to sell this company even if we get 50 bucks,'" correct?



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1647 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                            244

R. Kost - Confidential

A.    Yes.

Q.    Right?  Meaning the investment bank should know we're not just going to accept any price, correct?

A.    Yes.

Q.    Right?  There are hurdles sometimes that are necessary for an investment bank to overcome in order for the sale of a company to make sense, right?

A.    I -- I think the context of my deposition testimony in 2020 was that we were going tell the market -- tell the investment banks, tell everybody -- that we don't have to settle company.

Q.    Right.

A.    Regardless of fire sale or not, one year, two year, five years, that we might just refinance and do something different.

Q.    Right, because if you had an alternative to selling the company, it wouldn't be a fire sale, right?

A.    If the deadlines were very short, then it would be a fire sale.

Q.    Right, but what -- what I'm trying to say is: If you don't have to sell --

A.    Right.

Q.    -- because you can refinance, it's not actually a fire sale, correct?



R. Kost - Confidential

A.    I think we're saying the same thing.

Q.    I hope so.

A.    Yeah.

Q.    But do you agree with what I said as a general matter, sir?

A.    I would leave out "fire sale."  Forget all that.  All I'm saying is if you have an option of refinancing --

Q.    Yes.

A.    -- you just don't have to sell the company whether it's short or long.  If you don't like the price, you can refinance.

Q.    Okay.

A.    You're adding the additional element of fire sale.

Q.    I'm trying to just make a simple point that if you don't actually have to sell the company, then you're not engaging in a fire sale, correct?

A.    Or just a sale.

Q.    Right.

A.    Doesn't have to be a fire sale.  It doesn't say "fire sale" here.

Q.    I'm not telling you it says "fire sale" here. What it says earlier is "a forced sale process,"



R. Kost - Confidential

which you equated to a fire sale, correct?

A.    Agreed.  Different.  A forced sale could be a fire sale.

Q.    Right.

A.    The point is a sale.  You don't have to sell.

Q.    Right.

A.    That's it.

Q.    And the context -- this whole discussion started about avoiding the perception of a forced sale environment, right?

A.    Yes.

Q.    Okay.  That's what I'm getting at, okay?

A.    Yes.

Q.    All of this is linked that I'm reading to you from your prior testimony to avoiding the forced sale environment, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes.

BY MR. KUSNETZ:

Q.    Yes.  Okay, so my point is:

There are hurdles for investment bankers to overcome to make a sale make sense, correct?

MS. MURPHY:  Objection to form.



R. Kost - Confidential

BY MR. KUSNETZ:

Q.    As a general matter?

MS. MURPHY:  Objection to form.

THE WITNESS:  We -- if my recollection is correct, what we were trying do is tell the banks and everybody that we didn't have to sell the asset.

BY MR. KUSNETZ:

Q.    I -- okay.  Sir, I've been very conciliatory during this deposition.

A.    Uh-huh.

Q.    And I've been trying hard not to be impatient, but I am asking a specific question, and that answer is not responsive to my question.

A.    Okay.

Q.    And so I'm just asking a general question. I'm not asking at all, frankly, right now in this question about what happened or what you were doing. Okay?  So please just listen to the question that I'm asking --

A.    Okay.

Q.    -- and this will go a little more smoothly.

MS. MURPHY:  Objection to the colloquy.



R. Kost - Confidential

BY MR. KUSNETZ:

Q.   My question is:  Is that -- I'll go back to it.

"Giving hurdles to investment bankers to surmount puts additional pressure on an investment banker to get the best price," right?

MS. MURPHY:  Objection to form.

THE WITNESS:  I'm sorry.  I don't mean to be argumentative.  What do you mean by "hurdles"?

BY MR. KUSNETZ:

Q.   You used the word "hurdle" -- "a hurdle."  Do you see that?  That's on line 11.

(Pause.)

THE WITNESS:  Yeah, I don't remember what I said seven years ago, what I meant by "hurdle."

BY MR. KUSNETZ:

Q.   Okay.  Well, based on your expertise, sir, over 30 years of expertise -- that's what I'm drawing on here, okay, with respect to terms like this, okay?

A hurdle could include you have to sell a company for a certain price or else a refinancing would make more financial sense.



R. Kost - Confidential

That could be a hurdle, right?

A.     That's correct.

Q.     A hurdle could be you have to sell a company for a certain amount to clear the debt for a sale to make sense, correct?

A.     Correct.

Q.     A hurdle could be you have to sell the company at a value that is a reserve value established by the company, correct?

A.     Correct.

Q.     All those are hurdles?

A.     I agree.

Q.     And all of those are hurdles that would incentivize an investment bank to go out and get the best price?

A.     That's correct.

Q.     Right?  Because they want to surmount those hurdles?

A.     That's correct.

Q.     Because if they surmount those hurdles, they get paid?

A.     That's correct.

Q.     Right, because they're paid based on percentages of the sales, correct?



R. Kost - Confidential

A.    Yes.

Q.    Okay.  That's all I was getting at.

MR. KUSNETZ:  All right.  Let's take a --
this is a good time to take a break.

THE VIDEOGRAPHER:  We are going off
record.  The time is 5:37, and this concludes
Media Unit No. 7.

(Recess taken at 5:37 p.m.)

(Resumed at 6:09 p.m.)

THE VIDEOGRAPHER:  We are back on record.
The time is 6:09, and this is the start of
Media Unit No. 8

BY MR. KUSNETZ:

Q.    Okay. Good evening, Mr. Kost.

A.    Good evening.

Q.    So ... let's talk valuations.  How does that
sound?

A.    Great.

Q.    All right.

In terms of your work as the chief monetization
office, it was important that you had an idea of what
these portfolio companies were worth, correct?

A.    A ballpark valuation, yeah.

Q.    Right, and there's various valuation



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1654 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                          251

R. Kost - Confidential

methodologies, correct?

A.   Yes.

Q.   There's the methodology of comparing public companies if you're marketing a private company, correct?

A.   Yes.

Q.   There's the valuation of comparing sales and M&A transactions of comparable companies, correct?

A.   Yes.

Q.   And there's also the methodology of using EBITDA multiples, correct?

A.   Yes.

Q.   And when I say "EBITDA multiple," you understand you're looking at the EBITDA of a company and then multiplying it by a certain number or range of numbers, correct?

A.   Yes.

Q.   And the investment bankers are adept at coming up with those EBITDA multiples, right?

A.   Yes.

Q.   And you would expect that the investment bankers for the portfolio companies would be the ones who would come up with the EBITDA multiples, right?

A.   Yes.  The investment banks in the original



R. Kost - Confidential

pitch would often put those materials together and give you sometimes the multiples, but usually the multiples and their estimated valuation.

Q.    I see.  Okay.  That came from them, not from you?

A.    That's correct.

Q.    That came from them, not from Lynn?

A.    That came from the investment banks, and sometimes they would update it and sometimes they wouldn't during the process.

Q.    Understood.

Are you familiar with a global refinancing plan in or around early 2019?

MS. MURPHY:  Mr. Kost, I'm going to instruct you not to answer.

Are you trying to get into the mediation?

MR. KUSNETZ:  No.

MS. MURPHY:  What other global refinancing?

MR. KUSNETZ:  The Jefferies one that preceded the mediation.

MS. MURPHY:  I believe that we have a disagreement about when the mediation started and it's our position that the global



R. Kost - Confidential

refinancing in early 2019 is the mediation.

MR. KUSNETZ:  Okay.  I'm going to show Mr. Kost a Jefferies illustrative equity analysis from February of 2019.

Is it your position that me showing him a list of values is prohibited under mediation privilege?

MS. MURPHY:  I don't know what document you're referring to.

MR. KUSNETZ:  I'll show you.

MS. MURPHY:  Yeah, it would be helpful to see the document.

MR. KUSNETZ:  I'll show you first before I show the witness.  Is that fair?

MS. MURPHY:  I think that's helpful.

MR. KUSNETZ:  All right.  That's Tab 8, Joe.  It's just a single, stand-alone document without a dormant.  I didn't --

MS. MURPHY:  Okay.

MR. KUSNETZ:  -- excise it from anything. It's just a stand-alone document from the Jefferies productions.

(Pause.)

MR. KUSNETZ:  This is how it was produced



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1657 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                          254

R. Kost - Confidential to us.

MR. BARTLEY:  I think we would stand on our objection.

MS. MURPHY:  Yeah.

MR. KUSNETZ:  To not show him this?

MS. MURPHY:  Yes.

MR. KUSNETZ:  What is the rationale for not showing him this, just so I understand for the record?

MR. BARTLEY:  Well, you can show it to him, but if you're going to expect to ask him questions, you'll be inducing testimony regarding mediation efforts that we believe are precluded under the local rules and the Court's prior rulings.

MR. KUSNETZ:  Are you saying that he would not have been privy to this?  Is that why?

MR. BARTLEY:  I'm saying under the rules you're not allowed to ask questions about what transpired during the mediation.

MR. KUSNETZ:  And if this document preceded the mediation, you still have that position with respect to this document?



R. Kost - Confidential

MR. BARTLEY:  Our position is it didn't precede the mediation, that it was during the mediation period over this transaction.

MS. MURPHY:  Yes.

MR. KUSNETZ:  Okay, so we respectfully disagree, and I guess we'll have to seek Court intervention for that if we're not able to work it out.

I will also reserve the right to keep Mr. Kost's deposition open and to depose Mr. Kost again to go over any documents that I was precluded from showing him should we resolve this and I'm allowed to show him this document either through Court intervention or through a future meet-and-confer process.

MS. MURPHY:  We appreciate the disagreement.  We also reserve rights.  We can't prevent you from reserving yours.  We appreciate it.

MR. KUSNETZ:  Okay.  So how about this: Why don't you hold on to that for a second because I want you to make sure that you're comfortable with it.

I'm going to ask him if he's ever seen



R. Kost - Confidential

this with a "yes" or "no" question.  Is that violating -- is that -- is that fair to say?

MR. BARTLEY:  I'm okay with the question.

MR. KUSNETZ:  Without showing him the document?

MR. BARTLEY:  Well, I don't know how you're going to ask --

MR. KUSNETZ:  That's what I mean.

(Thereupon, an informal discussion was held off the record with the shorthand reporter.)

MR. KUSNETZ:  Okay, so I'm going to show him that.  All right?

BY MR. KUSNETZ:

Q.    Mr. Kost, this is going to be a little sensitive, so I'm going to ask questions.  They may object.  They're your counsel.  You should listen to them.  Okay?

A.    Understood.

Q.    Okay.

MR. KUSNETZ:  I'm going to mark as Kost Exhibit 4 --

MR. BARTLEY:  Well ...

MR. KUSNETZ:  I'm marking it.  Whether



Case 1:16-cv-04488-VM-KHP  Document 419  Filed 03/27/26  Page 1660 of 2249

ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                      257

R. Kost - Confidential

it's admissible is another story.  So much anticipation for this.

(Thereupon, a document was marked by the shorthand reporter as Exhibit 4 for identification.)

MR. KUSNETZ:  For the record, this document is Bates numbered Jefferies_Subpoena_0000175.

BY MR. KUSNETZ:

Q.    Do you see this document in front of you? "Yes" or "no"?

A.    Yes.

Q.    Okay.  Have you ever seen this document before?

A.    No, I don't believe so.

Q.    Okay.  Aside from this particular single page, have you ever seen the information on this page before?  "Yes" or "no"?

MS. MURPHY:  Instruct the witness not to answer with any information received during the mediation.

THE WITNESS:  So again, to be clear on your question, I'm not sure exactly what you mean by "information on this page."



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1661 of 2249

ROBERT KOST  Conf.                                           May 13, 2025
DUNN V. PATRIARCH PARTNERS                                              258

R. Kost - Confidential

I -- I will state that I really had no role during what is referred to as the -- that mediation, including the Jefferies refinancing or financing.

I mean, I'm vaguely -- I -- I was aware that it was happening, but I was not involved and did not take part and did not see their materials.

BY MR. KUSNETZ:

Q.    Understood.

So you're saying you did not see the Jefferies materials, correct?

A.    I don't recall seeing the Jefferies materials.

Q.    Okay, and you do or do not recall seeing the data on this page in a different document or setting?

A.    I possibly saw a piece or two of a Jefferies presentation that -- and my recollection is it may or may not have had to do with one of the portfolio companies, but I didn't --

I don't recall ever seeing an aggregate Jefferies view of the value of the debtors' portfolio companies.

Q.    Okay.  We'll move on.  Thank you for making that clear.



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1662 of 2249

ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                    259

                    R. Kost - Confidential

                    MR. KUSNETZ:  Again, we reserve all
          rights, but hopefully that was okay, what we
          just did.

                    MR. BARTLEY:  That's okay.

                    MS. MURPHY:  That's fine.

BY MR. KUSNETZ:

     Q.    In addition -- sorry.  Let's move on from
this.

     Did you also review valuations prepared by FTI
Consulting during the course of your period as the CMO
that looked to calculate waterfalls from a hypothetical
perspective?

     A.    I don't recall when we first started to
prepare waterfalls, and when I say "we," I mean FTI.

     Q.    Uh-huh.

     A.    FTI started to prepare -- prepare waterfalls
later in the case.  I don't remember or recall what the
first waterfall would have been.  At some point, I did
start to see drafts of waterfalls.

     Q.    Okay, and did you see drafts of waterfalls
before and after Ms. Tilton resigned from her role as
the sole director of portfolio companies?

     A.    My recollection would be substantially after
she resigned in 2020.



R. Kost - Confidential

And I use the words "drafts" because there were all drafts.  There were always draft valuations that kept being revised.

Q.    Right, it wasn't like a final valuation --

A.    No, I don't think there was --

Q.    -- to your knowledge?

A.    -- ever a final.

Q.    Okay, and why would you say your recollection is that substantially after she resigned that you would be receiving these draft waterfall analyses from FTI?

A.    We just never built a waterfall recovery model until much later in the case.  It just wasn't something that was something that we did.  We just did not do that early in the case.

Q.    When you say "we," are you saying you were involved in the preparation of these draft waterfall recovery models?

A.    Thank you for clarifying that.  I use the "we" as the debtors' advisors.

Q.    Yeah.

A.    FTI was responsible for building the waterfall recoveries.

Q.    The royal "we"?  Is that fair to say, you were using?



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1664 of 2249

ROBERT KOST  Conf.                                            May 13, 2025
DUNN V. PATRIARCH PARTNERS                                            261

R. Kost - Confidential

A.    That was a version of a royal "we."

Q.    Okay.  I always try to get one Big Lebowski reference into the deposition.

In any event, why wasn't it necessary to -- for FTI to compile these waterfall analyses while Ms. Tilton was the sole director of the portfolio companies?

A.    I don't think it had anything to do with Ms. Tilton before or after.  It -- I think my recollection would be that we needed to have a basis for how to calculate the waterfalls.

What were the debts at each of the portfolio companies?  What was the creditor ownership or Ms. Tilton's ownership or -- there were so many pieces to a waterfall that I just don't think it was something we focused on until later on in the case when we had more information.

Q.    And what more information was that?

A.    Just the entire waterfall analysis that started at the top with theoretical or hypothetical values for each of the portfolio companies, what the debts and the obligations were at the portfolio company, how the debt and preference shares and equity rolled down into the Zohars.  It was, as you know, very complicated.



R. Kost - Confidential

Q.    Yeah.  So why, though, was it not necessary for FTI to compile waterfall analyses during the first monetization process?

So the period after the settlement but before the timeline dispute?

MS. MURPHY:  Objection to form.

THE WITNESS:  I guess I would reiterate my answer, which is first of all, we were focused on other things.  We were focused on hiring investment bankers, getting sale processes started.  There was still significant litigation.  FTI was understanding each of the portfolio companies and how they could be helpful.

I -- you'd have to ask FTI why we didn't start the waterfall earlier.  I don't recall.

BY MR. KUSNETZ:

Q.    It wasn't a decision by you --

A.    No.

Q.    -- about when to start these things?

A.    No.  The waterfall analysis wasn't something that was necessarily relevant for the sale process.

Q.    Understood, and I'm just going to ask one more question and then we'll take a quick break for



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1666 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                          263

R. Kost - Confidential

dinner.

If you had succeeded -- the royal "you" -- you and Ms. Tilton and the investment banks had succeeded in selling a number of portfolio companies during that initial monetization process, it wasn't important to the debtors' representatives to understand how the waterfall would work?

MS. MURPHY:  Objection to form.

THE WITNESS:  I would agree that it would have become much more relevant if we had significant proceeds to determine the relevant waterfall.

BY MR. KUSNETZ:

Q.    Okay, but you're not testifying here that you didn't even think a sale was likely, so as a result, you didn't want -- you didn't feel the need to create a waterfall; is that correct?

A.    That's correct.  No, I'm not saying that.

Q.    Okay.  You're just saying you had other priorities at the time?

A.    Yes.  And you'd have to ask FTI why we didn't build a waterfall earlier.  I don't recall.

Q.    Okay.  That's helpful.

MR. KUSNETZ:  Let's take a break for



R. Kost - Confidential

dinner.

THE VIDEOGRAPHER:  Okay.  We are going off record.  The time is 6:24, and this concludes Media Unit No. 8.

(Recess taken at 6:24 p.m.)

(Resumed at 7:11 p.m.)

THE VIDEOGRAPHER:  We are back on record. The time is 7:11, and this is the start of Media Unit No. 9.

BY MR. KUSNETZ:

Q.    Okay.  I hope you enjoyed your dinner, Mr. Kost?

A.    Yes.  Thank you.

Q.    Better than the usual fare?

A.    Quite good.

Q.    Okay.  Well, we're happy to take care of you, sir.

Let's talk a little bit about some of the early portfolio company sales.  Sound good?

A.    Okay.

Q.    Do you recall the sale of a portfolio company called Denali?

A.    Yes.

Q.    All right, and do you recall when that



R. Kost - Confidential

occurred, broadly?

A.    That would have been -- it could have been in 2018.

Q.    Fair to call it a success story?

A.    Yes.

Q.    With respect to the sale process?

A.    Yes.

Q.    An early win, correct?

A.    Yes.

Q.    And it wasn't smooth, though, right?  To the best of your recollection?  "Yes" or "no"?

MS. MURPHY:  Objection to form.

THE WITNESS:  Life is relative.  It was one of the smoother ones for Zohar.

BY MR. KUSNETZ:

Q.    You know what?  Fair.  Fair.

Okay, but let me ask it a different way.

Do you recall that -- do you recall that there was an initial sales process by Denali that did not result in bids?

A.    I don't recall that.  Was that conducted --

I can't ask you questions.

Q.    You cannot ask me questions.

A.    I --



R. Kost - Confidential

Q.    Continue.

A.    Why don't you ask your question again?

Q.    Sure.  Let me ask it this way:

The first sale process that was run for Denali was not successful, correct?

A.    My recollection is if --

If we're talking about the same thing, there was a sale process where I was not involved, and the interested party ended up being our ultimate buyer during our -- our process.

Is that what you're getting at?

Q.    No.

A.    Okay.

Q.    But that's fair.  The --

Do you recall that there were two CIMs prepared for Denali?

A.    I don't recall that.

Q.    Okay.  That's fine.  This was one of the first companies.  I get it.

Do you recall that after testifying in your 2020 deposition that "After disappointing results from the first process, the decision was made to prepare quality earnings report and to rework the CIM"?

A.    That's quite possible.  I just don't recall



R. Kost - Confidential

redoing the Denali sale.

Q.    Okay.  Let's look at Exhibit 1.  This is page 101.

MR. BARTLEY:  Transcript page 101?

MR. KUSNETZ:  Yep.  Of the document, it's page 26.  26 on the bottom right-hand corner.

THE WITNESS:  Okay.

BY MR. KUSNETZ:

Q.    Okay.  Sir, do you see where you testified with respect to the Denali sale process that "After the disappointing results from the first process, the decision was made to prepare a quality of earnings report and to rework the CIM"?

That's lines 8 through 11.

A.    Yes, I see that.

Q.    Okay.  Does that refresh your recollection of what actually happened?

A.    No.

Q.    Do you have any reason to believe that's not what happened?

A.    No.

Q.    So you have no reason to believe your testimony is not accurate, correct?

A.    That's correct.



R. Kost - Confidential

Q.     Okay, and this testimony was from 2020, correct?

A.     Yes.

Q.     So this would have just been under two years after the sales process was launched, correct?

A.     Yes.

Q.     Okay, so you would have been a little more fresh then than you are now?

A.     Yes.

Q.     Okay.  You also testified that it was a learning opportunity in the sense that after Denali's first sales process, which didn't work out, the decision was made to prepare a quality of earnings report for all of the portfolio companies that were going to be sold under the monetization process.

Does that sound familiar to you?

MS. MURPHY:  Sorry.  Is that here?

MR. KUSNETZ:  That is in his transcript.

BY MR. KUSNETZ:

Q.     Does that sound familiar to you?

A.     Yes.  I -- I do recall now that -- and it does make sense that when we did the quality of earnings report, I didn't recall that it was Denali, but that the learning we took away from that was we should prepare

Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1672 of 2249

ROBERT KOST  Conf.                                           May 13, 2025
DUNN V. PATRIARCH PARTNERS                                          269

R. Kost - Confidential

quality of earnings reports for other portfolio companies.

I'm not sure I agree -- that I would remember it was for every portfolio company, but yes.

Q.   Let me -- let me direct you to page 102, lines 17 through 19, where you say, "I think we collectively agreed it would be best to prepare one for every company."

A.   Okay.

Q.   So does that refresh your recollection that it was decided that collectively, we'll prepare quality of earnings reports for all the portfolio companies that get put up for sale during the monetization process?

A.   Yes.  I mean, I'm stating here that it would be best to prepare one for every company.  I don't know if we did.

Q.   Do you recall any portfolio companies being marketed during the sale process besides the initial Denali sales process that a quality of earnings report was not prepared for a portfolio company?

A.   I don't recall.  I know we did prepare a number.  I just don't remember how many.

Q.   And to your expect -- to your understanding, it was for all of them, correct?



R. Kost - Confidential

A.    It could have been.  I don't recall.

Q.    Okay, but it would have surprised you if there was a portfolio company sales process that did not include a quality of earnings report, correct?

A.    I don't -- I guess I wouldn't use the word "surprise."  I don't know.

Q.    Okay.  That's fine.

But you don't contest that a quality of earnings report could have been prepared for all of the portfolio companies?

A.    No, that's true.

Q.    Okay.  I knew we were going to get there.

And quality of earnings reports are helpful to getting initial bidders, correct?

A.    Yes.

Q.    And they are helpful to maximizing the value of a portfolio company, correct?

A.    Yes, they can be very helpful.

Q.    And the decision was made to prepare these quality of earnings reports by you and Ms. Tilton, correct?

A.    I don't recall who specifically made the decision.  In regular way M&A, the investment banks would often recommend that a company prepare a quality



R. Kost - Confidential

of earnings report to give to potential buyers.

Also, many buyers would conduct their own quality of earnings report once they were invited to Phase II. Our decision was that we could get the processes to move a little more quickly by doing the legwork in advance for the potential buyers.

Q.    And when you say "our decision," that is you, the investment bankers, and Ms. Tilton, correct?

A.    I think we would be all -- yeah, we'd all be on the same page there.

Q.    Right.  If Ms. Tilton said, "No, don't do a quality of earnings report for every portfolio company," that would be something that would stand out in your mind, correct?

A.    Yes.  I just don't recall her saying that or not saying that.

Q.    Right, but you don't recall her saying that, right?

A.    No.

Q.    Okay, so --

And do you recall that Ms. Tilton was involved in the preparation of a second CIM by Denali?

A.    I don't recall specifically, but it wouldn't surprise me that she was involved.

Case 1:16-cv-04488-VM-KHP Document 419 Filed 03/27/26 Page 1675 of 2249

ROBERT KOST Conf. May 13, 2025
DUNN V. PATRIARCH PARTNERS 272

R. Kost - Confidential

Q. Okay. Do you recall that Ms. Tilton was "unhappy" with the first CIM?

A. That actually rings a bell.

Q. Yeah? Why does that ring a bell?

A. I just now -- I recollect that -- I recollect some -- Lynn saying something like that.

Q. And do you recall that Ms. Tilton didn't like the first CIM and wanted to rewrite it?

A. That -- that would be my general recollection.

Q. Okay, and the second CIM did result in additional bidders, correct?

A. Yes.

Q. And ultimately, as part of this second sales process with the revised CIM, Denali was sold, correct?

A. Yes.

Q. Do you recall what Denali was sold for?

A. It was sold to National Oilwell Varco. I don't remember the actual price, but it was in excess of a hundred million.

Q. Okay. Do you recall that Denali was sold for 125 million?

A. That sounds about right.

Q. Okay, and do you recall internal valuations



R. Kost - Confidential

of Denali being equivalent to 125 million?

MS. MURPHY:  Objection to form.

THE WITNESS:  I don't recall.

BY MR. KUSNETZ:

Q.   Do you recall internal valuations of Denali to be in the same ballpark as what Denali was eventually sold for?

MS. MURPHY:  Objection to form.

THE WITNESS:  I just don't recall.

BY MR. KUSNETZ:

Q.   Do you recall that the sale of -- the sale price for Denali was in accordance with valuation expectations at the beginning of the sales process?

MS. MURPHY:  Objection to form.

THE WITNESS:  I just don't recall.

BY MR. KUSNETZ:

Q.   Why was it a success story?

A.   It was a success because we were able to sell it for a price that I would recall as being in the ballpark.  It actually went relatively smoothly, all things being equal.

I had completely forgotten that it was two processes, but relative to some of the other sale processes, it was a success, and it was sold to a very



R. Kost - Confidential

strong buyer for cash in a reasonable amount of time.

Q.    Okay, and when you say "in a reasonable amount of time," meaning that there was sufficient time with respect to the sales process for Denali to retool the sales process by drafting a quality of earnings report and rewriting the CIM, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  That's my recollection.

BY MR. KUSNETZ:

Q.    Right, so by giving Denali the time to get a quality of earnings report prepared and a rewritten CIM, that went a long way towards helping Denali attract the successful bid that it eventually did, correct?

A.    Those were helpful facts, yes.

Q.    Right, so the flexibility that you were able to afford Denali in -- in retooling the bid was instrumental to achieving a valuation for Denali that comported with your -- with expectations of what the company was worth?

A.    You said "retooling the bid."  I think you meant retooling the CIM?

Q.    Yes.

A.    Yes, I -- I -- again, I still barely recall rewriting the CIM, but the second CIM and process ended



R. Kost - Confidential

up in a -- in a sale.

Q.    Let me ask it, just so we have a clear record -- and thank you for catching me.  The dinner definitely made you sharper, which I was hoping was going to put you to sleep.

So the flexibility that the sales process was able to afford Denali to give the investment bankers, you, and Lynn time to retool the CIM and to have a quality of earnings report prepared was instrumental to helping Denali attract the successful bid that it eventually did, correct?

A.    They were helpful in getting to a sale to NOV, yes.

Q.    Right, so affording Denali that flexibility to retool was helpful to getting to an eventual sale, correct?

A.    And by "retool," you just mean rewriting the CIM?

Q.    And a quality of earnings report.

A.    And -- yes.  I mean, I don't know what "retooling" means, but yes.

Q.    Okay.  Well, reworking the sales process?  Is that --

A.    Yeah.  We rewrote the CIM --



R. Kost - Confidential

Q.    Right.

A.    -- and prepared a quality of earnings report.

Q.    Right.

A.    Those were helpful.

Q.    So you were able -- you had time to take a second swing at it, right?

A.    Yes.

Q.    And that second swing was successful, correct?

A.    Yes.

Q.    Okay.  Had you not had time to take a second swing, it would have remained a disappointing result, correct?

A.    Yes.

Q.    Do you recall another company being sold in 2019 called Oasis?

A.    Yes.

Q.    And do you recall Raymond James was the banker for Oasis?

A.    Yes.

Q.    And Oasis was also a success story, correct?

A.    Yes.

Q.    And why is that?

A.    Again, it was sold to Culligan in a



R. Kost - Confidential

relatively normal process in a relatively normal time frame.

And again, I say that relative to some of the other sale processes.  Yes, it was a success.

Q.    Okay, and do you recall the sale price of Oasis being $76 million?

A.    That sounds about right.

Q.    And do you recall the sale price of $76 million to be in the ballpark of what the company was internally valued?

MS. MURPHY:  Objection to form.

THE WITNESS:  I don't recall specifically, but in the ballpark makes sense -- makes sense.

BY MR. KUSNETZ:

Q.    Okay.  Meaning the valuation that you -- that the sales process was able to achieve for Oasis comported with the valuation expectations that you, the bankers, and Ms. Tilton had, correct?

A.    Today, I don't recall what those expectations were, but I recall that they seemed in the ballpark.

Q.    Right, and that was a good result?

A.    I remember it as a good result.

Q.    Okay.



R. Kost - Confidential

(Pause.)

BY MR. KUSNETZ:

Q.    Now, with respect to Oasis ...

Do you recall that it was -- the original potential buyer who had issued a letter of intent was this company called Gemspring?

A.    Yes, that rings a bell.

Q.    And do you recall that Gemspring retraded and lowered its bid?

A.    Yes, that's my recollection.

Q.    Okay, and do you recall that --

Do you recall that Mr. Katzenstein did not necessarily want to go back and seek additional bids?

A.    No, I don't recall that.

Q.    Okay.  Do you recall that Ms. Tilton wrote an email to Mr. Katzenstein, which was described in your deposition in March of 2019, telling him "Do you really not want to go back to others who had higher bids before we went exclusive?"

A.    I don't recall that.

Q.    Okay.  Let's look at page 67 of Exhibit 1.

(Pause.)

BY MR. KUSNETZ:

Q.    All right, and if you go down -- are you at



R. Kost - Confidential

67?

A.    Yes.

Q.    Great, and if you go down to page -- sorry -- to line 13, do you see there's an exhibit which is an email between Ms. Tilton and Mr. Katzenstein in March of 2019 that's introduced?

A.    Okay.

Q.    And do you see that the transcript quotes what I just said, which Ms. Tilton writes to Katzenstein, "Do you really not want to go back to others who had higher bids before we went exclusive?"

A.    Yes, I see that line.

Q.    Okay, and do you see Ms. Tilton noted, as per this transcript, that "Gemspring had been traded twice"?

(Pause.)

BY MR. KUSNETZ:

Q.    Do you see that?

A.    Yes, I see that.

Q.    And does that comport with your recollection?

A.    Yes.

Q.    And Ms. Tilton writes in that email, as quoted here in your transcript, "I think you're rewarding horrific behavior and who knows where they will end up"?



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1683 of 2249

ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                      280

R. Kost - Confidential

Do you see that?

A.      Yes, I see that.

Q.      The horrific behavior she's referring to is retrading, correct?

A.      Yes.

Q.      I mean, that's a no-no in the world of investment banking, correct?

A.      That's correct.

Q.      Right.  It's kind of like bad faith, right?

A.      Agreed.

Q.      And when she's saying, "I think you're rewarding," she's implying that it looks like Mr. Katzenstein is interested in accepting the retraded bid, correct?

            MS. MURPHY:  Objection to form.

            THE WITNESS:  I think that's what that's implying.

BY MR. KUSNETZ:

Q.      Okay.  And you testified that what you recall back in 2020 was that you -- "We," meaning the debtors, "wanted to proceed with Gemspring to continue to negotiate with them to try to get to a point where they would be in a position to sign the purchase agreement"?

Do you recall that testimony?



R. Kost - Confidential

A.    I don't.

Q.    If you look at page 68, lines 16 through 20, you say, "What I do recall is we want to proceed with Gemspring to continue to negotiate with them to try to get to the point where we would be in a position" --

(Thereupon, an informal discussion was held off the record with the shorthand reporter.)

BY MR. KUSNETZ:

Q.    "What I do recall is we want to proceed with Gemspring to continue to negotiate with them to try to get to the point where we would be in a position to sign the purchase agreement.

"Question:  Even though they had retraded twice?

"Answer:  Yes.

"Even though they had reduced their bid by over 20 million?

"Answer:  Yes.

"Question:  You wanted to continue negotiating with them?

"Answer:  Yes."

Do you see that?

A.    Yes.

Q.    Okay, so does that comport with your



R. Kost - Confidential

recollection?

A.    I don't specifically recall that, but that makes sense to me.

Q.    Okay.  You don't dispute that testimony --

A.    No.

Q.    -- from 2020?

A.    No.

Q.    Okay.  So according to your testimony in 2020, even though Gemspring had retraded twice and reduced their bid by over $20 million and was -- the debtors were still interested in negotiating with them, correct?

A.    Yes.

(Pause.)

BY MR. KUSNETZ:

Q.    And you recall having discussions with Raymond James and coming to the conclusion with Raymond James that you should take the Gemspring offer?

Do you recall that?

A.    Not specifically.

Q.    If you look at the bottom of page 70, line 23, continuing to line 4 of page 71:

"Yes, I specifically remember having this discussion with Raymond James as to whether or not we



R. Kost - Confidential

should take the Gemspring offer, and we both came to the

conclusion that we should take the Gemspring offer."

        Do you see that?

        A.    Yes.

        Q.    Okay, so even though Gemspring had retraded

twice, reduced their offer by 20 million, you and

Raymond James eventually came to the conclusion that you

should still take their -- their latest offer, correct?

        A.    Yes.  I -- I just don't recall where we were

in the process.  Was this a nonbinding indication of

interest or a purchase agreement?  I -- I just don't

recall.

        Q.    That's fine, but you don't contest that you

were going to take whatever that offer was, correct?

        A.    Correct.

        Q.    Okay.  And in your experience, you testified

here that "When you have a bidder who has reduced their

bid, it makes sense to go back to prior bidders to see

if you can get a competing bid," right?

        A.    Yes.

        Q.    And ultimately, a prior bidder for Oasis did

get reinvolved in the process, correct?

        A.    I believe so.

        Q.    And that prior bidder was Culligan, correct?



R. Kost - Confidential

C-U-L-L-I-G-A-N?

A.    Yes, that makes sense.

Q.    And Culligan eventually bought the company for a significantly higher value than what Gemspring had been offering, correct?

A.    Sounds right.

Q.    Okay, and so this was -- so -- sorry.  Just let me ...

(Pause.)

BY MR. KUSNETZ:

Q.    So with respect to Oasis, it's fair to say that the initial bid that was almost --

MR. KUSNETZ:  Sorry.  Withdrawn.

BY MR. KUSNETZ:

Q.    It's fair to say that Oasis had an initial bidder who had retraded twice and the debtors and Raymond James were prepared to accept that bid, and Ms. Tilton objected and wanted to go back to other bidders, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  That's possible.  I just don't recall.

BY MR. KUSNETZ:

Q.    Does that comport with your testimony in



R. Kost - Confidential

2020?

A.    I -- I just don't recall the sequencing.

Q.    Well, if you recall back from when I discussed that email on page 67 --

A.    Uh-huh.

Q.    -- right, where Ms. Tilton is calling this -- was -- was saying that she thought Mr. Katzenstein was rewarding Gemspring's horrific behavior, right?

A.    Right.  And are you saying that's bad?

Q.    Sounds bad to me.  Is that bad?

A.    It's bad, but it doesn't mean that -- you could still pursue a transaction with them.

Q.    Yeah.  No, I'm not saying that.

This is my question.

A.    Uh-huh.

Q.    Okay?  Just -- we did a whole long line of questioning about Oasis.  Now I'm trying to just make it a little bit more compact and then move on, okay?

So fair to say that Oasis -- the first serious bidder for Oasis had retraded twice and reduced their offer by 20 million, and the debtors and Raymond James were prepared to accept that offer, correct?

A.    Again, I don't recall the specifics.

Q.    But you recall testifying to that effect?



R. Kost - Confidential

A.     I just don't remember where Culligan was. Were we talking to Culligan?  Were we not talking to Culligan?  Were they on the precipice?  Did it take one more phone call?  I don't remember.

Q.     None of that was my question, sir.  I'm asking you very simply, okay?  I walked through your testimony.  I'm not trying to trick you --

A.     Uh-huh.

Q.     -- I'm just trying to summarize.  Okay?  Just so that we get a clean record.

A.     Why don't you just use this testimony?

Q.     I'd like your testimony.

A.     Great.

Q.     I'm not miss -- I'm not the person who took this deposition, okay?

A.     Okay.

Q.     So very simply, Mr. Kost, isn't it true that Raymond James and the debtors were prepared to take the offer on the table for -- from Gemspring, and that offer had come -- had been reduced by 20 million and Gemspring had retraded twice, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  That's correct.



R. Kost - Confidential

BY MR. KUSNETZ:

Q.    And Ms. Tilton encouraged Mr. Katzenstein not to take that offer, correct?

MS. MURPHY:  Objection.

THE WITNESS:  Apparently.

BY MR. KUSNETZ:

Q.    And you have no reason to disagree that Ms. Tilton encouraged Mr. Katzenstein not to take that offer?

A.    I don't recall specifically.

Q.    And -- but no reason to disagree, correct?

A.    No.

Q.    And then Gemspring --

MR. KUSNETZ:  Sorry.  Withdrawn.

BY MR. KUSNETZ:

Q.    And then the investment bankers reengaged with prior bidders, including Culligan, and was able to secure a favorable bid from Culligan, correct?

A.    Yes.

MS. MURPHY:  Objection to form.

BY MR. KUSNETZ:

Q.    And that bid from Culligan exceeded the retraded bid from Gemspring, correct?

A.    I just don't remember the numbers, but I --



R. Kost - Confidential

I'll agree that -- if that's what the case was.

Q.    You have no reason to disagree that wasn't the case?

A.    I have no reason to disagree.

Q.    Okay, so it's fair to summarize the Oasis sales story as initial bidder, retraded, reduced their bid by 20 million; Raymond James and debtors willing to accept it, Tilton says no; Raymond James goes back to the market and comes back with a bid that exceeds Gemspring; is that correct?

          MS. MURPHY:  Objection to form.

          THE WITNESS:  That's possible that that happened.

BY MR. KUSNETZ:

Q.    Is my summary correct?

          MS. MURPHY:  Objection to form.

          THE WITNESS:  I don't recall the specifics.

BY MR. KUSNETZ:

Q.    Is my summary consistent with your testimony back in 2020?

          MS. MURPHY:  Objection.

          THE WITNESS:  I believe so.



R. Kost - Confidential

BY MR. KUSNETZ:

Q.    Okay, and you have no reason to doubt that testimony, correct?

A.    No.

Q.    And that testimony was given in 2020, which was very close in time to when Oasis was sold, correct?

A.    Yes.

Q.    So it was fresh in your mind back then, correct?

A.    Yes.

Q.    Okay.  All right.  Moving on from our success stories, let's talk about the timeline dispute, so ...

Do you recall that there came a time in late 2019 when Ms. Tilton and the debtors made competing proposals regarding the timeline for a sale of the Group A portfolio companies?

A.    Yes.

Q.    And do you also recall that the Zohar III controlling class and MBIA made competing proposals that differed from the debtors and Ms. Tilton regarding the timeline for the sale of the Group A portfolio companies?

A.    I generally recall that.

Q.    Okay, and you recall being deposed as part of



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1693 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                          290

R. Kost - Confidential

that dispute in February of 2020, correct?

A.    Yes.

Q.    Now, prior to your deposition and those competing proposals, there was a hearing before the judge about the need to alter the timeline for sales, correct?

A.    Yes.

Q.    And ...

MR. KUSNETZ:  Do you have it?

BY MR. KUSNETZ:

Q.    I'm going to show you what I'm going to mark as Exhibit 5.

(Thereupon, a document was marked by the shorthand reporter as Exhibit 5 for identification.)

BY MR. KUSNETZ:

Q.    Mr. Kost, I'm showing you what's been marked as Exhibit 5.  This is a transcript of a court hearing before the Honorable Karen Owens, bankruptcy judge, on September 24, 2019.

Do you see that?

A.    Yes.

Q.    Okay, and do you see that Young Conaway, on the first page, appeared for the debtors?



R. Kost - Confidential

A.    Yes.

Q.    Okay, and if you go to the next page, do you see that a Christopher Shore, from the law firm of White & Case, appeared for Mr. Farnan?

A.    Yes.

Q.    And were you familiar with Christopher Shore of White & Case?

A.    I think I met him during this case --

Q.    Okay.

A.    -- for the first time.

Q.    The name sounds familiar?

A.    Oh, yes.

Q.    And so you knew who he was, correct?

A.    Yes.

Q.    And you may have met with him?

A.    Yes.

Q.    And did you meet with him in preparation for this September 2019 hearing?

A.    Possibly, but I don't recall.

Q.    Okay.

      (Pause.)

BY MR. KUSNETZ:

Q.    Are you aware if this proceeding was sealed?

A.    I'm generally aware that almost everything



R. Kost - Confidential

was sealed in this case.

Q.    All court hearings were sealed?

A.    A lot of them were.

Q.    Do you see --

Do you recall being in this courtroom for this particular hearing?

A.    I don't recall.

Q.    Okay.  Do you see a notation on this transcript as this proceeding having been sealed?

A.    I don't think so.

Q.    Okay, so fair to say, based on your understanding -- I know you're not a lawyer -- that this proceeding was conducted in open court?

A.    It may have been.

Q.    Now, did Mr. Shore -- where it says for Joseph Farnan -- represent your interests, sir?

A.    Mine as the chief monetization --

Q.    As CMO, yes.

A.    I don't believe so.

Q.    It shows Young Conaway here for the debtors, right?

A.    Yes.

Q.    Why did Mr. Farnan have separate counsel from the debtors?



R. Kost - Confidential

MS. MURPHY:  Objection to form, and caution the witness not to include legal advice.

THE WITNESS:  I don't know the answer.

BY MR. KUSNETZ:

Q.   Do you know the answer if that answer comes from advice from an attorney as a "yes" or a "no"?

MS. MURPHY:  So you can answer "yes" or "no" if you know the answer because of legal advice.

THE WITNESS:  I don't know the answer for any reason.

BY MR. KUSNETZ:

Q.   Okay.

A.   With or without.

Q.   Did it strike you as odd that Mr. Farnan would have his own counsel?

A.   No.

Q.   But you've met this counsel before?

A.   Yes.

Q.   And you've spoken to this counsel before?

A.   Yes.

Q.   So you were speaking with Mr. Shore at some point, and you were speaking with him even though he did



R. Kost - Confidential

not represent you?

A.    It's not unusual for independent directors to have counsel.

Q.    Okay, so it didn't strike you as odd is what you're saying?

A.    That's correct.

Q.    But he didn't necessarily speak for you as the CMO?

A.    No, I don't believe so.

Q.    But he spoke for Mr. Farnan, who was the independent director of the debtors, correct?

A.    That would be my view.

Q.    Okay.  If you go to page 18 of this transcript, do you see in the middle of page 18, it says "the Court," and the Court says:  "I'd like to hear from all the parties that are in support of the debtors' position first."

Do you see that?

A.    Yes.

Q.    Then do you see Mr. Shore say, "Thank you, Your Honor.  Good morning.  Chris Shore from White & Case on behalf of Mr. Farnan"?

A.    Yes.

Q.    Okay, and do you see where Mr. Shore says, at



R. Kost - Confidential

the bottom of page 18:

"I'm going to focus on one word, 'monetize.'"

Do you see that?

A.    Yes.

Q.    Now, as the chief monetization officer of the debtors, you have an opinion, sir, as to what "monetize" means, right?

A.    Generally, yes.

Q.    It's in your title?

A.    Yes.

Q.    It's a fairly bespoke title, as we've discussed, correct?

A.    Yes.

Q.    Mr. Shore, on behalf of Mr. Farnan, defines "monetize."

Directing your attention to page 19, Mr. Shore states, in open court:

"There can be no dispute about this.  The word 'monetize' means convert to currency engagement; that's it.  It does not mean maximize the value of.  It does not mean realize the highest and best price for.  It does not mean restructure.  It does not even mean conduct a public auction for.  It means convert to currency."



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1699 of 2249

ROBERT KOST  Conf.                                        May 13, 2025
DUNN V. PATRIARCH PARTNERS                                      296

R. Kost - Confidential

Do you see that?

A.    I do.

Q.    Do you recall Mr. Shore, on behalf of Mr. Farnan, giving that testimony that "monetize" means "convert to currency"?

A.    I do not.

Q.    Are you surprised to see that testimony?

A.    No.

Q.    Now, if you were a buyer for a portfolio company and you heard the independent director of the debtors who was in charge of overseeing the monetization process -- that heard the independent director's lawyer of the debtors who was in charge of overseeing the monetization process saying that "monetize" simply means "convert to currency," does not mean maximizing value, what would you take from that?

            MS. MURPHY:  Objection to form.

            THE WITNESS:  You're asking me to speculate?

BY MR. KUSNETZ:

Q.    No -- yeah.  I'm asking you as having 30 years of experience in this industry and knowing what buyers should know and shouldn't know and the messages that should be sent to buyers.  That's what I'm asking.



R. Kost - Confidential

So I'm saying:  If you're a buyer and you heard the representative for the independent director of the debtors say, "Monetize means convert to currency. That's it.  It doesn't mean maximizing value," would you understand that to be they're looking to sell quickly? "Yes" or "no"?

MS. MURPHY:  Objection to form.

THE WITNESS:  Looking at this paragraph, I think in the strictest sense, you could say that the definition is correct, but that for my purposes, running a sale process, this wouldn't have been as helpful for an interested buyer to read.

BY MR. KUSNETZ:

Q.   It wouldn't have been helpful to the buyer or wouldn't have been helpful to the sales process?

A.   To the sales process.

Q.   It would have been helpful to the buyer?

A.   It would have been -- I would have preferred this not to -- this isn't my definition per se of monetizing in our sale process.

Q.   And you were the chief monetization officer at the time?

A.   Yes, I was.



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1701 of 2249

ROBERT KOST  Conf.                                        May 13, 2025
DUNN V. PATRIARCH PARTNERS                                         298

R. Kost - Confidential

Q.    And so Mr. Shore wasn't using your definition of monetization?

A.    What I'm saying is this probably is a definition of "to monetize" in the strictest sense, but I wouldn't have preferred him to say it this way in an open court.

Q.    And it conflicted --

Mr. Shore's language conflicted with how you defined the goal of the monetization process back in 2018 in your April deposition of 2018, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  I think you could monetize the portfolio companies and seek to maximize value.

BY MR. KUSNETZ:

Q.    Right.  "Monetize" meaning sell, but for maximum value, correct?

A.    Yes.

Q.    And you did, in fact, testify back in 2018, as we discussed much earlier today when the sun was up, that the goal was to go about this monetization process to maximize value.

Do you recall that testimony?

A.    Yes.



R. Kost - Confidential

Q.    And that's literally the opposite of what Mr. Shore is saying in September of 2019, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Obviously, you could ask Mr. Shore what he was trying to get at, but I think the point he's trying to make is we had to be more successful.  We had not been very successful to date.

BY MR. KUSNETZ:

Q.    Sir, I'm asking you, as someone reading this transcript, just like a buyer could, okay?

You, Mr. Kost, testified that the goal of the monetization process was to maximize the value of the portfolio companies, correct?

A.    Yes.

Q.    And Mr. Shore is -- on behalf of Judge Farnan, the independent director of the debtors, is saying the exact opposite, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes, that's what he's saying.

BY MR. KUSNETZ:

Q.    Right, the exact opposite.  Thank you.

And this was not helpful for the sales process,



R. Kost - Confidential

correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  I don't know if anybody read this or saw this, but yeah, that's not -- I would have said it differently.

BY MR. KUSNETZ:

Q.   Right.  Well, I mean, you wouldn't have said that "monetize" only means converting to currency and not maximizing value, right?

MS. MURPHY:  Objection to form.

THE WITNESS:  That's correct.

BY MR. KUSNETZ:

Q.   Do you recall talking to Mr. Farnan about this testimony?

A.   I do not.

Q.   Do you recall hearing that this testimony occurred?

A.   Not specifically.  I -- my recollection was that Mr. Shore was trying to speed up the process and get people to focus and complete sales.

Q.   Without seeking to maximize value, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  I don't know if that's what he actually meant.



R. Kost - Confidential

BY MR. KUSNETZ:

Q.    That's what he said, right?

A.    That is what he said.

Q.    In court?

A.    Yes.

Q.    Okay.  And if this was open court, that means in public, correct?

A.    If you say so.  Apparently, yes.

Q.    Let's talk about the motion -- the competing motions for approval of the timeline process.

I'd like to show you as Exhibit 6 Tab 15, please.

(Thereupon, a document was marked by the shorthand reporter as Exhibit 6 for identification.)

BY MR. KUSNETZ:

Q.    Let me show you what's been marked as Exhibit 6, please.

Okay.  Mr. Kost, do you have Exhibit 6 before you?

A.    Yes.

Q.    This is a motion of Lynn Tilton for approval of timeline and guidelines regarding monetization of the Group A portfolio companies, and in the bottom of the page, it says "filed December 20, 2019."

A.    Yes.



R. Kost - Confidential

Q.    Okay.  Do you recall reading this motion?

A.    I do recall generally recall reading this motion.

Q.    Okay.  And looking at page 2, paragraph 2, do you see at the bottom where Ms. Tilton writes:

"The bankruptcy filing and subsequent settlement agreement temporarily placed on hold those value-destructive disputes so the debtors and Ms. Tilton could engage jointly in a process to monetize various portfolio companies."

Do you see that?

A.    Yes.

Q.    Do you agree Ms. Tilton is accurately describing what happened?

A.    Yes.  I think that was the goal of the settlement agreement.

Q.    Right, and the debtors and Ms. Tilton at that point were aligned, correct?

A.    At that point, we were getting unaligned, but I think yes, we still wanted to maximize value.

Q.    And work together or, as she puts it, "engage jointly," correct?

A.    Yes.

                    (Pause.)



R. Kost - Confidential

BY MR. KUSNETZ:

Q.    And let's read page -- sorry.  Let's read paragraph 3.

"And engage she did.  Ms. Tilton worked tirelessly to sell or refinance the portfolio companies from the moment the settlement agreement was agreed to (and even before):  Ms. Tilton negotiated on the company's behalves the engagement of blue chip investment bankers to market the portfolio companies; she personally expended millions of dollars of her own money to obtain qualities of earnings reports from a highly reputable firm for the key portfolio companies; she spent hundreds of hours writing and editing each confidential marketing memorandum; she personally met with many potential bidders; she coordinated with the portfolio companies and investment bankers to provide voluminous company information for interested bidders in data rooms and throughout the diligence process.  This has all -- this has all been accomplished while Ms. Tilton continues to actively manage the four most valuable portfolio companies as CEO."

Do you see that paragraph?

A.    Yes.

Q.    Is there anything in that paragraph that is



R. Kost - Confidential

incorrect, sir?

A.    I don't know who paid for the quality of earnings reports.  I don't recall that she paid for it, but that may have been.

Q.    And you have no reason to believe it was not her who paid for the quality of earnings reports?

A.    Right.  I just don't know.

Q.    Okay, so my question is:

For this paragraph, can you point me to anything that is -- that you know to be incorrect?  How about that?

A.    No.  Again, I just don't know whether -- who paid for the quality of earnings reports.  I know she worked with the investment bankers.  I don't know if she actually provided voluminous company information, but she might have, so I -- in way -- no way to say that was true or not true.

Q.    So let me just be clear.  Paragraph 3 of this motion from Ms. Tilton, focusing on that which I read to you.  I'm just asking what you know, not what you don't know.

Do you know that any of paragraph 3 is incorrect?  "Yes" or "no"?

MS. MURPHY:  Objection to form.



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1708 of 2249

ROBERT KOST  Conf.                                                May 13, 2025
DUNN V. PATRIARCH PARTNERS                                              305

                    R. Kost - Confidential

                    THE WITNESS:  Much of it's true, and some

          of it, I don't know whether it's true or not.

BY MR. KUSNETZ:

     Q.    Okay.  None of it false, to your knowledge?

     A.    I have no view on a few pieces.  Like I don't

know who paid for the quality of earnings reports.

     Q.    Okay.  Would it have surprised you if it was

Ms. Tilton who paid for the quality of earnings reports?

     A.    Maybe.

     Q.    Okay.

     A.    I would have thought the portfolio companies

paid for them.

     Q.    Okay.  Well, that's fair.  We're not going to

adjudicate that in this deposition.  Don't you worry.

We don't have the time for that.

     And if you go to paragraph 54, which is on page 20,

do you see that Ms. Tilton provides a timeline for the

sale of the Group A portfolio companies?

     A.    Yes.

     Q.    And do you see that she has a deadline

proposed for the recommencement of market sale efforts?

Correct?

     A.    Yes.

     Q.    She does not include a deadline for those



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1709 of 2249

ROBERT KOST  Conf.                                              May 13, 2025
DUNN V. PATRIARCH PARTNERS                                            306

R. Kost - Confidential

companies to be sold, though, correct?

A.    Correct.

Q.    Okay.  Let's look at the debtors' proposal.

MR. KUSNETZ:  I'm going to mark this as Exhibit 7.

(Thereupon, a document was marked by the shorthand reporter as Exhibit 7 for identification.)

BY MR. KUSNETZ:

Q.    Okay.  Do you see Exhibit 7 in front of you?

A.    Yes.

Q.    Do you see this is a motion -- if you go to the second -- sorry.  If you go to the third page, this is the debtors' motion for entry of an order in aid of implementation of the settlement agreement and the settlement order establishing certain deadlines, milestones, and other parameters in furtherance of the monetization process for the Group A portfolio companies.

Do you see that?

A.    Yes.

Q.    All right.  And do you see --

Well, this version does not appear to be dated, but it does say "Filed under seal."  Oh, it's dated, yes, on



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1710 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                        307

R. Kost - Confidential

page 2.

Do you see on page 2 -- Young Conaway apparently likes to date things on the second page, not the last page, which is fine.  It's a Delaware thing.

Can you see on page 2, it says it's dated December 20, 2019?

A.    Yes.

Q.    Okay.  Same date as Ms. Tilton's competing motion, correct?

A.    Yes.

Q.    Do you recall reviewing this filing when it was in draft form?

A.    Generally, yes.

Q.    Okay, and if you turn to the last two pages, do you see there's an Exhibit 1?

A.    Yes.

Q.    And do you see the debtors provide their own deadlines and milestones for -- to sell the Group A portfolio companies?

A.    Yes.

Q.    And do you see that the deadlines include when these portfolio companies should go to market?

(Pause.)

THE WITNESS:  I see different dates.



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1711 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                          308

R. Kost - Confidential

Letter of intent, closing.  Each one has kind of a different terminology.

BY MR. KUSNETZ:

Q.    Understood.

For some of these companies, the marketing had already commenced, correct?

A.    Yes.

Q.    Okay.  The marketing had already commenced for Dura, which was governed by a bankruptcy process, correct?

A.    Yes.

Q.    Marketing had already commenced for Hussey, correct?

A.    Yes.

Q.    Marketing had already commenced for Rand McNally, right?

A.    Yes.

Q.    Okay, but for the rest -- GAS, Intrepid, MD Helicopters, Stila, PDP, Snelling, Vulcan, and Universal Instruments and the Group B companies, the debtors provide a timeline of deadlines for commencement of market sale efforts, correct?

A.    Yes.

MS. MURPHY:  Objection to form.



R. Kost - Confidential

BY MR. KUSNETZ:

Q.    And Ms. Tilton also provided a deadline for commencement of market sale efforts, correct, in her competing proposal?

A.    Yes.

Q.    Ms. Tilton did not include a deadline for there to be completed sales of those portfolio companies, correct?

A.    Correct.

Q.    The debtors did not include deadlines for there to be competed sales for the companies that had not yet restarted their marketing processes, correct?

A.    Agreed.

Q.    Ms. Tilton says no deadlines.  Debtors say no deadlines, correct?

A.    Correct.

Q.    That was not part of their competing proposals?

A.    Apparently.

Q.    Well, was it or wasn't it, sir?

A.    Not in this document.

Q.    Okay.  But the initial proposals in December 2019, Ms. Tilton and the debtors were aligned in their -- in that their proposals did not include



R. Kost - Confidential

deadlines for the completion of the sale of the

portfolio companies, correct?

A.    Agreed.

Q.    Now, let's talk about our friends MBIA and

Bardin Hill.

You recall that MBIA and Bardin Hill made their own

submissions to the court regarding the timeline to sell

these companies, correct?

A.    Generally, I agree.

Q.    Okay.  Let's look at MBIA's.

MR. KUSNETZ:  While you're at it, Joe,
we'll do Bardin Hill's too.  We'll do one at a
time.

(Thereupon, an informal discussion was
held off the record.)

MR. KUSNETZ:  We'll mark this as
Exhibit 8.

(Thereupon, a document was marked by the
shorthand reporter as Exhibit 8 for
identification.)

BY MR. KUSNETZ:

Q.    Okay.  Do you have Exhibit 8 in front of you,

Mr. Kost?

A.    Yes.



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1714 of 2249

ROBERT KOST  Conf.                                                  May 13, 2025
DUNN V. PATRIARCH PARTNERS                                              311

R. Kost - Confidential

Q.    And do you see that this document is MBIA Insurance Corporation's statement in support of debtors' preliminary objection to motion of Lynn Tilton for approval of timeline and guidelines regarding monetization of the Group A portfolio companies?

A.    Yes.

Q.    And this document was filed, if you turn to page 3, on January 7, 2019.

A.    Yes.

Q.    Do you recall reviewing this filing in January of 2019?

A.    Vaguely, yes.

Q.    Did you have a role in its drafting?

A.    No.

Q.    Why did you review it?

A.    It probably would have been sent to me.

Q.    Okay.  By whom?

A.    Probably Young Conaway.

Q.    Turning to second page, paragraph 2, do you see where MBIA writes:

"MBIA respectfully submits that specific and measurable deadlines for actual" -- and then they bold and italicize this -- "completed monetization processes" -- end bold italicization -- "for all of the



ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                     312

R. Kost - Confidential

Group A portfolio companies required to be monetized

under the settlement agreement must be established and

ordered by the court."

Do you see that?

A.    Yes.

Q.    So MBIA is departing from the debtors' and

Ms. Tilton's proposals in that they are demanding

deadlines for the actual completed sales of these

portfolio companies?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes, I see that.

BY MR. KUSNETZ:

Q.    You see that they differ from the -- sorry.

You see that MBIA is departing from the proposals

by both the debtors and Ms. Tilton to that respect,

correct?

A.    Yes.

Q.    And we previously discussed and you

previously testified the impact that deadlines could

have on a sale process, correct?

A.    Yes, we've discussed that.

Q.    Right.  Especially if a buyer finds out that

a certain sale process has a deadline, correct?

A.    Yes.



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1716 of 2249

ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                  313

R. Kost - Confidential

Q.    And is it fair to say that MBIA wanted deadlines to complete the monetization process for these portfolio companies because they wanted their money quickly?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes, they would have liked to have been paid more quickly.

BY MR. KUSNETZ:

Q.    Right, and this was one way to do it, right?

A.    They were trying to get us to speed up the process.

Q.    Not just speed up the process, but to actually commit to dates when each company would be sold, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  I had forgotten that, but yes, that's what this says.

BY MR. KUSNETZ:

Q.    Okay.  Let's look at Bardin Hill.

MR. KUSNETZ:  I'm going to mark this as Exhibit 9.

(Thereupon, a document was marked by the shorthand reporter as Exhibit 9 for identification.)



R. Kost - Confidential

BY MR. KUSNETZ:

Q.    Do you see Exhibit 9 in front of you, sir?

A.    Yes.

Q.    Do you see that this is a preliminary statement and response of Zohar III controlling class in response to motions seeking monetization procedures filed by debtors and Patriarch?

A.    Yes.

Q.    Okay, and Bardin Hill was the primary creditor of the Zohar III debtor, correct?

A.    Yes.

Q.    All right.

Turning to paragraph 3, do you see where it says:

"The Zohar III controlling class strongly supports the concept of a court-imposed" -- and in parentheses, and again, this time also with bolding and italics -- "and enforced" -- no more bold and italics -- "timeline, but it supports" -- and now, this is interesting.  This is bold, italics, and underlined, so they one up MBIA by adding the underline.

"But it supports a timeline for sales -- rather than a timeline to merely commence a sale process."

Do you see that?

A.    Yes, I see that.



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1718 of 2249

ROBERT KOST Conf.                                        May 13, 2025
DUNN V. PATRIARCH PARTNERS                                        315

R. Kost - Confidential

Q.    You see what they write in the bold, italics, and underlined?

A.    Yes.

Q.    Okay.  According to Bardin Hill, the debtors and Ms. Tilton proposed a deadline to merely commence a sale process, correct?

          MS. MURPHY:  Objection to form.

          THE WITNESS:  Yes.

BY MR. KUSNETZ:

Q.    And Bardin Hill disagreed?

A.    Yes.

Q.    Bardin Hill wanted a court-imposed and enforced -- in bold and italics -- timeline for sales, right?

A.    That's what they say here.

Q.    They wanted deadlines for the sale of each portfolio company, correct?

          MS. MURPHY:  Objection to form.

          THE WITNESS:  Yes.

BY MR. KUSNETZ:

Q.    And we previously talked about what a deadline means with respect to a monetization process for a portfolio company, correct?

A.    Yes.



R. Kost - Confidential

Q.    Did you have any role in drafting this Bardin Hill motion?

A.    No.

Q.    Did you review it before it was filed?

A.    No.

Q.    Do you recall reviewing it after it was filed?

A.    Not -- I don't recall.

Q.    They didn't run this by the debtors first, to your knowledge?

A.    I don't know.

Q.    They didn't run it by you?

A.    I don't recall.

Q.    MBIA and Bardin Hill are giving their position on the monetization process, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes.

BY MR. KUSNETZ:

Q.    And they didn't talk to the chief monetization officer for the debtors first before proposing markedly different proposals than what the debtors had proposed?

MS. MURPHY:  Objection to form.

THE WITNESS:  Not in a legal sense.



R. Kost - Confidential

BY MR. KUSNETZ:

Q.   I don't know -- I don't know what that means. What does that mean?

A.   They didn't show me this.  I -- I don't remember seeing it.  But they were also disappointed, like MBIA, with the pace of the process and wanted us to speed up the sales processes.

Q.   Let me -- just so the record is clear, MBIA and Bardin Hill proposed deadlines for the monetization process that -- and that departed from the proposed timeline by the debtors, correct?

A.   Yes.

Q.   And they did not run -- "they," meaning Bardin Hill and MBIA -- did not run that proposal by you, the chief monetization office, before they made these filings, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  I don't recall seeing them before they filed them.

BY MR. KUSNETZ:

Q.   You were not aligned, sir, with MBIA and Bardin Hill, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Aligned with their views on



R. Kost - Confidential

these deadlines?

BY MR. KUSNETZ:

Q.    Yeah.

A.    No.  I think we came up with what we thought was appropriate.

Q.    And they thought that was not appropriate?

A.    Apparently.

Q.    So at this point, you did not share common cause with MBIA and Bardin Hill, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  I think what I took away -- and probably not specifically from these documents -- is they wanted us to accelerate the process.

BY MR. KUSNETZ:

Q.    Right.

A.    And it was within our purview as the debtors' financial advisors and chief monetization officer to come up with our own deadlines.

Q.    But you guys disagreed on what was an appropriate timeline, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Apparently.  I -- again, I think they're trying to send a message to



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1722 of 2249

ROBERT KOST  Conf.                                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                                      319

R. Kost - Confidential

hurry up.

BY MR. KUSNETZ:

Q.    Oh, you didn't think they were serious?

MS. MURPHY:  Objection to form.

THE WITNESS:  I think they wanted the process to go faster than we were running it.

BY MR. KUSNETZ:

Q.    Are you aware that the court eventually did impose deadlines as a result of these motions?

A.    Yes, many of which were changed many times.

Q.    But the court imposed the deadlines, correct?

A.    Yes.

Q.    Didn't take the debtors' proposal, right?

A.    That's correct.

Q.    Didn't take Patriarch's proposal, right?

A.    I think it was a mishmash, but something -- yes, they had deadlines.

Q.    Right, and Patriarch and the debtors did not?

A.    Yes, that's true.

Q.    So with respect to MBIA and Bardin Hill, they got what they wanted, right?

MS. MURPHY:  Objection to form.

THE WITNESS:  Then it all became moot.



                    R. Kost - Confidential

BY MR. KUSNETZ:

    Q.    I don't --

    A.    60 days later.

    Q.    I don't know what that -- what that means,
but I'm saying they wanted deadlines and they got
deadlines, correct?

            MS. MURPHY:  Objection to form.

            THE WITNESS:  Apparently, yes.

BY MR. KUSNETZ:

    Q.    Now, as you testified just now, it was --
you --

            MR. KUSNETZ:  Sorry.  Withdrawn.

BY MR. KUSNETZ:

    Q.    As you testified just now, the debtors
thought it was appropriate that there not be deadlines
for the sales process, correct?

            MS. MURPHY:  Objection to form.

            THE WITNESS:  I think our view -- my
        view -- at that point was to try to get the
        processes moving forward as quickly as
        possible.  Per se, I'm not a big fan of
        deadlines.

BY MR. KUSNETZ:

    Q.    For obvious reasons?



R. Kost - Confidential

A.    Yes.

Q.    Okay.

(Thereupon, an informal discussion was held off the record with the shorthand reporter.)

THE VIDEOGRAPHER:  We're going to go off record.  The time is 8:22, and this concludes Media Unit No. 9.

(Recess taken at 8:22 p.m.)

(Resumed at 8:55 p.m.)

THE VIDEOGRAPHER:  We are back on record. The time is 8:55, and this is start of Media Unit No. 10.

BY MR. KUSNETZ:

Q.    Okay.  Mr. Kost, did you attend the February 2020 trial regarding the monetization timeline dispute?

A.    I don't recall.

Q.    It was a few days, correct?

A.    That -- yes, that sounds right.

Q.    February 19, 20, and 24?  Does that sound right to you?

A.    Yes.

Q.    And do you recall attending any of those days?



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1725 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                          322

R. Kost - Confidential

A.    I -- I attended a couple court hearings, and it could have -- and could have been that one, but I don't recall.

Q.    Did you ever attend the last day, the 24th, when there were closing arguments?

A.    I just don't recall.

Q.    Do you recall that February 24, 2020 -- that hearing was in open court?

A.    I don't recall.

Q.    Would it surprise you that it was in open court?

A.    Yes, because I seem to recall many of them being closed.

Q.    And when these closing arguments happened, because it was in open court, do you recall that there were code names for the names of the buyers and the companies, like Company A?

A.    Yes, that does ring a bell.

Q.    Right?

A.    Yes.

Q.    So do you recall being in open court February 24th, hearing closing arguments?

A.    I do recall being in a court where we talked about code names.



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1726 of 2249

ROBERT KOST  Conf.                                              May 13, 2025
DUNN V. PATRIARCH PARTNERS                                              323

R. Kost - Confidential

Q.    Okay.

A.    So that probably was the name day.

Q.    No reason to disagree?

A.    No.

Q.    Okay, and being in open court, potential buyers or their representatives could sit in, correct?

A.    Theoretically, yes.

Q.    Well, actually, yes, correct?

A.    Actual --

Q.    Could --

            (Indistinguishable crosstalk.)

BY MR. KUSNETZ:

Q.    Could they sit in?

A.    Yes, they could sit in.

Q.    They were not barred from the courthouse?

A.    No.

Q.    Right, and so they --

Potential buyers heard during closing arguments that there was a disagreement about end dates for the timeline process, correct?

            MS. MURPHY:  Objection to form.

            THE WITNESS:  I believe so, yes.

BY MR. KUSNETZ:

Q.    Right, so buyers knew at least by February



R. Kost - Confidential

24, 2020 in open court -- the proceedings in open court that there was a dispute about whether there should be deadlines for the sale of the portfolio companies, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes, it's quite possible.

BY MR. KUSNETZ:

Q.    In fact, that's what was discussed during that hearing, correct?

A.    Yes.

Q.    And to be even more clear, it was Ms. Tilton who did not want deadlines for the sale process, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes, that's correct.

BY MR. KUSNETZ:

Q.    And Ms. Tilton argued --

Ms. Tilton's representatives argued that in open court that they did not want deadlines, correct?

A.    I don't recall specifically, but yes, I would take your word for it.

Q.    Well, you would assume they would, based on their filings, correct?

A.    Yes.



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1728 of 2249

ROBERT KOST  Conf.                                              May 13, 2025
DUNN V. PATRIARCH PARTNERS                                              325

R. Kost - Confidential

Q.    Okay.  No reason to doubt that Ms. Tilton's advocates explicitly stated that they did not want the Court to order deadlines for the monetization process, correct?

A.    Correct.

Q.    And so if the monetization order by the Court didn't go Ms. Tilton's way, you would expect that monetization order to have deadlines, correct?

A.    Correct.

Q.    Because there were other parties involved in this process who wanted deadlines, right?

A.    Yes.

Q.    And we established that was MBIA and Bardin Hill, correct?

A.    Yes.

Q.    All right.

Now, do you recall that you weren't the only one deposed in the run-up for that trial, correct?

A.    I think that's correct.

Q.    A ton of bankers were also deposed, correct?

A.    Yes.

Q.    The bankers that were hired to run the sales for multiple portfolio companies, correct?

A.    Yes.



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

R. Kost - Confidential

Q.    Okay.  Now, do you recall also that one particular banker ...

MR. KUSNETZ:  This is not correct.

That's the deposition.  I need ... that.

BY MR. KUSNETZ:

Q.    Are you -- do you recall that one particular banker, Azad Badakhsh from Moelis, gave testimony in court during the trial?

A.    Yes, I believe that's correct.

Q.    And do you recall Mr. Badakhsh --

Actually, am I saying that correctly?

A.    That's how I say it.

Q.    Badakhsh?

A.    I don't know if it's right, but that's how I say it.

MR. KUSNETZ:  It is A-Z-A-D, last name B-A-D-A-K-H-S-H.

(Thereupon, an informal discussion was held off the record.)

MR. KUSNETZ:  Okay.  I'm going to show you that testimony.

(Thereupon, a document was marked by the shorthand reporter as Exhibit 10 for identification.)



R. Kost - Confidential

BY MR. KUSNETZ:

Q.    Do you recall being in court for Mr. Badakhsh's testimony?

A.    Vaguely, yes.

Q.    Okay.  Do you recall -- actually, let's just go to it so we can just speed this along.  I'd like to direct you to page 432 of this court transcript.


A.    Yes.

Q.    Okay.

        MS. MURPHY:  Have you added the highlighting here, Counsel?

        MR. KUSNETZ:  What highlighting?

        MS. MURPHY:  Page 14, 15, 16?

        MR. KUSNETZ:  Which one?  5 what?

        MS. MURPHY:  14 through 16.  I just saw it looking through.

        MR. KUSNETZ:  I don't know, but we're not going to go to those pages.

BY MR. KUSNETZ:

Q.    I direct you, Mr. Kost, don't look at anything with highlighting.  We ain't going to it.



R. Kost - Confidential

MR. KUSNETZ:  We will replace this copy for the record with one that has no highlighting, but we're not going there right now.

BY MR. KUSNETZ:

Q.    All right.  Let's turn to page -- this is the February 20, 2020 hearing transcript in front of Judge Owens, page 432.

Do you recall ever seeing a copy of this transcript?

A.    No, I don't believe I saw it -- a transcript copy.

Q.    Okay.  This -- on page 432, Mr. Badakhsh is testifying.  Directing you to lines 3 to 12:

"Question:  Let's assume that it's known in the marketplace that a sell-by date exists, but a specific date is not in the marketplace, but just that a sell-by date exists as ordered by the Court.

"Would you agree that would likely have a negative impact on the sale and marketing to get the highest and best price for MD Helicopters?

"Answer" by Mr. Badakhsh:  "It could have a negative impact, correct."

Do you see that?



R. Kost - Confidential

A.    Yes.

Q.    So Mr. Badakhsh here is testifying that a sell-by date ordered by the Court could have a negative impact on achieving the highest and best price for MD Helicopters, correct?

A.    Yes.

Q.    And let's turn to page 487 of this transcript.  Okay.  Mr. Badakhsh is still testifying here.

(Pause.)

BY MR. KUSNETZ:

Q.    Directing you to line 22.

"Question:  What of the fact that the that [sic] gave an indication of the marketplace that there were, in fact, milestones that were only known to the parties and not to the market?"

Do you see that?

A.    Yes.

Q.    Mr. Badakhsh replies:

"It could have a potential significant negative impact."

Do you see that?

A.    Yes.

Q.    So the question posed to Mr. Badakhsh was



R. Kost - Confidential

"What if the milestones were known only to the parties and not to the general public," correct?

A.    Yes.

Q.    Even in that scenario, where the milestones contained deadlines known to the parties and not to the market, Mr. Badakhsh testifies it could have a potential significant negative impact on the ability to sell MD Helicopters, correct?

A.    Yes, that's what he's saying.

Q.    Okay, and that is the banker for MD Helicopters testifying about the negative impact that end dates can have on a sale process, correct?

A.    Yes.

Q.    Okay.  Isn't it true that Mr. Badakhsh was not the only one who believed that --

MR. KUSNETZ:  Actually, withdrawn.

I forgot one more.  This is good stuff.

I got to keep going.  I'm sorry.

Let's go to page 428.

(Pause.)

BY MR. KUSNETZ:

Q.    "Question:  In connection with" --

This is line 15.  Connection -- sorry.  Line 15, page 428.



R. Kost - Confidential

"Question:  In connection with putting MD Helicopters back in the marketplace, would you recommend a public end date or sell-by date?

"Answer" from Mr. Badakhsh:

"Generally, from a Moelis perspective, our view is that a public sell-by date is not consistent with value maximization."

Do you see that?

A.    Yes.

Q.    So Moelis is -- so Mr. Badakhsh from Moelis is testifying that a public sell-by date for MD Helicopters or even a private sell-by date only known to the parties and not to the marketplace both are not consistent with value maximization, correct?

A.    Yes, I see that.

Q.    And that is the testimony of the investment banker that you and Ms. Tilton selected for the sale of MD Helicopters, correct?

A.    Yes.

Q.    Now, isn't it true that it was not just Mr. Badakhsh who testified that end dates are antithetical to maximizing value, but, in fact, a total of seven bankers testified that way?

MS. MURPHY:  Objection to form.



R. Kost - Confidential

Counsel, may I ask you to lower the volume slightly?

THE WITNESS:  I don't know how many testified to that effect.

BY MR. KUSNETZ:

Q.   Would it surprise you that seven bankers hired by you and Ms. Tilton all testified in their depositions before the monetization hearing or during the monetization hearing itself that end dates -- that deadlines for the sale of portfolio companies would have a negative impact on value maximization?

MS. MURPHY:  Objection to form.

BY MR. KUSNETZ:

Q.   Would it surprise you?

A.   It would not surprise me, especially under the context that the end dates became public.

Q.   Okay, but Mr. Badakhsh actually testified that even if the end date was private, that would not be conducive to maximizing value, correct?

A.   That's what he testified to.

Q.   That's what he testified to, right?

A.   Yes.

Q.   Okay.  He wasn't the only one who testified that nonpublic end dates would be -- would harm efforts



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1736 of 2249

ROBERT KOST  Conf.                                    May 13, 2025
DUNN V. PATRIARCH PARTNERS                                      333

R. Kost - Confidential

to maximize the value of the portfolio companies, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  I don't know the answer to that.

BY MR. KUSNETZ:

Q.    Okay.  Let's look at another transcript.

MR. KUSNETZ:  This is Exhibit 11.

(Thereupon, a document was marked by the shorthand reporter as Exhibit 11 for identification.)

BY MR. KUSNETZ:

Q.    Okay.  Do you see on the cover here Exhibit 11?  This is the deposition transcript of Chris Hendrickson taken February 10, 2020.

A.    Yes.

Q.    All right, and Mr. Hendrickson was the banker from Ziegler, correct?

A.    Yes.

Q.    And he was hired to lead the sales process for Intrepid, correct?

A.    Yes.

Q.    And you and Ms. Tilton hired Mr. Ziegler [sic], correct?



R. Kost - Confidential

A.    Yes.

MR. KUSNETZ:  Actually, withdrawn.

BY MR. KUSNETZ:

Q.    You and Ms. Tilton decided to hire Mr. Ziegler -- Mr. Hendrickson.

MR. KUSNETZ:  Let's withdraw that whole thing.

BY MR. KUSNETZ:

Q.    You and Ms. Tilton decided to hire Mr. Hendrickson, correct?

A.    Yes.

Q.    Okay.  All right.  Directing your attention to page 73, line 11.  Sorry.  Yeah, line 11.

"Question:  And if there are firm milestones, can buyers use that to their advantage in the marketing and negotiation process?

"Answer by Mr. Hendrickson:  Well, I would say this may sound a little strange, but I think the best time to sell is when you've got lots of fluidity, when the decisions reside on your side.  So yes, being in a forced position can create awkward dynamics in a sale process."

Do you see him testifying to that?

A.    Yes.



800.211.DEPO (3376)
EsquireSolutions.com

R. Kost - Confidential

Q.    Right, and that is consistent with your prior testimony, sir, about firm end dates, correct?

A.    I would generally agree with that statement.

Q.    Right, and looking at the next question, line 20.

"Question:  And even if a buyer doesn't know the exact deadline by which a transaction has to be completed but the buyer knows that those firm deadlines exist, can that give a buyer leverage?

"Answer from Mr. Hendrickson:  Absolutely.  You never want to give the buyer the upper hand or know that they can -- I hate to use the word -- take advantage of a situation, but oftentimes, you see that in the marketplace."

Do you see that?

A.    Yes, I see that.

Q.    So this is Mr. Hendrickson, the banker that you and Ms. Tilton selected for the sale of Ziegler, testifying that you don't even want -- that --

MR. KUSNETZ:  Withdrawn.

BY MR. KUSNETZ:

Q.    Testifying that even if a banker doesn't know the exact deadline but knows that deadline does -- that a deadline does exist, that is harmful to value



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1739 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                          336

R. Kost - Confidential

maximization, correct?

MS. MURPHY:  Objection to form.  You said "sale of Ziegler."

MR. KUSNETZ:  I said "sale of Ziegler"?  Well, maybe that's what I meant.

MS. MURPHY:  Objection withdrawn?

MR. KUSNETZ:  Withdrawn.

BY MR. KUSNETZ:

Q.    Let's do that again.  I'm sorry about that.  Okay.  So, Mr. Kost, this is Mr. Hendrickson of Ziegler, whom you and Ms. Tilton selected to run the sales process of Intrepid, testifying that it is harmful for value maximization even if a buyer doesn't know the exact deadline but does know that firm deadlines exist, correct?

A.    Yes, that's what it says.

Q.    And so I have now shown you testimony from at least two investment bankers who have testified in sworn testimony that even nondisclosed firm deadlines are not conducive to value maximization, correct?

A.    Yes.

Q.    Okay.

(Pause.)


ESQUIRE
DEPOSITION SOLUTIONS

Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1740 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                            337

R. Kost - Confidential

BY MR. KUSNETZ:

Q.    Now, two weeks --

MR. KUSNETZ:  Sorry.  Withdrawn.

BY MR. KUSNETZ:

Q.    In the interim between that trial and when the Court issued its ruling, there were active sales processes going on for some of the portfolio companies, correct?

A.    I believe so.

Q.    Well, we established that there were some portfolio companies who were being actively -- you know, marketed in both your -- listed in the timelines both from your motion and the debtors' and Ms. Tilton's motion, correct?

A.    Yes.

Q.    Okay.  So just for a clean record, in the intervening period between the end of the trial in February of 2020 and when the Court issued its decision later in March 2020, portfolio companies were being actively marketed for sale, correct?

A.    Yes.

Q.    And you took great care to manage this process, right?

A.    Yes.



                    R. Kost - Confidential

        Q.    You worked, I think you testified, thousands
of hours on this process?

        A.    Yes.

        Q.    You carefully managed multiple investment
banks for multiple portfolio companies?

        A.    Yes.

        Q.    You reviewed, to your knowledge, every single
confidential information memorandum, correct?

        A.    Yes.

        Q.    And what was written in the confidential
information memorandums was important, right?

        A.    Yes.

        Q.    The precise language used to describe the
portfolio companies was important, right?

                MS. MURPHY:  Objection to form.

                THE WITNESS:  Yes.

BY MR. KUSNETZ:

        Q.    Indeed, you and Ms. Tilton cared about what
was in those confidential information memorandums,
right?

        A.    Yes, I believe so.

        Q.    And that's because buyers would see it,
right?

        A.    Yes.



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1742 of 2249

ROBERT KOST  Conf.                                                May 13, 2025
DUNN V. PATRIARCH PARTNERS                                                  339

R. Kost - Confidential

Q.    Now, notwithstanding your carefully managed process, on March 9, 2020, just two weeks after this monetization trial concluded, the Zohar Litigation Trust filed a complaint, an adversary complaint starting this action, why we're sitting here today, against Ms. Tilton and Patriarch, correct?

A.    I believe so.

Q.    Have you seen the complaint?

A.    It's been a number of years.

Q.    But you did see it at some point?

A.    I believe so.

Q.    Okay.  Did can you have any role in drafting that complaint?

A.    I -- not that I can recall.

Q.    Did you get sent a draft complaint before it was filed?

A.    Possibly, but I can't recall.

Q.    Did you know that complaint was coming on March 9, 2020?

        MS. MURPHY:  Objection to form.  Caution the witness not to divulge any communications with counsel.

        THE WITNESS:  I can't recall.



R. Kost - Confidential

BY MR. KUSNETZ:

Q.   Actually, you can tell me even if counsel told you with a "yes" or a "no."

Did you know, "yes" or "no," that this complaint was coming on March 9, 2020?

MS. MURPHY:  Objection to form.

And I caution the witness with the same thing, and I will caution counsel that you cannot instruct my client to answer.

BY MR. KUSNETZ:

Q.   "Yes" or "no"?  Did you know?

A.   I can't recall.

Q.   Okay.  Did you edit any of this language in the complaint?

A.   I don't recall.

Q.   What is the Zohar Litigation Trust?

A.   There -- it was part of the plan of liquidation to receive the litigation after the Zohars were liquidated pursuant to the plan of liquidation.

Q.   You were a representative of the debtors, correct?

A.   Yes.

Q.   Does that mean that you had any relationship to the Zohar Litigation Trust?



R. Kost - Confidential

MS. MURPHY:  Objection to the form.

THE WITNESS:  I -- I -- my -- my engagement terminated well before, I believe, the litigation trust was formed.

BY MR. KUSNETZ:

Q.   Oh.  This lawsuit was filed March 9, 2020. You were still the CMO.

A.   I'm confused as to what you're talking about.

Q.   All right.  Well, let's clarify it.

MR. KUSNETZ:  Here's Exhibit 12, please.

(Thereupon, a document was marked by the shorthand reporter as Exhibit 12 for identification.)

BY MR. KUSNETZ:

Q.   Do you see Exhibit 12 in front of you?

A.   Yes.

Q.   Okay.  Do you see this is a complaint filed in the United States Bankruptcy Court for the District of Delaware?

A.   Yes.

Q.   Okay.  Do you see it's filed under seal?

A.   Yes.

Q.   Okay, and do you see that the plaintiffs are defined here collectively as the Zohar Funds?



R. Kost - Confidential

A.    Yes.

Q.    Okay.  Now, do you see above the line there's a reference to debtors?

A.    Yes.

Q.    Okay, so I'm asking you, sitting here today, do you know if you, as chief monetization officer, were in any way affiliated with those who brought this complaint?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes.  You used the term "litigation trust" --

BY MR. KUSNETZ:

Q.    Uh-huh.

A.    -- in your question to me.

Q.    Yeah.  Well, I'm not using that term right now.  I'm using "the Zohar funds."

A.    Yes, I'm familiar with the Zohar funds.

Q.    And --

A.    And that they brought the litigation.

Q.    And you were affiliated with the Zohar funds as chief monetization officer, correct?

A.    Yes.

Q.    But you don't recall reviewing this complaint before it was filed?



R. Kost - Confidential

A.    I -- I don't recall.

Q.    Right, and as we -- as you testified, the precise language and how the portfolio companies were described during the sales process was critical to a successful sales process, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  Yes.

BY MR. KUSNETZ:

Q.    Let's look at how the Zohar funds described the portfolio companies.  Let's turn to page 47 -- let's turn to paragraph 476, which is on ... oh, I'm sorry. 467.  I'm tired.

MS. MURPHY:  Page 99?

MR. KUSNETZ:  It's on page 99.  Thank you.

MS. MURPHY:  Okay.

BY MR. KUSNETZ:

Q.    Tell me when you're there.

A.    I'm there.

Q.    Okay.  Do you see that in this complaint filed two weeks after the monetization hearings, while portfolio companies were being actively marketed, the Zohar funds described in this lawsuit, the portfolio companies as the following:



R. Kost - Confidential

Paragraph 467.  "Finally, each of the portfolio companies has been in precarious financial condition at all relevant times."

Do you see that?

A.    Yes.

Q.    Okay.  Turning to paragraph 473, page 100, do you see where the Zohar funds describe the portfolio companies as "impoverished"?  Do you see that?

A.    Yes.

Q.    Okay.  In any of the CIMs that you reviewed during the monetization process prior to this date, were any of the portfolio companies described as "in precarious financial condition" or "impoverished"?

A.    Some of the CIMs would have highlighted problems and issues.  I -- I wouldn't use the terms "impoverished" or --

Q.    "Precarious financial" --

A.    -- "precarious financial."  No, we would not have used those in the CIMs.

Q.    Right, so just to be clear for a clean record, you don't recall a single CIM used in a sales process sent to buyers before this date, March 9, 2020, that described the portfolio companies as either "in precarious financial condition" or "impoverished"?



R. Kost - Confidential

A.    No, I don't recall those specific terms. Some of them had financial issues and considerations --

Q.    Of course.

A.    -- but we did not use those terms.

Q.    You did not use those terms in the CIMs?

A.    The bankers did not use those terms.

Q.    And you reviewed the CIMs?

A.    That's correct.

Q.    And you didn't notice any language similar to what you're seeing here in this complaint, correct?

A.    Again, some of the portfolio companies did have financial concerns.  I would have used more of a word more like "concern."

Q.    Yeah.  "Precarious" is a little different than "concern," right?

            MS. MURPHY:  Objection to form.

            THE WITNESS:  Yes.  A CIM is more of a
        marketing document.

BY MR. KUSNETZ:

Q.    Right, but "precarious" is not a term that was used to describe the portfolio companies, correct?

A.    I don't believe so.

Q.    Right.  Fair to say that this complaint in March 9, 2020, filed by the Zohar funds told a very



R. Kost - Confidential

different story about the financial condition of the portfolio companies than what the market had been receiving in the form of the CIMs?

A.    Yeah.  I mean, these are just two sentences. They're pretty -- pretty vague and generic.

Q.    Not only are they vague and generic, sir, they don't specify which portfolio companies, right?

A.    They do not.

Q.    Right, and you're telling me that there were some portfolio companies that had financial difficulties, correct?

A.    Yes.

Q.    But that's not what this says, right?

A.    That's true.

Q.    Right.  It doesn't distinguish saying "This portfolio company wasn't doing so great, may be precarious, but these were fine"?

Doesn't do that, right?

A.    That's correct.

Q.    It just paints it with a broad brush, right?

        MS. MURPHY:  Objection to form.

        THE WITNESS:  That's the way it's written, yes.



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1750 of 2249

ROBERT KOST  Conf.                                        May 13, 2025
DUNN V. PATRIARCH PARTNERS                                          347

R. Kost - Confidential

BY MR. KUSNETZ:

Q.    Okay.  Now, do you recall seeing this language before today?

A.    No.

Q.    This was a sealed complaint, right?  Do you see that?

A.    Yes.

Q.    But sealed complaints leak, right?

MS. MURPHY:  Objection to form.

THE WITNESS:  I -- I don't have a view on that.

BY MR. KUSNETZ:

Q.    The market was aware of this lawsuit almost contemporaneously, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  That would not surprise me.

BY MR. KUSNETZ:

Q.    Why would it not surprise you?

A.    Because there was a lot of litigation in our case and the Zohar cases.

Q.    And the market got wind of new litigation developments, correct?

MR. KUSNETZ:  Objection to form.

THE WITNESS:  I believe so, yes.



R. Kost - Confidential

BY MR. KUSNETZ:

Q.    Right, and it would not be conducive to maximizing the value of the portfolio companies if potential buyers read, for example, that each of the portfolio companies were in precarious financial condition, correct?

A.    That's true, in -- yes.

Q.    Okay.  Let's look at the Court's monetization decision.

MR. KUSNETZ:  This is going to be marked as Exhibit 13.

(Thereupon, a document was marked by the shorthand reporter as Exhibit 13 for identification.)

BY MR. KUSNETZ:

Q.    Okay.  Sir, do you see Exhibit 13 in front of you?

A.    Yes.

Q.    And do you see that it is an order establishing certain guidelines and milestones in furtherance of the monetization process for the Group A and Group B portfolio companies?

A.    Yes.

Q.    And do you see that this was filed on March



R. Kost - Confidential

20, 2020?

A.    Yes.

Q.    Filed two weeks -- just under two weeks after the Zohar funds filed that complaint, correct?

A.    Yes.

Q.    Okay.  This order was issued just under a month after the conclusion of the monetization trial, correct?

A.    Yes.

Q.    Okay, and do you recall reviewing this document?

A.    Yes.

Q.    Looking at page 3 of this document, at the top, do you see there's a chart?

A.    Yes.

Q.    And the Court lists portfolio companies?

A.    Yes.

Q.    And the Court provides go to market deadlines for these portfolio companies, correct?

A.    Yes.

Q.    But then it also provides signed agreement deadlines for these portfolio companies, correct?

A.    Yes.

Q.    Okay, so originally, Ms. Tilton and the



Case 1:16-cv-04488-VM-KHP   Document 419   Filed 03/27/26   Page 1753 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                           350

R. Kost - Confidential

debtors did not propose a timeline with signed agreement deadlines, correct?

A.    Correct.

Q.    That was Bardin Hill and MBIA, correct?

A.    Yes.

Q.    And Bardin Hill and MBIA got what they wanted?

A.    Apparently.

MS. MURPHY:  Objection to form.

BY MR. KUSNETZ:

Q.    Apparently, right?  The Court did -- did order signed agreement deadlines, right?

A.    Yes.

Q.    Okay, so Ms. Tilton lost that battle of establishing a monetization timeline without deadlines?

A.    Yes.

MR. KUSNETZ:  There's your admission for that.  Let's look at -- that was a joke.

THE WITNESS:  I can't believe the irony of COVID hitting like within days of this.

MR. KUSNETZ:  Isn't it amazing?

THE WITNESS:  Amazing.  I forgot --

(Thereupon, an informal discussion was held off the record.)



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1754 of 2249

ROBERT KOST  Conf.                                              May 13, 2025
DUNN V. PATRIARCH PARTNERS                                           351

                    R. Kost - Confidential

                    MR. KUSNETZ:  Let's look Tab 6.  I don't
          have too much more time.

                    (Thereupon, a document was marked by the
          shorthand reporter as Exhibit 14 for
          identification.)

                    MR. KUSNETZ:  Exhibit 14.

BY MR. KUSNETZ:

     Q.    Sir, do you see this email sent from
Ms. Tilton to Mr. Katzenstein and Mr. Farnan on March
21, 2020?

     A.    Yes.

     Q.    Okay, and do you see that Ms. Tilton writes,
"Dear Joe and Mike, Please see the attached.  It's with
a heavy heart that I've made this decision."

     Do you see that?

     A.    Yes.

     Q.    Okay, and there's an attachment to this
email, correct?  It says "Tilton Letter 3-21-20 PDF,"
correct?

     A.    Yes.

     Q.    Okay, and do you see the attachment is a
letter from Ms. Tilton?

     A.    Yes.

     Q.    And do you see that it's entitled -- sorry.



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1755 of 2249

ROBERT KOST  Conf.                                           May 13, 2025
DUNN V. PATRIARCH PARTNERS                                          352

R. Kost - Confidential

The subject line of this letter is "Resignation"?

A.    Yes.

Q.    Okay.  Do you see Ms. Tilton writes.

"Dear Joe and Mike, As you know, the Zohars very recently filed an adversary proceeding in the pending bankruptcy seeking, among other things, a declaration that they are the beneficial owners of all the Group A and Group B companies and that all proxies and LLC agreements executed in connection with those companies are null and void"?

Do you see that?

MS. MURPHY:  Objection.  I think it was "LLC amendments."

BY MR. KUSNETZ:

Q.    "Amendments executed in connection with these companies are null and void."

Do you do that?

A.    Yes, I see that.

Q.    Okay.  Do you see where she says in the second paragraph:

"Because of the actions taken by the Zohars, including last week's mediation failure where the Zohars chose not to negotiate and continued to refuse to extend the term loan maturity dates and the filing of an



R. Kost - Confidential

adversary action that continues the Zohars' smear campaign against me in court, I know that I can no longer effectively lead the companies forward into the future."

Do you see that?

A.    Yes.

Q.    Ms. Tilton here in this letter is resigning from her role as director of and manager of the portfolio companies, correct?

A.    Yes.

Q.    You were not on this email, right?

A.    Correct.

Q.    Did you ever receive this letter?

A.    I believe I did see this letter.

Q.    Okay.  Were you surprised to receive it? "Yes" or "no"?

MS. MURPHY:  Objection to form.

THE WITNESS:  I was surprised that Ms. Tilton resigned as -- her positions.

MR. KUSNETZ:  Okay.

(Thereupon, an informal discussion was held off the record.)

MR. KUSNETZ:  Okay.  I'm going to show you what's been marked as Exhibit 15.



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1757 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                         354

R. Kost - Confidential

(Thereupon, a document was marked by the shorthand reporter as Exhibit 15 for identification.)

BY MR. KUSNETZ:

Q.    Okay.  Do you see this is an email from Lynn DeGregorio, D-E-G-R-E-G-O-R-I-O, @seaportglobal.com on March 26, 2020, sent to Mr. Greene at Bardin Hill and a Mr. McQuade at Bardin Hill?

A.    Yes.

Q.    And do you see the subject line is "DJ, Lynn Tilton resigns from control of struggling businesses"?

A.    Yes.

Q.    "DJ" is a reference to Dow Jones, correct?

A.    Yes.

Q.    Okay.  And do you see this woman, Ms. Degregorio, writes to Bardin Hill, "What did my nana say?  Good riddance to bad rubbish"?

Do you see that?

A.    Yes.

Q.    Do you share Ms. Degregorio's assessment "good riddance to bad rubbish" with respect to Ms. Tilton?

A.    No.

Q.    What is Seaport Global's role in this action?



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1758 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                         355

                     R. Kost - Confidential

Do you recall?

     A.    I don't know Ms. Degregorio.  Seaport had a
role, and I -- I just -- I can't remember what their
role was.

     Q.    Okay, and what -- what Ms. Degregorio is
forwarding is this Dow Jones article by Peg Brickley.

     Do you see that?

     A.    Yes.

     Q.    Okay.  Do you see the Dow Jones article
starts:

     "Turnaround manager Lynn Tilton has walked away
from a collection of troubled businesses she has managed
for years after being ordered to sell them to pay off
Zohar Funds."

     "Lenders that have sued her."  Do you see that?

     A.    Yes.

     Q.    Okay.  Now, that monetization order from the
court was sealed, correct?

     A.    Yes.

     Q.    Right?  It was especially sealed because it
had agreement -- signed agreement deadlines, right?

               MS. MURPHY:  Objection to form.

               THE WITNESS:  Yes.



                    R. Kost - Confidential

BY MR. KUSNETZ:

    Q.    Right, but yet the Dow Jones knew about there
was a monetization order, correct?

    A.    I think this is just talking about Ms. Tilton
resigning.

    Q.    "Ordered to sell them."  Do you see that?

    A.    Yes, I see that.

    Q.    Yeah, and if you go down to the last
paragraph on the first page, this is -- sorry.  Bates
Barden Hill_0012063.

    It says "Ms. Tilton resigned less than 24 hours
after losing a fight over a schedule for selling the
businesses.  Under court orders to help with a sale
effort, Ms. Tilton could simply refuse to engage,
destabilizing the situation, Mr. Shore said."

    Okay.  We'll get to Mr. Shore in a second.

    So based on your reading of this article, the
monetization order leaked, correct?

                MS. MURPHY:  Objection to form.

                THE WITNESS:  Apparently that there was a
        monetization order with scheduling deadlines.

BY MR. KUSNETZ:

    Q.    Leaked?

    A.    Leaked.



R. Kost - Confidential

Q.    And as we previously discussed, Ms. Tilton in the public hearing, stated -- Ms. Tilton's representatives in the public monetization hearing said that she was against having deadlines for the sale of the portfolio companies, correct?

A.    Yes.

MS. MURPHY:  Objection to form.  Counsel, you're out of time.

MR. KUSNETZ:  Am I out of time?

THE VIDEOGRAPHER:  We're at seven hours, two minutes.

MR. KUSNETZ:  I'm just going to finish my last question.  You don't mind finishing this document?

MS. MURPHY:  I would prefer for you to be out of time, so last question.

MR. KUSNETZ:  All right.

Well, I'm going to finish the document, if you don't mind.

BY MR. KUSNETZ:

Q.    So when this news article says that Ms. Tilton "lost a fight over the schedule," that implies that there are, in fact, deadlines to the monetization process, correct?



R. Kost - Confidential

MS. MURPHY:  Objection to form.

THE WITNESS:  A reader could infer that.

BY MR. KUSNETZ:

Q.    Right, and last question.

(Pause.)

MR. KUSNETZ:  Ah, here it is.

BY MR. KUSNETZ:

Q.    If you go -- last question.

If you go to the next page, which is ending in
Bates number 64, third paragraph, it says:

"In recent weeks, the Zohar CLO funds sued
Ms. Tilton, but, as with much of the action in their
bankruptcy case, the lawsuit is being kept secret."

Do you see that?

A.    Yes.

Q.    So the lawsuit filed by the Zohar funds
against Ms. Tilton leaked, and people in the market were
aware of it, correct?

MS. MURPHY:  Objection to form.

THE WITNESS:  I will infer that, yes.

MR. KUSNETZ:  Okay.  No further

questions.

MS. MURPHY:  Okay.

(Thereupon, an informal discussion was



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1762 of 2249

ROBERT KOST  Conf.                                        May 13, 2025
DUNN V. PATRIARCH PARTNERS                                        359

R. Kost - Confidential

held off the record.)

MR. BARTLEY:  Let's take five minutes.

MS. MURPHY:  Let's take five.

MR. KUSNETZ:  We're out of time, but if you want a few questions at the end, you gave me a few.  I'll give you a few.

THE VIDEOGRAPHER:  We are going off the record.  The time is 9:39, and this concludes Media Unit No. 10.

(Recess taken at 9:39 p.m.)

(Resumed at 9:45 p.m.)

THE VIDEOGRAPHER:  We are back on record. The time is 9:45, and this is the start of Media Unit No. 11.


CROSS-EXAMINATION

BY MS. MURPHY:


Q.   Good evening, Mr. Kost.

A.   Good evening.

Q.   Are you aware of the text of the complaint that you were shown today being made public or actually leaking to the press?

A.   No, I'm not.



R. Kost - Confidential

Q.    Are you aware of the text of the monetization order from the court that you were shown today being actually made public or leaking to the press?

A.    No, I'm not.

Q.    Earlier today, do you recall counsel asking you a question where -- a couple questions, maybe, where I believe he referred to an ad hoc creditors committee of the board?

A.    No.  There was just an ad hoc creditors committee.

Q.    What was the relationship between the board of the Zohar debtors and the ad hoc creditors committee?

A.    None.

Q.    Was it your understanding that the bankruptcy proceedings of the Zohar funds were commenced in order to sell the portfolio companies?

A.    Ms. Tilton had her own reasons to put the companies into bankruptcy.  Our initial thoughts were we were going to work to try to do an out-of-court settlement and/or out-of-court monetization process, but Ms. Tilton instructed us that we were to help her prepare for a bankruptcy filing.

Q.    And once the bankruptcy filing had been made, did you understand that one of the purposes of the



Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1764 of 2249

ROBERT KOST  Conf.                                          May 13, 2025
DUNN V. PATRIARCH PARTNERS                                        361

R. Kost - Confidential

bankruptcy filing was to sell the portfolio companies?

MR. KUSNETZ:  Objection to form.

THE WITNESS:  Yes.  Once we were in bankruptcy and negotiated the settlement agreement, the whole -- that's the whole point of the settlement agreement was to work together to monetize the portfolio companies.

BY MS. MURPHY:

Q.    So was it public that one of the goals of the bankruptcy proceedings was to sell the portfolio companies?

A.    I believe so.

Q.    Do normal -- I think you said "regular way" sales processes sometimes have presumed deadlines for things like indications of interest or letters of intent?

A.    Yes, they do for those purposes.

MR. KUSNETZ:  Ms. Murphy, I'll note that you've been going for two minutes and 20 seconds, and we are overtime and I did an extra two minutes.  How more time do you anticipate?

MS. MURPHY:  Less than 10 minutes, and I believe that counsel gets to redirect.



R. Kost - Confidential

MR. KUSNETZ:  Not when the deposition is over and you didn't cross-notice this witness.

MS. MURPHY:  I would like to finish my questioning, as we gave you the grace to finish yours.

MR. KUSNETZ:  I finished my questioning two minutes overtime.  You're at two minutes and 20 seconds overtime, so I suggest that you finish within the next minute or so, because I will not consent to additional questioning that goes well beyond the time for this deposition.

BY MS. MURPHY:

Q.    Does having presumed deadlines in a sales process cause the sales to be a fire sale?

MR. KUSNETZ:  Objection to form.

THE WITNESS:  No.

BY MS. MURPHY:

Q.    Did you understand that the processes set by the court in 2020 -- in Exhibit 13, if that's helpful -- had flexibility to be moved back?

A.    Yes.

Q.    Did you understand that that did, in fact, happen here and the deadlines were, in fact, moved back


ESQUIRE
DEPOSITION SOLUTIONS

R. Kost - Confidential

after they were set?

MR. KUSNETZ:  Objection to form.

THE WITNESS:  Yes, they were moved many times.

BY MS. MURPHY:

Q.   Do you think that any deadline in this case from this order caused an adverse result in the sale process?

MR. KUSNETZ:  Objection to form.

THE WITNESS:  No.  I think that the market knew that we were in bankruptcy as the Zohar debtors and we owned the portfolio companies, so that was -- that was well known by the market.

BY MS. MURPHY:

Q.   You did not have detailed portfolio company information when you were reading the CIMs, right?

MR. KUSNETZ:  Objection to form.

THE WITNESS:  Can you rephrase the question?

BY MS. MURPHY:

Q.   Absolutely.

You read the CIMs before -- for the portfolio companies before they were sent to potential buyers for



R. Kost - Confidential

the portfolio companies, right?

     A.    Yes.

     Q.    At that time, you did not have detailed portfolio company financial information; is that right?

          MR. KUSNETZ:  Objection to form.

          THE WITNESS:  In some cases, I would have had financial information, but probably not detailed financial information.

          MS. MURPHY:  Understood.

          MR. KUSNETZ:  Ms. Murphy, I must insist. You are now over four minutes.  You are now twice what I did over the time.

          You did not cross-notice this deposition. The deposition is over, so I don't really understand what you're doing and why you think it's appropriate to do twice as much time as I did over the time, so I must insist that this deposition be over.

          MS. MURPHY:  I have two more questions I would like to ask.

          MR. KUSNETZ:  You may ask those two and no more.

BY MS. MURPHY:

     Q.    Did you regard it as your responsibility to


DEPOSITION SOLUTIONS

Case 1:16-cv-04488-VM-KHP    Document 419    Filed 03/27/26    Page 1768 of 2249

ROBERT KOST  Conf.                                         May 13, 2025
DUNN V. PATRIARCH PARTNERS                                        365

R. Kost - Confidential

confirm that the CIMs were accurate?

MR. KUSNETZ:  Objection to form.

THE WITNESS:  I think my duty was try to help the investment bankers put out the best possible CIM to maximize value.

BY MS. MURPHY:

Q.    When you supported sending the CIM out to buyers, you were not agreeing that everything within was accurate; you were just agreeing that it should be sent out, right?

MR. KUSNETZ:  Objection to form.

THE WITNESS:  That's correct.

MS. MURPHY:  Those are my questions.

MR. KUSNETZ:  Okay.  We're done.  Thank you so much.

THE VIDEOGRAPHER:  Okay.

MR. KUSNETZ:  I would like to designate this confidential under the protective order.

THE VIDEOGRAPHER:  This concludes today's testimony given by Robert Kost.  There's a standing order on file for transcripts and videography work.

There's a total media units of 11 were used for today's deposition.



800.211.DEPO (3376)
EsquireSolutions.com

R. Kost - Confidential

And everyone have a good night.  Thank you.

MR. KUSNETZ:  Thank you.

THE WITNESS:  Thank you.

(Thereupon, the deposition concluded at 9:51 p.m.)

(The exhibits were retained by the shorthand reporter to be attached to the transcript.)

***      ***      ***



ACKNOWLEDGMENT OF DEPONENT

I, ROBERT KOST, do hereby certify that the foregoing testimony given by me on May 13, 2025, is true and accurate, including any corrections noted on the corrections page, to the best of my knowledge and belief.

_____

ROBERT KOST


At _____ in said County of _____, this _____ day of _____, 2025, personally appeared ROBERT KOST and he made an oath to the truth of the foregoing corrections by him subscribed.


Before me, _____, Notary Public.  My commission expires _____.



C E R T I F I C A T E

I, CHERYLL KERR, CSR, a Certified Shorthand Reporter and Notary Public, do hereby certify that the witness whose deposition is hereinbefore set forth was duly sworn by me, and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 14th day of May, 2025.

*Cheryll Kerr*
_____
CHERYLL KERR, CSR



ROBERT KOST  Conf.                                     May 13, 2025
DUNN V. PATRIARCH PARTNERS                                      369

                ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name:   IN RE: ZOHAR III CORP. et al.,

Dep. Date:  May 13, 2025

Deponent:   Robert Kost

Reason codes:

        1.   To clarify the record.

        2.   To conform to the facts.

        3.   To correct transcription errors.

   Pg.     Ln.      Now Reads       Should Read     Reason

_____   _____    _____    _____    _____

_____   _____    _____    _____    _____

_____   _____    _____    _____    _____

_____   _____    _____    _____    _____

_____   _____    _____    _____    _____

_____   _____    _____    _____    _____

_____   _____    _____    _____    _____

_____   _____    _____    _____    _____

_____   _____    _____    _____    _____

_____
     Signature of Deponent


SUBSCRIBED AND SWORN BEFORE ME

THIS _____ DAY OF _____, _____.

_____

(Notary Public)  My Commission Expires: _____



# Exhibit I

C O N F I D E N T I A L

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

-----------------------------)

In re:                        )Chapter 11

                             )

Zohar III, Corp., et al.,    )Case No.

                             )18-10512(KBO)

           Debtors.         )

-----------------------------)Jointly Administered


Deposition of ROBERT KOST

February 7, 2020

Reported by: Dawn Matera

**Key:**
Stipulated Designations

**Page 2**

200 Park Avenue

New York, New York

February 7, 2020

10:06 a.m.

Videotaped Deposition of ROBERT KOST, a Witness in the above-entitled action, held at the above time and place, taken before Dawn Matera, a Shorthand Reporter and Notary Public of the State of New York.

* * *

A P P E A R A N C E S :

GIBSON DUNN & CRUTCHER LLP
Attorneys for Lynn Tilton, Patriarch
Partners XV, LLC and Octaluna, LLC
200 Park Avenue
New York, New York 10166-0193
By:   MARY BETH MALONEY, ESQ.
mmaloney@gibsondunn.com

By: SARAH WHITE, ESQ.
swhite@gibsondunn.com

- and -

BY:   MONICA K. LOSEMAN, ESQ.
mloseman@gibsondunn.com
1801 California Street
Suite 4200
Denver, Colorado 80202
(Telephonically)

YOUNG CONAWAY STARGATT & TAYLOR LLP
Attorneys for Zohar Funds
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
(302)571-6705
By:   MICHAEL NEIBURG, ESQ.
mneiburg@ycst.com

Page 4

A P P E A R A N C E S : (Continued)

CADWALADER WICKERSHAM & TAFT LLP
     Attorneys for MBIA
          One World Financial Center
          New York, New York 10281
          (212)504-6975

     By:   INGRID BAGBY, ESQ.
           ingrid.bagby@cwt.com
     BY:   MICHELE C. MAMAN, ESQ.
           michele.maman@cwt.com


     ARNOLD & PORTER KAYE SCHOLER LLP
     Attorneys for the Zohar III
     Controlling Class
          250 West 55th Street
          New York, New York 10019
          (212)836-8317

     By:   BRIAN J. LOHAN, ESQ.
           brian.lohan@arnoldporter.com


     WHITE AND CASE LLP
     Attorneys for Joseph Farnan, the
     Independent Director to the Zohar
     Debtors
          1221 Avenue of the Americas
          New York, New York 10020
          212-819-7845

     By:  SAMUEL P. HERSHEY, ESQ.
          sam.hershey@whitecase.com
     By:  CHARLES R. KOSTER, ESQ.
          ckoster@whitecase.com

**Page 5**

A P P E A R A N C E S : (Continued)


Also Present:

Carolyn Schiff, Patriarch Partners,

Vice President, Litigation

Tom Devine, Videographer

Kost - Confidential

THE VIDEOGRAPHER: Good morning. We are going on the record at a.m. on February 7th, 2020. Please note that the microphones are sensitive and may pick up whispering, private conversations and cellular interference. Please turn off all cell phones or place them away from the microphones as they can interfere with the deposition audio.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit one of the video-recorded deposition of Robert Kost in the matter of In Re: Zohar III Corporation, et al., filed in the U.S. Bankruptcy Court for the District of Delaware, case number 18-10512 (KBO).

This deposition is being held at the offices of Gibson Dunn located at 200 Park Avenue, New York, New York.

My name is Thomas Devine from

Kost - Confidential

the firm Veritext New York and I am the videographer.  The court reporter is Dawn Matera also with Veritext New York.

I am not authorized to administer an oath.  I am not related to any party in this action, nor am I financially interested in the outcome.

Counsel and all present in the room and everyone attending remotely will now please state their appearances and affiliations for the record.  If there are any objections to proceeding, please state them at the time of your appearance, beginning with the noticing attorney.

After appearances are noted, the court reporter will swear in the witness and we may proceed.

MS. MALONEY:  Mary Beth Maloney from Gibson Dunn representing Patriarch, the Patriarch stakeholders and Ms. Tilton.  I am joined today by my colleague Ms. Sarah White and by

Kost - Confidential

phone, Ms. Monica Loseman.

And from Patriarch Partners, Ms. Carolyn Schiff.

MR. NEIBURG: Michael Neiburg from Young Conaway Stargatt & Taylor on behalf of the debtors.

MR. HERSHEY: Sam Hershey, from White & Case on behalf of Joseph J. Farnan as the independent director. I am joined by my colleague Charles Koster.

MS. BAGBY: Ingrid Bagby from Cadwalader Wickersham & Taft for MBIA Insurance Corp., and I am also here with my colleague Michele Maman.

MR. LOHAN: Brian Lohan from Arnold & Porter here on behalf of the Zohar III controlling class.

R O B E R T  K O S T, having been first duly sworn by Dawn Matera, a Notary Public, was examined and testified as follows:

Page 9

Kost - Confidential

EXAMINATION BY MS. MALONEY:

Q.    Good morning, Mr. Kost.  We've met before.

A.    Yes, good morning.

Q.    For purposes of the record, Mary Beth Maloney, and state your full name for the record, please.

A.    Robert Kost, K-O-S-T.

Q.    And you are currently employed where?

A.    I am a managing director at Goldin Associates, Inc.

Q.    And you've been deposed before; is that right?

A.    Yes.

Q.    Okay.  And specifically, you've been deposed in connection with this action; is that right?

A.    Yes.

Q.    Do you recall being deposed on April 12th, 2018?

A.    Yes.

Q.    And do you recall that I was also present for that deposition?

Page 10

Kost - Confidential

A.      Yes.

Q.      Okay.  In preparation for this deposition, did you take a look at the transcript for that deposition?

A.      I did not.

Q.      Okay.  And Mr. Neiburg is your counsel today; is that correct?

A.      Yes.

Q.      And he was also your counsel at that deposition?

A.      Yes.

Q.      So you're familiar with the rules of the road for being deposed; right?

A.      Yes.

Q.      I am just going to quickly go over them just to remind you.

First priority is to tell the truth.  Second is answer the question asked, not a different question.

Answer audibly, so the court reporter can hear you.  Wait for me to finish my question until you answer. Give your counsel an opportunity to

Kost - Confidential

object.  And unless counsel instructs you
not to answer, even if there is an
objection, please answer.

Is that sufficient?

A.    Yes.

Q.    Great.  Mr. Kost, have you
reviewed this document I am going to mark
as Exhibit 1 in your deposition, the
Notice of Deposition?

(Kost Exhibit 1, Notice of
Deposition, was so marked for
identification, as of this date.)

MR. NEIBURG:  Are we going to go
Kost 1?

MS. MALONEY:  Yes.

A.    I am pretty sure I received
this and I skimmed it quickly.

Q.    And you understand you're being
deposed today in connection with the
parties' competing motions for approval
of guidelines and milestones for the
monetization process?

A.    Yes.

Q.    Okay.  And if I use the term

Kost - Confidential

"milestone motion," you will understand what I am referring to?

A.    Yes.

Q.    I should say if I use the term "milestone motions," and then I clarify debtors' milestone motion versus Patriarch's milestone motion, does that make sense?

A.    Yes.

Q.    And you understand you're being deposed today in your capacity as the chief monetization officer of the debtors in these cases?

A.    Yes.

Q.    And the debtors in these cases are generally referred to as the Zohar funds.  If I use that terminology, you will understand to what I am referring; correct?

A.    Yes.

Q.    Okay.  What did you do to prepare for your deposition today?

A.    Primarily I met at two sessions with my counsel Mike Neiburg.

Kost - Confidential

Q.    And when were those two sessions?

A.    Wednesday and Thursday, and I also met with Mr. Neiburg for breakfast this morning.

Q.    Where did you guys have breakfast?

A.    Cafe Centro.

Q.    The usual?

A.    Yes.

Q.    How long was the first session?

A.    The first session was approximately six hours.

Q.    The second session?

A.    Three-and-a-half hours.

Q.    And what time did you all meet for breakfast this morning?

A.    8:45.

Q.    And did you review documents in preparation for your deposition?

A.    Yes.

Q.    Are any documents -- do any documents come to mind specifically?

A.    Counsel prepared two binders

Kost - Confidential

for me that included a variety of e-mails that had my name on them; a variety of documents that were produced by other parties, again, that had my name on them, as part of an e-mail attachment.

And I also saw copies of the various motions and filings from the parties.

Q.   Okay.  So you reviewed the guidelines proposed by debtors in their guidelines motion of December 20th?

A.   Yes.

Q.   And did you review the guidelines proposed by Ms. Tilton in her motion of December 20th?

A.   Yes.  I reviewed them cursorily over the last two days but I have also read them in the past.

Q.   Okay.  And did you speak with anyone other than Mr. Neiburg in preparation for this deposition?

A.   Yes.

Q.   And who was that?

A.   Mr. Hershey and Charlie.

Kost - Confidential

MR. KOSTER:  Koster.

A.    Charlie Koster.  I should know that one.

Q.    Who does Mr. Hershey represent?

A.    Both Mr. Koster and Mr. Hershey work for White & Case and they are here on behalf of Judge Farnan.

Q.    And in your preparation with Mr. Neiburg, was anyone else present?

A.    No, it was just the three gentlemen.

Q.    So Mr. Hershey and Mr. Koster were also present with Mr. Neiburg; is that right?

A.    Correct.  Not for the full time, but, yes, they were there.

Q.    And did you have separate preparation sessions with Mr. Hershey and Mr. Koster?

A.    No.

Q.    So no preparation sessions in which Mr. Neiburg wasn't present?

A.    Correct.

Q.    Is that correct, to your

Kost - Confidential

recollection?

A.    I mean I prepared a little bit by myself.

Q.    Okay.  And did you speak with anyone who was not counsel about your upcoming deposition?

A.    No.

Q.    Speak with any of the bankers who are working on -- who have been retained for any of the portfolio companies about your upcoming deposition?

A.    I have spoken to the bankers, but I did not talk about my deposition.

Q.    Did you let them know you were being deposed?

A.    I may have.

Q.    And do you recall who you may have let know you were being deposed, who was a banker retained by a portfolio company?

A.    I believe I commiserated with Mr. Dalton at Lazard.

Q.    Is Mr. Dalton a friend of yours?

Kost - Confidential

A.     No.

Q.     You have become friendly over the past year of him working to monetize one of the portfolio companies?

A.     I wouldn't use the word "friendly," but he is a banker that I have been working with for a year.

Q.     Okay.  Did he tell you he was also deposed?

A.     I think I asked him if he was being deposed because I had heard that he was being deposed.

Q.     Have you spoken to him since his deposition?

A.     No.

Q.     And did you review the transcript of his deposition in preparation for your deposition?

A.     No.

Q.     Did you discuss the contents of his deposition as part of the preparation for your deposition?

A.     No.

Q.     And are you aware of any other

Kost - Confidential

bankers who have been deposed to date?

A.    I am aware that Gene Bazemore

from Founders has been deposed to date.

Q.    Okay.  Did you discuss the

contents of his deposition with your

counsel?

A.    No.

Q.    And did you review the

transcript of his deposition?

A.    No.

Q.    Are you aware generally what

Mr. Bazemore testified to?

A.    No.

Q.    And you know that he -- strike

that.

You said that he was with

Founders.

Okay.  And Mr. Kost, do you

intend to testify at the hearing on

February 19th or February 20th, if

called?

A.    I believe I am listed as a

potential witness.

Q.    Let's talk about your role as

Kost - Confidential

chief monetization officer for debtors in this matter.

How would you characterize that position of chief monetization officer?

A.     In my role as chief monetization officer, I represent the debtors with respect to the oversight and sale of their investments in the portfolio companies.

Q.     And when you say you represent the debtors, represent the debtors relative to whom?

A.     Well, I am a chief monetization officer, so I am an officer of the Zohar debtors.

Q.     And what are your responsibilities as chief monetization officer?

A.     To oversee the monetization and sale of the debtors' assets.

Q.     Okay.  So that includes -- what does overseeing include?

A.     Typically, my oversight role over the last 18 months has been to be

Kost - Confidential

the point of contact with the investment bankers that we have jointly interviewed and retained to monetize and sell the Group A portfolio companies.

Q.   So you have been the point of contact for the debtors with the investment bankers that you've jointly interviewed and retained to monetize the companies?

A.   Yes.

Q.   Okay.  And when you say "we have jointly interviewed and retained to monetize the companies," who is the "We" you are referring to?

A.   I am referring primarily to Ms. Tilton from Patriarch Partners.  In addition, Randy Jones, an employee of Patriarch Partners.

There were a number of investment bankers that were interviewed and retained prior to my retention as a chief monetization officer.  But generally, subsequent to that date, I have been involved in the interview and

Kost - Confidential

retention of investment bankers.

Q. Did you raise any concerns with Ms. Tilton about the choices of investment banker who were retained prior to your appointment as chief monetization officer?

A. No, we reviewed the prior retentions and they're generally reputable investment banks.

Q. And when you say you reviewed the prior retentions, did you review the retention agreements that were entered prior to your appointment as chief monetization officer to determine if they were -- period. Strike that.

When you say you reviewed the prior retentions, did you review the retention agreements that were entered prior to your retention as chief monetization officer?

A. Yes.

Q. And when you reviewed those, did you make a determination as to whether they were entered on commercially

Kost - Confidential

reasonable terms?

MR. NEIBURG:  Object to form.

A.    I reviewed the engagement letters and they are generally reasonable.

Q.    If they had not been entered on commercially reasonable terms, would you have raised that with Ms. Tilton?

A.    Yes.

Q.    Would you have raised that with Mr. Katzenstein?

A.    Yes.

Q.    And Mr. Katzenstein is the chief restructuring officer for the funds?

A.    Yes.

Q.    But you did not raise any concern that the prior retentions were entered on terms other than those that were commercially reasonable?

MR. NEIBURG:  Object to form.

A.    That's correct.

Q.    So as the chief monetization officer, you support Mr. Katzenstein in

Kost - Confidential

his capacity as the chief restructuring officer with respect to the monetization process?

A.    Yes.

Q.    You have said that in a sworn declaration in connection with Oasis, and a little bit later on we will go through some of your prior declarations, but I will try to let you know so that you're not feeling like, wait, is that exactly what I've said.

Tell me about your educational background.

A.    I have an undergraduate degree from the University of Michigan. Economics major.  I have a graduate degree from the Fuqua School of Business at Duke University.  My MBA is in finance.

Q.    And what's your current position at Goldin Associates?

A.    I am a managing director of Goldin Associates, Inc.  I am also a managing director of Goldin Capital

Kost - Confidential

Advisors, and I run our transactional advisory services business.

Q.    And you've characterized yourself previously in filings with the Court as a broad-based generalized investment banker; is that accurate?

A.    Yes.

Q.    Do you hold any licenses?

A.    Yes.

Q.    And what are those?

A.    FINRA series 7, 24 and 63.

Q.    And those are in relation to securities; is that right?

A.    Yes, I am a fully registered, registered representative under FINRA and a Series 24 means I can theoretically run a branch.

Q.    Okay.  But you've never done that before?

A.    Series 24 is for people who oversee other registered reps.

Q.    Have you ever been the director of a company before?

A.    No.

Page 25

Kost - Confidential

Q.    Have you ever served in a management position at a company before, other than at Goldin?

A.    Let me -- can I go back for one thing?

Q.    Of course.

A.    I am a director of a not-for-profit organization, which is technically a corporation.

Q.    Correct.  But other than -- strike that.

You've never been the director of a for-profit company; is that correct?

A.    No.

Q.    Okay.  You have said previously that you have over 30 years of experience as an investment banker; is that correct?

A.    Yes.

Q.    And that you've also testified numerous times on matters related to investment banking and corporate finance; is that correct?

A.    Yes.

Q.    You've testified as a fact

Page 26

Kost - Confidential

witness previously in connection with matters relating to investment banking and corporate finance?

A.    Both fact and expert.

Q.    And it's fair to say you have a lot of experience in bankruptcy situations; is that right?

A.    Yes.

Q.    And you're familiar with the process of bankruptcy proceedings?

A.    Yes.

Q.    And you have led companies through -- strike that.

You have served as the investment banker for companies going through a bankruptcy; is that right?

A.    Yes.

Q.    Have you also served as an investment banker for companies that are not in bankruptcy that are doing straight M&A transactions?

A.    Yes.

Q.    Can you put an approximate percentage on your experience with

Kost - Confidential

companies going -- your experience as an investment banker with companies going through a bankruptcy versus companies going through an M&A transaction outside of bankruptcy?

A.    A rough guesstimate would probably be three quarters would be in a restructuring context and one quarter would be a perfectly, you know, normal --

Q.    M&A?

A.    -- M&A assignment.

Q.    Okay.  How did you first become involved in the Zohar bankruptcy?

A.    I was brought in to join our team at Goldin Associates to pitch for the chief restructuring officer and advisory role for the Zohars, and that process was led by Mark Kirschner.

Q.    And so you recall Mark Kirschner's involvement in the Zohar funds at the beginning of the filing of these cases?

A.    Yes.

Q.    And you were supporting him at

Kost - Confidential

the beginning of the filing of these cases?

A.    Yes.

Q.    And then do you recall that Mr. Kirschner also testified in connection with this action?

A.    Yes.

Q.    And do you recall that he submitted a declaration in support of the first day filing of this action?

A.    Yes.

Q.    Do you recall being involved in the drafting of that declaration?

A.    No.

Q.    And is Mr. Kirschner involved in the Zohar funds bankruptcy anymore?

A.    No.

Q.    He's not currently involved in it?

A.    No.

Q.    And why is that?

A.    His role -- he was replaced by Katzenstein as the chief restructuring officer when Goldin Associates was

Kost - Confidential

replaced by FTI Consulting.

Q.    And do you know why he was replaced?

MR. NEIBURG:  I will just caution the witness that you can answer that question to the extent you have independent knowledge of the reason why he was replaced.  But do not divulge any communications with counsel.

A.    Pursuant to the settlement agreement, the parties decided to search for a replacement chief restructuring officer and firm.

Q.    Did you discuss with him why he was replaced?

A.    Did I discuss?

Q.    Have you discussed with Mr. Kirschner why he was replaced?

MR. NEIBURG:  Object to form.

Q.    It's just a yes or no.

A.    I don't recall.  Mark Kirschner was at all the same meetings that I was back during the settlement discussions.

Kost - Confidential

Q.    Mr. Kirschner testified, as you said earlier, in connection with these actions.  And do you have any reason to think he testified untruthfully?

A.    No.

Q.    You think he testified truthfully?

A.    I would assume he testified truthfully.

Q.    And did you review his deposition?

A.    No.

Q.    Okay.  Did you discuss his deposition with him?

A.    I don't recall.

Q.    Do you have any concerns about testifying in this matter now and potentially being replaced as a result of your testimony?

MR. NEIBURG:  Object to form.

A.    No.

Q.    And you're aware that Houlihan Lokey is being considered as an investment banker for the debtors?

Kost - Confidential

A.      Yes.

Q.      And is -- have you reviewed or considered the hiring of Houlihan Lokey to become an investment banker for the debtors?

A.      I have reviewed one or more drafts of their engagement letter.

Q.      Okay.  And you said that Goldin was replaced by FTI to serve -- that Goldin was replaced by FTI.

So when Goldin was replaced by FTI, what was the role that FTI was taking on?

A.      Chief restructuring officer, Mike Katzenstein.

Q.      Okay.  And is FTI handling any financial advisory services for debtors, to your knowledge?

A.      Yes.

Q.      And is Goldin also still providing financial advisory services for debtors?

A.      In my role as chief monetization officer, I periodically use

Kost - Confidential

one or more of my junior staff, but it has been extremely light usage to date.

Q.    And I've reviewed your bills to the debtors and I see the use of staff.

I also saw a number of entries which we can get to later where you're reviewing what you describe as waterfalls; what are those?

A.    Waterfall analyses are prepared by FTI Consulting and looked to calculate from a hypothetical perspective the recoveries to the Zohar creditors.

Q.    So you reviewed waterfall analyses prepared by FTI Consulting; is that correct?

A.    Yes.

Q.    And those -- and what was the purpose of the review of the waterfall analyses?

MR. NEIBURG:  Object to form.

MS. MALONEY:  Strike that.

Q.    What was the purpose of your reviewing waterfall analyses prepared by FTI Consulting that calculated recoveries

Kost - Confidential

for the Zohar creditors?

A.    My role in the review was primarily focused on the hypothetical or illustrative valuation ranges for the portfolio companies that were included or in those waterfall analyses.

Q.    And having determined the hypothetical or illustrative valuation ranges for the portfolio companies that were included in those waterfall analyses, did you assess them against any other valuations?

MR. NEIBURG:  Object to form.

A.    No.

Q.    Did you assess them against the valuations that investment bankers were identifying for various portfolio companies?

A.    You'd have to clarify your question because I don't know what you mean by when you say valuations identified investment bankers.

Q.    Okay.  So when you reviewed the waterfall analyses, were you comparing

Kost - Confidential

the valuations in those analyses to any other valuations?

A.    Yes.

Q.    Were they compared -- did you compare them to any valuations prepared by Ms. Tilton?

A.    No.

Q.    Have you ever reviewed a waterfall analysis prepared by Ms. Tilton?

A.    Yes.

Q.    Okay.  And was that waterfall analysis also reviewed by FTI --

A.    Yes.

Q.    -- to your knowledge?  Did you review the analysis of a -- strike that.

Did you review a waterfall analysis prepared by FTI of a waterfall analysis prepared by Ms. Tilton?

MR. NEIBURG:  Object to form.

A.    Yes.  I do recall that FTI prepared an analysis that incorporated Ms. Tilton's views on value for the portfolio companies.

Kost - Confidential

Q.    We've talked about a waterfall analysis prepared by Ms. Tilton.  Are you aware that there were multiple waterfall analyses prepared by Ms. Tilton and submitted to debtors?

MR. NEIBURG:  Object to form.

A.    I would say no.  I specifically recall one.

Q.    And approximately when was that?

A.    Last summer.

Q.    And what do you specifically recall about the waterfall analysis prepared by Ms. Tilton that you recall from last summer?

A.    That Ms. Tilton had put together her own waterfall analysis that included hypothetical -- well, her view of value for certain companies that were within the Group A portfolio.

Q.    Okay.  Do you know if it included the most valuable companies in the Group A portfolio?

A.    Yes.

Kost - Confidential

Q.    And what were, to your recollection, the most valuable companies in the Group A portfolio?

A.    The two companies that all the parties have believed were the most valuable would be MD Helicopters and Dura Automotive.

Q.    Do you recall if Stila was included in that waterfall analysis prepared by Ms. Tilton?

A.    It's possible.

Q.    It's possible.  So you don't have any recollection one way or another whether the company from which Zohar III will receive the most recovery was included in Ms. Tilton's waterfall analysis?

MR. NEIBURG:  Object to form.

A.    Stila was definitely one of the companies that we used to talk about.  I just can't remember whether it was part of her -- it's kind of -- Stila has kind of come in and out of proposals, which I don't really follow a lot of

Kost - Confidential

Ms. Tilton's -- that wasn't my role to follow what we call the omnibus or the global refinancing.  That wasn't my focus.

So I remember Stila kind of coming in and out.

Q.    Did Stila -- do you have any understanding of why Stila would come in and out of this global refinancing?

MR. NEIBURG:  I'll just caution the witness that if you have independent knowledge of that fact, if it did occur, you may answer that question.  But if your knowledge comes from discussions with counsel, I'll instruct you not to answer.

A.    Ms. Tilton, it was my impression that Ms. Tilton didn't want to put Stila on the block to sell in the early part of the sale processes.  She wanted to keep pushing it off to the back end.

So I don't recall whether or not it was in or out of her waterfalls.

Kost - Confidential

There were a lot of variations of the waterfalls.

Q.    And the order of sales for the portfolio companies was something that was jointly determined under the settlement agreement by Ms. Tilton and the CRO; is that correct?

MR. NEIBURG:  Object to form.

A.    I would think the -- it was supposed to be jointly and Ms. Tilton was very strong in her views on what she thought would be the appropriate process.

Q.    So when you say she was very strong in her views, what does that mean?

A.    As you know, Ms. Tilton, Ms. Tilton had her own views as what she thought the order of the sale process should be.

Q.    And did her views carry the day as to the order of the sales process?

MR. NEIBURG:  Object to form.

A.    I can't answer that.  It's been a lot of joint discussions over the last 18 months, so I couldn't answer who

Kost - Confidential

prevailed as to the actual timing of any portfolio company.

Q.   Okay.  Well, Stila was not part of the joint -- was not put up for sale during the past 20 months; you know that, right?

A.   Yes.

Q.   And you said earlier that Stila was one of the companies that Ms. Tilton wanted to push off to the back end; right?

A.   Yes.

Q.   And so since it wasn't put up for sale and she wanted to push it off to the back end, would you say that her views on the timing for the selling of Stila prevailed?

MR. NEIBURG:  Object to form.

A.   Yes, if you put it that way, she prevailed.

Q.   And did she prevail over Mr. Katzenstein's objections?

A.   Again, I don't know what you mean by objections.

Kost - Confidential

Q.     Did Mr. Katzenstein disagree and think that Stila should have been put up for sale before the end of the 15-month monetization period?

MR. NEIBURG:  I'll just caution the witness that to the extent Mr. Katzenstein may have raised that within the deliberations with counsel, but did not express that to Ms. Tilton, I will instruct the witness not to answer.

But if you know that Mr. Katzenstein said that to Ms. Tilton, you may answer that question.

MS. MALONEY:  Well, I am talking about the joint monetization process between Ms. Tilton and the debtors, and I am asking him, asking you --

MR. NEIBURG:  I am saying --

MS. MALONEY:  You don't need to interrupt me.  I am asking you --

MR. NEIBURG:  No, we are talking about grounds that can be covered by

Kost - Confidential attorney-client privilege.  I am not going to be cut off on that.

MS. MALONEY:  Reread my question, if you would.

(Record read.)

MR. NEIBURG:  And, again, I will instruct the witness, if as part of internal deliberations Mr. Katzenstein expressed a view one way or the other within deliberations with counsel, I am instructing you not to answer that question.

However, if you know that Mr. Katzenstein expressed a view to Ms. Tilton or someone at Patriarch about that subject, that's what you can answer.

A.     I don't know whether Mr. Katzenstein agreed or disagreed.  I do know that Mr. Katzenstein and I both would have preferred to sell Stila sooner rather than later.

Q.     And did you raise that preference to put Stila in an earlier

Kost - Confidential

point in the sales process with the Court?

MR. NEIBURG:  Object to form.

A.    I don't recall whether we raised it with the Court.

Q.    Well -- strike that.

Debtors would have brought a motion to the Court seeking relief had they had a dispute as part of the monetization process; right?

MR. NEIBURG:  Object to form.

A.    I don't recall whether or not we brought it to the Court's attention.

Q.    Mr. Kost, you don't recall whether or not you brought to the Court's attention the timing of the sale of Stila during the 15-month window?

MR. NEIBURG:  Object to form.

A.    I am not sure where you're going with your question.

Q.    I am seriously asking you, you have no recollection of whether you brought to the Court's attention, debtors brought to the Court's attention during

Page 43

Kost - Confidential

the 15-month window concerns about the timing of the sale of Stila?

MR. NEIBURG:  Object to form.

A.     I guess we did.  I don't know. I don't know.  Maybe you can show me a document.

Q.     Is Stila up for sale now?

A.     Not yet.

Q.     Has a banker been retained?

A.     Yes.

Q.     And did that happen by order of the Court?

A.     If by that do you mean is it a Group A company that is covered by the settlement agreement, of course the answer is yes.

Q.     Did the Court order that sales be commenced for Stila?

MR. NEIBURG:  Object to form.

A.     Well, it's a Group A company within the settlement agreement.

Q.     So you have no recollection as to whether or not the bankruptcy Court had to intervene to solve a dispute as to

**Page 44**

Kost - Confidential

the timing of the sale of Stila; is that right?

A.    That's correct.

Q.    To your recollection, in conversations with Ms. Tilton, which you were present, did you consistent -- strike that.

To your recollection, in conversations with Ms. Tilton, while Stila was not up for sale, did you say Stila should be put up for sale?

MR. NEIBURG:  Object to form.

A.    Yes.  Mike Katzenstein and I both suggested that, you know, we should get the process going for Stila.

Q.    And do you recall when that was suggested?

A.    Not specifically, no.

Q.    Okay.  Do you recall it being at the end of 2018?

A.    It's possible.

Q.    And do you recall her response to your suggesting that it be put up for sale?

Kost - Confidential

A.     No.

Q.     Okay.  Do you recall moving forward with any banker after suggesting that it be put up for sale?

A.     I assume you're alluding to in 2018?

Q.     Mm-hmmm.

A.     No.

Q.     But you have gone forward with, as part of the joint monetization process, retaining a banker now for the -- for putting up Stila for sale; is that right?

MR. NEIBURG:  Object to form.

A.     Yes.

Q.     You're not testifying as an expert in banking today; is that right?

A.     No, I don't think so.

Q.     Okay.  You're just testifying as a percipient witness to this action; right?

MR. NEIBURG:  Object to form.

Q.     You're testifying as a fact witness today; right?

Kost - Confidential

A.    Yes.

Q.    Okay.  I am asking because, you know, you have a lot of experience in banking and in bankruptcy, and I want to make sure that your experience is applied to the specific circumstances of today. Your testimony will be about the specific facts of today.

So what are -- are there any other companies other than Stila over which you had disagreement with Ms. Tilton about the timing for sale?

MR. NEIBURG:  Object to form.

A.    Mike Katzenstein, Young Conaway, White & Case and we have had numerous discussions on how we can accelerate the sale processes and get them moving forward more quickly.

That's been conveyed to Ms. Tilton probably on many occasions, primarily and most likely by Mike Katzenstein and by counsel.

Q.    That's nice.  But did you have any other companies other than Stila over

Page 47

Kost - Confidential

which you had disagreement with Ms. Tilton about the timing for sale? I would like to know a specific company.

MR. NEIBURG: I'll just caution the witness again. If there were internal deliberations that you had with Mike Katzenstein, independent director and their counsel, you should not reveal those communications.

But if you're aware of disagreements expressed to Ms. Tilton or her counsel, that's what you can talk about.

A. Yes. I mean, MD Helicopters is an example.

Q. MD Helicopters was put up for sale during the monetization process; wasn't it?

A. That's correct. And then the process was stopped.

Q. And to your recollection, why was the process stopped?

A. The process was stopped because the two most interested parties decided

Kost - Confidential

to withdraw their offer.

Q.   Did you and Mr. Katzenstein disagree with -- strike that.

Did you and Mr. Katzenstein think the efforts to sell MD should have continued after the two most interested parties decided to withdraw their offer?

A.   Yes.

Q.   And you conveyed that to Ms. Tilton?

A.   That -- Mike may have conveyed that to Ms. Tilton.

That happened at about the same time that Ms. Tilton started having discussions with the debtors with respect to a global refinancing that was funded by Jefferies.

Q.   But you never conveyed to Ms. Tilton that efforts to sell MD should continue after the two most interested parties decided to withdraw their offers?

MR. NEIBURG:   Object to form.

A.   I may not have.  I also didn't tell her to stop the sale process either.

Kost - Confidential

Q.    And when the sale process stopped in order to pursue the global refinancing that was to be funded by Jefferies, at that point did you raise an objection to Ms. Tilton and tell her that she should continue to try to sell MD separate from the global refinancing?

MR. NEIBURG:  Object to form.

A.    No.

Q.    Do you know if Mr. Katzenstein did?

A.    I don't know.

Q.    Mr. Katzenstein, to your understanding, didn't agree with Ms. Tilton pursuing the global refinancing that was funded by Jefferies?

MR. NEIBURG:  Again, I will caution the witness.  To the extent that question touches upon conversations you had with Mr. Katzenstein with counsel present, you should not reveal that.

But if that disagreement or agreement with Ms. Tilton was

Kost - Confidential

expressed to Ms. Tilton or Patriarch or her advisors, you can answer that question.

A.    I don't know what Mr. Katzenstein said or didn't say to Ms. Tilton.

As the chief monetization officer at that time, I would say that the process was suspended while the parties, including the Zohar debtors, started to talk to Ms. Tilton about a global refinancing.

Q.    And isn't that because, it was suspended because MD was an essential part of the global refinancing?

MR. NEIBURG:  Object to form.

A.    Yes, that's correct.

Q.    Okay.  Did you have any confidence personally in the success of the global refinancing that was being pursued with Jefferies?

A.    My role in the global refinancing with Jefferies was tangential.  I was aware of it.  I was on

Kost - Confidential

biweekly update calls where it was discussed, but I wasn't, I was not an integral part of the refinancing process.

Q.    And is that because you were continuing to pursue the sale of other companies that were not the subject of the global refinancing?

A.    Yes, that's correct.

Q.    And you were pursuing the sale of those other companies as part of the joint monetization process; is that right?

A.    Yes.

Q.    And Ms. Tilton was also involved in pursuing the sale of other companies during the time of the proposed refinancing?

A.    Yes.

Q.    And what were those companies, to your recollection?

A.    They were primarily Oasis and Denali.

In addition, we were still ongoing with the Hussey sale process, the

Kost - Confidential

Rand sale process.

Q.   So during the global refinancing effort, there were one, two, three, four additional sales processes that were also being pursued?

A.   Yes.

Q.   And two of those four resulted in sales; is that right?

A.   Yes.

Q.   Let's talk about Oasis.  I am going to attempt to minimize my use of the portfolio company name.

It's not as big a deal with you because you're testifying live.  But if there is, at any point where I am not clear, you're not certain about which company I am talking about, just ask. But we're trying to anonymize the names of the companies --

A.   Okay.

Q.   -- to the extent that we can. I think we can redact the transcript so it will be fine.  We may not need your transcript since you'll be live.  But I

Kost - Confidential

just want to give you a sense of where things are with that.

A.    Just a clarification question.

Q.    Yeah.

A.    I assume you're referring to the buyers or other interested parties?

Q.    That's a great question.  It's anonymizing the company name and the buyer name, so that that's not made public.  And that's a little bit more difficult dealing with the buyer name.

So we're kind of -- you're one of the early witnesses.  Maybe we can figure out how to make this work most effectively so that everybody knows what we're talking about, but everybody who is public doesn't know what we're talking about.

MR. NEIBURG:  Do you have the -- maybe we should go with what it's called there.

MS. MALONEY:  Yeah, what is it called there?

MR. NEIBURG:  If you say Company

Kost - Confidential

X.   We will do our best.

MS.  MALONEY:  And then we got customer A, customer B.

MR.  NEIBURG:  Do we need to say "buyer"?  Do you need to identify the specific buyer?  I don't know if you do.

MS.  MALONEY:  Let's just see.

MR.  NEIBURG:  In terms of portfolio company, maybe we can use the convention.

Q.   What is the business of Oasis?

A.   Oasis makes a variety of water products, both pressurized and not pressurized water fountains and -- fountains.  They make water fountains.

Q.   And ultimately Oasis was sold for 76 million; is that right?

A.   Yes, that's correct.

Q.   And Ms. Tilton was the sole manager of Oasis; is that right?

A.   Yes.

Q.   Now, those four companies that were in a sales process while the global

Kost - Confidential

refinancing was being pursued, was Ms. Tilton the CEO of any of those companies?

A.    No.

Q.    Oasis, she wasn't the CEO, Denali she wasn't the CEO, Hussey she wasn't the CEO, Rand she wasn't the CEO; correct?

A.    That's correct.

Q.    She was the director, the sole director of each of those companies; is that correct?

A.    Yes.

Q.    As part of the sales process, you had to become generally familiar with Oasis's operations and business and financial affairs; right?

A.    Yes.

Q.    And is that true for all the companies that have been part of the sales process?

A.    Yes.

Q.    Would you say you're more familiar with the companies that are --

Kost - Confidential

where bankers have been retained and the sales process is in progress than those where bankers are just retained, have just been retained?

A.    Yes.

Q.    So you would agree you have less familiarity with the operations of Stila where a banker has just been retained than Oasis?

A.    That's correct.

Q.    Okay.  And what were your responsibilities as CMO in connection with the sale of Oasis?

A.    My primary responsibilities were working with the investment bankers through all stages of the process; preparing the marketing materials, reviewing buyer lists, and then getting updates on a relatively frequent basis as they began their marketing outreach and were talking to interested parties.

Q.    Were you responsible for getting information about the information about the company's finances to the

Kost - Confidential

investment bankers?

A.    No.

Q.    Were you responsible for setting up management meetings with the investment bankers?

A.    No, it's more of an oversight role working with the investment banker. That's why we retain the investment banker, to lead all of those processes.

Q.    And when you say that you were responsible for preparing the marketing materials, what did that entail?

A.    I don't know if I said preparing.  I think I said reviewing.

Q.    Okay.  You said preparing, but if you meant reviewing, that's fine.

So you were responsible for reviewing the marketing materials?

A.    That's correct.  I did not prepare any of the marketing materials.

Q.    Okay.

A.    I reviewed the marketing materials.

Q.    And did you make substantive

Page 58

Kost - Confidential

changes to the marketing materials after they were prepared?

A.    No.

Q.    Okay.  Was Ms. Tilton also responsible for reviewing the marketing materials?

MR. NEIBURG:  Object to form.

A.    Yes, to my understanding.

Q.    Do you have any understanding of whether she was involved in preparing marketing materials for Oasis?

A.    It's my understanding that she reviewed and would provide comments to Oasis's confidential information memorandum.

Q.    So a confidential information memorandum was prepared for the sale of Oasis; right?

A.    Yes.

Q.    And is a -- has a confidential information memorandum, does that have to be prepared for every company that's going through a sales process?

A.    It's very typical, yes.

Kost - Confidential

Q.    And for those companies for which bankers have been retained and materials have been sent to prospective buyers, are confidential information materials part of those materials that are going to prospective buyers?

MR. NEIBURG:  Object to form.

A.    Yes.

Q.    And those materials don't go to prospective buyers until an NDA has been signed with them; is that correct?

A.    That's correct.

Q.    Okay.  All right.  So is the banker for Oasis one of the bankers that was retained before you were appointed as CMO for the funds?

A.    Yes.

Q.    Okay.  You recall they were retained in approximately April of 2018?

A.    Yes.

Q.    And after then you were retained as the CMO.  You have stated previously that you began regular contact with the members of the Raymond James

Page 60

Kost - Confidential

team, both telephonically and by e-mail; is that right?

A.    Yes.

Q.    And the Oasis sales process was launched in, you have testified previously, October 28 of 2018; do you recall that?

A.    That sounds about right.

Q.    Okay.  So approximately four months between their being retained and the launch of the process; is that correct?

A.    Yes.

Q.    Were there any delays that you are aware of that -- that caused four months to pass before the sales process was launched?

A.    Four months is a very long time to prepare for a sale process.  I don't recall the specific reasons.  I would surmise that it had to do with the Zohar's bankruptcy and getting things ready and trying to get a sale and milestone procedures order passed.

Kost - Confidential

Q.    So the effort to get a sale and milestone procedure order passed resulted in Raymond James being unable to launch the sales process for four months?

MR. NEIBURG:  Object to form.

A.    Like I said, I don't recall specifically.  But something delayed them for four months.

Q.    And did you ever ask them why it was taking them, as you said, so long to launch the sales process?

A.    I don't recall.

Q.    So you don't have any specific knowledge of why it took four months to launch the sales process?

A.    I really don't recall.

Q.    Okay.  You've testified previously that once a sales process was launched, that they contacted approximately 164 potential interested parties; do you recall that?

A.    That sounds right.

Q.    And they established a deadline for submitting indications of interest by

Page 62

Kost - Confidential

December 2018?

A.     Yes.

Q.     Okay.  And during December and January, you've testified, January 2019, that Raymond James and management conducted management presentations and assisted interested parties with their due diligence efforts; do you recall that?

MR. NEIBURG:  Object to form.

A.     Yes.

Q.     And do you know if there were complications with the diligence related to the sale of Oasis?

A.     I don't know what you mean by complications to the diligence.

Q.     Well, it was -- it's a consumer -- how did you describe it?  A consumer water company?

A.     They make pressurized drinking fountains.  For example, you find a drinking fountain in a school or building.  They also make free-standing nonpressurized water dispensers is the

Kost - Confidential

word.

Q.    What was the area of diligence that buyers, to your knowledge, potential buyers, spent the most time on?

MR. NEIBURG:  Object to form.

A.    What you may be eluding to is during the Oasis process, it was really a bifurcated process.  I can't remember if I wrote that in my declaration or not.

Q.    Okay.

A.    But we went out to the market and got a certain amount of interest. Stepped back.  Reassessed.  Reworked some of the marketing materials.  And then went back out to market.

Q.    Okay.

A.    So I am not sure which, which diligence process you're referring to.

Q.    So when you went to the market, initially in December or January, and ultimately you received two indications of interest for Oasis from potential buyers; is that correct?

A.    Yes.

Page 64

Kost - Confidential

Q.    And then there was a single final bidder for Oasis; is that right?

A.    Yes.

Q.    That was in February of 2019?

A.    Yes.

Q.    And that bidder was Gemspring?

A.    That's correct.

Q.    And they are a private equity firm; right?

A.    Yes.  We thought there would be more interest and more interested buyers at that point.

Q.    And when you say we thought there would be more interested buyers, are you speaking about you and the investment banker?

A.    Yes, and Ms. Tilton.

Q.    And Ms. Tilton?

A.    We all thought that there would be a number of direct competitors that would participate in the process that chose not to.

Q.    Did you have any understanding of why they chose not to participate in

Kost - Confidential

the process?

A.    Yes, there is actually a presentation that summarizes the feedback from those parties that decided not to participate.

Q.    And to your recollection, what were the reasons for that?

A.    I would have to review the process update.  But it would be things like some from small family businesses that decided not to participate.  They were doing other transactions at the time.

But there is a presentation that summarizes those reasons.

Q.    Any indication that the overhang of bankruptcy was a reason for certain buyers not participating?

MR. NEIBURG:  Object to form.

A.    Not that I recall.

Q.    Any discussion of whether the bankruptcy was suppressing potential buyers from putting in bids?

MR. NEIBURG:  Object to form.

Kost - Confidential

A.    I don't recall.

Q.    Do you recall that Gemspring reduced their final bid by more than 20 percent?

A.    Yes.

Q.    And what was the response to Gemspring reducing its business by more than 20 percent, to your recollection?

A.    I think Gemspring reduced their bid more than once.  Obviously we and Ms. Tilton weren't happy about the reduction in the purchase price.

We had numerous discussions on how to reinvigorate the sale process and go out to additional parties.

Q.    And do you recall Ms. Tilton actually asked Mr. Katzenstein if he wanted to go back to others to seek higher bids?

A.    That's quite possible because that's what's happened.

Q.    I'm sorry, I can show you a document to show you that she asked if he approved her going back, but I am

Kost - Confidential

wondering, do you recall if she asked Mr. Katzenstein if he wanted to go back to others to seek higher bids?

A.    I don't recall that specifically.

MS. MALONEY:  Okay.  So let's mark this as Exhibit 2.

(Kost Exhibit 2, e-mail from Ms. Tilton to Mr. Katzenstein in March of 2019, was so marked for identification, as of this date.)

Q.    I recognize that you're not on this e-mail, Exhibit 2.  It's an e-mail from Ms. Tilton to Mr. Katzenstein in March of 2019.

And she says, "Do you really not want to go back to others who had higher bids before we went exclusive?"

She notes, as you did, that Gemspring has now retraded twice, and is down from 80 plus 2 to 62.5 and 7 earnout.  "I think you're rewarding horrific behavior and who knows where they will end up."

Kost - Confidential

Do you recall discussing that, the idea of going back to others who had higher bids before you went exclusive, to try to get another bid?

MR. NEIBURG:  Object to form.

A.    I don't recall seeing this e-mail.  I do recall having a discussion with Mike Katzenstein about Gemspring, who we all were extremely disappointed that Gemspring has reduced their purchase price once, I think it was actually twice.  I don't recall specifically whether or not we said don't go back to other parties.

What I do recall is we want to proceed with Gemspring, to continue to negotiate with them to try to get to the point where we would be in a position to sign the purchase agreement.

Q.    Even though they had retraded twice?

A.    Yes.

Q.    Even though they had reduced their bid by over $20 million?

Page 69

Kost - Confidential

A.    Yes.

Q.    You wanted to continue negotiating with them?

A.    Yes.

Q.    And even though they had been made the exclusive -- they were the exclusive buyer at that point?

A.    I would have to go back and look at the LOI as to whether we were going to give exclusivity.  I don't recall.

Q.    But at that point, when they had retraded and their bid was under, was $20 million less than what they had originally said, they were the only buyer at the table?

MR. NEIBURG:  Object to form.

A.    That's correct.  We did not have any other alternatives.

We had run a full process, two processes, actually.  And I don't recall whether the LOI had exclusivity or not. I would have to look.

Q.    In your experience handling M&A

Kost - Confidential

deals, is it usually helpful or not helpful to have two competing bidders?

A.    Oh, absolutely.  You would much prefer to have two bidders.

Q.    It increased -- and why is that?

A.    That's the investment banker's role, to play a game with interested parties to let them know they are not the only game in town.

Sometimes you can do that without having a number two interested party.  But I don't recall exactly what Raymond James would have told Gemspring.

Q.    Do you think Raymond James, at this point when Gemspring had retraded and had come back with a number of $20 million below their initial bid, was Raymond James doing the best job, in your mind, as the investment banker on this deal?

A.    Yes.  I specifically remember having this discussion with Raymond James as to whether or not we should take the

Kost - Confidential

Gemspring offer.  And we both came to the conclusion that we should take the Gemspring offer.

Q.   Okay.  So ultimately did Raymond James go back to prior bidders to get a different bidder into the process, other than Gemspring?

A.   Yes.  I mean, as I am sure you know, we were able to get another party interested, which ultimately became the buyer.

Q.   And when you say "We were able to get the other party interested," it was at Mr. Katzenstein's direction that Raymond James go back to prior bidders to get them involved in the process?

MR. NEIBURG:  Object to form.

A.   I don't recall who would have talked to -- it would have been me.  Mike Katzenstein does not have direct conversations with the bankers, generally.

Q.   Okay.  And so you directed that Raymond James go back to prior bidders?

Kost - Confidential

A.    I would not have directed Raymond James.  It's a joint process.

I don't -- I would have to go back to my notes to see who, you know, what we were talking about at that point.

Q.    But you had testified earlier that you thought that they should go forward with the Gemspring deal; right?

A.    That's correct.

Q.    Okay.

A.    But until we signed the letter of intent, which I don't recall whether or not it had exclusivity or not, you keep talking to people.  And that's exactly --

Q.    And that's what you said Raymond James should do?

A.    I would always say that to every process.  And that's exactly what happened.  And Culligan came back into the process.

Q.    So is it your recollection that Ms. Tilton directed that Raymond James go back to prior bidders to see if they

Kost - Confidential

could get a competing bid to Gemspring?

MR. NEIBURG:  Object to form.

A.    It sounds like you're trying to apportion credit for who told Raymond James to go back and talk to other parties.

That's what you do in an M&A process.  Raymond James' job is to keep talking to people and try to find another interested party, that's his job.

Q.    But you agree that's only their job if somebody says you need to go back and find another bidder, because you said there was a bid on the table; right?

MR. NEIBURG:  Object to form.

A.    No, I think you are misstating it.  The investment banker's job is to keep trying to find a better bid until such time as you sign that letter of intent that binds you to stop looking for a better bid through the exclusivity.

Q.    You testified just a few minutes ago, we want to proceed with Gemspring, to continue to negotiate with

Kost - Confidential

them to try to get to a point where we would be in the position to sign the purchase agreement?

A.      Correct.

Q.      So you intended to negotiate with Gemspring.

And I said, even though they reduced their bid by over $20 million.

Yes.

Even though they had retraded twice.

Yes.

You wanted to continue negotiating with them.

Yes.

A.      That's all correct.

Q.      So you wanted to continue negotiating -- let me ask the question.

MR. NEIBURG:  Wait until there is a question.

Q.      You wanted to continue negotiating with them, but you also thought it made sense to go find, go back to prior bidders; is that right?

Page 75

Kost - Confidential

A.    Yes.

Q.    And in general when you have -- in your experience, when you have a bidder who has reduced their bid, it makes sense to go back to prior bidders to see if you can get a competing bid; would you agree?

A.    Yes.

Q.    Okay.  And in this circumstance, it made sense to do that because you expected that Raymond James could get prior bidders interested again; is that right?

A.    We had run a very long and extensive process.  We were down to one interested party.  We had these discussions.

We did not want to have a failed auction.  And the investment banker's job, which I would have mentioned to him.

Q.    Um-hum.

A.    I remember having discussions with Mike Pokrassa that, you know, keep

Kost - Confidential

talking to other people who are out there that might be interested until such time as we had to make that final decision as to whether to sign the LOI.

We had not made the decision to sign the LOI at that point.  We were continuing to negotiate.

Q.    And you're talking about the LOI with Gemspring; is that right?

A.    Yes.

Q.    So ultimately, a prior bidder did get reinvolved with the process; is that right?

A.    Yes.

Q.    And that prior bidder ultimately did purchase Oasis; right?

A.    Yes.  That bidder was previously contacted and had declined to pursue the opportunity.

We got lucky that that bidder had done a customer-related transaction with Oasis, completely unrelated to the sale process.  And because of that, an advocate within the buyer's firm realized

Page 77

Kost - Confidential

the opportunity to put together a buyer with Oasis.

And -- and I don't know the timing or the sequencing, but when Raymond James reached out to or -- I don't know who talked to whom at what point, that's not my job.  The buyer had changed their mind and became interested again.

Q.    So you said that you got lucky that the bidder had done a customer-related transaction with Oasis.

How did you become aware of that customer-related transaction that had occurred in Oasis and the prior bidder?

A.    Well, it's not something that I or even Raymond James may have known.  It was communicated to Raymond James after the ultimate buyer had become reestablished in the process.

Somebody on their buyer side told Raymond James and Raymond James told me.

Kost - Confidential

Q.    Okay.  Even when Raymond James went back to the prior bidders and were able to get a bid from Culligan, there were still challenges with Culligan's bid; is that right?

A.    Yes.

Q.    It ended up being better than Gemspring's bid, but still not as good as had been hoped; is that right?

A.    That's correct.  Culligan also reduced their purchase price.

Q.    And you were concerned that continuing to push Culligan would result in losing the opportunity to sell Oasis; is that right?

A.    I don't know what you mean by that question.

MS. MALONEY:  Okay.  Let's mark this Exhibit 3.

(Kost Exhibit 3, e-mail, was so marked for identification, as of this date.)

MR. NEIBURG:  Mary Beth, can we shoot for a break for about 15

Page 79

Kost - Confidential

minutes?

MS. MALONEY:  I am almost done with this section.  So do like five or so.

MR. NEIBURG:  Whatever works.

Q.    So if we look back at Exhibit 2 for one second, that's March of 2019. And Ms. Tilton is asking Mr. Katzenstein, "Do you really not want to go back to others who had higher bids before we went exclusive?"

So she seems to have thought that you all went exclusive with Gemspring.  But setting that aside.  It appears, based on your testimony, there was ultimately agreement to go back to prior bidders; is that correct?

A.    Yes.

Q.    And then in June of 2019, approximately three months later, you're in negotiations to sell Oasis.

Culligan has, it appears, offered a revised bid, suggesting that there might have been a bid before that;

Kost - Confidential

right?

A.    There was.

Q.    And it seems like, based on your e-mail here, that the revised bid was lower than the prior bid; is that right?

A.    So from March till this period, Culligan had conducted considerable due diligence.  This obviously was probably their second LOI.

They hired a firm to do their own quality of earnings report.  And within -- so we had dueling quality of earnings reports.

Q.    Just to clarify, because Raymond James had also prepared a quality of earnings report, or was the auditor for Oasis the preparer of that quality of earnings report?

A.    So it's become relatively standard practice for a seller to prepare the quality of earnings report.

Some buyers will accept that because it's prepared by a reputable

Page 81

Kost - Confidential

audit firm.

Q.    Right.

A.    Other buyers choose to hire their own due diligence teams to prepare their own reports including an auditor doing a quality of earnings report.

Culligan decided to hire their own firm and they prepared their own report, which took some time.

And the purchase price reduction was due, in part, to what they found in a quality of earnings report.

Q.    The purchase price reduction was due to what Culligan found in the independently drafted and developed quality of earnings report that Culligan had prepared to assess its purchase of Oasis; is that right?

A.    We can't know for sure how and why Culligan reduced their purchase price.  But it was represented to us by Culligan that at least part of the purchase price reduction was due to what they found in their independently

Kost - Confidential

prepared quality of earnings report, which was Raymond James and Oasis's management's job to push back on all of those points.

Q.   So approximately how long did this independent quality of earnings report take to prepare?

A.   I don't recall.

Q.   Okay.   But it was prepared some time by Culligan between March of 2019 and June of 2019; right?

A.   Yes.

Q.   Okay.   So you write here that you were supportive of attempting to persuade Culligan to rethink their revised bid; right?

A.   Yes.

Q.   And you were supportive of Raymond James attempting to do that; right?

A.   Yes.

Q.   But you also wanted to make clear that you didn't, you write here, "debtors do not want to lose the

Kost - Confidential
opportunity to sell Oasis and would be supportive of the transaction with Culligan."

So what did you mean by that?

A.   Yes, we were supportive of selling Oasis to Culligan, even at their reduced purchase price, but try to get some value back.

Q.   Okay.  Ms. Tilton says she also doesn't want to lose the opportunity. And is it your understanding that Raymond James did go back to continue negotiating the sale?

MR. NEIBURG:  Object to form.

Q.   With -- strike that.

Is it your understanding that Raymond James did go back to Culligan to try to push up their purchase price?

A.   Yes.

Q.   And do you understand that to have been successful?

A.   I seem to recall that we did get a little bit back.

Q.   Okay.  Ultimately, you have --

**Page 84**

Kost - Confidential

you've told the Court before that the purchase price from Culligan represented a fair and reasonable price that was market tested and the best offer received; right?

MR. NEIBURG:  Object to form.

A.    Yes, I think that's what my declaration says.

Q.    And ultimately, you, representing debtors, and Mr. Katzenstein along with Ms. Tilton jointly agreed to proceed with that offer from Culligan; is that right?

A.    Yes.

Q.    Okay.

MS. MALONEY:  Let's take a break.

THE VIDEOGRAPHER:  The time now is approximately 11:22, we are going off the record.

(Off the record.)

THE VIDEOGRAPHER:  And the time now is approximately 11:34, we are back on the record.  It's the

Kost - Confidential

beginning of media 2.

Q.    Let's talk about the sales process for Denali.  That was also one of the portfolio companies that was in the process during the restructuring efforts; is that right?

A.    Yes.

Q.    And when I say the restructuring efforts, that's the global restructuring that you referred to earlier, the proposal with Jefferies?

A.    Yes, that's correct.

Q.    Okay.  So what is Denali's business?

A.    Denali makes various sized fiberglass tanks that are used in several industries.  The largest industry would be fiberglass tanks for petroleum products.

So, for example, an underground storage tank at a gas station.  That's a big chunk of the business.  And the other chunk of the business would be water and all other types of foodstuffs, syrups,

Kost - Confidential

water.  Non-petroleum.

They have other little businesses, but those are the two big businesses.

Q.    Okay.  And had the banker for the sale of Denali been retained prior to your retention as the chief monetization officer?

A.    Yes.

Q.    Okay.  And the banker for Denali was Greenhill; is that right?

A.    Yes.

Q.    And they were retained in approximately April of 2018?

A.    Yes.

Q.    And in June 2018, after you became the chief monetization officer, you were in regular contact with the Greenhill team about the sale of Denali; is that right?

A.    Yes.

Q.    And you provided updates to Mr. Farnan and Mr. Katzenstein on the sale process for Denali?

Kost - Confidential

A.    Yes.

Q.    You provided those updates at weekly Zohar board meetings; right?

A.    Yes.

Q.    Now, on your time entries you reference communications with a creditor's committee.  Is that a different term for board?

A.    Yes.

Q.    The Zohar board?  Who is on the creditor's committee for the Zohars?

A.    So obviously our time entries need to be relatively vague.  The only two parties that I had any contact with -- I shouldn't say that.  The majority of my contact would be with MBIA or Bardin Hill, which was previously known as Halcyon.

Q.    So there is a Zohar board.  And who are the members of the Zohar board?

A.    Judge Farnan.

Q.    Judge Farnan and any representative of MBIA?

A.    No.

Page 88

Kost - Confidential

Q.     And no representative of Bardin Hill?

A.     No.

Q.     And you understand there to be a separate creditor's committee; is that right?

A.     An ad hoc creditor's committee.

Q.     The ad hoc creditor's committee.  Who are the members of the ad hoc creditor's committee?

A.     MBIA and Bardin Hill.

Q.     And is there a specific individual who serves on the ad hoc creditor's committee for MBIA?

A.     I am not a lawyer, but it's my understanding that they, at some point in the process in the last two years, signed nondisclosure agreements, and at various points over the last two years, we have met with them.  We provided them with updates.

Q.     I don't need to know all of that.  I am just wondering who is the specific individual from MBIA who serves

Kost - Confidential

on the ad hoc creditor's committee?

A.    Well, it's an ad hoc committee. I don't know if it has specific individuals.  I don't know who signed their NDA.

Q.    Which individual have you spoken to who is a representative from MBIA on the committee?

A.    I've spoken to Anthony McKiernan, Dan Avitabile.  And periodically they had one or two of their colleagues in the meetings or on the calls.

Q.    You recall the name of the other colleagues?

A.    Yes.  Cristian Cavalieri.  And Keith, I don't remember Keith's last name.

Q.    And have you spoken to any individuals who are representatives from Bardin Hill on that committee?

A.    Yes.

Q.    And what are their names?

A.    John Green and Pratik Desai.

Kost - Confidential

Q.    And does that ad hoc committee meet on a regular basis?

A.    No.

Q.    How frequently does it meet, to your recollection?

A.    Infrequently.

Q.    And do you participate in those meetings?

A.    Periodically.

Q.    And do you have conversations with the members of those ad hoc committees periodically as well?

A.    Yes.

Q.    To update them, and those conversations are to update them on the sales process; is that right?

A.    It has changed over the year, over the last 18 months.

Q.    Okay.  What have the conversations been about?

MR. NEIBURG:  I will just caution the witness that if counsel for the parties were present during these conversations --

Page 91

Kost - Confidential

MS. MALONEY:  Can I help?  Okay.

MR. NEIBURG:  Sure, you can.

Q.    Did you have communications with any of the ad hoc board members on your own, one-on-one communications with any of those ad hoc board members?

A.    Yes.

Q.    Okay.  So in those one-on-one communications, are you aware of counsel being present?

A.    No.

Q.    Okay.  So my question is directed at those communications.

Over the past 18 months, you've said that your communications with these board members have changed.  So tell me about the topics that you've discussed in those one-on-one communications with the ad hoc board members.

MR. NEIBURG:  And one cautionary word for the witness, you can answer that question.  The topics, right.  So let's just start there.

A.    So I am not aware of having

**Page 92**

Kost - Confidential

one-on-one discussions with MBIA or

Bardin Hill in 2018.

Q.     Right.   2019?

A.     Probably it would have started

at some point in 2019.   Obviously I was

aware that they would have been subject

to a nondisclosure agreement.   And given

my role as a chief monetization officer,

my conversations generally would have

been with respect to what I will call

relatively generic updates on the sales

processes.

MR. LOHAN:   Can I interrupt for

a second, Ms. Maloney, you said ad hoc

board.   I believe you meant ad hoc

committee members.   I just wanted

to --

MS. MALONEY:   Fine.

MR. LOHAN:   -- clarify.

Q.     Did these generally, relatively

generic updates to members of the ad hoc

committee that you had commence over the

summer of 2019?

A.     They could have happened during

Kost - Confidential

the summer of 2019.  I don't recall specifically.

Q.    Do you recall if there were -- if these communications included discussions of this global refinancing proposal with Jefferies that you mentioned earlier?

A.    No, they specifically did not.

Q.    Did they specifically focus on the sales process for specific companies?

A.    Yes.

Q.    Okay.  And so did they -- did you discuss with any of these ad hoc board committee members -- strike that.

Did you discuss with -- in your -- strike that.

In your discussions with ad hoc committee members, did you discuss the timing of sale of companies?

A.    I'm not sure what you mean by timing.  I'll answer it maybe slightly differently, which is they were generic updates.

For example, you know, we're in

**Page 94**

Kost - Confidential

the market on Dura, or we're in the market on MD.  Or, you know, we asked for LOIs to be due, you know, for Oasis by X date.

Q.    And did you discuss the estimates of value that were coming out of the sales process for specific companies?

A.    No, we specifically did not.

Q.    Okay.  So what type of issues did you discuss about being in the process for a specific company?

A.    So it was really process updates.  We're writing a confidential information memorandum.

Just to clarify something, as you know, MBIA is a public corporation. They specifically asked that I not say anything about valuation under any circumstances.

Q.    I'm sorry, I need to clarify that.

Representatives of MBIA specifically asked you in your

Kost - Confidential communications with them to not discuss valuation of any of the portfolio companies?

A.    Yes.

Q.    Okay.  And their explanation for why they did not want to know the valuation that was being assigned to any of the portfolio companies was because they are a publicly traded company?

MR. NEIBURG:  Object to form.

A.    You would have to ask them specifically.  I -- I may have interpreted that.

Q.    Okay.  So you never discussed the waterfalls for recoveries with representatives of MBIA who served on the ad hoc creditors committee?

A.    I did not.

MR. NEIBURG:  Just so we're clear for the record, are we just focusing your questions on the individual conversations Mr. Kost may have had with individual committee members and all of these questions

Kost - Confidential

exclude conversations with counsel present?

MS. MALONEY:  That's the way I framed it.

I think that's how you've been -- I mean if you've been answering it differently --

MR. NEIBURG:  I just want to make sure.

A.    That's correct.

Q.    As part of the updates, was the Denali sales process included in these updates that you gave to the ad hoc members of the creditors committee?

A.    I would believe so, yes.

Q.    Okay.  The Denali sales process was also conducted in two stages; is that right?

A.    Yes.

Q.    And the initial stage focused on strategic buyers?

A.    Yes, that's correct.

Q.    Tell me what strategic buyers are?

Kost - Confidential

A.     We were looking for a strategic buyer who was already in the tank, fiberglass tank business or tangential businesses.  And we thought that there would be interest from a number of parties in -- from strategics.

So we focused our initial outreach -- well, I should say the investment banker Greenhill focused their initial outreach on strategics while also reaching out to private equity firms, but it was a more limited private equity list.

Q.     And the second stage, which commenced in September of 2018, was focused on both strategic and financial buyers?

A.     It really flopped.  We had already reached out to most of the strategics that we thought would be interested and obviously were surprised that we didn't have a stronger level of interest.  So the bankers significantly expanded the private equity buyer list.

Kost - Confidential

And so the second phase was more focused, much more focused on financial sponsors.

Q.    In this space of the fiberglass tank business, forgive me, but approximately how many fiberglass tank potential strategic buyers do you recall estimating there might be to bid on Denali?

A.    So the good news/bad news is there were a number, but they were relatively smaller.  It's a relatively fragmented business.

Q.    When you say "a number," do you mean half a dozen?

A.    Half a dozen, eight.

Q.    Okay.

A.    Denali was one of the largest fiberglass tank manufacturers in the country.

By definition, their business was a rollup; they had acquired themselves half a dozen businesses over the prior however long.

Page 99

Kost - Confidential

Q.    Do you know the history of Denali becoming a portfolio company?

A.    I don't recall the specifics.

Q.    And do you know if those acquisitions occurred while Denali was a Patriarch portfolio company?

A.    Yes, I believe a number of them did.

Q.    So in September 2018, the second stage of attempting to find a buyer commences; is that right?

A.    Yes.

Q.    And tell me about that process; how did that go?

A.    We did have interest from some private equity firms.  Again, for this deposition I did not go back and review my notes on the Denali sale process given that it had been closed.

Q.    That's fine.

A.    So I don't recall specifically when our interested buyer reentered the process.

Q.    Okay.  So a CIM was prepared

Kost - Confidential

for the Denali sale; is that right?  Do you recall that?

A.    Yes.

MS. MALONEY:  And I'm just going to give you a copy of this and make sure we have got the right one here. This is going to be your Exhibit 4.

(Kost Exhibit 4, CIM for Denali, was so marked for identification, as of this date.)

Q.    So was the CIM for Denali, is this the only CIM that was prepared for Denali?

A.    No.

Q.    Okay.  Because this CIM is from October 2018; right?

A.    I don't see the date.  But there were two CIMs.

Q.    Ms. Tilton sent it in October of 2018?

A.    Yes.

Q.    And the first CIM, to your recollection, how did the first CIM differ from the second CIM?

Kost - Confidential

A.    My recollection is that the Greenhill bankers and, I would assume, the management team would prepare the first CIM.  I don't know to what extent Ms. Tilton provided input on the first CIM.

After the disappointing results from the first process, the decision was made to prepare a quality of earnings report and to rework the CIM.

Q.    In general -- strike that.

For all of the companies -- strike that, because I think you answered that before and I don't want to reask you that.

In general, is a quality of earnings report prepared as part of a sales process in your experience?

A.    So it's become more common to prepare a quality of earnings report. It's also more common to prepare them for smaller private companies that have not been in the market.

Q.    Okay.

Kost - Confidential

A.    Denali and Oasis were the first two companies.  And I don't remember -- I don't know why we did or did not prepare a quality of earnings report in the first instance, but we did not.  The decision was subsequently made to prepare one.

Q.    Okay.  And on a forward basis, after Denali, has a decision been made to prepare a quality of earnings report for potential buyers for all of the portfolio companies that will go through a sales process?

A.    Yes.

Q.    That's not decided on a company-by-company basis?

A.    No, I think we collectively agreed it would be best to prepare one for every company.

Q.    And when you say "collectively," was that a decision between, among Ms. Tilton, Patriarch and debtors?

A.    I don't recall the specific conversations.

Page 103

Kost - Confidential

Q.    Well, you said "collectively," so who was part of the collection?

A.    Okay.  So I know I've talked to Mike Katzenstein over time about quality of earnings reports.

Q.    Okay.

A.    We both agreed.  I seem to recall having that conversation with Ms. Tilton over time and I seem to recall that she also agreed.

Q.    But at the very least, you and Mr. Katzenstein agreed that preparing quality of earnings reports for companies that are going through the sales process makes sense as part of monetizing these portfolio companies; is that right?

A.    Yes, they generally are helpful.

Q.    And they are helpful to increasing the value that is ultimately obtained from the sale of the companies; is that right?

          MR. NEIBURG:  Object to form.

A.    They are helpful in educating

Kost - Confidential

interested parties as to the financial performance of the company.

Q.    So are they helpful to getting initial bidders?

A.    Yes.

Q.    And they may or may not be helpful to increasing value?

A.    That's correct.

Q.    Okay.  Fair enough.

So, to your knowledge, Ms. Tilton was involved in the preparation of this CIM by Denali; is that right?

A.    Anecdotally I recall the bankers commenting that Ms. Tilton did not like the first CIM and wanted to rewrite the CIM.

I don't know who rewrote it, but she was unhappy with the first CIM.

Q.    Okay.  That's fine.

And the second CIM did result in additional bidders; is that right?

MR. NEIBURG:  Object to form.

A.    Yes.

Kost - Confidential

Q.    Because after the first CIM you didn't -- Denali didn't have any bidders; is that right?

A.    I would have to go back and look at my notes, but we were disappointed.

Q.    Okay.  Ultimately, as part of the second stage, Denali received additional bids, you've told the Court, in January of 2019; is that right?

A.    That sounds right.

Q.    And in February of 2019, you've told the Court that the parties entered into a letter of intent with the ultimate purchaser of Denali; do you recall that?

MR. NEIBURG:  Object to form.

A.    Yes.  I would have to go back and review the declaration, but that sounds right.

Q.    And the ultimate purchaser of Denali attempted to obtain a large holdback due to the bankruptcy; do you recall that?

A.    Generally, yes.

Page 106

Kost - Confidential

Q.     Okay.  And what was the debtors' response to the holdback sought by NOV for the sales price of Denali?

MR. NEIBURG:  Just caution the witness, you can answer that question to the extent you do not have to reveal privileged communications.

A.     So as we were getting into the negotiations of areas such as holdbacks, I took less of a role.  That was more our lawyers negotiating those provisions.

Q.     Okay.  You're familiar, though, that NOV sought a multimillion dollar holdback due to the bankruptcy; correct?

A.     I know they sought a holdback, I don't know for what reason specifically.

MS. MALONEY:  Let's do Exhibit 5.

(Kost Exhibit 5, E-mail, was so marked for identification, as of this date.)

Q.     You're not on this e-mail.  I am just wondering if it refreshes your

Kost - Confidential

recollection.

If you look at the bottom e-mail on the first page.  The second page is just a signature line.  On February 7th, Lynn wrote to Mr. Farnan and Mr. Katzenstein that NOV's asking for a large holdback due to the bankruptcy and what they call "concerns over the current situation involving ongoing Court proceedings and disagreements?"

Does this refresh your recollection as to the reason for NOV's holdback?

MR. NEIBURG:  Object to form.

A.    I have not seen this e-mail.

My general understanding was that the holdbacks were related to what I'll call unknowns in terms of liabilities on the balance sheet since this was an equity purchase agreement.

Q.    What would those unknowns on the balance sheet have been, to your recollection?

A.    Generally, my understanding was

Page 108

Kost - Confidential

they were potential contingent liabilities, but you don't know what kind of contingent liabilities.

Q. And you said that the concerns related to unknowns in terms of liabilities on the balance sheet since this was an equity purchase agreement.

So what did the aspect of it being an equity purchase agreement, to your knowledge, how did that trigger concerns?

A. The buyer was buying the -- and it's maybe not as simple as Denali, because I think there was a holding company, but essentially they were buying the equity of Denali and taking all the assets and liabilities that came with Denali.

Q. Do you recall that ultimately a letter of comfort was provided to NOV to move forward with the sale?

A. Yes, I do generally recall.

Q. Okay. And that ultimately that did result in the sale of Denali. And

Kost - Confidential

you've represented that that was at a fair and reasonable price; do you recall that?

MR. NEIBURG:  Object to form.

A.    Yes.

Q.    And that -- do you also recall that ultimately the buyer did not insist on a $10 million holdback?

A.    That's correct.

Q.    Okay.  And do you know the circumstances of why they didn't insist on the $10 million holdback?

MR. NEIBURG:  Again, I will just caution the witness not to reveal privileged communications.

But if you can answer that question without revealing any privileged communications, you may.

A.    As I mentioned earlier, a lot of these negotiations were handled by Young Conaway, and I had kind of moved on from those aspects of this transaction.

Q.    What's your understanding of Stila's business?

**Page 110**

Kost - Confidential

A.    Stila is a color cosmetics company that's been around for over 20 years.

Q.    Is there some -- you use the adjective "color cosmetics" company.  Is there a different kind of cosmetics company?

A.    Well, as opposed to skin care, hair care.

Q.    Okay.  Okay.  And do you know the circumstances of Stila becoming a portfolio company?

A.    No, I do not.

Q.    Okay.  Do you know approximately when it became a portfolio company?

A.    I don't recall.

Q.    So is that the type of information, the genesis of Stila becoming a Patriarch portfolio company, that you would learn as part of the sales process when the company was actually in a sales process?

A.    I mean I have learned it for

Kost - Confidential

each of the companies.  I don't necessarily keep that top of mind; I don't think it's overly relevant.

Q.   Do you recall the approximate number of Stila employees or maybe -- have you ever known that?

A.   I don't know if I have ever known that.

Q.   Okay.  Do you know where it's located?

A.   Where is Stila?  No, I don't remember.

Q.   Ever visited?

A.   No.

Q.   Ever been asked to visit?

A.   Not yet.

Q.   Ever ask to visit?

A.   We have generally visited the portfolio companies earlier in the process.  Not all of them.  But Joe, Mike and I have at times, different times, visited different portfolio companies.

Q.   You testified earlier that you thought that Stila should be put into the

Kost - Confidential

monetization process and put up for sale earlier in the process; correct?

MR. NEIBURG:  Object to form.

A.    I think we would have liked to start the sales process for Stila earlier.

Q.    And on what basis would you have -- what was the reason for wanting to start the sale process for Stila earlier?

A.    My role as the chief monetization officer is to assist with the monetization of the investments in the portfolio companies that the debtors have, which includes Stila.

Q.    Okay.  But that doesn't explain why you would want Stila to go into the sales process earlier than another company.

So what was the reason for wanting to start the sale process for Stila earlier than other companies that were put up for sale?

A.    So you're talking about one or

Kost - Confidential

two years ago?  You're not talking about now?

Q.    I'm talking about -- yeah, you were -- so your testimony earlier was that during the course of the 15-month window, you wanted to put Stila into the sales process.  And that Ms. Tilton was resistant to that; correct?

MR. NEIBURG:  Object to form.

A.    What I -- we, the debtors, including myself, would have liked to have started the sale process for Stila earlier.

Q.    And what were the reasons why the debtors wanted to put Stila into the sales process earlier?

A.    Because it is a relatively valuable asset of the Zohar estate.

Q.    And had you reviewed Stila's audited financials during the course of the 15-month window?

A.    We would have received -- we generally received audited year end financials for each of the portfolio

Page 114

Kost - Confidential

companies during the 15-month period.

Q.    I understand that you received them.  Did you review them as part of your reaching the conclusion that Stila should be put into the monetization process?

MR. NEIBURG:  Object to form.

A.    So I would have reviewed the financials for Stila.  Part of the decision process is that we wanted to monetize Stila regardless of what the financial statements for any given point in time said.

Q.    Okay.  So Stila's financial statements were irrelevant to your recommendation that Stila needed to be put in the monetization process within the 15-month window?

A.    I mean financial statements are important with respect to, you know, what it means for Stila as a company.

The decision -- we obviously would have liked to have started the sale process for Stila earlier in the 15-month

**Page 115**

Kost - Confidential

window.

Q.   Did you review any of Stila's financial projections during the 15-month window?

A.   No.

Q.   Have you asked for Stila's financial projections since -- let's start with this.

Over the course of the 15-month window, did you ask to review Stila's financial projections?

A.   We've asked on a number of occasions for more specific information on the companies, including projections.

Q.   Do you know if you have reviewed any financial projections for Stila?

A.   Yes, we have recently received some financial projections for Stila, relatively recently.

Q.   I'm sorry, Mr. Kost, you are not answering my questions.

Have you reviewed financial projections for Stila?  I understand

Kost - Confidential

you've received them; have you reviewed them?

A.    I have reviewed a lot of financials that I received in the last month or two.

Q.    I am going to stop you.  I am going to stop you.  It's fine if you don't recall.  You can say "I don't recall."

I just would like to know the answer to my question if you reviewed them.

MR. NEIBURG:  Let's just get on to your question.  He'll get it. He'll get it.

Q.    Have you reviewed the financial projections for Stila?

A.    So I think part of the problem here is I have reviewed financials that have included projections, for example, for the remainder of 2019.

Q.    For Stila?

A.    For Stila.  That was before it was the full year, so it had a

Page 117

Kost - Confidential

projection.

I don't have a set of projections for Stila for the next five years, for example.

Q.   Got it.  That's helpful.

A.   I am not aware that we have any projections for Stila beyond -- I don't think -- I actually don't think we have 2020 yet.

Q.   Okay.  Have you reviewed or asked to review Stila's general ledger?

A.   So a lot of these specific financial requests would go through either FTI or Ankura.  When they get the information, to the extent it was relevant, they would send it to me.

I don't know -- I have not asked for a general ledger.

Q.   Right.  It wasn't my question. I asked if you'd reviewed them.

A.   I have not reviewed a general ledger.

Q.   And you also don't know whether you have access to a general ledger?

Kost - Confidential

A.    I don't know if I have access to a general ledger.

Q.    Have you ever personally advised a company in the cosmetics industry in connection with its sale?

A.    No.

Q.    Okay.  What about advising a company in connection with the purchase of a sale -- the purchase of a cosmetics company?

A.    No.

Q.    Debt refinancing of a cosmetics company?

A.    No.

Q.    Restructuring of a cosmetics company?

A.    No.

Q.    Okay.  And I asked you before if you've ever been an executive at a for-profit company.

Ever been in management at a for-profit company, other than your management role at Goldin?

A.    No.

Kost - Confidential

Q.    So you don't have any unique personal knowledge that informed -- of the cosmetic industry, that you're bringing to bear on your view of the need to sell Stila?

A.    No.

Q.    What about the timing of selling Stila?

A.    I've been an investment banker for 30 years, so I had general knowledge of what it takes to conduct an M&A process.  But that's the specific reason that we've hired investment bankers to sell each of the portfolio companies.

Q.    So Perella Weinberg was retained to sell Stila in December of 2019; is that correct?

A.    Yes.

Q.    And did you have any involvement in the negotiation of the retention agreement with Perella Weinberg?

A.    No.

Q.    But you reviewed the retention

Kost - Confidential

agreement for Perella Weinberg; right?

A.      Yes.

Q.      Do you know if Ms. Tilton was involved in the negotiation of the retention of Perella Weinberg?

A.      No.

Q.      You don't have any knowledge whatsoever?

A.      I know that Randy Jones and in-house counsel at Patriarch took the lead in negotiating an engagement letter.  I don't know what they reviewed or mentioned to Ms. Tilton.

Q.      Do you know if Mr. Katzenstein had any involvement in negotiating the retention agreement with Perella Weinberg?

A.      No, I don't believe he did.

Q.      Okay.  And having reviewed the retention agreement, do you have any concerns with its terms?

A.      No.

Q.      Do its terms appear to be commercially reasonable based on your

Kost - Confidential

experience in the industry?

MR. NEIBURG:  Object to form.

A.     Yes.

Q.     What's the name of the lead banker, to your recollection, that's handling the sale of Stila from Perella Weinberg?

A.     Anthony Guilano.

Q.     And have you worked previously with Mr. Guilano on any other deals?

A.     No.

Q.     Have you begun having regular conversations with Mr. Guilano on the status of the sale of Stila?

A.     I have spoken to Anthony probably two times since he was retained.

Q.     Okay.  But you have access to speak to him about the status of the sales process; right?

A.     Yes.

Q.     Tell me about your first conversation with him, approximately when did that happen?

A.     It would have been a couple of

Document 419  Filed 03/27/26  Page 1895 of 2249

Page 122

Kost - Confidential

weeks ago.

And I called in to check in, find out the status of the sales process, in terms of his ability to get due diligence information, his ability to schedule a kickoff meeting, and his ability to meet with management.

Q.   And when was your more recent communications with him?

A.   Probably a week-and-a-half ago, maybe.

Q.   And what was the content, to your recollection, of that conversation?

A.   I was again trying to determine whether he started his sale process, his preparation in terms of gathering information and meeting with management and scheduling a meeting, none of which he had been able to do yet.

Q.   Have you discussed with Mr. Guilano debtors' proposed timeline for Stila's sale?

A.   No.

Q.   Why not?

212-267-6868          www.veritext.com          516-608-2400

Page 123

Kost - Confidential

A.    So we're -- running regular way M&A sale processes that are the, you know, recommended by the investment bankers.

Q.    Okay.  Debtors are running regular M&A sales processes recommended by the bankers.

So at the time debtors filed their milestone motion on December 20th, 2019, they included Stila with a launch-by or outreach date of March 31st, 2020; do you recall that?

A.    Yes.

Q.    And was that an aspirational date or was that based on having communicated with a banker about the buyer outreach date for Stila?

MR. NEIBURG:  Object to form.

A.    So I think you're confusing two things.  Maybe I misunderstood your question.

You talked about a sale process.  This is a launch date.  This is when do you, you know, launch your

Page 124

Kost - Confidential

process.  And we assumed for Stila that if the banker was retained in mid-December, that March 31st would give them adequate time to prepare for a sale process.

Q.    Let's talk about how you prepare for a sales process.  You've testified previously in this case about the type of processes and activities you'd expect to engage in as part of diligence in a mergers and acquisitions process.

Do you recall any of that testimony from back in 2018?

MR. NEIBURG:  Object to form.

A.    Vaguely.

Q.    Okay.  So prior to launching a sales process, would you have to have full access to the company's management team?

A.    Yes.

Q.    Okay.  And would you expect the investment banker to review monthly management reports as part of launching a

Page 125

Kost - Confidential

sales process?

A.    Yes.

Q.    And you would expect them to do that as part of completing their marketing materials for the sale; right?

A.    Yes.

Q.    And you'd expect them to have full access to any documents that could be relevant to the sales process; is that right?

MR. NEIBURG:  Object to form.

A.    Yes, that they found relevant.

Q.    Okay.  And the types of documents that would be relevant to the sales process would be audited financials, to the extent they exist?

A.    Yes.

Q.    Okay.  So three to five years of audited financials?

A.    Yes.

Q.    And they would need to review those; is that right?

A.    Yes.

Q.    And then you mentioned earlier

Page 126

Kost - Confidential

that there would need to be a quality of earnings report prepared. That's not prepared by the bankers, though; right?

A. No, that's prepared by a third party.

Q. Does the banker consider the quality of earnings report in preparing its marketing materials?

A. You could.

Q. In this case, where qualities of earnings report have been prepared alongside confidential information memorandums by bankers, to your knowledge, have the bankers considered the quality of earnings report prior to launching the sale of the company?

A. So a quality of earnings report has adjusted EBITDA. To the extent you were including adjustments in your confidential information memorandum, it would be helpful but not required.

Q. Would the investment banker, prior to launching a sale process, need to review quarterly unaudited financials?

Page 127

Kost - Confidential

A.    Yes.

Q.    And would you expect them to test the accuracy of the financials of the company?

MR. NEIBURG:  Object to form.

A.    I don't know what you mean by "test the accuracy."

Q.    Would you expect a banker preparing for the sales process to look behind the financials at, say, the general ledger?

A.    Yes.

Q.    Okay.  And you'd expect them to meet with the CFO?

A.    Yes.

Q.    You'd expect them to understand the company's inventory?

A.    Yes.

Q.    You would expect them to understand the company's accounts receivables?

A.    Yes.

Q.    You would expect them to understand the receivable schedules?

Kost - Confidential

A.     Yes.

Q.     Payable schedules?

A.     Yes.

Q.     You'd expect them to know the company's operations; right?

A.     Yes.

Q.     And have an understanding of all of the operational information about the company?

MR. NEIBURG:  Object to form.

A.     Generally, yes.

Q.     Would that include -- understanding the operational information of the company, would that include understanding whether the facilities were leased or owned?

A.     Generally, yes.

Q.     Do you have any idea of whether Stila's operations are leased or owned?

A.     I don't recall.

Q.     Do you have any idea if they work out of more than one building?

A.     I don't recall.

Q.     Have you ever looked -- have

Kost - Confidential

you ever attempted to obtain such information?

A.    That would be in the audited financial report but I just don't recall.

Q.    As part of your work as the chief monetization officer, do you have any involvement with Ankura?

A.    No.

Q.    Okay.  Do you know what their role is in this case?

A.    I believe they're administrative agent for the debtors.

Q.    And does Ankura -- do you receive any reports from Ankura?

A.    Not directly.  Any reports from Ankura would go to FTI and they would pass along to me, to the extent they thought relevant.

Q.    Have you ever reviewed any reports prepared by Ankura?

A.    So when you say "reports," I don't, just to clarify, I don't know if they prepare any reports.  They pass along reports prepared by portfolio

Page 130

Kost - Confidential

companies.

Those are the -- so they are passing along information prepared by portfolio companies that I would receive.

Q. And do you know if Ankura has collected information, say, on Stila's leases or its facilities?

A. I don't know.

Q. Okay. To the extent Stila owns facilities, owns buildings, those could be assets that secure the loans of the Zohars; is that right?

A. Yes.

Q. Do you have any idea whether or not the loans of the Zohars are secured by such assets?

MR. NEIBURG: Object to form.

A. Again, I am not a lawyer. It's my understanding that the Zohar loans are secured by the assets of each of the portfolio companies.

Q. Have you done any investigation as to whether the Zohar loans are secured by the physical assets of the portfolio

Kost - Confidential

companies?

A.    I have not.

Q.    Have you done any investigation into whether there are any distinctions in the collateral to which the loans are secured depending on the portfolio company?

MR. NEIBURG:  Object to form.

A.    I have not.  That would be FTI's role.

Q.    Okay.  So that's Mr. Katzenstein's role?

A.    Mr. Katzenstein and his firm.

Q.    Okay.  Have you ever worked with Mr. Tully?

A.    Yes.

Q.    And what's his role?

A.    Mr. Tully is a managing director who reports directly to Mike Katzenstein and does a lot of the work for Mike.

Q.    And when you say he does a lot of the work for Mike, what are you thinking of?

Kost - Confidential

A.     You would have to ask Mr. Katzenstein, but my understanding is that Mr. Katzenstein requests, directs Mr. Tully to do whatever work that Mr. Katzenstein feels needs to be done.

Q.     Okay.  So Mr. Tully may have done an investigation into the types of assets that secure the loans of the Zohar funds?

MR. NEIBURG:  Object to form.

A.     I don't know.

Q.     You don't know, that's fine.

Going back to what an investment banker would have to do before it launched the sale of Stila; would it have to conduct a legal review of the company?

MR. NEIBURG:  Object to form.

A.     So an investment banker would do a review to understand general areas that might be of importance to a buyer.

Q.     Um-hum.

A.     Obviously, that would be handled by the portfolio company's

Kost - Confidential

counsel, legal counsel, and obviously would be something that would become even more relevant later in a process when an interested party did its legal reviews.

Q.    Is what is important to a buyer dependent on the company?

A.    Yes.

Q.    So some companies, a legal review would be extremely important to a buyer and for other companies it wouldn't be as important; is that right?

MR. NEIBURG:  Object to form.

A.    It's possible.

Q.    What about environmental diligence?  Is environmental diligence and the importance of it dependent upon the company that's being sold?

A.    Yes.

Q.    Okay.  And in your experience, environmental -- can environmental diligence hold up a sale?

A.    Yes.

Q.    And why is that?

A.    Because it's one of these

Page 134

Kost - Confidential

potential contingent liabilities that we were just talking about that is important to a buyer.

Q.    And among the portfolio companies with which you have familiarity, has environmental diligence been an issue that has held up the sale process for any of the companies that are currently being -- that are currently in a sales process?

A.    I wouldn't say that it's held up; it's been an issue and an important issue, yes.

Q.    Has environmental -- was environmental diligence an important issue in the diligence related to the sale of MD?

A.    I don't recall discussions about environmental issues for MD.

Q.    Okay.  What about for Dura?

A.    I don't recall specific discussions, but obviously as an auto parts manufacturer, it would be relevant.

Q.    What about for Hussey?

Kost - Confidential

A.    Yes, it is very relevant.

Q.    And when you say it is very relevant, it's relevant to the buyer's decision to put in a bid or -- actually, is it relevant to the buyer's decision to even put in a bid?

MR. NEIBURG:  Object to form.

A.    Yes, it was very important to at least two parties.

Q.    Okay.  And it's also important to determining the value of the bid; is that right?

A.    Yes.

Q.    Do you have any understanding of whether Houlihan Lokey has done any investigation into Stila's finances?

A.    By information and belief, I don't believe they started any diligence for any portfolio company.

Q.    You know that the debtors have represented to the Court that Houlihan Lokey will be well positioned to monetize the portfolio companies in a manner that meets the Court's expectations; right?

Kost - Confidential

MR. NEIBURG:  Object to form.

A.     I read that sentence.

Q.     Do you agree with that sentence, based on your knowledge of what Houlihan Lokey has done to date?

A.     I am not sure that sentence refers to what they've done to date.

Q.     So based on what Houlihan Lokey has done to date, they are not currently well positioned to monetize the companies in a manner that meets the Court's expectations, in your view?

MR. NEIBURG:  Object to form.

A.     I don't agree with that.

Q.     Okay.  So what is your view of Houlihan Lokey's ability to monetize the portfolio companies in a manner that meets the Court's expectations?

A.     I think Houlihan Lokey is an extremely well respected, large restructuring firm with a tremendous number of highly experienced individuals in restructuring and M&A, and they are just -- they are a highly reputable firm.

Kost - Confidential

Q.    Would they replace any of the bankers who have currently been retained by the portfolio companies?

MR. NEIBURG:  Object to form.

A.    I don't know.

Q.    Is it your -- well, so would they work alongside the bankers that have been retained for the portfolio companies?

A.    It's possible.

Q.    Is that something that you've talked to Mr. Katzenstein about outside the presence of counsel?

A.    No.

Q.    Is that something that you've talked to Mr. Katzenstein about in the presence of counsel?

MR. NEIBURG:  Object to form.

A.    I have had very limited discussions with Mr. Katzenstein or anybody about Houlihan's role.

Q.    So you don't have any personal knowledge of whether debtors expect Houlihan Lokey to replace existing

Page 138

Kost - Confidential

bankers or not?

A.    I don't know.

Q.    But they could?

A.    It's possible.

Q.    And if they replace current bankers, what would happen to the sales processes in those circumstances; would they restart?

MR. NEIBURG:  Object to form.

A.    I don't know.  It would be a case-by-case decision I would assume.

Q.    Okay.  Would you expect Ms. Tilton to be involved in the preparation of a CIM for the sale of Stila?

A.    Yes, it would be helpful.

Q.    Why would it be helpful for her to be involved in the preparation of a CIM for Stila?

A.    She's the CEO of Stila.

Q.    And in general a CEO, it's helpful to have a CEO involved in the preparation of a CIM for what reason?

A.    In general, it's helpful

**Page 139**

Kost - Confidential

because they are the Chief Executive Officer. They know a lot about the company, and it would be helpful.

Q. Would buyers expect the CEO to be involved in the preparation of a CIM for a company?

MR. NEIBURG: Object to form.

A. I am not sure that a buyer would really even think about that as a consideration.

Q. Okay. You've testified previously that investment bankers need to have answers to any and all questions that a potential buyer would request. To have that degree of understanding of the company, would it be helpful to have Ms. Tilton's involvement?

MR. NEIBURG: Object to form.

A. So an investment banker will do a lot of due diligence, as much diligence as they can, be as prepared as they can. They are the first line that reaches out -- they are retained to reach out to the interested parties, tell the story,

Kost - Confidential

answer questions.

Obviously if there is a question from a buyer that they don't know the answer to, they would go to somebody on the management team.

Q.    And it might be the CEO?

A.    That's correct.

Q.    So at the start of these cases, you and Ms. Tilton discussed the types of issues that could cause the monetization process for a given portfolio company to take longer.  You testified to that in 2018.

One of the issues that you flagged was the involvement of a -- if a foreign buyer turned out to be the most likely buyer.

Why is it that the involvement of a foreign buyer can extend the timeline for a sales process?

MR. NEIBURG:  Object to form.

A.    So generally, generally, foreign buyers have a number of issues they need to overcome, including language

Page 141

Kost - Confidential

barriers, you know, customs barriers. It's a stereotype, but generally foreign buyers tend to be a bit more bureaucratic.

Q.     The German ones, specifically?

A.     For example.  And then recently, Asian buyers, primarily Chinese buyers, for example, have had CFIUS and other tariff issues, as a specific example.

Q.     And you agreed with Ms. Tilton that an Asian strategic buyer would be the best buyer for Stila, haven't you?

          MR. NEIBURG:  Object to form.

A.     I have not agreed.  We discussed potential Asian strategic buyers as being very, you know, likely candidate for Stila.

          MS. MALONEY:  Mark this.

          (Kost Exhibit 6, Patriarch timeline 1404, was so marked for identification, as of this date.)

Q.     Okay.  If you flip to the back page, this is an e-mail chain with Lynn

Kost - Confidential

and you and Mr. Jones --  strike that.

If you flip to the back page, this is an e-mail exchange with Ms. Tilton, you and Mr. Jones.  And Mr. Jones writes, "Is this your deal you referenced Friday?"  It appears that he's writing to Mr. Guilano, who you identified earlier as the lead banker for Perella Weinberg Partners on this deal.

If you go to the Bates ending in 1406, you see that it's about the acquisition of Dr. Jart.

And then Mr. Guilano, on Bates ending on 1405, has an extensive response to Mr. Jones.

It turns out that Perella Weinberg wasn't actually involved in the Dr. Jart acquisition.

And Mr. Jones passes this along to you and Ms. Tilton.

Are you in regular communication with Mr. Jones about the sales process for Stila?

A.    So I have periodic phone calls

Page 143

Kost - Confidential

with Mr. Jones as scheduling discussions with Ms. Tilton is challenging.  So Mr. Jones and I frequently or periodically catch up.

So we may talk about whatever portfolio company at a given time is relevant to discuss, which would include Stila.

Q.     And Perella Weinberg actually thinks that an Asian strategic buyer is the best buyer for Stila; right?

MR. NEIBURG:  Object to form.

A.     I don't recall if they used the words "best."

During our two meetings with Perella Weinberg, we did spend time discussing entry into the Korean market and the relative opportunities for Stila to enter into Korea, and that's obviously, this was part of the genesis of this e-mail, is to other M&A activity that's happening in Korea.

Q.     And so Ms. Tilton agreed or represents here on this front page, she

Kost - Confidential

writes to Mr. Jones and you and says, "I really think they will do the best job for Stila.  And they believe, as I do, that an Asian strategic buyer will be the best buyer.  Let's go with them."

You respond, "Agreed."

What were you agreeing to?

A.    So I think I was more specifically referring to Anthony Guilano and Perella Weinberg as being -- doing the best job for Stila.  I do, I think they are good bankers and I think they would do a very good job.

And I don't disagree -- again, I am not a color cosmetics banker, but an Asian strategic would be a likely candidate.

Q.    Do you know if Stila has any outstanding debt to the Zohars?

A.    No, I don't believe they do.

Q.    Okay.  Are you aware of whether Stila has any outstanding debt to any third parties?

A.    They may have had a small

**Page 145**

Kost - Confidential

amount at some point.  I don't know if they do now or not.

Q.    Let's talk about MD.  So MD Helicopters is one of the Group A portfolios the debtor proposed launching a sale, launching buyer outreach for before March 1st, 2020; do you recall that?

A.    Yes.

Q.    And is it true that debtors have identified MD as the most valuable Group A portfolio company?

A.    That's our belief.

Q.    And what is that belief based on?

A.    That belief was based on the fact that MD was very profitable.  It has become less profitable in 2019.  But it's a good business.

Q.    Have you prepared or has Goldin prepared a valuation of MD?

A.    We have not prepared a valuation of MD.

Q.    Has, to your knowledge, FTI

Kost - Confidential

prepared a valuation of MD?

A.    So as I testified earlier, we
prepared waterfalls that include
illustrative valuations, which are top
down.

Q.    What is an illustrative
valuation?

A.    An illustrative valuation is a
shorthand for a relatively high-level
top-down valuation.

It's generally multiple driven.
It is not a full discounted cash flow
valuation.  It's not using the three
methodologies to prepare a, what I will
call a formal valuation.

Q.    And the three methodologies to
prepare a formal valuation are what?

A.    Public market comparables, M&A
transactions and discounted cash flow.

Q.    So it's multiple driven and the
multiple is based on -- and the multiple
is applied to what?

A.    Generally EBITDA, but you could
also do revenue or EBIT or other

Kost - Confidential

multiple -- other metrics.

Q.    In this case for the waterfall that you're referring to, is the multiple applied to EBITDA?

A.    Yes.

Q.    And do you recall approximately, in this waterfall that you're referring to, what was the valuation for MD?

A.    We have created little illustrative waterfall valuations at many points in time, so you would have to be more specific.

Q.    Okay.  What's the lowest valuation in the waterfalls that you've prepared, to your recollection, for MD?

A.    Possibly 6 to 800 million.

Q.    What's the highest, to your recollection?

A.    I think we potentially ran waterfall values upwards of a billion 5.

Q.    And the difference between the 6 to 800 million and the 1.5 billion is a change in the EBITDA multiple?

Page 148

Kost - Confidential

A.      First of all, they are illustrative, so I can't tell you specifically how they were prepared.

We would also have the benefit at one point in time of the marketing process back in 2018 and the indications of interest we received.

Q.      I'm sorry, you just told me you couldn't tell me how they were prepared, but I thought you had explained to me how they were prepared, that they were based on an EBITDA multiple.

Are they based on something other than an EBITDA multiple?

A.      Generally, we were using EBITDA multiples.  But I can't -- I don't remember the EBITDA or the multiple specifically --

Q.      That's fine?

A.      -- for that, for those numbers.

Q.      Right.  So at the time of 2018, when you received the indications of interest -- and we'll go through those, there is a variation in those indications

Kost - Confidential

of interest -- is that when the waterfall valuation that FTI had prepared was closer to 1.5 billion?

A.    Yes.

Q.    And is it now closer to 6 to 800 million?

A.    Yes.

Q.    Do you recall what it was in the summer of 2019?

A.    I don't.

Q.    Okay.  Was it lower than 1.5 billion?

A.    Yes.

Q.    Higher than 800 million?

A.    I don't recall.

Q.    Around 800 million?

A.    It's possible.

Q.    Did you agree with the valuations that you've been seeing from FTI, you personally, as an experienced investment banker, do you agree with the valuations that FTI has prepared for MD?

A.    So, again, I want to be very clear, these are illustrative and --

Page 150

Kost - Confidential

Q. I can change my question if you want.

Have you agreed that the illustrative valuations that FTI has prepared for MD are, in your view, accurate?

MR. NEIBURG: Object to form.

A. So my interface with FTI -- again, to be clear, I don't prepare the waterfalls. I have discussions with FTI about populating the illustrative enterprise value.

So at any given time, you know, those would have been numbers that we would have debated. And I don't know exactly what they ended up putting in; I would have, but I don't recall at this point.

Q. Yeah. And who -- who do you have these discussions with at FTI about populating the illustrative values?

A. So it would have been -- so the way it would work is FTI would send me a draft of the waterfall. I would look at

Page 151

Kost - Confidential

it.  I would generally call them and we would discuss, and then we would potentially make changes to the waterfall.

And then at some point we would get on a phone call with Mike Katzenstein, Conor Tully, Eddie Moser and myself, and I am talking generically, I can't remember any specific time, but generally we would talk about the numbers we are putting into the waterfall.

Q.    And this was occurring in the summer of 2019?

A.    This happened continuously for the whole case.

Q.    What was the most recent time that you all did this?

A.    We haven't done it in a little while.  I would probably have to say Q4. Sometime last year.  End of, like November -- October, November, December.

Q.    And have you ever discussed these illustrative values with Ms. Tilton, you personally?

Page 152

Kost - Confidential

A.    I personally have not.

Q.    Do you know if -- strike that.

As part of determining the illustrative values in these waterfalls, have you considered valuations provided by Ms. Tilton?

A.    I have not.

Q.    Do you know if these illustrative waterfalls are prepared entirely independently of any valuation that has been provided by Ms. Tilton?

A.    I don't know.

Q.    Who would know that?

A.    The FTI team.

Q.    Have you ever advised a company in the aerospace industry in connection with its sale?

A.    No.

Q.    Okay.  Purchase?

A.    No.

Q.    Debt refinancing?

A.    No.

Q.    Restructuring?

A.    No.

Kost - Confidential

Q.    Okay.

A.    Well, Orbital ATK is an aerospace company, they were a client last year.

Q.    Is it your view that that particular deal is akin to the MD sale, that you can parallel between the two?

A.    Satellites versus helicopters.

Q.    Different industries?

A.    Yes.

Q.    Okay.  You're aware that Moelis has been retained to sell MD?

A.    Yes.

Q.    And do you recall the name of the lead banker at MD -- strike that.

Do you recall the lead banker at Moelis?

A.    Yes.

Q.    What his name?

A.    Azad Badakhsh, something like that.

Q.    That's all right.  We won't offend him by destroying his last name.

And have you worked with -- I

Kost - Confidential

am going to use his first name because I don't want to be disrespectful of his last name, though, generally I prefer to use last names.  Have you -- and he seems to be okay with that, so.  Have you worked with Azad before?

A.    Not with Azad.

Q.    Okay.  But you've worked with Moelis before on deals?

A.    Yes, other members on their team I have.

Q.    And during the course of the sales process for MD -- strike that.

Do you know if Moelis was retained prior to you becoming the CMO for the funds?

A.    Yes, they were.

Q.    And you reviewed the retention agreement once you became the CMO?

A.    Yes.

Q.    And do you know if that retention is still in place?

A.    I believe it's still in place.

Q.    But you don't have any personal

Kost - Confidential

knowledge of whether it's still in place?

I think it is, too.

        A.    I don't know whether it is or

isn't.

        Q.    Okay.  When was the last time

you spoke with Azad?

        A.    We had a conference call with

Azad in October or November.

        Q.    And when you say "we," who was

a participant in that conference call?

        A.    Joe Farnan, and I can't recall

whether Mike was on that call or not.

        Q.    And October or November was the

last time you had communications with

Azad?

        A.    Yes.

        Q.    No e-mails since then?

        A.    Yes, there have been e-mails.

I have not -- I would be a copy on

e-mails with Azad.  But I have not

reached out to Azad since that phone

call.

        Q.    Do you have any recollection of

the last time debtors had communications

**Page 156**

Kost - Confidential

with Azad?  And when I say debtors, I mean Mr. Farnan, Mr. Katzenstein or you.

A.    Yes, there were a number of e-mails and/or phone calls in November or December with respect to sale process.

Q.    Okay.  And during the course of the first sale process, were you in contact with Azad as well?

A.    Yes.

Q.    Okay.  And so did Azad keep you apprised of the status of that sale process?

A.    Yes.

Q.    Have you visited MD?

A.    Yes.

Q.    You visited it with Mr. Katzenstein?

A.    Yes.

Q.    Approximately when did you visit MD?

A.    May or June of 2018.

Q.    Do you know the approximate number of employees at MD?

A.    Couple hundred.

Page 157

Kost - Confidential

Q.    Okay.  And Ms. Tilton is the CEO of MD; correct?

A.    Yes.

Q.    And do you recall or -- strike that.

Do you know the circumstances of MD becoming a Zohar portfolio company?

A.    I know some general background.

Q.    Okay.  What is that?

A.    That Ms. Tilton bought MD Helicopters when it was not operating but had a great opportunity and lots of intellectual property, and she restarted MD Helicopters and restarted production.

Q.    Are you aware of any litigation related to that, MD's intellectual property?

A.    Yes.

Q.    What, tell me about that?

A.    Just generally aware that she has litigation against Boeing --

Q.    Okay.

A.    -- who at one point was the owner of MD.

Page 158

Kost - Confidential

Q.    Are you aware of the status of that litigation?

A.    I am not.

Q.    Is anyone on debtors' team following developments in litigation related to MD?

A.    I don't know.

Q.    As part of your role as chief monetization officer, is that part of your responsibility to stay apprised of litigation related to the portfolio companies?

A.    Generally it would be.

Q.    Okay.  And have you been doing that, keeping apprised of litigation related to the portfolio companies?

A.    Generally.  And it's much more relevant as you're in a sale process and you're getting closer to a deal where it's relevant and important to the buyer.

Q.    But it would be also relevant to these determinations of valuation that we talked about or no, through the waterfall?

Kost - Confidential

MR. NEIBURG:  Object to form.

A.    It's possible.  If you were to structure an asset deal as opposed to an equity deal, it becomes less relevant.

Q.    Okay.  Does MD have outstanding loans from the Zohars?

A.    Yes.

Q.    And are you aware of whether MD has outstanding loans of any -- from any of the Patriarch stakeholders?

A.    Yes.

Q.    Are you aware of the approximate percentage of outstanding loans to the Zohars versus the Patriarch stakeholders?

A.    I am going to say we're approximately 250 million and they're 100 million.

Q.    What about other third parties? Are you aware of any loans outstanding with other third parties?

A.    I don't recall.

Q.    Don't know one way or the other?

Kost - Confidential

A.    I think there are some small loans.  It might be to a lien or something related.

Q.    As part of these waterfalls that we've discussed, is there an expected recovery assigned to Zohars on account of their debt?

A.    Yes, the waterfalls include all of the information you just asked about.

It has all the liabilities, all of the third-party debt, Zohar, Patriarch, everybody.

Q.    And do they also assign an expected recovery on account of the Zohars' disputed equity interest?

A.    I would rephrase the question. I don't know what you mean by "assign an expected recovery."

Q.    Okay.

A.    It has a value to equity at the bottom.

Q.    Okay.  Have you reviewed the waterfalls that we discussed earlier with Azad?

Kost - Confidential

A.     No, we have not.

Q.     Reviewed them with any party outside of debtors?

A.     No.

Q.     Have you reviewed them with MBIA?

A.     No.

Q.     And is that because MBIA -- your testimony earlier that MBIA doesn't want to know the valuation of companies from you all?

MR. NEIBURG:  Object to form.

A.     I don't know why we haven't reviewed it with MBIA.  But that's a good reason.

Q.     Have you reviewed the waterfall with anyone at Bardin Hill or representing Bardin Hill?

A.     No, I have not.

Q.     Patriarch and the Zohars aren't the only holders of an interest in MD; correct?

A.     That's correct.

Q.     Okay.  And are you aware of the

Page 162

Kost - Confidential

third party that holds or the third parties that hold those additional interests; are you aware of their names?

A.   I probably knew the name at one point.  It's a legacy holder from back at the initial acquisition.

Q.   At any point have debtors participated in any discussion with representatives of that third party?

A.   I have not had any discussions with that third party.

Q.   Do you know if anyone from debtors have had any discussion with that third party?

A.   I do not know.

Q.   Heritage Aviation.  It's another Group A company; right?

A.   Yes.

Q.   Is it also being marketed by Moelis alongside MD?

A.   My understanding is no, but that, in the first process, I thought -- I was under the understanding that Heritage Aviation was being marketed with

Page 163

Kost - Confidential

MD.

I subsequently have come to understand that that may not have been the case.

Q. On what basis did you think it was being marketed along with MD in the first process?

A. Because Heritage is a captive provider of parts to MD.

Q. Moelis commenced its marketing of MD in May of 2018; right?

A. That sounds about right.

Q. Okay. And you actually participated in the interviewing of Moelis; is that right?

A. I don't --

Q. Before you were retained as the CMO, you participated in the interview of Moelis; right?

A. I actually don't remember.

Q. Okay. Were you invited to participate in that, do you remember?

A. I recall meeting with Moelis early in the case, but I thought they had

**Page 164**

Kost - Confidential

already been retained.  But it's possible that that was a pitch interview.

Q.    Okay.  There was a confidential information presentation prepared for MD; right?

A.    Yes.

Q.    And did you have any involvement in the preparation of that confidential information presentation?

A.    No.

Q.    We talked about CIMs.  Is a confidential information presentation the same as a CIM, it's just a different name?

A.    That's correct.  And some people even called them confidential information presentations, CIPs.  They are all the same.

Q.    So CIMs and CIPs are the same thing, just different -- they go by different names?

A.    Yes.

Q.    Ms. Tilton prepared the CIP for MD with Moelis; is that right?

**Page 165**

Kost - Confidential

A.      It's my understanding.

Q.      And Ms. Tilton provided you with a draft of the CIP prepared by herself and Moelis for MD in November of 2018; do you recall that?

A.      I do believe we got drafts.  I don't recall the date.

MS. MALONEY:  Okay.  Let's take a five-minute break.  We can get the e-mails together, and then that way we won't be slowed down; is that okay?

MR. NEIBURG:  Okay.

THE VIDEOGRAPHER:  Thank you. The time now is approximately 12:58, we are going off the record.  It's the end of media 2.

Page 166

Kost - Confidential

Afternoon Session

THE VIDEOGRAPHER:  The time now is approximately 1:35 p.m., we are back on the record, this is the beginning of media 3.

Examination by Ms. Maloney (continued):

Q.    Okay.  Mr. Kost, let's take a look at -- it's my understanding that there were actually a short-form CIM that Moelis prepared for the sale of MD and then a long-form CIM.  Do you have a recollection of that?

A.    Yes, that's correct.

(Kost Exhibit 7, short-form CIM, was so marked for identification, as of this date.)

Q.    So let's look at Exhibit 7, which I think is the short-form CIM.

MR. NEIBURG:  This is Kost 7?

THE REPORTER:  Correct.

Q.    So what is a short-form CIM generally?  Is that a term in the industry?

Kost - Confidential

A.    Well, other terminology would be a teaser.  This is a longer form of a teaser.

Teasers tend to be one or two pages.  So this is, I would go with short-form CIM.

Q.    And Ms. Tilton, in this e-mail, mentions that it's to be used for initial meetings that Moelis has with certain potential strategic buyers.

So do you have a recollection of there being a staging of the sharing of information with potential buyers?

A.    Yes.

Q.    And explain that to me?

A.    So the strategy for the last sale process for MD was to focus on large strategic buyers.  And Moelis put together the short-form CIM.

And they scheduled what they called fireside chats where Ms. Tilton and one or more of the Moelis bankers went out and did a very -- they use the term "fireside chat."  It's kind of what

Kost - Confidential

it sounds like.  It's an initial meeting to gauge the interest of the strategic buyer's interest in MD Helicopters.

Q.    Okay.  Are you -- do you have a recollection of the names of the strategic buyers who were initially approached?

A.    Yes.

Q.    And approximately how many were initially approached?

A.    Probably somewhere in the range of six to eight.

Q.    And were these strategic buyers, they are called strategic buyers because they are buyers that are in the industry; is that correct?

A.    Most of these would have been direct competitors in the helicopter space or maybe -- I would have to refresh my memory -- fixed wing or something very close.

Q.    And was there a script generated for these fireside chats, to your knowledge?

Page 169

Kost - Confidential

A.    I seem to recall there may have been a script.  Obviously they were using a teaser or mini-CIM I believe.  But it was a fireside chat.

They were literally going to some of largest aerospace and defense companies in the world to gauge their interest.

Q.    And so did you participate in any of these fireside chats?

A.    No.

Q.    Did anyone from debtors?

A.    No.

Q.    Was there any in-person prep sessions that you participate in for the fireside chats?

A.    No.  And it would have been unusual for us to participate in these meetings.

Q.    Okay.  Do you have any idea approximately how long they lasted, the fireside chats?

A.    You mean the duration of the actual meeting?

Page 170

Kost - Confidential

Q.    I'll ask the question a different way.

Do you have any understanding of how long each fireside chat -- no, that doesn't work either.  Strike that.

Over the course of what period of time did these fireside chats occur?

A.    They occurred I believe over a number of weeks, three or four weeks.

A number of these strategic buyers are located in Europe.  And so I know that Moelis and/or -- well, Lynn for sure and/or Moelis joined in some of these meetings in Europe.

Q.    And do you know, for each fireside chat, approximately how long it lasted?

A.    I don't recall if I ever knew exactly the time of each meeting.

Q.    Okay.  We talked about earlier how MD was removed from the sales process.

Do you know what was communicated to the potential strategic

Page 171

Kost - Confidential

buyers about it being removed from the market?

A.    So I think you're going to need to be a little more specific.

Q.    Okay.  Do you know if the bankers conveyed anything to the potential strategic buyers about MD no longer being on the market?

A.    So I am going to try to help you with this.

Q.    Appreciate that.

A.    There would be strategic parties that were contacted who then, on their own volition, said they were not interested.

Q.    Right.

A.    Or moved along in the process and at a later stage said they were not interested.

And then we moved on with parties that were interested.  There is no --

Q.    So this is helpful.  And maybe what I've done is I jumped ahead and had

Kost - Confidential

we gone through the whole process, we would have gotten there.

But essentially, by the time MD was removed from the market, there were no strategic buyers that were talking to Moelis about buying MD, so there was no need to communicate to them that it had been removed from the market; is that right?

A.    That's correct.  I don't know if Moelis followed up with interested parties who had previously said they are not interested who, oh, by the way, were not moving forward with the sales process.  I don't know.

Q.    Let's move back to Exhibit 7. Ms. Tilton says, "We are in the midst of creating a full CIP," which we will get to, "finishing a Q of E with KPMG."

So this was one of the companies where a quality of earnings report was prepared; correct?

A.    Yes.

Q.    And was KPMG MD's auditors as

Kost - Confidential

well?

A.    I don't recall.  I think not.
I think we try to use somebody other than
the auditor.

Q.    That is my question.  When you
prepare a Q of E, do you prepare it with
an accounting firm that already has --
that's already retained by the company
for purposes of its financials?

A.    I think the answer is generally
no.

Q.    And then she says, "We're
waiting on an industry report from
Renaissance."

Now, what's an industry report,
in your experience?

A.    So sometimes in sale processes
you hire a third party -- I am trying to
think of what they would be called -- but
it's a third party whose job is to follow
an industry.  And they literally will
write a report about that industry.

Much of the report is based on
public information.

**Page 174**

Kost - Confidential

Q.    Um-hum?

A.    But oftentimes what they do is they get insider -- not insider information, they get non-public information from competitors.  And they anonymize it and then everybody gets the report for free if they provided information to the report writer.

Renaissance, I don't know what their general business is.  But Renaissance wrote a report that looked at the helicopter market.

Q.    Okay.  Was this the only company that was part of a sales process for which an industry report was prepared?

A.    I believe that's the case.

Q.    And was the industry report prepared, do you know, to your knowledge, at the recommendation of Moelis?

A.    I believe it was Moelis's recommendation to prepare the report.

Q.    And was the purpose of the industry report to obtain additional

Kost - Confidential

bidders?

A.    The purpose of the report would have been primarily to elicit interest from parties that are not directly in the business, because if you are in the business, you probably would already know that information.

So I would -- my belief would be that it would be best for a private equity firm, financial sponsor, or possibly a strategic buyer that is in a tangential business or a Tier 1 supplier.

Q.    So an industry report is intended to assist the banker in expanding the scope of potential bidders; is that accurate?

A.    Yes, the outcome of the report could be that it provides enough information to entice a party to become interested, yes.

Q.    Do you have any knowledge of the basis that Ms. Tilton wrote, "It appears that no one in the market, including my direct competitors, have any

Page 176

Kost - Confidential

idea how much MD has evolved and how profitable is the company"?

MR. NEIBURG:  Object to form.

A.    Yes, I recall having this conversation with Moelis.  I don't remember if I had it with Ms. Tilton or not.  But it really was -- a theme would be that the Patriarch Zohar portfolio companies were private companies and they had been out of the market eye for a number of years.  And people just don't know -- if you're not out there marketing, people don't know.

We had similar comments come back to us about Dura.

Q.    Okay.  And so when a company has been off the public market for a long period of time and grown, does that result in a delay in the timing for obtaining bids for the company?

A.    I think if a company has been private and not participating in industry conferences, for example, that's -- oftentimes even private companies will go

Kost - Confidential

to conferences run by third parties or financial institutions and they will tell their story.

It just simply means it takes a little more time and effort by the banker to tell the story during their market outreach.

MS. MALONEY:  Let's mark Exhibit 8.

(Kost Exhibit 8, E-mail dated September 20, 2018 from Mr. Farnan to Ms. Tilton, was so marked for identification, as of this date.)

Q.    You're not on this e-mail but it references you, I believe, Mr. Kost.

Mr. Farnan writes to Ms. Tilton, "As you know, Rob, Mike by phone and I met with three of the bankers today."

Do you know which bankers Mr. Farnan was referring to?

A.    I am struggling to remember what meeting this was.  I don't see any reference in the e-mail.

Kost - Confidential

Q.    Okay.  Do you recall having a meeting with Moelis in which Mr. Katzenstein and Mr. Farnan participated?

A.    Yes.

Q.    And do you recall having more than one meeting with bankers in which Mr. Katzenstein and Mr. Farnan participated?  Strike that.

Do you recall having more than one meeting with Moelis in which Mr. Katzenstein and Mr. Farnan participated?

A.    I remember probably one meeting that Joe and I went to without Mike.  I am just having a hard time remembering with whom.

Q.    That's fine.

A.    Can you --

Q.    I think I have a document, but I don't have it right here, to figure out exactly who was at this meeting.  But that's okay.  Let's move on.

MS. MALONEY:  Let's do Exhibit

Page 179

Kost - Confidential

9.

(Kost Exhibit 9, E-mail dated September 20, 2018 from Mr. Kost to Ms. Tilton, was so marked for identification, as of this date.)

Q.    It's this one.  This is going to help us.

Okay.  So this e-mail is also on September 20th, 2018, same day as Mr. Farnan's e-mail to Ms. Tilton.

And you write to her that "Mr. Farnan came up to New York City today and we had three meetings this afternoon.  Mike joined by phone.  And we were able to schedule meetings with Moelis, Jefferies and Cowen who are available?"

Does this refresh your recollection as to these banker meetings?

A.    Yes.  I remember having lunch with Joe at a deli.  It's the funny things you remember.

Q.    Yeah.  And Moelis, banker for MD; right?

Page 180

Kost - Confidential

A.    Yes.

Q.    Jefferies is the banker for Dura and GAS; correct?

A.    Yes.

Q.    And Cowen is the -- was the banker for what company?

A.    Cowen is the banker for Universal.

Q.    Okay.  And it appears that you had a good impression of the sales process for each of the three companies, MD, Dura and Universal, as a result of these meetings with the bankers; would you agree with that?

A.    Yes.

Q.    And it appears that each of the three sales processes included preparing quality of earnings reports; right?

A.    Yes.

Q.    And Mr. Farnan was present with you at those meetings.  Is it your recollection that he also had a good impression of the sales process at that time?

Page 181

Kost - Confidential

MR. NEIBURG: Object to form.

A. Several times over the past 18 months Mr. Farnan has asked me to set up meetings or calls with the investment bankers and this was one of the early ones.

And these were the three bankers that I could get to be available when Joe was available. And unfortunately Mike was not available. I didn't remember he had surgery.

But I thought the meetings went well, yes.

Q. And he wrote to Ms. Tilton -- "he" being Mr. Farnan -- wrote to Ms. Tilton that he thought that, "I thought all three went well and further evidenced all the hard work you've done with the bankers and otherwise in preparing the companies to be sold."

Did you agree with Mr. Farnan's impression of the meeting with the three bankers for MD, Dura and Universal?

MR. NEIBURG: Object to form.

Page 182

Kost - Confidential

A.   I don't remember specifically, but I remember having meetings with Joe with bankers.  I generally recall they went well.

Q.   Wait a second.  You said you did remember these meetings; right?

MR. NEIBURG:  I'm sorry, I don't think I have that same document.

MS. MALONEY:  It's Exhibit 8.

MR. NEIBURG:  You went back to 8?

MS. MALONEY:  Mm-hmmm.

MR. NEIBURG:  Sorry about that.

Q.   So you recall meeting with Joe, Mr. Farnan and the banker for MD; right?

A.   Yes.

Q.   And you recall on September 20th, right?

A.   Yes.

Q.   And you recall meeting with Joe and the banker for Dura, which was Jefferies, that meeting also occurred on September 20th?

A.   Yes.

Kost - Confidential

Q.    And you recall meeting with Joe and the banker for Universal, Cowen, which also occurred on September 20th; right?

A.    I remember that meeting the least of the three, but, yes, I remember the three meetings.

I don't remember the exact substance that we discussed at each of the meetings.

Q.    Not asking you for that.  I am asking if you agree with Mr. Farnan's representation to Ms. Tilton that he thought the three went well and further evidenced all the hard work you have done with the bankers and otherwise in preparing the companies to be sold?

MR. NEIBURG:  Object to form.

A.    Yes, that's what Joe's e-mail says.

Q.    And did you agree with Joe's characterization of how the meetings went and what was conveyed about Ms. Tilton's hard work?

Page 184

Kost - Confidential

If you don't agree, that's fine.

A.   I don't agree or disagree.  I just don't recall the specifics as to whether those three meetings evidenced Lynn's hard work.

Q.   Did you also get an impression from the bankers of Ms. Tilton having been involved in preparing the companies, specifically MD, Dura and Universal, to be sold?

MR. NEIBURG:  Object to form.

A.   That's my point.  I thought the meetings with the investment bankers went well, and I don't recall whether we discussed Lynn Tilton's hard work or not at those meetings.

Q.   Don't recall whether you discussed Ms. Tilton being involved in preparing the companies to be sold at all?

A.   I don't recall specifically talking about Lynn Tilton's involvement at those meetings.

**Page 185**

Kost - Confidential

Q.    Okay.  That's fine.  On November 6th, Ms. Tilton sent you a CIP for MD Helicopters.  And I am going to give you a copy of that right now.

(Kost Exhibit 10, CIP for MD Helicopters, was so marked for identification, as of this date.)

Q.    Now, Mr. Kost, this CIP is 106 pages long.  The preliminary CIP was 15 pages long.

If you look here on the first, the first page of the attachment to this e-mail, which is the cover of the CIP, it says Preliminary Draft as of 11/5/2018.

Do you recall if you reviewed multiple drafts of the CIP prepared for Moelis -- prepared by Moelis for MD?

A.    I generally recall getting more versions than just the final version.

Q.    And did you provide substantive comments to these draft CIPs to Moelis?

A.    No.  We have not been providing edits or comments to CIPs generally.

We have -- I have discussed it

Page 186

Kost - Confidential

with investment bankers as to sometimes where I thought it was stronger or weaker.  But we don't edit CIPs.

Q.    Did you provide any comments to Ms. Tilton about the contents of the CIP?

A.    I don't know if I provided comments to Lynn or to Moelis.  But I thought that the MD CIP was pretty well done.

Q.    And this says it's a preliminary draft of November 5th.  Do you know if there was then a later draft that was prepared?

A.    Well, I know there was a final version.

Q.    Okay.  That's fine.

Do you recall if this -- those fireside chats, were those meetings conducted after the final CIP was prepared or as part of the teasers, the time of the teaser CIP?

MR. NEIBURG:  Object to form.

A.    It's my recollection that those meetings were not subject to a

**Page 187**

Kost - Confidential

confidentiality agreement, and therefore would not, for sure, have included any draft or final version of a CIP in my opinion.

Q.    Okay.

A.    My recollection is that they were preliminary nonconfidential meetings.

Q.    And did you -- strike that.

I am going to identify a list of strategic buyers or at least a list of buyers and we'll redact them after the fact, if necessary.

Are you aware of a fireside chat occurring with Moelis, Ms. Tilton and Leonardo Helicopters on November 12th, 2018?

A.    Yes.

Q.    Are you aware of a meeting occurring with Ms. Tilton, Moelis and Vista Jet on November 12th, 2018?

A.    Not Vista Jet, no.

Q.    What is your recollection of -- strike that.

Kost - Confidential

You recall the meeting with Leonardo Helicopters.  Were you given a report about that meeting after the fact?

A.    Yes.

Q.    From Moelis?

A.    Yes.

Q.    Okay.  And what was the report?

A.    There is also a written process update report from Moelis that summarizes the response from all of these interested parties.

I seem to recall that Leonardo actually expressed some interest in moving forward, that that -- I don't believe they said no at that meeting, they weren't interested.  I believe they kept in the process a little longer.

Some of the other meetings, the parties said "No, we are not interested."

Q.    Okay.  And are you aware of a fireside chat occurring with Moelis, Ms. Tilton and Milan on or about November 12th, 2018?

A.    I'm sorry, in Milan?

Page 189

Kost - Confidential

Q.    No.

A.    The company's name is Milan?

Q.    The company's name is Milan, M-I-L-A-N.

A.    No.

Q.    Are you aware of a fireside chat occurring between Moelis, Ms. Tilton and Airbus in November 13, 2018?

A.    Yes.

Q.    Are you aware of a fireside chat occurring between Moelis, Ms. Tilton and Airbus Blagnac, spelled B-L-A-G-N-A-C, in approximately November 13, 2018?

A.    I know there were one or more meetings with Airbus, so I am not sure.

Q.    Does Airbus have different subsidiaries that might be separate potential buyers or different parts to Airbus that would result in them having different buyers and require different meetings?

A.    The specific meeting I was told about was Ms. Tilton's meeting with

Page 190

Kost - Confidential

Airbus in Toulouse.

Q.    Okay.  And are you aware of a meeting occurring with Ms. Tilton, Moelis and KKR on or about November 14, 2018?

A.    Yes.

Q.    Are you aware of a meeting occurring between Ms. Tilton, Moelis, Veritas -- and Veritas, on or about November 14, 2018?

A.    Yes.

Q.    Are you aware of a meeting occurring between Ms. Tilton, Carlyle and Moelis, on or about November 15, 2018?

A.    Yes.

Q.    Are you aware of a meeting occurring between Ms. Tilton, Moelis and American Securities on or about November 15?

A.    Yes.

Q.    Are you aware of a meeting occurring between Ms. Tilton, Moelis and Textron on or about November 16?

A.    Yes.

Q.    Are you aware of meeting

Page 191

Kost - Confidential

occurring between Ms. Tilton, Moelis and Heico, spelled H-E-I-C-O, on or about November 16, 2018?

A.    Yes.

Q.    Are you aware of a meeting occurring between Moelis and Blackstone on or about November 16, 2018?

A.    I don't recall.

Q.    Blackstone wouldn't be a strategic buyer; right?

A.    Correct.

Q.    Neither would Carlyle; right?

A.    Correct.

Q.    They would be one of those private equity fund buyers; right?

A.    Yes.

Q.    Are you aware of a fireside chat occurring between Ms. Tilton, Moelis and Platinum Equity on or about November 28, 2018?

A.    Yes.

Q.    Did you participate in a drafting session for the confidential information memorandum for Moelis?

Page 192

Kost - Confidential

A.    I don't believe so.

Q.    Okay.  Did you discuss with Ms. Tilton any of these meetings that I've just gone through with you in November?

A.    Yes.

Q.    Okay.  And did you discuss them contemporaneous with the meetings or did you discuss them after the fact?

A.    After the fact.

Q.    Okay.  And did you discuss them with any representative of the ad hoc committee that we discussed earlier, the ad hoc creditors committee?

A.    Can you say that question exactly again?

Q.    Do you have a recollection of updating any members of the ad hoc creditors committee on the meetings that we have gone through in November of 2018 between Ms. Tilton, Moelis and the various buyers?

MR. NEIBURG:  Object to form.

A.    I don't recall talking to the

Kost - Confidential

creditors committee members in any
specifics about any of those meetings or
any of the outcomes.

Q.    Okay.  Your conversations with
members of the ad hoc creditors committee
would have been limited to the sort of
process updates you received from Moelis;
is that correct?

A.    The conversations would have
been very general and vague with respect
to the process and did we still have
interested parties.

Q.    Did you ever identify potential
buyers of MD in your communications with
members of the ad hoc committee,
creditors committee, to your
recollection?

A.    I don't recall.

Q.    Would you have had any concerns
about sharing information about potential
buyers with members of the ad hoc
creditors committee related to the sales
process for MD?

A.    As an M&A banker, I prefer not

**Page 194**

Kost - Confidential

to share information with any party other than those that are conducting the process.

Q.    Do you know if the members of the ad hoc creditors committee were subject to any NDA related to the information coming from the sales process for the sale of MD?

A.    I know that they entered into a nondisclosure agreement, but I don't know when or what it covered.

Q.    Let's talk about the process update that you mentioned earlier.

MS. MALONEY:  This is going to be Exhibit 11.

(Kost Exhibit 11, Project Maverick First-Round Bid Summary dated December 20th, 2018, was so marked for identification, as of this date.)

Q.    This document is entitled Project Maverick First-Round Bid Summary, dated December 20th, 2018.

So the CIM, the initial CIM for MD was completed back in June; is that

Kost - Confidential

right?  Let's see.

So the teaser was completed for MD in September and then the CIM was completed and then we have the first-round bid summary in December.

So if you turn to page 3 of this document, it appears that Moelis received three first-round bid proposals; do you see that?

A.    Yes.

Q.    And the first-round bid proposals are then addressed in greater detail at page 4; do you see that?

A.    Yes.

Q.    And you see that the purchase price range that's reflected here on the low end is 800 million from Textron; do you see that?

A.    Yes.

Q.    And on the high end, it's the upper range of American Securities at 1.375 billion; do you see that?

A.    Yes.

Q.    You mentioned earlier that the

Page 196

Kost - Confidential

waterfalls that you have reviewed that address potential recoveries from MD include on the high range a sales price of 1.6 billion; is that correct?

A.    No, I thought --

Q.    Strike that.  1.5 billion.

A.    Correct.

Q.    So what was the basis for -- so the American Securities bid, which is at the high end of 1.375 billion, did debtors view that as a lower bid than the purchase price that they ultimately expected for MD?

A.    We would have been very happy with that purchase price.  Ms. Tilton had a higher purchase price in mind.

Q.    So was the 1.5 billion that's part of the debtors' waterfall, was that a number that you obtained from Ms. Tilton?

A.    I think the 1.5 billion would have been a very early, preliminary estimate based on Ms. Tilton's comments.

I don't remember whether that

Page 197

Kost - Confidential

number preceded or succeeded these bids.

Q.    And you were in contact during this period with Azad at Moelis about these bids; correct?

A.    Yes.

Q.    And are these considered bids or are these considered -- he writes in his process memo that they are "First-round proposals."

Is there a difference between a first-round proposal and an indication of interest?

A.    So these would all be terms of art.  I think of an indication of interest and a letter of intent as being generally synonymous.

Q.    Okay.

A.    And they included enough terms that you would feel comfortable with signing the indication of interest or the letter of intent.

We often receive literally e-mails, or one-page letters.  They are short of an indication of interest.  And

Page 198

Kost - Confidential

I just don't remember what level of documentation.

Q.    And if you flip through here -- I am not keeping this from you, it's actually towards the back -- it appears that they -- that American Securities, the Carlyle Group, and Textron all sent letters that reflected their interest in potentially acquiring the company.  And it reflects the purchase prices that are then shown on that chart on page 4.

Do you see those letters on the back of this exhibit?

MR. NEIBURG:  Object to form.

A.    Yes, I do.

Q.    And did you review these letters when they were -- as part of your reviewing this first-round bid summary?

A.    Yes.

Q.    And did you have any concerns about the issues identified in the various letters?  Generally, what was your reaction to these three letters of interest?

Page 199

Kost - Confidential

MR. NEIBURG:  Object to form.

A.    So we were pleased that we received written proposals from three very well known, two large private equity firms and one corporation, strategic corporation.  Obviously not letters of intent, but they were well thought out and had solid purchase price ranges.

Q.    And which is the strategic corporation; is that Textron?

A.    Yes, Textron.

Q.    And what is Textron's business, do you know?

A.    Textron is a pretty diversified aerospace and defense firm that makes all kinds of products in aerospace.

They are really more known as a component manufacturer, but they also have demonstrated an interest to get into this space within the helicopter industry.

Q.    Okay.  Let's take a look at Exhibit 12.

(Kost Exhibit 12, E-mail from

**Page 200**

Kost - Confidential

Azad re bid summary from American Securities, was so marked for identification, as of this date.)

Q.    That's an e-mail from Azad, if you go to the second page, where he identifies that they received the bid summary from American Securities, which is a proposal from American Securities, which is reflected in the first-round bid summary.

And then Azad appears to give Ms. Tilton an update in the next e-mail on January 23:  "We had our update with Rob Kost and Mike Katzenstein a few days ago.  It all went fine.  The one follow-up item they requested was a soft copy of the bid summary.  Could you kindly confirm you're okay with us sending the attached bid summary which we shared with you on 12/20 to Rob and Mike."

And he says, "Yes, you may send."

So did you receive -- going

**Page 201**

Kost - Confidential

forward, after January 23rd, 2019, did you receive regular updates from Moelis about the status of bids?

A.    So Moelis would update us generally after, in my opinion, Ms. Tilton was updated.

In fact, that's a relatively, seems relatively typical for the investment bankers for all of the portfolio companies.

We were disappointed that we didn't get this presentation closer to December 20th.  And I would have to go back and try to figure out when we actually had the update phone call with Azad.

Q.    So to go back to my question, after January 23rd, 2019, did you receive bids or process updates on a -- on a regular basis from Moelis regarding the MD sales process?

A.    We received, I guess, after January 23rd, the first-round bid summary dated December 20th and would have been

Kost - Confidential

in contact with Azad to get updates and obviously discuss these indications of interest.

Q.    Did you have an issue receiving updates after January 23rd from Moelis about the status of the sales process for MD?

A.    I don't know what you mean by did I have an issue with?

Q.    Were there delays as there had been in December?

MR. NEIBURG:  Object to form.

A.    I don't recall.

Q.    You don't recall.  Okay.

Let's look at Exhibit 13.

(Kost Exhibit 13, E-mail from Ms. Tilton dated 2/6/2019, was so marked for identification, as of this date.)

Q.    Do you recall being given access to speak to Moelis directly in connection with the sale of MD?

Ms. Tilton writes at the top of this e-mail on 2/6/2019, in response to a

Kost - Confidential

question from Azad -- in response to an e-mail from Azad, about the status of the process timeline.  By forwarding it to Mr. Farnan, Mr. Katzenstein and others, although you are not on this, and says, "Please see attached the updated process and timeline for MD.  As always, you should feel free to speak to Moelis directly."

So do you recall being given access to speak to Moelis directly in connection with the sale of MD?

A.    Yes.  We had access to speak to Moelis regarding the MD sale process.

Q.    Let's look at another process update.  This is going to be Exhibit 14.

(Kost Exhibit 14, Process update, was so marked for identification, as of this date.)

Q.    At times did you reach out directly to Ms. Tilton to find out the status of the MD sale process?

A.    Yes.

Q.    And did you find her responsive

Page 204

Kost - Confidential

to your telephone calls?

A.      I had some one-on-one calls.

Q.      Let me pause you for a second.
I broke down the question.  I am going to
do calls, e-mails.  So I will ask the
question again.

Did you find Ms. Tilton
responsive to your telephone calls when
you reached out to her to find out the
status of the MD sale process?

A.      Generally, yes.

Q.      Okay.  And when you reached out
to Ms. Tilton to find out the status of
the MD sale process through e-mail, did
you find her responsive?

A.      Generally, yes.

Q.      And when you have reached out
to Ms. Tilton to find out the status of
the sales process for other companies
that have been in process, have you found
her to be responsive to your phone calls?

A.      Generally, yes, except for it's
hard to reach Ms. Tilton.

Q.      I don't understand.  How can it

Kost - Confidential

be generally yes, but also be hard to reach Ms. Tilton?  Does she not return your phone calls in a timely fashion as far as you're concerned?

MR. NEIBURG:  Object to form.

A.    It's very difficult to call Ms. Tilton and speak to her at that time that you call her.  She's very busy, and she often has to call you back.

Q.    Oh, so Ms. Tilton doesn't immediately answer the phone when you call her?

A.    If I call Ms. Tilton's assistant, it's unlikely that I will able to speak to Ms. Tilton at that time.

Ms. Tilton will then get back to me in a generally timely manner.

Q.    Okay.  Let's look at Exhibit 14 and this process update.

So the final CIP for MD was completed in -- what did we figure out that was -- November; right?  Is that correct?

A.    November/December.

Page 206

Kost - Confidential

Q.    You get your initial -- your first-round bid summaries in December. And then if you look at page 4 of this summary, there is a calender. And the calender shows that the transaction close is targeted for the end of May; right?

A.    Yes.

Q.    And the calender also shows, it's number 12 of Phase II, that you'll solicit final bid packages including revised SPA markups around April 17 or so; do you see that?

A.    Yes.

Q.    Were final bid packages ever solicited for the sale of MD?

A.    No.

Q.    And why was that?

A.    Because Textron was not invited to the next round. And Moelis worked with our two financial sponsors and ultimately both of those sponsors declined to proceed.

Q.    So the two financial sponsors you're referring to are Carlyle and

Page 207

Kost - Confidential

American Securities; is that right?

A.     Yes.

Q.     And then when you said that Textron was not invited to the next round, tell me about that.

A.     Ms. Tilton was very disappointed with the Textron bid and wanted to focus on the two financial sponsors, American Securities and Carlyle, who had clearly superior bids.

And so Moelis spent a fair amount of time assisting those two financial sponsors with their due diligence, including, primarily financial due diligence, but they also obviously answered other operational questions with respect to the business.

Q.     And Textron's initial first-round bid number was 800 million; is that right?

A.     Yes.

Q.     It was 200 million less than the low end bid for The Carlyle Group?

A.     Yes.

Kost - Confidential

Q.      And when you said that Ms. Tilton was very disappointed by the Textron bid, were debtors disappointed by the Textron bid?

A.      We liked the other two bids better.

Q.      And how do you know that Ms. Tilton was very disappointed by the Textron bid?  What's that characterization based on?

A.      She told us.

Q.      And did Mr. Katzenstein agree that it was a disappointing bid?

A.      Yes.

Q.      And did he agree that Moelis should focus on the American Securities and Carlyle Group bids?

A.      We didn't disagree with that course of action.

Q.      Did you discuss that course of action with anyone, any members of the ad hoc group of the creditors committee?

MR. NEIBURG:  Object to form.

A.      Not to my recollection at that

Kost - Confidential

time.

Q.    At the time the decision was made, you and Mr. Katzenstein did not discuss with the members of the ad hoc creditors committee whether they agreed with that decision; right?

MR. NEIBURG:  Object to form.

A.    Yeah, and let me just clarify my prior answer.

At some point months later potentially --

Q.    Um-hum.

A.    -- obviously we talked about the MD process that had not resulted in an offer with the members on the creditors committee.  But at any time coincident to these offers, we did not.

Q.    And when you talked about the members of the -- with the members of the creditors committee about those prior offers, did they express disappointment that Mr. Katzenstein and you had not attempted to proceed with the Textron bid?

Kost - Confidential

MR. NEIBURG:  Object to form.

A.     After the fact, it probably, you know, we all probably wish we had talked to Textron more.

Q.     Is the expectation that when the sales process restarts, debtors will direct Moelis to return to Textron?

A.     Yes.

Q.     Has there been any communication, to your knowledge, with Textron at this time regarding moving forward with the bid for MD?

A.     Not to my knowledge.

Q.     And is it your expectation, debtors -- strike that.

Is it debtors' expectation that when Moelis returns to Textron, that their bid will still be at $800 million?

MR. NEIBURG:  Object to form.

A.     We have no expectation as to what their interest level is at this time.

Q.     Well, you mentioned before that you had reviewed waterfalls that had a

Kost - Confidential

valuation range for MD of between 600

million and 800 million.  So is it your

expectation that the 600 million is a

valuation that you may see from bidders

when you come back to them this time

around?

MR. NEIBURG:  Object to form.

A.    Textron would not be in

possession of the 2019 financial

performance for MD, so they would

obviously have to see 2019 performance

and whatever revised projections are

available and they would come up with

their own valuation.

I don't know.  I don't have a

view as to the valuation at this time.

Q.    Are you -- are debtors in

possession of the 2019 financial

performance for MD?

A.    Yes.

Q.    And based on -- and have

debtors conducted an analysis of the

financial performance of MD for 2019 to

determine what it expects will be a

Kost - Confidential
valuation from potential bidders of the
company?

A.    We have the 2019 preliminary
results.  I have not updated our
illustrative valuation or any waterfall
analysis at this point.

Q.    Is there two different
documents?  Is there an illustrative
valuation and a waterfall analysis?

A.    No, there is just the waterfall
analysis.

Q.    And we called it earlier an
illustrative valuation; is that right?

A.    Yes.

Q.    I just want to make sure we're
talking about the same thing.

The waterfall analysis includes
illustrative valuations for each of the
portfolio companies; is that true?

A.    That's correct.

Q.    Okay.  It includes them for
each of the Group A portfolio companies?

A.    That's correct.

Q.    For any of the Group B

Page 213

Kost - Confidential

portfolio companies?

A.    No.

Q.    Okay.  And I think you testified earlier that you didn't think that the waterfall analysis had been updated since fourth quarter of 2019; is that right?

A.    That's correct.

Q.    Okay.  Let's talk about Exhibit 15.

(Kost Exhibit 15, E-mail chain among Moelis and Ms. Tilton, was so marked for identification, as of this date.)

Q.    This is an e-mail among Moelis and Ms. Tilton.  And if I could turn your attention to the second-to-last page, which is an e-mail from Lynn, Ms. Tilton to Azad and others.

And she says, "Do you have time this afternoon to update Mike Katzenstein on the MD process?  It's pretty clear that there is an issue with Carlyle and I think it would be helpful for Mike and I

**Page 214**

Kost - Confidential

to jump on a call to hear it directly from you."

Do you recall what the issue was with Carlyle?

A.    So I don't recall -- there were issues that both Carlyle and American Securities had and I haven't reviewed any of these process materials in preparation for this deposition.

Q.    That's fine.

A.    It's all in the materials.  But one or both of them had issues with the business model and strategy of MD Helicopters.

One or both had concerns with respect to the Ravine management team. And just the relative positioning of MD at the bottom of the helicopter market.

Q.    Are you aware of MD losing employees while the company was in -- was -- strike that.

Are you aware of MD losing executives while this bankruptcy has been pending?

Page 215

Kost - Confidential

A.     Yes, Lynn reported that to both Mike Katzenstein and myself.

Q.     Did you confirm her report?

A.     I took her at her word for that.

Q.     And you have no reason to doubt that; right?

A.     That's correct.

Q.     Okay.  Because you answered Lynn reported it.

So it is true that MD lost executive employees during the course of the bankruptcy?

A.     Yes, Lynn told us.  I didn't mean anything by reported other than Lynn told us.

Q.     Okay.  All right.  And do you recall what their roles were?

A.     I believe there was some relatively senior people.  I can't remember specifically the titles.  But they were meaningful people in marketing and/or finance.

Q.     Have you -- do you have any

Page 216

Kost - Confidential

idea whether those individuals have been replaced?

A.    No.   But we obviously suggested to Lynn that she go out and try to hire as quickly as possible, even if she has to bring in temporary help at those levels.

MS. MALONEY:   Let's look at Exhibit 16.

(Kost Exhibit 16, another Process update for Project Maverick from Moelis, was so marked for identification, as of this date.)

Q.    This is another process update for Project Maverick from Moelis.

Are you familiar with this document?

A.    Yes.

Q.    Do you recall receiving this document?

A.    They all look the same, but, yes, I am sure I received this.

Q.    If you look at page 3, it identifies recent developments.  And it

Kost - Confidential

says, "On 3/6, Carlyle dropped out of the process after their internal committee discussion."

Do you see that?

A.     Yes.

Q.     And that's your understanding, as well, as to what occurred with the Carlyle bid?

A.     Yes.

Q.     And you see there it says, "On 3/15, Apollo submitted a nonbinding initial valuation framework indicating an $851 million valuation for Maverick but cited they would only be interested if Patriarch included additional portfolio companies into a transaction perimeter such that the aggregate EBITDA of the acquired businesses is at least 300 million."

Do you have any understanding of what is being discussed there?

A.     Yes.  I had forgotten about this until seeing it now, but it was -- it really -- I don't remember it going

Kost - Confidential

anywhere.

It was Apollo looking to buy a bunch of businesses under a kind of portfolio theory.

Q.   So if you look back at Exhibit 11, Apollo is not listed, right, among the first-round bidders?

A.   That's correct, they were not.

Q.   So Apollo came in later?

A.   Yes.

Q.   And do you know which businesses were targeted by Apollo to purchase?

A.   I don't recall.

Q.   Do you know if Ms. Tilton -- do you recall Ms. Tilton raising the possibility of the Apollo -- of an Apollo deal with Mr. Katzenstein and with you?

A.   I recall somebody raising it, whether it was Ms. Tilton or the Moelis guys.

Q.   And do you recall that as a condition of the Apollo deal, Ms. Tilton would have to remain in her CEO position

Kost - Confidential

at MD?

A.    I don't recall that.

Q.    Okay.  Do you recall any conditions that Apollo placed on its proposal?

A.    No, I don't recall.

Q.    And where is Textron on this list?  Were they just dropped from the process immediately after their first-round bid?

A.    I believe that I recall that Textron was put on hold.

Q.    Did Textron conduct any financial due diligence, to your knowledge?

A.    My recollection is no.  Moelis spent time with Carlyle and American Securities instead.

Q.    Do you remember discussing what Moelis should do next with Moelis in response to these recent developments?

MR. NEIBURG:  Objection to form.

A.    You're referring to after American Securities and Carlyle in effect

Page 220

Kost - Confidential

withdrew from the process?

Q.    Yes.

A.    Again, we were extremely disappointed, as was Ms. Tilton, I recall.  And we were trying to figure out where do we go from here.

Q.    And so did you discuss a strategy for where to go from here with Moelis?

A.    We must have, but I don't recall specifically.  It kind of segued into the, kind of the overall Jefferies big deal.

Q.    Okay.  So the strategy was to use MD as the key company for the Jefferies and we'll call it, we'll use your word from earlier, global refinancing?

A.    Yes, that's correct.

Q.    Okay.  And so at that point, MD was taken out of -- off the market and no longer part of a sales process; is that right?

A.    I don't recall if we had to do

Kost - Confidential

anything proactive.  So I would probably use the better term "suspended."

Q.    Okay.  Once Moelis is immediately reengaged, which is what debtors' guideline motion proposed, would the CIM have to be updated?

A.    Yes.

Q.    Is it your view that the CIM would have to be updated if Textron was identified as the only potential buyer?

MR. NEIBURG:  Object to form.

A.    A CIM is used more for marketing outreach.  You could -- for a party that was already well along the path, you could put together a package of financial information and/or operational information that would be a substitute.

Q.    And based on where Textron was in the process when the process -- when they dropped out or -- sorry.  Strike that.

Based on where Textron was in the process, were they far enough along that you could merely update the

Page 222

Kost - Confidential

financial information that they had?

A.    In my view, I think you could put together a package of updated financial and operational information that would get you where you needed to be.

Q.    And is that a view that you have conveyed to the ad hoc committee of creditors?

A.    No.

Q.    Is that a view that has informed the timelines provided in debtors' motion?

A.    We haven't discussed specific marketing plans with respect to Textron.

Q.    Did you have any -- did you review the guidelines provided by debtors for the timing of the marketing and sale of MD prior to its filing?

A.    You're talking about debtors' motion with process and timelines?

Q.    I am talking about dates and debtors' motion with respect to MD.

A.    Yes.

Page 223

Kost - Confidential

Q.    And you agreed that those were reasonable?

A.    Yes.

Q.    And you thought they were reasonable on the basis of what with respect to MD?

A.    So Mike Katzenstein, Joe Farnan, myself, Young Conaway and White & Case had numerous deliberations with respect to those timelines.  And those are the timelines that we agreed to as being reasonable and filed with our motion, obviously.

Q.    Understood.  But I am asking for your reasoning that explains why you thought they were reasonable.

MR. NEIBURG:  I just caution the witness not to reveal the substance of privileged communications, but if you have an independent view outside the context of deliberations involving counsel, you can answer that question.

Q.    And if you don't have an independent view, that's okay, too.

Page 224

Kost - Confidential

A.     My independent view is that those start dates were reasonable.

Q.     Did the start date that you provided for MD and debtors' motion of March 1st, 2020 to launch buyer outreach assume Houlihan Lokey's involvement?

A.     Not specifically.

Q.     Generally assume Houlihan Lokey's involvement?

A.     We assumed that Houlihan Lokey would become advisor to the debtors.

Q.     And did you assume that they would be involved with Moelis in launching buyer outreach for MD by March 1st, 2020?

MR. NEIBURG:  Again, I would just caution the witness not to reveal the substance of the privileged communications.

A.     Again, our view was that Houlihan Lokey would be retained and on board and would be in a position to help us in any way that would be required.

Q.     Has anyone from debtors, to

Kost - Confidential

your knowledge, talked to Moelis of the effect of this pause in the sales process on the next round of marketing?

A.    Yes.

Q.    And to your knowledge, has anyone at Moelis discussed with the prior bidders their interest in bidding in a new process?

A.    Yes.

Q.    Do you know which prior bidders Moelis has spoken to?

A.    We had a conversation with Azad in, I am going to say November and they updated us on who has reached out to them and who has not reached out to them.

And I recall there being one or two parties that their bankers had bumped into or spoken to on other matters who had asked what's up with MD Helicopters.

Q.    Okay. And their response was "We're restarting the process"?

A.    No, I don't believe that was the answer.

Q.    Okay. When these potential --

Kost - Confidential

were these strategic buyers, to your

knowledge, who Moelis bumped into and

asked "What's up with MD Helicopters?"

A.    It could have been -- it was

probably strategic.  But it may have been

one of the two financial sponsors.

Q.    Well, did you ask Azad which --

A.    Yes.

Q.    -- folks he bumped into?

A.    Yes.

Q.    And who did he say?

A.    I can't recall.

Q.    Did he -- okay.

Would it refresh your

recollection -- well, do you recall if it

was any of the prior buyers who were

listed in the original --

A.    Yes.

Q.    -- first-round bids?

A.    I'm sorry, I jumped into your

question.

Q.    That's okay.

A.    Are you talking about those

three parties?

Page 227

Kost - Confidential

Q.    Yes, I was talking about -- let me just do the question and then that way you can answer.

So you do recall that Azad identified prior strategic buyers, strategic buyers who showed interest initially during the first round of the sales process and are now -- and have now indicated that they are interested again; is that true?

A.    No, not entirely.

Q.    Okay.  So explain to me what it was Azad said, to your recollection?

A.    To the best of my recollection, Azad or one of his bankers bumped into one of those strategic parties who asked about the MD process and what's going on.

I am not aware that they expressed any interest or lack thereof.

Q.    And was one of those strategic parties Textron, to your recollection?

A.    It's possible.

Q.    And you said that you thought that one of the strategic parties had

Page 228

Kost - Confidential

been identified in this first-round bid summary, which is marked as Exhibit 11.

So let's go through them.

Airbus?

A.   I don't recall the name.

Q.   I'm attempting to refresh your recollection by identifying strategic buyers but you don't think it will work?

A.   I know all the names.  I can't remember who it was.  I just don't remember.

Q.   I asked you has anyone at Moelis discussed with the prior bidders their interest in bidding in a new process, and you said yes.

A.   Okay.  I will clarify that.

Q.   Please.

A.   I didn't hear your word "new process."

Q.   I thought maybe you hadn't heard prior bidders.  Because there were only three prior bidders; right?

A.   Okay.  So you're being very specific.

Kost - Confidential

Q.    Yeah.

A.    Three prior bidders for a new process?

Q.    My question to you was:  "To your knowledge, has anyone at Moelis discussed with the prior bidders their interest in bidding in a new process?"

And you said "Yes."

What did you mean when you said yes?

A.    I am not aware of Moelis saying that they talked to anybody that's interested in participating in a new process.

Q.    But they have spoken to people who are interested in reigniting their prior bids?

A.    No.

Q.    So what is your understanding of Azad's conversations, other than bumping into people who were with companies who asked what's up with MD?

A.    That's exactly what it is.  One or two parties who had been previously

Page 230

Kost - Confidential

involved in the process asked Azad or one of his bankers, "Hey, what's going on with the MD sale process?"

Q.    And on the basis of that, you think that the MD sale process will move pretty quickly?

MR. NEIBURG:  Object to form.

A.    I am not equating those at all.

Q.    What did you -- what value do you take from Azad running into one or two bankers asking what is going on with the MD sales process?

A.    Just about none.

Q.    Hussey is another one of the Group A portfolio companies in which debtors have proposed a closing date for the sale of the company; right?

A.    Yes.

Q.    And you recall from debtors' filing that they proposed February 29th, 2020?

A.    Yes.

Q.    And do you also agree with, that that deadline is an appropriate

Kost - Confidential

timeline for the sale of Hussey?

MR. NEIBURG:  Object to form.

A.    I will make two comments.

Q.    Okay.

A.    The first is that timeline was filed on December 20th and we expected a hearing in the early to mid-January. This is February 5th or 6th.

Q.    Yeah.

A.    That's part one.

Q.    You do know that debtors had an opportunity to file a reply in which they could put in updated timelines; was there ever a request to do that?

MR. NEIBURG:  Object to form.

A.    I will leave that to my lawyers to answer that question.

Q.    Here is a question.  Because it is really a point of confusion.

Is the expected timeline that is being or the timeline that's being proposed for the sale of Hussey still February 29 or have you all come up with some other date?

Page 232

Kost - Confidential

MR. NEIBURG:  Object to form.

A.  I would have to defer that question to my lawyers.

Q.  Have you discussed it with anyone?  Have you discussed another date, other than February 29th?

A.  I don't know the answer to your question.

Q.  You don't know whether you discussed something?  Have you --

A.  Okay.

Q.  Has there been an acknowledgment among debtors that February 29 is too soon for a closing on Hussey?

MR. NEIBURG:  Just caution the witness not to reveal privileged communications to the extent you discussed topics regarding the motion.

Q.  Is it your view that February 29th is no longer an appropriate time to close the sale of Hussey?

A.  My view is that Revere could move very quickly.

Page 233

Kost - Confidential

Q.    Is it --

A.    -- to close a transaction, and that it's a possibility that they could close by February 29th.

Q.    And is that based on your conversations with Mr. Dalton?

A.    Yes.

Q.    And what is that Mr. Dalton has told you that makes you think that Revere could close by February 29?

A.    I didn't say they could close by 29.  I said it was a possibility that they could close by February 29th.

Q.    Great.  So let me ask the question based on exactly what you said.

What was it that Mr. Dalton told you that makes you think that it is a possibility that Revere could close by February 29?

A.    Mr. Dalton has told me that Revere has completed a significant amount of due diligence.  Has completed their financing.  Has completed their environmental analysis.  And that it's

Page 234

Kost - Confidential

really coming down to confirmatory due diligence.

In the original proposals they had asked for 45 to 60 days.  But if you told them you have to close by February 29th, it's a possibility.

Q.    Mr. Dalton has told you that Revere has completed their financing, has financing for this deal?

MR. NEIBURG:  Object to form.

A.    Mr. Dalton has told me that they have made significant progress with lining up their financing.

Q.    What you initially testified was that "Mr. Dalton has told me that Revere has completed their financing." Are you changing that answer?

MR. NEIBURG:  Object to form.

A.    I guess you and I are using a different word as "completed."

Q.    To your knowledge, based on your conversations with Mr. Dalton, does Revere have the financing to complete the deal that they have proposed to buy

Kost - Confidential

Hussey?

A.    In my view, Mr. Dalton has told me that Revere has substantially completed all of the work that needs to be done for them to have their financing in place.

Q.    Substantially completed, so --

A.    I am with you.  I would agree, it's not -- I am not aware that it's a done deal.

Q.    Okay.  That's fine.  You were in communication with Mr. Dalton throughout the sales process for Hussey; right?

A.    Yes.

MS. MALONEY:  Why don't we take five.  We'll get these together, get them marked up.  I really only need five minutes.

Off the record.

THE VIDEOGRAPHER:  Thank you.  The time now is 2:55, we are going off the record.  This is the end of media 3.

Page 236

Kost - Confidential

(Off the record.)

THE VIDEOGRAPHER:   The time now is approximately 3:02 p.m., we are now back on the record.  This is the beginning of media 4.

Q.   Let's talk about Intrepid. What's your understanding of the business that Intrepid is in?

A.   Intrepid provides home health services and also hospice services.  They send people into homes and get reimbursed by CMS on a per-patient basis.

Q.   And it's also a Zohar portfolio company?

A.   Yes.

Q.   Strike that.

It's also a Patriarch Partners portfolio company?

A.   Yes.

Q.   Do you know when it became a Patriarch portfolio company?

A.   I don't recall.

Q.   Did you visit Intrepid?

A.   No, I would like to.

Page 237

Kost - Confidential

Q.    Have you asked to visit Intrepid?

A.    No, but given that we're starting the process, I am going to try to get out to Intrepid, Stila, Snelling, S-N-E-L-L-I-N-G, and PDP.

Q.    Have you ever advised a company in the home health services industry in connection with a sale?

A.    No.

Q.    Purchase?

A.    No.

Q.    Debt refinancing?

A.    No.

Q.    Restructuring?

A.    No.

Q.    Ziegler has now been retained by Intrepid to act as their investment banker; is that your understanding?

A.    Yes.

Q.    And they were retained in December of 2019?

A.    Yes.

Q.    And do you know when they first

Page 238

Kost - Confidential

pitched for the work?

A.    Yes.  So I was at that pitch with Ziegler in the end of November, mid-November, maybe.

Q.    Did the pitch occur in November?  I think their pitch materials were prepared in October?

A.    It could have been October.

Q.    That's fine.

A.    I guess it took that long to get the engagement letter signed.

Q.    Right.  It took some time to get the engagement letter signed.

And do you know the reasons why it took time to get the engagement letter signed?

A.    Difference of opinion on what the fee should be.

Q.    So there was a negotiation over fees on behalf of the portfolio company; is that right?

A.    Yes.

Q.    Were you involved in that negotiation over fees?

Page 239

Kost - Confidential

A.     No.

Q.     And would debtors have to pay any of the fees associated with -- with the retention of Ziegler?

MR. NEIBURG:  Object to form.

A.     No, it's from the portfolio company.

Q.     Okay.  What about the preparation of a CIM for one of these portfolio companies?  Do debtors pay for the cost associated with preparing the CIM?

A.     The investment banker prepares a CIM of management under its engagement letter with the portfolio company.

Q.     Okay.  Did you discuss debtors' proposed timeline of the Intrepid sale with the banker at Ziegler?

A.     No.

Q.     Okay.

A.     Ziegler's proposed sale timeline was included in their pitch materials.

Q.     Okay.

Page 240

Kost - Confidential

A.    On a preliminary basis.

Q.    Okay.  Is the proposed sale timeline for Intrepid as proposed by debtors a timeline that you think will maximize the sale value of the company?

MR. NEIBURG:  Object to form.

A.    It's a relatively standard M&A process timeline.

Q.    And are you aware of the stage at which Ziegler is in in doing its diligence on Intrepid?

A.    They have just started.

Q.    Okay.  So when you say they have just started, do you know if they reviewed Intrepid's financials?

A.    It's my understanding that they received some very preliminary financial information prior to their meetings at the J.P. Morgan healthcare conference.

Q.    Okay.  And do you know if they've reviewed or had the opportunity to understand the company's operations?

A.    They are very familiar with the home healthcare space and sector and what

**Page 241**

Kost - Confidential

Intrepid does, but, no, they haven't had the opportunity yet to begin in-depth due diligence on Intrepid.

Q.   And is it your expectation that complete marketing materials for Intrepid would also include a confidential information memorandum?

A.   Yes.

Q.   Is it your -- strike that.

Has -- to your knowledge, has Ms. Tilton been involved in the drafting of confidential information memorandums for companies of which she was not the CEO?

A.   It is my understanding, as reported to me by investment bankers for other processes, that Ms. Tilton has had involvement in preparing and/or revising CIMs.

Q.   Whether she was the CEO for that portfolio company or not; is that correct?

A.   Yes, that's correct.

Q.   And is it your expectation that

**Page 242**

Kost - Confidential

she would be involved in the drafting of the CIM for Intrepid?

A.    Knowing Ms. Tilton, yes, I think she would like to be involved in preparing that CIM.

Q.    Do you think it would helpful for her to be involved?

A.    I think it would be helpful.

Q.    Okay.

A.    But not required.

Q.    In the waterfall that we talked about earlier that you reviewed, was Intrepid included in that waterfall?

A.    Yes.

Q.    And do you recall the valuation range for Intrepid in that waterfall?

MR. NEIBURG:  Object to form.

A.    I generally -- I don't recall specifically.

Q.    Was it approximately $100 million?

A.    Yes, it was approximately 100 million.

Q.    Do you recall if it was as low

**Page 243**

Kost - Confidential

as 50 million?

A.    I don't recall the low number.

Q.    Let's talk about PDP for a minute.  What's your understanding of PDP's business?

A.    PDP is a California-based manufacturer of peripheral gaming equipment that go along with platforms such as Xbox, Nintendo, PlayStation.

Q.    Do you understand PDP to be involved in the Guitar Hero game?

A.    Yes, a number of years ago.

Q.    Do you know where PDP is located?

A.    I believe it's San Diego.

Q.    Is PDP one of the companies that you intend on visiting but have not yet visited?

A.    I would like to visit PDP.  Joe Farnan and Mike Katzenstein have already visited PDP.

Q.    And PDP was not previously part of the sales process; is that right?

A.    That's correct.

**Page 244**

Kost - Confidential

Q.    But they have now had a banker retained; is that right?

A.    Yes.

Q.    Do you recall approximately when that banker was retained?

A.    On or about December 16th or 17th.

Q.    Were you involved in the retention of -- in the interview of that banker?

A.    Yes.

Q.    And were you involved in negotiating the retention agreement for that banker?

A.    No.

Q.    Do you -- have you reviewed the retention agreement for that banker?

A.    Yes.

Q.    And do you have any concerns with it?

A.    No.

Q.    Based on your experience, it was a commercially reasonable agreement; is that right?

Kost - Confidential

MR. NEIBURG:  Object to form.

A.    Yes.

Q.    And I didn't ask you that question for Intrepid.  So have you reviewed the Intrepid retention agreement?

A.    Yes.

Q.    And you mentioned it had been negotiated for quite some time.  Do you think that the ultimate terms were commercially reasonable based on your experiences as an investment banker?

MR. NEIBURG:  Object to form.

A.    Yes.

Q.    And do you know what stage -- PDP's investment banker is Stifel?

A.    Yes.

Q.    And do you know who is leading the -- leading the diligence for Stifel?

A.    Yes.  Chris Hagar.

Q.    And do you have -- have you communicated with Mr. Hagar?

A.    Yes.

Q.    And what have been your

Page 246

Kost - Confidential

communications with Mr. Hagar to date?

A.    I have had probably six or eight conversations with Mr. Hagar.  The first three or four were with respect to how long the engagement letter was taking to get signed.

And at one point there was a risk that we weren't going to get to an agreement with Stifel.  But Stifel ultimately agreed to an arrangement with Patriarch.

Q.    Is that because the portfolio company did not accept the pricing that Stifel had offered in its initial engagement letter?

A.    That's correct.

Q.    So you had six or eight conversations with Mr. Hagar, but it sounds like only three or four of them were about the actual sales process, as opposed to the engagement letter?

A.    That's correct.

Q.    Do you have any sense of the status of Stifel's diligence with respect

Page 247

Kost - Confidential

to the sale of PDP?

A.    Yes.  I had a number of conversations with Chris to try to understand where he was in his attempts to schedule a kickoff meeting and get due diligence information.

And in each of those meetings until the last one, which I believe has been scheduled, he was unable to schedule the kickoff meeting and/or receive due diligence information.

At one point, maybe two calls ago, he unfortunately told me, which I did not know, that Q4 financials for PDP were significantly below budget and that EBITDA was significantly lower than what we had told him would be the 2019 EBITDA, under which what -- he created his whole engagement letter fee structure.  And he was disappointed.

Q.    And when you said "significantly lower than what we had told him," was that what debtors told him or what the portfolio company told him?

Kost - Confidential

A.     What Randy Jones from Patriarch and I had told him at our first meeting.

Q.     So what has been the effect of that on the launching of the sales process?

A.     So we had told him that the EBITDA would be in the range of 10 to 12 million and it looks like it's going to be zero or lower, which is obviously problematic for an investment banker, but that's just part of the sale process.

Q.     Okay.  And who is the investment banker, the day-to-day investment banker for Intrepid at Ziegler?

A.     Chris Hendrickson.

Q.     And have you also had conversations with Chris Hendrickson about the state of that sales process?

A.     Yes.

Q.     And approximately how many conversations have you had with him?

A.     Probably three or four.

Q.     And what's your understanding

Kost - Confidential

of the state of the sales process there?

A.    This is Intrepid we're talking about?

Q.    Yes, I am back to Intrepid again.

A.    So my first conversation with Chris at Ziegler on Intrepid had to do with a liquidity issue where the debtors incorrectly were told that Ziegler was helping to raise financing to get through this unfortunate liquidity issue, which nobody had really known about.

So a couple of the first conversations were with Chris to ascertain whether he was working on emergency financing or just the sale process. And it turns out he was just working on the sale process.

So my later conversations with Chris were about the sale process and whether they had received any information, and if they had been able to schedule a kickoff meeting, which they had not.

**Page 250**

Kost - Confidential

Q.    Why was PDP not previously part of the sales process during the 15-month window?

MR. NEIBURG:  Object to form.

A.    It's my understanding that PDP was put towards the back end of the process because they had had a pretty rough go of it over the last couple of years from a financial performance perspective.  And they were looking to bring new products to market.

Q.    And is that understanding based on representations that were made to you by Ms. Tilton?

A.    Yes.  In addition, as I mentioned earlier, Joe Farnan and Mike Katzenstein went out to PDP and heard the story firsthand and they reported to me on what they learned when they were out at PDP.

Q.    So because of the rough go of it over the last couple of years from a financial performance perspective, debtors agreed it was reasonable to not

Page 251

Kost - Confidential

put PDP in the sales process during the 15-month window?

MR. NEIBURG:  Object to form.

A.    That's part of the story, yes. We were hoping that PDP's performance would improve.

Q.    And was the hope that PDP's performance would improve in 2019?

A.    Yes.

Q.    And to your knowledge, has it improved?

A.    No, to the contrary.

Q.    Okay.  And Intrepid, why was Intrepid not previously included in the sales process during the 15-month window?

MR. NEIBURG:  Object to form.

A.    I actually don't know the answer to that question.  I believed it was because it was on the smaller side.

Q.    So do you know if there was ever any discussion with Ms. Tilton and debtors about putting Intrepid into the sales process?

A.    Earlier?

**Page 252**

Kost - Confidential

Q.    During the 15-month window.

A.    I don't recall.

Q.    And do you know at what point debtors suggested to Ms. Tilton that Intrepid should be put into a sales process?

A.    I don't recall.

Q.    Do you recall that there was any conversation with Ms. Tilton by debtors to put Intrepid into a sales process?

A.    Yes.  We, on numerous occasions, asked Ms. Tilton to start the process to interview and hire bankers for Intrepid.

Q.    Did those numerous occasions occur before September 2019?

A.    It probably would have been sometime after the summer.

Q.    Do you have any specific recollection of an occasion in which debtors asked Ms. Tilton to start the process to interview and hire bankers for Intrepid?

**Page 253**

Kost - Confidential

A.    I don't recall the first date that we asked her to hire bankers for Intrepid.

Q.    What about PDP, at what point did debtors tell Ms. Tilton that she needed to hire a banker for PDP?

A.    I think the answer is similar for all four, Intrepid, PDP, Snelling, and -- and who am I missing?  Stila.

Q.    And the similar answer is what, it would have probably been after the summer?

A.    Yes.

Q.    And was it in a meeting, an in-person meeting?

A.    I don't recall when we first asked Lynn, "Hey, we have to start moving on the four remaining portfolio companies."

Mike Katzenstein might know the answer.

Q.    And the reason for moving on the four remaining portfolio companies at that time was what?

Kost - Confidential

A.      Primarily due to the failure of the MD and Dura processes, the ability to only close two small sales, and the fact that the Hussey and Rand process were going extremely slowly.

Q.      Let's talk about Universal. Universal is also one of the Group A portfolio companies for which debtors propose the CRO and Ms. Tilton presented positions to the Court on or before March 31st, 2020; is that still debtors' proposal, to your knowledge?

A.      I am not aware that we updated our filings.

Q.      Are you aware of thinking that it might make sense to -- strike that.

A.      Yes, strike that.

Q.      Are you aware of Ms. Tilton's position at Universal?

A.      Yes.

Q.      And what is that?

A.      She's the member.

Q.      Okay.  And has an investment banker been hired for Universal?

Kost - Confidential

A.    Yes.

Q.    And that is Cowen?

A.    Cowen.

Q.    And who is the lead investment banker for Cowen for Universal?

A.    So we haven't talked them in a long time.  David Hunt and Zach Gordon maybe.  Does that sound right?

Q.    Sure.  When you say you haven't talked to them in a long time, do you have any recollection of when was it; earlier this summer, last year?

A.    It hasn't been -- I have not spoken to them since we suspended the process, which I am going to say was -- I don't remember when it was.  Spring of '19.

Q.    Yeah, let's go through that.

So Cowen was retained by Universal in approximately May of 2018; is that correct?

A.    Yes.

Q.    Do you recall if you had any involvement in selecting Cowen as the

**Page 256**

Kost - Confidential
investment banker for Universal?

A.    I don't think so.

Q.    Were they selected prior to you being retained as the CMO?  You just can't remember?

A.    I can't remember.

Q.    That's fine.  Have you reviewed the retention agreement?

A.    Yes, at one point I did.

Q.    Any concerns with it?

A.    No.

Q.    Based on your experience, you think it was entered on commercially reasonable terms?

A.    Yes.

Q.    Do you know if a CIM was prepared for Universal?

A.    Yes.

Q.    Did you have any personal involvement in the preparation of that CIM?

A.    No.

Q.    Do you know if anyone from debtors did?

Page 257

Kost - Confidential

A.    No, I don't believe the debtors did.

Q.    And Ms. Tilton was involved in the preparation of the CIM; is that right?

A.    Yes, to my knowledge she was.

Q.    Okay.  And the CIM -- is this the CIM?  Right.

And the CIM was provided by Ms. Tilton to you in approximately October 2018; do you recall that?

A.    That sounds right.

Q.    Okay.

MS. MALONEY:  So let's mark, we're now to Exhibit 17.

(Kost Exhibit 17, E-mail re Project Blue, was so marked for identification, as of this date.)

Q.    This is going to be confusing because on the cover of the e-mail the subject line is Denali, but that's an error.

A.    I remember that.

Q.    It has caused much chagrin

Kost - Confidential

amongst the team.

A.    Project Blue is definitely Universal.

Q.    Okay.  Does this refresh your recollection that you received a CIM for Universal in approximately October of 2018?

A.    Yes.

Q.    And you also received a quality of earnings report for Universal in approximately October of 2018; do you recall that?

A.    Now, let's look at the quality of earnings report for a second.

MS. MALONEY:  That's going to be Exhibit 18.

(Kost Exhibit 18, Quality of earnings report dated September 26, 2018, was so marked for identification, as of this date.)

Q.    Now, if you look at the first page of the quality of earnings report, it says it's September 26th, 2018; right?

A.    Yes.

Page 259

Kost - Confidential

Q.    So does the quality of earnings report only contain financial information through September of 2018?

A.    Yes.

Q.    To your knowledge, has the quality of earnings report been updated for Universal?

A.    No.

Q.    And to your knowledge, the CIM hasn't been updated for Universal either; right?

A.    That's correct.

MS. MALONEY:  And let's look at a progress report for Universal.  It's going to be 19.

(Kost Exhibit 19, Progress report for Universal, was so marked for identification, as of this date.)

Q.    So this is a February 2019 process update.  And if you look at page 3, it breaks down strategic buyers versus financial buyers.

And you see here that Universal contacted 40 prospective strategic buyers

Page 260

Kost - Confidential

and 83 prospective financial buyers?

A.    Yes.

Q.    And ultimately, do you recall -- well, it says here there were five indications of interest received. That's on page 4 of Exhibit 19; do you see that?

A.    Yes, and it was really from four different parties.

Q.    From four different parties. And why do you say it was really from four different parties?

A.    They put two different Foxconn bids on the same page.

Q.    Oh, I see.  Are you aware of whether the Zohars and Ms. Tilton are the only holders of an interest in Universal?

MR. NEIBURG:  Object to form.

A.    No, there is another party, Francisco Partners, that has a significant equity interest.

Q.    Do the Zohars have a larger than 50 percent interest in Universal?

MR. NEIBURG:  Object to form.

Page 261

Kost - Confidential

A.    I don't recall specifically what the percentage is.

Q.    Do you recall that the third party represents more than a 50 percent interest in Universal?

A.    That sounds right.

Q.    Have you participated in any discussion with representatives of that third-party interest?

A.    No.

Q.    Have you asked to participate in any conversations with that representative of a third-party interest?

A.    Not specifically.

Q.    Okay.  So you're not aware of the third party's views on the sales process for Universal?

A.    No.

Q.    Have you directed Cowen to speak to the third party about their views on a sales process at this time?

A.    In order to launch a process, obviously, we would want to follow up with the third party as to what their

**Page 262**

Kost - Confidential

views were.

Q.    Okay.  So before launching the process for Universal, that would have to occur; right?

A.    Yes.

Q.    Ultimately the Universal sales process failed; is that correct?

A.    Yes.

Q.    Was Universal considered as part of the global financing Jefferies deal?

A.    I don't believe so.

Q.    It was outside of that process?

A.    That's correct.

Q.    It was not considered in calculating what would be paid to debtors as a result of the global refinancing; is that right?

A.    Correct.

Q.    And what about Snelling; do you have a recollection of Snelling being included as part of that global financing deal?

A.    No, I believe Snelling was

Kost - Confidential

excluded also.

Q.    And what about PDP?

A.    Excluded.

Q.    And Intrepid?

A.    Again, I wasn't directly involved in the global refinancing.  I would say excluded.

Q.    Okay.  So the Universal sales process failed.  Do you recall the circumstances around that?

A.    Yes.

Q.    And so tell me about those.

A.    So Universal is a great business.  I like it a lot.  I like the management team.  We really thought it would sell well.

It has one or two kind of significant issues that we have to resolve.  One of which is that over 50 percent of its sales are into China.  And number two, that a lot of the demonstrated interest from the first process was Chinese or Asian buyers who would have CFIUS risk issues.

**Page 264**

Kost - Confidential

MS. MALONEY:  Okay.  Exhibit 20.

(Kost Exhibit 20, E-mail re KNS/Universal bid, was so marked for identification, as of this date.)

Q.    What does CFIUS risk issues mean?

A.    So I believe CFIUS stands for, I believe, the Committee For Investment in the United States.  It means that the U.S. government has to potentially approve the sale of sensitive technologies to foreign buyers.

In this case, it would be the sale of Universal's automation equipment.

Q.    So that's one of those issues with foreign buyers that can delay a sale you've identified previously; is that right?

A.    Yes.

Q.    And is that considered, when you're looking at, discussing diligence issues for a buyer, is that considered a legal diligence issue?  Or what bucket would you assign that to?

Kost - Confidential

A.    I guess I would probably put CFIUS in a regulatory bucket, kind of like HSR.

Q.    So what was KNS, a strategic buyer or a financial buyer?

A.    So KNS is strategic.  They are a Singapore-based buyer that I don't believe would have a significant CFIUS risk.

But the other issue we have obviously as I mentioned is over 50 percent of the sales go into China.  And with U.S./China tariffs as they are, it's an area that needs to be resolved.

Q.    Okay.  And if you look at page 2 of Exhibit 20, Lynn writes that "KNS was the only bidder left in the final round of buyers after over a year of ongoing process for the sale of Universal Instruments.  KNS has officially withdrawn.  As always, I encourage you to speak directly to the bankers considering the bidders and the process so that you fully understand the hard work of all

Kost - Confidential

involved including the company's management team and the circumstances surrounding the failure to secure a bidder?"

Do you recall receiving that e-mail?

A.      Yes.

Q.      And did you take Ms. Tilton up on your offer to discuss the situation with -- directly with the bankers?

A.      Yes.

Q.      And what did the bankers tell you?

A.      So I spoke to the bankers and also set up a meeting with Mike Katzenstein, so he and I could call the bankers.

And we went through each of the interested parties and why they had decided to withdraw from the process.

And obviously we were extremely disappointed when we saw the e-mail that was forwarded -- forwarded to us by KNS from this gentleman who was the lead

Page 267

Kost - Confidential

advocate within KNS.

Q.    Ms. Tilton writes and responds to your e-mail, because you wrote back to her, "I really thought that at least one of the interested parties would get to the goal line.  But there were a number of headwinds."

Those headwinds I suspect are the tariffs that you mentioned earlier; is that right?

A.    Yes, correct.  The tariffs and the CFIUS issues.

Q.    Okay.  And she responds that she's hoping the trade issues get resolved.

Is it your belief that the trade issues have been resolved?

A.    No, obviously the U.S./China trade tariff issues have not been resolved.

Q.    And then she also says, "The company hit its EBITDA numbers for the year."

So what does that mean?  I

Page 268

Kost - Confidential

mean, what does that mean that it hit its EBITDA numbers for the last year -- for the year?  Why does that matter in terms of it being a failed sales process?

A.    Well, the date of this e-mail is February of 2019, so I am assuming that she's referring to fiscal year 2018.

Q.    Yeah.

A.    That obviously it's a good thing that the company was on performance, it is well run.  And that we were just disappointed that there still wasn't an interested party who stuck it out.

Q.    What if a company misses its EBITDA target; at what point is it, in your experience, material to a sales process if a company misses its EBITDA target?

MR. NEIBURG:  Object to form.

A.    I don't think I can answer that hypothetical because it would all be relative to different industries.

It will be relative to if the

Kost - Confidential

whole industry is down, maybe it's much less important.

Q.   Okay.  It depends on -- it depends on the company; is that right?

A.   Correct.

Q.   So .1 percent might be material for some companies if it misses its EBITDA target but not for others?

A.   Correct.

Q.   Okay.  Let's talk about Hussey. What is Hussey's business?  Let's see if you can explain it better than Hussey's banker.

A.   Hussey is primarily a copper smelter that has some fabrication businesses.

Q.   And who are the types of customers that Hussey has?

A.   So Hussey is making products that are generally bought by other manufacturers to fabricate products.

So they make bar, sheet, wire, plate and busbar.

Q.   And do you recall approximately

Page 270

Kost - Confidential

when Hussey retained a banker to engage in a sales process?

A.    In 2018.

Q.    Okay.  Were you part of the negotiations over the retention of Lazard as Hussey's banker?

A.    I think I was party to those interviews.  I just can't think of who else we interviewed.  Yes.

Q.    And did you review the retention letter for Lazard?

A.    Yes.

Q.    Any concerns with it?

A.    No.

Q.    Entered, based on your experience, on commercially reasonable terms?

MR. NEIBURG:  Object to form.

A.    Yes.

Q.    And do you recall if Hussey was included as one of the companies within the global refinancing?

A.    I believe it was contemplated that Hussey would continue with its sale

Page 271

Kost - Confidential

and that the proceeds from the Hussey

sale might have been part of the package.

Q.    Okay.

A.    But I would have to check.

Q.    Do you recall the estimates --

the estimates for the value of Hussey as

part of that waterfall analysis?

A.    Yes, because we had a number of

indications of interest as far back as

February of 2019.

Q.    Okay.  So what number was

assigned to Hussey within the waterfall

for the global refinancing?

A.    Approximately 85 to 90 million.

Q.    Okay.  In connection with the

Hussey sales process, did Ms. Tilton

limit your access to Mr. Dalton?

A.    No.

Q.    So you had regular

communications with Mr. Dalton over the

course of that process?

A.    Yes.

Q.    And you've continued to have

communications with Mr. Dalton over the

Page 272

Kost - Confidential

course of the Hussey sales process; is that right?

A.   Yes.

Q.   An LOI was submitted to Hussey by Revere on December 4th, 2019; do you recall that?

A.   Yes, it's dated December 4th, 2019.

Q.   Are you aware that there were discussions about that LOI with Mr. Dalton prior to it being submitted on December 4?

A.   Conversations by and with whom?

Q.   Conversations between Mr. Dalton and Revere's bankers?

A.   Yes.

Q.   And did you participate in any of those conversations?

A.   No.

Q.   Did Mr. Dalton keep you apprised of the conversations with Revere regarding the LOI that was ultimately submitted on December 4th?

A.   I believe so.

**Page 273**

Kost - Confidential

Q.    Okay.

MS. MALONEY:  Let's mark this Exhibit 21.

(Kost Exhibit 21, e-mail produced by debtors dated December 2nd, was so marked for identification, as of this date.)

MS. MALONEY:  For the record our colleague Nicholas Watts has also joined us.  Nick is helping us get these exhibits distributed efficiently, as well.

Q.    So this is an e-mail dated December 2nd.  I'm sorry for the form. They were produced by debtors and I don't quite know why the form looks so change. But the Bates number is on the second page ending in 6021.

You asked for an update from Mr. Dalton on December 2nd.  He responds that "Revere is targeting tomorrow for the bid."  And you respond with what, Mr. Kost?

A.    "You the man.  Any color worth

Page 274

Kost - Confidential

chatting about or should we chat tomorrow?"

Q. So was it -- given your response, did you think it was impressive that he was able to get an LOI out of Revere?

A. I was excited that he got an offer out of Revere as the prior offer, LOI, had expired.

Q. Okay. Had he communicated that he thought it was going to be tough to get a new LOI from Revere?

A. You're always concerned until you get an LOI. So, yes, I was concerned that Revere was not going to provide us with a new LOI, and they did.

MS. MALONEY: Exhibit 22.

(Kost Exhibit 22, E-mail from Mr. Kost to Mr. Dalton dated December 4th, was so marked for identification, as of this date.)

Q. Let's start on the second page. December 4. The morning of December 4, 10:33 a.m.

Page 275

Kost - Confidential

You e-mail Mr. Dalton, "How are we doing?  Any update?"

He responds, "No update."

You respond, "Anything?"

And then it appears to come across.

A.    Oh, I see, I'm sorry.

Q.    Are you with me?

A.    I didn't realize it was double-sided, sorry.

Q.    I should have checked.  Let's look at your e-mail on the front page on December 4, 4:51.

A.    Just give me one second.

Q.    Oh, yeah, no problem.

(Witness reviews document.)

A.    Okay.

Q.    So you appear to be discussing the value that Hussey has placed on the company; is that correct?

A.    Yes.

Q.    And strike that.

You appear to be discussing the value that Revere has placed on Hussey;

Page 276

Kost - Confidential

is that correct?

A.    Yes.

Q.    And both you and Mr. Dalton --
well, what was your reaction to Revere's
valuation?

A.    So Revere's letter of intent
has text and also exhibits.  And in their
exhibits they have two different exhibits
or schedules.

The first one is a working
capital analysis and target as of a
specific date.  And the second exhibit is
a sources and uses, which is somewhat odd
and unusual for a letter of intent.

Q.    And you note in that second
paragraph in Bates ending in 6059, which
is the first page of Exhibit 22, "will be
interested to better understand what you
guys in management think of the WC
target."

Is that the working capital
analysis that you referred to?

A.    Yes.

Q.    And did you and Goldin prepare

Kost - Confidential

your own independent analysis of the working capital target that was provided by Revere?

A.    Yes.

Q.    Did you provide that to Mr. Katzenstein?

A.    So the FTI team was getting monthly working capital reports.

Q.    From Hussey?

A.    From Ankura.

Q.    Okay.

A.    Hussey would send them to Ankura.  Ankura would send them to FTI. FTI would send them to me.

Q.    Okay.

A.    And the working -- and I guess they are maybe a borrowing base or a working capital analysis.  And so you could see the movement in inventory and receivables on a monthly basis.

In addition, Lazard prepared a one-page forecast of working capital that was provided to Revere and Matt Dalton provided that analysis to me.

Page 278

Kost - Confidential

So I was looking at -- I was trying to triangulate between the actual working capital, the forecast working capital, and trying to understand what the buyer was doing in their schedule.

Q.   Okay.  All right.  And in the first paragraph you reference "Lower inventory means a lower recurrent AVL balance, but they take most of that out of the purchase price, so maybe the existing term loan does get a bit more."

Is the term loan a reference to the Zohar loan?

A.   Yes.

Q.   And then at the top here you say, "Let's chat later in the day."

Do you recall talking with him later in the day?

A.   Either that day or the next day, yes.

Q.   You're aware that Mr. Dalton sent the Revere LOI to Ms. Tilton as well; right?

A.   I would hope so.

Page 279

Kost - Confidential

Q.    Did he discuss with you her concerns about the bid?

A.    At some point.  I don't remember on what phone call, but yes.

Q.    Did you ever discuss the Revere LOI with Ms. Tilton prior to the filing of debtors' motion on December 10?

A.    I feel like we did, but I can't recall specifically, so we may not have. I just don't recall.

Q.    Did you typically discuss other LOIs that had come in for other companies, would you have discussed those with Patriarch or Ms. Tilton?

A.    Yes.

Q.    Okay.  When did debtors decide to seek the Court's involvement in enforcing the LOI that was submitted on December 4th?

MR. NEIBURG:  Just caution the witness not to reveal the content of privileged communications.  But if you can answer that question without doing so, you may.

Page 280

Kost - Confidential

A.    So we had been working on the Hussey transaction for over a year. We've had at least five rounds of bids, including I think five or six from Revere.

It was made pretty clear to us, either directly or indirectly, by Ms. Tilton -- I think directly early on, indirectly through Matt Dalton later on -- that Ms. Tilton was disappointed with the purchase price.

By December 4th, the process had talked to over 215 parties. We knew where all of those parties stood. We knew where their interest was. And we were supportive of moving forward with Revere and signing a letter of intent.

Matt Dalton conveyed to us that Ms. Tilton was not in favor of executing the letter of intent, and so we decided to move forward.

Q.    You decided to move forward after finding out from Mr. Dalton that Ms. Tilton was not in favor of moving

Kost - Confidential

forward with the letter of intent; is that right?

A.    I don't recall the specific timing, but yes.

Q.    You recall that Matt had some trouble reaching Ms. Tilton or hadn't spoken to Ms. Tilton until -- until a couple of days after receiving a letter of intent?

A.    I don't know that.

MS. MALONEY:  Exhibit 23.

(Kost Exhibit 23, E-mail from Mr. Kost dated December 6 re update request, was so marked for identification, as of this date.)

Q.    So this is on Friday, two days after the letter of intent has come through, and you ask Mr. Dalton is there any update and whether -- ask him whether he was able to speak to Ms. Tilton or anyone at Patriarch.

Had you spoken to Ms. Tilton or anyone at Patriarch at this point?

A.    I definitely did not speak to

Kost - Confidential

Ms. Tilton about it.  I know I talked to Randy Jones about it at some point, but I can't tell you whether it was in this time period.

Q.    Okay.  And Matt Dalton says that he has no updates.  And then you respond, "Please keep on them and remind them that the clock is ticking."

What clock are you talking about there?

A.    Revere's letter of intent was dated December 4th and had an expiration date of December 11th.

Q.    And then you wrote that you think -- I think -- well, can you read that last sentence, I want to make sure we get it right.

A.    The last sentence of my e-mail says, "But I think I know where this is going."

Q.    And you knew where it was going because you knew that debtors were planning on seeking Court intervention?

MR. NEIBURG:  I'll just caution

Kost - Confidential

the witness not to reveal privileged communications.

A.    No, not at all.  I was referring to the fact that Ms. Tilton wasn't supportive of the prior LOIs from Revere and/or purchase price incorporated in those LOIs.  And so it was my thinking that she wouldn't be supportive of this LOI either.

Q.    You had no expectation that debtors would be seeking Court information at the time you sent this e-mail; correct, on December 6th?

MR. NEIBURG:  I'll caution the witness not to reveal the content of privileged communications.

A.    I don't know when we started to talk about "Hey, we should file with the Court."

Q.    Okay.  Well, let's look.  This is going to be Exhibit 24.

(Kost Exhibit 24, Staffing reports June 2018 through December of 2019, was so marked for

Page 284

Kost - Confidential

identification, as of this date.)

Q.      These are your staffing reports for June 2018 through December of 2019. I am not going to make you look at all of them, but I thought that folks might appreciate having them all together and tabbed.

A.      This is such -- a millennial would not be happy with this binder.

Q.      Okay.  So now we're looking now at Exhibit 24.  If you would flip to last tab, which is the December 2019 Goldin staffing report.

MR. NEIBURG:  I have to say I was looking at this across the table and wondering what it was.

A.      This is a summary of my life for the last two years.

MR. NEIBURG:  Now we know.

A.      Can you please rephrase the question?

Q.      It's fine.  All I asked for is for you to look at the last tab, which is December 2019 Goldin staffing report.

Kost - Confidential

A.    Okay.

Q.    And on the first page it says Staffing and Compensation Report of Goldin Associates for the period December 1st through December 31, 2019.  It was filed with the Court.

And then if you can continue to flip through it, are you familiar with this document?

A.    Yes.

Q.    And if you look to Exhibit D of that filing with the Court, which at the top it says page 4 of 10, it's the summary of hours and compensation by project category.

A.    Yes.

Q.    And then summary of hours and compensation by professional on the following page.  And if you flip to -- if you flip to page 12, page numbers are at the bottom, and you look at matters other than monetization process, you see it says your name there?

A.    Yes.

Page 286

Kost - Confidential

Q.    And on the left-hand column are dates.  And to the right of that are descriptions.

And it says here that on December 4th, 2019 -- if you'd read that, please?

A.    It says, "Review and revise YCST work product, Re debtor emergency motion."

Q.    Was that, on December 4th, something other than the LOI motion that you were working on reviewing and revising?

MR. NEIBURG:  I'll caution the witness not to reveal the substance of communications you may have had or what you were working on, other than what's reflected in the staffing report.

And I have to say, what does this have to do with the milestone motions?

MS. MALONEY:  Are you objecting? Would you like to speak about that off

Page 287

Kost - Confidential

the record, because I'm not putting on the record the reasons why I think that this -- we can discuss it off the record, but not in front of the witness.

MR. NEIBURG:  I'll object --

MS. MALONEY:  First of all, I'm impeaching the witness.

MR. NEIBURG:  I'll object to this line of questioning.

MS. MALONEY:  We're going to his credibility.

MR. NEIBURG:  This has nothing to do with the milestone motions.

MS. MALONEY:  It certainly does, and we'll get to that in the questioning.

MR. NEIBURG:  Again, I am instructing the witness not to reveal the content of privileged communications.  The staffing report says what it says.

Q.    Does the debtors' emergency motion that you describe here refer to

Page 288

Kost - Confidential

the LOI motion that was filed on December 10?

A.    I really just don't recall specifically.  We were working on a number of different filings --

Q.    Okay.

A.    -- at this time period.

Q.    Do you recall what emergency motion has been filed by debtors other than debtors' emergency motion?

A.    So the other motion that I was working on was --

MR. NEIBURG:  I'll just caution the witness, was it actually filed, what you're about to talk to, talk about?

THE WITNESS:  Yes.

MR. NEIBURG:  Okay.

A.    This could be, again, two-and-a-half hours -- this could be the actual timeline, debtors' timeline in sale process motion that we filed on 2/20.

Q.    Okay.  Though that was not

Kost - Confidential

filed as an emergency motion; correct?

A.    It may not be, correct.  It just seems to me that two-and-a-half hours is a long time.

Q.    And then on December 5th, you also worked on that emergency motion to the Court?

A.    That's correct.

Q.    And then on December 6th, you worked on just a debtor motion to the Court, which might have been something different, I guess?

A.    That's correct.

Q.    And you're aware that the guideline motion wasn't filed on an emergency basis; right?

A.    That's -- I think that's right.

Q.    Okay.  So it's your testimony that you're not sure whether you were working on the Revere LOI emergency motion filed by debtors on December 10th when you put in your time descriptions that you were working on debtors' emergency motion on December 4th and 5th;

Page 290

Kost - Confidential

is that right?

A.     That's correct.  I am not sure specifically what I am referring to in this time entry.

Q.     Okay.  So when you said to Mr. Dalton that you think you know where this is going, you were not referring to debtors' emergency motion?

MR. NEIBURG:  Asked and answered.

A.     No.

Q.     Prior to December 4th, all of those LOIs that you mentioned before that Revere submitted, did you seek Ms. Tilton's views directly on those LOIs?

MR. NEIBURG:  Object to form.

A.     With respect to Revere?

Q.     Yeah.

A.     So my interactions with Ms. Tilton were more fulsome earlier in the process.  So during 2018 and even probably earlier in 2019, we would talk on a more regular basis.

Page 291

Kost - Confidential

In the last six or nine months, I've had much less interaction with Ms. Tilton and most of my interactions are through the investment bankers.

Q.   So is it your view that -- I am just trying to understand, and I would appreciate an explanation, if you can give me one, why you would not have reached out to Ms. Tilton about the LOI prior to beginning work on a motion to bring the Court in to enforce it?

MR. NEIBURG:   Object to form. And I will caution the witness not to reveal the content of privileged communications.

A.   So I am an investment banker, not a lawyer.   The whole legal side of filing the motions I leave to Young Conaway.   They will send me materials to comment on.

Q.   To revise, was your description?

A.   Yes, comment on, revise.

Q.   And you spent at least

Kost - Confidential

two-and-a-half hours on it?

A.    Yeah, I really don't think it was this motion, because it wouldn't take two-and-a-half hours to work on the Hussey motion.

But, again, I was pretty confident that my discussions with Matt Dalton, who had spoken directly to Ms. Tilton on this and all the way going back to February, I mean, you've seen the paper trail, she was not supportive of the transaction going back to February.

Q.    Yeah.

A.    As I said in my e-mail to her, it was pretty clear that the revised Revere bid would not be acceptable to Ms. Tilton.

Q.    Yeah, but as reflected in the e-mails, even as of the end of the day on the 6th, you confirmed with Mr. Dalton that he hadn't actually spoken to Ms. Tilton about her views of this LOI; right?

MR. NEIBURG:  Object to form.

Page 293

Kost - Confidential

Q.    And that was the 6th.  These time entries were working on this through the 4th and 5th?

MR. NEIBURG:  Object to form. Asked and answered.  Move on.

Don't answer the question.

MS. MALONEY:  You're directing him not to answer because it's privileged?  I would appreciate you not directing --

MR. NEIBURG:  This has nothing to do with milestone motions.

MS. MALONEY:  I would appreciate if you do not direct your witness to answer -- to not to answer the questions.

MR. NEIBURG:  This has nothing to do with the milestone motions.

MS. MALONEY:  It absolutely does.

Q.    Here is what I would like to understand, is it your view that at this point the joint process has broken down so much that you couldn't even let

**Page 294**

Kost - Confidential

Ms. Tilton know that you thought this LOI was so fantastic that if she didn't agree to it, you were going to Court to enforce it?

MR. NEIBURG:  Object to form.

I will instruct the witness not --

MS. MALONEY:  You're going to instruct on something that's not privileged?  Yeah, go ahead.  Give your instruction.

MR. NEIBURG:  I was going, I will instruct not to reveal the content of privileged communications, Ms. Maloney.

Q.   Go ahead.  Do you need it read back?

A.   No.

Q.   Because I really, this is something I would really like to know.

MR. NEIBURG:  Hold on, that's not a pending question.

Please read the question back.

MS. MALONEY:  Sure.

**Page 295**

Kost - Confidential

Q.    Is it your view that at this point the joint monetization process has broken down so much that you couldn't even let Ms. Tilton know that you thought this LOI should be agreed to and that if she didn't agree to it, debtors would go to the Court to enforce it?

MR. NEIBURG:  Again, object to form.

I will caution the witness not to reveal the content of privileged communications that you've had with counsel.  If you can answer that question in your capacity as an investment banker, you may do so.

A.    So I had conversations with Matt Dalton about the process.  I am aware from having worked on this for 10 months that this is an offer that Ms. Tilton will be very unlikely to support.

I don't know or recall when I found out from Matt Dalton that Lynn Tilton and Patriarch were not going to

Page 296

Kost - Confidential

support this.  I conveyed my updates to Mike Katzenstein and Young Conaway.  It was not my decision to move forward with any Court filings.

Q.    Do you know if the Hussey sales process is continuing to move forward?

A.    It's based on my discussions with Matt Dalton that it's substantially completed.

MS. MALONEY:  Let's do Exhibit 25.

(Kost Exhibit 25, E-mail from Ms. Tilton on December 9 to Mr. Katzenstein and others, was so marked for identification, as of this date.)

Q.    This is an e-mail from Ms. Tilton on December 9 to Mr. Katzenstein and others.  You don't appear to be on this e-mail.

Did you recall receiving this e-mail?

A.    Yes.

Q.    And did you discuss its

Kost - Confidential

contents with Mr. Katzenstein?

A.    Yes.

Q.    And discuss it with Mr. Farnan?

A.    Yes.

Q.    And what was your view of --
what was debtors' view of Ms. Tilton's
suggestion that she would serve as a
stalking horse bidder at the price Revere
had proposed with a 60-day shop period?

MR. NEIBURG:  Just caution the
witness that to the extent this
communication happened with the
presence of counsel and they were
talking about strategy, that do not
reveal the content of those
communications.

A.    Well, as I am sure you know, we
responded to this letter in writing.

Q.    Did you respond -- did debtors
respond to this prior to filing the
December 10 emergency motion to enforce
the LOI?

A.    Actually, I will rephrase that.
There was a letter that was drafted,

Page 298

Kost - Confidential

which I thought was sent, but I don't know at what time or what date it was sent.

MS. MALONEY:  Okay.  Let's take a break and I will go through the next portfolio company and try to narrow down what I have here, okay?

MR. NEIBURG:  Sounds good.  10 minutes?

MS. MALONEY:  Yeah, that's fine.

THE VIDEOGRAPHER:  Thank you. The time now is approximately 4:10 and we are going off the record.

(Off the record.)

THE VIDEOGRAPHER:  The time now is approximately 4:23, we are back on the record.  It's the beginning of media 5.

Q.    Rand McNally, it's also a Group A portfolio company; correct?

A.    Yes.

Q.    And it's one that debtors proposed an LOI be executed on or about January 31, 2020, as of the filing of

**Page 299**

Kost - Confidential

their motion on December 20th, 2019?

A.    Yes.

Q.    Do you recall that?  Do you know if there has been any revision to the deadline for executing an LOI for Rand?

MR. NEIBURG:  I will just caution the witness not to reveal privileged communications.

A.    I'm sorry, are you talking about what the date was in our motion?

Q.    Yeah.

A.    Or just the process in general?

Q.    I am wondering if debtors have come up with a different date by which they want to tell the Court they propose having an LOI executed on, other than January 31, 2020?  Since that date has passed.

A.    I was going to say, I am not privy to exactly what our counsel wants to propose on that.  But the date has passed and we had some negative developments with respect to the Rand

Page 300

Kost - Confidential

process.

Q.    But you are providing guidance as to what is viable for an LOI signing date because you're the one in communication with the bankers; right?

A.    Yes.

Q.    So at this point, has your guidance as the chief monetization officer for the Zohar funds been sought for a date for which it would be reasonable to tell the Court debtors propose an LOI be executed for Rand?

MR. NEIBURG:  Object to form.

And also I'll caution the witness not to reveal privileged communications to the extent it talks about these Court proceedings.

A.    I haven't been asked to provide my views as to revised dates for the Court motion, for the Court.

Q.    Okay.  Do you have views?

A.    Yes.

Q.    Okay.  And do you have views as to potential revised dates for all of the

Page 301

Kost - Confidential

portfolio companies or are you just speaking of Rand?

A.    Well, we are talking about start dates and Rand's is different, because Rand is a get-to-a-close and we have had negative developments with respect to the Rand sale process that would make that unachievable.

Q.    Do you have a date in mind to when you think an LOI can be executed for Rand?

A.    That is extremely difficult at this moment.

Q.    So you do not have a date in mind as to when an LOI could be executed for Rand?

A.    Given where we are in the process, that would be difficult to do right now.

Q.    If a date were imposed by which an LOI had to be obtained for Rand, is there even a buyer for which that is viable?

A.    We've discussed with the

**Page 302**

Kost - Confidential

bankers a process to reinvigorating the sales process for Rand that would hopefully lead to an interested party, and the whole process; you need an LOI and then diligence and then a closing.

Q.    You discussed that with the bankers.  Have you also discussed it with Ms. Tilton?

A.    No.

Q.    Are you planning on discussing with Ms. Tilton or anyone at Patriarch a strategy for reinvigorating the sales process for Rand?

A.    I think we're on the same page. I had discussions with the bankers.  The bankers have discussions with Ms. Tilton. And I think we're on the same page as to a process for reinvigorating the Rand sale process.

Q.    Not planning on doing another emergency filing without giving her notice of it?

MR. NEIBURG:  Object to form.

Q.    So what's Rand's business?

Page 303

Kost - Confidential

A.    Rand is in three or four businesses.  One of them, which everybody knows about, is their analog business.  It's publishing, it's paper, Rand McNally maps and other publishing materials.

The rest of the business is hardware and software.  And they are in several businesses including fleet management, logistics and something that they call the connected vehicle, primarily connected truck.

Q.    Okay.

A.    Provides infotainment and other services for truckers in their cab.

Q.    Okay.  And the banker for Rand is who?

A.    Jason Russell and Jonathan Berger.

Q.    And they are with PJ Solomon?

A.    That's correct.

Q.    And you have never advised on a publishing or mapping company deal previously, have you?

A.    No.

**Page 304**

Kost - Confidential

Q.    Never been involved in a restructuring of a company in the publishing or mapping industry?

A.    No.

Q.    Sale of a company in the publishing or mapping industry?

A.    No.

Q.    Debt financing?

A.    No.

Q.    Purchase?  No?

A.    No.

Q.    And are you in regular communication with Jason Russell and Jonathan Berger of PJ Solomon?

A.    Yes.

Q.    How frequently do you speak with them?

A.    Well, it will change depending on what is happening with the sales process.  It could be once or twice a week or it could be once every three or four weeks.

Q.    When was the last time you spoke with them about the recent

Page 305

Kost - Confidential

developments that you eluded to earlier?

A.    It was probably two weeks ago.

Q.    And so it's been two weeks since you've discussed the status of the sales process for Rand with Rand's bankers; is that right?

A.    So let me clarify.  When you say "discuss," I think call.  Like speaking live.

Q.    That's fine.

A.    We also exchange e-mails.

Q.    Okay.  When was the last time you exchanged an e-mail with them about the status of the sales process?

A.    Last week.

Q.    And what was discussed over e-mail regarding the status of the sales process?

A.    So the plan for the Rand sales process is to update the materials to create a refreshed mini CIM.

And it will include revised financials, including preliminary 2019 and a revised 2020 budget.  I got a draft

Page 306

Kost - Confidential

of those materials last week.

Q.    And this plan to update the materials and create a refreshed mini CIM is in response to the failed sales process to date?

A.    That's correct.

Q.    Okay.  And so at this point, the joint monetization process is having to accommodate the failed sales process of this company; is that right?

MR. NEIBURG:  Object to form.

A.    That's correct.  We were very disappointed that a very interested party withdrew from the process after a significant amount of time and effort.

Q.    So a sales process, in general, needs room to accommodate this type of development, where there is a failed sales process; would you agree with that?

MR. NEIBURG:  Object to form.

A.    Yeah, by definition, it's -- you, you know, things happen.

Q.    And if you put an end date, a deadline on when a company has to be

Page 307

Kost - Confidential

sold, you can't accommodate this type of development; is that right?

MR. NEIBURG:  Object to form.

A.    Well, you would obviously not attain your end date if something like this happened.

Q.    Okay.  Now, was Rand one of the companies that was part of the global restructuring?

A.    I believe early on Rand was included but it may have then been taken out later in the process.

Q.    Do you recall if there was a valuation completed of Rand as part of these waterfalls that we discussed?

A.    Yes.

Q.    And do you recall the range for the expected recovery from Rand?

A.    Yes.

Q.    And what was that?

A.    Initially, early in the process we thought it might be in the range of 200, 225 million or higher.

Q.    Okay.  That was early in the

Page 308

Kost - Confidential

process.  Early in the process, by that you mean 2018?

A.    Yes, 2018.  Maybe early 2019.

Q.    Okay.  And by summer 2019, do you recall where the number landed?

A.    It would be declining during the summer of 2019 but I can't give you a specific number.

Q.    Did it decline below 200 million?

A.    Yes.

Q.    Below 100 million?

A.    Not during the summer.

Q.    Okay.  Has more recent waterfall analysis shown -- had Rand at a valuation below 100 million?

A.    The waterfall analysis prepared in the end of last year, November, whenever, would have probably been more in the 150 million range.

Q.    Okay.  Do you recall approximately when PJ Solomon was retained to market and sell Rand?

A.    In 2018.

Kost - Confidential

Q.    Approximately July 2018; is that correct?

A.    Yeah, that sounds right.

Q.    And did you review the retention agreement for PJ Solomon?

A.    Yes.

Q.    Were you part of the process of interviewing PJ Solomon?

A.    Yes.

Q.    And so you have any concerns with the terms of the retention agreement?

A.    No.

Q.    And that retention agreement was with the company; right?

A.    Yes.

Q.    Based on your experience, the retention agreement was entered on commercially reasonable terms?

MR. NEIBURG:  Object to form.

A.    Yes.

Q.    Okay.  Now, a CIM was prepared by PJ Solomon along with Ms. Tilton for Rand in February 2019; do you recall

Page 310

Kost - Confidential

that?

A.    Yes.

MS. MALONEY:   This will be Exhibit 26.

(Kost Exhibit 26, E-mail re Rand CIM, February 1, 2019, was so marked for identification, as of this date.)

Q.    Ms. Tilton sent you the Rand CIM as well as a Q of E prepared for the company in -- on February 1st, 2019; do you see that on this e-mail?

A.    Yes.

Q.    Okay.  And if you look at these documents, do you recall receiving these from Ms. Tilton?

A.    Yes.

Q.    Okay.  This CIM is long. 122 -- no, let's see.  The CIM is 122 pages; right?

A.    Yes.

Q.    Is this a complicated company?

A.    It is complicated in the sense that it has multiple products.

Q.    Does it have multiple

Kost - Confidential

subsidiaries?

A.    It does have multiple subsidiaries.

Q.    It have multiple locations?

A.    Most of it is out of New York. I don't know where the other locations are.

Q.    Have you ever visited Rand?

A.    I know some of it is actually in the Patriarch building downtown, but, no, I haven't met with Patriarch -- I haven't met with Rand management.

Q.    Okay.  And then in February -- on February 4th, Ms. Tilton sent you an updated CIM for Rand and that we will mark as Exhibit 27.

(Kost Exhibit 27, Updated CIM for Rand, was so marked for identification, as of this date.)

Q.    Did you comment on the February 1 CIM?  Do you recall providing substantive comments for the February 1 CIM for Rand?

A.    No, we didn't provide

Page 312

Kost - Confidential

substantive comments.

Q. Generally, debtors didn't provide substantive comments to any of the CIMs; is that right?

MR. NEIBURG: Object to form.

A. That's correct. We didn't write or revise the CIMs. But we would review them and obviously this is a --

Q. And Ms. Tilton's e-mail to you and Mr. Farnan and Mr. Katzenstein indicates that it includes LW's comments.

Do you know who LW was?

A. I am pretty sure that refers to Latham.

Q. And Latham & Watkins, is that the law firm of Latham & Watkins?

A. Yes.

Q. And what is Latham and Watkins' role with respect to Rand?

A. I believe they are portfolio company's counsel.

Q. Does Latham and Watkins provide any legal services to debtors?

A. I don't know.

**Page 313**

Kost - Confidential

Q.    And if you take a look at this, do you recall reviewing this document at the time?

A.    Yes.

Q.    And this one is still 121 pages, plus the cover.  So it didn't get shorter in the revision.

Why do you think it took from June 2019 -- strike that.

Why do you think it took from approximately July 2018, when PJ Solomon was retained, to February 2019 or seven months to prepare the CIM?

A.    I don't remember it being that long, but I'll take your word for it that it was seven months.

I recall, to the best of my recollection, that Peter J. Solomon got off to a relatively slow start.  I don't recall the reason why they got off to a slower start.

I do recall that the CIM, as you noted, went through multiple iterations.

Page 314

Kost - Confidential

Q.    Okay.

A.    I don't believe Ms. Tilton was happy with the first iteration prepared by Peter J. Solomon, and worked with Peter J. Solomon and the management team to revise the CIM.

Q.    And when you say she wasn't happy, I find it so frequently that Ms. Tilton's feelings are put at issue.

So do you believe -- did Ms. Tilton convey to you that she didn't find the CIM persuasive?

MR. NEIBURG:  Object to form.

Q.    What did you mean by -- I guess, when you say she wasn't happy with the CIM, did she not like the colors of it?  What do you mean by that?

A.    No.  So, my understanding of the comments, whether I learned them through Ms. Tilton or through Peter J. Solomon, I can't recall, but the point of a CIM is to tell a story and also provide information so that an interested party, based on this sole document, can

Kost - Confidential

determine whether they have an interest in proceeding with a potential opportunity.  And she felt that it didn't tell the Rand's story the way she thought it should be told.

Q.    And the way she thought it would be told would be -- that's fine.

And did you disagree with her, did you think it told a story in a sufficiently persuasive manner?

A.    The way the process works is each portfolio company hires an investment banker whose specialty is this sector, and we hired them to be the people who lead the process in terms of preparing the CIM and marketing materials.

And so we obviously review it, but with an eye towards taking the recommendation of the banker who wrote it, because that's his job and that's his industry.

So my view is it was actually a relatively solid product.  But that

Kost - Confidential

Ms. Tilton decided to continue to work on it and make changes to it.

Q.    So you didn't think it was improved by Ms. Tilton's changes; is that right?

A.    No, no, I didn't say that.

Q.    Okay.

A.    No, it probably was improved by Ms. Tilton.

Q.    You don't have an opinion either way whether Ms. Tilton's substantive changes to the Rand CIM actually improved it?

A.    I would have to go back and compare the two, but I believe that Ms. Tilton did improve the CIM.

Q.    But right here, we're just talking about two CIMs between February 1st and February 4th; had you reviewed an earlier CIM that Ms. Tilton had made significant substantive changes to?

A.    Yes, I believe that the Rand CIM was prepared over a longer time frame.

Page 317

Kost - Confidential

Q.    Okay.  You believe it was prepared over a longer time frame, but did you actually review an earlier CIM before February 1st, 2018?

A.    I don't recall.

Q.    Okay.  So you don't know what substantive changes necessarily Ms. Tilton made to an earlier version of the February 1, 2018 CIM?

A.    That's correct.

MR. NEIBURG:  Do you mean --

MS. MALONEY:  Exhibit 28.

MR. NEIBURG:  Just for the record, do you mean '19?

MS. MALONEY:  I do mean '19, thank you.

(Kost Exhibit 28, E-mail including process update from PJ Solomon, was so marked for identification, as of this date.)

Q.    So do you recognize this e-mail?

A.    Yes.

Q.    And it includes a process

Kost - Confidential

update from PJ Solomon; right?

A.    Yes.

Q.    So it looks like on page 2 -- sorry, page 1 of the process update, it reflects that there were 125 buyers contacted?

A.    Yes.

Q.    And first-round bids were targeted for March 28 and April 22nd, 2019?

A.    Between March 28th and April 22nd.

Q.    So at this point, in March of 2019, no one had sent in an indication of interest; is that right?

A.    That's correct.  I recall, I think it was April 4th, maybe, was the final date they actually settled on, but I would have to look at the materials.

MS. MALONEY:  And then on April 8th, there was another bid summary update from Rand.  So this is Exhibit 29.

(Kost Exhibit 29, Bid summary

Kost - Confidential

update from Rand, was so marked for identification, as of this date.)

Q.    Let's look at this one.  By April 2019, you got four IOIs for Rand; is that right?  No, six IOIs for Rand.

A.    Six.

Q.    So these bids reflect a valuation of 170 million to, actually, 180 million at the top end; right?  And that's One Equity Partners, appearing on page 2?

A.    Yes.

Q.    And 70 million at the low end, for AssetWorks; do you see that?

A.    Yes.

Q.    On page 3.

Now, your valuation from the waterfall, you said, was between 200 and 225 million; do you recall that?

MR. NEIBURG:  Object to form.

A.    Yes.

Q.    So what explains the enormous discrepancy between debtors' valuation for Rand and what these IOIs reflect?

Page 320

Kost - Confidential

MR. NEIBURG:  Object to form.

A.    So the 225 was, as I said, was early in the process before we received these indications of interest.

And there was actually a great hope, and one of the reasons that we picked Peter J. Solomon, was their access to large strategic parties that we thought could use the Rand McNally brand name; companies like Verizon or T-Mobile or even a Google, to be quite honest.

We really were hoping that somebody like that would say, "Hey, the Rand McNally name and their underlying mapping software," I mean, you could basically become almost a Google competitor in the mapping space.

Again, it was a bit of a stretch.  Obviously didn't turn out that way.  But towards the end of 2018 and until those people started to drop out of the process, it became then clearer that people were going to be more interested in the specific business lines, such as,

Page 321

Kost - Confidential

you know, logistics and fleet and even just the publishing business.

Q.   And at some point it was determined that the publishing business would have to be spun off; is that right?

A.   So one interested party entered the process later, to your point, said "Hey, I want all of the businesses related to trucking and I don't want to buy the publishing business."

MS. MALONEY:  Let's look at Exhibit 30.

(Kost Exhibit 30, E-mail re second-round bid date for Rand McNally, was so marked for identification, as of this date.)

Q.   Now, you're not on this e-mail, but do you recall that the second bid, the second-round bid date for Rand McNally occurred approximately June of 2019?

A.   Yes.

Q.   And you recall that it wasn't good news, as Ms. Tilton says here?

Kost - Confidential

A.    That's correct.  We had six IOIs that we received in April.  We moved forward with several of them, including the two financial sponsors that had the highest bids.

And after their second round due diligence, they decided not to bid and it was obviously disappointing, again, for all of us.

Q.    So at that point, was that a failed sales process?

MR. NEIBURG:  Object to form.

A.    Well, let's just say it wasn't going well.

Q.    Were there any bidders as of June 2019?

A.    So we had six IOIs and we had not decided to move forward with, I think, three of them.

And we did go forward with two or three because they were very large, well-known financial sponsors.  We thought that it was definitely worth our time to spend with One Equity and Aegis

Page 323

Kost - Confidential

Partners.  And we were really disappointed after they both decided, again, after a significant amount of due diligence, to withdraw from the process.

Q.    But the process continued through June and July; is that right?

A.    Yes, I would have to again refresh myself from the materials.

Actually, not dissimilar to one of the other processes, WABCO decided to kind of come back -- I can't remember when WABCO decided to come back into the process, but WABCO decided.

MS. MALONEY:  Let's look at Exhibit 31.

(Kost Exhibit 31, E-mail dated July 18, 2019 re WABCO IOI, was so marked for identification, as of this date.)

Q.    This is an e-mail from July 18, 2019.  While you are not on it, Mr. Katzenstein and Mr. Farnan are.  And it is an indication of interest from WABCO for 143 million without the

Page 324

Kost - Confidential

publishing business.

Do you recall reviewing this indication of interest?

A.    Yes.

Q.    And do you recall discussing it with Mr. Katzenstein and Mr. Farnan?

A.    Yes.

Q.    Were you surprised to receive this?

A.    Yes.

Q.    Prior to receiving this, what was the expectation of debtors for the valuation for Rand?

A.    So I am not going to remember the exact days, weeks, months of this process, but we had two interested parties that were in, call it the 175 million range.  As they completed their due diligence, they both withdrew from the process.

During our discussions with Peter J. Solomon -- and again, I hope this whole record is sealed -- they -- I won't give you the numbers unless you

Kost - Confidential

want me to --

Q.    I do.  This record should be sealed.  You're absolutely right.  And we have an agreement that the numbers will, at the very least, be sealed as well as the names.

A.    Okay.

Q.    So I would like to hear the numbers, to the extent you remember them.

A.    So I believe, and I can't remember if it was One Equity or Aegis, one of them wouldn't give us a number. And another of them gave us a very soft verbal number that it would be half of that, call it 75 million.

Q.    Right.

A.    At some point after that time frame, WABCO kind of came back into the picture.

And WABCO had been, they are a direct competitor.  They were called earlier in the process and decided not to participate because they were being acquired.

Kost - Confidential

Q.    Go ahead.

A.    They were in the process of their own internal transaction, which we didn't know that I believe at the time.

Q.    Okay.

A.    It was subsequently announced at some point that they were being acquired by a German company.

Once that kind of stabilized -- and again, you would have to ask the Peter J. Solomon guys who called who -- but at some point WABCO came back into the picture.  Peter J. Solomon talked to them, got them comfortable.  And they submitted this LOI, whatever date this is, July 18th.

Given where we were with the other interested parties, obviously we were again happy that we had an interested party, and the decision was made to move forward with WABCO and provide them their Phase II due diligence.

Q.    Do you recall if Ms. Tilton was

Page 327

Kost - Confidential

bullish on WABCO coming in with a bid at this level before it came in?

A.    I don't know what we expected WABCO to come in at.  We were all disappointed when the other parties exited the process.  And so I know we were excited and happy to have WABCO come to the table with this offer.

Q.    So this bid was totally unexpected to debtors?

A.    I wouldn't say totally unexpected.  It was that they had been out of the process.

And again, I don't remember who reached out to whom, but we were -- I guess it's unexpected that they came back into the process after previously saying that they weren't able to be part of the process.

Q.    And the value was significantly higher than you expected, given the fact that there were no pending bidders at that point; right?

A.    Right.  When you add the 143

Kost - Confidential

million with the 25 million, you got back to the level of the prior two bids.

Q. So did the debtors direct Ms. Tilton to accept this $143 million bid? What happened next?

A. I would have to again go back to the materials, but I remember WABCO then doing a significant amount of due diligence.

And we obviously weren't able to -- I am trying to think what happened -- they had done a ton of due diligence, WABCO, over the last six-and-a-half months. And it was again unfortunate that after doing all of that due diligence, decided to withdraw from the process.

Q. All right. New company. Dura is also one of the Group A portfolio companies; right?

A. Yes.

Q. And it's currently in bankruptcy; correct?

A. Yes.

Kost - Confidential

Q.    It is the only Group A portfolio company that is currently in a bankruptcy process; is that right?

A.    Yes.

Q.    And Dura also went through the monetization process or was put up for sale as part of the monetization process during the 15-month window; is that correct?

A.    Yes.

Q.    And was Dura also valued by debtors as part of the global refinancing?

A.    Yes.

Q.    And do you recall the value that was assigned to Dura as part of that valuation?

MR. NEIBURG:  Object to form.

A.    In our waterfall process?

Q.    Mm-hmmm.

A.    Yes.  I would say that during 2018 and maybe in 2019, it was probably somewhere in the range of 700 million.

Q.    Are you aware that debtors

Page 330

Kost - Confidential

filed a motion last night seeking to credit bid Dura for the value of their debt?

MR. NEIBURG:  Object to form.

A.    I have not read the motion.  I saw that it was filed, yes.

Q.    And are you aware of the amount of debt outstanding to the Zohars for Dura?

A.    The Zohar debt of Dura I think is in excess of 100 million.

Q.    So at this point, have debtors determined that they don't expect to recover any more than 100 million or the value of their debt from the Dura bankruptcy process?

MR. NEIBURG:  Just caution the witness not to reveal privileged communications.

A.    I don't have a view on the debtors' recovery from Dura.

Q.    Is the -- do you not have -- why don't you have a view on that?

A.    Because the -- I am aware of

Page 331

Kost - Confidential

generally how the sales process is going. So I haven't created a recovery for the Zohars at this time.

Q.   As part of your role as chief monetization officer, are you keeping apprised of the sales process for Dura within the bankruptcy?

A.   Yes.

Q.   And are you having communications with the banker for Dura as part of the process in the bankruptcy?

A.   Yes.  To be very clear, to answer your question, I have been working on this deposition.  I have been working on my other deals.

I don't know exactly what's happened in the Dura sales process in the last 72 hours.  We were supposed to have a 10:00 call on Thursday with debtors' advisors and none of them showed up on the call except for Portage and myself.

Q.   Okay.

A.   I know they were in meetings with the OEMs, I know they are meeting

Kost - Confidential

with other people.  It's a realtime situation that I just don't have an answer to what that means to us in terms of a recovery.

Q.    Okay.  Were you involved in executing the retention for Dura?

MR. NEIBURG:  Object to form.

A.    No, I didn't negotiate the retention engagement.

Q.    The retention engagement for Jefferies?

A.    I did not negotiate the retention agreement.

Q.    But you reviewed it?

A.    Yes.

Q.    It was entered before you became the CMO; is that right?

A.    So, I actually think I did interview Jefferies, which, I thought I did actually interview Jefferies as part of this process.  Did I?

Q.    I think you did.

A.    Because I think it was --

Q.    Yeah, I think you were part of

Page 333

Kost - Confidential

the interview process, if this refreshes your recollection, of Jefferies prior to the filing of the bankruptcy.

A.    I think I did.

Q.    You participated in a meeting with them in Arizona.

A.    Yes.

Q.    Okay.  You recall that?

A.    Yeah.  I don't remember -- so, no, I didn't go to Arizona.  I didn't go to Arizona.

Q.    Let's just make the record clear as to whether you were involved or not, now that we've gone down that path. Okay.  So this is going to be Exhibit 32.

(Kost Exhibit 32, Text messages between Ms. Tilton and Mr. Kost, was so marked for identification, as of this date.)

Q.    These are a series of text messages with Ms. Tilton and you.  And the Zohar bankruptcy was filed 3/12/2018.

And Ms. Tilton writes to you on 3/16/2018 that she will -- and I will

Kost - Confidential

read the correct word -- "be interviewing additional bankers on Wednesday and Thursday this coming week in Arizona if you have interest in being present."

And you responded that, in the third sentence, "We have scheduled our first meetings with MBIA's advisors and the controlling holding's advisors for Wednesday and Thursday next week.  So I really need to attend those meetings.  I really would like to attend some IV pitches but don't hold up anything."

Does that refresh your recollection as to whether you were actually present for the Dura interview?

MR. NEIBURG:  Object to form.

Q.    I mean, the Jefferies interview?

A.    I just can't recall -- it doesn't sound like I was actually at the Jefferies pitch.

And as you know, just to clarify the record, this is in my capacity as a --

**Page 335**

Kost - Confidential

Q.    Advisor?

A.    -- advisor to Mark Kirschner, not as a CMO.

Q.    Okay.  So after -- do you know approximately when Jefferies was retained?

A.    I don't.  Back in early to mid-2018.

Q.    Let's talk about the CIM for Jefferies, which we'll -- actually, we'll get the engagement agreement.

So does it refresh your recollection if I tell you they were retained in approximately May of 2018?

A.    That sounds right.

Q.    Okay.  Great.  Let's talk about the CIM for Dura.

MS. MALONEY:  This is Exhibit 33.

(Kost Exhibit 33, CIM for Dura, was so marked for identification, as of this date.)

Q.    Ms. Tilton sent you -- no, Ms. Tilton just sent Katzenstein and

**Page 336**

Kost - Confidential

Farnan -- she must have been having trouble with your e-mail -- the -- on August 21, 2018, the CIM for Dura.

If you take a look at this document, does it refresh your recollection that you reviewed this document previously?

A.    Yes.

Q.    Okay.  And to your knowledge, was this CIM prepared along with Jefferies and Ms. Tilton?

A.    Yes.

Q.    Now, the CIM didn't come out until August.  The retention was in May. Does that seem like a reasonable amount of time to get a CIM prepared?

A.    No, that's also a long time.

Q.    Do you have any knowledge of what would have delayed the preparation of the CIM, in your mind?

A.    I don't recall.  There was just a lot going on in the case and the bankruptcy filing.  I don't recall.

Q.    In addition to preparing a CIM,

**Page 337**

Kost - Confidential

Jefferies also prepared -- did Jefferies also prepare a Q of E or have a Q of E as part of the process?

A.    Yes.

Q.    And they also put up a data room; is that right?

A.    Yes.

Q.    Do you recall accessing the data room for Dura?

A.    So the data room goes live when you move on from Phase I to Phase II.

And we had a bit of an issue with Ms. Tilton and the bankers as to when we would get access to the data room.  I don't remember when Dura's data room went live and we had access.

Q.    Okay.  We'll get back to that.

So tell me a little bit about the process for marketing Dura.  Did it also include going to strategics as MD?

A.    Yes.  Jefferies went to strategics and financial sponsors, both domestic and foreign.

Q.    Okay.  And do you recall

Page 338

Kost - Confidential

meeting with Ms. Tilton at Dura's Auburn Hills headquarters in August of 2018?

A.    Yes.

Q.    And did Ms. Tilton do fireside chats with potential buyers in Dura as she did for MD?

A.    I believe she and Jefferies did do a few.  And they were maybe not as substantial as the fireside chats in MD.

Q.    Did she tell you or did the banker Jefferies tell you about meetings that were occurring with potential buyers in connection with the sale of Dura?

A.    At that point or throughout the whole process?

Q.    Throughout the process.

A.    Yes.

Q.    Are you aware that Ms. Tilton and Jefferies met with Lowe's in connection with the sale of Dura?

A.    Lowe's?

Q.    No?

A.    No.

Q.    Are you aware that they met

Kost - Confidential

with the Moody's rating agency in connection with Dura?

A.    Yes, for a different process, but yes.

Q.    And for what process was that meeting?

A.    It may have been done for two purposes, but I do believe at some point Jefferies was considering staple financing for interested parties.

And then later in the process, which I am not sure when they did the Moody's presentation for, there was also another presentation, another financing they were trying to do in Europe to provide financing for Jefferies.

Q.    Okay.

A.    For Dura.

Q.    Are you aware of her having a meeting with Nomura in connection with Dura?

A.    Again, Nomura would be a financing of some sort.  It does ring a bell, but I couldn't tell you when or how

Page 340

Kost - Confidential

or why.

Q.    Okay.  And what about Shenkman?

A.    I don't know that name.

Q.    And then Blue Mountain?

A.    Yes, I think that was one of the potentially interested financial partners.

Q.    Bain?

A.    Yes.

Q.    What about BlackRock?

A.    I would have to look and see. I don't recall if it was Dura or one of the other portfolio companies.

Q.    Apollo?

A.    Again, same answer.

Q.    Okay.  So do you recall Ms. Tilton disclosing to you and Mr. Katzenstein that she and Jefferies were meeting with rating agencies and debt investors as a backup to sale?

A.    Yes.

Q.    Okay.  And also in August 2018, that was then when you met with Ms. Tilton at Dura's headquarters, and

Page 341

Kost - Confidential

did you take a tour of the manufacturing
facilities?

A.    Yes.

Q.    And that was at the
headquarters in Auburn Hills, Michigan;
is that right?

A.    Yes.

Q.    And then Mr. Farnan and
Mr. Katzenstein were both there as well;
is that right?

A.    Yes.

Q.    Okay.  And Ms. Tilton is the
CEO of Dura?

A.    Yes.

Q.    Right.  And she gave you access
to the management team as part of that
process of -- part of the sales process;
is that right?

A.    Yes.

Q.    Okay.  In January of 2019,
Ms. Tilton informed you and
Mr. Katzenstein that she was going to
pursue a refinancing of Dura; is that
right?

**Page 342**

Kost - Confidential

A.    That's about the right time frame, yes.

Q.    Okay.  So let's look at that. That's Exhibit 34.

(Kost Exhibit 34, January 1, 2019 e-mail from Ms. Tilton to Mr. Katzenstein and Mr. Kost, was so marked for identification, as of this date.)

Q.    January 1, 2019 e-mail from Ms. Tilton to Mr. Katzenstein and you.

At the bottom, there is an e-mail from you to the Jefferies bankers on which Ms. Tilton does not appear.  Do you see that?  It's on the second page, it's the substance?

A.    Yes.

Q.    "I wanted to follow up on the sales process discussion and see if there is any progress on setting a timetable process for scheduling management presentations."

Do you see that?

A.    Yes.

**Page 343**

Kost - Confidential

Q.    "I am copying Mike as I know there are other factors impacting the sales process."

Do you recall what you were referring to there when you mention the other factors?

A.    Yes.

Q.    And what was that?

A.    So we received indications of interest for Dura, I am going to say it was at some point in December.  We were -- the debtors were interested in moving forward.

Ms. Tilton, at the same time, and Dura, were seeking a large contract for an OEM that would have -- that is very significant.  And Ms. Tilton was concerned that an ongoing sales process or even an actual sales process would be considered a negative development by the OEM in the award of that contract.

So during this time frame, Ms. Tilton wanted to suspend the sale process.

Kost - Confidential

Q.    Okay.

A.    And then moved on at that point in early January to a refinancing, when we were thinking that we were actually going to do the management presentations.

Q.    And did Mr. Katzenstein or you express that she should not move forward with a refinancing of Dura?

A.    Our general view, that would probably be in e-mails, was that we were amenable to slowing the process down and to let the OEM award the contract, and then in earlier, early January, restart the sale process.

And Ms. Tilton disagreed with that course of action.

Q.    Okay.  So when she disagreed with that course of action in early January 2019, what was debtors' response?

A.    Well, her response was she wanted to move forward with a refinancing.

Q.    I understand, but what was debtors' response to her wanting to move

Kost - Confidential

forward with a refinancing?

MR. NEIBURG:  I'll just caution the witness that, not to reveal the substance of privileged deliberations. But if there was a response --

MS. MALONEY:  I asked --

MR. NEIBURG:  Just so he doesn't -- if there was a response provided to Tilton or Patriarch, you can answer that question.

A.    I don't recall the specific conversation with Ms. Tilton.  But I know Mike and I conveyed that we wanted to move forward with the sale process, we wanted to continue to schedule the management presentations, but we understood the impact of the OEM contract.

And it was a balancing act between trying to get the OEM contract, but also keeping the sale process moving forward.

Q.    So did Ms. Tilton move forward with the refinancing over the objection

Page 346

Kost - Confidential

of debtors?

A.    You use the word "objection." I am not sure what our wording was. But I would say that, you know, we weren't opposed to a refinancing, either.

But it would have been great to do both. It would have been great to continue the sales process and move forward on the refinancing.

Q.    Okay. Throughout January and February, Ms. Tilton kept you and Mr. Katzenstein apprised of the refinancing efforts; is that correct?

A.    Yes.

MS. MALONEY:  Okay.  Let's mark this one Exhibit 35.

(Kost Exhibit 35, February 17 e-mail to Mr. Farnan and Mr. Katzenstein re Dura refinancing, was so marked for identification, as of this date.)

Q.    This is a February 17 e-mail to Mr. Farnan and Mr. Katzenstein about -- with information that was apparently

Page 347

Kost - Confidential

requested.

Do you know if this information was requested in relation to assessing the Dura refinancing?

A.    Yes.   There is two pieces of information in this package that really go together, which is obviously why they are together.

The new OEM contract required significant capital expenditures by Dura. That would be expended up front, which means you needed financing.

And that was part of the impetus to going to the European banks for European financing that Jefferies then led.

And this is the information that obviously we requested that talked about both the OEM contract and what it meant from a financial perspective, and how it would interact with the European bank financing that would provide the capital expenditures to fund the OEM program.

Page 348

Kost - Confidential

Q.     Ms. Tilton also made you aware in February that risk management at Daimler had requested letters of comfort in connection with the award of their new battery trade business; do you recall that?

A.     Generally.

Q.     And those letters of comfort were requested by wealth management at Daimler in connection with the new business; do you recall that?

A.     Yes, generally.

Q.     And do you recall what generally the letters of comfort said?

A.     They generally referred to a subsequent change of control of the ownership of Dura.

Q.     And the letter of comfort was intended to convey that there would be no change of control for two years from the date that the transaction for the battery trade business changes; is that right?

A.     I think the letter will speak for itself.  It has -- I think it's a

Kost - Confidential

right but not a -- they have the right but not the requirement to pull the contract if, in fact, there was a change of control.

Q.    In two years, over the course of two years?

A.    In two years.

Q.    I am frankly trying to avoid putting this into the record because I just -- so I very much appreciate your ability to recall some of the facts here. I recognize Dura is in bankruptcy, so everything is probably public anyway.

Did Ms. Tilton disclose to you and Mr. Katzenstein that Dura had lost its credit insurance during this time?

A.    I heard that.  I don't recall when that happened.

Q.    Okay.  Do you recall it was in approximately February of 2019?

A.    I would have thought later. But that could be the right date.

Q.    Okay.  And do you recall Ms. Tilton disclosing to you and

Page 350

Kost - Confidential

Mr. Katzenstein that Dura's value was declining over the course of the summer of 2019?

A.    Not specifically.

Q.    Do you recall her providing a snapshot of the deterioration of Dura's finances in July of 2019?

A.    It's possible, but I don't recall that.

Q.    Do you recall her sharing with Mr. Katzenstein Dura's cash needs to avoid being shut down by suppliers in July of 2019?

A.    Yes.

Q.    And do you recall what debtors' response was to that?

MR. NEIBURG:  Again, I will just caution the witness that you can answer if there was a response to Ms. Tilton or Patriarch, but not internal privileged deliberations.

A.    No, I don't recall specifically what our response was to that.

Q.    Okay.  Do you recall that

Page 351

Kost - Confidential

Ms. Tilton disclosed to Mr. Katzenstein that Dura could not get financing because of ongoing concern with what would happen in the bankruptcy?

A. I didn't have these conversations with Ms. Tilton. These are more of Mike Katzenstein and FTI.

Q. Okay. That's fine.

MS. MALONEY: Let's take a break. I will try to narrow things down again and then we'll go back on the record. Does that sound okay?

THE VIDEOGRAPHER: Thank you. The time now is 5:22. We are going off the record.

(Off the record.)

THE VIDEOGRAPHER: The time now is approximately 5:30, we are back on the record, it's the beginning of media 6.

Q. What does GAS stand for, Mr. Kost?

A. Global Automotive Systems.

Q. Does GAS have the same

**Page 352**

Kost - Confidential

management as Dura?

          A.     Above the plant level, yes.

          Q.     And when Dura was part of the monetization process and being sold, was GAS contemplated to be sold along with it?

          A.     Yes.

          Q.     Okay.  And when you visited Dura, did you also visit GAS?

          A.     Yes.

          Q.     And is Ms. Tilton also the CEO of GAS?

          A.     Yes.

          Q.     What is the relationship between the two companies in terms of their products?

          A.     It mostly is a separate stand-alone business with its own product lines.

          Q.     And what is that set of product lines?

          A.     They are what we call in the industry, it's a metal vendor.  They bend and weld and stamp and just sheet metal.

Kost - Confidential

And they make door frames for Jeep products, among others.

Q.    And is Dura a customer of theirs?

A.    There may be some intercompany transfer between Dura and GAS, but I can't tell you what level.

Q.    Okay.  And it has been suggested by Mr. Farnan in his filings with the Court that Dura should be put into a sales process after first MD goes and then Stila goes; are you aware of that?

MR. NEIBURG:  Object to form.

A.    You said --

MR. NEIBURG:  Did you mean Dura?

A.    You said GAS.

Q.    Let me do it again.

It has been suggested by Mr. Farnan in his filings by the Court that GAS should be put in a sales process after first MD goes into a sales process and Stila goes into a sales process.  Are aware of that view that Mr. Farnan holds?

Page 354

Kost - Confidential

MR. NEIBURG:  Object to form.

A.     Yes.

Q.     And do you share that view?

A.     I think we would like MD and Stila to move forward because they are large -- in large value properties.  And GAS is also a valuable property but relatively less than both MD and Dura.

Q.     And in determining that GAS should be sold after MD and Stila, was any thought given to how that would affect the value of the sale price of GAS if it were sold many months following the close of the Dura bankruptcy?

MR. NEIBURG:  Object to form.

A.     Yes, it's an issue that we'll have to resolve.

Q.     So that issue has not yet been considered?

A.     We have discussed it internally.  It will obviously require some kind of management services or transition agreement with Dura, and to the extent somebody buys Dura, with the

**Page 355**

Kost - Confidential

buyer.

Q.    But you don't think that the Dura bankruptcy requires that GAS be sold following the bankruptcy?

A.    I am not sure what the interaction is between Dura and GAS in Dura's bankruptcy.

Q.    And do you think or have you considered whether there would be an effect on the value of GAS if it were sold immediately following the bankruptcy?

MR. NEIBURG:  Object to form.

A.    You keep talking about these timings.  I don't look at the timing per se.

GAS needs a management team. Dura is the management team right now. So whether it's before, during or after, it just needs a management team.  And right now, Dura provides that management team.  We have to resolve that issue.

Q.    And Dura's management team is dealing with the Dura bankruptcy right

Page 356

Kost - Confidential

now; is that right?

A.    And they are still managing GAS.

Q.    Right.  And so your suggestion, would it -- is it reasonable to have Dura's management team dealing with a bankruptcy as well as with a sale of a second company?

MR. NEIBURG:  Object to form.

A.    It's not optimal.

Q.    And is it not optimal from the perspective of value for that second company?

A.    Again, it's a bigger issue. It's a bigger issue because if Dura is sold, we don't know what the management team will be at Dura subsequent to a sale.

So those are all considerations we need to take into consideration.

Q.    So is it your view that Dura should be sold first before GAS is put into a sales process?

A.    Well, I don't see why you have

Kost - Confidential

to stagger them like that.  Dura is already in a sales process.  It's going to end within weeks, in theory.  And we couldn't even start the GAS process because we don't have an investment banker yet.

Q.    You said it's not optimal for Dura's management team, while Dura is in bankruptcy, to also oversee a sale of a second company; why is that?

A.    During the sale process you obviously would need management's attention to a sale process in addition to their day-to-day responsibilities to operate the Dura and the GAS business.

Q.    Are you aware of whether Ms. Tilton's attention has been required in connection with the Dura sales process?

A.    It's unclear exactly what Ms. Tilton's role is in the Dura sale process.

It's my understanding that she's not involved in the sale process in

Page 358

Kost - Confidential

terms of management presentations, buyer outreach, all of those kind of things.

Q.    As part of the global refinancing with Jefferies in 2019 that was under consideration, was GAS also valued?

A.    Yes.

Q.    And do you recall the range of valuation for GAS?

A.    I think it was in the $100 million range.

Q.    And has that value declined in debtors' most recent waterfall analysis for the portfolio companies?

A.    I don't think we've changed it since November.

Q.    Since November?

A.    It's been the same through November.

Q.    Okay.  So do you know, it was approximately 100 million in November, as well?

A.    I don't specifically recall.

Q.    Okay.  So during the time of

Kost - Confidential

the Jefferies refinancing, global refinancing proposal in 2019, which was around the summer of 2019, you had it at approximately 100 million?

A.    To the best of my recollection.

Q.    And it's still at approximately 100 million as of November?

A.    Again, these are illustrative valuations.  They are not --

Q.    Understood.

A.    Yes.

Q.    Is that illustrative valuation, did it change between the summer or November, or is it still at 100 million in November?

A.    I don't recall what it is in November.

Q.    Has it lowered since the summer?

A.    I don't recall.

Q.    What's Vulcan's line of business?

A.    Vulcan is a foundry engineering company.

Kost - Confidential

Q.    And has it been part of the sales process to date?

A.    No.

Q.    Why is that?

A.    Vulcan is a relatively small-value company.

In addition, going back to 2018, it's my understanding from Ms. Tilton that Vulcan had an environmental issue that created some issues with the EPA that needed to be resolved before we went to market with Vulcan.

Q.    Do you know if those issues with the EPA have been resolved?

A.    I haven't heard an update in at least six months.  It was my understanding that Vulcan had retained Washington counsel to work on the environmental issue, but I don't know how -- I don't know if it's been resolved or not.

Q.    Have you sought updates and not received them?

Kost - Confidential

A.    I have not sought updates. It's a relatively small company that we've had many other things to focus on.

Q.    Okay.  So you've been prioritizing the sale of certain companies over others based on what you value them at; is that fair to say?

A.    I've been prioritizing my day-to-day timing and Vulcan has, yes, been lower on my list of things to do.

Q.    And it's lower on your list of things to do because you valued it at a lower sale price than the other companies; is that right?

A.    Yes, and it had an unresolved EPA issue.

Q.    Okay.  Do you know if Vulcan has any outstanding loans from third parties?

A.    I don't recall.

Q.    Do you know if a banker has been retained for Vulcan?

A.    Yes.

Q.    And do you know the name of

Kost - Confidential

that banker?

A.      Yes, Gene Bazemore.

Q.      Do you know when they were retained?

A.      Probably back in early to mid-2018.

Q.      Early to mid-2018.

So a banker was retained, but then the sales process was never launched; is that right?

A.      That's correct.

Q.      Okay.  And the sales process was never launched with the agreement of debtors because of the value of the company?

MR. NEIBURG:  Object to form.

A.      And also because of the environmental issue.

Q.      Okay.  But it was something that you discussed with Ms. Tilton and agreed upon; is that right?

A.      We actually haven't discussed Vulcan in -- I can't even remember the last time we discussed Vulcan with

            Kost - Confidential

Ms. Tilton.

     Q.    Right.  You discussed it back
in mid-2018, though, as part of
determining --

     A.    At some time in 2018, yes.

     Q.    Is Snelling another company
that was low on debtors' priority list
because it's a low value company?

     A.    Yes, in part.

     Q.    Okay.  What's the other reason
for it?

     A.    I was thinking valuation
because of where it is in its business
cycle.  But, yes, it's because it's a low
value company.

           It is not a very -- I shouldn't
say this.  I was going to say it's not an
exciting company, but it's a business
staffing.  I don't want them to read
that.

     Q.    What does it do?

     A.    It does professional business
services.  Staffing.

     Q.    And so as compared to a company

**Page 364**

Kost - Confidential

that builds helicopters, it's not particularly exciting?

A.    The real reason is it is relatively small.

Q.    Okay.  And do you know if there has been a retention agreement for a banker for Snelling?

A.    There is not a retention agreement for Snelling.

Q.    Has debtors directed Ms. Tilton to enter a retention agreement for a banker for Snelling?

A.    We have interviewed bankers for Snelling.  And have not retained an investment banker at this time.

Q.    Okay.  And why is that, to your knowledge?

A.    Well, our first choice was a company called Bowstring.  And we like the Bowstring team, and they have decided to pass on the opportunity to be the investment banker.

Q.    So you attempted to get an investment banker, but the investment

Kost - Confidential

banker you wanted didn't want you; is that right?

A.    Something like that.

Q.    Do you know if -- do you have a view of the appropriate timeline for the sale of Snelling to maximize its value?

MR. NEIBURG:  Object to form.

A.    It's a relatively standard business, I would think it would be four to six months through a regular process.

Q.    Okay.  And that -- and that is to maximize the value to debtors; is that right?

MR. NEIBURG:  Object to form.

A.    We would conduct a regular way M&A process that would maximize value.

Q.    Are you aware of the company Glenoit?

A.    A bit.

Q.    Okay.  You know it's a Group B company; right?

A.    Yes.

Q.    And are you aware that a banker has been retained for Glenoit?

Page 366

Kost - Confidential

A.    So I actually think you're referring to Gorham.

Q.    Oh, you know what, I was actually thinking of Glenoit, and I'm sorry --

A.    It's Gorham.

Q.    Let's start again.  So yeah, let's start again.

So for Gorham, tell me what Gorham does?

A.    Gorham is a tissue company. They make various types of tissue and toilet paper and that kind of stuff.

Q.    And the full name is Gorham Tissue and Paper?

A.    Yes.

Q.    Do you it know where they are located?

A.    I do not.  Somewhere probably in the northeast.

Q.    And Gorham is a Group B company; is that right?

A.    Yes.

Q.    And are you aware that

Kost - Confidential

Ms. Tilton is interviewing a potential banker for Gorham?

A.    Yes.

Q.    Were you invited to be part of that interview?

A.    Only after the fact.

Q.    Were you invited to be part of making the determination of the retention of the banker for Gorham?

A.    Ms. Tilton -- Randy Jones, maybe 10 days ago, told me that Ms. Tilton and Patriarch would like to retain an investment banker to sell Gorham; that Ms. Tilton had met with the investment banker in California because she was in California and liked the banker.

I asked if I could have a call with the investment banker to talk to him about his credentials. And I got an e-mail back saying, yes, and they would do it under -- what's the word -- that she wasn't required under the settlement agreement, but that -- I can't remember

Kost - Confidential

the word, not a favor.

Anyway, so I set up a call with Randy Jones and I, and we talked to the banker.

And I've reviewed the banker's pitch materials and he's got a lot of good experience, and it's a relatively narrow sector that there aren't a lot of investment bankers.

Q.   So you concurred with Ms. Tilton's decision that this particular banker for Gorham was a good choice?

A.   I am supportive of selecting the banker, yes.

Q.   And you don't know if they've gone forward with that yet or not?

A.   It was my understanding that the banker was going to provide a draft engagement letter.  And I have not seen one.

Q.   Okay.  Are you familiar with Glenoit, that we mentioned earlier?

A.   Only a bit.

**Page 369**

Kost - Confidential

Q.    You know Glenoit was one of the companies that was subject to the -- that was the subject of the 225 matter in Delaware Chancery Court; are you aware of that?

A.    Yes, generally.

Q.    And are you aware that Glenoit has -- that a third party holds an interest in Glenoit?

A.    Yes.

Q.    And has there been an attempt by the debtors to monetize Glenoit?

A.    Not to my knowledge.

Q.    Are you aware of the extent of the third party's interest in Glenoit?

A.    I believe it's meaningful.

Q.    Does 45 percent or so sound correct?

A.    Yes.

Q.    So debtors have not proposed a monetization schedule for Glenoit; is that right?

A.    Not to my knowledge.

Q.    Since becoming the chief

**Page 370**

Kost - Confidential

monetization officer, you communicate regularly with Mr. Katzenstein; is that right?

A.    Yes.

Q.    And what is the frequency of your communications with him?

A.    Generally, at least two times a week.

Q.    And what is the format of your communications with him?

A.    We have calls on Tuesday and Thursday at 10:00 with myself, Mike and his FTI team, and Young Conaway.  Then to the extent required, we have additional follow-up calls.

Once a week we also have a board call, which we also discuss updates and issues.

Q.    Okay.  And the members of the board, you said earlier, that was Mr. Farnan.  Anyone else?

A.    No.

Q.    And that's the board of the Zohars; right?

Page 371

Kost - Confidential

A.   Yes.

Q.   And did you have a call with Mr. Katzenstein on -- yesterday at 10 a.m.?

A.   Everything was canceled yesterday.  It was a relatively busy day.

Q.   So when was the last time you spoke to Mr. Katzenstein?

A.   Monday or Tuesday.

Q.   Okay.  Did you present -- you've testified before that you presented weekly updates on the sales process for Oasis at weekly board meetings.  Do you recall that testimony?  It was via declaration.

A.   Oh, I'm sorry, you used the word "Oasis."  I testified in Oasis that I give -- yes, I give weekly updates at the board meeting.

Q.   Do you give weekly updates at the board meeting for all of the -- the monetization status of all of the companies?

A.   No.

Kost - Confidential

Q. Okay. How do you determine which company you give the board an update about?

A. I give the board updates on the sale process when I think there is something to update the board on.

Q. Okay. Have you made recommendations for the order of sales of the Group A portfolio companies to the board?

A. When you say "order of sales"?

Q. The prioritization of the sales of the companies.

A. So the relative order in our motion that we filed with the Court is relatively tight. The number of weeks between them is relatively small.

Q. Do you know if Zohar III -- strike that.

Do you know if Bardin Hill is in agreement with the schedule that's been proposed by debtors in its motion of December 20th?

A. I don't know Bardin Hill's view

Page 373

Kost - Confidential

as to our motion.

Q.     You know that Bardin Hill proposed a different timeline for sale of companies than proposed by debtors?

A.     No, I don't know that.

Q.     You know that Bardin Hill suggested in its filing that there be executed purchase agreements by a date certain for the remaining Group A portfolio companies that have not been sold?

MR. NEIBURG:  Object to form.

A.     I haven't read or seen the Bardin Hill filing.

Q.     Bardin Hill has put in its filing to the Court that there should be executed purchase agreements by December 31, 2020 for each of the Group A portfolio companies that has not yet been sold.

MR. NEIBURG:  Object to the form.

Q.     Is that --

MS. MALONEY:  I haven't finished

Page 374

Kost - Confidential

the question.

Q.    Is that something that has been discussed in the board meetings?

A.    Not to my knowledge.

Q.    Do you agree that it's in the best interest of the funds to put an executed purchase agreement date on the sale of each of the portfolio companies?

MR. NEIBURG:  Object to form.

A.    As the chief monetization officer, I am more concerned with starting the sale processes than having an end date.

Q.    In your experience in bankruptcy proceedings, and you said earlier that three quarters of the banking, investment banking guidance that you have given has been in the restructuring context, when you put an end date on a sales process, what affect does that have on value?

MR. NEIBURG:  Object to form.

A.    I think it's too vague and hypothetical to answer.

Kost - Confidential

Q.    Okay.  Other than the valuation that debtors have put on MD, are there any other reasons why it is recommended to the Court that MD be put up first for sale?

MR. NEIBURG:  Just caution the witness not to reveal the contents of privilege deliberations, but if you have an independent view of that, you may answer.

A.    We have been at this process for the better part of two years.  And MD is, again, one of the largest assets.  I think that would be one of the primary motivating factors to restart the MD sale process.

Q.    So debtors' valuation of MD is the primary motivating factor for putting MD first in the sales process; is that right?

MR. NEIBURG:  Object to form.

A.    You keep saying "first in the sale process."  I don't know what that means.  It has a -- we have a date we

Page 376

Kost - Confidential

would like to start the sale process for MD.  We would like to start the sale process for all the companies.

Q.    Well, Ms. Tilton has a later date for MD.  So I am trying to understand if the earlier date for MD proposed by debtors is based solely on it being what debtors perceive as the most valuable company in the portfolio.

A.    We would like to start the MD sales process sooner rather than later.

Q.    And is that solely based on debtors' perception or belief that it is the most valuable company in the portfolio?

A.    We would like to start the MD sale process because it is one of the most valuable assets in the Zohar's portfolio.

Q.    You know, at the commencement of these cases you considered the time frame for the sales of the 12 Group A portfolio companies to maximize the value of those sales; right?

Kost - Confidential

A.    We sought to create processes that maximize the value of the portfolio companies.

Q.    And you discussed those time frames with Ms. Tilton; do you recall that?

MR. NEIBURG:  Object to form.

Q.    Do you recall testifying to that?

A.    Back in 2018?

Q.    Mm-hmmm.

A.    I don't know if I testified as to that.

Q.    Okay.  At the commencement of these cases you testified that it's unusual to potentially monitor and oversee upwards of 12 separate sales processes; do you recall that?

MR. NEIBURG:  Object to form.

A.    I actually don't even remember testifying.

Q.    At your deposition?

A.    Okay.  So that's different. When you said testify, I think Court.

Kost - Confidential

Q.    It's the same.  You're testifying here today, you're just not testifying in Court.

So now, do you recall giving testimony in your deposition as to the time frame for the sales of the 12 Group A portfolio companies?

MR. NEIBURG:  Object to form.

A.    Could you please repeat the question?

Q.    At the beginning of this process, in 2018, you spoke to Ms. Tilton about the time frame for monetizing the Group A portfolio companies to maximize long-term values; do you recall that?

MR. NEIBURG:  Object to form.

A.    Vaguely.

Q.    You conveyed to Ms. Tilton that, based on your general knowledge of running M&A processes, you believed that a process for individual companies could take anywhere between three and 12 months; do you recall that?

MR. NEIBURG:  Object to form.

Page 379

Kost - Confidential

A.    No, I don't recall that.

Q.    You had discussions with Ms. Tilton about specific issues for Group A portfolio companies that may lead to a longer time frame for one or more companies; do you recall that?

MR. NEIBURG:  Object to form.

A.    No, I don't recall that.

Q.    Do you recall testifying to that?

A.    No.

Q.    Do you not agree that there could be specific issues for a specific Group A portfolio companies that could lead to a longer time frame than 12 months for the sale of that company?

A.    I don't disagree with that statement.

Q.    Okay.  And do you agree that there could be issues that are not foreseen at this time that could lead to a process that requires more than 12 months to sell one of the portfolio companies?

Page 380

Kost - Confidential

MR. NEIBURG:  Object to form.

A.    I would agree with that statement.

Q.    And you would agree that there are several factors that could extend the time frame for selling a portfolio company beyond 12 months?

MR. NEIBURG:  Object to form.

A.    To clarify, we're talking about the length of a process, and I would agree if you're talking about the length of a process.

Q.    And one of the things that we discussed earlier was a foreign buyer could extend that process out; right?

A.    That's correct.

Q.    Okay.  And another that you testified to before is that management turnover can make a company a lot harder to sell within a 12-month time period; do you recall that?

MR. NEIBURG:  Object to form.

A.    I would agree that it could cause a longer sales process.

Page 381

Kost - Confidential

Q.    Management turnover can result in a longer sales process than might otherwise be expected; right?

A.    Yes.

Q.    And a company without audited financials can also be a lot harder to sell; do you agree with that?

MR. NEIBURG:  Object to form.

A.    I don't know about the word "harder."  I would prefer to have audited financials than not.

Q.    Okay.  If a company doesn't have audited financials, what, in your experience, does a buyer have to do to address that fact?

A.    Some buyers might prefer or require audited financials.  So it would depend on the buyer.

Q.    Okay.  And you testified previously that if your goal is to maximize value and monetize the Group A portfolio companies in the right way, you wouldn't want the market to have any perception of a fire sale.  Do you still

Page 382

Kost - Confidential

agree with that?

MR. NEIBURG:  Object to form.

A.     Yes, I would agree.

Q.     Is the marketing and sale process of a Chapter 11 or a distressed company differ from the marketing and sale process of a healthy company, in your experience?

A.     Yes, they can differ.

Q.     Okay.  So if a company were in bankruptcy, it could be sold free and clear of any liens or encumbrances; is that right?

A.     Yes.

Q.     And is that true for the portfolio companies that are the subject of this process, that they can be sold free and clear of any liens or encumbrances?

MR. NEIBURG:  Object to form.

A.     Well, no.

Q.     Okay.  So in bankruptcy, could the portfolio companies have pending litigation be subject to an automatic

Kost - Confidential

stay?

A.    Yes.

Q.    And that's not the case here; right?  The portfolio companies' pending litigation against them, to the extent it exists, is ongoing during the sales process; is that right?

A.    Well, yes.

Q.    Okay.  And were the companies in bankruptcy and being sold, there the companies' audited and unaudited financials would not be confidential; is that right?

MR. NEIBURG:  Object to form.

Q.    They could be made public by the Court?

A.    One could expect them to become public.

Q.    Okay.  And if they -- do you have any view on what occurs to the perception of value of a company when audited and unaudited financials are made public?

MR. NEIBURG:  Object to form.

Page 384

Kost - Confidential

A.    I think it would depend on the portfolio company.

Q.    Mr. Katzenstein ever tell you that he was concerned that certain of your communications with bankers suggested the companies were in a 363 sale?

A.    Not that I recall.

Q.    Ms. Tilton ever express her concern that certain of your communications with bankers suggested the companies were in a 363 sale?

A.    Ms. Tilton conveyed to me that she didn't like anybody to use the word "363" or "bankruptcy" within any context of the portfolio companies.

Q.    And did she explain why?

A.    Because she didn't want the negative perception in the market.

Q.    Okay.

A.    With respect to 363 or bankruptcy.

Q.    And did you agree with Ms. Tilton's view about characterizing

Page 385

Kost - Confidential

the portfolio companies as being in a 363 or bankruptcy and that that would have a negative affect in the market?

A.    I never characterized that the portfolio companies were in 363 or in bankruptcy, because they weren't.

Q.    Good.  But I'm asking if you agreed with Ms. Tilton's view that characterizing the portfolio companies as being in a 363 or bankruptcy could have a negative affect on their value in the market?

A.    So you're saying if I hypothetically did say it, which I wouldn't say it, would it be bad?

Q.    I am not asking you about anything that you did or didn't say.  I am asking if you agree that characterizing a company as being in a 363 or a bankruptcy could have a negative affect on their value in the market?

MR. NEIBURG:  Object to form.

A.    Just to clarify, we're not talking about the portfolio companies.

Kost - Confidential

This is a generic, if any company was in 363 or bankruptcy, would it have a negative impact, that's the question?

Q.    On its value in the market?

A.    Yes.

Q.    Yeah.  And why is that?

A.    There are certain buyers or interested buyers who prefer not to be involved with companies that are in bankruptcy or part of a 363 sale.

Q.    Is that the only reason?

A.    Again, it's just not good to be in 363 or bankruptcy.

Q.    When a company is in a 363 sale or a bankruptcy, isn't there generally an auction date set for the sale of that company?

MR. NEIBURG:  Object to form.

A.    I mean, by definition, a 363 sale is of a company in bankruptcy and the Court will set milestones and dates and deadlines, yes.

Q.    And when a deadline for the sale of a company is set, is it your view

Kost - Confidential

that that can affect the value of the sale price for that company?

A. Well, the company is already in bankruptcy, so it's just a deadline for a sale process within the context of a bankruptcy.

Q. Have you ever dealt with a company not in bankruptcy that's had a Court-imposed sale date placed upon it?

A. Not that I can recall.

Q. So having not ever experienced that, do you not have any view on what the effect would be on the value of the company to buyers if a company not in bankruptcy had a sale date imposed on it by a Court?

A. So a buyer -- so you're saying a buyer would have knowledge that a company -- because a company had a specific sell-by date, that that would impact the buyer's viewpoint as to what the value of the company is?

It's a possibility. The answer is possibly, yes.

Page 388

Kost - Confidential

Q.    Would you expect it would?

A.    I don't know.

Q.    Is that something that's been considered by debtors, whether imposing a sale deadline on the portfolio companies could reduce the value of those companies in a sale?

MR. NEIBURG:  Just caution the witness not to reveal privileged deliberations.

A.    I believe that our focus in our motion was to create a start date and not to create a deadline.  So I focused on creating the start date for the sale process.

Q.    How do you resolve disagreements between what your view as a representative of the CRO is of how the monetization process should continue and, say, Bardin Hill's view of how the monetization process should continue?

MR. NEIBURG:  Object to form.

A.    I work for Mike Katzenstein.

Q.    Yeah.

Page 389

Kost - Confidential

A.     Mike and I talk about this, these issues.  And Mike and I and Joe Farnan talk about them, and Joe Farnan ultimately makes the decision.

We don't necessarily involve Bardin Hill in these discussions or in our decision-making process.

Q.    Okay.  Is Bardin Hill, if it comes up with -- which it has -- its own timeline for sales and also decides to assert an end date for when sales should be completed, you have no views on that?

MR. NEIBURG:  Object to form.

A.     I didn't even -- I haven't even read the Bardin Hill filing.

MS. MALONEY:  Let's take a pause.  I think I'm done.  But if we can go off the record, I can make sure.

THE VIDEOGRAPHER:  Thank you. The time now is 6:09, we are going off the record.

(Off the record.)

THE VIDEOGRAPHER:  The time now

Page 390

Kost - Confidential

is 6:16, we are back on the record.

MS. MALONEY:  Thank you very much for your time today, Mr. Kost. And I am done for now, although I reserve if it's necessary to ask further questions on redirect.

THE WITNESS:  Thank you, Ms. Maloney.

EXAMINATION BY MR. HERSHEY:

Q.    Mr. Kost, I know we met before, but just for the record, Sam Hershey, White & Case on behalf of Mr. Farnan, the independent director.  Let me ask you a few questions.

Mr. Kost, what is your definition of a fire sale?

A.    A fire sale would be an M&A sale process that was conducted extremely quickly.

Q.    What is extremely quickly?

A.    In a rushed manner.

THE VIDEOGRAPHER:  I'm sorry, we have to start over.

(Off the record.)

Page 391

Kost - Confidential

THE VIDEOGRAPHER: And the time now is 6:18, we are back on the record.

Q. So Mr. Kost, one more time. Sam Hershey from White & Case on behalf of Mr. Farnan, the independent director. I am going to ask you a few follow-up questions.

Mr. Kost, what is your definition of a fire sale?

A. In the context of an M&A sale process, it's a process that's conducted much more quickly than a normal process, in a rushed manner.

Q. And in your opinion, in the context of this case, have the debtors ever proposed a fire sale for any of the portfolio companies?

A. No.

Q. And when you say no, does that include the sale procedures that the debtors are currently advocating?

A. That's correct.

Q. Okay. You were appointed as

Kost - Confidential

chief monetization officer in May 2018;
is that right?

A.    That's correct.

Q.    Okay.  And that was a Court-
ordered appointment?

A.    Yes.

Q.    And what did you understand
your mandate from the Court to be, if
anything?

A.    My mandate as the chief
monetization officer is as it sounds,
it's to monetize and sell the debtors'
investments in the portfolio companies.

Q.    And was it your understanding
that the Court intended there to be any
time constraints on this process?

A.    Yes.  We ultimately, pursuant
to the settlement agreement, we had 15
months or potentially 18 months to
monetize, hopefully, enough of the
portfolio company assets to repay the
creditors of the Zohars in full.

Q.    Were there any other
circumstances that you felt created a

Page 393

Kost - Confidential

time constraint on the process given the status of the portfolio companies, the Zohar funds?

A.   No, not with respect to the individual sale processes.

Q.   Okay.  In your experience, on average, how long does it take to get a company to market?

A.   Generally, an M&A sale process from start to finish, in a regular way manner, should be about four to six months.

Q.   Okay.  So from start to finish, just to break that up, so does that include getting it to market and selling it?

A.   In my opinion, it would be -- once you've retained the investment banker and started it, and you said go, to a close would be four to six months.

Q.   And is there like an intermediate step in terms of getting all the materials that the investment bankers need so they can present the companies to

Page 394

Kost - Confidential

potential buyers?

A.    There are numerous steps in between.

Q.    How long does it take to get from retaining an investment banker to that step, to presenting the company to potential buyers?

MS. MALONEY:  Objection.

A.    I would say generally four to six weeks for an investment banker to prepare the marketing materials to be in a position to start market outreach.

Q.    Okay.  And sitting here today, is there any reason you're aware of that would prevent the investment bankers that have been retained for these portfolio companies to bring those companies to market within that time frame?

A.    So obviously, that's a general time of four to six weeks.  I think that each of our processes would be a little bit different.

Some might be a little faster, some might be a little slower.  But

Kost - Confidential

that's a good ballpark time frame.

Q.    Roughly four to six weeks, give or take a week or two for each of the portfolio companies?

A.    That's right.

Q.    Okay.  Are you familiar with the management for each of the Group A portfolio companies?

A.    No.

Q.    Are you -- strike that.

Is there any reason you're aware of that management for any of the Group A portfolio companies would not be capable of conducting a sale process within the time frame you just described?

A.    A number of the portfolio companies have management teams that are -- do not include Ms. Tilton.

Ms. Tilton is the CEO for two of the portfolio companies.  The other teams, I would not require Ms. Tilton. They have their own management teams.

Q.    Right.  And based on your understanding of those teams, are they

Kost - Confidential

competent to conduct a sale process?

A.    So I haven't met all of the management teams, but we obviously have investment bankers who had worked directly with those management teams and could actually supplement and help the management teams as required to put together the marketing materials to be in a position to go to market.

Q.    Okay.  And are you familiar with the investment bankers that have been retained by the portfolio companies?

A.    Yes.

Q.    And is there any reason you can think of why they wouldn't be capable of conducting a sale process within the time frame that you described?

A.    No.  Generally within that process, time frame.

Q.    If we are trying to de-risk the sale process, should we try to sell the portfolio companies in the near term or in the far term, as a general rule?

MS. MALONEY:  Objection to form.

Kost - Confidential

A.     As a general rule, and in particular in this situation where we are in the business cycle, it is actually important in that we've had a bull market for a long time and none of these companies will do better if we have a recession or a downturn in the market, which I don't know when -- I don't have a crystal ball.  But obviously economic fundamentals, if they deteriorated, would harm most of these companies.

Q.     So getting more specific with the portfolio companies, based on what we know from experience, has waiting improved the sale price available to these portfolio companies or has it hurt the sale price available to the portfolio companies?

A.     It has generally hurt each of the portfolio companies to have waited as long as we did.

Q.     And do you feel that waiting has increased risk for these companies or decreased risk for these companies?

Kost - Confidential

A.    It's increased risk.

Q.    And is that true for MD?

A.    Yes.

Q.    Would you say it's also true for Stila?

A.    Stila has underperformed in 2019, so it has not been helpful to wait.

Q.    Okay.  Now, you testified that it is your view that Stila should be among the companies that should be sold first; is that correct?

A.    Sooner.

Q.    Sooner, yes.

You also testified that Stila is one of the companies where it would be helpful for Ms. Tilton to be involved in the sales process; is that right?

A.    Yes.

Q.    So to the extent that you believe Stila should be sold first and Ms. Tilton should be involved in the process, what do you think Ms. Tilton should do?

A.    I would like to see Ms. Tilton

Page 399

Kost - Confidential

prioritize her efforts with respect to the sale of MD and Stila and spend less time on the other portfolio companies.

MR. HERSHEY:  Give me just one second to discuss with my colleagues.

No further questions for now.  I reserve.

MS. MALONEY:  Do you have any questions?

MR. NEIBURG:  None for me.

MS. MALONEY:  I am going to need to go back, sorry.

BY MS. MALONEY (Continued):

Q.    Mr. Kost, you were asked earlier how long does it take, retaining the investment banker, to that step, to presenting the company to potential buyers; do you recall that?

A.    Yes.

Q.    And you testified that generally it takes four to six weeks for an investment banker to prepare the marketing materials to be in a position to start market outreach; do you recall

Page 400

Kost - Confidential

that?

A.    Yes.

Q.    Do you recall in April of 2018 being asked by Mr. Hoff at Cadwalader:

"So just so I am clear on this, what your testimony is, is that you're really not in any position to say what would be an appropriate time for any particular portfolio company to maximize long term values; correct?"

And you responded, "I discussed internally that it would take at least three months to get the process underway and to get -- I am not even sure you could get to a conclusion in three months.  Hence my internal discussion with my team has been that it's a minimum of three months and could have been, could easily 9 or 12 months."

Do you recall that testimony?

A.    No, but that doesn't even make any sense with respect to what we're talking about right now.

Q.    Well, we're talking about the

Kost - Confidential

timeline to launch a sale and your testimony was that it could be done in four to six weeks?

A.     Yes.

Q.     And is that consistent with your view of the amount of time it would take to launch a sale as you testified to Mr. Hoff back in April of 2014?

MR. NEIBURG:  Object to form.

A.     Well, I would have to go back and reread that testimony.  It doesn't sound like we're talking about apples and oranges there.

Q.     Well, you were also asked just now how long does it take -- strike that.

You were also asked just now, "So from start to finish, just to break that up, so does that include getting to market and selling it"?

And you responded, "In my opinion, it would be, once you retained the investment banker and started," and you said "go to a close, that would be four to six months."

Kost - Confidential

Do you recall your testimony from April 2018 where you said that taking a company to market would take 3 to 12 months?

MR. NEIBURG:  Object to form.

A.    No, I don't recall saying that.

Q.    Okay.  You were asked, "Did Ms. Tilton express her views with respect to the time frame to monetize the portfolio companies to maximize long-term values?"

"Yes.

"When you laughed when I used the word 'fire sale,' I believe she was not happy when I used that word either, and I should actually have stricken that, that verbiage from my use.  But no, she was -- I think we're generally on the same page with respect to the general time frame that a normal M&A process would take, and our plan would be to have independent investment bankers hired by each of the portfolio companies.  And that would be their job.  Their job would

Page 403

Kost - Confidential

be to make a proposal as to the best, you know, process and the timetable that that process would take.  So my comment to you of anywhere between 3 and 12 months is based on my general knowledge of running an M&A process and that's all the information that I've had to date to convey to my team or Ms. Tilton."

Does that refresh your recollection that in April of 2018, that you believed it would take three to 12 months to take a company from retention to sale?

MR. NEIBURG:  Object to form.

A.    I guess that's what I said in 2018.

Q.    And do you no longer have that view about the portfolio companies?

A.    So the question that Mr. Hershey asked me was a general M&A process.  And I think a general M&A process should or could take four to six months from start to finish.

Q.    But you now spent 20 months

Page 404

Kost - Confidential

working with these portfolio companies. So in terms of these portfolio companies, is your view that it should take six weeks to launch a sale and four to six months to complete the sale?

A.    I think we were talking and we still are talking a general M&A process.

Q.    I am not talking about a general M&A process.  I am talking about your prior testimony about the portfolio companies that you are the chief monetization for, and where you testified that it would take between three to nine months to maximize long-term values for the company.

A.    Okay.  I obviously must have said that.  I have not given any view as to the length of a sale process for each of the portfolio companies.  I didn't -- I haven't done that today.

Q.    You haven't done that analysis as to how long it would take to sell a particular portfolio company?

A.    That's correct.

Page 405

Kost - Confidential

Q.    You haven't reached any conclusions about whether a portfolio company can or cannot be sold within the next six months?

A.    No.

Q.    You have not reached any conclusions about whether a portfolio company can or cannot be sold within the next 12 months?

A.    I have not -- I haven't said anything about when a sale process would end for any of our portfolio companies.

MS. MALONEY:  Thank you.  That's enough.

THE WITNESS:  I've talked about the start date.

MR. NEIBURG:  Finish your answer, thank you.

MS. MALONEY:  That's fine, thank you.

THE VIDEOGRAPHER:  We are going off the record at 6:32 p.m. and this concludes today's testimony given by Robert Kost.  The total number of

**Page 406**

Kost - Confidential

media units used was six and will be retained by Veritext, New York.  Thank you.

(Time noted:  6:32 p.m.)

_____

Subscribed and sworn to before me this_____day of_____, 2020.

_____

Page 407

CERTIFICATION

I, DAWN MATERA, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 10th day of February, 2020.

_____
DAWN MATERA

Page 408

I N D E X

| Witness | Page |
|---|---|

Robert Kost

Examination by Ms. Maloney          9, 399

Examination by Mr. Hershey            390

E X H I B I T S

| Kost | Page |
|---|---|

Exhibit 1 Notice of Deposition        11

Exhibit 2 e-mail from Ms. Tilton to    67
          Mr. Katzenstein in March
          of 2019

Exhibit 3 e-mail                       78

Exhibit 4 CIM for Denali              100

Exhibit 5 E-mail                      106

Exhibit 6 Patriarch timeline 1404     141

Exhibit 7 short-form CIM              166

Exhibit 8 E-mail dated September 20,  177
          2018 from Mr. Farnan to
          Ms. Tilton

Exhibit 9 E-mail dated September 20,  179
          2018 from Mr. Kost to Ms.
          Tilton

**Page 409**

Exhibit 10 CIP for MD Helicopters          185

Exhibit 11 Project Maverick             194
            First-Round Bid Summary
            dated December 20th, 2018

Exhibit 12 E-mail from Azad re bid        199
            summary from American
            Securities

Exhibit 13 E-mail from Ms. Tilton         202
            dated 2/6/2019

Exhibit 14 Process update               203

Exhibit 15 E-mail chain among Moelis     213
            and Ms. Tilton

Exhibit 16 Process update for Project    216
            Maverick from Moelis

Exhibit 17 E-mail re Project Blue        257

Exhibit 18 Quality of earnings report    258
            dated September 26, 2018

Exhibit 19 Progress report for           259
            Universal

Exhibit 20 E-mail re KNS/Universal       264
            bid

Exhibit 21 E-mail produced by debtors    273
            dated December 2nd

Exhibit 22 E-mail from Mr. Kost to       274
            Mr. Dalton, December 4th

**Page 410**

Exhibit 23  E-mail from Mr. Kost dated    281
            December 6 re update
            request

Exhibit 24  Staffing reports June 2018    283
            through December of 2019

Exhibit 25  E-mail from Ms. Tilton on     296
            December 9 to
            Mr. Katzenstein and others

Exhibit 26  E-mail re Rand CIM,           310
            February 1, 2019

Exhibit 27  Updated CIM for Rand          311

Exhibit 28  E-mail including process      317
            update from PJ Solomon

Exhibit 29  Bid summary update from       318
            Rand

Exhibit 30  E-mail re second-round bid    321
            date for Rand McNally

Exhibit 31  E-mail dated July 18, 2019    323
            re WABCO IOI

Exhibit 32  Text messages between         333
            Ms. Tilton and Mr. Kost

Exhibit 33  CIM for Dura                  335

Exhibit 34  January 1, 2019 e-mail        342
            from Ms. Tilton to
            Mr. Katzenstein and Mr.

**Page 411**

Kost

Exhibit 35 February 17 e-mail to          346
Mr. Farnan and
Mr. Katzenstein re Dura
refinancing


                   *     *     *

Page 412

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC
CASE NAME:  In Re Zohar III Corp.
DATE OF DEPOSITION:  February 7, 2020
WITNESS'S NAME: ROBERT KOST

| PAGE/LINE(s)/ | CHANGE | REASON |
|---|---|---|
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |
| ____/_____/ | _____/ | _____ |

_____
ROBERT KOST

Subscribed and Sworn To
Before Me This_____Day
of_____, 2020.
_____
Notary Public
My Commission Expires_____

[& - 2018]                                                                                      Page 1

## &

**&** 3:4,17 4:3,11 8:6,9,14,18 15:7 46:16 223:9 312:16,17 390:13 391:6

## 1

**1** 11:9,11,15 175:13 269:7 310:7 311:22,23 317:10 318:5 342:6,11 408:11 410:10,23
**1.375** 195:23 196:11
**1.5** 147:24 149:4 149:12 196:7,18 196:22
**1.6** 196:5
**10** 109:9,13 185:6 248:8 279:8 285:14 288:3 295:19 297:22 298:9 367:12 371:4 409:1
**100** 159:18 242:21 242:23 308:13,17 330:12,15 358:11 358:22 359:5,8,15 408:16
**1000** 3:19
**10019** 4:13
**10020** 4:20
**10166-0193** 3:6
**10281** 4:5
**106** 185:9 408:17
**10:00** 331:20 370:13
**10:06** 2:4

**10:33** 274:25
**10th** 289:22 407:18
**11** 1:4 194:16,17 218:7 228:3 382:6 408:11 409:2
**11/5/2018** 185:15
**11:22** 84:20
**11:34** 84:24
**11th** 282:14
**12** 199:24,25 206:10 248:8 285:21 376:23 377:18 378:7,23 379:16,23 380:8 380:21 400:20 402:5 403:5,12 405:10 409:5
**12/20** 200:21
**121** 313:6
**122** 310:19,19
**1221** 4:19
**125** 318:6
**12:58** 165:15
**12th** 9:22 187:18 187:22 188:24
**13** 189:9,15 202:16 202:17 409:8
**14** 190:5,10 203:17 203:18 205:19 409:10
**1404** 141:22 408:18
**1405** 142:15
**1406** 142:12
**141** 408:18
**143** 323:25 327:25 328:5
**15** 40:4 42:18 43:2 78:25 113:6,22 114:2,19,25 115:4

115:10 185:10 190:14,19 213:11 213:12 250:3 251:3,16 252:2 329:9 392:19 409:11
**150** 308:21
**16** 190:23 191:4,8 216:10,11 409:13
**164** 61:21
**166** 408:19
**16th** 244:7
**17** 206:12 257:16 257:17 346:18,23 409:15 411:2
**170** 319:9
**175** 324:18
**177** 408:20
**179** 408:23
**17th** 244:8
**18** 19:25 38:25 90:19 91:15 181:3 258:17,18 323:18 323:21 392:20 409:16 410:18
**18-10512** 1:6 6:20
**180** 319:10
**1801** 3:12
**185** 409:1
**18th** 326:17
**19** 255:18 259:16 259:17 260:7 317:15,16 409:18
**194** 409:2
**19801** 3:19
**199** 409:5
**19th** 18:21
**1:35** 166:5
**1st** 145:8 224:6,16 285:6 310:11 316:20 317:5

## 2

**2** 67:8,9,14,22 79:7 85:2 165:17 265:17 318:4 319:12 408:12
**2/20** 288:24
**2/6/2019** 202:18 202:25 409:9
**20** 39:6 66:4,9 68:25 69:15 70:18 74:9 110:3 177:12 179:4 264:2,3 265:17 403:25 408:20,23 409:20
**200** 2:2 3:5 6:24 207:23 307:24 308:10 319:19
**2014** 401:9
**2018** 9:22 44:21 45:7 59:20 60:7 62:2 86:15,17 92:3 97:16 99:10 100:17,21 124:15 140:14 148:7,22 156:22 163:12 165:6 177:12 179:4,10 187:18 187:22 188:24 189:9,15 190:5,10 190:14 191:4,8,21 192:21 194:19,23 255:21 257:12 258:8,12,20,24 259:4 268:8 270:4 283:24 284:4 290:23 308:3,4,25 309:2 313:12 317:5,10 320:21 329:23 335:9,15 336:4 338:3 340:23 360:9

**[2018 - 4th]**                                                                 Page 2

362:7,8 363:4,6
377:11 378:13
392:2 400:4 402:3
403:11,17 408:21
408:24 409:4,17
410:4
**2019**  62:5 64:5
67:11,16 79:8,20
82:11,12 92:4,6,24
93:2 105:11,13
116:22 119:18
123:11 145:19
149:10 151:14
201:2,19 211:10
211:12,19,24
212:4 213:7
237:23 247:18
251:9 252:18
259:20 268:7
271:11 272:6,9
283:25 284:4,13
284:25 285:6
286:6 290:24
299:2 305:24
308:4,5,8 309:25
310:7,11 313:10
313:13 318:11,15
319:5 321:22
322:17 323:18,22
329:23 341:21
342:7,11 344:20
349:21 350:4,8,14
358:5 359:3,4
398:8 408:14
410:5,10,18,23
**202**  409:8
**2020**  1:10 2:3 6:4
117:10 123:12
145:8 224:6,16
230:22 254:12
298:25 299:19

305:25 373:19
406:10 407:19
412:4,23
**203**  409:10
**20th**  14:12,16
18:21 123:10
179:10 182:19,24
183:4 194:19,23
201:14,25 231:7
299:2 372:24
409:4
**21**  273:4,5 336:4
409:22
**212**  4:5,13
**212-819-7845**  4:20
**213**  409:11
**215**  280:14
**216**  409:13
**22**  274:18,19
276:18 409:24
**225**  307:24 319:20
320:3 369:4
**22nd**  318:10,13
**23**  200:14 281:12
281:13 410:1
**23rd**  201:2,19,24
202:6
**24**  24:12,17,21
283:22,23 284:12
410:4
**25**  296:12,13 328:2
410:6
**250**  4:12 159:18
**257**  409:15
**258**  409:16
**259**  409:18
**26**  258:19 310:5,6
409:17 410:9
**264**  409:20
**26th**  258:24

**27**  311:17,18
410:11
**273**  409:22
**274**  409:24
**28**  60:7 191:21
317:13,18 318:10
410:12
**281**  410:1
**283**  410:4
**28th**  318:12
**29**  231:24 232:15
233:11,13,20
318:24,25 410:14
**296**  410:6
**29th**  230:21 232:7
232:22 233:5,14
234:7
**2:55**  235:23
**2nd**  273:7,15,21
409:23

|  **3**  |
| --- |

**3**  78:20,21 166:7
195:7 216:24
235:25 259:22
319:17 402:4
403:5 408:15
**3/12/2018**  333:23
**3/15**  217:12
**3/16/2018**  333:25
**3/6**  217:2
**30**  25:17 119:11
321:13,14 410:16
**300**  217:19
**302**  3:20
**31**  285:6 298:25
299:19 323:16,17
373:19 410:18
**310**  410:9
**311**  410:11
**317**  410:12

**318**  410:14
**31st**  123:12 124:4
254:12
**32**  333:16,17
410:20
**321**  410:16
**323**  410:18
**33**  335:20,21
410:22
**333**  410:20
**335**  410:22
**34**  342:5,6 410:23
**342**  410:23
**346**  411:2
**35**  346:17,18 411:2
**363**  384:7,13,16,22
385:2,6,11,21
386:3,11,14,15,20
**390**  408:6
**399**  408:5
**3:02**  236:4

|  **4**  |
| --- |

**4**  100:8,9 195:14
198:12 206:4
236:6 260:7
272:13 274:24,24
275:14 285:14
408:16
**40**  259:25
**4200**  3:13
**45**  234:5 369:18
**4:10**  298:13
**4:23**  298:17
**4:51**  275:14
**4th**  272:6,8,24
274:21 279:20
280:13 282:13
286:6,11 289:25
290:13 293:4
311:15 316:20
318:18 409:25

**[5 - advisory]**

**5**

**5** 106:20,21 147:22 298:19 408:17
**50** 243:2 260:24 261:5 263:20 265:12
**504-6975** 4:5
**55th** 4:12
**571-6705** 3:20
**5777** 407:21
**5:22** 351:15
**5:30** 351:19
**5th** 186:12 231:9 289:6,25 293:4

**6**

**6** 141:21 147:18,24 149:6 281:14 351:21 408:18 410:2
**60** 234:5 297:10
**600** 211:2,4
**6021** 273:19
**6059** 276:17
**62.5** 67:22
**63** 24:12
**67** 408:12
**6:09** 389:22
**6:16** 390:2
**6:18** 391:3
**6:32** 405:23 406:5
**6th** 185:3 231:9 283:14 289:10 292:21 293:2

**7**

**7** 1:10 2:3 24:12 67:22 166:16,19 166:21 172:17 408:19 412:4
**70** 319:14

**700** 329:24
**72** 331:19
**75** 325:16
**76** 54:19
**78** 408:15
**7th** 6:4 107:6

**8**

**8** 177:10,11 182:10 182:12 408:20
**80** 67:22
**800** 147:18,24 149:7,15,17 195:18 207:20 210:19 211:3
**80202** 3:13
**83** 260:2
**836-8317** 4:13
**85** 271:15
**851** 217:14
**8:45** 13:19
**8th** 318:22

**9**

**9** 179:2,3 296:14 296:19 400:20 408:5,23 410:7
**90** 271:15

**a**

**a.m.** 2:4 6:4 274:25 371:5
**ability** 122:5,6,8 136:17 254:3 349:12
**able** 71:10,13 78:4 122:20 179:16 205:15 249:23 274:6 281:21 327:19 328:11
**absolutely** 70:4 293:20 325:4

**accelerate** 46:18
**accept** 80:24 246:14 328:5
**acceptable** 292:17
**access** 117:25 118:2 121:18 124:20 125:9 202:22 203:12,14 271:18 320:8 337:15,17 341:16
**accessing** 337:9
**accommodate** 306:10,18 307:2
**account** 160:8,15
**accounting** 173:8
**accounts** 127:21
**accuracy** 127:4,8
**accurate** 24:7 150:7 175:17
**acknowledgment** 232:14
**acquired** 98:23 217:19 325:25 326:9
**acquiring** 198:10
**acquisition** 142:13 142:19 162:7
**acquisitions** 99:6 124:12
**act** 237:19 345:20
**action** 2:8 7:8 9:19 28:7,11 45:21 208:20,22 344:17 344:19 407:14
**actions** 30:4
**activities** 124:10
**activity** 143:22
**actual** 39:2 169:25 246:21 278:3 288:22 343:20

**ad** 88:8,9,10,14 89:2,3 90:2,12 91:5,7,20 92:15,16 92:22 93:14,18 95:18 96:14 192:13,15,19 193:6,16,22 194:6 208:22 209:5 222:9
**add** 327:25
**addition** 20:18 51:24 250:16 277:22 336:25 357:14 360:8
**additional** 52:5 66:16 104:23 105:10 162:3 174:25 217:16 334:3 370:15
**address** 196:3 381:16
**addressed** 195:13
**adequate** 124:5
**adjective** 110:6
**adjusted** 126:19
**adjustments** 126:20
**administer** 7:7
**administered** 1:7
**administrative** 129:13
**advised** 118:5 152:16 237:8 303:22
**advising** 118:8
**advisor** 224:12 335:2,3
**advisors** 24:2 50:3 331:21 334:8,9
**advisory** 24:3 27:18 31:18,22

**[advocate - appears]**

advocate  76:25
  267:2
advocating  391:23
aegis  322:25
  325:12
aerospace  152:17
  153:4 169:7
  199:16,17
affairs  55:18
affect  354:13
  374:21 385:4,12
  385:22 387:2
affiliations  7:13
afternoon  166:2
  179:15 213:22
agencies  340:20
agency  339:2
agent  129:13
aggregate  217:18
ago  73:24 113:2
  122:2,11 200:16
  243:13 247:14
  305:3 367:12
agree  6:14 49:15
  56:7 73:12 75:8
  136:4,15 149:19
  149:22 180:15
  181:22 183:13,22
  184:2,4 208:13,16
  230:24 235:9
  294:3 295:7
  306:20 374:6
  379:13,20 380:3,5
  380:12,24 381:8
  382:2,4 384:24
  385:19
agreed  41:20
  84:12 102:18
  103:8,11,13
  141:12,16 143:24
  144:7 150:4 209:6

223:2,12 246:11
  250:25 295:6
  362:22 385:9
agreeing  144:8
agreement  29:13
  38:7 43:16,22
  49:25 68:20 74:4
  79:17 92:8 107:21
  108:8,10 119:22
  120:2,17,21
  154:20 187:2
  194:11 244:14,18
  244:24 245:7
  246:10 256:9
  309:6,13,15,19
  325:5 332:14
  335:12 354:24
  362:14 364:7,10
  364:12 367:25
  372:22 374:8
  392:19
agreements  21:13
  21:19 88:19 373:9
  373:18
ahead  171:25
  294:11,17 326:2
airbus  189:9,13,17
  189:18,21 190:2
  228:5
akin  153:7
al  1:5 6:18
alluding  45:6
alongside  126:13
  137:8 162:21
alternatives  69:20
amenable  344:12
american  190:18
  195:22 196:10
  198:7 200:2,8,9
  207:2,10 208:17
  214:7 219:18,25

409:6
americas  4:19
amount  63:13
  145:2 207:13
  233:22 306:16
  323:4 328:9 330:8
  336:16 401:7
analog  303:4
analyses  32:10,15
  32:20,24 33:7,12
  33:25 34:2 35:5
analysis  34:10,14
  34:17,19,20,23
  35:3,14,18 36:10
  36:18 211:23
  212:7,10,12,18
  213:6 233:25
  271:8 276:12,23
  277:2,19,25
  308:16,18 358:14
  404:22
anecdotally
  104:15
ankura  117:15
  129:8,14,15,17,21
  130:6 277:11,14
  277:14
announced  326:7
anonymize  52:19
  174:7
anonymizing  53:9
answer  10:20,22
  10:24 11:3,4 29:7
  37:14,17 38:23,25
  40:12,15 41:12,18
  43:17 50:3 91:22
  93:22 106:6
  109:17 116:12
  140:2,5 173:11
  205:12 209:10
  223:23 225:24

227:4 231:18
  232:8 234:18
  251:19 253:8,11
  253:22 268:22
  279:24 293:7,9,16
  293:16 295:14
  331:14 332:4
  340:16 345:11
  350:20 374:25
  375:11 387:24
  405:19
answered  101:14
  207:17 215:10
  290:11 293:6
answering  96:8
  115:23
answers  139:14
anthony  89:10
  121:9,16 144:10
anybody  137:22
  229:13 384:15
anymore  28:17
anyway  349:14
  368:3
apollo  217:12
  218:3,7,10,13,18
  218:18,24 219:5
  340:15
apparently  346:25
appear  120:24
  275:19,24 296:21
  342:15
appearance  7:16
appearances  7:13
  7:18
appearing  319:11
appears  79:16,23
  142:7 175:24
  180:10,17 195:8
  198:6 200:12
  275:6

**apples**  401:13
**applied**  46:6
  146:23 147:5
**appointed**  59:16
  391:25
**appointment**  21:6
  21:14 392:6
**apportion**  73:5
**appreciate**  171:12
  284:7 291:8
  293:10,14 349:11
**apprised**  156:12
  158:11,16 272:22
  331:7 346:13
**approached**  168:8
  168:11
**appropriate**  38:13
  230:25 232:22
  365:6 400:9
**approval**  11:21
**approve**  264:12
**approved**  66:25
**approximate**
  26:24 111:5
  156:23 159:14
**approximately**
  13:14 35:10 59:20
  60:10 61:21 79:21
  82:6 84:20,24
  86:15 98:7 110:16
  121:23 147:8
  156:20 159:18
  165:15 166:5
  168:10 169:22
  170:17 189:14
  236:4 242:21,23
  244:5 248:22
  255:21 257:11
  258:7,12 269:25
  271:15 298:13,17
  308:23 309:2

313:12 321:21
  335:6,15 349:21
  351:19 358:22
  359:5,7
**april**  9:22 59:20
  86:15 206:12
  318:10,12,18,21
  319:5 322:3 400:4
  401:9 402:3
  403:11
**area**  63:3 265:15
**areas**  106:10
  132:21
**arizona**  333:7,11
  333:12 334:4
**arnold**  4:11 8:18
**arnoldporter.com**
  4:15
**arrangement**
  246:11
**art**  197:15
**ascertain**  249:16
**asian**  141:8,13,17
  143:11 144:5,17
  263:24
**aside**  79:15
**asked**  10:21 17:11
  66:18,24 67:2
  94:3,19,25 111:16
  115:7,13 117:12
  117:19,21 118:19
  160:10 181:4
  225:20 226:4
  227:17 228:13
  229:23 230:2
  234:5 237:2
  252:14,23 253:3
  253:18 261:12
  273:20 284:23
  290:10 293:6
  300:19 345:7

367:19 399:15
  400:5 401:15,17
  402:8 403:21
**asking**  40:20,20,23
  42:22 46:3 79:9
  107:7 183:12,13
  223:15 230:12
  385:8,17,19
**aspect**  108:9
**aspects**  109:23
**aspirational**
  123:15
**assert**  389:12
**assess**  33:12,16
  81:18
**assessing**  347:4
**asset**  113:19 159:4
**assets**  19:21
  108:18 130:12,17
  130:21,25 132:9
  375:14 376:19
  392:22
**assetworks**  319:15
**assign**  160:14,18
  264:25
**assigned**  95:8
  160:7 271:13
  329:17
**assignment**  27:12
**assist**  112:13
  175:15
**assistant**  205:15
**assisted**  62:8
**assisting**  207:13
**associated**  239:4
  239:12
**associates**  9:13
  23:22,24 27:16
  28:25 285:5
**assume**  30:9 45:6
  53:6 101:3 138:12

224:7,9,13
**assumed**  124:2
  224:11
**assuming**  268:7
**atk**  153:3
**attached**  200:20
  203:7
**attachment**  14:6
  185:13
**attain**  307:6
**attempt**  52:12
  369:12
**attempted**  105:22
  129:2 209:24
  364:24
**attempting**  82:15
  82:20 99:11 228:7
**attempts**  247:5
**attend**  334:11,12
**attending**  7:11
**attention**  42:14,17
  42:24,25 213:18
  357:14,18
**attorney**  7:17 41:2
**attorneys**  3:4,18
  4:4,11,18
**auburn**  338:2
  341:6
**auction**  75:20
  386:17
**audibly**  10:22
**audio**  6:11,12
**audit**  81:2
**audited**  113:21,24
  125:16,20 129:4
  381:6,11,14,18
  383:12,23
**auditor**  80:18 81:6
  173:5
**auditors**  172:25

**[august - bankers]**                                                                                                            Page 6

**august**  336:4,15
  338:3 340:23
**authorized**  7:6
**auto**  134:23
**automatic**  382:25
**automation**
  264:15
**automotive**  36:8
  351:24
**available**  179:18
  181:9,10,11
  211:14 397:16,18
**avenue**  2:2 3:5
  4:19 6:24
**average**  393:8
**aviation**  162:17,25
**avitabile**  89:11
**avl**  278:9
**avoid**  349:9
  350:13
**award**  343:22
  344:13 348:5
**aware**  17:25 18:3
  18:12 30:23 35:4
  47:11 50:25 60:16
  77:14 91:10,25
  92:7 117:7 144:22
  153:12 157:16,21
  158:2 159:9,13,21
  161:25 162:4
  187:15,20 188:21
  189:7,11 190:3,7
  190:12,16,21,25
  191:6,18 214:20
  214:23 227:19
  229:12 235:10
  240:10 254:14,16
  254:19 260:16
  261:16 272:10
  278:22 289:15
  295:19 329:25

330:8,25 338:19
  338:25 339:20
  348:2 353:13,25
  357:17 365:18,24
  366:25 369:5,8,15
  394:15 395:13
**azad**  153:21 154:7
  154:8 155:7,9,16
  155:21,22 156:2,9
  156:11 160:25
  197:4 200:2,5,12
  201:17 202:2
  203:2,3 213:20
  225:13 226:8
  227:5,14,16 230:2
  230:11 409:5
**azad's**  229:21

**b**

**b**  8:21 54:4 189:14
  212:25 365:21
  366:22 408:9
**back**  25:5 29:25
  37:22 39:11,16
  63:14,16 66:19,25
  67:3,18 68:3,14
  69:9 70:18 71:6
  71:16,25 72:5,21
  72:25 73:6,13
  74:24 75:6 78:3
  79:7,10,17 82:4
  83:9,13,18,24
  84:25 99:18 105:5
  105:18 124:15
  132:14 141:24
  142:3 148:7 162:6
  166:6 172:17
  176:16 182:11
  194:25 198:6,14
  201:15,18 205:10
  205:17 211:6
  218:6 236:5 249:5

250:7 267:4
  271:10 292:11,13
  294:18,24 298:17
  316:15 323:12,13
  325:19 326:13
  327:17 328:2,7
  335:8 337:18
  351:12,19 360:8
  362:6 363:3
  367:22 377:11
  390:2 391:3
  399:13 401:9,11
**background**  23:14
  157:9
**backup**  340:21
**bad**  98:11 385:16
**badakhsh**  153:21
**bagby**  4:6 8:13,13
**bain**  340:9
**balance**  107:20,23
  108:7 278:10
**balancing**  345:20
**ball**  397:10
**ballpark**  395:2
**bank**  347:23
**banker**  16:20 17:7
  21:5 24:7 25:18
  26:16,20 27:3
  30:25 31:5 43:10
  45:4,12 56:9 57:8
  57:10 59:15 64:17
  70:21 86:6,11
  97:10 119:10
  121:6 123:17
  124:3,24 126:7,23
  127:9 132:15,20
  139:20 142:9
  144:16 149:22
  153:16,17 175:15
  177:6 179:20,24
  180:3,7,8 182:16

182:22 183:3
  193:25 237:20
  239:14,19 244:2,6
  244:11,15,18
  245:13,17 248:11
  248:14,15 253:7
  254:25 255:6
  256:2 269:14
  270:2,7 291:17
  295:16 303:16
  315:14,21 331:11
  338:12 357:7
  361:22 362:2,9
  364:8,13,16,23,25
  365:2,24 367:3,10
  367:14,16,18,20
  368:5,13,16,20
  393:20 394:6,11
  399:17,23 401:23
**banker's**  70:8
  73:18 75:21 368:6
**bankers**  16:9,13
  18:2 20:3,8,21
  21:2 33:17,23
  56:2,4,16 57:2,6
  59:3,15 71:22
  97:24 101:3
  104:16 119:14
  123:5,8 126:4,14
  126:15 137:3,8
  138:2,7 139:13
  144:13 167:23
  171:7 177:19,21
  178:8 180:14
  181:6,9,20,24
  182:4 183:17
  184:9,15 186:2
  201:10 225:18
  227:16 230:3,12
  241:17 252:15,24
  253:3 265:23

**[bankers - bidders]** Page 7

266:11,13,15,18
272:16 291:5
300:6 302:2,8,16
302:17 305:7
334:3 337:14
342:14 364:14
368:10 384:6,12
393:24 394:16
396:5,12 402:23
**banking** 25:22
26:3 45:18 46:5
374:18,18
**bankruptcy** 1:3
6:19 26:7,11,17,21
27:4,6,14 28:17
43:24 46:5 60:23
65:18,23 105:23
106:15 107:8
214:24 215:14
328:24 329:4
330:17 331:8,12
333:4,23 336:24
349:13 351:5
354:15 355:4,5,8
355:13,25 356:8
357:10 374:16
382:12,23 383:11
384:16,23 385:3,7
385:11,21 386:3
386:11,14,16,21
387:5,7,9,16
**banks** 21:10
347:15
**bar** 269:23
**bardin** 87:18 88:2
88:12 89:22 92:3
161:18,19 372:21
372:25 373:3,7,15
373:16 388:21
389:7,9,16

**barriers** 141:2,2
**base** 277:18
**based** 24:6 79:16
80:4 120:25
123:16 136:5,9
145:15,17 146:22
148:12,14 173:24
196:24 208:11
211:22 221:19,23
233:6,16 234:22
243:7 244:23
245:12 250:13
256:13 265:8
270:16 296:8
309:18 314:25
361:7 376:8,13
378:20 395:24
397:14 403:6
**basically** 320:17
**basis** 56:20 90:3
102:8,16 112:8
163:6 175:23
196:9 201:21
223:6 230:5
236:13 240:2
277:21 289:17
290:25
**bates** 142:11,14
273:18 276:17
**battery** 348:6,22
**bazemore** 18:3,13
362:3
**bear** 119:5
**becoming** 99:3
110:12,21 154:16
157:8 369:25
**began** 56:21 59:24
**beginning** 7:16
27:22 28:2 85:2
166:7 236:6
291:11 298:18

351:20 378:12
**begun** 121:13
**behalf** 8:7,9,18
15:8 238:21
390:13 391:6
**behavior** 67:24
**belief** 135:18
145:14,15,17
175:9 267:17
376:14
**believe** 16:22
18:23 92:16 96:16
99:8 120:19
129:12 135:19
144:4,21 154:24
165:7 169:4 170:9
174:18,22 177:16
188:16,17 192:2
215:20 219:12
225:23 243:16
247:9 257:2
262:13,25 264:8,9
265:9 270:24
272:25 307:11
312:21 314:3,11
316:16,23 317:2
325:11 326:5
338:8 339:9
369:17 388:12
398:21 402:15
**believed** 36:6
251:19 378:21
403:12
**bell** 339:25
**bend** 352:24
**benefit** 148:5
**berger** 303:19
304:15
**best** 54:2 70:20
84:5 102:18
141:14 143:12,15

144:3,6,12 175:10
227:15 313:18
359:6 374:7 403:2
**beth** 3:7 7:21 9:7
78:24
**better** 73:19,22
78:8 208:7 221:3
269:13 276:19
375:13 397:7
**beyond** 117:8
380:8
**bid** 66:4,11 68:5
68:25 69:14 70:19
73:2,15,19,22 74:9
75:5,7 78:4,6,9
79:24,25 80:5,6
82:17 98:9 135:5
135:7,12 194:18
194:22 195:6,9,12
196:10,12 198:19
200:2,7,10,18,20
201:24 206:3,11
206:15 207:8,20
207:24 208:4,5,10
208:14 209:25
210:13,19 217:9
219:11 228:2
264:4 273:23
279:3 292:17
318:22,25 321:15
321:19,20 322:8
327:2,10 328:6
330:3 409:3,5,21
410:14,16
**bidder** 64:3,7 71:7
73:14 75:5 76:12
76:16,18,21 77:12
77:17 265:18
266:5 297:9
**bidders** 70:3,5
71:6,16,25 72:25

74:25 75:6,13 78:3 79:18 104:5 104:23 105:3 175:2,16 211:5 212:2 218:8 225:8 225:11 228:14,22 228:23 229:3,7 265:24 322:16 327:23

**bidding** 225:8 228:15 229:8

**bids** 65:24 66:20 67:4,19 68:4 79:11 105:10 176:21 197:2,5,7 201:4,20 207:11 208:6,18 226:20 229:18 260:15 280:4 318:9 319:8 322:6 328:3

**bifurcated** 63:9

**big** 52:14 85:23 86:4 220:14

**bigger** 356:15,16

**billion** 147:22,24 149:4,13 195:23 196:5,7,11,18,22

**bills** 32:4

**binder** 284:10

**binders** 13:25

**binds** 73:21

**bit** 16:3 23:8 53:11 83:24 141:4 278:12 320:19 337:13,19 365:20 368:25 394:23

**biweekly** 51:2

**blackrock** 340:11

**blackstone** 191:7 191:10

**blagnac** 189:13

**block** 37:20

**blood** 407:14

**blue** 257:18 258:3 340:5 409:15

**board** 87:4,9,11 87:20,21 91:5,7,17 91:20 92:16 93:15 224:23 370:18,21 370:24 371:14,20 371:22 372:3,5,7 372:11 374:4

**boeing** 157:22

**borrowing** 277:18

**bottom** 107:3 160:22 214:19 285:22 342:13

**bought** 157:11 269:21

**bowstring** 364:20 364:21

**branch** 24:18

**brand** 320:10

**break** 78:25 84:18 165:10 298:6 351:11 393:15 401:18

**breakfast** 13:5,8 13:18

**breaks** 259:22

**brian** 4:14 8:17

**brian.lohan** 4:15

**bring** 216:7 250:12 291:12 394:18

**bringing** 119:5

**broad** 24:6

**broke** 204:5

**broken** 293:24 295:4

**brought** 27:15 42:8,14,16,24,25

**bucket** 264:24 265:3

**budget** 247:16 305:25

**building** 62:24 128:23 311:11

**buildings** 130:11

**builds** 364:2

**bull** 397:5

**bullish** 327:2

**bumped** 225:18 226:3,10 227:16

**bumping** 229:22

**bunch** 218:4

**bureaucratic** 141:5

**busbar** 269:24

**business** 23:18 24:3 54:13 55:17 66:8 85:15,23,24 97:4 98:6,14,22 109:25 145:20 174:11 175:6,7,13 199:13 207:18 214:14 236:8 243:6 263:15 269:12 302:25 303:4,7 320:25 321:3,5,11 324:2 348:6,12,23 352:19 357:16 359:23 363:14,19 363:23 365:10 397:4

**businesses** 65:11 86:4,5 97:5 98:24 217:19 218:4,13 269:17 303:3,9 321:9

**busy** 205:9 371:7

**buy** 218:3 234:25 321:11

**buyer** 53:10,12 54:6,7 56:19 69:8 69:16 71:12 77:2 77:8,21,23 97:3,25 99:12,23 108:13 109:8 123:18 132:22 133:6,11 134:4 139:9,15 140:4,17,18,20 141:13,14 143:11 143:12 144:5,6 145:7 158:21 175:12 191:11 221:11 224:6,15 264:23 265:6,6,8 278:6 301:23 355:2 358:2 380:15 381:15,19 387:18,19

**buyer's** 76:25 135:4,6 168:4 387:22

**buyers** 53:7 59:5,7 59:11 63:4,5,24 64:12,15 65:19,24 80:24 81:4 96:22 96:24 97:18 98:8 102:11 139:5 140:24 141:4,8,9 141:18 167:11,14 167:19 168:7,15 168:15,16 170:12 171:2,8 172:6 187:12,13 189:20 189:22 191:16 192:23 193:15,22 226:2,17 227:6,7 228:9 259:22,23

**[buyers - chat]** Page 9

259:25 260:2
263:24 264:13,17
265:19 318:6
338:6,13 381:17
386:8,9 387:15
394:2,8 399:19
**buying** 108:13,16
172:7
**buys** 354:25

**c**

**c** 1:2 3:2 4:2,8 5:2
189:14 191:3
**cab** 303:15
**cadwalader** 4:3
8:14 400:5
**cafe** 13:9
**calculate** 32:11
**calculated** 32:25
**calculating** 262:17
**calender** 206:5,6,9
**california** 3:12
243:7 367:16,17
**call** 37:3 92:11
107:9,19 146:16
151:2,7 155:8,11
155:13,23 201:16
205:7,9,10,13,14
214:2 220:17
266:17 279:5
303:11 305:9
324:18 325:16
331:20,22 352:23
367:19 368:3
370:18 371:3
**called** 18:22 53:22
53:24 122:3
164:17 167:22
168:15 173:20
212:13 325:22
326:12 364:20

**calls** 51:2 89:14
142:25 156:5
181:5 204:2,3,6,9
204:22 205:4
247:13 370:12,16
**canceled** 371:6
**candidate** 141:19
144:18
**capable** 395:15
396:16
**capacity** 12:12
23:2 295:15
334:25
**capital** 23:25
276:12,22 277:3,9
277:19,23 278:4,5
347:11,24
**captive** 163:9
**care** 110:9,10
**carlyle** 190:13
191:13 198:8
206:25 207:11,24
208:18 213:24
214:5,7 217:2,9
219:18,25
**carolyn** 5:5 8:4
**carry** 38:20
**case** 1:5 4:17 6:20
8:9 15:7 46:16
124:9 126:11
129:11 138:12,12
147:3 151:16
163:5,25 174:18
223:10 264:14
336:23 383:4
390:13 391:6,17
412:4
**cases** 12:14,16
27:23 28:3 140:9
376:22 377:16

**cash** 146:13,20
350:12
**catch** 143:5
**category** 285:16
**cause** 140:11
380:25
**caused** 60:16
257:25
**caution** 29:6 37:11
40:6 47:5 49:19
90:23 106:5
109:15 223:18
224:18 232:17
279:21 282:25
283:15 286:15
288:14 291:14
295:11 297:11
299:9 300:15
330:18 345:3
350:19 375:7
388:9
**cautionary** 91:21
**cavalieri** 89:17
**cell** 6:9
**cellular** 6:7
**center** 4:4
**centro** 13:9
**ceo** 55:3,6,7,8,8
138:21,22,23
139:5 140:7 157:3
218:25 241:15,21
341:14 352:12
395:20
**certain** 35:20
52:17 63:13 65:19
167:10 361:6
373:10 384:5,11
386:8
**certainly** 287:16
**certification** 407:2

**certify** 407:6,12
**cfius** 141:9 263:25
264:6,8 265:3,9
267:13
**cfo** 127:15
**chagrin** 257:25
**chain** 141:25
213:12 409:11
**challenges** 78:5
**challenging** 143:3
**chancery** 369:5
**change** 147:25
150:2 273:17
304:19 348:17,21
349:4 359:14
412:6
**changed** 77:9
90:18 91:17
358:16
**changes** 58:2
151:4 316:3,5,13
316:22 317:8
348:23
**changing** 234:18
**chapter** 1:4 382:6
**characterization**
183:23 208:11
**characterize** 19:4
**characterized**
24:4 385:5
**characterizing**
384:25 385:10,20
**charles** 4:23 8:11
**charlie** 14:25 15:3
**chart** 198:12
**chat** 167:25 169:5
170:5,17 187:16
188:22 189:8,12
191:19 274:2
278:17

chats  167:22
  168:24 169:11,17
  169:23 170:8
  186:19 338:6,10
chatting  274:2
check  122:3 271:5
checked  275:12
chief  12:13 19:2,5
  19:6,14,18 20:23
  21:6,14,20 22:15
  22:24 23:2 27:17
  28:24 29:14 31:15
  31:24 50:8 86:8
  86:18 92:9 112:12
  129:7 139:2 158:9
  300:9 331:5
  369:25 374:11
  392:2,11 404:12
china  263:21
  265:13,14 267:19
chinese  141:8
  263:24
choice  364:19
  368:14
choices  21:4
choose  81:4
chose  64:23,25
chris  245:21 247:4
  248:17,19 249:8
  249:15,21
chunk  85:23,24
cim  99:25 100:9
  100:12,13,16,23
  100:24,25 101:5,7
  101:11 104:13,17
  104:18,20,22
  105:2 138:15,20
  138:24 139:6
  164:14 166:11,13
  166:16,20,23
  167:7,20 169:4

194:24,24 195:4
  221:7,9,13 239:10
  239:13,15 242:3,6
  256:17,22 257:5,8
  257:9,10 258:6
  259:10 305:22
  306:4 309:23
  310:7,10,18,19
  311:16,18,22,24
  313:14,23 314:7
  314:13,17,23
  315:17 316:13,17
  316:21,24 317:4
  317:10 335:10,18
  335:21 336:4,11
  336:14,17,21,25
  408:16,19 410:9
  410:11,22
cims  100:19
  164:12,20 241:20
  312:5,8 316:19
cip  164:24 165:4
  172:19 185:3,6,9
  185:10,14,17
  186:6,9,20,22
  187:4 205:21
  409:1
cips  164:18,20
  185:22,24 186:4
circumstance
  75:11
circumstances
  46:7 94:21 109:12
  110:12 138:8
  157:7 263:11
  266:3 392:25
cited  217:15
city  179:13
ckoster  4:23
clarification  53:4

clarify  12:6 33:20
  80:16 92:20 94:17
  94:22 129:23
  209:9 228:17
  305:8 334:24
  380:10 385:24
class  4:12 8:19
clear  52:17 82:24
  95:21 149:25
  150:10 213:23
  280:7 292:16
  331:13 333:14
  382:13,19 400:6
clearer  320:23
clearly  207:11
client  41:2 153:4
clock  282:9,10
close  168:22 206:6
  232:23 233:3,5,11
  233:12,14,19
  234:6 254:4 301:6
  354:15 393:21
  401:24
closed  99:20
closer  149:4,6
  158:20 201:13
closing  230:17
  232:15 302:6
cmo  56:13 59:17
  59:23 154:16,20
  163:19 256:5
  332:18 335:4
cms  236:13
coincident  209:18
collateral  131:6
colleague  7:25
  8:11,16 273:10
colleagues  89:13
  89:16 399:6
collected  130:7

collection  103:3
collectively  102:17
  102:21 103:2
color  110:2,6
  144:16 273:25
colorado  3:13
colors  314:17
column  286:2
come  13:24 36:24
  37:9 70:18 163:3
  176:15 211:6,14
  231:24 275:6
  279:13 281:18
  299:16 323:12,13
  327:5,8 336:14
comes  37:15
  389:10
comfort  108:21
  348:4,9,15,19
comfortable
  197:20 326:15
coming  37:7 94:7
  194:8 234:2 327:2
  334:4
commence  92:23
commenced  43:19
  97:16 163:11
commencement
  376:21 377:15
commences  99:12
comment  291:21
  291:24 311:21
  403:4
commenting
  104:16
comments  58:14
  176:15 185:22,24
  186:5,8 196:24
  231:4 311:23
  312:2,4,12 314:20

**commercially**
21:25 22:8,21
120:25 244:24
245:12 256:14
270:17 309:20
**commiserated**
16:22
**commission**
412:25
**committee**  87:8,12
88:6,8,10,11,15
89:2,3,9,22 90:2
92:17,23 93:15,19
95:18,24 96:15
192:14,15,20
193:2,6,16,17,23
194:6 208:23
209:6,17,21 217:3
222:9 264:9
**committees**  90:13
**common**  101:20
101:22
**communicate**
172:8 370:2
**communicated**
77:20 123:17
170:25 245:23
274:11
**communication**
142:23 210:11
235:13 297:13
300:6 304:14
**communications**
29:10 47:10 87:7
91:4,6,10,14,16,19
93:5 95:2 106:8
109:16,19 122:10
155:15,25 193:15
223:20 224:20
232:19 246:2
271:21,25 279:23

283:3,17 286:17
287:22 291:16
294:15 295:13
297:17 299:10
300:17 330:20
331:11 370:7,11
384:6,12
**companies**   16:12
17:5 19:10 20:5
20:10,14 26:13,16
26:20 27:2,3,4
33:6,10,19 34:25
35:20,23 36:3,5,21
38:5 39:10 46:11
46:25 51:7,11,17
51:20 52:20 54:24
55:4,12,21,25 59:2
85:5 93:11,20
94:9 95:4,9
101:13,23 102:3
102:12 103:14,17
103:22 111:2,20
111:23 112:15,23
114:2 115:15
119:15 130:2,5,22
131:2 133:9,11
134:6,9 135:24
136:11,18 137:4
137:10 158:13,17
161:11 169:8
172:22 176:10,10
176:25 180:12
181:21 183:18
184:10,21 201:11
204:20 212:20,23
213:2 217:17
229:23 230:16
239:11 241:14
243:17 253:20,24
254:9 269:8
270:22 279:14

301:2 307:9
320:11 328:21
340:14 352:16
358:15 361:7,15
369:3 371:24
372:10,14 373:5
373:11,20 374:9
376:4,24 377:4
378:8,15,22 379:5
379:7,15,25
381:23 382:17,24
383:5,10,12 384:7
384:13,17 385:2,6
385:10,25 386:10
388:6,7 391:19
392:14 393:3,25
394:18,18 395:5,9
395:14,18,21
396:13,23 397:7
397:12,14,17,19
397:21,24,25
398:11,16 399:4
402:11,24 403:19
404:2,3,12,20
405:13
**company**   16:21
24:24 25:3,14
36:15 39:3 43:15
43:21 47:4 52:13
52:18 53:9,25
54:11 58:23 62:20
94:13 95:10 99:3
99:7 102:16,16,19
104:3 108:16
110:3,6,8,13,17,21
110:23 112:20
114:22 118:5,9,11
118:14,17,21,23
126:17 127:5
128:10,15 131:8
132:18 133:7,18

135:20 139:4,7,17
140:12 143:7
145:13 152:16
153:4 157:8
162:18 173:9
174:15 176:3,17
176:21,22 180:7
198:10 212:3
214:21 220:16
230:18 236:15,19
236:22 237:8
238:21 239:8,16
240:6 241:22
246:14 247:25
267:23 268:11,16
268:19 269:5
275:21 298:7,21
303:23 304:3,6
306:11,25 309:16
310:11,22 315:13
326:9 328:19
329:3 356:9,14
357:11 359:25
360:7 361:3
362:16 363:7,9,16
363:19,25 364:20
365:18,22 366:12
366:23 372:3
376:10,15 379:17
380:8,20 381:6,13
382:7,8,11 383:22
384:3 385:20
386:2,15,18,21,25
387:3,4,9,15,15,20
387:20,23 392:22
393:9 394:7
399:18 400:10
402:4 403:13
404:16,24 405:4,9
**company's**  56:25
124:20 127:18,21

**[company's - confidential]**

128:6 132:25
189:3,4 240:23
266:2 312:22
**comparables**
146:19
**compare** 34:6
316:16
**compared** 34:5
363:25
**comparing** 33:25
**compensation**
285:4,15,19
**competent** 396:2
**competing** 11:21
70:3 73:2 75:7
**competitor** 320:18
325:22
**competitors** 64:21
168:19 174:6
175:25
**complete** 234:24
241:6 404:6
**completed** 194:25
195:3,5 205:22
233:22,23,24
234:9,17,21 235:5
235:8 296:10
307:15 324:19
389:13
**completely** 76:23
**completing** 125:5
**complicated**
310:22,23
**complications**
62:14,17
**component** 199:19
**conaway** 3:17 8:6
46:16 109:22
223:9 291:20
296:3 370:14

**concern** 22:19
351:4 384:11
**concerned** 78:13
205:5 274:14,15
343:19 374:12
384:5
**concerns** 21:3
30:17 43:2 107:9
108:5,12 120:22
193:20 198:21
214:16 244:20
256:11 270:14
279:3 309:11
**concludes** 405:24
**conclusion** 71:3
114:5 400:16
**conclusions** 405:3
405:8
**concurred** 368:11
**condition** 218:24
**conditions** 219:5
**conduct** 119:12
132:17 219:14
365:16 396:2
**conducted** 62:7
80:9 96:18 186:20
211:23 390:19
391:13
**conducting** 194:3
395:15 396:17
**conference** 155:8
155:11 240:20
**conferences**
176:24 177:2
**confidence** 50:20
**confident** 292:8
**confidential** 6:1
7:1 8:1 9:1 10:1
11:1 12:1 13:1
14:1 15:1 16:1
17:1 18:1 19:1

20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1,15
58:17,21 59:1,5
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1 83:1
84:1 85:1 86:1
87:1 88:1 89:1
90:1 91:1 92:1
93:1 94:1,15 95:1
96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1,13,21 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1

140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1,4,10,13,17
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
191:24 192:1
193:1 194:1 195:1
196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1
205:1 206:1 207:1
208:1 209:1 210:1
211:1 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1 222:1
223:1 224:1 225:1
226:1 227:1 228:1
229:1 230:1 231:1
232:1 233:1 234:1
235:1 236:1 237:1
238:1 239:1 240:1
241:1,7,13 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:1 253:1 254:1
255:1 256:1 257:1

258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1 267:1 268:1 269:1 270:1 271:1 272:1 273:1 274:1 275:1 276:1 277:1 278:1 279:1 280:1 281:1 282:1 283:1 284:1 285:1 286:1 287:1 288:1 289:1 290:1 291:1 292:1 293:1 294:1 295:1 296:1 297:1 298:1 299:1 300:1 301:1 302:1 303:1 304:1 305:1 306:1 307:1 308:1 309:1 310:1 311:1 312:1 313:1 314:1 315:1 316:1 317:1 318:1 319:1 320:1 321:1 322:1 323:1 324:1 325:1 326:1 327:1 328:1 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:1 337:1 338:1 339:1 340:1 341:1 342:1 343:1 344:1 345:1 346:1 347:1 348:1 349:1 350:1 351:1 352:1 353:1 354:1 355:1 356:1 357:1 358:1 359:1 360:1 361:1 362:1 363:1 364:1 365:1 366:1 367:1 368:1 369:1 370:1 371:1 372:1 373:1 374:1 375:1 376:1 377:1 378:1 379:1 380:1

381:1 382:1 383:1 383:13 384:1 385:1 386:1 387:1 388:1 389:1 390:1 391:1 392:1 393:1 394:1 395:1 396:1 397:1 398:1 399:1 400:1 401:1 402:1 403:1 404:1 405:1 406:1

**confidentiality** 187:2

**confirm** 200:19 215:4

**confirmatory** 234:2

**confirmed** 292:21

**confusing** 123:20 257:20

**confusion** 231:20

**connected** 303:11 303:12

**connection** 9:18 11:20 23:7 26:2 28:7 30:3 56:13 118:6,9 152:17 202:23 203:13 237:10 271:16 338:14,21 339:3 339:21 348:5,11 357:19

**conor** 151:8

**consider** 126:7

**considerable** 80:9

**consideration** 139:11 356:21 358:6

**considerations** 356:20

**considered** 30:24 31:4 126:15 152:6

197:7,8 262:10,16 264:21,23 343:21 354:20 355:10 376:22 388:5

**considering** 265:23 339:10

**consistent** 44:7 401:6

**constraint** 393:2

**constraints** 392:17

**consulting** 29:2 32:11,15,25

**consumer** 62:19 62:20

**contact** 20:2,7 59:24 86:19 87:15 87:17 156:9 197:3 202:2

**contacted** 61:20 76:19 171:14 259:25 318:7

**contain** 259:3

**contemplated** 270:24 352:6

**contemporaneous** 192:9

**content** 122:13 279:22 283:16 287:21 291:15 294:15 295:12 297:16

**contents** 17:21 18:6 186:6 297:2 375:8

**context** 27:9 223:22 374:20 384:16 387:6 391:12,17

**contingent** 108:2,4 134:2

**continue** 6:13 48:21 49:7 68:17 69:3 73:25 74:14 74:18,22 83:13 270:25 285:8 316:2 345:16 346:9 388:20,22

**continued** 4:2 5:2 48:7 166:8 271:24 323:6 399:14

**continuing** 51:6 76:8 78:14 296:7

**continuously** 151:15

**contract** 343:16 343:22 344:13 345:19,21 347:10 347:20 349:4

**contrary** 251:13

**control** 348:17,21 349:5

**controlling** 4:12 8:19 334:9

**convention** 54:12

**conversation** 103:9 121:23 122:14 176:6 225:13 249:7 252:10 345:13

**conversations** 6:7 44:6,10 49:21 71:22 90:11,16,21 90:25 92:10 95:23 96:2 102:25 121:14 193:5,10 229:21 233:7 234:23 246:4,19 247:4 248:19,23 249:15,20 261:13 272:14,15,19,22 295:17 351:7

**[convey - customers]** Page 14

convey   314:12
348:20 403:9
conveyed   46:20
48:10,12,19 171:7
183:24 222:9
280:19 296:2
345:14 378:19
384:14
copies   14:7
copper   269:15
copy   100:6 155:20
185:5 200:18
copying   343:2
corp   1:5 8:15
412:4
corporate   25:22
26:4
corporation   6:18
25:10 94:18 199:6
199:7,11
correct   10:8 12:20
15:16,24,25 22:23
25:11,14,18,23
32:16 38:8 44:4
47:20 50:18 51:9
54:20 55:9,10,13
56:11 57:20 59:12
59:13 60:13 63:24
64:8 69:19 72:10
74:5,17 78:11
79:18 85:13 96:11
96:23 104:9
106:15 109:10
112:3 113:9
119:18 140:8
157:3 161:23,24
164:16 166:15,22
168:17 172:11,23
180:4 191:12,14
193:9 196:5,8
197:5 205:24

212:21,24 213:9
215:9 218:9
220:20 241:23,24
243:25 246:17,23
255:22 259:13
262:8,15,20
267:12 269:6,10
275:21 276:2
283:14 289:2,3,9
289:14 290:3
298:21 303:21
306:7,13 309:3
312:7 317:11
318:17 322:2
328:24 329:10
334:2 346:14
362:12 369:19
380:17 391:24
392:4 398:12
400:11 404:25
cosmetic   119:4
cosmetics   110:2,6
110:7 118:5,10,13
118:16 144:16
cost   239:12
counsel   7:10 10:8
10:10,25 11:2
12:25 13:25 16:6
18:7 29:11 37:16
40:9 41:11 46:23
47:9,13 49:22
90:23 91:10 96:2
120:11 133:2,2
137:14,18 223:23
295:14 297:14
299:22 312:22
360:20
country   98:21
couple   121:25
156:25 249:14
250:9,23 281:9

course   25:7 43:16
113:6,21 115:10
154:13 156:7
170:7 208:20,21
215:13 271:22
272:2 344:17,19
349:6 350:3
court   1:3 6:19 7:3
7:19 10:22 24:6
42:3,6,9 43:13,18
43:24 84:2 105:10
105:14 107:10
135:22 254:11
282:24 283:12,20
285:7,13 289:8,12
291:12 294:4
295:8 296:5
299:17 300:12,18
300:21,21 353:11
353:21 369:5
372:16 373:17
375:5 377:25
378:4 383:17
386:22 387:10,17
392:5,9,16
court's   42:14,16
42:24,25 135:25
136:12,19 279:18
cover   185:14
257:21 313:7
covered   40:25
43:15 194:12
cowen   179:17
180:6,8 183:3
255:3,4,6,20,25
261:20
create   305:22
306:4 377:2
388:13,14
created   147:11
247:19 331:3

360:11 392:25
creating   172:19
388:15
credentials   367:21
credibility   287:13
credit   73:5 330:3
349:17
creditor's   87:8,12
88:6,8,9,11,15
89:2
creditors   32:13
33:2 95:18 96:15
192:15,20 193:2,6
193:17,23 194:6
208:23 209:6,17
209:21 222:10
392:23
cristian   89:17
cro   38:8 254:10
388:19
crutcher   3:4
crystal   397:10
culligan   72:21
78:4,11,14 79:23
80:9 81:8,15,17,21
81:23 82:11,16
83:4,7,18 84:3,13
culligan's   78:5
current   23:21
107:10 138:6
currently   9:10
28:19 134:10,10
136:10 137:3
328:23 329:3
391:23
cursorily   14:17
customer   54:4,4
76:22 77:12,15
353:4
customers   269:19

**[customs - debtors]** Page 15

customs 141:2
cut 41:3
cwt.com 4:7,8
cycle 363:15 397:4

**d**

d 1:2 285:12 408:1
daimler 348:4,11
dalton 16:23,24
233:7,9,17,21
234:8,12,16,23
235:3,13 271:18
271:21,25 272:12
272:16,21 273:21
274:20 275:2
276:4 277:24
278:22 280:10,19
280:24 281:19
282:6 290:7 292:9
292:21 295:18,24
296:9 409:25
dan 89:11
data 337:6,10,11
337:15,16
date 11:13 18:2,4
20:24 32:3 67:12
78:23 94:5 100:11
100:18 106:23
123:12,16,18,24
136:6,8,10 141:23
165:8 166:18
177:14 179:6
185:8 194:20
200:4 202:20
203:20 213:15
216:14 224:4
230:17 231:25
232:6 246:2 253:2
257:19 258:21
259:19 264:5
268:6 273:8
274:22 276:13

281:16 282:14
284:2 296:17
298:3 299:12,16
299:19,23 300:5
300:11 301:10,15
301:21 306:6,24
307:6 310:8
311:20 317:21
318:19 319:3
321:15,17,20
323:20 326:16
333:20 335:23
342:10 346:22
348:22 349:23
360:3 373:9 374:8
374:14,21 375:25
376:6,7 386:17
387:10,16,21
388:13,15 389:12
403:8 405:17
410:17 412:4
dated 177:11
179:3 194:18,23
201:25 202:18
258:19 272:8
273:6,14 274:20
281:14 282:13
323:17 408:20,23
409:4,9,17,23
410:1,18
dates 222:23 224:3
286:3 300:20,25
301:5 386:22
david 255:8
dawn 1:12 2:9 7:4
8:22 407:4,22
day 28:11 38:20
179:10 248:14,14
278:17,19,20,21
292:20 297:10
357:15,15 361:10

361:10 371:7
406:10 407:18
412:22
days 14:18 200:15
234:5 281:9,17
324:16 367:12
de 396:21
deadline 61:24
230:25 299:6
306:25 386:24
387:5 388:6,14
deadlines 386:23
deal 52:14 70:22
72:9 142:6,10
153:7 158:20
159:4,5 218:19,24
220:14 234:10,25
235:11 262:12,24
303:23
dealing 53:12
355:25 356:7
deals 70:2 121:11
154:10 331:16
dealt 387:8
debated 150:16
debt 118:13
144:20,23 152:22
160:8,12 237:14
304:9 330:4,9,11
330:16 340:21
debtor 145:6
286:9 289:11
debtors 1:6 4:19
8:7 12:7,13,16
14:11 19:2,8,12,12
19:16,21 20:7
30:25 31:6,18,23
32:5 35:6 40:19
42:8,24 48:16
50:11 82:25 84:11
102:23 106:3

112:15 113:11,16
122:22 123:6,9
129:13 135:21
137:24 145:11
155:25 156:2
158:5 161:4 162:8
162:14 169:13
196:12,19 208:4
210:7,16,17
211:18,23 221:6
222:14,18,21,24
224:5,12,25
230:17,20 231:12
232:14 239:3,11
239:17 240:5
247:24 249:9
250:25 251:23
252:5,11,23 253:6
254:9,12 256:25
257:2 262:17
273:6,16 279:8,17
282:23 283:12
287:24 288:10,11
288:22 289:22,24
290:9 295:7 297:7
297:20 298:23
299:15 300:12
312:3,24 319:24
324:13 327:11
328:4 329:13,25
330:13,22 331:20
343:13 344:20,25
346:2 350:16
358:14 362:15
363:8 364:11
365:13 369:13,21
372:23 373:5
375:3,18 376:8,9
376:14 388:5
391:17,23 392:13
409:22

**december** 14:12 14:16 62:2,4 63:21 119:17 123:10 124:4 151:22 156:6 194:19,23 195:6 201:14,25 202:12 205:25 206:3 231:7 237:23 244:7 272:6,8,13 272:24 273:6,15 273:21 274:20,24 274:24 275:14 279:8,20 280:13 281:14 282:13,14 283:14,24 284:4 284:13,25 285:5,6 286:6,11 288:2 289:6,10,22,25 290:13 296:14,19 297:22 299:2 343:12 372:24 373:18 409:4,23 409:25 410:2,5,7

**decide** 279:17

**decided** 29:13 47:25 48:8,22 65:5,12 81:8 102:15 266:21 280:21,23 316:2 322:8,19 323:3,11 323:13,14 325:23 328:17 364:21

**decides** 389:11

**decision** 76:4,6 101:9 102:6,9,21 114:11,23 135:5,6 138:12 209:3,7 296:4 326:21 368:12 389:5,8

**declaration** 23:7 28:10,14 63:10 84:9 105:19 371:16

**declarations** 23:9

**decline** 308:10

**declined** 76:19 206:23 358:13

**declining** 308:7 350:3

**decreased** 397:25

**defense** 169:7 199:16

**defer** 232:3

**definitely** 36:20 258:3 281:25 322:24

**definition** 98:22 306:22 386:20 390:17 391:11

**degree** 23:15,18 139:16

**delaware** 1:3 3:19 6:20 369:5

**delay** 176:20 264:17

**delayed** 61:8 336:20

**delays** 60:15 202:11

**deli** 179:22

**deliberations** 40:9 41:9,11 47:7 223:10,22 345:5 350:22 375:9 388:11

**demonstrated** 199:20 263:23

**denali** 51:23 55:7 85:4,16 86:7,12,20 86:25 96:13,17

98:10,19 99:3,6,19 100:2,9,12,14 102:2,9 104:13 105:3,9,16,22 106:4 108:14,17 108:19,25 257:22 408:16

**denali's** 85:14

**denver** 3:13

**depend** 381:19 384:2

**dependent** 133:7 133:17

**depending** 131:7 304:19

**depends** 269:4,5

**deposed** 9:14,18 9:21 10:14 11:20 12:12 16:16,19 17:10,12,13 18:2,4

**deposition** 1:9 2:6 6:11,16,22 9:25 10:4,5,11 11:9,10 11:12 12:23 13:21 14:22 16:7,12,14 17:15,18,19,22,23 18:6,10 30:12,15 99:18 214:10 331:15 377:23 378:6 408:11 412:4

**depth** 241:3

**desai** 89:25

**describe** 32:8 62:19 287:25

**described** 395:16 396:18

**description** 291:23

**descriptions** 286:4 289:23

**destroying** 153:24

**detail** 195:14

**deteriorated** 397:11

**deterioration** 350:7

**determination** 21:24 367:9

**determinations** 158:23

**determine** 21:15 122:15 211:25 315:2 372:2

**determined** 33:8 38:6 321:5 330:14

**determining** 135:12 152:4 354:10 363:5

**developed** 81:16

**development** 306:19 307:3 343:21

**developments** 158:6 216:25 219:22 299:25 301:7 305:2

**devine** 5:7 6:25

**diego** 243:16

**differ** 100:25 382:7,10

**difference** 147:23 197:11 238:18

**different** 10:21 71:7 87:9 110:7 111:22,23 153:10 164:14,21,22 170:3 189:18,20 189:22,22 212:8 234:21 260:10,11 260:13,14 268:24 276:9 288:6

289:13 299:16 301:5 339:4 373:4 377:24 394:23

**differently** 93:23 96:8

**difficult** 53:12 205:7 301:13,19

**diligence** 62:9,14 62:17 63:3,19 80:10 81:5 122:6 124:12 133:16,16 133:22 134:7,16 134:17 135:19 139:21,21 207:15 207:16 219:15 233:23 234:3 240:12 241:4 245:20 246:25 247:7,12 264:22 264:24 302:6 322:8 323:5 324:20 326:24 328:10,14,17

**direct** 64:21 71:21 168:19 175:25 210:8 293:15 325:22 328:4

**directed** 71:24 72:2,24 91:14 261:20 364:11

**directing** 293:8,11

**direction** 71:15

**directly** 129:16 131:20 175:5 202:22 203:10,12 203:22 214:2 263:6 265:23 266:11 280:8,9 290:16 292:9 396:6

**director** 4:18 8:10 9:12 23:23,25 24:23 25:8,13 47:9 55:11,12 131:20 390:14 391:7

**directs** 132:4

**disagree** 40:2 48:4 144:15 184:4 208:19 315:9 379:18

**disagreed** 41:20 344:16,18

**disagreement** 46:12 47:2 49:24

**disagreements** 47:12 107:11 388:18

**disappointed** 68:10 105:7 201:12 207:8 208:3,4,9 220:5 247:21 266:23 268:13 280:11 306:14 323:3 327:6

**disappointing** 101:8 208:14 322:9

**disappointment** 209:22

**disclose** 349:15

**disclosed** 351:2

**disclosing** 340:18 349:25

**discounted** 146:13 146:20

**discrepancy** 319:24

**discuss** 17:21 18:5 29:16,18 30:14

93:14,16,19 94:6 94:12 95:2 143:8 151:3 192:3,8,10 192:12 202:3 208:21 209:5 220:8 239:17 266:10 279:2,6,12 287:4 296:25 297:4 305:9 370:18 399:6

**discussed** 29:19 51:3 91:18 95:15 122:21 140:10 141:17 151:23 160:6,24 183:10 184:17,20 185:25 192:14 217:22 222:15 225:7 228:14 229:7 232:5,6,11,20 279:14 301:25 302:7,8 305:5,17 307:16 354:21 362:21,23,25 363:3 374:4 377:5 380:15 400:12

**discussing** 68:2 143:18 219:20 264:22 275:19,24 302:11 324:6

**discussion** 65:22 68:8 70:24 162:9 162:14 217:4 251:22 261:9 342:20 400:17

**discussions** 29:25 37:16 38:24 46:17 48:16 66:14 75:18 75:24 92:2 93:6 93:18 134:19,23 137:21 143:2

150:11,21 162:11 272:11 292:8 296:8 302:16,17 324:22 379:3 389:7

**dispensers** 62:25

**dispute** 42:10 43:25

**disputed** 160:16

**disrespectful** 154:3

**dissimilar** 323:10

**distinctions** 131:5

**distressed** 382:6

**distributed** 273:12

**district** 1:3 6:19

**diversified** 199:15

**divulge** 29:10

**document** 11:8 43:7 66:24 178:21 182:9 194:21 195:8 216:18,21 275:17 285:10 313:3 314:25 336:6,8

**documentation** 198:3

**documents** 13:20 13:23,24 14:4 125:9,15 212:9 310:15

**doing** 26:21 65:13 70:20 81:7 144:11 158:15 240:11 275:3 278:6 279:24 302:21 328:9,16

**dollar** 106:14

**domestic** 337:24

**door** 353:2

double  275:11
doubt  215:7
downtown  311:11
downturn  397:8
dozen  98:16,17,24
dr  142:13,19
draft  150:25 165:4
  185:15,22 186:12
  186:13 187:4
  305:25 368:20
drafted  81:16
  297:25
drafting  28:14
  191:24 241:12
  242:2
drafts  31:8 165:7
  185:17
drinking  62:21,23
driven  146:12,21
drop  320:22
dropped  217:2
  219:9 221:21
due  62:9 80:9 81:5
  81:12,15,24 94:4
  105:23 106:15
  107:8 122:5
  139:21 207:14,16
  219:15 233:23
  234:2 241:3 247:6
  247:11 254:2
  322:8 323:4
  324:20 326:23
  328:9,13,17
dueling  80:14
duke  23:19
duly  8:22 407:8
dunn  3:4 6:23 7:22
dura  36:7 94:2
  134:21 176:16
  180:4,13 181:24
  182:22 184:11

254:3 328:19
329:6,12,17 330:3
330:10,11,16,22
331:7,11,18 332:7
334:16 335:18,21
336:4 337:10,20
338:6,14,21 339:3
339:19,22 340:13
341:14,24 343:11
343:16 344:9
346:20 347:5,11
348:18 349:13,16
351:3 352:2,4,10
353:4,7,11,17
354:9,15,24,25
355:4,7,19,22,25
356:16,18,22
357:2,9,16,19,22
410:22 411:4
dura's  337:16
  338:2 340:25
  350:2,7,12 355:8
  355:24 356:7
  357:9
duration  169:24

e

e  1:2 3:2,2 4:2,2
  5:2,2 8:21 14:2,6
  60:2 67:9,14,14
  68:8 78:21 80:5
  106:21,24 107:4
  107:16 141:25
  142:4 143:22
  155:18,19,21
  156:5 165:11
  167:8 172:20
  173:7 177:11,15
  177:25 179:3,9,11
  183:20 185:14
  191:3 197:24
  199:25 200:5,13

202:17,25 203:3
204:6,15 213:12
213:16,19 237:7
257:17,21 264:3
266:7,23 267:4
268:6 273:5,14
274:19 275:2,13
281:13 282:19
283:14 292:15,20
296:13,18,21,23
305:12,14,18
310:6,10,12
312:10 317:18,23
321:14,18 323:17
323:21 336:3
337:3,3 342:7,11
342:14 344:11
346:19,23 367:22
408:1,9,12,15,17
408:20,23 409:5,8
409:11,15,20,22
409:24 410:1,6,9
410:12,16,18,23
411:2
earlier  30:3 39:9
  41:25 72:7 85:12
  93:8 109:20
  111:20,24 112:3,7
  112:11,19,23
  113:5,14,17
  114:25 125:25
  142:9 146:3
  160:24 161:10
  170:21 192:14
  194:14 195:25
  212:13 213:5
  220:18 242:13
  250:17 251:25
  255:13 267:10
  290:22,24 305:2
  316:21 317:4,9

325:23 344:14
368:24 370:21
374:17 376:7
380:15 399:16
early  37:21 53:14
  163:25 181:6
  196:23 231:8
  280:9 307:11,22
  307:25 308:2,4
  320:4 335:8 344:4
  344:14,19 362:6,8
earnings  80:13,15
  80:18,20,23 81:7
  81:13,17 82:2,7
  101:10,18,21
  102:5,10 103:6,14
  126:3,8,12,16,18
  172:22 180:19
  258:11,15,19,23
  259:2,7 409:16
earnout  67:23
easily  400:20
ebit  146:25
ebitda  126:19
  146:24 147:5,25
  148:13,15,16,18
  217:18 247:17,18
  248:8 267:23
  268:3,17,19 269:9
economic  397:10
economics  23:17
eddie  151:8
edit  186:4
edits  185:24
educating  103:25
educational  23:13
effect  219:25
  225:3 248:4
  355:11 387:14
effectively  53:16

**[efficiently - exhibit]** Page 19

efficiently 273:13
effort 52:4 61:2
  177:6 306:16
efforts 48:6,20
  62:9 85:6,10
  346:14 399:2
eight 98:17 168:13
  246:4,18
either 48:25
  117:15 170:6
  259:11 278:20
  280:8 283:10
  316:12 346:6
  402:16
elicit 175:4
eluded 305:2
eluding 63:7
emergency 249:17
  286:9 287:24
  288:9,11 289:2,7
  289:17,21,25
  290:9 297:22
  302:22
employed 9:10
employee 20:18
employees 111:6
  156:24 214:21
  215:13
encourage 265:22
encumbrances
  382:13,20
ended 78:8 150:17
enforce 291:12
  294:4 295:8
  297:22
enforcing 279:19
engage 124:11
  270:2
engagement 22:4
  31:8 120:12
  238:12,14,16

239:15 246:6,16
  246:22 247:20
  332:10,11 335:12
  368:21
engineering
  359:24
enormous 319:23
entail 57:13
enter 143:20
  364:12
entered 21:13,19
  21:25 22:7,20
  105:14 194:10
  256:14 270:16
  309:19 321:7
  332:17
enterprise 150:13
entice 175:20
entirely 152:11
  227:12
entitled 2:7 194:21
entries 32:6 87:6
  87:13 293:3
entry 143:18
  290:5
environmental
  133:15,16,21,21
  134:7,15,16,20
  233:25 360:11,21
  362:19
epa 360:12,16
  361:17
equating 230:9
equipment 243:9
  264:15
equity 64:9 97:12
  97:13,25 99:17
  107:21 108:8,10
  108:17 159:5
  160:16,21 175:11
  191:16,20 199:5

260:22 319:11
  322:25 325:12
errata 412:2
error 257:23
esq 3:7,8,11,21 4:6
  4:8,14,21,23
essential 50:15
essentially 108:16
  172:4
established 61:24
estate 113:19
estimate 196:24
estimates 94:7
  271:6,7
estimating 98:9
et 1:5 6:18
europe 170:12,15
  339:16
european 347:15
  347:16,22
everybody 53:16
  53:17 160:13
  174:7 303:3
evidenced 181:19
  183:16 184:6
evolved 176:2
exact 183:9 324:16
exactly 23:11
  70:14 72:16,20
  150:17 170:20
  178:23 192:17
  229:24 233:16
  299:22 331:17
  357:21
examination 9:2
  166:8 390:10
  408:5,6
examined 8:23
example 47:16
  62:22 85:21 93:25
  116:21 117:5

141:7,9,11 176:24
excess 330:12
exchange 142:4
  305:12
exchanged 305:14
excited 274:8
  327:8
exciting 363:19
  364:3
exclude 96:2
excluded 263:2,4
  263:8
exclusive 67:19
  68:4 69:7,8 79:12
  79:14
exclusivity 69:11
  69:23 72:14 73:22
executed 298:24
  299:18 300:13
  301:11,16 373:9
  373:18 374:8
executing 280:20
  299:6 332:7
executive 118:20
  139:2 215:13
executives 214:24
exhibit 11:9,11
  67:8,9,14 78:20,21
  79:7 100:8,9
  106:19,21 141:21
  166:16,19 172:17
  177:9,11 178:25
  179:3 182:10
  185:6 194:16,17
  198:14 199:24,25
  202:16,17 203:17
  203:18 205:19
  213:10,12 216:10
  216:11 218:6
  228:3 257:16,17
  258:17,18 259:17

**[exhibit - farnan's]** Page 20

260:7 264:2,3
265:17 273:4,5
274:18,19 276:13
276:18 281:12,13
283:22,23 284:12
285:12 296:11,13
310:5,6 311:17,18
317:13,18 318:23
318:25 321:13,14
323:16,17 333:16
333:17 335:19,21
342:5,6 346:17,18
408:11,12,15,16
408:17,18,19,20
408:23 409:1,2,5,8
409:10,11,13,15
409:16,18,20,22
409:24 410:1,4,6,9
410:11,12,14,16
410:18,20,22,23
411:2
**exhibits** 273:12
276:8,9,9
**exist** 125:17
**existing** 137:25
278:12
**exists** 383:7
**exited** 327:7
**expanded** 97:25
**expanding** 175:16
**expect** 124:11,23
125:4,8 127:3,9,14
127:17,20,24
128:5 137:24
138:13 139:5
330:14 383:18
388:2
**expectation** 210:6
210:15,17,21
211:4 241:5,25
283:11 324:13

**expectations**
135:25 136:13,19
**expected** 75:12
160:7,15,19
196:14 231:7,21
307:19 327:4,22
381:4
**expects** 211:25
**expended** 347:12
**expenditures**
347:11,24
**experience** 25:17
26:7,25 27:2 46:4
46:6 69:25 75:4
101:19 121:2
133:20 173:17
244:23 256:13
268:18 270:17
309:18 368:8
374:15 381:15
382:9 393:7
397:15
**experienced**
136:23 149:21
387:12
**experiences**
245:13
**expert** 26:5 45:18
**expiration** 282:13
**expired** 274:10
**expires** 412:25
**explain** 112:17
167:16 227:13
269:13 384:18
**explained** 148:11
**explains** 223:16
319:23
**explanation** 95:6
291:8
**express** 40:10
209:22 344:8

384:10 402:9
**expressed** 41:10
41:15 47:12 50:2
188:14 227:20
**extend** 140:20
380:6,16
**extensive** 75:16
142:15
**extent** 29:7 40:7
49:19 52:22 101:5
106:7 117:16
125:17 126:19
129:18 130:10
232:19 297:12
300:17 325:10
354:25 369:15
370:15 383:6
398:20
**extremely** 32:3
68:10 133:10
136:21 220:4
254:6 266:22
301:13 390:19,21
**eye** 176:11 315:20

**f**

**f** 1:2
**fabricate** 269:22
**fabrication** 269:16
**facilities** 128:16
130:8,11 341:3
**fact** 25:25 26:5
37:13 45:24
145:18 187:14
188:4 192:10,11
201:8 210:3 254:4
283:5 327:22
349:4 367:7
381:16
**factor** 375:19
**factors** 343:3,7
375:16 380:6

**facts** 46:9 349:12
**failed** 75:20 262:8
263:10 268:5
306:5,10,19
322:12
**failure** 254:2
266:4
**fair** 26:6 84:4
104:10 109:3
207:12 361:8
**familiar** 10:13
26:10 55:16,25
106:13 216:17
240:24 285:9
368:23 395:7
396:11
**familiarity** 56:8
134:7
**family** 65:11
**fantastic** 294:3
**far** 205:5 221:24
271:10 396:24
**farnan** 4:18 8:10
15:8 86:24 87:22
87:23 107:6
155:12 156:3
177:12,17,22
178:4,9,13 179:13
180:21 181:4,16
182:16 203:5
223:9 243:21
250:17 297:4
312:11 323:23
324:7 336:2 341:9
346:19,24 353:10
353:21,25 370:22
389:4,4 390:13
391:7 408:21
411:3
**farnan's** 179:11
181:22 183:13

**fashion** 205:4
**faster** 394:24
**favor** 280:20,25
  368:2
**february** 1:10 2:3
  6:4 18:21,21 64:5
  105:13 107:6
  230:21 231:9,24
  232:7,15,21 233:5
  233:11,14,20
  234:6 259:20
  268:7 271:11
  292:11,13 309:25
  310:7,11 311:14
  311:15,21,23
  313:13 316:19,20
  317:5,10 346:12
  346:18,23 348:3
  349:21 407:19
  410:10 411:2
  412:4
**fee** 238:19 247:20
**feedback** 65:4
**feel** 197:20 203:9
  279:9 397:23
**feeling** 23:11
**feelings** 314:10
**feels** 132:6
**fees** 238:21,25
  239:4
**felt** 315:4 392:25
**fiberglass** 85:17
  85:19 97:4 98:5,7
  98:20
**figure** 53:15
  178:22 201:15
  205:22 220:6
**file** 231:13 283:19
**filed** 6:18 123:9
  223:13 231:7
  285:7 288:2,10,15

288:23 289:2,16
289:22 330:2,7
333:23 372:16
**filing** 27:22 28:2
28:11 222:20
230:21 279:7
285:13 291:19
297:21 298:25
302:22 333:4
336:24 373:8,15
373:17 389:16
**filings** 14:8 24:5
254:15 288:6
296:5 353:10,21
**final** 64:3 66:4
76:4 185:20
186:15,20 187:4
205:21 206:11,15
265:18 318:19
**finance** 23:20
25:22 26:4 215:24
**finances** 56:25
135:17 350:8
**financial** 4:4 31:18
31:22 55:18 97:17
98:4 104:2 114:13
114:15,20 115:4,8
115:12,17,20,24
116:17 117:14
129:5 175:11
177:3 206:21,24
207:9,14,15
211:10,19,24
219:15 221:17
222:2,5 226:7
240:18 250:10,24
259:3,23 260:2
265:6 322:5,23
337:23 340:7
347:21

**financially** 7:9
**financials** 113:21
  113:25 114:10
  116:5,20 125:17
  125:20 126:25
  127:4,11 173:10
  240:16 247:15
  305:24 381:7,12
  381:14,18 383:13
  383:23
**financing** 233:24
  234:9,10,14,17,24
  235:6 249:11,17
  262:11,23 304:9
  339:11,15,17,24
  347:13,16,23
  351:3
**find** 62:22 73:10
  73:14,19 74:24
  99:11 122:4
  203:22,25 204:8
  204:10,14,16,19
  314:9,13
**finding** 280:24
**fine** 52:24 57:17
  92:19 99:21
  104:21 116:8
  132:13 148:20
  178:19 184:3
  185:2 186:17
  200:16 214:11
  235:12 238:10
  256:8 284:23
  298:11 305:11
  315:8 351:9
  405:20
**finish** 10:24
  393:11,14 401:18
  403:24 405:18
**finished** 373:25

**finishing** 172:20
**finra** 24:12,16
**fire** 381:25 390:17
  390:18 391:11,18
  402:15
**fireside** 167:22,25
  168:24 169:5,11
  169:17,23 170:5,8
  170:17 186:19
  187:15 188:22
  189:7,11 191:18
  338:5,10
**firm** 7:2 29:15
  64:10 76:25 80:12
  81:2,9 131:14
  136:22,25 173:8
  175:11 199:16
  312:17
**firms** 97:12 99:17
  199:6
**first** 8:21 10:19
  13:12,13 27:13
  28:11 100:23,24
  101:5,6,9 102:2,5
  104:17,20 105:2
  107:4 121:22
  139:23 148:2
  154:2 156:8
  162:23 163:8
  185:12,13 194:18
  194:22 195:6,9,12
  197:9,12 198:19
  200:10 201:24
  206:3 207:20
  218:8 219:11
  226:20 227:8
  228:2 231:6
  237:25 246:5
  248:3 249:7,14
  253:2,17 258:22
  263:23 276:11,18

278:8 285:3 287:8 314:4 318:9 334:8 353:12,23 356:23 364:19 375:5,20 375:23 398:12,21 409:3

**firsthand** 250:19

**fiscal** 268:8

**five** 79:4 117:4 125:19 165:10 235:18,20 260:6 280:4,5

**fixed** 168:21

**flagged** 140:16

**fleet** 303:9 321:2

**flip** 141:24 142:3 198:4 284:12 285:9,20,21

**flopped** 97:19

**flow** 146:13,20

**focus** 37:5 93:10 167:18 207:9 208:17 361:4 388:12

**focused** 33:4 96:21 97:8,10,17 98:3,3 388:14

**focusing** 95:22

**folks** 226:10 284:6

**follow** 36:25 37:3 173:21 200:17 261:24 342:19 370:16 391:8

**followed** 172:12

**following** 158:6 285:20 354:14 355:5,12

**follows** 8:24

**foodstuffs** 85:25

**forecast** 277:23 278:4

**foreign** 140:17,20 140:24 141:3 264:13,17 337:24 380:15

**foreseen** 379:22

**forgive** 98:6

**forgotten** 217:23

**form** 22:3,22 29:21 30:21 32:21 33:14 34:21 35:7 36:19 38:9,22 39:19 42:4,12,19 43:4,20 44:13 45:15,23 46:14 48:23 49:9 50:17 58:8 59:8 61:6 62:11 63:6 65:20 65:25 68:6 69:18 71:18 73:3,16 83:15 84:7 95:11 103:24 104:24 105:17 107:15 109:5 112:4 113:10 114:8 121:3 123:19 124:16 125:12 127:6 128:11 130:18 131:9 132:11,19 133:13 135:8 136:2,14 137:5,19 138:10 139:8,19 140:22 141:15 143:13 150:8 159:2 161:13 166:11,13 166:16,20,23 167:3,7,20 176:4 181:2,25 183:19 184:13 186:23 192:24 198:15 199:2 202:13

205:6 208:24 209:8 210:2,20 211:8 219:23 221:12 230:8 231:3,16 232:2 234:11,19 239:6 240:7 242:18 245:2,14 250:5 251:4,17 260:19 260:25 268:21 270:19 273:15,17 290:18 291:13 292:25 293:5 294:6 295:10 300:14 302:24 306:12,21 307:4 309:21 312:6 314:14 319:21 320:2 322:13 329:19 330:5 332:8 334:17 353:15 354:2,16 355:14 356:10 362:17 365:8,15 373:13,23 374:10 374:23 375:22 377:8,20 378:9,17 378:25 379:8 380:2,9,23 381:9 382:3,21 383:15 383:25 385:23 386:19 388:23 389:14 396:25 401:10 402:6 403:15 408:19

**formal** 146:16,18

**format** 370:10

**forth** 407:8

**forward** 45:4,10 46:19 72:9 102:8 108:22 172:15

188:15 201:2 210:13 280:17,22 280:23 281:2 296:4,7 322:4,19 322:21 326:22 343:14 344:8,22 345:2,15,23,24 346:10 354:6 368:18

**forwarded** 266:24 266:24

**forwarding** 203:4

**found** 81:13,15,25 125:13 204:21 295:24

**founders** 18:4,18

**foundry** 359:24

**fountain** 62:23

**fountains** 54:16,17 54:17 62:22

**four** 52:5,8 54:24 60:10,16,19 61:5,9 61:15 170:10 246:5,20 248:24 253:9,19,24 260:10,11,13 303:2 304:23 319:5 365:10 393:12,21 394:10 394:21 395:3 399:22 401:4,25 403:23 404:5

**fourth** 213:7

**foxconn** 260:14

**fragmented** 98:14

**frame** 316:25 317:3 325:19 342:3 343:23 376:23 378:7,14 379:6,16 380:7 394:19 395:2,16

**[frame - glenoit]** Page 23

396:18,20 402:10
402:21
**framed** 96:5
**frames** 353:2
377:6
**framework**
217:13
**francisco** 260:21
**frankly** 349:9
**free** 62:24 174:8
203:9 382:12,19
**frequency** 370:6
**frequent** 56:20
**frequently** 90:5
143:4 304:17
314:9
**friday** 142:7
281:17
**friend** 16:24
**friendly** 17:3,7
**front** 143:25
275:13 287:5
347:12
**fti** 29:2 31:10,11
31:13,13,17 32:11
32:15,25 34:14,19
34:22 117:15
129:17 145:25
149:3,21,23 150:5
150:9,11,21,24
152:15 277:8,14
277:15 351:8
370:14
**fti's** 131:11
**full** 9:7 15:16
69:21 116:25
124:20 125:9
146:13 172:19
366:15 392:23
**fully** 24:15 265:25

**fulsome** 290:22
**fund** 191:16
347:24
**fundamentals**
397:11
**funded** 48:17 49:4
49:17
**funds** 3:18 12:18
22:16 27:22 28:17
59:17 132:10
154:17 300:10
374:7 393:4
**funny** 179:22
**fuqua** 23:18
**further** 181:18
183:15 390:7
399:7 407:12

**g**

**g** 189:14 237:7
**game** 70:9,11
243:12
**gaming** 243:8
**gas** 85:22 180:4
351:22,25 352:6
352:10,13 353:7
353:18,22 354:8
354:10,13 355:4,7
355:11,18 356:4
356:23 357:5,16
358:6,10
**gathering** 122:17
**gauge** 168:3 169:8
**gemspring** 64:7
66:3,8,10 67:21
68:9,11,17 70:15
70:17 71:2,4,8
72:9 73:2,25 74:7
76:10 79:15
**gemspring's** 78:9
**gene** 18:3 362:3

**general** 75:3
101:12,17 107:17
117:12,19,22,25
118:3 119:11
127:12 132:21
138:22,25 157:9
174:11 193:11
299:14 306:17
344:10 378:20
394:20 396:24
397:2 402:20
403:6,21,22 404:8
404:10
**generalized** 24:6
**generally** 12:17
18:12 20:24 21:9
22:5 55:16 71:23
92:10,21 103:18
105:25 107:25
108:23 111:19
113:24 128:12,18
140:23,23 141:3
146:12,24 148:16
151:2,11 154:4
157:21 158:14,18
166:24 173:11
182:4 185:19,24
197:17 198:23
201:6 204:12,17
204:23 205:2,18
224:9 242:19
269:21 312:3
331:2 348:8,13,15
348:16 369:7
370:8 386:16
393:10 394:10
396:19 397:20
399:22 402:19
**generated** 168:24
**generic** 92:12,22
93:23 386:2

**generically** 151:9
**genesis** 110:20
143:21
**gentleman** 266:25
**gentlemen** 15:12
**german** 141:6
326:9
**getting** 56:19,24
60:23 104:4 106:9
158:20 185:19
277:8 393:16,23
397:13 401:19
**gibson** 3:4 6:23
7:22
**gibsondunn.com**
3:7,9,12
**give** 10:25 53:2
69:11 100:6 124:4
185:5 200:12
275:15 291:9
294:11 308:8
324:25 325:13
371:19,19,21
372:3,5 395:3
399:5
**given** 92:8 99:19
114:13 140:12
143:7 150:14
188:3 202:21
203:11 237:4
274:4 301:18
326:18 327:22
354:12 374:19
393:2 404:18
405:24 407:10
**giving** 302:22
378:5
**glenoit** 365:19,25
366:5 368:24
369:2,8,10,13,16
369:22

**[global - happen]**                                                    Page 24

**global**  37:4,10
   48:17 49:3,8,16
   50:13,16,21,23
   51:8 52:3 54:25
   85:10 93:6 220:18
   262:11,18,23
   263:7 270:23
   271:14 307:9
   329:13 351:24
   358:4 359:2
**go**  6:14 10:17
   11:14 23:8 25:5
   53:21 59:10 66:16
   66:19 67:3,18
   68:14 69:9 71:6
   71:16,25 72:4,8,24
   73:6,13 74:24,24
   75:6 79:10,17
   83:13,18 99:15,18
   102:12 105:5,18
   112:18 117:14
   129:17 140:5
   142:11 144:6
   148:24 164:21
   167:6 176:25
   200:6 201:14,18
   216:5 220:7,9
   228:4 243:9 250:9
   250:22 255:19
   265:13 294:11,17
   295:7 298:6
   316:15 322:21
   326:2 328:7
   333:11,11 347:8
   351:12 389:19
   393:20 396:10
   399:13 401:11,24
**goal**  267:7 381:21
**goes**  337:11
   353:12,13,23,24

**going**  6:3 10:17
   11:8,14 26:16
   27:2,3,5 41:3
   42:21 44:16 52:12
   58:24 59:7 66:25
   68:3 69:11 84:20
   100:5,8 103:15
   116:7,8 132:14
   154:2 159:17
   165:16 169:6
   171:4,10 179:7
   185:4 187:11
   194:15 200:25
   203:17 204:5
   217:25 225:14
   227:18 230:3,12
   235:23 237:5
   246:9 248:9 254:6
   255:16 257:20
   258:16 259:16
   274:12,16 282:21
   282:22 283:22
   284:5 287:12
   290:8 292:10,13
   294:4,9,13 295:25
   298:14 299:21
   320:24 322:15
   324:15 331:2
   333:16 336:23
   337:21 341:23
   343:11 344:6
   347:15 351:15
   357:3 360:8
   363:18 368:20
   389:22 391:8
   399:12 405:22
**goldin**  9:13 23:22
   23:24,25 25:4
   27:16 28:25 31:9
   31:11,12,21
   118:24 145:21

   276:25 284:13,25
   285:5
**good**  6:2 9:3,5
   78:9 98:11 144:13
   144:14 145:20
   161:15 180:11,23
   268:10 298:9
   321:25 368:8,13
   385:8 386:13
   395:2
**google**  320:12,17
**gordon**  255:8
**gorham**  366:3,7
   366:10,11,12,15
   366:22 367:3,10
   367:15 368:13
**gotten**  172:3
**government**
   264:11
**graduate**  23:17
**great**  11:7 53:8
   157:13 233:15
   263:14 320:6
   335:17 346:7,8
**greater**  195:13
**green**  89:25
**greenhill**  86:12,20
   97:10 101:3
**grounds**  40:25
**group**  20:5 35:21
   35:24 36:4 43:15
   43:21 145:5,13
   162:18 198:8
   207:24 208:18,23
   212:23,25 230:16
   254:8 298:20
   328:20 329:2
   365:21 366:22
   372:10 373:10,19
   376:23 378:7,15
   379:5,15 381:22

   395:8,14
**grown**  176:19
**guess**  43:5 201:23
   234:20 238:11
   265:2 277:17
   289:13 314:16
   327:17 403:16
**guesstimate**  27:7
**guidance**  300:3,9
   374:18
**guideline**  221:6
   289:16
**guidelines**  11:22
   14:11,12,15
   222:18
**guilano**  121:9,11
   121:14 122:22
   142:8,14 144:10
**guitar**  243:12
**guys**  13:7 218:22
   276:20 326:12

---

**h**

**h**  191:3 408:9
**hagar**  245:21,23
   246:2,4,19
**hair**  110:10
**halcyon**  87:19
**half**  13:16 98:16
   98:17,24 122:11
   288:21 289:4
   292:2,5 325:15
   328:15
**hand**  286:2 407:18
**handled**  109:21
   132:25
**handling**  31:17
   69:25 121:7
**happen**  43:12
   121:24 138:7
   306:23 351:4

**happened** 48:14 66:22 72:21 92:25 151:15 297:13 307:7 328:6,13 331:18 349:19

**happening** 143:23 304:20

**happy** 66:12 196:15 284:10 314:4,9,16 326:20 327:8 402:16

**hard** 178:17 181:19 183:16,25 184:7,17 204:24 205:2 265:25

**harder** 380:20 381:7,11

**hardware** 303:8

**harm** 397:12

**he'll** 116:15,16

**headquarters** 338:3 340:25 341:6

**headwinds** 267:8 267:9

**health** 236:10 237:9

**healthcare** 240:20 240:25

**healthy** 382:8

**hear** 10:23 214:2 228:19 325:9

**heard** 17:12 228:22 250:18 349:18 360:17

**hearing** 18:20 231:8

**heico** 191:3

**held** 2:8 6:22 134:8,12

**helicopter** 168:19 174:13 199:21 214:19

**helicopters** 36:7 47:15,17 145:5 153:9 157:12,15 168:4 185:4,7 187:17 188:3 214:15 225:20 226:4 364:2 409:1

**help** 91:2 171:10 179:8 216:7 224:23 396:7

**helpful** 70:2,3 103:19,20,25 104:4,8 117:6 126:22 138:17,18 138:23,25 139:4 139:17 171:24 213:25 242:7,9 398:8,17

**helping** 249:11 273:11

**hendrickson** 248:17,19

**hereunto** 407:18

**heritage** 162:17,25 163:9

**hero** 243:12

**hershey** 4:21 8:8,8 14:25 15:5,6,13,19 390:10,12 391:6 399:5 403:21 408:6

**hey** 230:3 253:18 283:19 320:14 321:9

**high** 146:10 195:21 196:4,11

**higher** 66:20 67:4 67:19 68:4 79:11

149:15 196:17 307:24 327:22

**highest** 147:19 322:6

**highly** 136:23,25

**hill** 87:18 88:3,12 89:22 92:3 161:18 161:19 372:21 373:3,7,15,16 389:7,9,16

**hill's** 372:25 388:21

**hills** 338:3 341:6

**hire** 81:4,8 173:19 216:5 252:15,24 253:3,7

**hired** 80:12 119:14 254:25 315:15 402:23

**hires** 315:13

**hiring** 31:4

**history** 99:2

**hit** 267:23 268:2

**hmmm** 45:8 182:13 329:21 377:12

**hoc** 88:8,9,11,14 89:2,3 90:2,12 91:5,7,20 92:15,16 92:22 93:14,18 95:18 96:14 192:13,15,19 193:6,16,22 194:6 208:23 209:5 222:9

**hoff** 400:5 401:9

**hold** 24:9 133:22 162:3 219:13 294:22 334:13

**holdback** 105:23 106:3,15,16 107:8

107:14 109:9,13

**holdbacks** 106:10 107:18

**holder** 162:6

**holders** 161:22 260:18

**holding** 108:15

**holding's** 334:9

**holds** 162:2 353:25 369:9

**home** 236:10 237:9 240:25

**homes** 236:12

**honest** 320:12

**hope** 251:8 278:25 320:7 324:23

**hoped** 78:10

**hopefully** 302:4 392:21

**hoping** 251:6 267:15 320:13

**horrific** 67:24

**horse** 297:9

**hospice** 236:11

**houlihan** 30:23 31:4 135:16,22 136:6,9,17,20 137:25 224:7,9,11 224:22

**houlihan's** 137:22

**hours** 13:14,16 285:15,18 288:21 289:5 292:2,5 331:19

**house** 120:11

**hsr** 265:4

**hum** 75:23 132:23 174:2 209:13

**hundred** 156:25

**hunt** 255:8

**hurt** 397:17,20
**hussey** 51:25 55:7
134:25 230:15
231:2,23 232:16
232:23 235:2,14
254:5 269:11,15
269:19,20 270:2
270:21,25 271:2,7
271:13,17 272:2,5
275:20,25 277:10
277:13 280:3
292:6 296:6
**hussey's** 269:12,13
270:7
**hypothetical**
32:12 33:4,9
35:19 268:23
374:25
**hypothetically**
385:15

**i**

**idea** 68:3 128:19
128:22 130:15
169:21 176:2
216:2
**identification**
11:13 67:12 78:22
100:10 106:22
141:23 166:17
177:14 179:6
185:8 194:20
200:4 202:19
203:20 213:14
216:14 257:19
258:21 259:19
264:5 273:7
274:21 281:16
284:2 296:16
310:8 311:20
317:21 319:3
321:17 323:19

333:19 335:22
342:9 346:21
**identified** 33:23
142:9 145:12
198:22 221:11
227:6 228:2
264:18
**identifies** 200:7
216:25
**identify** 54:6
187:11 193:14
**identifying** 33:18
228:8
**ii** 206:10 326:23
337:12
**iii** 1:5 4:11 6:18
8:19 36:15 372:19
412:4
**illustrative** 33:5,9
146:5,7,9 147:12
148:3 149:25
150:5,12,22
151:24 152:5,10
212:6,9,14,19
359:9,13
**immediately**
205:12 219:10
221:5 355:12
**impact** 345:18
386:4 387:22
**impacting** 343:3
**impeaching** 287:9
**impetus** 347:15
**importance**
132:22 133:17
**important** 114:21
133:6,10,12 134:3
134:13,16 135:9
135:11 158:21
269:3 397:5

**imposed** 301:21
387:10,16
**imposing** 388:5
**impression** 37:19
180:11,24 181:23
184:8
**impressive** 274:5
**improve** 251:7,9
316:17
**improved** 251:12
316:5,9,14 397:16
**include** 19:23
128:13,15 143:8
146:4 160:9 196:4
241:7 305:23
337:21 391:22
393:16 395:19
401:19
**included** 14:2 33:6
33:11 35:19,23
36:10,17 93:5
96:13 116:21
123:11 180:18
187:3 197:19
217:16 239:23
242:14 251:15
262:23 270:22
307:12
**includes** 19:22
112:16 212:18,22
312:12 317:25
**including** 50:11
81:6 113:12
115:15 126:20
140:25 175:25
206:11 207:15
266:2 280:5 303:9
305:24 317:19
322:4 410:12
**incorporated**
34:23 283:7

**incorrectly** 249:10
**increased** 70:6
397:24 398:2
**increasing** 103:21
104:8
**independent** 4:18
8:10 29:8 37:13
47:8 82:7 223:21
223:25 224:2
277:2 375:10
390:14 391:7
402:23
**independently**
81:16,25 152:11
**indicated** 227:10
**indicates** 312:12
**indicating** 217:13
**indication** 65:17
197:12,15,21,25
318:15 323:24
324:4
**indications** 61:25
63:22 148:7,23,25
202:3 260:6
271:10 320:5
343:10
**indirectly** 280:8
280:10
**individual** 88:14
88:25 89:7 95:23
95:24 378:22
393:6
**individuals** 89:5
89:21 136:23
216:2
**industries** 85:18
153:10 268:24
**industry** 85:18
118:6 119:4 121:2
152:17 166:25
168:17 173:14,16

173:22,23 174:16
174:19,25 175:14
176:23 199:22
237:9 269:2 304:4
304:7 315:23
352:24
**information** 56:24
56:24 58:15,17,22
59:5 94:16 110:20
115:14 117:16
122:6,18 126:13
126:21 128:9,14
129:3 130:4,7
135:18 160:10
164:5,10,13,18
167:14 173:25
174:5,6,9 175:8,20
191:25 193:21
194:2,8 221:17,18
222:2,5 240:19
241:8,13 247:7,12
249:23 259:3
283:13 314:24
346:25 347:3,7,18
403:8
**informed** 119:3
222:13 341:22
**infotainment**
303:14
**infrequently** 90:7
**ingrid** 4:6 8:13
**ingrid.bagby** 4:7
**initial** 70:19 96:21
97:8,11 104:5
162:7 167:9 168:2
194:24 206:2
207:19 217:13
246:15
**initially** 63:21
168:7,11 227:8
234:15 307:22

**input** 101:6
**insider** 174:4,4
**insist** 109:8,12
**instance** 102:6
**institutions** 177:3
**instruct** 37:17
40:11 41:8 294:7
294:10,14
**instructing** 41:12
287:20
**instruction** 294:12
**instructs** 11:2
**instruments**
265:21
**insurance** 8:15
349:17
**integral** 51:4
**intellectual** 157:14
157:17
**intend** 18:20
243:18
**intended** 74:6
175:15 348:20
392:16
**intent** 72:13 73:21
105:15 197:16,22
199:8 276:7,15
280:18,21 281:2
281:10,18 282:12
**interact** 347:22
**interaction** 291:3
355:7
**interactions**
290:21 291:4
**intercompany**
353:6
**interest** 61:25
63:13,23 64:12
97:6,24 99:16
148:8,24 149:2
160:16 161:22

168:3,4 169:9
175:4 188:14
197:13,16,21,25
198:9,25 199:20
202:4 210:22
225:8 227:7,20
228:15 229:8
260:6,18,22,24
261:6,10,14
263:23 271:10
280:16 315:2
318:16 320:5
323:24 324:4
334:5 343:11
369:10,16 374:7
**interested** 7:9
47:25 48:7,21
53:7 56:22 61:21
62:8 64:12,15
70:9,13 71:11,14
73:11 75:13,17
76:3 77:9 97:22
99:23 104:2 133:5
139:25 171:16,20
171:22 172:12,14
175:21 188:11,17
188:20 193:13
217:15 227:10
229:14,17 266:20
267:6 268:14
276:19 302:4
306:14 314:24
320:24 321:7
324:17 326:19,21
339:11 340:7
343:13 386:9
407:15
**interests** 162:4
**interface** 150:9
**interfere** 6:10

**interference** 6:8
**intermediate**
393:23
**internal** 41:9 47:7
217:3 326:4
350:22 400:17
**internally** 354:22
400:13
**interpreted** 95:14
**interrupt** 40:23
92:14
**intervene** 43:25
**intervention**
282:24
**interview** 20:25
163:19 164:3
244:10 252:15,24
332:20,21 333:2
334:16,19 367:6
**interviewed** 20:3,9
20:13,21 270:10
364:14
**interviewing**
163:15 309:9
334:2 367:2
**interviews** 270:9
**intrepid** 236:7,9
236:10,24 237:3,6
237:19 239:18
240:4,12 241:2,4,6
242:3,14,17 245:5
245:6 248:15
249:3,5,8 251:14
251:15,23 252:6
252:11,16,25
253:4,9 263:5
**intrepid's** 240:16
**inventory** 127:18
277:20 278:9
**investigation**
130:23 131:4

132:8 135:17
**investment** 20:2,8
  20:21 21:2,5,10
  24:7 25:18,22
  26:3,16,20 27:3
  30:25 31:5 33:17
  33:23 56:16 57:2
  57:6,8,9 64:17
  70:8,21 73:18
  75:20 97:10
  119:10,14 123:4
  124:24 126:23
  132:15,20 139:13
  139:20 149:22
  181:5 184:15
  186:2 201:10
  237:19 239:14
  241:17 245:13,17
  248:11,14,15
  254:24 255:5
  256:2 264:9 291:5
  291:17 295:16
  315:14 357:6
  364:16,23,25,25
  367:14,16,20
  368:10 374:18
  393:19,24 394:6
  394:11,16 396:5
  396:12 399:17,23
  401:23 402:23
**investments** 19:9
  112:14 392:14
**investors** 340:21
**invited** 163:22
  206:19 207:5
  367:5,8
**involve** 389:6
**involved** 20:25
  27:14 28:13,16,19
  51:16 58:11 71:17
  104:12 120:5

138:14,19,23
139:6 142:18
184:10,20 224:14
230:2 238:24
241:12 242:2,5,8
243:12 244:9,13
257:4 263:7 266:2
304:2 332:6
333:14 357:25
386:10 398:17,22
**involvement** 27:21
  119:21 120:16
  129:8 139:18
  140:16,19 164:9
  184:24 224:7,10
  241:19 255:25
  256:21 279:18
**involving** 107:10
  223:22
**ioi** 323:18 410:19
**iois** 319:5,6,25
  322:3,18
**irrelevant** 114:16
**issue** 134:8,13,14
  134:17 202:5,10
  213:24 214:4
  249:9,12 264:24
  265:11 314:10
  337:13 354:17,19
  355:23 356:15,16
  360:11,21 361:17
  362:19
**issues** 94:11
  134:20 140:11,15
  140:24 141:10
  198:22 214:7,13
  263:19,25 264:6
  264:16,23 267:13
  267:15,18,20
  360:12,15 370:19
  379:4,14,21 389:3

**item** 200:17
**iteration** 314:4
**iterations** 313:25
**iv** 334:12

**j**

**j** 4:14 8:9 313:19
  314:5,6,21 320:8
  324:23 326:12,14
**j.p.** 240:20
**james** 59:25 61:4
  62:6 70:15,16,20
  70:24 71:6,16,25
  72:3,18,24 73:6,9
  75:12 77:6,19,20
  77:24,24 78:2
  80:17 82:3,20
  83:13,18
**january** 62:5,5
  63:21 105:11
  200:14 201:2,19
  201:24 202:6
  231:8 298:25
  299:19 341:21
  342:6,11 344:4,14
  344:20 346:11
  410:23
**jart** 142:13,19
**jason** 303:18
  304:14
**jeep** 353:2
**jefferies** 48:18
  49:5,17 50:22,24
  85:12 93:7 179:17
  180:3 182:23
  220:13,17 262:11
  332:12,20,21
  333:3 334:18,22
  335:6,11 336:12
  337:2,2,22 338:8
  338:12,20 339:10
  339:17 340:19

342:14 347:16
358:5 359:2
**jet** 187:22,23
**job** 70:20 73:9,11
  73:13,18 75:21
  77:8 82:4 144:3
  144:12,14 173:21
  315:22 402:25,25
**joe** 111:21 155:12
  178:16 179:22
  181:10 182:3,15
  182:21 183:2
  223:8 243:20
  250:17 389:3,4
**joe's** 183:20,22
**john** 89:25
**join** 27:15
**joined** 7:24 8:11
  170:14 179:15
  273:11
**joint** 38:24 39:5
  40:18 45:11 51:12
  72:3 293:24 295:3
  306:9
**jointly** 1:7 20:3,8
  20:13 38:6,11
  84:12
**jonathan** 303:18
  304:15
**jones** 20:18 120:10
  142:2,5,6,16,20,23
  143:2,4 144:2
  248:2 282:3
  367:11 368:4
**joseph** 4:18 8:9
**judge** 15:8 87:22
  87:23
**july** 309:2 313:12
  323:7,18,21
  326:17 350:8,14
  410:18

**[jump - know]** Page 29

| | | | |
|---|---|---|---|
| **jump** 214:2 | 351:2,8 370:3 | **kkr** 190:5 | 170:16,24 171:6 |
| **jumped** 171:25 | 371:4,9 384:4 | **knew** 162:5 | 172:11,16 174:10 |
| 226:21 | 388:24 408:13 | 170:19 280:14,16 | 174:20 175:7 |
| **june** 79:20 82:12 | 410:8,25 411:4 | 282:22,23 | 176:13,14 177:18 |
| 86:17 156:22 | **katzenstein's** | **know** 15:3 16:15 | 177:21 186:7,13 |
| 194:25 283:24 | 39:23 71:15 | 16:19 18:15 23:10 | 186:15 189:16 |
| 284:4 313:10 | 131:13 | 27:10 29:3 33:21 | 194:5,10,11 |
| 321:21 322:17 | **kaye** 4:11 | 35:22 38:16 39:6 | 199:14 202:9 |
| 323:7 410:4 | **kbo** 1:6 6:21 | 39:24 40:13 41:14 | 208:8 210:4 |
| **junior** 32:2 | **keep** 37:22 72:15 | 41:19,21 43:5,6 | 211:16 218:12,16 |
| **k** | 73:9,19 75:25 | 44:15 46:4 47:4 | 225:11 228:10 |
| | 111:3 156:11 | 49:11,13 50:5 | 231:12 232:8,10 |
| **k** 3:11 8:21 9:9 | 272:21 282:8 | 53:18 54:7 57:14 | 236:21 237:25 |
| **katzenstein** 22:12 | 355:15 375:23 | 62:13,16 70:10 | 238:15 240:15,21 |
| 22:14,25 28:24 | **keeping** 158:16 | 71:10 72:5 75:25 | 243:14 245:16,19 |
| 31:16 40:2,8,14 | 198:5 331:6 | 77:4,7 78:17 | 247:15 251:18,21 |
| 41:9,15,20,21 | 345:22 | 81:20 88:23 89:4 | 252:4 253:21 |
| 44:14 46:15,23 | **keith** 89:18 | 89:5 93:25 94:3,4 | 256:17,24 273:17 |
| 47:8 48:3,5 49:11 | **keith's** 89:18 | 94:18 95:7 99:2,5 | 281:11 282:2,20 |
| 49:14,22 50:6 | **kept** 188:18 | 101:5 102:4 103:4 | 283:18 284:20 |
| 66:18 67:3,10,15 | 346:12 | 104:19 106:16,17 | 290:7 294:2,21 |
| 68:9 71:21 79:9 | **key** 220:16 | 108:3 109:11 | 295:5,23 296:6 |
| 84:11 86:24 103:5 | **kickoff** 122:7 | 110:11,15 111:8 | 297:18 298:3 |
| 103:13 107:7 | 247:6,11 249:24 | 111:10 114:21 | 299:5 306:23 |
| 120:15 131:14,21 | **kind** 36:23,23 37:6 | 115:16 116:11 | 311:7,10 312:13 |
| 132:3,4,6 137:13 | 53:13 108:3 | 117:18,24 118:2 | 312:25 317:7 |
| 137:17,21 151:8 | 109:22 110:7 | 120:4,10,13,15 | 321:2 326:5 327:4 |
| 156:3,18 178:4,9 | 167:25 218:4 | 123:4,25 127:7 | 327:7 331:17,24 |
| 178:13 200:15 | 220:12,13 263:18 | 128:5 129:10,23 | 331:25 334:23 |
| 203:5 208:13 | 265:3 323:12 | 130:6,9 132:12,13 | 335:5 340:4 343:2 |
| 209:4,23 213:22 | 325:19 326:10 | 135:21 137:6 | 345:13 346:5 |
| 215:3 218:19 | 354:23 358:3 | 138:3,11 139:3 | 347:3 356:17 |
| 223:8 243:21 | 366:14 | 140:5 141:2,18 | 358:21 360:15,21 |
| 250:18 253:21 | **kindly** 200:19 | 144:19 145:2 | 360:22 361:18,22 |
| 266:17 277:7 | **kinds** 199:17 | 150:14,16 152:3,9 | 361:25 362:4 |
| 296:3,15,20 297:2 | **king** 3:19 | 152:13,14 154:15 | 364:6 365:5,21 |
| 312:11 323:23 | **kirschner** 27:19 | 154:22 155:4 | 366:4,18 368:17 |
| 324:7 335:25 | 28:6,16 29:20,23 | 156:23 157:7,9 | 369:2 372:19,21 |
| 340:19 341:10,23 | 30:2 335:3 | 158:8 159:24 | 372:25 373:3,6,7 |
| 342:8,12 344:7 | **kirschner's** 27:21 | 160:18 161:11,14 | 375:24 376:21 |
| 346:13,20,24 | | 162:13,16 170:13 | 377:13 381:10 |
| 349:16 350:2,12 | | | |

| | | | |
|---|---|---|---|
| 388:3 390:11 | 27:1 28:1 29:1 | 145:1 146:1 147:1 | 256:1 257:1,17 |
| 397:9,15 403:3 | 30:1 31:1 32:1 | 148:1 149:1 150:1 | 258:1,18 259:1,17 |
| **knowing** 242:4 | 33:1 34:1 35:1 | 151:1 152:1 153:1 | 260:1 261:1 262:1 |
| **knowledge** 29:8 | 36:1 37:1 38:1 | 154:1 155:1 156:1 | 263:1 264:1,3 |
| 31:19 34:16 37:13 | 39:1 40:1 41:1 | 157:1 158:1 159:1 | 265:1 266:1 267:1 |
| 37:15 61:15 63:4 | 42:1,15 43:1 44:1 | 160:1 161:1 162:1 | 268:1 269:1 270:1 |
| 104:11 108:11 | 45:1 46:1 47:1 | 163:1 164:1 165:1 | 271:1 272:1 273:1 |
| 119:3,11 120:8 | 48:1 49:1 50:1 | 166:1,9,16,21 | 273:5,24 274:1,19 |
| 126:15 136:5 | 51:1 52:1 53:1 | 167:1 168:1 169:1 | 274:20 275:1 |
| 137:24 145:25 | 54:1 55:1 56:1 | 170:1 171:1 172:1 | 276:1 277:1 278:1 |
| 155:2 168:25 | 57:1 58:1 59:1 | 173:1 174:1 175:1 | 279:1 280:1 281:1 |
| 174:20 175:22 | 60:1 61:1 62:1 | 176:1 177:1,11,16 | 281:13,14 282:1 |
| 210:11,14 219:16 | 63:1 64:1 65:1 | 178:1 179:1,3,4 | 283:1,23 284:1 |
| 225:2,6 226:3 | 66:1 67:1,9 68:1 | 180:1 181:1 182:1 | 285:1 286:1 287:1 |
| 229:6 234:22 | 69:1 70:1 71:1 | 183:1 184:1 185:1 | 288:1 289:1 290:1 |
| 241:11 251:11 | 72:1 73:1 74:1 | 185:6,9 186:1 | 291:1 292:1 293:1 |
| 254:13 257:7 | 75:1 76:1 77:1 | 187:1 188:1 189:1 | 294:1 295:1 296:1 |
| 259:6,10 336:10 | 78:1,21 79:1 80:1 | 190:1 191:1 192:1 | 296:13 297:1 |
| 336:19 364:18 | 81:1 82:1 83:1 | 193:1 194:1,17 | 298:1 299:1 300:1 |
| 369:14,24 374:5 | 84:1 85:1 86:1 | 195:1 196:1 197:1 | 301:1 302:1 303:1 |
| 378:20 387:19 | 87:1 88:1 89:1 | 198:1 199:1,25 | 304:1 305:1 306:1 |
| 403:6 | 90:1 91:1 92:1 | 200:1,15 201:1 | 307:1 308:1 309:1 |
| **known** 77:19 | 93:1 94:1 95:1,23 | 202:1,17 203:1,18 | 310:1,6 311:1,18 |
| 87:19 111:7,9 | 96:1 97:1 98:1 | 204:1 205:1 206:1 | 312:1 313:1 314:1 |
| 199:5,18 249:13 | 99:1 100:1,9 | 207:1 208:1 209:1 | 315:1 316:1 317:1 |
| 322:23 | 101:1 102:1 103:1 | 210:1 211:1 212:1 | 317:18 318:1,25 |
| **knows** 53:16 67:24 | 104:1 105:1 106:1 | 213:1,12 214:1 | 319:1 320:1 321:1 |
| 303:4 | 106:21 107:1 | 215:1 216:1,11 | 321:14 322:1 |
| **kns** 264:4 265:5,7 | 108:1 109:1 110:1 | 217:1 218:1 219:1 | 323:1,17 324:1 |
| 265:17,21 266:24 | 111:1 112:1 113:1 | 220:1 221:1 222:1 | 325:1 326:1 327:1 |
| 267:2 409:20 | 114:1 115:1,22 | 223:1 224:1 225:1 | 328:1 329:1 330:1 |
| **korea** 143:20,23 | 116:1 117:1 118:1 | 226:1 227:1 228:1 | 331:1 332:1 333:1 |
| **korean** 143:18 | 119:1 120:1 121:1 | 229:1 230:1 231:1 | 333:17,18 334:1 |
| **kost** 1:9 2:7 6:1,17 | 122:1 123:1 124:1 | 232:1 233:1 234:1 | 335:1,21 336:1 |
| 7:1 8:1 9:1,3,9 | 125:1 126:1 127:1 | 235:1 236:1 237:1 | 337:1 338:1 339:1 |
| 10:1 11:1,7,11,15 | 128:1 129:1 130:1 | 238:1 239:1 240:1 | 340:1 341:1 342:1 |
| 12:1 13:1 14:1 | 131:1 132:1 133:1 | 241:1 242:1 243:1 | 342:6,8 343:1 |
| 15:1 16:1 17:1 | 134:1 135:1 136:1 | 244:1 245:1 246:1 | 344:1 345:1 346:1 |
| 18:1,19 19:1 20:1 | 137:1 138:1 139:1 | 247:1 248:1 249:1 | 346:18 347:1 |
| 21:1 22:1 23:1 | 140:1 141:1,21 | 250:1 251:1 252:1 | 348:1 349:1 350:1 |
| 24:1 25:1 26:1 | 142:1 143:1 144:1 | 253:1 254:1 255:1 | 351:1,23 352:1 |

**[kost - loans]** Page 31

353:1 354:1 355:1 356:1 357:1 358:1 359:1 360:1 361:1 362:1 363:1 364:1 365:1 366:1 367:1 368:1 369:1 370:1 371:1 372:1 373:1 374:1 375:1 376:1 377:1 378:1 379:1 380:1 381:1 382:1 383:1 384:1 385:1 386:1 387:1 388:1 389:1 390:1,4,11 390:16 391:1,5,10 392:1 393:1 394:1 395:1 396:1 397:1 398:1 399:1,15 400:1 401:1 402:1 403:1 404:1 405:1 405:25 406:1 408:3,10,24 409:24 410:1,21 411:1 412:5,21

**koster** 4:23 8:12 15:2,2,3,6,13,20

**kpmg** 172:20,25

**l**

**l** 1:2 189:5,14 237:7,7

**lack** 227:20

**landed** 308:6

**language** 140:25

**large** 105:22 107:8 136:21 167:18 199:5 320:9 322:22 343:16 354:7,7

**larger** 260:23

**largest** 85:18 98:19 169:7 375:14

**lasted** 169:22 170:18

**latham** 312:15,16 312:17,19,23

**laughed** 402:14

**launch** 60:12 61:4 61:12,16 123:11 123:24,25 224:6 261:23 401:2,8 404:5

**launched** 60:6,18 61:20 132:16 362:11,14

**launching** 124:18 124:25 126:17,24 145:6,7 224:15 248:5 262:3

**law** 312:17

**lawyer** 88:16 130:19 291:18

**lawyers** 106:12 231:17 232:4

**lazard** 16:23 270:6 270:12 277:22

**lead** 57:10 120:11 121:5 142:9 153:16,17 255:5 266:25 302:4 315:16 379:5,16 379:22

**leading** 245:19,20

**learn** 110:22

**learned** 110:25 250:20 314:20

**leased** 128:17,20

**leases** 130:8

**leave** 231:17 291:19

**led** 26:13 27:19 347:17

**ledger** 117:12,19 117:23,25 118:3 127:12

**left** 265:18 286:2

**legacy** 162:6

**legal** 132:17 133:2 133:5,9 264:24 291:18 312:24

**length** 380:11,12 404:19

**leonardo** 187:17 188:3,13

**letter** 31:8 72:12 73:20 105:15 108:21 120:12 197:16,22 238:12 238:14,16 239:16 246:6,16,22 247:20 270:12 276:7,15 280:18 280:21 281:2,9,18 282:12 297:19,25 348:19,24 368:21

**letters** 22:5 197:24 198:9,13,18,23,24 199:7 348:4,9,15

**level** 97:23 146:10 198:2 210:22 327:3 328:3 352:3 353:8

**levels** 216:8

**liabilities** 107:20 108:3,4,7,18 134:2 160:11

**licenses** 24:9

**lien** 160:3

**liens** 382:13,19

**life** 284:18

**light** 32:3

**liked** 112:5 113:12 114:24 208:6

367:17

**limit** 271:18

**limited** 97:13 137:20 193:7

**line** 107:5 139:23 257:22 267:7 287:11 359:22 412:6

**lines** 320:25 352:20,22

**lining** 234:14

**liquidity** 249:9,12

**list** 97:14,25 187:11,12 219:9 361:11,12 363:8

**listed** 18:23 218:7 226:18

**lists** 56:19

**literally** 169:6 173:22 197:23

**litigation** 5:6 157:16,22 158:3,6 158:12,16 382:25 383:6

**little** 16:3 23:8 53:11 83:24 86:3 147:11 151:19 171:5 177:6 188:18 337:19 394:22,24,25

**live** 52:15,25 305:10 337:11,17

**llc** 3:5,5 412:3

**llp** 3:4,17 4:3,11 4:17

**loan** 278:12,13,14

**loans** 130:12,16,20 130:24 131:6 132:9 159:7,10,15 159:21 160:3 361:19

**[located - making]** Page 32

located   6:23
111:11 170:12
243:15 366:19
locations   311:5,7
logistics   303:10
321:2
lohan   4:14 8:17,17
92:14,20
loi   69:10,23 76:5,7
76:10 80:11 272:5
272:11,23 274:6
274:10,13,15,17
278:23 279:7,19
283:10 286:12
288:2 289:21
291:10 292:23
294:2 295:6
297:23 298:24
299:6,18 300:4,13
301:11,16,22
302:5 326:16
lois   94:4 279:13
283:6,8 290:14,17
lokey   30:24 31:4
135:16,23 136:6,9
136:20 137:25
224:11,22
lokey's   136:17
224:7,10
long   13:12 60:19
61:11 75:15 82:6
98:25 166:13
169:22 170:5,17
176:18 185:10,11
238:11 246:6
255:8,11 289:5
310:18 313:16
336:18 378:16
393:8 394:5 397:6
397:22 399:16
400:11 401:16

402:11 404:15,23
longer   140:13
167:3 171:9
188:18 220:23
232:22 316:24
317:3 379:6,16
380:25 381:3
403:18
look   10:4 69:10,24
79:7 105:6 107:3
127:10 150:25
166:10,19 185:12
199:23 202:16
203:16 205:19
206:4 216:9,22,24
218:6 258:14,22
259:14,21 265:16
275:13 283:21
284:5,24 285:12
285:22 310:14
313:2 318:20
319:4 321:12
323:15 336:5
340:12 342:4
355:16
looked   32:11
128:25 174:12
looking   73:21 97:2
218:3 250:11
264:22 278:2
284:11,16
looks   248:9 273:17
318:4
lose   82:25 83:11
loseman   3:11 8:2
losing   78:15
214:20,23
lost   215:12 349:16
lot   26:7 36:25 38:2
38:24 46:4 109:20
116:4 117:13

131:21,23 139:3
139:21 263:15,22
336:23 368:7,9
380:20 381:7
lots   157:13
low   195:18 207:24
242:25 243:3
319:14 363:8,9,15
lowe's   338:20,22
lower   80:6 149:12
196:12 247:17,23
248:10 278:8,9
361:11,12,14
lowered   359:19
lowest   147:15
lucky   76:21 77:11
lunch   179:21
lw   312:13
lw's   312:12
lynn   3:4 107:6
141:25 170:13
184:17,24 186:8
213:19 215:2,11
215:15,16 216:5
253:18 265:17
295:24
lynn's   184:7

**m**

m   189:5
m&a   26:22 27:5
27:11,12 69:25
73:8 119:12 123:3
123:7 136:24
143:22 146:19
193:25 240:8
365:17 378:21
390:18 391:12
393:10 402:21
403:7,21,22 404:8
404:10

mail   14:6 60:2
67:9,14,14 68:8
78:21 80:5 106:21
106:24 107:4,16
141:25 142:4
143:22 167:8
177:11,15,25
179:3,9,11 183:20
185:14 199:25
200:5,13 202:17
202:25 203:3
204:15 213:12,16
213:19 257:17,21
264:3 266:7,23
267:4 268:6 273:5
273:14 274:19
275:2,13 281:13
282:19 283:14
292:15 296:13,18
296:21,23 305:14
305:18 310:6,12
312:10 317:18,23
321:14,18 323:17
323:21 336:3
342:7,11,14
346:19,23 367:22
408:12,15,17,20
408:23 409:5,8,11
409:15,20,22,24
410:1,6,9,12,16,18
410:23 411:2
mails   14:2 155:18
155:19,21 156:5
165:11 197:24
204:6 292:20
305:12 344:11
major   23:17
majority   87:17
making   269:20
367:9 389:8

**maloney** 3:7 7:21 7:21 9:2,7 11:16 32:22 40:17,22 41:4 53:23 54:3,9 67:7 78:19 79:3 84:17 91:2 92:15 92:19 96:4 100:5 106:19 141:20 165:9 166:8 177:9 178:25 182:10,13 194:15 216:9 235:17 257:15 258:16 259:14 264:2 273:3,9 274:18 281:12 286:24 287:8,12 287:16 293:8,14 293:20 294:9,16 294:25 296:11 298:5,11 310:4 317:13,16 318:21 321:12 323:15 335:19 345:7 346:16 351:10 373:25 389:17 390:3,9 394:9 396:25 399:9,12 399:14 405:14,20 408:5

**maman** 4:8 8:16

**man** 273:25

**management** 25:3 57:5 62:6,7 101:4 118:22,24 122:8 122:18 124:20,25 140:6 214:17 239:15 263:16 266:3 276:20 303:10 311:13 314:6 341:17 342:22 344:6

345:17 348:3,10 352:2 354:23 355:18,19,21,22 355:24 356:7,17 357:9 358:2 380:19 381:2 395:8,13,18,23 396:4,6,8

**management's** 82:4 357:13

**manager** 54:22

**managing** 9:12 23:23,25 131:19 356:3

**mandate** 392:9,11

**manner** 135:24 136:12,18 205:18 315:11 390:22 391:15 393:12

**manufacturer** 134:24 199:19 243:8

**manufacturers** 98:20 269:22

**manufacturing** 341:2

**mapping** 303:23 304:4,7 320:16,18

**maps** 303:6

**march** 67:10,16 79:8 80:8 82:11 123:12 124:4 145:8 224:6,15 254:11 318:10,12 318:14 408:13

**mark** 11:8 27:19 27:20 29:23 67:8 78:19 141:20 177:9 257:15 273:3 311:17 335:3 346:16

**marked** 11:12 67:11 78:22 100:10 106:22 141:22 166:17 177:13 179:5 185:7 194:19 200:3 202:19 203:19 213:14 216:13 228:3 235:19 257:18 258:20 259:18 264:4 273:7 274:21 281:15 283:25 296:16 310:7 311:19 317:20 319:2 321:16 323:19 333:19 335:22 342:9 346:21

**market** 63:12,16 63:20 84:5 94:2,3 101:24 143:18 146:19 171:3,9 172:5,9 174:13 175:24 176:11,18 177:7 214:19 220:22 250:12 308:24 360:13 381:24 384:20 385:4,13,22 386:5 393:9,16 394:13 394:19 396:10 397:5,8 399:25 401:20 402:4

**marketed** 162:20 162:25 163:7

**marketing** 56:18 56:21 57:12,19,21 57:23 58:2,6,12 63:15 125:6 126:9 148:6 163:11

176:14 215:23 221:14 222:16,19 225:4 241:6 315:17 337:20 382:5,7 394:12 396:9 399:24

**markups** 206:12

**marriage** 407:14

**mary** 3:7 7:21 9:7 78:24

**matera** 1:12 2:9 7:4 8:22 407:4,22

**material** 268:18 269:7

**materials** 56:18 57:13,19,21,24 58:2,7,12 59:4,6,6 59:10 63:15 125:6 126:9 214:9,12 238:7 239:24 241:6 291:20 303:6 305:21 306:2,4 315:18 318:20 323:9 328:8 368:7 393:24 394:12 396:9 399:24

**matt** 277:24 280:10,19 281:6 282:6 292:8 295:18,24 296:9

**matter** 6:17 19:3 30:18 268:4 369:4 407:16

**matters** 25:21 26:3 225:19 285:22

**maverick** 194:18 194:22 216:12,16 217:14 409:2,14

**maximize** 240:6
365:7,13,17
376:24 377:3
378:15 381:22
400:10 402:11
404:15
**mba** 23:19
**mbia** 4:4 8:14
87:17,24 88:12,15
88:25 89:9 92:2
94:18,24 95:17
161:7,9,10,15
**mbia's** 334:8
**mckiernan** 89:11
**mcnally** 298:20
303:5 320:10,15
321:16,21 410:17
**md** 36:7 47:15,17
48:6,20 49:7
50:15 94:3 134:18
134:20 145:4,4,12
145:18,22,24
146:2 147:10,17
149:23 150:6
153:7,13,16
154:14 156:15,21
156:24 157:3,8,11
157:15,25 158:7
159:6,9 161:22
162:21 163:2,7,10
163:12 164:5,25
165:5 166:12
167:18 168:4
170:22 171:8
172:4,7 176:2
179:25 180:13
181:24 182:16
184:11 185:4,6,18
186:9 193:15,24
194:9,25 195:4
196:3,14 201:22

202:8,23 203:8,13
203:15,23 204:11
204:15 205:21
206:16 209:15
210:13 211:2,11
211:20,24 213:23
214:14,18,20,23
215:12 219:2
220:16,21 222:20
222:24 223:7
224:5,15 225:20
226:4 227:18
229:23 230:4,6,13
254:3 337:21
338:7,10 353:12
353:23 354:5,9,11
375:3,5,13,16,18
375:20 376:3,6,7
376:11,17 398:3
399:3 409:1
**md's** 157:17
172:25
**mean** 16:3 33:22
38:15 39:25 43:14
47:15 62:16 71:9
78:17 83:5 93:21
96:7 98:16 110:25
114:20 127:7
156:3 160:18
169:24 202:9
215:16 229:10
264:7 267:25
268:2,2 292:11
308:3 314:15,18
317:12,15,16
320:16 334:18
353:17 386:20
**meaningful**
215:23 369:17
**means** 24:17
114:22 177:5

264:10 278:9
332:4 347:13
375:25
**meant** 57:17 92:16
347:21
**media** 6:15 85:2
165:17 166:7
235:24 236:6
298:19 351:21
406:2
**meet** 13:17 90:3,5
122:8 127:15
**meeting** 122:7,18
122:19 163:24
168:2 169:25
170:20 177:24
178:3,8,12,15,23
181:23 182:15,21
182:23 183:2,6
187:20 188:2,4,16
189:24,25 190:4,7
190:12,16,21,25
191:6 247:6,11
248:3 249:24
253:15,16 266:16
331:25 333:6
338:2 339:7,21
340:20 371:20,22
**meetings** 29:24
57:5 87:4 89:13
90:9 143:16
167:10 169:20
170:15 179:14,16
179:20 180:14,22
181:5,13 182:3,7
183:8,11,23 184:6
184:15,18,25
186:19,25 187:9
188:19 189:17,23
192:4,9,20 193:3
240:19 247:8

331:24 334:8,11
338:12 371:15
374:4
**meets** 135:25
136:12,19
**member** 254:23
**members** 59:25
87:21 88:10 90:12
91:5,7,17,20 92:17
92:22 93:15,19
95:25 96:15
154:11 192:19
193:2,6,16,22
194:5 208:22
209:5,16,20,20
370:20
**memo** 197:9
**memorandum**
58:16,18,22 94:16
126:21 191:25
241:8
**memorandums**
126:14 241:13
**memory** 168:21
**mention** 343:6
**mentioned** 75:22
93:8 109:20
120:14 125:25
194:14 195:25
210:24 245:9
250:17 265:12
267:10 290:14
368:24
**mentions** 167:9
**merely** 221:25
**mergers** 124:12
**messages** 333:17
333:22 410:20
**met** 9:4 12:24 13:5
88:21 177:19
311:12,13 338:20

338:25 340:24 367:15 390:11 396:3

**metal** 352:24,25

**methodologies** 146:15,17

**metrics** 147:2

**michael** 3:21 8:5

**michele** 4:8 8:16

**michele.maman** 4:8

**michigan** 23:16 341:6

**microphones** 6:5 6:10

**mid** 124:4 231:8 238:5 335:9 362:7 362:8 363:4

**midst** 172:18

**mike** 12:25 31:16 44:14 46:15,22 47:8 48:12 68:9 71:20 75:25 103:5 111:21 131:20,22 131:24 151:7 155:13 177:18 178:16 179:15 181:11 200:15,22 213:22,25 215:3 223:8 243:21 250:17 253:21 266:16 296:3 343:2 345:14 351:8 370:13 388:24 389:2,3

**milan** 188:23,25 189:3,4

**milestone** 12:2,6,7 12:8 60:25 61:3 123:10 286:22 287:15 293:13,19

**milestones** 11:22 386:22

**millennial** 284:9

**million** 54:19 68:25 69:15 70:19 74:9 109:9,13 147:18,24 149:7 149:15,17 159:18 159:19 195:18 207:20,23 210:19 211:3,3,4 217:14 217:20 242:22,24 243:2 248:9 271:15 307:24 308:11,13,17,21 319:9,10,14,20 323:25 324:19 325:16 328:2,2,5 329:24 330:12,15 358:12,22 359:5,8 359:15

**mind** 13:24 70:21 77:9 111:3 196:17 301:10,16 336:21

**mini** 169:4 305:22 306:4

**minimize** 52:12

**minimum** 400:18

**minute** 165:10 243:5

**minutes** 73:24 79:2 235:20 298:10

**misses** 268:16,19 269:8

**missing** 253:10

**misstating** 73:17

**misunderstood** 123:21

**mloseman** 3:12

**mm** 45:8 182:13 329:21 377:12

**mmaloney** 3:7

**mneiburg** 3:21

**mobile** 320:11

**model** 214:14

**moelis** 153:12,18 154:10,15 162:21 163:11,16,20,24 164:25 165:5 166:12 167:10,19 167:23 170:13,14 172:7,12 174:21 176:6 178:3,12 179:17,24 185:18 185:18,22 186:8 187:16,21 188:6 188:10,22 189:8 189:12 190:4,8,14 190:17,22 191:2,7 191:19,25 192:22 193:8 195:8 197:4 201:3,5,21 202:6 202:22 203:9,12 203:15 206:20 207:12 208:16 210:8,18 213:13 213:16 216:13,16 218:21 219:17,21 219:21 220:10 221:4 224:14 225:2,7,12 226:3 228:14 229:6,12 409:11,14

**moelis's** 174:22

**moment** 301:14

**monday** 371:10

**monetization** 11:23 12:13 19:2 19:5,7,14,18,20 20:23 21:6,15,21

22:24 23:3 31:25 40:5,18 42:11 45:11 47:18 50:8 51:12 86:8,18 92:9 112:2,13,14 114:6,18 129:7 140:11 158:10 285:23 295:3 300:9 306:9 329:7 329:8 331:6 352:5 369:22 370:2 371:23 374:11 388:20,22 392:2 392:12 404:13

**monetize** 17:4 20:4,9,14 114:12 135:23 136:11,17 369:13 381:22 392:13,21 402:10

**monetizing** 103:16 378:14

**monica** 3:11 8:2

**monitor** 377:17

**month** 40:5 42:18 43:2 113:6,22 114:2,19,25 115:4 115:10 116:6 250:3 251:3,16 252:2 329:9 380:21

**monthly** 124:24 277:9,21

**months** 19:25 38:25 39:6 60:11 60:17,19 61:5,9,15 79:21 90:19 91:15 181:4 209:11 291:2 295:20 313:14,17 324:16 328:15 354:14 360:18 365:11

378:24 379:17,24 380:8 392:20,20 393:13,21 400:14 400:17,19,20 401:25 402:5 403:5,13,24,25 404:6,15 405:5,10

**moody's** 339:2,14

**morgan** 240:20

**morning** 6:2 9:3,5 13:6,18 274:24

**moser** 151:8

**motion** 12:2,7,8 14:12,16 42:9 123:10 221:6 222:14,22,24 223:14 224:5 232:20 279:8 286:10,12 287:25 288:2,10,11,12,23 289:2,7,11,16,22 289:25 290:9 291:11 292:4,6 297:22 299:2,12 300:21 330:2,6 372:16,23 373:2 388:13

**motions** 11:21 12:6 14:8 286:23 287:15 291:19 293:13,19

**motivating** 375:16 375:19

**mountain** 340:5

**move** 108:22 172:17 178:24 230:6 232:25 280:22,23 293:6 296:4,7 322:19 326:22 337:12 344:8,22,25

345:15,24 346:9 354:6

**moved** 109:22 171:18,21 322:3 344:3

**movement** 277:20

**moving** 45:3 46:19 172:15 188:15 210:12 253:18,23 280:17,25 343:13 345:22

**multimillion** 106:14

**multiple** 35:4 146:12,21,22,22 147:2,4,25 148:13 148:15,18 185:17 310:24,25 311:3,5 313:24

**multiples** 148:17

**n**

**n** 1:2,2 3:2 4:2 5:2 189:5,14 237:7,7 408:1

**name** 6:25 9:8 14:3,5 52:13 53:9 53:10,12 89:15,19 121:5 153:15,20 153:24 154:2,4 162:5 164:15 189:3,4 228:6 285:24 320:11,15 340:4 361:25 366:15 412:4,5

**names** 52:19 89:24 154:5 162:4 164:22 168:6 228:10 325:7

**narrow** 298:7 351:11 368:9

**nda** 59:11 89:6 194:7

**near** 396:23

**necessarily** 111:3 317:8 389:6

**necessary** 187:14 390:6

**need** 40:22 52:24 54:5,6 73:13 87:14 88:23 94:22 119:5 125:22 126:2,24 139:13 140:25 171:4 172:8 235:19 294:17 302:5 334:11 356:21 357:13 393:25 399:12

**needed** 114:17 222:6 253:7 347:13 360:12

**needs** 132:6 235:5 265:15 306:18 350:12 355:18,21

**negative** 299:24 301:7 343:21 384:20 385:4,12 385:21 386:4

**negotiate** 68:18 73:25 74:6 76:8 332:9,13

**negotiated** 245:10

**negotiating** 69:4 74:15,19,23 83:13 106:12 120:12,16 244:14

**negotiation** 119:21 120:5 238:20,25

**negotiations** 79:22 106:10 109:21 270:6

**neiburg** 3:21 8:5,5 10:7 11:14 12:25 13:5 14:21 15:10 15:14,23 22:3,22 29:5,21 30:21 32:21 33:14 34:21 35:7 36:19 37:11 38:9,22 39:19 40:6,21,24 41:7 42:4,12,19 43:4,20 44:13 45:15,23 46:14 47:5 48:23 49:9,18 50:17 53:20,25 54:5,10 58:8 59:8 61:6 62:11 63:6 65:20 65:25 68:6 69:18 71:18 73:3,16 74:20 78:24 79:6 83:15 84:7 90:22 91:3,21 95:11,20 96:9 103:24 104:24 105:17 106:5 107:15 109:5,14 112:4 113:10 114:8 116:14 121:3 123:19 124:16 125:12 127:6 128:11 130:18 131:9 132:11,19 133:13 135:8 136:2,14 137:5,19 138:10 139:8,19 140:22 141:15 143:13 150:8 159:2 161:13 165:13 166:21 176:4 181:2,25 182:8,11,14 183:19 184:13

**[neiburg - object]**

186:23 192:24
198:15 199:2
202:13 205:6
208:24 209:8
210:2,20 211:8
219:23 221:12
223:18 224:17
230:8 231:3,16
232:2,17 234:11
234:19 239:6
240:7 242:18
245:2,14 250:5
251:4,17 260:19
260:25 268:21
270:19 279:21
282:25 283:15
284:15,20 286:15
287:7,10,14,19
288:14,19 290:10
290:18 291:13
292:25 293:5,12
293:18 294:6,13
294:22 295:9
297:11 298:9
299:8 300:14
302:24 306:12,21
307:4 309:21
312:6 314:14
317:12,14 319:21
320:2 322:13
329:19 330:5,18
332:8 334:17
345:3,8 350:18
353:15,17 354:2
354:16 355:14
356:10 362:17
365:8,15 373:13
373:22 374:10,23
375:7,22 377:8,20
378:9,17,25 379:8
380:2,9,23 381:9

382:3,21 383:15
383:25 385:23
386:19 388:9,23
389:14 399:11
401:10 402:6
403:15 405:18
**neither** 191:13
**never** 24:19 25:13
48:19 95:15
303:22 304:2
362:10,14 385:5
**new** 2:2,2,11 3:6,6
4:5,5,13,13,20,20
6:24,24 7:2,4
179:13 225:9
228:15,19 229:3,8
229:14 250:12
274:13,17 311:6
328:19 347:10
348:5,11 406:3
407:5 412:3
**news** 98:11,11
321:25
**nice** 46:24
**nicholas** 273:10
**nick** 273:11
**night** 330:2
**nine** 291:2 404:14
**nintendo** 243:10
**nomura** 339:21,23
**non** 86:2 174:5
**nonbinding**
217:12
**nonconfidential**
187:8
**nondisclosure**
88:19 92:8 194:11
**nonpressurized**
62:25
**normal** 27:10
391:14 402:21

**north** 3:19
**northeast** 366:21
**notary** 2:10 8:22
407:4 412:24
**note** 6:5 276:16
**noted** 7:18 313:24
406:5
**notes** 67:20 72:5
99:19 105:6
**notice** 11:10,11
302:23 408:11
**noticing** 7:17
**nov** 106:4,14
108:21
**nov's** 107:7,13
**november** 151:22
151:22 155:9,14
156:5 165:5 185:3
186:12 187:17,22
188:23 189:9,14
190:5,10,14,18,23
191:4,8,20 192:6
192:21 205:23,25
225:14 238:4,5,7
308:19 358:17,18
358:20,22 359:8
359:15,16,18
**number** 6:20
20:20 32:6 64:21
70:13,18 97:6
98:12,15 99:8
111:6 115:13
136:23 140:24
156:4,24 170:10
170:11 176:12
196:20 197:2
206:10 207:20
243:3,13 247:3
263:22 267:7
271:9,12 273:18
288:6 308:6,9

325:13,15 372:17
395:17 405:25
**numbers** 148:21
150:15 151:11
267:23 268:3
285:21 324:25
325:5,10
**numerous** 25:21
46:17 66:14
223:10 252:13,17
394:3

**o**

**o** 1:2 8:21,21 9:9
191:3
**oasis** 23:7 51:22
52:11 54:13,14,18
54:22 55:6 56:10
56:14 58:12,19
59:15 60:5 62:15
63:8,23 64:3
76:17,23 77:3,13
77:16 78:15 79:22
80:19 81:19 83:2
83:7 94:4 102:2
371:14,18,18
**oasis's** 55:17 58:15
82:3
**oath** 7:7
**object** 11:2 22:3
22:22 29:21 30:21
32:21 33:14 34:21
35:7 36:19 38:9
38:22 39:19 42:4
42:12,19 43:4,20
44:13 45:15,23
46:14 48:23 49:9
50:17 58:8 59:8
61:6 62:11 63:6
65:20,25 68:6
69:18 71:18 73:3
73:16 83:15 84:7

**[object - okay]**                                                                 Page 38

| | | | |
|---|---|---|---|
| 95:11 103:24 | 355:14 356:10 | 357:13 394:20 | 22:15,25 23:3 |
| 104:24 105:17 | 362:17 365:8,15 | 396:4 397:10 | 27:17 28:25 29:15 |
| 107:15 109:5 | 373:13,22 374:10 | 404:17 | 31:15,25 50:9 |
| 112:4 113:10 | 374:23 375:22 | **occasion**  252:22 | 86:9,18 92:9 |
| 114:8 121:3 | 377:8,20 378:9,17 | **occasions**  46:21 | 112:13 129:7 |
| 123:19 124:16 | 378:25 379:8 | 115:14 252:14,17 | 139:3 158:10 |
| 125:12 127:6 | 380:2,9,23 381:9 | **occur**  37:14 170:8 | 300:10 331:6 |
| 128:11 130:18 | 382:3,21 383:15 | 238:6 252:18 | 370:2 374:12 |
| 131:9 132:11,19 | 383:25 385:23 | 262:5 | 392:2,12 |
| 133:13 135:8 | 386:19 388:23 | **occurred**  77:16 | **offices**  6:23 |
| 136:2,14 137:5,19 | 389:14 401:10 | 99:6 170:9 182:23 | **officially**  265:21 |
| 138:10 139:8,19 | 402:6 403:15 | 183:4 217:8 | **oftentimes**  174:3 |
| 140:22 141:15 | **objecting**  286:24 | 321:21 | 176:25 |
| 143:13 150:8 | **objection**  11:4 | **occurring**  151:13 | **oh**  70:4 172:14 |
| 159:2 161:13 | 49:6 219:23 | 187:16,21 188:22 | 205:11 260:16 |
| 176:4 181:2,25 | 345:25 346:3 | 189:8,12 190:4,8 | 275:8,16 366:4 |
| 183:19 184:13 | 394:9 396:25 | 190:13,17,22 | 371:17 |
| 186:23 192:24 | **objections**  7:14 | 191:2,7,19 338:13 | **okay**  9:17 10:3,7 |
| 198:15 199:2 | 39:23,25 | **occurs**  383:21 | 11:25 12:22 14:10 |
| 202:13 205:6 | **obtain**  105:22 | **octaluna**  3:5 | 14:20 16:5 17:9 |
| 208:24 209:8 | 129:2 174:25 | **october**  60:7 | 18:5,19 19:22 |
| 210:2,20 211:8 | **obtained**  103:22 | 100:17,20 151:22 | 20:12 24:19 25:16 |
| 221:12 230:8 | 196:20 301:22 | 155:9,14 238:8,9 | 27:13 30:14 31:9 |
| 231:3,16 232:2 | **obtaining**  176:21 | 257:12 258:7,12 | 31:17 33:24 34:13 |
| 234:11,19 239:6 | **obviously**  66:11 | **odd**  276:14 | 35:22 39:4 44:20 |
| 240:7 242:18 | 80:10 87:13 92:6 | **oem**  343:17,22 | 45:3,20 46:3 |
| 245:2,14 250:5 | 97:22 114:23 | 344:13 345:18,21 | 50:19 52:21 56:12 |
| 251:4,17 260:19 | 132:24 133:2 | 347:10,20,24 | 57:16,22 58:5 |
| 260:25 268:21 | 134:23 140:3 | **oems**  331:25 | 59:14,19 60:10 |
| 270:19 287:7,10 | 143:21 169:3 | **offend**  153:24 | 61:18 62:4 63:11 |
| 290:18 291:13 | 199:7 202:3 | **offer**  48:2,8 71:2,4 | 63:17 67:7 71:5 |
| 292:25 293:5 | 207:16 209:14 | 84:5,13 209:16 | 71:24 72:11 75:10 |
| 294:6 295:9 | 211:12 216:4 | 266:10 274:9,9 | 78:2,19 82:10,14 |
| 300:14 302:24 | 223:14 248:10 | 295:20 327:9 | 83:10,25 84:16 |
| 306:12,21 307:4 | 261:24 265:12 | **offered**  79:24 | 85:14 86:6,11 |
| 309:21 312:6 | 266:22 267:19 | 246:15 | 90:20 91:2,9,13 |
| 314:14 319:21 | 268:10 307:5 | **offers**  48:22 | 93:13 94:11 95:6 |
| 320:2 322:13 | 312:9 315:19 | 209:18,22 | 95:15 96:17 98:18 |
| 329:19 330:5 | 320:20 322:9 | **officer**  12:13 19:2 | 99:25 100:16 |
| 332:8 334:17 | 326:19 328:11 | 19:5,7,15,15,19 | 101:25 102:8 |
| 353:15 354:2,16 | 347:8,19 354:22 | 20:23 21:7,15,21 | 103:4,7 104:10,21 |

**[okay - overseeing]**

105:8 106:2,13
108:24 109:11
110:11,11,15
111:10 112:17
114:15 117:11
118:8,19 120:20
121:18 123:6
124:18,23 125:14
125:19 127:14
129:10 130:10
131:12,15 132:7
133:20 134:21
135:11 136:16
138:13 139:12
141:24 144:22
147:15 149:12
152:20 153:2,12
154:6,9 155:6
156:7,11 157:2,10
157:23 158:15
159:6 160:20,23
161:25 163:14,22
164:4 165:9,12,13
166:9 168:5
169:21 170:21
171:6 174:14
176:17 178:2,24
179:9 180:10
185:2 186:17
187:6 188:8,21
190:3 192:3,8,12
193:5 197:18
199:23 200:19
202:15 204:13
205:19 212:22
213:4,10 215:10
215:18 219:4
220:15,21 221:4
223:25 225:21,25
226:14,23 227:13
228:17,24 231:5

232:12 235:12
239:9,17,21,25
240:3,14,21
242:10 248:13
251:14 254:24
257:8,14 258:5
261:16 262:3
263:9 264:2
265:16 267:14
269:4,11 270:5
271:4,12,16 273:2
274:11 275:18
277:12,16 278:7
279:17 282:6
283:21 284:11
285:2 288:7,19,25
289:19 290:6
298:5,8 300:22,24
303:13,16 305:13
306:8 307:8,25
308:5,15,22
309:23 310:14,18
311:14 314:2
316:8 317:2,7
325:8 326:6
331:23 332:6
333:9,16 335:5,17
336:10 337:18,25
339:18 340:3,17
340:23 341:13,21
342:4 344:2,18
346:11,16 349:20
349:24 350:25
351:9,13 352:9
353:9 358:21,25
361:5,18 362:13
362:20 363:11
364:6,17 365:12
365:21 368:23
370:20 371:11
372:2,8 375:2

377:15,24 379:20
380:18 381:13,20
382:11,23 383:10
383:20 384:21
389:9 391:25
392:5 393:7,14
394:14 395:7
396:11 398:9
402:8 404:17
**omnibus** 37:3
**once** 61:19 66:11
68:12 154:20
221:4 304:21,22
326:10 370:17
393:19 401:22
**ones** 141:6 181:7
**ongoing** 51:25
107:10 265:20
343:19 351:4
383:7
**operate** 357:16
**operating** 157:12
**operational** 128:9
128:14 207:17
221:17 222:5
**operations** 55:17
56:8 128:6,20
240:23
**opinion** 187:5
201:6 238:18
316:11 391:16
393:18 401:22
**opportunities**
143:19
**opportunity** 10:25
76:20 77:2 78:15
83:2,11 157:13
231:13 240:22
241:3 315:4
364:22

**opposed** 110:9
159:4 246:22
346:6
**optimal** 356:11,12
357:8
**oranges** 401:14
**orbital** 153:3
**order** 38:4,18,21
43:12,18 49:3
60:25 61:3 261:23
372:9,12,15
**ordered** 392:6
**organization** 25:9
**original** 226:18
234:4
**originally** 69:16
**outcome** 7:9
175:18 407:15
**outcomes** 193:4
**outreach** 56:21
97:9,11 123:12,18
145:7 177:8
221:14 224:6,15
358:3 394:13
399:25
**outside** 27:5
137:13 161:4
223:21 262:14
**outstanding**
144:20,23 159:6
159:10,14,21
330:9 361:19
**overall** 220:13
**overcome** 140:25
**overhang** 65:18
**overly** 111:4
**oversee** 19:20
24:22 357:10
377:18
**overseeing** 19:23

**oversight** 19:8,24 57:7
**owned** 128:17,20
**owner** 157:25
**ownership** 348:18
**owns** 130:10,11

**p**

**p** 3:2,2 4:2,2,21 5:2,2
**p.m.** 166:5 236:4 405:23 406:5
**package** 221:16 222:4 271:3 347:7
**packages** 206:11 206:15
**page** 107:4,5 141:25 142:3 143:25 185:13 195:7,14 197:24 198:12 200:6 206:4 213:18 216:24 258:23 259:21 260:7,15 265:16 273:19 274:23 275:13 276:18 277:23 285:3,14,20,21,21 302:15,18 318:4,5 319:12,17 342:16 402:20 408:2,10 412:6
**pages** 167:6 185:10,11 310:20 313:7
**paid** 262:17
**paper** 292:12 303:5 366:14,16
**paragraph** 276:17 278:8
**parallel** 153:8

**park** 2:2 3:5 6:24
**part** 14:6 17:22 36:22 37:21 39:4 41:8 42:10 45:11 50:16 51:4,11 55:15,21 59:6 81:12,23 96:12 101:18 103:3,16 105:8 110:22 114:4,10 116:19 124:11,25 125:5 129:6 143:21 152:4 158:9,10 160:5 174:15 186:21 196:19 198:18 220:23 231:11 243:23 248:12 250:2 251:5 262:11,23 270:5 271:3,8 307:9,15 309:8 327:19 329:8,13 329:17 331:5,12 332:21,25 337:4 341:17,18 347:14 352:4 358:4 360:2 363:4,10 367:5,8 375:13 386:11
**participant** 155:11
**participate** 64:22 64:25 65:6,12 90:8 163:23 169:10,16,19 191:23 261:12 272:18 325:24
**participated** 162:9 163:15,19 178:5 178:10,14 261:8 333:6
**participating** 65:19 176:23

229:14
**particular** 153:7 368:13 397:3 400:10 404:24
**particularly** 364:3
**parties** 6:14 11:21 14:5,9 29:13 36:6 47:25 48:8,22 50:11 53:7 56:22 61:22 62:8 65:5 66:16 68:15 70:10 73:7 87:15 90:24 97:7 104:2 105:14 135:10 139:25 144:24 159:20,22 162:3 171:14,22 172:13 175:5 177:2 188:12,20 193:13 225:18 226:25 227:17,22 227:25 229:25 260:10,11,13 266:20 267:6 280:14,15 320:9 324:18 326:19 327:6 339:11 361:20 407:13
**partners** 3:5 5:5 8:3 20:17,19 142:10 236:18 260:21 319:11 323:2 340:8
**parts** 134:24 163:10 189:20
**party** 7:8 70:14 71:10,14 73:11 75:17 126:6 133:5 160:12 161:3 162:2,10,12,15 173:19,21 175:20 194:2 221:15

260:20 261:5,10 261:14,21,25 268:14 270:8 302:4 306:14 314:24 321:7 326:21 369:9
**party's** 261:17 369:16
**pass** 60:17 129:18 129:24 364:22
**passed** 60:25 61:3 299:20,24
**passes** 142:20
**passing** 130:4
**path** 221:16 333:15
**patient** 236:13
**patriarch** 3:4 5:5 7:23,23 8:3 20:17 20:19 41:16 50:2 99:7 102:22 110:21 120:11 141:21 159:11,15 160:13 161:21 176:9 217:16 236:18,22 246:12 248:2 279:15 281:22,24 295:25 302:12 311:11,12 345:10 350:21 367:13 408:18
**patriarch's** 12:8
**pause** 204:4 225:3 389:18
**pay** 239:3,11
**payable** 128:3
**pdp** 237:7 243:4,7 243:11,14,17,20 243:22,23 247:2 247:15 250:2,6,18 250:21 251:2

**[pdp - portfolio]** Page 41

253:5,7,9 263:3

**pdp's** 243:6 245:17 251:6,8

**pending** 214:25 294:23 327:23 382:24 383:5

**people** 24:21 72:15 73:10 76:2 164:17 176:12,14 215:21,23 229:16 229:22 236:12 315:16 320:22,24 332:2

**perceive** 376:9

**percent** 66:5,9 260:24 261:5 263:21 265:13 269:7 369:18

**percentage** 26:25 159:14 261:3

**perception** 376:14 381:25 383:22 384:20

**percipient** 45:21

**perella** 119:16,22 120:2,6,17 121:7 142:10,17 143:10 143:17 144:11

**perfectly** 27:10

**performance** 104:3 211:11,12 211:20,24 250:10 250:24 251:6,9 268:12

**perimeter** 217:17

**period** 21:16 40:5 80:8 114:2 170:7 176:19 197:4 282:5 285:5 288:8 297:10 380:21

**periodic** 142:25

**periodically** 31:25 89:12 90:10,13 143:5

**peripheral** 243:8

**person** 169:15 253:16

**personal** 119:3 137:23 154:25 256:20

**personally** 50:20 118:4 149:21 151:25 152:2

**perspective** 32:12 250:11,24 347:21 356:13

**persuade** 82:16

**persuasive** 314:13 315:11

**peter** 313:19 314:5 314:6,21 320:8 324:23 326:12,14

**petroleum** 85:19 86:2

**phase** 98:2 206:10 326:23 337:12,12

**phone** 8:2 142:25 151:7 155:22 156:5 177:19 179:15 201:16 204:22 205:4,12 279:5

**phones** 6:9

**physical** 130:25

**pick** 6:6

**picked** 320:8

**picture** 325:20 326:14

**pieces** 347:6

**pitch** 27:16 164:3 238:3,6,7 239:23

334:22 368:7

**pitched** 238:2

**pitches** 334:13

**pj** 303:20 304:15 308:23 309:6,9,24 313:12 317:19 318:2 410:13

**place** 2:8 6:9,13 154:23,24 155:2 235:7

**placed** 219:5 275:20,25 387:10

**plan** 305:20 306:3 402:22

**planning** 282:24 302:11,21

**plans** 222:16

**plant** 352:3

**plate** 269:24

**platforms** 243:9

**platinum** 191:20

**play** 70:9

**playstation** 243:10

**please** 6:4,8 7:12 7:15 9:8 11:4 203:7 228:18 282:8 284:21 286:7 294:24 378:10

**pleased** 199:3

**plus** 67:22 313:7

**point** 20:2,6 42:2 49:5 52:16 64:13 68:19 69:8,13 70:17 72:6 74:2 76:7 77:8 88:17 92:6 114:13 145:2 148:6 150:19 151:6 157:24 162:6,8 184:14 209:11 212:7

220:21 231:20 246:8 247:13 252:4 253:5 256:10 268:17 279:4 281:24 282:3 293:24 295:3 300:8 306:8 314:22 318:14 321:4,8 322:11 325:18 326:8,13 327:24 330:13 338:15 339:9 343:12 344:3

**points** 82:5 88:20 147:13

**pokrassa** 75:25

**populating** 150:12 150:22

**portage** 331:22

**porter** 4:11 8:18

**portfolio** 16:11,20 17:5 19:10 20:5 33:6,10,18 34:25 35:21,24 36:4 38:5 39:3 52:13 54:11 85:5 95:3,9 99:3,7 102:11 103:17 110:13,16 110:21 111:20,23 112:15 113:25 119:15 129:25 130:5,22,25 131:7 132:25 134:5 135:20,24 136:18 137:4,9 140:12 143:7 145:13 157:8 158:12,17 176:9 201:11 212:20,23 213:2 217:16 218:5 230:16 236:14,19

**[portfolio - pretty]** Page 42

236:22 238:21
239:7,11,16
241:22 246:13
247:25 253:19,24
254:9 298:7,21
301:2 312:21
315:13 328:20
329:3 340:14
358:15 372:10
373:11,20 374:9
376:10,16,20,24
377:3 378:8,15
379:5,15,24 380:7
381:23 382:17,24
383:5 384:3,17
385:2,6,10,25
388:6 391:19
392:14,22 393:3
394:17 395:5,9,14
395:17,21 396:13
396:23 397:14,17
397:18,21 399:4
400:10 402:11,24
403:19 404:2,3,11
404:20,24 405:3,8
405:13
**portfolios** 145:6
**position** 19:5
23:22 25:3 68:19
74:3 218:25
224:23 254:20
394:13 396:10
399:24 400:8
**positioned** 135:23
136:11
**positioning** 214:18
**positions** 254:11
**possession** 211:10
211:19
**possibility** 218:18
233:4,13,19 234:7

387:24
**possible** 36:12,13
44:22 66:21
133:14 137:11
138:5 149:18
159:3 164:2 216:6
227:23 350:9
**possibly** 147:18
175:12 387:25
**potential** 18:24
61:21 63:4,23
65:23 98:8 102:11
108:2 134:2
139:15 141:17
167:11,14 170:25
171:8 175:16
189:20 193:14,21
196:3 212:2
221:11 225:25
300:25 315:3
338:6,13 367:2
394:2,8 399:18
**potentially** 30:19
147:21 151:4
198:10 209:12
264:11 340:7
377:17 392:20
**practice** 80:22
**pratik** 89:25
**preceded** 197:2
**prefer** 70:5 154:4
193:25 381:11,17
386:9
**preference** 41:25
**preferred** 41:22
**preliminary**
185:10,15 186:12
187:8 196:23
212:4 240:2,18
305:24

**prep** 169:15
**preparation** 10:3
13:21 14:22 15:9
15:19,22 17:19,22
104:13 122:17
138:15,19,24
139:6 164:9 214:9
239:10 256:21
257:5 336:20
**prepare** 12:23
57:21 60:20 80:22
81:5 82:8 101:4
101:10,21,22
102:4,7,10,18
124:5,8 129:24
146:15,18 150:10
173:7,7 174:23
276:25 313:14
337:3 394:12
399:23
**prepared** 13:25
16:3 32:10,15,24
34:6,10,19,20,23
35:3,5,15 36:11
58:3,18,23 80:17
80:25 81:9,18
82:2,10 99:25
100:13 101:18
126:3,4,5,12
129:21,25 130:4
139:22 145:21,22
145:23 146:2,4
147:17 148:4,10
148:12 149:3,23
150:6 152:10
164:5,24 165:4
166:12 172:23
174:17,20 185:17
185:18 186:14,21
238:8 256:18
277:22 308:18

309:23 310:10
314:4 316:24
317:3 336:11,17
337:2
**preparer** 80:19
**prepares** 239:14
**preparing** 56:18
57:12,15,16 58:11
103:13 126:8
127:10 180:18
181:21 183:18
184:10,21 239:12
241:19 242:6
315:17 336:25
**presence** 137:14
137:18 297:14
**present** 5:4 7:10
9:25 15:10,14,23
44:7 49:22 90:24
91:11 96:3 180:21
334:5,16 371:11
393:25
**presentation** 65:4
65:15 164:5,10,13
201:13 339:14,15
**presentations** 62:7
164:18 342:23
344:6 345:17
358:2
**presented** 254:10
371:13
**presenting** 394:7
399:18
**president** 5:6
**pressurized** 54:15
54:16 62:21
**pretty** 11:17 186:9
199:15 213:23
230:7 250:8 280:7
292:7,16 312:14

**[prevail - process]**

**prevail** 39:22
**prevailed** 39:2,18
  39:21
**prevent** 394:16
**previously** 24:5
  25:16 26:2 59:24
  60:7 61:19 76:19
  87:18 121:10
  124:9 139:13
  172:13 229:25
  243:23 250:2
  251:15 264:18
  303:24 327:18
  336:8 381:21
**price** 66:13 68:12
  78:12 81:11,14,22
  81:24 83:8,19
  84:3,4 106:4
  109:3 195:17
  196:4,13,16,17
  199:9 278:11
  280:12 283:7
  297:9 354:13
  361:14 387:3
  397:16,18
**prices** 198:11
**pricing** 246:14
**primarily** 12:24
  20:16 33:4 46:22
  51:22 141:8 175:4
  207:15 254:2
  269:15 303:12
**primary** 56:15
  375:15,19
**prior** 20:22 21:5,8
  21:12,14,18,20
  22:19 23:9 71:6
  71:16,25 72:25
  74:25 75:6,13
  76:12,16 77:16
  78:3 79:18 80:6

  86:7 98:25 124:18
  126:16,24 154:16
  209:10,21 222:20
  225:7,11 226:17
  227:6 228:14,22
  228:23 229:3,7,18
  240:19 256:4
  272:12 274:9
  279:7 283:6
  290:13 291:11
  297:21 324:12
  328:3 333:3
  404:11
**prioritization**
  372:13
**prioritize** 399:2
**prioritizing** 361:6
  361:9
**priority** 10:19
  363:8
**private** 6:7 64:9
  97:12,13,25 99:17
  101:23 175:10
  176:10,23,25
  191:16 199:5
**privilege** 41:2
  375:9
**privileged** 106:8
  109:16,19 223:20
  224:19 232:18
  279:23 283:2,17
  287:21 291:15
  293:10 294:11,15
  295:12 299:10
  300:16 330:19
  345:5 350:22
  388:10
**privy** 299:22
**proactive** 221:2
**probably** 27:8
  46:21 80:10 92:5

  121:17 122:11
  151:20 162:5
  168:12 175:7
  178:15 210:3,4
  221:2 226:6 246:3
  248:24 252:19
  253:12 265:2
  290:24 305:3
  308:20 316:9
  329:23 344:11
  349:14 362:6
  366:20
**problem** 116:19
  275:16
**problematic**
  248:11
**procedure** 61:3
**procedures** 60:25
  391:22
**proceed** 7:20
  68:17 73:24 84:13
  206:23 209:24
**proceeding** 7:15
  315:3
**proceedings** 26:11
  107:11 300:18
  374:16
**proceeds** 271:2
**process** 11:23 23:4
  26:11 27:19 38:13
  38:18,21 40:18
  42:2,11 44:16
  45:12 47:18,21,23
  47:24 48:25 49:2
  50:10 51:4,12,25
  52:2 54:25 55:15
  55:22 56:3,17
  58:24 60:5,12,17
  60:20 61:5,12,16
  61:19 63:8,9,19
  64:22 65:2,10

  66:15 69:21 71:7
  71:17 72:3,20,22
  73:9 75:16 76:13
  76:24 77:22 85:4
  85:6 86:25 88:18
  90:17 93:11 94:8
  94:13,14 96:13,17
  99:14,19,24 101:9
  101:19 102:13
  103:15 110:23,24
  111:21 112:2,3,6
  112:10,19,22
  113:8,13,17 114:7
  114:11,18,25
  119:13 121:20
  122:4,16 123:24
  124:2,6,8,13,19
  125:2,10,16
  126:24 127:10
  133:4 134:9,11
  140:12,21 142:24
  148:7 154:14
  156:6,8,13 158:19
  162:23 163:8
  167:18 170:23
  171:18 172:2,16
  174:15 180:12,24
  188:9,18 193:8,12
  193:24 194:4,8,13
  197:9 201:20,22
  202:7 203:4,7,15
  203:16,18,23
  204:11,15,20,21
  205:20 209:15
  210:7 213:23
  214:9 216:12,15
  217:3 219:10
  220:2,23 221:20
  221:20,24 222:22
  225:3,9,22 227:9
  227:18 228:16,20

229:4,8,15 230:2,4
230:6,13 235:14
237:5 240:9
243:24 246:21
248:6,12,20 249:2
249:18,19,21
250:3,8 251:2,16
251:24 252:7,12
252:15,24 254:5
255:16 259:21
261:18,22,23
262:4,8,14 263:10
263:24 265:20,24
266:21 268:5,19
270:3 271:17,22
272:2 280:13
285:23 288:23
290:23 293:24
295:3,18 296:7
299:14 300:2
301:8,19 302:2,3,5
302:14,19,20
304:21 305:6,15
305:19,21 306:6,9
306:10,15,17,20
307:13,22 308:2,2
309:8 315:12,16
317:19,25 318:5
320:4,23 321:8
322:12 323:5,6,14
324:17,21 325:23
326:3 327:7,14,18
327:20 328:18
329:4,7,8,20
330:17 331:2,7,12
331:18 332:22
333:2 337:4,20
338:16,17 339:4,6
339:12 341:18,18
342:20,22 343:4
343:19,20,25

344:12,15 345:15
345:22 346:9
352:5 353:12,22
353:23,24 356:24
357:3,5,12,14,20
357:23,25 360:3
362:10,13 365:11
365:17 371:14
372:6 374:21
375:12,17,20,24
376:2,4,12,18
378:13,22 379:23
380:11,13,16,25
381:3 382:6,8,18
383:8 387:6
388:16,20,22
389:8 390:19
391:13,13,14
392:17 393:2,10
395:15 396:2,17
396:20,22 398:18
398:23 400:14
402:21 403:3,4,7
403:22,23 404:8
404:10,19 405:12
409:10,13 410:12
**processes**  37:21
  46:18 52:5 57:10
  69:22 92:13 123:3
  123:7 124:10
  138:8 173:18
  180:18 241:18
  254:3 323:11
  374:13 377:2,19
  378:21 393:6
  394:22
**produced**  14:4
  273:6,16 409:22
**product**  286:9
  315:25 352:19,21

**production**  157:15
**products**  54:15
  85:20 199:17
  250:12 269:20,22
  310:24 352:17
  353:3
**professional**
  285:19 363:23
**profit**  25:9,14
  118:21,23
**profitable**  145:18
  145:19 176:3
**program**  347:25
**progress**  56:3
  234:13 259:15,17
  342:21 409:18
**project**  194:17,22
  216:12,16 257:18
  258:3 285:16
  409:2,13,15
**projection**  117:2
**projections**  115:4
  115:8,12,15,17,20
  115:25 116:18,21
  117:4,8 211:13
**properties**  354:7
**property**  157:14
  157:18 354:8
**proposal**  85:12
  93:7 197:12 200:9
  219:6 254:13
  359:3 403:2
**proposals**  36:24
  195:9,13 197:10
  199:4 234:4
**propose**  254:10
  299:17,23 300:13
**proposed**  14:11,15
  51:17 122:22
  145:6 221:6
  230:17,21 231:23

234:25 239:18,22
240:3,4 297:10
298:24 369:21
372:23 373:4,5
376:8 391:18
**prospective**  59:4,7
  59:11 259:25
  260:2
**provide**  58:14
  185:21 186:5
  274:16 277:6
  300:19 311:25
  312:4,23 314:23
  326:23 339:17
  347:23 368:20
**provided**  86:23
  87:3 88:21 101:6
  108:21 152:6,12
  165:3 174:8 186:7
  222:13,18 224:5
  257:10 277:3,24
  277:25 345:10
**provider**  163:10
**provides**  175:19
  236:10 303:14
  355:22
**providing**  31:22
  185:23 300:3
  311:22 350:6
**provisions**  106:12
**public**  2:10 8:23
  53:11,18 94:18
  146:19 173:25
  174:5 176:18
  349:14 383:16,19
  383:24 407:4
  412:24
**publicly**  95:10
**publishing**  303:5,6
  303:23 304:4,7
  321:3,5,11 324:2

**pull** 349:3
**purchase** 66:13
  68:11,20 74:4
  76:17 78:12 81:11
  81:14,18,21,24
  83:8,19 84:3
  107:21 108:8,10
  118:9,10 152:20
  195:16 196:13,16
  196:17 198:11
  199:9 218:14
  237:12 278:11
  280:12 283:7
  304:11 373:9,18
  374:8
**purchaser** 105:16
  105:21
**purpose** 32:19,23
  174:24 175:3
**purposes** 9:6
  173:10 339:9
**pursuant** 29:12
  392:18
**pursue** 49:3 51:6
  76:20 341:24
**pursued** 50:22
  52:6 55:2
**pursuing** 49:16
  51:10,16
**push** 39:11,15
  78:14 82:4 83:19
**pushing** 37:22
**put** 26:24 35:17
  37:20 39:5,14,20
  40:3 41:25 44:12
  44:24 45:5 47:17
  77:2 111:25 112:2
  112:24 113:7,16
  114:6,18 135:5,7
  167:19 219:13
  221:16 222:4

231:14 250:7
251:2 252:6,11
260:14 265:2
289:23 306:24
314:10 329:7
337:6 353:11,22
356:23 373:16
374:7,20 375:3,5
396:8
**putting** 45:13
  65:24 150:17
  151:12 251:23
  287:2 349:10
  375:19

## q

**q4** 151:20 247:15
**qualities** 126:11
**quality** 80:13,14
  80:17,19,23 81:7
  81:13,17 82:2,7
  101:10,17,21
  102:5,10 103:5,14
  126:2,8,16,18
  172:22 180:19
  258:10,14,18,23
  259:2,7 409:16
**quarter** 27:9
  213:7
**quarterly** 126:25
**quarters** 27:8
  374:17
**question** 10:20,21
  10:24 29:7 33:21
  37:15 40:16 41:5
  41:13 42:21 49:20
  50:4 53:4,8 74:19
  74:21 78:18 91:13
  91:23 106:6
  109:18 116:12,15
  117:20 123:22
  140:4 150:2

160:17 170:2
173:6 192:16
201:18 203:2
204:5,7 223:23
226:22 227:3
229:5 231:18,19
232:4,9 233:16
245:5 251:19
279:24 284:22
293:7 294:23,24
295:15 331:14
345:11 374:2
378:11 386:4
403:20
**questioning**
  287:11,18
**questions** 95:22,25
  115:23 139:14
  140:2 207:17
  293:17 390:7,15
  391:9 399:7,10
**quickly** 10:17
  11:18 46:19 216:6
  230:7 232:25
  390:20,21 391:14
**quite** 66:21 245:10
  273:17 320:12

## r

**r** 3:2 4:2,23 5:2
  8:21,21
**raise** 21:3 22:18
  41:24 49:5 249:11
**raised** 22:9,11
  40:8 42:6
**raising** 218:17,20
**ran** 147:21
**rand** 52:2 55:8
  254:5 298:20
  299:7,25 300:13
  301:3,6,8,12,17,22
  302:3,14,19 303:2

303:5,16 305:6,20
307:8,11,15,19
308:16,24 309:25
310:6,9 311:9,13
311:16,19,24
312:20 316:13,23
318:23 319:2,5,6
319:25 320:10,15
321:15,20 324:14
410:9,11,15,17
**rand's** 301:5
  302:25 305:6
  315:5
**randy** 20:18
  120:10 248:2
  282:3 367:11
  368:4
**range** 168:12
  195:17,22 196:4
  211:2 242:17
  248:8 307:18,23
  308:21 324:19
  329:24 358:9,12
**ranges** 33:5,10
  199:9
**rating** 339:2
  340:20
**ravine** 214:17
**raymond** 59:25
  61:4 62:6 70:15
  70:16,20,24 71:6
  71:16,25 72:3,18
  72:24 73:5,9
  75:12 77:6,19,20
  77:24,24 78:2
  80:17 82:3,20
  83:12,18
**reach** 139:24
  203:21 204:24
  205:3

**reached** 77:6
97:20 155:22
204:10,13,18
225:15,16 291:10
327:16 405:2,7
**reaches** 139:23
**reaching** 97:12
114:5 281:7
**reaction** 198:24
276:5
**read** 14:19 41:6
136:3 282:16
286:6 294:17,24
330:6 334:2
363:20 373:14
389:16
**ready** 60:24
**real** 364:4
**realize** 275:10
**realized** 76:25
**really** 36:25 61:17
63:8 67:17 79:10
94:14 97:19
139:10 144:3
176:8 199:18
217:25 231:20
234:2 235:19
249:13 260:9,12
263:16 267:5
288:4 292:3
294:20,21 320:13
323:2 334:11,12
347:7 400:8
**realtime** 332:2
**reask** 101:15
**reason** 29:9 30:4
65:18 106:17
107:13 112:9,21
119:13 138:24
161:16 215:7
253:23 313:21

363:11 364:4
386:12 394:15
395:12 396:15
412:6
**reasonable** 22:2,6
22:8,21 84:4
109:3 120:25
223:3,6,13,17
224:3 244:24
245:12 250:25
256:15 270:17
300:12 309:20
336:16 356:6
**reasoning** 223:16
**reasons** 60:21 65:8
65:16 113:15
238:15 287:3
320:7 375:4
**reassessed** 63:14
**recall** 9:21,24
16:18 27:20 28:5
28:9,13 29:23
30:16 34:22 35:9
35:14,15 36:9
37:24 42:5,13,15
44:17,20,23 45:3
59:19 60:8,21
61:7,13,17,22 62:9
65:21 66:2,3,17
67:2,5 68:2,7,8,13
68:16 69:12,22
70:14 71:19 72:13
82:9 83:23 89:15
93:2,4 98:8 99:4
99:22 100:3
102:24 103:9,10
104:15 105:16,24
108:20,23 109:3,7
110:18 111:5
116:9,10 123:13
124:14 128:21,24

129:5 134:19,22
143:14 145:8
147:7 149:9,16
150:18 153:15,17
155:12 157:5
159:23 163:24
165:6,8 169:2
170:19 173:3
176:5 178:2,7,11
182:4,15,18,21
183:2 184:5,16,19
184:23 185:16,19
186:18 188:2,13
191:9 192:25
193:19 202:14,15
202:21 203:11
214:4,6 215:19
216:20 218:15,17
218:20,23 219:3,4
219:7,12 220:6,12
220:25 225:17
226:13,16 227:5
228:6 230:20
236:23 242:16,19
242:25 243:3
244:5 252:3,8,9
253:2,17 255:24
257:12 258:13
260:5 261:2,4
263:10 266:6
269:25 270:21
271:6 272:7
278:18 279:10,11
281:4,6 288:4,9
295:23 296:22
299:4 307:14,18
308:6,22 309:25
310:15 311:22
313:3,18,21,23
314:22 317:6
318:17 319:20

321:19,24 324:3,6
326:25 329:16
333:9 334:20
336:22,24 337:9
337:25 340:13,17
343:5 345:12
348:6,12,14
349:12,18,20,24
350:6,10,11,16,23
350:25 358:9,24
359:17,21 361:21
371:15 377:6,9,19
378:5,16,24 379:2
379:7,9,10 380:22
384:9 387:11
399:19,25 400:4
400:21 402:2,7
**receivable** 127:25
**receivables** 127:22
277:21
**receive** 36:16
129:15 130:5
197:23 200:25
201:3,19 247:11
324:9
**received** 11:17
63:22 84:6 105:9
113:23,24 114:3
115:19 116:2,5
148:8,23 193:8
195:9 199:4 200:7
201:23 216:23
240:18 249:22
258:6,10 260:6
320:4 322:3
343:10 360:25
**receiving** 202:5
216:20 266:6
281:9 296:22
310:15 324:12

**recession** 397:8
**recognize** 67:13
  317:22 349:13
**recollection** 16:2
  36:3,14 42:23
  43:23 44:5,9
  47:22 51:21 65:7
  66:9 72:23 90:6
  100:24 101:2
  107:2,13,24 121:6
  122:14 147:17,20
  155:24 166:14
  167:12 168:6
  179:20 180:23
  186:24 187:7,24
  192:18 193:18
  208:25 219:17
  226:16 227:14,15
  227:22 228:8
  252:22 255:12
  258:6 262:22
  313:19 333:3
  334:15 335:14
  336:7 359:6
  403:11
**recommendation**
  114:17 174:21,23
  315:21
**recommendations**
  372:9
**recommended**
  123:4,7 375:4
**record** 6:3,14 7:14
  9:6,8 41:6 84:21
  84:22,25 95:21
  165:16 166:6
  235:21,24 236:2,5
  273:9 287:2,3,5
  298:14,15,18
  317:15 324:24
  325:3 333:13

334:24 349:10
  351:13,16,17,20
  389:19,23,24
  390:2,12,25 391:4
  405:23 407:10
**recorded** 6:16
**recording** 6:12
**recover** 330:15
**recoveries** 32:13
  32:25 95:16 196:3
**recovery** 36:16
  160:7,15,19
  307:19 330:22
  331:3 332:5
**recurrent** 278:9
**redact** 52:23
  187:13
**redirect** 390:7
**reduce** 388:7
**reduced** 66:4,10
  68:11,24 74:9
  75:5 78:12 81:21
  83:8
**reducing** 66:8
**reduction** 66:13
  81:12,14,24
**reengaged** 221:5
**reentered** 99:23
**reestablished**
  77:22
**refer** 287:25
**reference** 87:7
  177:25 278:8,13
**referenced** 142:7
**references** 177:16
**referred** 12:17
  85:11 276:23
  348:16
**referring** 12:3,19
  20:15,16 53:6
  63:19 144:10

147:4,9 177:22
  206:25 219:24
  268:8 283:5 290:4
  290:8 343:6 366:3
**refers** 136:8
  312:14
**refinancing** 37:4
  37:10 48:17 49:4
  49:8,17 50:13,16
  50:21,24 51:4,8,18
  52:4 55:2 93:6
  118:13 152:22
  220:19 237:14
  262:18 263:7
  270:23 271:14
  329:14 341:24
  344:4,9,23 345:2
  345:25 346:6,10
  346:14,20 347:5
  358:5 359:2,3
  411:5
**reflect** 319:8,25
**reflected** 195:17
  198:9 200:10
  286:19 292:19
**reflects** 198:11
  318:6
**refresh** 107:12
  168:20 179:19
  226:15 228:7
  258:5 323:9
  334:14 335:13
  336:6 403:10
**refreshed** 305:22
  306:4
**refreshes** 106:25
  333:2
**regarding** 201:21
  203:15 210:12
  232:20 272:23
  305:18

**regardless** 114:12
**registered** 24:15
  24:16,22
**regular** 59:24
  86:19 90:3 121:13
  123:2,7 142:22
  201:3,21 271:20
  290:25 304:13
  365:11,16 393:11
**regularly** 370:3
**regulatory** 265:3
**reigniting** 229:17
**reimbursed**
  236:12
**reinvigorate** 66:15
**reinvigorating**
  302:2,13,19
**reinvolved** 76:13
**related** 7:7 25:21
  62:14 76:22 77:13
  77:15 107:18
  108:6 134:17
  157:17 158:7,12
  158:17 160:4
  193:23 194:7
  321:10 407:13
**relating** 26:3
**relation** 24:13
  347:4
**relationship**
  352:15
**relative** 19:13
  143:19 214:18
  268:24,25 372:15
**relatively** 56:20
  80:21 87:14 92:12
  92:21 98:13,13
  113:18 115:21
  146:10 201:8,9
  215:21 240:8
  313:20 315:25

354:9 360:6 361:3
364:5 365:9 368:8
371:7 372:17,18
**relevant** 111:4
117:17 125:10,13
125:15 129:19
133:4 134:24
135:2,4,4,6 143:8
158:19,21,22
159:5
**relief** 42:9
**remain** 218:25
**remainder** 116:22
**remaining** 253:19
253:24 373:10
**remember** 36:22
37:6 63:9 70:23
75:24 89:18 102:3
111:13 148:18
151:10 163:21,23
176:7 177:23
178:15 179:21,23
181:12 182:2,3,7
183:6,7,9 196:25
198:2 215:22
217:25 219:20
228:11,12 255:17
256:6,7 257:24
279:5 313:15
323:12 324:15
325:10,12 327:15
328:8 333:10
337:16 362:24
367:25 377:21
**remembering**
178:17
**remind** 10:18
282:8
**remotely** 7:11
**removed** 170:22
171:2 172:5,9

**renaissance**
173:15 174:10,12
**repay** 392:22
**repeat** 378:10
**rephrase** 160:17
284:21 297:24
**replace** 137:2,25
138:6
**replaced** 28:23
29:2,4,9,17,20
30:19 31:10,11,12
216:3
**replacement** 29:14
**reply** 231:13
**report** 80:13,18,20
80:23 81:7,10,13
81:17 82:2,8
101:11,18,21
102:5,10 126:3,8
126:12,16,18
129:5 172:23
173:14,16,23,24
174:8,9,12,16,19
174:23,25 175:3
175:14,18 188:4,8
188:10 215:4
258:11,15,19,23
259:3,7,15,18
284:14,25 285:4
286:20 287:22
409:16,18
**reported** 1:12
215:2,11,16
241:17 250:19
**reporter** 2:10 7:3
7:19 10:23 166:22
**reporting** 412:3
**reports** 80:15 81:6
103:6,14 124:25
129:15,16,21,22
129:24,25 131:20

180:19 277:9
283:24 284:3
410:4
**represent** 15:5
19:7,11,12
**representation**
183:14
**representations**
250:14
**representative**
24:16 87:24 88:2
89:8 192:13
261:14 388:19
**representatives**
89:21 94:24 95:17
162:10 261:9
**represented** 81:22
84:3 109:2 135:22
**representing** 7:22
84:11 161:19
**represents** 143:25
261:5
**reps** 24:22
**reputable** 21:10
80:25 136:25
**request** 139:15
231:15 281:15
410:3
**requested** 200:17
347:2,4,19 348:4
348:10
**requests** 117:14
132:4
**require** 189:22
354:22 381:18
395:22
**required** 126:22
224:24 242:11
347:10 357:18
367:24 370:15
396:8

**requirement**
349:3
**requires** 355:4
379:23
**reread** 41:4
401:12
**reserve** 390:6
399:8
**resistant** 113:9
**resolve** 263:20
354:18 355:23
388:17
**resolved** 265:15
267:16,18,21
360:13,16,22
**respect** 19:8 23:3
48:16 92:11
114:21 156:6
193:11 207:18
214:17 222:16,24
223:7,11 246:5,25
290:19 299:25
301:8 312:20
384:22 393:5
399:2 400:23
402:9,20
**respected** 136:21
**respond** 144:7
273:23 275:5
282:8 297:20,21
**responded** 297:19
334:6 400:12
401:21
**responds** 267:3,14
273:21 275:4
**response** 44:23
66:7 106:3 142:15
188:11 202:25
203:2 219:22
225:21 274:5
306:5 344:20,21

344:25 345:6,9
350:17,20,24
**responsibilities**
19:18 56:13,15
357:15
**responsibility**
158:11
**responsible** 56:23
57:4,12,18 58:6
**responsive** 203:25
204:9,16,22
**rest** 303:7
**restart** 138:9
344:14 375:16
**restarted** 157:14
157:15
**restarting** 225:22
**restarts** 210:7
**restructuring**
22:15 23:2 27:9
27:17 28:24 29:14
31:15 85:6,10,11
118:16 136:22,24
152:24 237:16
304:3 307:10
374:20
**result** 30:19 78:14
104:22 108:25
176:20 180:13
189:21 262:18
381:2
**resulted** 52:8 61:3
209:15
**results** 101:8
212:5
**retain** 57:9 367:14
**retained** 16:11,20
20:4,9,13,22 21:5
43:10 56:2,4,5,10
59:3,16,20,23
60:11 86:7,14

119:17 121:17
124:3 137:3,9
139:24 153:13
154:16 163:18
164:2 173:9
224:22 237:18,22
244:3,6 255:20
256:5 270:2
308:24 313:13
335:7,15 360:19
361:23 362:5,9
364:15 365:25
393:19 394:17
396:13 401:22
406:3
**retaining** 45:12
394:6 399:16
**retention** 20:22
21:2,13,19,20 86:8
119:22,25 120:6
120:17,21 154:19
154:23 239:5
244:10,14,18
245:6 256:9 270:6
270:12 309:6,12
309:15,19 332:7
332:10,11,14
336:15 364:7,9,12
367:9 403:13
**retentions** 21:9,12
21:18 22:19
**rethink** 82:16
**retraded** 67:21
68:21 69:14 70:17
74:11
**return** 205:3
210:8
**returns** 210:18
**reveal** 47:10 49:23
106:8 109:15
223:19 224:18

232:18 279:22
283:2,16 286:16
287:20 291:15
294:14 295:12
297:16 299:9
300:16 330:19
345:4 375:8
388:10
**revealing** 109:18
**revenue** 146:25
**revere** 232:24
233:10,19,22
234:9,17,24 235:4
272:6,22 273:22
274:7,9,13,16
275:25 277:4,24
278:23 279:6
280:6,18 283:7
289:21 290:15,19
292:17 297:9
**revere's** 272:16
276:5,7 282:12
**review** 13:20
14:14 17:17 18:9
21:12,18 30:11
32:19 33:3 34:17
34:18 65:9 99:18
105:19 114:4
115:3,11 117:12
124:24 125:22
126:25 132:17,21
133:10 198:17
222:18 270:11
286:8 309:5 312:9
315:19 317:4
**reviewed** 11:8
14:10,17 21:8,11
21:17,23 22:4
31:3,7 32:4,14
33:24 34:9,14
57:23 58:14

113:20 114:9
115:17,24 116:2,4
116:12,17,20
117:11,21,22
119:25 120:13,20
129:20 154:19
160:23 161:3,6,15
161:17 185:16
196:2 210:25
214:8 240:16,22
242:13 244:17
245:6 256:8
316:20 332:15
336:7 368:6
**reviewing** 32:8,24
56:19 57:15,17,19
58:6 198:19
286:13 313:3
324:3
**reviews** 133:5
275:17
**revise** 286:8
291:22,24 312:8
314:7
**revised** 79:24 80:5
82:17 206:12
211:13 292:16
300:20,25 305:23
305:25
**revising** 241:19
286:14
**revision** 299:5
313:8
**rewarding** 67:23
**rework** 101:11
**reworked** 63:14
**rewrite** 104:18
**rewrote** 104:19
**right** 9:15,19
10:15 15:15 24:14
26:8,17 39:7,12

**[right - sale]**                                              Page 50

42:11 44:3 45:14
45:18,22,25 51:13
52:9 54:19,22
55:18 58:19 59:14
60:3,9 61:23 64:3
64:10 72:9 73:15
74:25 75:14 76:10
76:14,17 78:6,10
78:16 80:2,7 81:3
81:19 82:12,17,21
84:6,14 85:7
86:12,21 87:4
88:7 90:17 91:23
92:4 96:19 99:12
100:2,7,17 103:17
103:23 104:14,23
105:4,11,12,20
117:20 120:2
121:20 125:6,11
125:23 126:4
128:6 130:13
133:12 135:13,25
143:12 148:22
153:23 162:18
163:12,13,16,20
164:6,25 171:17
172:10 178:22
179:25 180:19
182:7,16,19 183:5
185:5 191:11,13
191:16 195:2
205:23 206:7
207:2,21 209:7
212:14 213:8
215:8,18 218:7
220:24 228:23
230:18 235:15
238:13,22 243:24
244:3,25 255:9
257:6,9,13 258:24
259:12 261:7

262:5,19 264:19
267:11 269:5
272:3 278:7,24
281:3 282:18
286:3 289:17,18
290:2 292:24
300:6 301:20
305:7 306:11
307:3 309:4,16
310:20 312:5
316:6,18 318:2,16
319:6,10 321:6
323:7 325:4,17
327:24,25 328:19
328:21 329:4
332:18 335:16
337:7 341:7,11,16
341:19,25 342:2
348:23 349:2,2,23
355:19,22,25
356:2,5 361:15
362:11,22 363:3
365:3,14,22
366:23 369:23
370:4,25 375:21
376:25 380:16
381:4,23 382:14
383:5,8,14 392:3
395:6,24 398:18
400:24
**ring** 339:24
**risk** 246:9 263:25
264:6 265:10
348:3 396:21
397:24,25 398:2
**road** 10:14
**rob** 177:18 200:15
200:21
**robert** 1:9 2:6 6:16
9:9 405:25 408:3
412:5,21

**rodney** 3:18
**role** 18:25 19:6,24
27:18 28:23 31:13
31:24 33:3 37:2
50:23 57:8 70:9
92:9 106:11
112:12 118:24
129:11 131:11,13
131:18 137:22
158:9 312:20
331:5 357:22
**roles** 215:19
**rollup** 98:23
**room** 7:11 306:18
337:7,10,11,16,17
**rough** 27:7 250:9
250:22
**roughly** 395:3
**round** 194:18,22
195:6,9,12 197:10
197:12 198:19
200:10 201:24
206:3,20 207:6,20
218:8 219:11
225:4 226:20
227:8 228:2
265:19 318:9
321:15,20 322:7
409:3 410:16
**rounds** 280:4
**rule** 396:24 397:2
**rules** 10:14
**run** 24:2,17 69:21
75:15 177:2
268:12
**running** 123:2,6
230:11 378:21
403:6
**rushed** 390:22
391:15

**russell** 303:18
304:14

| s |
| --- |

**s** 3:2 4:2 5:2 8:21
9:9 237:7 408:9
412:6
**sale** 19:9,21 37:21
38:18 39:5,15
40:4 42:17 43:3,8
44:2,11,12,25 45:5
45:13 46:13,18
47:3,18 48:25
49:2 51:6,10,16,25
52:2 56:14 58:18
60:20,24 61:2
62:15 66:15 76:24
83:14 86:7,20,25
93:20 99:19 100:2
103:22 108:22,25
112:2,10,22,24
113:13 114:24
118:6,10 121:7,15
122:16,23 123:3
123:23 124:5
125:6 126:17,24
132:16 133:22
134:8,18 138:15
145:7 152:18
153:7 156:6,8,12
158:19 166:12
167:18 173:18
194:9 202:23
203:13,15,23
204:11,15 206:16
222:19 230:4,6,18
231:2,23 232:23
237:10 239:18,22
240:3,6 247:2
248:12 249:17,19
249:21 264:12,15
264:17 265:20

| | | | |
|---|---|---|---|
| 270:25 271:3 | 142:24 154:14 | **sarah** 3:8 7:25 | **search** 29:13 |
| 288:23 301:8 | 170:22 172:15 | **satellites** 153:9 | **second** 10:20 |
| 302:20 304:6 | 174:15 180:11,18 | **saw** 14:7 32:6 | 13:15 79:8 80:11 |
| 329:8 338:14,21 | 180:24 193:23 | 266:23 330:7 | 92:15 97:15 98:2 |
| 340:21 343:24 | 194:8 196:4 | **saying** 40:21 | 99:11 100:25 |
| 344:15 345:15,22 | 201:22 202:7 | 229:12 327:18 | 104:22 105:9 |
| 354:13 356:8,19 | 204:20 210:7 | 367:22 375:23 | 107:4 182:6 200:6 |
| 357:10,12,14,22 | 220:23 225:3 | 385:14 387:18 | 204:4 213:18 |
| 357:25 361:6,14 | 227:9 230:13 | 402:7 | 258:15 273:18 |
| 365:7 372:6 373:4 | 235:14 243:24 | **says** 67:17 73:13 | 274:23 275:15 |
| 374:9,13 375:6,16 | 246:21 248:5,20 | 83:10 84:9 144:2 | 276:13,16 321:15 |
| 375:24 376:2,3,18 | 249:2 250:3 251:2 | 172:18 173:13 | 321:19,20 322:7 |
| 379:17 381:25 | 251:16,24 252:6 | 183:21 185:15 | 342:16 356:9,13 |
| 382:5,8 384:8,13 | 252:11 254:4 | 186:11 200:23 | 357:11 399:6 |
| 386:11,15,17,21 | 261:17,22 262:7 | 203:6 213:21 | 410:16 |
| 386:25 387:3,6,10 | 263:9,21 265:13 | 217:2,11 258:24 | **section** 79:4 |
| 387:16 388:6,8,15 | 268:5,18 270:3 | 260:5 267:22 | **sector** 240:25 |
| 390:17,18,19 | 271:17 272:2 | 282:6,20 285:3,14 | 315:15 368:9 |
| 391:11,12,18,22 | 296:6 302:3,13 | 285:24 286:5,8 | **secure** 130:12 |
| 393:6,10 395:15 | 304:20 305:6,15 | 287:23,23 321:25 | 132:9 266:4 |
| 396:2,17,22 | 305:18,20 306:5 | **schedule** 122:7 | **secured** 130:16,21 |
| 397:16,18 399:3 | 306:10,17,20 | 179:16 247:6,10 | 130:24 131:7 |
| 401:2,8 402:15 | 322:12 331:2,7,18 | 249:24 278:6 | **securities** 24:14 |
| 403:14 404:5,6,19 | 341:18 342:20 | 345:16 369:22 | 190:18 195:22 |
| 405:12 | 343:4,19,20 346:9 | 372:22 | 196:10 198:7 |
| **sales** 38:4,21 42:2 | 353:12,22,23,24 | **scheduled** 167:21 | 200:3,8,9 207:2,10 |
| 43:18 52:5,9 | 356:24 357:3,19 | 247:10 334:7 | 208:17 214:8 |
| 54:25 55:15,22 | 360:3 362:10,13 | **schedules** 127:25 | 219:19,25 409:7 |
| 56:3 58:24 60:5 | 371:13 372:9,12 | 128:3 276:10 | **see** 32:5 54:9 72:5 |
| 60:17 61:5,12,16 | 372:13 374:21 | **scheduling** 122:19 | 72:25 75:7 100:18 |
| 61:19 85:3 90:17 | 375:20 376:12,23 | 143:2 342:22 | 142:12 177:24 |
| 92:12 93:11 94:8 | 376:25 377:18 | **schiff** 5:5 8:4 | 195:2,10,14,16,19 |
| 96:13,17 101:19 | 378:7 380:25 | **scholer** 4:11 | 195:23 198:13 |
| 102:12 103:15 | 381:3 383:7 | **school** 23:18 62:23 | 203:7 206:13 |
| 106:4 110:22,24 | 389:11,12 398:18 | **scope** 175:16 | 211:5,12 217:5,11 |
| 112:6,19 113:8,17 | **sam** 8:8 390:12 | **script** 168:23 | 259:24 260:8,16 |
| 121:20 122:4 | 391:6 | 169:3 | 269:12 275:8 |
| 123:7 124:8,19 | **sam.hershey** 4:22 | **se** 355:17 | 277:20 285:23 |
| 125:2,10,16 | **samuel** 4:21 | **sealed** 324:24 | 310:12,19 319:15 |
| 127:10 134:11 | **san** 243:16 | 325:4,6 | 340:12 342:16,20 |
| 138:7 140:21 | | | 342:24 356:25 |

398:25
**seeing**  68:7 149:20
  217:24
**seek**  66:19 67:4
  279:18 290:15
**seeking**  42:9
  282:24 283:12
  330:2 343:16
**seen**  107:16
  292:11 368:21
  373:14
**segued**  220:12
**selected**  256:4
**selecting**  255:25
  368:15
**sell**  20:4 37:20
  41:22 48:6,20
  49:7 78:15 79:22
  83:2 119:6,15,17
  153:13 263:17
  308:24 367:14
  379:24 380:21
  381:8 387:21
  392:13 396:22
  404:23
**seller**  80:22
**selling**  39:17 83:7
  119:9 380:7
  393:16 401:20
**send**  117:17
  150:24 200:24
  236:12 277:13,14
  277:15 291:20
**sending**  200:20
**senior**  215:21
**sense**  12:9 53:2
  74:24 75:6,11
  103:16 246:24
  254:17 310:23
  400:23

**sensitive**  6:6
  264:12
**sent**  59:4 100:20
  185:3 198:8
  278:23 283:13
  298:2,4 310:9
  311:15 318:15
  335:24,25
**sentence**  136:3,5,7
  282:17,19 334:7
**separate**  15:18
  49:8 88:6 189:19
  352:18 377:18
**september**  97:16
  99:10 177:12
  179:4,10 182:18
  182:24 183:4
  195:4 252:18
  258:19,24 259:4
  408:20,23 409:17
**sequencing**  77:5
**series**  24:12,17,21
  333:21
**seriously**  42:22
**serve**  31:10 297:8
**served**  25:2 26:15
  26:19 95:17
**serves**  88:14,25
**services**  24:3
  31:18,22 236:11
  236:11 237:9
  303:15 312:24
  354:23 363:24
**session**  13:12,13
  13:15 166:2
  191:24
**sessions**  12:24
  13:3 15:19,22
  169:16
**set**  117:3 181:4
  266:16 352:21

368:3 386:17,22
  386:25 407:8,18
**setting**  57:5 79:15
  342:21
**settled**  318:19
**settlement**  29:12
  29:25 38:7 43:16
  43:22 367:24
  392:19
**seven**  313:13,17
**share**  194:2 354:4
**shared**  200:21
**sharing**  167:13
  193:21 350:11
**sheet**  107:20,23
  108:7 269:23
  352:25 412:2
**shenkman**  340:3
**shoot**  78:25
**shop**  297:10
**short**  166:11,16,20
  166:23 167:7,20
  197:25 408:19
**shorter**  313:8
**shorthand**  2:9
  146:10
**show**  43:6 66:23
  66:24
**showed**  227:7
  331:21
**shown**  198:12
  308:16
**shows**  206:6,9
**shut**  350:13
**side**  77:23 251:20
  291:18
**sided**  275:11
**sign**  68:20 73:20
  74:3 76:5,7
**signature**  107:5
  407:21

**signed**  59:12 72:12
  88:18 89:5 238:12
  238:14,17 246:7
**significant**  233:22
  234:13 260:22
  263:19 265:9
  306:16 316:22
  323:4 328:9
  343:18 347:11
**significantly**  97:24
  247:16,17,23
  327:21
**signing**  197:21
  280:18 300:4
**similar**  176:15
  253:8,11
**simple**  108:14
**simply**  177:5
**singapore**  265:8
**single**  64:2
**sitting**  394:14
**situation**  107:10
  266:10 332:3
  397:3
**situations**  26:8
**six**  13:14 168:13
  246:3,18 280:5
  291:2 319:6,7
  322:2,18 328:15
  360:18 365:11
  393:12,21 394:11
  394:21 395:3
  399:22 401:4,25
  403:23 404:4,5
  405:5 406:2
**sized**  85:16
**skimmed**  11:18
**skin**  110:9
**slightly**  93:22
**slow**  313:20

**slowed** 165:12
**slower** 313:22
　394:25
**slowing** 344:12
**slowly** 254:6
**small** 65:11
　144:25 160:2
　254:4 360:6 361:3
　364:5 372:18
**smaller** 98:13
　101:23 251:20
**smelter** 269:16
**snapshot** 350:7
**snelling** 237:6
　253:9 262:21,22
　262:25 363:7
　364:8,10,13,15
　365:7
**soft** 200:17 325:14
**software** 303:8
　320:16
**sold** 54:18 133:18
　181:21 183:18
　184:12,21 307:2
　352:5,6 354:11,14
　355:4,12 356:17
　356:23 373:12,21
　382:12,18 383:11
　398:11,21 405:4,9
**sole** 54:21 55:11
　314:25
**solely** 376:8,13
**solicit** 206:11
**solicited** 206:16
**solid** 199:9 315:25
**solomon** 303:20
　304:15 308:23
　309:6,9,24 313:12
　313:19 314:5,6,22
　317:20 318:2
　320:8 324:23

326:12,14 410:13
**solve** 43:25
**somebody** 73:13
　77:23 140:6 173:4
　218:20 320:14
　354:25
**somewhat** 276:14
**soon** 232:15
**sooner** 41:22
　376:12 398:13,14
**sorry** 66:23 94:22
　115:22 148:9
　182:8,14 188:25
　221:21 226:21
　273:15 275:8,11
　299:11 318:5
　366:6 371:17
　390:23 399:13
**sort** 193:7 339:24
**sought** 106:3,14
　106:16 300:10
　360:24 361:2
　377:2
**sound** 255:9
　334:21 351:13
　369:18 401:13
**sounds** 60:9 61:23
　73:4 105:12,20
　163:13 168:2
　246:20 257:13
　261:7 298:9 309:4
　335:16 392:12
**sources** 276:14
**spa** 206:12
**space** 98:5 168:20
　199:21 240:25
　320:18
**speak** 14:20 16:5,9
　121:19 202:22
　203:9,12,14 205:8
　205:16 261:21

265:23 281:21,25
　286:25 304:17
　348:24
**speaking** 64:16
　301:3 305:10
**specialty** 315:14
**specific** 46:7,8
　47:4 54:7 60:21
　61:14 88:13,25
　89:4 93:11 94:8
　94:13 102:24
　115:14 117:13
　119:13 134:22
　141:10 147:14
　151:10 171:5
　189:24 222:15
　228:25 252:21
　276:13 281:4
　308:9 320:25
　345:12 379:4,14
　379:14 387:21
　397:13
**specifically** 9:17
　13:24 35:8,13
　44:19 61:8 67:6
　68:13 70:23 93:3
　93:9,10 94:10,19
　94:25 95:13 99:22
　106:18 141:6
　144:10 148:4,19
　182:2 184:11,23
　215:22 220:12
　224:8 242:20
　261:2,15 279:10
　288:5 290:4 350:5
　350:23 358:24
**specifics** 99:4
　184:5 193:3
**spelled** 189:13
　191:3

**spend** 143:17
　322:25 399:3
**spent** 63:5 207:12
　219:18 291:25
　403:25
**spoke** 155:7
　266:15 304:25
　371:9 378:13
**spoken** 16:13
　17:14 89:8,10,20
　121:16 225:12,19
　229:16 255:15
　281:8,23 292:9,22
**sponsor** 175:11
**sponsors** 98:4
　206:21,22,24
　207:10,14 226:7
　322:5,23 337:23
**spring** 255:17
**spun** 321:6
**square** 3:18
**stabilized** 326:10
**staff** 32:2,5
**staffing** 283:23
　284:3,14,25 285:4
　286:19 287:22
　363:20,24 410:4
**stage** 96:21 97:15
　99:11 105:9
　171:19 240:10
　245:16
**stages** 56:17 96:18
**stagger** 357:2
**staging** 167:13
**stakeholders** 7:23
　159:11,16
**stalking** 297:9
**stamp** 352:25
**stand** 351:22
　352:18

**[standard - substantially]** Page 54

standard 80:22
240:8 365:9
standing 62:24
stands 264:8
staple 339:10
stargatt 3:17 8:6
start 91:24 112:6
112:10,22 115:9
140:9 224:3,4
252:14,23 253:18
274:23 301:5
313:20,22 357:5
366:8,9 376:2,3,11
376:17 388:13,15
390:24 393:11,14
394:13 399:25
401:18 403:24
405:17
started 48:15
50:12 92:5 113:13
114:24 122:16
135:19 240:13,15
283:18 320:22
393:20 401:23
starting 237:5
374:13
state 2:10 7:12,15
9:7 248:20 249:2
407:5
stated 59:23
statement 379:19
380:4
statements 114:13
114:16,20
states 1:3 264:10
station 85:22
status 121:15,19
122:4 156:12
158:2 201:4 202:7
203:3,23 204:11
204:14,19 246:25

305:5,15,18
371:23 393:3
stay 158:11 383:2
step 393:23 394:7
399:17
stepped 63:14
steps 394:3
stereotype 141:3
stifel 245:17,20
246:10,10,15
stifel's 246:25
stila 36:9,20,23
37:6,8,9,20 39:4,9
39:18 40:3 41:22
41:25 42:17 43:3
43:8,19 44:2,11,12
44:16 45:13 46:11
46:25 56:9 110:2
110:12,20 111:6
111:12,25 112:6
112:10,16,18,23
113:7,13,16 114:5
114:10,12,17,22
114:25 115:18,20
115:25 116:18,23
116:24 117:4,8
119:6,9,17 121:7
121:15 123:11,18
124:2 130:10
132:16 138:16,20
138:21 141:14,19
142:24 143:9,12
143:19 144:4,12
144:19,23 237:6
253:10 353:13,24
354:6,11 398:6,7
398:10,15,21
399:3
stila's 109:25
113:20 114:15
115:3,7,11 117:12

122:23 128:20
130:7 135:17
stood 280:15
stop 48:25 73:21
116:7,8
stopped 47:21,23
47:24 49:3
storage 85:22
story 139:25 177:4
177:7 250:19
251:5 314:23
315:5,10
straight 26:21
strategic 96:22,24
97:2,17 98:8
141:13,17 143:11
144:5,17 167:11
167:19 168:3,7,14
168:15 170:11,25
171:8,13 172:6
175:12 187:12
191:11 199:6,10
226:2,6 227:6,7,17
227:21,25 228:8
259:22,25 265:5,7
320:9
strategics 97:7,11
97:21 337:21,23
strategy 167:17
214:14 220:9,15
297:15 302:13
street 3:12,19 4:12
stretch 320:20
stricken 402:17
strike 18:15 21:16
25:12 26:14 32:22
34:17 42:7 44:8
48:4 83:16 93:15
93:17 101:12,14
142:2 152:3
153:16 154:14

157:5 170:6
178:10 187:10,25
196:7 210:16
214:22 221:21
236:17 241:10
254:17,18 275:23
313:10 372:20
395:11 401:16
strong 38:12,15
stronger 97:23
186:3
structure 159:4
247:20
struggling 177:23
stuck 268:14
stuff 366:14
subject 41:17 51:7
92:7 186:25 194:7
257:22 369:3,4
382:17,25
submitted 28:10
35:6 217:12 272:5
272:12,24 279:19
290:15 326:16
submitting 61:25
subscribed 406:9
412:22
subsequent 20:24
348:17 356:18
subsequently
102:7 163:3 326:7
subsidiaries
189:19 311:2,4
substance 183:10
223:19 224:19
286:16 342:17
345:5
substantial 338:10
substantially
235:4,8 296:9

**substantive** 57:25 185:21 311:23 312:2,4 316:13,22 317:8
**substitute** 221:18
**succeeded** 197:2
**success** 50:20
**successful** 83:22
**sufficient** 11:5
**sufficiently** 315:11
**suggested** 44:15 44:18 216:4 252:5 353:10,20 373:8 384:7,12
**suggesting** 44:24 45:4 79:24
**suggestion** 297:8 356:5
**suite** 3:13
**summaries** 206:3
**summarizes** 65:4 65:16 188:10
**summary** 194:18 194:22 195:6 198:19 200:2,8,11 200:18,20 201:24 206:5 228:3 284:18 285:15,18 318:22,25 409:3,6 410:14
**summer** 35:12,16 92:24 93:2 149:10 151:14 252:20 253:13 255:13 308:5,8,14 350:3 359:4,14,20
**superior** 207:11
**supplement** 396:7
**supplier** 175:13
**suppliers** 350:13

**support** 22:25 28:10 295:22 296:2
**supporting** 27:25
**supportive** 82:15 82:19 83:3,6 280:17 283:6,9 292:12 368:15
**supposed** 38:11 331:19
**suppressing** 65:23
**sure** 11:17 42:20 46:6 63:18 71:9 81:20 91:3 93:21 96:10 100:7 136:7 139:9 170:14 187:3 189:17 212:16 216:23 255:10 282:17 289:20 290:3 294:25 297:18 312:14 339:13 346:4 355:6 389:20 400:15
**surgery** 181:12
**surmise** 60:22
**surprised** 97:22 324:9
**surrounding** 266:4
**suspect** 267:9
**suspend** 343:24
**suspended** 50:10 50:15 221:3 255:15
**swear** 7:19
**swhite** 3:9
**sworn** 8:22 23:6 406:9 407:8 412:22

**synonymous** 197:17
**syrups** 85:25
**systems** 351:24

**t**

**t** 1:2 8:21,21 9:9 320:11 408:9
**tab** 284:13,24
**tabbed** 284:8
**table** 69:17 73:15 284:16 327:9
**taft** 4:3 8:14
**take** 6:13 10:4 70:25 71:3 82:8 84:17 140:13 165:9 166:9 199:23 230:11 235:17 266:9 278:10 292:4 298:5 313:2,16 336:5 341:2 351:10 356:21 378:23 389:17 393:8 394:5 395:4 399:16 400:13 401:8,16 402:4,22 403:4,12,13,23 404:4,14,23
**taken** 2:9 220:22 307:12
**takes** 119:12 177:5 399:22
**talk** 16:14 18:25 36:21 47:14 50:12 52:11 73:6 85:3 124:7 143:6 145:4 151:11 194:13 213:10 236:7 243:4 254:7 269:11 283:19 288:16,16 290:24

335:10,17 367:20 389:2,4
**talked** 35:2 71:20 77:7 103:4 123:23 137:13,17 158:24 164:12 170:21 209:14,19 210:5 225:2 229:13 242:12 255:7,11 280:14 282:2 326:14 347:19 368:4 405:16
**talking** 40:17,24 52:18 53:17,18 56:22 72:6,15 73:10 76:2,9 112:25 113:2,4 134:3 151:9 172:6 184:24 192:25 212:17 222:21,23 226:24 227:2 249:3 278:18 282:10 297:15 299:11 301:4 316:19 355:15 380:10,12 385:25 400:24,25 401:13 404:7,8,9,10
**talks** 300:17
**tangential** 50:25 97:4 175:13
**tank** 85:22 97:3,4 98:6,7,20
**tanks** 85:17,19
**target** 268:17,20 269:9 276:12,21 277:3
**targeted** 206:7 218:13 318:10
**targeting** 273:22

**[tariff - think]** Page 56

tariff 141:10
267:20
tariffs 265:14
267:10,12
taylor 3:17 8:6
team 27:16 60:2
86:20 101:4
124:21 140:6
152:15 154:12
158:5 214:17
258:2 263:16
266:3 277:8 314:6
341:17 355:18,19
355:21,23,24
356:7,18 357:9
364:21 370:14
400:18 403:9
teams 81:5 395:18
395:22,23,25
396:4,6,8
teaser 167:3,4
169:4 186:22
195:3
teasers 167:5
186:21
technically 25:10
technologies
264:13
telephone 204:2,9
telephonically
3:14 60:2
tell 10:19 17:9
23:13 48:25 49:6
91:17 96:24 99:14
121:22 139:25
148:3,10 157:20
177:3,7 207:6
253:6 263:13
266:13 282:4
299:17 300:12
314:23 315:5

335:14 337:19
338:11,12 339:25
353:8 366:10
384:4
temporary 216:7
tend 141:4 167:5
term 11:25 12:5
87:9 166:24
167:25 221:3
278:12,13 378:16
396:23,24 400:11
402:11 404:15
terminology 12:18
167:2
terms 22:2,8,20
54:10 107:19
108:6 120:22,24
122:5,17 197:14
197:19 245:11
256:15 268:4
270:18 309:12,20
315:16 332:4
352:16 358:2
393:23 404:3
test 127:4,8
tested 84:5
testified 8:23
18:13 25:20,25
28:6 30:2,5,7,9
60:6 61:18 62:5
72:7 73:23 111:24
124:9 139:12
140:13 146:3
213:5 234:15
371:12,18 377:13
377:16 380:19
381:20 398:9,15
399:21 401:8
404:13
testify 18:20
377:25

testifying 30:18
45:17,20,24 52:15
377:9,22 378:3,4
379:10
testimony 30:20
46:8 79:16 113:5
124:15 161:10
289:19 371:15
378:6 400:7,21
401:3,12 402:2
404:11 405:24
407:7,10
text 276:8 333:17
333:21 410:20
textron 190:23
195:18 198:8
199:11,12,15
206:19 207:5,8
208:4,5,10 209:24
210:5,8,12,18
211:9 219:8,13,14
221:10,19,23
222:16 227:22
textron's 199:13
207:19
thank 165:14
235:22 298:12
317:17 351:14
389:21 390:3,8
405:14,19,20
406:3
theirs 353:5
theme 176:8
theoretically
24:17
theory 218:5
357:4
thereof 227:20
thing 25:6 164:21
212:17 268:11

things 53:3 60:23
65:10 123:21
179:23 306:23
351:11 358:3
361:4,11,13
380:14
think 17:11 30:5,7
38:10 40:3 45:19
48:6 52:23 57:15
66:10 67:23 68:12
70:16 73:17 84:8
96:6 101:14
102:17 108:15
111:4 112:5
116:19 117:9,9
123:20 136:20
139:10 144:3,9,12
144:13 147:21
155:3 160:2 163:6
166:20 171:4
173:3,4,11,20
176:22 178:21
182:9 196:22
197:15 213:4,5,25
222:3 228:9 230:6
233:10,18 238:7
240:5 242:5,7,9
245:11 253:8
256:3,14 268:22
270:8,9 274:5
276:20 280:5,9
282:16,16,20
287:3 289:18
290:7 292:3
301:11 302:15,18
305:9 313:9,11
315:10 316:4
318:18 322:20
328:12 330:11
332:19,23,24,25
333:5 340:6

**[think - time]**                                                                                               Page 57

348:24,25 354:5
355:3,9 358:11,16
365:10 366:2
372:6 374:24
375:15 377:25
384:2 389:18
394:21 396:16
398:23 402:19
403:22 404:7
**thinking**  131:25
254:16 283:8
344:5 363:13
366:5
**thinks**  143:11
**third**  126:5 144:24
159:20,22 160:12
162:2,2,10,12,15
173:19,21 177:2
261:4,10,14,17,21
261:25 334:7
361:19 369:9,16
**thomas**  6:25
**thought**  38:13,18
64:11,14,20 72:8
74:24 79:13 97:5
97:21 111:25
129:19 148:11
162:23 163:25
181:13,17,18
183:15 184:14
186:3,9 196:6
199:8 223:5,17
227:24 228:21
263:16 267:5
274:12 284:6
294:2 295:5 298:2
307:23 315:5,7
320:10 322:24
332:20 349:22
354:12

**three**  13:16 15:11
27:8 52:5 79:21
125:19 146:14,17
170:10 177:19
179:14 180:12,18
181:8,18,23 183:7
183:8,15 184:6
195:9 198:24
199:4 226:25
228:23 229:3
246:5,20 248:24
303:2 304:22
322:20,22 374:17
378:23 400:14,16
400:19 403:12
404:14
**thursday**  13:4
331:20 334:4,10
370:13
**ticking**  282:9
**tier**  175:13
**tight**  372:17
**till**  80:8
**tilton**  3:4 7:24
14:15 20:17 21:4
22:9 34:7,11,20
35:3,5,15,17 36:11
37:18,19 38:7,11
38:16,17 39:10
40:11,15,19 41:16
44:6,10 46:13,21
47:3,12 48:11,13
48:15,20 49:6,16
49:25 50:2,7,12
51:15 54:21 55:3
58:5 64:18,19
66:12,17 67:10,15
72:24 79:9 83:10
84:12 100:20
101:6 102:22
103:10 104:12,16

113:8 120:4,14
138:14 140:10
141:12 142:5,21
143:3,24 151:25
152:7,12 157:2,11
164:24 165:3
167:8,22 172:18
175:23 176:7
177:13,18 179:5
179:11 181:15,17
183:14 184:9,20
185:3 186:6
187:16,21 188:23
189:8,12 190:4,8
190:13,17,22
191:2,19 192:4,22
196:16,21 200:13
201:7 202:18,24
203:22 204:8,14
204:19,24 205:3,8
205:11,16,17
207:7 208:3,9
213:13,17,19
218:16,17,21,24
220:5 241:12,18
242:4 250:15
251:22 252:5,10
252:14,23 253:6
254:10 257:4,11
260:17 266:9
267:3 271:17
278:23 279:7,15
280:9,11,20,25
281:7,8,21,23
282:2 283:5
290:22 291:4,10
292:10,18,23
294:2 295:5,21,25
296:14,19 302:9
302:12,17 309:24
310:9,16 311:15

314:3,12,21 316:2
316:10,17,21
317:9 321:25
326:25 328:5
333:18,22,24
335:24,25 336:12
337:14 338:2,5,19
340:18,25 341:13
341:22 342:7,12
342:15 343:15,18
343:24 344:16
345:10,13,24
346:12 348:2
349:15,25 350:21
351:2,7 352:12
360:10 362:21
363:2 364:11
367:2,11,13,15
376:5 377:6
378:13,19 379:4
384:10,14 395:19
395:20,22 398:17
398:22,23,25
402:9 403:9
408:12,22,25
409:8,12 410:6,21
410:24
**tilton's**  34:24
36:17 37:2 139:18
183:24 184:17,24
189:25 196:24
205:14 254:19
290:16 297:7
312:10 314:10
316:5,12 357:18
357:22 368:12
384:25 385:9
**time**  2:8 7:16
13:17 15:17 48:15
50:9 51:17 60:19
63:5 65:14 73:20

**[time - turn]** Page 58

76:3 81:10 82:11
84:19,23 87:6,13
103:5,10 114:14
123:9 124:5 143:7
143:17 147:13
148:6,22 150:14
151:10,17 155:6
155:15,25 165:15
166:4 170:8,20
172:4 176:19
177:6 178:17
180:25 186:22
205:8,16 207:13
209:2,3,17 210:12
210:23 211:6,17
213:21 219:18
232:22 235:23
236:3 238:13,16
245:10 253:25
255:8,11 261:22
282:5 283:13
288:8 289:5,23
290:5 293:3 298:3
298:13,16 304:24
305:13 306:16
313:4 316:24
317:3 322:25
325:18 326:5
331:4 336:17,18
342:2 343:15,23
349:17 351:15,18
358:25 362:25
363:6 364:16
371:8 376:22
377:5 378:7,14
379:6,16,22 380:7
380:21 389:22,25
390:4 391:2,5
392:17 393:2
394:19,21 395:2
395:16 396:17,20

397:6 399:4 400:9
401:7 402:10,21
406:5
**timeline** 122:22
140:21 141:22
203:4,8 231:2,6,21
231:22 239:18,23
240:4,5,9 288:22
288:22 365:6
373:4 389:11
401:2 408:18
**timelines** 222:13
222:22 223:11,12
231:14
**timely** 205:4,18
**times** 25:21
111:22,22 121:17
181:3 203:21
370:8
**timetable** 342:21
403:3
**timing** 39:2,17
42:17 43:3 44:2
46:13 47:3 77:5
93:20,22 119:8
176:20 222:19
281:5 355:16
361:10
**timings** 355:16
**tissue** 366:12,13
366:16
**titles** 215:22
**today** 7:24 10:8
11:20 12:12,23
45:18,25 46:7,9
177:20 179:14
378:3 390:4
394:14 404:21
**today's** 405:24
**toilet** 366:14

**told** 70:15 73:5
77:24,24 84:2
105:10,14 148:9
189:24 208:12
215:15,17 233:10
233:18,21 234:6,8
234:12,16 235:3
247:14,18,24,24
247:25 248:3,7
249:10 315:6,8,10
367:12
**tom** 5:7
**tomorrow** 273:22
274:3
**ton** 328:13
**top** 111:3 146:5,11
202:24 278:16
285:14 319:10
**topics** 91:18,23
232:20
**total** 405:25
**totally** 327:10,12
**touches** 49:20
**tough** 274:12
**toulouse** 190:2
**tour** 341:2
**town** 70:11
**trade** 267:15,18,20
348:6,23
**traded** 95:10
**trail** 292:12
**transaction** 27:5
76:22 77:13,15
83:3 109:23 206:6
217:17 233:3
280:3 292:13
326:4 348:22
**transactional** 24:2
**transactions** 26:22
65:13 146:20

**transcript** 10:5
17:18 18:10 52:23
52:25 407:9
**transfer** 353:7
**transition** 354:24
**tremendous**
136:22
**triangulate** 278:3
**trigger** 108:11
**trouble** 281:7
336:3
**truck** 303:12
**truckers** 303:15
**trucking** 321:10
**true** 55:20 145:11
212:20 215:12
227:11 382:16
398:3,5 407:10
**truth** 10:20
**truthfully** 30:8,10
**try** 23:10 49:7
68:5,18 73:10
74:2 83:8,19
171:10 173:4
201:15 216:5
237:5 247:4 298:7
351:11 396:22
**trying** 52:19 60:24
73:4,19 122:15
173:19 220:6
278:3,5 291:7
328:12 339:16
345:21 349:9
376:6 396:21
**tuesday** 370:12
371:10
**tully** 131:16,19
132:5,7 151:8
**turn** 6:8 195:7
213:17 320:20

**[turned - updated]** Page 59

**turned** 140:17
**turnover** 380:20
  381:2
**turns** 142:17
  249:18
**twice** 67:21 68:13
  68:22 74:12
  304:21
**two** 12:24 13:2,25
  14:18 36:5 47:25
  48:7,21 52:4,8
  63:22 69:21 70:3
  70:5,13 86:4
  87:15 88:18,20
  89:12 96:18
  100:19 102:3
  113:2 116:6
  121:17 123:20
  135:10 143:16
  153:8 167:5 199:5
  206:21,24 207:9
  207:13 208:6
  212:8 225:18
  226:7 229:25
  230:12 231:4
  247:13 254:4
  260:14 263:18,22
  276:9 281:17
  284:19 288:21
  289:4 292:2,5
  305:3,4 316:16,19
  322:5,21 324:17
  328:3 339:8 347:6
  348:21 349:6,7,8
  352:16 370:8
  375:13 395:4,20
**type** 94:11 110:19
  124:10 306:18
  307:2
**types** 85:25 125:14
  132:8 140:10

269:18 366:13
**typical** 58:25
  201:9
**typically** 19:24
  279:12

**u**

**u.s.** 6:19 264:11
  265:14 267:19
**ultimate** 77:21
  105:15,21 245:11
**ultimately** 54:18
  63:22 71:5,11
  76:12,17 79:17
  83:25 84:10
  103:21 105:8
  108:20,24 109:8
  196:13 206:22
  246:11 260:4
  262:7 272:23
  389:5 392:18
**um** 75:23 132:23
  174:2 209:13
**unable** 61:4
  247:10
**unachievable**
  301:9
**unaudited** 126:25
  383:12,23
**unclear** 357:21
**undergraduate**
  23:15
**underground**
  85:21
**underlying** 320:15
**underperformed**
  398:7
**understand** 11:19
  12:2,11,19 83:21
  88:5 114:3 115:25
  127:17,21,25
  132:21 163:4

204:25 240:23
243:11 247:5
265:25 276:19
278:5 291:7
293:23 344:24
376:7 392:8
**understanding**
  37:9 49:15 58:9
  58:10,13 64:24
  83:12,17 88:17
  107:17,25 109:24
  128:8,14,16
  130:20 132:3
  135:15 139:16
  162:22,24 165:2
  166:10 170:4
  217:7,21 229:20
  236:8 237:20
  240:17 241:16
  243:5 248:25
  250:6,13 314:19
  357:24 360:9,19
  368:19 392:15
  395:25
**understood**
  223:15 345:18
  359:11
**underway** 400:14
**unexpected**
  327:11,13,17
**unfortunate**
  249:12 328:16
**unfortunately**
  181:11 247:14
**unhappy** 104:20
**unique** 119:2
**unit** 6:15
**united** 1:3 264:10
**units** 406:2
**universal** 180:9,13
  181:24 183:3

184:11 254:7,8,20
254:25 255:6,21
256:2,18 258:4,7
258:11 259:8,11
259:15,18,24
260:18,24 261:6
261:18 262:4,7,10
263:9,14 264:4
265:20 409:19,20
**universal's** 264:15
**university** 23:16
  23:19
**unknowns** 107:19
  107:22 108:6
**unrelated** 76:23
**unresolved** 361:16
**untruthfully** 30:5
**unusual** 169:19
  276:15 377:17
**upcoming** 16:7,12
**update** 51:2 65:10
  90:15,16 188:10
  194:14 200:13,14
  201:5,16 203:17
  203:19 205:20
  213:22 216:12,15
  221:25 259:21
  273:20 275:3,4
  281:14,20 305:21
  306:3 317:19
  318:2,5,23 319:2
  360:17 372:4,7
  409:10,13 410:2
  410:13,14
**updated** 201:7
  203:7 212:5 213:7
  221:7,10 222:4
  225:15 231:14
  254:14 259:7,11
  311:16,18 410:11

updates  56:20
86:23 87:3 88:22
92:12,22 93:24
94:15 96:12,14
193:8 201:3,20
202:2,6 282:7
296:2 360:24
361:2 370:18
371:13,19,21
372:5
updating  192:19
upper  195:22
upwards  147:22
377:18
usage  32:3
use  11:25 12:5,18
17:6 31:25 32:5
52:12 54:11 110:5
154:2,5 167:24
173:4 220:16,17
221:3 320:10
346:3 384:15
402:18
uses  276:14
usual  13:10
usually  70:2

**v**

vague  87:14
193:11 374:24
vaguely  124:17
378:18
valuable  35:23
36:3,7 113:19
145:12 354:8
376:10,15,19
valuation  33:5,9
94:20 95:3,8
145:22,24 146:2,8
146:9,11,14,16,18
147:10,16 149:3
152:11 158:23

161:11 211:2,5,15
211:17 212:2,6,10
212:14 217:13,14
242:16 276:6
307:15 308:17
319:9,18,24
324:14 329:18
358:10 359:13
363:13 375:2,18
valuations  33:13
33:17,22 34:2,3,6
146:5 147:12
149:20,23 150:5
152:6 212:19
359:10
value  34:24 35:20
83:9 94:7 103:21
104:8 135:12
150:13 160:21
230:10 240:6
271:7 275:20,25
327:21 329:16
330:3,16 350:2
354:7,13 355:11
356:13 358:13
360:7 361:8
362:15 363:9,16
365:7,13,17
374:22 376:24
377:3 381:22
383:22 385:12,22
386:5 387:2,14,23
388:7
valued  329:12
358:7 361:13
values  147:22
150:22 151:24
152:5 378:16
400:11 402:12
404:15

variation  148:25
variations  38:2
variety  14:2,3
54:14
various  14:8 33:18
85:16 88:19
192:23 198:23
366:13
vehicle  303:11
vendor  352:24
verbal  325:15
verbiage  402:18
veritas  190:9,9
veritext  7:2,4
406:3 412:3
verizon  320:11
version  185:20
186:16 187:4
317:9
versions  185:20
versus  12:7 27:4
153:9 159:15
259:22
viable  300:4
301:24
vice  5:6
video  6:12,16
videographer  5:7
6:2 7:3 84:19,23
165:14 166:4
235:22 236:3
298:12,16 351:14
351:18 389:21,25
390:23 391:2
405:22
videotaped  2:6
view  35:19 41:10
41:15 119:5
136:13,16 150:6
153:6 196:12
211:17 221:9

222:3,8,12 223:21
223:25 224:2,21
232:21,24 235:3
291:6 293:23
295:2 297:6,7
315:24 330:21,24
344:10 353:25
354:4 356:22
365:6 372:25
375:10 383:21
384:25 385:9
386:25 387:13
388:18,21 398:10
401:7 403:19
404:4,18
viewpoint  387:22
views  34:24 38:12
38:15,17,20 39:17
261:17,22 262:2
290:16 292:23
300:20,22,24
389:13 402:9
visit  111:16,18
156:21 236:24
237:2 243:20
352:10
visited  111:14,19
111:23 156:15,17
243:19,22 311:9
352:9
visiting  243:18
vista  187:22,23
volition  171:15
vulcan  359:24
360:6,10,14,19
361:10,18,23
362:24,25
vulcan's  359:22

**[wabco - witness's]**

**w**

**wabco** 323:11,13
  323:14,18,25
  325:19,21 326:13
  326:22 327:2,5,8
  328:8,14 410:19
**wait** 10:23 23:11
  74:20 182:6 398:8
**waited** 397:21
**waiting** 173:14
  397:15,23
**want** 37:19 46:5
  53:2 67:18 68:16
  73:24 75:19 79:10
  82:25 83:11 95:7
  96:9 101:15
  112:18 149:24
  150:3 154:3
  161:11 212:16
  261:24 282:17
  299:17 321:9,10
  325:2 363:20
  365:2 381:24
  384:19
**wanted** 37:22
  39:11,15 66:19
  67:3 69:3 74:14
  74:18,22 82:23
  92:17 104:17
  113:7,16 114:11
  207:9 342:19
  343:24 344:22
  345:14,16 365:2
**wanting** 112:9,22
  344:25
**wants** 299:22
**washington**
  360:20
**water** 54:14,16,17
  62:20,25 85:24
  86:2

**waterfall** 32:10,14
  32:19,24 33:7,11
  33:25 34:10,13,18
  34:19 35:2,4,14,18
  36:10,17 147:3,8
  147:12,22 149:2
  150:25 151:5,12
  158:25 161:17
  196:19 212:6,10
  212:11,18 213:6
  242:12,14,17
  271:8,13 308:16
  308:18 319:19
  329:20 358:14
**waterfalls** 32:9
  37:25 38:3 95:16
  146:4 147:16
  150:11 152:5,10
  160:5,9,24 196:2
  210:25 307:16
**watkins** 312:16,17
  312:19,23
**watts** 273:10
**way** 36:14 39:20
  41:10 96:4 123:2
  150:24 159:24
  165:11 170:3
  172:14 224:24
  227:3 292:10
  315:5,7,12 316:12
  320:21 365:16
  381:23 393:11
  407:15
**wc** 276:20
**we've** 9:3 35:2
  115:13 119:14
  160:6 280:4
  301:25 333:15
  358:16 361:4
  397:5

**weaker** 186:4
**wealth** 348:10
**wednesday** 13:4
  334:3,10
**week** 122:11
  304:22 305:16
  306:2 334:4,10
  370:9,17 395:4
**weekly** 87:4
  371:13,14,19,21
**weeks** 122:2
  170:10,10 304:23
  305:3,4 324:16
  357:4 372:17
  394:11,21 395:3
  399:22 401:4
  404:5
**weinberg** 119:16
  119:23 120:2,6,18
  121:8 142:10,18
  143:10,17 144:11
**weld** 352:25
**went** 63:12,16,20
  67:19 68:4 78:3
  79:11,14 167:24
  178:16 181:13,18
  182:5,11 183:15
  183:23 184:15
  200:16 250:18
  266:19 313:24
  329:6 337:17,22
  360:13
**west** 4:12
**whatsoever** 120:9
**whereof** 407:17
**whispering** 6:6
**white** 3:8 4:17
  7:25 8:9 15:7
  46:16 223:9
  390:13 391:6

**whitecase.com**
  4:22,23
**wickersham** 4:3
  8:14
**wilmington** 3:19
**window** 42:18
  43:2 113:7,22
  114:19 115:2,5,11
  250:4 251:3,16
  252:2 329:9
**wing** 168:21
**wire** 269:23
**wish** 210:4
**withdraw** 48:2,8
  48:22 266:21
  323:5 328:17
**withdrawn** 265:22
**withdrew** 220:2
  306:15 324:20
**witness** 2:7 7:20
  18:24 26:2 29:6
  37:12 40:7,12
  41:8 45:21,25
  47:6 49:19 90:23
  91:22 106:6
  109:15 223:19
  224:18 232:18
  275:17 279:22
  283:2,16 286:16
  287:6,9,20 288:15
  288:18 291:14
  293:15 294:7
  295:11 297:12
  299:9 300:16
  330:19 345:4
  350:19 375:8
  388:10 390:8
  405:16 407:7,11
  407:17 408:2
**witness's** 412:5

**witnesses**  53:14
**wondering**  67:2
  88:24 106:25
  284:17 299:15
**word**  17:6 63:2
  91:22 215:5
  220:18 228:19
  234:21 313:16
  334:2 346:3
  367:23 368:2
  371:18 381:10
  384:15 402:15,16
**wording**  346:4
**words**  143:15
**work**  15:7 53:15
  128:23 129:6
  131:21,24 132:5
  137:8 150:24
  170:6 181:19
  183:16,25 184:7
  184:17 228:9
  235:5 238:2
  265:25 286:9
  291:11 292:5
  316:2 360:20
  388:24
**worked**  121:10
  131:15 153:25
  154:7,9 206:20
  289:7,11 295:19
  314:5 396:5
**working**  16:10
  17:4,8 56:16 57:8
  249:16,19 276:11
  276:22 277:3,9,17
  277:19,23 278:4,4
  280:2 286:13,18
  288:5,13 289:21
  289:24 293:3
  331:14,15 404:2

**works**  79:6 315:12
**world**  4:4 169:8
**worth**  273:25
  322:24
**write**  82:14,24
  173:23 179:12
  312:8
**writer**  174:9
**writes**  142:6 144:2
  177:17 197:8
  202:24 265:17
  267:3 333:24
**writing**  94:15
  142:8 297:19
**written**  188:9
  199:4
**wrote**  63:10 107:6
  174:12 175:23
  181:15,16 267:4
  282:15 315:21

**x**

**x**  54:2 94:4 408:1
  408:9
**xbox**  243:10
**xv**  3:5

**y**

**ycst**  286:9
**ycst.com**  3:21
**yeah**  53:5,23
  113:4 150:20
  179:24 209:9
  229:2 231:10
  255:19 268:9
  275:16 290:20
  292:3,14,19
  294:11 298:11
  299:13 306:22
  309:4 332:25
  333:10 366:8
  386:7 388:25

**year**  17:4,8 90:18
  113:24 116:25
  151:21 153:5
  255:13 265:19
  267:24 268:3,4,8
  280:3 308:19
**years**  25:17 88:18
  88:20 110:4 113:2
  117:5 119:11
  125:19 176:12
  243:13 250:10,23
  284:19 348:21
  349:6,7,8 375:13
**yesterday**  371:4,7
**york**  2:2,2,11 3:6
  3:6 4:5,5,13,13,20
  4:20 6:24,24 7:2,5
  179:13 311:6
  406:3 407:5 412:3
**young**  3:17 8:6
  46:15 109:22
  223:9 291:19
  296:3 370:14

**z**

**zach**  255:8
**zero**  248:10
**ziegler**  237:18
  238:4 239:5,19
  240:11 248:16
  249:8,10
**ziegler's**  239:22
**zohar**  1:5 3:18
  4:11,18 6:17 8:19
  12:17 19:15 27:14
  27:21 28:17 32:13
  33:2 36:15 50:11
  87:4,11,20,21
  113:19 130:20,24
  132:9 157:8
  160:12 176:9
  236:14 278:14

  300:10 330:11
  333:23 372:19
  393:4 412:4
**zohar's**  60:23
  376:19
**zohars**  27:18
  87:12 130:13,16
  144:20 159:7,15
  160:7,16 161:21
  260:17,23 330:9
  331:4 370:25
  392:23

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.