USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/15/2026

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PATRIARCH PARTNERS AGENCY SERVICES, LLC,

Plaintiff,

- against -

ZOHAR CDO 2003-1, LTD., ET AL.,

Defendants.

**16-CV-4488 (VM)**

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

Plaintiff Patriarch Partners Agency Services, LLC, ("PPAS") brought this action against defendants Zohar CDO 2003-1, Ltd., Zohar I CDO 2003-1, LLC (together with Zohar CDO 2003-1, Ltd., "Zohar I"), Zohar II 2005-1, Ltd., Zohar II 2005-1, LLC (together with Zohar II 2005-1, Ltd., "Zohar II"), Zohar III, Ltd., and Zohar III, LLC (together with Zohar III, Ltd., "Zohar III", and collectively with Zohar I and Zohar II, the "Zohar Funds" or "Defendants"), Alvarez & Marsal Zohar Management, LLC ("AMZM"), and Alvarez & Marsal Zohar Agency Services, LLC ("AMZAS"). (See "Complaint" or "Compl.," Dkt. No. 1; "Amended Complaint" or "Amend. Compl.," Dkt. No. 46.) The Zohar Litigation Trust-A (the "Zohar Trust") subsequently replaced the Zohar Funds as defendant/counterclaim plaintiff, (See Dkt. No. 236), and the parties voluntarily dismissed without prejudice PPAS's claims

against AMZM and AMZAS pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii), (see Dkt. No. 246.)

Following this Court's decision and order concerning the parties' motions for summary judgment, (see "Summ. J. D&O," Dkt. No. 362), three live claims remain. PPAS asserts a breach of contract claim based on the Zohar Funds' attempted termination of PPAS as administrative agent ("Administrative Agent") under the parties' credit agreements (the "Credit Agreements"). The Zohar Funds' attempted termination of PPAS as Administrative Agent was determined by this Court at summary judgment to be a breach of Section 9.1 of the Credit Agreements[1], but the issues of whether the breach caused damages or whether there was a prior material breach by PPAS were left for trial. (See Summ. J. D&O at 88-90, 104-105.) The Zohar Trust also asserts two live counterclaims against PPAS. First, the Zohar Trust argues that PPAS violated the Credit Agreements because PPAS did not follow the Zohar Funds' default instructions. Second, the Zohar Trust argues that PPAS failed to remit certain funds that PPAS claims it properly held in a banking capacity under Section 9.5 of the Credit Agreements.

[1] Because the Credit Agreements are materially the same, the Court uses the Croscill Credit Agreement, ("Croscill Agreement" or "Croscill Agmt.," Plaintiff's Exhibit or "P. Ex." 70), as an exemplar. Hence, the Court refers to provisions common to the Credit Agreements with their placement in the Croscill Agreement.

The Court held a bench trial on March 16, 17, 18, 19, and 20, 2026, to adjudicate PPAS and the Zohar Trust's claims. The Court now sets forth its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I. FINDINGS OF FACT[2]

### A. CLOs

In 2000, Lynn Tilton ("Tilton") founded Patriarch Partners, LLC ("Patriarch"). (See Joint Stipulation of Undisputed Facts and Law or "JSUFL," Dkt. No. 403, ¶ 1; "Trial Transcript" or "Tr.," 8:2-9:1.) Tilton is the principal and owner of Patriarch. (See id.) At Patriarch, Tilton developed a business model that allowed investors to pool resources in a portfolio of commercial loans to distressed businesses through a collateralized loan obligation ("CLO"). (See Tr. 8:9-24.) Because the CLOs known as the Zohar Funds are central to this action, the Court first describes how CLOs typically function.

A CLO is an investment vehicle that bundles a pool of commercial loans and sells securities backed by the loans to investors in groups, known as tranches. (See id. 638:1-4,

[2] While the Court has reviewed and considered all of the live testimony, designated depositions, and accompanying exhibits admitted in evidence in connection with the trial in this matter, the Court addresses only those portions of the evidence relevant to the Court's legal conclusions.

642:9-12.) Generally there are three types of commercial loans: (1) term loans, by which the borrower receives the full amount of the loan at the outset, (2) delayed draw term loans ("DDTLs"), by which the borrower may borrow incrementally over time up to a predetermined maximum amount of funds, and (3) revolving credit facilities ("Revolvers"), by which borrower may borrow up to a specified amount, pay back part of what it borrowed, and then borrow more. (See id. 63:7-64:3, 638:24-639:24.)

Generally, in a CLO, a collateral manager will purchase noninvestment-grade commercial loans. (See id. 640:8-24.) The loans are then put into a special purpose investment vehicle, known as a CLO. (See id. 638:1-4.) The CLO sells securities notes backed by the cash flows of interest and principal from these loans to a pool of investors in tranches that represent different risk-reward profiles. (See id. 10:2-9; 641:4-643:20.) The notes pay interest and principal at maturity. (See id.)

There are multiple entities with distinct roles that help a CLO function. First, there is a collateral manager. The collateral manager purchases the loans and actively manages the portfolio of loans to maximize returns. (See id. 30:3-8, 640:23-24.) There are also administrative agents, which consist of administrative intermediaries handling the

CLO's day-to-day functions such as facilitating the movement of money, information, and documents between the borrowers, which consist of the companies with loans, and the lenders, who comprise the noteholders. (See id. 644:8-645:16.) For each borrower in a CLO, there is a contract between the borrower and lender known as a credit agreement, which also describes the duties of the administrative agent. (See id. 643:23-644:7.) Finally, there is also the trustee, who bears all the responsibility for the CLO's cash. (See id. 31:13-32:5.) With the lender's approval, the trustee releases money to the borrowers that the borrowers request. (See id.) The trustee also distributes cash received from the borrowers to the noteholders. (See id.) Additionally, the trustee maintains books and records for the CLO and sends reports to the noteholders. (See id.)

B. The Zohar Funds and PPAS as Administrative Agent

Tilton created a series of three CLOs known collectively as the Zohar Funds. In 2003, Tilton created Zohar I. (See JSUFL ¶ 2.) She created Zohar II in 2005 and in 2007 she created Zohar III. (See id.) The Zohar Funds each had a maturity date of 12 years. (See Tr. 18:9-17, 21:16-22, 22:6-14.) The Zohar Funds' investors were provided notes in exchange for their capital, which the Zohar Funds invested in company loans and equity securities. (See P. Ex. 1.) The Zohar

Funds engaged in a strategy of purchasing distressed "Portfolio Company" assets and then loaning money to these Portfolio Companies. (See Tr. 19:18-20:24.)

Patriarch Partners VIII, LLC, Patriarch Partners XIV, LLC, and Patriarch Partners XV, LLC (collectively, the "Patriarch Managers") are Delaware limited liability companies managed by Tilton that served as the collateral managers ("Collateral Managers") for each of Zohar I, Zohar II, and Zohar III, respectively, from 2003 to 2016. (See JSUFL ¶ 5.) The Patriarch Managers selected the Zohar Funds' investments. (See id. ¶ 8.) Between 2003 and 2013, the Zohar Funds extended loans to thirty-seven distressed Portfolio Companies pursuant to separate Credit Agreements for each Portfolio Company.[3] (See id. ¶ 9.) The Portfolio Companies

[3] Specifically, the Portfolio Companies were RM Acquisition, LLC ("Randy McNally"); LVD Acquisition, LLC ("LVD"); Intrepid U.S.A. Inc.; Heritage Aviation Ltd. ("Heritage"); Global Automotive Systems, LLC; Denali Incorporated; MD Helicopters, Inc.; Libertas Copper, LLC; Jewel of Jane, LLC ("Jewel of Jane"); Gorham Paper and Tissue, LLC; Vulcan Engineering Co.; eMag Solutions, LLC ("eMag"); Dura Operating Corp.; White Mountain Tissue, LLC; Snelling Staffing, LLC ("Snelling"); Snelling Medical Staffing, LLC; Mobile Armored Vehicles, LLC (f/k/a PVI Acquisition, LLC)("MAV"); Remco Maintenance, LLC ("Remco"); Scan-Optics, LLC (f/k/a SO Acquisition, LLC) ("Scan Optics"); Silverack, LLC ("Silverack"); Spiegel, LLC ("Spiegel"); 180s, Inc. ("180s"); Acme International Enterprises, Inc. (f/k/a Acme, LLC)("Acme"); American Doors, LLC (d/b/a Black Mountain Door, LLC)("BMD"); Best Textiles Acquisition, LLC ("Best Textiles"); Duro Industries, Inc. (f/k/a Chace Street, Inc.) ("Chace St."); Croscill Acquisition, LLC ("Croscill"); Duro Textiles, LLC ("Duro"); East Alliance Limited ("East Alliance"); NetVersant Solutions, Inc. (NetVersant"); Fetco Home Décor, Inc. ("Fetco"); Galey & Lord, LLC ("Galey"); Galey & Lord Industries, LLC ("GLI"); Hartwell Industries, Inc. ("Hartwell"); Inter-Marketing Group, Inc. ("IMG"), Dana Classic Fragrances, Inc. ("Dana"), and/or Dana S.A.U.; and Natura Water, LLC (f/k/a Natura Water, Inc.) ("Natura"). (See JSUFL ¶ 9.)

had access to three types of loans: term loans, DDTLs, and Revolvers. (See Tr. 32:16-25.)

PPAS, which is also managed by Tilton, was the Administrative Agent under each Credit Agreement, as amended. (See JSUFL ¶¶ 10-12.) PPAS was a party to each Credit Agreement, along with at least one of the Zohar Funds as the lender (the "Lender"), the Portfolio Company as the borrower (the "borrower"), and in some cases other Lenders. (See id. ¶ 13.) PPAS's primary responsibilities as Administrative Agent included money movement, documentation, and information flow between the Lenders and Borrowers. (See Tr. 49:11-50:4, 61:8-62:17, 64:4-66:13.) PPAS managed the cash flows for the Portfolio Companies by collecting Portfolio Companies' loan payments and distributing them to the Lenders. (See id.) PPAS also received the Portfolio Companies' borrowing requests and worked with U.S. Bank, which served as trustee for the Zohar Funds, to fund borrowing requests that were approved by the Collateral Manager on behalf of the Lenders. (See id. 49:11-50:4; JSUFL ¶ 6.)

The start of PPAS's tenure as Administrative Agent varied, as provided under each Credit Agreement and/or Credit Agreement Amendment. (See JSUFL ¶ 11.) Pursuant to the Credit Agreements, PPAS was entitled to be paid an agency fee (the "Agency Fee") by each Portfolio Company for serving as

Administrative Agent, which, as of 2015, was typically $75,000 per year per company. (See id. ¶ 14; Tr. 76:24-77:4.) In practice, however, PPAS often agreed to defer and accrue payment of Agency Fees it was owed by certain Portfolio Companies. (See JSUFL ¶ 58; Tr. 77:5-78:4.) Typically, even when PPAS did not collect the Agency Fee, the Portfolio Company was still invoiced for the outstanding amount and PPAS continued to provide the Portfolio Company with its services. (See Tr. 77:5-78:4.) In 2011, existing Credit Agreements were amended to state that PPAS was "irrevocably" appointed Administrative Agent. (See id. 57:2-19.) Credit Agreements executed after June 2011 also stated that PPAS was "irrevocably" appointed Administrative Agent. (See id.)

In addition to leading Patriarch, Patriarch Managers, and PPAS, Tilton also held management positions at each of the Portfolio Companies, where she was either a Manager, Director, and/or a Chief Executive Officer ("CEO"). (See id. 43:4-17.) Tilton also managed Patriarch Partners Management Group ("PPMG"), which supported the Portfolio Companies by providing them with access to executives, lawyers, and other industry specialists. (See id. 41:14-42:7.) Tilton's Patriarch-affiliated entities also supported the functioning of PPAS. PPAS had no employees of its own and delegated its duties pursuant to Section 9.3 of the Credit Agreements to

Patriarch and PPMG employees. (See Croscill Agmt. § 9.3; Tr. 57:20-58:14.)

Under the Collateral Management Agreements, there was a broad conflict of interest waiver for Patriarch and its affiliates to perform in all these different roles relating to the Zohar Funds. (See P. Ex. 11 § 6.2; Tr. 38:17-41:7.) In wearing multiple hats as head of Patriarch, Patriarch Managers, PPAS, PPMG and as the manager of the Portfolio Companies themselves, Tilton engaged in a strategy of centralized control to turn around the performance of the highly distressed Portfolio Companies, thereby maximizing cash flows and long-term value for all parties involved in the Zohar Funds. (See Tr. 38:17-41:7.)

C. Drawdowns of Funds and AMZM's Appointment

Between June 2015 and March 2016, Tilton, in her various roles at the Portfolio Companies, Patriarch Managers, and PPAS, approved drawdowns on the remaining committed Revolver and DDTL loans for the Portfolio Companies. (See id. 104:6-105:11.) A drawdown in the context of a DDTL or Revolver means that the borrower actually borrows and receives funds from the lender that had previously been approved as committed by the lender. During this June 2015 to March 2016 period, instead of sending the drawn funds directly to a bank account in the individual Portfolio Company's name, as was previously

the usual practice, PPAS held most of these funds on behalf of the Portfolio Companies in a commingled bank account at Wells Fargo that PPAS controlled. (See id. 100:11-104:3; 116:11-118:5; P. Ex. 186.)

In total there were nearly $75 million in custody drawdowns, of which approximately $54 million occurred between February and March 2016. (See P. Ex. 534.) PPAS claims it held this money in its banking capacity pursuant to Section 9.5 of the Credit Agreements ("Section 9.5"). (See Tr. 116:11-22; Croscill Agmt. § 9.5.) To access the money being held by PPAS, the Portfolio Companies needed to receive Tilton's approval in her capacity as the manager of the respective Portfolio Company. (See Tr. 109:19-110:6.)

On February 5, 2016, the Patriarch Managers resigned as Collateral Manager for all the Zohar Funds, effective as of March 3, 2016. (See JSUFL ¶¶ 15-16.) On March 3, 2016, Alvarez & Marsal Zohar Management LLC ("AMZM") became the Zohar Funds' new Collateral Manager, replacing the various Patriarch Managers. (See id.) Elizabeth LaPuma ("LaPuma") was the Managing Director at Alvarez & Marsal and performed work relating to AMZM and the Zohar Funds. (See id. ¶ 17.)

On March 4 and March 7, 2016, LaPuma on behalf of AMZM, approved around $17.5 million in drawdowns requested by certain Portfolio Companies. (See P. Ex. 178, 179, 180, 181;

Tr. 113:15-18.) After March 7, 2016, the Portfolio Companies ceased making borrowing requests to AMZM. (See Tr. 398:18-24.)

D. Attempted Termination of PPAS as Administrative Agent

On June 14, 2016, AMZM, acting on the Zohar Funds' behalf, sent PPAS and the Portfolio Companies letters purporting to terminate PPAS as Administrative Agent effective June 17, 2016. (See P. Ex. 201, 202.) In these letters, AMZM stated that the Zohar Funds had appointed AMZAS as the new Administrative Agent and directed PPAS to immediately remit to AMZAS all fees under the Credit Agreements. (See P. Ex. 202.) The next day, on June 15, 2016, PPAS commenced this action against the Zohar Funds and AMZM. (See Compl.)

On July 25 and 26, 2016, AMZAS sent the Portfolio Companies letters claiming that they had replaced PPAS as Administrative Agent. (See P. Ex. 214, 216.) In these letters, AMZAS instructed the Portfolio Companies to provide AMZAS with all their books and records and other information required under the Credit Agreements, to refrain from making any payments to PPAS, and to send to an AMZAS bank account all interest, commitment fees, and any principal payments owed to the Zohar Funds. (See id.) On November 28, 2016, during a pre-motion conference, this Court instructed that

PPAS should continue as Administrative Agent pending resolution of the lawsuit. (See Dkt. No. 31; Dkt. Minute Entry for Nov. 28, 2016.)

E. Events of Default

On October 9, 2017, LaPuma, writing for AMZM on behalf of the Zohar Funds, notified Tilton as Manager of PPAS that nineteen Portfolio Companies (the "Default Companies")[4] failed to pay interest for one or multiple periods, triggering events of default ("Events of Default") under the Credit Agreements. (See the "Default Letters," P. Ex. 292.) In the Default Letters, the Zohar Funds provided default instructions (the "Default Instructions") directing PPAS to send notices of default and acceleration to the Default Companies declaring all unpaid obligations immediately due and any DDTLs or Revolvers terminated. (See id.) The Default Instructions also directed PPAS to "exercise all applicable rights or remedies provided in the Credit Documents, including but not limited to enforcing liens and security

[4] The Default Companies were: (1) Fetco, (2) IMG, Dana, and Dana S.A.U., (3) Chace St., (4) Duro, (5) Galey, (6) East Alliance, (7) Scan Optics, (8) Spiegel, (9) NetVersant, (10) Croscill, (11) Natura, (12) Hartwell, (13) Silverack, (14) GLI, (15) 180s, (16) Best Textiles, (17) Acme, (18) Remco, and (19) BMD. (See P. Ex. 292; JSUFL ¶ 27.) Note that while there are nineteen Default Companies, some of these were really the same entities in practice. For example, Duro was the operating company for Chace St., which only held real estate for Duro, and Galey and GLI were the same company. (See Tr. 196:25-197:13.) For this reason, it appears Tilton referred to there being either nineteen or eighteen Default Companies at different points of her testimony. (See id. 401:18-20, 412:13-413:13, 415:8-416:18.)

interests and foreclosing promptly on all Collateral and related Liens, or other interests, on behalf of the Lenders." (Id.)

As of October 9, 2017, PPAS had already sent out notices of default and acceleration to seven of the Default Companies.[5] Additionally, as of October 9, 2017, PPAS was holding $12.6 million in funds on behalf of ten of the Default Companies in PPAS's banking capacity.[6] (See P. Ex. 534.) The Default Letters marked the beginning of letter exchange (the "Letter Exchange") between LaPuma, on behalf of AMZM and the Zohar Funds, and Tilton, on behalf of PPAS, that continued until February 16, 2018. (See Default Letters, P. Ex. 315, 316, 317, 328, 332, 354, 357, 358.)

On October 17, 2017, Tilton, as manager of PPAS, wrote to AMZM in response to the Default Letters. (See the "October 17 Letter," P. Ex. 315.) In the October 17 Letter Tilton stated that sending notices of default and acceleration to the Default Companies would mean that the companies could no

[5] On September 26, 2016, PPAS sent notices of default and acceleration to Chace St., Duro, Galey, and GLI. (See P. Ex. 232.100-400.) On April 25, 2017, PPAS sent a notice of default and acceleration to Remco. (See P. Ex. 277.100.) On May 24, 2017, PPAS sent a notice of default and acceleration to Fetco. (See P. Ex. 280.100.) On July 13, 2017, PPAS sent a notice of default and acceleration to Spiegel. (See P. Ex. 283.100.)

[6] As of October 9, 2017, PPAS held money in a custodial capacity for the following Default Companies: (1) 180s ($1,293,950); (2) Acme ($583,077); (3) Best Textiles ($422); (4) Croscill ($2,925,769); (5) Hartwell ($259,809); (6) IMG/Dana ($243,303); (7) Natura ($5,572,014); (8) NetVersant ($2,639); (9) Scan Optics ($1,749,931); and (10) Spiegel ($2,337). (See P. Ex. 534; Defendant's Exhibit, or "D. Ex." 110.)

longer operate in the normal course and would need to be wound down[7]. (See id.) Tilton further stated that PPAS would only send notices of default and acceleration to the Default Companies "once we are advanced wind-down costs of $2 [million] per company." (Id.) Tilton also identified five Default Companies - Scan Optics, 180s, IMG/Dana, Croscill, and Natura (the "Value Companies") — that she stated would generate greater value if permitted additional time to strengthen before being sold. (See id.) Finally, Tilton wrote that, as of October 17, 2017, Remco, Silverack, Galey, GLI, Spiegel, BMD, Best Textiles, Chace St., Duro, Fetco, Hartwell, and NetVersant had "already ceased operations and are in wind-down mode." (Id.)

On October 19, 20, and 23, 2017, PPAS transferred approximately $20.3 million of Portfolio Company funds from PPAS's bank account to bank accounts in the names of the individual Portfolio Companies, including approximately $10 million in Default Company funds.[8]

[7] A wind-down is the process of shutting down a company either over time in the ordinary course, or immediately once a notice of default and acceleration has been sent to the company. (See Tr. 79:23-84:2.) Wind-down costs often include paying lawyers, investment bankers, liquidators, remaining payroll, and the costs of securing physical property. (See id.)

[8] Specifically, for the Default Companies on October 19, 20, and 23, 2017, PPAS transferred $1,293,950.02 to a 180s bank account, $5,572,014.15 to a Natura bank account, $1,425,000 to a Croscill bank account, and $1,789,931.46 to a Scan Optics bank account. (See P. Ex. 529; P. Ex. 534; Tr. 818:11-824:19.) For other Portfolio Companies during this period, PPAS also transferred $1,047,791.37 to an eMag bank account, $1,927,191.68 to a Heritage bank account, $2,040,423.87 to a Jewel of Jane bank account,

On October 23, 2017, LaPuma responded on behalf of AMZM and the Zohar Funds to Tilton's October 17 Letter. (See the "October 23 Letter," P. Ex. 316.) LaPuma agreed to hold in abeyance the Zohar Funds' Default Instructions for the Value Companies if PPAS provided "their most recent financial statements and a list of their assets by October 23, 2017," which was the same day the letter was sent. (Id.) Regarding Tilton's advancement demand, LaPuma stated that PPAS could not refuse to execute the Zohar Funds' Default Instructions pending an advancement of wind-down costs and that PPAS could only request indemnification after seeking reimbursement from the Portfolio Companies. (See id.) LaPuma also wrote that PPAS had not provided "any information to the Zohar Funds to assess the reasonableness of your demand." (Id.)

On October 30, 2017, Tilton responded on behalf of PPAS to LaPuma's October 23 Letter. (See the "October 30 Letter," P. Ex. 317.) Regarding the Value Companies, Tilton stated her understanding that the Zohar Funds "have agreed to hold in abeyance" their Default Instructions and explained that "PPAS understands that those [Value Companies] will agree to provide their most recent financial statements, subject to AMZM's execution of a confidentiality agreement." (Id.)

$3,007,791 to an LVD bank account, $423,561.85 to a MAV bank account, and $1,790,000 to a Randy McNally bank account. (See id.)

On November 10, 2017, LaPuma, on behalf of AMZM and the Zohar Funds, responded to Tilton's October 30 Letter. (See the "November 10 Letter," P. Ex. 328.) In the November 10 Letter, LaPuma asserted that that the Credit Agreements did not condition PPAS's delivery of the Value Companies' financial information on the execution of a confidentiality agreement. (See id.) LaPuma wrote that if PPAS did not provide the Value Companies' most recent financial statements within seven days, the Zohar Funds would "reinstate their October 9 directions to accelerate repayment as to these five companies and direct PPAS to immediately take all actions to foreclose on their Collateral." (Id.) Also in the November 10 Letter, AMZM reiterated its demand that PPAS remit all funds and deposits of the Default Companies it was holding. (See id.) PPAS did not respond by the November 17, 2017, deadline.

On November 21, 2017, Tilton on behalf of PPAS sent AMZM a letter in response to LaPuma's November 10 Letter. (See the "November 21 Letter," P. Ex. 332.) In the November 21 Letter, Tilton characterized AMZM as "threatening" to reinstate the Zohar Funds' October 9 Default Instructions unless PPAS disclosed the Value Companies' most recent financial information. (Id.) Tilton also stated that PPAS could not disclose the Value Companies' financial information because AMZM refused to enter into a confidentiality agreement with

those companies. (See id.) Tilton wrote further that "should you nonetheless elect to reinstate the October 9 instructions . . . you will first need to advance to PPAS all administrative costs associated with such foreclosure and wind-down." (Id.)

On November 22, 2017, PPAS sent notices of default and acceleration to BMD, Best Textiles, Silverack, and Hartwell. (See P. Ex. 333.) On November 30, 2017, PPAS sent AMZM a letter stating that PPAS had sent these notices. (See id.)

On January 10, 2018, LaPuma on behalf of AMZM and the Zohar Funds sent a letter to PPAS in response to PPAS's November 21 and November 30 letters. (See the "January 10 Letter," P. Ex. 354.) In the January 10 Letter, LaPuma asserted that "nothing in the Credit Agreements conditions PPAS's delivery of financial information to the Lenders on the execution of a confidentiality agreement or gives PPAS the right to request a confidentiality agreement." (Id.)

On February 8, 2018, LaPuma on behalf of AMZM and the Zohar Funds again wrote to PPAS stating that PPAS had not responded to the January 10 Letter. (See the "February 8 Letter," P. Ex. 357.) LaPuma also asked PPAS to confirm whether Portfolio Companies Jewel of Jane and MAV were in "wind down mode." (Id.)

On February 11, 2018, PPAS sent a notice of default and acceleration to NetVersant. (See P. Ex. 357.100.)

On February 16, 2018, Tilton on behalf of PPAS sent AMZM a response to the February 8 Letter. (See the "February 16 Letter," P. Ex. 358.) In the February 16 Letter, Tilton stated that PPAS had already complied with AMZM's directive to send notices of default and acceleration to Silverack, Best Textiles, Hartwell, and BMD. (See id.) For Jewel of Jane, MAV, and Acme, Tilton recommended their default instructions be held in abeyance along with the five other Value Companies. (See id.) Tilton continued that "AMZM ha[d] prudently elected not to reinstate its October 9 [default] instructions" as to the Value Companies. (Id.) AMZM and the Zohar Funds did not reply to PPAS's February 16 Letter.

F. Zohar Funds' Bankruptcy

On March 11, 2018, the Zohar Funds filed for bankruptcy protection in the United States Bankruptcy Court for the District of Delaware. (See JSUFL ¶ 49.) All three of the Zohar Funds were debtors in those bankruptcy proceedings. (See id. ¶ 50.) In connection with those proceedings, PPAS and the Zohar Funds agreed that PPAS would be replaced as the Funds' Administrative Agent. (See id. ¶ 51.) In 2019, Ankura Trust company succeeded PPAS in the role of Administrative Agent for certain Portfolio Company Credit Agreements pursuant to

the terms of a retention agreement between the Zohar Funds and Ankura Trust and the March 19, 2019, order of the Bankruptcy Court. (See id. ¶ 52.) PPAS remained as co-Agent for certain other Portfolio Company Credit Agreements. (See id.)

## II. CONCLUSIONS OF LAW

There are three live claims remaining in this case. The Court first addresses the Zohar Trust's two breach of contract counterclaims before addressing PPAS's breach of contract claim.

### A. Zohar Trust's Counterclaim III

The Zohar Trust's Counterclaim III alleges that PPAS breached Section 8.2 of the Credit Agreements ("Section 8.2") by failing to follow the Zohar Funds' Default Instructions as to the Default Companies. Section 8.2 states that in an Event of Default not caused by bankruptcy the Administrative Agent, at the request of the Lenders, "shall send notice to the borrower" declaring "the unpaid principal amount of the loans and interest . . . and all other Obligations to be immediately due and payable." (Croscill Agmt. § 8.2.) Section 8.2 also requires the Administrative Agent, at the request of the Lender, to "exercise all rights and remedies provided in the Credit Documents." (Id.)

The Zohar Trust argues that PPAS breached Section 8.2 by: (1) not delivering timely notices of default and acceleration to certain Default Companies and (2) not enforcing the Zohar Funds' security interests as to funds that PPAS held in a banking capacity for certain Default Companies. Neither party disputes that there were Events of Default on October 9, 2017, or that Section 8.2 required PPAS to follow the Zohar Funds' Default Instructions. However, PPAS argues that it did not breach Section 8.2 because: (1) the Default Instructions for the Value Companies remained in abeyance and (2) PPAS could defer executing the Default Instructions pending an advancement of wind-down costs by the Zohar Funds. The Court rejects both of PPAS's arguments.

a. PPAS Failed to Deliver Notices of Default and Acceleration in a Timely Manner

Section 8.2, in relevant part, requires PPAS as Administrative Agent to send notices of default and acceleration to the Borrower if an Event of Default occurred and the Lenders requested that such notice be sent. (See id.) On October 9, 2017, the Zohar Funds, through AMZM, declared that Events of Default had occurred for the Default Companies and directed PPAS to "immediately" send notices of default and acceleration to those companies. (Default Letters.)

Despite the Zohar Funds' mandatory directive that PPAS send notices "immediately," it took PPAS over a month after the receipt of the Default Letters on October 9, 2017, to send the first notices to any of the Default Companies. (See P. Ex. 333.) PPAS first sent notices to the Default Companies BMD, Best Textiles, Silverack, and Hartwell on November 22. (See id.) Setting aside the five Value Companies, which initially had their Default Instructions held in abeyance by the Zohar Funds, and the seven Default Companies[9] which had already received notices of default and acceleration by October 9, at a minimum PPAS should have sent notices to the other remaining seven Default Companies[10] immediately upon receipt of the Default Letters. By failing to send notices of default and acceleration to these Default Companies in a timely manner, PPAS breached Section 8.2 of the Credit Agreements.

b. PPAS Failed to Remit Funds to Zohar Trust

The Zohar Funds argues that PPAS also breached Section 8.2 by not enforcing the Zohar Funds' security interests against the Default Companies. Specifically, The Zohar Funds

---

[9] As of October 9, 2017, PPAS had already sent notices of default and acceleration to the following seven Default Companies: Remco, Spiegel, Galey, GLI, Chace St., Duro, and Fetco. (See P. Ex. 232.100-400, 277.100, 280.100, 283.100.)

[10] The seven Default Companies are (1) East Alliance, (2) Hartwell (3) Silverack, (4) Best Textiles, (5) Acme, (6) Remco, and (7) BMD.

asserts that PPAS should have remitted the $12.6 million in funds that PPAS held in a bank account on behalf of ten Default Companies as of October 9, 2017.

In the Default Letters, AMZM, on behalf of the Zohar Funds, directed PPAS to "exercise all applicable rights or remedies provided in the Credit Documents, including but not limited to enforcing liens and security interests and foreclosing promptly on all Collateral and related Liens, or other interest, on behalf of the Lenders." (Default Letters.) AMZM reiterated this direction in its November 10, 2017, letter, where it again stated that PPAS should immediately remit all funds and deposits it was holding for the Default Companies. (See P. Ex. 328.)

Under Section 8.2, the Agent, at the Lender's direction, has the duty to exercise all possible remedies upon an Event of Default. (See Croscill Agmt. § 8.2.) One remedy provided by the Credit Agreements is the right of set off. (See id. § 7.4.) In an Event of Default, Section 7.4 of the Credit Agreements ("Section 7.4") authorizes the Lender or the Agent to "set off and to appropriate and to apply any and all deposits . . . at any time held or owing by such Lender or the Agent." (Croscill Agmt. § 7.4.)

As of October 9, 2017, PPAS held $12.6 million in deposits for ten Default Companies in a PPAS controlled bank

account. (See P. Ex. 534.) Tilton testified that the PPAS bank account was a form of account over which there was a security interest under the Credit Agreements. (Tr. 406:22-25.) She further testified that PPAS, as Administrative Agent, had the ability to exercise security interests against that PPAS bank account. (See Tr. 407:1-3.).

Accordingly, under Section 7.4, on October 9, 2017, PPAS should have remitted all the deposits it held on behalf of the Default Companies which did not have their Default Instructions held in abeyance at that time (the "Remaining Default Companies").[11] As is discussed in greater detail below, the Default Instructions for the Value Companies were temporarily held in abeyance by AMZM and the Zohar Funds until November 17, 2017, when their Default Instructions were reinstated. Therefore, as to the Value Companies, PPAS should have remitted all deposits it held on their behalf on November 17, 2017, when the Default Instructions were reinstated for these five companies. Because PPAS did not remit any funds held by PPAS on behalf of the Default Companies, either on October 9 or November 17, 2017, PPAS breached Section 8.2.

[11] The Remaining Default Companies (and the PPAS account balances as of October 9, 2017, in parentheses) are Acme ($583,076.58); Best Textiles ($422.03); Hartwell ($25,9808.5); NetVersant ($2,638.73); and Spiegel ($2,336.6). (See P. Ex. 534.)

To the extent that PPAS argues there are limitations regarding the right of set off as to funds PPAS held in its custodial capacity pursuant to Section 9.5 of the Credit Agreements, the Court disagrees. These funds were Default Company deposits in a bank account owned and controlled by PPAS and Section 7.4 applies without limitation to "any and all deposits" held by the Agent. (Croscill Agmt. § 7.4.)

Therefore, PPAS breached Section 8.2 of the Credit Agreements in two ways. First PPAS breached Section 8.2 by failing to remit to the Zohar Funds the Default Company deposits for which there was a security interest. Second, PPAS also breached Section 8.2 by failing to send timely notices of default and acceleration to certain Default Companies. The Court now turns to PPAS's arguments that it did not breach Section 8.2.

c. PPAS's Arguments That it Did Not Breach Section 8.2 are Unavailing

PPAS argues that it did not breach Section 8.2 for two reasons. First, as to the Value Companies, PPAS argues that Zohar Funds held their Default Instructions permanently in abeyance. Second, for the Default Companies, PPAS argues that it was permitted under the Credit Agreements to refuse to execute the Zohar Funds' Default Instructions pending the Zohar Funds' payment of a $2 million per Default Company

advancement for wind-down costs. The Court addresses the abeyance argument first.

i. <u>The Default Instructions for the Value Companies Were Not Permanently Held in Abeyance</u>

While neither party disputes that the Zohar Funds at least temporarily held the Default Instructions in abeyance as to the Value Companies, at trial, the Zohar Trust argued that the Default Instructions were reinstated on November 17, 2017. Specifically, the Zohar Trust argues that the Default Instructions were reinstated after PPAS failed to provide AMZM and the Zohar Funds with the Value Companies' recent financial information by a November 17, 2017, deadline AMZM imposed on PPAS. PPAS counters that the Default Instructions for the Value Companies remained permanently in abeyance even after AMZM's deadline to provide financial information expired on November 17, 2017. To support this argument, PPAS points to the Letter Exchange between Tilton and LaPuma after November 17, 2017, where LaPuma did not correct Tilton's characterizations that the Default Instructions for the Value Companies remained in abeyance.

The Court finds that the Default Instructions for the Value Companies were reinstated on November 17, 2017. In AMZM's November 10, 2017, letter, LaPuma gave PPAS a clear seven-day deadline to "disclose the most recent financial

statements for" the Value Companies. (Id.) Specifically, LaPuma stated: "if PPAS fails to comply with this request within seven days of the date hereof [i.e. November 17, 2017], the Zohar Funds reinstate their October 9 directions to accelerate repayment as to those five companies and direct PPAS to immediately take all actions to foreclose on their Collateral." (Id.) This language was self-executing, meaning that if PPAS failed to comply by November 17, 2026, the Zohar Funds automatically reinstated their Default Instructions for the Value Companies.

PPAS did not respond within the seven-day deadline, only responding eleven days later on November 21, 2017. (See P. Ex. 332.) In that late response PPAS did not provide the requested financial information but instead argued that AMZM needed to enter into a confidentiality agreement with the Value Companies before PPAS could provide them with such information. (See id.) Therefore, because PPAS failed to adequately respond to AMZM by November 17, 2017, the Default Instructions were reinstated as to the Value Companies.

The Court is not convinced that Tilton's subsequent letters show that the Zohar Funds held the Value Companies' Default Instructions in abeyance. By AMZM's clear language in the November 10 Letter, the Default Instructions for the Value Companies would be reinstated if PPAS failed to provide

certain financial information by November 17, 2017. PPAS failed to provide that financial information by November 17, 2017. The Court does not find that LaPuma was required to repeatedly reinstate the Default Instructions after the November 17, 2017, deadline had already passed.

Accordingly, the Court finds that the Zohar Funds, through AMZM, reinstated the Default Instructions as to the Value Companies on November 17, 2017. PPAS therefore breached Section 8.2 by not immediately sending notices of default and acceleration to the Value Companies once the instructions were reinstated. PPAS also breached Section 8.2 by not immediately remitting all funds that PPAS held in its banking capacity on behalf of the Value Companies as of November 17, 2017.

ii. PPAS Was Not Allowed to Delay the Execution of the Zohar Funds' Default Instructions Pending an Advancement for Wind-Down Costs

In response to the Default Letters, PPAS told AMZM that "we will proceed with your direction once we are advanced wind-down costs of $2 [million] per company." (P. Ex. 315.) PPAS refused to follow the Zohar Funds' Default Instructions until such an advancement was paid. There are several disputes that need to be resolved to determine whether PPAS was permitted under the Credit Agreements to refuse to follow the

Default Instructions pending an advancement of wind-down costs by the Zohar Funds. PPAS and the Zohar Trust dispute the following: (1) whether the Zohar Funds' Default Instructions required PPAS to wind-down the Default Companies; (2) whether PPAS's ability to request an advancement is supported by the Credit Agreements; and (3) whether PPAS's demand for an advancement of wind-down costs here were improper under the Credit Agreements. The Court addresses each dispute in order.

1. Wind-Downs Were Required

While it is undisputed that the Zohar Funds instructed PPAS to "foreclose[] promptly on all Collateral," the parties disagree on whether foreclosing on "all Collateral" required wind-downs of the Default Companies. (Default Letters.)

The Court finds that wind-downs were required by the Zohar Funds' Default Instructions. In the Default Letters, AMZM, on behalf of the Zohar Funds, instructed PPAS to immediately send notices of default and acceleration to the Default Companies and exercise "all applicable rights or remedies provided in the Credit Documents, including but not limited to enforcing liens and security interests and foreclosing promptly on all Collateral and related Liens." (Default Letters.) Sending a notice of default and acceleration to a Portfolio Company would render outstanding

loan amounts immediately due and payable, with the company's assets, including its cash, being seized on behalf of the Lenders. (Default Letters.) As Tilton testified, the day this notice was sent, "you are shutting down the company" because PPAS was required to seize all the company's assets which are secured by the defaulted loan. (Tr. 203:16-23.)

The Court agrees with Tilton that if PPAS had to immediately seize all the assets of the Default Companies, as was directed by the Zohar Funds in their Default Instructions and required under Section 8.2 of the Credit Agreements, the companies would have been unable to continue operating in the ordinary course because they would not be able to meet basic operating expenses, such as payroll. (See Default Letters; Croscill Agmt. § 8.2.)

LaPuma testified that wind-downs were not required because the notices of default and acceleration were simply an invitation to start a "conversation" between "the lender and the borrowers about how they make good on their obligations." (Tr. 571:19-572:8.) However, the language LaPuma used in the Default Letters was not an invitation to have a conversation but a direction that PPAS "send notice immediately to the Borrower declaring all unpaid principal, interest and any other Obligations immediately due and payable without present, demand, protest or other notice of

any kind." (Default Letters.) The Default Letters further instructed PPAS "to exercise all applicable rights or remedies provided in the Credit Documents, including but not limited to enforcing liens and security interests and foreclosing promptly on all Collateral." (Id.) This direction for PPAS to seize all the Default Companies' assets in practical terms meant shutting down these highly distressed companies because they would no longer have the cash or other assets to continue operating in the normal course of business. Because the seizure of the Default Companies' assets would prevent them from continuing to operate in the normal course of business, wind-downs were required once notices of default and acceleration were sent.

2. Advancements Were Allowed Under the Credit Agreements

While all the Credit Agreements contain an indemnification provision in which the Lender (i.e. the Zohar Funds) agrees to indemnify the Agent (i.e. PPAS), the indemnification provisions at issue are not identical. Nine of the Credit Agreements for the Default Companies contain an indemnification provision that allowed PPAS to "cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished." (Croscill Agmt. § 9.7.) However, three Default Companies each have unique

indemnification provisions (See P. Ex. 1 § 11.5, 15 § 15.7, 51.) Accordingly, the Court first analyzes the Credit Agreements that contain the "cease, or not commence" language, then analyzes the Credit Agreements with distinct indemnification provisions.

a. The "cease, or not commence" Credit Agreements

Nine Default Companies' have Credit Agreements that contain identical indemnification provisions containing the "cease, or not commence" language. Section 9.7 of the Credit Agreements ("Section 9.7") provides, in relevant part, that:

> Each Lender . . . agrees to indemnify the Agent . . . to the extent that the Agent shall not have been reimbursed by any Credit Party, for and against any and all liabilities . . . incurred by . . . [the Agent] in . . . performing its duties hereunder . . . ; provided, no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Agent's gross negligence or willful misconduct. If any indemnity furnished to the Agent for any purpose shall, in the opinion of such the Agent, be insufficient or become impaired,

> the Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished.
>
> (Croscill Agmt. § 9.7.)

At summary judgment, the Court found that Section 9.7 required PPAS to first seek payment from the Portfolio Companies before the Zohar Funds' duty to indemnify was triggered. (See Summ. J. D&O at 66.) The Court also found that Section 9.7 was ambiguous regarding whether "indemnification" pertains to reimbursement or the advancement of costs. (See id. at 66-69.) Because the language of Section 9.7 is ambiguous regarding whether an advancement of costs is allowed or if PPAS must first incur costs and then get reimbursed, the Court turns to extrinsic evidence offered by the parties at trial. See Greenfield v. Philles Records, Inc., 780 N.E.2d 166, 170 (N.Y. 2002) ("Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous, which is an issue of law for the courts to decide.").

PPAS argues that Section 9.7 allowed the advancement of costs because the provision enabled PPAS to "call for additional indemnity and cease, or not commence, to do the acts indemnified against until such indemnity is furnished."

(Croscill Agmt. § 9.7.) The Zohar Trust argues that advancements were not permitted, because the structure of 9.7 requires the Agent to first incur costs and then seek reimbursement.

The Court agrees with PPAS that advancements are allowed by Section 9.7. While use of the term "reimbursed" indicates that PPAS needs to first incur costs before seeking repayment, that interpretation is at odds with the clause allowing PPAS to "call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished." (Id.) The "cease, or not commence" clause allows the Administrative Agent to not perform indemnified acts until it receives an additional indemnity. That PPAS could call for an indemnity in addition to the amount "already furnished to the Agent," further implies that the Administrative Agent could receive an advancement of costs prior to beginning the indemnified acts and could seek additional indemnification if the funds originally furnished were deemed by the Administrative Agent to be insufficient. (Id.)

PPAS's role as an administrative intermediary supports the interpretation that PPAS could request advancements. As Tilton testified, the Administrative Agent is simply an "administrative intermediary" that gets paid a low annual

fee, typically $75,000 per Portfolio Company in PPAS's case, to serve as a go between for the Portfolio Companies and the Lenders. (Tr. 86:25-87:5; JSUFL ¶ 14.) Given the relatively low Agency Fee PPAS was entitled to, PPAS would "not have the money to finance the seizure and sale of collateral under an event of default." (Tr. 86:25-87:5) With wind-downs potentially costing hundreds of thousands to millions of dollars, PPAS's annual fee would have been entirely inadequate to front such costs. (See Tr. 206:7-21, 420:1-22; P. Ex. 534.)

The testimony of PPAS's expert witness Frederick Van Zijl ("Van Zijl") also supports the interpretation that advancements were allowed under Section 9.7. According to Van Zijl, Administrative Agents typically do not go out of pocket to cover wind-down costs. (Tr. 653:1-21.) Van Zijl further testified that Section 9.7's "cease, or not commence" language was not typical in his experience, but that given PPAS's high risk exposure that he could "see the rationale" of such a provision. (Tr. 654:4-655:23.) Van Zijl further explained that wind-downs are expensive, and the Portfolio Companies that PPAS worked with were all distressed, making it more likely that they would fail and have to be wound down. (See id.) This meant that there was a "big potential risk"

for PPAS, which had limited resources and was "relatively small." (Id.)

Accordingly, requiring PPAS to incur significant costs up front would be commercially unreasonable and contrary to the expectations of the parties given the fact that all the Portfolio Companies were highly distressed and had a high propensity to require wind-downs. "[A] a court must avoid any interpretation that would be absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties." Oppenheimer & Co. v. Trans Energy, Inc., 946 F. Supp. 2d 343, 348 (S.D.N.Y. 2013) (internal quotations omitted). Therefore, because of PPAS's low annual fee and the potentially high costs of executing multiple wind-downs, the Court interprets Section 9.7 as allowing an advancement of costs.

b. The Other Credit Agreements

While the Credit Agreements for Hartwell, IMG/Dana, and Acme each have distinct language, the Court finds that they are functionally equivalent to Section 9.7 as discussed above, in that they each allow PPAS to request an advancement.

Under the Hartwell Credit Agreement, "[t]he Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement . . . unless it . . . shall be indemnified to its satisfaction by the

Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action." (P. Ex. 15 § 15.4.) Similar to Section 9.7, the Hartwell Credit Agreement also requires the Administrative Agent to first seek indemnification from the Borrower. (See id. § 15.7 ("The Lenders agree to indemnify . . . the Administrative Agent . . . to the extent not reimbursed by the Borrower.").) Given that the Hartwell Credit Agreement allows PPAS to be fully justified in "failing or refusing to take action" until it receives an indemnity from Lenders if the Borrower cannot cover the costs, the Court finds that advancements are allowed under the Hartwell Credit Agreement's plain language.

Next, the IMG/Dana Credit Agreement states "[i]f Agent so requests, it shall first be indemnified to its reasonable satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action." (P. Ex. 51 § 16.4.) The IMG/Dana Credit Agreement also contains a provision requiring PPAS to request money from the Borrower before going to the Lender. (See id. § 16.7 ("In the event Agent is not reimbursed for such costs and expenses by Borrowers or Guarantors, each Lender hereby agrees that it is and shall be obligated to pay to Agent such Lender's Pro Rata Share thereof.") Based on the

IMG/Dana Credit Agreement allowing PPAS to "first be indemnified to its reasonable satisfaction," before taking action, the Court finds that advancements are allowed under the agreement's plain language.

Finally, the Acme Credit Agreement states that the "Agent shall in all cases be fully justified in failing or refusing to act under any loan documents unless it shall receive further assurances to its satisfaction from lenders of their indemnification obligations under Section 11.5 against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action." (P. Ex. 1 § 11.7.) The Acme Credit Agreement also requires PPAS to first seek money from the Borrower before requesting money from the Lenders. (See id. § 11.5 ("Lenders agree to indemnify Agent . . . to the extent not otherwise reimbursed by Borrower . . .").) Because PPAS would be "fully justified" to not act or refusing to take an action before receiving sufficient indemnity, the Court finds that advancements are also allowed under the plain language of Acme's Credit Agreement. (See id. § 11.7.)

3. PPAS's Advancement Request Was Improperly Made Under the Credit Agreements

While the Credit Agreements gave PPAS the right to request advancement of certain costs not paid for by the

Borrowers, the Court finds that PPAS's advancement demand here was improper here because PPAS did not first request to be indemnified by the Default Companies as is required by the relevant Credit Agreements.

As discussed above, under the Credit Agreements for the Default Companies, PPAS was required to first seek funds from the Portfolio Companies to cover the cost of wind-downs before seeking advancement of those costs from the Portfolio Companies. Despite being required to go to the Borrowers first, PPAS has not presented credible evidence that it first requested $2 million dollars from each of the Default Companies before demanding that the Zohar Funds advance these wind-down costs. At trial, when Tilton was asked if she was aware of any written indemnification requests made by PPAS to any of the Default Companies, she stated that "the only thing in the record is [Plaintiff's Exhibit] 529 showing us taking that money to use for the wind-down and then spending the rest ourselves." (Tr. 417:19-23.)

Plaintiff's Exhibit 529 is a spreadsheet showing transactions for 22 Portfolio Companies that PPAS held funds for in a PPAS bank account. The spreadsheet includes dates of specific transactions, a brief description of the transaction, and the amount of money either put into or taken out of a PPAS bank account broken down by individual Portfolio

Companies. Some of the entries are for "Net Activity," which summarized the monthly activity in the account for the Portfolio Company by "net[ing] the ins and outs for [] that particular [P]ortfolio [C]ompany." (Tr. 767:14-20.)

There are no entries on this spreadsheet that show PPAS received money from the Portfolio Companies to pay for wind-down expenses before Tilton demanded the Lenders to advance PPAS $2 million per company for such expenses on October 17, 2017. (See P. Ex. 529.) The first entry that explicitly relates to wind-down expenses is dated November 12, 2019, and has the description "To PPAS – Winddown Custody" with a $389,774.78 deposit into the PPAS account from the Portfolio Company eMag. (Id.) That entry postdates Tilton's October 17, 2017, demand that the Lenders advance PPAS wind-down costs by over two years. While the spreadsheet does include deposits and withdrawals from PPAS's bank account for different Portfolio Companies that predate Tilton's October 17, 2017, letter, it is not clear what those funds were used for. Some of those transactions are labelled in the spreadsheet as "Net Activity," and PPAS produced no evidence at trial to demonstrate that the funds in these transactions were used to pay for wind-down costs. Therefore, the Court finds no evidence to support Tilton's testimony that PPAS requested wind-down costs from Portfolio Companies prior to seeking

advancement from Zohar Funds, as was required by the Credit Agreements. (See Tr. 417:4-23.) Accordingly, PPAS's request for an advancement of wind-down costs for the Default Companies was improper under the Credit Agreements because PPAS did not present sufficient evidence that it first sought payment of these wind-down costs from the borrowers.

Given that the Default Instructions regarding the Value Companies were not held in abeyance and PPAS's request for wind-down costs were improper, the Court finds that PPAS breached Section 8.2 by not following the Default Instructions.

d. PPAS's Breach Caused the Zohar Funds Damages

As discussed above, on October 9, 2017, when the AMZM sent the Default Letters to PPAS, PPAS held $12,633,249.52 in its bank account on behalf of certain Default Companies. (See P. Ex. 534.) Of the $12,633,249.52 million in deposits PPAS held for the Default Companies, $11,784,967.08 million were deposits by the Value Companies, with $848,282.44 in deposits by the Remaining Default Companies. As discussed above, the Value Companies initially had their October 9 Default Instructions held in abeyance temporarily until they were reinstated on November 17, 2017. On November 17, 2017, PPAS

was holding $1,533,886.65 in deposits on behalf of the Value Companies.[12]

PPAS should have enforced the Zohar Funds' default remedies by remitting the $848,282.44 in funds it held its custodial capacity for the remaining Default Companies as of October 9, 2017. PPAS also should have remitted the $1,533,886.65 in funds it held on behalf of the Value Companies as of November 17, 2017, when the Zohar Funds reinstated its Default Instructions for those companies. PPAS's refusal to enforce the Zohar Funds' default remedies caused the Zohar Funds not to receive the $2,382,169.09 in Default Company funds that the Zohar Funds were entitled to pursuant to Section 8.2. Accordingly, these damages are directly and proximately caused by PPAS's breach of contract.

e. PPAS is Not Protected by the Exculpatory Clause

PPAS's actions constitute willful misconduct such that it is not protected by the exculpatory provision in the Credit Agreements. The Credit Agreements for the Default Companies include an exculpation provision that provides, in relevant part, that "[n]one of the Agent . . . shall be liable to the Lenders for any action taken or omitted by the Agent under or

[12] The Value Companies had the following amounts of deposits held by PPAS as of November 17, 2017: Scan Optics had $0 in deposits, 180s had $0 in deposits, IMG/Dana had $16,214.42, Croscill had $1,517,672.23, and Natura had $0. (See P. Ex. 534.)

in connection with any of the Credit Documents except to the extent caused by the Agent's gross negligence or willful misconduct." (Croscill Agmt. § 9.4(b).)

Gross negligence means "conduct that evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing." Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd., 611 N.E.2d 282, 284 (N.Y. 1993); accord Am. Tel. & Tel. Co. v. City of New York, 83 F.3d 549, 556 (2d Cir. 1996). "Willful misconduct" requires tortious intent, such as fraud, malice, a dishonest purpose, or bad faith. See Kalisch-Jarcho, Inc. v. City of New York, 448 N.E.2d 413, 416 (N.Y. 1983). A party commits a willful breach when its "proffered reasons for not performing under the agreement are baseless and a pretext." Harvest Town Vill. Vestavia Hills LLC v. Tvillage Tulsa LP, 116 A.D.3d 599, 599 (2014).

The Court finds that PPAS's breach of Section 8.2 was in bad faith, such that the exculpatory clause does not apply. PPAS breached Section 8.2 in part by failing to remit funds it held on behalf of certain Default Companies once the Zohar Funds called Events of Default. PPAS's excuse for not remitting these funds it held in a banking capacity was that it could ignore the Default Instructions pending the receipt of an advancement for wind-down costs. However, the true purpose of this pretextual advancement demand appears to have

been a delay tactic to prevent PPAS from having to remit funds it held on behalf of certain Default Companies.

As discussed previously, when the Zohar Funds called Events of Default on October 9, 2017, pursuant to Section 8.2 it directed PPAS to immediately exercise all rights and remedies. (See Default Letters; Croscill Agmt § 8.2.) Accordingly, PPAS should have exercised the available remedy of set off, pursuant to Section 7.4, by remitting to the Lenders the funds PPAS held in a bank account for the Borrowers. (See Croscill Agmt § 7.4.)

However, PPAS refused to remit any money until the Zohar Funds paid PPAS a $2 million advancement per Default Company to cover future wind-down expenses. (See P. Ex. 315.) That this advancement demand was a pretextual delay tactic is supported by the blanket nature of the demand. Except for the Value Companies, PPAS was requesting an advancement of wind-down costs of $2 million per Default Company, even though twelve of the Default Companies were already in the process of winding down. (See P. Ex. 315.) While at trial, Tilton tried to claim that she was not asking for an advancement of wind-down costs for these twelve companies, this stands in opposition to her previous deposition testimony. (See Tr. 412:13-416:18.) When Tilton was previously asked how many Default Companies were included as part of her advancement

demand, she said she was asking for a $26 million advancement for all the Default Companies, except the Value Companies which PPAS was asking the Zohar Funds to hold in abeyance. (See id.) Accordingly, PPAS's $26 million advancement demand included future wind-down costs for companies that had already ceased operations and were being wound-down.

One such company that was already winding down was NetVersant. In July 2017, an employee of PPMG sent Tilton an email seeking approval of $9,478.94 in outstanding expenses to complete the wind-down process. (See P. Ex. 285.100.) However, just months later, Tilton was demanding that the Zohar Funds advance $2 million to cover the future wind-down expenses for NetVersant that had been less than $10,000 previously. In fact, winding down the Default Companies ultimately cost PPAS far less than $2 million each in most cases. At trial, except for Duro which had $980,021 in unpaid wind-down costs, PPAS requested damages for unpaid wind-down costs of less than $600,000 per company. (See P. Ex. 534.)

While PPAS and AMZM exchanged letters arguing whether PPAS's advancement demand was permitted or appropriate, PPAS on October 19, 20, and 23, 2017 transferred about $20.3 million in Portfolio Company funds from PPAS's bank account to bank accounts in the names of individual Portfolio Companies, including over $10 million in funds from Default

Companies. (See P. Ex. 529, 534.) Because the right to set off under Section 7.4 applied only to deposits that PPAS as Administrative Agent held in a PPAS bank account, such deposits would no longer have to be remitted by PPAS to the Zohar Funds once they were in the individual Portfolio Companies' bank accounts.

However, Tilton still in essence controlled the use of these funds even after they left the PPAS bank account. That is the case because Tilton, in her capacity as the Manager, Director and/or CEO of the Portfolio Companies, required the Portfolio Companies to receive her permission to access funds in the Portfolio Companies' individual bank accounts. (See Tr. 128:17-25.) According to Tilton, "we also set up separate accounts [for the borrowers] that would serve the same purpose as being held in custody at PPAS, they would be accounts that money could only be released with manager or director signature." (Tr. 127:8-21; see also Tr. 426:25-427:8.)

Thus, PPAS's advancement request helped delay the notices of default and acceleration going out until PPAS had moved significant amounts of money into different bank accounts so that it could avoid immediately remitting the money to the Zohar Funds. That action was taken in bad faith, as PPAS's pretextual advancement demand allowed Tilton to maintain control over the funds of certain Default Companies

by circumventing the Lenders' direct order to remit funds PPAS held on behalf of the Borrowers. See Harvest Town Vill. Vestavia Hills LLC v. Tvillage Tulsa LP, 116 A.D.3d 599, 599 (1st Dep't 2014) (finding that where a party's "proffered reasons for not performing under the agreement are baseless and a pretext," that action amounts to willful misconduct.) PPAS's bad faith intent constitutes willful misconduct. Accordingly, PPAS is not protected by the exculpatory clause in the Credit Agreements. See In re CCT Commc'ns, Inc., 464 B.R. 97, 106 (Bankr. S.D.N.Y. 2011) ("Willful misconduct . . . requires tortious intent, such as fraud, malice, a dishonest purpose or bad faith.") (internal quotation omitted).

B. Zohar Trust's Counterclaim V

The Zohar Trust asserts a breach of contract counterclaim alleging that PPAS breached Section 2.14(d) of the Credit Agreements, ("Section 2.14(d)"), by failing to distribute to the Zohar Funds payments of principal and interest that PPAS received after AMZM became the Collateral Manager in March 2016. Section 2.14(d) provides that the "Agent shall promptly distribute to each Lender . . . all payments and prepayments of principal and interest due hereunder, together with all other amounts due." (Croscill Agmt. § 2.14(d).)

At summary judgment, the Court found that while PPAS could hold drawn funds on behalf of the Portfolio Companies pursuant to Section 9.5, there remained a "genuine dispute of material fact regarding whether the funds PPAS held were drawn loan facilities or payments that should have been remitted to the Zohar Funds under Section 2.14(d)" and "whether transactions recorded in PPAS's Account Reconciliation Spreadsheet merely reflected the movement of funds in and out of PPAS's account or draws and repayments of loan facilities." (Summ. J. D&O at 110.)

The Court finds that the Zohar Trust failed to prove that the funds held by PPAS in its banking capacity were not fully drawn loans. First, the Portfolio Companies either paid interest, or incurred interest if unable to pay, on the full amount of the drawn loans that PPAS held on their behalf. (See Tr. 230:22-232:13, 103:15-104:3, 808:13-19.) If the funds held by PPAS on behalf of the Portfolio Companies were not fully drawn loans, then there would be no reason for the Portfolio Companies to have either paid or accrued interest on the fully drawn amount.

Second, the financial statements for the Portfolio Companies, which were audited by independent auditors, reflect that the funds being held by PPAS in its banking capacity for the Portfolio Companies were fully drawn loans

that belonged to the Portfolio Companies. (See Tr. 122:21-125:25; P. Ex. 169, 197, 250, 251, 252.) For example, Snelling's 2016 audited financial statement states that "[i]n March 2016, $3,000 of the delayed draw term loan commitments were drawn by [Snelling,] with the proceeds being held in reserve at the Agent for the Company's benefit. These amounts are included in Funds Held at Agent on the Company's balance sheet as of December 30, 2016 []. Funds Held at Agent may be accessed by the Company with approval of the Company's board of managers." (P. Ex. 250.)

Third, contemporaneous communications between Patriarch employees and employees at certain Portfolio Companies confirmed that the funds being held by PPAS were fully drawn and belonged to the Portfolio Companies. (See P. Ex. 187; D. Ex. 142, 50.) For example, in an email exchange on April 4, 2016, a Patriarch employee told the CEO of Snelling that the funds PPAS was holding on behalf of Snelling "are drawn" and that "[t]hey are the company's funds. They are available." (P. Ex. 187.)

Fourth, credible trial testimony by Tilton and Patriarch Partner's Controller Carlos Mercado ("Mercado") make clear that the money was fully drawn and belonged to the Portfolio Companies. At trial, Tilton testified repeatedly that the money held by PPAS in its banking capacity "was the borrower's

money. It was fully drawn funds that they were incurring interest on the entire amounts." (Tr. 232:1-13; see also Tr. 109:19-110:6, 103:15-104:3, 120:20-121:2.) Similarly, Mercado testified that "[o]nce they were drawn down and [in] custody at PPAS, then any activity there we considered to be either deposits or withdrawals, similar to what you would see on a bank account." (Tr. 760:6-8.)

Despite the evidence and discussion spelled out above, the Zohar Trust argues that the funds PPAS held in its banking capacity were not fully drawn loans and that the movement of funds in the PPAS bank account represented loan repayments that should have been remitted to the Zohar Funds. To support this argument, the Zohar Trust relies on the use of loan-related terminology in PPAS spreadsheets and in certain PPAS communications.

The Court does not find the Zohar Trust's terminology-related evidence convincing given the testimony of Tilton and Mercado explaining the use of such nomenclature. The use of the terms "borrowing" and "paydown" reflected the fact that PPAS spreadsheets and Patriarch employees continued using established, if inaccurate, terminology, because certain aspects of sending funds to the Portfolio Companies did not change after PPAS held funds in a banking capacity. Importantly, both before and after the drawdowns, the

Portfolio Companies needed Tilton's sign-off to access funds. (See Tr. 64:12-66:13; 117:5-118:5.) Before the loans were completely drawn down, to access funds, the Portfolio Companies needed Tilton's approval in her capacity as the Manager, Director, and/or CEO of the respective Portfolio Company and in her capacity, at least until March 3, 2016, as manager of the Patriarch Managers, who were the Collateral Managers at that time. (See id. 64:12-66:13) After the funds were drawn down and held in PPAS's banking capacity, the Portfolio Companies still needed Tilton's approval, now only in her capacity as the Manager, Director, and/or CEO of the respective company. (See id. 117:5-118:5.)

Given the same need for Tilton's approval, and the fact that there were years of established processes and existing template spreadsheets for how to request and track the disbursements of funds to Portfolio Companies, it is plausible that there could be a continuation of certain terminology even after the loans were fully drawn down and were being held by PPAS in its banking capacity. As Tilton explained at trial, "there was a long course of performance and we did not change the nomenclature. Everyone internally knew what was happening, but to track everything we used the same spreadsheet. The nomenclature was the same." (Tr. 385:15-18; see also 760:9-14.)

The Court does not find the Zohar Trust's nomenclature argument compelling because the books and records of the Zohar Funds, independent auditors, the accrual of interest on the fully drawn amounts, the testimony of Tilton and Mercado, and contemporaneous communications between Portfolio Companies and PPAS all show that these were fully drawn funds held by PPAS in its banking capacity pursuant to Section 9.5. Accordingly, the Court finds that the Zohar Trust failed to prove that PPAS breached Section 2.14(d) of the Credit Agreements.

C. PPAS's Count II

At summary judgment, this Court held that the Zohar Funds' attempted termination of PPAS as Administrative Agent breached Section 9.1 of the Credit Agreements, which irrevocably appointed PPAS as Administrative Agent. (See Summ. J. D&O at 90.) However, this Court also found that there were genuine disputes of material fact regarding "(1) whether the Zohar Funds' breach of Section 9.1 injured PPAS and (2) whether PPAS previously materially breached the Credit Agreements by failing to remit financial information to the [Zohar] Funds." (Id. at 105.)

PPAS claims that the attempted termination injured it in the form of (1) unpaid agency fees and (2) unpaid wind-down costs. Additionally, PPAS claims that it did not commit a

prior material breach. The Zohar Trust asserts that the attempted termination did not injure PPAS and that there was a prior material breach based on PPAS's failure to provide AMZM and the Zohar Funds with certain financial information that was required under the Credit Agreements.

For the reasons stated below, the Zohar Trust is not liable to PPAS on Count II because the trial record establishes that PPAS was not injured by the Zohar Funds' breach of contract.

a. Injury

To establish a breach of contract under New York law, a plaintiff must prove the following elements: (i) the existence of a contract; (ii) performance by the plaintiff; (iii) breach by the defendant; and (iv) damages suffered because of the breach. See Anhui Joyful Mfg. & Trading Co. v. M.I.S.S. Sportswear, Inc., 774 F. Supp. 3d 675, 683 (S.D.N.Y. 2025). To succeed on a breach of contract claim under New York law, a plaintiff must "prove that a defendant's breach directly and proximately caused his or her damages." Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank, 392 F.3d 520, 525 (2d Cir. 2004); see also LNC Invs., Inc. v. First Fid. Bank, N.A. N.J., 173 F.3d 454, 464 (2d Cir. 1999) ("[C]ausation is required to recover damages for breach of contract."); Wiener v. AXA Equitable Life Ins. Co., 113 F.4th 201, 214 (2d Cir.

2024) ("Because causation is an essential element of damages in a breach of contract action, damages for breach of contract must be such only as actually follow or may follow from the breach of the contract." (internal quotations and alterations omitted)). Damages are not recoverable if they are "so remote as not to be directly traceable to the breach" or "the result of other intervening causes." Nat'l Mkt. Share, 392 F.3d at 526.

PPAS asserts that the attempted termination caused it to suffer damages in two ways: (1) unpaid Agency Fees and (2) unpaid wind-down costs. The Court addresses unpaid Agency Fees first.

i. Agency Fees

Under the Credit Agreements, PPAS was entitled to be paid an Agency Fee by each Portfolio Company for serving as Administrative Agent, which, as of 2015, was typically $75,000 per year per company. (See JSUFL ¶ 14.) PPAS argues that the Zohar Funds' attempted termination of PPAS as Administrative Agent caused the Portfolio Companies to withhold payment of the full amount of Agency Fees that PPAS was entitled to receive.

PPAS asserts that the breach caused unpaid Agency Fees in two distinct ways. First, PPAS contends the attempted termination created uncertainty among the Portfolio Companies

and this uncertainty caused some Portfolio Companies to withhold Agency Fee payments to PPAS. (See Tr. 330:5-23.) Second, PPAS argues that regardless of any uncertainty by the Portfolio Companies, the Zohar Funds refused to indemnify PPAS for any unpaid Agency Fees because the Zohar Funds did not recognize PPAS as Administrative Agent. (See id.)

Addressing the uncertainty argument first, according to PPAS, the attempted termination of PPAS as Administrative Agent, (see P. Ex. 201, 202), and the Zohar Funds' subsequent instructions to the Portfolio companies to remit payments to AMZAS and to not pay PPAS, (see P. Ex. 214, 216), led to "a period where the [P]ortfolio [C]ompanies held back payments [of Agency Fees], not certain who would end up as the [Administrative] Agent, and then some of those [P]ortfolio [C]ompanies did not survive through AMZM's default and did not pay [the Agency Fee]." (Tr. 331:1-11.)

The Court finds that PPAS has failed to establish that the attempted termination of PPAS caused the Portfolio Companies any uncertainty regarding the payment of Agency Fees. First, it is undisputed that AMZAS never received any Agency Fees from the Portfolio Companies. (See JSUFL ¶ 26.) Further, at trial, Tilton could not identify a single specific Portfolio Company that failed to pay Agency Fees because they

were uncertain who was the proper Administrative Agent. (See Tr. 344:23-345:10.)

That there could be any uncertainty at the Portfolio Companies strains belief given the direct control that Tilton herself exercised at the Portfolio Companies. Tilton was either the Manager, Director, and/or CEO at every Portfolio Company. (See id. 334:4-13.) At trial, Tilton testified that she was not uncertain that PPAS was the proper Administrative Agent. (See id.) Given Tilton's control of the Portfolio Companies and her lack of any uncertainty, it seems implausible that there was any confusion.

As evidence of uncertainty at the Portfolio Companies, PPAS put forth only two emails by Portfolio Company employees discussing the receipt of a July 25, 2016, letter from AMZAS. (See P. Ex. 215, 220.) AMZAS's July 25 letter stated that AMZAS had been appointed as Administrative Agent and provided the Portfolio Companies with payment instructions. (See P. Ex. 215.) In the first email, the CFO of Scan Optics wrote to Patriarch Partner employees stating she "received this communication," referring to the July 25 letter from AMZAS, that was "again asking for books and records and financials. Please advise." (P. Ex. 220.) In the second email, the CFO of Snelling wrote in an email to Patriarch employees that he "[r]ecieved the following notice just now . . . We may want

to cover this on our call tomorrow as it has implications for our Wells Fargo credit facility and the reservation of rights letter." (P. Ex. 215.) Neither of those emails indicates any uncertainty about who was the proper Administrative Agent and makes no mention of Agency Fees.

In fact, on July 26, 2016, counsel for the Portfolio Companies responded to AMZAS with a letter stating, "we believe PPAS remains the Administrative Agent of the Zohar Funds and our clients will continue to conduct their businesses accordingly, unless the court directs otherwise." (D. Ex. 52.) This letter by the counsel for the Portfolio Companies shows that the companies were not uncertain whether PPAS "remain[ed] the Administrative Agent." (Id.)

A more likely reason that some Portfolio Companies did not pay the full amount of Agency Fees was PPAS's undisputed practice of deferring the collection of unpaid Agency Fees. (See JSUFL ¶ 58; Tr. 77:5-78:4.) PPAS frequently deferred the collection of unpaid Agency Fees to allow the distressed Portfolio Companies a better chance to succeed financially. (See Tr. 77:5-78:4; P. Ex. 530.) PPAS's own records show that the deferral of Agency Fees by PPAS was common and that for some Portfolio Companies Agency Fees had not been collected for several years prior to PPAS's purported termination. (See P. Ex. 530; Tr. 336:25-344:13.)

At trial, Tilton testified that it did not matter why the Portfolio Companies did not pay these fees because the Zohar Funds should have indemnified PPAS for any unpaid Agency Fees. (See Tr. 330:5-23.)

However, PPAS cannot point to any indemnification request made for unpaid Agency Fees. The only circumstance coming close to a request for indemnification by PPAS was the $2 million per company advancement that PPAS demanded in its October 17 Letter. (See P. Ex. 315.) However, this letter explicitly stated that the advancement was for prospective wind-down costs, rather than historical unpaid Agency Fees. (See id.) Therefore, PPAS was not considering unpaid Agency Fees as part of its $2 million wind-down demand. Finally, as the Court discusses in greater detail below, PPAS cannot show that the Zohar Funds refused to indemnify PPAS because of its attempted termination of PPAS as Administrative Agent.

Accordingly, the Court finds that PPAS has failed to demonstrate that the Zohar Funds' breach caused PPAS to suffer damages in the form of unpaid Agency Fees.

ii. Wind-Down Costs

PPAS argues that the Zohar Funds' termination attempt injured PPAS because it caused the Zohar Funds to not advance PPAS's wind-down costs. The Court finds that while under the Credit Agreements wind-downs were required and advancements

were allowed, the attempted termination of PPAS as Administrative Agent did not cause the Zohar Funds' failure to indemnify PPAS's wind-down costs. The evidence presented at trial instead demonstrates that the Zohar Funds did not indemnify PPAS because (1) it did not believe that the Credit Agreements allowed for advancements and (2) PPAS did not provide any substantiation to support their advancement request.

At trial, LaPuma testified that the Zohar Funds' refusal to pay the $2 million per Default Company advancement for wind-downs had nothing to do with the Zohar Fund's failed efforts to terminate PPAS as Administrative Agent. (See Tr. 608:21-24.) According to LaPuma, it was not the termination attempt that caused the Zohar Funds to not indemnify PPAS, but rather the fact that PPAS was asking for an unsubstantiated advancement of $2 million per Default Company. As LaPuma explained, she had "never heard of anyone ask for a flat fee to just wind down companies without any basis for those costs." (Id. 570:5-11.) LaPuma also testified that Tilton never provided any substantiation or information that would have supported the $2 million per company advancement demand. (See id. 623:9-14.) At trial, PPAS did not identify any evidence that it attempted to substantiate

or provide supporting information for its demand for $2 million per company. (See id. 422:19-423:24.)

LaPuma's contemporaneous response to Tilton's demand for an advancement of wind-down costs further demonstrates that the Zohar Funds refused to pay an advancement because (1) it did not believe that the Credit Agreements allowed for advancements and (2) PPAS did not provide any substantiation to support such request. (See P. Ex. 316.) LaPuma responded to PPAS's advancement demand in AMZM's October 23 Letter by stating that "PPAS is not permitted under the Credit Agreements to disregard the Zohar Funds' directions pending an advance of its purported expenses." (P. Ex. 316.) LaPuma continued by explaining, "[e]xpenses that PPAS incurs in enforcing or collecting on the Obligations after an Event of Default are to be paid at the outset by the Borrowers. []. To the extent the Borrowers do not pay these expenses, then PPAS can seek reasonable indemnification from the Lenders." (Id.) LaPuma further wrote, "[n]othing in the Credit Agreements permits PPAS to condition its compliance with its contractual obligations on its first receiving an advance of its expenses, and, tellingly, you do not identify any contractual provision in support of your demand." (Id.)

The October 23 Letter quoted above shows that AMZM refused to pay PPAS's advancement demand of $2 million per

company not because it did not recognize PPAS as the proper Administrative Agent, but because it did not believe that an advancement request was allowed by the Credit Agreements. Nowhere in the October 23 Letter does LaPuma mention PPAS's termination, nor does she not recognize PPAS as Administrative Agent. Instead, LaPuma affirmed that under the Credit Agreements PPAS had a right to indemnification, while rejecting PPAS's claim that it could seek an advancement of wind-down costs. Regardless of the validity of the Zohar Funds' position on advancements, which the Court already addressed above, the Court finds that this contemporaneous evidence cuts against PPAS's argument that the Zohar Funds refused to pay wind-down costs because of the Zohar Funds' attempted termination of PPAS.

In the same October 23 Letter, LaPuma also raised AMZM and the Zohar Funds' concern that the $2 million per company advancement demand was unsubstantiated. In that letter, LaPuma stated "[n]or have you provided any information to the Zohar Funds to assess the reasonableness of your demand." (Id.) At trial, Tilton testified that PPAS never provided the Zohar funds with an itemization of PPAS's wind-down expenses outside of the Zohar Funds' bankruptcy that occurred in 2018. (See Tr. 423:15-24.)

The Court does not find PPAS's evidence compelling. To support its position, PPAS could only cite a footnote in the Default Letters that stated "AMZM and the Zohar Funds dispute whether PPAS properly remains as Agent, which dispute is the subject of litigation in [this action]." (Default Letters, n.1.) Tilton testified that in this footnote the Zohar Funds was telling PPAS "take the actions, spend the money, but we don't acknowledge you as the agent, we believe that you have been properly terminated and you are not authorized to represent the lenders under the credit agreement. . ." (Tr. 197:19-198:3.)

However, this footnote is simply a reservation of AMZM and the Zohar Funds' legal position in this action. The footnote also states that "[t]his notice is directed to PPAS per the Court's instruction that PPAS be treated as Agent during the pendency of the litigation. However, this notice is without prejudice to AMZM's and the Zohar Funds' positions that PPAS's role as Agent was properly terminated and that PPAS is no longer properly authorized to represent the Lenders under the Credit Agreement." (Default Letters, n.1.) At that point in this litigation, this Court had already preliminarily ruled that PPAS could not be removed as Administrative Agent for the Portfolio Companies. (See Dkt. No. 31; Dkt. Minute Entry for

Nov. 28, 2016.) As explained by LaPuma, the footnote "is saying, we are doing what the Court ordered during the pendency of this litigation, but we're reserving our rights." (Tr. 533:12-534:4.)

The Court agrees that this footnote is a reservation of rights rather than evidence that the Zohar Funds later refused to advance millions in wind-down costs because the Zohar Funds did not recognize PPAS as the proper Administrative Agent. If the Zohar Funds had not recognized PPAS as Administrative Agent, it could have simply used AMZAS to send notices of default and acceleration to the Default Companies. However, in sending PPAS the Default Letters, AMZM and the Zohar Funds recognized that PPAS at that time was still legally the Administrative Agent. (See Default Letters.)

Accordingly, the Court finds that PPAS did not demonstrate at trial that it was injured by the Zohar Funds' attempted termination of PPAS as Administrative Agent because this breach of the Credit Agreements did not cause PPAS any damages either in the form of unpaid Agency Fees or unpaid wind-down costs. As explained above, such a failing is fatal to this claim because "causation is an essential element of damages in a breach of contract action." Nat'l Mkt. Share, 392 F.3d at 525. Therefore, the Court finds that the Zohar

Trust is not liable to PPAS on PPAS's Count II claim for breach of contract.

a. Prior Material Breach

Because the Court finds that PPAS failed to establish an essential element of its Count II claim for breach of contract, it need not address the Zohar Trust's affirmative defense that there was a prior material breach by PPAS.

## III. ORDER

For the reasons stated above, it is hereby

**ORDERED** that judgment shall be entered against plaintiff Patriarch Partners Agency Services, LLC ("PPAS") and in favor of defendant Zohar Litigation Trust-A ("Zohar Trust") on PPAS's Count II claim for breach of contract.

**ORDERED** that judgment in the amount of $2,382,169.09 shall be entered in favor of the Zohar Trust against PPAS on the Zohar Trust's Counterclaim III for breach of contract regarding the default instructions.

**ORDERED** that judgment shall be entered against the Zohar Trust and for PPAS on the Zohar Trust's Counterclaim V for breach of contract regarding the remission of certain funds.

**SO ORDERED.**

Dated: 15 July 2026
New York, New York

Victor Marrero
U.S.D.J.